ORIGINAL

FILED IN OPEN COURT
U.S.D.C. - Atlanta

FEB 22 2016

JAMES N. HATTEN, Clerk
By:
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Action No. |
| *v.* | 1:16-CR-65 |
| NATHAN E. HARDWICK IV AND ASHA R. MAURYA | |

### Government's Motion for Detention

The United States of America, by John A. Horn, United States Attorney, and David M. Chaiken and J. Russell Phillips, Assistant United States Attorneys for the Northern District of Georgia, respectfully moves for the detention of Defendant Nathan E. Hardwick IV pursuant to 18 U.S.C. §§ 3142(e) and (f), on grounds that there is a serious risk that the defendant will flee and there are no conditions of release that will reasonably assure his appearance as required.

## I.   Introduction

The above-captioned indictment charges Hardwick, the former managing partner of Morris Hardwick Schneider and LandCastle Title, with conspiracy and wire fraud in connection with his alleged embezzlement of over $20 million from the law firm's attorney escrow accounts and operating accounts between 2011 and 2014.  The indictment also charges Hardwick with bank fraud and making false statements to FDIC-insured banks in connection with over $3.5 million in loans that he is alleged to have obtained from 2009 through 2014 based on fraud and false statements.

The United States seeks an order detaining Hardwick pending trial because there is a serious risk that he will flee if released, and there is no condition or

combination of conditions that will reasonably assure his appearance at future court proceedings in this case. The reasons are as follows: First, after Hardwick became aware of the government's criminal investigation, he repeatedly stated that he intended to flee to avoid prosecution, that he would never go to jail, and that he had so many rich friends that he would simply board a jet and the government would never find him. Second, before and after information about the MHS embezzlement started to become public in August 2014, Hardwick told multiple people that he intended to kill himself, a form of flight that shows his consciousness of guilt and makes him a serious risk of non-appearance. Third, Hardwick's character and history of misconduct involving judicial proceedings — despite being an attorney sworn to uphold the law — evidences a deep-seeded contempt for the judicial system, which shows he cannot be trusted to abide by any conditions of release. Fourth, the scope, variety, and severity of Hardwick's alleged crimes is staggering, as is Hardwick's concomitant custody Guidelines exposure, currently estimated at between 325-405 months in federal prison. The fact that Hardwick is 50 years old and facing the prospect of spending the remainder of his life in prison gives him an enormous incentive to flee. Accordingly, as set forth in greater detail below, the Court should detain Hardwick pending trial.

## II.    Background

Morris Hardwick Schneider and LandCastle Title ("MHS") was a law firm and title insurance agency headquartered in Atlanta. MHS employed approximately 80 lawyers and 800 non-lawyer employees in 16 states. MHS's law practice specialized in residential real estate closings and default and

foreclosure matters, and its title insurance business involved selling title insurance policies in connection with residential real estate closings. During periods of high activity in the real estate market, MHS performed thousands of residential real estate closings per month, and received hundreds of millions of dollars in closing funds that it was required to hold in trust in attorney escrow accounts until disbursed in accordance with its clients' closing instructions for each transaction.

While he was serving as MHS's managing partner and CEO in the late 2000s, Hardwick began to experience severe financial problems caused in part by a sharp decline in the residential real estate market that made MHS less profitable, and a July 2008 divorce decree that required him to pay his ex-wife over $550,000 per year in alimony and other payments for five years. *See Hardwick v. Hardwick*, No. 2008CV147021 (Fulton Co. Super. Ct.). Hardwick's legitimate income could not keep pace with his lavish lifestyle, which included private jet travel; multi-million dollar homes; high-end retail goods and services; gambling at casinos in Louisiana, Mississippi, New Jersey, and Nevada; and payments to bookies and girlfriends.

Beginning in late 2010, Hardwick faced an onslaught of lawsuits and judgments, including the following:

- a $6 million judgment against him by The National Bank of Georgia over a failed real estate investment (*The National Bank of Georgia v. Nathan E. Hardwick, IV et al.*, No. 2010CV191587 (Fulton Co. Sup. Ct. filed 9/29/10));

- a $250,000 judgment against him by the Bellagio Resort & Casino in Las Vegas over a gambling debt (*Bellagio, LLC v. Hardwick et al.*, No. A-11-633904-C (Clark Co. Dist. Ct. filed 1/25/11));

- a $1 million judgment against him by NetJets for unpaid private jet travel services (*NetJets Aviation Inc. et al. v. Nathan Hardwick*, No. 11-CV-8186 (Franklin Co. Ct. Comm. Pleas filed 7/25/11));

- a $600,000 judgment against him by First Citizens Bank & Trust for failure to repay a loan (*First Citizens Bank & Trust Company, Inc. v. Nathan E. Hardwick, IV*, Civil File No. 11-1-07919-42 (Cobb Co. Super. Ct. filed 8/18/11)); and

- a $160,000 judgment against him by American Express for unpaid credit card bills (*American Express Centurion v. Nat Hardwick*, No. 11A38574 (DeKalb Co. State Ct. filed 8/30/11)).

In addition, Hardwick accumulated approximately $600,000 in gambling debt to an Atlanta bookie that he could not repay, and he was unable to repay multi-million dollar credit lines and off-the-books loans that he had obtained from various individuals and entities, including his MHS secretary, an MHS client, his personal accountant and income tax preparer, a family trust, and an MHS closing lawyer.

To maintain the illusion of wealth and success despite his financial problems, and to continue to live beyond his means, in or about 2011, Hardwick began directing co-defendant Asha R. Maurya — MHS's escrow account controller and later CFO — to make millions of dollars in shareholder distributions, bonuses, and other payments to and for Hardwick's benefit, directly out of MHS's bank accounts, in amounts that exceeded the share of MHS's profits to which Hardwick was entitled, at times when no shareholder bonuses or distributions were scheduled to be made, and without causing or directing proportionate bonuses or distributions to be made to the other MHS shareholders. The excess bonuses, distributions, and payments to and for Hardwick's benefit included

4

payments to American Express, Colony Bank, First Citizens Bank & Trust, NetJets, and Hardwick's ex-wife to satisfy the personal judgments against him. They also included payments to casinos, private jet charter companies, credit card issuers, and other creditors and accounts.

To fund the vast majority of Hardwick's illicit payments, Hardwick and Maurya caused millions of dollars to be wire transferred to and for Hardwick's benefit out of MHS's attorney escrow accounts and operating accounts, primarily via the Federal Reserve Wire Network, known as "Fedwire." Hardwick and Maurya fraudulently concealed Hardwick's excess payments from the other MHS shareholders, MHS employees, outside auditors, title insurance underwriters, and others through false statements, half-truths, and by the omission of material facts, and by distributing and causing the distribution of false and misleading financial information and records.

When other MHS shareholders, MHS employees, and one of MHS's title insurance underwriters began to uncover the conspiracy in July and August 2014, Hardwick took further steps to conceal the illicit payments and to delay and obstruct the discovery of the scheme, including by making false statements about the nature, amount, and cause of the excess payments and any resulting escrow account shortages. In particular, Hardwick delayed notifying the other MHS shareholders of the problem for over two weeks, told a representative of the title insurance underwriter that he would handle the matter internally, attempted to convince the other MHS shareholders not to become involved in any internal investigation, dissuaded the other MHS shareholders from speaking with Maurya directly, and attempted to convince the other MHS shareholders

not to notify state bar authorities in various states that certain of the illicit payments to Hardwick had been made from MHS's attorney escrow accounts.

Before the other MHS shareholders and employees knew the full extent of the scheme, Hardwick also tried to conceal the amount of his illicit payments and the severity of the resulting escrow account shortages by lying to obtain and to attempt to obtain loans from various individuals and entities to repay part of the money that he had stolen. For example, Hardwick falsely represented to one prospective lender, who was a longtime MHS client and the CEO of a real estate agency, that he needed the funds because a tax issue had arisen with the IRS that required all of the MHS partners to contribute to a large payment to the IRS. There was no such tax issue involving the IRS.

In addition, Hardwick convinced an Atlanta businessman, Jim Pritchard, to loan him $2 million based on false representations that MHS had agreed to repay the loan if Hardwick could not do so, something that MHS had expressly instructed Hardwick not to do; that all of the MHS partners were "over-disbursed," when in fact Hardwick knew that the so-called "over-disbursements" all went to Hardwick; and that Hardwick would pledge his interest in a title abstract company as security for the loan, when in fact Hardwick knew that he had already pledged that interest to First Landmark Bank in support of a different loan. Hardwick fraudulently obtained a $3 million loan from another individual — top-ranked professional golfer Dustin Johnson, whom Hardwick had convinced to become his client in 2011 by agreeing to be his attorney free of charge — based on false representations that the loan was backed by MHS and that it was a "very good" investment "opportunity,"

6

without telling Johnson about Hardwick's illicit payments or any other problems at MHS. Notably, Hardwick began recruiting Johnson for this multi-million dollar investment "opportunity" at least as early as May or June 2014, well before the conspiracy began to be discovered, and did not follow the prophylactic Georgia Rules of Professional Conduct governing transactions between lawyers and their clients.

MHS's discovery of the alleged embezzlement was referred to the FBI for criminal investigation on August 25, 2014, the same day that MHS filed a civil lawsuit against Hardwick seeking $30 million in damages, and multiple lawsuits were later filed against MHS, Hardwick, and others over the $5 million in loans that Hardwick obtained in July 2014 from Pritchard and Johnson. MHS could not survive these allegations, and declared bankruptcy in early 2015.

## III.    Applicable Law

The Bail Reform Act of 1984 ("the Act") authorizes pretrial detention of a criminal defendant without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. *See United States v. King*, 849 F.2d 485, 488 (11th Cir. 1988). A finding that a defendant is a danger to the community must be supported by clear and convincing evidence. *See* 18 U.S.C. § 3142(f). A finding that a defendant is a flight risk need only be supported by a preponderance of the evidence. *See King*, 849 F.2d at 489. Notably, the preponderance standard is not a difficult one, and simply requires the

government to prove that a contention is "more likely true than not true." Eleventh Circuit Pattern Jury Instructions (Civil) 2013, at 1.1; *United States v. Fuentes*, 107 F.3d 1515 (11th Cir. 1997) (equating preponderance standard with "more-likely-than-not" standard of review for purposes of criminal sentencing).

The factors to be considered in determining whether detention is appropriate include: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family ties, community ties, employment, financial resources, ties to the community, past conduct, and record concerning appearance at court proceedings; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  18 U.S.C § 3142(g).

## IV.  Argument

### A. Hardwick Should Be Detained As A Flight Risk Because He Has Repeatedly Stated That He Would Flee If Charged.

There can be no greater proof of a criminal defendant's intent than his own words.  Here, the Court does not have to guess as to whether Hardwick will flee if released because that is exactly what he repeatedly said that he would do if he was ever charged in this case.  Specifically, Hardwick told his then-fiancé on numerous occasions from late 2014 until their separation in April 2015 that he would never go to jail, and that he had so many rich friends that he could simply board a jet and the government would never find him.  In this same context, Hardwick also repeatedly discussed the need to obtain a passport for he and his fiancé's toddler daughter, which Hardwick's fiancé refused to do for fear that

8

Hardwick would flee with their daughter. At one point, Hardwick told his fiancé that his attorneys were considering offering his passport to the government to prove that Hardwick was not a flight risk, prompting Hardwick to tell his fiancé: "like I would really need a passport to leave the country anyway." Hardwick also learned about certain non-extradition countries to which he could flee by watching the NBC television series, *The Blacklist*, and he discussed this topic with his fiancé from time to time.

Remarkably, Hardwick made these statements <u>after</u> he became aware of the government's criminal investigation, <u>after</u> he was already represented by counsel in connection with the criminal investigation and related civil litigation, and <u>after</u> his lawyers began having direct communications with the undersigned AUSAs about the investigation. That a sworn member of the bar would make such statements is shocking in and of itself. The fact that Hardwick repeatedly did so while his criminal defense lawyers were communicating with the government indicates that, rather than reflecting a genuine intent to deal with his potential criminal exposure, Hardwick was simply using his lawyers as an early warning device so that he could flee when the time came.

Moreover, evidence uncovered during the government's investigation indicates that Hardwick likely has assets with which to flee and friends and family members willing to assist him in doing so, including wealthy friends with access to private jets who could be manipulated into helping him, even if unwittingly. By way of example, Hardwick has extensive experience with private jet travel and has contacts at various companies throughout the industry. Hardwick once bragged to one of his former law partners that he was known in

Las Vegas as "the white P. Diddy," a reference to hip hop mogul Sean Combs, and has many friends and acquaintances who owe him money and favors. Hardwick stole over $20 million from MHS that has not been fully accounted for, and he has a variety of properties and other assets, business interests, and other income sources, which he has every incentive to hide from his creditors and fraud victims. In early 2015, for example, Hardwick recruited his parents to assist him in hiding approximately $130,000-$180,000 in cash that he kept in a safe at his condominium at the St. Regis Atlanta. Hardwick was convinced that he was about to be arrested, and was seeking to hide assets so that they could not be seized by law enforcement. Part of this money had been accumulated by Hardwick's fiancé (Hardwick would leave thousands of dollars in cash lying around their condo), so Hardwick wrote her a check for approximately $100,000 in exchange for cash. Hardwick and his fiancé helped his mother pack the money into a Lululemon shopping bag at Hardwick's condo, and then Hardwick's parents transported the money to their Dunwoody home. (Hardwick's mother was extremely concerned that the valets at the St. Regis would take the bag from her and discover its contents, because Hardwick tipped the valets so generously that they were overly attentive to his family members). Similarly, Hardwick told his fiancé that his sister helped him hide tens of thousands of dollars in luxury watches and rare antique books, which Hardwick's sister likewise retrieved from his condo and left with in a shopping bag. When Hardwick's fiancé later questioned him about the cash secreted at his parents' house and asked what the U.S. Attorney's Office would think about it,

Hardwick stated, "that's been moved 10 times by now" and "it's not there anymore."

