```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF GEORGIA
 2                         ATLANTA DIVISION

 3   UNITED STATES OF AMERICA         )
                                      )
 4              Plaintiff,            )    CRIMINAL ACTION FILE
                                      )    NO. 1:16-CR-65-ELR-1
 5   v.                               )
                                      )    ATLANTA, GEORGIA
 6   NATHAN E. HARDWICK IV (1)        )
                                      )
 7              Defendant.            )
     _____)

 8

 9                  TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE ELEANOR L. ROSS,
10         UNITED STATES DISTRICT JUDGE, AND A JURY

11                         VOLUME 3
                 Wednesday, September 26, 2018
12

13

14   APPEARANCES OF COUNSEL:

15   For the Plaintiff:        OFFICE OF THE U.S. ATTORNEY
                               (By:  John Russell Phillips
16                                   Douglas W. Gilfillan
                                     Lynsey Morris Barron)
17
     For the Defendant:        GARLAND SAMUEL & LOEB P.C.
18                             (By:  Edward T. M. Garland
                                     Kristen Wright Novay
19                                   Robin N. Loeb)

20

21

22        Proceedings recorded by mechanical stenography
             and computer-aided transcript produced by
23               NICHOLAS A. MARRONE, RMR, CRR
                   1714 U. S. Courthouse
24               75 Ted Turner Drive, S.W.
                    Atlanta, GA  30303
25                   (404) 215-1486
```

1                              I N D E X

2    *Witness*                                       *Page*

3    MARK WITTSTADT
            Direct-Continued (By Ms. Barron)         606
4           Cross (By Mr. Garland)                   753

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    Wednesday Morning Session

2                      September 26, 2018

3                          9:08 a.m.

4                         -- -- --

5                  P R O C E E D I N G S

6                         -- -- --

7          (In open court without a jury present:)

8          THE COURT:  I see the defense is not

9    here.  I wanted to come out before 9:15 to see if there was

10   anything we needed to take up, but we will wait.

11         Be at ease.  Do whatever you were doing.  Thank

12   you.

13         (All counsel now present.)

14         THE COURT:  Just very quickly.  We are still

15   missing about five jurors.  It's about 9:10.  We probably

16   will have to stick with the 9:30 and maybe go later.

17         We are missing eight?

18         Okay.  We are missing eight, so that number has

19   increased since the last report.  Some have disappeared.  No,

20   so we probably -- we will talk about that.  I am thinking we

21   will go 9:30 to 5:45 maybe.

22         Is there anything before we bring them in?

23         MS. BARRON:  No, Your Honor.

24         THE COURT:  Defense?

25         MR. GARLAND:  No, Your Honor.
```

1          THE COURT:  All right.  We will be at ease until we

2    are told they have all arrived.

3          (In open court with a jury present:)

4          THE COURT:  The jury is seated.  Everyone else may

5    be seated.

6          Good morning, ladies and gentlemen.  Thank you for

7    being here a little earlier than normal.  We appreciate it.

8          We are going to keep playing around with these

9    times in terms of yesterday I know we went until about

10   5:45.  That was great if it was not a problem for anyone.

11   If it was a problem, communicate that with Ms. Beck.

12         Because even though I said we are going to try to

13   stop at 4:45, if we can push it some days, I want to try to

14   do that.  I want to make sure that we kind of stay on

15   track.

16         So yesterday I said 4:45.  I hate having to change

17   things, but let's see if we can push it to at least 5:30 or

18   5:45.  Again, if that is a problem, though, let Ms. Beck

19   know.

20         I appreciate you all following instructions

21   too.  I saw one of your number this morning on the elevator

22   and he did like this, turned all the way around.

23         I said, Okay, we are not supposed to say more, but

24   we can at least say good morning.  It's okay.

25         And he said, I was just following instructions.

```
 1           So thank you very much, but it's okay.
 2           But no other -- no talking, though.  You are still
 3  doing fine.  Follow those instructions, but I just wanted to
 4  make it clear that my being the judge, not the lawyers,
 5  saying good morning was all right.
 6           So we are going to jump right back into it.
 7  Government, I think we had a witness on the stand; is that
 8  correct?  All right, he may reenter.
 9           Good morning, sir.
10           THE WITNESS:  Good morning, Your Honor.
11           THE COURT:  As you approach the witness stand,
12  I just remind you that you are still under oath.
13           THE WITNESS:  Yes, ma'am.
14                      --  --  --
15                    MARK WITTSTADT
16           being previously duly sworn by the Court,
17             testifies and says further as follows:
18                      --  --  --
19             DIRECT EXAMINATION (Continued)
20  BY MS. BARRON:
21  Q.   Good morning, sir.
22  A.   Good morning.
23  Q.   So to recap, yesterday we talked about a lot of
24  things.  Most recently we talked about the flow of
25  information about financials from the default division to
```

```
1    the closing division.  Do you remember that?

2    A.   Yes, ma'am.

3    Q.   Okay.  And then you talked about how you repeatedly were

4    asking for information about financials from the closing

5    side.  Do you remember that?

6    A.   Yes, ma'am.

7    Q.   Okay.  So now I want to focus on what information you

8    did receive from the closing side.

9    A.   Okay.

10   Q.   Now, you mentioned early in your testimony yesterday

11   that you had monthly calls with Mr. Hardwick.  Could you tell

12   the jury a little more about that?

13   A.   Yes, ma'am.  When -- starting in May 2011, or a little

14   thereafter, Mr. Hardwick and I decided and agreed that we

15   would have a standing call, and it was actually on our

16   Outlook Calendar.  If you send an Outlook invite to someone,

17   you can set it as a recurring event.

18            MR. GARLAND:  Pardon me, Your Honor.  Could we --

19   I may not have heard it.  He's talking about a conversation,

20   and he said May, and I would like to know what year we are

21   talking about so we can keep up with it.

22            THE COURT:  Okay.  And we will address those things

23   on cross going forward, but, yes, if you could go ahead and

24   specify the year?

25            THE WITNESS:  2011.
```

```
1              THE COURT:  Okay.
2    A.   We had a standing call every single month say either the
3    second Tuesday, second full Tuesday or the third full
4    Tuesday -- I'm not remembering exactly which day it was, but
5    it was a standing call, and it was at 11:00.
6         And during that call, it was myself, my brother and
7    Mr. Hardwick would have a call.
8              MR. GARLAND:  Your Honor, I ask that there be
9    questions so that it's not just a --
10             THE COURT:  Narrative?
11             MR. GARLAND:  Yeah, just not a narrative.
12             THE COURT:  Okay, understood.  At this time I don't
13   think it's gotten to that point, so I would not sustain a
14   narrative objection.
15             But just keep it Q-and-A.  But, thank you, I think
16   he can elaborate on his responses.
17             So if you can go ahead, sir.
18   BY MS. BARRON:
19   Q.   So you had these monthly calls?
20   A.   Yes, ma'am.
21   Q.   And in terms of the financial information that you were
22   receiving from Mr. Hardwick, you mentioned earlier how on the
23   closing side of the business, if you know the number of
24   closings in a month, you can kind of estimate what the profit
25   would be for the closing side?  Do you recall that?
```

A.    I said that you could estimate the total revenue from

that side.

Q.    I'm sorry, total revenue, that's right.

      And so would you all discuss the number of closings?

A.    Yes.  Mr. Hardwick would tell me that he received --

that the closing side had opened up so many title orders and

that they had closed so many transactions so far that month,

and he would tell me what he estimated based upon the numbers

that he received and things that he would look at how many

closings he anticipated the law firm would close throughout

the entire month.

Q.    Okay.  Did he talk about something called a break-even

number?

A.    Yes, ma'am.

Q.    What's a break-even number?

A.    So what Mr. Hardwick would explain to me was that based

upon his review of the financials and his -- the reports that

he would receive, if they would do fourteen hundred closings

in the month, that would cover the entire closing side's

expenses.  Their payroll, their rent, their IT expense, those

type of things.

      So once they hit fourteen hundred -- say fourteen

hundred closings, then anything that they did over top of

fourteen hundred closings would be the profit that they would

make.

1       And that number moved.  Obviously as closings -- as

2   closings began to rebound, that meant that they had to have

3   more employees in order to do it, so that number would move.

4   And Mr. Hardwick was very focused in on reducing the

5   break-even number of closings so that the profit on the

6   closing side could be maximized.

7   Q.   And in those calls, did Mr. Hardwick tell you where he

8   got the closing numbers from?

9   A.   Yes.

10  Q.   Who did he get that information from?

11  A.   He had a private assistant, secretary, her name was

12  Bobbie Christian.  She would run reports in the SoftPro

13  system and give him that information.

14  Q.   Are you familiar with the term Crystal Reports?

15  A.   That's the name of the reports.

16  Q.   Okay.  Did he say that he got those numbers ever from

17  Asha Maurya?

18  A.   He never told me he got those numbers from Asha.

19  Q.   Okay.  So you talked about the number of closings.

20  Would you all talk about expected profits overall once you

21  factor in default profits and closings?

22  A.   Yes.

23  Q.   Would you talk about expected distributions on those

24  calls?

25  A.   Yes.

1    Q.   Okay.  And I want to ask you about how distributions

2    were made in a month.

3         So if you are -- I think you said yesterday that you all

4    had moved to a monthly distribution system where you were

5    getting distributed -- if there were profits, you would get

6    your distributions on a monthly basis.  Do you remember

7    that?

8    A.   Yes.

9    Q.   Okay.  So how would that number be determined?  The

10   amount that was available, the size of the pie, how would

11   that be determined?

12   A.   We would take the closing profit that Mr. Hardwick and

13   his side would say that they made, and we would take the

14   default profit off of those P&L statements that we showed

15   earlier, you add those two together.

16        And then under the agreements that we had, Mr. Morris

17   was entitled to 10 percent off the top.

18        And then the balance of the 90 percent, 30 percent was

19   to be placed away to two different accounts, one to pay our

20   taxes and things of that nature, another to bonus our

21   employees.

22        And then the balance, the 70 percent, would be

23   distributed to myself 22 and a half percent, my brother

24   22 and and a half percent, and Mr. Hardwick was supposed to

25   get 55 percent of that 70.

1    Q.    Okay.  And in coming up with that number -- let's say

2    hypothetically June 2013, to figure out the size of the pie,

3    what profit, what month's profit would you look at?

4    A.    In June?

5    Q.    Uh-huh.

6    A.    May.

7    Q.    So at the end of May you know how much money you've

8    made, you distribute that money in June?  Is that how it

9    would work, generally?

10   A.    You wouldn't -- you would have to close the books for

11   May.  So closing the books for May usually takes ten, fifteen

12   days.

13         So by the 15th of June or so, you would know what May

14   did, you would have all the numbers together.

15   Q.    So on these monthly calls, would you all discuss

16   distribution estimates?

17   A.    Yes.

18   Q.    Okay.  And let's say that after you finished closing the

19   books the numbers don't quite add up, that the actual profit

20   is either more or less than what you estimated, how would

21   that work out?

22   A.    Well, Mr. Hardwick, we had that one standing call, but

23   he and I would have numerous calls during the month.  But we

24   would -- we had that one standing call, and then another call

25   we would have is we would also talk about how much we were

1    getting, whether that matched up to what we estimated it to

2    be.  If there was a difference, why.  Why did that occur?

3    Was there something -- was there an outlier?

4        You needed to make sure that your estimates, what you

5    were estimating, was really coming in to what it should

6    be.  Because if your estimates are wrong every month, then

7    you are doing something wrong.

8        So in order to run a business, you really need to look

9    at what your projections are and then to see what reality

10   matches up to those projections.

11   Q.   Okay.  So thinking back to the amount of distributions

12   you received every month, was it in line with what you

13   expected to receive based on your conversations with

14   Mr. Hardwick?

15   A.   It was in line with what I expected to receive, in line

16   with my conversations with Mr. Hardwick, it was in line with

17   what I -- with the default numbers that I transmitted to

18   Atlanta.

19   Q.   So you said that he received closing numbers from

20   Bobbie Christian.  Did he talk about conversations he had

21   with Asha Maurya?

22   A.   He did.

23   Q.   And what did he say about that?

24   A.   He told me that he would -- he had financial meetings

25   with Asha every single day going over what the cash flows

1    were, what expenses, how things were going, those type of

2    things.

3    Q.   And then he relayed that information -- whatever Asha

4    told him, he would relay that to you?

5    A.   I don't know whether he relayed what Asha told him to

6    me.  I can only tell you what he told me.

7    Q.   Okay.  And so was there ever a month where you get your

8    distribution and, you know, you are looking back to that

9    conversation and thinking, Wow, Mr. Hardwick said we were

10   making all this money, why am I only getting this tiny little

11   distribution?

12   A.   No, there was only that one time that I -- there was

13   that one -- in that one e-mail I asked why the difference,

14   but every other time it was right in line with what we talked

15   about.

16   Q.   Your discussions of profits made sense in light of what

17   you were getting?

18   A.   Yes.  I mean, you know, we may have said we are going to

19   make 250, we made 260, or we made 240, or we made --

20   you know, but nothing, nothing that really glared out.

21   Q.   Okay.

22           MS. BARRON:  Your Honor, at this time, and I

23   don't -- based on prior conversations I don't think there

24   will be an objection, I would like to move into evidence

25   Government's Exhibit 1004.

```
1              THE COURT:  Any objection?

2              MR. GARLAND:  Subject to our agreement.

3              THE COURT:  All right.  It's admitted subject to

4   the agreement.

5              MS. BARRON:  I'm going to set this right here for

6   now.

7              THE WITNESS:  Okay.

8              MS. BARRON:  And then I have another chunk of

9   exhibits that I want to offer.  I am going -- to just be more

10  efficient, I am going to list them.

11             This will be Government's 213 -- and,

12  Mr. Wittstadt, if you would turn over your stack, and as I go

13  through them pull them and review them.

14             213, 402, 214, 216.

15             THE WITNESS:  I don't have -- I have 214 and then

16  it goes to 403.

17             MS. BARRON:  It may be stuck together.

18             THE WITNESS:  You are right, I'm sorry.

19             MS. BARRON:  So after 216, 403, 404, 405, 120.

20             I'm sorry, am I going too fast?

21             THE WITNESS:  The paper is kind of -- I don't want

22  to miss one.

23             120 you said?

24             MS. BARRON:  120, and then 120-A, 221, 121, 226?

25             THE WITNESS:  Hold on, you are getting faster than
```

1    me.  121, 226?

2              MS. BARRON:  226, 227.

3              THE WITNESS:  Hold on, 227.

4              MS. BARRON:  230, 231, 232, and 313.

5              MR. GARLAND:  Could I ask you to repeat the last

6    three?

7              MS. BARRON:  I will.

8              THE WITNESS:  Yes, I have all those.

9              MS. BARRON:  And just for the record to make sure

10   that we are all clear:  213, 402, 214, 216, 403, 404, 405,

11   120, 120-A, 221, 121, 226, 227, 230, 231, 232, and 313.

12             MR. GARLAND:  Thank you.

13   BY MS. BARRON:

14   Q.   Okay.  Mr. Wittstadt, if you would review those e-mails

15   and tell me, do they appear to be e-mails either from Asha or

16   Mr. Hardwick, or both, to the partners of the firm discussing

17   distributions?

18   A.   213 talks about taxes and distributions.

19        402, Mr. Hardwick, Asha, talks about that, yes.

20        Yes.

21        Yes.

22        Yes.

23        Yes.

24        Yes.

25        Yes.

1        Yes.

2        Yes.

3        Yes.

4        Yes.

5        Yes.

6        Yes.

7        Yes.

8        Yes.

9        Yes, all of them do.

10   Q.   Thank you.

11             MS. BARRON:  Your Honor, at this time I would move

12   that long list of exhibits into evidence.

13             THE COURT:  Any objection to any of them?

14             Any objection to any of them?

15             MR. GARLAND:  No objection.

16             THE COURT:  All right.  They are all admitted.

17             MS. BARRON:  Thank you.

18             Okay.  At this time I am also going to mark for

19   identification purposes an exhibit that is not on our exhibit

20   list but that was shared with the defense on Friday.

21   BY MS. BARRON:

22   Q.   And, Mr. Wittstadt, I am just going to ask you to set

23   this aside and keep it for reference for now.

24             THE COURT:  I did not have 120-A on my list.  I had

25   a 120-B.  Is that the same thing?

1            MS. BARRON:  I think it is the same thing.  I had

2    marked it as 120-B and it is actually -- because there is

3    no other --

4            THE COURT:  Okay.

5            MS. BARRON:  There is just one sub-120, so that is

6    my error, and I apologize.

7            THE COURT:  Okay.

8    BY MS. BARRON:

9    Q.   Okay.  Mr. Wittstadt, I want you to keep what's been

10   marked for identification purposes only as 1034 by your side

11   as we go through these exhibits.

12   A.   Okay.

13   Q.   Let's start with Government's Exhibit 213.  What is

14   Government's Exhibit 213?

15   A.   Government's Exhibit 213 is an e-mail that starts out

16   with Bob Driskell talking about the 2011 tax returns and --

17           THE COURT:  Okay.  Your next question?

18           THE WITNESS:  I'm sorry?

19           THE COURT:  I'm sorry.  Your next question.  He

20   identified it.

21           MS. BARRON:  Thank you.

22   BY MS. BARRON:

23   Q.   And what does it talk about?

24   A.   It's talking about how much money the firm made and what

25   it reported on its tax returns, how much money Mr. Hardwick

1    got, how much money Mr. Morris got, and how much money my

2    brother Rod and I received.

3    Q.   Okay.  Ms. Fleming, if you could please turn to page two

4    and highlight --

5              MR. GARLAND:  Your Honor, is there something that

6    I can do to improve my ability to see this?  It is blurred on

7    my screen.

8              MR. GILFILLAN:  It's the same for us, Judge.

9              MS. BARRON:  Yeah, that's why we enlarge.  I was

10   going to enlarge.

11             THE COURT:  Is it enlarged now?

12             MR. GARLAND:  It is now.

13             THE COURT:  She had only initially put it on

14   there.

15             MR. GARLAND:  Right.  Yesterday it enlarged and

16   then it faded again, like now it's faded.  So we are

17   having --

18             THE COURT:  She's not enlarged it again; right?

19             MS. BARRON:  Right.

20             THE COURT:  Yes.  Yesterday some -- were a couple

21   of them actually blurry on one document about compensation,

22   that one?

23             MS. BARRON:  Yes, Your Honor.

24             THE COURT:  That one it was, but some of these, it

25   just hasn't been enlarged yet.  So she's enlarged it.  Now

1    she's taken it off.

2                MR. GARLAND:  What I'm saying is when the enlarged

3    document comes up, all of mine are blurry.  We've managed.

4    When it gets enlarged I can only see a part of the

5    document.

6                If that's the best we can do, we will work around

7    it, Your Honor.

8                THE COURT:  Okay.  I'm not sure that you are seeing

9    anything different.  When they are enlarging it, they are

10   only showing a portion of it.

11               MR. GARLAND:  I understand.  It's before it's

12   enlarged when I can't see the document.

13               MS. BARRON:  And I would like to put on the record

14   that these exhibits have been produced in electronic and

15   hard-copy form to the defense by number.

16               MR. GARLAND:  They are.

17               THE COURT:  Yes, sir.  To answer your question, we

18   will see if we can address your issues at a break.  Thank

19   you.

20               MS. BARRON:  Ms. Fleming, if you would please,

21   about the third of the way down where it says, *On October*

22   *4th*, if you can highlight the rest, or blow up -- there you

23   go, right there, if you could blow that up?  Thank you.

24   BY MS. BARRON:

25   Q.   Mr. Wittstadt, is this an e-mail from Bob Driskell?

1   A.    Yes, ma'am.

2   Q.    And remind the jury, in October of 2012, what was

3   Mr. Driskell's role at the firm?

4   A.    He was the chief operating officer of the entire firm.

5   Q.    Was he the chief operating officer?

6   A.    I mean, I'm sorry, chief financial officer of the entire

7   firm.

8   Q.    Okay.  And if you would read the first sentence there,

9   please?

10  A.              *The MHS Law tax return for 2011 shows taxable*

11              *income of $1,527,653.*

12  Q.    Okay.  And then the next sentence?

13  A.              *The K-1s show that Nat with 53.15 percent and*

14              *$811,957 of ordinary income, and Art with*

15              *46.85 percent and $715,696 of ordinary income.*

16  Q.    Okay.  Can you tell the jury what a K-1 is?

17  A.    A K-1, we talked a little bit about this yesterday.  In

18  either an S corporation or an L.L.C., they are pass-through

19  entities, so the corporation is not taxed but the

20  shareholders are.

21      So the K-1 statement was coming from the parent company

22  MHS Law P.C. and it was passing through the income to its

23  shareholders.

24  Q.    Is a K-1 a form that a corporation fills out to tell the

25  IRS how much shareholders got paid?

1   A.   Yes.   It's part of the tax return that is filed with the

2   corporate tax return.   So the corporation still has to file a

3   tax return.   It just doesn't pay income taxes.

4        Because what it does is it passes through the income,

5   all of the income, to its shareholders, for those

6   shareholders to then take that K-1 statement, attach it to

7   his or her personal income tax returns, to show the

8   United States and to the State of Georgia, or the State in

9   Maryland in my case, how much money you made above and beyond

10  your salary, which you get a W-2 for.

11  Q.   And how much money is Mr. Driskell saying that

12  Mr. Hardwick made for fiscal year 2011?

13  A.   It is saying that he -- $811,957.

14  Q.   And total firm income, a little over $1.5 million?

15  A.   Yes, ma'am.

16  Q.   Ms. Fleming, if you could enlarge the sentence right

17  above this portion from Mr. Hardwick?

18       And what is his response?

19  A.              *Sounds right.  Mark and I will get a slight*

20              *bonus from Holabird to even that up.  That should*

21              *fix 2011.*

22  Q.   Okay.   So he's affirming that that's what he received in

23  2011?

24  A.   That's what it appears to say.

25              MR. GARLAND:   Objection, leading.

1          THE COURT:  Overruled.

2    BY MS. BARRON:

3    Q.   Ms. Fleming, if you can turn to Government's 1005, which

4    was admitted yesterday, page one.

5          Mr. Wittstadt, if you look at the bottom right-hand

6    corner of the document, do you see where it says December

7    2011 year-to-date total?

8    A.   Yes.

9    Q.   I will represent to you that this is an exhibit that

10   was introduced yesterday summarizing what the government

11   believes are the total amount of payments that Mr. Hardwick

12   received not including salary in 2011.  How much is that

13   figure?

14   A.   $1,275,999.82.

15   Q.   And is that more than he had affirmed in that e-mail

16   that we just discussed, Government's 213?

17   A.   That was significantly more than what he was entitled

18   to.

19   Q.   Okay.  If we could look at Government's 402?

20        Oh, let me ask you, before we start discussing --

21          MR. GARLAND:  I'm going to object to that in that

22   he is rendering an expert opinion as an accountant.

23          THE COURT:  Overruled.

24   BY MS. BARRON:

25   Q.   Two questions before we move to Government's 402.

1      Did you know that Mr. Hardwick had received that much

2   money?

3   A.   No, I did not.

4   Q.   Second question:  This is October 2012.  You testified

5   yesterday that you all were operating under this Maryland

6   agreement even though the Maryland corporation didn't really

7   come to be.  Do you remember that testimony?

8   A.   Yes, ma'am.

9   Q.   Okay.  And so in October of 2012, you are several months

10  into that agreement; correct?

11  A.   Yes, ma'am.

12  Q.   Is Mr. Hardwick pushing back at all on you and your

13  brother receiving equity portions of the firm's profits at

14  this point?

15  A.   No, ma'am.

16  Q.   Okay.  Now, if you could look at Government's 402,

17  please?

18      Okay.  And you are not copied on this e-mail.  Can you

19  explain to the jury who this e-mail is from, who it's to, and

20  what it's discussing?

21  A.   The e-mail is from Mr. Hardwick to Asha Maurya.

22  Q.   Okay.  And what --

23  A.   It's discussing a distribution in the total amount of

24  $275,000.

25  Q.   Okay.  And is that what Ms. Maurya is telling

1    Mr. Hardwick that's what we are going to distribute?

2    A.    *We can comfortably do 275.*

3    Q.    And of that amount, how much is Mr. Hardwick supposed to

4    receive?

5    A.    $110,000.

6    Q.    Okay.  And how much are you supposed to receive?

7    A.    $34,375.

8    Q.    Ms. Fleming, if you would turn to Government's 1004, and

9    bring up page 22 of the summary.

10        Okay.  So if you look at this chart, which the

11   government will show through a later witness represents all

12   of the payments that went to Mr. Hardwick for October 2012,

13   do you see that $110,000 payment in distributions that he's

14   entitled to receive?

15   A.    I see it.

16   Q.    Do you see extra money?

17   A.    I see significantly more money.

18   Q.    And how much did he receive in that month?

19   A.    $706,567.55.

20   Q.    Okay.  Let's stay here a minute and walk through some of

21   these numbers.

22        Do you see at the top October 1st, 2012, a payment from

23   operating for $32,930.77 to Fortuna?

24   A.    I do.

25   Q.    Do you know what that is?

1    A.   Yes.

2    Q.   What is that?

3    A.   We talked about this yesterday.   Under the agreements --

4    Mr. Hardwick owed Fidelity, Fortuna, he borrowed three

5    million dollars from them back in 2005.

6    Q.   Mr. Wittstadt, could you please speak into the

7    microphone?

8    A.   I'm sorry.   Back in 2005 Mr. Hardwick borrowed three

9    million dollars from Fidelity.

10        Under our agreements, the firm -- when we negotiated the

11   agreements, we were told that -- my brother and I were told

12   that that was Mr. Hardwick's personal obligation to repay,

13   but yet the firm had been, as a courtesy to him, had been

14   making those payments for him.

15        So when we negotiated the agreements between us, that

16   $32,930 the firm would pay, and it would be deducted from his

17   hundred -- in this case it should have been deducted from

18   $110,000.

19   Q.   Okay.   $50,000 to Julie Callaway on October 5th,

20   2012.   Do you know who Julie Callaway is?

21   A.   I do.

22   Q.   Who is she?

23   A.   That is Mr. Hardwick's ex-wife.

24   Q.   Do you know what this $50,000 payment is?

25   A.   It's a payment to her.

```
1    Q.   Okay.  Did you ever discuss with Mr. Hardwick the firm

2    sending money to his ex-wife?

3    A.   Never.

4    Q.   Okay.  These other payments, $100,000, $173,000,

5    $240,000, they go to an entity called Divot Holdings L.L.C.

6    Do you know what that is?

7    A.   Yes, I do.

8    Q.   What is it?

9    A.   It's Mr. Hardwick's personal holding company.

10   Q.   Did you ever discuss these extra payments going to

11   Mr. Hardwick?

12   A.   No.

13   Q.   Did he receive unanimous vote of the board of directors

14   before receiving these extra payments?

15   A.   I never agreed to it.

16   Q.   Okay.  Ms. Fleming, if we could go back to Government's

17   402, and if you could turn to page two and highlight the top

18   half of that page, please?  I'm sorry, enlarge and

19   highlight.

20        Mr. Wittstadt, did you even know that those extra

21   payments were going to Mr. Hardwick, other than the Fortuna

22   loan that you mentioned?

