IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | INDICTMENT NO.: |
| v. | ) | |
| | ) | 1:16-cr-00065-ELR-CMS |
| NATHAN E. HARDWICK IV, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT HARDWICK'S SENTENCING MEMORANDUM**

COMES NOW the Defendant, Nathan Hardwick, and files his Sentencing Memorandum in connection with his upcoming sentencing scheduled for January 10, 2019.

Pursuant to 18 U.S.C. §3553(a) and *Booker v. United States*, 543 U.S. 220 (2005), the Court must first calculate and consult the advisory Sentencing Guidelines and then consider the factors from §3553(a). Mr. Hardwick will go over the unresolved Guidelines issues first, and then show that this case is an outlier, especially when compared with statistical analyses performed by the United States Sentencing Commission on similar cases. Lastly, Mr. Hardwick will address the §3553(a) factors that the Court must consider. Finally, a reasonable sentence, after considering all of the necessary factors, is 96 months and Mr. Hardwick asks that the Court sentence him to 96 months.

The Government, Probation and Mr. Hardwick all agree that the appropriate guideline for the base level of the offense is 7, pursuant to U.S.S.G. §2Bl.l(a)(l). However, the Defense makes several objections to the applied enhancements under the Guidelines: loss amount (+ 20), criminal activity involving 5 or more victims or was otherwise extensive (+ 4), and obstruction of justice (+ 2).

## I.   MR. HARDWICK'S GUIDELINE OBJECTIONS

Mr. Hardwick objects to certain applied enhancements under the Guidelines as follows.

### a. The Government Has Not Calculated the Appropriate Amount of Loss

Section 2B1.1 is the applicable Guidelines provision for wire fraud, the offenses on which the jury convicted Mr. Hardwick. *See* U.S.S.G. §2B1.1. That section makes the "loss" the primary determinant of the offense level. *See id.* at §2B1.l(b)(1); *United States v. Olis,* 429 F.3d 540, 545 (5th Cir. 2005) ("The most significant determinant of [the defendant's] sentence is the guidelines loss calculation."). The general rule is that the "loss" for purposes of the Guidelines calculation "is the greater of the actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). The Guidelines define "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* at §2B1.1 cmt. n.3(A)(i). "Reasonably foreseeable pecuniary harm" is further defined as "pecuniary harm that the defendant knew, or under the circumstances, reasonably should have known, was a potential

result of the offense." *Id.* at §2B1.1 cmt. n.3(A)(iv). The Guidelines and the case law make clear that actual loss "incorporates [a] causation standard that, at a minimum, requires factual causation (often called 'but for' causation) and provides a rule for legal causation (i.e., guidance to courts regarding how to draw the line as to what losses should be included and excluded from the loss determination)." *See Olis,* 429 F.3d at 545 (quoting U.S.S.G. Supp. 2 App. C, Amend. 617 (Nov. 1, 2001)). In a case involving collateral pledged or otherwise provided by the defendant, the Guidelines provide for a "credit against loss . . . in the amount the victim has recovered at the time of sentencing from disposition of the collateral." *Id.* at §2B1.1 cmt. n.3(E)(ii). (E.g., in a mortgage fraud case involving a default on a home loan, this "credit" equates to the proceeds of a foreclosure sale. *U.S. v. Mallory,* 709 F. Supp. 2d 455, 458-59 (E.D. Va. 2010)). The Government bears the burden of establishing the amount of loss under section 2B1.1 by a preponderance of the evidence.

In the instant case, the Government has failed to prove an appropriate loss amount for sentencing. It's worth noting that the loss amount was not proved at trial. In fact, AUSA Douglas Gilfillan made a point of stating during the trial that the Government did not need to prove loss, although he conceded that it might be an issue at sentencing. The Government appears to be depending on the amount of money infused by Fidelity—$22 million—as the appropriate calculation for loss. This number is wrong for several reasons.