Bank records show that Hardwick has the ability to access large amounts of untraceable cash and other funds.  For example, records show that Hardwick made a $70,000 cash deposit into one of his accounts as recently as August 2015, that a close friend sent him $25,000 identified as a loan repayment in July 2015, and that Hardwick was spending hundreds of dollars per day placing bets through DraftKings.com as late as October 2015, well over a year after his MHS resignation cut off virtually all of his known sources of income.  Further, Hardwick told his fiancé that he tried to hide large amounts of money by sending it to his girlfriend in Mississippi for safekeeping, and it is likely that he attempted to do the same with others.  He also told his fiancé in late 2015 that he could not qualify for government-subsidized health insurance because his income is too high.  In short, in addition to having every incentive to flee and repeatedly stating that he would do so, Hardwick's true financial condition remains a mystery, evidence indicates that Hardwick has secreted money and other property that could be used to finance his flight, and he has family members and others who appear willing to assist him in doing so, justifying Hardwick's detention on this ground alone.

## B. Hardwick Should Be Detained As A Flight Risk Because His Suicidal Ideation Is A Form Of Flight And Creates A Risk Of Non-Appearance.

After Hardwick's embezzlement began to be uncovered in July and August 2014, but both before and after the news became public, Hardwick repeatedly indicated that he would commit suicide, saying that life was no longer worth living and that it would be easier to just jump off the balcony of his residence at

11

the St. Regis Atlanta. Hardwick made such comments to his fiancé, his brother, his MHS secretary, and co-defendant Maurya, all of whom took the comments seriously.[1] Hardwick's fiancé was so concerned that she had the balcony doors locked from the outside and hid the key so that Hardwick could not find it, Maurya offered to call 9-1-1, and Hardwick's brother attempted to have Hardwick committed for his own protection. On numerous occasions after Hardwick became aware of the government's criminal investigation, Hardwick told his fiancé, "I'll kill myself before I go to jail."

A criminal defendant's suicidal ideation is relevant to several aspects of the Section 3142 detention inquiry, including the defendant's mental state and the nature and seriousness of the danger to any person or the community posed by the defendant's release, both of which militate in favor of detention here. 18 U.S.C § 3142(g). But more importantly, suicide is a form of flight, and creates a risk of non-appearance that is cognizable under Section 3142. *See, e.g., United States v. Cody*, 498 F.3d 582, 591-92 (6th Cir. 2007) (holding that suicidal ideation and/or attempts may be viewed as a form of flight, and therefore may be admissible as relevant evidence of consciousness of guilt); *United States v. Metz*, No. 12-M-01193-JJM, 2012 WL 6632501, at *4-*5 (W.D.N.Y. Dec. 12, 2012) (holding that defendant's risk of suicide constituted a flight risk and a risk of non-appearance under Section 3142); *see also United States v. Krueger*, No. 13–20242, 2013 WL 8584873, *2 (E.D. Mich. July 10, 2013) (opining that "the Bail Reform Act

---

[1] During a telephone conversation on August 17, 2014, before the embezzlement allegations became public, Defendant told one of MHS's victim shareholders that he would not take his own life, most likely because he knew that if he told the truth it would be viewed as a concession of guilt.

12

allows and may, in fact, require me to consider the potential of the Defendant committing suicide in the context of assessing his possibility of non-appearance.").

Here, in response to the revelation of Hardwick's misconduct at MHS and the eventual public disclosure of that information, Hardwick told multiple people that he would take his own life. It is fortunate that Hardwick has not done so, but this does not mean that Hardwick is no longer a suicide risk. Indeed, the loss of Hardwick's job, prestige, and embarrassment over news of a civil lawsuit against him by his former partners, however traumatic, pales in comparison to a federal grand jury indictment and the real prospect of spending the rest of his life in federal prison. Further, as the Court is aware, from time to time criminal defendants involved in proceedings in this district have taken their own lives. As far as the undersigned AUSAs are aware, defendants have done so at all different stages of the proceedings, including while the case is still being investigated, after pleading guilty but before being sentenced, and even after an adverse jury verdict. Just because Hardwick has not yet attempted suicide (as far as the government knows), therefore, does not mean that he does not remain a serious suicide risk and, therefore, a risk of flight and/or non-appearance.

In addition, psychiatric research supports the concept of an "anniversary effect" or "anniversary reaction," an increase in a person's suicide risk during the time leading up to and including the anniversary of a traumatic triggering or instigating event, even a year or more after the fact. To the extent that Hardwick's August 2014 resignation and embezzlement allegations triggered his initial suicidal ideation, this mental state could be expected to be renewed or

refreshed each summer, for example, dissipating over the years. Psychiatric research also supports the notion of suicide "contagion" or suicide "clusters," whereby individuals who might be inclined to commit suicide are further encouraged to do so by news of another's suicide, which makes the conduct appear less deviant. This may increase Hardwick's suicide risk here because he is aware that, in November 2014, an MHS executive with whom Hardwick worked committed suicide at least in part as a result of information about him that was uncovered during the government's investigation. And finally, the government notes that additional factors make Hardwick a higher suicide risk than others, including his age and race, his separation from his fiancé, child custody proceedings over his daughter and, of course, the instant federal indictment. Accordingly, Hardwick presents a serious suicide risk that creates a serious risk of flight and a serious risk of non-appearance, which further supports his detention here.

### C. Hardwick's Character, Past Conduct, And History Of Contempt For The Judicial System Show That He Cannot Be Trusted To Abide By Any Conditions Of Release.

Hardwick should also be detained pending trial because his character, multi-year crime spree, and history of contempt and disrespect for the judicial system proves that he cannot be trusted to abide by any condition or combination of conditions of release imposed by the Court. *See, e.g., United States v. Poulsen*, 521 F. Supp. 2d 699, 706 (S.D. Ohio 2007) (ordering pretrial detention in part because possibility that defendant may not have been entirely truthful with the Court suggested his contempt for judicial authority, undermining confidence that defendant would respect any conditions of pretrial release).

Specifically, in addition to the crimes described above, which involve lies to his partners, clients, federally-insured banks, and others, Hardwick has a history of perjuring himself in sworn testimony in civil lawsuits, he has signed false affidavits under penalty of perjury knowing that they would be filed in state and federal lawsuits, and he has caused his attorneys to make false statements to the State Bar of Georgia in connection with the State Bar's investigation of his misconduct.

For example, in sworn deposition testimony in his divorce proceedings on December 10, 2009, in response to a question about how much salary he was being paid by MHS, Hardwick falsely testified, "right now . . . we are not paying a salary," and that he "didn't take a salary for two years." Ex. 1 at 52:3-11. But records obtained in the investigation show that Hardwick regularly received income from MHS throughout 2008 and 2009 (including over $200,000 per month for much of 2009); that in February 2007 Hardwick personally received approximately $14 million from the sale of MHS's default business to a foreclosure processing company later known as Prommis Solutions, income that he concealed from his wife; and that Hardwick reported nearly $3 million in salary and distributions from MHS on his 2009 tax returns. Further, according to at least one of Hardwick's former MHS partners, there was never an extended period of time during which Hardwick was not paid a salary, and certainly never a period of time anywhere close to two years. Notably, the fact that Hardwick was represented by counsel in connection with the deposition, or that he is a licensed attorney, did not deter Hardwick from lying under oath.

15

In a more recent example, Hardwick testified falsely in a deposition in a related civil case on February 16, 2015 that he did not know of any lawsuits against him prior to 2014, other than his divorces. Ex. 2 at 18-19 ("**Q.** In your personal capacity then, to the best of your recollection, prior to 2014 the only time you've been a civil defendant is in a divorce proceeding, correct? **A.** To my knowledge, correct."). But at the time, Hardwick well knew about the barrage of lawsuits that were filed against him in 2010 and 2011 — including by the Bellagio, NetJets, and American Express — which resulted in millions of dollars in judgments against him. This brazen falsehood speaks volumes about Hardwick's character and his respect for the judicial system. And again, the fact that Hardwick was represented by counsel at the deposition — in fact, by his current criminal defense counsel — did not deter him from lying under oath in an effort to obstruct the proceedings.

Hardwick also signed affidavits under penalty of perjury and provided them to lawyers in two different state and federal civil cases arising out of his alleged misconduct even though Hardwick knew that his affidavits contained numerous material falsehoods, and that the perjured affidavits would be filed in court and relied upon by the parties and the courts. For example, Hardwick falsely stated in his affidavits that MHS agreed to back the loans that he had obtained from Messrs. Johnson and Pritchard, when in fact he knew that the opposite was true. Ex. 3 ¶¶ 11, 13-14; Ex. 4 ¶¶ 10, 12-13. And Hardwick falsely stated in his affidavits that prior to July 2014 he "did not know of any shortfalls of any nature with MHS's escrow account or any problems with MHS's escrow account," when in truth Hardwick had been misusing attorney escrow accounts for years,

attorney escrow accounts for which he was responsible were approximately $1 million out of balance at least as early as 2003, and Hardwick had been outright looting the firm's escrow accounts since at least as early as 2012.  Ex. 3 ¶ 6; Ex. 4 ¶ 5; Ex. 5 at 6 Sched. C (identifying approximately $1 million attorney escrow account shortage as of December 31, 2003); Ex. 6 (identifying $60,000 in "loans" by Hardwick to "the Dunwoody escrow account" as of December 31, 2001); Ex. 7 (8/6/07 Email from Hardwick to Bank of America Merrill Lynch requesting a $350,000 wire transfer and stating, in relevant part, "I am closing down ALL of my old J and H accounts this week.  I have to fund any shortages from the last 17 years . . . Trust me it sucks!"); Ex. 8 (3/9/13 Email from Maurya to Hardwick confirming $350,000 wire transfer to The Cosmopolitan of Las Vegas from MHS attorney escrow account).  Despite years of theft and misuse of attorney escrow accounts, Hardwick caused his attorneys to convey similar lies to the State Bar of Georgia in September 2014 in response to the State Bar's investigation into his misconduct.

Hardwick's character and past conduct show a complete lack of respect for the judicial system, and prove that, to Hardwick, this Court is merely another victim to be manipulated to his own advantage.  Accordingly, Hardwick cannot be trusted to honor any pretrial release conditions, and therefore there is no condition or combination of conditions that will reasonably assure his appearance as required.

### D. Additional Factors That Make Hardwick A Serious Flight Risk.

While they are by no means exhaustive, the following are additional factors weighing in favor of detention in this case.

The Weight Of The Evidence Against Hardwick

The weight of the evidence against Hardwick is strong. The government has identified tens of millions of dollars stolen by Hardwick during the relevant period, and an overwhelming motive to steal. There are scores of emails to and from Hardwick requesting and confirming the illicit payments to and for his benefit. Numerous witnesses are expected to testify that Hardwick was well versed in MHS's financials through regular reports and meetings, and that in particular he was laser-focused on MHS's profits and shareholder distributions. But emails show that behind the scenes, he was demanding and receiving payments that were wildly in excess of the distributions to which he knew he was entitled. Hardwick did not report his excess payments on one or more income tax returns that he filed during the relevant period, and his obstructive and deceitful conduct when the embezzlement began to be discovered and afterwards constitutes powerful proof of his criminal intent. Accordingly, this factor weighs in favor of detention.

The Severity Of Hardwick's Potential Prison Sentence

Courts have recognized that the prospect of a lengthy prison sentence gives a criminal defendant an even greater incentive to flee, and is therefore an appropriate consideration under Section 3142. *See, e.g., United States v. Madoff*, 316 F. App'x 58, 59 (2d Cir. 2009) (finding that exposure to a lengthy imprisonment "naturally bears upon and increases the risk of flight"). In this case, based on a cumulative loss amount of approximately $30 million resulting from Hardwick's crimes and relevant conduct, and after applying enhancements for abuse of trust, obstruction of justice, supervisory role, sophisticated means,

and obtaining over $1 million from an FDIC-insured financial institution, Hardwick's custody Guidelines exposure is currently estimated to be between 325-405 months. Accordingly, Hardwick has every incentive to flee, as he has repeatedly stated he will do, to avoid spending the rest of his life in federal prison.

Hardwick's Lack Of Community Ties

Hardwick apparently no longer lives or works in Atlanta, but instead moves between a beach house in Myrtle Beach, South Carolina and a house on a golf course in Port St. Lucie, Florida rented in his mother's name. Rather than having ties to his former clients, colleagues, and to the Atlanta legal community, he is now a pariah in that community. Hardwick is estranged from his ex-fiancé and their daughter, who live in Florida. Hardwick is no longer providing financial support to his daughter, requiring his ex-fiancé to initiate child support and child custody proceedings. And to the extent that any of Hardwick's family members remain in Atlanta, there are serious questions as to whether Hardwick's family members would be inclined to assist him in fleeing or could be manipulated by him into doing so unwittingly. Accordingly, this factor likewise weighs in favor of detention.

Hardwick's Release Would Pose A Danger To Himself And To Others

As described in greater detail above, Hardwick is a serious suicide risk. As such, Hardwick's release would pose a serious risk of "danger to any person or the community" within the meaning of Section 3142, weighing in favor of detention. But in addition, Hardwick has acted violently towards and physically abused his ex-fiancé by striking her with a close-fisted blow to her face and

smashing her head in a door jam. He has threatened his ex-fiance's life, telling her that he could make one phone call and no one would ever hear from her again. And he has manufactured evidence to use if she ever complained to authorities, telling her that no one would ever believe her. Accordingly, Hardwick's release would pose a serious danger to both himself and his ex-fiancé, another factor weighing in favor of detention here.