23   A.   I knew about the Fortuna and 110.

24   Q.   Did you know about the rest of them?

25   A.   No.
```

1   Q.   If you look at this e-mail, so this is the chart that we

2   just discussed, and what is Mr. Hardwick's response to

3   Ms. Maurya here at the top?

4   A.   *Send mine to Merrill Lynch.*

5   Q.   Okay.  Does he say make sure you deduct the Fortuna loan

6   from mine?

7   A.   No.

8   Q.   Does he -- did he ever say to you, You know what,

9   I got all this extra money, I need to true up what I owe

10  you?

11  A.   No.

12  Q.   Okay.  If you would turn to Government's Exhibit 214,

13  please?

14  A.   Can I put this one aside?

15  Q.   Yes, you may.  I think we are done with that.

16       And, Ms. Fleming, if you would please enlarge?  Thank

17  you.

18       Okay.  What's the date of this e-mail?

19  A.   November 14th, 2012.

20  Q.   Still under the Maryland agreement?  Is this during the

21  time where you were still operating under the Maryland

22  agreement?

23  A.   Yes, ma'am.

24  Q.   Okay.  And read the first few sentences there?

25  A.   Okay.

1          *Good afternoon.  I hope you are having a great*
2          *day.*
3              *We are going to do a disbursement on Friday*
4          *for October.  The plan was to do about six hundred*
5          *thousand.  After the numbers came in, we are*
6          *probably going to do about three hundred*
7          *thousand.  This was the profit that closing*
8          *did.  I was not expecting the loss to be so big in*
9          *foreclosure.*
10             *I know things slowed down and we have a big*
11         *first quarter, so no big deal.  Looks like*
12         *foreclosure lost about eight hundred and fifty*
13         *thousand, which includes about five hundred K in*
14         *bonuses.*
15             *Did I mention, I hate paying bonuses on*
16         *accrual?*
17     Q.   Okay.  So when you read that, *It looks like we are*
18     *probably going to do about three hundred thousand*, what does
19     that mean to you?
20     A.   That he's estimating that we are going to do a $300,000
21     disbursement in accordance with our agreements and each of us
22     get our proportionate share.
23     Q.   And do you understand that to be the total amount that's
24     disbursable to all of the partners?
25     A.   Yes, ma'am.

1    Q.   Ms. Fleming, if you could please pull up Government's

2    1004 and turn to page 23, and then enlarge it.  Thank you

3    very much.

4         Okay.  So the total amount for everyone is three hundred

5    thousand according to Mr. Hardwick.  If you look at this, in

6    the month of November 2012, how many payments does he

7    receive?  What's the total amount of payments?

8    A.   $417,930.77.

9    Q.   Okay.  And we see here that some of that money appears

10   to have come from operating, some from the trust account.

11   Did you know at this time that any money was coming out of

12   escrow?

13   A.   No.

14   Q.   Would you have assumed that some of the money could have

15   come from escrow?

16   A.   Never.

17   Q.   Why not?

18   A.   It's not our money.

19   Q.   Okay.  When you say not our money, what do you mean by

20   that?

21   A.   It's other people's money.  They are trust accounts.

22        We as lawyers are entrusted with other people's

23   funds.  The rules of professional conduct do not allow us to

24   do that.  It's just the first thing they teach you in law

25   school, don't touch other people's money.

1    Q.   Okay.  Thank you, sir.

2         Do you see this payment on November 2nd to First

3    Citizens Bank for $60,000?

4    A.   Yes, ma'am, I do.

5    Q.   Do you know what that was for?

6    A.   I understand what it is for now.

7    Q.   When did you learn that?

8    A.   After -- after Mr. Hardwick's resignation.

9    Q.   What did you learn?

10   A.   Mr. Hardwick had a judgment against him.

11   Q.   Personal judgment?

12   A.   Yes.

13   Q.   And does it appear that the law firm was paying that

14   judgment?

15   A.   It does now.

16   Q.   If you look at the 11-30-12, November 30th, 2012,

17   payment to Colony Bank for five thousand, do you know what

18   that was for?

19   A.   I understand the same thing.

20   Q.   Was it a payment of a personal judgment?

21   A.   Yes.

22         MS. BARRON:  Thank you, Ms. Fleming.

23   BY MS. BARRON:

24   Q.   Okay.  And one thing I have not been doing, if you turn

25   back to what's been marked as 1034 -- this has not been

1    admitted -- do you see where it says October 2012, and in the

2    middle column it says $110,000?

3    A.    Yes.

4    Q.    Is that the amount -- have you reviewed this chart

5    before coming in today?

6    A.    I have.

7    Q.    And is that $110,000 the amount that is expressed in the

8    chart in Government's Exhibit 402?

9    A.    That's the amount that is expressed in that and the

10   amount that I believe Mr. Hardwick was receiving.

11   Q.    Okay.  And in November 2012, do you see where it says

12   $165,000?

13   A.    Yes, ma'am.

14   Q.    And do you know what that number represents?

15   A.    That's the amount that he should have received basically

16   off of the three hundred.

17   Q.    Okay.  And is that number actually a little bit high?

18   Is that 55 percent?

19   A.    Take 300, take off $30,000 for Mr. Morris, that leaves

20   you with 270.  Then take off 30 percent to be put into the

21   reserve accounts, and then he would get 55 percent.  I don't

22   have have my calculator, so --

23   Q.    Well, let me ask you, in November of 2012, what share of

24   the equity was Mr. Hardwick entitled to?

25   A.    2012?  I'm sorry, I didn't have -- I did not have 22 and

1   a half percent.  I had 12 and a half, my brother Rod had 12

2   and a half.

3       I would have to look back at the exhibit to know exactly

4   that amount at that point in time.

5   Q.  Ms. Fleming, if you would please pull up Government's

6   980 at page 32?

7       And 980, as we established yesterday, is the

8   Maryland agreement.  And if you would highlight that

9   chart?

10      And in the middle it says as of the execution of the

11  agreement, what percentage of the profits is Mr. Hardwick

12  entitled to under the Maryland agreement?

13  A.  As of -- 40 percent.

14  Q.  Okay.  So what is 40 percent of $300,000?

15  A.  Can I borrow somebody's phone with a calculator on it?

16  They wouldn't allow me to bring mine in.

17  Q.  Okay, that was an unfair question.  Is it less than

18  $165,000?

19  A.  Forty -- 10 percent of $300,000 is $30,000, times four

20  is 120.

21  Q.  Thank you, sir.

22      Okay.  And so is the amount $165,000, is that actually a

23  little more than he was entitled to?

24  A.  Yes.

25  Q.  Okay.  Now, if we could look at Government's 216?

1        Now, yesterday you discussed with the jury that there

2   was a time where you all agreed to borrow off the Action

3   Capital line of credit, the factoring line, to pay

4   distributions.  Does that e-mail at the very bottom, does

5   that discuss that transaction?

6   A.   Yes.

7   Q.   Okay.  And then if you would highlight the next e-mail

8   up from Mr. Ritterman?

9        What is Mr. Ritterman saying here?

10  A.   He says:

11               *Got it on the calendar.  Be sure that your*

12               *hatch is locked down tight.  We might be running*

13               *cash flow negative for some 80 days because our*

14               *receivables are continuing to grow and clients are*

15               *slower to pay.*

16  Q.   Okay.  So what's the message Mr. Ritterman is trying to

17  send?  What does make sure that your hatch is locked down

18  tight, what did you understand that to mean?

19  A.   The same thing that I was telling Nat when he wanted to

20  do that.  It's like, Look, that's going to make it tight.  We

21  are going to be tight come January and February.

22       Because closings -- the closing market in January and

23  February is not good.  It never is.  People just don't buy

24  homes in January and February.  It's cold.  They just

25  don't.  Springtime is a good market.

1      Default market, it's the holidays, so the financial

2  banks, financial institutions, they don't like to -- they

3  don't want to cause people problems over the holidays.  So

4  they slow that down.

5      So things slow down, and they don't pick up again.

6  That's all.

7  Q.   Okay.  And, Ms. Fleming, if you could highlight

8  Mr. Hardwick's response to this e-mail right above that?

9      What does he say?

10  A.   *I understand*.

11  Q.   *Have a great holiday*?

12  A.   *Have a great holiday.*

13  Q.   Okay.  Thank you.

14      Now, if you can look at Government's 403?

15      Okay.  What is Government's 403?

16  A.   Rod, my brother Rod sent an e-mail to Asha dated

17  Thursday, February 14th, 2013.

18              *Are you making a distribution to me?  If so,*

19          *how much?  Are you going to -- and how are you*

20          *going to get it to me?*

21  Q.   Okay.  And if you look at the second page there, similar

22  kind of chart that we have seen before, breaking down the

23  distributions?

24  A.   Yes.

25  Q.   And how much is Mr. Hardwick supposed to receive?

1    A.    For January, $198,000 even.

2    Q.    Okay.  And at this point, this is February 2013, are you

3    all operating under the new agreement?

4    A.    At that point, yes.

5    Q.    Okay.  So if we look at these numbers, it says four

6    hundred thousand dollars total.  Mr. Morris gets 10 percent

7    off the top?

8    A.    Yes.

9    Q.    And then I think you said the 90 percent is divided

10   among the percentages?

11   A.    Right.

12   Q.    Mr. Hardwick gets how much?

13   A.    198.

14   Q.    I mean, what's his percentage?

15   A.    At that point?

16   Q.    Yes, sir.

17   A.    55.

18   Q.    Okay.  Ms. Fleming, if you could turn to Government's

19   1004, page 26, and if you would highlight that chart?

20         So Mr. Hardwick is supposed to get $198,000.  How much

21   does he actually get?

22   A.    $1,080,305.78.

23   Q.    Okay.  So we see the same Colony Bank that you talked

24   about earlier.  Do you see that payment for ten thousand

25   dollars?

1    A.    Yes.

2    Q.    We see the Fortuna payment?

3    A.    Two, two Fortuna payments.

4    Q.    Do you know what that second one is for?

5    A.    No.

6    Q.    Then there is a third payment to NetJets.  Do you know

7    what that is?

8    A.    I do now.

9    Q.    What is it?

10   A.    Mr. Hardwick had a judgment entered against him by

11   NetJets because he didn't pay them for the flights he took.

12   Q.    Was that a personal judgment?

13   A.    It is.

14   Q.    Did you know that the firm was paying that personal

15   judgment for him?

16   A.    No.

17   Q.    Okay.  We see another payment to Julie Callaway?

18   A.    I see it.

19   Q.    First Citizens.

20         This Campbell & Brannon L.L.C. for $680,000, do you know

21   what that is?

22   A.    I know exactly what that is.

23   Q.    What is that?

24   A.    Mr. Hardwick collapsed his prior escrow accounts to that

25   tune of money and used it to buy his condominium at the

1    St. Regis.

2    Q.    That's a down payment on his house?

3    A.    That's what it is.

4    Q.    Did you know at the time that the firm was making the

5    down payment on his house?

6    A.    No.

7    Q.    Would you have approved that transaction?

8    A.    No.

9    Q.    Okay.  And then the final one to American Express for

10   $63,000.

11         Ms. Fleming, if you would turn to page 498 of

12   Government's 1004, and if you could enlarge the e-mail at the

13   top?

14         Who is this e-mail from?

15   A.    Asha to Mr. Hardwick.

16   Q.    And what's the date?

17   A.    February 27, 2013.

18   Q.    And do you see where it says Fed ref?

19   A.    Yes.

20   Q.    Do you know what that is?

21   A.    I know, yes, ma'am.

22   Q.    What is that?

23   A.    When you wire money, you call your bank up and you wire

24   money, however you do that, they give you a reference number

25   that it went through the Federal Reserve to show that it

1    went, and that's what that is.

2    Q.    And now, Ms. Fleming, if you could highlight the

3    contents of that e-mail, this screenshot?

4          Okay.   Is this a screenshot of that $63,000, if you look

5    kind of in the middle in that gray line there?

6    A.    Yes, it is.

7    Q.    Okay.   And do you see where it says ordering customer

8    account?

9    A.    Yes, ma'am.

10   Q.    Do you see where it says ordering customer address

11   one?

12   A.    Yes, ma'am.

13   Q.    What account is that money being wired out of?

14   A.    Escrow account.

15   Q.    How do you know that?

16   A.    It says Georgia IOLTA.   IOLTA means Interest on

17   Attorneys Trust Accounts.

18   Q.    So Mr. Hardwick is receiving a screenshot of a wire from

19   a trust account?

20   A.    Yes, ma'am.

21   Q.    And what's the date on this e-mail again?

22   A.    February 23rd, 2013.

23   Q.    Thank you, sir.

24         If you could look at Government's Exhibit 403?

25         I'm sorry, we were just on 403 weren't we?

1        If you would look back to that chart that I asked you to

2   set aside, Government's 1034, where it says February 2013?

3   A.   Yes, ma'am.

4   Q.   $198,000, is that the amount reflected in Government's

5   403?

6   A.   Yes, ma'am.

7   Q.   Now let's look at Government's Exhibit 404.

8        Okay.  Now, who is this e-mail from?

9   A.   From myself to Asha Maurya.

10  Q.   And the date?

11  A.   March 22nd, 2013.

12  Q.   Okay.  And what is this e-mail about?

13  A.   Money that I will be receiving.

14  Q.   Okay.  And what does she tell you, if you look about a

15  third of the way down, the total disbursement will be?

16  A.   $350,000.

17  Q.   Okay.  And what is your share of that?

18  A.   Under my agreement, it was $70,875.

19  Q.   Okay.  And ballpark about what would be Mr. Hardwick's

20  55 percent share of the 90 percent?  And I can get you a

21  calculator if that will help?

22  A.   I would appreciate it.

23  Q.   Okay.  So it's a $350,000 pie?

24  A.   Oh, you have got a funny one.

25  Q.   Mr. Morris gets how much off the top?

1    A.    Ten percent.

2    Q.    Okay.

3    A.    That would leave $315,000.

4          And then times .70 would leave 220.

5          And at that point in time, Mr. Hardwick should have

6    received -- times .55 -- he would be receiving $121,275.

7    Q.    Okay.  And so if you look at the March 2013 line on

8    Government's 1034, is what he was entitled to actually less

9    than what was represented here?

10   A.    You have got $192,500, which would be that on the 350.

11   Q.    Right.

12   A.    So if we just did it off the 350, then that would be

13   correct?

14   Q.    So he's actually entitled to less than that; is that

15   correct?

16   A.    Yes.

17   Q.    Okay.

18   A.    Assuming the money was withheld, the 30 percent, yes.

19   Q.    And the date here is important.  What is the date that

20   you are being told this is what's available?

21   A.    March 22nd, 2013.

22          MS. BARRON:  Your Honor, at this time -- and

23   I believe we have a stipulation of this -- I would like to

24   offer Government's Exhibit 2.

25          THE COURT:  So stipulated?

1        MR. GARLAND:  Yes.

2        THE COURT:  All right.  It's admitted upon

3   stipulation.

4   BY MS. BARRON:

5   Q.   Mr. Wittstadt, I'm showing you Government's Exhibit 2.

6        Have you seen this document before?

7   A.   I have seen a lot of e-mails, but I think I have seen

8   this one before.

9   Q.   Okay.  Ms. Fleming, if you could please pull up the

10  first page of Government's 2, and if you would highlight the

11  date on that e-mail?

12       Who is that from?

13  A.   Ms. Maurya.

14  Q.   Who is it to?

15  A.   Mr. Hardwick.

16  Q.   What's the date?

17  A.   March 19th, 2013.

18  Q.   Is that two days before you had just been told the total

19  amount for everyone is $350,000?

20  A.   Yes.

21  Q.   Okay.  And, Ms. Fleming, if you could please highlight

22  the screenshot that is reflected in Government's Exhibit 2?

23       What is the amount that is being wired here?

24  A.   $350,000.

25  Q.   And who is the recipient of this wire?

1    A.    Cosmopolitan Casino in Las Vegas.

2    Q.    And where is this money coming from, if you look down

3    to --

4    A.    The Georgia IOLTA trust account.

5    Q.    -- ordering customer address?

6          And this information is being sent to Mr. Hardwick?

7    A.    Yes, it is.

8    Q.    And so two days later you are told the entire pie for

9    everyone is $350,000.

10         Ms. Fleming, if we could please pull up Government's

11   Exhibit 1004, and go to page 27.

12         Mr. Wittstadt, how many payments to or for

13   Mr. Hardwick's benefit were made from the firm in March

14   2013?

15   A.    Eight.

16   Q.    And what's the total?

17   A.    $1,002,930.77.

18   Q.    Okay.  Do you see that wire to the Cosmopolitan for

19   $350,000?

20   A.    I do.

21   Q.    And eleven days before that, how much money was sent to

22   Divot Holdings?

23   A.    $350,000.

24   Q.    Three days before that, how much was sent to

25   Nat Hardwick?

```
 1   A.   $50,000.

 2   Q.   Four days before that, how much was sent to Divot

 3   Holdings?

 4   A.   $100,000.

 5   Q.   Did you know about any of these payments?

 6   A.   No, ma'am.

 7   Q.   Would you ever have approved these payments going to

 8   Mr. Hardwick --

 9   A.   No, ma'am.

10   Q.   -- or for his benefit?

11   A.   No, ma'am.

12   Q.   Did he say, I have got some client event at the

13   Cosmopolitan and I need $350,000?

14   A.   No, ma'am.

15   Q.   And assume that he had said that, would you have

16   allowed that?  Would your vote have been to approve that

17   expense?

18   A.   We voted and negotiated the Tour Championship.

19            THE COURT:  I'm sorry.  Answer her question first.

20   A.   No.

21   Q.   Thank you, sir.

22        If you could look at Government's Exhibit 405, please?

23   A.   405?

24   Q.   Yes, sir.

25   A.   Am I done with Exhibit 2?
```

1   Q.   You are.

2   A.   Would you like this one back?

3   Q.   You can just put it there on that stack.

4   A.   I will put it here.

5   Q.   Thank you, sir.

6        And what's the date on Government's Exhibit 405?

7   A.   April 19th, 2013.

8   Q.   Okay.  And if you look to page two, Ms. Fleming, and if

9   you will highlight the bottom half?

10       Do you see where it says total disbursement, $370,375?

11  A.   Yes, ma'am.

12  Q.   And so what is Ms. Maurya telling you your share of that

13  is going to be?

14  A.   $75,000.

15  Q.   Okay.  So if the total of everyone is $370,000, do you

16  expect Mr. Hardwick to be getting something less than that?

17  A.   I expect him to be -- when I looked at these, I always

18  expected him to get a little bit more than twice what I got.

19  Q.   Okay.  55 percent of whatever the pie is?

20  A.   Right.

21  Q.   Okay.  And if you would look to Ms. Maurya's e-mail

22  right above that beginning *I will*, what is she saying

23  here?

24  A.   *I will be sending a true-up distribution in the amount*

25  *of $21,075 today.*

1    Q.    Okay.  This is something we kind of talked around but we

2    haven't really addressed.  As you and your partners used that

3    term, what did true-up distribution mean?

4    A.    We got used to distributing once a month quarterly --

5    I mean, once a month, around the 15th.  So we knew what our

6    estimates were, but sometimes the final numbers hadn't -- not

7    every number was in.

8         So we would -- it happened very rarely, but occasionally

9    the books weren't completely closed, and we would estimate

10   say 350, and it may have came in at 375.

11        And I got a distribution based upon the 350, and then

12   when the books actually closed it was really 375, or 250,

13   275, something like that.

14   Q.    Okay.  So was it to account for the difference between

15   the estimated disbursement and then the actual, what was

16   actually available?

17   A.    Yes.

18   Q.    Did you ever in the context of true-up receive money

19   from Mr. Hardwick?

20   A.    I did not.

21   Q.    Were you ever aware of him sending money back to the

22   firm as part of a true-up?

23   A.    No.

24   Q.    Okay.  And, Ms. Fleming, if we look at Government's

25   1004, page 28, please?

1     Mr. Wittstadt, in April 2013, what is the total amount

2  of payments that went to Mr. Hardwick or were made on his

3  behalf?

4  A.    $711,375.01.

5  Q.    And is that more than the amount that Ms. Maurya told

6  you was available for distribution?

7  A.    Yes, ma'am.

8  Q.    So let's just thought-experiment here.  If Mr. Hardwick

9  is entitled to this much money, about how much profit should

10 the firm have made in April of 2013?

11 A.    1.5 million.

12 Q.    The whole time you were a partner, did you ever hear of

13 the firm making that much profit in a single month?

14 A.    No.

15 Q.    Were you aware that Mr. Hardwick was receiving all of

16 these payments?

17 A.    No.

18 Q.    Did he ask for a vote of the board of directors before

19 receiving any of these payments?

20 A.    No.

21 Q.    If you could turn to Government's 120, please, and if

22 you would please enlarge the first third?  Thank you.

23      Mr. Phillips raises a good point.  If Mr. Hardwick

24 received $711,000 in April of 2013, how much should you have

25 received?  If that's 55 percent, what would your share have

1   been, ballpark?

2   A.   350.

3   Q.   Did you ever receive anything near that much in a single

4   month?

5   A.   No.  The biggest one I received was $139,000.

6   Q.   Okay.  And we will talk about that in a minute.

7        So back to 120, what's the date on this e-mail?

8   A.   June 5th, 2013.

9   Q.   Okay.  And who is the e-mail from?

10  A.   Mr. Hardwick.

11  Q.   And it is to?

12  A.   Myself, my brother, and cc'ed Mr. Ritterman, Mr. Morris,

13  Mr. Schneider, and Asha Maurya.

14  Q.   Okay.  And what is he saying?

15  A.   May results.

16  Q.   And if you would please read what he writes in this

17  e-mail?

18  A.            *Good morning.  I hope everyone is having a*

19            *great day.  It looks like we will break 2,300*

20            *closings in May.  This will be our best month since*

21            *June 2009.  We should make about 550K on that*

22            *number.*

23            *The centralized model has really helped with*

24            *our profitability.  June should be very*

25            *similar.  Have a great day.  Nat.*

1    Q.    Okay.  So the $550,000, is that just for the closing

2    operation?

3    A.    That's what he would -- yes.

4    Q.    So you would then factor in whatever you all made in

5    default?

6    A.    Yes.

7    Q.    And I know you don't remember off the top of your head

8    what you made in default, but, Ms. Fleming, if you could

9    please bring up Government's 1004, page 30?

10         Mr. Wittstadt, how much money to Mr. Hardwick or for his

11   benefit was paid out from the firm in June 2013?

12   A.    $1,218,499.40.

13   Q.    Okay.  So if that is how much he's entitled to, what

14   would the firm profit had to have been?

15   A.    2.5 million.

16   Q.    Okay.  Well, if the closing side did only $500,000, did

17   the default side bring in two million that month?

18   A.    No.

19   Q.    Did the default side ever bring in two million?

20   A.    In a month?

21   Q.    In a month.

22   A.    No.

23   Q.    Did it ever bring in anything close to two million in a

24   month?

25   A.    No.

```
1    Q.    If you look at these payments here, did you know that

2    any of these payments were being made to Mr. Hardwick or for

3    his benefit?

4    A.    No.

5          Oh, well, yes.  The $32,930.77 I knew was to be paid.

6    Q.    Okay.  But none of the other payments that we have

7    talked about?

8    A.    No.

9    Q.    And to your knowledge, was that Fortuna payment ever

10   deducted from his distributions?

11   A.    Not to my knowledge.

12   Q.    Okay.  I want to go to Government's Exhibit 120-A very

13   quickly.

14         Now, you said that profit for June 2013 per

15   Government's 120 is $550,000.  If we look at the bottom

16   there, Ms. Fleming, if you would please highlight the very

17   last e-mail on that page?

18   A.    Which am I --

19   Q.    This is Government's 120-A.  I apologize for moving

20   around.

21   A.    Okay.

22   Q.    I want to stay in June of 2013 for a minute.

23         Okay.  Who is this e-mail from?

24   A.    Well, it starts off from Bobbie to Nat.

25   Q.    And what is she saying to him in this e-mail?
```

1  A.   She's talking about those Crystal Reports and talking

2  about the number of closings that will happen.

3  Q.   And SoftPro, is that that system you were talking about

4  that generates the closing numbers?

5  A.   SoftPro is a case management system that is utilized by

6  certain -- by closing firms to manage the file, the escrow

7  accounts, the closing practice.

8  Q.   And if you would highlight or enlarge, please, the top

9  half of the e-mail, Ms. Fleming?

10      So he gets this closing number from Bobbie Christian,

11 and then what does Mr. Hardwick write to Asha Maurya?

12 A.   *Profit at this number should be 550, question mark.*

13 Q.   And what does she respond?

14 A.   *Yes, it will be close to 550.*

15 Q.   And his response?

16 A.   *Cool.  It will be so fun when we have a budget.*

17 Q.   Is this an example of Mr. Hardwick getting the financial

18 information from Ms. Christian which you talked about

19 earlier?

20 A.   Yes.  Well, the closing numbers, yes.

21 Q.   And from the closing number, you can estimate what the

22 profit will be -- or I'm sorry, what the revenue will be?

23 A.   And then you understand what your break-even is, and

24 then it's just -- it's just basic math, plus, minus,

25 multiply, divide.

1    Q.    Okay.  Thank you, sir.

2          If you would please turn to Government's 221?

3          We are still in June.  Now, Government's Exhibit 221,

4    I want you to start on page three.  Ms. Fleming, if you could

5    please enlarge the top half of that e-mail?

6          So June 19th, 2013 --

7    A.    Where am I, on the last page?

8    Q.    We are on page three, sir.  I'm sorry.

9    A.    Page three.

10   Q.    Okay.  We see another one of those charts?

11   A.    Yes.

12   Q.    And how much is Asha Maurya telling you that

13   Mr. Hardwick will receive in June based on the May results?

14   A.    We are going to distribute $470,000.  Mr. Hardwick would

15   receive $232,650.

16   Q.    Thank you, sir.

17         And is it your understanding that that is all

18   Mr. Hardwick was going to get?

19   A.    That's all he was entitled to.

20   Q.    And the date is June 19th?

21   A.    June 19th.

22   Q.    Okay.  If you would look at page four, and if you would

23   enlarge the top half there?

24         So this is two days later.  Mr. Hardwick is asking

25   Ms. Maurya what question?

1  A.   *How are we looking about cash?*

2  Q.   And if you would turn to page five?

3  A.   Yes.

4  Q.   And what's the date on this e-mail?

5  A.   June 21st, 2013.

6  Q.   Same day?

7  A.   Same day.

8  Q.   And if you look back, is this about ten minutes after he

9  asked how are we looking in cash?

10  A.   The e-mail from Mr. Hardwick to Ms. Maurya was at

11  11:20 a.m.  Her response is at 11:30 a.m., ten minutes

12  later.

13  Q.   Okay.  And so this subject line of this e-mail is

14  dashboard?

15  A.   Yes.

16  Q.   Is this an example of what we talked about yesterday,

17  Government's 1031?

18  A.   Yes.

19  Q.   The dashboards that Mr. Hardwick was receiving?

20  A.   Yes.

21  Q.   Did you ever receive this e-mail or anything like it?

22  A.   No.

23  Q.   And the attachment here, XLSX, what does that mean?

24  A.   Well, the attachment is the dashboard report that

25  Ms. Maurya would send to Mr. Hardwick every day.

1    Q.    Is it an Excel document?

2    A.    It is.

3    Q.    Okay.  Ms. Fleming, if you would please turn to the next

4    page?  This is page six, and this is tiny.  If you would

5    please enlarge the -- not that -- the second block there.

6    Thank you very much.

7         Okay.  So this is the dashboard.  How much cash is on

8    hand in the firm on June 21st, 2013?

9    A.    $501,000.

10   Q.    Okay.  But then it says checks holding, what does that

11   mean?

12   A.    They were checks written against that bank statement or

13   bank account that had not been sent out to the vendor or

14   whoever was entitled to receive that check.

15   Q.    So is that money that the firm owed?  It's a payable?

16   A.    It's a payable.

17   Q.    Okay.  And then holding claims, what does that mean?

18   A.    I'm not 100 percent sure what exactly that means.

19   Q.    All right.

20   A.    I'm just not 100 percent sure exactly what that means in

21   this report.

22   Q.    In this context, yes.  But you know what checks holding

23   means?

24   A.    Yes.

25   Q.    You have got $501,000 in the bank, but we are holding

1    $300,000 approximately?

2    A.   Yes.

3    Q.   If you would turn to page seven, please?  And,

4    Ms. Fleming, if you would highlight the very bottom of that

5    page?

6         Same day, June 21st, 2013?

7    A.   Yes.

8    Q.   11:28 a.m.?

9    A.   Yes.

10   Q.   So is this eight minutes after Ms. Maurya had just told

11   Mr. Hardwick how much cash was on hand?

12   A.   Yes.

13   Q.   And what does he ask for?

14   A.              *I know we just had payroll, so it's no big

15                   deal either way.  If we are okay, I would like to

16                   do $150,000 to Merrill and another 100K to here to

17                   Cosmo.*

18   Q.   Cosmo is what?

19   A.   Las Vegas.

20   Q.   Is that a casino, the Cosmopolitan Casino?

21   A.   Yes.

22   Q.   Okay.  Continue.

23   A.              *It will let us go to do this event.  It's no

24                   biggy.  I rather firm be flush with cash.  Just let

25                   me know.*

1    Q.    Okay.   What event is Mr. Hardwick hosting at the Cosmo?

2    A.    None that I know of.

3    Q.    Did he ask for board approval to host some marketing

4    event or client development event at the Cosmopolitan that

5    would require at least a hundred thousand dollars?

6    A.    No.

7    Q.    Okay.   When he says I would like to do a 150K to

8    Merrill, do you know what that is?

9    A.    That's to -- Merrill Lynch is where Divot Holdings had

10   its account.

11   Q.    Okay.   And what does Ms. Maurya say, if you look at the

12   next e-mail up?

13   A.    *Hi, Nat.   No problem.*

14   Q.    And then does she send him the wire information?

15   A.    *Okay.   Send me two confirms.   Have a great weekend.*

16   Q.    Okay.

17   A.    *Thank you.*

18         And then she gives the Fed reference numbers 100K to

19   Cosmopolitan, Fed reference number $150,000 to

20   Merrill Lynch.

21   Q.    Okay.   Ms. Fleming, if you could go to page one of this

22   exhibit?

23         So that's on December 1st; is that correct?   That's when

24   that whole e-mail exchange occurred that we just looked at?

25   A.    Yes.

1   Q.   If you look at page one, what are the dates of these

2   e-mails?

3   A.   June 13th, 2013.

4   Q.   So a week earlier?

5   A.   One week, yeah.

6   Q.   And if you would look at about a third of the way down,

7   Ms. Fleming, if you could highlight?

8        What does Mr. Hardwick say?

9   A.            *Can you tell me what is being wired to*

10            *Merrill Lynch on Friday?  Is the $500,000 set for*

11            *Monday to the Cosmopolitan?  Next Friday amount?*

12            *Just checking.*

13  Q.   And then what does Ms. Maurya respond?

14  A.            *$150,000 on Friday, $500,000 to the Cosmo,*

15            *$125,000 the following Friday.*

16  Q.   Ms. Fleming, if you would please go back to Government's

17  1004, page 30?

18       Mr. Wittstadt, on this page, do you see that $500,000

19  wire to the Cosmopolitan?

20  A.   I do.

21  Q.   Do you see the $150,000 that was discussed in that June

22  13th e-mail to Divot?

23  A.   I do.

24  Q.   Do you see the extra hundred thousand that Mr. Hardwick

25  says will allow him to do some event?

1    A.   I see it.

2    Q.   And then there is an additional amount to Divot Holdings

3    on the 28th?

4    A.   I see that too.

5    Q.   Mr. Wittstadt, did you know that Mr. Hardwick was

6    receiving -- I'm sorry, let me ask that differently.

7         Did you know that the Cosmopolitan was receiving six

8    hundred thousand dollars from the firm in this month?

9    A.   No.

10   Q.   Did the firm ever vote for that to happen?

11   A.   Never.

12   Q.   Did the firm ever vote for Mr. Hardwick to receive all

13   of these extra distributions?

14   A.   Never.

15   Q.   Thank you.

16        If you would turn to Government's Exhibit 121?

17        If we look at the top, what is the date on this e-mail?

18   A.   Friday, July 5th, 2013.

19   Q.   Okay.  And from Mr. Hardwick to whom?

20   A.   Mr. Ritterman, myself, my brother, Mr. Daniel,

21   Mr. Driskell, and Asha Maurya.

22   Q.   And what is he saying?

23   A.   Default June M/E Dashboard.

24   Q.   And then the substance of the e-mail, beginning with

25   glad?

A.                  *Glad we had some profit after all.  Great*

                 *job.  Looks like file count coming up too.  I think*

                 *closings will make about 450.  Thanks.*

Q.   So 450 from closings plus whatever default.

      What does this glad we have some profit after all mean?

Was the default side struggling in June 2013?

A.   No, we weren't struggling, but what was happening

was the real estate market was -- the closing market was

starting to come up, and as a result of that, the default

market, the number of folks -- because the economy was

recovering, the number of folks that were unfortunate

enough to have to go into that process was starting to

come down.

      As a result of that, we still had big expenses, we

still had lots of space and things, and we were strategic in

starting to collapse our expenses and trying to get those

expenses in line with what we saw the reality of the default

business becoming.

Q.   Okay.  If Mr. Hardwick says that the closing side is

making $450,000 -- let me pause on that.

      If you could please pull up Government's 1004, page 31,

please, Ms. Fleming?

      So this is June profits to be disbursed in July.  How

much has Mr. Hardwick disbursed?

A.   $767,900.93.

1    Q.   Okay.  So if that's what he believes he's legitimately

2    entitled to, what should the firm -- ballpark, what should

3    the firm profit have been in June 2013?

4    A.   1.3 million, 1.35.

5    Q.   So if closing does about 450, which is what he's telling

6    you, did default make enough to make up that difference?  Did

7    default make about eight hundred thousand dollars?

8    A.   No.

9    Q.   Did default ever make eight hundred thousand dollars in

10   a month?

11   A.   No.

12   Q.   Did Mr. Hardwick ever say, Okay, this is what I'm

13   telling you, $450,000, this is what I'm putting in the

14   e-mail, but let me tell you, Asha Maurya is telling me that

15   we are making so much more money than this?  Did he ever say

16   that to you?

17   A.   No.

18   Q.   If you would turn to Government's Exhibit 226, please?

19        And what is the date on this e-mail?

20   A.   226, ma'am?

21   Q.   Yes, sir.

22   A.   February 8, 2014.

23   Q.   Okay.  And if you look at page two?

24        And if you would enlarge that chart, please,

25   Ms. Fleming.

1      Okay.  What is this chart?  This is a little different

2  than the charts we have been seeing.  What is this chart?

3  A.   Okay.  So that's correct, the reserve accounts didn't

4  start to come into play until now.

5  Q.   When you say reserve accounts, what do you mean?

6  A.   That was the 30 percent, that when you took --

7  Mr. Morris had 10, that left 90, we were doing the 55 and

8  whatever the distribution was on that number.  And then this

9  kicked in -- was kicking in to do the 30 percent for the

10  reserve accounts.

11  Q.   What do you mean this was kicking in, the 30 percent?

12  A.   Well, the --

13  Q.   Is this what's mentioned in the shareholder agreement --

14  A.   Yes.

15  Q.   -- about setting aside 30 percent?

16  A.   Yes, ma'am.

17  Q.   And what was that 30 percent supposed to be set aside

18  for?

19  A.   Rainy day, pay taxes, and to bonus our employees.

20  Q.   Do you know if Ms. Maurya was actually setting any money

21  aside?

22  A.   I was told she was.

23  Q.   Do you know if she actually did?

24  A.   I never saw it.

25  Q.   And who told you that she was setting aside this money?

1    A.   She did, and so did Mr. Hardwick.

2    Q.   Okay.  So how much are you supposed to receive based on

3    this chart?

4    A.   We are showing here that default made 190, closing made

5    198, so the total income was 388.

6         Distribution calculations, total income per earnings is

7    550.  Mr. Morris is getting fifty-five thousand.  Default

8    division had 171, closing division had 178.  20 percent

9    hold-back on $34,200, $17,000 for me, $17,000 for Rod,

10   default division, closing division.  Mr. Hardwick was

11   supposed to receive $155,392, and I was to receive $62,171,

12   and so was my brother.

13   Q.   Okay.  And if you look at page one at the very top?

14   A.   Uh-huh.

15   Q.   Ms. Fleming, if you could highlight that, the very first

16   e-mail there?

17        Okay.  And is she telling you that's what you are going

18   to get here, $62,171 now?

19   A.   Yes.

20   Q.   And the remainder here, is that that 30 percent, the

21   rainy-day 30 percent?

22   A.   Yes.

23   Q.   And if you could turn to page eight of that e-mail, and

24   at the bottom --

25   A.   Okay.

1    Q.    -- okay, this is a few weeks later, February 26th?

2    A.    Yes.

3    Q.    Okay.  From Mr. Hardwick to you and your brother?

4    A.    Yes.

5    Q.    Okay.  The subject here, January 1, 2014, Equity Partner

6    Distributions XLSX, do you know what that is?

7    A.    That would have been an attachment, I guess, to the --

8    yeah.

9    Q.    And so what is he saying here in the content of this

10   e-mail?

11   A.              *Good morning.  I hope you guys are having a*

12              *great day.  Here is the January distribution*

13              *info.*

14        So Mr. Hardwick is sending me January.

15              *We are trying to improve the info that the*

16              *three of us get.  As you know, starting January 1,*

17              *I get 20 percent of the cash bonus earned by*

18              *closing, and you get 10 percent each of the cash*

19              *bonus earned by foreclosure.*

20              *Two questions arise.  Can we individually*

21              *take the money from our capital account as we*

22              *choose?*

23   Q.    Can I stop you there?

24   A.    Uh-huh.

25   Q.    When he says we are trying to improve the info that the

1    three of us get, starting in January 2014, did you start to

2    get a little more information?

3    A.   Not really.  Just a little bit.

4    Q.   Okay.  Were you receiving daily updates of cash flows

5    the way that we have seen in Government's 1031 and 1032

6    Mr. Hardwick received?

7    A.   No.

8    Q.   Okay.  And then he goes on to discuss the cash bonus

9    that you talked about; is that correct?

10   A.   Yes.

11   Q.   Okay.

12   A.   Do you want me --

13   Q.   No.  No, we don't need to go any further.

14        If you could look at Government's Exhibit 227, please?

15   A.   Okay.

16   Q.   And, Ms. Fleming, if you would highlight the top?

17        What is this e-mail?

18   A.   It's an e-mail from Ms. Maurya to Mr. Hardwick dated

19   March 12, 2014.

20   Q.   And what does it say?

21   A.   It's attaching some documents, an estimate for January.

22   *The difference for your 250 for next week will come out of*

23   *March profits.*

24   Q.   And the subject line, do we see February 2014 Equity

25   Partner Distribution dot XLSX?

```
1    A.    Yes.

2    Q.    Okay.  And if you look at the next page?

3    A.    Yes.

4    Q.    This is page two?

5                MR. GARLAND:  Page three?

6                MS. BARRON:  This is page two.

7                MR. GARLAND:  Two?

8                MS. BARRON:  Yes, sir.

9    A.    February estimates.

10   Q.    So does this appear to be the same attachment that

11   Mr. Hardwick received two days earlier?

12   A.    That's what it appears to be.

13   Q.    Do you know why Mr. Hardwick would receive that

14   information before you did?

15   A.    Do I know why?

16   Q.    Were you ever told why you weren't getting information

17   at the same time as him?

18   A.    No.

19   Q.    Were you ever told why he's not copied on this e-mail to

20   you and your brother?