First, while Fidelity may be able to show what money they transferred into accounts at MHS, the Government has not demonstrated that the money was transferred because of a loss *caused by Mr. Hardwick*. There has been no identification of transfers into the accounts that were required exclusively because of improper earlier transfers to Mr. Hardwick or on his behalf. In reality, there was never a proper 3-way reconciliation done of the accounts to determine what amounts were missing from what accounts and why. The law firm continued to use the trust and operating accounts at issue, never zeroing out the accounts, or attempting to reconcile them from the time that financial irregularities started. The trial record reflects that funds were transferred among the various trust accounts, thus making a complete reconciliation necessary to determine the amount and cause of any loss. MHS used the wire account, SunTrust account 7328, for $41 million for payroll and for wires for the benefit of the partners (not just Mr. Hardwick). Robert Driskell and Asha Maurya moved tens of millions of dollars from various operating accounts into SunTrust various accounts into various escrow accounts including account 7328. The majority of the accounts existed prior to the time period alleged in the Indictment and there were likely substantial losses inside those accounts that had nothing to do with the criminal activity alleged against Mr. Hardwick. Moreover, Ms. Maurya stole unidentified money from the escrow accounts beginning in 2009. A final precise number with respect to the funds stolen by Ms. Maurya was never determined. Accordingly, the $22 million number that the Government is using as

the loss is meaningless if it is supposed to represent a loss that was the fault of Mr. Hardwick.

Second, Fidelity has produced a ledger showing transfers into accounts, but provided no proof that those accounts had missing funds. There are multiple reasons why an account may be short, including mistake, error, double batching, funding issues, theft by others, bank fees, multiple payoffs and expenses. There has been no accurate assessment made and produced of why the accounts were short at any given time, or why or whether they needed to be funded, or whether the losses were ultimately replaced by funds coming from somewhere other than Fidelity. There are multiple occasions when Fidelity funded accounts purely for the purpose of pulling out fees earned. Such "funding" was improper, as the fees had already been removed and the account was already balanced. Indeed, there were even instances when the accounts were over-funded.

 Third, it is misleading to say that Fidelity's transfers constitute evidence of a "loss" at all. Fidelity entered an investment deal to purchase the shares that Mr. Hardwick owned in MHSLAW, the parent company. At that point in time, the law firm could have operated smoothly and gone forward, were it not for Mr. Hardwick's abrupt ouster, the bad publicity incited by Fidelity and the subsequent mismanagement and poor business decisions.

Finally, the charges against Mr. Hardwick were that more money was transferred to him or for his benefit than he was entitled to receive. The Government

never established the amount Mr. Hardwick was entitled to get, although in the PSR, the Probation Officer proposes that the correct number is $9 million, providing no explanation. While the partners should have taken less than they did, and the jury determined that a disproportionate amount of the excess was taken by Mr. Hardwick, the evidence produced by the Government falls far short of showing the *intended* loss was $22 million.

**b. The Criminal Conduct in This Case Did Not Involve Five or More Participants, Nor Was It Otherwise Extensive**

Mr. Hardwick was the majority partner at the MHS law firm. The scheme, as alleged and convicted by the jury, was, essentially, that he emailed Ms. Maurya in accounting and asked her to send money from the law firm accounts (predominately the SunTrust 7328 account) either to him directly or to another entity for his benefit. There were no other persons involved—only two people. The criminal activity was not otherwise extensive; the criminal activity only involved Ms. Maurya making payments to Mr. Hardwick or for his benefit.

Some circuits have set forth tests or factors to consider in evaluating whether criminal activity is otherwise extensive. The Second Circuit, Third Circuit and Sixth Circuit focus on the size of the criminal organization—counting heads of everyone involved, not just those defined as "participants" under the Guidelines. *See United States v. Anthony*, 280 F.3d 694, 699 (6th Cir. 2002); *United States v. Helbling*, 209 F.3d 226 (3d Cir. 2000); *United States v. Carrozzella*, 105 F.3d 796, 802-03 (2d Cir.

1997). Other circuits focus more broadly on the totality of the circumstances, not just the number of participants and non-participants, but also the width, breadth, scope, complexity, and duration of the scheme. *See United States v. Colon-Munoz*, 318 F.3d 348 (1st Cir. 2003). In a recent unpublished opinion, the Eleventh Circuit stated that our circuit seems to follow the broader, totality-of-the-circumstances approach of the First Circuit. *United States v. Zada,* 706 Fed. Appx. 500 (11th Cir. 2017) (citing *United States v. Holland*, 22 F.3d 1040, 1046 (11th Cir. 1994)).