### E. No Condition Or Combination Of Conditions Would Ensure Hardwick's Appearance As Required.

Finally, in light of the serious risks of flight and danger posed by Hardwick's release, his stated intention to flee or kill himself, his lack of ties to any community, his history of contempt for the judicial process, the severity of his potential sentence, and other factors, there are no conditions of release that will reasonably assure Hardwick's appearance as required. Indeed, "[n]either electronic monitoring nor the GPS system of surveillance defeats the resolute, resourceful, energetic, and non-compliant releasee." *United States v. Megahed*, 519 F. Supp. 2d 1236, 1244 (M.D. Fla. 2007) (citing *United States v. Benevolence Int'l Found., Inc.*, 222 F. Supp. 2d 1005, 1007, (N.D. Ill. 2002)). The "delay inherent in modern monitoring is commonly known and understood," and "a determined releasee with resources and assistance (i.e., money and friends, such as [defendant] enjoys) poses an unreasonable and immediate risk of flight, likely to succeed through the hours necessary to enter the traffic lanes prerequisite to departing the state and the nation[,]" especially if "a releasee has no compelling and enduring ties to the locality." *Id.* Modern monitoring techniques "are designed to 'incentivize' the compliant releasee [but] cannot reliably disable the non-compliant release[.]" *Id*; *see also United States v. LaFontaine*, 210 F.3d 125, 135

(2d Cir. 2000) ("Home detention and electronic monitoring at best elaborately replicate a detention facility without the confidence of security such a facility instills."); *United States v. Anderson*, 384 F. Supp. 2d 32, 41-43 (2005) (holding that any monitoring would be insufficient to prevent defendant's flight, given that "[w]eekly or even daily call-ins or visits to Pretrial Services would still allow the defendant a day's head-start on flight from the United States[,]" and that "[c]onventional electronic monitoring . . . would only apprise authorities of whether [the defendant] was in or out of his home, and would likewise give him ample lead time if he wished to flee); *United States v. Townsend*, 897 F.2d 989, 994-95 (9th Cir. 1990) ("Nor does the wearing of an electronic device offer assurance against flight occurring before measures can be taken to prevent a detected departure from the jurisdiction.").

Given a steady docket of passport fraud and other false identification and identity theft cases in this district and others that indicate that false identities and identification documents are readily available to virtually anyone for the right price, surrendering one's passport and agreeing not to apply for new travel documents are insufficient to reasonably assure the appearance of a defendant who, like Hardwick, has repeatedly stated that he intends to flee. Moreover, as Hardwick himself noted, a passport or other travel documents may not even be needed to leave the U.S., depending on the mode of travel and the destination. Further, Hardwick presents a serious risk of flight even if he has no intention of leaving the U.S. Indeed, although courts conducting risk-of-flight analyses under Section 3142 tend to focus on foreign travel experience, foreign contacts, and foreign assets that could be used to finance such flight (making passports

and travel documents more relevant), this focus appears to be somewhat misguided. Specifically, Section 3142 refers only to "a serious risk that such person will flee," and is not limited to or qualified by the destination, distance, or the foreign or domestic nature of such flight. Section 3142 simply asks courts to consider whether there are reasonable assurances that a defendant will show up for his next court appearance, not whether he might someday be apprehended or successfully extradited back to the U.S. months or years into the future if he flees. And there are multiple examples of fugitives disappearing within this country and living undetected in plain sight for long periods of time rather than fleeing and remaining abroad. *See, e.g., United States v. Andrew Cox*, No. 2:05-CR-2-WCO (N.D. Ga.), Docket No. 235 at 19 (fugitive marijuana grower lived under assumed name in Arizona for several years before being apprehended in 2008); *United States v. Aubrey Lee Price*, No. 6:12-CR-10-LGW-GRS-1 (S.D. Ga.), *The Fraudster Who Faked His Own Death, Inside the Aubrey Lee Price Case*, FBI.gov (Dec. 18, 2014) (fugitive bank executive who faked his own death and disappeared for a year and a half despite being on electronic monitoring was ultimately apprehended in the charging district in 2013); *United States v. James J. Bulger et al.*, No. 1:99-CR-10371-DJC-3, Docket No. 609, Ex. 1 (D. Mass.) (famous organized crime figure apprehended in Santa Monica, California in 2011 after 16 years as a fugitive, during which time he reportedly lived openly and traveled freely between California and Mexico to obtain discount prescription medications). Accordingly, Hardwick is a serious flight risk regardless of any foreign contacts or accounts, there are no conditions of release that will assure his appearance as required, and the Court should order him to be detained pending trial.

## Conclusion

For the foregoing reasons, the government's Motion should be GRANTED.

Respectfully submitted, this 22nd day of February, 2016.

> JOHN A. HORN
> *United States Attorney*
>
> /s/ DAVID M. CHAIKEN
> *Assistant United States Attorney*
> Georgia Bar No. 118618
> david.chaiken@usdoj.gov
>
> /s/ J. RUSSELL PHILLIPS
> *Assistant United States Attorney*
> Georgia Bar No. 576335
> russell.phillips@usdoj.gov
> U.S. Courthouse & Federal Building
> 75 Ted Turner Drive S.W., Suite 600
> Atlanta, Georgia 30303-3309
> Phone: (404) 581-6000
> Fax: (404) 581-6181

**Certificate of Service**

The United States Attorney's Office served this document today by handing a copy to defense counsel in open court:

> Edward T.M. Garland, Esq.
> Donald F. Samuel, Esq.
> Garland, Samuel & Loeb P.C.
> 3151 Maple Drive N.E.
> Atlanta, GA 30305

February 22, 2016

/s/ DAVID M. CHAIKEN
_____
DAVID M. CHAIKEN

*Assistant United States Attorney*

```
 1              IN THE SUPERIOR COURT OF FULTON COUNTY
                          STATE OF GEORGIA
 2

 3

      JULIE HARDWICK,
 4
                    Plaintiff,        CIVIL ACTION
 5
                vs.                   FILE
 6
      NATHAN EVERETTE HARDWICK,       NO. 2008CV147021
 7    IV,

 8                  Defendant.
      ~~~~~~~~~~~~~~~~~~~~~~~~~~
 9

10                     DEPOSITION OF

11          NATHAN EVERETTE HARDWICK, IV, ESQ.

12                     10:20 a.m.

13                December 10, 2009

14                1570 Warsaw Road
                  Roswell, Georgia
15

16          Linda E. Cheek, RMR, CCR-A-752

17

18

19

20

21

22

23

24

25
```



Case 1:16-cr-00065-ELR-CMS   Document 13   Filed 02/22/16   Page 26 of 70

NATHAN EVERETTE HARDWICK, IV, ESQ.                    December 10, 2009
HARDWICK vs. HARDWICK                                                    52

```
 1    salary is.
 2         A.     That won't take long.
 3         Q.     And how much is your salary?
 4         A.     Well, right now, you know, we are not
 5    paying a salary because we are -- actually, you know,
 6    we put a couple million dollars into the firm.
 7         Q.     What do you mean we?
 8         A.     Well, we have three people that own the
 9    firm.
10         Q.     Yeah.  And when did you --
11         A.     Art, Randy and me.
12         Q.     When did we put a million dollars into the
13    firm?
14         A.     In the last two years over the whole thing
15    or the firm would have crashed.
16         Q.     All right.
17         A.     And I have got money in -- I have got --
18    and didn't take salary for two years.  So, I got
19    money owed to me by the firm.
20         Q.     Okay.  Well, let's talk about what the
21    firm pays.  The firm pays for your cars; does it not?
22         A.     One car.
23         Q.     One car?
24         A.     Uh-huh (witness nods head affirmatively).
25         Q.     Does the firm pay for the leasing of the
```



JAMES A. PRITCHARD, III vs. DIVOT HOLDINGS, LLC, ET AL.
Nathan E. Hardwick, IV on 02/16/2015                                    Page 1

```
1                IN THE SUPERIOR COURT OF FULTON COUNTY
                          STATE OF GEORGIA
2

3     JAMES A. PRITCHARD, III,

4            Plaintiff,

5       vs.                            CIVIL ACTION

6     DIVOT HOLDINGS, LLC,       NO. 2014-CV-252435
      MORRIS|SCHNEIDER|
7     WITTSTADT, LLC f/k/a
      MORRIS|HARDWICK|
8     SCHNEIDER, LLC, and
      NATHAN E. HARDWICK, IV,
9
             Defendants.
10    _____

11

12              VIDEOTAPED DEPOSITION OF

13              NATHAN E. HARDWICK, IV

14

15                February 16, 2015

16                  9:03 a.m.

17

18             3151 Maple Drive, N.E.

19                Atlanta, Georgia

20

21

22

23

24         LAURA R. SINGLE, CCR-B-1343

25
```

1  understand that you probably know the question, but

2  in case the question is different --

3       A.   Go right ahead.

4       Q.   Sure.

5            Do you maintain any current residences other

6  than at The St. Regis Hotel?

7       A.   I have a family beach house in Myrtle Beach.

8       Q.   What's the address of the family beach

9  house?

10      A.   I have no idea.

11      Q.   How long have you held that?

12      A.   I've personally held it for probably ten

13 years.

14      Q.   Have you ever been a plaintiff or a

15 defendant in a civil lawsuit prior to 2014?

16      A.   Besides -- besides the divorce?

17      Q.   So there's the divorce.

18      A.   There would have been two divorces, so --

19      Q.   Any others?

20      A.   Any other divorces?

21      Q.   No; any other times that you've been a

22 defendant in a civil lawsuit.

23      A.   I'm sure during a business -- in a business

24 setting I was a defendant or a plaintiff but not that

25 I recall specifically.

```
 1        Q.    In your personal capacity then, to the best
 2   of your recollection, prior to 2014 the only time
 3   you've been a civil defendant is in a divorce
 4   proceeding, correct?
 5        A.    To my knowledge, correct.
 6        Q.    And the first divorce proceeding was filed
 7   by Julie Hardwick, correct?
 8        A.    No.  That's the second.
 9        Q.    The second.
10              Who was the first divorce proceeding --
11        A.    Terri Hardwick.
12        Q.    Can you spell Terri for me?
13        A.    I can.  T-E-R-R-I.
14        Q.    When did you get divorced from Terri?
15        A.    '99, just approximately.
16        Q.    Have you ever been a defendant in a criminal
17   case?
18        A.    No.
19        Q.    Have you ever pled guilty to a criminal
20   offense?
21        A.    No.
22        Q.    Have you ever pled guilty to a tax offense?
23        A.    No.
24        Q.    Have you ever testified in -- in a court of
25   law?
```



IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

JAMES A. PRITCHARD, III,                    )
                                            )
      Plaintiff,                          )
                                            )          CIVIL ACTION
vs.                                         )          FILE NO:  2014CV252435
                                            )
DIVOT HOLDINGS, LLC,                        )
MORRIS | SCHNEIDER | WITTSTADT, LLC         )
f/k/a MORRIS | HARDWICK | SCHNEIDER, LLC,   )
and NATHAN E. HARDWICK, IV                  )
                                            )
      Defendants.                         )

## NOTICE OF FILING

COMES NOW Plaintiff, James A. Pritchard, III, and hereby files the following:

1.     Affidavit of Nathan E. Hardwick, IV.

This _____ day of December, 2014.

                           Respectfully submitted,

                           ANDERSEN, TATE, & CARR, P.C.

                           James C. Joedecke, Jr.
                           jjoedecke@atclawfirm.com
                           State Bar No. 391885
                           Elizabeth Clack-Freeman
                           lcfreeman@atclawfirm.com
                           State Bar No. 126888
                           Tyler Dillard
                           tdillard@atclawfirm.com
                           State Bar No. 115229
                           Counsel for Plaintiff

One Sugarloaf Centre
1960 Satellite Blvd., Suite 4000
Duluth, Georgia 30097
(770) 822-0900 Phone
(770) 822-9680 Fax

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| JAMES A. PRITCHARD, III | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION |
| vs. | ) | FILE NO.  2014-cv-252435 |
| | ) | |
| DIVOT HOLDINGS, LLC, | ) | |
| MORRIS \| SCHNEIDER \| WITTSTADT, LLC, | ) | |
| f/k/a MORRIS \| HARDWICK \| SCHNEIDER, | ) | |
| LLC, and NATHAN E. HARDWICK, IV | ) | |
| | ) | |
| Defendants. | ) | |

STATE OF GEORGIA
FULTON COUNTY

## AFFIDAVIT OF NATHAN HARDWICK IV

PERSONALLY APPEARED before the undersigned, an officer duly authorized by law to administer oaths, Nathan E. Hardwick, IV, who after first being duly sworn, states:

1.  My name is Nathan E. Hardwick, IV.  I am over 21 years of age, am competent to make this Affidavit, and make it based upon my own personal knowledge

2.  I am the former Managing Partner of the law firm Morris Hardwick Schneider, LLC ("MHS").  At all times during my tenure as Managing Partner for MHS, I engaged in all professional activities on behalf of MHS with full legal authority from the firm and conducted business with the knowledge and consent from my partners, including Mark Wittstadt ("M. Wittstadt") and Gerard M. Wittstadt Jr. ("G. Wittstadt").

3.  MHS has since been renamed Morris Schneider Wittstadt, LLC ("MSW").

1

4.   On or around July 11, 2014, I learned from Alyce Ritchie, an MHS Partner and the Firm's Closing Practice Manager, that a routine audit being conducted by Fidelity National Title Group ("Fidelity") had uncovered an altered SunTrust bank statement. The auditors initially suspected the altered statement to have been the result of a mistake by SunTrust Bank.

5.   On July 18, 2014, while at my residence preparing for a ten-day international trip, I received a call from Ms. Ritchie informing me that it was now suspected that the document had been altered by Asha Maurya, the Firm's CFO. I immediately called Ms. Maurya and confronted her about the about the altered document. She admitted that she had altered the SunTrust bank statement. I asked her if any money was missing. She at first denied that any money was missing. After repeatedly asking her if any money was missing, she finally said that she had made a mistake and said that $689,018.93 was missing from an escrow account. I instructed Ms. Maurya to cover the shortfall from firm funds. I then informed her that she was suspended and that she should go home until we had an opportunity to get to the bottom of what transpired. I immediately contacted Randy Schneider, a founder of the Firm and recipient of continued deferred compensation, and Ms. Ritchie and asked them to investigate all accounts while I was overseas.

6.   Prior to the revelations regarding Ms. Maurya, I did not know of any shortfalls of any nature with MHS's escrow account or any problems with MHS's escrow account.

7.   When I returned from my international trip on the evening of July 28, I conferred with Ms. Ritchie, and I was advised that there were additional shortfalls.

2

8.   The following morning, I contacted M. Wittstadt and G. Wittstadt to inform them of the existence of the shortfalls in the firm's escrow accounts.