21   A.    No.

22   Q.    And if you will look at page three?

23   A.    Okay.

24   Q.    Now, this is even yet a different kind of chart that we

25   haven't seen yet.  What is being conveyed to you in this
```

1    chart?

2    A.   There was an estimate that was calculated for January,

3    and then there was January actual.  And then there was a

4    February estimate, and then we would have gotten a February

5    actual.

6    Q.   Okay.  So if you look down about two-thirds of the way

7    down in this chart, do you see where it says distribution

8    highlighted in red?

9    A.   Yes.

10   Q.   Okay.  And there is four lines down, it has

11   Nathan Hardwick, Mark Wittstadt, Gerard Wittstadt, and has

12   your percentages listed?

13   A.   Yes.

14   Q.   So when you were talking earlier about there would be an

15   estimate distribution and then an actual, is this what you

16   are referring to?  You all are estimating $155,000 to

17   Mr. Hardwick, but actually it's only 152?

18   A.   Yes.

19   Q.   So were there months where there would be some kind of

20   either residual or deficit?

21   A.   I don't recall ever really overestimating and having

22   to -- this is the one, it's by like fifteen -- it's less,

23   it's like 950 bucks or something like that.

24   Q.   Okay.  And on this e-mail, March 14th, 2014, what is

25   Ms. Maurya, what is in this document here?  What is the

1    estimate of what your share of the distribution is going to

2    be?

3    A.    For February?

4    Q.    February results that will be distributed in March?

5    A.    $102,000.

6    Q.    Okay.  And if you would turn to page four of that

7    exhibit?

8         And if you would highlight the top half of that, please?

9    I'm sorry, enlarge and highlight, thank you, the top half.

10   Thank you.  The top half.  If you would go down to -- yes,

11   ma'am.

12        So you are expecting $102,000, you write Ms. Maurya

13   back, *Are you disbursing $102,000 today*?

14        And what does she say?

15   A.    *Yes.  The wires were confirmed about twenty minutes*

16   *ago.*

17   Q.    And your understanding, is that the only distribution

18   you were going to get in March 2014?

19   A.    That's it.

20   Q.    Okay.  And if you are getting $102,000, what had you

21   just been told Mr. Hardwick was going to get?

22   A.    Again, roughly double what I got.  But I would actually

23   have known what Mr. Hardwick -- if I am getting 102 because

24   of this chart, he's getting 255.

25   Q.    Okay.  Ms. Fleming, if you could pull up Government's

1    1004, page 39, please?

2         Mr. Wittstadt, how much did Mr. Hardwick actually

3    receive in March of 2014?

4    A.   $853,871.45.

5    Q.   And is that more than the firm even made for February

6    2013 --

7    A.   Yes.

8    Q.   -- the entire month?

9         Okay.  If you would turn to Document 230?

10        And what's the date on this e-mail?

11   A.   Tuesday, April 29, 2014.

12   Q.   Okay.  Now, a different set of people on this e-mail.

13   Who is it from?

14   A.   Ms. Maurya.

15   Q.   Who is it to?

16   A.   Mr. Hardwick and myself.

17   Q.   And you are copied, okay.

18        And this is the March 2014 package?

19   A.   Yes.

20   Q.   Okay.  And if you would turn to page two?

21   A.   Yes.

22   Q.   Now, this is an even different kind of chart than we

23   have seen before.  What kind of detail is being expressed

24   here?

25   A.   This is a combined between closings and default.

1   Q.   Okay.  And are these numbers consistent with what you

2   and Mr. Hardwick are talking about?  I mean, do you recall

3   ever seeing these numbers in print and saying, Hey, we talked

4   about something totally different on the phone?

5   A.   No, these would be consistent with what we had talked

6   about.

7   Q.   And if this is what you and Mr. Hardwick are being

8   told by Ms. Maurya is the firm profit, was your

9   distribution for that month consistent with what you

10  expected to receive?

11  A.   It is consistent.  But my knowledge wasn't just based

12  upon what Ms. Maurya was telling me.  It was based upon the

13  information Mr. Hardwick was giving me plus the information

14  that I was getting and would look at from default and the

15  default products, the default P&Ls that we were going

16  through.

17  Q.   And if you look at page twelve, sir?

18  A.   Page twelve?

19  Q.   And what is -- is this also part of the attachment that

20  had been sent by Ms. Maurya to you and Mr. Hardwick?  Is this

21  part of the same set of charts?

22  A.   If this was attached to this e-mail, then, yes.

23  Q.   Okay.  Mr. Wittstadt, if you look at -- okay, so we have

24  talked about estimate versus actual and how sometimes there

25  is a residual, sometimes there is a deficit.

1    Do you see how for January, February and March there is

2    estimate, actual, estimate, actual, estimate, actual?  Do you

3    see that?

4    A.    Where am I looking at?

5    Q.    I'm sorry, you are on page twelve.  It's also on the

6    screen.

7    A.    Yes, yes.

8    Q.    And then do you see over to the right there are these

9    numbers kind of outside the chart, it says due?

10   A.    Yes.

11   Q.    What is that?

12   A.    That would have been the difference between the estimate

13   and the actual.

14   Q.    Okay.

15   A.    The true-up.

16   Q.    The true-up, okay.

17        So if we added together all of these 155 for January

18   minus 152 actual, if we do that for each of the months, would

19   that yield these numbers here on the right?

20   A.    Yes.

21   Q.    And is that what you understood a true-up to be?

22   A.    That's the only thing a true-up was.

23   Q.    Okay.  And how much is Mr. Hardwick supposed to be

24   receiving -- based on the information that you and he are

25   receiving from Ms. Maurya, what is his distribution amount?

1    A.    He's supposed to get an additional $59,000.

2    Q.    Ms. Fleming, if you could please pull up Government's

3    1004, page 40?

4          Mr. Wittstadt, how much did Mr. Hardwick receive in

5    April of 2014?

6    A.    $1,055,709.99.

7    Q.    And is that more than the firm even made in

8    profit --

9    A.    Yes.

10   Q.    -- that month?

11   A.    Yes.

12   Q.    Ms. Fleming, if you could turn to Government's 1004,

13   page 876?  If you would highlight the second half of that

14   e-mail?

15         Okay.  This is an e-mail from Mr. Hardwick to Ms. Maurya

16   in April of 2014.  What is the subject line?

17   A.    Apollo Jets invoice, Biloxi trip.

18   Q.    What is Apollo Jets?

19   A.    A private jet company.

20   Q.    Okay.  And Mr. Hardwick says what here?

21   A.              *Please wire this today as my May flight.*

22              *This is for me going to Alabama for the*

23              *underwriter.*

24   Q.    And what's the date?

25   A.    April 29th, 2014.

```
1    Q.   So he's saying he's going to Alabama to meet with an

2    underwriter?

3    A.   That's what he's saying.

4    Q.   And if you would flip to the next page, please,

5    Ms. Fleming?  I'm sorry, this would be page 877, and if you

6    would highlight the middle section there?

7         Okay.  And what's the date of the travel here?

8    A.   May 1st, 2014.

9    Q.   And he is going from Atlanta to where?

10   A.   Gulfport, Mississippi.

11   Q.   Okay.  So not Alabama; is that correct?

12   A.   It's not in Alabama.

13   Q.   Okay.  This is his Biloxi trip.  Where is Biloxi?

14   A.   Biloxi?

15   Q.   Yes.

16   A.   Mississippi.

17   Q.   Okay.  What else is in Biloxi, Mississippi?

18   A.   The Beau Rivage Casino.

19   Q.   Ms. Fleming, if we go back to Government's 1004.

20        And he's supposed to be flying on May 1st, 2014, to meet

21   with Alabama underwriters?

22   A.   That's what the e-mail said.

23   Q.   Thank you.

24        Ms. Fleming, if you would go back to Government's 1004,

25   page 40, please?
```

1    And so the day before he flies to Biloxi to discuss

2   Alabama business, how much money is sent to the Beau Rivage

3   Casino in Biloxi, Mississippi?

4   A.   Three hundred thousand dollars.

5   Q.   Did Mr. Hardwick tell you I'm going to the Beau Rivage

6   to conduct firm business?

7   A.   No.

8   Q.   Can you, as you sit here today, imagine why it would be

9   necessary to spend three hundred thousand dollars --

10          MR. GARLAND:  I'm going to object to this man's

11   imagination.

12          THE COURT:  I will sustain just as to form,

13   starting it that way.

14   BY MS. BARRON:

15   Q.   Mr. Wittstadt, as the managing partner, one of the

16   managing partners of this law firm, would there have been an

17   ordinary and necessary business reason for the firm to spend

18   three hundred thousand dollars at a casino in Biloxi to

19   conduct business with an Alabama underwriter?

20   A.   Ma'am, there is no reason to spend any money at a

21   casino, and that kind of money, that kind of thing -- no.

22   The answer to your question is simply no.

23   Q.   Well, even if there were, did Mr. Hardwick discuss this

24   with you at all?

25   A.   No.

```
1    Q.   Did he seek board approval before taking this private

2    jet and spending this money?

3    A.   No.

4    Q.   If you would please turn to Government's 231?

5    A.   Am I done with 230?

6    Q.   You are, sir.

7         What is this e-mail?

8              THE COURT:  Before he answers, ladies and

9    gentlemen, are you okay?  Just raise your hand if you need a

10   little break.

11             A little break?  Okay.

12             THE WITNESS:  Me too.

13             THE COURT:  Not a problem.  I told you all

14   yesterday just let me know.

15             Okay.  A quick five- to ten-minute break.  Thank

16   you.

17             That goes for everyone.  Five-, ten-minute break.

18   Thank you.

19             (A recess is taken 10:48 a.m.)

20                           --  --  --

21             (In open court without a jury present at

22   11:00 a.m.:)

23             THE COURT:  All right.  Let's line the jurors up

24   and we will get the defense back in.  Everybody be seated,

25   please.  Thank you.
```

```
1                    (In open court with a jury present:)

2            THE COURT:  You may continue your examination.

3            MS. BARRON:  Thank you, Your Honor.

4    BY MS. BARRON:

5    Q.   Mr. Wittstadt, we had moved on to another exhibit, but

6    I actually want to stay on this end of April 2014 but

7    beginning of May 2014 trip to Biloxi.

8    A.   All right.

9            MS. BARRON:  I'm going to move to admit

10   Government's Exhibit 981.  This is also not on our exhibit

11   list.  I have shown it to defense counsel.  I will show it to

12   the Court.

13           THE COURT:  Any objection?

14           MR. GARLAND:  No objection.

15           THE COURT:  All right.  981, is that what you

16   said?

17           THE CLERK:  There is a 981 on there.

18           THE COURT:  That is on this list.

19           THE CLERK:  Should it be 789?

20           THE COURT:  Does it correspond to what's listed on

21   our exhibit list?

22           MS. BARRON:  It does not.  This is a brand new

23   one.

24           MR. GARLAND:  We are communicating about exhibits,

25   Your Honor.
```

```
1              THE COURT:  I'm sorry?

2              MR. GARLAND:  The government and the defense are in

3    communication about working out --

4              THE COURT:  Okay, we are just talking about the

5    number now, but thank you.

6              MR. GARLAND:  I thought that's what you were asking

7    about.

8              THE COURT:  No, we have an exhibit by that number

9    already, so we are just trying to figure out the number.  But

10   thank you, Mr. Garland, I appreciate that.

11             MS. BARRON:  And I apologize, Your Honor, it's lack

12   of communication on my part.  It's 985.

13             THE COURT:  985.

14             MS. BARRON:  It's a brand new exhibit.  I offer

15   it.

16             And I will switch to the ELMO to publish it since

17   no one has a copy.

18             THE COURT:  985.

19             MR. GARLAND:  It's now 985?

20             THE COURT:  Yes, sir.

21             MR. GARLAND:  Thank you.

22             THE COURT:  Thank you.

23             MS. BARRON:  So I move Government's Exhibit 985

24   into evidence.

25             MR. GARLAND:  No objection.
```

```
1              THE COURT:  Okay, thank you.  It's admitted.
2    BY MS. BARRON:
3    Q.   Okay.  Mr. Wittstadt, I don't think you have ever seen
4    this document.  And you said that Apollo Jets is a private
5    jet company?
6    A.   Yes, ma'am.
7    Q.   Okay.  Do you remember right before the break we were
8    looking at an e-mail where Mr. Hardwick says this is for my
9    Biloxi trip for the Alabama underwriters?
10   A.   Yes, ma'am.
11   Q.   And then there is a May 1st, 2014, flight that he's on
12   to go to Gulfport?
13   A.   Yes.
14   Q.   Okay.  Well, let's look at the manifest for the
15   passengers on this May 1st, 2014, flight to Gulfport.
16        So we see Mr. Hardwick?
17   A.   Yes.
18   Q.   Do you know who Kevin Andrews is?
19   A.   No, I do not.
20   Q.   Do you know who Scott Elmore is?
21   A.   No, I do not.
22   Q.   Do you know who Alex Hardwick is?
23   A.   Yes, I do.
24   Q.   Who is that?
25   A.   That is Mr. Hardwick's brother.
```

```
 1   Q.   Do you know who Brad Little is?

 2   A.   Yes, I do.

 3   Q.   Who is Mr. Little?

 4   A.   He is one of Mr. Hardwick's friends from childhood.

 5   Q.   I'm sorry?

 6   A.   One of Mr. Hardwick's friends from his childhood.

 7   Q.   Is he a client -- was he a client of MHS?

 8   A.   Not that I'm aware of.

 9   Q.   Do you know who Ted Smith is?

10   A.   No, I do not.

11   Q.   Thank you, sir.

12        Okay.  And before we move on to the next exhibit that

13   I'll have you identify, I want to show you Government's 308

14   for identification purposes.

15        Okay.  Mr. Wittstadt, are you copied on Government's

16   308?

17   A.   No, ma'am, I'm not.

18   Q.   Okay.  But who is it from?

19   A.   Mr. Hardwick.

20   Q.   Who is it to?

21   A.   Asha Maurya.

22   Q.   What's the date?

23   A.   December 11, 2013.

24            MS. BARRON:  Your Honor, I offer Government's 308.

25            THE COURT:  Any objection?
```

```
1              MR. GARLAND:  No objection.

2              THE COURT:  It's admitted.

3              MS. BARRON:  Thank you, Ms. Beck.  You are a step

4    ahead of me.

5              Ms. Fleming, if you could please pull up

6    Government's Exhibit 308, and then highlight the first third

7    of that page?

8    BY MS. BARRON:

9    Q.   Mr. Wittstadt, would you please read what Mr. Hardwick

10   is saying to Asha Maurya in this e-mail?

11   A.              Please wire $61,000 to the following

12                   instructions.  This is for my trip this week to

13                   Utah and my one to Charleston on BP claim and new

14                   office next week.  There will be no January or

15                   February flights due to baby.  Needs to go out

16                   today.  The 500 goes to the Cosmo.

17   Q.   Okay.  And again, what is the Cosmo?

18   A.   A casino in Las Vegas.

19   Q.   Cosmopolitan?

20   A.   Yes, ma'am.

21   Q.   Okay.  And, Ms. Fleming, if you would please turn to

22   page three of that exhibit?

23        And, Mr. Wittstadt, does that show the $61,000 --

24   A.   Yes, it does.

25   Q.   -- being wired?
```

1    A.    Yes.

2    Q.    Apollo Jets on the right side half way down, do we see

3    beneficiary, BNF, Apollo Jets?

4    A.    Yes.

5    Q.    Okay.  And where did Mr. Hardwick tell Ms. Maurya he was

6    going?

7    A.    Said he was going this week to Utah and to my one to

8    Charleston.

9    Q.    Okay.  Ms. Fleming, if you would please turn to page

10   six, and if you would highlight in the middle there?  Thank

11   you.

12        Where is Mr. Hardwick actually going on this flight?

13   Do you know what McCarran International Airport is?  Do you

14   know where that is?

15   A.    I do.

16   Q.    Where is that?

17   A.    Las Vegas.

18   Q.    Okay.  And, Ms. Fleming, if we turn to Government's

19   1004, page 36?

20        And, Mr. Wittstadt, if you could just look back at 308,

21   page six, what is the date of that flight?  We don't have to

22   pull it up, but, Mr. Wittstadt, do you mind looking at

23   Government's 308, page six, and tell me what the date of that

24   flight is?

25   A.    December the 11th.

```
 1    Q.   And on December the 11th, how much money goes to the
 2    Cosmopolitan Casino in Las Vegas?
 3    A.   One half a million dollars.
 4    Q.   Thank you, sir.
 5         Okay.  Now, if you could turn to Government's -- and I'm
 6    sorry, that's 2013.  Is that December 2013?
 7    A.   December 2013, yes.
 8    Q.   Okay.  If you could turn to Government's 231, please,
 9    sir?
10         What is the date on this e-mail?
11    A.   The top page, May 23rd, 2014.
12    Q.   Okay.  And from Ms. Maurya to you?
13    A.   Yes.
14    Q.   Okay.  And what's the subject line?
15    A.   April 2014 equity distributions.
16    Q.   And then if you would turn the page to page two?
17    A.   Okay.
18    Q.   Does it look like Mr. Hardwick received equity partner
19    distributions as well?
20    A.   There was an e-mail from Ms. Maurya to Mr. Hardwick
21    dated May 27, 2014, at 1:47 p.m.
22    Q.   And then if you could turn to page three, please?
23    A.   Okay.
24    Q.   And, Ms. Fleming, if you could highlight -- well, if you
25    could highlight kind of the right half of this page?
```

1    Actually, you know what?  I messed that up.  Let's do

2    the bottom half of that page, because we need to see who this

3    money is going to.  Yes, ma'am, thank you.

4    How much money is Mr. Hardwick supposed to be receiving

5    in May for distributions based on April profit?

6    A.    $178,225.

7    Q.    Okay.  Now, Mr. Wittstadt, as you are receiving these

8    e-mails from Asha or from Mr. Hardwick or from both or from

9    whomever, are the numbers that you are being told in terms of

10   firm profit and then your share, are those consistent with

11   what Mr. Hardwick was saying to you on the phone with what

12   you all were discussing would be the profit and the

13   distributions?

14   A.    Yes, ma'am.

15   Q.    Was there ever a month where you thought, you know,

16   based on what Mr. Hardwick was telling us that Asha said, we

17   should be getting way more than this?

18        MR. GARLAND:  I want to object based on it being

19   leading, argumentative.  It's an argument.

20        THE COURT:  Okay.  Thank you.  Overruled.

21   A.    No.

22   Q.    So Mr. Hardwick is supposed to get $178,225?

23   A.    That's what he was supposed to have received.

24   Q.    Ms. Fleming, if you pull up Government's 1004,

25   page 41?

1     Mr. Wittstadt, how much did Mr. Hardwick actually
2  receive?
3  A.   $503,977.57.
4  Q.   And consistent with the other charts that we have looked
5  at that look this way, do you see a payment to Colony Bank?
6  A.   Yes.
7  Q.   And is that the personal judgment that you talked about
8  earlier?
9  A.   Yes.
10 Q.   The Fortuna payment?
11 A.   Yes.
12 Q.   Does it appear that that number is deducted from his
13 distributions?
14 A.   No.
15 Q.   SunTrust payment of $55,000, do you know what that is,
16 sir?
17 A.   I found out what it was.
18 Q.   What is it?
19 A.   Mr. Hardwick borrowed or had a -- borrowed money from
20 SunTrust Bank, and he contacted SunTrust and told them to
21 start withdrawing it directly from the firm's operating
22 account.  It was his personal obligation.
23 Q.   Do you see another payment to NetJets for that debt that
24 you discussed earlier?
25 A.   I do.

1   Q.   And then several payments to Divot, and then another

2   flight with Apollo Jets?

3   A.   Yes.

4   Q.   Okay.  Now, yesterday when we talked about the

5   jet travels, you said that you had a discussion with

6   Mr. Hardwick that he was not to charge the firm for his

7   private jet travel.  Did that policy ever change from your

8   perspective?

9   A.   We never had another conversation about it.

10  Q.   Did you know that he was still traveling on private jets

11  and charging the firm?

12  A.   No, I did not.

13  Q.   If you would please turn to Government's Exhibit 232?

14       What is this document?

15  A.   Government's Exhibit 232?

16  Q.   Yes, sir.

17  A.   This is an e-mail from Ms. Maurya to Mr. Hardwick dated

18  Thursday, June 19th, 2014, at 8:16 p.m.

19  Q.   Okay.  And if you'd highlight the middle of that e-mail,

20  Ms. Fleming, please?

21       What is Ms. Maurya telling Mr. Hardwick is available for

22  distribution on June 19th?

23  A.   $605,000.

24  Q.   Total?

25  A.   Total.

1    Q.   And total, if you look down, how much is supposed to go

2    to Mr. Morris, how much to Mr. Hardwick, and how much to you

3    and your brother?

4    A.   Sixty to Mr. Morris, 242 to Mr. Hardwick, $96,000 to

5    each -- to my brother and I, and $109,000 into the reserve

6    account.

7    Q.   Okay.  So that's June 19th she's telling him $242,000

8    available to go to you; is that correct?

9    A.   That's what she is saying, that we are disbursing

10   $605,000 for May, that's what we made, and $605,000 is what

11   will be disbursed in June.

12   Q.   But that is from Ms. Maurya to Mr. Hardwick?

13   A.   Yes.

14   Q.   If you would turn to page three, sir?

15   A.   Okay.

16   Q.   So is this -- and I will wait for, Ms. Fleming, if you

17   wouldn't mind enlarging it, please?

18        Is this the very next day?

19   A.   Very next day, 10:38 in the morning.

20   Q.   Okay.  And Mr. Hardwick is telling Ms. Maurya thank

21   you.  What is he thanking her for?

22   A.   There is a wire -- Fed wire reference number and a

23   confirmation from MHS operating 9436 attached.

24   Q.   And if we turn the page to page four, what is the wire

25   that he is thanking her for?

1   A.   $300,000.

2   Q.   Okay.  So this is the day after she tells him $242,000

3   is what you are entitled to?

4   A.   Right.

5   Q.   Okay.  And if we turn the page to page five, what is

6   this e-mail?

7   A.   Another -- it's a wire from Asha to me -- an e-mail from

8   Asha to me saying that she's wired me $96,939.

9   Q.   Okay.  And if we turn to page eight, and if you would

10  highlight the bottom half of that page, please?  Thank you.

11       So does this chart tell you basically the same thing

12  Ms. Maurya was telling Mr. Hardwick, that he gets $242,000?

13  A.   Yes.

14  Q.   Ms. Fleming, if you would pull up Government's 1004,

15  page 42?

16       Mr. Wittstadt, in June 2014, how much money did

17  Mr. Hardwick receive?

18  A.   $1,350,375.73.

19  Q.   Is that about five times what Ms. Maurya told him he was

20  entitled to receive?

21  A.   That's what the math equals.

22  Q.   Okay.  And if we look at what this money includes, look

23  at that June 3rd, 2014, wire to the Venetian.  What is the

24  Venetian?

25  A.   That's a casino in Las Vegas.

1    Q.   Okay.  Now, around this time, were you aware that

2    Mr. Hardwick was trying to acquire a business in

3    Las Vegas?

4    A.   Not at that time I wasn't.

5    Q.   Did you later learn that?

6    A.   I did.

7    Q.   And as a partner -- well, first of all, did you learn

8    what type of business it was?

9    A.   It was a small closing operation.

10   Q.   Okay.  And is that the kind of thing that if

11   Mr. Hardwick was going to be going to Las Vegas to negotiate

12   a deal like this for the company, would you expect to know

13   about that?

14   A.   Yes.  He had told me that he had -- we had discussed the

15   firm expanding its footprint, and we had discussed the firm

16   expanding at one point in time its footprint into Nevada,

17   including doing default work there.

18        We discussed it, and I didn't have any objection to

19   exploring that possibility.

20   Q.   Okay.  And so would you have expected that in order to

21   further that possibility, that Mr. Hardwick would need to go

22   to Las Vegas and meet with people there?

23   A.   I would have expected if he were pursuing that, that he

24   would be telling me what his plans were with regards to

25   that.  And that may include a trip to Las Vegas, yes.

1    Q.    And do you know if he ever successfully closed that deal

2    with the company in Las Vegas?

3    A.    It did not.

4    Q.    Okay.  Did he negotiate a contract?  Did they reach some

5    agreement?

6    A.    I understood that -- yes.

7    Q.    And how much was MHS supposed to pay for that business?

8    A.    LandCastle Title, I believe, that was actually one of

9    the arms.  I think it was like $25,000.

10   Q.    So a $25,000 business?

11   A.    Thereabouts, yes.

12   Q.    Okay.  Is there an ordinary and necessary business

13   purpose for spending $400,000 at a casino to acquire a

14   $24,000 business?

15   A.    No.

16   Q.    Thank you, sir.

17         And again, if Mr. Hardwick believes that he is entitled

18   to 1.3 million dollars --

19              MR. GARLAND:  Objection, argumentative.

20              THE COURT:  Overruled.

21              MR. GARLAND:  Calls for speculation, Your Honor.

22              THE COURT:  Overruled.

23              MS. BARRON:  I will take the word believe out of

24   that.

25              THE COURT:  I have already overruled, but you can

1    change it if you like.

2    BY MS. BARRON:

3    Q.    If Mr. Hardwick is actually entitled to 1.3 million

4    dollars, what must the firm have made for this month?

5    A.    2.5, 2.6 million.

6    Q.    Are you aware of the firm ever doing that well in a

7    single month?

8    A.    No.

9    Q.    What is the largest distribution you ever remember

10   receiving?

11   A.    Approximately $139,000.

12   Q.    So based on ownership percentages, what is the largest

13   amount of distribution you ever would have expected

14   Mr. Hardwick to have received?

15   A.    That occurred in the spring of 2014 -- 140? -- 260,

16   265?

17   Q.    Were you aware that there were months -- were you aware

18   that in almost every month he was receiving consistently more

19   than that amount of money?

20   A.    I have now become aware of it.  Did I know at the time?

21   Absolutely not.

22   Q.    And if you would turn to Government's Exhibit 313, sir?

23         What is Government's Exhibit 313?

24   A.    It's an e-mail from Mr. Hardwick to myself and my

25   brother Rod.

1    Q.    Okay.  And is he talking about here what you have called

2    the rainy-day funds?

3    A.    Yes, ma'am.

4    Q.    Okay.  And how much is supposedly set aside in these

5    rainy-day funds, if we look at that chart?

6    A.    $726,701 in the one account, and $535,980 in the second

7    account.

8    Q.    Okay.  And then if you look at his e-mail, what is he

9    asking you about these accounts?  What's he wanting to do?

10   A.    He wants -- what he wants to do at that point in time,

11   he's saying, Look, we are making a lot of money.  We don't

12   need to have this second account.  I would like to go ahead

13   and distribute it to -- go ahead and distribute it out in

14   accordance with these agreements.

15   Q.    And did you agree with that?

16   A.    I did.

17   Q.    Okay.  And if we turn to page four of that e-mail?

18   A.    Okay.

19   Q.    Is this you agreeing?

20   A.    That's me agreeing and asking Asha to send my money to

21   pay my taxes.

22   Q.    Okay.  So back to a larger question that I have asked

23   you many times.  We have exhaustively gone through the

24   shareholder agreement, and it says set aside money for this,

25   it says quarterly distributions, it says this is your

1    salary.

2              MR. GARLAND:  Your Honor, this is argumentative and

3    leading and summarization.

4              THE COURT:  I'm sorry, Mr. Garland.

5              MR. GARLAND:  We object.

6              THE COURT:  I understand that.  I overrule.

7    I don't find so.  I overrule.

8    BY MS. BARRON:

9    Q.   Mr. Wittstadt, we discussed what the shareholder

10   agreement says, and then we have talked about instances where

11   you all have deviated from that.  Would this be one of those

12   examples?

13   A.   Yes, where we -- I am in Baltimore, Mr. Hardwick is in

14   Atlanta, so this is kind of a meeting, whether it be over

15   e-mail or phone.  But, yes, this is an agreement to say we

16   can do something different.

17   Q.   Okay.  So if there are instances where the three of you

18   decide to mutually --

19             MR. GARLAND:  Objection, argumentative.

20             THE COURT:  Overruled.

21   BY MS. BARRON:

22   Q.   If there are instances where the three of you decide to

23   mutually depart from the shareholders agreement, would you

24   expect that in good faith your partners would at least

25   discuss that with you?

1  A.   You can't deviate from the shareholders agreement unless

2  we agree.

3           THE COURT:  I'm sorry, answer her first.

4  A.   Do I expect them?  Yes, absolutely, 100 percent.

5           THE COURT:  You can still elaborate to some

6  extent.  I want you to answer her first.

7           THE WITNESS:  Yes, ma'am.  I'm sorry.

8           THE COURT:  That's okay.

9  A.   Yes, ma'am.

10  Q.   And did you want to --

11  A.   The shareholders agreement was negotiated.  It was

12  there for a reason, and it said if we needed to deviate,

13  we meet and we agree.

14       We met and we agreed.  That's what I expected to

15  happen.

16  Q.   Okay.  So I handed you a while ago what I had premarked

17  for identification as Government's Exhibit 1034.  Prior to

18  today, and in fact yesterday, did you have chance to review

19  Government's 1034?

20  A.   I have.

21  Q.   Okay.  And if you look at the columns in the middle, do

22  those match up with the distributions that you were told

23  Mr. Hardwick would be receiving for the respective months

24  based on the government's exhibits identified there?

25  A.   Yes, ma'am.

1    Q.    And have you also looked at Government's Exhibit 1004?

2    A.    I have.

3    Q.    And do the numbers in the far right column match up

4    with the numbers that are reflected in Government's Exhibit

5    1004?

6    A.    They do.

7              MS. BARRON:  Your Honor, at this time I would move

8    to admit Government's Exhibit 1034 as a summary exhibit.

9              THE COURT:  Any objection?

10             MR. GARLAND:  No, Your Honor.

11             THE COURT:  It's admitted.

12             MS. BARRON:  Thank you, Your Honor.

13             Ms. Beck, can I switch to the ELMO, please?

14             THE CLERK:  Yes, I'm sorry.

15             MS. BARRON:  Thank you.

16   BY MS. BARRON:

17   Q.    Okay.  So in October 2012, you were told Mr. Hardwick

18   would receive $110,000.  He actually received this amount; is

19   that correct?

20   A.    That is correct.

21   Q.    And is that true for each of these months, this is what

22   you are told, this is what he gets?

23   A.    Yes, ma'am.

24   Q.    Mr. Wittstadt, if you had known, if you had been told

25   at any -- in any one of these months that this is the

1   amount Mr. Hardwick is actually getting, what would you

2   have done?

3   A.   If I would have been told in October of 2012 that

4   Mr. Hardwick received $706,567.55 when he was only supposed

5   to receive $110,000, November 2012 through '13 and through

6   the rest would not have occurred.

7   Q.   What do you mean by that?

8   A.   I would have been in Atlanta and found out what was

9   going on and stopped it.

10  Q.   Thank you, sir.

11         MS. BARRON:  We can switch back to the computer.

12  Thank you.

13  BY MS. BARRON:

14  Q.   Okay.  I asked you about --

15  A.   Am I done with 1034, ma'am?

16  Q.   You are, sir.  I'm sorry.

17       We talked yesterday about the Warren Averett

18  consolidated financial reports.  Do you recall that

19  conversation?

20  A.   I do, ma'am.

21  Q.   Okay.  And so, Ms. Fleming, if you could please pull up

22  Government's Exhibit 1201?  Thank you.  And if you would turn

23  to page six, and if you would highlight -- well, let's see.

24       Okay, actually, if you could highlight the right side,

25  the two columns on the right?

1    Okay.  Mr. Wittstadt, do you understand this page to

2    represent Warren Averett's summary of the net income of

3    Morris Hardwick Schneider for 2012 and 2011?

4    A.    Yes, ma'am.

5    Q.    Is this information that Mr. Hardwick forwarded to you?

6    Is this report something that he sent to you?

7    A.    I know that I received the '12 and '13.  To my -- I just

8    don't remember if I received the '11.  I may have.

9    Q.    Okay.  Well, what is Warren Averett telling Mr. Hardwick

10   the firm's net income for 2012 is?

11   A.    1.5 million dollars.  1.5 million dollars and change.

12   Q.    And what is Warren Averett telling Mr. Hardwick the

13   firm's net income for 2011 is?

14   A.    $549,000 and change.

15   Q.    Ms. Fleming, if you could please turn to Government's

16   1005, page one?

17        So Warren Averett tells Mr. Hardwick the firm made about

18   five hundred thousand, a little extra.  How much does he

19   receive for the entire year 2011?

20   A.    1.2 million.  1.275.

21   Q.    More than twice what the firm even made?

22   A.    The financial statements said $549,000, so a little bit

23   more than double.

24   Q.    Okay.  And then, Ms. Fleming, if you could turn to the

25   next page, please?

So this is for 2012.  Warren Averett tells Mr. Hardwick

that the firm made 1.5 million.  How much did Mr. Hardwick

receive?

A.   Seven and a half million dollars.

Q.   Ms. Fleming, if you would please bring up Government's

1202?  And if you would turn to page six, please, and if you

would highlight -- thank you.

Mr. Wittstadt, how much does Warren Averett tell

Mr. Hardwick that MHS made in 2013?

A.   7.8 million dollars.

Q.   And, Ms. Fleming, if you could bring up Government's

1005, page three?

Mr. Wittstadt, how much did Mr. Hardwick receive in

2013?

A.   11.7, almost 11.8 million dollars.

Q.   So every single year he's receiving more than the firm

even made?

A.   Yes, ma'am.

Q.   Now, could you all have agreed to that?  Well,

hypothetically, could the partners agree to operate in the

red?

A.   Where are we getting the money from?

Q.   Would you have ever agreed to that?

A.   No.

Q.   If it came to a shareholder vote, would you have ever

1    agreed, (A), that anybody could take more than the firm

2    actually made?

3    A.    No.

4    Q.    But even if you had agreed to that, would you also

5    demand that all of the partners receive their proportionate

6    share?

7    A.    I don't -- I can't answer that, because this type of

8    business does not have the money to be able to go into the

9    red.

10   Q.    Okay.  Thank you.

11         So we have talked about what information was shared with

12   you.  Now I want to talk about a different category of

13   information that was not shared with you.

14         If you would -- I think it should be the next item in

15   your stack, Government's 203, sir.

16         Is this an e-mail from Asha Maurya to Nat Hardwick on

17   October the 17th, 2011?

18   A.    Yes.

19             MS. BARRON:  Your Honor, I offer Government's 203.

20             THE COURT:  Any objection?

21             MR. GARLAND:  Just a moment.

22             No objection.

23             THE COURT:  All right.  It's admitted.

24   BY MS. BARRON:

25   Q.    Okay.  Mr. Wittstadt, if we look at the first page?

1      And, Ms. Fleming, if you would highlight the top half of

2  that page down through the percentages that we see there?

3      Okay.  What is Asha Maurya telling Mr. Hardwick is

4  available to be distributed?

5  A.   $100,702.

6  Q.   That's the profit; correct?

7  A.   Yes.  Well, then the total distribution is $62,717.

8  Q.   Okay.  And is that because some money has to be set

9  aside?

10  A.   SunTrust loan pay-down, 2010 catch-up, 2010 catch-up due

11  from Holabird.

12  Q.   Let's talk about that catch-up.  Do you know what that's

13  referring to?

14  A.   I don't.

15  Q.   Okay.  Let me see if I can refresh your recollection.

16  A.   The catch-up of what, the 2010?

17  Q.   2010 catch-up, do you remember anything about a payroll

18  catch-up from 2010?

19  A.   No, I just don't.

20  Q.   Okay.  Ms. Fleming, if you could please pull up

21  Government's 980, and turn to page 13, and highlight

22  Paragraph (f), Withholding Taxes.  Thank you.

23      Okay.  So this is the Maryland agreement.

24  Mr. Wittstadt, if you would read this section?  And you don't

25  have to read it verbatim, just read it silently and look up

1    at me when you are finished.

2    A.   Yeah, I remember this.  I remember that.

3    Q.   Okay.  What is this about?

4    A.   Mr. Hardwick's prior firm, they failed to -- the prior

5    firm withheld tax money from people's paychecks.

6              MR. GARLAND:  Objection, hearsay.  Calling for

7    hearsay and speculation.

8              THE COURT:  I will sustain at this point.

9              MS. BARRON:  Well, Your Honor, this is an

10   agreement that he was party to, and so he must have had an

11   understanding of what this provision --

12             THE COURT:  Well, then lay that out.

13   BY MS. BARRON:

14   Q.   Mr. Wittstadt, did you have an understanding of what

15   this provision refers to?

16   A.   Yes, ma'am.

17   Q.   When you all were negotiating this 2011 Maryland

18   agreement, did you have discussions with Mr. Hardwick about a

19   prior tax debt that he owed?

20   A.   Yes, I did.

21   Q.   And what did he tell you about that debt?

22   A.   There was four hundred -- the IRS had placed a lien

23   against Mr. Hardwick's prior firm in the amount of

24   $431,000.

25        What it was for is there were payroll withholdings that

1    were taken from the employees' checks but never remitted to

2    the IRS, and they had placed a lien against Mr. Hardwick and

3    against the firm.

4         But the IRS had not executed on that lien yet.  And like

5    everything, things have statute of limitations to them.  The

6    statute of limitations on this one was coming up on

7    April 15th, 2015.  If the IRS hadn't executed on that lien,

8    then it's gone.

9    Q.   Okay.  So is this referring to a debt Mr. Hardwick owes

10   to the IRS?

11   A.   Yes.

12   Q.   And if we look halfway down this paragraph, do you see

13   I'm going to guess about eight lines down, it says:

14              *To the IRS obligation, the following shall be*

15              *withheld from Mr. Hardwick and paid into an escrow*

16              *account to be established by the corporation.*

17   A.   Right.

18   Q.   *(i) the amounts payable to Mr. Hardwick under*

19              *Section 7 (c) (iv) of approximately $172,000.*

20        So is this saying that some amount is to be held from

21   him, placed in an escrow to help satisfy this debt?

22   A.   Yes.

23   Q.   And if we turn to page seven of that same agreement, and

24   at the bottom where it says compensation, (c) (i), salary?

25   A.   Where am I looking?