A consideration of the totality of the circumstances involved in this case shows the criminal conduct was not otherwise extensive. The scheme as alleged and proven was not at all complex and only involved two people. While Mr. Hardwick acknowledges his role as the majority shareholder of the law firm, his role in this offense should warrant a two-level enhancement and not a four-level enhancement.

**c. Mr. Hardwick's Trial Testimony Did Not Obstruct Justice**

The application of an obstruction of justice enhancement for simply testifying chills a defendant's right to defend himself and testify in a criminal case. At trial, Mr. Hardwick testified: he admitted that he made the requests to Ms. Maurya to transfer money either to him or for his benefit; he admitted that the transfers were actually made; and, he admitted that the transfers in the Indictment had nothing to do with the firm.

The only things that Mr. Hardwick denied were that he had direct knowledge that Ms. Maurya had comingled client trust funds and law firm funds, and that he had

the intent to defraud anyone. Mr. Hardwick's testimony did not impede any jury deliberation or any investigation. He only disputed his knowledge of and intent to commit the criminal conduct. Section 3C1.1 of the Guidelines allows a 2-level enhancement if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. §3C1.1 Proof that a defendant committed perjury that "pertains to conduct that forms the basis of the offense of conviction" justifies an enhancement for obstruction. *See id.* cmt. n.4(b). The burden is on the Government to prove by a preponderance of the evidence that the defendant has committed perjury. *See United States v. Golden,* 255 Fed. App'x 733, 736 (4th Cir. 2007).

A defendant does not commit perjury simply because he testifies at trial and then is convicted. *Id.; see United States v. Dunnigan,* 507 U.S. 87, 94 (1993) ("not every accused who testifies at trial and is convicted will incur an enhanced sentence under §3C1.1 for committing perjury") *United States v. Lester*, 376 F. Supp. 2d 679, 683 (W.D. Va. 2005) ("While the jury obviously disbelieved the defendant, and I believe that there was sufficient evidence for the jury to do so, I cannot make the necessary findings myself in order to impose an enhancement for perjury."); §3C1.1 cmt. n.2. ("In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake or

faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful intent to obstruct justice."). Rather, for the obstruction enhancement to apply, the court must find that the defendant must give "false testimony under oath 'concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *Golden,* 255 Fed. App'x at 736 (quoting *Dunnigan,* 507 U.S. at 94). Put another way, perjury requires a finding of intent to testify falsely, not just a finding that testimony was inaccurate. *See Lester,* 376 F. Supp. 2d at 683-84.

The PSR recommends the finding that Mr. Hardwick obstructed justice "by testifying falsely at trial." PSR ¶ 86. The PSR is silent, however, as to what testimony was false and only notes that the jury simply "found the Defendant's testimony not credible." "Not credible" testimony is not enough to apply the enhancement. Where the Government cannot bear its burden of proving that Mr. Hardwick committed perjury, the obstruction of justice enhancement is improper.

## II.   THE SUGGESTED GUIDELINE RANGE IS A STATISTICAL OUTLIER AND NOT AN APPROPRIATE SENTENCE

This Court is familiar with the command of section 3553(a) that the Court shall impose a sentence "sufficient, but not greater than necessary," to achieve the goals of sentencing. *See* 18 U.S.C. §3553(a); *Kimbrough v. United States,* 552 U.S. 85, 101 (2007). Mr. Hardwick respectfully contends that for the reasons reflected in the many letters that will be provided to the Court and to be advanced at the sentencing hearing,

this is a case in which a variance sentence below the advisory Guidelines range is appropriate.

Before turning to the specific factors under 18 U.S.C. §3553(a), Mr. Hardwick suggests that the Court look at how the PSR's recommended range stacks up against several decades' worth of experience in applying the Federal Sentencing Guidelines. The U.S. Sentencing Commission keeps detailed figures on sentences, variances, types of cases, the geographic region, and other factors that might or might not affect how a sentence is imposed.

The Sentencing Commission publishes its annual sourcebook. This compendium of statistics shows figures by circuit and district, by primary offense and offender characteristics, and reveals when and by how much federal judges go outside the otherwise applicable Guideline range. The Commission's website contains these numbers going back to 1996. While the data and analysis has somewhat deepened over the years, the bottom line numbers and trends have remained remarkably consistent.