9.   I then contacted Tony Adams of Alliance of Financial Professionals, LLC, who was the accountant for me and MHS. With his assistance, I engaged an outside forensic accounting firm, forensic accountant Jeff Moore, and a team to investigate the accounts to determine what happened. In addition, I retained for the firm outside attorney Jeffrey M. Smith to advise on the ethical duties confronting MHS and its attorneys in light of the discovery.

10.   Between August 2, 2014, and August 18, 2014, Ms. Maurya admitted to MHS partners and financial advisors on at least four separate occasions that I was unaware of any money improperly coming from any escrow account: (1) during a meeting she attended on August 2, 2014, attended by M. Wittstadt and Art Morris; (2) on a teleconference with Tony Adams; (3) on a separate call with Tony Adams and Jeff Moore; and (4) at a meeting attended by the Fidelity audit team; Erika Meinhardt, President of National Agency Operations at Fidelity; and Tony Adams.

11.   M. Wittstadt, G. Wittstadt, Art Morris, Randy Schneider, and I agreed that MHS needed to obtain funds to cover the shortfall. We had an understanding that we had to do whatever was necessary to borrow the money to cover the shortfall, and I was told to do whatever was necessary to obtain the money. During this time, there were continuous discussions about what progress I was making. I advised that the firm would have to guarantee the loans, and it was understood that I would proceed with the transactions.

3

12.  From July 31, 2014, to August 6, 2014, the MHS accounting team consistently estimated the loss at approximately $6 million. At a meeting on August 7, 2014, attended by Tony Adams, Jeffrey M. Smith, Art Morris, M. Wittstadt, and others, the forensic accountants identified a potential $5.9 million shortage in MHS's escrow account; at that time, the auditors believed the $5.9 million figure to be within $500,000 of the full extent of the shortage.

13.  M. Wittstadt, G. Wittstadt, and I understood and agreed that MHS would guarantee any loans we obtained to cover the shortfall, and MHS would guarantee to pay the loans back on the terms I could negotiate.

14.  When I agreed to seek out and secure these loans on behalf of MHS, I had every intention that the loans would be paid back by MHS per the terms of the agreements I could negotiate. At the time, I believed that M. Wittstadt and G. Wittstadt intended to have MHS pay back the loans as well.

15.  Tony Adams, who was also Mr. Pritchard's accountant and financial advisor, suggested I obtain a loan from Mr. Pritchard. Tony Adams spoke to Mr. Pritchard about the loan and subsequently advised me to speak to Mr. Pritchard about finalizing the terms of the loan.

16.  Prior to obtaining the loan from Mr. Pritchard, I told M. Wittstadt and G. Wittstadt that I was working on obtaining loans, including a loan from Mr. Pritchard.

17.  Tony Adams reviewed and approved the terms of the loan.

18.  Tony Adams also approved a similar loan involving Dustin Johnson.

19.  Fred Boynton, an attorney with MHS, drafted a note, a guarantee by MHS, and a security pledge (the "Loan Documents"). The Loan Documents were then approved by Tony

4

Adams. I executed the note and the security pledge, and I executed the guarantee by the law firm guaranteeing the repayment of the loan to Mr. Pritchard, and then I sent the Loan Documents to Mr. Pritchard via overnight delivery.

20. The Promissory Note, Pledge and Security Agreement, and Guaranty of Promissory Note, attached as Exhibit A to Mr. Pritchard's Complaint in Pritchard v. Divot Holdings, et al., No. 2014-cv-252435 (Fulton Super. Ct. filed Oct. 8, 2014) are all true and correct copies of the Loan Documents.

21. I instructed Mr. Pritchard to wire his investment to my Divot account, from which I caused the funds to be wired to the law firm's "Equity Partner Account," which was a replenishment account set up at the direction of MHS's retained outside counsel, Jeffrey M. Smith to cover any shortfall revealed by the investigation.

22. Mr. Pritchard's bank completed a wire transfer of Two Million Dollars ($2,000,000.00) of Mr. Pritchard's funds to my Divot account, from which I caused the funds to be wired to MHS'S "Equity Partner Account."

23. MHS received the Two Million Dollars ($2,000,000.00) and used it to fund the escrow account shortage. All money went to the benefit of MHS.

24. Also, Dustin Johnson invested Three Million Dollars ($3,000,000) in MHS by way of a loan guaranteed by MHS.

25. Prior to the receipt of any funds from Mr. Johnson or Mr. Pritchard, I deposited One Million Four Hundred Thousand Dollars ($1,400,000) of my personal funds into the MHS's Equity Partner Account, in order to assist in covering the shortfall.

26.    I had express, apparent, and actual authority to act on behalf of MHS and bind MHS in connection with obtaining loans from Dustin Johnson and Jim Pritchard to cover the firm's shortfall.

27.    Once the funds from me, Mr. Prichard, and Mr. Johnson were deposited, I believed that MHS was fully funded, and the firm was generating ample profits to pay back the loan to Mr. Pritchard and the loan to Mr. Johnson in full with no difficulty.

28.    On Sunday, August 10, 2014, I had a telephone conversation with Erika Meinhardt and David Baum of Fidelity.  On that call, David Baum asked me to confirm that there were $5 million in loans guaranteed by MHS, and I confirmed that to be true.  That $5 million in loans comprised a $3 million loan from Dustin Johnson and a $2 million loan from James A. Pritchard, III.

_____

NATHAN E. HARDWICK, IV

Sworn to and subscribed before me,

this _18th_ day of _November_ , 2014.

_____
Notary Public

6

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

JAMES A. PRITCHARD, III,  )
                          )
         Plaintiff,       )
                          )          CIVIL ACTION
vs.                       )          FILE NO: 2014CV252435
                          )
DIVOT HOLDINGS, LLC,      )
MORRIS | SCHNEIDER | WITTSTADT, LLC   )
f/k/a MORRIS | HARDWICK | SCHNEIDER, LLC, )
and NATHAN E. HARDWICK, IV  )
                          )
         Defendants.      )

## CERTIFICATE OF SERVICE

This is to certify that I have this day served the within and foregoing **Notice of Filing**

upon all parties to this matter by depositing a true copy of same in the U.S. Mail, proper postage

paid, addressed to counsel of record as follows:

Edward T.M. Garland, Esq.          William J. Holley, II, Esq.
Robin N. Loeb, Esq.                Rebeccah L. Bower, Esq.
Matthew D. Daley, Esq.             1500 Marquis Two Tower
Garland, Samuel & Loeb, P.C.       285 Peachtree Center Ave. NE
3151 Maple Drive, N.E.             Atlanta, GA 30303
Atlanta, GA 30305

This 20 day of December, 2014.

                              ANDERSEN, TATE, & CARR, P.C.

                              James C. Joedecke, Jr.
                              jjoedecke@atclawfirm.com
                              State Bar No. 391885
                              Elizabeth Clack-Freeman
                              lcfreeman@atclawfirm.com
                              State Bar No. 126888
                              Tyler Dillard
                              tdillard@atclawfirm.com
                              State Bar No. 115229
                              Counsel for Plaintiff

One Sugarloaf Centre
1960 Satellite Blvd., Suite 4000
Duluth, Georgia 30097
(770) 822-0900 Phone
(770) 822-9680 Fax

2225940_1.DOCX

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| DUSTIN JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO.: |
| | ) | 1:14-CV-03457-SCJ |
| MORRIS SCHNEIDER | ) | |
| WITTSTADT, LLC fka MORRIS | ) | |
| HARDWICK SCHNEIDER, LLC; | ) | |
| MSLAW, INC. fka MHSLAW, INC.; | ) | |
| NATHAN HARDWICK IV, ESQ.; | ) | |
| MARK WITTSTADT, ESQ.; | ) | |
| GERARD WM. WITTSTADT JR., | ) | |
| ESQ., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

STATE OF GEORGIA
FULTON COUNTY

<u>AFFIDAVIT OF NATHAN HARDWICK IV</u>

I, NATHAN HARDWICK IV, Esq., declare under the penalty of perjury:

1.    I am the former Managing Partner of the law firm Morris Hardwick

Schneider, LLC ("MHS").  At all times during my tenure as Managing

Partner for MHS, I engaged in all professional activities on behalf of MHS

1

with full legal authority from the firm and conducted business with the

knowledge and consent from my partners, including Mark Wittstadt ("M.

Wittstadt") and Gerard M. Wittstadt Jr. ("G. Wittstadt").

2.     MHS has since been renamed Morris Schneider Wittstadt, LLC ("MSW").

3.     On or around July 11, 2014, I learned from Alyce Ritchie, an MHS Partner

and the Firm's Closing Practice Manager, that a routine audit being

conducted by Fidelity National Title Group ("Fidelity") had uncovered an

altered SunTrust bank statement.  The auditors initially suspected the altered

statement to have been the result of a mistake by SunTrust Bank.

4.     On July 18, 2014, while at my residence preparing for a ten-day

international trip, I received a call from Ms. Ritchie informing me that it was

now suspected that the document had been altered by Asha Maurya, the

Firm's CFO.  I immediately called Ms. Maurya and confronted her about the

about the altered document.  She admitted that she had altered the SunTrust

bank statement.  I asked her if any money was missing.  She at first denied

that any money was missing.  After repeatedly asking her if any money was

missing, she finally said that she had made a mistake and said that

$689,018.93 was missing from an escrow account.  I instructed Ms. Maurya

to cover the shortfall from firm funds.  I then informed her that she was

suspended and that she should go home until we had an opportunity to get to the bottom of what transpired.  I immediately contacted Randy Schneider, a founder of the Firm and recipient of continued deferred compensation, and Ms. Ritchie and asked them to investigate all accounts while I was overseas.

5.    Prior to the revelations regarding Ms. Maurya, I did not know of any shortfalls of any nature with MHS's escrow account or any problems with MHS's escrow account.

6.    When I returned from my international trip on the evening of July 28, I conferred with Ms. Ritchie, and I was advised that there were additional shortfalls.

7.    The following morning, I contacted M. Wittstadt and G. Wittstadt to inform them of the existence of the shortfalls in the firm's escrow accounts.

8.    I then contacted Tony Adams of Alliance of Financial Professionals, LLC, who was the accountant for me and MHS.  With his assistance, I engaged an outside forensic accounting firm, forensic accountant Jeff Moore, and a team to investigate the accounts to determine what happened.  In addition, I retained for the firm outside attorney Jeffrey M. Smith to advise on the ethical duties confronting MHS and its attorneys in light of the discovery.

3

9.    Between August 2, 2014, and August 18, 2014, Ms. Maurya admitted to

MHS partners and financial advisors on at least four separate occasions that

I was unaware of any money improperly coming from any escrow account:

(1) during a meeting she attended on August 2, 2014, attended by M.

Wittstadt and Art Morris; (2) on a teleconference with Tony Adams; (3) on a

separate call with Tony Adams and Jeff Moore; and (4) at a meeting

attended by the Fidelity audit team; Erika Meinhardt, President of National

Agency Operations at Fidelity; and Tony Adams.

10.   M. Wittstadt, G. Wittstadt, Art Morris, Randy Schneider, and I agreed that

MHS needed to obtain funds to cover the shortfall. We had an

understanding that we had to do whatever was necessary to borrow the

money to cover the shortfall, and I was told to do whatever was necessary to

obtain the money. During this time, there were continuous discussions about

what progress I was making. I advised that the firm would have to guarantee

the loans, and it was understood that I would proceed with the transactions.

11.   From July 31, 2014, to August 6, 2014, the MHS accounting team

consistently estimated the loss at approximately $6 million. At a meeting on

August 7, 2014, attended by Tony Adams, Jeffrey M. Smith, Art Morris, M.

Wittstadt, and others, the forensic accountants identified a potential $5.9

4

million shortage in MHS's escrow account; at that time, the auditors

believed the $5.9 million figure to be within $500,000 of the full extent of

the shortage.

12.   M. Wittstadt, G. Wittstadt, and I understood and agreed that MHS would

guarantee any loans we obtained to cover the shortfall, and MHS would

guarantee to pay the loans back on the terms I could negotiate.

13.   When I agreed to seek out and secure these loans on behalf of MHS, I had

every intention that the loans would be paid back by MHS per the terms of

the agreements I could negotiate.  At the time, I believed that M. Wittstadt

and G. Wittstadt intended to have MHS pay back the loans as well.

14.   Dustin Johnson was my client at MHS for many years, continuing

uninterrupted through August 2014, and, as such, he was a client of MHS,

including M. Wittstadt and G. Wittstadt, who each served as 22.5% owners

of the firm at the time of the loan.

15.   Prior to obtaining the loan from Mr. Johnson, I told M. Wittstadt and G.

Wittstadt that I was working on obtaining a loan from Dustin Johnson.

16.   Mr. Johnson and I agreed that Tony Adams, who was also Mr. Johnson's

accountant and financial advisor, would review and approve the terms of the

loan.

5

17.   Tony Adams independently reviewed the investment opportunity and
approved it on two occasions.

18.   To memorialize the loan to Mr. Johnson, I caused to be prepared a note and
guarantee in the same form used in the Pritchard transaction, which is
described below.  Due to the increased loan amount, I increased the interest
rate.  I executed the note and executed the guarantee by the law firm
guaranteeing the repayment of the loan to Mr. Johnson.

19.   On August 5, 2014, I provided wiring instructions to Mr. Johnson in an e-
mail from my account at MHS, reflecting the address of the firm, my contact
information, along with my title, CEO and Managing Partner, Morris
Hardwick Schneider, LLC.

20.   I instructed Mr. Johnson to wire his investment to the "Equity Partner
Account," which was a replenishment account set up at the direction of
MHS's retained outside counsel, Jeffrey M. Smith to cover any shortfall
revealed by the investigation.

21.   On August 6, 2014, Mr. Johnson's bank completed a wire transfer of Three
Million Dollars ($3,000,000.00) of Mr. Johnson's funds to MHS'S "Equity
Partner Account."

22. MHS received the Three Million Dollars ($3,000,000.00) and used it to fund the escrow account shortage. All money went to the benefit of MHS.