```
1    Q.   Do you see where it says salary?

2    A.   Yes.

3    Q.   And then so that paragraph (c)(i) is referring to the

4    salary here; correct?

5    A.   Yes.

6    Q.   So some amount of money is supposed to be withheld and

7    put in escrow to satisfy this debt.

8         You know what, I totally lost my place.  I'm going to

9    move to a different topic.

10        Same e-mail, back to 2003, Government's Exhibit 2003.

11   I apologize, I lost my train of thought.

12             MR. GARLAND:   203?

13             MS. BARRON:   203.

14             And if you could highlight that same part that we

15   had earlier with the percentages?   Thank you.

16   BY MS. BARRON:

17   Q.   So we have got $62,000 available total for disbursement.

18   This is what Ms. Maurya says.

19        If you would turn to page three of that e-mail, and if

20   you would highlight the top half?

21        Okay.  So same e-mail from Ms. Maurya to Mr. Hardwick,

22   and then do you see at the top where he responds to her,

23   *Let's talk tomorrow*?

24   A.   Yes.

25   Q.   What does he say?
```

1    A.   He said:

2              *Let's talk tomorrow.  I told everyone 85.  Do*

3         *we have that extra amount?*

4    Q.   Okay.  So she's just told him $62,000 is what we have.

5    Did you know that Mr. Hardwick asked Ms. Maurya if they could

6    actually distribute more than she had told him was available

7    for distribution?

8    A.   No.

9    Q.   If he had raised that issue with you, what would you

10   have said?

11   A.   I would have said no.  We have got to distribute -- give

12   me $7,879.73.

13   Q.   And if we look at page two at the bottom, bottom third,

14   if you look at Ms. Maurya's response, what does she say

15   beginning with sure?

16   A.   *Sure.  We can certainly swing the difference.*

17   Q.   And then he says?

18   A.              *Go ahead and do it tomorrow so everyone is*

19        *happy.  Thanks.  Just send my extra to the RBC*

20        *account this time.  Thanks.*

21   Q.   Mr. Wittstadt, if you had known that only $62,000 was

22   available for distribution, would you have been happy that

23   the firm was actually going to disburse $85,000?

24   A.   No.  We distribute what we earn.  I mean, you run down

25   that path, you start running down that path.

```
1    Q.   Were you ever aware of a distribution being made before

2    the money has even come into the firm?

3    A.   No.

4    Q.   If you would turn to Government's Exhibit 205, what's

5    been premarked as Government's 205?  It should be the next

6    e-mail in your stack.

7        Is this an April 2nd, 2012, e-mail from Mr. Hardwick to

8    Ms. Maurya?

9    A.   Yes.

10            MS. BARRON:  Your Honor, I move to admit

11   Government's Exhibit 205.

12            THE COURT:  Any objection?

13            MR. GARLAND:  No objection.

14            THE COURT:  Okay.  It's admitted.

15            MS. BARRON:  Ms. Fleming, if you would please

16   publish the first half of page one?

17   BY MS. BARRON:

18   Q.   Starting at the bottom, Asha Maurya to Nat Hardwick,

19   what is she telling him?

20   A.            *Cash is limited on the default side, so*

21            *I don't think we will receive funds from them*

22            *today.  Normally I would cover the distributions*

23            *till they send the funds, but I need to pay rents*

24            *and I am anticipating the Kenn-Tex first payment*

25            *this week.*
```

1              *I will keep you abreast of their cash*

2                  *availability and the distribution of funds*

3                  *throughout the week.*

4    Q.   Mr. Wittstadt, if Ms. Maurya had been communicating with

5    you, if you had been copied on this e-mail, would you have

6    approved a distribution to be made at this point?

7    A.   No.

8    Q.   Read what Mr. Hardwick responds?

9    A.              *Okay.  I may have to do just 50K to me on*

10                 *Tuesday because I made a promise.  I will let ya*

11                 *know.  Thanks.*

12   Q.   So he made a promise.  Do you know what that promise

13   is?

14   A.   No.

15   Q.   Do you know why Mr. Hardwick is asking that he's the

16   only one who gets disbursed?

17   A.   No.

18   Q.   Okay.  And if you turn the page, page two, what does

19   this show?

20   A.   Wire detail from the bank showing the money, $50,000

21   coming out of the IOLTA account, the trust accounts, to Divot

22   Holdings.

23   Q.   Okay.  And so Ms. Maurya did what Mr. Hardwick told her

24   to do; is that correct?

25   A.   That's what it appears.

```
1    Q.   Okay.  Switching topics, I'm going to hand you what's

2    been premarked as Government's Exhibit 3 through 22.

3              MS. BARRON:  And, Your Honor, I would move to admit

4    these, by agreement.

5              MR. GARLAND:  No objection.

6              THE COURT:  All right.  Three through 22?

7              MS. BARRON:  Yes, Your Honor.

8              THE COURT:  They are admitted.

9    BY MS. BARRON:

10   Q.   Okay.  Mr. Wittstadt, have you had a chance to review

11   Government's -- well, actually 2 through 22, but Government's

12   Exhibit 2 has already been admitted.  Have you had a chance

13   to review those documents?

14   A.   I don't know.  Let me take a look.

15   Q.   Did we review those documents yesterday?

16   A.   Yes.  Yes, I have.

17   Q.   And then I'm going to hand you what has been marked for

18   identification as Government's Exhibit 1035.

19             MS. BARRON:  This is also not on our exhibit list,

20   but it was produced to the defense last Friday.

21   A.   Okay.

22   Q.   Mr. Wittstadt, have you reviewed Government's Exhibit

23   1035?

24   A.   Yes, I have.  I did -- yes, I have.

25   Q.   And have you confirmed that the items in the middle
```

1  column, the amounts listed, the places the money went to, and

2  the government exhibit numbers correspond with Government's

3  Exhibits 2 through 22?

4  A.   Yes, I have.

5  Q.   And did you review Government's Exhibits 1031 and 1032?

6  And just to refresh, that's the dashboard --

7  A.   Okay.

8  Q.   -- and the cash flow.

9  A.   Yes.

10  Q.   And have you confirmed that the available cash and the

11  checks holding listed in this column on the right correspond

12  with the documents in Government's Exhibit 1031, that

13  dashboard?

14  A.   Yes, yes, yes, and yes.

15        MS. BARRON:  Your Honor, at this time I ask that

16  Government's Exhibit 1035 be admitted as a summary exhibit.

17        THE COURT:  Any objection?

18        MR. GARLAND:  No objection.

19        THE COURT:  It's admitted.

20        MS. BARRON:  May I switch to the ELMO, please?

21  Thank you.

22  BY MS. BARRON:

23  Q.   I am going to ask for 1035 back so I can put it on the

24  ELMO.  Thank you, sir.

25  A.   I will put these aside for now.

```
1    Q.   Mr. Wittstadt, so we talked about earlier the daily
2    dashboard.  Do you remember where you talked about the
3    available cash and then the checks holding?
4    A.   Yes, ma'am.
5    Q.   So on March 19th, 2013, does Mr. Hardwick, or for his
6    benefit is a wire sent to the Cosmopolitan Casino for
7    $350,000?
8    A.   Yes.
9    Q.   And the day before, how much money did Asha Maurya tell
10   him was available in the operating account?
11   A.   $228,000.
12   Q.   And how many checks were being held, payable checks that
13   the firm owed?
14   A.   $383,000.
15   Q.   Mr. Wittstadt, if somebody had told you this is how much
16   money we have in operating and you asked for this wire
17   anyway, where else could that money have come from?
18   A.   Don't have it.
19   Q.   Well, if the money is sent, can it come out of
20   operating?
21   A.   It's $150,000 upside-down.
22   Q.   Are there any other accounts that it could have come out
23   of?
24   A.   No accounts that the firm owned, that was firm money.
25   I mean, the only two accounts that the firm has, they have
```

1    operating accounts and they have trust accounts.  Trust

2    accounts had hundreds of millions of dollars in them.

3    Q.   And if we look at other items here, June 17, 2013, wire,

4    $500,000 to the Cosmopolitan Casino.  That same day

5    Ms. Maurya tells Mr. Hardwick how much money do we have

6    available in the operating account?

7    A.   $504,000.

8    Q.   And how much do we owe?

9    A.   Three hundred -- well, we have checks --  we owe

10   probably more than that, but we have $309,000 worth of checks

11   that they are holding.

12   Q.   Okay.  And so for each of these wires that are listed

13   here, Government's 2 through 9, do the amounts on the right

14   correspond with the information that was given to

15   Mr. Hardwick by Ms. Maurya around the time of these wires?

16   A.   Yes.  Those dates, those amounts, those three documents

17   line up.

18   Q.   Let's look at Government's Exhibit 17 here.  This is

19   April 30th, 2014.  This is that trip to Biloxi, Mississippi,

20   to negotiate an Alabama underwriter deal.  Do you remember us

21   talking about that?

22   A.   I remember us talking about it.

23   Q.   Okay.  So Mr. Hardwick asks for $300,000 plus the

24   flight.  The day before how much had Ms. Maurya told him was

25   available in the operating account?

1    A.    $70,000.

2    Q.    Mr. Wittstadt, where else could this money have come

3    from?

4    A.    It had to come out of the escrow account.

5    Q.    Thank you, sir.

6          MS. BARRON:   Thank you, Ms. Beck.   If we can switch

7    over?

8    BY MS. BARRON:

9    Q.    Mr. Wittstadt, if you had received the information that

10   you had asked for, if you had received those dashboards, if

11   you had received the daily information that Mr. Hardwick was

12   receiving, would you ever have cast your vote as a

13   shareholder and member of the board of directors to approve

14   the wires that he demanded?

15   A.    No.

16   Q.    I want to fast-forward your attention to the summer of

17   2014.  What happened in July of 2014?

18   A.    I was on vacation with my wife and family at the beach.

19   On July 29th I received an e-mail from Mr. Hardwick that set

20   an emergency call.  He needed to have a call with my brother

21   and I to discuss -- it just said emergency call, and it was

22   for 10:00 that evening -- I mean 10:00 that morning.

23   Q.    Okay.  And what was the emergency call?

24   A.    Mr. Hardwick called -- we had to call, my brother and I.

25   Mr. Hardwick and Mr. Schneider were on the phone.

1        Mr. Hardwick informed me that Asha Maurya, that he had

2    suspended Asha Maurya from the firm on July 18th on his way

3    out on his trip to Europe --

4    Q.    Okay.  And --

5    A.    -- just before he left.

6    Q.    I'm sorry, sir.

7    A.    Just before he left he told me that he suspended

8    Asha Maurya because there was an altered bank statement in

9    the escrow account that had come up.

10       And he had told me that Asha admitted to him that she

11   inadvertently moved $670,000 from the escrow account to the

12   operating account, and he advised me that he instructed that

13   that money be moved back from the operating account to the

14   escrow account and that he suspended her.  And then he left

15   for Europe on a private plane.

16   Q.    Okay.  And what was he going to Europe for, did he tell

17   you?

18   A.    He didn't -- I -- he -- I knew he was going to Europe.

19   He told me he was going over to play golf and to go to the

20   British Open.

21   Q.    Okay.  And so remind the jury again when you had this

22   conversation with Mr. Hardwick?

23   A.    When he came back.

24   Q.    Which was when?

25   A.    Well, he sent me the e-mail on July 29th, so that was

1    the first call at 10:00 that morning.

2    Q.   Okay.  So eleven days after he had suspended Ms. Maurya?

3    A.   Yes.

4    Q.   Did you ask him why he didn't tell his partners the day

5    it happened?

6    A.   He said that he was looking into it and he just said he

7    was leaving.  I was more focused on the fact -- at that

8    point, I was really just focused on the fact that there was a

9    problem in the escrow account.

10   Q.   What did you do in response?

11   A.   We had a number of calls that day.  I said, I'm coming

12   to Atlanta.  I packed up my bags.

13        My wife came back and she said, Where are you going?

14        I said, I'm going to Atlanta.

15   Q.   Okay.

16   A.   I was on an airplane the next morning, flew down to

17   Atlanta.

18   Q.   Did Mr. Hardwick try to talk you out of coming?

19   A.   He kept telling me, You are on vacation, I've got it,

20   I'll keep you informed.

21        I said, No, no I'm coming.  If there is a problem in the

22   escrow account, I'm on my way.

23   Q.   Okay.  So you come to Atlanta.  Then what happens?

24   A.   I get to Atlanta the next morning.  I think I had like a

25   six a.m. flight, seven a.m. flight the next morning.

1       I get to Atlanta.  I go to the corporate office.

2   Mr. Hardwick is there, his accountant Tony Adams is there,

3   and we begin to talk about what's going on.  And I'm just

4   being told that there is this problem there in the escrow

5   account about this altered bank statement.

6       And prior to that, me coming, at one of those

7   conversations, one of those conversations during the day the

8   day before, Mr. Hardwick told my brother and I that we needed

9   to raise 2.2 million, 2.1 million dollars.  Two million

10  dollars.

11      Two million we needed to raise, and so we each had to

12  come up with, and he told me that I needed to put in

13  $450,000, my brother needed to put in $450,000, and he was

14  going to put in 1.1 million.

15      And I asked him, I said, Why do we have to put in this

16  money?  I mean, if it was an altered bank statement, it's

17  $670,000, and we've already moved it from the operating

18  account back to the escrow account, why do I need to write a

19  check?

20  Q.   And what did he say?

21  A.   He just -- he didn't.  He didn't really say anything.

22      And I'm like, I'm coming to Atlanta.  I'm coming to

23  Atlanta.

24  Q.   Did you tell your brother Roddy what had happened?

25  A.   Well, he was on the phone.

1    Q.   He was on the call?

2    A.   He was on the call.

3    Q.   Okay.

4    A.   So I get to Atlanta.  And we are talking about it, and

5    Mr. Adams is there, and I said, Mr. Adams, I said, Are you a

6    forensic accountant?  I need a forensic accountant.  I want

7    to know what's going on here.

8         He was not.

9         I asked him for a recommendation.  He gave me a

10   gentleman's name by the name of Jeff Moore.

11   Q.   So was it your idea to hire a forensic accountant?

12   A.   I wanted a forensic fraud accountant.  If there is a

13   problem in my escrow account, I want a forensic guy.

14   Q.   Okay.  Did you -- had Mr. Hardwick said anything that

15   led you to believe that it might be bigger than what you

16   understood it to be at that time?

17   A.   At that time, no.

18   Q.   Okay.

19   A.   At that time, no.

20   Q.   So how much of a deficit did you all believe -- or did

21   you believe at that time?

22   A.   At that point in time, I thought it was just

23   $670,000.  But I was -- nobody just does that, and so

24   I thought, I was like maybe she stole more money.  We don't

25   know.

1        You never catch -- just the probability of catching

2   somebody the first time they do something, I thought that

3   there might be another one.

4            THE COURT:  Okay.  Next question.

5            THE WITNESS:  I'm sorry, ma'am.

6            THE COURT:  It's okay.  It's okay.  I just want to

7   keep it Q-and-A.  Go ahead.

8   BY MS. BARRON:

9   Q.   Mr. Wittstadt, staying on that next day when you get to

10  Atlanta, I want you to look at Government's Exhibit 315.

11  A.   Are we done with 3 through --

12  Q.   Yes, sir.

13  A.   Can I put these back over here with 2?

14  Q.   You can set them on that binder, that's fine.

15  A.   Okay.  What am I looking at?

16  Q.   Government's Exhibit 315.

17  A.   Okay, 125.

18       Oh, I have got water right there, thank you, ma'am.

19  Q.   You are welcome.

20  A.   Okay.  Yes, 135.

21  Q.   315, sir.

22  A.   315, yes, ma'am.

23  Q.   Do you recognize Government's Exhibit 315?  Have you

24  seen this document before?

25  A.   I have.

```
1    Q.    What is it?

2    A.    These are text messages between Mr. Hardwick and my

3    brother.

4    Q.    Your brother Roddy?

5    A.    Yes.

6    Q.    And what's the date of these texts?

7    A.    Friday, August 1st.

8    Q.    2014?

9    A.    2014.

10             MS. BARRON:  Your Honor, I offer Government's

11   Exhibit 315.

12             THE COURT:  Any objection?

13             MR. GARLAND:  No objection.

14             THE COURT:  Admitted.

15   BY MS. BARRON:

16   Q.    Mr. Wittstadt, if you would turn to page three, is this

17   a text from Mr. Hardwick to your brother?

18   A.    Yes.  It starts actually on page two, the "not yet," and

19   then it flows over to other files I wired.

20   Q.    And then is he talking about the money that he is

21   contributing?

22   A.    1.5 million.

23   Q.    And he says he got a loan for two for sure and meeting a

24   guy for a loan for three.

25             Three what?  Is that million?
```

1  A.   Three million.

2  Q.   Okay.  So that's on top of the 1.5 million that he's

3  kicking in?

4  A.   Yes.

5  Q.   And had you told him at that point that he needed to

6  raise that two and three million dollars?

7  A.   Yes, ma'am.

8  Q.   And did you tell him whether the firm would be willing

9  to take responsibility for that loan, whether he could

10 obligate the firm for those loans?

11 A.   I told him he was not allowed to do that.

12 Q.   Okay.  And then what does he say to your brother?

13 A.          *She totally screwed me and told me we were*

14              *making all this money and overdisbursed to me for*

15              *sure.  I'm so upset.*

16 Q.   She is who?  Who is she?

17 A.   Asha Maurya.

18 Q.   Okay.  And is this consistent with what he was telling

19 you?

20 A.   At that point, yes.

21 Q.   Now, think back to everything we have talked about.  We

22 have talked about what information Mr. Hardwick is telling

23 you the firm profits are, and what information you were told

24 his disbursements should be.

25          Based on what you knew about the firm profits and what

1    his distribution should have been, did you believe he had

2    been overdisbursed?

3    A.   At this point in time?  At this point in time, or

4    today?

5    Q.   At that point in time.

6    A.   I was focused at that point in time on figuring out what

7    the issue was and getting the money back.  I wasn't trying to

8    lay blame on anybody at that point in time.  We had a

9    problem, and he said he got the money.

10       And at this point in time, he's my law partner, he's

11   telling me something.  I'm not thinking back to all of these

12   things that we have, all of these documents at that point.

13       I'm just saying, If you got the money, you need to go

14   get it and put it back in this law firm.

15   Q.   Sir, if you would turn to page five?

16       Is this Mr. Hardwick again to your brother, *She duped*

17   *me*?

18   A.   Yes.

19   Q.   She being Asha?

20   A.   Yes.

21   Q.   Did he ever explain to you what exactly she had duped

22   him about?

23   A.   All he kept saying to me was that, She told me we were

24   making this much money and I just thought I was entitled to

25   it.

718

1    Q.   Okay.  And -- okay, so you are a lawyer, and at this

2    point you have learned that there is a hole in the escrow

3    account.  What are your concerns from a professional

4    standpoint?

5    A.   I need to notify the bar.

6    Q.   And did you have that conversation with Mr. Hardwick?

7    A.   I did.

8    Q.   And what did you need to notify the bar -- and when you

9    say the bar, you mean the state bar that governs lawyers?

10   A.   Yes.  Every state has a bar association that controls

11   the ethical conduct of attorneys, and most bar associations,

12   the ones that I am barred with, have an ethical obligation to

13   self-report.

14        So if there is a problem, not only can you get in

15   trouble for whatever happened, but then you can get in

16   trouble for not telling on yourselves.

17        So I believed that it was my ethical responsibility to

18   notify every state bar that we dealt with as a law firm in

19   all the different states and to notify them of what I knew to

20   be the problem at the time that I knew it.

21   Q.   And did Mr. Hardwick agree with that decision?

22   A.   Initially no.  And then I said, Well, I'm doing it

23   whether you want to or not.  And he finally did agree.

24   Q.   Okay.  Mr. Wittstadt, if you would look at Government's

25   Exhibit 317?

1           And tell me if you recognize Government's Exhibit 317?

2     A.    These are -- I had my phone -- these are my text

3     messages.

4     Q.    With whom?

5     A.    Mr. Hardwick.

6     Q.    And is this around the time, this July and August 2014

7     time period?

8     A.    Yes.  These are from August 1, 2014, forward.

9             MS. BARRON:  Your Honor, I move Government's

10    Exhibit 317 into evidence.

11            THE COURT:  Any objection?

12            MR. GARLAND:  No objection.

13            THE COURT:  Admitted.

14            MS. BARRON:  Ms. Fleming, if you would turn to page

15    five and about a little over halfway down the page?  Do you

16    see a text that begins I'm sorry?  If you would highlight

17    that portion, please?

18    BY MS. BARRON:

19    Q.    Okay.  Who is saying I'm sorry this happened?

20    A.    Well, that's from -- you will see that that says from --

21    that's Mr. Hardwick's phone number, so that's from him.

22    Q.    And what is he saying here?

23    A.              *I'm sorry this happened.  I feel awful and my*

24              *heart won't stop pounding.  I did nothing wrong but*

25              *trust Asha.  I am ashamed and feel awful.*

1   Q.   Okay.  And is that consistent with what he had been

2   telling you, that he trusted Asha --

3   A.   Right.

4   Q.   -- and she misled him?

5   A.   That's what he had been telling me.

6   Q.   If you turn to page seven, please, and about a third of

7   the way down, Ms. Fleming, there is a sentence that begins

8   *Jeff said he would be working with Tony*.

9   A.   *Jeff said he would be working with Tony*.

10  Q.   Jeff who?

11  A.   That would be Jeff Moore.  That was the forensic

12  accountant.

13  Q.   Okay.  And that's the person that Tony Adams

14  recommended --

15  A.   Yes.

16  Q.   -- at your request?

17  A.   Yes.

18  Q.   Okay.  And so is that a text message that you were

19  sending to Mr. Hardwick?  Are you the one that says,

20  *Jeff said he would be working with Tony*?

21  A.   That's to.  Yes, I said that to him.

22  Q.   And Mr. Hardwick responds?

23  A.   *Perfect*.

24  Q.   And then you say?

25  A.   *He is laying out the whole plan in the engagement*

1    *letter.   This is not going to be cheap.*

2    Q.   So were you the one primarily communicating with

3    Mr. Moore about this?

4    A.   Yes.

5    Q.   Okay.

6    A.   I'm the one that signed the engagement letter with

7    Mr. Moore.

8    Q.   Okay.   Did Mr. Hardwick ever tell you how much he

9    actually was overdisbursed?

10   A.   The number kept changing.   First it was two, then it may

11   have been five, it couldn't be any more than six.

12   Q.   Is this what he was saying?

13   A.   That's what he was saying.

14   Q.   And had you ever heard the word overdisbursed before?

15   A.   No.   That's a new term of art.

16   Q.   Did he ask you how much money you had received?

17   A.   I went back in and looked and went back and tallied up

18   what I received, yes.

19   Q.   And did you tell him?

20   A.   Yes, I did.   I handed him a copy of it.

21   Q.   And what was his response?

22   A.   I got a lot more than that.

23   Q.   But did he ever tell you how much he got?

24   A.   I said, How much more?

25   Q.   And what did he say?

1    A.    I don't know.

2          And then I asked him, I said, Go back and add up

3    yours.  Go to your bank account.

4    Q.    So by August 1st, you said that the number kept

5    changing.  Was it at least clear -- whatever the number is,

6    was it at least clear that there was money missing and that

7    it had gone to Mr. Hardwick, and whatever the number is, we

8    have got to plug it?

9    A.    This timeline is fluid; okay?  This timeline is fluid.

10         He said he got too much money.  There was money

11   moved from -- we knew for a fact that money -- that there

12   was an altered bank statement.  We knew for a fact that

13   Mr. Hardwick directed that $670,000 be moved from one

14   account to the other.  We knew that there were other

15   issues for a fact, because the escrow accounts didn't look

16   right.

17         How much money Mr. Hardwick had gotten at that point in

18   time, he couldn't tell me.  The number kept moving.  He said

19   that he got too much money.

20   Q.    And he had acknowledged that early on?

21   A.    Yes.

22   Q.    Okay.  Ms. Fleming, if you would please pull up

23   Government's 1004, page 997?  Do you mind rotating it,

24   please, and enlarging the check?

25         Mr. Wittstadt, what's the date of this check?

1  A.   August 1st, 2014.

2  Q.   Okay.  And is this right after you arrive in Atlanta?

3  A.   Day after.

4  Q.   Okay.  And how much is the check for?

5  A.   $32,930.77.

6  Q.   And who is it to?

7  A.   Fortuna.

8  Q.   Who signs this check?

9  A.   Mr. Hardwick.

10 Q.   Is this that same Fortuna loan that we have been talking

11 about that was a personal obligation of his that was supposed

12 to count against his disbursements?

13 A.   Yes.

14 Q.   So knowing there is a hole in the escrow account, he's

15 still taking money out?

16 A.   Not -- yes.

17 Q.   Ms. Fleming, if you could pull up page 995, please?

18 A.   This is the one that really bothers me.

19 Q.   Thank you.  Can you enlarge it?  Is it possible to

20 enlarge it just a little bit?

21      Is this that same day?

22 A.   Same day.

23 Q.   How much is this check for?

24 A.   $25,000.

25 Q.   Who is it to?

1   A.   Colony Bank.

2   Q.   And who signs this check?

3   A.   Mr. Hardwick.

4   Q.   And I believe you said Colony Bank was a personal

5   judgment of Mr. Hardwick's?

6   A.   Yes.

7   Q.   If you had known that he was still cutting checks on his

8   behalf from the operating account, would you have allowed

9   that to happen?

10  A.   No.  We agreed we weren't taking any money.  We agreed

11  that we wouldn't even take our paychecks, our salaries at

12  that point in time.

13  Q.   Thank you.

14  A.   I didn't get a salary, I didn't get a paycheck, because

15  I agreed not to take a paycheck because I didn't know what

16  the situation was.

17  Q.   Okay.  At some point did you receive -- well, let me ask

18  you this.

19      Mr. Ritterman, CFO of the default division, did you ask

20  him to come down and participate in this process?

21  A.   Yes, I did.

22  Q.   And did he?

23  A.   Yes, he did.

24  Q.   And did you ask him -- thank you, Ms. Fleming, we can

25  take this down.

1     Did you ask him to try and figure out how much money was

2  taken out of the escrow accounts?

3  A.   I asked him to be involved in the investigation, yes.

4  Q.   Mr. Wittstadt, if you would look at Government's 961,

5  please, and tell me if you recognize this?

6  A.   Which?

7  Q.   Government's 961, sir.

8  A.   Oh.

9  Q.   You can skip 960 for now.

10  A.   Okay, 961.

11  Q.   Yes, sir.  What is 961?

12  A.   It's an e-mail from Mr. Ritterman to myself --

13  Q.   Okay.

14  A.   -- talking about the wire account which I found out

15  about.

16  Q.   Okay.  Is it dated August 4th, 2014?

17  A.   It is.

18       MS. BARRON:  Your Honor, I move Government's 961

19  into evidence.

20       MR. GARLAND:  No objection.

21       THE COURT:  It's admitted.

22  BY MS. BARRON:

23  Q.   Okay.  This says wire account.  You just mentioned

24  something, you said you didn't know it existed.

25  A.   Huh-uh.

1    Q.   Tell me what you learned at this time wire account

2    meant?

3    A.   Sometime late in the day on August the 1st, I started

4    getting information about how the money got out of the firm,

5    and I was looking through accounts.  I came across the

6    Georgia wire account.

7         So I saw some wires going out, and I asked for the

8    detail.  I said, Somebody get me the detail.  Tell me --

9    I want to see who it went to, what it was for, how much, that

10   kind of thing.

11   Q.   And is that what Mr. Ritterman did, did he send you the

12   details for this account?

13   A.   He did.

14   Q.   Okay.  And is this the account that we have been talking

15   about we have seen in some e-mails, the MHS IOLTA Incoming

16   Wire Account?

17   A.   Yes.  This was a Georgia trust account that was set up

18   to accept inbound wires for closings.

19   Q.   Okay.  And does the account end in 7328?

20   A.   Yes.

21   Q.   Okay.  And then Mr. Ritterman sends you a bunch of

22   pages.

23        Can you just summarize for the jury, because all they

24   have is the screen, what these several pages represent, and

25   then we will go into detail on a few of them?

```
1    A.   I asked him to send me -- attach his Excel summary for

2    the past six months, two tabs to view, and then the detail

3    reports.

4    Q.   Okay.

5    A.   So basically it's telling me all of the wires that went

6    out of this account in an Excel format, and then the detail

7    that you get from the bank that says what time it went, what

8    bank it went to, who the beneficiary was, that type of

9    thing.

10   Q.   Mr. Wittstadt, did you learn that Asha Maurya had been

11   paying payroll out of this IOLTA account?

12   A.   I did.

13   Q.   If you would turn to page three, please?  And

14   Ms. Fleming, if you could just highlight the top half of that

15   page, because it is blurry.  Thank you.

16        Okay.  So is this 1.9 million being wired out of this

17   account?

18   A.   Yes.

19   Q.   And who is the beneficiary?

20   A.   PayCom.

21   Q.   And is that the third-party vendor that processed the

22   firm's payroll?

23   A.   Yes.

24   Q.   Should Ms. Maurya have been paying anything out of an

25   IOLTA account --
```

1    A.    No.

2    Q.    -- that was for payroll?

3    A.    No.

4    Q.    Should she have been paying distributions out of this

5    account?

6    A.    No.

7    Q.    Did you learn that you had been distributed money out of

8    this account?

9    A.    Yes.

10   Q.    If we turn to page 13, please?

11   A.    Is it page --

12   Q.    Page 13.

13   A.    Is it going to be 7 of 41?  Because mine aren't

14   specifically numbered here.

15   Q.    If you'd look --

16   A.    It will say 11 of 41 at the bottom?

17   Q.    It will say 11 of 41, yes, sir.

18   A.    I have got it.

19   Q.    And, Ms. Fleming, if you would highlight the top half

20   of that?

21       Okay.  So you talked earlier about this huge

22   distribution that you received in April of $134,000.

23   Is that the one that you said was the biggest you ever

24   received?

25   A.    Yes, ma'am.

1    Q.   Did you know that it came out of this IOLTA escrow

2    account?

3    A.   No, ma'am.

4    Q.   And was your brother also sent money out of this escrow

5    account?

6    A.   Same, yes, ma'am.

7    Q.   Now, if you would turn back to page ten, please,

8    Ms. Fleming?

9    A.   Is that going to be -- does that say 5 of 41 at the

10   bottom?

11   Q.   I believe --

12          THE COURT:  Can you look to the right also, to the

13   right --

14          THE WITNESS:  Oh, I see it now.  Okay.

15          MS. BARRON:  I'm sorry, sir.

16          THE WITNESS:  The way it was doing it, I couldn't

17   see that page number.  Okay, I have it.

18   BY MS. BARRON:

19   Q.   Okay.  Do you see at the top that $400,000 wire to the

20   Venetian that we have already talked about?

21   A.   Yes.

22   Q.   Do you see that that came out of an IOLTA account?

23   A.   I do.

24   Q.   And then right below that, same page, another $300,000?

25   A.   Yes.

1   Q.   And did that go to BRR in Biloxi, Mississippi?

2   A.   Yes.

3   Q.   Do you know what BRR is?

4   A.   Beau Rivage --

5   Q.   Resort?

6   A.   -- Casino.

7   Q.   So when Mr. Ritterman sends you this report, is this the

8   first time that you had learned that you had been disbursed

9   money out of escrow?

10  A.   I didn't know anything about being disbursed out of

11  escrow until I got -- there was the initial of the

12  spreadsheet, but it didn't have any detail to it, and then

13  I got this, which was within a day, they are within days of

14  each other.

15  Q.   Okay.  And so you didn't know you were getting paid out

16  of escrow, but had you ever asked for more money than was

17  supposed to be disbursed to you?

18  A.   There was one time that I was -- my wife and I were

19  buying a home in Florida and I needed to wire $90,000 to the

20  title company that was handling the closing.

21       I had plenty of money in my Wells Fargo account to wire

22  the money, and I called Wells Fargo -- I was with their

23  private bank -- and I called Wells, and I asked them, and the

24  person that dealt with my account was not in -- this is like

25  on a Thursday -- and they couldn't wire the $90,000.

1      So I picked up the phone and I called Asha, and I said,

2   Asha, how much money do we have in the operating account?

3      She told me we had about eight or nine hundred

4   thousand.

5      I said, Good.  Here is what I need you to do.  I need

6   you to wire $90,000 and some change down to this title

7   company for me, and I am going to overnight you a check from

8   my account for $90,000 and change, whatever that was, because

9   I can't get the money wired today.

10     And she said okay, and she wired it.

11     I took out my checkbook, wrote a check back to the law

12  firm for $90,000, put it in the overnight, and sent it back

13  to the firm.

14  Q.   So the one time you asked for extra money, you

15  immediately paid it back?

16  A.   It wasn't even -- it was just -- I just called, I said

17  how much do we have, and she told me, and I immediately just

18  wrote a check and put it back.

19     I wasn't taking a distribution.  I was just in a jam

20  that I couldn't wire my money, and that's why I called to ask

21  how much money we had in the operating account.

22  Q.   Staying on Asha, you said that Mr. Hardwick had

23  suspended her in July.  Did there come a time after you get

24  down to Atlanta when the decision was made to bring her back

25  in?

1    A.    Yes.

2    Q.    And why was she brought back in?

3    A.    To try to help unwind the mess.

4    Q.    Do you remember when she was brought back in?

5    A.    After the 18th.

6    Q.    Of July?

7    A.    Of -- after the 18th of August.

8    Q.    So he was not brought back --

9    A.    Well, she was brought in -- I'm sorry, she came -- she

10   met in the corporate offices when all the investigators were

11   there on, what was it, the 16th to tell --

12   Q.    When you say investigators, do you mean Mr. Moore?

13   A.    Mr. Moore, the folks from Fidelity, lawyers.  A bunch of

14   people.

15   Q.    So she was brought in for that meeting?

16   A.    Yes.

17   Q.    Okay.  And was she brought back on the payroll at some

18   point?

19   A.    Yes, I brought her back.  I authorized her to come back

20   on the payroll to help with the investigators to unwind and

21   try to figure out how this mess could be unwound.

22   Q.    And when did you make that decision to bring her back?

23   A.    19th of August.

24   Q.    Okay.  If you would look at Government's Exhibit 962,

25   please?

```
1   A.    Okay.

2   Q.    Do you recognize -- well, you don't, you are not copied

3   on it.  What is this?

4   A.    It's an e-mail from Mr. Hardwick to Mr. Davenport.

5   Q.    Who is Joe Davenport?

6   A.    He was the HR director.

7   Q.    And what's the date of this e-mail?

8   A.    August the 11th.

9   Q.    Okay.  So a week before you authorized Ms. Maurya to

10  come back?

11  A.    Yes.

12        MS. BARRON:  Your Honor, I move Government's 962

13  into evidence.