One of the simplest ways to look at these cases is to review Table 6 for each year's figures. This Table outlines the mean and median sentence in 32 separate primary offense categories. One category is fraud, which encompasses both the present case and a wide variety of other conduct. Nevertheless, as a starting point it is worth noting that the mean fraud sentence nationwide is 27 months while the median was 17 months for 2018.


*https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2018/Table6.pdf.* The Court should note that this includes all criminal history categories, and not just those with no prior record, like Mr. Hardwick. While there has been a slight increase in nationwide fraud sentences since 1996, overall the numbers are remarkably consistent year after year.[1] Another method for analyzing federal criminal sentences is to look at the specific number of months imposed by the judge in relation to the range suggested by the Guidelines themselves. This information is found on a yearly basis in a series of tables discussing departures and sentences within the Guideline range. On the broadest level, Table N of 2017 explains that 49.1% of all sentences fell inside the Guideline range, 2.9% were above, and the remainder were all below the range otherwise recommended by the commission. *https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2017/TableN.pdf.* This means that around one-half of all criminal sentences are below the otherwise applicable Guideline range. Similar figures are found for all the cases from the 11th

[1] A document called Figure E is also compiled each year, with a different statistical view for length of imprisonment in each "general crime category". In this view, the Commission lumps together all economic offenses. The 2017 sourcebook looks back over the past 5 years, and shows amazing regularity, the average sentence for economic offenses being either 33 or 34 months each year. *https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2017/FigureE.pdf.*

Circuit. *https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2017/TableN-11.pdf.*

The Commission also keeps detailed figures on the reasons why sentences are outside the Guideline range, and whether a downward variance is requested by the prosecution or not. In 2017, Figure G shows that over the past 5 years approximately 1 out of every 5 sentences were below the guidelines for reasons other than a request by the government. *https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2017/FigureG.pdf.*This means that 20% of cases in 2013-2017 were below the Guideline range for reasons other than a substantial assistance motion or other request by the government. The 2017 Table 27 contains information showing sentences relative to the Guideline range for each primary offense category, and the reasons why the sentence was above or below the range. Out of the almost 6,000 fraud cases from 2017, only 42.8% were within the Guideline range, a few were above, and the majority were below the Guideline range. However, out of all fraud cases, 25.5% were below the otherwise applicable range based on *Booker v. United States.* *https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-andsourcebooks/2017/Table27A.pdf.* This means that more than one in four fraud cases involved a judge who decided, without a request from the prosecution, to sentence the defendant lower than the range suggested by the Commission's Guidelines.

The results are clear: most fraud offenders, even those in the most severe Criminal History Category VI, get sentences below 5 years. Half of all federal sentences are imposed below the range suggested by the Guidelines. One out of every four fraud cases are sentenced below the Guideline range, based on the Court's determination that the factors from §3553(a) require such a result.

Looking at the Sentencing Commission's yearly analysis of general fraud sentences from 2017, *https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Theft_Property_Destruction_Fraud_FY17.pdf,* over the preceding five years, the average fraud sentence ranged between 22 to 24 months.[2]

The Court in *United States v. Parris*, 573 F. Supp. 2d 744 (E.D. N.Y. 2008), an opinion issued in 2008, discovered the same basic fact pattern a decade ago.[3] That opinion contains a helpful compendium of fraud—specifically securities fraud with high loss amounts—sentences over the preceding decade. Many offenders responsible for losses in the *billions of dollars* and who did not cooperate with the

---

[2] Even looking at average sentences in securities fraud cases, where the median loss amount was higher with $2.1 million, the average fraud sentence ranged between 49 and 77 months, and that most of these were significantly below the otherwise applicable Guideline range. *https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Securities_Fraud_FY17.pdf*

[3] *Parris* involved securities fraud case where the defendant was facing a Guideline range of 360 to life, largely due to a Guideline enhancement of 18 points for loss amount. The sentencing judge noted that,

> I have sentenced Lennox and Lester Parris today to a term of incarceration of 60 months in the face of an advisory guidelines range of 360 to life. This case represents another example where the guidelines in a securities-fraud prosecution "have so run amok that they are patently absurd on their face," *United States v. Adelson,* 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), due to the "kind of 'piling-on' of points for which the guidelines have frequently been criticized." *Id.* at 510

prosecution got sentences below the Guideline range that was suggested in the PSR for Mr. Hardwick. Other non-cooperators whose losses more resembled the figures in the present case got sentences ranging from 4 to 12 years. *Id.* at 753.