23. Also, Jim Pritchard invested Two Million Dollars ($2,000,000) in MHS by way of a loan guaranteed by MHS.

24. Prior to the receipt of any funds from Mr. Johnson or Mr. Pritchard, I deposited One Million Four Hundred Thousand Dollars ($1,400,000) of my personal funds into the MHS's Equity Partner Account, in order to assist in covering the shortfall.

25. I had express, apparent, and actual authority to act on behalf of MHS and bind MHS in connection with obtaining loans from Dustin Johnson and Jim Pritchard to cover the firm's shortfall.

26. Once the funds from me, Mr. Prichard, and Mr. Johnson were deposited, I believed that MHS was fully funded, and the firm was generating ample profits to pay back the loan to Mr. Pritchard and the loan to Mr. Johnson in full with no difficulty.

27. On Sunday, August 10, 2014, I had a telephone conversation with Erika Meinhardt and David Baum of Fidelity. On that call, David Baum asked me to confirm that there were $5 million in loans guaranteed by MHS, and I confirmed that to be true. That $5 million in loans comprised a $3 million

loan from Dustin Johnson and a $2 million loan from James A. Pritchard, III.

I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct.

Date Executed:     November 14, 2014

_____

NATHAN HARDWICK IV

/21240521v.1

8



600 Galleria Parkway
Suite 1950
Atlanta, Georgia 30339
Phone 770-432-0308
Fax 770-432-4138
www.adamscapital.com

March 11, 2004

## Personal and Confidential

Mr. Nathan Hardwick IV
Jackson & Hardwick
Managing Partner
7000 Central Parkway
Suite 300
Atlanta, Georgia 30328

Mr. Randolph H. Schneider
Morris & Schneider
Partner
2781 Windy Ridge Parkway
Atlanta, GA 30339

## Jackson & Hardwick and Morris & Schneider, P.C. Transaction Advisory Services

Dear Gentlemen:

We revised our prior analysis and made certain adjustments which are reflected in the attached schedules. An adjusted debt free cash flow to partners analysis is included (see schedule A-1). In the valuation of privately held companies, it is appropriate to adjust reported net income to cash flow available to debt and equity holders. These adjustments may include non-recurring items (revenue and/or expense) and reclassification of certain items. In addition to these adjustments, we received updated financial statements from Jackson & Hardwick. The prior schedules were based on September 30, 2003 data for Jackson & Hardwick. The updated schedules are based on December 31, 2003 data. In summary, the following changes were made to the prior analysis:

Morris & Schneider:

- Number of closings was included in Summary of Analysis (see Schedule A). We recently obtained this information.
- Removed "interest bearing debt" of $3,046,650 in discounted cash flow analysis that had been previously misclassified. (see Schedule 5)
- Included "interest bearing debt" of $35,998 for a car note payable. (see Schedule 5)
- Removed "bad debts" of $415,838 from total expenses in discounted cash flow analysis. (see Schedule 5) This amount was reclassified as "escrow files refunding" in the income statement (see Schedule 12) and identified as a non-recurring expense in the discounted cash flow analysis. (see Schedule 5)

Mr. Nathan Hardwick IV
Mr. Randolph H. Schneider
March 11, 2004

Jackson & Hardwick:

- Number of attorneys was increased from 25 to 32. We recently obtained this information. (see Schedule A)
- Removed $3,046,650 of interest bearing debt in the discounted cash flow analysis. We reclassified this item in the balance sheet as "funds in escrow" and "escrows payable" in the amounts provided on the December 31, 2003 balance sheet of $452,791 (Schedule 9).
- Included $3,248,977 of interest bearing debt in the discounted cash flow analysis (remaining buyout due to Mr. Jackson as of March 5, 2004). (see Schedule 1, footnote 6)
- Removed $820,530 from "other expenses" in the discounted cash flow analysis and identified it as a non-recurring expense. (see Schedule 7, footnote 7) This amount was reclassified as "escrow files refunding" in the income statement. (see Schedule 10)
- Adjusted "payments to partners" from $6,716,926 to $4,973,942 reflecting only payments to Mr. Hardwick, payments to Mr. Jackson for the buyout, and the buyout legal fees. (see Schedule 10)
- Adjusted "salaries and wages" from $7,811,381 to $9,502,384 to reflect the salary expense of all employees and non-managing partners. (see Schedule 10)
- Adjusted employee benefits from $529,562 to $575,082 to capture the total benefits expense of all employees and non-managing partners. (see Schedule 10)

Please check for possible consolidation and synergy benefits. We have included a final adjustment of $2,000,000 in positive cash flow projected by Mr. Driskell however; we have not performed any consolidating adjustments in accordance with GAAP. Should you have any questions, please contact me at 770-432-0308.

Very truly yours,

*David Adams*

David P. Adams III, CPA, ABV, ASA
President

DPA/dmm
Enclosures

# Morris & Schneider / Jackson & Hardwick

Schedule B

## Income Analysis (1)

Valuation date: December 31, 2003

|  | Morris and Schneider | | Jackson and Hardwick | | Consolidated Company |
|---|---|---|---|---|---|
| Sales | $ 29,243,999 | 57.7% | $ 21,478,099 | 42.3% | $ 50,722,098 |
| Operating expenses |  |  |  |  |  |
| Payments to partners or officers | 1,655,700 | 25.0% | 4,973,942 | 75.0% | 6,629,642 |
| Salaries & wages | 14,872,794 | 61.0% | 9,502,384 | 39.0% | 24,375,178 |
| Repairs and maintenance | 23,698 | 75.3% | 7,785 | 24.7% | 31,483 |
| Escrow files refunding | 415,838 | 33.6% | 820,530 | 66.4% | 1,236,368 |
| Rents | 980,987 | 43.0% | 1,302,766 | 57.0% | 2,283,753 |
| Taxes and licenses | 295,138 | 36.4% | 516,143 | 63.6% | 811,281 |
| Interest | 84 | 100.0% | - | 0.0% | 84 |
| Charitable contributions | 2,124 | 2.6% | 78,637 | 97.4% | 80,761 |
| Depreciation | 103,512 | 25.7% | 300,000 | 74.3% | 403,512 |
| Advertising | 12,615 | 3.1% | 395,277 | 96.9% | 407,892 |
| Pension, profit-sharing, etc. | 60,620 | 44.7% | 75,000 | 55.3% | 135,620 |
| Employee benefit programs | 202,023 | 26.0% | 575,082 | 74.0% | 777,105 |
| Other deductions | 6,957,439 | 66.3% | 3,535,468 | 33.7% | 10,492,907 |
| Total operating expenses | $ 25,582,572 | 53.7% | $ 22,083,014 | 46.3% | $ 47,665,586 |
| Operating income | 3,661,427 | 119.8% | (604,915) | -19.8% | 3,056,512 |
| Other income |  | 0.0% | 119,491 | 100.0% | 119,491 |
| Net income | $    3,661,427 | 115.3% | $    (485,424) | -15.3% | $    3,176,003 |
| EBIT | 3,661,511 | 119.8% | (604,915) | -19.8% | 3,056,596 |
| EBITDA | 3,765,023 | 108.8% | (304,915) | -8.8% | 3,460,108 |

### Notes:

(1) Based on 2003 tax returns and internal reports provided by Management.

$5,317,000$   $4,488,000$

Morris & Schneider / Jackson & Hardwick                                                      Schedule A
Summary of Analysis
Valuation date: December 31, 2003

| | Morris and Schneider (3) | | Jackson and Hardwick | | Consolidated Company |
|---|---|---|---|---|---|
| Number of offices | 36 | 73.5% | 13 | 26.5% | 49 |
| Number of attorneys | 38 | 54.3% | 32 | 45.7% | 70 |
| Number of closings | 27,600 | 51.9% | 25,609 | 48.1% | 53,209 |
| Revenues | 29,243,999 | 57.7% | 21,478,099 | 42.3% | 50,722,098 |
| Total costs (1) | 23,926,872 | 58.3% | 17,109,072 | 41.7% | 41,035,944 |
| Non-recurring escrow refunding adjustment | 415,838 | 33.6% | 820,530 | 66.4% | 1,236,368 |
| Operating income | 5,732,965 | 52.5% | 5,189,557 | 47.5% | 10,922,522 |
| Distributable income | 5,732,965 | 51.9% | 5,309,048 | 48.1% | 11,042,013 |
| EBITDA | 5,836,477 | 51.0% | 5,609,048 | 49.0% | 11,445,525 |
| Business enterprise value @ 0% annual growth | 28,393,092 | 52.0% | 26,202,127 | 48.0% | 54,595,219 |
| Equity value @ 0% annual growth | 28,357,094 | 55.3% | 22,953,150 | 44.7% | 51,310,244 |
| Equity value @ 3% annual growth | 37,059,826 | 54.0% | 31,546,964 | 46.0% | 68,606,790 |
| Equity value @ 5% annual growth | 40,104,336 | 53.6% | 34,668,654 | 46.4% | 74,772,989 |
| Equity value @ 8% annual growth | 45,106,293 | 53.1% | 39,817,542 | 46.9% | 84,923,836 |
| Debt free cash flow to partners @ 0% annual growth | 3,450,672 | 52.2% | 3,163,519 | 47.8% | 6,614,191 |
| Adjustment to debt free cash flow to partners (after synergies) (4) | | | | | 2,000,000 |
| Adjusted debt free cash flow to partners | | | | | 8,614,191 |
| Average (2) | | 52.5% | | 47.5% | |

Notes:
(1) Exclusive of partner/officer compensation and benefits.
(2) Excludes consideration of number of offices, number of attorneys, number of closings, revenues, total costs, and non-recurring escrow refunding adjustments.
(3) Includes only law firm and title company, excluded are joint ventures and foreclosure which generated approximately $875,000 in additional cash flow to partners.
(4) Includes synergistic benefit estimate by Mr. Driskell.

DRAFT ○ FOR DISCUSSION PURPOSES ONLY ○ DRAFT

**Morris & Schneider / Jackson & Hardwick**
Adjusted Debt Free Cash Flow to Partners Analysis
Valuation date: December 31, 2003

Schedule A-1

| | Morris and Schneider | | Jackson and Hardwick | | Consolidated Company |
|---|---|---|---|---|---|
| Net Income (1) | $ 3,661,427 | 115.3% | (485,424) | -15.3% | $   3,176,003 |
| Add: payments to partners or officers (2) | 1,655,700 | 25.0% | 4,973,942 | 75.0% | 6,629,642 |
| Add: non-recurring escrow refunding (3) | 415,838 | 33.6% | 820,530 | 66.4% | 1,236,368 |
| Pre-tax income | 5,732,965 | 51.9% | 5,309,048 | 48.1% | 11,042,013 |
| Less: income tax | (2,235,856) | 51.9% | (2,070,529) | 48.1% | (4,306,385) |
| Adjusted net income | 3,497,109 | 51.9% | 3,238,519 | 48.1% | 6,735,628 |
| Add: tax affected interest expense | 51 | 100.0% | - | 0.0% | 51 |
| Debt free net income | 3,497,160 | 51.9% | 3,238,519 | 48.1% | 6,735,679 |
| Add: depreciation | 103,512 | 25.7% | 300,000 | 74.3% | 403,512 |
| Less: capital expenditures | (150,000) | 28.6% | (375,000) | 71.4% | (525,000) |
| Adjusted debt free cash flow to partners | $ 3,450,672 | 52.2% | $ 3,163,519 | 47.8% | 6,614,191 |
| Adjustment to debt free cash flow to partners (after synergies) (4) | | | | | 2,000,000 |
| Adjusted debt free cash flow to partners | | | | | $    8,614,191 |

Notes:
(1) As stated on income statements dated December 31, 2003.
(2) Jackson and Hardwick payments include compensation and loan payments to Mr. Hardwick, as well as legal fees and buyout payments to Mr. Jackson.
(3) Previously classified as bad debts and/or other expenses.
(4) Includes synergistic benefit estimate by Mr. Driskell.

DRAFT  ·  FOR DISCUSSION PURPOSES ONLY  ·  DRAFT

Morris & Schneider / Jackson & Hardwick                                    Schedule C
Asset Analysis (1)
As of December 31, 2003