14        THE COURT:  Any objection?

15        Any objection?

16        MR. GARLAND:  Oh, excuse me.

17        THE COURT:  That's all right.

18        MR. GARLAND:  No objection.

19        THE COURT:  It's admitted.

20        MS. BARRON:  If you would please publish,

21  Ms. Fleming, and then enlarge the top?

22  BY MS. BARRON:

23  Q.    What does Mr. Hardwick tell Mr. Davenport?

24  A.    He told him to pay her on the payroll.

25  Q.    Pay Asha?
```

```
1    A.    Yes.

2    Q.    And this was before you had authorized her to come back

3    to the firm?

4    A.    I thought she was suspended without pay.

5    Q.    And why was she suspended without pay again?

6    A.    She admitted to moving -- to falsifying a bank

7    statement.

8    Q.    Okay.  So you hired Mr. Moore.  Did there come a time

9    where Mr. Moore had some results to share with the partners

10   of what he found in his forensic audit?

11   A.    Yes.  He called me on the evening of August the 14th.

12   Q.    Okay.  And what did you learn?

13   A.    Mr. Moore informed me that the escrow accounts were 37

14   million dollars upside-down.

15   Q.    Was that more than you expected?

16   A.    Yes, ma'am.

17   Q.    And what did you do, sir?

18   A.    Well, I called my brother -- well, I don't know if I

19   called him.  It was late.

20         I called Mr. Morris and told him.

21   Q.    Mr. Art Morris?

22   A.    Mr. Art Morris and told him and asked him to pick me up

23   in the morning at the hotel.

24   Q.    And did you tell him that you had learned the shortage

25   was 37 million?
```

1   A.   I did.

2   Q.   Okay.  And what did you do next?

3   A.   He picked me up in the morning.  At some point in time

4   I told my brother.  And I picked up the phone, and Mr. Morris

5   called Erika Meinhardt at Fidelity National Title Insurance

6   Company.

7   Q.   Okay.  And what is Erika Meinhardt -- what is her role

8   at Fidelity?

9   A.   She was the president of agency.  She was the boss.

10  Q.   Okay.  And when you say agency, what do you mean?

11  A.   Fidelity National Title Insurance Company.

12       When you conduct a real estate closing, there is this

13  thing called title insurance.  What it does is it guarantees

14  to the lender that their mortgage is first, is in the

15  position that they believe it to be in.  It's an insurance

16  policy.

17       And it also guarantees to the new homeowners that they

18  own the property free and clear of any prior liens and that

19  kind of thing.  And it's a one-time fee.

20       And it also -- Fidelity also guarantees as part of the

21  policies that they issue through its agent, which in this

22  case was LandCastle Title -- and in some cases the law firm,

23  but mostly LandCastle -- that all the money that's entrusted

24  to the firm will be used solely for the purposes in which it

25  is entrusted to the firm.

1      So if there is money missing from the escrow account,

2  not being used, they are on the hook as the insurance

3  company, and we were contractually obligated under the agency

4  agreements to notify them.

5  Q.    Okay.  And I know you are contractually obligated to

6  notify Fidelity.  What could Fidelity have done?

7  A.    Bring in their team.

8      Art was -- Mr. Morris was, No way could it be 37 million

9  dollars.

10      I'm shocked.  Maybe he's wrong, but I need help.  I need

11  the kind of help that -- okay, if it's not 37 million, it's

12  35 million, or it's 32 million.  It's still millions and

13  millions and millions of dollars.

14  Q.    Mr. Wittstadt, are you familiar with something called a

15  closing protection letter?

16  A.    That's what I was talking about.  One of the things that

17  is issued is what's called a closing protection letter, and

18  what it does, it goes to the bank.

19      So let's say Bank of America is lending the money to the

20  borrower, right, at the closing table, and they are wiring

21  two hundred thousand dollars of Bank of America's money to

22  the firm to hold in its trust accounts.

23      And it says that -- the insured closing protection

24  letter says, We guarantee you, Bank of America -- we, being

25  Fidelity, guarantee you, Bank of America, that your two

1    hundred thousand dollars is safe and secure in that

2    attorney's account.  And if there is any money that's not

3    safe and secure, if it ever is not, we are going to pay you.

4    Q.   Okay.

5    A.   That's what it says.

6    Q.   And under the agency agreement with Fidelity, would they

7    have had the right to pull their closing protection letters,

8    CPLs?

9    A.   Yeah.  Oh, yeah.

10   Q.   And if Fidelity had done that, what would have happened

11   to all of those outstanding loans?

12   A.   That would have been bad.

13   Q.   What do you mean by that?

14   A.   The real estate market in Atlanta was just recovering

15   from its -- you know, it was bad.  It would have been really

16   bad.

17        People's mortgages wouldn't have been -- sellers'

18   mortgages wouldn't have been paid off.  They wouldn't

19   have gotten their seller proceeds to go buy the next

20   house.

21        Insurance policies would not have been paid.  Claims,

22   therefore, if there was any claims from homeowners, they

23   wouldn't be covered.

24   Q.   Well, let's make this real, Mr. Wittstadt.  If I have

25   a deal that's pending -- we haven't closed yet, but I have

1   a deal that's pending, I have got a closing date in two

2   weeks, and Morris Hardwick Schneider is going to close that

3   deal.

4        If Fidelity pulls the CPL on my home deal, what happens

5   to me?

6   A.   Well, you are actually not in a bad spot, because you

7   haven't given us the money yet and the bank hasn't given us

8   the money yet.

9   Q.   But do I get to close on that house?

10  A.   You may go someplace else.  You are not really the

11  problem.

12       The problem was the guy that was closing today, the guy

13  that closed yesterday, the guy that is closing tomorrow,

14  those type of monies.

15       And when you are closing 2,300 closings, and the average

16  price is two hundred thousand, three hundred thousand

17  dollars, those are the problems.

18       Because if you were the seller and I'm the buyer and

19  I give my money and the bank gives me the money and you are

20  expecting to take -- to sell me your house and expecting

21  $100,000 in net proceeds to you and expecting the law firm to

22  pay off your $250,000 mortgage, your $250,000 mortgage

23  doesn't get paid off.

24       You've transferred this property to me.  Now I own it,

25  but I own it subject to your mortgage.  Now my bank's

1   mortgage is on there.

2       Your $100,000 bounced.  We couldn't give it to -- you

3   couldn't go buy -- you and your husband or you and your

4   partner or whoever couldn't go buy your next home because you

5   didn't have the hundred thousand.

6           THE COURT:  I'm sorry.  Ms. Barron, take control of

7   your examination.

8           THE WITNESS:  I'm sorry.

9           THE COURT:  It's okay, it's not you.  It's the

10  lawyer who is examining, she needs to take control.

11          MS. BARRON:  I'm trying not to interrupt the

12  witness.

13          THE COURT:  I understand.

14          MS. BARRON:  But I will try to do a better job.

15          THE COURT:  I understand.

16  BY MS. BARRON:

17  Q.  Mr. Wittstadt, when Fidelity comes into Atlanta after

18  they have learned of this escrow shortage, did they make --

19  did they -- excuse me -- were there any conditions about

20  Fidelity deciding not to pull those CPLs, not to pull those

21  closing protection letters?

22  A.  Initially?

23  Q.  Uh-huh.

24  A.  Not initially.  There was no decision made initially

25  when they first came in on the 15th.

```
1   Q.   Okay.  Did you, as one of the managing partners of this
2   firm, make a decision about whether Mr. Hardwick would be
3   allowed to continue his employment at the firm?
4   A.   Eventually I did.
5   Q.   Okay.  And what decision did you reach?
6   A.   Based upon what we had found out so far, the fact that
7   the escrow accounts were that far upside-down, that
8   Mr. Hardwick had received -- that significant amounts of
9   money had been wired out to Mr. Hardwick to casinos and jets
10  and such, my brother and I on the 17th met and suspended
11  Mr. Hardwick from the firm without pay pending further
12  investigation.
13  Q.   Mr. Wittstadt, if you would look at Government's Exhibit
14  964?
15  A.   Okay.
16  Q.   Is this an e-mail from Mr. Hardwick to you on that day,
17  August 17th, 2014?
18  A.   Yes.
19       MS. BARRON:  Your Honor, I move to admit
20  Government's 964.
21       THE COURT:  Any objection?
22       MR. GARLAND:  No objection.
23       THE COURT:  All right.  It's admitted.
24       MS. BARRON:  Ms. Fleming, if you would highlight
25  the bottom e-mail there?
```

1    BY MS. BARRON:

2    Q.   Mr. Hardwick says:

3                    *Mark, Good evening.  I hope you are having a*

4            *great day.*

5        And then he sends a list of ten things.  What are these

6    ten conditions, generically?  What is he trying to broker

7    here?

8    A.   He's trying to negotiate an exit for himself from the

9    firm.

10   Q.   Okay.  If you look at item number two, what is one of

11   his demands?

12   A.               *I want to control the message to the firm*

13           *and the public.  Fidelity can agree to the*

14           *content.*

15   Q.   If you look at number four, what is he saying?

16   A.               *I will have no further liability to Fidelity,*

17           *the firm, or its partners.*

18   Q.   And then number five?

19   A.               *The loans equaling five million to*

20           *Dustin Johnson and Jim Pritchard will be paid by*

21           *the firm.*

22   Q.   So he sends you these conditions.  Did you agree to

23   these conditions?

24   A.   No.

25   Q.   Okay.  If you would look at Government's 963?

1        And I'm sorry, before we get to 963 -- if you could pull

2   that back up, Ms. Fleming, 964, and highlight number seven?

3        What else is he asking for in number seven?

4   A.            *I receive a salary of 100K a month or my*

5               *split from the 27.5 percent remaining interest,*

6               *whichever is greater.*

7   Q.   Okay.  Did you agree to that term?

8   A.   No.

9   Q.   Okay.  Now if you would look at Government's 963?

10       Do you recognize Government's Exhibit 963?

11  A.   Yes.

12  Q.   Is that an e-mail from Mr. Hardwick to you on that same

13  day?

14  A.   Yes.

15            MS. BARRON:  Move to admit Government's Exhibit

16  963.

17            MR. GARLAND:  No objection.

18            THE COURT:  It's admitted.

19            MS. BARRON:  If you would publish, Ms. Fleming, and

20  then highlight -- thank you.

21  BY MS. BARRON:

22  Q.   Okay.  Is Mr. Hardwick modifying his conditions here?

23  A.   Trying to.

24  Q.   Okay.  What Is he saying?

25  A.   Well, he's saying that -- well, number ten of the prior

1    one said if he didn't have his law license.  Now he's saying

2    if he doesn't have his law license, then he wants his shares

3    to go to his sister.

4    Q.    Okay.  And then, *I want you to know*, could you please

5    read that?

6    A.              *I want you to know that I am only considering*

7                    *this to save the firm and the 800 employees I have*

8                    *built up over the 24 years.  That is the only*

9                    *reason.*

10                   *I had no knowledge that any money came out of*

11                   *escrow funds, and I believed that the money*

12                   *I received came from my share of the profits.*

13                   *I had no knowledge of this prior to July 18th,*

14                   *and I did not knowingly violate and law or ethical*

15                   *duty.*

16                   *I won't be a scapegoat to the firm but will*

17                   *help save it.*

18   Q.    Mr. Wittstadt, after you learned that the hole in the

19   escrow account was maybe 37 million, but we are talking about

20   that large, based on what Mr. Hardwick was saying to you the

21   profits of the firm were, based on what Ms. Maurya and

22   Mr. Hardwick were saying to you his distribution should be,

23   is there any way that sentence can be true, he believed the

24   money he received came from his share of the profits?

25                   MR. GARLAND:  Objection.

1           THE COURT:  Sustained as to the form of the

2    question.

3    BY MS. BARRON:

4    Q.   Mr. Wittstadt, based on the amount of money that

5    Mr. Hardwick received in excess of the distributions, was

6    there ever any profitability of the firm that Mr. Hardwick

7    communicated to you or that Ms. Maurya communicated to you

8    that would justify him taking that much money?

9    A.   No.

10          MS. BARRON:  No further questions.

11          THE COURT:  All right.  We are at 12:30, which

12   I think is a good stopping point before we start

13   cross-examination.

14          All right.  Ladies and gentlemen, it's 12:30.  I'm

15   going to excuse you for an hour for lunch.  We will reconvene

16   at 1:30.  Thank you so much.

17          Of course, do not discuss the case.  Thank you so

18   much.

19          (In open court without a jury present:)

20          THE COURT:  All right.  Everyone be at ease for a

21   second.

22          And I want to make it clear, because it's hard to

23   balance here.  Of course, government, I understand this is a

24   critical witness and I understand there is emotion involved,

25   so I'm trying to give you some flexibility.

1           And I also understand he's a lawyer, and with all

2   due respect, we legal types love to talk and love to explain

3   things.  But, Ms. Barron, again as the examining attorney,

4   you have to control the examination.

5           And I overruled the defense's objections to

6   narrative and to just letting the witness go on and on,

7   but I look to you as the examining attorney to make sure it

8   stays in the Q-and-A format, and that if there is something,

9   even if it's emotional testimony, that you guide the

10  examination instead of allowing the witnesses to do so.

11          So I just want to make that clear, just everyone

12  keep that in mind.  But again I'm trying to do the best I can

13  to balance it, because I know, again, this is an important

14  witness who has a lot to say, and I understand that.  So I'm

15  not overlooking that.

16          MR. GARLAND:  Your Honor, I would like to address a

17  request.

18          This, we had some -- we have not had pulled

19  together literally hundreds of disseparate documents.

20  I would make a request that you allow me to cross-examine

21  starting in the morning and that the government go forward

22  with some other witnesses in order that I can make the

23  examination coherent from the documents.

24          We were going from one to one to one, and you know

25  it comes out of a vast pool of documents.

1           THE COURT:  Okay.  Let me understand the issue a
2    little bit more clearly.
3           What is it, first of all, that you are saying
4    that you -- is there something you are saying that you just
5    received today, a summary or something else that was just
6    received today?
7           MR. GARLAND:  No, I didn't -- well, no, I'm not
8    saying that.  We got different materials at different times,
9    but I am saying there is so much that was referenced out of a
10   huge pool, that to do a coherent examination to deal with all
11   of those documents pulled from all of those places and
12   interlaced with extensive testimony, that -- you know, this
13   is a summary witness but interlaced with all kinds of other
14   things.
15          I am simply asking for time overnight and I be
16   allowed to cross-examine him in the morning.  And I believe
17   the government has other witnesses they could move forward
18   with.
19          THE COURT:  I'm not going to grant that request.
20          And, I'm sorry, Mr. Garland, I think I have bent
21   over backwards to accommodate you.  I've allowed your expert
22   to remain in the courtroom the entire trial, not just during
23   certain testimony.  I have tried to ensure that all deadlines
24   have been met.  I have looked the other way several times
25   when attorneys have failed to meet my deadlines and have

1    created their own deadlines for document exchange.

2            And I hear everything you are saying, and I am

3    sensitive to the needs to be fully prepared and to give

4    Mr. Hardwick an adequate defense, but I deny that request at

5    this time.

6            You do have an hour, and I will even add a couple

7    extra minutes to that, if you like.  But I will not suspend

8    the trial or ask them to call another witness out of order to

9    start cross-examination in the morning.

10           MR. GARLAND:  Would you give me an extra fifteen

11   minutes?

12           THE COURT:  I will give -- I will do that.  I will

13   give an extra fifteen minutes.

14           All right.  Thank you, sir.  And we will tell the

15   jury that as well.

16           All right.  Thank you so much.

17           MS. NOVAY:  Your Honor, I'm sorry, we sort of

18   drifted into lavish spending a little bit with each witness.

19           THE COURT:  Let me make something clear.  Fifteen

20   minutes is starting -- the time has started, all right, from

21   12:30.  So we are doing 1:45.  We can take up issues as much

22   as we want, but 1:45 we are coming back.

23           But let's go.

24           MS. NOVAY:  We started to drift into lavish

25   spending with different witnesses.

```
 1              THE COURT:  Yes, ma'am.

 2              MS. NOVAY:  We have a limiting instruction.

 3              You know, I would prefer that it be done

 4    contemporaneously, and I am kind of looking to the government

 5    to say what they are bringing in.

 6              THE COURT:  I have forgotten all about it.  I mean,

 7    it was given at the beginning when Mr. Phillips reminded me

 8    during the preliminary instruction, but I didn't even think

 9    any more about it.

10              Government, do you agree that it probably should

11    have been given maybe -- I don't even remember who testified

12    before this, but definitely at this time?

13              MR. PHILLIPS:  I don't, Your Honor.  I don't see

14    any reason to restate it.  The jury has already heard it.

15              THE COURT:  Oh, so the government was never of the

16    mind-set that it should be given contemporaneously with the

17    evidence?

18              MR. PHILLIPS:  Your Honor --

19              THE COURT:  And I think -- come to think of it --

20    and I'm sorry to cut you off -- is that the discussion that

21    we had -- and I just don't remember.

22              I remember at the beginning that I discussed

23    contemporaneously, and I was the one who asked but how am

24    I supposed to know with which witnesses?  Am I supposed to do

25    it with each one?
```

1          And I thought that's when we agreed that it should

2    be done once at the begin and also at the end.  So my memory

3    now is not that I would keep giving it, but do you recall

4    something else, Ms. Novay?

5          Because I do remember asking you how am I, as the

6    Court, supposed to know to what witness it applies.

7          MS. NOVAY:  I recall that as well.

8          THE COURT:  Okay.

9          MS. NOVAY:  My understanding was I thought that

10   I had said -- and I haven't seen the transcript, but

11   I thought I had said I will check with the government and I

12   will ask in advance.

13         But our position all along is this is something

14   that is tough evidence, and in fact I think it was Mr. Morris

15   that even said who would spend money on that, who would use

16   these planes, it's a waste of money.

17         We are now getting into the witnesses' opinions

18   about the evidence.  I think absolutely having a curative

19   instruction -- or limiting instruction --

20         THE COURT:  Not curative, right.

21         Okay.  Let me hear from Mr. Phillips, but I will

22   tell you what my inclination is.

23         It is not to try to figure out which witnesses

24   qualify as lavish spending witnesses and to give it each

25   time.  I think that's unnecessary.

1          But I have given it once at the beginning, I will

2   give it again at the end, and I will give it one more time

3   somewhere in the trial.

4          If this is the witness, if you want me to remind

5   them again right before -- I don't know, at some point,

6   I will.  But I'm not going to give it repeatedly.

7          So, Mr. Phillips, let me hear from you.

8          MR. PHILLIPS:  That's fine, Your Honor.  No

9   objection.

10          THE COURT:  All right.  So, Ms. Novay, given that

11   that's what I'm going to do, when is it that you suggest that

12   I give it?

13          We have already gone under -- we've taken this

14   witness underway at this point, we are getting ready to start

15   his cross, but when would you like me to do it again?

16          MS. NOVAY:  If I can reserve answering, I would

17   like to talk to the government about who they might call

18   and --

19          THE COURT:  Not waste it, not spend it yet?

20          MS. NOVAY:  Right.

21          THE COURT:  Okay.  Not a problem, not a problem.

22          MR. PHILLIPS:  Your Honor, I can just tell you on

23   the record, that person is Kim Johnson.

24          THE COURT:  Why don't you talk to her about it.

25   That's what I'd like you all to do is talk to each other

1    sometimes.

2              MR. PHILLIPS:  We've already talked about that.

3              THE COURT:  Well, talk again.  Talk again,

4    Mr. Phillips.  I'm directing you to do that, to have a

5    conversation with them.  It shouldn't take that long just to

6    talk to them.

7              She's interested in speaking about this important

8    issue.  I direct you to do that.

9              MR. PHILLIPS:  Yes, Your Honor.

10             THE COURT:  Thank you so much.  We will reconvene

11   after lunch.

12                  (A recess is taken at 12:39 p.m.)

13                        --  --  --

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    Wednesday Afternoon Session

 2                      September 26, 2018

 3                          1:48 p.m.

 4                          -- -- --

 5           (In open court without a jury present:)

 6           THE COURT:  We will wait for Mr. Garland to rejoin

 7    us.

 8           THE WITNESS:  Your Honor, would you like me to take

 9    the stand again?

10           THE COURT:  Yes, please, sir.

11           Ms. Loeb, has someone sent word to him?  If you

12    would let him know that the Judge is on the bench.

13           (Attorneys assemble.)

14           MR. GARLAND:  Sorry.

15           THE COURT:  That's okay.

16           (In open court with a jury present:)

17           THE COURT:  Ladies and gentlemen, I would just let

18    you know that I have received your memo to please, please let

19    us out by 4:45 like you promised yesterday, so we will work

20    within the parameters the best way we can.

21           But the memo has made it to me.  Thank you so

22    much.

23           MR. GARLAND:  Is my name on it, Judge?

24           THE COURT:  You may proceed.

25                          -- -- --
```

CROSS-EXAMINATION

BY MR. GARLAND:

Q.   Good day, Mr. Wittstadt.

A.   Good day, Mr. Garland.

Q.   You and I have met before?

A.   We have.

Q.   And I had occasion to take your deposition up in
Baltimore, did I not?

A.   Yes, you did.  Yes, sir.

Q.   Now, could I ask -- and we haven't done this before --
the government to show Defendant's Exhibit 28?

         MR. GARLAND:  Do you have 28, Defendant's Exhibit
28?

         MS. BARRON:  We only have the government's
exhibits.  We only have yours on a thumb drive.

         MR. GARLAND:  If I put it on the ELMO, will it go
up there?

         MS. BARRON:  Yes.

         THE COURT:  Ms. Novay and Mr. Phillips only, may
I have up here?

         (At sidebar:)

         THE COURT:  Did you all decide anything about when
to give this again?

         MS. NOVAY:  I think we have.

         THE COURT:  Will it affect this witness at all?

```
 1              MS. NOVAY:  No.

 2              THE COURT:  Remind me to bring it up again after

 3    this witness.

 4              MS. NOVAY:  Thank you.

 5              (In open court:)

 6    BY MR. GARLAND:

 7    Q.   Mr. Wittstadt, I show you what is marked as Defendant's

 8    Exhibit 28.

 9    A.   May I remove these out of the way and put these

10    someplace over here?

11    Q.   You might need them.

12    A.   That's fine.  I will just keep them out of the way over

13    here.

14         Okay.  Yes, sir.

15              THE COURT:  You said 28, Mr. Garland?

16              MR. GARLAND:  28.

17              THE COURT:  Okay, yes, sir.

18    BY MR. GARLAND:

19    Q.   Do you recognize that?

20    A.   Do I recognize it?  I am not copied on it, sir, but

21    I see what it is.

22    Q.   All right.  Aren't you shown as a recipient?

23    A.   Let me see.  No, sir, I am not.

24    Q.   Did you write -- well, let me ask you this.  The

25    question is did you write the e-mail at the top?
```

1   A.   No, sir, I did not.

2   Q.   You are -- I see, this is written by your brother.

3   A.   Yes, sir.

4   Q.   Do you recognize this as part of the business records of

5   the firm?

6   A.   If you'd let me see it again, sir?

7        I recognize this as a formatted e-mail from my brother

8   Rod to Asha Maurya, yes.  I see the e-mail addresses, yes,

9   sir.

10             MR. GARLAND:  I move in 28.

11             MS. BARRON:  No objection.

12             THE COURT:  All right.  It's admitted.

13   BY MR. GARLAND:

14   Q.   Now, you would -- when you would get distributions, you

15   would get the same as your brother; right?

16   A.   Yes, sir.

17   Q.   Okay.  I want to put page -- the third page of this

18   exhibit, I will point your attention to the bottom line.

19   A.   I am not sure who that is from, but it says to

20   Gerard Wittstadt, Jr., subject Estimated Payments.

21   *Roddy, sorry, see attached*.

22   Q.   Okay.  Then let's go to the next page, and there is an

23   e-mail from your brother?

24   A.   Can you slide it down a little bit?

25   Q.   Oh, I'm sorry.

1    A.    That's fine.  Yes, sir, I can see it.

2    Q.    There is an e-mail from your brother to Asha concerning

3    estimated payments; correct?

4    A.    Yes, sir.

5    Q.    And there your brother says he's going to pay his

6    estimated taxes today.

7                    *Make sure that my December distribution is*

8              *wired to me when it is ready to be so.  Please*

9              *confirm the date and the amount so that I can keep*

10             *my records straight.*

11         And it was from your brother; correct?

12   A.    That's what it says, yes, sir.

13   Q.    Now, we will go to the next page, and would you at the

14   beginning of the next page -- excuse me, there is an e-mail

15   from Asha to your brother; correct?

16   A.    Yes, sir.

17   Q.    And it says:

18                    *Hi, Rod.  Distribution amount of $600,075 is*

19             *being wired to your account ending in 5712*

20             *today.  I hope you and your family have a Merry*

21             *Christmas.*

22         Is that what it says?

23   A.    Yes, sir.

24   Q.    And you got a six hundred thousand dollar distribution

25   wire just like your brother on that day, didn't you?

1    A.   No, I did not.

2    Q.   You didn't receive the money?

3    A.   I received two hundred -- I directed that Asha -- I was

4    supposed to get six hundred seventy-five thousand, and

5    I directed that Asha withhold, the firm withhold from my

6    distribution a significant amount of that money and send it

7    to the IRS.

8    Q.   So whether it was sent to the IRS or to you, your

9    distribution was $600,075 just like your brother's?

10   A.   Unfortunately, no, sir.  They never sent my money to the

11   IRS.  They told me -- it was told that it was sent to the

12   IRS, but it never got sent.

13   Q.   Asha told you --

14   A.   Yes.

15   Q.   Right.  Asha told you that she had done it; right?

16   A.   Yes, she did.

17   Q.   And she deceived you?

18   A.   Yes, she did.

19   Q.   And you didn't know it.  You didn't know you were being

20   deceived, did you?

21   A.   No, I did not.

22   Q.   But your brother got the six hundred thousand?

23   A.   Yes, he -- I believe he did, yes, sir.

24   Q.   Now, earlier today several times you said the largest

25   distribution was -- what did you say that you got, $134,000?

1    A.    Yes, sir.

2    Q.    Okay.  And there were plenty of times, were there not,

3    that you communicated directly with Asha Maurya?

4    A.    Yes, sir.

5    Q.    And your brother communicated directly with Asha Maurya,

6    to your knowledge?

7    A.    I believe he did.

8    Q.    Okay.  And Frank Ritterman, your comptroller -- he is

9    your comptroller?

10   A.    He was the CFO of the default side of the firm.

11   Q.    Chief financial officer?

12   A.    That is correct.

13   Q.    And you knew he was in frequent communication with Asha;

14   right?

15   A.    I directed him to do so, yes, sir.

16   Q.    Okay.  Now, do you know whether Asha drew down off of

17   the credit line to make this distribution?

18   A.    Yes, sir.

19   Q.    Did she?

20   A.    Yes -- no.  Did she?  No, she did not.  Mr. Ritterman

21   did.

22   Q.    So they were working together?

23   A.    No, not working together.

24   Q.    I mean, they coordinated to get the money off the credit

25   line; right?

1    A.    It was agreed between myself, my brother, and

2    Mr. Hardwick that that 2.2 million dollars would be drawn

3    down off the line to pay Mr. Morris and to pay Mr. Hardwick

4    and to pay myself and my brother Rod.

5    Q.    So two million --

6    A.    I think it was two million, yes.

7    Q.    Two million, in that number, was taken off the credit

8    line, and this was 2013; right?

9    A.    2012.

10   Q.    2012?

11   A.    December of 2012.

12          Well, wait a minute.  What is the date of that e-mail,

13   sir?

14   Q.    This is '13.

15   A.    Excuse me?

16   Q.    This was '13.

17   A.    '13, yes.  The two million -- there was a draw-down on

18   the credit line, yes, sir.

19   Q.    And it had been done in prior years, had it not?

20   A.    One year prior.

21   Q.    And do you remember how much was drawn down off the

22   credit line one year prior at the end of the year as a

23   distribution?

24   A.    Not exactly, sir, not off the top of my head.  The

25   records would show.

1    Q.   All right.  So at that moment you were able to draw down

2    off the credit line two million; right?

3    A.   We agreed to, yes, sir.

4    Q.   Now, you didn't have the tax returns prepared at that

5    time, did you, for 2013?  They hadn't been prepared obviously

6    at that time?

7    A.   If we pulled down -- if we pulled down for 2012, if it

8    was done at -- wait a minute.

9    Q.   Okay.  So this was a draw --

10   A.   Wait a second, I'm getting my dates confused.  So which

11   time are you talking about, sir?

12   Q.   December 23rd, 2015 -- excuse me, 2013.

13   A.   December of 2013?

14   Q.   Yes.

15   A.   We were drawing down for our personal estimated taxes

16   for 2013.

17   Q.   This was looking forward?

18   A.   Yes.  Under the IRS rules, you have to have a certain

19   amount of your personal income taxes paid by either it's the

20   end of December or January 15th to avoid penalty.

21   Q.   Is it for the year before?

22   A.   Yes.

23   Q.   So --

24   A.   So that would be if we were pulling down for '13, if

25   that happened in '13, that was a draw-down for 2013 taxes,

1    that the tax return would be due April 15th, 2014.

2    Q.    Right, okay.  And likewise you did that same kind of

3    thing the year before?

4    A.    Yes, sir.

5    Q.    Okay.  And do you remember what the net profit was in

6    2012?

7    A.    2012?  2012, I think it was 1.5 million.

8    Q.    So in one draw-down, you took out more than the profits

9    in distribution from the credit line?

10   A.    No.  The profits are based upon cash profits, I believe,

11   and it's an accounting process.  I mean, Mr. Ritterman was

12   involved, and it was done so that -- and it was done the way

13   it was supposed to be done.  I talked to Mr. Ritterman about

14   that.

15   Q.    In fact, Ritterman got involved back in '12.  Driskell

16   got involved, didn't he?

17   A.    I believe that's correct.

18   Q.    Everybody was figuring out that the distributions were a

19   different matter than the profits; right?

20   A.    No, not necessarily.

21   Q.    Well, you all were taking out collectively more than the

22   profits, because you showed a negative, didn't you, on your

23   tax returns that were filed?

24          MS. BARRON:  Objection, Your Honor.  He's

25   misstating the evidence as to the profits of 2013.

1    THE COURT:  I will overrule.  I will overrule.

2  Let him get the question out and the witness can clarify.

3  A.   I don't believe so.  I don't think that's correct,

4  sir.

5  Q.   Do you know how you went into the negative on the

6  books?  Do you know how much the negative was?

7    MS. BARRON:  Objection, Your Honor.  He's

8  misstating the evidence.

9    THE COURT:  Thank you.  I will overrule.

10  A.   I don't think that's correct, sir.

11  Q.   The balance sheet in 2011, did it show a negative?

12  A.   I think it did.  I think it did on the capital accounts,

13  yes.

14  Q.   And in 2012?

15  A.   I didn't see that until later, but I think -- if that's

16  what the audited financial statements show, then that's what

17  they show.

18  Q.   Right.  It shows a negative, doesn't it, of a million or

19  more; right?

20  A.   If you would show me the statement, sir, I would be more

21  than happy to look it.

22  Q.   If I can put my hands on it, I will.  But --

23    THE COURT:  What did you say, Mr. Garland?

24    MR. GARLAND:  I said if I could put my hands on it,

25  I will.

1   BY MR. GARLAND:

2   Q.    You know that the balance sheet, you studied this,

3   showed a substantial negative, correct, on the capital

4   accounts --

5   A.    Sir, you asked me --

6   Q.    -- in 2012?

7   A.    You asked me since I studied it.  I haven't studied it.

8   Q.    Okay.

9   A.    But, I mean, I understand that the capital accounts were

10  in the negative, yes, sir.  I do know that.

11  Q.    And if you take money that you have borrowed and make a

12  distribution of that money, that could drive -- if it was

13  more than you had invested in it, it could drive your capital

14  account into the negative; right?

15  A.    I don't know, but I didn't have a capital account in

16  2012.

17  Q.    Right.  Because you were not a shareholder in 2012;

18  correct?

19  A.    I was not one under the Georgia corporation, as we had

20  talked about in my direct examination.  That is correct,

21  sir.

22  Q.    But you say -- but there was this understanding, these

23  agreements between you and Mr. Hardwick, that you would be

24  paid like a partner; right?

25  A.    There were certain agreements that were in place, yes,

1    sir.

2    Q.    Yeah.   That started back in 2011; right?

3    A.    Yes, sir.

4    Q.    And do you know the date they started?

5    A.    Well, yes, sir.   They are dated May 17th, 2011.

6    Q.    May 17th.   Now, before May 17th, you were operating your

7    employment under a service agreement; correct?

8    A.    Yes, sir, that is correct.

9    Q.    Right.   And there is two service agreements, one for you

10   and one for your brother; right?

11   A.    That is correct.

12   Q.    But we get up to 2011, and you know the date, and

13   I can't keep it in my head, but May?

14   A.    That's the date that it's executed, yes, sir.

15   Q.    That's right.   And so at that point, you and

16   Mr. Hardwick did have an agreement that you would get paid

17   like you were a partner or shareholder, but the paperwork

18   wouldn't show that you were a shareholder.   You would just

19   get paid like one; correct?

20   A.    Basically.   In easy terms, that's kind of correct, yes,

21   sir.

22   Q.    Just regular old laymen's terms, that was the effect of

23   it; right?

24   A.    Basically what it did was it changed the way in which

25   I got paid, and it put me into the position to make more

1    decisions with regards to the firm.

2    Q.    You have been talking about getting your distributions.

3    You would have salary; right?

4    A.    Yes, sir.

5    Q.    And it was agreed with Mr. Hardwick you would have a

6    bonus; right?

7    A.    Distribution, bonus, yes, sir.

8    Q.    That's right, distributions and bonus being in the same

9    category; right?

10   A.    Yes, sir.

11   Q.    But you got it under the appearance that you were not a

12   shareholder but a salaried employee; right?

13   A.    I'm not following that one.

14   Q.    Well, you were treated on the books as a salaried

15   employee; correct?

16   A.    Yes, we all were.  We were all salaried employees of the

17   firm.

18   Q.    Everybody had a salary, among your brother, you and Nat,

19   and then until Mr. Morris left.  That changed some as it

20   related to Mr. Morris; right?

21   A.    Well, yes, sir.  He no longer received a salary.  He

22   received deferred compensation, which is a completely

23   different animal.

24   Q.    Different.  But I want to go back to you, now.

25   A.    Okay.

1    Q.   So the agreement that we have seen -- you have seen what

2    we call the Maryland agreement.  You know the one -- you know

3    what I'm talking about?

4    A.   Yes, sir, I do.

5    Q.   Right.  And so you were following the understanding that

6    you and Mr. Hardwick had, but the Maryland agreement couldn't

7    be used in Georgia; right?

8    A.   That's correct.

9    Q.   Right.

10   A.   Well, the Maryland agreement was between -- it dealt

11   with a Maryland corporation and the Georgia P.C., and

12   that was --

13   Q.   It was never carried out in Georgia?

14   A.   Well, in effect it was.  In effect it was.

15   Q.   You are talking about the agreement you and Mr. Hardwick

16   had?