The Government will almost certainly cite *United States v. Stanley*, 739 F. 3d 633 (11th Cir. 2014), a case from this district where the sentences of 276 months and 192 months, were upheld on appeal after the defendants went to trial. For starters, each of those sentences was *below* the Guideline range for the defendant in question. Furthermore, that offense involved approximately 6,000 investors whose losses exceeded $42 million. In addition, one of the defendants was in Criminal History Category III, both defendants engaged in a similar pump and dump scheme at another company, and one defendant fled in the middle of trial. *Stanley* provides little guidance for the present situation.

Mr. Hardwick fully recognizes that each case is different, and each judicial officer tries to impose the right sentence for the offender and the offense. This look at statistics is merely designed to demonstrate that the range recommended in the PSR is an outlier and, as Judge Block noted in *Parris*, is "patently absurd on its face."

## III. A REASONABLE SENTENCE UNDER THE §3553 FACTORS

The Court well knows the various factors under §3553(a) that impact a reasonable sentence. Mr. Hardwick will highlight some of those factors that can impact his sentence.

**a. Nature and Circumstances of the Offense**

This is a serious case. However, despite the seriousness of the offenses, the Court should consider the Mr. Hardwick's motivation. Unlike so many convicted of fraud, Mr. Hardwick was trying to build a legitimate business. His intention, that was uncontested at trial, was that he poured himself and his reputation into his law firm 24 hours a day and 7 days a week. He was dedicated to his clients and his firm. Additionally, he intended to grow the firm and expand nationally.

However, Mr. Hardwick certainly failed at managing his own expenses, keeping up with his personal expenditure and distributions, and managing the firm financially. And clearly, he also placed trust in the wrong controller, Ms. Maurya. The jury decided that those failures included withdrawing millions from co-mingled accounts for personal benefit that crossed the line between aggressive business marketing practices and crime. Mr. Hardwick is not attempting to re-argue his case, he merely points out that, unlike so many fraud defendants, he was trying to create real businesses so that the lawyers, employees, and the business could prosper.

**b. Characteristics of the Defendant**

Certainly, the Court now has a somewhat better understanding of Mr. Hardwick after hearing the story of his history at trial, reviewing the PSR, and reviewing the many letters of support submitted on his behalf. Mr. Hardwick suggests that the many people who have known him for most of his life understand that he is

a man of good character and high moral standards who, according to the verdict, came up short of those values when trying to support himself in a difficult economy.

The PSR and letters show that Mr. Hardwick was raised in a solid household with a wonderful family and supportive community. Family is clearly very important to Mr. Hardwick, as he has remained close and cared for his aging parents, has a 4-year-old daughter that he loves very much, and employed his sister at his firm. Mr. Hardwick was the sole care-giver of both of his parents Indeed, of the numerous letters provided to this Court through family and friends, Mr. Hardwick among many wonderful characteristics, Mr. Hardwick is described as: "a hard worker," "extremely kind," and "very generous to his time in working with charities." Most telling is one letter from Kristen Knodel, a high school friend of Mr. Hardwick's, who gives one of many examples of his generosity to others:

> When [my husband] had a mild heart attack in the summer of 2014, Nat got word of the personal deductible that we would need to pay for his heart catherization and he gave enough money to pay our major illness deductible in full! Some tears were shed that day as we opened his letter.

Another aspect of Mr. Hardwick's character was shown by how he has handled himself since learning of the investigation into his business. He hired counsel and worked diligently to save his firm by injecting his own funds into the firm, borrowing money, properly notifying the State Bar of Georgia of any ethical matters, and, ultimately, giving up his shares in MHS. Through all this, Mr. Hardwick maintained a sense of dignity, even after the prosecution's extraordinary decision to bring in a

raid squad to arrest a man at his deposition with his attorneys, who had stayed in contact with the Government over a several month period.