| | Morris and Schneider | | Jackson and Hardwick | | Consolidated Company | |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Current assets | | | | | | |
|   Cash and cash equivalents | $ 1,176,210 | 86.7% | $ 180,763 | 13.3% | $ 1,356,973 | |
|   Trade notes and accounts receivable | 320 | 100.0% | - | 0.0% | 320 | |
|   Cash in escrow | - | 0.0% | 452,791 | 100.0% | 452,791 | |
|   Other current assets | 30,122 | 31.9% | 64,286 | 68.1% | 94,408 | |
|   Loans to share holders | 361,000 | 100.0% | - | 0.0% | 361,000 | |
| Total current assets | $ 1,567,652 | 69.2% | $ 697,840 | 30.8% | $ 2,265,492 | |
| | | | | | | |
| **Fixed Assets** | | | | | | |
|   Buildings and other depreciable assets | $ 1,435,547 | 38.5% | 2,291,287 | 61.5% | 3,726,834 | |
|   Less accumulated depreciation | (1,077,844) | 43.3% | (1,409,450) | 56.7% | (2,487,294) | |
|   Net fixed assets | $ 357,702 | 28.9% | $ 881,837 | 71.1% | $ 1,239,539 | |
|   Other assets | 17,370 | 26.0% | 49,429 | 74.0% | 66,799 | |
| Total assets | $ 1,942,724 | 54.4% | $ 1,629,106 | 45.6% | $ 3,571,830 | |
| | | | | | | |
| **LIABILITIES & EQUITY** | | | | | | |
| Current liabilities | | | | | | |
|   Accounts payable | $ (4,637) | -5.9% | $ 82,870 | 105.9% | $ 78,233 | |
|   Escrow payable | - | 0.0% | 452,791 | 100.0% | 452,791 | |
|   Reserve for negative files to be funded from operations | (1) | 0.0% | 820,530 | 100.0% | 820,529 | |
| Total current liabilities | (4,638) | -0.3% | 1,356,191 | 100.3% | 1,351,553 | |
| | | | | | | |
| Long-term liabilities | | | | | | |
|   Mortgage, notes, bonds payable in more than one year | 35,999 | 100.0% | - | 0.0% | 35,999 | |
|   Other liabilities | (3,022) | 100.0% | - | 0.0% | (3,022) | |
| Total long-term liabilities | 32,977 | 100.0% | - | 0.0% | 32,977 | |
| | | | | | | |
| Total liabilities | $ 28,338 | 2.0% | $ 1,356,191 | 98.0% | $ 1,384,529 | |
| | | | | | | |
| Total equity | 1,914,386 | 87.5% | 272,915 | 12.5% | 2,187,301 | |
| | | | | | | |
| Total liabilities and equity | $ 1,942,724 | 54.4% | $ 1,629,106 | 45.6% | $ 3,571,830 | |
| | | | | | | |
| Working capital analysis | | | | | | |
| Plus: Current assets | 1,567,652 | 69.2% | 697,840 | 30.8% | 2,265,492 | |
| Minus: Current liabilities | (4,638) | -0.3% | 1,356,191 | 100.3% | 1,351,553 | |
| Plus: interest bearing current liabilities | (1) | 100.0% | - | 0.0% | (1) | |
| Debt free working capital (DFWC) | 1,572,289 | 172.0% | (658,351) | -72.0% | 913,938 | |
| | | | | | | |
| Average DFWC | 1,456,963 | 137.6% | (397,806) | -37.6% | 1,059,157 | |
| Revenues | 29,243,999 | 57.7% | 21,478,099 | 42.3% | 50,722,098 | |
| Average DFWC/ Revenues | 4.98% | | -1.85% | | 2.09% | |
| | | | | | | |
| Average accounts receivable | 3,160 | 100.0% | - | 0.0% | 3,160 | |
| Average total assets | 1,927,319 | 44.5% | 2,399,315 | 55.5% | 4,326,634 | |
| Average net assets | 1,475,536 | 74.1% | 515,627 | 25.9% | 1,991,163 | |
| Average equity | 1,475,536 | 74.1% | 515,627 | 25.9% | 1,991,163 | |
| | | | | | | |
| Total liabilities / assets | 1.46% | | 83.25% | | 39% | |
| Interest bearing debt / assets | 1.85% | | 5.09% | | 3% | |
| Interest bearing debt | 35,998 | 30.3% | 82,870 | 69.7% | 118,868 | |
| Net assets | 1,914,385 | 87.5% | 272,915 | 12.5% | 2,187,300 | |

Notes:
(1) Based on internal reports provided by Management.

DRAFT ∘ FOR DISCUSSION PURPOSES ONLY ∘ DRAFT

Jackson & Hardwick
Discounted Cash Flow Method (1)
As of December 31, 2003

Schedule 1



| | For the Years Ending December 31, | | | | | Terminal (2) |
|---|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008 | |
| *Annual revenue growth rate* | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 6.0% |
| Net revenues | $ 21,478,099 | $ 21,478,099 | $ 21,478,099 | $ 21,478,099 | $ 21,478,099 | $ 21,478,099 |
| | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Compensation of partners and officers | 9,502,314 | 9,502,314 | 9,502,314 | 9,502,314 | 9,502,314 | 9,502,314 |
| | 44.2% | 44.2% | 44.2% | 44.2% | 44.2% | 44.2% |
| Salaries and wages | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 |
| | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% |
| Depreciation expense | | | | | | |
| Other expense (7) | 6,416,114 | 6,416,114 | 6,416,114 | 6,416,114 | 6,416,114 | 6,416,114 |
| | 39.2% | 29.9% | 29.9% | 29.9% | 29.9% | 29.9% |
| Total costs | 16,218,542 | 16,218,542 | 16,218,542 | 16,218,542 | 16,218,542 | 16,218,542 |
| | 75.6% | 75.6% | 75.6% | 75.6% | 75.6% | 75.6% |
| Operating income | 5,159,557 | 5,159,557 | 5,459,557 | 5,159,557 | 5,159,557 | 5,159,557 |
| | 30.2% | 30.2% | 30.2% | 30.2% | 30.2% | 30.2% |
| Other income (expense) | 119,491 | 119,491 | 119,491 | 119,491 | 119,491 | 119,491 |
| | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% |
| Pre-tax income | 5,309,048 | 5,309,048 | 5,309,048 | 5,309,048 | 5,309,048 | 5,309,048 |
| | 24.7% | 24.7% | 24.7% | 24.7% | 24.7% | 24.7% |
| Income tax (3) @ 39% | 2,070,529 | 2,070,529 | 2,070,529 | 2,070,529 | 2,070,529 | 2,070,529 |
| | 9.6% | 9.6% | 9.6% | 9.6% | 9.6% | 9.6% |
| Net income | 3,238,519 | 3,238,519 | 3,238,519 | 3,238,519 | 3,238,519 | 3,238,519 |
| | 15.1% | 15.1% | 15.1% | 15.1% | 15.1% | 15.1% |
| Plus: Depreciation expense (4) | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 |
| | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% |
| Less: Capital expenditure (4) | (375,000) | (375,000) | (375,000) | (375,000) | (375,000) | (375,000) |
| | (1.7%) | (1.7%) | (1.7%) | (1.7%) | (1.7%) | (1.7%) |
| Less: (increase) decrease in DFWC (5) @ 14% | - | - | - | - | - | - |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Debt-free cash flow (DFCF) | 3,163,519 | 3,163,519 | 3,163,519 | 3,163,519 | 3,163,519 | 3,163,519 |
| | 14.7% | 14.7% | 14.7% | 14.7% | 14.7% | 14.7% |
| Residual value (DFCF/(WACC - G)) | | | | | | 24,911,647 |
| Periods to discount | 0.50 | 1.50 | 2.50 | 3.50 | 4.50 | 4.50 |
| Present value factors @ 13% | 0.9407 | 0.8325 | 0.7367 | 0.6520 | 0.5770 | 0.5770 |
| Present values | $ 2,975,921 | 2,633,610 | 2,330,665 | 2,062,615 | 1,825,351 | 14,373,043 |

Summary of indicated value as of December 31, 2003:

| | |
|---|---|
| PV of forecasted cash flows | $ 11,828,084 |
| PV of residual value | 14,373,043 |
| Business enterprise value | 26,202,127 |
| Less: Interest bearing debt outstanding (6) | 3,245,977 |
| Equity value on a controlling, marketable basis | $ 22,955,169 |

Notes:
(1) Projections based on annually growth of 0.0%.
(2) The terminal year growth rate based on long-term industry and economic growth rates.
(3) Marginal tax rate estimated based on applicable state and federal tax law for a hypothetical potential buyer (a C corporation) of 39%.
(4) Capital expenditures are expected to equal depreciation/amortization expense in perpetuity.
(5) Change in DFWC assumed to be 14% of the change in revenues. Estimated from historical financial statements and industry norms.
(6) Debt on interest-bearing debt from partner payout, as of March 3, 2004.
(7) Excludes non-recurring owner-related expense.



Jackson & Hardwick
Discounted Cash Flow Method (1)
As of December 31, 2003

Schedule 2

Summary of indicated value as of December 31, 2003:

| | |
|---|---|
| PV of forecasted cash flows | $ 12,737,924 |
| PV of residual value | 22,035,017 |
| Business enterprise value | 34,792,941 |
| Less: Interest bearing debt outstanding (6) | 3,246,977 |
| Equity value on a nonmarketable, marketable basis | $ 31,545,964 |



Schedule 3

**Jackson & Hardwick**
Discounted Cash Flow Method (1)
As of December 31, 2003

For the Years Ending December 31,

| | 2004 | 2005 | 2006 | 2007 | 2008 | Terminal (12) |
|---|---|---|---|---|---|---|
| Annual revenue growth rate | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| Net revenues | $ 23,553,004 | $ 23,678,603 | $ 24,661,344 | $ 26,106,764 | $ 27,412,102 | $ 28,234,465 |
| | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Compensation of partners and officers | 9,977,303 | 10,416,371 | 11,000,192 | 11,550,202 | 12,127,717 | 0.0% |
| | 42.3% | 44.0% | 44.2% | 44.2% | 44.2% | 44.2% |
| Salaries and wages | 315,000 | 330,750 | 347,218 | 364,632 | 312,144 | 1.4% |
| | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% | |
| Depreciable expense | 6,662,011 | 6,926,071 | 7,245,383 | 7,712,176 | 8,098,855 | 29.3% |
| | 29.3% | 29.3% | 29.3% | 29.3% | 29.3% | |
| Other expenses (17) | | | | | | 13.2% |
| Total costs | 16,955,435 | 17,672,306 | 18,593,167 | 19,021,033 | 20,609,317 | |
| | 72.2% | 72.2% | 72.2% | 72.2% | 72.2% | |
| Operating income | 5,596,569 | 5,876,398 | 6,170,218 | 6,478,729 | 6,903,665 | 23.3% |
| | 23.5% | 23.5% | 23.5% | 23.5% | 23.5% | |
| Other interest (expense) | 155,466 | 111,739 | 131,316 | 145,242 | 132,104 | 0.6% |
| | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | |
| Pre-tax income | 5,712,035 | 5,993,137 | 6,305,543 | 6,623,971 | 6,935,169 | 23.4% |
| | 23.4% | 23.4% | 23.4% | 23.4% | 23.4% | |
| Income tax (T) | 39% | 2,211,594 2,343,175 | 2,460,332 | 2,513,149 | 2,312,316 | 9.9% |
| | | 9.9% | 9.9% | 9.9% | 9.9% | |
| Net income | 3,490,441 | 3,654,963 | 3,844,212 | 4,040,622 | 4,242,653 | 4,369,933 |
| | 13.5% | 13.5% | 13.5% | 13.5% | 13.5% | 13.5% |
| Plus: Depreciation expense (4) | 315,000 | 310,750 | 347,218 | 364,632 | 312,144 | 1.4% |
| | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% | |
| Less: Capital expenditure (4) | (315,000) | (398,750) | (411,438) | (434,109) | (455,815) | (1.7%) |
| | (1.7%) | (1.7%) | (1.7%) | (1.7%) | (1.7%) | |
| Less: (Increase)/decrease in DFWC (J) | 14% (193,711) | (183,903) | (169,092) | (177,141) | (116,412) | (0.7%) |
| | (0.7%) | (0.7%) | (0.7%) | (0.7%) | (0.7%) | (117,447) |
| Debt-free cash flow (DFCF) | 3,272,070 | 3,446,972 | 3,613,910 | 3,791,618 | 3,933,299 | 4,232,448 |
| | 14.3% | 14.3% | 14.3% | 14.3% | 14.3% | 14.3% |
| Residual value (DFCF/(WACC - G)) | | | | | | 42,534,459 |
| Periods to discount | 0.50 | 1.50 | 2.50 | 3.50 | 4.50 | 4.50 |
| Present value factor @ | 13% 0.9407 | 0.8325 | 0.7367 | 0.6520 | 0.5770 | 0.5770 |
| Present values | $ 3,037,740 | 2,864,349 | 2,661,673 | 2,473,439 | 2,299,354 | 24,536,344 |

**Summary of indicated value as of December 31, 2003:**

| | |
|---|---|
| PV of forecasted cash flows | $ 13,310,747 |
| PV of residual value | 24,536,344 |
| Indicated enterprise value | 37,917,631 |
| Less: Interest bearing debt outstanding (6) | 3,213,977 |
| Equity value on a controlling, marketable basis | $ 34,648,654 |

Notes:
(1) Projection based on trends from 4th and 5th.
(2) The terminal year growth rate is based on long-term industry and economic growth rates.
(3) Marginal tax rate is estimated at both state and federal levels for a hypothetical potential buyer (a C corporation) at 39%.
(4) Capital expenditures are expected to approximate depreciation expenses over the period.
(5) Change in DFWC is estimated based on historical financial statement and industry norms.
(6) Used net interest-bearing debt from period hereof, as of March 5, 2004.
(7) Excludes non-recurring income reflecting expense.

Schedule 4

**Jackson & Hartswick**
Discounted Cash Flow Method (1)
As of December 31, 2003



|  | 2004 | 2005 | 2006 | 2007 | 2008 | Terminal [2] |
|---|---|---|---|---|---|---|
| Annual revenue growth rate | 8.0% | 8.0% | 8.0% | 8.0% | 8.0% | 3.0% |
| Net revenues | $ 23,196,347  100.0% | $ 25,052,055  100.0% | $ 27,056,219  100.0% | $ 29,220,717  100.0% | $ 31,558,374  100.0% | $ 32,505,125  100.0% |
| Compensation of partners and officers | 10,242,213  44.2% | 11,061,581  44.2% | 11,970,367  44.2% | 12,927,189  44.2% | 13,961,120  44.2% | 0.0% |
| Salaries and wages | 326,000  1.4% | 349,920  1.4% | 377,913  1.4% | 408,147  1.4% | 440,798  1.4% | 1.4% |
| Depreciation expense | 6,718,093  29.2% | 7,110,511  29.2% | 7,895,356  29.2% | 8,516,985  29.2% | 9,209,144  29.2% | 29.2% |
| Other expenses (F) | 14.8% | 14.8% | 14.8% | 14.8% | 14.8% | 14.8% |
| Total costs | 17,355,570  74.8% | 18,744,016  74.8% | 20,243,537  74.8% | 21,852,020  74.8% | 23,611,263  74.8% | |
| Operating income | 5,840,777  25.2% | 6,309,039  25.2% | 6,811,682  25.2% | 7,357,697  25.2% | 7,946,312  25.2% | |
| Other income/(expense) | 155,050  0.6% | 159,324  0.6% | 195,524  0.6% | 162,566  0.6% | 175,371  0.6% | |
| Pre-tax income | 5,699,827  25.7% | 6,447,417  25.7% | 6,965,206  25.7% | 7,520,263  25.7% | 8,121,684  25.7% | |
| Income tax (1)  39% | 2,212,211  10.2% | 2,514,461  10.2% | 2,715,659  10.2% | 2,932,902  10.2% | 3,167,555  10.2% | |
| Net income | 3,641,394  15.7% | 3,932,921  15.7% | 4,242,536  15.7% | 4,587,350  15.7% | 4,954,249  15.7% | 5,102,919 |
| Plus: Depreciation expense (4) | 324,000  1.4% | 349,920  1.4% | 377,913  1.4% | 408,147  1.4% | 440,798  1.4% | |
| Less: Capital expenditures (4) | (375,000) (1.6%) | (405,000) (1.6%) | (417,400) (1.6%) | (472,392) (1.6%) | (510,183) (1.6%) | |
| Less: (Increase) decrease in DFWC (5) 14% | (245,324) (1.1%) | (265,025) (1.1%) | (285,225) (1.1%) | (209,138) (1.1%) | (333,852) (1.1%) | (113,312) |
| Debt-free cash flow (DFCF) | 3,345,201  14.4% | 3,612,317  14.4% | 3,907,342  14.4% | 4,213,510  14.4% | 4,551,108  14.4% | 4,967,788 |
| Residual value (DFCF/(WACC - G)) | | | | | | 49,677,840 |
| Periods to discount | 0.50 | 1.50 | 2.50 | 3.50 | 4.50 | 4.50 |
| Present value factors @  13% | 0.9497 | 0.8325 | 0.7357 | 0.6510 | 0.5770 | 0.5770 |
| Present values | $ 3,146,310 | 3,007,670 | 2,874,477 | 2,741,511 | 2,625,990 | 28,664,021 |