17   A.   What was stated in that agreement, whether it be --

18   whether it be up in Maryland or what, wherever, that was the

19   agreement that Mr. Hardwick, my brother, Mr. Morris, and

20   I had with regards to what my salary would be and the

21   percentage of the profits of the overall entity I would

22   receive.  And it also dealt with how I would be on the board

23   and decisions that were to be made.

24   Q.   So that agreement ultimately got replaced by the June

25   2013 shareholders agreement; right?

1    A.    That is correct.

2    Q.    Right.  The June 2013 agreement had not been drawn up

3    and signed until 2013; right?

4    A.    There were many, many drafts back and forth trying to

5    get it fixed, like I said, and then figuring how to let the

6    air out of the tires and then figure to the Inc.

7         But, yes, it took some time, but we finally got it done

8    June of '13.

9    Q.    You all had discussions, debates going back and forth to

10   try to finally get a comprehensive document of what the

11   understanding would be; right?

12   A.    Yes, sir.

13   Q.    And once you reached that understanding, that agreement

14   said this agreement relates all the way back to May of 2011;

15   right?

16   A.    No, I don't think so.  It became effective January 1 of

17   '13.

18   Q.    It became effective, but it relates back as if it had

19   been in place; correct?

20   A.    I don't know, sir.  You would have to show me the

21   agreement and let me look at the language.

22   Q.    We will get to the agreement.

23        That agreement, to get there, you had debates over many

24   things, right, with Mr. Hardwick?

25   A.    Throughout the course of trying to have Mr. Schneider,

1    Mr. Morris exit, and my brother Rod and I to come in, yes, it

2    took some time.

3    Q.   And it wound up with you being the sole person in charge

4    of default; correct?

5    A.   Yes, sir.

6    Q.   That's the word, sole person in charge?

7    A.   That's what it says.

8    Q.   Right.  And when it came to the closing section,

9    Mr. Hardwick became the sole person in charge in that

10   agreement; correct?

11   A.   Right.  But there was certain things that allowed each

12   of us to kind of step over the boundaries.  But in general

13   senses, yes.

14   Q.   You all weren't going to get involved in each other's

15   business one way or the other, right, when you say step over

16   the boundaries?

17   A.   Basically what it came down to was this.  That I would

18   run default, Mr. Hardwick would run closings.  That I would

19   consult with him about things, he would consult with me about

20   things, and we would make decisions regarding the overall

21   thing of the firm together.

22   Q.   It was kind of loosey-goosey what was overall and what

23   was your sole dominion and what was his sole dominion, wasn't

24   it?

25   A.   No, sir, that's not true.

```
1    Q.   Oh, okay.
2              MR. GARLAND:   Could you help me, where is 979?   I
3    don't know if it's up here.
4              MS. BARRON:   I think it's here.
5              MR. GARLAND:   It's here?
6    BY MR. GARLAND:
7    Q.   I am going to place before you an admitted exhibit
8    Government 979.
9    A.   Okay.
10   Q.   I know you are familiar with it, but would you look at
11   that and check and make sure that is the agreement?
12   A.   Yes, sir, this is the agreement.
13   Q.   All right.   Let me borrow it back.
14   A.   Sure.
15             MS. BARRON:   Ed, we can put that up, if you like?
16             MR. GARLAND:   That would be helpful.   Would you put
17   up the first page of Government's Exhibit 979?
18   BY MR. GARLAND:
19   Q.   Can you read it on there or does it need to be
20   enhanced?
21   A.   I can.   My eyesight isn't that bad.
22   Q.   Well, mine is.   Would you block off like you do the
23   introductory paragraph?
24        All right.   That is what it says, who is involved in
25   this agreement; correct?
```

1    A.    Yes, sir, it does.

2    Q.    Okay.  And it says is made and entered into effective as

3    of the 1st day of June 2013; correct?

4    A.    That's what it says, yes, sir.

5    Q.    And that is the date that you say you became an actual

6    shareholder; right?

7    A.    In the Georgia corporation, yes, sir.

8    Q.    Right.  Up to that time you had not been.  You and

9    Mr. Hardwick were working off agreements that weren't

10   reflected in a shareholders agreement but were reflected

11   in -- excuse me, that were scattered through a number of

12   shareholders agreements and understandings; right?

13   A.    I'm not agreeing with your classification of scattered

14   through.

15   Q.    No?

16   A.    But the agreements were a living document.  It was a

17   living process.

18         From the time that Mr. Schneider wanted to depart

19   throughout the time that Mr. Hardwick wanted to depart, as

20   I testified earlier, there were these things about trying to

21   get us to become a shareholder in the Georgia corporation,

22   and we kept going around the mulberry bush.

23         But in order to effectuate what our understandings were

24   of what we wanted to do, we entered into the May 2011

25   agreement for the Maryland one.

1      And that's how we treated one another -- at least,

2  that's how I thought we would treat one another going

3  forward.

4  Q.   Okay.  So I would like the government to put up page

5  twelve of 979, that shareholders agreement.

6      Now, would you go to the bottom -- oh, excuse me.  Would

7  you take the first six sentences of the third paragraph and

8  please highlight it?  Would you highlight a little more?  Oh,

9  that's enough.

10     Okay.  Up at the top:

11          *Hardwick shall perform services for the*

12          *corporation on a substantially full-time basis as*

13          *chief executive officer of the corporation, shall*

14          *manage and control as the sole manager of the*

15          *closing side of the corporation's business and the*

16          *support services of the corporation, which will be*

17          *conducted through MHS L.L.C., LandCastle, and its*

18          *other subsidiaries; correct?*

19  A.   That's what it says.

20  Q.   And there is similar language in there about your

21  duties?

22  A.   Similar, yes.

23  Q.   If we could go all the way down to the bottom of the

24  page, same page twelve, where it says duties of

25  Mr. Wittstadt, and it says that you will be the sole manager;

1   right?  That's what we have been talking about?

2   A.   Yes, sir.

3   Q.   Right.

4   A.   Yes, sir.

5   Q.   Then there is detailed language spelling out the

6   authority that you have and limitations on that authority;

7   right?

8   A.   Throughout the agreement, yes, sir.

9   Q.   Well, I'm just talking about in that paragraph.  We

10  could go back up and show the whole paragraph number (ii).

11  A.   Okay.

12  Q.   In that language -- there is a lot of language.  That's

13  the top part of the paragraph; right?

14  A.   Right.  I mean, there are a lot of things in here, yes,

15  sir.

16  Q.   Right, there are a lot of things.

17  A.   Uh-huh.

18  Q.   And would you go down and show the bottom half of the

19  paragraph?  That would be good, thank you.

20       Now, down at the bottom sentence where you have

21  Mr. Hardwick's authority, it says -- I think we need to go

22  down one more line, I think, to finish that down to right

23  above the other paragraph.  That ought to do it, yes.

24       All right.  And it says marketing activities;

25  correct?

1    A.   Yes, that's what it says.

2    Q.   And he was the sole manager over the decisions as it

3    related to marketing activities, was he not?  So, I mean, it

4    says he's --

5    A.   It says what it says, Mr. Garland.

6    Q.   It says what it says.  And when you read it, what it

7    says is that he was the sole manager of the marketing

8    activities, right, in that sentence?

9    A.   In that sentence.  But in the sentences up above it says

10   he was discuss with my brother Rod and I important issues.

11   So --

12   Q.   I understand that.

13   A.   It says what it says.

14   Q.   It says what it says, right.

15        And what was an important issue and not an important

16   issue was not ever written out or defined, was it?  Answer

17   yes or no?

18   A.   Well, no, it was.

19   Q.   Will you answer me and then explain?

20   A.   Sure.  Yes, sir, it was.  It was written out and

21   defined.

22   Q.   Well, you said it was he agreed to consult on important

23   issues.

24   A.   But it was also written out and defined.

25   Q.   Important issues were defined?

1   A.   Well, anything over ten thousand dollars in the other

2   portions of the agreement.

3   Q.   You said in the ordinary course of business, that would

4   include ordinary course of business in the marketing side,

5   wouldn't it?  It would, wouldn't it?

6   A.   Ordinary course of business in the marketing side,

7   sure.

8   Q.   That's right.

9   A.   Sure.

10  Q.   So that could be a matter of argument as to what is in

11  the ordinary course of business that he was given the power

12  over when it came to spending money on marketing, couldn't

13  it?

14  A.   If that's what you think that it says.  It's not what

15  I think it says, but, yeah, okay.

16  Q.   I understand.  Well, now --

17  A.   Yes, sir, I hear you.

18  Q.   There are a whole stack of these agreements, and there

19  are more of them, aren't there?  Well, I don't have them all

20  laid out.  But they make up a stack about that high, don't

21  they?

22  A.   They are rather thick.  The entire corporate documents

23  of the firm?  Yeah, they are kind of thick.

24  Q.   I mean, the various shareholders agreements, if you add

25  in your service agreement, it takes a lawyer who specializes

1    in corporate documents to figure out what is in all that

2    writing, doesn't it?

3    A.    No.

4    Q.    All right.

5    A.    No.  You just read it.

6    Q.    Right, I understand, like we just read Mr. Hardwick's

7    power when it came to marketing activity.  You would agree

8    with that, you just have to read it?

9    A.    You have got to read it.

10   Q.    Okay, right.  And there is so much of it, you can't keep

11   it all up here, can you?

12   A.    Different people can keep different things in their

13   head, Mr. Garland.  You know, I can keep a lot of stuff in my

14   head.

15   Q.    You can, we remember.

16        Now, would you explain what -- let's go up back into the

17   big paragraph down to the middle, please, and let me try --

18   nine, ten sentences up where it has the default side is

19   defined.  Come down just a little bit more.  You had it,

20   I just wanted to expand it a little bit.  That will be

21   good.

22        Support services -- this is in the section on

23   Mr. Hardwick's being the sole manager.  It says he's sole

24   manager over support services; right?

25   A.    That is correct, sir.

1    Q.    What are support services?

2    A.    Support services were IT, HR, facilities, corporate

3    accounting, closing escrow accounts, closing operating

4    accounts.

5          Let's see, what else?  Certain things with regards to

6    each side had somebody that dealt in case the firm was

7    involved in any litigation, the closing side had somebody,

8    we had somebody that handled that.  Information technology.

9          That's pretty much it.  Yeah, that's pretty much it for

10   support services.

11   Q.    You can take that one down.

12         Could I ask you to put up Defendant's Exhibit 179?

13              MS. BARRON:  Ed, we only have government's

14   exhibits.

15              MR. GARLAND:  We have shared it.  We are just

16   making sure.

17              Your Honor, at this time, pursuant to our

18   agreement, I would move in Defendant's Exhibit 179.

19              MS. BARRON:  No objection.

20              THE COURT:  All right.  It's admitted.

21   BY MR. GARLAND:

22   Q.    Now, Mr. Wittstadt, I want to show you a copy of the

23   e-mail dated January 22nd, 2013.

24   A.    Hold on, you are going to have to -- all I have got is

25   the blank bottom part, so you are going to have to slide

1    it.  There -- keep coming.  There we go.  You may need to

2    focus in.

3    Q.   I'm sorry.

4    A.   Okay, I see it.

5    Q.   I'm trying to get it a little bigger for everybody.

6    A.   Come back.  Right there.

7    Q.   All right.  Have you read this e-mail before?

8    A.   I don't think I have seen this e-mail before.

9    Q.   Okay.  Well, it appears to be an e-mail to

10   Mr. Bob Driskell by Tony Adams in which Mr. Hardwick was

11   copied.  That's what it appears to be?

12   A.   Well, if you slide it down a little bit, you will see

13   that it is actually what it appears to be, but I don't see --

14   I see -- I don't see Mr. Driskell's -- normally you would

15   see Mr. Driskell's *@ClosingSource* e-mail address at the top

16   where it said Bob Driskell, so I don't know what all of that

17   is.

18        But it appears to be an e-mail from Mr. Driskell to

19   Tony Adams where Mr. Hardwick is copied.

20   Q.   Right.  And you know Mr. Adams was the accountant who

21   prepared tax returns for the law firm in 2012; right?

22   A.   I understand he was.

23   Q.   He's the one that prepared it?

24   A.   I understand he was.

25   Q.   Now, let's turn to what is Defendant's Exhibit 180.

1          MR. GARLAND:  And they got stapled together,

2    Your Honor, but the second page of this which the government

3    has seen is Defendant's Exhibit 180, and I move it into

4    evidence.

5          MS. BARRON:  No objection.

6          THE COURT:  Okay.  And I missed what you said

7    before that.  That is stapled to something?

8          MR. GARLAND:  It is stapled to 179 --

9          THE COURT:  Okay.

10          MR. GARLAND:  -- and it relates to it.  But we put

11    two different numbers on one document.

12          THE COURT:  Got you, on different pages.

13          It's admitted.  Thank you.

14    BY MR. GARLAND:

15    Q.   I am showing you the second page of Defendant's Exhibit

16    179 which we have labeled Defendant's Exhibit 180.

17    A.   You need to slide that -- I can't see the whole thing,

18    so we have got to kind of start there.  Okay.  No, now you

19    made it bigger.  You have got to shrink it.

20    Q.   Well, let's see now, make it come in some.

21    A.   Now it's blurry.

22    Q.   Yeah, right.

23          So let's go down the left-hand column.  If anybody can't

24    see it -- I will learn these controls better.

25          But it says distributions, Nat Hardwick getting

1    $3,600,000, Art getting $3,164,000, you getting $1,130,000

2    and Rod getting $1,130,000, for total distributions among all

3    of you of $9,000,000, doesn't it?

4    A.   That's what this says.

5    Q.   Right.  Was a tax return filed reflecting this, or was

6    it changed?

7    A.   I don't think I have seen this before.

8    Q.   I see.  Well, let's go down.  There is this statement,

9    convert to payroll, and it says Mark --

10   A.   I'm not seeing that, sir.

11   Q.   The second --

12   A.   Oh, convert to payroll.

13   Q.   Convert to payroll, and you come across and it says

14   $1,130,000 of money you have gotten -- under the agreement

15   that you had with Mr. Hardwick was $1,130,000; right?

16   A.   That's what this document is saying, yes.

17   Q.   Okay.  Let me ask you, isn't it correct -- I was

18   questioning you little while ago about how you were listed as

19   an employee but were actually receiving money in accordance

20   with the agreement in fact that you had with Mr. Hardwick,

21   and that it all got moved from distribution into salary;

22   correct?

23   A.   I don't think -- I'm not sure how it did, but I know

24   I reported my income on my income tax returns.

25   Q.   Well, you had this way under the Maryland agreement of

1    being paid like you were a shareholder, but what went in

2    to the IRS showed you to get that money as an employee;

3    correct?  That was what was actually the effect of the other

4    agreements?

5    A.   I received money from the law firm in accordance with

6    the agreements I had with Mr. Hardwick, and I reported that

7    income to the IRS and paid my taxes on it.

8    Q.   But you got the information to report to the IRS from

9    the calculations that were being done of what you had gotten

10   in that portion of your income that was being calculated

11   based on the idea that if you had been a shareholder, this is

12   the amount you would have gotten; correct?

13   A.   And I think it corresponded with the amount that I

14   got.

15   Q.   I'm not saying it didn't.

16   A.   Okay.

17   Q.   I'm asking you at this moment, you had gotten those

18   distributions; right?

19   A.   Yes, sir.

20   Q.   And you had gotten salary.  I think we will get to your

21   salary, but you had gotten a salary, and we will come to

22   that.

23        But at this point, that was added to your payroll;

24   right?  That was the system?

25   A.   I'm not sure -- I just don't remember.  But I do

1    remember getting money -- I remember getting the amount of

2    money I was supposed to get that the company made, and

3    I remember -- and I reported that money to the IRS and paid

4    taxes on it.

5        I don't know -- I don't recall.  I remember something

6    about this now.

7    Q.   We will get to it, but Mr. -- Art got three million

8    according to this, the distributions to you were a million

9    three, your brother a million three, for total distributions

10   of nine million dollars in the year 2012, is that correct, if

11   I am reading it right?

12   A.   That's what it appears to -- that's what that appears to

13   say.

14   Q.   Now, did the law firm make nine million dollars in

15   2012?

16   A.   No.

17   Q.   Clearly if these figures are correct -- they were sent

18   by Mr. Driskell, we have established that; right?

19   A.   If you are telling me --

20   Q.   On the front page of the e-mail --

21   A.   If you are representing to me, Mr. Garland, that that

22   was attached to that e-mail that Mr. Driskell sent, then I am

23   going to take you at your word at it that it was and that's

24   what was sent to Mr. Adams.

25       But as you see, I'm not copied on that e-mail.

1    Q.   I know.  I know you are not.

2         The e-mail says:

3               *Tony, Nat asked me to forward this to you so*

4               *you can see what we have done to date to even up*

5               *the shareholders.*

6         That would be consistent with you being treated as a

7    shareholder even though you were not shareholder; correct?

8    A.   I believe Mr. Hardwick believed that I was a

9    shareholder, that he was to treat me as one.

10   Q.   He was treating you as one, even though under the law,

11   as you say, you were not a shareholder?

12   A.   Well, you say -- you know, I thought he was treating me

13   as one, but as it turns out, maybe -- I don't think he was.

14   Q.   I know, you have made that clear with your opinion.

15        And this says hopefully this was what you intended.

16               *We still have not received any numbers out of*

17               *the default division, so that final income is just*

18               *a guess.*

19   A.   Okay.

20   Q.   Okay.  And then he goes on to talk about adjusting

21   entries, et cetera.

22        Now, when this, your payments were going on, you didn't

23   know that from time to time your checks were coming out of an

24   account that had an IOLTA tag on it; right?

25   A.   I didn't get a check out of an IOLTA account.

1    Q.   You got it from a payroll account?

2    A.   I got it from an operating account.  The checks that I

3    received came from an operating account.

4    Q.   You got wires out of the --

5    A.   Eventually I started to receive a wire, and it turned

6    out that it was being wired out of that account.

7    Q.   You just -- you expected it to come from operating

8    accounts, didn't you?

9    A.   I wouldn't see -- I didn't have any reason to disbelieve

10   at the time.

11   Q.   How many operating accounts were there?

12   A.   Well, that's a -- I am really not sure, but I know

13   that we had about three up in Maryland that we ran the

14   default business out of.  I would assume they had a few

15   down there.

16   Q.   Do you know whether it was ten, twenty?

17   A.   I remember -- let me be careful.

18        I was required at some point in the future to go through

19   and list a variety of accounts and list them for some folks,

20   and we had somewhere in the neighborhood of sixty some

21   accounts that were listed in some of those documents, which

22   I think you understand what I'm talking about.

23   Q.   I understand what you are talking about.

24   A.   So there were a number of operating accounts.  To give

25   you the exact number of them, I cannot today.

1    Q.    Okay.   Well, we have seen here today documents and you

2    are making comparisons about available cash.   Did it include

3    all of the cash in various operating accounts in the closing

4    side of this operation?

5    A.    What I am seeing there is what Ms. Maurya is saying

6    is that here is the available cash.   It's not referencing

7    any particular account.   It's saying here is the available

8    cash.

9    Q.    Right.   It's not referencing it, like you did when you

10   got your year-end pay -- or when your brother got his, the

11   cash that was available on the credit line either, is it?

12   It's not listing that, or is it listing it?

13   A.    Well, there was other information that was listing the

14   available money between what the receivable was pledged and

15   what was available on the line.

16   Q.    Actually there it showed the available -- on the reports

17   Asha was sending to Mr. Hardwick, it showed the available

18   credit line on Action Capital, did it not?

19   A.    You are right, sir.   There was a few of them that did

20   have that information on there.   There was some.   I don't

21   think they all did, but I think to be fair with you, yes,

22   sir, I believe that there was some of that information that

23   was on there.

24   Q.    I do want you to be fair with me.

25   A.    I am always going to be fair with you, sir.

1    Q.    So I think we have got a book of them around here, but

2    there were these detail reports that would be sent to

3    Mr. Hardwick to look at.  They were long, and a few minutes

4    ago we had to blow it up to really see it; right?

5    A.    Yes, sir.

6    Q.    Okay.  And those reports changed to a simpler report,

7    did they not, from Asha to Mr. Hardwick?

8    A.    I believe that at some point in time there became

9    another report, but again I didn't see them until way after

10   Mr. Hardwick's resignation.

11   Q.    Okay.  So you had pointed out that there were checks

12   listed in there, holding checks on those reports; right?

13   A.    Checks held, yes, sir.

14   Q.    Right.  And were you familiar with the process of the

15   payment of invoices inside of the law firm, of cutting the

16   check but not releasing the check until the payment had to be

17   made?

18   A.    That's what -- that's what I explained.  I think there

19   was a bill that would become due, and a check would be

20   issued, but it would be held and not released to whomever it

21   needed to go to.

22   Q.    So the cash report would show checks held, meaning that

23   cash hadn't been spent; right?

24   A.    Well, it's been spent, but not -- the check has been

25   written, it's been earmarked for, let's say, for Federal

1  Express.  It's been earmarked for them, but it hasn't been

2  delivered to them yet so that they couldn't present it to the

3  bank.

4  Q.   Just to be specific, the cash represented by those

5  checks that had not been released would still be, of the ones

6  that had not been released, would still be in the bank;

7  right?

8  A.   The cash would still be in the bank.

9  Q.   And if you knew that you were producing income based on

10 a metric of closings, you also would know that more money was

11 going to be coming in in subsequent days; correct?

12 A.   Yes, sir.

13 Q.   So you had checks cut, cash still there, and the

14 anticipation of more cash and profits being made every day

15 there was closings; right?

16 A.   That is the plan, sir.  That is the plan.

17 Q.   That is the plan.  And likewise up in your section, you

18 said you had three accounts; right?

19 A.   We had -- well, we had one main -- we had one main

20 operating account, and then we had one main escrow account,

21 and then we had smaller escrow accounts in the various states

22 where the bars required it and small operating accounts

23 there to.

24 Q.   How many operating accounts did you have in

25 Baltimore?

1  A.   Again, we could have had eight, six.  Six, five,

2  something like that.

3  Q.   On the reports Mr. Hardwick was getting, was the cash

4  balances in those accounts listed furnished by Mr. Ritterman

5  to him?

6  A.   You'd have to -- I don't know.  I don't know what

7  Ms. Maurya was considering when she was doing that.  It just

8  says cash available, so cash available.

9  Q.   You would have to know what that means?

10  A.   Cash available.

11  Q.   That's the word, but you don't know whether it includes

12  the cash available up in Baltimore in your operating

13  account?

14  A.   That's a pretty good point, Mr. Garland.  You don't know

15  what that includes.

16  Q.   Right.  So we know -- I mean, you can anticipate that

17  there would be cash coming in if your business, as I

18  understand, was good and there would be cash coming in

19  in your end, and there would be cash coming in in the

20  closing end, and you would have to think about that in

21  determining what was a possible distribution or payment;

22  right?

23  A.   To all three of us.

24  Q.   Yeah.  Well, you would have to think about it --

25  A.   And discuss it.

1    Q.   Right.  Actually, wasn't it the practice for

2    Mr. Ritterman to call up Asha, or Asha to call Ritterman,

3    and you all would wire money down?

4    A.   We wired money down every two weeks.

5    Q.   Right.  But that wasn't included in available cash, was

6    it?  In the figures that have been put up here in the charts,

7    the money up in your account wasn't included in that

8    available cash, was it?

9    A.   Mr. Garland, it says available cash.  I can't change

10   what it says.  It says available cash.  And if what you look

11   at it says available cash and you don't know if that includes

12   all the cash, then you would ask a question.

13        I'm not following you.  I'm sorry, sir.  I'm really not

14   following you.

15   Q.   I am just asking the question.  If you can answer the

16   question, please do.  You seem to -- I think my question

17   was --

18   A.   Let me see if I can answer it.  Go ahead, I'm not

19   following, so please ask me.

20   Q.   I think my question was in the term available cash --

21   you just said I made a good point about that.  In the term

22   available cash, there is no indication that the money in

23   Baltimore was included in that number?  Would you answer that

24   yes or no?

25   A.   I don't see it -- I don't see anything that says what it

1    includes.  So there is no indication that it does.  There is

2    no indication that it does.

3    Q.   So we can get it clear -- and I know you want to answer

4    my questions.

5    A.   I do.

6    Q.   The answer to that question is yes, isn't it, sir?

7    There is no indication that it includes the money in the

8    operating accounts in Baltimore?  If you'd just --

9    A.   That is true.  That is true.

10   Q.   The answer --

11   A.   It is true that it does not mention that.

12   Q.   That it's true means yes; right?

13   A.   I guess that means yes.

14   Q.   Okay, it does mean yes.  I was trying to get a yes or

15   no, so thank you.

16   A.   Okay.

17   Q.   So, now, I want to move over back to Mr. Ritterman.

18   A.   Okay.

19   Q.   Mr. Hardwick wanted Mr. Ritterman to move to Atlanta if

20   you wanted him to be head of -- the CFO of the whole thing,

21   didn't he?

22   A.   He didn't want Mr. Ritterman to be the head CFO.

23   I think I offered -- talked to Mr. Ritterman about him

24   moving to Atlanta, and he said he would be willing to do

25   so.

Q.   And then didn't -- wasn't it understood that because the
entire accounting staff was in Atlanta, the computers and
spitting out all the information was in Atlanta, that
Mr. Ritterman would come down at least once or twice a
month?  Did you have that agreement with Mr. Hardwick?
A.   He didn't come down once or twice a month.
Q.   But did you have an agreement when you all were debating
who got the job, Asha or Mr. Ritterman?
A.   There was an agreement that they could -- that they were
supposed to work with one another and that they could both go
down -- that Asha could come to Baltimore, Mr. Ritterman
could go to Atlanta.
Q.   Now, at the time those discussions were going on, you
didn't know in 2011, your first -- I think you said March or
May of 2011 when it went from the service agreement to the --
the agreement that you all would be sharing on distributions
and the other things we have been talking about, you didn't
know when you entered that that Asha Maurya had been stealing
from the law firm, did you?
A.   No, Mr. Garland, I did not know that.
Q.   You didn't know.  And you have looked through and become
aware of her personal theft of a whole list of expenditures;
right?
A.   Yes, sir, I have.
Q.   Okay.  As a matter of fact, let me just bring a moment

1    forward.  You've talked to us about what happened when the

2    false bank statement was uncovered, and ultimately you put

3    her on the payroll -- or you and Fidelity put her on the

4    payroll.

5        How long was she, Asha Maurya, on the payroll after

6    Mr. Hardwick was out?

7    A.   Six, six weeks.

8    Q.   Six weeks?

9    A.   Six weeks, give or take -- give or take a little bit.

10   Q.   And all the auditors would go -- not all.  People would

11   go down and confer with you or go into whatever office she

12   was in, whether they be auditors or whoever, and confer with

13   her about what the books and records showed; correct?

14   A.   I was under the understanding that that was the reason

15   that she needed to come back on was so that the investigators

16   could go in, ask her questions, try to figure out and unwind

17   the mess that was caused.

18   Q.   Right.  And so during any of those interviews of her,

19   while she was working there, did she reveal when she was

20   telling everybody the truth that she had been stealing?

21   A.   She never admitted it to me.  And whether she admitted

22   it to anybody else, I have no idea, because I wasn't involved

23   with this.

24   Q.   Right, nobody called you up and gave you the notice, the

25   investigators working for you and Fidelity, that she has said

1   she had been stealing personally?  She concealed that, right,

2   as far as you know?

3   A.   Ms. Maurya is -- yeah, she did not tell us the truth.

4   There is no question about it.

5   Q.   All right.  So she is getting a paycheck and she is

6   there working to find evidence in connection with the

7   investigation; right?

8   A.   I don't know if she -- no, I don't think that that is

9   correct, sir.  I don't think that your characterization of

10   finding evidence --

11   Q.   Finding information?

12   A.   I think what she -- no, sir.  What I think she was

13   there to do, which my knowledge of what she was there to

14   do was to answer questions, not conduct an investigation or

15   in any way lead one, but simply to when the auditors or the

16   investigators would want to know how something worked or how

17   this tied into that, they would go ask her about that.

18        But what they did with the information that she gave to

19   them and how they compiled it and put it together on paper,

20   I don't know.

21   Q.   So when you hired her back in, you didn't know about her

22   history of thievery, did you?

23   A.   I knew about -- she had admitted about the falsified

24   bank statement.

25   Q.   That's what you knew about her --

1    A.   That's what I knew about her.  And I knew also at that

2    point in time that she would wire money at Mr. Hardwick's

3    direction to the various places we have talked about, and

4    I knew that.  So --

5    Q.   You knew that.  But I'm asking about her prior history

6    of thievery.

7    A.   You mean with the firm?

8    Q.   No, with all the -- a whole list of her prior

9    employers.

10   A.   I did not.  I did not know about -- the only thing

11   I knew about Ms. Maurya was what I just said.

12   Q.   That's the only thing you knew about her.

13        You didn't know and she didn't reveal to you that she

14   had no accounting degree, did you?

15   A.   No, sir, I didn't.

16   Q.   That she had no formal training in accounting?

17   A.   I did not know.  I did not know that.

18   Q.   She had had on-the-job training in prior employments.

19   You knew that, didn't you?

20   A.   Sir, I wasn't involved at all with regards to hiring

21   Ms. Maurya.  That was Mr. Driskell, Mr. Hardwick,

22   Mr. Schneider that were involved in hiring her.  I was not

23   involved in that.

24   Q.   Well, Mr. Schneider was the operations partner that you

25   worked with extensively under your service agreement and

1    later before he left, and you would agree with me that he was

2    a savvy person when it came to accounting and accounting

3    systems and the real estate closing operation, would you

4    not?

5    A.    Please define what you mean by savvy?

6    Q.    Really smart and knew it and knew how to do it.

7    A.    He portrayed himself to be such.

8    Q.    I see.  And under him in the accounting chain of command

9    was Mr. Driskell.  You knew him too, didn't you?

10   A.    Yes, sir, I did know him.

11   Q.    And you know he was a highly-qualified CPA; right?

12   A.    Again, that's what he portrayed himself to be.

13   Q.    Did you get to know Candy Sylvester?

14   A.    I had some brief interactions with her in 2008, 2009,

15   before the woman got sick.

16   Q.    Right.  But underneath her -- I mean, excuse me, she was

17   underneath Driskell, the accountant.  And then underneath

18   her, Candy Sylvester, there was a position known as escrow

19   account manager, wasn't there?

20   A.    You are getting way too deep into how the closing

21   operation ran.  I didn't get involved in the closing

22   operation, how it ran or whatnot, until this gynormous mess

23   came to play.  I was in Baltimore running default trusting my

24   partners in Atlanta.

25   Q.    And you trusted Mr. Schneider?

```
1    A.   I did.

2    Q.   Correct?

3    A.   I did.

4    Q.   You trusted Mr. Morris?

5    A.   I did.

6    Q.   And you had no reason not to trust Mr. Driskell?

7    A.   I did not.

8    Q.   All right.  Now, you were around when Mr. Schneider

9    retired; right?

10   A.   Right.

11   Q.   You had your relationship with Mr. Hardwick?

12   A.   When I first came on, my service agreement talked about

13   what I did and who I reported to and that thing, yes.

14   Q.   And when you finally got the official shareholder

15   agreement, the understandings that was made in 2011, was

16   Mr. Schneider still involved?

17   A.   He was on his way out.

18   Q.   Oh, he was on his way out.

19        And then was Mr. Driskell still involved?

20   A.   Yes.

21   Q.   All right.  And under him, when you got in, when you

22   became shareholder, Mr. Driskell was still there; right?

23   A.   Yes, sir, he was.

24   Q.   And underneath Mr. Driskell was who in the chain of

25   command?  When you became a shareholder, who was in that
```

1  chain of command?

2  A.   I'm not sure if it was just Asha or if there was

3  somebody else or not.  But Asha Maurya was there under

4  Mr. Driskell.  Whether there was somebody, her counterpart or

5  something to that nature, I just -- I don't know.

6  Q.   But you do know Alyce Ritchie?

7  A.   I do know who she is, yes, sir.

8  Q.   And you knew she was -- under her umbrella of

9  authorities was this accounting section; right?

10  A.   I didn't -- I'm not -- I did not know exactly what --

11  who was responsible for what in the closing practice.

12  Q.   All right.

13  A.   I knew that there was Mr. Hardwick, Ms. Ritchie,

14  Ms. Krebbs.  I knew some of the names down there, but I

15  wasn't in Atlanta every day, you know, and in that business.

16  Q.   But in all of your review that you have done, you have

17  become aware that Asha -- well, as far as you were concerned

18  at that point, Alyce Ritchie was honestly performing her

19  services, correct, as best you knew?

20  A.   At what point in time?

21  Q.   At the time this blew up and before then.

22  A.   I knew Ms. Ritchie, I knew who she was.  I had some

23  interaction with Ms. Ritchie when we first did the merger

24  because she was over top of -- IT reported to her and she

25  reported Mr. Hardwick.

1       So there was a lot of going back and forth with IT in

2  getting the default side integrated in, so she was involved

3  heavily in that.

4       And then for a very long period of time, although

5  I would see her when I came to Atlanta, I didn't have any

6  real interaction with her.

7  Q.   But you have since learned that Asha Maurya would come

8  in with stacks of checks for her to sign, haven't you?  You

9  learned that?

10  A.   I understand that Alyce Ritchie had signature authority

11  on accounts.  Mr. Hardwick had signature authority on certain

12  accounts.  Would she sign checks?  Yes, she did.  So did

13  Mr. Driskell.

14  Q.   Right.  Most of the checks were signed by either

15  Driskell or Ritchie, but there were also checks signed by

16  Hardwick from time to time; right?

17  A.   I understand they all signed checks.

18  Q.   But you learned that Ms. Maurya would slide into the

19  checks checks that were going to her benefit that she

20  disguised from Alyce Ritchie so she could get money out

21  personally?  Did you learn that?

22  A.   I have learned that, yes, sir.

23  Q.   Okay.  And that's one of the ways she was able to do

24  what?

25  A.   She stole money from the firm.

1   Q.   But when she was doing that, she was engaging in

2   practices to conceal her scheme of theft?

3          MS. BARRON:  Objection, Your Honor.  Calls for

4   speculation into the mind of Asha Maurya.

5          THE COURT:  I will overrule.  I will overrule.

6   BY MR. GARLAND:

7   Q.   I mean, that act of --

8   A.   Certainly.  When you steal money -- when you steal money

9   from somebody, you are always doing it to deceive them.

10         So whenever you steal, you don't tell the truth.  If you

11  are telling the truth, then you are not stealing.  I have

12  never known a thief to tell the truth.

13  Q.   You've heard the expression -- let's see if I can get

14  this right -- by Johnny Depp in the *Pirates of the*

15  *Caribbean* --

16  A.   I was watching a little bit of that last night on

17  television.

18  Q.   Do you remember where he said you can trust a lying

19  man --

20         THE COURT:  Let's keep it going, Mr. Garland.

21  I will give you a second on this one, but let's keep it

22  going, unless Johnny Depp is going to come in here and

23  testify.