Mr. Hardwick has no prior criminal record. He has been a productive person, finished college, obtained his legal degree, and built several businesses. He intensely loves his family, and an asset to his community before everything went so very wrong. He has an abundant source of support in the community from his family, his neighbors and his friends who stand by him and will assure that he lives a stable law-abiding life. There is a future for Mr. Hardwick, and his character shows that the Court should consider a sentence that imposes punishment, but not so much as to be overly punitive.

Finally, prior to trial, Mr. Hardwick 32 months in home confinement. For over 1 year, he was only allowed to leave his parents' home for a few hours, 2 days per week. The Court modified his conditions to allow him restricted travel outside of the home for business or to help his parents. He did not have a single deviation or cause any problems for his pre-trial services officer. In fact, just after his conviction, his officer testified that he was "perfect." Bureau of Prisons will not give Mr. Hardwick a single day's worth of credit for 32 months of home confinement with an ankle monitor. For this reason alone, this Court should consider a downward variance.

**c. Unwarranted Sentencing Disparities**

Pursuant to 18 U.S.C. §3553(a)(6), "the need to avoid unwarranted sentencing disparities" is a factor to be decided when imposing a reasonable sentence. A district

court acts unreasonably when not considering this factor. *United States v. Killen*, 2018 WL 1560050, (11th Cir. Mar. 29, 2018) (reversing imposition of upward variance for failing to consider other similar cases especially when the crime encompasses a "wide range of conduct"). Further, a district court acts unreasonably when imposing a sentence "seriously out of line with sentences imposed on other defendants" for the same crime. *United States v. Irey*, 612 F. 3d 1160, 1220 (11th Cir. 2010 (*en banc*).

No two cases and no two defendants are identical, however, comparisons are often necessary in order to avoid unwarranted sentencing disparities. Mr. Hardwick has already provided the Court with the figures from the Sentencing Commission. Nationwide the sentences for fraud ranged from 22 months to 77 months over the past five years. The majority of fraud sentences were below the advisory Guideline range. More than one out of three fraud sentences resulted from a variance for reasons other than a request from the government. *https://www.ussc.gov/research/quick-facts/securities-and-investment-fraud.*

Mr. Hardwick fully recognizes that statistics can only go so far when helping a court avoid unwarranted sentencing disparities. However, the Sentencing Commission is the greatest source of information when it comes to federal sentences. The Commission's data make clear that sentences for cases such as the present tend to fall within 2 to 7 years in custody. The Appendix of specifically securities fraud sentences involving high loss amounts for non-cooperators attached to the opinion

in *United States v. Parris* reveal similar numbers. Mr. Hardwick strongly urges the Court to consider similar factors considered by other judicial officers when imposing sentences on similarly situated defendants.

## IV. CONCLUSION

The mission of §3553(a) is to ensure that the sentence imposed is reasonable. Further, a variance below the advisory Guidelines range is sufficient to achieve the goals of sentencing. For a person with Mr. Hardwick's background and for a person who poses no risk to any person or to society, a sentence of 96 months is reasonable.

Respectfully submitted,

*/s/ Edward T.M. Garland*
EDWARD T.M. GARLAND
Georgia Bar No. 284900

*/s/ Robin N. Loeb*
ROBIN N. LOEB
Georgia Bar No. 455702

*/s/ Kristen W. Novay*
KRISTEN W. NOVAY
Georgia Bar No. 742762

*/s/ Mia Patrice Fulks*
MIA PATRICE FULKS
Georgia Bar No. 279902

GARLAND, SAMUEL & LOEB, P.C.
3151 Maple Drive, N.E.
Atlanta, Georgia 30305
404-365-5041
kwn@gsllaw.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | INDICTMENT NO.: |
| v. | ) | |
| | ) | 1:16-cr-00065-ELR-CMS |
| NATHAN E. HARDWICK IV, | ) | |
| | ) | |
| Defendant. | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that I have this date served the within and foregoing **DEFENDANT HARDWICK'S SENTENCING MEMORANDUM** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record.

This the 3rd day of January, 2019.

*/s/ Kristen W. Novay*
KRISTEN W. NOVAY
Georgia Bar No. 742762