**Summary of Indicated value as of December 31, 2003:**

| | |
|---|---|
| PV of forecasted cash flows | $ 14,402,418 |
| PV of residual value | 28,664,021 |
| Business enterprise value | 43,066,519 |
| Less: Interest bearing debt outstanding (6) | 3,148,977 |
| Equity value on a controlling, marketable basis | $ 39,917,542 |

Notes:
(1) Projections based on entity's growth of X%.
(2) The terminal year growth rate is based on long term industry and economic growth rates.
(3) Marginal tax rate is estimated based on applicable state and federal tax rate for a Professional/potential based in Corporation at 39%.
(4) Detail projections are expected to equal depreciation/amortization expense in terminals.
(5) Change in DFWC assumed to be 11% of the change in revenues. Estimated from historical financial statement and industry norms.
(6) Based on interest-bearing debt from entity balance sheet, as of March 3, 2004.
(7) Excludes non-recurring income following expense.



Schedule 4

**Morris & Schneider and Republic Title**
Discounted Cash Flow Method (1)
As of December 31, 2003



| | 2004 | | 2005 | | Twelve Years Ending December 31, | | 2007 | | 2008 | | Terminal (2) | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 3.0% | | 3.0% | 2006 3.0% | | 3.0% | | 3.0% | | 3.0% | |
| *Annual revenue growth rate* | | | | | | | | | | | | |
| Net revenues | $ 30,121,335 | 100.0% | $ 31,024,975 | 100.0% | $ 31,955,707 | 100.0% | $ 32,914,379 | 100.0% | $ 33,901,810 | 100.0% | $ 34,918,864 | 100.0% |
| Compensation of partners and officers | 15,318,974 | 50.9% | 15,781,548 | 50.9% | 16,251,904 | 50.9% | 16,739,461 | 50.9% | 17,241,645 | 50.9% | | |
| Salaries and wages | 106,617 | 0.4% | 109,815 | 0.4% | 113,110 | 0.4% | 116,503 | 0.4% | 119,998 | 0.4% | | |
| Depreciation expense | 97 | 0.0% | 99 | 0.0% | 99 | 0.0% | 93 | 0.0% | 98 | 0.0% | | |
| Interest expense | | 0.0% | | 0.0% | | 0.0% | | 0.0% | | 0.0% | | |
| Other expenses (7) | 8,743,180 | 29.0% | 9,005,662 | 29.0% | 9,275,831 | 29.0% | 9,554,112 | 29.0% | 9,840,736 | 29.0% | | |
| Total costs | 24,130,049 | 80.2% | 24,854,150 | 80.2% | 25,640,941 | 80.2% | 26,410,172 | 80.2% | 27,202,477 | 80.2% | | |
| Operating income | 5,933,270 | 29.0% | 6,109,518 | 29.0% | 6,314,764 | 29.0% | 6,503,206 | 29.0% | 6,699,333 | 29.0% | | |
| Other income (expenses) | | 0.0% | | 0.0% | | 0.0% | | 0.0% | | 0.0% | | |
| Pre-tax income | 5,933,270 | 19.8% | 6,170,337 | 19.8% | 6,314,764 | 19.8% | 6,504,206 | 19.8% | 6,699,333 | 19.8% | | |
| Income tax (3) | 39% | 2,313,385 | 7.7% | 2,379,867 | 7.7% | 2,450,738 | 7.7% | 2,535,641 | 7.7% | 2,612,240 | 7.7% | 4,270,191 |
| Net income | | 3,620,015 | 12.1% | 3,726,411 | 12.1% | 3,852,262 | 12.1% | 3,967,566 | 12.1% | 4,086,593 | 12.1% | |
| Debt free net income | | 3,620,033 | | 3,729,364 | | 3,852,062 | | 3,967,624 | | 4,086,653 | | |
| Plus: Depreciation expense (4) | | 106,617 | 0.4% | 109,815 | 0.4% | 113,110 | 0.4% | 116,503 | 0.4% | 119,998 | 0.4% | |
| Less: Capital expenditures (4) | | (150,000) | (0.5%) | (109,215) | (0.5%) | (119,133) | (0.5%) | (163,907) | (0.5%) | (169,216) | (0.5%) | |
| Less: (Increase) decrease in DFWC (5) | 16% | (135,786) | (0.4%) | (129,055) | (0.4%) | (137,339) | (0.4%) | (115,019) | (0.4%) | (141,031) | (0.4%) | (145,332) |
| Debt-free cash flow (DFCF) | | 3,442,239 | 11.3% | 3,366,172 | 11.3% | 3,673,311 | 11.3% | 3,782,304 | 11.3% | 3,896,303 | 11.3% | 4,063,599 |
| Residual value (DFCF/(WACC-G)) | | | | 1.50 | | 2.50 | | 3.50 | | 4.50 | | 40,639,317 |
| Periods to discount | 13% | 0.50 | | 1.50 | | | | | | | | 4.50 |
| Present value factors @ | 13% | 0.9405 | | 0.8235 | | 0.7287 | | 0.6510 | | 0.5770 | | 0.5770 |
| Present values | | $ 3,236,047 | | 2,961,830 | | 2,709,911 | | 2,486,714 | | 2,249,435 | | 23,448,926 |

| Summary of indicated value as of December 31, 2003: | |
| --- | --- |
| PV of forecasted cash flows | $ 13,645,951 |
| PV of residual value | 23,448,926 |
| Business enterprise value | 37,093,124 |
| Less: Interest bearing debt outstanding (6) | 33,951 |
| Equity value on a marketable minority basis | $ 37,059,824 |

**Notes:**
(1) Projections based on annually growth of 3%.
(2) Terminal year based on long-term industry and economic growth rates.
(3) Marginal tax rate is indicated based on applicable state and federal tax law for the hypothetical potential buyer (a C corporation) or 39%.
(4) Capital expenditures are expected to equal depreciation/amortization expense in perpetuity.
(5) Change in DFWC assumed to be 16% of the change in revenues. Estimated from historical financial statements and industry surveys.
(6) Based on interest bearing debt as of December 31, 2003.
(7) Excludes non-recurring revenue refunding payback.



Schedule 7

**Morris & Schneider and Republic Title**
Discounted Cash Flow Method (1)
As of December 31, 2001

| | 2004 | 2005 | For the Year Ending December 31, 2006 | 2007 | 2008 | Terminal (2) |
|---|---|---|---|---|---|---|
| Annual revenue growth rate | | | | | | |
| Net revenues | 12,756,199 | 12,211,509 | 23,113,584 | 31,546,184 | 37,212,377 | 38,443,284 |

Notes:
(1) Depreciation based on annuity growth of 0%.
(2) The terminal year growth rate based on a long term industry and economic growth rate.
(3) Marginal tax rate is estimated based on applicable state and federal tax for the S-Corporation.
(4) Capital expenditures are expected to equal depreciation expense for the prospective period.
(5) Change in DFWC assumed to be 11% of the change in revenues. Estimated from historical financial statements and industry norms.
(6) Based on interest-bearing debt as of December 31, 2001.
(7) Excludes nonrecurring owner-related expenses.

Summary of indicated value as of December 31, 2001:

| | |
|---|---|
| PV of forecasted cash flows | $ 14,119,715 |
| PV of residual value | 25,930,619 |
| Indirect enterprise value | 40,140,334 |
| Less: Interest-bearing debt outstanding (6) | 35,993 |
| Equity value on a controlling, marketable basis | $ 40,104,336 |



Schedule 9

## Jackson and Hardwick
### Historical Balance Sheets (1)

For the Years Ending December 31,

| | 2003 | | 2002 | | 2001 | | 2000 | | 1999 | | 1998 | | 5 Year CAGR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | | | | |
| **Current assets:** | | | | | | | | | | | | | |
| Cash and cash equivalents | 180,769 | 11.1% | 156,899 | 6.2% | 250,156 | 1.3% | 261,473 | 15.0% | 336,348 | 28.6% | 443,169 | 12.4% | -14.4% |
| Cash in escrow | 452,701 | 27.8% | 2,131,769 | 67.3% | 18,878,935 | 94.9% | 933,635 | 55.3% | 468,403 | 39.5% | 2,838,287 | 79.5% | -0.8% |
| Other receivables | 64,286 | 3.9% | (51,734) | -1.7% | (17,557) | -1.1% | 774 | 0.0% | 57,093 | 4.9% | 32,469 | 0.9% | 3.0% |
| Total current assets | 697,840 | 42.8% | 2,271,935 | | 19,121,534 | | 1,245,882 | | 861,844 | | 3,313,925 | | -5.1% |
| Buildings and other depreciable assets | 2,291,287 | 140.6% | 1,560,000 | 62.0% | 1,440,537 | 7.2% | 967,599 | 55.3% | 642,594 | 54.7% | 503,001 | 14.1% | 37.4% |
| Less accumulated depreciation | (1,409,490) | -86.5% | (1,109,490) | -35.0% | (686,059) | -3.5% | (492,459) | -28.2% | (319,225) | -28.0% | (255,577) | -7.2% | 42.5% |
| Intangible assets | - | 0.0% | 731 | 0.0% | 731 | 0.0% | 731 | 0.0% | 731 | 0.1% | 731 | 0.0% | -100.0% |
| Less accumulated amortization | - | 0.0% | (634) | 0.0% | (521) | 0.0% | (366) | 0.0% | (210) | 0.0% | (72) | 0.0% | -100.0% |
| Security deposits | 49,020 | 3.0% | 338,106 | 1.2% | 20,570 | 0.1% | 39,870 | 0.1% | 8,651 | 0.7% | 7,927 | 0.2% | 54.6% |
| Total assets | 1,637,106 | 142.8% | 3,149,324 | 100.0% | 19,903,520 | 100.0% | 1,748,358 | 100.0% | 1,174,737 | 100.0% | 3,570,734 | 100.0% | 8.5% |
| **LIABILITIES & CAPITAL** | | | | | | | | | | | | | |
| **Current liabilities:** | | | | | | | | | | | | | |
| Reserve for negative fees to be funded from operations | 820,570.00 | 50.4% | | 0.0% | - | 0.0% | 5,584,600 | 0.3% | 6,766.00 | 0.6% | 1,905.00 | 0.1% | 231.8% |
| Retirement payable and 401K witheld | 82,870 | 5.1% | 279,416 | 8.8% | 307,635 | 1.5% | 332,761 | 18.4% | 240,166 | 20.3% | 126,137 | 3.5% | -23.4% |
| Escrow payable | 452,701 | 27.8% | 2,131,769 | 67.3% | 18,878,935 | 94.9% | 983,635 | 56.3% | 468,403 | 39.9% | 2,838,287 | 79.5% | -0.8% |
| Total current liabilities | 1,356,191 | 83.2% | 2,411,185 | 76.1% | 19,186,580 | 96.3% | 1,310,982 | 75.0% | 715,335 | 60.5% | 2,966,330 | 83.1% | 17.3% |
| Loans from shareholders | - | 0.0% | - | 0.0% | - | 0.0% | - | 0.0% | - | 0.0% | - | 0.0% | n/a |
| Mortgage, notes, bonds payable in more than one year | - | 0.0% | - | 0.0% | - | 0.0% | - | 0.0% | - | 0.0% | - | 0.0% | n/a |
| Other liabilities | - | 0.0% | - | 0.0% | - | 0.0% | - | 0.5% | - | 0.0% | - | 0.0% | n/a |
| Total liabilities | 1,356,191 | 83.2% | 2,411,185 | 76.1% | 19,186,580 | 96.4% | 1,310,982 | 75.0% | 715,335 | 60.9% | 2,966,330 | 83.1% | 17.3% |
| Member's capital accounts | 272,915 | 16.3% | 738,339 | 23.9% | 716,940 | 3.6% | 437,276 | 25.0% | 419,244 | 39.1% | 604,404 | 16.9% | -12.2% |
| Total members' equity | 272,915 | 16.8% | 738,339 | 23.9% | 716,940 | 3.6% | 437,376 | 25.0% | 419,244 | 39.1% | 604,404 | 16.9% | -12.2% |
| Total liabilities and capital | 1,639,106 | 100.0% | 3,149,524 | 100.0% | 19,903,520 | 100.0% | 1,748,358 | 100.0% | 1,174,739 | 100.0% | 3,570,734 | 100.0% | 8.5% |
| **Working Capital Analysis** | | | | | | | | | | | | | |
| Plus: Current assets | 697,840 | | 2,273,923 | | 19,121,854 | | 1,245,882 | | | | 3,313,925 | | |
| Minus: Current liabilities | 1,356,191 | | 2,411,185 | | 19,116,530 | | 1,310,982 | | | | 2,966,330 | | |
| Plus: interest bearing current liabilities | | | (137,260) | | (64,726) | | (65,100) | | 146,109 | | 347,595 | | |
| Debt free working capital (DFWC) | (658,351) | | (100,993) | | (64,913) | | 40,655 | | 236,932 | | 347,595 | | |
| Average DFWC | (397,806) | | 16,535,982 | | 12,318,933 | | (132,251) | | 6,593,125 | | 6,904,825 | | |
| Revenues | 21,478,099 | | | | | | | | | | | | |
| Average DFWC/Revenues | -1.9% | | -0.6% | | -0.5% | | 0.6% | | 3.0% | | 5.0% | | |