24         MR. GARLAND:  I just --

25         THE COURT:  But go ahead.

BY MR. GARLAND:

Q.   But you are familiar with that expression, that a lying
man will lie to you every time, honestly.  That's what
Johnny Depp said.  Did you hear that last night?

A.   He could have said that.  You know, there is a lot of
nice fun quotes out there.  We could go back and forth.

Q.   Right.  But you were saying that your experience with
thieves are that they are lying to you.

A.   These are liars.

Q.   Right.  And they conceal, as you said -- they are trying
to conceal their thieving; right?

A.   Absolutely.

Q.   Now, Mr. Driskell, did you ever sit down and talk to
Mr. Driskell about his function or how he was supervising
anything?

A.   I would have conversations with Mr. Driskell when I came
to Atlanta how are things going, is there anything going on,
what does this look like, what does that look like, how are
we making payments, are we paying our bills, those type of
things.

Q.   All right.

          MR. GARLAND:  Could I just have a moment to confer
with counsel?

          THE COURT:  Sure, yes.

          THE WITNESS:  I am going to raise my hand soon.

```
1          THE COURT:  We are going to get there.  I was

2    trying to go to -- I was just looking at when we could take

3    our break.

4          Tell you what, we will go ahead and take a quick

5    ten-minute break for the afternoon.

6          (In open court without a jury present:)

7          THE COURT:  Government, before you depart, let me

8    just ask to make sure where we are.

9          My understanding yesterday evening was that you

10   were planning to put up four witnesses including

11   Mr. Wittstadt today, and this is still the first of four.  Is

12   that where we are generally?

13         MR. GILFILLAN:  Your Honor, we have got two

14   witnesses waiting on deck, which given what I talked to

15   Mr. Garland about, should get us through the rest of the

16   day.

17         We had one witness whose wife had emergency issues

18   and he's not here today.

19         THE COURT:  But you think we will get to those

20   other two?

21         MR. GILFILLAN:  It's all in Mr. Garland's hands at

22   this point.

23         MR. GARLAND:  I don't think so.

24         THE COURT:  Okay.  What did you say?

25         MR. GARLAND:  Excuse me, Your Honor.  I don't think
```

1    so.

2         THE COURT:  That's my concern.  Yeah, that's the

3    point I was making is that you -- I know you all told me you

4    anticipated about four today, and I don't see -- I don't even

5    know if we will get off with one.  So I was just making

6    sure -- I was checking in to see.

7         Let me ask you this.  The two that you have on

8    deck, how would you characterize the length of their

9    anticipated testimony?

10        MR. GILFILLAN:  I think an hour or less each.

11        THE COURT:  All right.  Let's take a ten-minute

12   break.  Thank you.

13        Yes, yes?

14        MR. GARLAND:  Do you want us to go ahead and break

15   this and put them up and we can resume with him after that?

16   I'm just going to --

17        THE COURT:  How does that help us?

18        MR. GARLAND:  You just get rid of two more

19   witnesses and --

20        THE COURT:  Yeah, I don't care about getting rid of

21   witnesses.  I want to keep the flow of the trial going.

22        Yes?

23        MR. GILFILLAN:  I just have a question.  Given what

24   Your Honor is saying, could I tell those witnesses they can

25   go home and go for the day and be back tomorrow, or do you

1    want me to --

2            THE COURT:  No, I wouldn't say that.  Yeah, I'm

3    sorry, I wish I could say that, but I definitely don't want a

4    lull just in case we do finish with Mr. Wittstadt earlier

5    than we are thinking.

6            Okay.  Thank you so much.

7            (A recess is taken at 3:08 p.m.)

8                            --   --   --

9            (In open court without a jury present at

10   3:19 p.m.:)

11           MR. GILFILLAN:  Can I ask one question before we

12   bring the jury in?

13           THE COURT:  Yes.

14           MR. GILFILLAN:  We have got the two witnesses

15   here.  Your Honor said to keep them both here.  But if we get

16   to 4:00 and Mr. Garland -- because even if he stops at 4:00

17   and no redirect, I know one witness will get us through the

18   end of the day, so can I tell the other one he can go at

19   4:00?

20           THE COURT:  I'm not telling you --

21           MR. GILFILLAN:  Okay.

22           THE COURT:  I'm sorry, I just am not telling you

23   how to direct your witnesses at all.  All I can tell you

24   is --

25           MR. GILFILLAN:  You want to go till 4:45.

```
 1              THE COURT:  -- be prepared to keep going, yeah.
 2              And so I'm sorry, I'm not trying to be evasive, but
 3    I just don't want to tell you, yeah, let them go not knowing
 4    exactly where we are going.
 5              MR. GILFILLAN:  I understand.  By the same token,
 6    I just wanted to make sure you weren't saying they have got
 7    to be here because -- then so --
 8              THE COURT:  No.  Just be ready to call someone at
 9    any point we are still working.
10              MR. GILFILLAN:  Got it.
11              THE COURT:  And by the way, one witness -- I told
12    Ms. Beck to find out more -- excuse me, one juror has told
13    her he has some -- hold on one second, just one second,
14    yeah -- some appointment on October 3rd that he's trying to
15    change.
16              I don't know the nature of the appointment, I don't
17    know what time it is or anything, and I don't even know the
18    identity of the juror.  So I have sent word back to her.
19    But, see, I just don't know what other things will come up as
20    well.
21              But as soon as I get that information, we will try
22    to sort through that as well.
23              (In open court with a jury present:)
24              THE COURT:  Mr. Garland, you may continue, sir.
25              MR. GARLAND:  I would like to ask the government to
```

```
 1    put back up Government's Exhibit 979, the 2013 amended

 2    restated shareholders agreement again.

 3    BY MR. GARLAND:

 4    Q.   And would you go to page 18?  Do you still have it up

 5    there, sir?

 6    A.   Yes, I can -- they have to blow it up, but, yes, when

 7    you get to what you want.

 8              THE CLERK:  Would they have it on the computer?

 9    Do you want me to put it back on the document camera?

10              MR. GARLAND:  Yes, would you, please?

11              THE CLERK:  Yes, no problem.

12              MR. GARLAND:  And would you zoom in on page 18 of

13    the shareholders agreement?

14              THE WITNESS:  Well, you have got it here, sir, so

15    I'm seeing what you are seeing there.

16              MR. GARLAND:  I meant to be talking to the

17    government, to this lovely lady who is assisting me.

18              Would you zoom in on Paragraph (g)?

19              THE CLERK:  You've got it.

20              MR. GARLAND:  Oh, I have to do it.

21              THE CLERK:  Well, I'm sending it back there.  She

22    will do it for you.

23              MR. GARLAND:  Okay, thank you.

24              Page 18, and would you zoom in on Paragraph (g) and

25    blow it up?
```

1    BY MR. GARLAND:

2    Q.    You are familiar with this, Benefits and Costs?

3    A.    Yes, sir.

4    Q.    It's one of the many, many paragraphs in those

5    agreements; right?

6    A.    Yes, sir.

7    Q.    All right.  And this says:

8                    *Unless otherwise approved by the affirmative*

9                *act of the board, the corporation shall continue to*

10               *pay for those benefits and expenses of the*

11               *shareholders that are being paid by the corporation*

12               *as of the effective date.*

13         Is that what it says?

14   A.    Yes, sir.

15   Q.    Now, would you go back to the first paragraph of

16   Government's Exhibit 979?  Excuse me, not on page 18, to the

17   very first page of Government's Exhibit 979, the very first

18   paragraph and zoom in on it?

19         And that's where there is a reference to the effective

20   date was June 2013; correct?

21   A.    Yes, sir.

22   Q.    But this agreement incorporated all the other agreements

23   and became a final agreement and did that relating back as if

24   it had been in existence; right?

25   A.    No, no.  That would make it so that I had -- no.

1   Q.   It doesn't relate back?

2   A.   I don't think -- the document is going to kind of speak

3   for itself legally, but I'm not really following what you

4   mean by relate it back.

5        Does this mean that this became the agreement all the

6   way back to 2005?

7   Q.   Excuse me.

8   A.   I'm sorry, sir.

9   Q.   I withdraw that question because I see the confusion in

10  it.

11       But this has an effective date of June 2013; correct?

12  A.   Yes, sir.

13  Q.   All right.  Now, would you go back to the paragraph on

14  page 18, (g) that we just had up there, Benefits and Costs.

15       All right.  Now, there is this statement:

16            *The corporation shall continue to pay for*

17            *those benefits and expenses of the shareholders*

18            *that are being paid by the corporation as of the*

19            *effective date.*

20  A.   Yes.

21  Q.   What expenses were those?

22  A.   Those were the ones that Mr. Hardwick and I discussed.

23  Q.   All right.  Well, I believe yesterday you told us about

24  a conversation you had with Mr. Hardwick in 2010 concerning a

25  jet; right?

1    A.   Yes, sir, I did.

2    Q.   And you told him he couldn't fly in jets back in 2010?

3    A.   I didn't tell him he couldn't fly in jets.  I said the

4    law firm wouldn't pay for it.

5    Q.   All right.  Let's see.  In 2010 were you an employee

6    under your service agreement?

7    A.   Yes, sir.

8    Q.   You had no other agreement about your authority to give

9    directions to Mr. Hardwick in 2010 before you ever had your

10   first agreement in March of 2011, did you?

11   A.   No, sir.  I was contemplating leaving the firm.

12   Q.   Okay.  I see.

13        And you said that was the only time you ever had that

14   conversation was back in 2010; correct?

15   A.   Yes, sir.

16   Q.   All right.

17             MR. GARLAND:  Your Honor, I wish to move in

18   pursuant to our stipulation Defendant's Exhibit 601.

19             MS. BARRON:  No objection.

20             THE COURT:  All right.  It's in, 601.

21   BY MR. GARLAND:

22   Q.   Can you take a look at Defendant's Exhibit 601?

23             MR. GARLAND:  And do you have that -- you don't

24   have that.

25             MS. BARRON:  No.

1    A.    Okay.

2    Q.    All right.  Do you know what that document is and what

3    it reflects?

4    A.    It's some type of check to my brother for $7,318.86 on

5    September 5th, 2013, and the corresponding exact amount of

6    the check to me for $7,318.88.

7    Q.    And who did the check come from?

8    A.    Morris Hardwick Schneider L.L.C.

9    Q.    Could I have the document back and I will put it on the

10   projector.

11        Morris Hardwick Schneider L.L.C. was making the bank

12   payment that Mr. Hardwick owed; right?  We have talked about

13   that.

14   A.    Which one, sir?

15   Q.    Well, the one that I believe you talked about was the

16   loan that he got originally, the three million dollar loan?

17   A.    The Fortuna loan that we agreed to in the corporate

18   documents, yes, sir.

19   Q.    Right.  You agreed that it would come out of his share;

20   right?

21   A.    Yes, sir.

22   Q.    All right.  Now, the amount shown on here going to you

23   and your brother was your percentage share of the mortgage

24   payment on the Fortuna loan, wasn't it?

25   A.    I don't know.

1    Q.    Okay.

2    A.    It could have been.

3    Q.    Do you know how much the payment on the Fortuna loan

4    was?

5    A.    What was it, 32 and change?

6    Q.    And if you were entitled to 22.5 percent -- have you got

7    your calculator there?

8    A.    You have got to go down and ask the marshals to give it

9    to me.

10         But if you are going to represent to me that that's

11   22.5 percent of thirty-two thousand, then if those numbers

12   work out, then that's what it is.

13   Q.    Well, I haven't done it, but that's kind of what it

14   looks like, doesn't it?  I can loan you my phone.

15   A.    How come everybody else gets to have one?

16         Look, somebody has got to tell me the exact amount of

17   the Fortuna loan.  It was 32 and change.  What's 22 and a

18   half percent of 32?

19   Q.    I can hand the calculator up.

20   A.    Okay.

21             MR. PHILLIPS:  I can give you mine.

22   A.    Okay.  I'm just going to do it at thirty-two thousand.

23         Seventy-two hundred.  So it's close.  Yes, it could be.

24   Q.    So this is where when the law firm made a payment on the

25   Fortuna loan that benefited Mr. Hardwick, you got individual

1    checks for your proportionate share if there are a series of

2    these; right?

3    A.    I don't believe there are a series of those at all.  But

4    if you found one, then that --

5    Q.    Well, this particular one is September 5th, 2013.

6    A.    Okay.

7    Q.    And have you checked all the financial records to

8    determine how many checks you got that way?

9    A.    No, sir, I have not.

10   Q.    All right.  Now, would you pull up Government's Exhibit

11   913?

12            MR. GARLAND:  It's also been designated,

13   Your Honor, and some of these we designated, so it has two

14   numbers on it.  We have put a defendant's number on it.

15   Should I just use the defendant's number even though I'm --

16            THE COURT:  The other number is a government's

17   exhibit number?  Because yesterday some of them had two

18   numbers because of an earlier deposition number.  I just want

19   to be clear.

20            MR. GARLAND:  This is numbers in this case.

21            THE COURT:  Okay, that's fine.

22            MS. BARRON:  Government's 913 has not been offered

23   yet.

24            MR. GARLAND:  At this time, Your Honor, I would

25   move in Government's Exhibit -- well, I will just move in

1    Defendant's Exhibit 394, but it has a government's sticker on

2    it 913.  I assume they will decide whether they want to move

3    it in.

4             MS. BARRON:  No objection.

5             THE COURT:  Okay, no objection.  It will be

6    admitted.

7             Government, are you asking for it -- it doesn't

8    really matter, but just do you have any issue with it being

9    admitted also as the government's exhibit under that number?

10            MS. BARRON:  I would say so we stay straight,

11   unless Mr. Garland objects --

12            THE COURT:  To what?

13            MS. BARRON:  It will be used with a later witness

14   on our side, so we can -- are you asking to --

15            THE COURT:  I'm just asking about the

16   identification, but never mind.  It's admitted.  It's

17   admitted.  Never mind.  It's admitted.  Thank you.

18   BY MR. GARLAND:

19   Q.   I'm going to hand you Defendant's Exhibit 394 so you

20   could get a good eyeball on it before I put it on the

21   projector.

22   A.   Okay.  I have not seen this before.  I have not seen

23   that before.

24   Q.   All right.  Well, I will put it up and show you

25   this.

1      Now, this document, Defendant's 394, appears to be an

2  e-mail from Asha Maurya and sent to Nat Hardwick concerning

3  Fortuna loan payments.

4      And if you look down in the summary there, it lists the

5  Fortuna loan payments; correct?

6  A.   Yes, I see that.

7  Q.   Okay.  And then it has a calculation of the respective

8  percentages in 2013; correct?

9  A.   Yes, sir.

10  Q.   And it has a calculation of the percentages in 2012?

11  A.   Yes.

12  Q.   And in 2012 your percentage is 12 -- I'm sorry, 12 and a

13  half percent; is that right?

14  A.   Yes.

15  Q.   Okay.  Now, were you receiving reports that the Fortuna

16  loan payment was being made by the firm?

17  A.   No, sir, I was not.

18  Q.   But you were receiving what appears to be a check giving

19  you your share; correct?

20  A.   I think I got that one check.  I don't ever remember --

21  if you could put that back up for me?  I'm sorry, sir.

22  Q.   I'm sorry.

23  A.   I don't ever remember -- I don't ever remember receiving

24  going forward, and I certainly don't remember receiving

25  $49,396.16 in 2012.  I don't remember that sir.

1    Q.    You don't remember that.  Have you checked your bank

2    account and tallied up the payments you got from the law firm

3    for your *pro rata* share of the Fortuna payment?

4    A.    No, sir, I have not.

5    Q.    Now, at the end of -- in August you were in Atlanta --

6    of 2014 -- you have told us about coming in Atlanta, leaving

7    the beach, and when you got to Atlanta you went into the

8    office; correct?

9    A.    Yes, sir.

10   Q.    Okay.  And there in the office you spoke with

11   Mr. Schneider; right?

12   A.    Mr. Schneider was there at some point during that day.

13   Q.    You spoke to Mr. Driskell?

14   A.    He was there at some point during that day.

15   Q.    And did you speak to his wife, who had been brought in

16   to help figure it out?

17   A.    No, I don't recall speaking to her.

18   Q.    And did you speak to Ms. Ritchie?

19   A.    I did.

20   Q.    And you spoke to Mr. Adams?

21   A.    I did.

22   Q.    Right.  And they advised you what they had when you

23   first arrived found thus far, the issue of how much was

24   missing; right?

25   A.    No, they did not.

814

1    Q.   They didn't discuss it with you?

2    A.   No, sir.

3    Q.   Well, did you ask them?

4    A.   I didn't know that they were even looking at anything

5    prior to that.  The first conversation I had was with

6    Mr. Hardwick on the day before talking to me about the

7    altered bank statement and moving the money.  I didn't know

8    that he had also -- that other people had been looking at

9    it.

10   Q.   You didn't know --

11   A.   I didn't know that.

12   Q.   -- that for a week they had been trying to find out was

13   it just a phoney statement or was there a greater problem?

14   A.   No.

15   Q.   You found that out when you talked to them, that they

16   were looking; right?

17   A.   I found out a few things after I eventually got some

18   information.

19        One was that it wasn't July 18th that the altered bank

20   statement came into play.  The altered bank statement was

21   found by Fidelity in the latter part of June.

22        And there were other things that I found out.  But I'm

23   not --

24   Q.   I'll ask --

25   A.   But go ahead and ask your question, sir.  I'm sorry, I'm

1    getting off track and I don't want to do that.

2    Q.   I want to ask you a little preface question.  Have you

3    reviewed the e-mail traffic between the Fidelity auditors

4    looking at that bank statement and Alyce Ritchie, and from

5    Alyce Ritchie to SunTrust, and the timing of those, what was

6    going on in the discovery?  Have you looked at those

7    documents?

8    A.   At which point in time, sir?  When I got there or now,

9    as of today?

10   Q.   As of today.

11   A.   Yes, sir, I have seen that.

12   Q.   Right.  And you have seen that there was e-mails going

13   from SunTrust Bank to Alyce Ritchie concerning what's going

14   on with the bank statement; right?

15   A.   Yes, I have seen those.

16   Q.   And there were e-mails in which SunTrust said they

17   had produced the incorrect bank statement at one point in

18   this investigation.  You have seen that e-mail, haven't

19   you?

20   A.   No, that e-mail I haven't seen, but I have heard rumors

21   that one exists to that effect.

22   Q.   All right.  In any event, you do recognize that

23   Ms. Ritchie had been digging in to find out whether the

24   statement was manufactured by the bank or by Asha; right?

25   You have seen that traffic?

1    A.   I have seen -- now as we sit here today, I have seen

2    that there was people looking at things starting prior to

3    Mr. Hardwick leaving for Europe, yes.

4    Q.   Right.  And you have seen an e-mail right before

5    Mr. Hardwick left in which he said contact Mr. Driskell,

6    contact Mr. Schneider, directed to Alyce Ritchie right before

7    he got on the plane.  You have seen that too, haven't you?

8    A.   I have seen e-mails from Mr. Hardwick, yes, to

9    Ms. Ritchie and asking that Mr. Schneider and Mr. Driskell

10   look into the matter.

11   Q.   Look into it, right.

12   A.   Yes.

13   Q.   And as you said earlier, you had no reason to distrust

14   Mr. Schneider or Mr. Driskell or Ms. Ritchie.  And at that

15   point, if I hear you right, Mr. Hardwick is saying call, find

16   out what's going on; right?

17   A.   He's telling those folks -- yes, that's what he's

18   telling them.

19   Q.   Okay.  Now, do you know when he arrives back?

20   A.   The day he arrived back?  I understand it to be the

21   28th.  I do not have personal knowledge of that.  July 28th,

22   2014.

23   Q.   Well, you told us you got a call on the 29th?

24   A.   He sent me an e-mail on the 29th asking for an emergency

25   call.

1    Q.   Right.  Now -- and he told you that you needed to put --

2    raise money, four hundred thousand.  He said he was putting

3    in a million.

4         And you said, What's going on?  Right?  You said,

5    I'm not putting any money in until I know what in the world

6    is going on.

7         Now, were you already in Atlanta when that happened, or

8    did that happen before you got on the plane and came to

9    Atlanta?

10   A.   The very first phone -- that happened on the 29th.  On

11   one of the subsequent -- we had about four calls on the 29th,

12   the first one being at 10:00 in the morning, probably the

13   last one at 4:00 in the afternoon.

14   Q.   Right.  And he gets back and you know he confers with

15   Ms. Ritchie about what has been found.  You know that;

16   right?

17   A.   I have seen -- I have seen some text messages and e-mail

18   traffic between Ms. Ritchie and Mr. Hardwick, yes.

19   Q.   And you learned in reviewing those e-mails that the

20   first time the word overdisbursed was the explanation that

21   Asha Maurya made to Alyce Ritchie.  You learned that too,

22   didn't you?

23   A.   I don't know who came up with the word overdisbursed.

24   Q.   Well, you have seen the e-mail where she says that Asha

25   said there were overdisbursements to partners?

1    A.   I have seen that text message.

2    Q.   Okay, the text message.

3    A.   On the 28th.

4    Q.   Right.

5    A.   Mr. Hardwick did not say that to me on the 29th.

6    Q.   But Alyce Ritchie said to Mr. Hardwick Asha says

7    overdisbursed?

8              MS. BARRON:  Your Honor, this is rank hearsay,

9    objection, what Ms. Ritchie said.  If he wants to introduce

10   an e-mail, that's fine.

11             THE COURT:  I will overrule.

12   A.   I have seen the text message.

13   Q.   I'm not -- just as long as --

14   A.   I have seen the text message.

15   Q.   That says what I'm saying; right?

16   A.   That Alyce Ritchie texted Mr. Hardwick and said

17   something to those words in effect.

18   Q.   And saying they had come out of the mouth of

19   Asha Maurya, not out of the mouth of Nat Hardwick?

20   A.   Sir, there is a text message that specifically says

21   that, and I don't have it in front of me.  It says exactly

22   what it says.  You are asking me to recall what a specific

23   document says verbatim.  I can't do that.

24   Q.   You recall you said Mr. Hardwick said that he had been

25   overdisbursed; right?

1    A.    That's what he told me later on.

2    Q.    Later on.  But all these people had been investigating,

3    and he had been told at that point he had been overdisbursed.

4    You know that?

5    A.    Well, Mr. Garland, it's interesting -- yes, that's

6    correct.  But it's interesting that I am not being told.

7    I am not the one down looking at it.  I'm a partner in the

8    firm, and I don't know that this is even going on.

9    Q.    I think you have made that point a number of times here

10   for a number of hours this morning; right?

11        Okay.  But I'm honing in on this one question at a time

12   here.

13   A.    I will answer your questions.

14   Q.    All right, sir.  And you have been, thank you.

15        Now, were you present in meetings where Asha Maurya said

16   Nat Hardwick, at that time with that investigation going on,

17   did not know that the money was coming from the escrow

18   account?

19   A.    Was I in meetings with Asha Maurya where she said that

20   Nat Hardwick did not know?  No, I was never in that kind of

21   meeting.

22   Q.    You weren't in that meeting?

23   A.    I only met with Asha Maurya one time --

24   Q.    Okay.  And --

25   A.    -- prior to August 18th.

1    Q.   But you became aware that she had said to a number of

2    people before she started getting her paycheck that

3    Nat Hardwick did not know the money was coming from the

4    escrow account when she was first being asked about this.

5    You know that.

6    A.   No, I don't know that.

7    Q.   Okay.  Now, you have told us what you didn't know about

8    Ms. Maurya.  Do you know now from your reviews how many

9    different previous companies she stole from before getting

10   her job and getting herself where she could steal from a law

11   firm?

12   A.   You know, I don't know the exact number, no.  I have

13   heard rumors about it, but I couldn't tell you which company

14   it was or how many times.

15   Q.   All right.

16          MR. GARLAND:  Your Honor, at this time I will move

17   in Defendant's Exhibit 196.

18          THE COURT:  Any objection?

19          MS. BARRON:  No objection.

20          THE COURT:  It's admitted.

21          THE WITNESS:  You can probably give Mr. Phillips

22   back his cell phone.  I don't want the marshals to think it's

23   mine.

24   BY MR. GARLAND:

25   Q.   As soon as you have a chance to eyeball it, I will put

1    up pieces of it on the screen.

2    A.   I have seen this piece, that piece.  Okay.

3    Q.   What is this?

4    A.   It's an e-mail -- well, if you give -- let me have it,

5    if you can give it back to me?

6        It's an e-mail from my brother Rod.  It starts off with

7    an e-mail that we have seen before from Mr. Driskell sending

8    out about the 2011 tax returns.

9        And then it goes up to Nat, to Bob, to Art, and me and

10   Asha, how are we holding in the reserve account as of today,

11   Rod, sending it there.  Asha responding, and then one

12   million, and then are we shooting for the 1.5 end of year or

13   more.

14       That's my brother Rod.

15   Q.   All right.  Your brother is having communications with

16   Mr. Driskell, with Art Morris, with you, with Nat, and

17   sending information and questions to Asha.

18       Those were all -- Mr. Driskell, we have got identified,

19   he's the chief financial officer, and in this e-mail there

20   is -- I will flip over to the second page of Defendant's

21   Exhibit 196.

22       Down at the bottom of the second page, there is a

23   statement October 4th, 2012, Bob Driskell wrote, and can you

24   read that?

25   A.   Yes.

*The MHS Law tax return for 2011 showed taxable*
*income of $1,527,653.  The K-1s show Nat with 53.15*
*percent and $811,957 of ordinary income, and Art*
*with 46.85 percent and $715,696 of ordinary*
*income.  Nat received distributions of $561,600, so*
*his difference is $250,357.*

*Nat's tax rate is 35 percent fed and 6 percent*
*state plus 1.45 Medicare for a combined rate of*
*42.45 percent.  He will owe $106,277 in additional*
*taxes.*

*To net Nat $106,277 will require additional*
*salary of $184,666.  We will have to be salary*
*I think instead of distribution so we don't have*
*unequal distributions in 2012.  Art follows the*
*same calculation.*

Q.   So you were familiar with unequal distributions, weren't
you?

A.   Well, that's because if you look at the percentage here,
the percentages are in fractions.  It's because, as I have
said all along during my testimony, Mr. Garland, this was a
living document that kept changing and the percentage of
interest changed in the middle of the year in a couple
settings.

Q.   It got really complex, didn't it?

A.   It didn't get that complex.  It didn't get that complex.

1   Q.   Did anybody do a program that would put it in a

2   computer to see that the accounting departments up in

3   Baltimore or in Atlanta was keeping up with the complicated

4   calculations?

5   A.   It wasn't that complicated.  I mean, you are talking

6   about -- look, if we are talking about 50 versus 48 or 53

7   versus 48, we are not talking about that much money here, we

8   are really not.

9        So this was for Mr. Driskell because it's this year,

10  and then 2012 everything was going to be -- everybody was

11  even, because in 2011 it became effective May, May of 2011,

12  so there was a couple of months.  So that's why that

13  difference.

14       But then in '12, 2012, easy, because --

15  Q.   Then it's all percentages after that?

16  A.   -- now it's going to be what the agreement says.

17  Q.   Okay.  So my question is the bottom of the page talks

18  about -- this is Mr. Driskell doing all these calculations;

19  right?

20  A.   That's what it looks like.

21  Q.   Okay.  Let's turn to the next page.

22            THE COURT:  Mr. Garland, is that the original

23  exhibit, the one that's been admitted into evidence?  Is that

24  the one that's been admitted into evidence?

25            MR. GARLAND:  It is the number.  What we have done,

1   Your Honor, is ensure that nothing is marked on it, so we

2   have a complete set.

3           THE COURT:  I'm just asking one question:  Was that

4   the one that was admitted into evidence?  That's all I need

5   to know right now.

6           MR. GARLAND:  It's admitted into evidence.

7           THE COURT:  That one that you have in your hand

8   that you've just highlighted and written on, is that the one

9   that was admitted?

10          MR. GARLAND:  May I explain?

11          THE COURT:  Let me ask Ms. Loeb for a second.

12          Yes, is that the one that was admitted?

13          MS. LOEB:  Mr. Wittstadt reviewed the one that

14  Mr. Garland has.  We have a clean copy here with an exhibit

15  sticker on it.

16          THE COURT:  That we can use as the one admitted?

17          MS. LOEB:  Yes.

18          THE COURT:  Thank you.

19          Okay.  Go ahead.

20          MR. GARLAND:  That's what I was trying to explain

21  to you.

22          THE COURT:  You weren't getting there fast enough

23  and I just want to keep it going.

24          MR. GARLAND:  I'm not fast enough.

25          THE COURT:  That's okay, that's okay.

1    BY MR. GARLAND:

2    Q.   So up here at the top, it says:

3                    *Rod and Mark were given a 1099 for $175,500 to*

4              *convert the distributions they received to*

5              *income.  Since Mark and Rod were taxed on their*

6              *exact distribution, they are even.  Since tax*

7              *returns are due October 15th, this should go on the*

8              *next week's payroll.*

9         And them he says he will be out of town.

10   A.   Uh-huh.

11   Q.   Now, when that happened, there was an effort to

12   make sure that the tax effects in a sub-S all worked out

13   fairly among the agreements you had with Mr. Hardwick;

14   right?

15   A.   That is my understanding of what that was about.

16   Q.   And I believe you explained this some yesterday.  All

17   that income of the law firm, LandCastle, the other

18   subsidiaries, flowed down, and it went down to the

19   shareholders; right?

20   A.   Yes.

21   Q.   That's the way it's supposed to work?

22   A.   Yes.

23   Q.   And the IRS would take away your exemption from double

24   taxation if you didn't even up, or whatever other term -- you

25   used a different term, didn't you?

1    A.   Well, you actually objected to that yesterday and they

2    wouldn't let me testify to that.  So if you want me to

3    answer, I can.

4    Q.   Is it even up?

5    A.   What it was, that was because the agreement took place

6    in May 2011, and then we started doing the distributions

7    based upon that.

8        I had to get a 1099 so there could be an expense from

9    the law firm, so that nobody got taxed on the money that

10   was given to me and that I would have something to show to

11   the IRS to show they paid taxes.  That's what the 1099 was

12   for.

13   Q.   And the adjustments being talked about is to make sure

14   by taking what had been your distribution and turning it into

15   salary, that made sure Mr. Hardwick didn't get taxed on your

16   distribution.  Because all the tax would flow to the -- on

17   paper in the tax returns, the situation was presented as if

18   there were just two partners, and that was Mr. Morris and

19   Mr. Hardwick at that point?

20   A.   For the tax returns, yes, sir.

21       But if I wouldn't have gotten a 1099, I would have

22   basically gotten -- there wouldn't have been an expense to

23   the law firm.  Mr. Morris and Mr. Hardwick would have paid

24   taxes on money that I received, and I wouldn't have paid

25   taxes, and that's not right.

1    So that's why I got the 1099 for the amount of money

2    that I received.

3    Q.   I want to hand you Defendant's Exhibit 93.

4         MR. GARLAND:  And, Your Honor, at this time

5    I will move in Defendant's Exhibit 93, pursuant to our

6    agreement.

7         MS. BARRON:  No objection.

8         THE COURT:  All right.  It's admitted.

9    BY MR. GARLAND:

10   Q.   If you would examine that.

11       While you are looking at that, it's a report you had

12   Mr. Ritterman prepare for you early on to figure out what had

13   been going through the wire account of the law firm?

14   A.   There was an exhibit that the government presented that

15   Mr. Ritterman e-mailed me.  I don't know if this is --

16       If these are the same back-up wire transfers, then

17   I have seen them.  If you want to use the government --

18   Q.   I will be glad to use the government's.

19   A.   I don't know, I would have to go through each one of

20   those.

21        MS. BARRON:  It's 961.

22        MR. GARLAND:  961?

23        MS. BARRON:  Do you want us to pull it up?

24        MR. GARLAND:  Yes, you can pull it up on the

25   screen, okay.

1    BY MR. GARLAND:

2    Q.    That's 961, the government's exhibit that you talked

3    about yesterday; right?

4    A.    Well, I talked about it, corect.  Whether it was

5    yesterday or this morning I'm not really sure.  But, yes,

6    sir.

7    Q.    Would you blow up that first page of that exhibit?

8    A.    What am I looking at?

9    Q.    I think it might help if we went back to that prior page

10   that you pulled up so we can get oriented to this, not this

11   page.  The one before, it was the cover letter.

12         This, would you enlarge that where we can read it, the

13   top part, and we will get oriented.

14   A.    Attached -- yeah, it's an e-mail from Mr. Ritterman to

15   myself, wire account.

16                      *Attached is the Excel summary for the past*

17                 *six months, two tabs to view.  Also find the*

18                 *detailed report.*

19   Q.    Now, the background of that was that you were in

20   Atlanta, you were finding out that there was problems,

21   money was missing, and you called Mr. Ritterman and tell

22   him you want a detail report of what kind of money had

23   been coming out of the account for the six months you had

24   available or he had available to examine of that account;

25   is that right?

1    A.    Yeah.   I think, Mr. Garland, if you would show me the

2    full e-mail, you will see what my request is down at the

3    bottom.

4    Q.    Let's go ahead and go down to the paragraph where he can

5    read.

6          Well, let's see, we did the top two, the middle.

7    A.    No, the middle part is just disclaimers, you know, if

8    you get this e-mail and so on.

9    Q.    Okay.   Well, let's get the rest of the writing.   Could

10   you move it over a little bit?   Well, I guess that's it.

11         Explain now?

12   A.    Well, there is actually another e-mail that is either

13   before that one here, but we don't have it.

14   Q.    Okay.

15   A.    At some point in time, I'm saying Mr. Ritterman was

16   in Atlanta and I e-mailed him.   It looks like I sent it

17   from my iPhone and I said, I want you to go back and get --

18   I had this list, but SunTrust allowed you to go back six

19   months online and actually pull that detail that's behind

20   it.

21         And I wanted -- I didn't know who created or wherever

22   this spreadsheet came from, and I wanted him to go into those

23   accounts -- into this account and go back as far as SunTrust

24   would let me go and say what's been coming out of this

25   account, to whom, where, where is it going.

1    Q.    And you told him you wanted it that night, and you got

2    it sometime.

3    A.    You need to go back at least until January of 2013, yes,

4    to me *right now*.  Everything that I wanted done at that point

5    I wanted it done *right now*.

6    Q.    All right.  So would you flip over to, let's see, page

7    eleven, the top entry there?

8    A.    Somebody needs to --

9    Q.    Okay.  Let's focus in on the top one up there?

10   A.    Yep.

11   Q.    And under beneficiary's name, it's you; right?

12   A.    Yes, sir, it is.

13   Q.    And you determined, I believe, that this was the wire

14   account; right?

15   A.    Yes, sir.

16   Q.    And you discovered that in that wire account, somebody

17   had been taking money out of the law firm operating account

18   in millions of dollars and putting it in that account.  You

19   discovered that, didn't you?