**Notes:**
(1) Based on tax returns provided by Management.
n/a = not applicable

DRAFT  •  FOR DISCUSSION PURPOSES ONLY  •  DRAFT



**Morris & Schneider and Republic Title**
Consolidated Historical Balance Sheets (1)

Schedule 11

*For the Years Ending December 31,*

| ASSETS | 2003 | | 2011 | | 2004 | | 1999 | | 1998 | | 5 Year CAGR |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Current assets** | | | | | | | | | | | |
| Cash and cash equivalents | $ 1,176,210 | 60.5% | $ 1,215,883 | 63.6% | $ 1,507,264 | 71.1% | 716,971 | 44.5% | 1,100,919 | 75.4% | 10.6% |
| Trade notes and accounts receivable | 310 | 0.0% | 6,000 | 0.3% | 24,244 | 0.0% | | 0.0% | | 0.0% | n/a |
| Other current assets | 30,121 | 1.6% | 87,116 | 4.6% | 395,444 | 1.3% | 222,263 | 13.8% | 83,571 | 5.9% | -39.3% |
| Loans to share holders | 353,000 | 18.6% | 404,117 | 21.1% | | 18.8% | 400,000 | 24.9% | | 0.0% | -2.5% |
| Total current assets | 1,560,652 | 80.7% | 1,713,108 | 89.7% | 1,793,754 | 93.6% | 1,402,234 | 87.0% | 1,184,490 | 81.3% | 2.7% |
| | | | | | | | | | | | |
| Buildings and other depreciable assets | 1,435,247 | 75.9% | 1,149,724 | 60.1% | 844,661 | 44.6% | 817,005 | 31.6% | 1,267,166 | 86.8% | 16.1% |
| Less accumulated depreciation | (1,077,944) | -53.5% | (974,322) | -51.0% | (826,149) | -39.9% | (711,752) | -12.1% | (1,018,265) | -70.4% | 14.3% |
| Land | — | 0.0% | — | 0.0% | 8,492 | 0.4% | 8,492 | 1.1% | 8,492 | 0.6% | -100.0% |
| Intangible assets | — | 0.0% | — | 0.0% | — | 0.0% | — | 0.0% | — | 0.0% | n/a |
| Less accumulated amortization | — | 0.0% | — | 0.0% | — | 0.0% | — | 0.0% | — | 0.0% | n/a |
| Other assets | 12,370 | 0.5% | 15,443 | 0.8% | 8,102 | 0.4% | 12,770 | 1.6% | 26,004 | 1.8% | -14.7% |
| | | | | | | | | | | | |
| **Total assets** | $ 1,942,721 | 100.0% | $ 1,911,811 | 100.0% | $ 1,119,188 | 100.0% | $ 1,609,119 | 100.0% | $ 1,459,766 | 100.0% | 4.8% |
| | | | | | | | | | | | |
| **LIABILITIES & SHAREHOLDERS' EQUITY** | | | | | | | | | | | |
| **Current liabilities** | | | | | | | | | | | |
| Accounts payable | $ (6,037) | -0.2% | 412,503 | 21.6% | 433,772 | 22.3% | 513,000 | 54.5% | 601,644 | 41.2% | n/a |
| Mortgages, notes, bonds payable in less than one year | (1) | 0.0% | 460,487 | 20.9% | 372,531 | 17.3% | 400,000 | 21.3% | 65,005 | 4.5% | n/a |
| Other current liabilities | 0 | 0.0% | 10,561 | 0.6% | 12,114 | 0.6% | 21,122 | 2.1% | 0 | 0.0% | -100.0% |
| Total current liabilities | (6,038) | -0.2% | 883,563 | 43.1% | 818,418 | 41.0% | 934,322 | 77.8% | 666,649 | 45.7% | 77.8% |
| | | | | | | | | | | | |
| Loans from shareholders | 35,999 | 0.0% | 31,665 | 0.0% | 29,511 | 0.0% | 54,000 | 0.5% | — | 0.0% | n/a |
| Mortgages, notes, bonds payable in more than one year | (3,022) | -0.2% | | 0.0% | | 0.0% | | 0.0% | — | 0.0% | -9.0% |
| Other liabilities | | 1.5% | | 43.8% | | 43.3% | | 0.05% | — | 45.7% | n/a |
| | | | | | | | | | | | |
| **Total liabilities** | 28,338 | | 875,228 | | 912,931 | | 934,321 | | 666,649 | | -58.9% |
| | | | | | | | | | | | |
| **Shareholder's equity:** | | | | | | | | | | | |
| Common stock | 1,500 | 0.1% | 1,500 | 0.1% | 1,500 | 0.1% | 1,500 | 0.1% | 1,500 | 0.1% | 0.0% |
| Paid in capital | (5,304,144) | -263.9% | 9,604 | 0.5% | 9,604 | 0.5% | 9,604 | 1.7% | 9,604 | 0.7% | n/a |
| Retained earnings - prior year | — | 0.0% | (54,656) | -2.9% | (61,109) | -2.9% | (31,200) | -9.3% | 712,013 | 53.6% | -100.0% |
| Retained earnings - current year | 3,455,583 | 177.9% | 1,010,233 | 55.5% | 1,231,836 | 59.1% | 699,410 | 17.4% | — | 0.0% | 49.1% |
| Year to due net income | 3,661,441 | 181.5% | — | 0.0% | — | 0.0% | — | 0.0% | — | 0.0% | n/a |
| Total shareholders' equity | 1,914,386 | 91.5% | 1,036,616 | 54.2% | 1,201,161 | 56.7% | 630,597 | 38.6% | 791,117 | 54.3% | 323.5% |
| | | | | | | | | | | | |
| **Total liabilities and shareholders' equity** | $ 1,942,724 | 100.0% | $ 1,911,814 | 100.0% | $ 1,119,165 | 100.0% | $ 1,609,119 | 100.0% | $ 1,459,766 | 100.0% | 4.8% |

| Working Capital Analysis | | | | | |
|---|---|---|---|---|---|
| Plus: Current assets | 1,567,652 | 1,713,018 | 1,793,754 | 1,402,234 | 1,184,490 |
| Minus: Current liabilities | (6,031) | 823,563 | 818,470 | 934,322 | 666,649 |
| Plus: interest bearing current liabilities (1) | | 452,162 | 472,095 | 434,000 | 65,005 |
| Debt free working capital (DFWC) | 1,572,289 | 1,341,637 | 1,517,379 | 924,712 | 584,846 |
| Average DFWC | 1,456,963 | 1,429,508 | 1,815,110 | 716,779 | 584,846 |
| Revenues | 25,243,999 | 20,043,311 | 22,416,828 | 14,317,188 | 17,207,304 |
| Average DFWC/Revenues | 5.7% | 5.5% | 3.6% | 5.3% | 3.4% |

Notes:
(1) Based on source provided by Management
n/a = not applicable

**Morris & Schneider and Republic Title**
Consolidated Historical Income Statement (1)

Schedule 11

_Table: rotated multi-year financial statement. Column headings across the top: 2003, 2002, 2001, 2000, 1999, 1998, 5 Year Average, 5 Year CAGR. Row labels in the left column:_

| | 2003 | | 2002 | | 2001 | | 2000 | | 1999 | | 1998 | | 5 Year Average | | 5 Year CAGR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Annual growth | | | | | | | | | | | | | | | |
| Sales | | | | | | | | | | | | | | | |
| Operating expenses | | | | | | | | | | | | | | | |
| Compensation of officers | | | | | | | | | | | | | | | |
| Payments to partners | | | | | | | | | | | | | | | |
| Salaries & wages | | | | | | | | | | | | | | | |
| Repairs and maintenance | | | | | | | | | | | | | | | |
| Escrow (fees refunding) | | | | | | | | | | | | | | | |
| Rents | | | | | | | | | | | | | | | |
| Taxes and licenses | | | | | | | | | | | | | | | |
| Interest | | | | | | | | | | | | | | | |
| Charitable contributions | | | | | | | | | | | | | | | |
| Depreciation | | | | | | | | | | | | | | | |
| Advertising | | | | | | | | | | | | | | | |
| Pension, profit-sharing, etc. | | | | | | | | | | | | | | | |
| Employee benefit programs | | | | | | | | | | | | | | | |
| Other deductions | | | | | | | | | | | | | | | |
| Total operating expenses | | | | | | | | | | | | | | | |
| Operating income | | | | | | | | | | | | | | | |
| Other income | | | | | | | | | | | | | | | |
| Pre-tax income | | | | | | | | | | | | | | | |
| Income taxes | | | | | | | | | | | | | | | |
| Net income | | | | | | | | | | | | | | | |
| EBIT | | | | | | | | | | | | | | | |
| EBITDA | | | | | | | | | | | | | | | |

(1) Based on tax returns provided by Management
(1) Based on tax returns provided by Management
EBIT = Earnings Before Interest and Taxes
EBITDA = Earnings Before Interest, Taxes, Depreciation, and Amortization
CAGR = Compound Annual Growth Rate
n = not applicable

DRAFT ∘ FOR DISCUSSION PURPOSES ONLY ∘ DRAFT

Schedule 13

**Merged Companies**
Consolidated Historical Balance Sheet (1)

For the Years Ended December 31,

| | 2003 | | 2002 | | 2001 | | 2000 | | 1999 | | 1998 | | 5 Year CAGR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**ASSETS**

Current assets:
- Cash and cash equivalents
- Trade notes and accounts receivable
- Less allowance for bad debts
- Other current assets
- Loans to shareholders

Total current assets

Buildings and other depreciable assets
- Less accumulated depreciation
- Land
- Intangible assets
- Less accumulated amortization
- Other assets

Total assets

**LIABILITIES & SHAREHOLDERS' EQUITY**

Current liabilities:
- Accounts payable
- Mortgages, notes, bonds payable in less than one year
- Other current liabilities

Total current liabilities

Loans from shareholders
Mortgages, notes, bonds payable in less more one year
Other liabilities

Total liabilities

Shareholders' equity:
- Common stock
- Paid in capital
- Retained earnings - prior year
- Retained earnings - current year
- Year to date net income

Total shareholders' equity

Total liabilities and shareholders' equity

Working Capital Analysis
- Plus: Current assets
- Minus: Current liabilities
- Net working capital
- Plus: Interest bearing current liabilities
- Debt free working capital (DFWC)
- Average DFWC
- Revenues
- Average DFWC/Revenues

**Notes:**
(1) Based on tax returns provided Management
n/a = not applicable

Merged Companies
Consolidated Historical Income Statement (1)

Schedule 14

| | 1993 | | 2001 | | For the Years Ending December 31, | | | | | | | | 3 Year Average | | 5 Year CAGR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 19.6% | | 18.1% | | 4.2% | | -7.1% | | -13.0% | | n/a | | | | |
| | 2001 | | 2001 | | 2001 | | 2002 | | 1999 | | 1998 | | | | |

**Annual growth**
Sales

Operating expenses
Compensation of officers
Payments to partners
Salaries & wages
Repairs and maintenance
Bad debts
Rents
Taxes and licenses
Interest
Charitable contributions
Depreciation
Advertising
Pension, profit-sharing, etc.
Employee benefit programs
Other deductions
Total operating expenses

Operating income

Other income

Pre-tax income

Income taxes

Net income

EBIT
EBITDA

(1) Based on tax returns provided by Management
EBIT = Earnings Before Interest and Taxes
EBITDA = Earnings Before Interest, Taxes, Depreciation, and Amortization
CAGR = Compound Annual Growth Rate
n/a = not applicable

DRAFT ° FOR DISCUSSION PURPOSES ONLY ° DRAFT

Jackson and Hardwick Distributions to
Nat Hardwick, PC
1/1/01 - 12/31/01


| | | |
|---|---:|---|
| Regular Monthly Split | 509,600 | |
| Additional Management Monthly Split | 201,400 | |
| Bonuses | 925,405 | (See note below) |
| Auto Allowance | 13,000 | |
| Dental Insurance Deducted | (417) | |
| AFLAC Premiums Deducted | (334) | |
| Georgia Courier Distributions | 58,328 | |
| Pension/Profit-Sharing Contribution for 2000 | 25,077 | |
| Total Distributions for 2001 | 1,732,059 | |
| Estimated YTD Taxable Earnings<br>Remaining in P/S (49%) | 98,000 | |

Note:  $925,405 does not include $60,195 of loans that Nat's PC made to the Dunwoody escrow account.
These loans were paid directly to the escrow account and were netted from bonus checks to the PC.

REDACTED

-----Original Message-----
**From:** Nat Hardwick [mailto:nhardwick@closingsource.net]
**Sent:** Monday, August 06, 2007 8:35 AM
**To:** Blair, Larry (Wilson, N.C.)
**Subject:**

Larry, Good Morning! I hope your trip went great. I am closing down ALL of my old J and H accounts this week. I have to fund any shortages from the last 17 years. I need to wire $350000 to the enclosed wiring instructions. Trust me it sucks! Have a good day. Nat

1

**From:** Asha Maurya
**Sent:** Tuesday, March 19, 2013 3:55 PM
**To:** Nat Hardwick
**Subject:** FW: Wire Instructions

0319F1QCZ68C003714



Asha R. Maurya
Controller
Morris|Hardwick|Schneider
3560 Lenox Road NE, Suite 3000
Atlanta, GA 30326
Telephone: (404) 961-9000 ext 12419
efax: (678) 946 - 0285
amaurya@closingsource.net

*To ensure prompt attention, please route escrow requests to #accounting_escrow and accounts payable invoices and inquiries to #accountspayable (payables@closingsource.net).*
his communication in error) please notify the sender immediately and destroy this communication.

1