20   A.    What I discovered was every two weeks, the default

21   division would wire down 1.5 million dollars or thereabouts

22   every two weeks.  1.5, 1.6, 1.7 every two weeks it would wire

23   from our operating account down to the operating accounts to

24   the firm, and then somebody took operating funds and put them

25   into this wire account.

1    Q.    And that commingled the funds; right?

2    A.    The money got commingled, yes, sir.

3    Q.    What?

4    A.    Yes, sir, money got commingled.

5    Q.    It got -- so when money came out, you also found out

6    that it went to pay lawyers' salaries; right?

7    A.    It paid -- there was payroll, payroll was made out of

8    this wire account.

9    Q.    Everybody was being paid out of commingled funds?

10   A.    The money got commingled, yes.  This was an account

11   that was in Atlanta.

12   Q.    Right.  And in that account, commingled in that

13   account were funds of the law firm and funds of clients;

14   right?

15   A.    Yes, sir.

16   Q.    And as you said, an escrow account is only supposed to

17   hold client funds and not have the lawyers' funds mixed up in

18   it; right?

19   A.    That's what you and I both learned when we went to law

20   school.

21   Q.    I think we learned it, as you said, first thing.  That

22   was a long time ago.

23   A.    The first thing is don't steal anybody's money.  The

24   second thing is don't commingle your money with clients'

25   money.

1    Q.    Right.  And when they do it, it's no longer meeting the

2    definition of what an escrow is, isn't it?

3    A.    No.  See, that's where you and I disagree.

4    Q.    Well, some of the money is being held for clients, and

5    some of it has been commingled in; right?

6    A.    You and I are going to disagree about this.  We

7    disagreed about this on the couple prior occasions we've

8    met.  Once the money -- once you have client funds, it's an

9    escrow account.

10          It doesn't change it because the lawyer that was

11   responsible for that escrow account decided to commingle it

12   and violate the rules of professional conduct.  It doesn't

13   change the fact that that account is an escrow account.  It's

14   just an escrow account that has been commingled with

15   operating funds.

16   Q.    So when you got your check here that we have up here --

17   or your wire, when you got your wire, you didn't check to

18   determine the source of it as the Georgia IOLTA incoming wire

19   account, did you?

20   A.    There was nothing on the wire that came to me, nor into

21   my bank statements which I reviewed every single month, that

22   had any indication whatsoever that it was coming from a

23   Georgia IOLTA account.

24          I never received a screenshot via e-mail that described

25   it coming out of a Georgia IOLTA account.  I never received

1    any type of information whatsoever that it was coming out of

2    a Georgia IOLTA account.

3    Q.   And generally when you would receive a wire, you were

4    just interested in whether you had gotten the money and how

5    much had come in; right?

6    A.   I was --

7    Q.   You weren't conducting any investigation to determine

8    which account it came out of, were you?

9    A.   No.  But when I balance my checking account at the

10   end -- when I get my bank statement, there is no

11   indication -- it just said Morris Hardwick Schneider on

12   there.

13        No, I did not conduct an investigation.  No, sir, I did

14   not.

15   Q.   I mean, would you agree with me that most people don't

16   look and determine what bank account the money they got came

17   out of?  If they are looking for money and they say it's in,

18   that's generally what people want to know; right?

19   A.   Most people want to know they got the money.

20   Q.   That they got the money.

21   A.   Sure, I will agree with you on that.

22   Q.   All right.  Now, let's zoom in on the next -- that

23   amount you got was $134,000; right?

24   A.   Yes, sir.

25   Q.   Okay.  Now, let's go down to the next entry right below

1   there, and would you blow that up?

2       And that shows that your brother got the identical

3   $134,000.

4           MR. GARLAND:   Excuse me, do what?

5           Oh, okay.

6   BY MR. GARLAND:

7   Q.   That shows that your brother got the $134,000?

8   A.   Yes, sir.

9   Q.   Right.  And you don't have any indication that he would

10  have looked at anything either; right?

11  A.   What --

12  Q.   Your investigation hadn't shown that your brother was

13  aware of it coming out of --

14  A.   No, he didn't know.

15  Q.   Okay, right.

16      Now, would you turn over, please, to page twelve?

17      Just a second, wait a minute.  Page twelve at the bottom

18  of the page, would you hone in on that, please?

19      All right.  Now, this is another transfer, and this one

20  is 2014; right?

21  A.   4-18-2014, yes.

22  Q.   Right.  And going back to the one we just went over, it

23  was 4-11; right?  The one --

24  A.   You are going to tell me it was 4-11.  If you really

25  want me to remember dates when I look at something, or if you

835

```
1    want to show it to me real fast so we don't have to flip
2    back?
3    Q.   All right.
4    A.   So this wire was done on April the 11th.
5         And then you are asking me to go to page what?
6    Q.   I am going to ask you a couple of questions.
7    A.   Yes, that was on April the 11th.
8    Q.   Right.  And your brother's was on April 11th?
9    A.   That's what that shows.  I was not in town when that
10   came in.
11   Q.   So then we go to the next page, and then your brother
12   gets how many days later a wire?
13   A.   Approximately a month later.  I mean, a month before.
14   Q.   Excuse me, a month before he had gotten --
15   A.   102.
16   Q.   -- 102.
17        Now, you were also getting salary -- I mean, your
18   brother was getting a salary?
19   A.   That's correct.
20   Q.   And your brother was getting bonuses; right?
21   A.   Yes, sir.
22   Q.   And this was in addition to that out of the wire
23   account; right?
24   A.   That's where that was coming from under the accounts
25   that were under support services, yes.
```

```
1    Q.    Is it satisfactory to you if I call out the dates and

2    put it back up there?

3    A.    Sure, I have no problem with you calling me out dates.

4    Q.    If I get one wrong, if I misspeak, I'm sure there is

5    enough people that will keep me straight.

6    A.    Somebody will pick it up.

7    Q.    All right.  So would you go over to page 13 of 41, top

8    of the page, page 13 of the exhibit, which is 93?

9    A.    Okay.

10   Q.    All right.  You can see that, right, so you don't have

11   to rely on me?

12   A.    Yes, sir.  That's the one we were talking about.

13   Q.    That's the one we were just looking at, all right.

14         Now, let's go to the page 14, going forward at the top

15   of the page.

16         And this is another one, and who received this one?

17   A.    LandCastle Title.

18   Q.    So this is where money was going out of the wire account

19   over to LandCastle Title; is that right?

20   A.    Yes.  But that's not unusual.

21   Q.    All right.  Well, maybe I'm -- would you go to page 14?

22   I'm not sure that this is the one I was -- page 14.

23             MS. BARRON:  The number in the bottom right corner,

24   is that what you are looking at?

25             MR. GARLAND:  It's in the middle, that's where the
```

1    page numbers are.

2              That appears to be it.  Would you go to the top

3    wire, please?

4    BY MR. GARLAND:

5    Q.    So this is out of the wire account, the one that has a

6    label on it that says Georgia IOLTA; right?

7    A.    Yes, sir.

8    Q.    And this is June 20th, and you got $96,000 out of the

9    account; right?

10   A.    That's correct, sir.

11   Q.    Okay.  And would you go to the bottom of that page and

12   blow that up?

13         And that's where your brother got the same thing out of

14   the wire account having that same designation; right?

15   A.    Yes, sir, that's what that shows.

16   Q.    And now let's go over to page 17 of 41, top of the page,

17   please?

18         And this one is May of 2014?

19   A.    Yes, sir.

20   Q.    And you got $71,000 out of that account at that time;

21   right?

22   A.    That's where it came from, yes, sir.

23   Q.    Right, okay.  And that was for May.

24         And then on the next page, 16, at the top of the page?

25         Page 16, top of the page, and this date is May, your

1    brother got a payment; right?

2    A.    Yes, sir.

3    Q.    All right.  Now, did you during January up to June get

4    distribution checks?

5    A.    No.  I used to get checks, and then at one point --

6    I used to get a check, and the check would be overnighted to

7    me.  And then at some point in time, Asha just asked if she

8    could wire the funds, and I said okay.

9    Q.    Did you get wires up until June or July of 2014 that did

10   not come from the IOLTA account but came from operating

11   accounts?

12   A.    I only received -- I only received a distribution once a

13   month, and as you can see, they are consistently right around

14   the middle, and they were what was set forth on those

15   documents that Mr. Hardwick would send to me.  And so that's

16   what I got.

17         And I didn't get any other checks.  I didn't take any

18   checks from my operating accounts in Baltimore.  I didn't

19   take any checks from any other place.  I lived and breathed

20   on my salary and the distributions that I was told that I was

21   to receive from Mr. Hardwick, and Ms. Maurya at some point in

22   time started wiring me out of this account.

23         I had no idea they were.  I didn't know this account

24   existed, and I certainly didn't know that the funds were

25   coming from an IOLTA account.  This was not an account that

1   we used in default at all.

2   Q.   And you don't know whether Ms. Maurya ever told

3   Nat Hardwick that the money he was getting was coming out of

4   an IOLTA account.  You weren't there and you never heard

5   that; right?

6   A.   I know they had a conversation about it.  In June of

7   2014 I know Ms. Maurya and Mr. Hardwick had a conversation

8   about four hundred thousand dollars being wired to the

9   Venetian, and then the Venetian kicking it back saying that

10  it was coming from escrow funds, and then Mr. Hardwick

11  directing the four hundred thousand dollars be taken from my

12  operating account and wired to the Venetian in replacement of

13  it.

14  Q.   So the Venetian got money out of an operating account,

15  not out of an escrow account?

16  A.   No, the initial wire was sent from the escrow account.

17  Q.   And it was rejected?

18  A.   And it was rejected.

19  Q.   So it never cleared?

20  A.   That's correct.

21  Q.   It never came out of the escrow account?

22  A.   That is correct.

23  Q.   And the funds that ultimately went to the Venetian came

24  out of an operating account.  That's correct, isn't it?

25  A.   That is correct, Mr. Garland.  That is 100 percent

1    correct.

2           MR. GARLAND:  Could we have a moment here to clear

3    some exhibits?

4           THE COURT:  I'm sorry, what are you requesting?

5           MR. GARLAND:  Just a moment to talk to counsel.

6           THE COURT:  Yes.

7           MR. GARLAND:  Your Honor, can we take a small

8    break?

9           THE COURT:  Not unless we really have to.  It's

10   only 4:20 and we are only going to go to 4:45.

11          MR. GARLAND:  Okay, I will keep going.  Let me get

12   away from these documents for a minute and turn to another

13   subject and we will come back to these.

14   BY MR. GARLAND:

15   Q.    There came a moment, you have told us about it, where

16   you had looked at the accounts and found where the wire

17   account was going, Fidelity had been called in, correct, and

18   arrived?  Meinhardt and company arrived from Fidelity.

19   A.    August the 15th, 2014.

20   Q.    August 15th.  And three days later, on the 18th, you got

21   Mr. Hardwick's resignation; right?

22   A.    Mr. Hardwick resigned on the 18th, that's correct.

23   Q.    And a deal was cut for LandCastle to -- well, by the

24   19th, you owned 100 percent of the law firm; correct?

25   A.    That is not correct.

1    Q.   Well, you and your brother?

2    A.   I still didn't own 100 percent of the law firm.  The

3    parent company, my brother and I, with Mr. --

4    Q.   Excuse me, I misspoke.

5    A.   Right.

6    Q.   You owned 100 percent of the parent company that owned

7    the law firm?

8    A.   My brother and I did.  Well, in effect, yes,

9    Mr. Hardwick surrendered his shares back to the firm, so the

10   net effect would be is that the two remaining shareholders in

11   the firm would be my brother and myself.

12   Q.   And let me make my words correct.  You and your brother

13   at that moment owned 100 percent of the holding company that

14   held all the other interests; correct?

15   A.   In laymen's terms, yes, sir, that's correct.

16   Q.   So let's just cut through all the documents.

17   A.   In laymen's terms.

18   Q.   Right.  And so a deal was cut with Fidelity in which

19   they agreed that they would be, in a multibillion dollar

20   corporation, they would issue their -- they would stand

21   behind and ensure that no checks bounced out of those

22   accounts; right?

23   A.   It took a little bit of time and a little bit of

24   dealing, but I thought I was able to do that and save the

25   firm, yes.

1    Q.    So the firm at that point had an agreement that ensured

2    that it could go forward and not have anybody lose any money

3    that had closings going; right?

4    A.    They agreed -- in very simple terms, they took a

5    percentage of LandCastle in exchange for a complete back-stop

6    of the escrow accounts.

7    Q.    So at the end of the day, you and your brother first had

8    100 percent, and then after your deal with Fidelity, Fidelity

9    wound up with 70 percent of LandCastle Title; right?  The

10   first deal?

11   A.    Yes.  Yes, they received, amongst other things --

12   Q.    Right.

13   A.    -- 70 percent of the membership interest in LandCastle

14   Title, the parent company retaining 30 percent.

15   Q.    All right.  And you said they received several other

16   things.  But before I ask you about those, before the deal

17   was cut with Fidelity, what percent of LandCastle Title did

18   they own?

19   A.    They didn't own any.

20   Q.    And they would get some revenue out of LandCastle Title,

21   wouldn't they?

22   A.    Based upon certain agency agreements you will recall

23   that you and I spoke about what I believe to be a contractual

24   obligation to contact them.

25   Q.    Right.

1    A.    Those controlled the agreements between Fidelity and
2    LandCastle Title as far as the split was concerned on title
3    insurance, the premiums.
4    Q.    The premiums.  So you have talked about a guarantee
5    letter that they issued; right?  What do you call that
6    letter?
7    A.    Insured closing protection letter.
8    Q.    An insured closing protection letter.
9          I never practiced real estate law.  But an insured
10   closing protection letter, they got a fee for that, didn't
11   they?
12   A.    Certain jurisdictions allowed for a fee to be charged
13   for an insured closing protection letter.  Other
14   jurisdictions did not.
15         But generally speaking, 25 bucks maybe.  25 bucks.
16   Q.    150 bucks in Georgia?
17   A.    I don't think so.
18   Q.    Okay.
19   A.    If they did, that's a -- but I don't think so.
20   Q.    They got a fee from that, and that didn't have anything
21   to do with their premium they got for underwriting the title
22   policy; right?
23   A.    That is correct.  They are two separate --
24   Q.    Two separate things?
25   A.    Yes, sir.

1    Q.   So now I just want to talk about their cut of the

2    premium.  They didn't own any of the company and they had an

3    agreement as to how much they were to get; right?

4    A.   I believe there was some changes to it, but generally

5    speaking they either got 15 or 20 percent.  So if the

6    premium was a grand, they got 150 bucks or 200 bucks on

7    each one.

8    Q.   Right.  So they got 15 or 20, and at that point they

9    had about 50 percent of the business; right?  Of the total

10   number of titles being written, there were other underwriters

11   that had scattered among them the rest of the business;

12   right?

13   A.   It was my understanding that Fidelity had the larger

14   piece of the market share of our business.

15   Q.   Okay.  You don't know whether it was 50 or 60?

16   A.   I don't know.  I believe they had the larger piece of

17   our business.

18   Q.   The larger piece could be 51/49; right?  But in any

19   event, there were these other companies that were competitors

20   of their's; right?

21   A.   The largest being First American, yes.

22   Q.   How many were there?  Were there four or five,

23   competitors in the marketplace?

24   A.   Fidelity, First American, Old Republic, North American

25   Title Insurance Company.  There are probably four.  I mean

1   four including Fidelity.  Probably four.

2   Q.   We would have to get out a list to check to see who is

3   writing; right?

4   A.   Like we wrote a little bit on North American, we wrote a

5   little bit on Old Republic, we wrote a decent amount on First

6   American, and wrote a bunch on Fidelity.  So -- but if there

7   was another small one in there --

8   Q.   You just don't --

9   A.   -- I don't know.

10  Q.   But you weren't down in the closing operations to see

11  where Hardwick was causing other entities to get part of the

12  fee; right?

13  A.   No.  I knew that on the default side, because we had to

14  issue policies of title insurance on the back end of our

15  foreclosures that we would do --

16  Q.   Right.

17  A.   -- we wrote those on Fidelity's paper.

18  Q.   Okay.

19  A.   I knew that.  I knew that.  And Fidelity was -- and

20  I had other relationships.  Fidelity has relationships -- is

21  involved in a lot of different aspects of the real estate

22  closing and real estate business.

23  Q.   They own other companies that did business in other

24  places.

25       Now, to go back to my question, before the deal with

1   Fidelity, their only interest was their 15 percent of the

2   title fee of the amount of business that they were doing with

3   LandCastle Title; correct?

4   A.   Fifteen percent.  There were certain guarantees of

5   amounts of money that were -- under the agency agreements

6   that were in place, the firm guaranteed that they would pay

7   them a minimum of like two or three million a year in

8   revenue.

9   Q.   Revenue, okay.  So you mentioned that there were other

10  benefits that Fidelity got in the transaction where they said

11  we will put our credit and worth and money, whatever the

12  amount of money that is missing, we will stand behind

13  it.  That's what they did; right?

14  A.   Yes.

15  Q.   And they got other benefits?

16  A.   Yes.

17  Q.   And one of the benefits they got was they wound up

18  owning 70 percent of the title company; right?

19  A.   Well, that was the main -- that is what we were just

20  talking about, that they got that.  They got other benefits

21  too.

22  Q.   They got an assignment -- oh, one of the other benefits

23  was that all the title business would be taken away from the

24  competitors and it would all go through them; right?

25  A.   I believe so, yes.  That's right.

1    Q.   Right, right.  So they not only -- and then they went

2    from no interest in a title company to 70 percent.

3         Then another benefit they got was the percentage of the

4    fee went up; right?  Went up to 40 percent; right?

5    A.   That was later on.  No, it was later on, because we

6    ended up turning the agency agreement from LandCastle Title

7    to switch it over to the law firm so that the law firm could

8    get -- the law firm wasn't getting enough revenue from the

9    closing business with just the settlement fee and its title

10   fee.

11        And in order for the closing business to survive, it

12   needs to make money doing -- the settlement fee, actually

13   passing the papers and the transaction, it needs to get a

14   revenue stream from its title work, and it also needs to get

15   a piece of the title insurance, the title insurance policy

16   that we talked about that's there.

17        With the original deal that we did, the entire title

18   premium went to -- was to be to LandCastle and they were

19   getting 70 percent.  We thought -- when we ran the numbers

20   initially in the transaction, it looked like that would

21   work.

22        But once we got into the deal, it didn't work.  We were

23   going to lose money and lose money fast.  So we went back to

24   them and said, Look, we can't do this or we are going to die

25   on the vine.

And they agreed to switch the title agency from
LandCastle, which we only owned 30 percent, to the law firm,
which we owned 100 percent, and give us 60 percent of the
premium instead of what we were getting at 80 percent.

Q.   Now, before that event happened, after you sign all
the documents -- you get them signed by within seven days;
right?

A.   Huh-uh, I think it was ten.  I think it was the 28th.
The documents -- whatever date that was, it was a Monday.

Q.   It was ten days?

A.   I think it was ten days.

Q.   From the time he gave his stock over, you had inked the
first agreement with Fideltiy?

A.   I believe -- it's seven to ten days.  It wasn't long.

Q.   Okay.  Now, in that first deal, are you saying that
they wound up taking all the cream, the honey off the top of
the -- well, they took so much of the honey with their new
deal, that later they had to convey it back to the law firm;
right?

A.   It ended up working out that way because the number of
employees that were going to go over with LandCastle didn't
correspond with the work that was going to be done.

     There is all these laws called RESPA, Real Estate
Settlements Procedure Act, and TILDA, the Truth in Lending
Disclosure Act, and they require all kinds of -- way too much

1    for here.

2        But it wasn't working, and so we had to come back and

3    redo it.

4    Q.   All right.  So just to make sure we are clear, until --

5    how long was it before you figured out that in this

6    transaction, that there wasn't enough money coming into the

7    law firm to do what the law firm needed to do?

8        And as you described, the law firm then acquired

9    ownership of 100 percent of the title company?

10   A.   No.  It eventually got to have 100 percent, but it was

11   like it got 5 percent -- there were some couple other

12   take-downs in order to help us to try to keep -- try to

13   stave off --

14   Q.   Who was getting what?  You say take-downs.  Were you

15   getting it back into the law firm?

16   A.   We were trying to negotiate to try to get revenue back

17   to the law firm.  In exchange for that, we were giving up

18   points.  We had 30 points in LandCastle; we were giving up

19   points to Fidelity in exchange for revenue streams to come to

20   the law firm.

21   Q.   All right.  One of the other benefits Fidelity got was

22   the law firm assigned to Fidelity the rights to any claims

23   against anyone that might exist that they could bring;

24   right?

25   A.   That is correct.

1    Q.    Right.  So if the law firm had been done bad, they could

2    sue people and try to get more money for themselves.  That

3    money would come to them; right?

4    A.    Not necessarily.  The agreements -- the agreements

5    had -- there was an agreement in place.

6         So Fidelity ended up putting in 30 million dollars.

7    That's how much money they funded the escrow accounts, 30

8    million.

9    Q.    By what date?  What date was the last time --

10   A.    I don't know.

11   Q.    -- when they put in the 30 million?  What's the last

12   time they put money in?

13   A.    It was sometime in 2015.

14   Q.    I see.  So they put money in while you were running the

15   firm, you and your brother, from August to when in '15?  To

16   July '15?

17   A.    Roughly.

18   Q.    Right.  Now, you all were the operators of the firm at

19   that point; right?

20   A.    Well, yes and no.  I was in charge of -- I was in charge

21   of the firm; however, part of the agreements of the firm is

22   that closing accounting was turned over to Fidelity to get

23   these accounts reconciled, to continue to put money -- it

24   wasn't as easy as just to go grab a bunch of bank statements

25   and start reconciling them.  It was an enormous undertaking.

1    Q.    All right.

2    A.    However, they continuously put money into the escrow

3    account, 30 million.

4          But you are asking me what did they get back, what would

5    we get back if they sued.  So once they got their 30 million

6    back, if they were able to recoup 30 million dollars from

7    people that got money wrongfully, then the law firm would

8    partake and share in anything that it got back in excess of

9    that.

10   Q.    Right.  Now, I believe we have talked about those rights

11   were an added benefit.  Were there other rights?

12   A.    Certain -- those were really -- those were really kind

13   of the big ones.  That was really kind of the biggies.

14   Q.    Well, you said they took over the accounting function

15   of the escrow accounts and the escrow -- that meant they

16   took over control of all of the law firm's escrow

17   accounts?

18   A.    Only the closing escrow accounts.  The default escrow

19   accounts were still under my control.

20   Q.    Under your control.  And they got a fee for that too;

21   right?

22   A.    Yes, they did.

23   Q.    Thirty thousand a month, is that it?

24   A.    No, I think it was like -- it ended up being like

25   twelve.

1    Q.   Okay.  And since they had the exclusive on -- did they

2    have the exclusive on your foreclosure business too?

3    A.   To write policies on Fidelity?  Sure.

4    Q.   So --

5    A.   I mean, we were in trouble.

6    Q.   No, I'm just asking what they got.

7    A.   Yeah.  Yes, they did.

8    Q.   So you and your brother at that point owned 100 percent

9    of the holding company that owned the law firm, and you still

10   had -- when the first agreement is inked, you still had

11   30 percent of LandCastle Title; right?

12   A.   Yes, sir.

13   Q.   Okay.  And with their backing, it looked to you like the

14   firm ought to just go right on and make money; right?

15   A.   No, no.

16   Q.   Okay, you disagree with that.

17   A.   No, Mr. Garland.

18   Q.   All right.  You answered my question.

19   A.   It was going to take a significant amount of work.

20   Q.   It would take work, but it wasn't going to be because a

21   client had lost any money that it was --

22   A.   No client lost money.

23   Q.   No clients lost money, all right.

24        Now, I want to go back a ways.

25             THE COURT:  Are you about to go into a new area?

1          MR. GARLAND:  Yes, Your Honor.

2          THE COURT:  So we have to continue over until the

3    morning with this witness?

4          MR. GARLAND:  I don't know what time it is.

5          THE COURT:  Yeah, it's about 4:40.

6          Ladies and gentlemen, I will tell you what.  This

7    has been a long day.  Again, I'm going to let you go.

8          I want you to understand that even though I have

9    said I will endeavor to stop at 4:45 every day, that may not

10   happen.

11         And I'm sorry that that keeps changing and it seems

12   fluid.  I have to allow, of course, in this case the

13   attorneys the time that they feel they need to make whatever

14   points they are attempting to make, and so there is only so

15   much control I have over that.

16         So all I can say to you is I will again attempt

17   to abide by that schedule, but please be prepared in the

18   event that we do have to stay longer some evenings going

19   forward.

20         Again, today I will stick to it because we had

21   already talked about it and agreed to it.  But going forward,

22   please be prepared to -- and if there is a day that that does

23   pose a significant issue, then feel free to let Ms. Beck

24   know.  But otherwise be as flexible as we need you to be,

25   please.

1              And again, I'm sorry that I have to ask that of

2      you, but it's necessary.

3              All right.  Thank you so much.  Have a great

4      evening.

5              (In open court without a jury present:)

6              THE COURT:  You all may be at ease.

7              We will go ahead and work probably from 9:15 to

8      5:45 I'm thinking going forward.  We only got through one

9      witness and haven't finished him today, so I will do as much

10     as I can on my end, but just be prepared for that.

11             Mr. Garland, do you have a lot more with this

12     witness?

13             MR. GARLAND:  I have a lot more, I realize.

14             Could on one of the days we -- could I be excused

15     at 5:00?

16             THE COURT:  On which day?

17             MR. GARLAND:  Just one of those days.  I need --

18             THE COURT:  You don't have a particular day?  It

19     doesn't matter which day?

20             MR. GARLAND:  Well, I have to arrange it.  And if

21     I can just address the Court with it?

22             THE COURT:  Yes, sir.  At this point, before you

23     do that, is the witness to remain here?  Any reason for

24     Mr. Wittstadt to remain here right now?

25             MS. BARRON:  Not right now.

1          MR. GARLAND:  Not for us.

2          THE WITNESS:  Your Honor, I do have one issue

3    tomorrow.

4          MS. BARRON:  I was going to raise that with the

5    Court.

6          THE COURT:  Well, then maybe he should stay.

7          MS. BARRON:  Okay.

8          THE COURT:  I don't know, is there an issue with

9    him hearing whatever you are about to present to the Court?

10          MR. GARLAND:  I'm not about to present anything to

11    the Court.

12          THE COURT:  Right, but you are getting ready to

13    tell me about a scheduling issue you have.

14          MR. GARLAND:  I was just going to approach the

15    bench with the prosecutor.

16          THE COURT:  Okay, you want to approach to discuss

17    your issue?

18          MR. GARLAND:  If I may?

19          THE COURT:  Mr. Wittstadt, what is your issue?

20          THE WITNESS:  I need to check my calendar.  I came

21    down Tuesday I thought until Thursday.  I have a 10:30

22    conference call tomorrow which is imperative for my new

23    business, and I need to be on that.

24          It would only take about a half an hour, if I could

25    please be permitted to make that?

1          THE COURT:  I'm going to ask you to just talk to

2    the government about it.

3          Government, you can propose whatever you need to

4    and ask me what arrangements --

5          MR. GARLAND:  It will be fine with us if the

6    government wants to stick a witness in there and we could

7    break and then I can take up with mine.

8          THE COURT:  I would discuss it further with the

9    government.

10         And it's at 10:30 and it's about thirty minutes?

11         THE WITNESS:  It won't take me longer than thirty

12   minutes.  But if I have to, I can't even reschedule now, it's

13   so late.

14         THE COURT:  Okay.  Thank you so much.  Thank you so

15   much, sir.  I don't mean to cut you off, but I will just have

16   to talk to the government further about what guidance they

17   can give you.

18         THE WITNESS:  I understand that.

19         Your Honor, I'm going to go ahead and step out.

20   I think the government is going to have to find me.  I have

21   to make arrangements to stay again tonight.

22         THE COURT:  Okay.

23         THE WITNESS:  Have good evening.

24         THE COURT:  You too.  Thank you, sir.

25         (The witness leaves the courtroom.)

1           THE COURT:  Is there anything else except for

2     Mr. Garland's issue, government?

3           MS. BARRON:  Your Honor, I am going to -- if I need

4     to do this in writing let me know -- orally move in order for

5     him to have his phone call, he needs to have his phone in the

6     courtroom.

7           Now, do I need to do a written motion?

8           THE COURT:  You just tell Ms. Beck and she will

9     prepare whatever it is.

10          MS. BARRON:  Thank you.

11          MR. GARLAND:  Do you want me to approach the

12     bench?

13          THE COURT:  All right.  Is there anything else but

14     for this issue that we are approaching on now and

15     Mr. Wittstadt?

16          Government, anything else?

17          MS. BARRON:  No.

18          THE COURT:  Defense, anything else?

19          MR. GARLAND:  No.

20          THE COURT:  Okay.  Is this something that should be

21     on the record?

22          MR. GARLAND:  I don't need it to be.

23          THE COURT:  Okay.  Off the record.

24          MR. GARLAND:  Thank you.

25          (A discussion is held off the record.)

1          THE COURT:  Back to Mr. Wittstadt, tomorrow,

2    government, are you -- do you still have these other

3    witnesses, Kevin Deaton, Michael Mock, I think it is,

4    Neal Barton lined up, or do you have to do some things out of

5    order with them, or what do you -- how do we work around

6    Wittstadt at this point?

7          MR. PHILLIPS:  We have a witness that we think

8    would take approximately a half an hour that we could put up

9    while he goes out to do his call.

10          THE COURT:  So considering that we are going to try

11    to start at 9:15 tomorrow, you would go ahead and put him up

12    until it's time for him to depart for his call, call one of

13    these other witnesses, and then put him back up once he's

14    ready to come back in?

15          MS. BARRON:  Yes, Your Honor.

16          THE COURT:  That's fine with the Court.

17          MR. GARLAND:  That's fine with us.

18          THE COURT:  All right.  Anything else before we

19    leave for this evening.  Government?

20          MR. PHILLIPS:  No, Your Honor.

21          THE COURT:  Defense?

22          MR. GARLAND:  No, Your Honor.

23          THE COURT:  All right.  Hold on one second.  Let me

24    just make sure these two notes that Ms. Beck has passed me

25    which I'm sure are from the jurors don't affect anything we

1    need to discuss.

2            Okay.  I will tell you that one juror, an

3    Emonnie Dorsey, is saying that on Mondays and Wednesday

4    because of child care issues she has to leave by 5:30 to pick

5    up her child.

6            I will also tell you that there is a juror named

7    Ms. Jones, Velverlyn Jones, who is a black female who has

8    been wearing a royal blue sweater that sits on the front all

9    the way on the end toward the back of the courtroom, I can't

10   help but noticing that she has slept through a lot of the

11   testimony.

12           And so I asked for her name.  I did want to bring

13   her in tomorrow morning -- these are the options I am

14   considering.  Either bring her in and ask her whether she

15   feels she has missed a lot of testimony.  She knows I've seen

16   her sleeping because when she wakes up I'm looking dead at

17   her.

18           Or in the alternative I can just without telling

19   her, without saying anything to anyone, switch her out and

20   make her an alternate juror without her ever knowing, since

21   they have never been told who the alternate jurors are.

22           Or I can, like I said, bring her in and ask her

23   some questions before we make any determination like that.

24   But I have observed her sleeping a significant part of the

25   trial, through a significant part of the trial.

1            I'm sorry, the rest of you back there, feel free to

2     be at ease.  You all don't have to go anywhere, but you don't

3     have to stand up either.

4            Yeah, we probably all need to stand up, get some

5     blood circulating.

6            Any feedback on Ms. Jones, on the issue with

7     Ms. Jones and how to deal with her, the sleeping juror?

8            MS. BARRON:  No, Your Honor.  Actually, Ms. Fleming

9     had told me, if it's the one I'm thinking about, the lady who

10    works for Kroger, she's been wearing the Kroger fleece,

11    Ms. Fleming said there was a day she was really jittery and

12    did not seem to be well, so I think we need to probe this

13    issue with her.

14           THE COURT:  Ms. Fleming, do we think we are talking

15    about the same juror, in the front all the way on the end?  I

16    don't know if it's Kroger attire, but it's blue.

17           MS. BARRON:  It's Kroger.

18           MR. GARLAND:  I have no idea because I haven't been

19    looking over there.

20           THE COURT:  Right, you all have been busy, so you

21    all have been focused up here.  I have been looking right at

22    her.

23           MR. GARLAND:  Our position would be we would like

24    the Court to conduct the questioning of her.

25           THE COURT:  Okay.  I will do that, and then we

1    won't make any decisions until after that is done, and we

2    will discuss it at some point.  So I will bring her in first

3    thing tomorrow morning.

4          All right.  If there is nothing else, then we are

5    adjourned for the evening.  Thank you.

6          MR. PHILLIPS:  Your Honor, did you want to know the

7    other witnesses we may call tomorrow?

8          We have two out-of-town witnesses who are flying in

9    tonight, and so we are going to get them up, and that may

10   mean that we have to deviate from the order that we had

11   already told the defense.

12         Their names are Tom Shedlock, S-h-e-d-l-o-c-k, and

13   Katrena Corcoran.

14         THE COURT:  And they are both coming from out of

15   town?

16         MR. PHILLIPS:  Yes, Your Honor.

17         THE COURT:  And let me make it clear -- let me make

18   clear what I was saying earlier.  I just am not comfortable

19   telling any side to, yes, release witnesses.  All I care

20   about is that if we are at a stopping point or if we finish

21   with one witness, you all have someone else ready to go in

22   case we are not ready to stop for the day.

23         So I just don't want to say, yeah, dismiss all your

24   witnesses for the day even though I'm thinking, like you, we

25   probably are not going to reach another one.  So that's why

1    I was not comfortable making that assertion.

2            As long as you all have somebody ready to go while

3    we are still working, I'm fine with that.

4            Okay.  Anything else, government?

5            MR. PHILLIPS:  No, Your Honor.

6            THE COURT:  Defense?

7            MR. GARLAND:  Not that I can think of at this late

8    hour.

9            THE COURT:  All right.  Well, I'm not going to give

10   you any more time to try to think of something, so I will see

11   you all in the morning.

12                (Proceedings adjourn at 4:53 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3    UNITED STATES OF AMERICA        :
                                      :
4    NORTHERN DISTRICT OF GEORGIA     :

5

6            I, Nicholas A. Marrone, RMR, CRR, Official Court

     Reporter of the United States District Court for the Northern

7    District of Georgia, do hereby certify that the foregoing 261

8    pages constitute a true transcript of proceedings had before

9    the said Court, held in the city of Atlanta, Georgia, in the

10   matter therein stated.

11           In testimony whereof, I hereunto set my hand on

12   this, the 25th day of October, 2018.

13

14

15

16                           /s/ Nicholas A. Marrone

17                           _____
                             NICHOLAS A. MARRONE, RMR, CRR
18                           Registered Merit Reporter
                             Certified Realtime Reporter
19                           Official Court Reporter
                             Northern District of Georgia
20

21

22

23

24

25