1    UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF GEORGIA
2    ATLANTA DIVISION

3

4    UNITED STATES OF AMERICA,

5            PLAINTIFF,
                            INDICTMENT NO. 1:16-CR-00065-ELR-CMS
6        -VS-               VOLUME 7
                            (PAGES 1692 - 1977)
7

     NATHAN E. HARDWICK IV,
8
             DEFENDANT.
9

10           TRANSCRIPT OF JURY TRIAL PROCEEDINGS
          BEFORE THE HONORABLE ELEANOR L. ROSS
11            UNITED STATES DISTRICT JUDGE
                   OCTOBER 2, 2018
12

13   APPEARANCES:

14   ON BEHALF OF THE GOVERNMENT:

15       RUSSELL PHILLIPS, ESQ.
         ASSISTANT UNITED STATES ATTORNEY
16
         DOUG GILFILLAN, ESQ.
17       ASSISTANT UNITED STATES ATTORNEY

18       LYNSEY BARRON, ESQ.
         ASSISTANT UNITED STATES ATTORNEY
19
     ON BEHALF OF THE DEFENDANT:
20
         EDWARD T.M. GARLAND, ESQ.
21
         KRISTIN NOVAY, ESQ.
22
         ROBIN LOEB, ESQ.
23

24   ELIZABETH G. COHN, RMR, CRR
     OFFICIAL COURT REPORTER
25   UNITED STATES DISTRICT COURT
     ATLANTA, GEORGIA

1   I N D E X

2   WITNESS                                        PAGE

3   BETH KORNEGAY-TYLER

4   DIRECT EXAMINATION BY MS. BARRON               1704

5   CROSS-EXAMINATION BY MS. NOVAY                 1775

6   REDIRECT EXAMINATION BY MS. BARRON             1797

7   RECROSS-EXAMINATION BY MS. NOVAY               1804

8

9   READING OF DEPOSITION EXCERPTS                 1818

10

11  ERIKA MEINHARDT

12  DIRECT EXAMINATION BY MR. GILFILLAN            1837

13  CROSS-EXAMINATION BY MR. GARLAND               1894

14  REDIRECT EXAMINATION BY MR. GILFILLAN          1960

15  RECROSS-EXAMINATION BY MR. GARLAND             1971

16

17

18

19

20

21

22

23

24

25

1       (ATLANTA, FULTON COUNTY, GEORGIA; OCTOBER 2, 2018, AT

2   9:27 A.M. IN OPEN COURT.)

3       THE COURT:  THANK YOU.  GOOD MORNING.  PLEASE BE

4   SEATED.

5       OKAY.  ANYTHING BEFORE THE JURY COMES OUT?

6   GOVERNMENT?

7       MS. BARRON:  NO, YOUR HONOR.

8       MR. PHILLIPS:  NO, YOUR HONOR.

9       THE COURT:  DEFENSE?

10      MR. GARLAND:  MAY I HAVE A MOMENT TO MOVE MY PAPERS

11  TO GIVE MY SEAT TO MS. NOVAY?

12      THE COURT:  OKAY.  AND LET'S SEE.  WHERE ARE WE

13  TODAY?  I HAVE TO LOOK AT MY NOTES.  DID WE COMPLETE A WITNESS

14  YESTERDAY EVENING?

15      THE COURTROOM DEPUTY:  YES.

16      THE COURT:  MR. CARROLL?

17      THE COURTROOM DEPUTY:  YES.

18      THE COURT:  OKAY.

19      MS. NOVAY:  YOUR HONOR, ACTUALLY, BEFORE THE JURY

20  COMES IN, WE HAVE A COUPLE OF MATTERS JUST TO TAKE UP QUICKLY

21  ABOUT SOME OF THE DOCUMENTS THE GOVERNMENT IS GOING TO USE.  IF

22  YOU COULD HEAR US ON THAT, IT SHOULDN'T TAKE LONG.

23      DO YOU WANT US TO PROCEED, YOUR HONOR?

24      THE COURT:  SURE.

25      MS. NOVAY:  I THINK WE'VE ALREADY ADDRESSED --

1    THE COURT:  ARE THESE IN CONNECTION WITH THE NEXT

2    WITNESS IN PARTICULAR?

3    MS. NOVAY:  IT IS, YOUR HONOR.

4    THE COURT:  AND WHO IS THE NEXT WITNESS?

5    MS. NOVAY:  BETH KORNEGAY-TYLER.

6    THE COURT:  OKAY.  AND WHO IS SHE?

7    MS. NOVAY:  THIS IS A BANK LOAN OFFICER AT FIRST

8    LANDMARK BANK, AND I THINK THIS IS IN CONNECTION WITH COUNTS 23

9    AND 24.

10    THE COURT:  OKAY.

11    MS. NOVAY:  AND THE OBJECTIONS I HAVE -- I'VE ALREADY

12    NOTED MY OBJECTION, WITH ONE OF THEM BEING THE BELLAGIO LAWSUIT

13    AND THE COMPLAINT BEING ATTACHED, AND YOU OVERRULED MY

14    OBJECTION.  SO I'LL JUST NOTE THAT WHEN THAT COMES UP.  WE

15    RESOLVED THAT ONE.  OH, 953 AND 957 IS THE ONLY TWO.

16    MS. BARRON:  957, I THINK WE TALKED ABOUT DELETING

17    PAGES 1 THROUGH 8 AND ONLY ADMITTING PAGE 9.

18    THE COURT:  I'M SORRY.  ARE YOU-ALL TALKING TO EACH

19    OTHER OR ON THE RECORD AT THIS POINT?

20    MS. BARRON:  LET'S ADDRESS THE OTHER ONE, AND I THINK

21    I HAVE ADDRESSED YOURS.

22    MS. NOVAY:  OKAY.  AND THEN 953 WAS THE OTHER ONE.

23    MS. BARRON:  REMIND ME OF YOUR OBJECTION TO 953.

24    MS. NOVAY:  LET ME LOOK AT IT.  I THINK IT WAS

25    RELEVANCE.

1     PERFECT.  ALL RIGHT.  WE'VE RESOLVED ALL BUT ONE

2  ISSUE.

3     THE COURT:  OKAY.

4     MS. NOVAY:  TRYING TO MOVE FAST.

5     THE COURT:  ALL RIGHT.  SO THERE IS AN OBJECTION TO

6  ONE EXHIBIT IN ADDITION TO THE ONE ON WHICH I'VE ALREADY RULED

7  WITH THE BELLAGIO?  THERE'S ONE OTHER -- ONE ADDITIONAL ONE?

8     MS. NOVAY:  YES.

9     THE COURT:  OKAY.  AND THAT EXHIBIT NUMBER IS?

10     MS. NOVAY:  THAT IS 953.

11     THE COURT:  AND IT IS WHAT?

12     MS. BARRON:  I HAVE MY COPY.

13     MS. NOVAY:  OH.  I KNOW WHAT THAT IS.  THERE WAS AN

14  E-MAIL THAT WAS THE SUBJECT OF COUNT 25 THAT HAS SINCE BEEN

15  DISMISSED.  THIS WAS AN E-MAIL BETWEEN MY CLIENT AND THE BANK

16  LOAN OFFICER.  THE COUNTS -- THE COUNT 23 IS 2011.  COUNT 24 IS

17  2013.  THIS IS SOMETHING FROM 2014, SO THIS ISN'T DURING THE

18  TIME OF COUNTS 1 AND 2.  IT'S AFTERWARDS.

19     AND THIS WAS IN CONNECTION -- THIS WAS THIS EXACT

20  E-MAIL THAT I THINK WAS REALLY THE SUBJECT OF COUNT 25.  SO I

21  JUST OBJECT TO THE RELEVANCE OF THAT.

22     THE COURT:  ALL RIGHT.  GOVERNMENT?

23     MS. BARRON:  YOUR HONOR, THERE WERE A SERIES OF LOAN

24  APPLICATIONS FROM FIRST LANDMARK BANK.  IT WAS ONE OF HIS

25  PRIMARY ACCOUNTS.  AND THERE WERE A SERIES OF REPEATED LIES.

1   FIRST OF ALL, THIS IS INEXTRICABLY INTERTWINED WITH COUNTS 23

2   AND 24 BECAUSE IT RELATES TO MISSTATEMENTS IN THOSE LOAN

3   APPLICATIONS TOO.  IT SHOWS KNOWLEDGE THAT HE HAD THIS DEBT.

4   SHOWS LACK OF MISTAKE.  IT SHOWS A PATTERN OF LYING TO BANKS IN

5   ORDER TO GET LOAN PROCEEDS AND HIDE HIS PERSONAL LIABILITIES.

6   AND SO WE BELIEVE THAT IT'S RELEVANT FOR THAT REASON.

7           THE COURT:  AND TELL ME AGAIN HOW IT'S INEXTRICABLY

8   INTERTWINED IN THE SENSE -- JUST BASED ON THE CONTENT, NOT

9   JUST -- NOT PATTERN.  NOT DEMONSTRATING A PATTERN, BUT JUST

10  WHAT IT HAS TO DO WITH THE EARLIER LOAN APPLICATIONS, I GUESS.

11          MS. BARRON:  SO IF I'M ADDRESSING -- I THINK IT'S

12  EXHIBIT 954, KRISTIN, THAT'S THE E-MAIL?

13          MS. NOVAY:  953.

14          MS. BARRON:  953 IS THE LOAN APPLICATION.  OH, I'M

15  SORRY.  I'M LOOKING AT THE WRONG DOCUMENT.

16          953, YOUR HONOR, IS AN E-MAIL THAT ADDRESSES THE

17  NETJET PAYMENT AND THE MISREPRESENTATION OF THE AMOUNT OF

18  PAYMENT THAT HE MADE.

19          THIS PERTAINS TO A JUDGMENT THAT HE HAD COMPLETELY

20  OMITTED FROM SOME PRIOR CREDIT APPLICATIONS.  AND HIS

21  MISSTATEMENTS IN 2014 SHOW THAT THERE WAS NO -- THAT THERE WAS

22  A CONSISTENT ENDEAVOR ON HIS PART TO WITHHOLD, TO MINIMIZE, TO

23  DOWNPLAY AND COMPLETELY CONCEAL THAT JUDGMENT AND THE AMOUNT

24  THAT HE ACTUALLY OWED.

25          THE COURT:  AND SO I GUESS I'M MISSING SOMETHING.

1    THE MISSTATEMENT IS RELATED TO NETJETS, WHICH NETJETS IS IN

2    COUNT 25, WHICH IS NO LONGER PART OF THE CASE, CORRECT?

3         MS. BARRON:  IT IS.

4         THE COURT:  SO I'M TRYING TO GET A BETTER

5    UNDERSTANDING OF THE INEXTRICABLY INTERTWINED ARGUMENT.  NOT

6    JUST -- I UNDERSTAND THE ARGUMENT OF DEMONSTRATION OF A

7    PATTERN.  BUT BASED ON THE CONTENT AND REPRESENTATIONS HE MADE

8    ON THIS APPLICATION, HOW IS IT INEXTRICABLY INTERTWINED?  IS

9    THE ONLY WAY THAT IT IS BECAUSE IT DOES DEMONSTRATE A PATTERN,

10   OR IS THERE SOMETHING ADDITIONAL?

11        MS. BARRON:  I THINK THAT'S RIGHT, YOUR HONOR.  I

12   MEAN, SO MAYBE IT'S MORE OF A 404(B) ISSUE.

13        THE COURT:  OKAY.

14        MS. BARRON:  SO WHAT IT SHOWS IS THAT HE HAS KNOWN

15   ABOUT THIS JUDGMENT ALL ALONG, THAT HE HAS KNOWN THE PRECISE

16   AMOUNT HE HAD TO PAY, AND THAT HE HAS CONSISTENTLY WITHHELD

17   THAT.  AND HE WITHHELD IT FOR A REASON, BECAUSE HE KNEW THAT IT

18   MIGHT AFFECT THE CREDIT DETERMINATION.  AND THAT'S A

19   MISREPRESENTATION THAT HE MADE OVER SEVERAL YEARS PRIOR TO

20   2014.

21        THIS JUST CONFIRMS LACK OF MISTAKE, PATTERN OF FALSE

22   STATEMENTS TO OBTAIN MONEY.  AND SO IT FITS WITHIN THE LARGER

23   STORY WE'RE TRYING TO TELL WITH MS. KORNEGAY-TYLER.

24        THE COURT:  AND SO HOW FAR DO WE GO IN THE

25   ESTABLISHMENT OF WHAT WAS GOING ON WITH RESPECT TO THIS

1    APPLICATION, CONSIDERING THAT THAT COUNT IS NO LONGER IN?

2        I MEAN, WILL THE JURY BE CONFUSED IN TERMS OF WHY

3    WE'RE TALKING ABOUT THIS WHOLE NETJETS THING WHEN THAT'S NOT

4    GOING TO BE BEFORE THEM ANYMORE?

5        MS. BARRON:  WELL, AND PERHAPS I SHOULD EXPLAIN THAT

6    WAS WHY WE DISMISSED THE COUNT, BECAUSE WE STILL THINK IT'S

7    RELEVANT.  IT'S A TECHNICALITY.

8        SO COUNT 25 ALLEGED A FALSE STATEMENT IN CONNECTION

9    WITH A LOAN FROM FIRST LANDMARK BANK.  FIRST LANDMARK BANK DID

10   HANDLE HIS PERSONAL FINANCIAL STATEMENTS FOR THIS LOAN, DID

11   HANDLE THE FINANCIAL REPRESENTATIONS, BUT THE LOAN WAS ACTUALLY

12   COMING FROM AN ENTITY CALLED ANGEL OAK MORTGAGE.  AND SO FOR

13   THAT TECHNICAL REASON, WE DISMISSED IT BECAUSE IT WAS JUST

14   ALLEGED AS THE WRONG ENTITY.

15       BUT THE FALSE STATEMENTS WERE MADE TO FIRST LANDMARK

16   BANK AND WE BELIEVE ARE STILL RELEVANT TO THIS STORY OF A

17   REPEATED PATTERN OF MISSTATEMENTS TO OBTAIN MONEY FROM THIS

18   FINANCIAL INSTITUTION.

19       THE COURT:  ALL RIGHT.  MS. NOVAY?

20       MS. NOVAY:  YOU KNOW, AS MUCH AS I'D LIKE TO SAY LACK

21   OF NOTICE, 404(B), WE WERE ALREADY PREPARED TO DEFEND IT.  I'M

22   NOT GOING TO COMPLAIN THAT IT'S BEEN DISMISSED, SO I DON'T

23   REALLY THINK THAT'S AN ISSUE.

24       BUT THE ISSUE WITH THE E-MAIL IS THAT THERE --

25       THE COURT:  WHERE IS THE E-MAIL -- WHERE IS THE

1  EXHIBIT, THE E-MAIL?

2       MS. BARRON:  THIS IS MY COPY, YOUR HONOR.

3       THE COURT:  OKAY.

4       MS. BARRON:  AND THIS IS -- THE E-MAIL IS ACTUALLY

5  THE FALSE STATEMENT THAT WAS ALLEGED IN COUNT 25.

6       THE COURT:  OKAY.

7       MS. BARRON:  HE IS UNDER A FORBEARANCE AGREEMENT OR

8  SETTLEMENT AGREEMENT TO PAY $33,444 A MONTH TO NETJETS.

9       THE COURT:  AND I THINK THAT'S COME OUT ALREADY.

10      MS. BARRON:  THAT HAS COME OUT.  HE REPRESENTS TO

11  MS. TYLER THAT THE OBLIGATION IS $10,000.  AND SHE SAYS, THAT'S

12  GREAT, BECAUSE IF IT WERE $30,000, THAT MIGHT MAKE IT HARDER.

13      THE COURT:  OKAY.  MS. NOVAY?

14      MS. NOVAY:  IF I CAN BE HEARD ON THAT.

15      THE COURT:  SURE.

16      MS. NOVAY:  THE ISSUE IS THAT THE E-MAIL -- AND IF

17  YOU READ IT, YOU ACTUALLY NEED TO START FROM THE BACK -- BOTTOM

18  UP.  IT'S A LITTLE BIT MORE AMBIGUOUS THAN THAT.

19      SHE'S ASKING HIM HOW MUCH HE OWES.  HE SAYS, I THINK

20  IT'S 600,000.  SHE SAYS, HOW MUCH DO YOU PAY A MONTH?  HE SAID,

21  33K.  AND THESE ARE E-MAILS KIND OF BACK AND FORTH.

22      THEN MS. TYLER DOES THE MATH AND SAYS, OKAY.  IF IT'S

23  33K, WE'LL DIVIDE THAT BY FIVE YEARS.  SO IT SOUNDS LIKE YOU

24  SHOULD BE PAYING ABOUT $10,000 A MONTH.  ARE YOU PAYING MORE OR

25  LESS?

1  I THINK HE GIVES HER SOME AMBIGUOUS ANSWER.  AND THEN

2  SHE SAYS, WELL, GREAT.  IF IT'S NOT THAT, THEN WE DON'T NEED TO

3  COUNT 33 IF WE DON'T HAVE TO.

4  THE COURT:  HOLD ON.  LET ME LOOK AT IT FOR A SECOND,

5  PLEASE.

6  MS. NOVAY:  OKAY.

7  THE COURT:  MS. BARRON, I MEAN, HE DOES SAY 33K.  SO

8  I GUESS -- I SEE HOW YOU COULD MAKE ARGUMENTS FROM THIS, BUT

9  HOW IS IT CLEARLY A FALSE STATEMENT WHEN HE DOES REPRESENT THE

10  CORRECT AMOUNT IN THIS E-MAIL EXCHANGE?

11  MS. BARRON:  BECAUSE SHE SAYS, SO IS IT THAT YOU --

12  WELL, I DON'T HAVE THE E-MAIL IN FRONT OF ME.

13  THE COURT:  OKAY.

14  MS. NOVAY:  I THINK IT'S BECAUSE SHE SAYS, OH, SO IT

15  SOUNDS LIKE YOU ONLY HAVE TO PAY 10K.  I DON'T WANT TO MAKE THE

16  GOVERNMENT'S ARGUMENT FOR THEM, BUT --

17  THE COURT:  RIGHT.  AND HE MAY NOT HAVE CLARIFIED

18  THAT.

19  MS. NOVAY:  RIGHT.  AND THERE MIGHT HAVE BEEN -- THE

20  PROBLEM IS THAT AS FAR AS FOLLOW-UP PHONE CALLS, IT'S A LONG

21  TIME AGO.  MS. KORNEGAY-TYLER DOESN'T REALLY REMEMBER IF THERE

22  WERE FOLLOW-UP PHONE CALLS.  I DON'T KNOW IF THERE WERE OR NOT.

23  BUT THE STATEMENT ALONE, IT'S NOT SOME OF THE

24  CLEARCUT ONES THAT HAVE ALREADY COME INTO EVIDENCE.  AND MY

25  ISSUE IS THAT IT'S A YEAR AFTER SOME OF THESE OTHER ISSUES COME

1    TO LIGHT.

2         I UNDERSTAND IF THE GOVERNMENT WANTS TO GET INTO

3    NETJETS SAYING THAT HE OWED A DEBT AND THAT WAS PART OF THE

4    MOTIVE.  I -- THE COURT'S ALREADY RULED ON THAT, AND I

5    UNDERSTAND IT.

6         BUT AS FAR AS SAYING, WELL, WE'RE GOING TO PILE ON

7    ANOTHER FALSE STATEMENT, WHEN IT MIGHT NOT BE TOTALLY CLEAR

8    THAT IT'S FALSE -- I GUESS IT'S RELEVANCE.

9         THE COURT:  ALL RIGHT.  LET ME GIVE YOU THE LAST

10   STATEMENT, MS. BARRON.

11        MS. BARRON:  THANK YOU, YOUR HONOR.  AND I DO WANT TO

12   SAY IN TERMS OF FALSE STATEMENTS, THE LAW IS CLEAR.  IT DOESN'T

13   HAVE TO BE A CLEAR LIE.  IT CAN BE A HALF TRUTH.  IT CAN BE AN

14   OMISSION.  IT CAN BE A FAILURE TO CORRECT.  AND SO THIS IS AT

15   LEAST ONE OF THE LAST THREE.

16        AND THE ISSUES THAT SHE RAISED ARE ABSOLUTELY

17   LEGITIMATE, AND THAT IS FAIR GAME TO PROBE ON CROSS BECAUSE IT

18   GETS TO WEIGHT.

19        THE COURT:  ALL RIGHT.  I AM GOING TO SUSTAIN THE

20   OBJECTION.  I FIND THAT THERE IS A LACK OF CLARITY, AND I DON'T

21   KNOW WHETHER THIS WITNESS WILL BE ABLE TO CLARIFY ON CROSS

22   BECAUSE OF THE AGE OF THE E-MAIL.

23        AND SO BASED ON WHAT I PERCEIVE TO BE A SUBSTANTIAL

24   AMOUNT OF PREJUDICE REGARDING THE INTERPRETATION OF IT AT THIS

25   POINT, I'LL SUSTAIN THE OBJECTION.

1    IS THERE ANYTHING ELSE BEFORE THE JURY COMES IN?

2  GOVERNMENT?

3    MS. BARRON:  NO, YOUR HONOR.

4    THE COURT:  DEFENSE?

5    MS. NOVAY:  NO, YOUR HONOR.

6    THE COURT:  LET'S BRING THEM IN.

7    (WHEREUPON, THE JURY RETURNED TO OPEN COURT AT

8  9:38 A.M., AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD.)

9    THE COURT:  ALL RIGHT.  THE JURY IS IN PLACE.

10  EVERYONE ELSE MAY BE SEATED.

11    GOVERNMENT, YOU MAY CALL YOUR NEXT WITNESS.

12    MS. BARRON:  THANK YOU, YOUR HONOR.  THE UNITED

13  STATES CALLS BETH KORNEGAY-TYLER.

14    THE COURT:  ALL RIGHT.  COME ON IN, MA'AM.

15    AS SHE'S COMING IN, GOOD MORNING, LADIES AND

16  GENTLEMEN.  I DON'T THINK I SPOKE TO YOU THIS MORNING.

17    COME ON UP, MA'AM, AND I WILL SWEAR YOU IN.  AND IF

18  YOU WOULD PLEASE RAISE YOUR RIGHT HAND.

19                    BETH KORNEGAY-TYLER,

20  HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

21  FOLLOWS:

22    THE COURT:  ALL RIGHT.  IF YOU WOULD PLEASE TAKE THE

23  WITNESS SEAT.  ONCE YOU ARE SEATED, IF YOU WOULD STATE AND THEN

24  ALSO SPELL YOUR NAME FOR THE RECORD.

25    THE WITNESS:  OKAY.

1    THE COURT:  ALL RIGHT.

2    THE WITNESS:  GOOD MORNING.  MY LEGAL NAME IS BETH

3   KORNEGAY-TYLER.  AND IT'S BETH, K-O-R-N-E-G-A-Y, HYPHEN, TYLER,

4   T-Y-L-E-R.

5                    DIRECT EXAMINATION

6   BY MS. BARRON:

7   Q.   GOOD MORNING, MS. KORNEGAY-TYLER.  HOW ARE YOU?

8   A.   FINE.  HOW ARE YOU?

9   Q.   FINE, THANK YOU.

10       DID YOU WORK AT FIRST LANDMARK BANK FROM AT LEAST 2010

11   UNTIL AT LEAST 2014?

12   A.   YES, BUT I WORKED UNTIL THE END OF FEBRUARY 2015.

13   Q.   OKAY.  AND WERE YOU WORKING THERE IN 2010 UNTIL THAT TIME

14   CONTINUOUSLY?

15   A.   APPROXIMATELY AUGUST 10TH OF 2010, YES.

16   Q.   OKAY.  AND WHAT WAS YOUR ROLE AT FIRST LANDMARK BANK?

17   A.   MY ROLE WAS A COMMERCIAL LOAN OFFICER TO DEVELOP BANK

18   RELATIONSHIPS OF ALL TYPES.  I DID A LOT OF PROFESSIONAL

19   BANKING, AND I WAS A SENIOR VICE PRESIDENT OF THE BANK.

20   Q.   DID YOU ALSO WORK WITH INDIVIDUAL CLIENTS?

21   A.   YES, UH-HUH.

22   Q.   AND WHEN I SAY INDIVIDUALS, I MEAN, NOT ENTITIES, BUT

23   PEOPLE WHO HAD ACCOUNTS AT FIRST LANDMARK BANK.

24   A.   YES.  AND THEIR BUSINESSES.

25   Q.   OKAY.  DO YOU KNOW IF FIRST LANDMARK BANK WAS INSURED BY

1    THE FEDERAL DEPOSITORY INSURANCE COMMISSION?

2    A.   YES, IT WAS.

3           MS. BARRON:  YOUR HONOR, BY STIPULATION, I OFFER

4    GOVERNMENT'S EXHIBIT 920.

5           THE COURT:  SO STIPULATED?

6           MS. NOVAY:  YES, YOUR HONOR.

7           THE COURT:  IT'S ADMITTED.  NO OBJECTION.

8    BY MS. BARRON:

9    Q.   AND, MS. KORNEGAY-TYLER, I'M SHOWING YOU GOVERNMENT'S 9 --

10   OR THE LAST PAGE OF GOVERNMENT'S 920.  DOES THIS APPEAR TO BE

11   THE FDIC CERTIFICATE DATED MARCH 24TH, 2008, FOR FIRST LANDMARK

12   BANK?

13   A.   YES.

14   Q.   AND, ACTUALLY, I'VE PLACED A STACK OF DOCUMENTS IN FRONT

15   OF YOU.  IF YOU WILL TURN THEM OVER.  THEY ARE IN THE ORDER IN

16   WHICH WE'RE GOING TO GO THROUGH THEM.

17   A.   OKAY.

18   Q.   THE FIRST DOCUMENT THERE WILL BE YOUR COPY OF

19   GOVERNMENT'S 920.

20   A.   OKAY.

21   Q.   I APOLOGIZE FOR NOT TELLING YOU THAT.

22          OKAY.  SO I WANT TO FOCUS ON YOUR RESPONSIBILITIES AS IT

23   RELATES TO INDIVIDUAL CLIENTS.

24   A.   OKAY.

25   Q.   WOULD YOU ASSIST THEM WITH CREDIT REPAIR?

1  A.  ABSOLUTELY, UH-HUH.

2  Q.  AND EXPLAIN TO THE JURY WHAT IT MEANS TO HELP REPAIR A

3  CLIENT'S CREDIT.

4  A.  WELL, ESSENTIALLY, WHEN YOU TAKE A LOAN APPLICATION, IT IS

5  VERY IMPORTANT TO ALSO OBTAIN A PERSONAL FINANCIAL STATEMENT.

6  AND A PERSONAL FINANCIAL STATEMENT IS A STATEMENT OF AN

7  INDIVIDUAL'S ASSETS AND LIABILITIES.  THE DIFFERENCE BETWEEN

8  THOSE TWO WOULD BE THEIR NET WORTH.  FOR EXAMPLE, IF THEY SOLD

9  EVERYTHING THEY OWNED AND PAID THEIR DEBT OFF, WHATEVER THEY

10  HAD IN THEIR HAND WAS CASH.

11      AND YOU WOULD EVALUATE THAT AGAINST A CREDIT REPORT.  AND

12  IF ANYTHING IN THAT CREDIT REPORT WAS SLOW OR DEROGATORY, YOU

13  MIGHT BE ABLE TO ANALYZE THOSE ASSETS, SECURE THEM AS

14  COLLATERAL, AND UTILIZE THAT TO PAY OFF OR BRING CURRENT THOSE

15  OBLIGATIONS.

16      IN THE PROCESS OF DOING THAT, IT WOULD BE YOUR GOAL TO

17  ENHANCE THEIR CREDIT SCORE.  AND THAT WOULD ALSO MAKE THEM MORE

18  VALUABLE AS A BORROWER AND HELP THEM TO EXPAND THEIR

19  RELATIONSHIP.  AND IF THEIR GOAL WAS TO BUY A HOME OR DO

20  SOMETHING AS SIMPLE AS A HOME OR A CAR OR INVEST IN A BUSINESS,

21  IT JUST PUTS THEM IN A BETTER POSITION TO MOVE FORWARD.

22      AND THAT'S A VALUABLE TOOL THAT I BELIEVE A BANK CAN USE

23  IN HANDLING RELATIONSHIPS.

24  Q.  THANK YOU.  AND WAS NAT HARDWICK A CLIENT OF YOURS AT

25  FIRST LANDMARK BANK?

1  A.   HE BECAME A CLIENT I WOULD SAY ABOUT SIX TO EIGHT MONTHS

2  AFTER I STARTED WITH THE BANK, YES.

3  Q.   AND WAS PART OF YOUR RESPONSIBILITY TO HIM TO HELP HIM

4  REPAIR HIS OWN CREDIT?

5  A.   YES.

6  Q.   OKAY.  IN ADDITION TO HELPING YOUR CLIENTS REPAIR THEIR

7  CREDIT, DID YOU ALSO HAVE RESPONSIBILITY TO MAKE DECISIONS

8  ABOUT CERTAIN LOAN APPLICATIONS IF YOUR CLIENTS WANTED TO

9  BORROW MONEY FROM THE BANK?

10  A.   TO A CERTAIN LEVEL.  BUT OVER LEVELS, IT WAS A VERY

11  DETAILED PROCESS INVOLVING CREDIT ANALYSIS, SENIOR MANAGEMENT

12  OF THE BANK, AND A LOAN COMMITTEE MADE UP OF SENIOR MANAGEMENT

13  AND CERTAIN MEMBERS OF THE BOARD OF DIRECTORS.

14  Q.   OKAY.  LET'S TALK ABOUT THOSE LEVELS.  OKAY.  AND BEFORE

15  WE GET INTO THE SPECIFIC LEVELS, CAN YOU EXPLAIN TO THE JURY

16  THE DIFFERENCE BETWEEN A SECURED AND AN UNSECURED LOAN?

17  A.   OKAY.  A SECURED LOAN -- AN UNSECURED LOAN WOULD BE A LOAN

18  THAT WAS BASED ON SOMEONE'S CREDITWORTHINESS, WHICH IS BASED ON

19  A LOT OF FACTORS.  IT HAS TO DO WITH HOW GOOD THEIR CREDIT IS,

20  THEIR CHARACTER, WHAT YOU KNOW ABOUT THEM, WHAT YOU KNOW ABOUT

21  THEIR PAST, THEIR CAPACITY, THEIR DEMONSTRATED VERIFIED INCOME

22  AGAINST THE DEBTS THEY HAVE OR THE DEBTS THEY WILL HAVE.  IF

23  YOU'RE DOING A CONSOLIDATION, THEIR DEBTS WOULD BE LOWER.  TO

24  WHAT RELATIONSHIP DOES THEIR INCOME COVER THOSE DEBTS AND

25  MARKET CONDITIONS AS TO THE LIKELIHOOD OF THEIR CONTINUATION OF

1    INCOME AND IN THEIR LINE OF WORK.

2         AND SO PAST HISTORY AND CONDITIONS WOULD DICTATE WHETHER

3    IT WOULD BE SAFE TO MAKE AN UNSECURED LOAN, AND YOU WOULD HAVE

4    A STRONG LIKELIHOOD OF BEING PAID BACK.

5         WITH A SECURED LOAN, YOU'RE BACK TO THAT FINANCIAL

6    STATEMENT, WHERE YOU ARE EVALUATING THOSE ASSETS, TRYING TO

7    FIGURE OUT WHICH ASSETS YOU MIGHT COULD LIQUIDATE QUICKLY,

8    WHICH ASSETS HAVE VALUE THAT -- IF THEY HAD TO BE SOLD, AND YOU

9    ARE SECURING THOSE ASSETS BY VARIOUS MEANS OF SECURING

10   COLLATERAL.

11   Q.   AND SO TO BREAK THAT DOWN INTO LAYMAN'S TERMS, ARE SECURED

12   LOANS THE TYPES OF LOANS -- YOU SAID COLLATERAL?

13   A.   YES.

14   Q.   IS THAT WHERE YOU'RE SAYING, OKAY, I PLEDGE MY HOUSE OR I

15   PLEDGE MY CAR OR MY BUSINESS OR WHATEVER IT IS, SO THAT IF I

16   DON'T MAKE MY PAYMENTS, YOU GET TO SEIZE THAT ASSET?  IS THAT A

17   SECURED LOAN?

18   A.   YES.  BUT A BUSINESS WOULD NOT BE A TANGIBLE ASSET TO

19   PLEDGE AS COLLATERAL, WHEREAS A DEED ON A HOUSE OR A LIEN ON A

20   CAR WOULD BE A MORE TANGIBLE ASSET BECAUSE YOU CAN READILY

21   CONVERT IT TO CASH FASTER.

22   Q.   OKAY.  SO LET'S TALK ABOUT UNSECURED LOANS.  UP TO WHAT

23   AMOUNT DID YOU HAVE AUTHORITY TO APPROVE AN UNSECURED LOAN?

24   A.   UP TO ONLY ABOUT $25,000.

25   Q.   OKAY.  AND UP TO WHAT AMOUNT DID YOU HAVE AUTHORITY TO

1   APPROVE A SECURED LOAN?

2   A.   UP TO $200,000.

3   Q.   OKAY.  AND ANYTHING ABOVE THAT, YOU SAID IT WOULD HAVE TO

4   GO TO A COMMITTEE?

5   A.   IT WOULD EITHER HAVE TO JUST GO TO SENIOR MANAGEMENT -- I

6   BELIEVE AT THE TIME IT WAS UP TO A HALF MILLION, SENIOR

7   MANAGEMENT.  AND ANYTHING OVER A HALF MILLION WOULD GO TO A

8   FULL LOAN COMMITTEE, WITH MEMBERS OF THE BOARD OF DIRECTORS.

9   AND AS THE BANK GREW, THOSE LIMITS CHANGED OVER TIME.

10  Q.   AND WOULD YOU MAKE RECOMMENDATIONS TO THAT COMMITTEE ABOUT

11  WHETHER THE BANK SHOULD TAKE THIS RISK AND LOAN THIS MONEY?

12  A.   OH, ABSOLUTELY.  IT WAS A VERY DETAILED ANALYSIS, AND IT

13  WAS PERFORMED IN CONJUNCTION WITH A CREDIT ANALYST TEAM.

14  Q.   OKAY.  AND ARE YOU FAMILIAR WITH THE CRITERIA THAT WOULD

15  BE CONSIDERED BY THE BANK WHEN DECIDING WHETHER TO MAKE A LOAN,

16  EITHER SECURED OR UNSECURED, TO AN INDIVIDUAL BORROWER?

17  A.   YES.

18  Q.   AND ARE YOU TRAINED IN UNDERWRITING RULES?

19  A.   YES.

20  Q.   AND EXPLAIN TO THE JURY VERY BRIEFLY WHAT UNDERWRITING

21  RULES ARE.  AND I'M NOT SAYING GO INTO WHAT THE RULES ARE.  I'M

22  JUST -- WHAT DOES UNDERWRITING MEAN?

23  A.   WELL, I WAS TALKING ABOUT ALL OF THE CONDITIONS OF CREDIT.

24  THE CHARACTER, THE CREDIT, THE COLLATERAL, THE CAPACITY.  AND

25  ESSENTIALLY, THE TWO KEYS ARE THE CREDIT, WHAT IS PAST HISTORY.

1   ANOTHER REAL KEY IS CAPACITY.  IF SOMEONE HAS A CERTAIN

2   LEVEL OF INCOME AND A CERTAIN LEVEL OF DEBT, WHAT CAN THEY

3   AFFORD?  GENERALLY, IF SOMEBODY HAD $100,000 IN GROSS INCOME A

4   YEAR, THEIR DEBT, THEIR DEBT PAYMENTS OVER A COURSE OF

5   12 MONTHS SHOULD NOT BE ANY GREATER THAN 30, 35 THOUSAND

6   DOLLARS.

7   AND WHEN YOU'RE CONSOLIDATING DEBT, YOU CAN ADJUST THAT

8   BECAUSE YOU'RE PAYING THINGS OFF.  SO THE DEBT ON A MONTHLY

9   BASIS IS LESS, AND YOU MAKE THAT WORK WITH TOTAL INCOME.

10   AND THEN DEPENDING ON THE COLLATERAL, IF YOU'RE LENDING

11   AGAINST CASH, YOU MIGHT LEND 100 PERCENT.  IF YOU'RE LENDING

12   AGAINST PUBLICLY TRADED SECURITIES, YOU MIGHT LEND 80 PERCENT.

13   IF YOU'RE LENDING AGAINST A HOME, YOU MIGHT LEND UP TO

14   90 PERCENT, DEPENDING ON REGULATORY GUIDELINES AND DEPENDING ON

15   WHETHER YOUR MORTGAGE IS A FIRST MORTGAGE OR A SECOND MORTGAGE.

16   Q.   THANK YOU.

17   OKAY.  AND IN ADDITION TO LOOKING AT INCOME AND THEIR LOAN

18   OBLIGATIONS, DO YOU ALSO LOOK AT WHETHER THERE HAVE EVER BEEN

19   JUDGMENTS FILED AGAINST THEM?

20   A.   YES, ABSOLUTELY.

21   Q.   DO YOU LOOK AT WHETHER THERE ARE LIENS AGAINST THEM?

22   A.   YES.

23   Q.   WOULD THAT INCLUDE TAX LIENS?

24   A.   YES.

25   Q.   WOULD IT INCLUDE PROPERTY LIENS?

1    A.   YES, UH-HUH.

2    Q.   AND IN ADDITION TO LOOKING AT THE JUDGMENTS, ARE THERE

3    OCCASIONS WHEN -- YOU KNOW, NOT JUST THE FACT OF THE JUDGMENT,

4    BUT SPECIFICALLY WHAT THE JUDGMENT IS FOR --

5    A.   YES.

6    Q.   -- THE UNDERLYING CAUSE OF ACTION WAS, COULD THAT BE A

7    FACTOR?

8    A.   YES.

9    Q.   OKAY.  WHEN DID YOU FIRST START -- YOU SAID EIGHT -- I

10   THINK YOU SAID SIX TO EIGHT MONTHS AFTER YOU STARTED IS WHEN

11   YOU FIRST STARTED WORKING WITH MR. HARDWICK?

12   A.   RIGHT.

13   Q.   SO WOULD THAT BE SOMETIME IN THE SPRING OF 2011?

14   A.   YES.

15   Q.   OKAY.  AND DID YOU ASSIST HIM WITH OBTAINING SEVERAL

16   PERSONAL LOANS FROM FIRST LANDMARK BANK OVER THE COURSE OF YOUR

17   RELATIONSHIP?

18   A.   YES.

19   Q.   IN EARLY 2011, DID MR. HARDWICK SEEK A LINE OF CREDIT FROM

20   FIRST LANDMARK BANK?

21   A.   YES.

22   Q.   AND DO YOU REMEMBER IF THAT WAS A SECURED OR UNSECURED

23   LOAN?

24   A.   IF YOU'RE TALKING ABOUT A SMALLER LINE OF CREDIT, IT WAS

25   UNSECURED.

1    Q.   OKAY.  I'M GOING TO SHOW YOU --

2         MS. BARRON:  WELL, FIRST OF ALL, YOUR HONOR, I OFFER

3    GOVERNMENT'S 927.

4         MS. NOVAY:  NO OBJECTION.

5         THE COURT:  IT'S ADMITTED.

6         MS. BARRON:  THANK YOU.

7    BY MS. BARRON:

8    Q.   OKAY.  IF YOU WOULD LOOK AT THE NEXT DOCUMENT IN YOUR

9    STACK, IT SHOULD BE GOVERNMENT'S 927.  AND I'M GOING TO PUT IT

10   UP ON THE ELMO.

11   A.   ALL RIGHT.

12   Q.   DO YOU RECOGNIZE THIS DOCUMENT?

13   A.   YES, I DO.

14   Q.   WHAT IS IT?

15   A.   IT IS AN APPLICATION FOR A LINE OF CREDIT.

16   Q.   AND WHO IS THE APPLICANT?

17   A.   NATHAN E. HARDWICK IV.

18   Q.   OKAY.  AND DOES HE INITIAL --

19   A.   YES.

20   Q.   -- THERE AT THE BOTTOM?

21   A.   YES.

22   Q.   AND IF WE LOOK AT THE SECOND PAGE, DO YOU SEE AT THE TOP

23   WHERE IT SAYS ATTACHED PFS?  WHAT DOES THAT MEAN?

24   A.   THAT STANDS FOR PERSONAL FINANCIAL STATEMENT.  AND WHAT

25   YOU HAVE TO UNDERSTAND, THIS IS NOT VERY COMPLETE, BUT IT

1    DOESN'T REALLY HAVE TO BE.  BECAUSE BEFORE WE COMPLETED THIS

2    REQUEST, HE HAD COMPLETED A PERSONAL FINANCIAL STATEMENT THAT

3    WOULD BE DATED BEFORE THIS THAT WOULD HAVE THE DETAILS THAT I

4    EARLIER DESCRIBED.  SO YOU WOULD USE IT AS A REFERENCE TO PUT

5    IT WITH THIS TO MAKE THIS APPLICATION MORE COMPLETE.

6    Q.   SO ARE YOU SAYING THAT YOU ALREADY HAD AN UNDERSTANDING AS

7    TO THE OVERALL FINANCIAL SITUATION?

8    A.   RIGHT.  THIS IS MOSTLY JUST AN ACCOMMODATION.  IT'S A LINE

9    OF CREDIT THAT WAS ATTACHED TO A CHECKING ACCOUNT.

10   Q.   MS. KORNEGAY-TYLER, WHAT IS THE DATE ON THIS PARTICULAR

11   APPLICATION?

12   A.   MAY 10TH OF '11.

13   Q.   AND HOW MUCH MONEY WAS HE SEEKING TO BORROW WITH THIS

14   PARTICULAR APPLICATION?

15   A.   OH, IT WAS JUST 25,000.

16   Q.   AND DOES HE SIGN HERE AT THE BOTTOM?

17   A.   YES.

18   Q.   AND I WANT TO ENLARGE AND HAVE YOU READ, IF YOU CAN -- IF

19   YOU CAN SEE THIS.  IT'S A LITTLE BLURRY.  BUT THIS STATEMENT

20   RIGHT HERE THAT I'VE GOT HIGHLIGHTED, WHAT DOES THAT SAY?

21   A.   RIGHT.  I CERTIFY THAT EVERYTHING I HAVE STATED IN THIS

22   APPLICATION AND ITS ATTACHMENTS IS CORRECT.

23   Q.   AND WHY DOES THE BANK ASK THE BORROWER TO CERTIFY THAT THE

24   INFORMATION THEY HAVE PROVIDED IS CORRECT?

25   A.   BECAUSE WHEN YOU ARE MAKING DECISIONS IN LINE WITH ALL THE

1 FACTORS THAT I STATED IN CREDIT, YOU WANT TO KNOW THAT YOU HAVE

2 COMPLETE INFORMATION.  AND ESPECIALLY IF YOU ARE WORKING WITH

3 ELECTRONIC CREDIT REPORTS, EVERYTHING THAT MIGHT BE OCCURRING

4 OR ANYTHING THAT'S VERY NEW MIGHT NOT BE ON THOSE REPORTS.

5     SO YOU HAVE TO RELY ON THE BORROWER TO TELL YOU EVERYTHING

6 THAT MAY BE OCCURRING WITH THEIR OBLIGATIONS THAT YOU MIGHT NOT

7 BE FINDING IN YOUR INVESTIGATION.

8 Q.   AND WHEN YOU SAY REPORTS, ARE YOU TALKING ABOUT LIKE

9 EXPERIAN AND EQUIFAX REPORTS?

10 A.   YES.

11 Q.   AND SO IS IT YOUR EXPERIENCE THAT SOMETIMES THERE ARE

12 OBLIGATIONS THAT ARE NOT ON SOMEONE'S CREDIT REPORT?

13 A.   THAT'S TRUE.  AND IT'S MY EXPERIENCE THAT THEY ARE NOT

14 ALWAYS CURRENT, AND IT'S MY EXPERIENCE THAT THEY SOMETIMES MAY

15 BE SATISFIED BUT IT'S NOT ALWAYS REPORTED.

16 Q.   OKAY.  IF YOU LOOK ON THIS PAGE UNDER GENERAL INFORMATION,

17 IF YOU WILL READ THE QUESTION THAT IS HIGHLIGHTED THERE.

18 A.   ARE THERE ANY SUITS OR JUDGMENTS PENDING AGAINST YOU.

19 Q.   AND WHAT IS THE ANSWER?

20 A.   NO.

21 Q.   OKAY.  DO YOU REMEMBER, ARE YOU THE ONE WHO CHECKED NO OR

22 DID MR. HARDWICK CHECK IT?

23 A.   HE DID.

24 Q.   OKAY.  AND WHEN HE SIGNED THIS BELOW, DID HE SIGN THIS IN

25 YOUR PRESENCE?

1   A.    YES.  MOST EVERY TIME AN APPLICATION WAS COMPLETED, I WAS

2   FACE TO FACE WITH HIM.  AND I WOULD GATHER A DRAFT, AND I WOULD

3   OFTEN TAKE IT BACK AND WORD PROCESS IT FOR MORE TYPED

4   APPLICATIONS.

5   Q.    OKAY.  I WANT YOU TO SET THIS ASIDE AND REMEMBER THE DATE

6   ON THIS APPLICATION.

7   A.    OKAY.  ALL RIGHT.

8   Q.    AND I'M GOING TO SHOW YOU WHAT'S BEEN PREVIOUSLY ADMITTED

9   AS GOVERNMENT'S EXHIBIT 967, AND I AM TURNING TO PAGE 13

10  SPECIFICALLY.  AND I DON'T BELIEVE THERE IS A COPY OF THIS IN

11  FRONT OF YOU BECAUSE IT'S ALREADY IN EVIDENCE, BUT IF YOU WILL

12  LOOK ON THE SCREEN.

13  A.    OKAY.

14  Q.    DO YOU SEE WHERE IT SAYS, SUIT ON NOTE?

15  A.    YES.

16  Q.    AND WHO IS THE PLAINTIFF?

17  A.    YES.

18  Q.    WHO IS THE PLAINTIFF?

19  A.    THE NATIONAL BANK OF GEORGIA.

20  Q.    AND WHO IS BEING SUED IN THIS LAWSUIT?

21  A.    D&H DEVELOPMENT, LLC, AND NATHAN E. HARDWICK IV.

22  Q.    AND WHAT IS THE DATE?

23  A.    SEPTEMBER 29TH OF '10.

24  Q.    OKAY.  AND OBVIOUS QUESTION, BUT IS THAT BEFORE THE DATE

25  OF THE APPLICATION --

1    A.   RIGHT.

2    Q.   -- FOR A LOAN?

3    A.   RIGHT.

4    Q.   OKAY.  AND I WANT TO SHOW YOU WHAT IS ALLEGED IN THIS

5    COMPLAINT.  IF YOU WILL SEE THAT COUNT 1 REFERS TO A ROUGHLY

6    $2.8 MILLION LOAN --

7    A.   YES.

8    Q.   -- THAT IS OUTSTANDING; AND THAT COUNT 2, ON PAGE 15 GOING

9    OVER INTO PAGE 16 OF GOVERNMENT'S 767, REFERS TO A ROUGHLY

10   $2.2 MILLION OBLIGATION.  DO YOU SEE THAT?

11   A.   YES.

12   Q.   IN DECIDING WHETHER TO EXTEND MR. HARDWICK A $25,000 LOAN,

13   WOULD YOU HAVE WANTED TO KNOW THAT THERE WAS A LAWSUIT PENDING

14   AGAINST HIM FOR OVER $5 MILLION?

15   A.   ABSOLUTELY.

16   Q.   SO WHEN HE ANSWERED NO TO THAT QUESTION ON GOVERNMENT'S

17   EXHIBIT 927, THAT THERE WERE NO PENDING LAWSUITS AGAINST HIM,

18   WAS THAT A TRUTHFUL STATEMENT?

19   A.   NO.

20          MS. BARRON:  I WANT TO AT THIS TIME OFFER, YOUR

21   HONOR, UNDER THE AGREEMENT --

22          MS. NOVAY:  YOUR HONOR, I'M GOING TO OBJECT TO THAT

23   LINE OF QUESTIONING.

24          THE COURT:  TO THE LAST QUESTION?

25          MS. NOVAY:  YEAH.  I THINK IT GOES TO THE ULTIMATE

1    ISSUE OF LYING -- I MADE MY OBJECTION.

2            THE COURT:  OKAY.  I'LL OVERRULE IT AT THIS TIME.

3            MS. BARRON:  YOUR HONOR, UNDER OUR AGREEMENT, I'D

4    LIKE TO OFFER GOVERNMENT'S 734.

5            THE COURT:  ANY OBJECTION?

6            MS. NOVAY:  NO, YOUR HONOR.  I'M SORRY.

7            THE COURT:  IT'S ADMITTED.  IT'S OKAY.  IT'S

8    ADMITTED.

9    BY MS. BARRON:

10   Q.   MS. TYLER, THE NEXT DOCUMENT IN YOUR STACK SHOULD BE

11   GOVERNMENT'S 734.  I AM GOING TO PUT IT UP ON THE SCREEN, BUT

12   YOU HAVE A HARD COPY.  AND I'M GOING TO TURN TO PAGE 2.

13           MS. NOVAY:  I'M SORRY, YOUR HONOR.  NO OBJECTION, BUT

14   PRIOR TO --

15           THE COURT:  I UNDERSTAND.

16           MS. NOVAY:  THANK YOU, YOUR HONOR.  I JUST WANT TO

17   MAKE SURE THE RECORD IS CLEAR.

18           THE COURT:  IT'S CLEAR.

19   BY MS. BARRON:

20   Q.   OKAY.  MS. TYLER, DOES THIS APPEAR TO BE A LAWSUIT PENDING

21   IN CLARK COUNTY, NEVADA?

22   A.   YES.

23   Q.   AND WHO IS THE PLAINTIFF?

24   A.   BELLAGIO, LLC.

25   Q.   AND WHO IS THE DEFENDANT?

1   A.   NATHAN HARDWICK, AKA NATHAN E. HARDWICK, AKA NATHAN

2   HARDWICK IV.

3   Q.   AND IF YOU LOOK IN THE TOP RIGHT CORNER, DO YOU SEE

4   ELECTRONICALLY FILED?

5   A.   YES.

6   Q.   WHEN WAS THIS LAWSUIT ELECTRONICALLY FILED?

7   A.   JANUARY 25TH OF '11.

8   Q.   AND IS THAT BEFORE HIS APPLICATION FOR THE $25,000 LOAN?

9   A.   YES, UH-HUH.

10  Q.   LESS THAN FOUR MONTHS BEFORE?

11  A.   YES.

12  Q.   OKAY.

13  A.   MAY 10TH, I BELIEVE.

14  Q.   AND LET'S LOOK AT THE SPECIFIC ALLEGATIONS.  DO YOU SEE IN

15  THE FIRST COUNT WHERE IT SAYS THAT MR. HARDWICK HAD NEGOTIATED,

16  EXECUTED, AND DELIVERED TO THE PLAINTIFF NEGOTIABLE CREDIT

17  INSTRUMENTS?

18       BASED ON YOUR BANKING HISTORY, WHAT DOES NEGOTIABLE CREDIT

19  INSTRUMENT MEAN?

20  A.   THAT WOULD HAVE TO BE SOME SORT OF A SECURITY AGREEMENT

21  AGAINST MAYBE SOMETHING LIKE AN OPEN LINE OF CREDIT OR

22  SOMETHING.

23  Q.   COULD IT BE A CHECK?  IS THAT A NEGOTIABLE INSTRUMENT?

24  A.   I GUESS IT COULD BE.

25  Q.   OKAY.  AND WHAT'S THE AMOUNT?

1  A.   250,000.

2  Q.   OKAY.  SO HE DELIVERED TO THE BELLAGIO NEGOTIABLE

3  INSTRUMENTS IN THE AMOUNT OF 250,000.

4       AND THEN PARAGRAPH 2, HE COMPLETED THE INSTRUMENT

5  NECESSARY FOR THE INSTRUMENTS TO BE PRESENTED FOR PAYMENT.  SO

6  HE OFFERED THEM FOR PAYMENT.  AND THEN WHAT HAPPENED?

7  A.   PRESENTED THEM THROUGH NORMAL BANKING CHANNELS FOR PAYMENT

8  ON DEFENDANT'S BANK ACCOUNT AND WERE RETURNED DISHONORED AND

9  UNPAID.

10 Q.   OKAY.  SO DOES THAT SOUND LIKE THEY WERE BOUNCED CHECKS?

11 A.   YES, ABSOLUTELY.  AND A CHECK IS A CONTRACT.

12 Q.   OKAY.  AND I'M SHOWING YOU PAGE 4.  DOES THIS APPEAR TO BE

13 A CHECK DATED AUGUST 21ST, 2010?

14 A.   YES.

15 Q.   TO THE BELLAGIO, SIGNED BY NATHAN HARDWICK?

16 A.   YES.

17 Q.   AND IF YOU'LL LOOK THROUGH YOUR PERSONAL COPY OF

18 GOVERNMENT'S 734, DO PAGES 5 THROUGH 15 ALSO APPEAR TO BE

19 COPIES OF CHECKS THAT MR. HARDWICK PRESENTED TO THE BELLAGIO?

20 A.   YES.

21 Q.   AND IF YOU WILL TURN TO THE VERY LAST PAGE, PAGE 20, OF

22 GOVERNMENT'S 734.

23 A.   DID YOU SAY PAGE 20?

24 Q.   YES, MA'AM.  IT'S THE VERY LAST PAGE.

25 A.   OH, OKAY.  OKAY.

1    Q.   YOU SEE AT THE TOP WHERE IT SAYS, AFFIDAVIT OF SERVICE?

2    A.   UH-HUH.

3    Q.   GILBERTO HOWELL, JR., SWEARS THAT THIS DOCUMENT WAS SERVED

4    ON -- WHAT'S THE DATE HERE?

5    A.   7TH OF MARCH, 2011.

6    Q.   AND WHO WAS THIS LAWSUIT SERVED ON?

7    A.   NATHAN E. HARDWICK IV.

8    Q.   WAS MR. HARDWICK SERVED WITH THIS LAWSUIT BEFORE HE

9    COMPLETED THE LOAN APPLICATION FOR FIRST LANDMARK BANK FOR

10   $25,000?

11   A.   YES.  YES.

12   Q.   OKAY.  NOW, BEFORE, WHEN I ASKED YOU ABOUT, YOU KNOW, NOT

13   JUST KNOWING THAT THERE IS A JUDGMENT BUT ARE THERE CERTAIN

14   TYPES OF JUDGMENTS THAT WOULD BE OF INTEREST, WOULD IT BE OF

15   INTEREST TO YOU THAT MR. HARDWICK HAD BEEN SUED BY A CASINO?

16   A.   ABSOLUTELY.

17   Q.   AND WHY IS THAT?

18   A.   WELL, THERE DEFINITELY COULD BE ACTIVITY INVOLVING THE

19   RISK OF FUNDS THAT YOU WOULD WANT TO KNOW ABOUT, BECAUSE YOU'RE

20   DEPENDENT ON THOSE FUNDS TO REPAY YOUR OBLIGATION.  AND

21   $250,000 IS A CONSIDERABLE AMOUNT.

22          MS. BARRON:  YOUR HONOR, UNDER OUR AGREEMENT, I OFFER

23   GOVERNMENT'S 736.

24          MS. NOVAY:  NO OBJECTION.

25          THE COURT:  IT'S ADMITTED.

1  BY MS. BARRON:

2  Q.   THE NEXT DOCUMENT IN YOUR STACK --

3         MS. NOVAY:  WAIT.  WAIT.  I'M SORRY.  734?

4         MS. BARRON:  736.

5         MS. NOVAY:  NO OBJECTION.

6         THE COURT:  IT'S ADMITTED.

7  BY MS. BARRON:

8  Q.   MS. KORNEGAY-TYLER, DOES THIS APPEAR TO BE ANOTHER

9  DOCUMENT THAT WAS FILED IN THAT LAWSUIT?

10  A.   YES.

11  Q.   AND WHAT'S THE DATE?

12  A.   APRIL 5TH OF '11.

13  Q.   IS THAT ALSO BEFORE HE FILLED OUT THE LOAN APPLICATION

14  WITH FIRST LANDMARK BANK?

15  A.   YEAH.  ABOUT A MONTH BEFORE, IT LOOKS LIKE.

16  Q.   AND DOES HE AGREE TO PAY THE BELLAGIO THE AMOUNT?

17  A.   YES.

18  Q.   OKAY.  AND IF WE LOOK DOWN, IT LOOKS LIKE THERE ARE SOME

19  PAYMENT DATES WHERE HE IS GOING TO MAKE THE PAYMENTS ON THAT

20  LAWSUIT?

21  A.   RIGHT.

22         MS. NOVAY:  YOUR HONOR, CAN WE APPROACH BRIEFLY?

23         THE COURT:  YES.

24         (WHEREUPON, A BENCH CONFERENCE OUT OF THE HEARING OF

25  THE JURY PROCEEDED AS FOLLOWS:)

1    MS. NOVAY:  YOUR HONOR, I THINK THERE'S -- I

2  UNDERSTAND WHAT MS. BARRON IS TRYING TO ACCOMPLISH WITH THIS

3  WITNESS, BUT THIS WITNESS IS NOT AN ATTORNEY, AND SHE'S NOT

4  WITH THE BELLAGIO.  SO I THINK THE PARAPHRASING OF THE DOCUMENT

5  IS A LITTLE INAPPROPRIATE.

6    IF THEY WANT TO ASK QUESTIONS ABOUT IT AND WHAT IT

7  SAYS -- BUT I THINK MS. BARRON'S NARRATIVE OF PARAPHRASING --

8  AND I UNDERSTAND WHAT IS HAPPENING.  I THINK THEY ARE SAYING

9  HE'S SUPPOSED TO -- I UNDERSTAND.

10    THE COURT:  MS. BARRON, BECAUSE I'M TRYING TO

11  UNDERSTAND, I'M TRYING TO MAKE SURE YOU DON'T GO TOO CLOSE.  I

12  AM AFRAID YOU ARE GOING TOO CLOSE TO -- WHY IS IT YOU FEEL THE

13  NEED TO ESTABLISH THROUGH THIS WITNESS HER OPINION OF WHETHER

14  OR NOT HE LIED OR DID CERTAIN THINGS, AS OPPOSED TO SETTING UP

15  THE FACTS SO YOU CAN ARGUE IT WITH THE JURY?  BECAUSE IT IS

16  THEIR ULTIMATE DETERMINATION.

17    MS. BARRON:  I AM NOT ASKING THAT QUESTION, BUT I

18  THINK IT IS IMPORTANT TO SHOW HE WAS AWARE OF THAT LAWSUIT,

19  THAT HE KNEW ABOUT IT, THAT HE ACKNOWLEDGED, BECAUSE HE LIED TO

20  HER LATER.  HE SAID THIS WAS A PAYMENT MISTAKE, THIS WHOLE

21  LAWSUIT WAS A MISTAKE.  AND I NEED TO BE ABLE TO ESTABLISH THAT

22  THERE WAS NO MISTAKE.  HE ACKNOWLEDGED THE DEBT.  HE AGREED TO

23  PAY IT.

24    THE COURT:  OKAY.  I'LL AGREE THAT YOU SHOULD PAY

25  CLOSE ATTENTION TO THE WAY IN WHICH YOU ASK THE QUESTIONS.  I

1  UNDERSTAND THE POINTS THAT YOU ARE MAKING.  IF THERE IS ANY

2  OBJECTION, I WON'T SUSTAIN IT, BUT I WILL JUST CAUTION YOU.

3          MS. NOVAY:  I WOULD ASK THAT THE COURT, AT THE END OF

4  THIS WITNESS'S TESTIMONY, GIVE A LIMITING INSTRUCTION ABOUT THE

5  FACT THAT HE LIED.  I THINK THAT GOES TO THE ULTIMATE ISSUE.

6          THE COURT:  I WILL HEAR FROM YOU.

7          MS. NOVAY:  THANK YOU.

8          (WHEREUPON, PROCEEDINGS RESUMED IN OPEN COURT AS

9  FOLLOWS:)

10  BY MS. BARRON:

11  Q.  MS. KORNEGAY-TYLER, I'M GOING TO ASK YOU TO READ

12  PARAGRAPH 2.

13  A.  DEFENDANT WILL EXECUTE AND DELIVER TO PLAINTIFF A SEPARATE

14  STIPULATION FOR ENTRY OF JUDGMENT AUTHORIZING JUDGMENT TO BE

15  ENTERED AGAINST DEFENDANT IN THE AMOUNT OF 250,000 AND NO/100

16  DOLLARS, OR LESSER PRINCIPAL BALANCE IF PAYMENTS HAVE BEEN

17  MADE, TOGETHER WITH INTEREST, ATTORNEY'S FEES, AND COSTS.

18  PLAINTIFF AGREES NOT TO FILE THE STIPULATION FOR ENTRY OF

19  JUDGMENT, NOR TO LEVY EXECUTION THEREON, SO LONG AS PAYMENTS

20  ARE MADE IN ACCORDANCE WITH THE STIPULATED SCHEDULE SET FORTH

21  IN PARAGRAPHS 1 A, B, C, D, E, AND F ABOVE.

22  Q.  THANK YOU, MA'AM.  AND I SHOWED YOU THE DATE THAT IT WAS

23  ELECTRONICALLY FILED.  I'M SHOWING YOU THE LAST PAGE.

24          DOES IT APPEAR THAT MR. HARDWICK SIGNED THIS DOCUMENT?

25  A.  YES.

1   Q.   AND WHAT DATE?

2   A.   31ST DAY OF MARCH, 2011.

3   Q.   THANK YOU.  SO AFTER THAT MAY 11TH, 2011, APPLICATION FOR

4   THE $25,000 LOAN, DID MR. HARDWICK EVER CALL YOU UP AND SAY,

5   YOU KNOW WHAT, I FORGOT TO MENTION THIS $5 MILLION LAWSUIT?

6   A.   NO.

7   Q.   DID HE SAY, YOU KNOW WHAT, I FORGOT TO MENTION THIS

8   $250,000 LAWSUIT BY THE BELLAGIO?

9   A.   NO.  I HAD NEVER SEEN THIS DOCUMENTATION BEFORE ABOUT

10  SUMMER OF '15.

11  Q.   LET ME ASK YOU:  EVEN IF YOU ULTIMATELY MAY HAVE DECIDED

12  TO LOAN HIM THE MONEY ANYWAY, ARE THERE STEPS YOU MIGHT HAVE

13  TAKEN HAD YOU KNOWN THAT THESE JUDGMENTS EXISTED?  ARE THERE

14  INVESTIGATIVE STEPS YOU MIGHT HAVE TAKEN?

15  A.   I WOULD HAVE TRIED TO FIGURE OUT WHAT THE REPAYMENT

16  OBLIGATIONS WERE AND FACTORED IT INTO THE CREDIT ANALYSIS,

17  ESPECIALLY THE D&H HOLDINGS OBLIGATION, BECAUSE THAT IS

18  INSTITUTIONAL CREDIT.

19       BUT BASED ON UNDERWRITING CRITERIA, WITH THE KIND OF

20  PAYMENTS I'M SEEING HERE, THERE'S NO WAY THAT HE WOULD HAVE

21  QUALIFIED FOR THE LOAN.

22  Q.   AND AT A LATER POINT IN YOUR RELATIONSHIP WITH

23  MR. HARDWICK -- AND BY RELATIONSHIP, I MEAN AS A BANKER, LIKE

24  WHILE YOU WERE STILL MANAGING HIS PORTFOLIO -- DID YOU LATER

25  LEARN ABOUT THESE TWO LAWSUITS?

1   A.   WELL, ON THE D&H HOLDINGS, I NEVER REALLY LEARNED ABOUT

2   THE SUIT FOR THIS AMOUNT OF MONEY UNTIL, I WANT TO SAY, SUMMER,

3   EARLY '14 MAYBE.

4        BUT AFTER I MADE THE FIRST LOAN FOR 25,000, THERE WAS A

5   SECOND LOAN THAT I BELIEVE WAS APPROXIMATELY 480,000.  BECAUSE

6   I DON'T HAVE MY WORKING FILE, I'M HAVING A BIT OF A PROBLEM

7   WITH THE TIMELINE.

8   Q.   OKAY.  I'M GOING TO SHOW YOU SOME DOCUMENTS.  I'M JUST

9   ASKING YOU THE BASIC QUESTION:  DID YOU AT SOME POINT LATER

10  LEARN ABOUT THESE TWO ISSUES?

11  A.   RIGHT.  AND I DID NOT LEARN ABOUT THE BELLAGIO ISSUE UNTIL

12  LATE IN '14.

13  Q.   AND WE'LL GET TO THAT IN A MINUTE.

14  A.   OKAY.

15       MS. BARRON:  BUT BEFORE WE DO, I WANT TO OFFER

16  GOVERNMENT'S 744, AGAIN BY AGREEMENT.

17       MS. NOVAY:  NO OBJECTION.

18       THE COURT:  IT'S ADMITTED.

19  BY MS. BARRON:

20  Q.   MS. KORNEGAY-TYLER, THIS WILL BE THE NEXT DOCUMENT IN YOUR

21  STACK.  DOES THIS APPEAR TO BE ANOTHER DOCUMENT FILED IN THAT

22  LAWSUIT --

23  A.   YES.

24  Q.   -- BY THE BELLAGIO AGAINST MR. HARDWICK?

25  A.   YES.

1    Q.   AND WHAT'S THE DATE OF THIS DOCUMENT?

2    A.   DECEMBER 21ST, 2011.

3    Q.   AND WHAT DOES THIS SAY?

4    A.   JUDGMENT.

5    Q.   AND IF YOU'LL JUST READ THE FIRST LINE THERE.

6    A.   IT IS ORDERED, ADJUDGED, AND DECREED THAT JUDGMENT BE AND

7    HEREBY IS ENTERED AGAINST DEFENDANT NATHAN HARDWICK, AKA -- ON

8    AND ON AND ON -- NATHAN E. HARDWICK IV, AND IN FAVOR OF

9    PLAINTIFF BELLAGIO, LLC, THROUGH ITS ATTORNEYS OF RECORD, AND

10   DEFENDANT HAVING DEFAULTED ON HIS MONTHLY PAYMENTS AS SPECIFIED

11   IN THE SETTLEMENT AGREEMENT.

12   Q.   AND IF WE LOOK AT PAGE 2, WHAT IS THE DATE THAT THIS

13   JUDGMENT IS SIGNED?

14   A.   7TH DAY OF DECEMBER, 2011.  BUT THEY HAD PUT IN NOVEMBER

15   AND CROSSED IT OUT.

16   Q.   THANK YOU.  LET'S TALK ABOUT SOMETHING ELSE THAT HAPPENED

17   IN DECEMBER 2011 IN ADDITION TO THAT JUDGMENT.  I WANT TO SHOW

18   YOU WHAT HAS ALREADY BEEN INTRODUCED INTO EVIDENCE AS

19   GOVERNMENT'S EXHIBIT 929.

20        AND IF YOU LOOK OVER TO THE RIGHT, WHAT IS THE DATE, THE

21   COURT-STAMPED DATE OF THIS DOCUMENT?

22   A.   DECEMBER 2ND, 2011, AT 10:39 A.M.

23   Q.   AND IS THIS AN AFFIDAVIT OF GARNISHMENT?

24   A.   YES.

25   Q.   FILED BY COLONY BANK AS ASSIGNEE OF NATIONAL BANK OF

1    GEORGIA?

2    A.   YES.

3    Q.   ON NATHAN HARDWICK?

4    A.   YES.

5    Q.   AND IS THIS YOUR BANK RIGHT HERE, FIRST LANDMARK BANK?

6    A.   YES, IT IS.

7    Q.   ARE YOU FAMILIAR WITH THE GARNISHMENT ACTION?

8    A.   YES.

9    Q.   OKAY.  TELL THE JURY WHAT YOU KNOW ABOUT THAT.

10   A.   OKAY.  THIS WAS AFTER I HAD ALREADY MADE THE LINE OF

11   CREDIT FOR 25,000 AND THE SECOND LOAN THAT I BELIEVE WAS

12   APPROXIMATELY 480,000.  AND WE HAD SET HIM UP, AS WE DO VERY

13   COMMONLY, WITH AUTOMATIC DEPOSIT OF PAYROLL.  AND SO THE

14   PAYMENTS ON THOSE LOANS WERE CLICKING ALONG VERY NICELY.  HE

15   WAS BUILDING A NICE RELATIONSHIP WITH THE BANK.  WE ENJOYED

16   SOME NICE DEPOSITS.

17       AND I WAS OUT ONE DAY WITH ANOTHER CLIENT WHO I WAS

18   HELPING VERY PERSONALLY, AND I WAS INTERRUPTED WITH THAT CLIENT

19   BECAUSE I GOT A CALL FROM THE BANK:  WE HAVE A GARNISHMENT ON

20   NAT HARDWICK'S ACCOUNTS.  IT HAS FROZEN ALL OF HIS CASH.  THE

21   DRAFTS FOR THE LOAN PAYMENTS ARE NOT COMING OUT.  WE HAVE A

22   PROBLEM.  GET BACK TO THE BANK RIGHT NOW.

23       AND SO I GOT BACK TO THE BANK AND IMMEDIATELY CONTACTED

24   NAT.

25   Q.   I WANT TO ASK YOU:  DID YOU WRITE A MEMO TO YOURSELF

1  OUTLINING THESE EVENTS?

2  A.   YES, UH-HUH.

3         MS. BARRON:  YOUR HONOR, I OFFER GOVERNMENT'S 967.

4         MS. NOVAY:  NO OBJECTION.

5         THE COURT:  OKAY.  IT'S ADMITTED.

6  BY MS. BARRON:

7  Q.   MS. KORNEGAY-TYLER, IF YOU WOULD LOOK AT THE NEXT DOCUMENT

8  IN YOUR STACK, WHICH I'M ALSO PLACING ON THE SCREEN.

9  A.   RIGHT.

10 Q.   IS THIS THE MEMO THAT YOU DRAFTED?

11 A.   YES.

12 Q.   WHAT'S THE DATE?

13 A.   JANUARY 11TH OF '12.

14 Q.   AND IF YOU WOULD READ THE FIRST PARAGRAPH, PLEASE.

15 A.   FIRST OF ALL, LET ME STATE THIS IS A MEMO TO THE FILE THAT

16 BECAME A PART OF THE WORKING DOCUMENTS OF THE BANK.

17 Q.   AND WHAT'S THE PURPOSE OF WRITING A MEMO TO FILE?

18 A.   JUST TO DOCUMENT THE -- MY ACTIONS IN A SITUATION THAT CAN

19 CREATE RISK TO THE BANK AND WHAT I DID TO OVERCOME THAT

20 SITUATION.

21 Q.   OKAY.  AND DO YOU SEE HERE WHERE IT SAYS, THIS IS TO

22 ACKNOWLEDGE THE NONDISCLOSURE BY BORROWER?

23 A.   YES.

24 Q.   IS THAT IN REFERENCE TO SOMETHING THAT THE BORROWER,

25 MR. HARDWICK, FAILED TO DISCLOSE TO YOU?

1     A.    YES. RELATED TO D&H DEVELOPMENT, BECAUSE I DID NOT

2     REALIZE THAT HE WAS OBLIGATED TO THAT BANK ON BEHALF OF THAT

3     ENTITY TO THE LEVEL THAT I LATER FOUND OUT THAT HE WAS.

4     Q.    OKAY. THE FIRST SENTENCE HERE, IT SAYS: INFORMATION

5     RESEARCHED INDICATES THAT NATHAN E. HARDWICK IV WAS A MINORITY

6     EQUITY MEMBER, 15 PERCENT OR LESS.

7         WHERE DID YOU GET THAT INFORMATION FROM?

8     A.    JUST BY TALKING TO HIM.

9     Q.    HE TOLD YOU THAT?

10     A.    YES.

11     Q.    OKAY. AND THEN IT SAYS: VARIOUS DEED AND COURT

12     RECORDINGS WERE FILED AFTER THE DATE OF HIS PERSONAL FINANCIAL

13     STATEMENT.

14         DID HE TELL YOU THAT, TOO?

15     A.    YES.

16     Q.    IT APPEARS THAT HE DID NOT KNOW THE ENTITY WAS IN A SEVERE

17     STATE OF DEFAULT UNTIL SEVERAL MONTHS AFTER COMPLETING OUR

18     PERSONAL FINANCIAL STATEMENT.

19         DID HE TELL YOU THAT AS WELL?

20     A.    YES.

21     Q.    AND IF WE LOOK AT THE NEXT PARAGRAPH: WHEN THE SITUATION

22     BECAME KNOWN TO HIM, INFORMATION EXISTS TO INDICATE THAT HE

23     ATTEMPTED COMMUNICATIONS WITH ALL INVOLVED AND WORKED OUT A

24     PLAN WITH THE LEAD PARTICIPATING BANK.

25         DID HE TELL YOU THAT?

1   A.   YES.

2   Q.   AND IF WE LOOK DOWN AT THE END:  ALL WERE SATISFIED, WITH

3   NOTHING EXPECTED THAT WOULD LEAD TO THE ACTION THAT ENSUED VIA

4   THE SUBJECT GARNISHMENT.

5        DID --

6   A.   YES.

7   Q.   -- HE TELL YOU THAT?

8   A.   YES, ALONG WITH THE FACT THAT HE UTILIZED AN ATTORNEY,

9   ANOTHER ATTORNEY IN HIS LAW FIRM -- I BELIEVE DONNA -- I CAN'T

10  REMEMBER HER LAST NAME -- I THINK SO TO HELP IN HAVING THIS

11  GARNISHMENT RELEASED, WHICH MADE IT BELIEVABLE THAT WHAT I HAD

12  WRITTEN HERE WAS ACCURATE.

13  Q.   OKAY.  AND AS A RESULT OF THIS, EVIDENCE FROM PLAINTIFF'S

14  ATTORNEY FOR RELEASE IS NOW IN OUR POSSESSION.

15       NOW, IS THAT JUST RELEASE OF THE GARNISHMENT OR --

16  A.   YES.

17  Q.   -- IS THAT RELEASE OF THE WHOLE LAWSUIT?

18  A.   THAT WAS RELEASE OF THE GARNISHMENT.  BECAUSE I DID NOT

19  REALIZE THERE WAS A WHOLE LAWSUIT.

20  Q.   AND NOW I WANT YOU TO READ THIS LAST SENTENCE, PLEASE.

21  A.   UPON CULMINATION OF THIS MATTER, DISCUSSIONS WILL BE HELD

22  WITH BORROWER TO UNDERSTAND FUTURE OBLIGATIONS AND MAKE SURE

23  ALL ARE AWARE.

24  Q.   DID YOU TALK WITH MR. HARDWICK ABOUT THE NEED TO BE

25  COMPLETELY FORTHCOMING?

1    A.    YES.  BECAUSE AFTER THIS EVENT, ADDITIONAL PERSONAL

2    FINANCIAL STATEMENTS AND APPLICATIONS WERE COMPLETED.  AND I

3    REMEMBER SAYING SPECIFICALLY, WHEN WE GET TO THE QUESTION OF

4    WHAT ARE YOUR PERSONAL GUARANTEES, WHAT JUDGMENT SUITS, WHAT

5    HAVE YOU, ARE OUT THERE, ARE YOU SURE THAT WE HAVE EVERYTHING

6    DOWN HERE?  BECAUSE THIS HAS HAPPENED.  IT'S VERY, VERY

7    IMPORTANT THAT WE GET EVERYTHING DOWN ON PAPER.

8    Q.    THANK YOU.  OKAY.  AND SO, AGAIN, THE DATE IS JANUARY

9    11TH, 2012?

10   A.    RIGHT.

11   Q.    LATER IN 2012, DID MR. HARDWICK ATTEMPT TO BORROW MORE

12   MONEY FROM FIRST LANDMARK BANK?

13   A.    YES.

14   Q.    OKAY.  I WANT TO DIRECT YOUR ATTENTION TO THE MAY 2012

15   TIME FRAME.

16          MS. BARRON:  AND, YOUR HONOR, AT THIS TIME I OFFER

17   GOVERNMENT'S 933.

18          MS. NOVAY:  NO OBJECTION.

19          THE COURT:  IT'S ADMITTED.

20   BY MS. BARRON:

21   Q.    OKAY.  AND THE NEXT DOCUMENT IN YOUR STACK SHOULD BE

22   GOVERNMENT'S 933.  I WANT TO START ON THE BOTTOM OF PAGE 5, AND

23   THEN WE WILL CONTINUE ON TO PAGE 6.

24   A.    OKAY.

25   Q.    E-MAILS APPEAR TO BE IN REVERSE ORDER.

1    A.    OKAY.

2    Q.    OKAY.  SO MAY 15TH, 2012, THE SUBJECT:  TWO-STEP LOAN

3    PROPOSAL WITH ONE CLOSING.

4          IS THIS REFERRING TO A LOAN FOR A LINE OF CREDIT?

5    A.    I DON'T BELIEVE THAT WAS A LINE OF CREDIT AT THAT POINT.

6    NOW, BY THAT POINT, I NEED TO EMPHASIZE THE FACT THAT HE HAD

7    PROBABLY REPAID TO THE BANK CLOSE TO $300,000 PERFECTLY.  AT

8    THAT POINT, AFTER THE GARNISHMENT ISSUE, EVERYTHING CLICKED

9    ALONG VERY NICELY.

10         SO WHAT WE WERE LOOKING TO DO WAS TAKE THAT REMAINING

11   BALANCE, ADD SOME FUNDS BACK, BECAUSE IT HAD BEEN PAID DOWN AND

12   THE COLLATERAL STILL HAD THE VALUE.

13         SO I THINK WE WERE PUTTING ONE LOAN ON A TIME NOTE, WHICH

14   MEANS YOU'RE MAKING A LOAN FOR A CERTAIN PERIOD OF TIME, WHERE

15   INTEREST AND PRINCIPAL IS NOT DUE UNTIL THAT TIME PERIOD ENDS;

16   AND THEN YOU'RE MAKING ANOTHER LOAN THAT IS AMORTIZING, MEANING

17   THE PRINCIPAL IS REDUCING WITH REGULAR MONTHLY PAYMENTS.

18   Q.    OKAY.  AND SO IT SAYS:  HI, NAT.  I'M SORRY THAT I HAVE

19   BEEN INTERRUPTED TERRIBLY TODAY.  I HAVE TO CRUNCH SOME

20   NUMBERS, AND AS I WAS WORKING, I CONTINUED TO PUT THOUGHT INTO

21   THIS.

22         BY CRUNCHING NUMBERS, ARE YOU REFERRING TO FIGURING OUT

23   HOW YOU'RE GOING TO WORK THROUGH THIS PLAN THAT YOU'VE JUST

24   TALKED ABOUT?

25   A.    RIGHT.  AND I'M REASSESSING, I'M REPULLING CREDIT, I'M

1    REANALYZING INCOME, I'M CONSTANTLY RECALCULATING THAT CAPACITY

2    TO REPAY DEBT.

3    Q.    OKAY.  AND IF WE TURN TO PAGE 6, WHICH IS WHERE THAT

4    E-MAIL CONTINUES, YOU'RE PROPOSING SOME ITEMS HERE, CORRECT?

5    YOU'RE PROPOSING SOME TERMS?

6    A.    YES.

7    Q.    OKAY.  AND I WANT TO DRAW YOUR ATTENTION TO THE

8    HIGHLIGHTED PORTION ON THE SCREEN.  COULD YOU PLEASE READ THAT?

9    A.    I WOULD NEED A BETTER EXPLANATION OF WHAT HAPPENED WITH

10   THE NETJET JUDGMENT SINCE IT WAS NEW ON YOUR CREDIT REPORT.

11   THIS WAS THE ONLY UNEXPECTED ITEM TO ME THIS TIME.  I THINK

12   YOUR SCORE WOULD HAVE BEEN BETTER WITHOUT THIS.

13   Q.    NOW, HAD HE EVER TOLD YOU ABOUT A JUDGMENT BY NETJETS

14   AGAINST HIM?

15   A.    NO.

16   Q.    OKAY.  WHEN YOU SAY ON YOUR CREDIT REPORT, DID YOU

17   DISCOVER IT BY LOOKING AT --

18   A.    IT POPPED UP LATER.  OVER TIME, YOU CONTINUE TO PULL FRESH

19   CREDIT REPORTS.

20   Q.    OKAY.  AND THEN IF WE LOOK AT PAGE 5, UPWARDS, ON

21   MAY 21ST, YOU'RE ASKING HIM AGAIN?

22   A.    FOR A BETTER EXPLANATION OF THE NETJET JUDGMENT.

23   Q.    OKAY.  AND IF WE LOOK AT THE BOTTOM OF PAGE 4, HE RESPONDS

24   TO THAT E-MAIL.  AND WHAT IS HIS RESPONSE?

25   A.    WHERE ARE WE ON OPTIONS FOR THIS LOAN?  I HAVE THE OTHER

1 BANK BREATHING DOWN MY NECK TO GIVE ME THE 500,000 LINE OF

2 CREDIT NEXT WEEK.  I NEED TO DO SOMETHING.  CAN WE DO A

3 $250,000 LINE OF CREDIT WHILE WE FINALIZE THIS?

4 Q.   HAD HE EXPLAINED ANYTHING ABOUT NETJETS YET?

5 A.   I -- THERE'S NO WAY -- THAT'S TOO SPECIFIC FOR ME TO

6 REMEMBER.

7 Q.   OKAY.  WELL, LET ME SHOW YOU YOUR RESPONSE TO HIS E-MAIL.

8 A.   OKAY.  OBVIOUSLY, I STILL NEEDED AN EXPLANATION.

9 Q.   SO WHAT DO YOU SAY?

10 A.   ALSO, I REALLY NEED A THOROUGH EXPLANATION OF THE NETJET

11 LIEN FOR THE CURRENT FILE AS WELL.

12 Q.   AND IF WE LOOK AT HIS RESPONSE HERE, DOES HE GIVE YOU AN

13 EXPLANATION?

14 A.   NO.

15 Q.   AND THERE'S SOME MORE E-MAIL BACK AND FORTH.  AND THEN

16 LATER THAT DAY, WHAT DOES HE WRITE YOU?

17 A.   CAN I DO ANYTHING SHORT TERM?  TAKE THE LINE OF CREDIT

18 FROM 25 TO 150 JUST SO HE CAN GIVE SOME CASH TO HIS EX WHILE HE

19 WAITS THE 30 DAYS WHILE I'M FINISHING MY ANALYSIS.

20 Q.   AND BY EX, DO YOU UNDERSTAND THAT TO MEAN HIS EX-WIFE?

21 A.   YES, UH-HUH.

22 Q.   AND WERE YOU AWARE THAT HE WAS -- THAT HE HAD A SETTLEMENT

23 AGREEMENT WITH HIS EX-WIFE?

24 A.   YES, UH-HUH.

25 Q.   WERE YOU AWARE OR DID HE TELL YOU THAT HIS LAW FIRM WAS

1    ACTUALLY PAYING HER INSTEAD OF HIM?

2    A.   AT ONE POINT I RECOLLECT HE MIGHT HAVE SAID THAT.

3    Q.   AND IF WE LOOK AT HIS RESPONSE --

4         MS. NOVAY:  YOUR HONOR, I'M GOING TO ACTUALLY OBJECT

5    TO THE CHARACTERIZATION OF THAT.  I THINK MAYBE DISBURSEMENTS

6    WERE COMING TO MY CLIENT THROUGH THE LAW FIRM.  THAT DOESN'T

7    NECESSARILY MEAN THE LAW FIRM WAS FUNDING IT.

8         THE COURT:  I WILL OVERRULE AT THIS TIME.  YOU CAN

9    CLARIFY ON CROSS-EXAMINATION.  I WILL OVERRULE.

10        MS. NOVAY:  THANK YOU.

11   BY MS. BARRON:

12   Q.   MS. KORNEGAY-TYLER, LATER, ON THE 25TH, WHAT DOES HE SAY

13   ABOUT NETJET?

14   A.   THE REP FROM NETJET SET UP A DEAL SO MY EX COULD NOT GET

15   FLIGHT INFO FOR DIVORCE.  HE SAID I COULD GET OUT OF IT AT ANY

16   TIME.  HE LEFT COMPANY, AND THEY TRIED TO CHARGE ME EVEN THOUGH

17   I NEVER USED IT.

18   Q.   AND WHY DO YOU CARE ABOUT THIS NETJET PAYMENT AT THIS

19   TIME?

20   A.   WELL, WHILE IT'S NOT AN INSTITUTIONAL OBLIGATION, IT --

21   YOU KNOW, IT DOESN'T RANK AS HIGH AS SOMETHING LIKE THE D&H

22   DEVELOPMENT OBLIGATION, BUT IT'S SOMETHING HE'S OBLIGATED TO

23   PAY.  AND HERE WE GO AGAIN WITH THAT CAPACITY OF WHAT CAN A

24   PERSON AFFORD ON A MONTHLY BASIS TO COVER THEIR OBLIGATIONS.

25   AND THAT CALCULATION IS NO GOOD IF YOU DON'T KNOW ALL OF THOSE

1 OBLIGATIONS.

2 Q. AND IF WE LOOK AT YOUR RESPONSE?

3 A. KNOWING IT RELATES TO YOUR DIVORCE HELPS, BUT WAS YOUR EX

4 FLYING AROUND AND THEY ARE TRYING TO CHARGE YOU FOR HER FLIGHTS

5 WHEN YOU DIDN'T AGREE TO PAY FOR THEM? DID YOU GET SOMETHING

6 IN WRITING THAT YOU WEREN'T RESPONSIBLE?

7 Q. AND HE SAYS?

8 A. HE CAME BACK TO ME ON THAT AND SAID THAT HE WOULD GET

9 SOMETHING FROM NETJETS. AND THEN NETJETS DID SEND A LETTER.

10 AND IT WAS NOT REAL DETAILED, BUT IT SAID THAT THEY HAD WORKED

11 OUT SOME SORT OF AGREEMENT, THAT THEY WERE SATISFIED OR

12 SOMETHING.

13 Q. RIGHT. BUT MY QUESTION IS: WHAT IS HIS RESPONSE HERE?

14 A. NO. IT WAS GOING TO BE FOR ME BUT WAS NOT USED.

15 Q. OKAY. SO YOU UNDERSTOOD THAT THERE WAS SOME KIND OF

16 PAYMENT SCHEDULE THAT HAD BEEN AGREED TO?

17 A. AT THAT POINT IN TIME, I DID. AND I REQUESTED

18 SUBSTANTIATION OF IT.

19 Q. OKAY. AND THEN DO YOU LATER WRITE BACK: CAN YOU GET

20 SOMETHING IN WRITING THAT SAYS YOU DON'T OWE IT?

21 A. RIGHT.

22 Q. WAS HE EVER ABLE TO GET YOU ANYTHING IN WRITING TO SAY

23 THAT HE DID NOT OWE THE DEBT?

24 A. LIKE I SAID, I GOT THAT LETTER. I DON'T BELIEVE THE

25 LETTER SAID HE DIDN'T OWE IT. YOU KNOW, I JUST -- I REALLY

1    WISH I COULD SEE THAT LETTER.  BUT THE LETTER GAVE ME A LOT OF

2    COMFORT.

3    Q.   OKAY.

4    A.   BUT I THINK -- I THINK THAT HE STILL OWED PAYMENTS,

5    BECAUSE IT CAME UP LATER.

6    Q.   AND THEN DID HE ULTIMATELY --

7         MS. BARRON:  WELL, ACTUALLY, YOUR HONOR, I OFFER

8    GOVERNMENT'S 934 UNDER OUR AGREEMENT.

9         MS. NOVAY:  NO OBJECTION.

10        THE COURT:  ALL RIGHT.  IT'S ADMITTED.

11   BY MS. BARRON:

12   Q.   MS. TYLER, THIS NEXT DOCUMENT --

13   A.   YES.

14   Q.   -- IS THIS ONE OF THOSE PERSONAL FINANCIAL STATEMENTS?

15   A.   IT CERTAINLY IS.

16   Q.   AND WHAT'S THE DATE OF THIS ONE?

17   A.   MAY 31ST OF '12.

18   Q.   OKAY.  AND I WANT TO TURN TO PAGE 3.  WHAT DATE IS THIS

19   ACTUALLY SIGNED?

20   A.   JULY 2ND OF '12.

21   Q.   AND WHO SIGNS IT?

22   A.   NAT HARDWICK.

23   Q.   AND IF YOU COULD PLEASE READ THE PORTION THAT I HAVE

24   HIGHLIGHTED RIGHT HERE.

25   A.   THE UNDERSIGNED HAS CAREFULLY READ THE INFORMATION

1  CONTAINED HEREIN AND WARRANTS IT TO BE COMPLETE, TRUE, CORRECT

2  AS OF THE FOLLOWING DATE, AND THAT THE LENDER MAY CONTINUE TO

3  RELY UPON THE STATEMENT AS CONTINUING TO BE TRUE AND CORRECT

4  UNTIL A WRITTEN NOTICE OF CHANGE IS GIVEN TO LENDER BY THE

5  UNDERSIGNED.

6  Q.   OKAY.  AND THEN IS THERE A PLACE ON THIS FORM WHERE HE IS

7  SUPPOSED TO LIST -- IF WE LOOK AT THE TOP, A PLACE TO LIST YOUR

8  REAL ESTATE?  DO YOU SEE THAT?

9  A.   YES.

10  Q.   AND THEN OTHER DEBTS OR ACCOUNTS PAYABLE.  DO YOU SEE

11  THAT?

12  A.   YES.

13  Q.   AND THEN THERE'S THIS SECTION CALLED CONTINGENT

14  LIABILITIES?

15  A.   RIGHT.

16  Q.   PLEASE LIST ALL DEBTS TO INSTITUTIONS OR INDIVIDUALS THAT

17  YOU PERSONALLY GUARANTEE OR COSIGN FOR?

18  A.   RIGHT.

19  Q.   OKAY.  NOW, IS THIS THE PLACE WHERE, IF YOU HAVE A

20  JUDGMENT AGAINST YOU, THAT YOU SHOULD LIST IT?

21  A.   RIGHT.  AS WELL AS ANY OBLIGATIONS THAT YOU HAVE

22  GUARANTEED.  AND THE MAJORITY OF THE TIME, THAT WOULD BE A

23  BUSINESS THAT YOU OWN OR YOU HAVE AN INTEREST IN.

24  Q.   OKAY.  SO MR. HARDWICK LISTS D&H DEVELOPMENT HERE, RIGHT?

25  A.   UH-HUH, RIGHT.

1  Q.  DOES HE LIST THE BELLAGIO JUDGMENT?

2  A.  NO.

3  Q.  DO YOU KNOW THAT THAT EXISTS AT THIS POINT IN TIME?

4  A.  NO.

5      MS. BARRON:  YOUR HONOR, AT THIS TIME I OFFER

6  GOVERNMENT'S 302 UNDER AGREEMENT.

7      MS. NOVAY:  NO OBJECTION.

8      THE COURT:  IT'S ADMITTED.

9  BY MS. BARRON:

10  Q.  MS. TYLER, THE NEXT DOCUMENT IN YOUR STACK IS A SERIES --

11  WELL, IT'S NOT REALLY A SERIES.  IT IS AN E-MAIL FROM YOU,

12  GOVERNMENT'S EXHIBIT 305.  DO YOU SEE THIS?

13      MS. NOVAY:  I'M SORRY, YOUR HONOR.  JUST TO CLARIFY,

14  I THINK SHE SAID 302.  I WAS THINKING 305.  IT SOUNDS LIKE THE

15  GOVERNMENT WAS ALSO THINKING 305.

16      MS. BARRON:  I'M SORRY.  IF I SAID 302, I MISSPOKE.

17  I APOLOGIZE.  BUT IT'S 305.

18      THE COURT:  ANY OBJECTION TO THAT?

19      MS. NOVAY:  NO, YOUR HONOR.

20      THE COURT:  OKAY.  SO WHICH ONE -- I'M SORRY.  WHICH

21  ONE CAME IN?

22      MS. BARRON:  305.

23      THE COURT:  ALL RIGHT.  IT'S ADMITTED.

24  BY MS. BARRON:

25  Q.  OKAY.  MS. KORNEGAY-TYLER, WHAT IS THE DATE OF THIS E-MAIL

1  FROM YOU TO HIM?

2  A.  JUNE 8TH OF '12.

3  Q.  OKAY.  SO IS THIS STILL IN THAT SAME TIME PERIOD AS THE

4  PERSONAL FINANCIAL STATEMENT WE WERE LOOKING AT?

5  A.  YES.

6  Q.  OKAY.  NOW, IT LOOKS LIKE YOU HAVE ASKED A SERIES OF

7  QUESTIONS HERE, CORRECT?

8  A.  RIGHT.

9  Q.  AND THEN HE RESPONDS:  SEE BELOW ANSWER.

10  DOES THAT MEAN THAT HE EMBEDDED HIS ANSWERS INTO THE

11  E-MAIL?

12  A.  RIGHT.

13  Q.  OKAY.  IF YOU WOULD LOOK AT THE HIGHLIGHTED PORTION HERE,

14  YOU ASK HIM:  DO YOU HAVE A LINE OF CREDIT WITH SUNTRUST FOR

15  1.4 MILLION BALANCE AND THE 750,000 ALSO FOR A DEFICIENCY ON

16  YOUR OLD LAKE OCONEE HOME?

17  WHAT IS HIS RESPONSE?

18  A.  IT IS A BUSINESS LINE OF CREDIT PAID BY MHS.

19  HE MEANT THE LAW FIRM MORRIS HARDWICK SCHNEIDER.

20  Q.  OKAY.  AND DO YOU UNDERSTAND HIM TO BE SAYING THAT THE

21  $1.4 MILLION BALANCE AND THE 750 IS A BUSINESS LINE OF CREDIT?

22  A.  YES, I DO.  AND I KNOW THERE WAS, BECAUSE I HAD THE

23  FINANCIAL STATEMENTS ON THE FIRM.

24  Q.  OKAY.  THANK YOU.

25  MS. BARRON:  AND NOW, YOUR HONOR -- WELL, ACTUALLY,

1    BEFORE I GET THERE --

2    BY MS. BARRON:

3    Q.   SO THAT'S IN 2012.  IN 2013, DID HE COME BACK TO SEEK

4    MONEY FROM FIRST LANDMARK IN ORDER TO PURCHASE A HOME?

5    A.   YES.

6    Q.   AND WAS THAT FOR A CONDOMINIUM AT THE ST. REGIS HOTEL IN

7    BUCKHEAD?

8    A.   YES.

9         MS. BARRON:  YOUR HONOR, AT THIS TIME I OFFER

10   GOVERNMENT'S 753.

11        MS. NOVAY:  NO OBJECTION.

12        THE COURT:  IT'S ADMITTED.

13   BY MS. BARRON:

14   Q.   OKAY.  MS. KORNEGAY-TYLER, THE NEXT DOCUMENT IN YOUR STACK

15   IS GOVERNMENT'S 753.  AND THIS LOOKS A LITTLE DIFFERENT THAN

16   THE OTHER DOCUMENTS WE'VE LOOKED AT.

17        WHAT IS UNIVERSAL CREDIT APPLICATION FOR CONSUMER REAL

18   ESTATE?  WHAT IS THIS APPLICATION FOR?

19   A.   THIS IS A SPECIFIED DOCUMENT FOR THE PURCHASE OF -- THE

20   PURPOSE OF PURCHASING A RESIDENTIAL PROPERTY OR REFINANCING OR

21   SECURING A LOAN AGAINST RESIDENTIAL PROPERTY.

22   Q.   OKAY.  AND WHO IS THE APPLICANT?

23   A.   NATHAN E. HARDWICK IV.

24   Q.   AND HOW MUCH CREDIT IS HE SEEKING?

25   A.   2,425,000.

1  Q.  NOW, WAS THAT THE ENTIRE PURCHASE PRICE OF THIS PROPERTY?

2  A.  OH, NO.  UNH-UNH.

3  Q.  OKAY.  ARE YOU AWARE IF HE ALSO PUT DOWN A DOWN PAYMENT?

4  A.  YES, UH-HUH.

5  Q.  OKAY.  AND WHERE IS THE PROPERTY LOCATED?

6  A.  88 WEST PACES FERRY ROAD, UNIT 1820, ATLANTA.

7       MS. BARRON:  COULD WE SWITCH TO THE COMPUTER VERY

8  QUICKLY?  COULD YOU PLEASE BRING UP GOVERNMENT'S 1004,

9  PAGE 493?

10  BY MS. BARRON:

11  Q.  I'M SHOWING YOU AN EXHIBIT THAT HAS ALREADY BEEN ADMITTED.

12       MS. BARRON:  AND IF YOU COULD PLEASE ENLARGE IT.

13  BY MS. BARRON:

14  Q.  MS. KORNEGAY-TYLER, I WILL REPRESENT TO YOU THAT ANOTHER

15  WITNESS HAS SAID THIS IS WIRE TRANSFER --

16  A.  YES.

17  Q.  -- FOR $680,000.

18  A.  YES.

19  Q.  AND IF YOU LOOK AT THE SEND DATE, FEBRUARY 21ST, 2013.

20  A.  THIS IS A FORM THAT I'M NOT USED TO LOOKING AT.

21  Q.  I UNDERSTAND THAT.  THIS IS A DOCUMENT THAT YOU HAVE NOT

22  SEEN.

23  A.  RIGHT.

24  Q.  BUT IF YOU LOOK AT -- ON THE RIGHT SIDE, IT SHOWS CAMPBELL

25  & BRANNON?

1  A.   RIGHT.

2  Q.   ARE YOU FAMILIAR WITH CAMPBELL & BRANNON?

3  A.   OH, ABSOLUTELY.

4  Q.   WHO WAS CAMPBELL & BRANNON IN CONNECTION TO MR. HARDWICK'S

5  REAL ESTATE LOAN?

6  A.   PARDON?

7  Q.   WHO WAS CAMPBELL & BRANNON IN CONNECTION WITH THIS REAL

8  ESTATE LOAN?

9  A.   THAT'S A VERY WELL-KNOWN LAW FIRM IN THE BUCKHEAD AREA

10  THAT HANDLES A LOT OF RESIDENTIAL CLOSINGS AND HANDLES A LOT OF

11  VERY HIGH-END RESIDENTIAL CLOSINGS, IN THE MILLIONS, THAT I

12  HAVE WORKED WITH OVER THE YEARS AND THAT I WANTED TO ENGAGE ON

13  BEHALF OF THE BANK TO REPRESENT THE BANK IN SECURING A FIRST

14  MORTGAGE ON THAT PROPERTY FOR PURCHASE MONEY PURPOSES.

15  Q.   OKAY.  SO IS THIS $680,000, WOULD THAT BE THE DOWN PAYMENT

16  TO THIS BANK?

17  A.   RIGHT.  CORRECT.

18        MS. BARRON:  IF WE COULD SWITCH BACK TO THE ELMO.

19        THE WITNESS:  THERE MAY HAVE BEEN SOME OTHER EARNEST

20  MONEY ON TOP OF THAT.  BUT I HAVEN'T SEEN THE PURCHASE CONTRACT

21  IN A NUMBER OF YEARS, SO I CAN'T SPEAK TO THAT.

22  BY MS. BARRON:

23  Q.   OKAY.  SO I'M GOING TO GO BACK TO GOVERNMENT'S 753.  AND I

24  WANT TO TURN YOUR -- WELL, LET'S GO TO THE LAST PAGE FIRST.

25  WE'RE LOOKING AT PAGE 5.

1    WHAT IS THE DATE THAT THIS UNIVERSAL CREDIT APPLICATION IS

2    SIGNED?

3    A.    FEBRUARY 4TH OF '13.

4    Q.    WHO SIGNS IT?

5    A.    NAT HARDWICK.

6    Q.    AND NOW, IF YOU CAN READ IT, IF YOU WOULD PLEASE READ TO

7    THE JURY THE HIGHLIGHTED PORTION UNDER 12, ACKNOWLEDGMENT AND

8    AGREEMENT.

9    A.    EACH OF THE UNDERSIGNED SPECIFICALLY REPRESENTS TO LENDER

10   AND TO LENDER'S ACTUAL OR POTENTIAL AGENTS, BROKERS,

11   PROCESSORS, ATTORNEYS, INSURERS, SERVICERS, SUCCESSORS, AND

12   ASSIGNS AND AGREES AND ACKNOWLEDGES THAT THE INFORMATION

13   PROVIDED IN THIS APPLICATION IS TRUE AND CORRECT AS OF THE DATE

14   SET FORTH OPPOSITE MY SIGNATURE AND THAT ANY INTENTIONAL OR

15   NEGLIGENT MISREPRESENTATION OF THIS INFORMATION CONTAINED IN

16   THIS APPLICATION MAY RESULT IN CIVIL LIABILITY, INCLUDING

17   MONETARY DAMAGES, TO ANY PERSON WHO MAY SUFFER ANY LOSS DUE TO

18   RELIANCE UPON ANY MISREPRESENTATION THAT I HAVE MADE ON THIS

19   APPLICATION, OR -- AND/OR IN CRIMINAL PENALTIES, INCLUDING BUT

20   NOT LIMITED TO FINE OR IMPRISONMENT OR BOTH, UNDER THE

21   PROVISIONS OF TITLE 18, UNITED STATES CODE, SECTION 1001,

22   ET SEQUENCE 2 -- BLAH, BLAH, BLAH.

23   Q.    AND IS THIS ANOTHER EXAMPLE OF THE BANK TELLING BORROWERS

24   THAT THEY HAVE TO BE FORTHCOMING IN THE INFORMATION THAT THEY

25   DISCLOSE?

1  A.   RIGHT.  AND THAT'S VERY STANDARD.  THAT -- THIS IS PRETTY

2  MUCH A GOVERNMENT-DRIVEN FORM FOR MORTGAGE APPLICATIONS.

3  Q.   I WANT TO TURN YOUR ATTENTION TO SECTION 8.  THIS IS ON

4  PAGE 3 AT THE BOTTOM.  DO YOU SEE UNDER 8-A, WHERE IT SAYS:

5  ARE THERE ANY OUTSTANDING JUDGMENTS AGAINST YOU?

6       DO YOU SEE THAT?

7  A.   YES.

8  Q.   AND WHAT IS MR. HARDWICK'S RESPONSE?

9  A.   YES.

10  Q.   NOW, DID HE TYPE IN THAT X OR DID YOU?

11  A.   NO.  I TYPED THAT IN.  BUT IT WAS FROM A FACE-TO-FACE

12  INTERVIEW.

13  Q.   SO WOULD HE HAVE GIVEN YOU THE INFORMATION THAT LED YOU TO

14  KNOW WHICH BOX TO CHECK?

15  A.   YES.  BUT BY, YOU KNOW, THIS TIME, I KNEW ABOUT THE NETJET

16  ISSUE.

17  Q.   YES, MA'AM.  I'M JUST ASKING --

18  A.   RIGHT.

19  Q.   -- WOULD YOU HAVE RECEIVED THE INFORMATION FROM HIM?

20  A.   RIGHT.  RIGHT.

21  Q.   AND SO HE SAYS YES.  AND IS THERE AN OPPORTUNITY LATER IN

22  THIS DOCUMENT TO EXPLAIN WHAT IS MEANT BY YES?

23  A.   YES.

24  Q.   OKAY.  AND ON D, ARE YOU A PARTY TO A LAWSUIT, WHAT ANSWER

25  DOES HE TELL YOU TO PROVIDE?

1  A.   NO.

2  Q.   OKAY.  AND THEN IF WE LOOK, DECLARATIONS CONTINUED, 8-H:

3  IS ANY PART OF THE DOWN PAYMENT BORROWED?

4  A.   NO.

5  Q.   WHAT'S THE RESPONSE?

6  A.   NO.

7  Q.   OKAY.  NOW, IN SECTION 9, CONTINUATION AND ADDITIONAL

8  INFORMATION, IS THIS THE PLACE WHERE YOU WOULD EXPLAIN ANY BOX

9  THAT YOU HAD CHECKED IN SECTION 8?

10  A.   RIGHT.

11  Q.   OKAY.  AND SO WHAT OBLIGATIONS DOES HE EXPLAIN IN BOX 8?

12  A.   MONTHLY ALIMONY ENDING IN JUNE OF '13.  CERTAIN INVESTMENT

13  PROPERTIES AND OTHER ASSETS ARE HELD IN BUSINESS ENTITY, NAMES

14  THAT HE GUARANTEES.

15  Q.   DOES THAT MEAN THE D&H DEVELOPMENT?

16  A.   RIGHT.

17  Q.   OKAY.

18  A.   FORMER SECOND HOME SOLD UNDER SHORT SALE.  JUDGMENT WHERE

19  RELATED TO PROPERTY INVESTMENTS IS RESOLVED, WITH DOCUMENTATION

20  PROVIDED AND AVAILABLE.  CERTAIN TAX LIENS WERE NOT REMOVED

21  FROM CREDIT FILE AND PREVIOUSLY PAID.  CONTRACT DISPUTE WITH

22  NETJET, CURRENTLY UNDER FINAL RESOLUTION.

23  Q.   OKAY.  ANY MENTION OF THE BELLAGIO JUDGMENT --

24  A.   NO.

25  Q.   -- HERE?

1  A.   NO.

2  Q.   AND IS THAT SOMETHING THAT YOU WOULD HAVE WANTED TO KNOW

3  IN DECIDING WHETHER TO EXTEND A $2.4 MILLION HOME LOAN TO

4  MR. HARDWICK?

5  A.   YES, DEFINITELY.

6        MS. BARRON:  YOUR HONOR, AT THIS TIME I ALSO WANT TO

7  OFFER GOVERNMENT'S 747.

8        MS. NOVAY:  NO OBJECTION, YOUR HONOR.

9        THE COURT:  IT'S ADMITTED.

10  BY MS. BARRON:

11  Q.   MS. KORNEGAY-TYLER, I DON'T KNOW IF YOU HAVE EVER SEEN

12  THIS DOCUMENT.

13  A.   I DON'T BELIEVE I HAVE.

14  Q.   OKAY.  WHO IS THE PLAINTIFF IN THIS -- WELL, LET'S START

15  BACK.

16        DOES THIS APPEAR TO BE A LAWSUIT FILED IN SUPERIOR COURT

17  OF COBB COUNTY?

18  A.   YES.

19  Q.   AND WHO IS THE PLAINTIFF?

20  A.   FIRST CITIZENS BANK & TRUST COMPANY.

21  Q.   WHO IS THE DEFENDANT?

22  A.   NATHAN E. HARDWICK IV.

23  Q.   WHAT IS THE DATE?

24  A.   JUNE 19TH OF 2012.

25  Q.   AND WHAT IS THE TITLE OF THIS DOCUMENT?

1   A.   FINAL JUDGMENT AND ORDER.

2   Q.   AND IF YOU WOULD READ "NOW, THEREFORE." IF YOU WOULD

3   READ.

4   A.   NOW, THEREFORE, THE COURT HEREBY ENTERS JUDGMENT IN FAVOR

5   OF PLAINTIFF FIRST CITIZENS BANK & TRUST COMPANY, INC., AND

6   AGAINST DEFENDANT NATHAN -- MAYBE THAT IS AN E; IT DOESN'T LOOK

7   LIKE IT -- HARDWICK IV IN THE AMOUNTS OF $500,000 IN PRINCIPAL,

8   49,667.85 IN INTEREST, 1,802.57 IN LOAN EXPENSES, AND 82,450.18

9   IN ATTORNEY'S FEES, FOR A JUDGMENT IN THE TOTAL AMOUNT OF

10  $633,920.59.  FIRST CITIZENS BANK & TRUST COMPANY SHALL BE

11  ENTITLED TO ALL RIGHTS AND BENEFITS CONFERRED UPON IT BY

12  O.C.G.A. 7-4-12 PERTAINING TO COLLECTION OF INTEREST ON

13  JUDGMENTS.

14  Q.   WHAT'S THE DATE OF THE JUDGMENT?

15  A.   JUNE 19TH, 2012.

16  Q.   OKAY.  AND NOW I WANT TO TURN YOUR ATTENTION TO PAGE 4 OF

17  THIS DOCUMENT.  DO YOU SEE WHERE IT SAYS SETTLEMENT AGREEMENT

18  AT THE TOP?

19  A.   YES.

20  Q.   AND WHAT IS THE DATE OF THE SETTLEMENT AGREEMENT?

21  A.   SEPTEMBER 17TH, 2012.

22  Q.   OKAY.  AND THEN I'M JUST SCROLLING DOWN SO YOU CAN SEE

23  THIS DOCUMENT.  I'M TURNING YOUR ATTENTION TO PAGE 5.

24       ACKNOWLEDGEMENTS BY BORROWER.  BORROWER ACKNOWLEDGES AND

25  AGREES THAT FOR THE PURPOSE OF THIS AGREEMENT, THE AMOUNT OWED

1   TO THE LENDER -- THAT WOULD BE FIRST CITIZENS BANK -- BY

2   BORROWER IS -- THIS AMOUNT RIGHT HERE, $644,449.75.  DO YOU SEE

3   THAT?

4   A.   YES.

5   Q.   AND THEN DO YOU SEE WHERE HE AGREES TO PAY AN INITIAL

6   PAYMENT OF $100,000?

7   A.   YES.

8   Q.   AND THEN HE AGREES TO MAKE MONTHLY PAYMENTS IN THE AMOUNT

9   OF $60,000?

10  A.   YES.

11  Q.   AND THEN TURNING --

12         (WHEREUPON, THE ATTORNEYS ARE CONFERRING.)

13  BY MS. BARRON:

14  Q.   OKAY.  NOW, I'M TURNING YOUR ATTENTION TO PAGE 11.  DO YOU

15  SEE, IN WITNESS THEREOF, THE PARTIES HAVE AGREED -- NOW,

16  MR. HARDWICK DOES NOT SIGN THIS?

17  A.   RIGHT.

18  Q.   DO YOU SEE THAT?

19  A.   YES.

20  Q.   IN FILLING OUT HIS RESIDENTIAL LOAN, DID MR. HARDWICK TELL

21  YOU THAT HE HAD A $600,000-PLUS JUDGMENT BY FIRST CITIZENS

22  AGAINST HIM?

23  A.   I DON'T RECALL HIM EVER TELLING ME 600,000.  I DO RECALL

24  AT SOME POINT WE DISCUSSED, BASED ON THE FACT THAT I THOUGHT

25  THAT HE HAD A MINORITY INTEREST OF 15 PERCENT --

1   Q.   THAT'S RELATED TO THE D&H DEVELOPMENT LAWSUIT, WHICH WE

2   ALREADY TALKED ABOUT.  I'M TALKING ABOUT A DIFFERENT JUDGMENT,

3   FIRST CITIZENS BANK & TRUST.

4   A.   RIGHT.  THEN NO.

5   Q.   DID HE DISCLOSE THAT IN SECTION 9, CONTINUATION AND

6   ADDITIONAL INFORMATION, WHERE HE'S SUPPOSED TO LIST THE

7   JUDGMENTS AGAINST HIM?

8                MS. NOVAY:  YOUR HONOR --

9                THE WITNESS:  NO.

10               MS. NOVAY:  IF WE COULD APPROACH, THAT'S PROBABLY A

11   BETTER WAY TO HANDLE IT.

12               (WHEREUPON, A BENCH CONFERENCE OUT OF THE HEARING OF

13   THE JURY PROCEEDED AS FOLLOWS:)

14               MS. NOVAY:  YOUR HONOR, THIS IS GETTING A LITTLE

15   CONFUSING IN THE SENSE THAT THIS LINE OF CREDIT OR LOAN ISN'T

16   PART OF COUNTS 23 -- ACTUALLY, WE ARE ON 24.  THIS ISN'T PART

17   OF COUNT 24, THE FAILURE TO DISCLOSE.  THIS IS NOT PART OF

18   THAT.  IT'S ONLY THE BELLAGIO AND THE --

19               THE COURT:  BUT SHE HAD AN ESTABLISHED RELATIONSHIP

20   WITH HIM WHERE HE IS SEEKING SEVERAL LOANS.  SO SHE'S GOING

21   BACK AND FORTH, STUFF IS POPPING UP ON HIS CREDIT REPORT.  SO

22   THIS IS INTERTWINED.

23               MS. NOVAY:  OKAY.  THAT'S MY OBJECTION.

24               (WHEREUPON, PROCEEDINGS RESUMED IN OPEN COURT AS

25   FOLLOWS:)

1    THE COURT: OVERRULED.

2    BY MS. BARRON:

3    Q.   AND SO IT'S NOT DISCLOSED ON THE HOME APPLICATION THAT WE

4    DISCUSSED, BUT DID YOU AT SOME POINT LEARN THAT MR. HARDWICK

5    WAS OBLIGATED TO MAKE THESE $60,000 MONTHLY PAYMENTS?

6    A.   NOT PAYMENTS THAT LARGE, NO.

7    MS. BARRON:  OKAY.  NOW I WANT TO OFFER UNDER

8    AGREEMENT GOVERNMENT'S 910, PLEASE.

9    MS. NOVAY:  NO OBJECTION.

10    THE COURT:  IT'S ADMITTED.

11    BY MS. BARRON:

12    Q.   MS. KORNEGAY-TYLER, IF YOU WOULD LOOK AT, IN YOUR STACK,

13    THIS IS GOVERNMENT'S 910.  AND THIS IS AN E-MAIL EXCHANGE

14    BETWEEN YOU AND MR. HARDWICK.  AND I WANT TO SPECIFICALLY TURN

15    YOUR ATTENTION TO PAGE 3.

16    DO YOU SEE THIS E-MAIL DATED FEBRUARY 20TH, 2013?

17    A.   RIGHT.

18    Q.   OKAY.  AND ARE Y'ALL DISCUSSING IN THIS E-MAIL THE CLOSING

19    ON THE HOME LOAN, THE ST. REGIS PROPERTY?

20    A.   YES.

21    Q.   OKAY.  AND DO YOU SEE HERE WHERE YOU SAY, CLOSING

22    INSTRUCTIONS TO CAMPBELL & BRANNON?

23    A.   CORRECT.

24    Q.   OKAY.  AND THEN ON THE NEXT PAGE, SAME DATE, DO YOU SEE

25    WHERE YOU SAY:  ON NBG, DO YOU HAVE SOMETHING THAT SAYS THEY

1  WANT COME BACK ON YOU AGAIN FOR SOME TYPE OF SUIT OR JUDGMENT?

2  I KNOW NOTHING IS IN YOUR NAME, AND THAT MAKES SENSE.

3      WHAT WERE YOU WANTING FROM HIM?

4  A.   THAT WAS SUPPOSED TO BE WON'T, W-O-N, APOSTROPHE, T.

5      BECAUSE THE LOAN WAS TO THE ENTITY, AND I DID NOT REALIZE

6  THAT HE HAD PERSONALLY GUARANTEED THE LOAN, BUT I DO RECALL

7  THAT HE AGREED TO SOME PAYMENT ON THE SIDE THAT WAS RELATIVELY

8  SMALL.  I SEEM TO REMEMBER I MIGHT HAVE COUNTED A MONTHLY

9  OBLIGATION AGAINST HIM FOR THAT BECAUSE HE JUST MADE A SIDE

10  AGREEMENT WITH THEM.

11  Q.   DO YOU SEE WHERE HE SAYS IN RESPONSE:  I SETTLED NBG AND

12  THAT'S WHY THEY DISMISSED CASE?

13  A.   RIGHT.

14  Q.   DID YOU TAKE THAT TO MEAN THAT HE'S TELLING YOU THAT THE

15  LAWSUIT HAD BEEN DISMISSED?

16  A.   AT THAT POINT IN TIME, I DON'T THINK I EVER REALIZED THERE

17  WAS A SUIT.  I FELT LIKE HE WORKED SOMETHING OUT, LIKE I SAID,

18  ON THE SIDE WITH THEM SO THEY WOULD NOT FILE A SUIT.

19  Q.   OKAY.  OKAY.  DID HE ATTEMPT TO BORROW MONEY AGAIN IN 2014

20  FROM FIRST LANDMARK BANK?

21  A.   YES.

22  Q.   OKAY.  AND WAS -- IN PARTICULAR, WAS THERE A RELATIONSHIP

23  BETWEEN YOU AND AN ENTITY CALLED ANGEL OAK MORTGAGE?

24  A.   A REFERRAL RELATIONSHIP, YES.

25  Q.   EXPLAIN TO THE JURY WHAT YOU MEAN BY A REFERRAL

1 RELATIONSHIP.

2 A.   WELL, AT THAT PARTICULAR POINT IN TIME, WHAT YOU HAVE TO

3 UNDERSTAND IS, FIRST LANDMARK BANK WAS A VERY SMALL BANK,

4 APPROXIMATELY 250 MILLION IN ASSETS, NOT A BIG BILLION-DOLLAR

5 BANK.  AND AT THAT POINT IN TIME, YOU COULD NOT EVEN GET

6 REGULATORY APPROVAL TO FORM A MORTGAGE COMPANY, LIKE THE LARGER

7 BANKS HAVE.

8      SO WHEN SOMEONE REQUESTS A MORTGAGE -- WHICH THAT REQUEST

9 WAS FOR ANOTHER MORTGAGE -- IT WAS JUST TOO LARGE FOR US TO

10 HANDLE.  AND SO, OFTEN, I WOULD UTILIZE OTHER ENTITIES TO MAKE

11 REFERRALS OF MY CLIENTS, BECAUSE THEY MAY HAVE CLIENTS THAT

12 THEY MAY REFER BACK TO ME.  IT WAS JUST GOOD BUSINESS

13 DEVELOPMENT.

14      SO BECAUSE IT WAS A LARGE MORTGAGE, I REFERRED THE

15 RELATIONSHIP.

16           MS. BARRON:  OKAY.  YOUR HONOR, AT THIS TIME I'D

17 OFFER GOVERNMENT'S 952.

18           MS. NOVAY:  I'M SORRY, YOUR HONOR.  I'M JUST CHECKING

19 MY NOTES.

20           THE COURT:  THAT'S ALL RIGHT.  OKAY.

21           MS. NOVAY:  NO OBJECTION.

22           THE COURT:  IT'S ADMITTED.

23 BY MS. BARRON:

24 Q.   MS. KORNEGAY-TYLER, THE NEXT DOCUMENT IN YOUR STACK IS

25 GOVERNMENT'S 952.  IS THIS AN ADDITIONAL PERSONAL FINANCIAL

1 STATEMENT?

2 A.   YES.

3 Q.   THAT MR. HARDWICK FILLED OUT?

4 A.   YES.

5 Q.   WHAT'S THE DATE OF THIS STATEMENT?

6 A.   MARCH 1ST OF '14.

7 Q.   AND IF WE TURN TO PAGE 3, AT THE BOTTOM, WHAT'S THE DATE

8 THAT THIS WAS SIGNED?

9 A.   MARCH 14TH OF '14.

10 Q.   AND WHO SIGNED IT?

11 A.   NAT HARDWICK.

12 Q.   OKAY.  OKAY.  NOW, IS MR. HARDWICK -- EVERY TIME HE FILLS

13 OUT A PERSONAL FINANCIAL STATEMENT, IS HE STILL OBLIGATED TO

14 INCLUDE TRUTHFUL INFORMATION?

15 A.   YES, UH-HUH.

16 Q.   I WANT TO FOCUS YOUR ATTENTION ON THIS SECTION RIGHT HERE

17 WHERE IT SAYS, CONTINGENT LIABILITIES.

18 A.   YES.

19 Q.   OKAY.  SO HE'S LISTING THE D&H DEVELOPMENT.  WHAT DOES HE

20 SAY IS HIS MONTHLY PAYMENT?

21 A.   7,000.  THAT'S WHAT I WAS TRYING TO REMEMBER EARLIER.

22 Q.   OKAY.  WOULD IT HAVE BEEN OF INTEREST TO YOU, WOULD IT

23 HAVE MATTERED TO YOU IF HIS MONTHLY PAYMENT WAS ACTUALLY

24 SIGNIFICANTLY HIGHER THAN THAT?

25 A.   YES.

1   Q.  IF IT WAS ACTUALLY $25,000 A MONTH, WOULD YOU HAVE WANTED

2   TO KNOW THAT?

3   A.  YES.

4   Q.  ANY MENTION OF THE BELLAGIO JUDGMENT HERE?

5   A.  NO.

6   Q.  AT SOME POINT DID YOU LEARN THAT THERE -- THAT

7   MR. HARDWICK HAD A JUDGMENT BY THE BELLAGIO -- OR A JUDGMENT

8   ENTERED AGAINST HIM INVOLVING THE BELLAGIO?

9   A.  I NEVER KNEW THAT UNTIL MY FIRST INTERVIEW WITH YOUR

10  OFFICE.

11       MS. BARRON:  YOUR HONOR, AT THIS TIME I WANT TO OFFER

12  GOVERNMENT'S 957.  AND WE HAVE AGREED THAT WE WILL ONLY BE

13  OFFERING PAGE 9.

14       MS. NOVAY:  NO OBJECTION.

15       THE COURT:  ALL RIGHT.  PAGE 9 IS ADMITTED.

16  BY MS. BARRON:

17   Q.  MS. TYLER, I'M SHOWING YOU AN E-MAIL FROM YOU

18  TO MR. HARDWICK IN JUNE OF 2004.

19   A.  RIGHT.

20   Q.  NOW, THIS REFERENCES THE BELLAGIO.

21   A.  RIGHT.

22   Q.  DOES THAT REFRESH YOUR RECOLLECTION AS TO WHETHER YOU

23  ACTUALLY LEARNED ABOUT IT BEFORE TALKING WITH MY OFFICE?

24       MS. NOVAY:  YOUR HONOR, I OBJECT TO REFRESHING THE

25  RECOLLECTION.  THE WITNESS HASN'T SAID SHE CAN'T REMEMBER.  SHE

1  BELIEVES THAT IT WAS WHEN SHE FIRST MET AT THE U.S. ATTORNEY'S

2  OFFICE.

3         THE COURT:  SUSTAINED.

4  BY MS. BARRON:

5  Q.  MS. KORNEGAY-TYLER, DOES GOVERNMENT 957 ACTUALLY SHOW THAT

6  YOU KNEW ABOUT THE BELLAGIO LAWSUIT BEFORE YOU TALKED TO MY

7  OFFICE?

8  A.  THIS IS WHEN I FIRST LEARNED, BUT I DID NOT SEE THE

9  WRITTEN JUDGMENT.  I DIDN'T SEE THE DOCUMENT UNTIL I TALKED TO

10 YOUR OFFICE.

11 Q.  OKAY.  SO I WANT TO LOOK AT WHAT YOU SAY HERE.  SO YOU'RE

12 TALKING ABOUT AN APPLICATION, AND YOU'RE DOING WHAT YOU

13 NORMALLY DO THERE; IS THAT RIGHT?  GETTING INFORMATION?

14 A.  RIGHT.  RIGHT.

15 Q.  MEANWHILE, IN ASSEMBLING THE INFORMATION, ANGEL OAK -- AND

16 THAT'S THE MORTGAGE COMPANY WE WERE JUST TALKING ABOUT?

17 A.  RIGHT.

18 Q.  -- PICKED UP A JUDGMENT THAT I HAVE NEVER SEEN IN MY

19 CREDIT WORK.

20 A.  RIGHT.

21 Q.  EVERYTHING ELSE THEY PICKED UP, THEY DIDN'T HAVE PROOF OF

22 SATISFACTION.

23         IF YOU LOOK AT THE NEXT PARAGRAPH, IF YOU COULD PLEASE

24 READ THAT.

25 A.  I REMEMBER YOU HAVING A LARGE DEPOSIT FROM BELLAGIO AND

1  MAYBE ALSO WIRING TO THEM.  THEY FILED A JUDGMENT PLACED BY A

2  CLARK DISTRICT -- I DON'T KNOW WHAT I WAS TRYING TO TYPE THERE,

3  MAYBE WHERE IT WAS LOCATED -- DECEMBER '11 FOR 250,000.  I

4  GUESS IN FULTON COUNTY, DOCKET A633904.  SO MAYBE I COULDN'T

5  READ IT.  I DON'T KNOW.

6  Q.  OKAY.  AND THEN THE NEXT PARAGRAPH?

7  A.  WERE YOU SETTLING THIS WHEN YOU MADE THE TRANSACTIONS I

8  REMEMBER?  AS TYPICAL, IF SO, IT HAS NOT BEEN REPORTED AS

9  SATISFIED.  NOBODY EVER REPORTS THE SATISFACTIONS AND PAYMENTS.

10  HOPEFULLY, YOU HAVE SOME CORRESPONDENCE LIKE WE HAVE OBTAINED

11  ON EVERYTHING ELSE.

12  Q.  OKAY.  AND WHAT IS HIS RESPONSE?

13  A.  THIS WAS SATISFIED AS A PAYMENT MISTAKE.  IT IS NO ISSUE.

14  Q.  AND WHAT DID YOU INTERPRET PAYMENT MISTAKE TO MEAN?

15  A.  I REALLY DIDN'T HAVE A GOOD INTERPRETATION FOR THAT.  BUT

16  THERE WAS A WIRE TRANSFER THAT I WONDERED IF IT WAS RELATED TO

17  THAT.

18       MS. BARRON:  OKAY.  YOUR HONOR, AT THIS TIME I OFFER

19  GOVERNMENT'S 966.

20       MS. NOVAY:  NO OBJECTION.

21       THE COURT:  ALL RIGHT.  IT'S ADMITTED.

22  BY MS. BARRON:

23  Q.  MS. KORNEGAY-TYLER, THE NEXT DOCUMENT IN YOUR STACK IS

24  GOVERNMENT'S 966.  IS THIS AN E-MAIL SHORTLY AFTER THE ONES WE

25  JUST LOOKED AT?

1    A.    YES.

2    Q.    OKAY.  AND SO IT'S FROM MR. HARDWICK TO YOU, COPIED

3    GIANNI --

4    A.    CERRETANI.

5    Q.    OKAY.  AND WHO IS THAT?

6    A.    HE WAS THE MORTGAGE LOAN OFFICER WITH ANGEL OAK MORTGAGE,

7    AND HE HAD INITIALLY MET NAT HARDWICK PREVIOUSLY, BACK IN '11,

8    WHEN I WAS INTRODUCED.

9    Q.    AND SO WHAT DOES MR. HARDWICK SAY HERE?

10   A.    HERE IS THE DISMISSAL YOUR LIEN SEARCH GROUP MISSED.  FYI,

11   I HAD A DISCOUNT DEAL BASED ON YEARLY PLAY WITH THE MGM

12   PRESIDENT.  HE LEFT BELLAGIO, AND THE NEW GUY SAID NO, SINCE I

13   STARTED PLAYING AT COSMO.  AS YOU CAN SEE, WE MADE HIM SEE THE

14   LIGHT, SO TO SPEAK.  THANKS, NAT.

15   Q.    OKAY.  SO THE STATEMENT, "AS YOU CAN SEE, WE MADE HIM SEE

16   THE LIGHT, SO TO SPEAK," DID MR. HARDWICK ATTACH SOMETHING TO

17   THIS E-MAIL?  IF YOU LOOK UP HERE IN ATTACHMENTS, PDF.

18   A.    YEAH.  I'M TRYING TO --

19   Q.    WELL, AND ACTUALLY, LET'S JUST TURN THE PAGE.

20   A.    RIGHT.  YEAH, YEAH.

21   Q.    THE NEXT PAGE.  DID HE SEND YOU THIS DOCUMENT?

22   A.    YES.  YES.  I THINK SO, UH-HUH.

23   Q.    OKAY.  AND THIS IS A STIPULATION AND ORDER FOR DISMISSAL?

24   A.    RIGHT.

25   Q.    AND WHAT'S THE DATE?

1  A.   MAY 20TH OF '13.

2  Q.   OKAY.  SO HE'S SENDING YOU THIS DISMISSAL AND TELLING YOU

3  THAT THEY MADE THEM SEE THE LIGHT.  WHAT DID YOU UNDERSTAND HIM

4  TO BE TELLING YOU?

5  A.   WELL, YOU'VE GOT TO UNDERSTAND, I WOULD E-MAIL HIM AND

6  THEN WE WOULD TALK ON THE TELEPHONE.  AND THIS CAME ABOUT RIGHT

7  AFTER I RECEIVED A WIRE THAT WAS -- I CAN'T REMEMBER IF IT WAS

8  INCOMING FROM THE BELLAGIO AND OUTGOING TO THE COSMO, BUT IT

9  WAS FROM ONE CASINO TO ANOTHER.

10      AND SO BECAUSE IT WAS A WASH, I FELT LIKE THE FACT THAT

11  THAT WAS A WASH, THIS SUBSTANTIATED THAT THERE WAS SOME SORT OF

12  AN ERROR.

13      BUT ANY TIME YOU SEE ANYTHING RELATED TO A CASINO AND

14  SOMEONE, IT'S GOING TO MAKE YOUR ANTENNAE GO UP BECAUSE YOU

15  DON'T KNOW IF THERE'S A PROBLEM THAT COULD INVOLVE GAMBLING OR

16  WHATEVER, AND THAT WOULD DEFINITELY IMPACT YOUR SITUATION.

17  Q.   MS. KORNEGAY-TYLER, DID MR. HARDWICK TELL YOU THAT THIS

18  WAS IN FACT A LAWSUIT FILED BY THE BELLAGIO AGAINST HIM FOR

19  CHECKS HE HAD BOUNCED THERE?

20  A.   NO.  THERE WAS NEVER ANY MENTION OF CHECKS THAT BOUNCED.

21  Q.   DID HE EVER TELL YOU THAT HE ACTUALLY HAD AGREED TO PAY

22  THAT MONEY BACK?

23  A.   NO.

24  Q.   DID HE EVER TELL YOU THAT THERE WAS ACTUALLY A JUDGMENT

25  AGAINST HIM IN THAT CASE BECAUSE HE FAILED TO PAY IT BACK?

1    A.   NO.

2    Q.   AND DID HE TELL YOU THAT THE REASON IT WAS DISMISSED WAS

3    BECAUSE HE ULTIMATELY DID PAY, NOT BECAUSE HE SHOWED ANYBODY

4    THE LIGHT?

5             MS. NOVAY:  I OBJECT.

6             THE COURT:  I'LL OVERRULE.  JUST AS AN ESTABLISHMENT

7    OF WHETHER SHE KNEW THESE THINGS.  I'LL OVERRULE.

8             THE WITNESS:  I NEVER KNEW OF ANY PAYMENTS TO ANY

9    CASINO.

10   BY MS. BARRON:

11   Q.   AND NOW THE LAST DOCUMENT IN YOUR STACK IS

12   GOVERNMENT'S EXHIBIT 1193 --

13            MS. BARRON:  -- WHICH I OFFER AT THIS TIME, YOUR

14   HONOR.

15            THE COURT:  ANY OBJECTION?

16            MS. NOVAY:  I'M SORRY, YOUR HONOR.

17            MS. BARRON, WHAT WAS THE NUMBER?

18            MS. BARRON:  1193.

19            MS. NOVAY:  OKAY.  NO OBJECTION.

20            THE COURT:  IT'S ADMITTED.

21   BY MS. BARRON:

22   Q.   MS. KORNEGAY-TYLER, I'M SHOWING YOU A SERIES OF DOCUMENTS,

23   AND I WILL REPRESENT TO YOU THE BATES NUMBER HERE AT THE

24   BOTTOM, MGM, THESE WERE PRODUCED BY THE MGM CORPORATION, WHICH

25   OWNS THE BELLAGIO.  AND THIS IS NOT THE BEST PRINT.  AND IN

1 FACT, I DON'T EVEN KNOW IF IT'S GOING TO SHOW UP ON THE ELMO.

2     CAN YOU SEE THE DATE ON THIS?

3 A.   MARCH 16 OF '11.

4 Q.   DO YOU SEE WHERE IT SAYS, SPOKE TO CUSTOMER?

5 A.   YES.

6 Q.   OKAY. THIS IS AN INTERNAL LOG. AND I WANT TO SHOW YOU A

7 FEW MORE PAGES IN THIS STACK.

8     THIS IS AN E-MAIL THAT BELLAGIO PRODUCED. IN THAT STACK.

9 A.   OKAY. I NEVER SAW THIS BEFORE TODAY.

10 Q.   I KNOW. DO YOU SEE ON MARCH 25TH, 2011 -- NOW, THIS IS

11 BEFORE THAT VERY FIRST LOAN APPLICATION WE TALKED ABOUT.

12 A.   YES.

13 Q.   MR. HARDWICK WRITES MICHELE DI GIOIA AT THE BELLAGIO:

14 MICHELE, I HAVE BEEN A VALUED CLIENT OF MGM FOR MANY YEARS, AND

15 I PLAN TO BE AGAIN. THE ONLY ISSUE THAT CAUSED THIS WAS A

16 NASTY DIVORCE AND A SECOND MOTION, WHICH I LOST. I AM TIED UP

17 IN THE SECOND QUARTER FINISHING PAYING HERE. HERE ARE MY

18 THOUGHTS.

19     IF YOU COULD PLEASE READ BULLET 1.

20 A.   I ORIGINALLY OWED 327K -- THAT MEANS 327,000. PLEASE

21 SPEAK WITH JEFF WHITE ON THIS. I PAID 100K. I SHOULD ONLY OWE

22 227K, NOT 250K.

23 Q.   I'M SHOWING YOU PAGE 13 IN THIS STACK. DO YOU SEE THIS

24 COMMUNICATION GOING TO MR. HARDWICK?

25 A.   YES.

1    Q.   WHAT DOES THIS SAY RIGHT HERE THAT IS HIGHLIGHTED?

2    A.   SHOULD YOU DEFAULT ON ANY ONE PAYMENT, HOWEVER, WE WILL

3    IMMEDIATELY MOVE TO ENFORCE THE REMAINDER OF THE JUDGMENT,

4    WHICH WOULD INCLUDE POST-JUDGMENT INTEREST.

5    Q.   AND THEN I'M SHOWING YOU PAGE 16, AND THIS IS DATED

6    MARCH 28TH, 2013.  WHAT DOES MR. HARDWICK WRITE TO JANICE

7    MAZUROSKI?

8    A.   FINAL WIRE WAS SENT TODAY.  PLEASE SEND ME ALL

9    CANCELLATION DOCS TO NATHAN HARDWICK, 88 WEST PACES FERRY ROAD,

10   ATLANTA, 30385.  THANKS, NAT.

11   Q.   OKAY.  SO THAT WAS MARCH 13TH.

12        I'M SHOWING YOU AGAIN GOVERNMENT'S 956, WHICH IS WHAT WE

13   LOOKED AT A MINUTE AGO.  THIS IS THE STIPULATION AND ORDER FOR

14   DISMISSAL IN THE BELLAGIO LAWSUIT.  AND WHAT'S THE DATE?

15   A.   MAY 9TH OF '13.

16   Q.   SO YOU'RE LOOKING UP HERE AT THE DATE IT WAS

17   ELECTRONICALLY FILED?

18   A.   5-20 OF '13.

19   Q.   OKAY.  AND WHAT'S THE DATE THAT IT IS ACTUALLY SIGNED?

20   A.   APRIL 17TH OF '13.

21        MS. BARRON:  THANK YOU, MS. KORNEGAY-TYLER.  NO MORE

22   QUESTIONS.

23        THE WITNESS:  OKAY.

24        THE COURT:  LADIES AND GENTLEMEN, LET'S GO AHEAD AND

25   TAKE OUR MORNING BREAK FOR TEN MINUTES.  LET'S COME BACK ABOUT

1    11:02.  TEN MINUTES.  THANK YOU.

2            (WHEREUPON, THE JURY RETIRED FROM THE COURTROOM AND A

3    BRIEF RECESS WAS HAD FROM 10:52 A.M. TO 11:02 A.M.)

4            THE COURT:  ALL RIGHT.  BEFORE THE JURY COMES BACK

5    IN, WE'LL NEED TO TAKE SOME THINGS UP ON THE RECORD.  LET'S GET

6    MR. GARLAND BACK IN.

7            MS. NOVAY:  YOUR HONOR.

8            THE COURT:  NO, NOT THE WITNESS.  NOT YET.

9            EVERYBODY BE SEATED, PLEASE.  I'M SORRY.  MY

10   APOLOGIES.  YES, PLEASE.

11           OKAY.  MS. NOVAY, YOU HAD AN ISSUE YOU WANTED TO

12   RAISE BEFORE WITH RESPECT TO A QUESTION THAT WAS ASKED OF THE

13   WITNESS WHO IS CURRENTLY ON THE STAND.  THE QUESTION WAS:  SO

14   WHEN HE ANSWERED NO TO THAT QUESTION THAT THERE WAS NO PENDING

15   LAWSUITS AGAINST HIM, WAS THAT A TRUTHFUL STATEMENT?

16           MS. NOVAY:  YES.  I THINK -- I DON'T HAVE A WHOLE LOT

17   MORE TO ADD, SO I WON'T TAKE UP A LOT OF THE COURT'S TIME.

18           THE COURT:  THAT'S OKAY.

19           MS. NOVAY:  BUT I THINK IT WAS REALLY JUST THAT IT

20   GOES TO THE ULTIMATE ISSUE AND THE TRUTHFULNESS OF THE

21   STATEMENT AND THE INTENTION, BECAUSE INTENT IS AN ELEMENT IN

22   THIS CASE.  THE FACT OF WHAT'S TRUTHFUL OR NOT, I THINK THAT

23   GOES TO THE ULTIMATE ISSUE.

24           AND IT GOES TO THE CHARGE, DID HE INTENTIONALLY GIVE

25   A TRUTHFUL STATEMENT?  WE HAVE ROOM FOR ARGUMENT.  I THINK THIS

1    IS MORE FOR CLOSING ARGUMENT THAN IT IS APPROPRIATE TRYING TO

2    GET IT OUT OF THE WITNESS.

3              AND IT ALSO GOES TO THE CREDIBILITY AND THE CHARACTER

4    OF THE DEFENDANT, WHICH WAS NOT PUT IN ISSUE.  WE'RE NOT

5    CALLING CHARACTER WITNESSES.  OR IF WE DO, I MEAN, THE

6    GOVERNMENT'S WELCOME TO PROBE THAT.  THEY HAVE EVERY RIGHT TO

7    DO SO.  THAT'S NOT WHAT WE'VE DONE YET.

8              SO I THINK THAT'S -- AND I ALSO UNDERSTAND THAT THE

9    WHOLE INHERENTNESS OF THE FALSE STATEMENT IS THE PROBLEM.  SO

10   IT'S NOT JUST A FRAUD OR IT'S NOT JUST AN ASSAULT.  WE'RE

11   ACTUALLY DEALING WITH A FALSE STATEMENT.

12             SO I'M NOT TRYING TO BE UNFAIR IN MY ARGUMENT IN ANY

13   SORT OF WAY.  BUT THEY CAN MAKE THE ARGUMENT.  THEY CAN SAY, IT

14   WAS THIS DATE AND THEN IT WAS THIS DATE, RIGHT?  AND THEN THEY

15   CAN SAY THE ARGUMENT, HE KNEW IT WAS FALSE -- YOU KNOW,

16   WHATEVER.  ANYTHING ELSE THEY WANT TO SAY.

17             BUT I THINK ASKING THE WITNESS TO DRAW THAT

18   CONCLUSION IS INAPPROPRIATE.

19             THE COURT:  ALL RIGHT.  RESPONSE.

20             MS. BARRON:  YOUR HONOR, HER -- OKAY.  SO SHE

21   REPRESENTS FIRST LANDMARK BANK.  THAT IS THE VICTIM OF

22   COUNTS 23 AND 24.  AND THE IMPRESSION TESTIMONY, I'VE GOT A

23   CASE HERE THAT MR. PHILLIPS PROVIDED.  IT'S ACTUALLY *PHILLIPS*

24   *VERSUS UNITED STATES*, 356 F.2D 297, 307.

25             THE COURT:  ONE MORE TIME?

1  MS. BARRON:  *PHILLIPS VERSUS UNITED STATES*, 356 F.2D

2  297, 307.  IT'S NINTH CIRCUIT, 1965.

3  BUT IT STATES THAT IMPRESSION TESTIMONY, WHICH IS

4  WHAT I ASKED HER, OF VICTIMS AS TO HOW THEY HAVE BEEN MISLED BY

5  THE DEFENDANT IS ADMISSIBLE TO SHOW PROOF OF INTENT TO DEFRAUD.

6  SHE TESTIFIED THAT HE HAD LIED ON THAT STATEMENT,

7  THAT HE HAD DECEIVED HER.  IT WAS HER IMPRESSION THAT WHEN HE

8  SAID YES, WHEN HE DIRECTED HER TO SAY YES AND FILL IN THAT BOX,

9  THAT HE WAS DECEIVING HER.  AND THAT'S THE TESTIMONY SHE GAVE,

10  AND THAT IS ADMISSIBLE TO SHOW HIS INTENT TO DEFRAUD.

11  THE COURT:  I DON'T THINK IT WAS ASKED THAT WAY.  IT

12  WAS NOT, WHAT WAS YOUR IMPRESSION, OR ANYTHING LIKE THAT.  IT

13  WAS, SO WHEN HE ANSWERED THAT, WAS THAT A TRUTHFUL STATEMENT?

14  WHICH IS ALMOST DIRECTLY WHAT IS ASKED IN THE INDICTMENT.

15  AND SO MY ISSUE, MY CONCERN HERE IS THAT, FOR A

16  SECOND TIME, IT SEEMS LIKE YOU ARE, IF NOT ALL THE WAY THERE,

17  VERY CLOSE TO ASKING THE WITNESSES THE ULTIMATE QUESTION THAT

18  IS FOR THE JURY, THAT'S WITHIN THE JURY'S PROVINCE.

19  AND I'M NOT SURE WHY YOU ARE DOING THAT, WHY IT'S

20  EVEN NECESSARY FOR YOU TO ASK THEM.  YOU LAY THE FOUNDATION AND

21  GET ALL OF THE STEPS.  BUT WHY ARE YOU ASKING HER -- AND WHAT

22  YOU ASKED HER WAS NOT, WAS IT YOUR IMPRESSION?  YOU ASKED, WAS

23  THAT A TRUTHFUL STATEMENT?

24  THAT'S FOR THE JURY TO DECIDE CONSIDERING ALL THE

25  EVIDENCE THAT'S PRESENTED.  AND SO THAT'S MY CONCERN HERE.

1    AND I DON'T WANT TO KEEP GIVING CURATIVE

2  INSTRUCTIONS, BUT --

3    MS. BARRON:  AND MAYBE WHAT I SHOULD HAVE DONE, YOUR

4  HONOR, IS FOLLOW THAT UP.  BECAUSE I THINK WHAT WOULD HAVE

5  CURED IT IS A FOLLOW-UP QUESTION:  IF YOU HAD LEARNED THAT HE

6  HAD BEEN MISTRUTHFUL -- OR BEEN UNTRUTHFUL OR HAD OMITTED

7  INFORMATION, WOULD THAT HAVE AFFECTED YOUR OVERALL DECISION TO

8  EXTEND HIM CREDIT?  AND HER ANSWER I KNOW WOULD BE YES.

9    THE COURT:  WELL, YOU DID ASK SOMETHING SIMILAR TO

10  THAT EVEN BEFORE YOU ASKED THAT, WHICH BEGS THE QUESTION EVEN

11  MORE OF WHY YOU WENT FORWARD TO ASK THAT QUESTION.  YOU ASKED

12  SOMETHING OF THAT, LIKE, TO THE -- I DON'T HAVE THAT PART OF

13  THE TESTIMONY UP BEFORE ME NOW, BUT -- IF YOU HAD KNOWN ABOUT

14  SOMETHING IN SOME WAY, WOULD IT HAVE CHANGED YOUR DECISION?

15  AND I CAN'T REMEMBER THE EXACT VERBIAGE.

16    BUT DO YOU UNDERSTAND MY CONCERN WITH ASKING THESE

17  WITNESSES QUESTIONS THAT SEEM DIRECTLY FROM THE INDICTMENT THAT

18  ARE FOR THE JURY'S DETERMINATION?

19    AND MY CONCERN IS ALSO THE WAY THAT THEY ARE ASKED,

20  WHICH SEEMS LIKE THEY ARE BEING ASKED TO BE A 13TH JUROR IN

21  SOME RESPECTS OF DID HE DO WHAT'S ALLEGED IN THIS INDICTMENT.

22    AND THAT'S THE REASON THE CURATIVE WAS GIVEN

23  YESTERDAY.  BUT IT SEEMS LIKE WE'RE ALMOST BACK IN THE SAME

24  PLACE TODAY.  AND TODAY I'M EVEN MORE CONCERNED, BECAUSE THE

25  QUESTION THAT WAS ASKED WAS PHRASED IN A WAY THAT SEEMS TO GO

1  EVEN MORE TOWARD THE WAY THAT THE ALLEGATION IS ALLEGED IN THE

2  INDICTMENT.  YESTERDAY, MS. RITCHIE WAS JUST ASKED MORE, WAS HE

3  HIDING SOMETHING OR COVERING SOMETHING.  BUT TODAY IT SEEMS

4  LIKE THIS WITNESS IS BEING ASKED SOMETHING ALMOST DIRECTLY FROM

5  THE INDICTMENT.

6       MS. BARRON:  OKAY.  I GUESS I'M CONFUSED.  I MEAN, IF

7  A WITNESS IS ASKED DO THEY BELIEVE THEY WERE LIED TO AND THEIR

8  STATEMENT WAS UNTRUTHFUL, I DON'T UNDERSTAND WHY THAT IS NOT

9  ACCEPTABLE.

10       THE COURT:  YOU DIDN'T ASK THAT.  YOU ASKED, SO WHEN

11  HE ANSWERED THAT, WAS THAT A TRUTHFUL STATEMENT?  WAS HE BEING

12  TRUTHFUL?  THAT FORM OF THE QUESTION DOESN'T TAKE INTO

13  CONSIDERATION ANYTHING ELSE THAT MIGHT BE PRESENTED OR

14  ANYTHING.  IT DOESN'T -- IT -- YOU DIDN'T SET IT UP TO BE BASED

15  ON ANYTHING IN PARTICULAR, ALL THE THINGS THAT WE ARE TALKING

16  ABOUT BEFORE.  YOU JUST ASKED WAS HE BEING TRUTHFUL OR NOT.

17  AND THAT'S FOR THE JURY TO ANSWER, WHETHER OR NOT HE WAS BEING

18  TRUTHFUL.

19       MS. BARRON:  WOULD IT BE OKAY IF I HAD ASKED HER, DO

20  YOU BELIEVE THAT HE WAS BEING TRUTHFUL?  WOULD THAT HAVE

21  BEEN --

22       THE COURT:  PERHAPS THAT WOULD, AND PERHAPS IF YOU

23  HAD ASKED FOR A BASIS.  BUT, I MEAN, HONESTLY, UNDERSTANDING

24  THAT YOU DO NOT ASK WITNESSES FOR ULTIMATE -- THE ULTIMATE

25  QUESTION, WHY EVEN -- WHY EVEN TAKE A CHANCE ON THAT AS A

1   PROSECUTOR IF YOU HAVE ALREADY SET UP ALL THE STEPS AND ALL THE

2   INFORMATION THAT SHOWS WHAT YOU ARE GOING TO BE ABLE TO ARGUE?

3   WHY WOULD YOU EVEN PUSH THAT TO THAT EXTENT?  THAT'S JUST A

4   RHETORICAL QUESTION.

5        MS. BARRON:  YOUR HONOR, I --

6        THE COURT:  I DON'T THINK THAT YOU DID -- I KNOW THAT

7   YOU WOULDN'T DO THAT INTENTIONALLY, BECAUSE NOBODY WANTS A

8   CURATIVE INSTRUCTION BEING READ TO THE JURY.  IT MAKES IT LOOK

9   LIKE SOMEONE HAS DONE SOMETHING INAPPROPRIATELY.  I JUST -- I'M

10  NOT SURE WHY WE ARE REVISITING THIS RIGHT HERE.

11       I HAVE OVERRULED THE OBJECTION.

12       DEFENSE, I DON'T KNOW IF THERE IS SOMETHING FURTHER

13  THAT YOU WANT OR YOU ARE ASKING OF ME, BUT I WILL ASK YOU THAT

14  FIRST AND THEN LET THE GOVERNMENT RESPOND AGAIN.  BUT I'VE

15  OVERRULED THE OBJECTION AT THIS POINT.

16       I AM WILLING TO REMIND THEM THAT CERTAIN QUESTIONS

17  AND ISSUES ARE WITHIN THEIR PROVINCE ONLY.  BUT WHAT IS IT THAT

18  YOU ARE REQUESTING AT THIS POINT?

19       MS. BARRON:  OH, WAIT.  YOUR HONOR, CAN I SAY ONE

20  MORE THING?

21       THE COURT:  SURE.

22       MS. BARRON:  MR. GILFILLAN HAS POINTED OUT THAT THE

23  RULE 704(A), AND IT REFERS TO LAY OR EXPERT --

24       THE COURT:  OR EXPERT, YES.

25       MS. BARRON:  THE COMMITTEE NOTES SAY THAT IT REFERS

1   TO LAY AND EXPERTS --

2        THE COURT: YES.

3        MS. BARRON: -- AND AN OPINION IS NOT OBJECTIONABLE

4   JUST BECAUSE IT EMBRACES THE ULTIMATE ISSUE.

5        THE COURT: NOT JUST BECAUSE IT DOES, RIGHT. BUT IT

6   ALSO GOES TOWARD THE MINDSET, THE INTENT OF THE DEFENDANT. IF

7   YOU READ THE WHOLE RULE -- THAT'S WHAT I WAS REVIEWING UP HERE

8   AS WELL. IT'S NOT OBJECTIONABLE ONLY BECAUSE OF THAT. I

9   UNDERSTAND THAT, AND THAT'S CORRECT. AND THAT'S WHY, IN PART,

10   I DON'T FEEL LIKE I NEEDED TO SUSTAIN THE OBJECTION, AND I

11   DON'T NECESSARILY KNOW THAT I NEED TO GIVE A CURATIVE, BECAUSE

12   I AM CONSIDERING THAT LANGUAGE IN 704.

13        MS. BARRON: THANK YOU, YOUR HONOR.

14        THE COURT: GO AHEAD.

15        MS. NOVAY: YOUR HONOR, I'M SOMEWHAT FAMILIAR WITH

16   THE *PHILLIPS* CASE BECAUSE THAT WAS ONE OF THE CASES I REVIEWED

17   IN MAKING MY ARGUMENT YESTERDAY IN TALKING ABOUT A WITNESS'S

18   IMPRESSION AND WHEN IT'S APPROPRIATE TO EXPRESS AN OPINION.

19        BUT THE PROBLEM IS THIS ISN'T JUST A MERE OPINION.

20   THIS IS THE ULTIMATE GUILT OF MY CLIENT.

21        AND THE SECONDARY ISSUE TO THAT IS THAT THERE'S A

22   LACK OF FOUNDATION. WELL, KNOWING THIS INFORMATION NOW, DO YOU

23   THINK HE WAS BEING TRUTHFUL? WHAT WE'VE TOLD YOU NOW, WHAT

24   YOU'VE LEARNED NOW, DO YOU THINK HE WAS BEING TRUTHFUL?

25        I DON'T THINK THAT IS APPROPRIATE GIVEN -- ASKING

1  ABOUT THE DEFENDANT AND WHAT IS ACTUALLY IN THE INDICTMENT.

2  THIS IS THE WHOLE REASON WE'RE HERE.  I THINK IT INVADES THE

3  PROVINCE OF THE JURY.

4         AND I ALSO -- INTENT IS A HUGE ISSUE.  THAT'S ONE OF

5  THE THINGS WE'RE ALL GOING TO BE FIGHTING ABOUT.

6         SO FOR THIS WITNESS TO SAY, YES, HE WAS BEING

7  UNTRUTHFUL, OR, NO, HE WASN'T BEING UNTRUTHFUL, HOWEVER THE

8  QUESTION WAS ASKED, IS INAPPROPRIATE, IT'S NOT NECESSARY, AND

9  IT'S INCREDIBLY UNFAIRLY PREJUDICIAL TO THE DEFENSE.

10        SO WHAT I'M ASKING FOR IS A LIMITING INSTRUCTION, A

11 LIMITING INSTRUCTION SAYING THAT IT IS FOR THE JURY TO

12 DETERMINE WHETHER OR NOT MR. HARDWICK INTENTIONALLY MADE A

13 FALSE STATEMENT AND THAT THEY WILL BE INSTRUCTED ON THAT LATER,

14 NOT FOR THE WITNESS TO TELL THEM, YES, THAT WAS A FALSE

15 STATEMENT.

16        THE COURT:  ALL RIGHT.  SO YOUR REQUEST IS FOR THAT

17 TYPE OF LIMITING INSTRUCTION.  AND YOU ARE REQUESTING THAT THAT

18 BE GIVEN WHEN?  WHEN THEY COME BACK HERE?  YOU'RE NOT ASKING

19 THAT I INSTRUCT THEM TO DISREGARD ANYTHING OR ANYTHING LIKE

20 THAT, BUT JUST TO REMIND THEM, AS I NOTED EARLIER?

21        OR WHAT IS YOUR FULL REQUEST, MS. NOVAY?

22        MS. NOVAY:  WELL, I THINK TO PRESERVE THE ISSUE, I DO

23 HAVE TO ASK THAT YOU DISREGARD IT.  SO I DO ASK THAT AND MOVE

24 THAT IT BE STRICKEN.  AND I ALSO ADDITIONALLY ASK FOR THE

25 CURATIVE INSTRUCTION, OR FOR THE -- AND/OR LIMITING

1  INSTRUCTION, DEPENDING ON HOW THIS COURT RULES, THAT THE COURT

2  GIVE THAT INSTRUCTION TO THE JURY.

3          THE COURT:  ALL RIGHT.  GOVERNMENT, ONE MORE TIME.

4          MS. BARRON:  I WILL JUST SAY -- AND I KNOW WE HAVEN'T

5  HAD OUR CHARGE CONFERENCE, BUT THERE IS THAT STANDARD

6  INSTRUCTION THAT TELLS THE JURY THAT THEY, AND THEY ALONE, HAVE

7  BEEN FOUND WORTHY TO FIND THE ULTIMATE ISSUE IN THIS CASE.  I

8  DON'T KNOW WHY AN ADDITIONAL INSTRUCTION ON TOP OF THAT, WHICH

9  WE PRESUME THE JURY WILL FOLLOW, IS NECESSARY.

10         THE COURT:  ALL RIGHT.  I UNDERSTAND.  AND I DO, AS I

11 SAID EARLIER, THINK THERE IS SOME SUPPORT FOR 704 FOR SOME GREY

12 AREA.  I'M NOT GOING TO TAKE A CHANCE ON IT, THOUGH.

13         I AM GOING TO TELL THEM TO DISREGARD AND TO GIVE A

14 CURATIVE INSTRUCTION AT THIS POINT.

15         IS THERE ANYONE WHO WISHES TO BE HEARD ON ANY OF

16 THIS?  GOVERNMENT?

17         MS. BARRON:  NO, YOUR HONOR.

18         THE COURT:  DEFENSE?

19         MS. NOVAY:  NO, YOUR HONOR.

20         THE COURT:  LET'S GET THE JURY BACK IN.

21         MS. BARRON:  AND, YOUR HONOR, WE WILL BRING THE

22 WITNESS IN AFTER THE INSTRUCTION, IF THAT'S OKAY.

23         THE COURT:  YEAH, THAT'S PERFECT.  THANK YOU.

24         MR. GILFILLAN:  JUDGE, CAN I ASK A QUESTION?

25         THE COURT:  SURE, SURE.

1    MR. GILFILLAN:  IS THERE ANY CHANCE YOU WOULD LET US

2  DO A LITTLE RESEARCH ON THIS ISSUE BEFORE YOU GIVE THAT

3  CURATIVE INSTRUCTION?

4    THE COURT:  WELL -- AND I WISH WE HAD DONE IT

5  YESTERDAY.  I DIDN'T THINK IT WOULD HAPPEN AGAIN TODAY.  MY

6  CONCERN IS THAT IT WILL BE SO FAR IN TIME FROM WHEN THIS

7  WITNESS TESTIFIES -- THE DEFENSE, WHAT'S YOUR POSITION?

8    AND I UNDERSTAND WHY YOU'RE MAKING THAT REQUEST, AND

9  I WISH THAT WE HAD TAKEN SOME MORE TIME DURING THIS BREAK AS

10  WELL.  BUT I'M INCLINED TO DO THAT AT THIS POINT.

11    BUT, MS. NOVAY, LET ME HEAR FROM YOU.

12    MS. NOVAY:  THAT'S EXACTLY MY CONCERN.  I'M CONCERNED

13  THAT IT'S GOING TO BE TOO FAR REMOVED IN TIME.  AND THEN IF YOU

14  BRING IT UP -- AND THEN IF IT'S BROUGHT UP, THEN IT'S JUST

15  REMINDING SOMEONE OF THE BAD TESTIMONY.  THAT'S MY CONCERN.

16    THE COURT:  THE THING IS -- AND I'M GOING TO DO THAT

17  SINCE WE DON'T HAVE IT IN FRONT OF ME, IN FRONT OF US RIGHT

18  NOW, I'M GOING TO DO IT THE WAY THAT I SAID.

19    I DO UNDERSTAND THAT IF THERE IS SOME OTHER AUTHORITY

20  OUT THERE THAT, GOVERNMENT, I WOULD HAVE TOLD THEM TO DISREGARD

21  SOMETHING.  AND THAT'S MY CONCERN FOR YOU, IS -- I DON'T HAVE A

22  PROBLEM EITHER WAY JUST TELLING THEM AS A REMINDER, THESE

23  QUESTIONS ARE FOR YOU, WITHIN YOUR PROVINCE.  BUT THE PORTION

24  OF MY INSTRUCTION WHERE I'M TELLING THEM TO ACTUALLY DISREGARD

25  IS THE THING I'M MORE CONCERNED ABOUT.

1    BUT I THINK, GIVEN THE CIRCUMSTANCES, I NEED TO BE

2  MORE CAUTIOUS WITH RESPECT TO MR. HARDWICK THAN THE GOVERNMENT

3  RIGHT NOW.

4    SO I UNDERSTAND YOUR REQUEST.  PLEASE, STILL, I'M

5  GOING TO ENCOURAGE YOU TO LOOK FOR THAT.  BUT I AM GOING TO

6  INSTRUCT THEM NOW TO DISREGARD THAT, BECAUSE THAT'S JUST BASED

7  ON MY UNDERSTANDING OF THE LAW WHEN IT COMES TO ULTIMATE

8  QUESTION TESTIMONY THAT WE'VE HEARD.  SO I'M GOING TO MAKE THAT

9  DECISION NOW TO DO THAT.

10    (WHEREUPON, THE JURY RETURNED TO OPEN COURT AT

11  11:15 A.M., AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD.)

12    THE COURT:  ALL RIGHT.  THE JURY IS IN PLACE.

13  EVERYONE MAY BE SEATED.

14    LADIES AND GENTLEMEN, BEFORE WE BRING THE WITNESS

15  BACK IN FOR CROSS-EXAMINATION, I NEED TO GIVE YOU A DIRECTIVE.

16    THE WITNESS WAS ASKED, SO WHEN MR. HARDWICK ANSWERED

17  NO TO THE QUESTION OF WHETHER THERE WAS A PENDING LAWSUIT

18  AGAINST HIM, WAS THAT A TRUTHFUL STATEMENT.  AND SHE ANSWERED.

19  I AM GOING TO TELL YOU TO DISREGARD THAT QUESTION AND ANSWER.

20    AND, AGAIN, NOT BECAUSE I AM IMPLYING OR SUGGESTING

21  THAT HER ANSWER WAS UNTRUTHFUL OR THAT IT WAS SOME WRONG IN

22  THAT WAY, BUT BECAUSE THESE QUESTIONS, CERTAIN QUESTIONS ARE

23  FOR YOU TO ANSWER, WHETHER HE WAS BEING UNTRUTHFUL OR INTENDED

24  TO BE UNTRUTHFUL OR CERTAIN THINGS LIKE THAT THAT ARE ALLEGED

25  IN THE INDICTMENT.  THERE ARE CERTAIN THINGS THAT ARE ULTIMATE

1    QUESTIONS THAT ARE FOR YOU TO DECIDE.

2           AND SO THE REASON THAT I AM ASKING YOU -- OR

3    DIRECTING YOU TO DISREGARD THAT IS SO THAT YOU WILL MAKE THAT

4    DETERMINATION YOURSELF, SO THAT YOU WILL BE THE SOLE

5    DETERMINERS OF THAT ISSUE, THAT PARTICULAR ISSUE AND ANY OTHER

6    ISSUE ON WHICH I DIRECT YOU.  THAT IS FOR YOUR DETERMINATION,

7    THE JURY'S DETERMINATION.

8           AND AS I TOLD YOU YESTERDAY, WHEN WE GET TO THE END

9    OF THIS CASE, I WILL GIVE YOU SOME ADDITIONAL INSTRUCTIONS ON

10   HOW TO JUDGE THE CREDIBILITY OR BELIEVABILITY OF WITNESSES.

11   THERE MAY BE SOME YOU BELIEVE, THERE MAY BE SOME YOU DON'T

12   BELIEVE.  YOU MAY BELIEVE A PART OR ALL OF SOME TESTIMONY.  AND

13   THERE ARE DIFFERENT CONSIDERATIONS -- WHETHER A WITNESS HAS AN

14   INTEREST IN THE CASE, WHETHER THE WITNESS HAD THE OPPORTUNITY

15   TO OBSERVE CERTAIN THINGS -- ALL OF THOSE THINGS COME INTO

16   PLAY.  BUT THE BOTTOM LINE IS THAT THESE ARE QUESTIONS FOR YOU

17   TO ANSWER.

18          SO I AM INSTRUCTING YOU TO DISREGARD

19   MS. KORNEGAY-TYLER'S RESPONSE TO THAT PARTICULAR QUESTION FOR

20   THAT REASON.  THANK YOU SO MUCH.

21          BRING HER IN.

22          AND, MA'AM, I REMIND YOU AS YOU COME UP THAT YOU'RE

23   STILL UNDER OATH, AND WE ARE ABOUT TO BEGIN YOUR

24   CROSS-EXAMINATION.

25          THE WITNESS:  OKAY.

1    THE COURT:  ALL RIGHT.

2                    CROSS-EXAMINATION

3  BY MS. NOVAY:

4  Q.   GOOD MORNING, MS. TYLER.

5  A.   GOOD MORNING.

6  Q.   HOW ARE YOU?

7  A.   FINE.  HOW ARE YOU?

8  Q.   FINE, THANK YOU.

9       YOU MIGHT HAVE MENTIONED THIS, BUT YOU FIRST MET

10 MR. HARDWICK -- WAS IT 2010?  IS THAT CORRECT?

11 A.   NO.  IT WAS EARLY '11.

12 Q.   2011.

13 A.   RIGHT.  OR SPRING.  BUT I HAD KNOWN OF HIM PRETTY MUCH ALL

14 MY LIFE.

15 Q.   OKAY.  AND WE'LL COME BACK TO THAT IN JUST A MINUTE.  BUT

16 WHEN DID YOU FIRST COME TO WORK AT FIRST LANDMARK BANK?

17 A.   APPROXIMATELY AUGUST 10TH OF 2010.

18 Q.   AND I BELIEVE -- WHERE WERE YOU WORKING PREVIOUSLY?

19 A.   PREVIOUSLY TO FIRST LANDMARK, I WAS WITH SYNOVUS.

20 Q.   AND IT WAS ACQUIRED; IS THAT CORRECT?  OR CHANGED?

21 A.   NO.  FIRST LANDMARK MERGED.  BUT I LEFT SYNOVUS TO GO TO

22 FIRST LANDMARK.

23 Q.   ALL RIGHT.  AND WHEN YOU CAME TO FIRST LANDMARK BANK, DID

24 YOU RECEIVE A SALARY CUT?

25 A.   YES.

1  Q.   NOW, YOUR FIRST MEETING WITH MR. HARDWICK IN EARLY 2011,

2  THAT WAS WITH REGARD TO A -- I THINK THAT WAS THE FIRST LOAN

3  THAT YOU GAVE TO HIM; IS THAT RIGHT?

4  A.   RIGHT.

5  Q.   AND THAT WAS FOR -- I THINK IT WAS A CONSOLIDATION OF

6  CREDIT; IS THAT RIGHT?

7  A.   NOT REALLY OF INSTITUTIONAL CREDIT.  IT WAS MORE SO FOR

8  HIM TO SATISFY SOME PRIVATE REAL ESTATE OBLIGATIONS -- BECAUSE

9  THAT WAS THE TIME RIGHT AFTER THE REAL ESTATE DOWNTURN THAT

10  IMPACTED A LOT OF PEOPLE -- AND TO PAY SOME FUNDS TO HIS

11  EX-WIFE.

12  Q.   AND I BELIEVE THAT WAS THE $480,000?

13  A.   RIGHT, UH-HUH.

14  Q.   THAT WAS THE FIRST ONE?

15  A.   RIGHT.

16  Q.   SO YOU ARE AWARE OF HIS DIVORCE?

17  A.   YES.

18  Q.   AND YOU ARE ALSO AWARE OF MR. HARDWICK, RIGHT?  YOU

19  MENTIONED?

20  A.   YES.

21  Q.   YOU KNEW HIS PARTNERS?

22  A.   YES, UH-HUH.

23  Q.   YOU WERE A LONGTIME ATLANTA RESIDENT?

24  A.   I'M NATIVE, UH-HUH.

25  Q.   GREW UP AROUND HERE?

1  A.   YES.

2  Q.   AND I THINK YOU MAYBE WERE FAMILY FRIENDS WITH ART MORRIS

3  AND RANDY SCHNEIDER; IS THAT CORRECT?

4  A.   WELL, IT WAS MORE OF A BUSINESS RELATIONSHIP, BECAUSE MY

5  FATHER CHARTERED AN OLD ATLANTA SAVINGS AND LOAN THAT DATED

6  BACK TO THE -- 1960, OR EARLY SIXTIES.  AND BEING A SAVINGS AND

7  LOAN, MORTGAGE AND LENDING WAS THE BUSINESS.

8       AND AT THE TIME, RANDY SCHNEIDER AND ART MORRIS WERE VERY

9  MUCH INVOLVED IN REAL ESTATE, ABSTRACTING, TITLE WORK, TITLE

10  INSURANCE.  AND SO MY FAMILY USED THEM FOR A LOT OF REAL ESTATE

11  WORK AND FORECLOSINGS.

12  Q.   SO YOU WERE REALLY IN THE FAMILY BUSINESS?

13  A.   RIGHT.

14  Q.   IS THAT FAIR?

15  A.   AND ART MORRIS REMINDED ME OF THAT THE FIRST TIME I

16  VISITED NAT BECAUSE HE WANTED TO KNOW IF MY PARENTS WERE STILL

17  LIVING.  SO WE HAD A NICE CONVERSATION.

18  Q.   SO YOU WOULD RECOGNIZE THEM IF YOU SAW THEM, OBVIOUSLY?

19  A.   YEAH, UH-HUH.

20  Q.   OKAY.  AND I THINK YOU MENTIONED THE DOWNTURN IN THE

21  MARKET AFFECTED A LOT OF PEOPLE.  BUT IT ALSO AFFECTED BANKS,

22  TOO; IS THAT CORRECT?

23  A.   ABSOLUTELY, UH-HUH.

24  Q.   AND THERE WAS A NEED TO GET BUSINESS AT THAT TIME?

25  A.   YES.

1  Q.   I THINK MANY BANKS WERE ACTUALLY SEEKING MR. HARDWICK'S

2  BUSINESS OUT; IS THAT CORRECT?

3  A.   I DEFINITELY WOULD THINK SO, BECAUSE THE FIRM AND ITS

4  PARTNERS HAD A STELLAR REPUTATION IN THIS CITY AND BEYOND FOR

5  YEARS AND YEARS.

6  Q.   AND AT SOME POINT -- AND I WANT TO BE CLEAR.  YOU ARE NOT

7  THE TRADITIONAL BANK LOAN OFFICER.  AND BY THAT, IF I WANT A

8  LOAN, I DON'T TAKE MY PAPERWORK, SHUFFLE INTO YOUR OFFICE, AND

9  HAND IT TO YOU.  YOU'RE MORE OF A CONCIERGE SERVICE; IS THAT

10 CORRECT?

11 A.   RIGHT.  AND IT'S -- THERE'S A LINE OF BANKING KNOWN AS

12 PRIVATE BANKING, WHERE YOU TEND TO CATER TO PROFESSIONALS --

13 ATTORNEYS, PHYSICIANS, ANY TYPE OF PROFESSIONAL PERSON THAT IS

14 GOING TO HAVE A NEED AND THAT'S VERY SHORT ON TIME AND JUST

15 APPRECIATES HAVING A LOT OF PERSONAL ATTENTION.

16 Q.   SO YOU'D SPEND A LOT OF HOURS ON THESE LOANS; IS THAT

17 CORRECT?

18 A.   OH, ABSOLUTELY.  AND THE UNDERWRITING CREDIT ANALYSIS

19 REQUIREMENTS CAUSE YOU TO.

20 Q.   AND I THINK YOU HAD -- WITH RESPECT TO MR. HARDWICK, YOU

21 WENT TO HIS OFFICE MANY TIMES.  YOU MENTIONED AT LEAST ONCE,

22 BUT IT WAS MANY TIMES, CORRECT?

23 A.   MANY TIMES, YES.

24 Q.   AND YOU WERE FAMILIAR WITH SOME OF HIS STAFF.  I THINK YOU

25 HAD E-MAILS WITH HIS ASSISTANT, BOBBIE CHRISTIAN LEFTWICH?

1    A.    CHRISTIAN -- YES, UH-HUH.

2    Q.    AS WELL AS YOU KNEW HIS PARTNERS, OF COURSE --

3    A.    UH-HUH.

4    Q.    -- MR. MORRIS AND MR. SCHNEIDER?

5    A.    NOT REALLY E-MAILING THEM BACK AND FORTH THAT MUCH BECAUSE

6    I DID NOT HAVE ANY PERSONAL RELATIONSHIPS WITH THEM.  IT WAS

7    JUST A CORDIAL TYPE OF THING WITH THEM.  AND I DID NOT HAVE THE

8    BUSINESS OF THE LAW FIRM EXCEPT FOR ONE IOLTA TRUST ACCOUNT.

9    Q.    BUT YOU WERE ALSO VERY CLOSE -- I SAY CLOSE, BUT THAT'S

10   NOT FAIR.  YOU WERE ALSO IN COMMUNICATION WITH A MAN NAMED TONY

11   ADAMS; IS THAT RIGHT?

12   A.    YES.

13   Q.    AND WHO IS TONY ADAMS TO YOU?

14   A.    NAT HARDWICK'S PERSONAL CPA.

15   Q.    AND THERE ARE MANY E-MAILS BETWEEN YOU AND HIM; IS THAT

16   RIGHT?

17   A.    YES, AS WELL AS HIS ASSISTANT.

18   Q.    AND PHONE CALLS, TOO; ISN'T THAT RIGHT?

19   A.    YES.  YES.

20   Q.    I BELIEVE HIS ASSISTANT WAS DARBY; IS THAT CORRECT?

21   A.    YES.

22   Q.    IS THAT YOUR UNDERSTANDING?

23   A.    YES.  I CAN'T REMEMBER HER LAST NAME.

24   Q.    OKAY.  AND IN ADDITION TO HIS CPA, SOME OF THE FOLKS THAT

25   WORK WITH HIM, AND MR. HARDWICK HIMSELF, YOU ALSO DID YOUR OWN

1  RESEARCH?

2  A.   YES.

3  Q.   OKAY.  PULLING PUBLIC DOCUMENTS, IS THAT RIGHT?  LOOKING

4  INTO CREDIT CHECKS AND CREDIT HISTORIES; IS THAT RIGHT?

5  A.   RIGHT.  MOSTLY ELECTRONIC CREDIT CHECKS AND ANY PUBLIC

6  DOCUMENTS THAT WERE PULLED, I WOULD USE THE BANK'S LEGAL

7  COUNSEL OR SUPPORT STAFF RESOURCES TO DO THAT.

8  Q.   THAT WAS MY NEXT QUESTION.  THE BANK HAD ATTORNEYS, RIGHT?

9  A.   RIGHT, UH-HUH.

10  Q.   AND THEY WOULD PULL THESE PUBLIC DOCUMENTS?

11  A.   RIGHT.

12  Q.   COURT FILINGS, LIENS, THINGS OF THAT NATURE; IS THAT

13  RIGHT?

14  A.   IF IT WAS NECESSARY BASED ON THE TYPE OF CREDIT I WAS

15  EXTENDING.

16  Q.   OKAY.  AND YOU ACTUALLY HAD FOR THE -- I GUESS IT WOULD BE

17  2011 TILL 2014, HAD A PRETTY GOOD RELATIONSHIP WITH

18  MR. HARDWICK?

19  A.   VERY GOOD.

20  Q.   BUSINESS RELATIONSHIP.

21  A.   YES.  VERY GOOD.

22  Q.   HE HAD AN EXCELLENT REPAYMENT HISTORY UP TO 2014?

23  A.   YES.  I WOULD SAY HE REPAID THE BANK AT LEAST A MILLION

24  DOLLARS.

25  Q.   AND YOU WERE AWARE OF THE, I GUESS, SUCCESS AND REPUTATION

1  OF HIS LAW FIRM; IS THAT RIGHT?

2  A.   FOR YEARS, YES.

3  Q.   THAT HE HAD GROWN IT, IT WAS AN EXPANSION OF TITLE

4  INSURANCE AND RESIDENTIAL INSURANCE OVER THE YEARS; IS THAT

5  RIGHT?

6  A.   AND CLOSINGS, YES.

7  Q.   AND CLOSINGS.  AND YOU ARE AWARE OF THE MERGER OF

8  MR. HARDWICK'S ORIGINAL FIRM, JACKSON HARDWICK --

9  A.   YES.

10  Q.   -- WITH MORRIS HARDWICK SCHNEIDER?

11  A.   YES.

12  Q.   HAD A GREAT REPUTATION OF DOING WONDERFUL BUSINESS IN

13  ATLANTA; IS THAT RIGHT?

14  A.   THAT'S RIGHT.

15  Q.   LET'S SEE.  I THINK AT ONE POINT YOU WERE AWARE THAT THE

16  FIRM HAD EXPERIENCED -- YOU HAD RESEARCHED GROSS REVENUES IN

17  THE -- UPWARDS OF 70 MILLION, POTENTIALLY?

18  A.   I WOULD SAY MORE IN THE 40, $42 MILLION RANGE.

19  Q.   OKAY.  I THINK AT ONE POINT YOU BELIEVED IT WAS

20  76 MILLION; IS THAT NOT RIGHT?

21  A.   KIND OF HAVING A HARD TIME RECALLING THAT.  I HAD AUDITED

22  FINANCIAL STATEMENTS ON THE FIRM.

23  Q.   WOULD SEEING A DOCUMENT THAT YOU HAD DRAFTED POSSIBLY

24  REFRESH YOUR RECOLLECTION?

25  A.   YEAH, UH-HUH.

1     MS. NOVAY:  ALL RIGHT.  IF I COULD HAVE JUST A

2  MOMENT, YOUR HONOR.

3     THE COURT:  SURE.

4  BY MS. NOVAY:

5  Q.  I'M LOOKING AT PAGE 2.

6     MS. NOVAY:  IF I COULD APPROACH.

7  BY MS. NOVAY:

8  Q.  DO YOU RECOGNIZE THIS DOCUMENT?

9  A.  IT'S A LOAN APPROVAL FORM, YES, THE BANK USED.

10  Q.  I'M GOING TO TURN TO PAGE 2, AND IF YOU WOULD JUST TAKE A

11  LOOK AT THE FIRST PARAGRAPH.  AND I HAVE SOME UNDERLINING

12  THERE.

13  A.  OKAY.

14  Q.  JUST READ IT AND LOOK UP AT ME WHEN YOU'RE FINISHED,

15  MA'AM, AND I'LL AWKWARDLY LOOK AT YOU.

16  A.  IT'S OKAY.

17     OKAY.  I MAY HAVE BEEN THINKING THE DIFFERENCE BETWEEN

18  GROSS REVENUE AND NET PROFIT.

19  Q.  THAT'S OKAY.  DOES THAT REFRESH YOUR RECOLLECTION?

20  A.  YEAH.

21  Q.  OKAY.  THANK YOU.  I BELIEVE YOU ALSO RECEIVED

22  MR. HARDWICK'S TAX RETURNS OVER THE YEARS; IS THAT CORRECT?

23  A.  YES, UH-HUH.  ANNUALLY.

24  Q.  AND HIS K-1 FORMS; IS THAT CORRECT?

25  A.  YES.

1  Q.  AND THOSE WERE GENERALLY GIVEN TO YOU VIA TONY THRASH, THE

2  CPA?

3  A.  TONY ADAMS?

4  Q.  I'M SORRY.  TONY ADAMS.  YES.

5  A.  YES.  AND INTERNALLY FROM TIME TO TIME, WHETHER IT BE THE

6  FINANCIAL ACCOUNTING STAFF OF MORRIS HARDWICK SCHNEIDER OR

7  HUMAN RESOURCES, THEY WOULD SOMETIMES GIVE ME THOSE

8  DOCUMENTATIONS BECAUSE IT HAD NOT BEEN YET TURNED OVER TO TONY

9  ADAMS.  SO IF TONY DIDN'T HAVE IT, I WOULD HAVE TO GO BACK TO

10  HUMAN RESOURCES AND THE FINANCIAL STAFF OF THE FIRM TO OBTAIN

11  THEM.

12  Q.  SO YOU HAD A -- YOU HAD A LOT OF DOCUMENTS WITH REGARD TO

13  MR. HARDWICK; IS THAT RIGHT?

14  A.  RIGHT.

15  Q.  I THINK AT SOME POINT YOU SAID THE FILE WAS LIKE YEA

16  THICK, ABOUT 2 FEET?

17  A.  YES, ABSOLUTELY.  AND IT'S DIFFICULT WITHOUT BEING ABLE TO

18  LOOK AT IT.

19  Q.  AND YOU HAD DISCUSSED HIS DIVORCE WITH HIM?

20  A.  YES.

21  Q.  WHEN HE HAD GONE THROUGH THAT?

22  A.  YES.

23  Q.  I THINK YOU HAD SAID -- YOU HAD ACTUALLY DISCUSSED SOME

24  IDEAS WHEN HE WAS ENGAGED TO BE MARRIED A SECOND TIME, OR A

25  THIRD TIME; ISN'T THAT CORRECT?

1    A.    YES.

2    Q.    YOU SAID THAT YOU BETTER GET A PRENUP, RIGHT?

3    A.    RIGHT.

4    Q.    AND GIVEN SOME LITTLE BIT OF FINANCIAL ADVICE, RIGHT?

5    A.    ABSOLUTELY.

6              THE COURT:  IF YOU ALL COULD STOP TALKING AT THE SAME

7    TIME.  MADAM COURT REPORTER IS PROBABLY GOING CRAZY DOWN THERE.

8    YES, SHE'S NODDING.  SO, PLEASE, ONE AT A TIME.

9              MS. NOVAY:  I'M SORRY, MS. COHN.

10   BY MS. NOVAY:

11   Q.    I THINK YOU HAD SAID, YOU KNOW, IF YOU SHOW UP -- IF I

12   SHOW UP AT THE WEDDING AND YOU DON'T HAVE A PRENUP, I'M GOING

13   TO OBJECT TO THAT MARRIAGE; IS THAT RIGHT?

14   A.    YES.

15   Q.    AND YOU WERE AWARE OF HIS FOUR-MONTH-OLD DAUGHTER AT THE

16   TIME; YOU KNEW HER?

17   A.    YES.

18   Q.    I THINK YOU HAD ALSO GIVEN HIM SOME END-OF-LIFE ADVICE,

19   SAYING, YOU NEED TO GET A WILL IN ORDER, RIGHT?

20   A.    YES.

21   Q.    I KNOW YOU SAID THAT YOU'D SPENT A LOT OF HOURS GOING OVER

22   DOCUMENTS WITH MR. HARDWICK AND SOME OF THE PEOPLE THAT WORK

23   WITH HIM.  CAN YOU GUESS, BEFORE YOU DID A LOAN, ABOUT HOW MANY

24   HOURS YOU WOULD SPEND?

25              AND LET ME CLARIFY.  THAT WOULD BE SPENT SPEAKING TO SOME

1  OF THE FOLKS THAT WORKED WITH MR. HARDWICK, WITH MR. HARDWICK,

2  AS WELL AS YOUR OWN RESEARCH INTO OTHER DOCUMENTS THAT MIGHT

3  PERTAIN TO THAT LOAN.

4  A.   YEAH.  I MEAN, I WOULD GIVE MYSELF PERSONALLY -- YOU KNOW,

5  YOU STOP, YOU START.  BUT I WOULD GIVE MYSELF PERSONALLY

6  PROBABLY, YOU KNOW, A WEEK AND A HALF.  SO, YOU KNOW, 50,

7  60 HOURS.

8       BUT THEN I WOULD HAVE TO TURN MY RESEARCH OVER TO A CREDIT

9  ANALYST GROUP.  AND AFTER ALL I RECEIVED, YOU'D BE AMAZED AT

10  WHAT ELSE COULD THEY POSSIBLY THINK OF.  BUT THEN THEY WOULD

11  SPEND HOURS COMPILING IT AND COMING BACK TO ME, ASKING FOR MORE

12  AND ASKING MORE QUESTIONS.  AND THEN I WOULD HAVE TO GO BACK TO

13  ALL THOSE SOURCES AND TRY TO OBTAIN ANYTHING THAT THEY WANTED

14  THAT I DID NOT HAVE.

15  Q.   AND SOMETIMES YOU WOULD TURN IN A LOAN DOCUMENT, AND THEY

16  WOULD GIVE IT BACK TO YOU, RIGHT?

17  A.   RIGHT, UH-HUH.

18  Q.   AND, I MEAN, I THINK WE JUST LOOKED AT DOCUMENT 440.  WAS

19  THAT AN EXAMPLE OF ONE THAT THERE WAS SOME CRITIQUES ON THERE

20  THAT WERE GIVEN BACK TO YOU?

21  A.   YES, UH-HUH.  BECAUSE WHEN IT'S PRESENTED TO A LOAN

22  COMMITTEE, IT NEEDS TO BE VERY CONCISE.  BECAUSE THEY ARE NOT

23  GOING TO DELVE THROUGH MY 2-FOOT-THICK FILE.  THEY WANT THE

24  INFORMATION LIKE THAT SO THE DECISION CAN BE MADE QUICKLY.

25            MS. NOVAY:  AND AT THIS TIME, YOUR HONOR, I'M GOING

1  TO MOVE FOR ADMISSION -- THIS IS THE FIRST PAGE, ONLY THE FIRST

2  PAGE OF DOCUMENT 440, DEFENDANT'S EXHIBIT 440.

3  THE COURT:  440, JUST PAGE 1?

4  MS. NOVAY:  JUST PAGE 1, YOUR HONOR.

5  THE COURT:  ANY OBJECTION?

6  MS. BARRON:  NO OBJECTION.

7  THE COURT:  IT'S ADMITTED.

8  MS. NOVAY:  AND IF I CAN PUBLISH?

9  BY MS. NOVAY:

10  Q.   I THINK THIS IS AN EXAMPLE WHERE MR. -- IS IT TERRY

11  GUTHRIE; IS THAT CORRECT?

12  A.   YES.

13  Q.   HE HAD WRITTEN YOU BACK AND SAID, THIS WAS TOO MUCH

14  OPINION, SENT IT BACK TO YOU TO CORRECT; IS THAT RIGHT?

15  A.   RIGHT, RIGHT.

16  Q.   OKAY.  THANK YOU.

17  LET'S SEE.  I THINK OVERALL YOU ACTUALLY DID FIVE LOANS

18  WITH MR. HARDWICK.  IS THAT YOUR UNDERSTANDING?

19  A.   THAT WOULD BE ABOUT RIGHT, YES.

20  Q.   SO THE FIRST ONE WAS THIS CONSOLIDATION, I CALL IT?

21  A.   RIGHT.

22  Q.   AND THAT WAS IN EARLY 2011, RIGHT?

23  A.   CORRECT.

24  Q.   AND THEN THERE WAS A SECOND LOAN THAT WAS MAY 10TH, 2011,

25  RIGHT?

1    A.    THE $25,000 LINE OF CREDIT, YES.

2    Q.    AND, ACTUALLY, THANK YOU FOR SAYING THAT.  BECAUSE IT

3    WASN'T REALLY A LOAN, IT WAS A LINE OF CREDIT?

4    A.    YES.

5    Q.    IS THIS SOMETHING THAT'S PRETTY STANDARD WITH MOST

6    CLIENTS?

7    A.    YES.

8    Q.    REALLY LIKE AN OVERDRAFT BALANCE?

9    A.    YES.

10    Q.    THIS WAS NOTHING YOU HAD TO RUN BY THE BOARD, IT WAS

11    SOMETHING THAT YOU COULD APPROVE?

12    A.    IT WAS JUST REALLY AN ACCOMMODATION.

13    Q.    IS THAT SOMETHING THAT MOST CLIENTS HAD?

14    A.    AT THAT LEVEL, YES.

15    Q.    AND I THINK IN EARLY 2011, AFTER THE $480,000 LOAN BUT

16    BEFORE THE LINE OF CREDIT, YOU AND MR. HARDWICK DISCUSSED THE

17    D&H DEVELOPMENT SITUATION, DID YOU NOT?

18    A.    RIGHT.

19    Q.    AND I THINK -- LET'S SEE.  YOU HAD DISCUSSED IT.  AND YOU

20    HAD TESTIFIED THAT IT WAS 2014 THAT YOU LEARNED ABOUT THE

21    GARNISHMENT, BUT IT WAS ACTUALLY 2011, JUST AFTER THE MAY OF

22    2011 LOAN; IS THAT RIGHT?

23    A.    IF I SAID 2014, I WAS MISTAKEN.  BECAUSE THAT'S ONE THING

24    I'M CLEAR ON, THAT THAT GARNISHMENT CAME IN WITHIN A MATTER OF

25    MONTHS AFTER I MADE THE FIRST TWO LOANS.

1    Q.   AND YOU DISCUSSED THAT WITH MR. HARDWICK; IS THAT RIGHT?

2    A.   RIGHT.  RIGHT.

3    Q.   AND YOU ALSO FILED THE MEMO --

4    A.   RIGHT.  RIGHT.

5    Q.   -- DID A MEMO TO THE FILE --

6    A.   RIGHT.

7    Q.   -- THAT THE GOVERNMENT SHOWED YOU?

8    A.   RIGHT.

9    Q.   LET'S SEE.  AT SOME POINT AFTER THE MAY 2011 LOAN, WHICH

10   WAS THE SECOND LOAN, THERE WAS ANOTHER LOAN YOU DID THAT

11   INVOLVED SOMETHING REGARDING MR. HARDWICK'S DIVORCE; IS THAT

12   RIGHT?

13   A.   UH-HUH.

14   Q.   AND I BELIEVE THERE WERE -- THERE WAS AN APPLICATION THAT

15   HAD BEEN FILLED OUT, BUT THE DIVORCE WASN'T ON THERE.  BUT

16   THERE WAS GOOD REASON WHY IT WAS NOT LISTED; IS THAT RIGHT?

17   A.   WELL, I DON'T -- A LOAN APPLICATION REALLY DOESN'T ASK

18   ABOUT PERSONAL ISSUES.  THAT'S KIND OF A PRIVACY ISSUE, SO

19   THAT'S NOT GOING TO BE ON THE LOAN APPLICATION.  BUT HE DID

20   TELL ME ABOUT IT AND HE DID GIVE ME A COPY OF THE SETTLEMENT.

21   IT'S VERY COMMON FOR A BANK TO ASK FOR A SETTLEMENT, KIND OF IN

22   A SHELL FORMAT FOR PRIVACY.

23   Q.   I THINK YOU HAD SAID THAT AT THAT TIME THERE WERE JUST

24   THREE OR FOUR PAYMENTS LEFT ON THAT OBLIGATION?

25   A.   IT WAS ABOUT TWO-THIRDS OF THE WAY THROUGH AT THAT POINT.

1  Q.   AND SO BECAUSE THERE -- IN YOUR WORDS, BECAUSE IT WAS

2  ABOUT TWO-THIRDS OF THE WAY THROUGH, IT WASN'T A LONG-TERM

3  OBLIGATION AS YOU VIEWED IT?

4  A.   NO, NOT REALLY.  AND SOME OF THE PROCEEDS I WAS LENDING

5  SUPPOSEDLY WAS TO PAY IT DOWN FURTHER.

6  Q.   I'M GOING TO SHOW YOU WHAT'S BEEN PREVIOUSLY MARKED AS

7  DEFENDANT'S EXHIBIT 700.

8       MS. NOVAY:  MS. BARRON, THIS IS A DOCUMENT I GAVE

9  YOU.

10      AND I'M GOING TO GO AHEAD AND MOVE IT INTO EVIDENCE.

11      MS. BARRON:  NO OBJECTION.

12      THE COURT:  IT'S ADMITTED.

13      MS. NOVAY:  IF I COULD HAVE JUST A MOMENT, YOUR

14  HONOR.  I'VE GOT A LOT OF STACKS OF PAPERWORK UP HERE.

15      THE COURT:  SURE.

16      MS. NOVAY:  THERE WE GO.  AND MAY I PUBLISH?

17      THE COURT:  YES.

18  BY MS. NOVAY:

19  Q.   THIS IS IN REGARD TO THE BELLAGIO LAWSUIT THAT -- WHICH WE

20  WERE DISCUSSING EARLIER.  CAN YOU SEE IT ALL RIGHT?

21  A.   YES, UH-HUH.

22  Q.   OKAY.  CHRONOLOGY OF EVENTS.  AND THIS IS SOMETHING THAT

23  APPEARS TO HAVE BEEN CREATED BY BELLAGIO, LLC.  IS THAT WHAT

24  YOU SEE THERE?

25  A.   YES.  YES.

1 Q. AND DOES THIS APPEAR TO BE JUST A CHRONOLOGY OF EVENTS

2 WITH REGARD TO THE PENDING LAWSUIT?

3 A. I'VE NEVER SEEN THIS; BUT, YES, IT DOES APPEAR TO BE THAT.

4 Q. I'M SORRY. YOU'VE NEVER SEEN THIS BEFORE?

5 A. UH-UH.

6 Q. DO YOU RECALL MEETING WITH AGENTS AT THE U.S. ATTORNEY'S

7 OFFICE HERE IN THE NORTHERN DISTRICT?

8 A. OH, I'M SORRY. THEY -- I DON'T KNOW IF THEY SHOWED THIS

9 TO ME, BUT THEY MAY HAVE MENTIONED TO ME. I MEANT I NEVER SAW

10 THIS WHILE I WAS AT THE BANK.

11 Q. OKAY. ALL RIGHT. THANK YOU VERY MUCH.

12 AND, ACTUALLY, SPEAKING OF WHICH, AT SOME POINT IN 2015,

13 YOU DID MEET WITH THE U.S. ATTORNEY'S OFFICE; IS THAT RIGHT?

14 A. I DID.

15 Q. NONE OF THE LAWYERS THAT ARE SITTING AT THIS TABLE HERE,

16 BUT ANOTHER ATTORNEY?

17 A. RIGHT.

18 Q. AND I THINK YOU HAD SAID YOU DIDN'T LEARN ABOUT THE

19 BELLAGIO JUDGMENT IN 2015 AND MAYBE RECALL THAT IT WAS ACTUALLY

20 2014?

21 A. YEAH. I LEARNED ABOUT IT WITH THE ANGEL OAK MORTGAGE

22 APPLICATION, BUT IT WAS JUST THROUGH AN E-MAIL AND

23 CONVERSATIONS WITH THAT MORTGAGE LOAN OFFICER, GIANNI

24 CERRETANI. I NEVER SAW THE JUDGMENT OR SUIT OR WHATEVER UNTIL

25 I CAME HERE TO THE U.S. ATTORNEY'S OFFICE IN THE SUMMER OF '15,

1    I GUESS IT WAS.

2    Q.    I THINK IT WAS AUGUST OF 2015.

3    A.    MAYBE.  YEAH, MAYBE.

4    Q.    MENTIONING MR. GIOVANNI --

5    A.    GIANNI.

6    Q.    MR. GIANNI.  I BELIEVE HE HAD ACTUALLY UNCOVERED IT; IS

7    THAT RIGHT?

8    A.    THAT'S CORRECT.

9    Q.    AND THEN BROUGHT IT TO YOUR ATTENTION?

10    A.    THAT'S RIGHT.

11    Q.    OKAY.  SO I THINK IN MEETING WITH THE U.S. ATTORNEY'S

12    OFFICE, YOU -- I BELIEVE THAT HIS NAME WAS DAVID CHAIKEN; IS

13    THAT CORRECT?

14    A.    YES.

15    Q.    AND HE ACTUALLY CONTACTED YOU AND REACHED OUT TO YOU IN

16    2015?

17    A.    CORRECT.

18    Q.    THE SUMMER?

19    A.    YES.

20    Q.    AND THEN IN AUGUST, YOU CAME UP HERE AND MET WITH HIM IN

21    HIS OFFICE; IS THAT RIGHT?

22    A.    CORRECT.

23    Q.    AND I BELIEVE HE TOLD YOU YOU WERE A VERY IMPORTANT

24    WITNESS, DID HE NOT?

25    A.    I THINK SO, YEAH.

1   Q.   AND DURING THAT INTERVIEW, I THINK YOU STATED YOU FELT

2   RUSHED?

3              MS. BARRON:  I OBJECT, YOUR HONOR.  THIS IS WAY

4   BEYOND THE SCOPE OF THE DIRECT.

5              THE COURT:  I'LL SUSTAIN.

6              MS. BARRON:  THE RELEVANCE IS UNCLEAR.

7              THE COURT:  I'LL SUSTAIN.

8              MS. NOVAY:  YOUR HONOR, ACTUALLY, I'D LIKE TO BE

9   HEARD ON THAT.  MAY I APPROACH?

10             THE COURT:  YEAH.

11             (WHEREUPON, A BENCH CONFERENCE OUT OF THE HEARING OF

12   THE JURY PROCEEDED AS FOLLOWS:)

13             MS. NOVAY:  THE RELEVANCE IS THAT THIS WITNESS IS

14   GOING TO SAY THAT SHE FELT INTIMIDATED AND SHE FELT VERY RUSHED

15   DURING THE INTERVIEW.  ONE OF THE THINGS THE DEFENDANT IS GOING

16   TO BE ARGUING IS THAT OF COURSE THIS WAS A RUSH TO JUDGMENT.

17   THE FACT THAT SHE --

18             THE COURT:  MAYBE ASK THAT, IF SHE FELT THAT WAY, AND

19   THEN GO BACK.  BECAUSE RIGHT NOW --

20             MS. NOVAY:  I'LL GO RIGHT BACK TO THAT.

21             THE COURT:  WHAT'S YOUR POSITION?

22             MS. BARRON:  WHETHER DAVID CHAIKEN INTIMIDATED HER

23   HAS NOTHING TO DO WITH WHETHER SHE OFFERED TRUTHFUL TESTIMONY

24   TODAY.

25             THE COURT:  YEAH, I AGREE WITH THAT.  I AGREE WITH

1   THAT.  THE WAY THAT HE -- AND, OF COURSE, HE'S NOT GOING TO BE

2   A WITNESS TO TESTIFY AS TO THE MANNER IN WHICH HE INTERVIEWED

3   HER.

4           MS. NOVAY:  I THINK IT'S MORE -- AND I'M SORRY.  I

5   DIDN'T MEAN TO CUT YOU OFF.  I CAN TRY TO CRAFT IT A LITTLE BIT

6   BETTER.  I SEE THE GOVERNMENT'S ARGUMENT.

7           THE COURT:  IT'S IMPROPER IMPEACHMENT.  BECAUSE

8   BASICALLY WHAT YOU'RE DOING IS SAYING THAT WHAT SHE SAID BEFORE

9   IS NOT TRUTHFUL, AND YOU'RE TRYING TO OFFER AN EXPLANATION THAT

10  IS IMPEACHMENT AND IMPROPER.

11          MS. BARRON:  IT SUGGESTS THAT WE BULLY PEOPLE.

12          THE COURT:  YEAH.

13          MS. NOVAY:  I HEAR THAT ARGUMENT.  I THINK MY THING

14  IS THAT SHE FELT THAT INITIALLY SHE WAS THE ONE WHO WAS IN

15  TROUBLE, SHE WAS THE ONE THAT FELT LIKE SHE WAS DOING WRONG AND

16  WAS NERVOUS AND FELT RUSHED IN GIVING EXPLANATIONS.

17          THE COURT:  WELL, I DON'T THINK YOU'VE ESTABLISHED IN

18  ANY WAY THAT ANY STATEMENT THAT SHE'S GIVEN IS UNTRUTHFUL.

19  THAT IS IMPEACHMENT.  AND SO THE WAY THAT YOU'RE DOING IT IS

20  IMPROPER IMPEACHMENT.  SO I WOULD SUSTAIN THIS.  OKAY.

21          (WHEREUPON, PROCEEDINGS RESUMED IN OPEN COURT AS

22  FOLLOWS:)

23          THE COURT:  RULING STANDS.

24          MS. NOVAY:  IF I MAY HAVE JUST ONE MOMENT, YOUR

25  HONOR?

1    THE COURT:  SURE.

2    MS. NOVAY:  THAT WASN'T ME, WAS IT?

3    UNIDENTIFIED SPEAKER:  THAT WAS ME.  I APOLOGIZE.

4  BY MS. NOVAY:

5  Q.   ALL RIGHT.  MS. KORNEGAY -- EXCUSE ME.  MS. TYLER.

6  A.   THAT'S FINE.

7  Q.   I BELIEVE YOU DISCUSSED AN E-MAIL REGARDING NETJETS WITH

8  THE GOVERNMENT ON YOUR DIRECT TESTIMONY; IS THAT RIGHT?

9  A.   YES.

10  Q.   AND I'M GOING TO PULL UP GOVERNMENT'S EXHIBIT 933, WHICH

11  HAS ALREADY BEEN ADMITTED INTO EVIDENCE.  AND THIS WAS --

12  EXCUSE ME.  THIS IS YOUR WRITING -- OR NOT YOUR WRITING, BUT

13  YOUR WORDS, WHERE YOU SAID:  KNOWING IT RELATES TO YOUR DIVORCE

14  HELPS.

15    YOU'RE TALKING ABOUT THE NETJETS LAWSUIT; IS THAT CORRECT?

16  A.   RIGHT.  RIGHT.

17  Q.   SAYING THAT, IF YOUR EX IS FLYING AROUND AND NOW THEY'RE

18  TRYING TO DING YOU FOR IT WHEN YOU DIDN'T AGREE TO PAY THEM,

19  THAT'S SOMETHING THAT COULD HELP, KNOWING THAT IT RELATES TO

20  YOUR DIVORCE; IS THAT RIGHT?

21  A.   RIGHT.

22  Q.   IT WOULD ACTUALLY HELP IN THE LOAN APPLICATION; IS THAT

23  CORRECT?

24  A.   WELL, THERE'S A DIFFERENCE BETWEEN WHETHER AN EX-WIFE WAS

25  OBLIGATED ON THE CONTRACT OR JUST USING THAT SERVICE FOR

1  FLIGHTS WHEN MAYBE SHE WAS NOT SUPPOSED TO OR AUTHORIZED TO.

2  Q.   AND MR. HARDWICK HAD RESPONDED THAT IN FACT, NO -- IF YOU

3  LOOK UP AT YOUR SCREEN -- NO, THIS WAS ACTUALLY SOMETHING

4  THAT'S GOING TO BE USED FOR ME.

5       MEANING, NO, IT'S NOT ABOUT MY DIVORCE; IS THAT CORRECT?

6  A.   RIGHT.   RIGHT.

7  Q.   WAS THAT YOUR UNDERSTANDING AT THE TIME?

8  A.   AT THE TIME, THAT THERE WAS SOME CONFUSION OVER THAT.

9  Q.   OKAY.   AND, MS. TYLER, LAST I'M GOING TO SHOW YOU WHAT'S

10  BEEN PREVIOUSLY MARKED AS DEFENDANT'S 422.   I'LL GET YOU YOUR

11  COPY.

12          MS. NOVAY:   AND I'LL MOVE FOR ADMISSION OF DOCUMENT

13  422.

14          MS. BARRON:   NO OBJECTION.

15          THE COURT:   IT'S ADMITTED.

16  BY MS. NOVAY:

17  Q.   ACTUALLY, I DON'T NEED TO GIVE YOU A COPY BECAUSE I'M JUST

18  GOING TO GO AHEAD AND SHOW IT TO YOU RIGHT NOW.   I'M TURNING TO

19  PAGE 6.   AND I'M GOING TO SHOW YOU, IF I CAN ZOOM IN -- THIS

20  HAS MY UNDERLINING ON IT.   I'LL GIVE A CLEAN COPY TO THE COURT.

21       WHAT IS THIS BORROWER'S BACKGROUND SECTION RIGHT HERE?

22  WHAT IS THAT?

23  A.   IT'S JUST A PARAGRAPH DRAFT TO HELP INDIVIDUALS UNDERSTAND

24  WHO THE BORROWER OR GUARANTOR IS, WHAT THEY DO, PERTINENT

25  POINTS ABOUT THEIR, THEIR OBLIGATIONS OR THEIR BUSINESSES.

1    Q.   AND WHAT IS THE DATE OF THIS DOCUMENT?

2    A.   JUNE 11TH OF '12.

3    Q.   AND THIS IS ACTUALLY -- LET ME SHOW THE FIRST PAGE -- A

4    FIRST LANDMARK BANK LOAN APPROVAL FORM; IS THAT RIGHT?

5    A.   YES.

6    Q.   IS THIS SOMETHING THAT YOU WOULD HAVE FILLED OUT?

7    A.   YES.  I WOULD HAVE FILLED IT OUT IN DRAFT FORM, AND THEN

8    OUR CREDIT ANALYSIS GROUP WOULD ADD CERTAIN ANALYSIS TO IT AND

9    MAKE RECOMMENDATIONS ABOUT MY DRAFT.

10   Q.   AND THIS IS SOMETHING YOU WOULD HAVE FILLED OUT I GUESS A

11   LITTLE LESS THAN A MONTH AFTER YOU SENT THE E-MAIL?

12   A.   YEAH.  IT'S SOMETHING THAT'S COMPLETED OVER TIME.  IT

13   TAKES QUITE A WHILE TO COMPILE.

14   Q.   AND I'M GOING TO TURN YOUR ATTENTION TO PAGE 6 OF THIS

15   DOCUMENT.  GIVE IT A SECOND TO CATCH UP.  AND I BELIEVE UNDER

16   THE BORROWER'S BACKGROUND, YOU STATED:  UNFORTUNATELY, EX-WIFE

17   OF BORROWER -- THAT'S MR. HARDWICK; IS THAT RIGHT?

18   A.   YES.

19   Q.   AND IT SAYS EX-WIFE.  YOU'RE TALKING ABOUT THIS PRIOR

20   SPOUSE, RIGHT?

21   A.   RIGHT.

22   Q.   DID NOT FULLY HONOR THE SETTLEMENT, RUNNING UP THE AMEX

23   CARD.

24        MEANING HIS EX-WIFE HAD RUN UP THE AMEX CARD; IS THAT

25   RIGHT?

1    A.   YES.

2    Q.   AND UTILIZING THE NETJETS CONTRACT; IS THAT CORRECT?

3    A.   YES.

4    Q.   OKAY.  I THINK THESE ARE ALL THE -- OH.  I HAVE ONE MORE

5    QUESTION.  I'M SORRY.

6         YOU HAD STATED THAT YOU DO RECEIVE COMMISSIONS BASED ON

7    THE LOANS THAT YOU PROVIDE; IS THAT CORRECT?

8    A.   IT'S MORE ON AN ANNUAL BASIS BASED ON AN ENTIRE PORTFOLIO.

9    Q.   OKAY.  AND MR. HARDWICK WAS PART OF YOUR PORTFOLIO?

10   A.   RIGHT.

11        MS. NOVAY:  THANK YOU, YOUR HONOR.  THOSE ARE ALL THE

12   QUESTIONS I HAVE.

13        THE COURT:  THANK YOU.

14        ANY REDIRECT?

15        MS. BARRON:  YES, YOUR HONOR.

16                      REDIRECT EXAMINATION

17   BY MS. BARRON:

18   Q.   REGARDING THAT NETJETS CONTRACT, MS. NOVAY SHOWED YOU

19   PAGE 2 OF GOVERNMENT'S 933, WHERE MR. HARDWICK SAYS, NO, IT WAS

20   GOING TO BE FOR ME BUT IT WAS NOT USED.

21   A.   CORRECT.

22   Q.   YOU STATED THAT THERE WAS SOME CONFUSION AS TO THAT?

23   A.   RIGHT.  RIGHT.

24   Q.   TELL THE JURY WHAT WAS CONFUSING ABOUT THAT.

25   A.   WELL, YOU HAVE TO KEEP IN MIND I ALSO HAD THE DIVORCE

1 SETTLEMENT. AND I FELT LIKE FROM HIM, HE FELT LIKE NETJET WAS

2 TRYING TO OVERCHARGE HIM. AND HE INDICATED TO ME, AS IN MOST

3 DIVORCE SETTLEMENTS, THAT ONCE IT'S SETTLED, THERE ARE CERTAIN

4 OBLIGATIONS THAT ONE SPOUSE OR THE OTHER IS RESPONSIBLE FOR.

5 AND THERE MAY HAVE BEEN JOINT OBLIGATIONS THEN. AND, YOU KNOW,

6 IN HIS CASE, HIS EX-WIFE SHOULD NOT CONTINUE TO UTILIZE THOSE

7 ITEMS, THAT SHE MIGHT HAVE GONE AHEAD AND CONTINUED TO USE THE

8 AMEX CARD AND THE NETJET SERVICES.

9     AND THAT'S WHY HE DIDN'T HAVE TO FULLY PAY, BECAUSE SHE

10 HAD UTILIZED A PART OF IT. AND THEY WEREN'T SUPPOSED TO

11 PROVIDE IT TO HER, OR IT WAS AGAINST HIS -- HE DID NOT AGREE TO

12 IT, OR THAT THEY WERE TRYING TO CHARGE HIM WITH USING THOSE

13 SERVICES MORE THAN HE ACTUALLY USED THEM.

14 Q.   SO WAS HE TRYING TO CONVINCE -- WAS HE TRYING TO TELL YOU

15 THAT THE NETJET FLIGHTS WERE USED BY HIS EX-WIFE?

16 A.   NOT TOTALLY, BUT PARTIALLY.

17       MS. BARRON:  YOUR HONOR, AT THIS TIME I MOVE TO ADMIT

18 GOVERNMENT'S 903.

19       MS. NOVAY:  NO OBJECTION, YOUR HONOR.

20       THE COURT:  IT'S ADMITTED.

21 BY MS. BARRON:

22 Q.   ALL RIGHT. MS. TYLER, THIS IS AN E-MAIL FROM MR. HARDWICK

23 TO DONNA SLOAN. AND I BELIEVE YOU TESTIFIED EARLIER THAT THAT

24 WAS HIS PERSONAL ATTORNEY?

25 A.   YES. AND I BELIEVE SHE WAS ALSO --

1    MS. NOVAY:  YOUR HONOR, IF I COULD APPROACH?

2    THE COURT:  YES.

3    MS. NOVAY:  I'M SORRY, YOUR HONOR.

4    (WHEREUPON, A BENCH CONFERENCE OUT OF THE HEARING OF

5    THE JURY PROCEEDED AS FOLLOWS:)

6    MS. NOVAY:  THIS IS -- ACTUALLY, SHE HAD PROVIDED

7    THIS TO ME, BUT I THINK I HAVE TO OBJECT BASED ON THIS IS

8    ATTORNEY-CLIENT PRIVILEGE.  THIS IS AN E-MAIL BETWEEN HIM AND

9    THE PERSON WHO WAS REPRESENTING HIM AT THE TIME.  I HAVE TO

10   PRESERVE THAT.  I OBJECT.

11   MS. BARRON:  WHAT IF I DID THIS, BECAUSE IT REALLY IS

12   AN E-MAIL FROM NETJETS TO HIM, IF WE JUST AGREE TO REDACT --

13   MS. NOVAY:  I THINK THAT CURES IT.

14   THE COURT:  OKAY.

15   MS. NOVAY:  YEAH.

16   (WHEREUPON, PROCEEDINGS RESUMED IN OPEN COURT AS

17   FOLLOWS:)

18   THE COURT:  EXHIBIT IS STILL ADMITTED SUBJECT TO THE

19   DISCUSSED ADJUSTMENTS.

20   BY MS. BARRON:

21   Q.   OKAY.  AND WHAT'S THE DATE ON THIS E-MAIL?

22   A.   AUGUST 3RD, 2010.

23   Q.   AND WHAT IS THE SUBJECT LINE?

24   A.   FLIGHT ACTIVITY REPORTS FOR 2008 TO PRESENT FOR NATHAN

25   HARDWICK.

1   Q.   OKAY.  NOW, I'M GOING TO SHOW YOU THE E-MAIL THAT IS

2   FORWARDED.  WHAT'S THE DATE ON THAT E-MAIL?

3   A.   JULY 30TH, 2010.

4   Q.   AND WHO IS IT FROM?

5   A.   NAT HARDWICK -- WAIT.  TEAM36.

6   Q.   AT?

7   A.   AT NETJETS.COM.

8   Q.   AND WHO IS IT TO?

9   A.   NAT HARDWICK.

10  Q.   OKAY.  AND THEN IF WE TURN TO PAGE 2, SO THIS IS REMINDER,

11  THE SUBJECT LINE IS FLIGHT ACTIVITY REPORTS.

12       REMIND THE JURY WHAT MR. HARDWICK'S EX-WIFE'S NAME IS.

13  A.   OH.  I NEVER MET HER.  JULIE?

14  Q.   JULIE CALLAWAY?  DOES THAT SOUND FAMILIAR?

15  A.   MAYBE.  YOU KNOW, I'D HAVE TO BE REMEMBERING FROM THE

16  DIVORCE SETTLEMENT, BECAUSE I NEVER MET HER.

17  Q.   OKAY.  DO YOU SEE WHERE IT LISTS ALL OF THE DATES OF THE

18  FLIGHTS?

19  A.   YES.

20  Q.   IN 2008?

21  A.   YES.

22  Q.   AND THEN OFF TO THE RIGHT, IT LISTS THE PASSENGERS?

23  A.   YES.

24  Q.   JULIA OLIVARES?

25  A.   RIGHT.

1    Q.   THAT IS NOT MR. HARDWICK'S WIFE, IS IT?

2              MS. NOVAY:  YOUR HONOR, I'M GOING TO OBJECT TO THE

3    RELEVANCE OF THIS.  I'M NOT SURE --

4              THE COURT:  I'LL SUSTAIN AS TO RELEVANCE AND AS TO

5    FOUNDATION.  I DON'T THINK THIS WITNESS CAN TESTIFY TO THAT,

6    FROM WHAT I'M UNDERSTANDING, UNLESS I MISUNDERSTOOD HER.

7              MS. BARRON:  WELL, YOUR HONOR, IT'S TO REBUT ON

8    CROSS-EXAMINATION.

9              THE COURT:  HOLD ON ONE SECOND.

10             DO YOU KNOW THE ANSWER TO THIS FIRST, BEFORE WE GO

11   FURTHER IN THE DISCUSSION?

12             THE WITNESS:  REPHRASE WHAT YOU'RE ASKING ME AGAIN.

13             MS. BARRON:  WELL, NOW I'M CONFUSED.  IS THE QUESTION

14   JUST AS TO WHO JULIA OLIVARES IS?

15             THE COURT:  WHETHER SHE CAN SAY.

16             MS. BARRON:  I WILL WITHDRAW THAT.

17             THE COURT:  OKAY.

18             THE WITNESS:  I KNOW OF HER.

19             THE COURT:  HOLD ON ONE SECOND.  LET'S FIGURE OUT

20   WHAT THE QUESTION IS SO WE CAN DETERMINE WHETHER THERE'S AN

21   OBJECTION TO IT.

22             SO WHAT IS THE QUESTION AT THIS POINT?

23             MS. BARRON:  WELL, I WILL WITHDRAW THE QUESTION AS TO

24   WHO WAS JULIA OLIVARES.

25             THE COURT:  OKAY.

1     MS. NOVAY:  I OBJECT TO THE DOCUMENT.  I MEAN, I

2  THINK IT'S BEING OFFERED TO SHOW MY CLIENT WAS IN SOME KIND OF

3  AFFAIR, WHICH IS NOT THE CASE.

4     THE COURT:  WAIT A MINUTE.  WAIT A MINUTE.  WAIT A

5  MINUTE.  I THOUGHT THAT THE DOCUMENT, SUBJECT TO THAT ONE

6  REDACTION, HAD NOT BEEN OBJECTED TO AND HAD ALREADY BEEN

7  ADMITTED.  IS THIS THAT SAME DOCUMENT?

8     MS. BARRON:  THAT IS CORRECT.  AND THAT IS ACTUALLY

9  NOT THE POINT I WAS GOING TO MAKE WITH IT.

10     THE COURT:  OKAY.  SO THIS DOCUMENT IS IN.  DO YOU

11  WISH TO REVISIT THE ADMISSION OF THE DOCUMENT FOR SOME REASON,

12  MS. NOVAY?

13     MS. NOVAY:  I THOUGHT I UNDERSTOOD WHERE THE

14  GOVERNMENT WAS GOING.

15     THE COURT:  I'M JUST ASKING MY QUESTION.

16     MS. NOVAY:  YES.

17     THE COURT:  DO YOU --

18     MS. NOVAY:  YES, YOUR HONOR.

19     THE COURT:  OKAY.  LOOK AT THE DOCUMENT.  AND SO YOU

20  HAVE SOME OBJECTION TO IT?  DISCUSS IT WITH -- YES.

21     MS. NOVAY:  THANK YOU.

22     (WHEREUPON, THE ATTORNEYS ARE CONFERRING.)

23     MS. NOVAY:  I UNDERSTAND, YOUR HONOR.  I'LL WITHDRAW

24  MY OBJECTION.

25     THE COURT:  ARE YOU SURE?

1    MS. NOVAY:  I AM.

2    THE COURT:  TO ALL PAGES?

3    MS. NOVAY:  WELL, WE'LL SEE.

4    THE COURT:  OKAY.  ALL RIGHT.  IT'S IN.  AT THIS

5    POINT IT IS IN, SUBJECT TO THAT EARLIER REDACTION DISCUSSED.

6    NOW, IS THERE AN OBJECTION TO A QUESTION, OR DO WE

7    NEED TO SEE WHAT THE QUESTION IS?

8    WHAT'S YOUR NEXT QUESTION, MS. BARRON?

9    BY MS. BARRON:

10   Q.   MS. KORNEGAY-TYLER, DO YOU SEE THE NAME JULIE HARDWICK OR

11   JULIE CALLAWAY ANYWHERE IN THE LEAD PASSENGER MANIFEST ON THIS

12   DOCUMENT?

13   A.   NO, I DON'T.  AND I'VE NEVER SEEN THAT DOCUMENT.

14   Q.   NOW I'M SHOWING YOU PAGE 3.  THERE IS SOME MORE LEAD

15   PASSENGERS.  SEE THE DATES.  DO YOU SEE THE NAME JULIE CALLAWAY

16   OR JULIE HARDWICK ANYWHERE OVER ON THE RIGHT?

17   A.   NO.

18   Q.   OKAY.  I THINK THAT'S IT.

19   AND THEN, FINALLY, MS. NOVAY ASKED YOU SOME QUESTIONS AS

20   TO -- A LOT OF QUESTIONS ABOUT THE DILIGENCE THAT THE BANK DOES

21   IN DECIDING TO MAKE A LOAN.  DO YOU REMEMBER THAT?

22   A.   YES.

23   Q.   ABOUT THE CREDIT APPLICATIONS AND THE JUDGMENTS Y'ALL LOOK

24   FOR.  I THINK SHE SAID A STACK YEA HIGH.  AND, FOR THE RECORD,

25   THIS IS ABOUT A FOOT BETWEEN MY HANDS.

1  A.   WELL, THAT WAS PERTAINING TO THE FILES THAT I HAD AT THE

2  BANK, I BELIEVE.

3  Q.   AND DESPITE THAT DILIGENT PROCESS, ARE THERE STILL THINGS

4  THAT YOU MISS FROM TIME TO TIME?

5  A.   ABSOLUTELY.

6  Q.   AND IS THAT WHY YOU PLACE THE BURDEN ON THE BORROWER TO BE

7  TRUTHFUL ON THEIR APPLICATION ABOUT LISTING ALL OF THEIR DEBTS

8  AND JUDGMENTS?

9  A.   YES.  YES.

10            MS. NOVAY:  OBJECTION TO LEADING.

11            THE COURT:  I'LL OVERRULE THERE.  I'LL OVERRULE.

12            MS. BARRON:  NO FURTHER QUESTIONS.

13            THE COURT:  ALL RIGHT.  ANYTHING FURTHER FROM THE

14  DEFENSE?

15            MS. NOVAY:  YES, YOUR HONOR.

16                    RECROSS-EXAMINATION

17  BY MS. NOVAY:

18  Q.   MS. TYLER, YOU NO LONGER WORK FOR FIRST LANDMARK BANK; IS

19  THAT CORRECT?

20  A.   THAT'S CORRECT.

21  Q.   IS IT STILL FIRST LANDMARK BANK OR DID IT MERGE?

22  A.   IT HAS AN ACQUISITION IN PROCESS BY A PUBLIC BANK OUT OF

23  BIRMINGHAM.

24  Q.   AND WHY DID YOU LEAVE?

25  A.   DUE TO THE FACT THAT THE BANK WAS GOING THROUGH A SMALLER

1  MERGER WITH METROPOLITAN BANK IN BUCKHEAD, AND THEY WERE MAKING

2  A LOT OF CHANGES.  AND THE REQUIREMENTS THAT THEY HAD DID NOT

3  FIT THE LINE OF BUSINESS THAT I WAS TRYING TO HANDLE.

4  Q.   WERE YOU CONCERNED THAT YOU WOULDN'T BE ABLE TO PRODUCE

5  THIS LINE OF BUSINESS THAT THEY WANTED?

6  A.   ABSOLUTELY, WHEN I BROUGHT BUSINESS THAT THEY DID NOT WANT

7  TO APPROVE.

8        MS. NOVAY:  ALL RIGHT.  THANK YOU VERY MUCH.  NO

9  FURTHER QUESTIONS.

10       THE COURT:  THANK YOU, MS. NOVAY.

11       ANYTHING FURTHER, MS. BARRON?

12       MS. BARRON:  NO, YOUR HONOR.

13       THE COURT:  ALL RIGHT.  THANK YOU, MA'AM.  YOU ARE

14  FREE TO GO.  THANK YOU SO MUCH.

15       THE WITNESS:  THANK YOU.

16       THE COURT:  ALL RIGHT.  LET'S AT LEAST TRY TO GET

17  ANOTHER WITNESS GOING BEFORE WE BREAK FOR LUNCH.

18       SO, GOVERNMENT, CALL YOUR NEXT WITNESS, PLEASE.

19       MR. PHILLIPS:  YOUR HONOR, MAY WE APPROACH THE BENCH

20  FOR A SECOND?

21       THE COURT:  YES, SIR.

22       (WHEREUPON, A BENCH CONFERENCE OUT OF THE HEARING OF

23  THE JURY PROCEEDED AS FOLLOWS:)

24       MR. PHILLIPS:  YOUR HONOR, WE'RE GOING TO CALL

25  SPECIAL AGENT CHIP CROMER TO READ IN SOME ADMISSIONS --

1          THE COURT:  OKAY.

2          MR. PHILLIPS:  -- BY THE DEFENDANT.  WE HAVE GOT

3    SEVERAL EXCERPTS FROM DEPOSITIONS AND SEVERAL E-MAILS THAT WE

4    WANT TO READ.

5          THE COURT:  OKAY.

6          MR. PHILLIPS:  AND SO I WANTED TO TALK TO THE COURT

7    ABOUT THE PROCEDURE FOR THAT.  WE'VE SEEN IT DONE SEVERAL WAYS.

8    SOMETIMES WE HAVE THE AGENT JUST TAKE THE STAND AND READ THE

9    PART OF THE DEFENDANT, AND THEN I WILL READ THE QUESTIONS ON

10   BEHALF OF THE LAWYER.

11         THE COURT:  THAT'S HOW I HAVE SEEN IT DONE.

12         DO YOU HAVE A POSITION ON THAT?

13         MS. LOEB:  YES.  WE JUST GOT THIS FOR THE FIRST TIME

14   LAST WEEK.  I WAS SURPRISED THAT TWO OF THEM WERE FROM

15   MR. HARDWICK'S DIVORCE.  THERE ARE DEPOSITIONS FROM 2008 AND

16   2009.  WE DON'T HAVE THE REST OF THE DEPOSITIONS TO --

17         MR. PHILLIPS:  SURE, YOU DO.

18         THE COURT:  SO YOUR ISSUE IS NOT TO THE MANNER IN

19   WHICH IT WILL BE PRESENTED.

20         MS. LOEB:  THE RELEVANCE.  I DON'T UNDERSTAND.

21         THE COURT:  LET ME SEND THE JURY OUT.  ALL RIGHT.

22         (WHEREUPON, PROCEEDINGS RESUMED IN OPEN COURT AS

23   FOLLOWS:)

24         THE COURT:  JURORS, IF YOU WOULD RETIRE TO THE JURY

25   ROOM FOR JUST A MOMENT.  THANK YOU.

1          (WHEREUPON, THE JURY RETIRED FROM THE COURTROOM AT

2     11:54 A.M., AND THE FOLLOWING PROCEEDINGS WERE HAD.)

3          THE COURT:  ALL RIGHT.  EVERYBODY MAY BE SEATED.

4          THE GOVERNMENT HAS INDICATED THAT IT INTENDS AT THIS

5     TIME TO HAVE SOME DEPOSITION PORTIONS READ INTO THE RECORD.

6          GOVERNMENT, I'LL GIVE YOU AN OPPORTUNITY TO STATE

7     AGAIN WHAT THESE DEPOSITIONS ARE.

8          I THOUGHT OUR CONVERSATION WAS GOING TO BE ABOUT THE

9     MANNER IN WHICH THEY WOULD BE READ, BUT IT APPEARS THAT DEFENSE

10    HAS AN OBJECTION EVEN TO THE DEPOSITIONS THEMSELVES.  SO LET'S

11    CLARIFY WHAT THE OBJECTION IS.

12         GOVERNMENT, GO AHEAD AND IDENTIFY WHAT IT IS YOU WANT

13    YOUR WITNESS TO READ FROM.

14         MR. PHILLIPS:  YOUR HONOR, I HAVE JUST A COUPLE OF

15    PAGES FROM THREE DIFFERENT DEPOSITIONS THAT THE DEFENDANT GAVE.

16    AS THE COURT CAN SEE BY WHAT I'M HOLDING UP, IT'S VERY SHORT.

17         ONE OF THE DEPOSITIONS IS FROM 2008, ONE IS FROM

18    2009, AND ONE IS FROM 2015.  I ALSO HAVE TWO E-MAILS THAT WERE

19    AUTHORED BY THE DEFENDANT THAT I WANT TO HAVE THE AGENT READ IN

20    AS WELL.

21         SO MS. LOEB HAD SAID WHEN WE WERE UP AT THE BENCH A

22    SECOND AGO THAT HER OBJECTION HAD SOMETHING TO DO WITH THE FACT

23    THAT THESE DEPOSITIONS WERE TAKEN IN THE DIVORCE CASE.  THE

24    PART THAT I WANT TO READ TO THE JURY HAS NOTHING TO DO WITH

25    THAT.

1    THE COURT:  WELL, WHAT IS IT THAT YOU WANT TO READ?

2 BECAUSE I THOUGHT THAT OUR DISCUSSION IN PRETRIAL DISCUSSIONS

3 WAS THAT CERTAIN DEPOSITION STATEMENTS COULD BE USED FOR

4 IMPEACHMENT, BUT I HAVEN'T HEARD WHAT THE USE WOULD BE.

5    SO WHAT -- FOR WHAT PURPOSE ARE YOU READING THESE?

6    MR. PHILLIPS:  WELL, FIRST OF ALL, IT'S AN ADMISSION

7 OF THE PARTY OPPONENT.

8    THE COURT:  ABOUT WHAT -- I MEAN, NOT JUST EVERY

9 STATEMENT, NOT JUST EVERY STATEMENT IS A STATEMENT AGAINST

10 INTEREST, AS WE TALKED ABOUT THE OTHER DAY, OR A PARTY OPPONENT

11 STATEMENT.  SO I DON'T KNOW THE CONTEXT.

12    MR. PHILLIPS:  LET ME BE SPECIFIC.

13    THE COURT:  OKAY.  JUST -- YEAH, IDENTIFY WHAT IT IS.

14    MR. PHILLIPS:  IN GOVERNMENT EXHIBIT 971, THE

15 DEFENDANT TALKS ABOUT FLYING ON A TRIP TO SCOTLAND AND WHO'S

16 GOING TO PAY FOR IT, WHETHER THE FIRM IS GOING TO PAY FOR IT OR

17 WHETHER THE FIRM PAYS FOR HIS FLIGHTS OR HE PAYS FOR THEM.

18    GOVERNMENT EXHIBIT 972 TALKS ABOUT THE ESCROW

19 ACCOUNTS THAT THEY HAD AT MHS.  AND THE DEFENDANT SAYS,

20 OBVIOUSLY, THAT'S NOT MY MONEY.

21    GOVERNMENT EXHIBIT 973 IDENTIFIES PEOPLE WHO WERE ON

22 THAT FLIGHT THAT WE'VE TALKED ABOUT SEVERAL TIMES, THE TRIP OF

23 A LIFETIME NUMBER 2, IN JULY OF 2014.  AND SO A NUMBER OF NAMES

24 OF INDIVIDUALS WHO WERE ON THAT FLIGHT AND OTHER FLIGHTS THAT

25 HAVE ALREADY BEEN PUT BEFORE THE JURY.  THE DEFENDANT WAS ASKED

1    ABOUT THOSE PEOPLE AND WHETHER ANY OF THOSE PEOPLE WORKED FOR

2    MHS.

3        AND THEN HE WAS ASKED WHETHER MHS HAD OFFICES IN

4    CERTAIN LOCATIONS WHERE VARIOUS FLIGHTS HAD GONE TO OVER TIME.

5    AND HIS ANSWER IN EACH CASE WAS, NO, THEY DID NOT HAVE AN

6    OFFICE THERE.

7        AND THEN, FINALLY, WERE JULIA OLIVARES, YOLANDA

8    OLIVARES, OR ERNEST OLIVARES EMPLOYED BY MHS IN 2014.

9        AND THOSE ARE ALL THINGS THAT ARE THE SUBJECT OF

10   ISSUES THAT ARE ALREADY BEFORE THE JURY.  THE JURY HAS ALREADY

11   HEARD ABOUT FLIGHTS THAT WERE TAKEN BY JULIA OLIVARES AND HER

12   FAMILY MEMBERS THAT THE DEFENDANT PAID FOR EVEN THOUGH THE

13   DEFENDANT WAS NOT ON THE FLIGHT.

14        THE COURT:  AND SO YOUR POSITION IS THEY COME INTO

15   THIS CRIMINAL TRIAL HOW?  JUST BY VIRTUE OF THE DEFENDANT

16   HAVING MADE THE STATEMENTS UNDER OATH?  OR WHAT'S THE BASIS, SO

17   THAT THE DEFENSE CAN RESPOND?

18        MR. PHILLIPS:  RIGHT, YOUR HONOR.  IT'S FEDERAL RULE

19   OF EVIDENCE 801(D)(2), I BELIEVE.  AND IT TALKS ABOUT AN

20   OPPOSING PARTY'S STATEMENT.

21        THE COURT:  STATEMENT.  NOT A -- A STATEMENT.

22        MR. PHILLIPS:  A STATEMENT.

23        THE COURT:  OKAY.

24        MR. PHILLIPS:  IT SAYS THE STATEMENT IS OFFERED

25   AGAINST AN OPPOSING PARTY, AND IT HAS FIVE DIFFERENT WAYS THAT

1    IT CAN COME IN:  WAS MADE BY THE PARTY IN AN INDIVIDUAL OR

2    REPRESENTATIVE CAPACITY; IS ONE THE PARTY MANIFESTED THAT IT

3    ADOPTED OR BELIEVED TO BE TRUE; WAS MADE BY A PERSON WHOM THE

4    PARTY AUTHORIZED TO MAKE A STATEMENT ON THE SUBJECT; OR WAS

5    MADE BY THE PARTY'S AGENT OR EMPLOYEE ON A MATTER WITHIN THE

6    SCOPE OF THAT RELATIONSHIP AND WHILE IT EXISTED; OR WAS MADE BY

7    THE PARTY'S CO-CONSPIRATOR DURING AND IN FURTHERANCE OF THE

8    CONSPIRACY.

9            SO THE ONE THAT WOULD BE RELEVANT HERE WOULD BE THAT

10   IT'S A STATEMENT THAT WAS MADE BY THE PARTY.  IT'S

11   801(D)(2)(A).

12           THE COURT:  ALL RIGHT.  ANYTHING ELSE AT THIS TIME?

13           AND THE MANNER IN WHICH YOU SUGGESTED TO PRESENT IT

14   WAS WHAT?

15           MR. PHILLIPS:  WELL, MY PROPOSAL WAS THAT WE HAVE THE

16   AGENT TAKE THE STAND.  AND EITHER THE COURT CAN EXPLAIN TO THE

17   JURY OR I CAN EXPLAIN TO THE JURY THAT WHAT WE'RE DOING IS THAT

18   I'M GOING TO READ THE PORTION THAT WAS ORIGINALLY SAID BY THE

19   LAWYER WHO WAS ASKING THE QUESTIONS, AND THE AGENT WILL READ

20   THE PORTION OF MR. HARDWICK'S TESTIMONY THAT MR. HARDWICK

21   ACTUALLY SAID DURING THE DEPOSITIONS.

22           THE COURT:  ALL RIGHT.

23           MR. PHILLIPS:  AND THEN IF THE E-MAILS ARE ADMITTED

24   INTO EVIDENCE, THEN WE WOULD PUT THOSE IN THE SAME WAY WE HAVE

25   WITH ALL THE OTHER E-MAILS.  WE WOULD PUBLISH THOSE AND ASK THE

1    AGENT JUST TO READ THE PARTS THAT WE'RE INTERESTED IN.

2            ALSO, YOUR HONOR, THERE'S NOTHING IN THAT RULE

3    801(D)(2) THAT REQUIRES THE STATEMENT TO BE AN ADMISSION.  IT

4    JUST SAYS IT HAS TO BE A STATEMENT OF THE OPPOSING PARTY.

5            THE COURT:  OKAY.  THANK YOU.

6            DEFENSE?

7            MS. LOEB:  YOUR HONOR, AS FAR AS THE DEPOSITION

8    EXCERPTS GO, WE SIMPLY DO NOT SEE THE RELEVANCE.  FOR ONE

9    THING, TWO OF THE DEPOSITIONS ARE FROM 2008 AND 2009.  AT THE

10   HEIGHT OF THIS FINANCIAL MELTDOWN, WHATEVER MR. HARDWICK SAID

11   THAT WAS RELEVANT AT THAT TIME IS NOT RELEVANT TEN YEARS LATER.

12           IT TALKS ABOUT DEDUCTING AND EXPENSING THE SCOTLAND

13   TRIP.  THERE'S NO CONTENTION IN THIS CASE THAT MR. HARDWICK WAS

14   TAKING THE SCOTLAND TRIP AS AN EXPENSE, THAT HE WAS EXPECTING

15   THE LAW FIRM TO PAY FOR THAT.  THAT'S GOING TO BE CONFUSING TO

16   THE JURY TO NOW HAVE A DEPOSITION FROM THAT LONG AGO TALKING

17   ABOUT THE TRIP TO SCOTLAND IN A COMPLETELY DIFFERENT CONTEXT.

18           AS FAR AS THE PARTS OF THE DEPOSITION THAT TALK ABOUT

19   MR. OLIVARES AND JULIA OLIVARES AND THE DOG, THERE'S NO --

20   THERE'S BEEN NO CONTENTION IN THIS CASE THAT THEY WERE

21   EMPLOYEES AND THAT THEY WERE PARTICIPATING IN THESE TRIPS AS IF

22   THEY WERE EMPLOYEES OF THE LAW FIRM.

23           ALL OF THOSE TRIPS HAD TO DO WITH MR. HARDWICK DOING

24   BUSINESS, THE PLACES THEY WERE GOING, EITHER BEFORE, DURING, OR

25   AFTER.  BUT THERE'S BEEN NO CONTENTION THAT THE OLIVARES FAMILY

1    WAS AN EMPLOYEE -- OR WERE EMPLOYEES OF THE LAW FIRM.  IT IS

2    CONFUSING AND NOT RELEVANT TO ANY OF THE ISSUES THAT HAVE BEEN

3    PRESENTED IN THE CASE.

4            MR. PHILLIPS:  MAY I RESPOND, YOUR HONOR?

5            THE COURT:  SURE.

6            MR. PHILLIPS:  WELL, SEVERAL THINGS.  NUMBER ONE, THE

7    ISSUE OF WHETHER THE DEFENDANT KNOWS THAT THE MONEY IN THE

8    FIRM'S ATTORNEY ESCROW ACCOUNTS DOES NOT BELONG TO HIM IS

9    CERTAINLY RELEVANT.  THAT IS ONE OF THE MAIN ISSUES IN THE

10   CASE, AND IT'S JUST AS RELEVANT NOW AS IT WAS IN 2008.

11           BUT THERE'S NOT AS MUCH DISTANCE BETWEEN THAT

12   DEPOSITION AND THE EVENTS IN THIS CASE AS THE DEFENSE HAS LED

13   THE COURT TO BELIEVE.  FIRST OF ALL, IT'S NOT THE DIFFERENCE

14   BETWEEN 2008 AND 2018.  IT'S THE DIFFERENCE BETWEEN 2008 AND

15   THE TIME PERIOD BETWEEN JANUARY 1, 2011, AND AUGUST OF 2014.

16   THAT'S THE PERIOD OF THE CONSPIRACY THAT'S CHARGED IN THE

17   INDICTMENT.

18           BUT IT'S RELEVANT REGARDLESS OF THE TIME PERIOD.

19           AND, SECOND, THE DEFENDANT HAS ALREADY SPENT A GREAT

20   DEAL OF THIS COURT'S TIME AND THE JURY'S TIME PUTTING IN

21   EVIDENCE OF DOCUMENTS FROM 2008.

22           FOR EXAMPLE, ON THE CROSS-EXAMINATION OF ALYCE

23   RITCHIE, THEY TALKED ABOUT A POWERPOINT FROM 2008.  THEY USED

24   THAT IN THEIR CROSS-EXAMINATION OF HER.  AND THEY TALKED ABOUT

25   HER RESPONSIBILITIES AND HER JOB DUTIES AT MHS DURING 2008,

1    EVEN THOUGH THE EVIDENCE WAS ALREADY PUT IN.

2              THE COURT:  OKAY.  I'M SORRY.  I'M FINISHED REVIEWING

3    THE RULE.  I WOULD BE INCLINED TO ALLOW IT IN.

4              DEFENSE, DO YOU HAVE ANY OTHER REASON TO OBJECT TO

5    IT?

6              I'M SORRY, MR. PHILLIPS.  I WAS REVIEWING AND

7    LISTENING AT THE SAME TIME.

8              MS. LOEB:  YOUR HONOR, AS FAR AS THE E-MAIL BETWEEN

9    MR. HARDWICK AND MR. ADAMS, THAT HAS TO DO WITH THE DEDUCTION

10   FOR DIVOT HOLDINGS.

11             THE COURT:  OH, WAIT A MINUTE.  DID WE TALK ABOUT THE

12   E-MAILS AS WELL OR JUST THE TRANSCRIPTION STATEMENTS?

13             WHAT ABOUT THE E-MAILS, MR. PHILLIPS?  AND THESE

14   E-MAILS ARE FROM WHOM TO WHOM AGAIN?

15             MR. PHILLIPS:  THE FIRST E-MAIL IS GOVERNMENT

16   EXHIBIT 1504, AND IT'S FROM NAT HARDWICK TO HIS PARTNERS,

17   INCLUDING ROD WITTSTADT AND MARK WITTSTADT.

18             THE COURT:  OKAY.

19             MR. PHILLIPS:  AND IT'S CONCERNING THIS ALLEGED

20   CLOSING OPERATION THAT WE'VE HEARD ABOUT THAT THE DEFENDANT

21   WANTED TO BUY IN LAS VEGAS.  AND IT ALSO TALKS ABOUT THE

22   DEFENDANT'S ATTEMPTS TO PURCHASE AN UNDERWRITER IN ALABAMA.

23             THE COURT:  AND WHAT'S THE BASIS ON WHICH THE E-MAILS

24   COME IN?

25             MR. PHILLIPS:  THE SAME.  IT'S AN ADMISSION OF THE

1   PARTY OPPONENT, STATEMENT OF THE PARTY OPPONENT.

2           AND, YOUR HONOR, BOTH SIDES HAVE, YOU KNOW, FREELY

3   ADMITTED AND USED E-MAILS IN THIS CASE.  THERE'S NO SURPRISE

4   ABOUT THIS.  THE DEFENSE HAS HAD THESE DOCUMENTS FOR YEARS, AND

5   THEY ARE THE DEFENDANT'S OWN STATEMENTS.

6           THE NEXT E-MAIL, GOVERNMENT EXHIBIT 1505, IS AN

7   E-MAIL BETWEEN NAT HARDWICK AND THE MAN WHO WAS JUST DESCRIBED

8   BY THE DEFENSE IN HER CROSS-EXAMINATION OF BETH KORNEGAY-TYLER

9   AS NAT HARDWICK'S PERSONAL CPA, TONY ADAMS.  AND IN IT,

10  MR. HARDWICK TALKS ABOUT TRYING TO MAKE JULIA OLIVARES AN

11  EMPLOYEE OF DIVOT HOLDINGS FOR TAX PURPOSES.

12          THE COURT:  OKAY.  ALL RIGHT.  LET ME HEAR FROM THE

13  DEFENSE WITH RESPECT TO YOUR POSITION ON THE E-MAILS AND THE

14  BASIS ON WHICH YOU OBJECT TO THE E-MAILS, PARTICULARLY THAT

15  DEALT WITH THE TRANSCRIPTION TESTIMONY -- OR THE DEPOSITION

16  TESTIMONY, I SHOULD SAY.

17          MS. LOEB:  WE'RE NOT GOING TO OBJECT TO GOVERNMENT

18  EXHIBIT 1504.  BUT 1505 TALKS ABOUT JULIA OLIVARES, WHICH IS

19  HIS GIRLFRIEND.  WE JUST SEE NO RELEVANCE.  AND IF IT IS

20  RELEVANT, THEN THE PREJUDICE OUTWEIGHS THE RELEVANCE UNDER 403.

21          READING THAT SECOND PAGE --

22          THE COURT:  WHAT IS -- AND I DON'T HAVE THESE

23  E-MAILS.  I HAVEN'T SEEN THEM, UNLIKE THE PARTIES.  SO WHAT IS

24  THAT E-MAIL -- WHAT'S THE SUBSTANCE OF THAT E-MAIL?

25          MS. LOEB:  IT TALKS ABOUT HIM DATING THE SAME GIRL

1    FOR SIX YEARS, JULIA OLIVARES.  I GIVE HER MONEY ON A MONTHLY

2    BASIS.

3        I MEAN, THEY'VE GONE OVER THE EXHIBITS THAT HAVE TO

4    DO WITH GIVING MONEY TO PEOPLE.  THIS -- ALL THIS DOES IS

5    PREJUDICE THE DEFENDANT.  THE PREJUDICE OUTWEIGHS THE BENEFIT.

6        THE COURT:  WELL, DOES IT ADD -- I MEAN, WE SAW A

7    CHART OF ALL OF THE DIFFERENT WOMEN ASSOCIATED WITH THE

8    DEFENDANT AND THE AMOUNTS OF MONEY SUPPOSEDLY GIVEN TO THEM BY

9    THE DEFENDANT.  SO DOES THIS DO ANYTHING THAT'S DIFFERENT THAN

10   THAT, OR DOES IT JUST LUMP IT ON MORE, IF THAT'S YOUR ARGUMENT?

11       MS. LOEB:  IT'S CUMULATIVE AND IT'S ALREADY BEEN

12   INTRODUCED IN OTHER EVIDENCE.  AND WE OBJECT UNDER 403.

13       THE COURT:  OKAY.

14       MR. PHILLIPS:  MAY I RESPOND BRIEFLY?

15       THE COURT:  NOT YET.  NOT YET, MR. PHILLIPS.  THANK

16   YOU SO MUCH.  I'M ABOUT TO RULE IN YOUR FAVOR IF YOU JUST GIVE

17   ME A SECOND.

18       MR. PHILLIPS:  ON THAT, YOUR HONOR, I --

19       THE COURT:  ALL RIGHT.  THANK YOU.  ALL RIGHT.

20       I WILL OVERRULE ON THE E-MAILS AS WELL, SO I WOULD

21   ALLOW THE GOVERNMENT TO USE THOSE.

22       ALL RIGHT.  IS THERE ANYTHING ELSE?

23       AND SO, GOVERNMENT, YES TO THE FORMAT THAT YOU

24   PROPOSED AS FAR AS THE WITNESS, YOUR AGENT, READING THE

25   RESPONSES.  AND I GUESS ONE OF YOU WILL READ THE QUESTIONS FROM

1    THE ATTORNEY'S STANDPOINT; IS THAT CORRECT?

2            MR. PHILLIPS:  I WILL, YOUR HONOR.  AND WHAT ABOUT

3    THIS -- WHAT ABOUT PUTTING -- SHOULD I JUST READ THE TESTIMONY

4    OR CAN I PUT THE TESTIMONY DOWN HERE ON THE ELMO FOR THE JURORS

5    TO READ ALONG WITH AS LONG AS I COVER UP THE PARTS THAT WE'RE

6    NOT READING?

7            THE COURT:  I DIDN'T KNOW THAT THAT WAS AN ISSUE.  SO

8    THERE ARE OTHER PORTIONS WITHIN THAT SAME PAGE THAT YOU WILL

9    NOT BE INCLUDING?

10           MR. PHILLIPS:  IT'S A PORTION OF A PAGE THAT WE'RE

11   READING.  I CAN JUST SIMPLY PUT A WHITE PIECE OF PAPER OVER IT.

12           THE COURT:  YES.  COVER ANYTHING THAT WE'RE NOT GOING

13   TO BE READING, AND THEN REMOVE IT AS SOON AS YOU FINISH READING

14   IT SO THAT IT DOESN'T REMAIN ON THE SCREEN.

15           OKAY.  LET'S GET THE JURORS BACK IN.

16           MR. PHILLIPS:  AND THAT'S -- MR. GILFILLAN REMINDED

17   ME, YOUR HONOR.  DO YOU WANT TO EXPLAIN TO THE JURY WHAT WE ARE

18   READING OR SHOULD I DO THAT?

19           THE COURT:  I WILL.  THIS IS DEPOSITIONS, THIS FIRST

20   PART, RIGHT?

21           MR. PHILLIPS:  CORRECT, YOUR HONOR.

22           THE COURT:  ALL RIGHT.

23           (WHEREUPON, THE JURY RETURNED TO OPEN COURT AT

24   12:09 P.M., AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD.)

25           THE COURT:  ALL RIGHT.  THE JURY IS SEATED.  EVERYONE

1    ELSE MAY BE SEATED.

2            LADIES AND GENTLEMEN, BEFORE WE GO INTO THIS NEXT

3    PORTION OF EVIDENCE, LET ME JUST TELL YOU THIS:  A DEPOSITION,

4    WHICH IS A TERM YOU MAY HAVE HEARD BEFORE, IS A WITNESS'S SWORN

5    TESTIMONY THAT IS TAKEN BEFORE A TRIAL.  IT MIGHT NOT BE

6    RELATED TO THIS TRIAL.  IT MIGHT BE RELATED TO SOMETHING ELSE.

7    IT MIGHT BE RELATED TO THIS ONE, BUT BEFORE A TRIAL.

8            DURING A DEPOSITION, A WITNESS IS UNDER OATH AND

9    SWEARS TO TELL THE TRUTH, AND THE LAWYER FOR EACH PARTY MAY ASK

10   QUESTIONS.  A COURT REPORTER IS PRESENT AND DOES RECORD THE

11   QUESTIONS AND ANSWERS.

12           IN THIS CASE, YOU WILL HEAR AT LEAST EXCERPTS OF SOME

13   DEPOSITIONS.  DO NOT PLACE ANY SIGNIFICANCE ON THE BEHAVIOR OR

14   THE TONE OF VOICE OF ANY PERSON READING THE QUESTIONS OR THE

15   ANSWERS.  THANK YOU.

16           YOU MAY PROCEED.

17           MR. PHILLIPS:  THANK YOU, YOUR HONOR.  YOUR HONOR,

18   WOULD THE COURT LIKE ME TO IDENTIFY THE DATE OF THE

19   DEPOSITIONS?

20           THE COURT:  YES.

21           MR. PHILLIPS:  YOUR HONOR, WE'RE GOING TO USE SPECIAL

22   AGENT CHIP CROMER FROM THE FBI TO READ THE PART OF

23   MR. HARDWICK'S ANSWERS, AND I WILL READ THE PART OF THE LAWYER

24   WHO ASKED THE QUESTIONS.

25           THE COURT:  ALL RIGHT.

1    MR. PHILLIPS:  YOUR HONOR, DOES THE COURT WANT TO

2 SWEAR THE WITNESS?

3    THE COURT:  I USUALLY DO A LIMITED SWEARING IN, JUST

4 AGREE TO DO THE BEST READING THAT YOU CAN.  BUT I AM NOT GOING

5 TO.  YOU ARE DIRECTED TO READ IT AS ACCURATELY AS POSSIBLE.

6    BUT, ALSO, BECAUSE IT WILL BE DISPLAYED, MY

7 UNDERSTANDING -- IS THAT CORRECT?

8    MR. PHILLIPS:  CORRECT.

9    THE COURT:  AGREED.

10    -- THE JURORS WILL ALSO BE ABLE TO MAKE THAT

11 DETERMINATION FOR THEMSELVES.  SO I WON'T DO THAT.  THANK YOU.

12 BY MR. PHILLIPS:

13 Q.  ALL RIGHT.  SPECIAL AGENT CROMER, I'M SHOWING YOU ON THE

14 SCREEN AN EXCERPT FROM A DEPOSITION OF NATHAN HARDWICK IV THAT

15 WAS TAKEN IN 2008.  AND THIS IS PART OF GOVERNMENT EXHIBIT 971.

16 I'LL READ THE PART THAT STARTS -- I'LL READ THE QUESTION AND

17 YOU READ THE ANSWER, PLEASE.

18 A.  OKAY.

19 Q.  QUESTION:  IS THE TRIP TO SCOTLAND GOING TO BE WRITTEN OFF

20 BY YOUR COMPANY?

21 A.  NO.  I DON'T PLAY GAMES WITH TAXES.  THERE ARE SOME

22 GOOD --

23 Q.  QUESTION:  ARE ANY OF THE PLANES THAT YOU HAVE LEASED WITH

24 MARQUIS BEEN WRITTEN OFF BY YOUR COMPANY?

25    LET ME TURN THE PAGE BEFORE YOU ANSWER.

1    A.   LET ME ANSWER THAT ANOTHER WAY, BECAUSE I DON'T THINK IT

2    IS MY COMPANY'S PROBLEM THAT I HAVE WHATEVER PSYCHOLOGICAL

3    ISSUE WITH FLYING OR WHATEVER.  SO I DON'T THINK IT IS FAIR FOR

4    THEM TO PAY FOR MY FLIGHTS EVEN WHEN I AM TAKING BUSINESS

5    PEOPLE WITH ME.

6        SO WHAT WE DO IS, AT THE END OF THE YEAR, THEY REIMBURSE

7    ME FOR A -- BASICALLY FOR EVERYBODY THAT WENT ON KIND OF

8    LIKE -- THEY HAVEN'T DONE IT YET, BUT WHEN WE START MAKING

9    MONEY AGAIN, THEY WILL REIMBURSE ME FOR LIKE A FIRST CLASS

10   TICKET FOR EVERY SINGLE BUSINESS THAT WAS FLOWN THAT WAS

11   BUSINESS RELATED.  SO I WILL GET SOME KIND OF REIMBURSEMENT

12   BACK, BUT IT IS NOT A WRITE-OFF.

13   Q.   ALL RIGHT.  QUESTION:  AFTER YOU PAID FOR THESE PLANES

14   THAT YOU ARE LEASING FROM MARQUIS, YOU SAY, QUOTE, AT THE END

15   OF THE YEAR, IF WE START MAKING MONEY, CLOSED QUOTE, YOUR

16   COMPANY IS GOING TO REIMBURSE YOU FIRST CLASS TICKETS FOR THE

17   EQUIVALENT OF THAT FLIGHT BY A LEASED AIRCRAFT?

18   A.   NO.  THEY ARE GOING TO REIMBURSE ME FOR WHATEVER BUSINESS

19   PEOPLE FLEW WITH ME ON ANY OF MY FLIGHTS UP TO -- AND WE ARE

20   TRYING TO FIGURE OUT WHAT THAT IS GOING TO LOOK LIKE, WHETHER

21   IT IS GOING TO BE AN AVERAGE OF A THOUSAND DOLLARS.  IT IS NOT

22   GOING TO BE ONE FOR ONE, LET'S PUT IT THAT WAY.  IT IS WHATEVER

23   IS FAIR TO THE COMPANY.  THE COMPANY ALWAYS COMES FIRST.

24   Q.   ALL RIGHT.  NOW I'M GOING TO SWITCH TO GOVERNMENT

25   EXHIBIT 972, WHICH IS A DEPOSITION FROM 2009.

1    QUESTION:  ALL RIGHT.  NOW, WHAT CORPORATE CHECKING

2    ACCOUNTS ARE YOU A SIGNATORY ON?

3    A.    HUNDREDS, IF YOU COUNT THE FIRM.  YOU KNOW, WE ARE IN

4    EVERY STATE.  WE ARE IN EVERY -- I MEAN, HUNDREDS.

5    Q.    QUESTION:  WHAT ARE THESE ACCOUNTS THAT YOU HAVE IN OTHER

6    STATES, GENERALLY?

7    A.    WELL, THEY ARE USUALLY ESCROW ACCOUNTS.

8    Q.    ALL RIGHT.

9    A.    AND OBVIOUSLY THAT'S NOT MY MONEY, AS YOU KNOW.

10   Q.    QUESTION:  DOES THE FIRM PAY FOR THE LEASING OF THE -- OF

11   THE AIRPLANE?

12   A.    NO.

13   Q.    NOW I'M GOING TO SWITCH TO GOVERNMENT EXHIBIT 973, WHICH

14   IS THE DEPOSITION OF NATHAN HARDWICK FROM 2015.

15       QUESTION:  IN 2014, WERE BUDDY HARDWICK, ANN HARDWICK,

16   DEBBIE HARDWICK, ALEX HARDWICK, NATALIE HARDWICK, HEATHER

17   INMAN, OR OLIVER THE DOG EMPLOYED BY THE FIRM?  ANY OF THOSE

18   FOLKS?

19   A.    SAY, SAY THE LIST AGAIN.

20   Q.    BUDDY HARDWICK, YES OR NO?

21   A.    NO.

22   Q.    ANN HARDWICK?

23   A.    NO.

24   Q.    DEBBIE HARDWICK?

25   A.    NO.

1    Q.   ALEX HARDWICK?

2    A.   NO.

3    Q.   NATALIE HARDWICK?

4    A.   YES.

5    Q.   HEATHER INMAN?

6    A.   NO.

7    Q.   OLIVER?

8    A.   NO.

9    Q.   QUESTION:  IS THERE A MORRIS HARDWICK SCHNEIDER LOCATION

10   IN ST. LUCIE, FLORIDA?

11   A.   THERE IS NOT.

12   Q.   KISSIMMEE, FLORIDA?

13   A.   KISSIMMEE, FLORIDA, NO.

14   Q.   SALT LAKE CITY?

15   A.   NO.

16   Q.   MYRTLE BEACH?

17   A.   NOPE.

18   Q.   GULFPORT, MISSISSIPPI?

19   A.   NO.  THERE'S CONVENTIONS AT MOST OF THOSE.

20   Q.   QUESTION:  WERE JULIA OLIVARES, YOLANDA OLIVARES, OR

21   ERNEST OLIVARES EMPLOYED BY MORRIS HARDWICK SCHNEIDER IN 2014?

22   A.   NOT TO MY KNOWLEDGE.

23          MR. PHILLIPS:  YOUR HONOR, I'M NOT SURE I DID THIS,

24   BUT I MOVE TO ADMIT GOVERNMENT EXHIBITS 1504 AND 1505 AND, TO

25   THE EXTENT NECESSARY, THE EXCERPTS FROM GOVERNMENT

1   EXHIBITS 971, 972, AND 973.

2           THE COURT:  OKAY.  THE LAST ONES THAT YOU LISTED ARE

3   THE DEPOSITIONS; IS THAT CORRECT?

4           MR. PHILLIPS:  THE 900 SERIES ARE THE THREE

5   DEPOSITIONS, AND THEN THE 1500'S ARE THE TWO E-MAILS.

6           THE COURT:  ALL RIGHT.  ANY ADDITIONAL OBJECTION TO

7   THOSE DEPOSITION EXCERPTS BEING MADE PART OF THE RECORD?

8   DISCUSSION ON THEM GOING BACK WE WILL TAKE UP.

9           BUT ANY ADDITIONAL E-MAIL ON THOSE -- ANY ADDITIONAL

10  OBJECTION ON THOSE COMING IN?

11          MS. LOEB:  NO ADDITIONAL ONES, YOUR HONOR.

12          THE COURT:  ALL RIGHT.  THOSE WILL BE PERMITTED.

13  AND, AS I SAID, WE WILL TAKE UP ANY CONTINUING WITNESS ISSUES

14  AND ALL AT A LATER POINT, DISCUSSING WHETHER THEY GO BACK.

15          MR. PHILLIPS:  YES, YOUR HONOR.

16          THE COURT:  OKAY.  THE OTHER DIGITS WERE -- EXHIBIT

17  NUMBERS WERE 150 --

18          MR. PHILLIPS:  04 AND 05.

19          THE COURT:  ANY ADDITIONAL OBJECTION ON THOSE?

20          MS. LOEB:  NO ADDITIONAL OBJECTIONS.

21          THE COURT:  ALL RIGHT.  THEY ARE ADMITTED.

22  BY MR. PHILLIPS:

23  Q.   ALL RIGHT.  I'M SHOWING YOU GOVERNMENT EXHIBIT 1504.  YOU

24  SEE THAT THIS IS AN E-MAIL EXCHANGE BETWEEN MARK WITTSTADT, NAT

25  HARDWICK, AND ROD WITTSTADT, DATED JULY 16 OF 2014?

1   A.   YES, SIR.

2   Q.   ALL RIGHT.  LET ME DIRECT YOUR ATTENTION TO THE BOTTOM OF

3   THE FIRST PAGE.  READ THE HIGHLIGHTED PORTIONS OF THE E-MAIL

4   THAT NAT HARDWICK WROTE ON JULY 16, 2014.

5   A.   IN GREAT NEWS, WE ARE OPEN AS A CLOSING OPERATION IN

6   LAS VEGAS, AND WE ARE PAYING A WHOPPING 24K TO TAKE IT OVER.

7   Q.   NOW, I'M DIRECTING YOUR ATTENTION TO PAGE 2 OF THAT

8   EXHIBIT.  AND PLEASE READ THE HIGHLIGHTED PARTS.

9   A.   BEFORE UNDERWRITER UPDATE, WE WENT IN FRONT OF THE ALABAMA

10  INSURANCE DEPARTMENT THREE WEEKS AGO FOR THE TENTH TIME.  AS

11  YOU KNOW, MY COMPANY WAS BUYING 60 PERCENT OF THE UNDERWRITER

12  AND LANDCASTLE 40 PERCENT.  THEY REJECTED THIS BILL, SAYING

13  THAT, AS OF THE END OF EACH YEAR, THAT LANDCASTLE IS INSOLVENT.

14  THEY FINALLY CAME BACK WITH MY COMPANY, DIVOT HOLDINGS, BUYING

15  THE UNDERWRITER.  THIS IS THE HOLDING COMPANY FOR MY CASH

16  STOCKS AND ASSETS AND HAS NO DEBT.

17       AND NUMBER 7:  WE HAVE NOW HAD TWO DEFAULT GROUPS SHUT

18  DOWN IN ATLANTA.  FIRST, GREAT JOB IN MAKING MONEY AS IT SLOWS

19  DOWN; AND, SECOND, BE CAREFUL WITH HEAD COUNT.  WHEN THINGS GET

20  SLOW, THEY TEND TO GET SLOW FAST.  UNFORTUNATELY TALKING FROM

21  EXPERIENCE.

22  Q.   ALL RIGHT.  NOW I'M SHOWING YOU GOVERNMENT EXHIBIT 1505.

23  I WANT YOU TO START FROM THE SECOND PAGE OF THIS E-MAIL CHAIN

24  AND READ THIS E-MAIL FROM NAT HARDWICK TO TONY ADAMS DATED

25  MAY 8, 2013.  READ THE SUBJECT MATTER AND THEN THE HIGHLIGHTED

1   PART.

2   A.   ALL RIGHT.  SUBJECT:  GF AS EMPLOYEE.  I HAVE BEEN DATING

3   THE SAME GIRL NOW FOR SIX YEARS, PARENTHESES, JULIA OLIVARES,

4   CLOSED PARENTHESES.  I GIVE HER MONEY ON A MONTHLY BASIS AND

5   PAID SOME EXPENSES.  CAN I MAKE HER AN EMPLOYEE OF DIVOT

6   HOLDINGS AND SAVE MONEY BY WRITING IT OFF AND JUST PAYING HER

7   TAXES?

8   Q.   ALL RIGHT.  I'LL SWITCH TO THE FIRST PAGE.  AND READ THE

9   RESPONSE FROM TONY ADAMS AT THE BOTTOM.

10  A.   ABSOLUTELY.  IT MIGHT BE BEST TO JUST PAY JULIA ON A 1099

11  BASIS AND MAKE HER ESTIMATED TAX PAYMENTS.  WOULD YOU LIKE FOR

12  ME TO TALK WITH HER?

13  Q.   ALL RIGHT.  NOW, READ THE NEXT E-MAIL FROM NAT HARDWICK TO

14  TONY ADAMS.

15  A.   NO.  WE CAN WORK IT OUT.  CAN WE DO IT RETROACTIVE, IT

16  MOVING FORWARD?  I HAVE BEEN PAYING FOR YEARS.

17  Q.   AND, FINALLY, AT THE TOP, READ TONY ADAMS' RESPONSE TO NAT

18  HARDWICK ON MAY 8TH, 2013.

19  A.   SURE.  NO PROBLEM AT ALL.

20          MR. PHILLIPS:  THAT'S ALL I HAVE, YOUR HONOR.

21          THE COURT:  ALL RIGHT.

22          ALL RIGHT.  YOU MAY STEP DOWN, SIR.  THANK YOU SO

23  MUCH.

24          ALL RIGHT.  LADIES AND GENTLEMEN, I AM GOING TO

25  DISMISS YOU FOR LUNCH NOW.  IT'S ABOUT 12:20, SO I WILL SEE YOU

1  BACK ABOUT 1:20.  THANK YOU SO MUCH.

2           (WHEREUPON, THE JURY RETIRED FROM THE COURTROOM AT

3  12:24 P.M., AND THE FOLLOWING PROCEEDINGS WERE HAD.)

4           THE COURT:  ALL RIGHT.  YOU MAY BE SEATED.

5           GOVERNMENT, IN ADDITION TO -- AND I'LL HEAR FROM THE

6  DEFENSE ON THIS AS WELL.  AS FAR AS ADMITTING THE ACTUAL

7  DOCUMENTS THAT WERE JUST ADMITTED INTO EVIDENCE, AS FAR AS

8  THOSE GOING BACK -- IN ADDITION TO ANY REDACTION ISSUES,

9  BECAUSE OF COURSE THEY WOULD NEED TO BE PUT INTO REDACTED

10 FORM -- ARE THERE ANY CONTINUING WITNESS ISSUES?

11          WHICH THERE OFTEN ARE WITH DEPOSITION TESTIMONY.  BUT

12 IN THIS CASE, ARE THEY REALLY ANY DIFFERENT FROM THE E-MAIL

13 CONVERSATIONS THAT ARE GOING BACK AND FORTH?

14          GOVERNMENT'S POSITION?  AND, AGAIN, WE'RE TALKING

15 ABOUT JUST -- THEY ARE PART OF THE RECORD, THEY HAVE BEEN

16 ADMITTED FOR THAT PURPOSE.  BUT NOW WE'RE TALKING ABOUT THE

17 POINT AT WHICH THE EXHIBITS GO BACK TO THE JURY.

18          MR. PHILLIPS:  I DON'T THINK THEY'RE ANY DIFFERENT,

19 BUT I AM HAPPY TO REDACT THOSE AND ONLY HAVE THE PARTS THAT I

20 ACTUALLY READ AND THE AGENT READ.  THAT'S NOT A PROBLEM.

21          THE COURT:  ALL RIGHT.  DEFENSE'S POSITION WITH

22 RESPECT TO THOSE TWO ISSUES?  I DON'T THINK THE REDACTION IS AN

23 ISSUE BECAUSE OF COURSE THEY DO NEED REDACTING.

24          BUT AS FAR AS WHETHER THERE'S ANY CONTINUING WITNESS

25 PROBLEM -- AND, AGAIN, I CAN'T SEE THAT THEY WOULD BE ANY

1   DIFFERENT IN THAT CONTEXT FROM THE E-MAILS, BUT I WILL

2   CERTAINLY HEAR YOU OUT ON THAT.

3        MR. GARLAND:  DEPOSITIONS ARE ORAL TESTIMONY, JUST

4   LIKE WITNESS TESTIMONY.  A STATEMENT SAID.  THEY'VE BEEN READ

5   TO THE JURY.  SO SENDING THE WRITTEN RECORD BACK --

6        THE COURT:  WELL, THAT IS USUALLY THE CASE WHEN A

7   WITNESS'S DEPOSITION IS READ INTO THE RECORD IN PLACE OF A

8   WITNESS.  FOR INSTANCE, A LOT OF DOCTORS CHOOSE TO HAVE THEIR

9   TESTIMONY PRESENTED BY DEPOSITION IN CIVIL CASES AS OPPOSED TO

10  BEING HERE.

11       BUT THESE WERE STATEMENTS.  AND A LOT OF TIMES,

12  STATEMENTS IN E-MAILS WOULD NOT COME IN, BUT I KNOW YOU ALL

13  MADE AGREEMENTS FOR THOSE TO GO IN.  SO THAT'S WHY I'M ASKING

14  IF THERE'S ANY DIFFERENCE IN THIS CASE IN TERMS OF HOW THEY

15  WERE USED, IF THAT'S CLEAR.  I'M NOT SURE --

16       MR. GARLAND:  THE FACT THAT THEY WERE WRITTEN DOWN IN

17  DEPOSITION HAS NOTHING TO WHAT IS THE NATURE OF THIS PROOF,

18  WHICH IS A CONTRADICTION.  THEY ARE OFFERING TO PROVE PART OF

19  THEIR CASE ABOUT ALLEGED LYING, WHICH IS JUST ORAL TESTIMONY.

20       SOMEBODY TAKE THE STAND THE SAME WAY AND SAY, DID YOU

21  HEAR A STATEMENT?  YES, I HEARD A STATEMENT.  WHAT DID THE

22  PERSON SAY?

23       THE SUBSTANCE -- THAT DOESN'T GET TYPED UP AND SENT

24  BACK TO THE JURY, AND THIS IS NO DIFFERENT.

25       THE COURT:  OKAY.  THE WAY IT WAS USED -- AND THIS IS

1 WHY I BROUGHT UP CONTINUING WITNESS IN THE FIRST PLACE.  NONE

2 OF THE ATTORNEYS RAISED IT, BUT THIS IS WHY I BROUGHT IT UP,

3 BECAUSE IT USUALLY IS DISCUSSED WITH RESPECT TO DEPOSITION

4 TESTIMONY.

5          BUT THE WAY THAT IT WAS USED IN THIS CASE IS

6 DIFFERENT THAN THE WAY IT NORMALLY IS.  AND SO WHEN YOU'RE

7 SAYING IT'S NO DIFFERENT, I DON'T KNOW THAT I AGREE WITH YOU

8 BASED ON THE WAY THAT IT WAS USED HERE.

9          IT'S STILL DEPOSITION TESTIMONY; YOU'RE CORRECT.

10 IT'S STILL UNDER OATH.  IT'S STILL TESTIMONY.  BUT IT DOESN'T

11 FIT WITHIN THE USUAL CONTINUING WITNESS VIOLATION.  SO THAT'S

12 WHY I'M ASKING.

13          YOUR POSITION, THEN, IS THAT, NO, IT'S STILL SUBJECT

14 TO THE CONTINUING WITNESS VIOLATION.

15          IS THAT WHAT I'M HEARING YOU SAY?

16          MR. GARLAND:  YES, WE ARE.  MY ATTEMPT TO MAKE THE

17 ANALOGY WAS --

18          THE COURT:  OKAY.

19          MR. GARLAND:  -- IF SOMEBODY WAS BROUGHT INTO THE

20 COURTROOM TO DELIVER TESTIMONY TO IMPEACH OTHER EVENTS, THEY

21 WOULD SIMPLY TESTIFY.

22          THE COURT:  RIGHT.  AND I UNDERSTAND.

23          MR. GARLAND:  THAT'S WHAT I THINK THIS IS THE

24 EQUIVALENT OF.

25          THE COURT:  I UNDERSTAND ALL OF THAT.  BUT, LIKEWISE,

1    YOU COULD NOT BRING A LOT OF THE INFORMATION IN THE E-MAILS IN

2    THAT YOU ALL DID, BUT YOU ALL HAVE STRUCK OR REACHED AN

3    AGREEMENT FOR THOSE.  AND SO THAT'S WHY I WAS ASKING.

4            SO IT SOUNDS LIKE YOU'RE SAYING THAT, NO, WE DO NOT

5    EXTEND THAT AGREEMENT TO THE DEPOSITION.  YOU'RE MAKING A

6    DISTINCTION NOW BETWEEN THE DEPOSITION --

7            MR. GARLAND:  I'M MAKING A DISTINCTION --

8            THE COURT:  HOLD ON ONE SECOND, SIR.

9            YOU'RE MAKING A DISTINCTION BETWEEN THE DEPOSITION

10   CONTENTS AND THE E-MAIL CONTENTS.  AND WHAT I'M SAYING IS I

11   RECOGNIZE DEPOSITIONS ARE TREATED DIFFERENTLY FOR MANY

12   PURPOSES.  BUT CONSIDERING YOU ALL HAD THIS AGREEMENT WITH THE

13   E-MAILS, AND WHAT'S REFLECTED IN THE DEPOSITION THAT WAS JUST

14   GIVEN IS SIMILAR TO THAT, I JUST WANTED TO SEE WHAT THE

15   DEFENSE'S POSITION IS.  BUT I THINK I UNDERSTAND IT.

16           MR. GARLAND:  I SEE --

17           THE COURT:  GO AHEAD.

18           MR. GARLAND:  I SEE THE COURT'S ANALYZING IT WAS

19   SIMILAR, BUT I THINK THIS IS DISSIMILAR.

20           THE COURT:  OKAY.  GOT IT.  GOT IT, MR. GARLAND.

21           GOVERNMENT, ANYTHING ELSE?

22           MR. PHILLIPS:  NO, YOUR HONOR.

23           THE COURT:  ALL RIGHT.  I WILL GO AHEAD AND FIND THAT

24   THEY WILL BE ADMITTED FOR THE RECORD.  THEY STILL SHOULD BE

25   REDACTED.  THEY WILL NOT GO BACK.  AND SO THOSE REDACTIONS,

1  MAKE THEM AS QUICKLY AS POSSIBLE, BUT AS LONG AS THEY ARE MADE

2  BEFORE THE EVIDENCE GOES OUT WITH THE JURY IS FINE.

3        THANK YOU SO MUCH.  WE'LL SEE YOU IN AN HOUR FOR

4  LUNCH.

5        THE COURTROOM SECURITY OFFICER:  ALL RISE.  THIS

6  COURT STANDS IN RECESS FOR ONE HOUR.

7        (WHEREUPON, THE LUNCH RECESS WAS HAD FROM 12:29 P.M.

8  TO 1:31 P.M.)

9        THE COURT:  BRING THE JURY IN.

10       MS. NOVAY:  YOUR HONOR?

11       THE COURT:  YES.

12       MS. NOVAY:  REAL QUICK, BEFORE WE BRING THE JURY IN.

13       THE COURT:  IS THERE A REASON WE NEED TO DO IT UP

14  HERE?

15       MS. NOVAY:  WELL, I THOUGHT YOU WERE BRINGING THE

16  JURY IN.

17       THE COURT:  WELL, THEY'RE NOT IN HERE.

18       MS. NOVAY:  OKAY.

19       (WHEREUPON, AN OFF-THE-RECORD DISCUSSION WAS HAD.)

20       THE COURT:  OKAY.  I THOUGHT THAT I WAS GOING TO BE

21  TOLD IN ADVANCE WHAT DAY THAT WAS.  THAT'S WHAT I THOUGHT.

22       MS. NOVAY:  THAT'S NOT REALLY THE MAIN ISSUE.  WE

23  WERE JUST TRYING TO FIGURE OUT WHAT THE COURT HAD PLANNED TO DO

24  AS FAR AS THE SCHEDULE.

25       THE COURT:  I HAVE NO IDEA BECAUSE I DON'T KNOW WHAT

1  WITNESSES WE HAVE LINED UP.  SO I'M ASKING YOU ALL AT DIFFERENT

2  POINTS WHO YOU ALL INTEND TO CALL.  SO I DON'T HAVE A PLAN.

3  IT'S JUST BASED ON WHOMEVER Y'ALL ARE PLANNING TO PRESENT, OR I

4  SHOULD SAY THE GOVERNMENT.

5          MR. PHILLIPS:  YOUR HONOR, FOR THE RECORD, I REDACTED

6  GOVERNMENT EXHIBITS 971, 972, AND 973 AND I PLACED IT UP HERE

7  WITH THE OTHER EXHIBITS.

8          THE COURT:  ALL RIGHT.  THANK YOU SO MUCH,

9  MR. PHILLIPS.

10          (WHEREUPON, THE JURY RETURNED TO OPEN COURT AT

11  1:32 P.M., AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD.)

12          MR. GARLAND:  MAY -- YOUR HONOR, COULD WE APPROACH

13  THE BENCH?

14          THE COURT:  CAN YOU STEP BACK OUT FOR A SECOND?  I'M

15  SORRY, LADIES AND GENTLEMEN.  CAN YOU JUST STEP OUT FOR ONE

16  MORE MINUTE?  THANK YOU SO MUCH.

17          (WHEREUPON, THE JURY RETIRED FROM THE COURTROOM AT

18  1:32 P.M., AND THE FOLLOWING PROCEEDINGS WERE HAD.)

19          THE COURT:  YES, MR. GARLAND.

20          YOU ALL MAY BE SEATED.  THANK YOU SO MUCH.

21          MR. GARLAND:  WE HAD DISCUSSIONS LATE YESTERDAY

22  AFTERNOON.  ONE OF THE ISSUES THAT CAME UP WAS THE ISSUE OF

23  WHETHER THE GOVERNMENT WOULD BE ALLOWED TO ELICIT FROM THIS

24  WITNESS WHAT THE, QUOTE, LOSS WAS.

25          THE COURT:  WHICH WITNESS?

1    MR. GARLAND:  THE WITNESS IS MS. MEINHARDT.

2    THE COURT:  OKAY.

3    MR. GARLAND:  SHE IS AN EMPLOYEE OF A SUBSIDIARY OF

4    FIDELITY.  THEY HAVE MANY SUBSIDIARIES.

5    THE COURT:  OKAY.

6    MR. GARLAND:  HE HAS SAID HE IS GOING TO ASK HER HOW

7    MUCH FIDELITY LOST.

8    AND WE SAY BEFORE HE DOES THAT, THERE HAS TO BE A

9    THOROUGH FOUNDATION ESTABLISHED.  AND WE WOULD LIKE TO HAVE A

10   VOIR DIRE OF HER ON THE BASIS OF THAT KNOWLEDGE, THE

11   RELIABILITY OF THE KNOWLEDGE, FOR THIS REASON:  THE CONTRACTUAL

12   DOCUMENTS WHEREBY, ON THE 25TH OF AUGUST, 2014, FIDELITY

13   ACQUIRED 70 PERCENT OF LANDCASTLE TITLE IS SPECIFICALLY

14   REFERRED TO IN THAT DOCUMENT AS AN INVESTMENT.  AND IN THAT

15   DOCUMENT, IT SAYS THEY ARE AWARE OF THE RISK INVOLVED, AND THEY

16   ARE -- THEIR PAYMENT FOR THEIR 70 PERCENT WAS A GUARANTEE TO

17   COVER ANY SHORTFALLS IN THE AGREEMENT.

18   SO THEY GO FORWARD, CLAIMING ATTORNEY'S FEES AND MANY

19   OTHER THINGS.  IN ADDITION, IN THAT AGREEMENT, THERE IS -- AN

20   ADDITIONAL AGREEMENT WAS ENTERED INTO THAT THEY PAY -- BE PAID

21   25,000 A MONTH TO MANAGE ALL -- BASICALLY MANAGE THE ENTIRE LAW

22   FIRM, INCLUDING THE -- ALL OF THE ACCOUNTS.  AND THERE WAS AN

23   AGREEMENT THEY'D GET ALL OF THE BUSINESS.  SO THIS IS NOT IN

24   ANY WAY LOSS.

25   SECONDLY, AND I WOULD LIKE TO MAKE A RECORD ON THAT

1    BEFORE -- IT'S RATHER LIKE, DO YOU THINK THE DEFENDANT'S

2    GUILTY, THAT THIS WOMAN --

3            THE COURT:  IT'S NOT, MR. GARLAND.  IT'S NOT LIKE

4    THAT AT ALL.

5            MR. GARLAND:  TO ME, IT IS.  IT IS WHEN SHE IS

6    ALLOWED TO SAY, WITHOUT PRODUCING A SCHEDULE OF ANY MONEY THEY

7    PUT INTO THOSE ESCROW ACCOUNTS, WITHOUT UNDERLYING FOUNDATIONAL

8    EVIDENCE -- SHE'S NOT IN THE ACCOUNTING DEPARTMENT.  SHE

9    FORMERLY WAS WITH THE COMPANY THAT ACQUIRED LANDCASTLE TITLE.

10           IN ADDITION, AS PART OF WHAT THEY WERE DOING, THEY

11   TOOK EMPLOYEES OUT OF THE LAW FIRM.

12           SO IT WAS AN INVESTMENT.  THEY LISTED IT AS AN

13   INVESTMENT ON THEIR 10-K, OR WHATEVER YOU CALL IT, WITH THE

14   S.E.C.  WE'LL HAVE A COPY OF THAT.

15           SO IT'S NOT LOSS.  IF I GO INTO A BUSINESS AND, HEY,

16   THERE'S ALL THESE RISKS, THESE ACCOUNTS ARE SHORT, WE DON'T

17   KNOW EXACTLY HOW MUCH, AND THEY UNDERTAKE TO RUN -- THEY --

18   WITH 70 PERCENT THEY RAN THE TITLE COMPANY, THEY CONTROLLED THE

19   TITLE COMPANY.  IN ADDITION, THEY COULDN'T PRACTICE LAW, BUT

20   THEY TOOK OVER THE OP -- THEY GOT A 25,000 --

21           THE COURT:  MR. GARLAND, I'M SORRY, BUT LET ME STOP

22   YOU.  LET ME HEAR FROM THE GOVERNMENT.  THIS COULD GO ON

23   FOREVER.  THANK YOU SO MUCH FOR YOUR POINT.

24           GOVERNMENT'S RESPONSE?

25           MR. GILFILLAN:  YOUR HONOR.

1    THE COURT:  I THOUGHT WE TALKED ABOUT THIS YESTERDAY

2  FOR ALMOST AN HOUR.  BUT GO AHEAD, MR. GILFILLAN.

3    MR. GILFILLAN:  YOUR HONOR, OTHER THAN LET'S DO WHAT

4  WE SAID AT THE END OF COURT YESTERDAY, LET'S HAVE THE WITNESS

5  TESTIFY.  AND I WILL DO MY BEST TO LAY FOUNDATION, AND

6  MR. GARLAND CAN MAKE WHATEVER OBJECTIONS HE HAS.

7    THE COURT:  WHAT DO YOU INTEND TO ELICIT TO ESTABLISH

8  THE FOUNDATION?  WHAT TYPES OF INFORMATION, WHAT TYPES OF

9  TESTIMONY FROM THIS WITNESS?

10    MR. GILFILLAN:  WELL, WITH RESPECT TO

11  HOW-MUCH-THEY-LOST ISSUE, I INTEND TO ASK HER -- WELL, FIRST OF

12  ALL, SHE'S GOING TO TESTIFY EXTENSIVELY ABOUT HER INVOLVEMENT

13  WITH MHS IN THE SUMMER OF 2014 AND HER CONVERSATIONS WITH

14  MR. HARDWICK ABOUT WHAT WAS GOING ON, INCLUDING HIS RESIGNATION

15  FROM THE FIRM AND ALSO, YOU KNOW, HER CONTINUING INVOLVEMENT

16  ONCE FIDELITY ACQUIRED AN INTEREST IN LANDCASTLE.

17    AND THEN I THINK THE FOUNDATIONAL QUESTIONS ARE, IN

18  THE COURSE OF YOUR EMPLOYMENT AT FIDELITY, CARRYING OUT THESE

19  ACTIVITIES, DID YOU KNOW HOW MUCH MONEY FIDELITY LOST IN

20  CONNECTION WITH ITS ACQUISITION OF LANDCASTLE TITLE.

21    AND I IMAGINE HER RESPONSE, SHE'LL SAY WHAT THE

22  NUMBER IS.  SHE'LL SAY, YES, AND THEN SHE CAN TELL US HOW MUCH

23  MONEY.

24    I THINK ALL OF MR. GARLAND'S POINTS, HE'S FREE TO

25  CROSS HER ON THAT.  IT GOES TO WEIGHT.

1    THE COURT:  ALL RIGHT.  YES.

2    MR. GARLAND:  YOUR HONOR --

3    THE COURT:  YES.

4    MR. GARLAND:  -- I ASK YOU TO CONDUCT A PRELIMINARY

5    EXAMINATION AS TO THE REALITY OF THE BASIS OF THE CONCLUSIONS.

6    YOU HAVE ISSUES -- WHAT IS SHE PUTTING IN AS LOSS?  ALL OF HER

7    ATTORNEY'S FEES?  ONGOING OPERATIONS?

8        AND SHE'S NOT AN ACCOUNTANT.  SHE HAS -- THERE'S NO

9    SHOWING SHE HAS ANY DATA.  TO HAVE SOMEBODY JUST COME IN AND

10   SAY, WELL, WE LOST 30,000, WE LOST -- YOU WOULDN'T ALLOW --

11   THE COURT:  WHAT IS HER POSITION?

12   MR. GARLAND:  CONCLUSORY TESTIMONY, YOU NEED A

13   FOUNDATIONAL BASIS.

14       NOW, WHAT HE WANTS TO DO IS LET HER SAY IT AND LET ME

15   CROSS-EXAMINE AND GO INTO ALL OF THE ASPECTS OF HOW THE LOSS --

16   IF YOU WERE HAVING TO PROVE LOSS IN A CIVIL CASE, YOU WOULDN'T

17   BE ABLE TO JUST DO IT THAT WAY.  YOU'D HAVE TO SAY THIS DATA

18   BACKING IT UP.

19   THE COURT:  THANK YOU, MR. GARLAND.

20   WHAT IS HER POSITION?

21   MR. GILFILLAN:  I BELIEVE SHE'S GOT -- SHE ACTUALLY

22   CAN BREAK THE NUMBER DOWN INTO CATEGORIES.  AND I ACTUALLY

23   TALKED TO HER THIS MORNING ABOUT LET'S NOT INCLUDE ATTORNEY'S

24   FEES.

25   THE COURT:  WHAT IS HER POSITION, THOUGH?  I MEAN,

1  WHAT IS -- WHAT'S HER TITLE?

2      MR. GILFILLAN:  OH.  AT THE TIME SHE WAS THE -- LET

3  ME LOOK AT MY NOTES HERE -- THE PRESIDENT OF NATIONAL AGENCY

4  OPERATIONS FOR FIDELITY NATIONAL FINANCIAL TITLE GROUP.  AND

5  WHAT THIS MEANS, IT'S A $10 BILLION COMPANY.  SHE OVERSAW OR

6  RAN A $2 BILLION SEGMENT THAT IS RESPONSIBLE FOR FIDELITY'S

7  RELATIONSHIP WITH THESE TITLE AGENCIES ACROSS THE COUNTRY.

8      AND SO, YOU KNOW, THAT'S WHY SHE GOT CONTACTED.  AND

9  SHE'LL TALK ABOUT THIS.  SHE HAD A PRIOR RELATIONSHIP WITH ART

10  MORRIS AND RANDY SCHNEIDER, AND THAT'S WHY THEY REACH OUT TO

11  HER AND CALL HER ON -- I THINK IT'S AUGUST 14TH.  AND SHE DROPS

12  WHAT SHE'S DOING.  SHE COMES TO ATLANTA.  SHE HAS MEETINGS.

13  SHE MEETS WITH MR. HARDWICK.  SHE'S INVOLVED IN THE FIDELITY

14  DECISION ABOUT -- BECAUSE THEY'RE ON THE HOOK.  SHE'S INVOLVED

15  IN ALL THIS STUFF, AND THEN SHE'S INVOLVED IN IT GOING FORWARD.

16      THE COURT:  ALL RIGHT.  I WILL DENY YOUR REQUEST FOR

17  THE VOIR DIRE OUTSIDE OF THE JURY'S PRESENCE.  I AM GOING TO

18  BRING HER IN.

19      MR. GARLAND:  YOUR HONOR --

20      THE COURT:  YES.  VERY BRIEFLY.  YES, MR. GARLAND.

21  VERY BRIEFLY.  AGAIN, WE TOOK UP A LOT OF THIS YESTERDAY

22  EVENING FOR 45 MINUTES OR SO.

23      MR. GARLAND:  ANOTHER ISSUE I WANT TO BE CLEAR ON.

24      THE COURT:  YES, SIR.

25      MR. GARLAND:  THE QUESTION IS TIMING.  THESE MONIES

1  WERE PUT IN OVER AN 18-MONTH PERIOD, UP TO AND INCLUDING THE

2  TIME OF THE BANKRUPTCY.

3         THE COURT:  OKAY.

4         MR. GARLAND:  I HAVE A SECOND POINT.

5         THE COURT:  VERY QUICKLY, MR. GARLAND.  I AM GOING TO

6  BRING THOSE JURORS IN IN JUST A FEW SECONDS, SIR.

7         MR. GARLAND:  IT'S MY UNDERSTANDING I THINK FROM YOUR

8  HONOR'S LAST COMMENTS YESTERDAY THAT I WOULD NOT BE VIOLATING

9  YOUR HONOR'S RULES IF I ASKED ABOUT THE FACT THAT FIDELITY

10  FILED A LAWSUIT AGAINST MR. HARDWICK THE SAME DAY THEY BOUGHT

11  THE INTEREST IN THE COMPANY AND THE CONSEQUENTIAL PUBLICITY.

12         THE COURT:  THAT IS CORRECT.  I TOLD YOU THAT IF YOU

13  GO TOO FAR DOWN THAT PATH AND WE START TALKING ABOUT A LOT OF

14  LITIGATION OUTSIDE OF THIS CASE, THAT -- AND THERE ARE

15  OBJECTIONS MADE, THAT I WILL RULE ACCORDINGLY.  BUT I DID SAY

16  EXACTLY WHAT YOU JUST REPRESENTED.

17         MR. GARLAND:  I JUST WANTED TO MAKE SURE.

18         THE COURT:  MR. GILFILLAN?

19         MR. GILFILLAN:  ONLY THAT I DO INTEND TO ASK WHY THEY

20  FILED A LAWSUIT AGAINST MR. HARDWICK.

21         THE COURT:  BRING THE JURY IN.

22         (WHEREUPON, THE JURY RETURNED TO OPEN COURT AT

23  1:41 P.M., AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD.)

24         THE COURT:  ALL RIGHT.  THE JURY IS SEATED.  EVERYONE

25  ELSE MAY BE SEATED.

1       LADIES AND GENTLEMEN, I HOPE YOU HAD A GREAT LUNCH,

2  AND WE ARE READY TO PROCEED.

3       SO, GOVERNMENT, PLEASE CALL YOUR NEXT WITNESS.

4       MR. GILFILLAN:  YOUR HONOR, THE GOVERNMENT CALLS

5  ERIKA MEINHARDT.

6       THE COURT:  ALL RIGHT.  COME ON UP, MA'AM.  AND IF

7  YOU'LL COME TO THE RIGHT OF THIS PODIUM AND COME AROUND TO THE

8  WITNESS STAND, I WILL SWEAR YOU IN.

9       MS. MEINHARDT, GOOD AFTERNOON TO YOU.  AND IF YOU'D

10  RAISE YOUR RIGHT HAND.

11                        ERIKA MEINHARDT,

12  HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

13  FOLLOWS:

14       THE COURT:  ALL RIGHT.  IF YOU WOULD TAKE THE WITNESS

15  SEAT, PLEASE.  AND ONCE YOU ARE SEATED, GO AHEAD AND STATE YOUR

16  NAME AND THEN ALSO SPELL IT FOR THE RECORD.

17       THE WITNESS:  MY NAME IS ERIKA MEINHARDT.  FIRST NAME

18  IS SPELLED E-R-I-K-A, AND MY LAST NAME IS M-E-I-N-H-A-R-D-T.

19                        DIRECT EXAMINATION

20  BY MR. GILFILLAN:

21  Q.   GOOD AFTERNOON, MS. MEINHARDT.

22  A.   GOOD AFTERNOON.

23  Q.   MS. MEINHARDT, WHERE DO YOU WORK?

24  A.   I WORK FOR FIDELITY NATIONAL FINANCIAL.

25  Q.   WHAT POSITION DO YOU HOLD AT FIDELITY NATIONAL FINANCIAL?

1    A.    MY CURRENT POSITION IS EXECUTIVE VICE PRESIDENT WITH OUR

2    NATIONAL AGENCY OPERATIONS.

3    Q.    HOW LONG HAVE YOU HELD THAT POSITION?

4    A.    JUST SINCE JANUARY.

5    Q.    WHAT DID YOU DO BEFORE THIS POSITION?

6    A.    PRIOR TO THAT, I WAS WORKING FULL-TIME, AND I WENT

7    PART-TIME AT THE END OF JANUARY.  BUT IN MY FULL-TIME POSITION,

8    I WAS PRESIDENT OF OUR NATIONAL AGENCY OPERATIONS FOR FIDELITY.

9    Q.    WERE YOU PRESIDENT OF THE NATIONAL AGENCY OPERATIONS FOR

10   FIDELITY BACK IN THE SUMMER OF 2014?

11   A.    YES, I WAS.

12   Q.    AND THAT'S THE POSITION THAT YOU HELD UNTIL YOU WENT

13   PART-TIME IN JANUARY OF THIS YEAR?

14   A.    THAT'S CORRECT.

15   Q.    ALL RIGHT.  NOW, HOW LONG HAD YOU BEEN PRESIDENT OF

16   NATIONAL AGENCY OPERATIONS FOR FIDELITY?

17   A.    APPROXIMATELY 14 YEARS.

18   Q.    SO THAT'S FROM ABOUT 2000 TO ABOUT 2014?

19   A.    THAT'S CORRECT.

20   Q.    NOW, BACK IN THE SUMMER OF 2014, WHERE WERE YOU PHYSICALLY

21   WORKING?  WHERE WAS YOUR OFFICE?

22   A.    OUR CORPORATE HEADQUARTERS WAS IN JACKSONVILLE, FLORIDA.

23   AND I WAS BASED IN JACKSONVILLE, AND I WAS PHYSICALLY PRESENT

24   AT THAT TIME.

25   Q.    EXCEPT WHEN YOU HAD TO TRAVEL?

1    A.   THAT'S CORRECT.

2    Q.   AND HOW LONG HAVE YOU BEEN WORKING FOR FIDELITY THERE IN

3    JACKSONVILLE?

4    A.   SINCE 2003.

5    Q.   ALL RIGHT.  NOW, LET'S TALK ABOUT, AS THE PRESIDENT OF

6    NATIONAL AGENCY OPERATIONS, WHAT WAS YOUR GEOGRAPHIC

7    RESPONSIBILITY FOR FIDELITY?

8    A.   IT WAS THE ENTIRE UNITED STATES.

9    Q.   NOW, WE'VE HEARD A LOT ABOUT FIDELITY.  LET'S TALK A

10   LITTLE BIT ABOUT WHAT -- WHAT KIND OF COMPANY IS FIDELITY

11   NATIONAL FINANCIAL?

12   A.   SO OUR PRIMARY BUSINESS IS ENSURING PROPERTY RIGHTS IN

13   RESIDENTIAL AND COMMERCIAL REAL ESTATE TRANSACTIONS.  AND AS

14   PART OF THAT, WE PERFORM TITLE SEARCHES, WE HANDLE REAL ESTATE

15   CLOSINGS, AND WE ALSO UNDERWRITE TITLE INSURANCE POLICIES.  AND

16   WE DO THAT THROUGH EITHER OUR DIRECT OPERATIONS, WHICH ARE OUR

17   COMPANY-OWNED STORES, OR THROUGH OUR NETWORK OF INDEPENDENT

18   AGENTS.

19   Q.   AND JUST TO JUMP AHEAD A LITTLE BIT, BUT YOU'RE HERE TO

20   TESTIFY ABOUT FIDELITY RELATIONSHIP WITH ONE OF THE INDEPENDENT

21   AGENTS, CORRECT?

22   A.   THAT'S CORRECT.

23   Q.   AND WHO IS THAT?

24   A.   IT'S NATHAN HARDWICK, AND THE TITLE AGENCY WAS LANDCASTLE

25   TITLE, AFFILIATED WITH MORRIS HARDWICK SCHNEIDER.

1  Q.   ALL RIGHT.  NOW, FIDELITY -- IS FIDELITY A LARGE COMPANY?

2  A.   IT IS A LARGE COMPANY.  WE'RE A FORTUNE 500 COMPANY.

3  WE'RE PUBLICLY TRADED ON THE NEW YORK STOCK EXCHANGE.  WE

4  HAVE -- WE DO BUSINESS IN ALL 50 STATES AND SEVERAL COUNTRIES

5  OUTSIDE OF THE UNITED STATES.  WE HAVE APPROXIMATELY 25,000

6  EMPLOYEES, ABOUT 400 OFFICES AROUND THE COUNTRY.  AS I

7  MENTIONED, WE HAVE A NETWORK OF INDEPENDENT AGENTS, ABOUT 5,000

8  INDEPENDENT AGENTS.  AND OUR REVENUES ARE APPROXIMATELY

9  $10 BILLION A YEAR.

10  Q.   THAT'S 10 BILLION, WITH A B?

11  A.   WITH A B.

12  Q.   AND THE SEGMENT OF THE BUSINESS THAT YOU WERE PRESIDENT

13  FOR, THE NATIONAL AGENCY OPERATIONS, WHAT WERE THE REVENUES OF

14  YOUR SEGMENT OF THE BUSINESS?

15  A.   APPROXIMATELY $2 BILLION A YEAR.

16  Q.   AND JUST TO BE CLEAR, WE'RE TALKING ABOUT -- THE TIME

17  PERIOD THAT YOU'RE TALKING ABOUT, THIS INCLUDES BACK IN ABOUT

18  2014?

19  A.   THAT'S CORRECT.

20  Q.   SO YOU WERE THE PRESIDENT OF A SECTION OF FIDELITY'S

21  BUSINESS THAT, IF I HEARD YOU CORRECTLY, REPRESENTS ABOUT

22  20 PERCENT OF THAT 10 BILLION IN GROSS REVENUE, CORRECT?

23  A.   THAT'S CORRECT.

24  Q.   NOW, LET'S EXPLAIN -- LET'S TALK A LITTLE BIT ABOUT -- YOU

25  MENTIONED THAT FIDELITY INSURES REAL ESTATE TRANSACTIONS,

1    CORRECT?

2    A.    CORRECT.

3    Q.    DOES FIDELITY -- WHAT IS FIDELITY'S INVOLVEMENT IN ISSUING

4    A TITLE POLICY IN CONNECTION WITH A RESIDENTIAL REAL ESTATE

5    CLOSING?

6    A.    SO WE ARE THE UNDERWRITER.  THE TITLE POLICY IS WRITTEN

7    EITHER, AGAIN, BY ONE OF OUR DIRECT OFFICES OR BY ONE OF OUR

8    INDEPENDENT AGENTS, BUT WE ARE THE UNDERWRITER.  WE RETAIN THE

9    RESERVES.  AND WE DEAL WITH THE INSURED IN THE EVENT OF A

10   CLAIM, AND WE HAVE THE OBLIGATION TO PAY THAT CLAIM UNDER THE

11   POLICIES.

12   Q.    AND THE CLAIM YOU'RE TALKING ABOUT IS IF THERE'S EVER A

13   CLAIM ON THE TITLE FOR A PIECE OF PROPERTY THAT CHANGES HANDS

14   IN A CLOSING; IS THAT RIGHT?

15   A.    WITH RESPECT TO THE POLICY, YES.

16   Q.    NOW, IS IT FAIR TO SAY THAT THE POLICY INSURES THE

17   VALIDITY OF THE BUYER'S INTEREST IN THE PROPERTY?

18   A.    THAT'S A GOOD WAY TO PUT IT, YES.

19   Q.    AND WHAT DOES THE INSURANCE HAVE TO DO WITH THE MONEY THAT

20   THE LENDER IS PUTTING INTO THE PROPERTY?

21   A.    WELL, THE LENDER HAS AN INTEREST IN THE TRANSACTION AND

22   THE REAL PROPERTY BY VIRTUE OF THE FACT THAT THEY TAKE A LIEN

23   ON THE PROPERTY.  THEY ARE LENDING THE MONEY TO THE BORROWER IN

24   THE TRANSACTION; AND IN RETURN, THEY HAVE A LIEN ON THE

25   PROPERTY IN THE EVENT THAT THE BORROWER SHOULD DEFAULT ON THEIR

1  LOAN.

2  Q.    AND THE LIEN YOU'RE TALKING ABOUT IS WHAT LAY PEOPLE MIGHT

3  REFER TO AS A MORTGAGE, RIGHT?

4  A.    RIGHT.

5  Q.    DOES FIDELITY ALSO ISSUE WHAT'S CALLED A CLOSING

6  PROTECTION LETTER?

7  A.    YES, WE DO.

8  Q.    WHAT'S THAT?

9  A.    SO IN ANY TRANSACTION INVOLVING A LENDER, ANY TIME EITHER

10 A BORROWER, WHETHER THAT'S AN INDIVIDUAL OR A COMPANY, IS

11 PURCHASING PROPERTY AND THEY DECIDE TO TAKE OUT A MORTGAGE,

12 LENDER BECOMES INVOLVED AT THAT POINT.  AND THE LENDER WILL

13 REQUIRE THAT THEY GET A CLOSING PROTECTION LETTER.  AND THAT IS

14 SOMETHING THAT IS ISSUED BY US, AS THE UNDERWRITER.

15     AND ESSENTIALLY WHAT THAT DOES IS IT PROVIDES ASSURANCES

16 TO THE PARTIES TO THE TRANSACTION, WHETHER IT'S THE LENDER OR

17 THE PURCHASER, OR IN SOME CASES THE SELLER, THAT THE

18 TRANSACTION WILL -- THAT THEY WILL COMPLY, WHOMEVER IS HANDLING

19 THE TRANSACTION, THE CLOSING, WILL COMPLY WITH THE TERMS OF THE

20 CLOSING STATEMENT AND THE DIRECTIONS THAT THE LENDER PROVIDES.

21 Q.    SO WITH A COMBINATION OF THE CLOSING PROTECTION LETTER AND

22 THE TITLE INSURANCE POLICY, IS IT FAIR TO SAY THAT IF THERE ARE

23 PROBLEMS WITH A RESIDENTIAL REAL ESTATE CLOSING, SUCH AS THAT

24 THE MONEY FROM THE LENDER IS NOT THERE TO CLOSE THE

25 TRANSACTION, IS FIDELITY NATIONAL FINANCIAL, THE INSURER, GOING

1   TO BE SUBJECT TO A CLAIM AND MAYBE EVEN HAVE TO PAY OUT ON A

2   CLAIM IN CONNECTION WITH THAT SITUATION?

3   A.   YES, WE WILL.

4   Q.   NOW, YOU MENTION -- IN YOUR ROLE AS PRESIDENT OF AGENCY

5   OPERATIONS, YOU MENTIONED A TITLE AGENT, AND YOU'VE MENTIONED

6   THAT MR. HARDWICK AND HIS LAW FIRM WAS A TITLE AGENT FOR

7   FIDELITY.  WHAT IS A TITLE AGENT?

8   A.   SO TITLE AGENT IS AN INDEPENDENT COMPANY, OFTENTIMES IN --

9   PARTICULARLY ON THE EAST COAST, IT IS AFFILIATED WITH A LAW

10  FIRM.  THAT'S NOT ALWAYS THE CASE.  BUT THEY ARE INDEPENDENT

11  COMPANIES THAT GENERALLY HAVE AN EXPERTISE IN THE AREA OF REAL

12  ESTATE TRANSACTIONS.  AND THEY, IN EFFECT, STEP INTO THE SHOES

13  OF WHAT WE WOULD OTHERWISE DO IN OUR DIRECT OPERATIONS.

14       SO THOSE AGENCIES ARE GENERALLY GOING TO BE THE ONES

15  PERFORMING THE TITLE SEARCH.  THEY WILL BE ACTUALLY CLOSING THE

16  TRANSACTION.  THEY'LL HOLD FUNDS IN ESCROW.  AND THEN THEY

17  ULTIMATELY WRITE THE TITLE POLICY THAT WE WOULD UNDERWRITE.

18  Q.   ALL RIGHT.  AND SO THAT'S WHAT MR. HARDWICK AND MORRIS

19  HARDWICK SCHNEIDER, THE LAW FIRM, THAT'S WHAT THEY -- THE

20  FUNCTION THEY WERE, OR ROLE THEY WERE WITH RELATIONSHIP TO

21  FIDELITY BACK IN 2014?

22  A.   THAT'S CORRECT.

23  Q.   AND JUST TO GIVE THE JURY A SENSE OF -- IN YOUR NATIONAL

24  OPERATIONS THAT YOU WERE THE PRESIDENT OF, HOW MANY INDEPENDENT

25  TITLE AGENTS DID YOU HAVE BACK IN 2014?

1    A.    APPROXIMATELY 5,000.

2    Q.    SO MORRIS HARDWICK SCHNEIDER WAS ONE OF 5,000?

3    A.    THAT'S CORRECT.

4    Q.    ALL RIGHT.  NOW, BUT WITH REGARD TO THE SIZE OF MORRIS

5    HARDWICK SCHNEIDER, BACK IN 2014, WHERE DID MORRIS HARDWICK

6    SCHNEIDER RANK ON THE SIZE OF INDEPENDENT AGENTS FOR FIDELITY

7    NATIONAL IN 2014?

8    A.    I DON'T HAVE THE SPECIFIC RANKING, BUT THEY WERE A VERY

9    LARGE AGENT FOR US.  AND IF I HAD TO ESTIMATE, I WOULD SAY THEY

10   WERE IN OUR TOP 20 OF OUR AGENTS ACROSS THE COUNTRY.

11   Q.    TOP 20 OF THOSE 5,000 ON A SIZE BASIS?

12   A.    SIZE.

13   Q.    YOU MENTIONED THE ESCROW ACCOUNTS OF A TITLE AGENT.

14   THAT'S WHERE THE MONIES THAT FIDELITY IS INSURING ARE HELD,

15   CORRECT?

16   A.    THAT'S CORRECT.

17   Q.    SO THAT'S SOMETHING THAT IS -- THE INTEGRITY OF THOSE

18   ACCOUNTS ARE IMPORTANT TO FIDELITY?

19   A.    THEY ARE EXTREMELY IMPORTANT.

20   Q.    NOW, HOW DOES THE COMPENSATION BETWEEN FIDELITY NATIONAL

21   AND THE TITLE AGENT WORK?  WHAT'S THE COMPENSATION ARRANGEMENT?

22   A.    SO WE ENTER INTO AN AGENCY AGREEMENT, A CONTRACT,

23   ESSENTIALLY, WITH OUR INDEPENDENT AGENTS.  AND THERE IS A

24   DIVISION OF THE PREMIUM THAT'S ESTABLISHED UNDER THAT CONTRACT.

25   ROUGHLY, IT'S ABOUT 80 PERCENT TO THE AGENT AND APPROXIMATELY

1   20 PERCENT TO THE UNDERWRITER, TO US.  THAT CAN VARY.

2       BUT THE EXPECTATION IS THAT THE AGENT IS BEARING A LOT OF

3   THOSE COSTS ASSOCIATED WITH PRODUCING THE TITLE POLICY, WHETHER

4   THAT'S CONDUCTING THE TITLE SEARCH, HANDLING THE ESCROW FUNDS,

5   HANDLING THE CLOSINGS, AND ULTIMATELY WRITING THE POLICY,

6   DEVELOPING THE BUSINESS.  SO THAT'S WHY THEY RECEIVE THE LARGER

7   SHARE OF THE COMPENSATION.

8   Q.    OKAY.  AND THE COMPENSATION COMES FROM -- IS IT THE BUYER

9   OR THE LENDER WHO PAYS FOR THE TITLE INSURANCE, THE TITLE

10   INSURANCE PREMIUM THAT GETS SPLIT 80-20?

11   A.    IT'S GENERALLY THE BUYER.

12   Q.    SO THAT'S THE MONEY THAT GETS SPLIT 20 PERCENT TO

13   FIDELITY, 80 PERCENT TO THE TITLE AGENT, MORRIS HARDWICK

14   SCHNEIDER?

15   A.    THAT'S CORRECT.

16   Q.    NOW, YOU MENTIONED THAT YOUR GROUP HAD TOTAL GROSS REVENUE

17   FROM ALL YOUR INDEPENDENT AGENTS OF ROUGHLY $2 BILLION BACK IN

18   2014.  MORRIS HARDWICK SCHNEIDER, IF YOU CAN, WHAT WAS THE

19   GROSS REVENUE THAT FIDELITY EARNED FROM MORRIS HARDWICK

20   SCHNEIDER IN 2014?

21   A.    I WOULD ESTIMATE THAT THE GROSS REVENUE WAS PROBABLY ABOUT

22   $10 MILLION.

23   Q.    AND IF I'VE DONE MY MATH CORRECTLY, THAT'S ABOUT A HALF OF

24   A PERCENT OF THE GROSS REVENUE IN YOUR GROUP.

25   A.    CORRECT.

1    Q.   SO, IN OTHER WORDS, 10 MILLION IS ABOUT HALF OF A PERCENT

2    OF THE $2 BILLION IN GROSS REVENUE THAT YOU WERE OVERSEEING?

3    A.   CORRECT.

4    Q.   ALL RIGHT.  NOW, SO YOU MENTIONED YOU WERE -- YOU DID WORK

5    IN ATLANTA FOR FIDELITY AT ONE POINT, RIGHT?

6    A.   I DID.

7    Q.   AND THEN YOU MOVED TO JACKSONVILLE, CORRECT?

8    A.   CORRECT.

9    Q.   DID YOU HAVE AN OCCASION TO FORM OR GET TO KNOW ON A

10   BUSINESS BASIS ART MORRIS AND RANDY SCHNEIDER?

11   A.   YES, I DID.

12   Q.   APPROXIMATELY WHEN DID THAT BUSINESS RELATIONSHIP FIRST

13   ARISE?

14   A.   I WOULD ESTIMATE THAT I MET ART MORRIS AND RANDY SCHNEIDER

15   IN THE LATE 1990'S.

16   Q.   AND YOU KNEW WHAT THEY DID FOR A LIVING, CORRECT?

17   A.   I DID.

18   Q.   AND WHAT WERE THEY?

19   A.   THEY WERE TITLE AGENTS.  AND WE UNDERWROTE THEM, ALONG

20   WITH OTHER COMPANIES.

21   Q.   AND WHEN YOU SAY THEY'RE TITLE AGENTS, ANOTHER WAY TO SAY

22   IT, THEY WERE REAL ESTATE CLOSING LAWYERS?

23   A.   CORRECT.

24   Q.   HOW ABOUT A LAWYER NAMED DALE JACKSON?

25   A.   I KNEW DALE AS WELL.

1    Q.   WAS HE A FIDELITY TITLE AGENT ALSO?

2    A.   HE WAS.

3    Q.   DID THERE COME A TIME WHEN YOU MET THE DEFENDANT IN THIS

4    CASE, NATHAN HARDWICK?

5    A.   I DID.

6    Q.   HOW DID YOU COME TO MEET HIM?

7    A.   I DON'T RECALL THE SPECIFIC CIRCUMSTANCES WHEN WE FIRST

8    MET, BUT I'M ASSUMING HE WAS INTRODUCED TO ME, OR VICE VERSA,

9    BY OUR SALES REP THAT WORKED WITH THAT FIRM, WITH JACKSON AND

10   HARDWICK.  HE WAS ASSOCIATED WITH DALE JACKSON AT THAT TIME.

11   Q.   SO YOU WERE AWARE THAT HE WAS EITHER IN MR. JACKSON'S LAW

12   FIRM OR A PARTNER OF MR. JACKSON?

13   A.   CORRECT.  I BELIEVED HE WAS A PARTNER IN THE FIRM, YES.

14   Q.   AND THE FIRM'S NAME WAS JACKSON AND HARDWICK?

15   A.   CORRECT.

16   Q.   DID THERE COME A TIME WHEN YOU LEARNED THAT MR. HARDWICK

17   WANTED TO BUY OUT MR. JACKSON?

18   A.   YES.

19   Q.   AND WHAT DID MR. HARDWICK WANT TO DO WHEN HE BOUGHT OUT

20   MR. JACKSON?

21   A.   WE WERE APPROACHED TO CONSIDER MAKING A LOAN TO NATHAN

22   HARDWICK TO ENABLE HIM TO BUY OUT HIS FORMER PARTNER, DALE

23   JACKSON, SO THAT HE COULD ULTIMATELY MERGE WITH MORRIS AND

24   SCHNEIDER.

25   Q.   AND WHEN YOU SAY WE WERE APPROACHED, WHO ACTUALLY

1    APPROACHED?

2    A.    WELL, I WAS CONTACTED ON BEHALF OF FIDELITY NATIONAL

3    FINANCIAL TO STEP IN AS A POTENTIAL LENDER ON THIS TRANSACTION.

4    Q.    WHAT PERSON CONTACTED YOU?

5    A.    I BELIEVE IT WAS ART MORRIS OR RANDY SCHNEIDER.

6    Q.    AND IS LOANING MONIES TO TITLE AGENTS OR LAWYERS FOR THEM

7    TO COMBINE OR GROW THEIR BUSINESS, IS THAT SOMETHING THAT

8    FIDELITY DOES AS PART OF ITS BUSINESS?

9    A.    WE DO.  IT'S NOT A ROUTINE PART OF WHAT WE DO, BUT IT'S

10   CERTAINLY SOMETHING THAT WE DO ON OCCASION.

11   Q.    AND THAT'S WHAT YOU WERE APPROACHED ABOUT BY EITHER

12   MR. MORRIS OR MR. SCHNEIDER?

13   A.    THAT'S CORRECT.

14   Q.    ARE YOU FAMILIAR WITH A COMPANY REFERRED TO AS FORTUNA?

15   A.    I AM.

16   Q.    WHAT IS FORTUNA?

17   A.    IT'S AN ARM OF FIDELITY NATIONAL FINANCIAL THAT HAS BEEN

18   USED AS A FINANCING VEHICLE FOR A NUMBER OF DIFFERENT TYPES OF

19   TRANSACTIONS.  SO IT, IN EFFECT, IS A LENDER WITHIN THE

20   FIDELITY NATIONAL FINANCIAL UMBRELLA.

21   Q.    NOW, WHEN MR. MORRIS OR MR. SCHNEIDER APPROACHED YOU WITH

22   RESPECT TO A LOAN, WHO WAS THE LOAN FOR -- WELL, ACTUALLY,

23   MA'AM, LET ME ASK YOU:  FORTUNA ULTIMATELY MADE THE LOAN; IS

24   THAT RIGHT?

25   A.    THAT'S CORRECT.

1    Q.   HOW MUCH WAS IT?

2    A.   IT WAS APPROXIMATELY $3 MILLION.

3    Q.   AND WERE YOU INVOLVED IN FIDELITY'S INTERNAL PROCESS IN

4    EVALUATING AND APPROVING THAT LOAN?

5    A.   I WAS INVOLVED IN MAKING THE RECOMMENDATION TO MOVE

6    FORWARD WITH THAT LOAN.  I DID NOT GET INVOLVED IN ACTUALLY

7    DETERMINING -- REVIEWING FINANCIALS AND MAKING THE ULTIMATE

8    DETERMINATION AS TO WHETHER WE WOULD MAKE THE LOAN.

9    Q.   DID YOU TALK TO THE NEW PARTNERS OF MORRIS HARDWICK

10   SCHNEIDER IN THAT PROCESS?

11   A.   I TALKED TO ART AND RANDY, AND I'M SURE I HAD A

12   CONVERSATION WITH NATHAN AS WELL.

13   Q.   MR. HARDWICK?

14   A.   CORRECT.

15   Q.   AND, ULTIMATELY, WHEN THE LOAN WAS MADE, WAS IT MADE BY

16   FORTUNA, WHICH YOU'VE JUST DESCRIBED?

17   A.   YES.

18   Q.   AND DID IT HAVE AN INTEREST RATE ATTACHED TO IT?

19   A.   IT DID.

20   Q.   AND A PAYMENT SCHEDULE?

21   A.   CORRECT.

22   Q.   WAS THAT AN ARM'S-LENGTH LOAN -- AN ARM'S-LENGTH INTEREST

23   RATE, OR DO FIDELITY TITLE AGENTS GET KIND OF A GOOD DEAL?

24   A.   WE ALWAYS HAVE TO USE AN ARM'S-LENGTH RATE WHENEVER WE

25   HANDLE ANY FINANCING IN THOSE SORTS OF TRANSACTIONS.

1    Q.    OKAY.  WHEN WAS THIS LOAN MADE?

2    A.    IT WAS BACK IN 2005.

3    Q.    NOW, AND ONCE THAT LOAN WAS MADE, DID MORRIS HARDWICK

4    SCHNEIDER, THE LAW FIRM, GET FORMED AND BECOME A TITLE AGENT OF

5    FIDELITY NATIONAL?

6    A.    YES, THEY DID.

7    Q.    AND IN YOUR ROLE AS PRESIDENT OF NATIONAL AGENCY

8    OPERATIONS, DID YOU CONTINUE TO HAVE CONTACT WITH THE PARTNERS

9    OF THAT FIRM?

10   A.    YES, I DID.

11   Q.    AND TO BE CLEAR, DID YOU HAVE PRIMARY RESPONSIBILITY FOR

12   DEALING WITH MORRIS HARDWICK SCHNEIDER, OR WERE THERE OTHER

13   FIDELITY EMPLOYEES WHO HANDLED THAT?

14   A.    NO.  MY RESPONSIBILITIES WERE VERY LIMITED AS IT RELATED

15   TO THE LAW FIRM AND TO LANDCASTLE TITLE.  WE HAD OTHERS.  THEY

16   HAD A SALES REP HERE.  WE HAD AN ESTATE MANAGER, A REGIONAL

17   MANAGER, A LOT OF SUPPORT STAFF, ATTORNEYS THAT WORKED WITH THE

18   FIRM.

19   Q.    BUT YOU -- DID YOU CONTINUE, THOUGH, TO HAVE OCCASION TO

20   INTERACT WITH THE PARTNERS OF THE FIRM OVER THE YEARS AFTER

21   THAT LOAN WAS MADE?

22   A.    YES, I DID.

23   Q.    OKAY.  DID THERE COME A TIME WHEN YOU WERE APPROACHED

24   ABOUT RESTRUCTURING MR. HARDWICK'S FORTUNA LOAN?

25   A.    YES.

1    Q.    WHO APPROACHED YOU ABOUT THAT?

2    A.    I BELIEVE IT WAS RANDY SCHNEIDER.

3    Q.    AND DID FORTUNA AND FIDELITY ULTIMATELY RESTRUCTURE THAT

4    LOAN?

5    A.    WE DETERMINED THAT WE WOULD ALLOW THEM TO DEFER -- I

6    BELIEVE THE AGREEMENT WAS THAT WE ALLOWED THEM TO EITHER

7    MAKE -- I THINK THEY WERE MAKING EITHER PRINCIPAL ONLY PAYMENTS

8    OR INTEREST ONLY PAYMENTS.  BUT WE DID ALLOW THEM TO DEFER SOME

9    OF THE PAYMENT FOR A PERIOD OF TIME.

10   Q.    AND WHAT WAS THE REASON THAT FIDELITY OR FORTUNA WAS GIVEN

11   ABOUT WHY FORBEARANCE OR RESTRUCTURING WAS REQUIRED?

12   A.    WHEN I WAS APPROACHED BY RANDY SCHNEIDER, HE HAD INDICATED

13   TO ME THAT THE FIRM WAS STRUGGLING FINANCIALLY.  THIS WAS BACK

14   AROUND 2008 OR 2009.  AND WE WERE, YOU KNOW, IN THE MIDDLE OF

15   THE ECONOMIC CRISIS, AND THE REAL ESTATE INDUSTRY HAD BEEN VERY

16   ADVERSELY IMPACTED.

17   Q.    NOW, AFTER THAT LOAN WAS -- AND I'M SORRY.  DID I ASK YOU

18   APPROXIMATELY WHEN THAT RESTRUCTURING HAPPENED?

19   A.    IT WOULD HAVE BEEN AROUND 2008 OR 2009.

20   Q.    SO THEN ON A GOING-FORWARD BASIS, DID YOU THEN CONTINUE TO

21   HAVE CONTACT WITH THE PARTNERS OF MORRIS HARDWICK SCHNEIDER?

22   A.    YES, I DID.

23   Q.    WHAT KIND OF CONTACT FOR YOU PERSONALLY?  HOW OFTEN, WHAT

24   KIND OF CONTACT?

25   A.    IT WAS VERY LIMITED.  I WOULD HEAR FROM ART MORRIS ON

1  OCCASION IF I HAPPENED TO BE IN TOWN.  THE SAME WITH RANDY

2  SCHNEIDER.  WHEN I WAS IN TOWN, MAYBE EVERY OTHER YEAR OR SO, I

3  WOULD GENERALLY TRY AND SCHEDULE A MEETING ALONG WITH A SALES

4  REP AND COME INTO THE OFFICE.  AND I WOULD SEE NAT HARDWICK AT

5  THAT TIME AS WELL.

6  Q.   SO THERE WAS TIMES IN THE YEARS AFTER THE LOAN

7  RESTRUCTURING WHEN YOU DID MEET WITH MR. HARDWICK AT HIS OFFICE

8  THERE AT MORRIS HARDWICK SCHNEIDER?

9  A.   YES.

10 Q.   AND YOU MENTIONED THE ACCOUNT REP.  WHO WAS -- IF WE FOCUS

11 ON, LET'S SAY, 2011 FORWARD, WHO WAS THE ACCOUNT REP AT

12 FIDELITY NATIONAL FOR MORRIS HARDWICK SCHNEIDER?

13 A.   I BELIEVE -- AND WE HAVE SEVERAL COMPANIES THAT WE OPERATE

14 UNDER HERE IN GEORGIA.  AND THE PRIMARY RELATIONSHIP I BELIEVE

15 WAS WITH ANDI STROUD, WHO WAS WITH OUR CHICAGO TITLE OPERATION.

16 Q.   AND I WAS GOING TO ASK THAT, IF THE JURY'S HEARD

17 REFERENCES TO MS. STROUD AT CHICAGO TITLE.  IS SHE, THROUGH A

18 SUBSIDIARY, ESSENTIALLY FIDELITY'S ACCOUNT REPRESENTATIVE FOR

19 MORRIS HARDWICK SCHNEIDER?

20 A.   CORRECT.

21 Q.   AND WHO IS MR. DAVID BAUM?

22 A.   DAVID BAUM WAS, IS STILL TODAY, OUR REGIONAL MANAGER FOR

23 THIS PART OF THE COUNTRY.  AND ANDI REPORTS TO HIM.

24 Q.   AND THEN HE ULTIMATELY REPORTS UP TO YOU?

25 A.   HE DID, YES.

1    Q.   ALL RIGHT.  OKAY.  SO THERE CAME A TIME WHEN YOU LEARNED

2    THAT RANDY SCHNEIDER RETIRED FROM THE FIRM?

3    A.   I DID LEARN THAT, YES.

4    Q.   DID THERE COME A TIME WHEN YOU LEARNED THAT ART MORRIS

5    RETIRED FROM THE FIRM?

6    A.   I DID NOT KNOW THAT UNTIL FOUR YEARS AGO.

7    Q.   THE EVENTS OF THE SUMMER OF 2014.

8    A.   CORRECT.

9    Q.   ALL RIGHT.  DID YOU KNOW THAT THE WITTSTADTS JOINED THE

10   FIRM?

11   A.   NO.  I HAD NEVER HEARD OF THEM UNTIL AUGUST 2014.

12   Q.   ALL RIGHT.  SO FROM YOUR PERSPECTIVE, WAS -- IS IT FAIR TO

13   SAY THAT IT WAS KIND OF BUSINESS AS USUAL WITH MORRIS HARDWICK

14   SCHNEIDER UP THROUGH AUGUST OF 2014?

15   A.   THAT'S CORRECT.

16   Q.   ALL RIGHT.  NOW, DID YOU HAVE OCCASION TO CONTACT

17   MR. HARDWICK IN JULY OF 2014?

18   A.   I DID.

19   Q.   WHAT DID YOU CONTACT HIM ABOUT?

20   A.   WE HAD BEEN CONDUCTING AN AUDIT, WHICH WE DO TYPICALLY FOR

21   AGENTS.  IT WAS JUST A ROUTINELY SCHEDULED AUDIT.  AND IT WAS

22   TAKING QUITE A BIT OF TIME, AND THERE WERE SOME ISSUES THAT

23   AROSE OUT OF THAT AUDIT.

24        AND I HAD GOTTEN WORD FROM ANDI STROUD THAT NAT WAS VERY

25   FRUSTRATED ABOUT THE AUDIT, FELT LIKE IT WAS TAKING TOO MUCH

1  TIME, WANTED TO GET THE AUDITORS OUT OF THERE.  ANDI WAS

2  CONCERNED THAT IT MIGHT ADVERSELY IMPACT THE BUSINESS

3  RELATIONSHIP.

4      AND SO I TOLD HER THAT I WAS GOING TO BE IN TOWN AND THAT

5  I WOULD TAKE THE TIME TO MEET WITH HIM AND DISCUSS THE AUDIT

6  AND SEVERAL OTHER THINGS AS WELL.

7  Q.   "HIM" BEING WHO?

8  A.   NAT HARDWICK.

9  Q.   WAS MR. HARDWICK'S FORTUNA LOAN STILL OUTSTANDING AT THIS

10  TIME IN JULY 2014?

11  A.   YES, IT WAS.  IT WAS DELINQUENT, THOUGH.

12  Q.   AND WHEN YOU SAY DELINQUENT, WHAT'S THAT MEAN?

13  A.   IT SHOULD HAVE BEEN PAID OFF BY THAT POINT IN TIME, AND A

14  NUMBER OF THE PAYMENTS HAD BEEN MISSED.  AND OF COURSE WE HAD

15  DEFERRED PART OF IT.  SO IT WAS, IT WAS OUTSTANDING WELL BEYOND

16  ITS TERM DATE.

17  Q.   THIS WAS THE LOAN THAT WAS MADE IN 2005?

18  A.   CORRECT.

19  Q.   AND WAS THAT SOMETHING THAT YOU WANTED TO TALK TO

20  MR. HARDWICK AT THE MEETING THAT YOU SET UP WITH HIM?

21  A.   YES.

22      MR. GILFILLAN:  YOUR HONOR, I'M GOING TO MOVE TO

23  ADMIT GOVERNMENT EXHIBIT 1600 AT THIS TIME.

24      AND, MS. MEINHARDT, YOU HAVE IT THERE ON YOUR LEFT.

25      MR. GARLAND:  NO OBJECTION.

1    THE COURT:  IT'S ADMITTED.

2    BY MR. GILFILLAN:

3    Q.    ALL RIGHT.  MS. MEINHARDT, BEFORE YOU MET WITH

4    MR. HARDWICK, DID YOU HAVE OCCASION TO SEND HIM AN E-MAIL?

5    A.    I DO HAVE THIS E-MAIL THAT I SENT HIM ON JULY 7TH.

6    Q.    OKAY.  AND WHAT DID YOU TELL MR. HARDWICK THERE IN YOUR

7    E-MAIL?  YOU CAN JUST READ THE HIGHLIGHTED LANGUAGE.

8    A.    IT SAYS:  WE CAN DISCUSS RESTRUCTURING YOUR LOAN AND ALSO

9    THE AUDIT THAT YOUR OFFICE HAS RECENTLY UNDERGONE.  I'VE BEEN

10   SPEAKING WITH ANDI REGARDING THE AUDIT AND AM HOPEFUL THAT IT

11   IS BACK ON TRACK AND READY TO WRAP UP.

12   Q.    ALL RIGHT.  WITH RESPECT TO THE REFERENCE TO ANDI AND THE

13   AUDIT, IS THAT THE ISSUES THAT YOU HAD JUST DESCRIBED A FEW

14   SECONDS AGO IN YOUR TESTIMONY?

15   A.    CORRECT.

16   Q.    NOW, WITH REGARD TO RESTRUCTURING THE LOAN, HAD YOU

17   ALREADY TALKED TO MR. HARDWICK ABOUT THE FORTUNA LOAN?

18   A.    NO.

19   Q.    OKAY.  DO YOU RECALL WHETHER HE HAD TALKED TO YOU?

20   A.    ACTUALLY, I TAKE THAT BACK, BECAUSE WHEN WE HAD HAD A

21   PHONE CALL, HE HAD EXPRESSED FRUSTRATION WITH THE INTEREST RATE

22   ON THAT LOAN.  AND SO THAT WAS PART OF WHAT WAS GOING TO BE

23   DISCUSSED AT THAT TIME AT OUR LUNCH MEETING.

24   Q.    ALL RIGHT.  AND SO DID YOU THEN SET UP A MEETING WITH

25   MR. HARDWICK?

1    A.   YES, WE DID.

2    Q.   ALL RIGHT.  AND WHERE WAS THE MEETING?

3    A.   WE MET FOR LUNCH AT THE ST. REGIS HOTEL IN BUCKHEAD.

4    Q.   WHY DID YOU MEET THERE?

5    A.   BECAUSE NAT HARDWICK OWNED A CONDOMINIUM AT THE ST. REGIS

6    AND SUGGESTED IT AS A PLACE TO HAVE LUNCH.

7    Q.   ALL RIGHT.  AT THE MEETING, DID YOU TALK TO HIM ABOUT THE

8    FORTUNA LOAN?

9    A.   YES, I DID.

10   Q.   WHAT DID YOU TELL HIM?

11   A.   I TALKED TO HIM ABOUT SOME OPTIONS.  ONE, HE HAD EXPRESSED

12   CONCERN, AS I SAID, ABOUT THE INTEREST RATE, WHICH I THINK WAS

13   APPROXIMATELY 5 AND A HALF PERCENT.  AND INTEREST RATES HAD

14   DROPPED, AND HE FELT THAT THE INTEREST RATE SHOULD BE ADJUSTED

15   DOWNWARD AS A RESULT OF THE CHANGE IN INTEREST RATES IN THE

16   MARKETPLACE.

17       I TALKED ABOUT THE FACT THAT THE LOAN WAS OUTSTANDING,

18   THAT IT WAS DELINQUENT, AND WE WERE CARRYING IT ON OUR BOOKS.

19   AND IT WAS GETTING UNCOMFORTABLE FOR ME BECAUSE WE WERE GETTING

20   READY TO HAVE TO WRITE THAT LOAN OFF, AND I HAD BEEN THE PERSON

21   THAT HAD PROPOSED THAT WE MAKE THE LOAN IN THE FIRST PLACE.

22       SO I SUGGESTED TO HIM THAT MAYBE WE LOOK AT ALTERNATIVES

23   TO DEALING WITH THAT LOAN.  AND ONE OF THE THINGS THAT I

24   SUGGESTED WAS THAT PERHAPS WE COULD TAKE AN EQUITY STAKE IN

25   LANDCASTLE TITLE IN EXCHANGE FOR THE BALANCE OF THE LOAN.

1    Q.   WHAT WAS HIS RESPONSE IN -- WHAT WAS -- WHAT DID HE

2    RESPOND -- WHAT DID HE SAY IN RESPONSE TO YOUR PROPOSAL?

3    A.   HE SCOFFED AT THE IDEA THAT I WOULD WANT TO TAKE AN

4    INTEREST IN THE COMPANY, BECAUSE HE INDICATED TO ME THAT HE HAD

5    HAD OTHER SUITORS FOR HIS COMPANY.  AND HE FELT THAT THE

6    COMPANY WAS VALUED AT WELL IN EXCESS OF $50 MILLION, AND THE

7    OUTSTANDING BALANCE OF THE LOAN WAS APPROXIMATELY 1.2 OR

8    $1.3 MILLION.  AND SO TO TAKE A STAKE IN HIS COMPANY WOULD NOT

9    MAKE ANY SENSE.

10   Q.   HOW DID IT GET LEFT WITH THE LOAN?  WAS THERE A RESOLUTION

11   ON WHAT WOULD HAPPEN TO IT AT THAT MEETING?

12   A.   NOT AT THAT MEETING, BUT I DID AGREE TO GO BACK AND LOOK

13   ABOUT POTENTIALLY EITHER RESTRUCTURING IT OR ADJUSTING THE

14   INTEREST RATE TO LOWER IT.

15   Q.   NOW, AT THAT MEETING ON JULY 11TH, 2014, AT THE ST. REGIS,

16   DID MR. HARDWICK ASK FOR MORE MONEY FROM FIDELITY IN CONNECTION

17   WITH THIS LOAN OR ANY OTHER LOAN?

18   A.   NOT AT THAT TIME.

19   Q.   NOW, WITH RESPECT TO -- DID YOU GUYS TALK ABOUT THE AUDIT

20   AT THIS LUNCH?

21   A.   WE DID TALK ABOUT THE AUDIT.  AND AT THAT TIME I THOUGHT

22   THAT THE AUDIT WAS COMING TO A CONCLUSION, ALTHOUGH, YOU KNOW,

23   WE TALKED ABOUT THE FACT THAT DURING THE COURSE OF THE AUDIT,

24   WE HAD IDENTIFIED THIS BANK STATEMENT THAT HAD BEEN ALTERED,

25   AND OBVIOUSLY THAT WAS A CONCERN TO US.

1    AT THAT TIME I HAD NO INDICATION THAT NAT HARDWICK WAS

2    INVOLVED IN WHAT HAD TRANSPIRED WITH THE THEFT IN THE ESCROW

3    ACCOUNTS.  I DID KNOW THAT HIS BOOKKEEPER HAD BEEN PUT ON

4    LEAVE, AND SO I WAS ASSUMING AT THAT POINT THAT IT WAS A SMALL

5    MATTER.

6    Q.   LET ME ASK YOU THIS -- LET'S JUST BE AS SPECIFIC AS WE

7    CAN.  ALL RIGHT.  SO AT THIS LUNCH, YOU TALKED TO MR. HARDWICK

8    ABOUT HIS FRUSTRATIONS WITH THE AUDIT THAT HAD BEEN ONGOING,

9    THAT YOU DESCRIBED EARLIER; YES?

10   A.   YES.

11   Q.   ALL RIGHT.  AND YOU DISCUSSED THE FACT THAT DURING THE

12   AUDIT, AN ALTERED BANK STATEMENT HAD BEEN DISCOVERED OR LEARNED

13   OF; IS THAT RIGHT?

14   A.   CORRECT.

15   Q.   BY FIDELITY AUDITORS?

16   A.   CORRECT.

17   Q.   AND THIS IS A LUNCH THAT YOU'RE HAVING WITH MR. HARDWICK

18   ON JULY 11TH, 2014.

19   A.   CORRECT.

20   Q.   AND YOU MENTIONED SOMETHING ABOUT A BOOKKEEPER BEING PUT

21   ON A LEAVE OF ABSENCE.  DO YOU RECALL WHETHER MR. HARDWICK GAVE

22   YOU THE BOOKKEEPER'S NAME?

23   A.   I DON'T RECALL WHETHER HE HAD, BUT I HAD HEARD IT FROM

24   ANDI STROUD.

25   Q.   OKAY.  DID THE NAME ASHA MAURYA COME UP AT YOUR LUNCH WITH

1  MR. HARDWICK?

2  A.   I DON'T RECALL THAT SPECIFICALLY, NO.

3  Q.   BUT THE TOPIC OF WHETHER A BOOKKEEPER HAD BEEN PUT ON

4  LEAVE OF ABSENCE THERE ON JULY 11TH, THAT DID COME UP?

5  A.   IT DID COME UP.

6  Q.   AND THAT'S SOMETHING THAT YOU DISCUSSED WITH MR. HARDWICK

7  AT THAT LUNCH?

8  A.   CORRECT.

9  Q.   DOES -- DID YOU TALK TO MR. HARDWICK ABOUT BRINGING IN

10 AUDITORS FROM FIDELITY -- OR MORE SPECIAL AUDITORS FROM

11 FIDELITY TO ADDRESS THE ISSUES THAT HAD BEEN IDENTIFIED TO THAT

12 POINT?

13 A.   YES.  BECAUSE UP TO THAT POINT, WE HAD HAD OUR INTERNAL

14 AUDIT TEAM CONDUCTING THE AUDIT, AND THEY ARE MORE ACCUSTOMED

15 TO JUST ROUTINE AUDITS.  WE HAVE ANOTHER GROUP WITHIN OUR

16 ORGANIZATION THAT ARE FORENSIC AUDITORS, AND THEY SPECIALIZE IN

17 THIS PARTICULAR ISSUE WHERE SOMEONE MAY HAVE STOLEN MONEY OUT

18 OF ESCROW ACCOUNTS.  THEY ARE EXPERTS IN THAT FIELD.

19      AND SO I HAD SUGGESTED TO MR. HARDWICK AT THAT TIME THAT

20 WE WERE HAPPY TO MAKE AVAILABLE TO HIM THAT TEAM OF FORENSIC

21 AUDITORS WHO WERE SPECIALISTS IN THAT PARTICULAR AREA, HAVE

22 THEM COME IN AND TAKE OVER ANY INVESTIGATION THAT WOULD TAKE

23 PLACE.

24 Q.   THIS IS AT THE MEETING ON JULY 11TH AT THE ST. REGIS IN

25 BUCKHEAD?

1    A.   YES.

2    Q.   YOU SPECIFICALLY OFFERED FOR FIDELITY TO SEND THESE

3    SPECIALIZED FORENSIC AUDITORS TO DEAL WITH THE ISSUES THAT HAD

4    BEEN UNCOVERED AT MORRIS HARDWICK SCHNEIDER?

5    A.   YES.

6    Q.   WHAT WAS MR. HARDWICK'S RESPONSE TO THAT?

7    A.   HE WAS NOT INTERESTED IN THAT.  HE INDICATED THAT HE HAD

8    BROUGHT IN HIS OWN AUDITOR, AND HE WAS COMFORTABLE WITH THAT

9    PROCESS, AND THAT HE WOULD LET ME KNOW IF HE FELT THAT HE

10   NEEDED ANY ADDITIONAL HELP.

11   Q.   NOW, AFTER THIS LUNCH, DID YOU KNOW WHETHER MR. HARDWICK

12   HAD AN UPCOMING TRIP OR VACATION?

13   A.   YES.  DURING THE COURSE OF OUR LUNCH, WE HAD TALKED ABOUT

14   GETTING BACK TOGETHER TO DISCUSS THE OUTSTANDING ITEMS THAT WE

15   HAD COVERED DURING THE LUNCH.  AND I MENTIONED TO HIM THAT I

16   WAS LEAVING I BELIEVE THAT WEEKEND OR THE FOLLOWING WEEK TO GO

17   ON VACATION MYSELF TO MONTANA, AND HE MENTIONED THAT HE WAS

18   GOING TO THE BRITISH OPEN.

19          MR. GILFILLAN:  LET ME MOVE TO ADMIT GOVERNMENT'S

20   EXHIBIT 1601.

21          MR. GARLAND:  NO OBJECTION.

22          THE COURT:  IT'S ADMITTED.

23   BY MR. GILFILLAN:

24   Q.   AND YOU HAVE A COPY THERE, OR YOU CAN LOOK ON THE SCREEN,

25   WHICHEVER YOU PREFER.

1    AND IN THE FIRST E-MAIL THERE, MS. MEINHARDT, THIS IS THE

2  DAY AFTER YOUR LUNCH WITH MR. HARDWICK ON JULY 11TH, CORRECT?

3  A.   CORRECT.

4  Q.   ALL RIGHT.  AND YOU REFERENCE THE -- YOUR RESPECTIVE

5  VACATIONS THAT YOU GUYS ARE GETTING READY TO TAKE, CORRECT?

6  A.   CORRECT.

7  Q.   AND YOU TELL MR. HARDWICK WHAT WITH RESPECT TO THE LOAN

8  ISSUE?

9  A.   I INDICATED THAT, I'LL GET THE BALL ROLLING ON THE LOAN

10  AND GET BACK TO YOU UPON OUR RESPECTIVE RETURNS.

11  Q.   MR. HARDWICK'S RESPONSE THERE, THE SAME DAY, WHAT DID HE

12  TELL YOU?

13  A.   THAT SAME DAY --

14  Q.   JUST RIGHT ABOVE IT.

15  A.   OH.  JUST, I ENJOYED IT, TOO.

16    IS THAT WHAT YOU'RE REFERRING TO?

17  Q.   YES, MA'AM.

18  A.   LET'S TALK ON ALL ISSUES THE 1ST OF AUGUST.

19  Q.   OKAY.  AND SO, FIRST OF ALL, WITH RESPECT TO GET THE BALL

20  ROLLING ON THE LOAN, WAS THAT THE INTEREST RATE REDUCTION YOU

21  TALKED ABOUT?

22  A.   CORRECT.

23  Q.   NOT ANYTHING TO DO WITH ANY NEW MONEY UNDER THE LOAN?

24  A.   THAT'S CORRECT.

25  Q.   ALL RIGHT.  AND MR. HARDWICK SAYS HE'S GOING TO GET BACK

1   TO YOU WHEN?  YOU GUYS WOULD GET BACK TOGETHER WHEN?

2   A.   IN AUGUST, THE 1ST OF AUGUST.

3   Q.   ALL RIGHT.  OKAY.  SO YOU GUYS WENT ON YOUR RESPECTIVE

4   VACATIONS.  AND DID THERE COME A TIME WHEN HE GOT BACK IN TOUCH

5   WITH YOU ABOUT THE TOPICS YOU DISCUSSED WITH HIM AT THAT LUNCH?

6   A.   YES.

7   Q.   WHICH TOPIC DID HE GET BACK IN TOUCH WITH YOU ABOUT?

8   A.   HE GOT BACK TO ME WITH RESPECT TO THE LOAN.

9   Q.   LET ME ASK YOU:  DID HE EVER GET BACK IN TOUCH WITH YOU

10  WITH RESPECT TO THE AUDIT ISSUE?

11  A.   NO.

12  Q.   NOW, WITH RESPECT TO THE LOAN, WHAT DID MR. HARDWICK WANT

13  WITH RESPECT TO THAT?

14  A.   HE CONTACTED ME AND INDICATED THAT HE HAD AN IDEA THAT HE

15  THOUGHT WOULD WORK VERY WELL FOR HIM AND FOR FIDELITY AS WELL.

16  AND HE WAS INTERESTED IN SEEING IF WE WOULD INCREASE THE AMOUNT

17  OF THE LOAN BACK UP, AND THAT HE WAS -- I NO LONGER NEEDED TO

18  WORRY ABOUT THE INTEREST RATE; HE WAS FINE WITH THE INTEREST

19  RATE.  BUT HE HAD -- THERE WAS SOME DEGREE OF URGENCY TO THIS,

20  AND HE NEEDED TO MOVE VERY QUICKLY.

21  Q.   OKAY.  WHEN YOU SAY HE WANTED TO INCREASE THE LOAN BACK

22  UP, WHAT DOES THAT MEAN?

23  A.   SO THE ORIGINAL LOAN WAS $3 MILLION, IN WHICH HE PAID

24  DOWN, OR THE LAW FIRM HAD PAID DOWN TO SOMEWHERE IN THE RANGE

25  OF 1.2 OR 1.3 MILLION.  AND SO HE WAS INTERESTED IN SEEING IF

1 WE WOULD INCREASE THE LOAN BACK UP TO THE ORIGINAL $3 MILLION,

2 OR POTENTIALLY MORE.

3 Q.   DID HE EXPLAIN TO YOU WHAT THE PURPOSE OF GETTING MORE

4 MONEY FROM FIDELITY UNDER THIS LOAN WAS?

5 A.   WELL, IN ORDER FOR US TO CONSIDER WHETHER WE WOULD IN FACT

6 BE WILLING TO INCREASE THE LOAN AMOUNT BACK UP, I ASKED HIM TO

7 EXPLAIN TO ME WHAT HE NEEDED THE NEW FUNDS FOR.  AND AT THAT

8 TIME HE INDICATED TO ME THAT HE WAS LOOKING TO BUY OUT A

9 MINORITY PARTNER AND THAT HE WAS ALSO LOOKING TO DO AN

10 ACQUISITION I BELIEVE IN LAS VEGAS.

11 Q.   OKAY.  LET'S LOOK AT --

12          MR. GILFILLAN:  OR I MOVE TO ADMIT GOVERNMENT

13 EXHIBIT 1602.

14          THE COURT:  ANY OBJECTION TO 1602?

15          MR. GARLAND:  NO OBJECTION.

16          THE COURT:  IT'S ADMITTED.

17 BY MR. GILFILLAN:

18 Q.   ALL RIGHT.  MS. MEINHARDT, WITH RESPECT TO THE TIMING OF

19 WHEN HE REACHED OUT TO YOU ABOUT GETTING MORE MONEY UNDER

20 THE FORTUNA LOAN, APPROXIMATELY WHEN WAS IT THAT HE CONTACTED

21 YOU ABOUT -- FOR THE FIRST TIME ABOUT GETTING MORE MONEY UNDER

22 THE FORTUNA LOAN?

23 A.   WELL, THIS E-MAIL IS DATED AUGUST 11TH.  SO APPROXIMATELY

24 THAT TIME WAS WHEN.

25 Q.   LET ME ASK YOU TO TAKE A LOOK AT THE EARLIEST E-MAIL ON

1  THIS CHAIN, WHICH IS THE SECOND PAGE OF GOVERNMENT'S

2  EXHIBIT 1602.

3  A.   OKAY.  I SEE.  SO IT WAS AUGUST 9TH.

4  Q.   AND WE ARE LOOKING AT AN AUGUST 9TH, 2014, E-MAIL FROM

5  MR. HARDWICK, CORRECT?

6  A.   YES.

7  Q.   AND THAT'S AN E-MAIL TO YOU?

8  A.   CORRECT.

9  Q.   ALL RIGHT.  AND WHAT DOES MR. HARDWICK SAY THERE IN THE

10  HIGHLIGHTED LANGUAGE, IF YOU CAN LOOK AT IT ON THE SCREEN?

11  A.   HE INDICATED -- HE SAYS:  I THINK I HAVE A GREAT IDEA THAT

12  LETS OUR PRESENT AGREEMENT STAND AS-IS WHILE GETTING YOU MORE

13  BUSINESS AND HELPING US.  CAN YOU DO A QUICK CALL ON MONDAY?

14  LET ME KNOW.  THANKS, NAT.

15  Q.   AND THEN YOUR RESPONSE IS?

16  A.   YES.  I'M IN JAX -- JACKSONVILLE, FLORIDA -- NUMBER BELOW,

17  ON MONDAY, SO CALL AT YOUR CONVENIENCE.  ERIKA.

18  Q.   AND HIS RESPONSE?

19  A.   GREAT.

20  Q.   AND THEN DID YOU GUYS PROCEED TO HAVE A CALL, AS WAS

21  DISCUSSED IN THESE E-MAILS?

22  A.   WE DID.

23  Q.   AND IS THAT WHEN MR. HARDWICK BROUGHT UP THE ISSUE OF

24  GETTING MORE LOAN FROM THE -- GETTING MORE MONEY UNDER THE

25  FORTUNA LOAN?

1   A.   YES, THAT IS.

2   Q.   TO TAKE THE BALANCE UP TO 3 MILLION?

3   A.   CORRECT.

4   Q.   ALL RIGHT.  AND DID YOU THEN WRITE HIM AN E-MAIL

5   CONFIRMING WHAT YOU GUYS DISCUSSED IN THAT CALL?

6   A.   YES, I DID.

7   Q.   AND IS THAT WHAT WE'RE LOOKING AT HERE ON THE FIRST PAGE

8   OF 1602 AT AUGUST 11, 2014, AT 5:05 P.M.?

9   A.   YES, IT IS.

10  Q.   OKAY.  I'M POINTING THE WRONG WAY.  OKAY.  HERE WE GO.

11  ALL RIGHT.  AND JUST IF YOU COULD READ THE FIRST -- THE

12  GREETING AND THEN THE FIRST PARAGRAPH.  WHAT DID YOU E-MAIL

13  MR. HARDWICK?

14  A.   NAT, AS A FOLLOW-UP TO OUR DISCUSSION THIS MORNING, I

15  WANTED TO CONFIRM THAT WE'RE ON THE SAME PAGE.  I HAVE SENT A

16  PRELIMINARY INQUIRY TO OUR LOAN COMPANY FORTUNA TO DETERMINE

17  THEIR REQUIREMENTS AND HAVE OUTLINED THE FOLLOWING.

18  Q.   AND ITEM NUMBER 1 IS WHAT?

19  A.   MODIFY EXISTING LOAN AGREEMENT TO INCREASE THE PRINCIPAL

20  FROM THE CURRENT APPROXIMATE BALANCE OF 1.3 MILLION TO

21  $3 MILLION.

22  Q.   SO THAT REFLECTS THE OUTSTANDING BALANCE OF THE FORTUNA

23  LOAN AT THAT POINT WAS HOW MUCH?

24  A.   $1.3 MILLION.

25  Q.   AND MR. HARDWICK WAS LOOKING FOR AN ADDITIONAL HOW MUCH

1    MONEY?

2    A.    1.7 MILLION.

3    Q.    AND THIS IS AUGUST 11TH?

4    A.    YES.

5    Q.    AND WAS THAT THE FIRST TIME THAT HE RAISED THAT WITH YOU?

6    A.    YES.

7    Q.    AND WITH RESPECT TO THE PURPOSE, DID YOU CONFIRM WITH HIM

8    WHAT YOU WERE TOLD ABOUT THE PURPOSE, THE PURPOSE OF THIS LOAN?

9    A.    I DID DO THAT.  I'M TRYING TO FIND IT.

10   Q.    CHECK OUT -- IT'S ITEM NUMBER 5 ON THAT E-MAIL.

11   A.    OKAY.  LOAN PROCEEDS TO BE USED TO FUND ACQUISITIONS AND

12   BUY OUT MINORITY PARTNER.

13   Q.    AND THEN WHAT DO YOU TELL MR. HARDWICK RIGHT BELOW THAT?

14   WHAT'S FORTUNA GOING TO NEED TO LOOK INTO GETTING HIM AN

15   ADDITIONAL 1.7 MILLION UNDER THIS LOAN?

16   A.    IN ORDER TO UNDERWRITE THE LOAN MODIFICATION AND INCREASE

17   UP TO $3 MILLION, FORTUNA HAS REQUESTED THAT YOU PROVIDE THE

18   FOLLOWING.

19       AND I THEN OUTLINED THE ITEMS THAT FORTUNA WANTED TO

20   REVIEW.

21   Q.    OKAY.  AND YOU PROVIDED HIM WITH A LIST OF ITEMS IN YOUR

22   E-MAIL, RIGHT?

23   A.    YES, I DID.

24   Q.    ALL RIGHT.  WHAT'S NUMBER 3?

25   A.    NUMBER 3, EXPLANATION OF ANY UNUSUAL ITEMS AFFECTING THE

1  INCOME STATEMENT.

2  Q.   OKAY.  AND THEN DOWN THERE AT THE BOTTOM, AFTER YOUR LIST,

3  WHAT DO YOU SAY?  HOW DO YOU CONCLUDE YOUR E-MAIL?

4  A.   WITH THE P.S.?

5  Q.   NO, MA'AM.  RIGHT ABOVE THE "THANKS".

6  A.   OH.  PLEASE TAKE A LOOK AT THIS AND LET ME KNOW IF I

7  ACCURATELY CAPTURED OUR DISCUSSIONS.

8  Q.   ALL RIGHT.  AND THEN THE P.S. IS IN REFERENCE TO WHAT?

9  A.   THAT WE ARE STILL OPEN TO DISCUSSIONS ON THE EQUITY FRONT

10  IF YOU DECIDE YOU WANT TO PURSUE THAT RATHER THAN INCREASING

11  THE LOAN AMOUNT.

12  Q.   ALL RIGHT.  IN THIS CALL WITH MR. HARDWICK ABOUT

13  INCREASING THE LOAN $1.7 MILLION, DID MR. HARDWICK GIVE YOU ANY

14  UPDATE ON THE AUDIT SITUATION?

15  A.   NOT THAT I SEE.

16  Q.   OKAY.  WELL, THAT'S A GOOD POINT.  IF HE HAD, IS THAT

17  SOMETHING THAT YOU WOULD HAVE ADDRESSED IN YOUR E-MAIL TO HIM

18  TO CONFIRM?

19  A.   YES.

20  Q.   AND SO DID MR. HARDWICK ASK THERE ON AUGUST 9TH AND SAY,

21  ERIKA, THAT AUDIT TEAM YOU TALKED ABOUT ON JULY 11TH, I WOULD

22  LIKE THEM BROUGHT UP TO ATLANTA THERE IN AUGUST?

23      DID HE RAISE THAT ISSUE?

24  A.   NO, HE DID NOT.

25  Q.   OKAY.  ALL RIGHT.  AND THEN IN RESPONSE TO YOUR QUESTION

1  ABOUT WHETHER YOU'VE ACCURATELY SUMMARIZED THE CONVERSATION

2  THERE ON AUGUST 11, 2014, AT 5:05 P.M., WHAT DOES MR. HARDWICK

3  RESPOND?  WHAT'S HIS RESPONSE?

4  A.   HE CONFIRMS BACK TO ME:  YES, THIS DOES.  I WAS HOPING TO

5  DO THIS QUICKLY.  IS THE BOTTOM STUFF REALLY NECESSARY GIVEN

6  OUR HISTORY?

7  Q.   OKAY.  FIRST, WITH RESPECT TO HIS STATEMENT, I WAS HOPING

8  TO DO THIS QUICKLY, YOU MENTIONED A LITTLE EARLIER THAT WHEN HE

9  BROUGHT UP WITH YOU THE IDEA OF GETTING MORE MONEY UNDER THE

10 LOAN, THERE WAS A SENSE OF URGENCY?

11 A.   CORRECT.

12 Q.   WHAT DID HE SAY WAS THE SENSE OF URGENCY?

13 A.   HE WAS JUST TRYING TO WORK ON SOME OF THESE BUSINESS DEALS

14 AND HE WANTED TO GET THEM DONE QUICKLY.

15 Q.   ALL RIGHT.  AND THEN YOUR RESPONSE TO HIS E-MAIL -- WELL,

16 AND THEN WHEN HE SAYS, IS THE BOTTOM STUFF REALLY NECESSARY

17 GIVEN OUR HISTORY, WHAT'S THE BOTTOM STUFF THAT HE'S REFERRING

18 TO THERE?

19 A.   TO THE VARIOUS ITEMS THAT I HAD OUTLINED BELOW THAT

20 FORTUNA WAS REQUIRING IN ORDER TO CONSIDER WHETHER WE WERE

21 GOING TO INCREASE THE LOAN FROM 1.3 MILLION BACK UP TO

22 $3 MILLION.

23 Q.   SO WAS HE ASKING WHETHER FORTUNA WOULD JUST MAKE THE LOAN

24 WITHOUT GETTING ADDITIONAL INFORMATION FROM HIM AND FROM MHS?

25 A.   THAT IS HOW I INTERPRETED IT, YES.

1    Q.   AND ON AUGUST 11, YOUR RESPONSE IS WHAT?

2    A.   I SAID:  WE CAN MOVE VERY QUICKLY.  I HAVE TO GET ITEMS 1,

3    2, AND 6.  AS FOR 1, EITHER AUDITED FINANCIALS OR TAX RETURNS,

4    WHICHEVER YOU PREFER.  THE REST OF IT WE DON'T CARE THAT MUCH

5    ABOUT.  I WILL GET SOMEONE TO REVIEW THEM WITHIN 48 HOURS OF

6    RECEIPT AND WE WILL GET THIS DONE FAST.

7    Q.   AND SO YOU WERE ATTEMPTING TO RESPOND TO HIS SENSE OF

8    URGENCY THAT HE EXPLAINED?

9    A.   CORRECT.

10   Q.   AND MR. HARDWICK'S RESPONSE WAS WHAT?

11   A.   OKAY.  LET ME WORK ON AND MAYBE WE CAN CLOSE FRIDAY OR

12   MONDAY AT LATEST.  I'M ON IT.

13   Q.   ALL RIGHT.  DID -- BUT WHAT HAPPENED, WHAT HAPPENED AFTER

14   THIS E-MAIL EXCHANGE?  DID YOU CONTINUE TO WORK ON THE --

15   GETTING MORE MONEY FOR MR. HARDWICK UNDER THIS LOAN THERE

16   WITHIN FIDELITY?

17   A.   WE WERE PROCEEDING, BUT WE DIDN'T RECEIVE MOST OF THE

18   DOCUMENTATION THAT WE WERE WAITING ON.

19   Q.   NOW, BUT BEFORE -- DID YOU ULTIMATELY GET SOME OF THE

20   DOCUMENTS FROM MR. HARDWICK THAT YOU HAD REQUESTED?

21   A.   I DON'T RECALL EXACTLY WHAT WE RECEIVED.

22        MR. GILFILLAN:  ALL RIGHT.  LET ME MOVE TO ADMIT

23   GOVERNMENT EXHIBIT 1603.

24        MR. GARLAND:  NO OBJECTION.

25        THE COURT:  IT'S ADMITTED.

1 BY MR. GILFILLAN:

2 Q. NOW, THE DATE OF THE LAST E-MAIL EXCHANGE WAS AUGUST 11.

3 1603, MS. MEINHARDT, IS AN E-MAIL THAT'S DATED AUGUST 12TH,

4 2014, CORRECT?

5 A. CORRECT.

6 Q. ALL RIGHT. AND IT IS TO YOU, RIGHT?

7 A. YES.

8 Q. AND WHAT'S THE SUBJECT?

9 A. SUBJECT IS TAX RETURNS AND FINANCIAL STATEMENTS.

10 Q. AND WHAT DOES THIS E-MAIL INDICATE IS ATTACHED?

11 A. IT INDICATES THAT ATTACHED ARE THE 2011 AND 2012 INCOME

12 TAX RETURNS FOR THE FIRM AND THE 2013 AUDIT.

13 Q. ALL RIGHT. OKAY. AND SO WERE THE TAX RETURNS AND AUDITED

14 FINANCIALS SOMETHING THAT YOU OR FORTUNA OR FIDELITY HAD ASKED

15 FOR IN CONNECTION WITH EVALUATING HIS REQUEST FOR MORE MONEY?

16 A. YES.

17 Q. OKAY. CONTINUE TO HAVE QUESTIONS OF OR COMMUNICATIONS

18 WITH MR. HARDWICK IN THIS TIME PERIOD ABOUT THIS INCREASE TO

19 THE LOAN?

20 A. I RECALL THAT THERE WAS SOME E-MAIL COMMUNICATION BACK AND

21 FORTH.

22        MR. GILFILLAN: I MOVE TO ADMIT GOVERNMENT

23 EXHIBIT 1604.

24        MR. GARLAND: NO OBJECTION.

25        THE COURT: IT'S ADMITTED.

1  BY MR. GILFILLAN:

2  Q.   THERE ON AUGUST 12, AT THE BOTTOM -- IS THIS AN E-MAIL

3  FROM MR. HARDWICK TO YOU ON AUGUST 12?

4  A.   YES.

5  Q.   AND AUGUST 12, 2014, WHAT DID MR. HARDWICK E-MAIL YOU?

6  A.   HIS FIRST E-MAIL WAS:  JUST WANT TO MAKE SURE YOU GOT THE

7  INFO.  I GOT A BIG MEETING WITH LAWYERS ON TUESDAY OF NEXT WEEK

8  AND WOULD LOVE TO HAVE THIS FINALIZED SO I CAN SELL THE

9  PARTNERSHIP OF OUR TWO FIRMS.  CAN WE MAKE THAT WORK?

10 Q.   IS THIS E-MAIL, IS THIS IN REFERENCE TO THE ADDITIONAL

11 1.7 MILLION THAT MR. HARDWICK WANTED FROM FIDELITY UNDER THE

12 LOAN?

13 A.   YES, IT IS.

14 Q.   AND WHAT DID YOU UNDERSTAND THE REFERENCE TO BE TO SELLING

15 THE PARTNERSHIP OF THE TWO FIRMS?  BASED ON YOUR DISCUSSIONS

16 WITH MR. HARDWICK TO THAT POINT, WHAT DID YOU UNDERSTAND THAT

17 TO MEAN?

18 A.   I UNDERSTOOD THAT -- HE HAD INDICATED THAT IF WE COULD

19 MAKE THIS LOAN, THAT HE HAD A DEAL GOING THAT WOULD ENHANCE OUR

20 RELATIONSHIP.  HE WOULD HAVE ADDITIONAL REVENUES THAT WOULD

21 ULTIMATELY BE DIRECTED TO US UNDER OUR AGENCY AGREEMENT.

22 Q.   ALL RIGHT.  AND YOU RESPOND TO HIM THAT THE CFO AT

23 FIDELITY IS REVIEWING EVERYTHING THAT'S BEEN SUBMITTED, RIGHT?

24 A.   CORRECT.

25 Q.   AND THEN YOU REFERENCE THE FACT THAT YOU GUYS WILL NEED

1   SOME ADDITIONAL INFORMATION, RIGHT?

2   A.   CORRECT.

3   Q.   ALL RIGHT.  AND WHAT'S YOUR CONCLUDING SENTENCE THERE IN

4   YOUR E-MAIL ON AUGUST 12, 2014?

5   A.   I INDICATED THAT ONCE FUNDING -- APPROVED, FUNDING CAN

6   HAPPEN WITHIN A DAY OR TWO, AND I WOULD KEEP HIM POSTED.

7   Q.   MR. HARDWICK RESPONDED TO THIS E-MAIL ON AUGUST 13TH,

8   CORRECT?

9   A.   CORRECT.

10  Q.   ALL RIGHT.  AND WHAT DID HE E-MAIL YOU?

11  A.   HE E-MAILED:  OKAY.  I WILL GET THE OTHER STUFF OVER TO

12  YOU.  THANKS.

13  Q.   AND THIS IS AUGUST 13TH, CORRECT?

14  A.   YES.

15  Q.   ALL RIGHT.  ON AUGUST 14, 2014, WAS FIDELITY CONTINUING TO

16  CONSIDER AND ADDRESS MR. HARDWICK'S REQUEST FOR ADDITIONAL

17  MONEY?

18  A.   YES.

19  Q.   ON AUGUST 15, DID FIDELITY MAKE A DECISION IT WASN'T GOING

20  TO LOAN MR. HARDWICK ANY MORE MONEY?

21  A.   YES.

22  Q.   WHY DID FIDELITY NATIONAL MAKE THAT -- WELL, LET ME ASK

23  YOU A BETTER QUESTION.

24       WHAT HAPPENED ON FRIDAY, AUGUST 15, 2014?

25  A.   I RECEIVED A PHONE CALL, INITIALLY A VOICEMAIL MESSAGE

1  FROM ART MORRIS ASKING ME TO CALL HIM.  HE CALLED MY CELL

2  PHONE, AND HE ASKED ME TO CALL HIM IMMEDIATELY, AS SOON AS I

3  RECEIVED THE VOICEMAIL MESSAGE.

4  Q.   OKAY.  DID -- WERE YOU ACTUALLY TALKING TO THE CFO ABOUT

5  THE LOAN THAT MORNING WHEN YOU GOT MR. MORRIS'S VOICEMAIL?

6  A.   I WAS.  MY OFFICE ADJOINED OUR CFO'S OFFICE.  AND I WAS

7  STANDING IN THE HALL TALKING WITH HIM ABOUT THE LOAN AND WHO

8  WAS REVIEWING THE DOCUMENTS.  I HEARD MY PHONE RING, BUT I LET

9  IT ROLL INTO VOICEMAIL SINCE I WAS IN THE MIDDLE OF A

10  CONVERSATION.

11  Q.   AFTER YOU CHECKED MR. MORRIS'S VOICEMAIL, WHAT DID YOU

12  TELL THE CFO ABOUT WHETHER HE SHOULD CONTINUE REVIEWING

13  MR. HARDWICK'S LOAN REQUEST?

14  A.   I GOT UP AND WALKED BACK INTO HIS OFFICE AND TOLD HIM HE

15  NEEDED TO DO NOTHING FURTHER, THAT IT LOOKED LIKE WE HAD A

16  MAJOR DEFALCATION OR THEFT IN THE ESCROW ACCOUNTS.

17  Q.   OKAY.  AND IN RESPONSE TO MR. MORRIS'S VOICEMAIL, IN

18  ADDITION TO TELLING THE CFO THAT, WHAT DID YOU PERSONALLY DO?

19  WHAT DID YOU DECIDE TO DO?

20  A.   WELL, I CALLED ART MORRIS BACK IMMEDIATELY THEREAFTER TO

21  SEE WHAT WAS GOING ON.  AND GIVEN THE FACT THAT WE HAD TURNED

22  UP SOME ISSUES IN THE AUDIT, I WAS, YOU KNOW, VERY, VERY

23  CONCERNED, HAVING GOTTEN THAT VOICEMAIL.  SO I CALLED HIM BACK

24  IMMEDIATELY.

25  Q.   OKAY.  AND AFTER YOU SPOKE TO MR. MORRIS, AFTER YOU SPOKE

1    TO MR. MORRIS, WHAT DID YOU THEN DO?

2    A.   I LEFT THE OFFICE IMMEDIATELY, DROVE TO THE AIRPORT AND

3    GOT ON THE FIRST FLIGHT THAT I COULD GET ON FROM JACKSONVILLE

4    TO ATLANTA.

5    Q.   WHERE WERE YOU GOING IN ATLANTA?

6    A.   I WAS GOING DIRECTLY TO WHAT WAS THEN THE MORRIS HARDWICK

7    SCHNEIDER MAIN OFFICE.

8    Q.   OKAY.  ALL RIGHT.  NOW, SO YOU WENT TO THE AIRPORT AND

9    FLEW TO ATLANTA?

10   A.   CORRECT.

11   Q.   THIS IS FRIDAY, AUGUST 15, 2014?

12   A.   YES.

13   Q.   ALL RIGHT.  WHEN YOU ARRIVED IN ATLANTA, DID YOU GO TO THE

14   MORRIS HARDWICK SCHNEIDER OFFICES?

15   A.   I DID.

16   Q.   AND WHO DID YOU MEET WITH THERE?

17   A.   I -- ON MY WAY TO THE AIRPORT IN JACKSONVILLE, I HAD

18   CONTACTED DAVID BAUM, WHO WAS OUR REGIONAL MANAGER HERE, ASKED

19   HIM -- TOLD HIM THAT I HAD BEEN ADVISED BY ART MORRIS THAT

20   THERE WAS A MAJOR THEFT IN THE ESCROW ACCOUNTS AND THAT I

21   NEEDED DAVID TO MEET ME AT THE OFFICE RIGHT AWAY, AS SOON AS I

22   LANDED.  SO WE MET IN THE LOBBY OF THE BUILDING AND THEN WENT

23   UP TO THE RECEPTION AREA OF THAT OFFICE.

24   Q.   ALL RIGHT.  AND ONCE YOU AND MR. BAUM WERE THERE AT

25   MORRIS HARDWICK SCHNEIDER, WHO WAS THERE?  WHO DID YOU MEET

1    WITH?

2    A.    ART MORRIS MET US IN THE LOBBY AND THEN TOOK US BACK TO AN

3    OFFICE.

4    Q.    AND WHO WAS THERE IN THAT OFFICE?

5    A.    MARK WITTSTADT WAS THERE IN THE OFFICE.  THAT WAS THE

6    FIRST TIME I MET HIM OR HAD EVER EVEN HEARD HIS NAME.  I

7    BELIEVE THE FIRM'S COUNSEL WAS THERE, JEFF -- I BELIEVE IT'S

8    JEFF SMITH.  I BELIEVE THE FORENSIC AUDITOR THAT HAD BEEN HIRED

9    BY THE FIRM WAS IN THE ROOM.  ART MORRIS, I THINK I MENTIONED,

10   WAS THERE.  I DON'T RECALL FOR CERTAIN WHETHER RANDY SCHNEIDER

11   WAS THERE OR NOT.  AND TONY ADAMS I DON'T BELIEVE WAS THERE,

12   BUT I THINK HE WAS IN A LATER MEETING.

13   Q.    OKAY.  AT LEAST AT THE OUTSET IN THAT FIRST MEETING WHEN

14   YOU ARRIVE AT THE FIRM THERE ON AUGUST 15, 2014, AT THE OUTSET,

15   WAS MR. HARDWICK THERE AT THAT MEETING?

16   A.    NO, HE WAS NOT.

17   Q.    OKAY.  NOW, WITHOUT -- DID YOU -- WHAT DID YOU DO?  WHAT

18   DID YOU TELL THE GROUP?  WHAT DID YOU ASK THEM TO DO FOR YOU?

19         AND THIS IS THE GROUP THAT YOU IDENTIFIED; MR. HARDWICK IS

20   NOT AT THIS MEETING YET?

21   A.    NO, HE IS NOT.

22   Q.    AND WHAT DID YOU ASK THEM TO DO FOR YOU?

23   A.    I ASKED THEM TO TELL ME WHAT THEY BELIEVED HAD OCCURRED

24   AND WHAT THE SITUATION WAS, BRING ME UP TO SPEED AS TO WHAT

25   THEY THOUGHT HAD OCCURRED THAT RESULTED IN THIS HUGE THEFT IN

1 THE ESCROW ACCOUNTS AND WHO THEY FELT WAS RESPONSIBLE FOR IT

2 AND WHERE WE WERE AT THAT POINT IN TIME.

3 Q. DID MR. HARDWICK, DID MR. HARDWICK JOIN THE MEETING?

4 A. HE DID.

5 Q. OKAY. AND IT HAD ALREADY BEEN IN PROGRESS FOR A PERIOD OF

6 TIME WHEN HE JOINED?

7 A. I WOULD ESTIMATE AN HOUR OR SO, YES.

8 Q. HOW DID HE APPEAR TO YOU? WHAT WAS HIS APPEARANCE OR

9 DEMEANOR?

10 MR. GARLAND: OBJECTION, CALLS FOR SPECULATION.

11 THE COURT: OVERRULE ON THAT BASIS. OVERRULED.

12 THE WITNESS: HE SEEMED VERY HARRIED AND FLUSTERED.

13 AND WHEN HE WALKED IN THE OFFICE, HE WAS VERY, VERY SURPRISED

14 TO SEE ME SITTING THERE AND TO SEE DAVID BAUM THERE AND

15 EXPRESSED THAT SURPRISE, LOOKED AT ME AND SAID, I'M SURPRISED

16 TO SEE YOU HERE.

17 BY MR. GILFILLAN:

18 Q. OKAY. DID HE ASK YOU WHAT MR. WITTSTADT AND ART MORRIS

19 AND THE OTHERS IN THAT MEETING, DID HE ASK YOU WHAT THEY HAD

20 BEEN TELLING YOU?

21 A. YES.

22 Q. ALL RIGHT. AND DID YOU TELL HIM WHAT THEY HAD BEEN

23 TELLING YOU?

24 A. YES.

25 Q. WHAT DID YOU SAY TO MR. HARDWICK?

1    A.   I TOLD HIM THAT THEY HAD INDICATED TO ME THAT THERE WERE

2    SIGNIFICANT LOSSES IN THE TRUST ACCOUNTS, IN THE ESCROW

3    ACCOUNTS, AND THAT THE MAJORITY OF THE FUNDS HAD BEEN DIVERTED

4    TO NAT HARDWICK.

5    Q.   WHAT WAS HIS RESPONSE TO THIS ON AUGUST 15TH, 2014?

6    A.   HE BEGAN CLAIMING THAT THE FUNDS THAT WERE DISBURSED TO

7    HIM WERE DISBURSED TO HIM WITHOUT HIS KNOWLEDGE AND THAT HE WAS

8    NOT AWARE THAT THESE WERE MONIES THAT HE WAS NOT ENTITLED TO

9    RECEIVE.

10    Q.   OKAY.  DID HE, DID HE BLAME ANYONE FOR THIS?

11    A.   YES.  HE INDICATED THAT IT WAS HIS BOOKKEEPER -- OR I'M

12    NOT SURE HER EXACT TITLE, PERHAPS HIS CFO -- WAS RESPONSIBLE

13    FOR TAKING THE FUNDS OUT OF THE ESCROW ACCOUNTS AND DIVERTING

14    THEM INTO HIS FOR HIS PERSONAL USE.

15    Q.   AND DID -- WAS THAT PERSON'S NAME USED THERE AT THAT

16    MEETING?

17    A.   I DON'T RECALL IT, BUT I'M CERTAIN IT WAS USED.

18    Q.   AND BASED ON WHAT YOU EVENTUALLY CAME TO KNOW, WAS IT YOUR

19    UNDERSTANDING THAT HE WAS REFERRING TO AN INDIVIDUAL NAMED ASHA

20    MAURYA?

21    A.   YES.

22    Q.   ALL RIGHT.  DID MR. HARDWICK HAVE ADDITIONAL QUESTIONS FOR

23    YOU OTHER THAN WHAT YOU HAD BEEN TOLD BY THE GROUP THAT YOU

24    FIRST MET WITH?

25    A.   HE WANTED TO POINT OUT THAT THE WITTSTADTS, WHO I JUST

1    LEARNED WERE PARTNERS IN THE FIRM, HAD ALSO RECEIVED FUNDS THAT

2    THEY WERE NOT ENTITLED TO.  BUT I QUICKLY LEARNED THAT THEY

3    TRULY DID NOT REALIZE IT, AND IT WAS VERY, VERY MINOR IN

4    COMPARISON TO THE FUNDS THAT HE RECEIVED.

5         AND THEN HE ASKED TO SPEAK TO ME PRIVATELY.

6    Q.   WHEN HE BROUGHT UP THE FACT THAT MARK WITTSTADT GOT FUNDS,

7    DID YOU THEN RESPOND TO HIM AND TELL HIM WHAT YOU HAD BEEN TOLD

8    ABOUT THE MARK WITTSTADT MONEY?

9    A.   YES.

10   Q.   SO YOU SAID THAT AT THE MEETING ABOUT THAT -- I WON'T

11   RECAP, BUT YOU TOLD MR. HARDWICK WHAT YOU JUST SAID?

12   A.   YES.

13   Q.   ABOUT THE MONIES THAT WENT TO MR. HARDWICK?

14   A.   YES.

15   Q.   A VERY SMALL AMOUNT AND THAT HE DIDN'T REALIZE IT.

16   A.   YES.

17   Q.   WITTSTADT.  THANK YOU.

18   A.   CORRECT.

19   Q.   OKAY.  DID MR. HARDWICK HAVE FURTHER QUESTIONS FOR YOU?

20   A.   HE WANTED TO SPEAK TO ME PRIVATELY AT THAT POINT IN TIME.

21   Q.   AND BEFORE WE TALK ABOUT THAT, DID HE ASK YOU WHAT YOU

22   WERE GOING TO DO?

23   A.   HE DID.

24   Q.   AND WHAT WAS -- WHAT DID YOU UNDERSTAND THAT QUESTION TO

25   BE ABOUT?

1  A.    THAT ACTUALLY -- HE WAS NOT THE ONLY ONE THAT ASKED ME

2  WHAT I INTENDED TO DO AT THAT POINT.  THAT HAD BEEN A TOPIC OF

3  DISCUSSION WITH ART MORRIS AND WITH MARK WITTSTADT PRIOR TO NAT

4  HARDWICK COMING INTO THE ROOM.

5       OUR -- ORDINARILY -- UNFORTUNATELY, IN OUR BUSINESS, WE

6  HAVE HAD OTHER INSTANCES WHERE AGENTS OR INDIVIDUALS WITHIN AN

7  AGENCY OPERATION HAVE STOLEN FUNDS OUT OF TRUST ACCOUNTS.  SO

8  WE HAVE A PROTOCOL IN PLACE; IT'S WHAT WE FOLLOW GENERALLY WHEN

9  THAT OCCURS.  AND PARTICULARLY IN AN INSTANCE LIKE THIS, WHERE

10 WE BELIEVED THE FUNDS WERE STOLEN BY A PRINCIPAL -- IN THIS

11 CASE, A MANAGING PARTNER -- ORDINARILY, WHAT WE DO IS WE CANCEL

12 OUR AGENCY AGREEMENT WITH THE LAW FIRM OR THE TITLE AGENCY.

13 AND WE HAVE A PROVISION IN OUR CONTRACT THAT ENABLES US TO

14 CANCEL USING THE TERM "FOR CAUSE," AND THAT MAKES IT EFFECTIVE

15 IMMEDIATELY.

16      AND SO THAT IS WHAT I WOULD ORDINARILY DO UNDER THE

17 CIRCUMSTANCES.  BUT BOTH MARK WITTSTADT AND ART MORRIS -- AND

18 THEN SUBSEQUENTLY, NAT HARDWICK -- HAD -- THEY WERE CONCERNED

19 THAT I WOULD TAKE THAT STEP IMMEDIATELY.  THEY WERE ASKING ME

20 WHAT I INTENDED TO DO.  AND I TOLD THEM AT THAT JUNCTURE I DID

21 NOT KNOW WHAT I WAS GOING TO DO.  IT WAS A SITUATION I HAD NOT

22 FOUND MYSELF IN BEFORE THAT.

23 Q.    ALL RIGHT.  NOW, YOU MENTION THAT MR. HARDWICK ASKED FOR A

24 PRIVATE MEETING WITH YOU.

25 A.    YES.

1    Q.    ALL RIGHT.  PRIOR TO THAT --

2              THE COURT:  I'M SORRY.  WE HAVE A REQUEST TO TAKE A

3    QUICK BREAK FROM THE JURY.

4              OKAY.  JURORS, GO AHEAD AND STEP OUT.  THANK YOU SO

5    MUCH.

6              (WHEREUPON, THE JURY RETIRED FROM THE COURTROOM AT

7    2:37 P.M., AND THE FOLLOWING PROCEEDINGS WERE HAD.)

8              THE COURT:  AND, LADIES AND GENTLEMEN, I WAS GOING TO

9    TRY TO PUSH US TILL 3:00 TO TAKE OUR AFTERNOON BREAK, BUT WE

10   WILL GO AHEAD AND TAKE A TEN-MINUTE BREAK NOW.

11             BEFORE WE DO THAT, MS. NOVAY, BEFORE THE LAST BREAK,

12   YOU ASKED ME SOMETHING ABOUT WHETHER I WAS STOPPING EARLY.

13   MAYBE I MISUNDERSTOOD FROM MS. LOEB EARLIER.  I ASKED HER

14   PREVIOUSLY TO LET ME KNOW WHAT DAY SHE NEEDED DO THAT, BECAUSE

15   I THOUGHT IT INVOLVED HER NEEDING TO MAKE SOME TYPE OF

16   APPOINTMENT.  SO I WAS WAITING TO HEAR BACK FROM HER.  SO I

17   HAVE NOT DESIGNATED ANY TIME TODAY.  DOES THAT NEED TO CHANGE

18   OR IS THERE SOMETHING SHE HAS OR --

19             MS. NOVAY:  NO, YOUR HONOR.  I THINK -- I DON'T WANT

20   TO SPEAK FOR MS. LOEB.  I KNOW SHE WAS TRYING TO NOT MAKE IT

21   ABOUT HER SITUATION.  THE QUESTION WAS, OH, IF SHE COULD SNEAK

22   OUT OF HERE AROUND 2:00, THEN SHE WOULD BE ABLE TO MAKE HER

23   APPOINTMENT.  WE'RE PAST THAT.  AT THIS POINT EVERYTHING IS

24   OKAY.

25             THE COURT:  THAT'S MOOT.  ALL RIGHT.  TEN MINUTES.

1    THANK YOU SO MUCH.  THANK YOU.

2              (WHEREUPON, A BRIEF RECESS WAS HAD FROM 2:38 P.M. TO

3    2:48 P.M.)

4              THE COURT:  THANK YOU, SIR.

5              (WHEREUPON, THE JURY RETURNED TO OPEN COURT AT

6    2:49 P.M., AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD.)

7              THE COURT:  ALL RIGHT.  THE JURY IS BACK IN PLACE.

8    YOU MAY BE SEATED.

9              AND YOU MAY CONTINUE YOUR EXAMINATION.  THANK YOU.

10             MR. GILFILLAN:  THANK YOU, YOUR HONOR.

11   BY MR. GILFILLAN:

12   Q.   MS. MEINHARDT, THERE AT THAT MEETING ATTENDED BY MARK

13   WITTSTADT, ART MORRIS, AND THE OTHER PEOPLE YOU MENTIONED, AND

14   THAT MR. HARDWICK HAD JOINED ON AUGUST 15, 2014, DID

15   MR. HARDWICK ASK TO MEET WITH YOU PRIVATELY?

16   A.   YES, HE DID.

17   Q.   DID YOU AGREE TO THAT?

18   A.   I DID.

19   Q.   WERE YOU A LITTLE NERVOUS ABOUT THAT?

20   A.   I WAS VERY NERVOUS ABOUT IT.

21   Q.   WHY?

22   A.   I HAD GOTTEN UP AND ASKED DAVID BAUM, WHO WAS WITH ME, TO

23   COME WITH ME AND TO WAIT OUTSIDE THE DOOR, BECAUSE I HAVE,

24   THROUGH THE YEARS, EXPERIENCED SOME SITUATIONS THAT -- NOT

25   QUITE ON THIS MAGNITUDE, BUT I -- MY FEELING IS THAT DESPERATE

1    PEOPLE DO DESPERATE THINGS.  AND I WAS CONCERNED THAT NAT

2    HARDWICK WAS DESPERATE AT THAT POINT.

3    Q.    DID YOU MEET WITH MR. HARDWICK ONE ON ONE?

4    A.    I DID, AND ASKED DAVID TO STAND OUTSIDE THE DOOR.

5    Q.    WHERE DID THIS MEETING TAKE PLACE?

6    A.    IN A CONFERENCE ROOM IN THEIR OFFICE, IN THE MORRIS

7    HARDWICK SCHNEIDER OFFICE.

8    Q.    WHAT DID YOU SAY TO MR. HARDWICK?

9    A.    I WAS VERY UPSET WITH HIM AT THAT TIME BECAUSE I FELT HE

10   HAD ATTEMPTED TO GET US TO INCREASE THAT LOAN AMOUNT AND GET

11   ADDITIONAL FUNDS FROM US UNDER FALSE PRETENSES, THAT HE HAD

12   LIED TO ME ABOUT THE CIRCUMSTANCES AND WHY HE WAS LOOKING FOR

13   THAT ADDITIONAL FUNDING.

14         I HAD LEARNED FROM ART MORRIS AND MARK WITTSTADT THAT HE

15   HAD COMMUNICATED TO THEM THAT HE WAS GOING TO TRY AND GET SOME

16   ADDITIONAL MONEY FROM FIDELITY BECAUSE OF THE SHORTAGES IN THE

17   ESCROW ACCOUNT.  SO THAT HAD BEEN CONVEYED TO ME.  AND I WAS

18   VERY ANGRY THAT HE HAD ATTEMPTED TO, REALLY, DUPE ME AND OUR

19   COMPANY INTO GIVING HIM ADDITIONAL FUNDS TO HELP SHORE UP THE

20   ESCROW ACCOUNTS.

21   Q.    DID YOU ACCUSE MR. HARDWICK OF LYING TO YOU?

22   A.    PERHAPS NOT IN SO MANY WORDS, BUT I THINK HE UNDERSTOOD

23   THAT I FELT THAT WAY, YES.

24   Q.    AND THIS IS THE LOAN THAT YOUR CFO HAD BEEN CONSIDERING

25   WHEN YOU GOT THE VOICEMAIL FROM MR. MORRIS THAT VERY MORNING?

1    A.    THAT'S CORRECT.

2    Q.    AND THIS IS THE LOAN THAT MR. HARDWICK HAD RAISED THE

3    POSSIBILITY ON AUGUST 9TH FOR THE FIRST TIME OF GETTING AN

4    ADDITIONAL 1.7 MILLION, RIGHT?

5    A.    THAT'S CORRECT.

6    Q.    AND THIS IS THE LOAN THAT MR. HARDWICK HAD SAID WAS -- THE

7    PURPOSE WAS TO BUY OUT MINORITY PARTNERS AND FOR BUSINESS

8    ACQUISITION?

9    A.    YES.

10   Q.    ALL RIGHT.  NOW, WHEN YOU TOLD MR. HARDWICK THAT YOU FELT

11   HE HAD DECEIVED YOU ABOUT THIS, WHAT WAS HIS RESPONSE?

12   A.    HE PROCEEDED TO TRY AND CONVINCE ME THAT IN FACT HE WAS

13   LOOKING FOR THAT ADDITIONAL $1.7 MILLION TO BUY OUT A MINORITY

14   PARTNER AND THAT HE WAS IN FACT LOOKING TO DO AN ACQUISITION,

15   WHICH I LATER LEARNED WAS ABOUT A $25,000 ACQUISITION.

16   Q.    AND WITH RESPECT TO MR. HARDWICK SAYING THAT THE

17   1.7 MILLION WAS TO BUY OUT A MINORITY PARTNER, WHAT DID YOU SAY

18   TO HIM ABOUT THAT?

19   A.    I TOLD HIM THAT THAT DID NOT MAKE SENSE TO ME.  BECAUSE HE

20   WAS REQUESTING AN ADDITIONAL LOAN OF 1.7 MILLION, AND JUST

21   WEEKS BEFORE HE HAD CLAIMED THAT HIS BUSINESS WAS WORTH WELL IN

22   EXCESS OF $50 MILLION.  I KNEW BY THEN, AS OF THAT MORNING,

23   THAT MARK AND RODDY WITTSTADT OWNED 45 PERCENT OF THE BUSINESS.

24   SO, LOGICALLY, IF THIS BUSINESS IS REALLY WORTH $50 MILLION,

25   WHO WOULD BE LOOKING TO SELL THEIR MINORITY INTEREST FOR

1  SOMETHING LESS THAN $1.7 MILLION?

2  Q.   HOW WAS MR. HARDWICK'S DEMEANOR DURING THIS MEETING?

3  A.   HE WAS VERY NERVOUS AND VERY CONCERNED.  AND I THINK HE,

4  YOU KNOW, HE KNEW THE JIG WAS UP.

5  Q.   HOW DID THE MEETING END?

6  A.   THE MEETING ENDED -- YOU KNOW, I CUT THE MEETING SHORT.

7  THERE WAS NOTHING MORE TO BE SAID AT THAT POINT IN TIME.  I HAD

8  CONVEYED TO HIM WHAT I NEEDED TO CONVEY, AND I FELT THAT HE

9  SHOULD LEAVE THE OFFICE BECAUSE WE NEEDED TO BEGIN OUR

10  INVESTIGATION TO DETERMINE EXACTLY WHAT HAD TRANSPIRED.

11  Q.   THIS WAS ALL ON FRIDAY, AUGUST 15, 2014?

12  A.   CORRECT.

13  Q.   AND AT SOME POINT DURING THE DAY, YOU HAD THE OPPORTUNITY

14  TO BEGIN DISCUSSING THE SITUATION WITH FOLKS YOU REPORTED TO AT

15  FIDELITY.

16  A.   YES.

17  Q.   ALL RIGHT.  THE NEXT DAY, SATURDAY, AUGUST 16, 2014, WERE

18  YOU -- DID YOU STAY HERE IN ATLANTA?

19  A.   I REMAINED HERE IN ATLANTA.

20  Q.   DID YOU GET -- DID MR. HARDWICK TRY TO COMMUNICATE WITH

21  YOU?

22  A.   YES, HE DID.

23  Q.   HOW DID HE TRY TO COMMUNICATE WITH YOU?

24  A.   HE SENT TEXTS AND PHONE CALLS.

25  Q.   JUST ONE?

1    A.    MULTIPLE.

2    Q.    WHAT DID YOU DO IN RESPONSE TO THAT?

3    A.    I DID NOT RETURN THOSE.

4    Q.    DID YOU ULTIMATELY CONTACT HIM ON SATURDAY, AUGUST 16,

5    2014?

6    A.    ON SATURDAY MORNING, YES.

7    Q.    AND WHAT -- WHY DID YOU ULTIMATELY CONTACT HIM?

8    A.    HE HAD SENT ME A TEXT FIRST THING SATURDAY MORNING

9    INDICATING THAT HE REALLY WANTED TO TALK TO ME.  SO I THEN -- I

10   GOT THE TEXT.  IT WAS PROBABLY ABOUT 7 A.M., AND I DID GO AHEAD

11   AND SEND HIM A TEXT SAYING THAT I WOULD CALL HIM BACK SHORTLY.

12        SO I WENT AHEAD AND GOT UP.  I WAS JUST GETTING UP AT THAT

13   POINT IN TIME.  GOT UP AND WALKED INTO MY BATHROOM SO I

14   WOULDN'T DISTURB MY HUSBAND TO GIVE NAT A CALL.

15   Q.    WHAT DID MR. HARDWICK SAY WHEN YOU CALLED HIM?

16   A.    HE WAS -- HE SOUNDED VERY DISTRAUGHT ON THE PHONE, WAS

17   CONTINUING TO BE CONCERNED ABOUT WHAT DECISION I WAS GOING TO

18   MAKE RELATIVE TO THE TITLE AGENCY AND WHETHER I WAS INTENDING

19   TO CANCEL THE AGENCY AGREEMENT FOR CAUSE.  AND HE WANTED TO

20   CONTINUE TO EXPRESS TO ME THAT THIS WAS ALL SOMEHOW A MISTAKE.

21        BUT HE -- AT THAT POINT IN TIME, WE HAD ALREADY BEGUN TO

22   UNCOVER SOME DISBURSEMENTS OUT OF THE TRUST ACCOUNTS THAT

23   CLEARLY WERE INAPPROPRIATE AND SENT TO CASINOS AND TO

24   MR. HARDWICK'S PERSONAL BUSINESS ACCOUNT.

25        AND SO I ASKED HIM ON THE PHONE AT THAT TIME -- I HAD ALSO

1   HEARD FROM OTHERS THAT HE HAD A POTENTIAL GAMBLING HABIT.  SO I

2   ASKED HIM ON THE PHONE AT THAT TIME WHETHER HE HAD A GAMBLING

3   ISSUE.  AND HE SEEMED VERY OFFENDED BY THAT QUESTION AND ASKED

4   ME WHY I WOULD ASK HIM THAT QUESTION.  I TOLD HIM BECAUSE, YOU

5   KNOW, ALL INDICATIONS WERE THERE WERE SOME SIGNIFICANT FUNDS

6   THAT HAD BEEN SENT TO CASINOS ON HIS BEHALF, WHICH WAS

7   INDICATIVE TO ME OF A GAMBLING ISSUE.

8       AND HIS RESPONSE WAS, NO, I ENJOY GAMBLING, BUT I DON'T

9   HAVE A PROBLEM.

10      AND THEN SHORTLY THEREAFTER, HE ASKED ME WHAT HE SHOULD

11  DO, WHAT DID I THINK HE SHOULD DO.

12  Q.   BEFORE I ASK YOU WHAT YOUR RESPONSE TO THAT WAS, WHEN

13  MR. HARDWICK -- YOU SAID, YOU SAID HE USED THE WORD -- THAT THE

14  MONIES THAT WENT TO HIM FOR HIS BENEFIT WAS A MISTAKE?

15  A.   I DON'T KNOW THAT THAT WAS THE ACTUAL TERM HE USED.

16  Q.   DID HE USE THE TERM OVERDISBURSED?

17  A.   MORE LIKELY HE USED OVERDISBURSED.

18  Q.   AND WHAT DID HE SAY ABOUT WHETHER HE KNEW HE WAS

19  OVERDISBURSED OR NOT?

20  A.   HE INDICATED HE DID NOT KNOW HE WAS OVERDISBURSED.

21  Q.   AND DO YOU KNOW WHAT THE TERM OVERDISBURSED MEANS?

22  A.   I HAD NEVER HEARD THAT TERM UNTIL THIS SITUATION OCCURRED.

23  Q.   ALL RIGHT.  NOW, WHEN MR. HARDWICK -- YOU SAID HE ASKED

24  YOU -- IN THIS PHONE CALL THERE ON SATURDAY MORNING, AUGUST 16,

25  HE ASKED YOU WHAT HE SHOULD DO?

1    A.   CORRECT.

2    Q.   WHAT DID YOU TELL HIM?

3    A.   I TOLD HIM THAT IN THESE CIRCUMSTANCES, MEANING WHEN

4    SOMEONE HAS GOTTEN FUNDS OUT OF A TRUST ACCOUNT THAT THEY ARE

5    NOT ENTITLED TO, THAT THE BEST THING THAT THEY CAN DO IS TO TRY

6    AND GET THE MONEY BACK IN AS QUICKLY AS POSSIBLE, AND THAT I

7    SUGGESTED HE START SELLING ASSETS AS SOON AS HE COULD.

8    Q.   NOW, DID YOU -- WERE YOU OFFERING MR. HARDWICK A FREE PASS

9    IF HE JUST PUT THE MONEY BACK INTO ESCROW?

10   A.   THERE IS NO FREE PASS WHEN YOU TAKE MONEY OUT OF AN ESCROW

11   ACCOUNT.

12   Q.   AND DO YOU THINK, FROM YOUR CONVERSATION WITH

13   MR. HARDWICK, YOU MADE THAT CLEAR TO HIM IN THAT CONVERSATION?

14   A.   YES.

15   Q.   ALL RIGHT.  THAT DAY, DID YOU CONTINUE TO HAVE

16   COMMUNICATIONS WITH OTHER FOLKS AT FIDELITY AND THE OTHER

17   PARTNERS OF THE LAW FIRM?

18   A.   YES, I DID.

19   Q.   OKAY.  LET'S GO TO THE NEXT DAY, SUNDAY, AUGUST 17TH,

20   2018.  WHAT WAS THE ISSUE -- WHAT WAS FIDELITY AND YOU -- WHAT

21   WAS THE ISSUE THAT YOU GUYS WERE TRYING TO DECIDE WITH RESPECT

22   TO FIDELITY'S RELATIONSHIP WITH MORRIS HARDWICK SCHNEIDER?

23   A.   THE WAY WE VIEWED IT IS THAT WE REALLY HAD TWO OPTIONS IN

24   THIS SCENARIO.  NEITHER OF THEM WERE GOOD OPTIONS.  BUT OUR TWO

25   OPTIONS WERE, IF WE CANCEL THE AGENCY AGREEMENT, LIKE WE'VE

1  DISCUSSED, FOR CAUSE, WHICH MEANT EFFECTIVE IMMEDIATELY, THEN

2  THAT IN TURN -- THEN WE WOULD THEN HAVE TO NOTIFY EVERY LENDER

3  ON EVERY TRANSACTION, REAL ESTATE TRANSACTION THAT THE FIRM WAS

4  INVOLVED IN, THAT OUR COMPANY WAS ALSO INVOLVED IN, MEANING

5  THAT WE HAD ISSUED A CLOSING PROTECTION LETTER ON IT.

6      WE WERE REQUIRED TO THEN NOTIFY ALL THE LENDERS.  THEY

7  WOULD HAVE IMMEDIATELY PULLED THEIR FUNDS.  THEY WOULD HAVE

8  STOPPED FUNDING ANY ADDITIONAL TRANSACTIONS OR LOANS THROUGH

9  THE FIRM.

10      IT LOOKED LIKE A CATASTROPHE IN THE MAKING.  WE HAD

11  800 EMPLOYEES AND THEIR JOBS AT STAKE HAD WE CANCELED THE

12  AGENCY.  THE LAW FIRM AND THE AGENCY, THE TITLE AGENCY, HAD

13  OTHER UNDERWRITERS.  BUT THOSE OTHER UNDERWRITERS ARE

14  COMPETITORS, AND IT'S A SMALL INDUSTRY.  AND THEY WOULD ALL

15  KNOW VERY QUICKLY IF WE HAD CANCELED THAT AGENCY AGREEMENT,

16  KNOWING THAT WE HAD HISTORICALLY HAD A VERY STRONG RELATIONSHIP

17  WITH THE FIRM.

18      I BELIEVED THAT EVERY OTHER UNDERWRITER WOULD HAVE

19  IMMEDIATELY CANCELED THEIR AGENCY AGREEMENTS AS WELL.  THE FIRM

20  WOULD HAVE THEN NOT BEEN ABLE TO CLOSE REAL ESTATE TRANSACTIONS

21  BECAUSE THEY WOULD NOT HAVE A TITLE AGENCY AT THAT POINT IN

22  TIME.  THEY WOULD HAVE DIFFICULTY GETTING LENDERS BE WILLING TO

23  FUND, AND YOU WOULD HAVE HAD CONSUMERS, BORROWERS, PURCHASERS,

24  SELLERS LINED UP AT THE DOOR TRYING TO, YOU KNOW, MAKE CLAIMS

25  FOR THE FUNDS.

1    BECAUSE ALL OF THESE INDIVIDUALS, OR MOST OF THEM, YOU

2    KNOW, THESE ARE BORROWERS WHO ARE -- FOR THE VAST MAJORITY,

3    THIS IS THE BIGGEST PURCHASE THEY WILL EVER MAKE IN THEIR

4    LIFETIME.

5    Q.   DID FIDELITY -- BASED ON ALL THIS, DID FIDELITY MAKE A

6    DECISION ON WHAT THEY WERE GOING TO DO?

7    A.   WE HAD NOT MADE A DECISION THERE, NO.

8    Q.   DID YOU CALL MR. HARDWICK THERE THAT SUNDAY?

9    A.   YES.

10   Q.   DID FIDELITY MAKE A DECISION ABOUT MR. HARDWICK'S ROLE

11   WITH MORRIS HARDWICK SCHNEIDER IF FIDELITY WAS GOING TO

12   CONTINUE CONSIDERING WHAT IT WAS GOING TO DO?

13   A.   YES.

14   Q.   SO, AND DID YOU CALL MR. HARDWICK TO RELATE THAT DECISION

15   TO HIM?

16   A.   YES, I DID.

17   Q.   ALL RIGHT.  WHAT DID YOU TELL MR. HARDWICK THERE ON

18   SUNDAY, AUGUST 17TH, 2014?

19   A.   I TOLD HIM THAT WE WERE STILL WEIGHING OUR OPTIONS AS TO

20   WHETHER WE WERE GOING TO CANCEL THE AGENCY AGREEMENT OR WHETHER

21   WE WERE GOING TO REMAIN IN AS A PARTNER AND SEE IF WE COULD

22   KEEP THIS THING AFLOAT.  BUT THAT UNDER THE CIRCUMSTANCES, HE

23   COULD NO LONGER BE ASSOCIATED WITH THE FIRM IN ANY CAPACITY.

24       WE HAD TOLD HIM -- DAVID BAUM WAS ALSO ON THE CALL WITH

25   ME.  WE TOLD HIM THAT IT WAS IN THE BEST INTEREST OF EVERYBODY

1  TO HAVE HIM STEP OUT OF THE FIRM.  IF WE WERE GOING TO CONSIDER

2  REMAINING IN, WE WOULD REQUIRE THAT.

3      AND IF WE REMAINED IN, IT WOULD ENABLE THOSE 800 EMPLOYEES

4  ASSOCIATED WITH THE LAW FIRM AND THE TITLE AGENCY TO IDEALLY

5  KEEP THEIR JOBS.  THERE WOULD BE NO CONSUMERS THAT WOULD BE

6  HARMED IN ALL OF THIS.  NO ONE WOULD LOSE THEIR EARNEST MONEY

7  DEPOSITS, BUT THAT THAT WOULD BE A REQUIREMENT ON OUR PART.

8      AND THAT HE WAS THEN TO PUT 50 PERCENT OF HIS SHARES, HIS

9  STAKE IN THE FIRM, INTO ESCROW, PENDING THE OUTCOME OF OUR

10  INVESTIGATION.

11  Q.   ALL RIGHT.

12  A.   AND THAT THAT WAS SUBJECT TO CHANGE, DEPENDING UPON WHAT

13  WE DETERMINED.

14  Q.   IN THAT CALL WITH MR. HARDWICK THERE ON SUNDAY,

15  AUGUST 17TH, DID MR. HARDWICK AGREE TO THAT PROPOSAL?

16  A.   NO, HE DID NOT.

17  Q.   NOW, AT SOME POINT PRIOR TO THIS CALL TO MR. HARDWICK, HAD

18  YOU LEARNED THAT MR. HARDWICK HAD SECURED TWO LOANS FROM AN

19  INDIVIDUAL WHOSE LAST NAME IS JOHNSON AND AN INDIVIDUAL WHOSE

20  LAST NAME IS PRITCHARD?

21  A.   YES.

22  Q.   DID YOU ASK -- AND THAT THE FUNDS FROM THOSE LOANS FROM

23  THOSE TWO INDIVIDUALS HAD BEEN PUT INTO THE FIRM, RIGHT?

24  A.   YES.

25  Q.   SO YOU WERE AWARE OF THAT?

1  A.   I WAS.

2  Q.   AND DID YOU ASK MR. HARDWICK ANYTHING ABOUT THOSE TWO

3  LOANS ON THIS CALL ON SUNDAY, AUGUST 17TH?

4  A.   YES.  I ASKED HIM WHETHER HE HAD OBLIGATED THE LAW FIRM

5  WITH RESPECT TO THOSE LOANS, WHICH ESSENTIALLY WOULD HAVE MADE

6  THE LAW FIRM LIABLE FOR THE OUTSTANDING DEBT ON THOSE TWO

7  LOANS.

8  Q.   AND WHAT DID, WHAT DID MR. HARDWICK TELL YOU WHETHER -- IF

9  HE HAD DONE THAT?

10 A.   HE TOLD ME THAT HE HAD OBLIGATED THE FIRM ON THOSE, ON

11 BOTH OF THOSE LOANS, AND THAT BOTH MARK WITTSTADT AND HIS

12 BROTHER ROD WITTSTADT WERE AWARE OF THAT.

13 Q.   ALL RIGHT.  NOW, AFTER THIS CALL WITH -- ACTUALLY, LET ME

14 BE CLEAR.  THESE ARE LOANS THAT THE FIRM IS ON THE HOOK FOR, AS

15 OPPOSED TO MR. HARDWICK PERSONALLY, CORRECT?

16 A.   THAT IS CORRECT.

17 Q.   NOW, HE SAID THAT MARK WITTSTADT AND HIS BROTHER WERE

18 AWARE THAT HE HAD OBLIGATED THE FIRM; IS THAT RIGHT?

19 A.   YES.

20 Q.   NOW, AFTER THIS CALL, DID YOU HAVE OCCASION TO TELL WHAT

21 MR. HARDWICK SAID ABOUT THAT TO MARK WITTSTADT?

22 A.   YES.

23 Q.   WHAT WAS HIS REACTION?

24 A.   HE WAS FURIOUS THAT NAT HARDWICK HAD IN FACT OBLIGATED THE

25 FIRM, THAT -- HE INDICATED TO ME THAT HE AND HIS BROTHER HAD

1    SPECIFICALLY TOLD NAT HARDWICK THAT HE COULD NOT OBLIGATE THE

2    FIRM, THAT THESE WERE HIS PERSONAL OBLIGATIONS.

3    Q.   ALL RIGHT.  AFTER THIS CALL ON SUNDAY, AUGUST 17TH, 2018,

4    DID YOU CONTINUE TO HAVE OR HAVE ANY ADDITIONAL CONVERSATIONS

5    OR COMMUNICATIONS WITH MR. HARDWICK?

6    A.   NO, I DID NOT.

7    Q.   DID -- ULTIMATELY, MR. HARDWICK RESIGNED FROM THE LAW

8    FIRM; IS THAT RIGHT?

9    A.   YES.

10   Q.   ALL RIGHT.  DID -- AFTER YOUR CALL WITH MR. HARDWICK, DID

11   YOU THEN RELATE TO MR. MORRIS OR MARK WITTSTADT WHAT -- THE

12   PROPOSAL THAT FIDELITY HAD MADE THAT YOU JUST DESCRIBED?

13   A.   YES, I DID, TO BOTH.

14   Q.   OKAY.  AND WHAT WAS YOUR UNDERSTANDING THAT THEY WERE

15   GOING TO DO IN RESPONSE TO THE PROPOSAL THAT YOU HAD

16   COMMUNICATED TO MR. HARDWICK THAT HE HAD NOT AGREED TO?

17   A.   ALL I KNOW IS THAT ART MORRIS INDICATED THAT HE WOULD CALL

18   NAT HARDWICK DIRECTLY.  I DO NOT KNOW WHAT THEY DISCUSSED ON

19   THAT CALL.

20   Q.   AFTER THAT CALL, DID MR. HARDWICK RESIGN FROM THE FIRM?

21   A.   YES, HE DID.

22   Q.   ALL RIGHT.  NOW, AND WHAT DID FIDELITY PROCEED TO DO WITH

23   RESPECT TO ADDRESSING THE AMOUNT OF MONEY THAT FIDELITY COULD

24   BE SUBJECT TO FOR TITLE CLAIMS AND OTHER CLAIMS UNDER THE

25   CLOSING PROTECTION LETTERS?

1    A.   ULTIMATELY, WE DECIDED THAT WE WOULD FUND THE SHORTAGES IN

2    THE ESCROW ACCOUNTS, ALL OF THE LOSSES.

3    Q.   ALL RIGHT.  AND AS PART OF WHAT FIDELITY DECIDED TO DO,

4    DID FIDELITY BRING UP THAT SPECIAL TEAM OF AUDITORS THAT YOU

5    HAD OFFERED TO MR. HARDWICK BACK ON JULY 11TH, 2014?

6    A.   YES.  THEY CAME EITHER THAT FRIDAY EVENING OR ON SATURDAY.

7    THEY WERE THERE PRETTY QUICKLY.

8    Q.   ALL RIGHT.  DID THEY ULTIMATELY -- AND YOU CONTINUED TO BE

9    INVOLVED AS THE SITUATION WENT FORWARD, RIGHT?

10   A.   CORRECT.

11   Q.   AND DID -- AND WITH RESPECT TO THE HOLE IN THE ESCROW

12   ACCOUNT THAT FIDELITY PLUGGED THAT YOU MENTIONED, ULTIMATELY,

13   HOW MUCH MONEY DID FIDELITY HAVE TO PUT IN TO PLUG THAT HOLE?

14           MR. GARLAND:  OBJECTION.  INADEQUATE FOUNDATION.

15   CALLS FOR HEARSAY.

16           THE COURT:  OVERRULED.

17           THE WITNESS:  ULTIMATELY, FIDELITY NATIONAL FINANCIAL

18   FUNDED $29.5 MILLION INTO THE TRUST ACCOUNTS.

19   BY MR. GILFILLAN:

20   Q.   AND SO IS THAT MONEY, THAT IS A LOSS TO FIDELITY?

21   A.   IT IS A LOSS.

22   Q.   AND DID FIDELITY -- I'M NOT GOING TO GET INTO THE AMOUNTS,

23   BUT DID FIDELITY SUFFER ADDITIONAL MONETARY LOSSES AS A RESULT

24   OF THIS?

25   A.   YES.  SIGNIFICANT LOSSES.

1   MR. GILFILLAN:  IF I MAY HAVE A MOMENT, YOUR HONOR?

2   THE COURT:  SURE.

3   MR. GILFILLAN:  I'LL TENDER THE WITNESS, YOUR HONOR.

4   THE COURT:  ALL RIGHT.  CROSS-EXAMINATION.

5                    CROSS-EXAMINATION

6   BY MR. GARLAND:

7   Q.   GOOD AFTERNOON.  WE'VE MET BEFORE --

8   A.   YES, WE HAVE.

9   Q.   -- CORRECT?  I HAD OCCASION TO TAKE YOUR DEPOSITION.

10  A.   YES.

11  Q.   AT WHICH TIME YOU WERE TESTIFYING IN A CIVIL MATTER,

12  CORRECT?

13  A.   CORRECT.

14  Q.   ALL RIGHT.  NOW, IN CONNECTION WITH YOUR DECISION TO

15  ACQUIRE AN INTEREST IN THE TITLE COMPANY, YOU MADE AN

16  INVESTMENT DECISION TO DO THAT, CORRECT?

17           MR. GILFILLAN:  OBJECT TO THE FORM OF THE QUESTION.

18           THE COURT:  I'LL OVERRULE.  I'LL OVERRULE.

19           DO YOU UNDERSTAND THE QUESTION OR --

20           THE WITNESS:  I BELIEVE I DO.

21           FIRST OF ALL, JUST TO CLARIFY, IT WAS NOT MY PERSONAL

22  DECISION TO DO THAT.  IT WAS A COMPANY DECISION.

23           BUT THE DECISION WAS NOT BASED ON WHETHER THIS WOULD

24  BE A GREAT INVESTMENT TO PUT IN $29.5 MILLION.  WE KNEW WE WERE

25  GOING TO SUFFER SIGNIFICANT LOSSES, AND THIS WAS A WAY TO

1  POTENTIALLY MITIGATE THOSE LOSSES AND ALSO TO ASSURE THAT MANY

2  PARTIES THAT HAD FUNDS IN THOSE TRUST ACCOUNTS WERE NOT

3  ADVERSELY IMPACTED.

4  BY MR. GARLAND:

5  Q.   WELL, YOU ENTERED INTO, DID YOU NOT, A WRITTEN AGREEMENT

6  IN RESPECT TO THAT ACQUISITION?

7  A.   FIDELITY NATIONAL FINANCIAL ENTERED INTO AN AGREEMENT,

8  YES.

9  Q.   EXCUSE ME.

10  A.   OKAY.

11  Q.   FIDELITY NATIONAL TITLE.  AND THAT WAS A FORMAL LEGAL

12  DOCUMENT, CORRECT?

13  A.   I DON'T KNOW.  I'M NOT FAMILIAR WITH THE TERMS OF THAT

14  AGREEMENT.

15          THE COURT:  I'M SORRY.  IS SOMETHING BEING REVIEWED?

16          MR. GILFILLAN:  YES, YOUR HONOR.  I'M SORRY.

17          THE COURT:  I JUST COULDN'T SEE OVER THE PODIUM.

18          MR. GILFILLAN:  I APOLOGIZE.

19          THE COURT:  OKAY.  ALL RIGHT.  NO PROBLEM.

20  BY MR. GARLAND:

21  Q.   I'M GOING TO SHOW YOU DEFENDANT'S EXHIBIT 675 AND ASK YOU

22  TO READ OVER THE FIRST PAGE OF THAT DOCUMENT.

23          MR. GARLAND:  YOUR HONOR, I MOVE IN DEFENDANT'S 675.

24          THE COURT:  ANY OBJECTION?

25          MR. GILFILLAN:  NO, YOUR HONOR.

1           THE COURT:  ALL RIGHT.  IT'S ADMITTED.

2     BY MR. GARLAND:

3     Q.   GO AHEAD AND ACQUAINT YOURSELF.

4     A.   OKAY.

5           THE COURT:  AND AT THIS TIME YOU'RE JUST ASKING HER

6     TO REVIEW THE VERY FIRST PAGE, MR. GARLAND; IS THAT RIGHT?

7           MR. GARLAND:  YES.  THAT WOULD BE ENOUGH FOR MY

8     PRELIMINARY QUESTIONS.

9           THE COURT:  OKAY.

10          HAVE YOU DONE SO, MS. MEINHARDT?

11          THE WITNESS:  YES.

12          THE COURT:  OKAY.

13    BY MR. GARLAND:

14    Q.   THAT DOCUMENT INDICATES THAT IT IS A LIMITED LIABILITY

15    COMPANY INTEREST CONTRIBUTION AGREEMENT, ENTERED AUGUST 25TH,

16    2014, BETWEEN LANDCASTLE TITLE, LLC, A GEORGIA LIMITED

17    LIABILITY COMPANY, AND MHS, INC., A GEORGIA CORPORATION,

18    LANDCASTLE ACQUISITION CORPORATION, A DELAWARE COMPANY, FNF,

19    MARK WITTSTADT, GERALD [SIC] W. WITTSTADT, AND THE SHAREHOLDERS

20    OF MHS, FOR THE PURPOSES OF THIS AGREEMENT, CERTAIN OTHER

21    CAPITALIZED TERMS AND VARIABLES --

22          MR. GILFILLAN:  MR. GARLAND NEEDS TO SPEAK INTO THE

23    MICROPHONE.

24          THE COURT:  YEAH.

25    BY MR. GARLAND:

1   Q.   YOU -- ARE YOU AWARE THAT THAT WAS THE AGREEMENT THAT WAS

2   ENTERED INTO REFLECTING THE DECISION MADE TO ACQUIRE 70 PERCENT

3   INTEREST IN LANDCASTLE TITLE?

4   A.   I DO KNOW THAT AN AGREEMENT WAS ENTERED INTO.  I JUST

5   DON'T KNOW THE SPECIFICS OR THE SPECIFIC TERMS OF THE

6   AGREEMENT.

7   Q.   ALL RIGHT.  NOW, DID YOU LEARN WHAT THE TERMS OF THAT

8   AGREEMENT WERE?

9   A.   I HAVE A GENERAL UNDERSTANDING OF WHAT THE TERMS OF THE

10  AGREEMENT WERE.

11  Q.   WOULD YOU TURN TO PAGE 4 OF THAT AGREEMENT, PARAGRAPH D.

12  A.   I'M SORRY.  PAGE 4?

13  Q.   PAGE 4.

14  A.   I DON'T SEE A PARAGRAPH D.

15  Q.   I'LL MOVE ON TO A DIFFERENT TOPIC UNTIL I CAN FIND IT, THE

16  RIGHT PAGE.

17       LET ME TALK TO YOU ABOUT THE ACQUISITION A LITTLE BIT

18  MORE.  THE TERMS OF THE AGREEMENT, DID YOU GENERALLY KNOW THAT

19  FIDELITY WOULD ACQUIRE 70 PERCENT STOCK IN LANDCASTLE TITLE?

20  A.   AT THE OUTSET OF THE TRANSACTION, AS WE WERE WORKING

21  THROUGH THIS, I DON'T RECALL WHAT THE SPECIFIC PERCENTAGE WAS.

22  WE DID -- I DO KNOW THAT FIDELITY COMMITTED TO TAKE A STAKE IN

23  LANDCASTLE TITLE IN RETURN AS AN OFFSET TO THE LOSSES THAT WE

24  HAD SUFFERED AS A RESULT OF PUTTING FUNDS INTO THE ESCROW

25  ACCOUNT.

1   Q.   AND THE KNOWN AMOUNT THAT YOU WOULD HAVE TO COVER WHEN YOU

2   WERE NEGOTIATING, IT WAS UP IN THE AIR, RIGHT?  YOU DIDN'T KNOW

3   WHAT THE NUMBER WOULD ACTUALLY BE?

4   A.   IT WAS -- WE WERE NOT CLEAR ON WHERE THAT NUMBER WOULD BE,

5   AS IT WAS INCREASING DAILY.  AT THAT POINT IN TIME, I THINK WE

6   KNEW WE WERE IN EXCESS OF $20 MILLION.

7   Q.   ALL RIGHT.  NOW, YOU TALKED ABOUT, TYPICALLY, YOU'VE HAD

8   THESE SITUATIONS.  AND THE ISSUE IS THAT MONEY WAS TAKEN OUT OF

9   AN ACCOUNT WHERE CLIENTS HAD THEIR ESCROW FUNDS, CORRECT?

10  TYPICALLY, THAT'S IT?

11  A.   YES.

12  Q.   AND THE FUNDS THAT ARE TAKEN ARE THE FUNDS THAT BELONG TO

13  THE CLIENT.  THAT'S THE TYPICAL SITUATION, RIGHT?

14  A.   YES.

15  Q.   NOW, HAD YOU HAD A SITUATION WHERE, WHEN YOU GOT INTO THE

16  FACTS -- OR YOU FOUND OUT IN THIS SITUATION, WHEN YOU GOT INTO

17  THE FACTS, THAT LAW FIRM FUNDS WERE REGULARLY BEING PUT INTO

18  ESCROW ACCOUNTS, DID YOU NOT?

19  A.   MR. GARLAND, I WAS NOT DIRECTLY INVOLVED IN THE WHOLE

20  AUDIT PROCESS, AND SO I DON'T HAVE ALL THE SPECIFICS ON THAT.

21  Q.   OKAY.  HAD YOU BEEN INVOLVED IN SITUATIONS WHERE MILLIONS

22  OF DOLLARS OF LAW FIRM FUNDS WERE COMMINGLED IN THE ACCOUNT?

23  HAD YOU HAD THAT SITUATION?

24  A.   NO.

25  Q.   OKAY.  SO IF THAT WERE THE CASE, THIS WOULD BE ATYPICAL OF

1 THE NORMAL CASE, WOULD IT NOT?  IF THOSE WERE THE FACTS HERE?

2 A.   EVERY ONE OF THESE SITUATIONS THAT I'VE BEEN IN HAS BEEN

3 UNIQUE.

4 Q.   OKAY.  ALL RIGHT.  SO THEY ARE TYPICALLY UNIQUE.  ALL

5 RIGHT?

6 A.   TYPICALLY UNIQUE.

7 Q.   OKAY.  NOW, YOU HAD -- ARE YOU FAMILIAR WITH THE ACCOUNT

8 THAT'S BEEN REFERRED TO OFTEN AS 7328, SUNTRUST WIRE ACCOUNT?

9 DID YOU HAVE ANY DISCUSSIONS ABOUT THAT?

10 A.   I HAVE HEARD THAT TERM USED THROUGHOUT THE COURSE OF THIS,

11 BUT I DID NOT HAVE ANY DIRECT INVOLVEMENT OR FAMILIARITY WITH

12 IT.

13 Q.   OKAY.  SO IF THERE'S MONEY IN THE POT, IN AN ACCOUNT

14 THAT'S LABELED ESCROW, PART OF THE MONEY BELONGS TO THE LAW

15 FIRM AND PART OF THE MONEY BELONGS TO THE CLIENTS, OR PEOPLE

16 WHO HAD PUT THEIR MONEY WITH THE LAW FIRM, AND MONEY COMES OUT

17 OF THAT ACCOUNT, WHICH MONEY COMES OUT OF THAT ACCOUNT?

18            MR. GILFILLAN:  OBJECTION.

19            THE WITNESS:  I DON'T --

20            THE COURT:  HOLD ON.

21            MR. GILFILLAN:  OBJECTION.  LACK OF FOUNDATION,

22 BEYOND THE SCOPE OF DIRECT.

23            MR. GARLAND:  I WANT TO SHOW THE STATUS OF HER

24 KNOWLEDGE.

25            THE COURT:  I WON'T SUSTAIN AS TO BEYOND SCOPE.  I

1   WILL SUSTAIN AS TO FOUNDATION.  I DON'T KNOW THAT YOU'VE

2   ESTABLISHED THAT SHE HAS A FOUNDATION THAT'S SUFFICIENT TO

3   TESTIFY TO THAT.

4           SO IF YOU WOULD DEVELOP THAT, I WILL ALLOW YOU AN

5   OPPORTUNITY TO DO THAT.  I DON'T KNOW IF YOU WILL BE ABLE TO.

6   BY MR. GARLAND:

7   Q.   IN YOUR POSITION, HAVE YOU EXAMINED HUNDREDS OF ESCROW

8   ACCOUNTS WHERE MONEY HAS BEEN MISSING FROM -- HAVE YOU HAD

9   OCCASION TO HAVE IT EXPLAINED TO YOU IN CONNECTION WITH YOUR

10  BUSINESS?

11  A.   I HAVE NOT PERSONALLY.  AND IT'S CERTAINLY NOT A SITUATION

12  THAT WOULD INVOLVE HUNDREDS OF ACCOUNTS.  I WILL SAY THAT IN

13  THE CASE -- IN MY EXPERIENCE, IN A CASE INVOLVING AN ESCROW OR

14  A TRUST ACCOUNT, IT SHOULD NEVER HAVE LAW FIRM MONEY IN IT.

15  Q.   WELL, I WOULD AGREE WITH YOU.

16  A.   IT'S CALLED CLIENT FUNDS.

17  Q.   DO YOU -- I UNDERSTAND.  AND YOU VIEWED THE SITUATION --

18  WHEN YOU CAME INTO THIS SITUATION, AND BEING TOLD HOW MUCH

19  MONEY WAS MISSING OUT OF THE ACCOUNT, YOU ASSUMED THAT THE

20  MONEY MISSING OUT OF THE ACCOUNT BELONGED TO CLIENTS, AS

21  OPPOSED TO MONEY BELONGING TO THE LAW FIRM; IS THAT RIGHT?

22  A.   IT SHOULD ONLY BE CLIENT FUNDS IN THAT ACCOUNT.

23  Q.   WE ARE IN AGREEMENT, RIGHT?  SO YOU DID MAKE THAT

24  ASSUMPTION, RIGHT?

25  A.   CORRECT.

1   Q.   YOU DIDN'T KNOW AT THAT TIME THAT THE LAW FIRM HAD BEEN

2   PAYING ITS PAYROLL AND EXPENSES OUT OF THIS 7328 ACCOUNT, DID

3   YOU?

4   A.   I DON'T KNOW WHAT THAT ACCOUNT IS.

5   Q.   WELL, YOU DIDN'T MEAN -- IT IS AN ACCOUNT THAT HAS A TITLE

6   IOLTA ON IT AND THAT POSSESSED BOTH CLIENT FUNDS AND LAW FIRM

7   FUNDS.

8        LET ME JUST SHORTEN MY QUESTION.

9           THE COURT:  MR. GARLAND, ARE YOU TESTIFYING NOW?  DO

10  I NEED TO PUT YOU ON THIS WITNESS STAND?  YOU'RE TELLING HER

11  WHAT IT IS?  ASK A QUESTION, SIR.

12          MR. GARLAND:  ALL RIGHT.  I'LL ASK THE QUESTIONS.

13  BY MR. GARLAND:

14  Q.   YOU DID -- YOU HAD BEEN TOLD THAT MONEY WAS TAKEN OUT OF

15  ESCROW ACCOUNTS AND THAT A LOT OF MONEY OF THOSE ESCROW

16  ACCOUNTS HAD GONE TO MR. HARDWICK.

17       AND AT THAT POINT, BASED ON YOUR KNOWLEDGE, YOU ASSUMED

18  THAT THE MONEY THAT WENT OUT OF THE POT OF FUNDS WERE FUNDS

19  BELONGING TO CLIENTS.  THAT WAS YOUR ASSUMPTION WHEN YOU WERE

20  HAVING THESE CONVERSATIONS, RIGHT?

21  A.   GENERALLY, THERE WOULD ONLY BE CLIENT FUNDS IN A TRUST

22  ACCOUNT.  THERE WAS $29.5 MILLION MISSING OUT OF THIS ONE.

23  Q.   ALL RIGHT.  NOW, YOU SAY -- DID YOU EVER DO, YOUR TEAM OF

24  AUDITORS, A THREE-PARTY RECONCILIATION AS TO WHAT CLIENT'S

25  MONEY WAS IN THE ACCOUNT?

1    DID YOU EVER SEE SUCH A DOCUMENT, WHERE THE FLOW OF FUNDS

2  IN AND OUT HAD BEEN DONE -- HAD WHAT WAS KNOWN AS A THIRD-PARTY

3  RECONCILIATION?  THAT IS, YOU'D HAVE AN ACCOUNTING STATEMENT --

4    MR. GILFILLAN:  OBJECTION.  FOUNDATION.  HE'S

5  TESTIFYING.

6  BY MR. GARLAND:

7  Q.  LET ME ASK YOU --

8    THE COURT:  I'LL SUSTAIN.

9  BY MR. GARLAND:

10  Q.  DID YOU EVER RECEIVE A THIRD-PARTY RECONCILIATION AS TO

11  ALL OF THE ACCOUNTS AND THE SOURCES OF ALL OF THE MONEY THAT

12  WENT INTO THE ESCROW ACCOUNTS OF THE LAW FIRM?

13  A.  I WAS NOT INVOLVED IN EITHER THE AUDITING PROCESS NOR THE

14  RECONCILIATION ON THE ACCOUNTING SIDE.

15  Q.  OKAY.  SO YOU HAD A CONVERSATION, A NUMBER OF

16  CONVERSATIONS YOU'VE TOLD US ABOUT WITH MR. HARDWICK.  AND WHEN

17  YOU TALKED TO MR. HARDWICK, HE SAID TO YOU THAT HE DID NOT KNOW

18  THAT HE WAS BEING OVERDISBURSED.  HE TOLD YOU THAT, DIDN'T HE?

19  A.  YES, USING A TERM I HAD NEVER HEARD BEFORE.

20  Q.  AND HE TOLD YOU HE DIDN'T KNOW THE MONEY WAS COMING FROM

21  ESCROW ACCOUNTS, CORRECT?

22  A.  THAT'S CORRECT.

23  Q.  OKAY.  AND YOU MENTIONED WHAT THE WITTSTADTS SAID HAD

24  OCCURRED CONCERNING BORROWING MONEY AND OBLIGATING THE FIRM,

25  BUT YOU WERE NOT PRESENT WHEN THE DISCUSSIONS TOOK PLACE

1   CONCERNING RAISING MONEY TO FILL IN A HOLE THAT WAS IN THE

2   FIRM.  YOU WEREN'T PRESENT?

3   A.   NO.

4   Q.   OKAY.  AND YOU DO NOT KNOW WHETHER THERE WERE OTHER PEOPLE

5   PRESENT WHO HEARD THE CONVERSATIONS, DO YOU?

6   A.   I DON'T KNOW.

7   Q.   OKAY.  YES, MA'AM.  NOW, BY THE TIME YOU HAD ARRIVED --

8   YOU ARRIVED ON THE 15H; IS THAT --

9   A.   I BELIEVE IT WAS THE 15TH, FRIDAY.

10  Q.   YOU FOUND OUT WHEN YOU GOT THERE THAT PEOPLE HAD BEEN

11  TRYING TO FIGURE OUT WHAT SHORTFALL THERE WAS FOR TWO WEEKS OR

12  MORE, DIDN'T YOU?

13  A.   ARE YOU SPEAKING OF THE FIRM'S --

14  Q.   EFFORTS?

15  A.   -- AUDITOR THAT THEY HAD ENGAGED?

16  Q.   THAT THERE HAD BEEN -- DID YOU FIND OUT THERE HAD BEEN

17  EFFORTS TO FIGURE OUT WHAT, IF ANYTHING, WAS MISSING WHEN YOU

18  ARRIVED?

19       YOU GOT A CALL FROM MR. MORRIS.  AND WERE YOU TOLD BY

20  MR. MORRIS WHAT THEY THOUGHT THE SHORTFALL WAS?

21  A.   YES.  WHEN I -- WHEN HE CALLED ME ON THE PHONE, OR WHEN I

22  RETURNED HIS CALL THAT MORNING, HE TOLD ME THAT THE SITUATION

23  WAS VERY, VERY BAD.  AND WHEN I ASKED HIM HOW BAD, HE INDICATED

24  THAT HE THOUGHT IT WAS BETWEEN 6 AND 6 AND A HALF MILLION

25  DOLLARS.

1       AND THEN WHEN I ARRIVED AT THE OFFICE IN ATLANTA, THEY

2  WERE -- THERE WERE DISCUSSIONS THAT THE NUMBER COULD BE AS HIGH

3  AS 30 MILLION, BUT THEY DIDN'T REALLY THINK IT WAS GOING TO BE

4  QUITE THAT BAD.

5  Q.   SO THE FIRST CALL, THE FIRST INDICATION FROM MR. MORRIS

6  WAS, WE THINK IT'S 6 TO 6 AND A HALF MILLION.

7       AFTER YOU ARRIVED IN ATLANTA AND HAD CONVERSATIONS WITH

8  MR. HARDWICK, YOU FOUND OUT THAT HE HAD BORROWED FROM DUSTIN

9  JOHNSON $3 MILLION AND HAD TAKEN THAT MONEY AND PUT IT INTO THE

10 FIRM, CORRECT?

11 A.   YES.  BUT HE HAD OBLIGATED THE FIRM, THEN, TO REPAY IT.

12 Q.   BUT HE HAD GONE AND BORROWED THAT MONEY, PERSONALLY

13 OBLIGATED HIMSELF, AND --

14       MR. GILFILLAN:  OBJECT TO FORM OF THE QUESTION.

15 THAT'S NOT WHAT THE WITNESS TESTIFIED.

16 BY MR. GARLAND:

17 Q.   DO YOU KNOW WHETHER OR NOT HE PERSONALLY HAD BORROWED THE

18 MONEY?

19 A.   I DO NOT KNOW THAT.

20 Q.   YOU SAID HE HAD HAD THE FIRM GUARANTEE THE LOAN.  BUT DID

21 YOU KNOW THE LOAN WAS NOT DIRECTLY TO THE FIRM BUT TO HIM?  DID

22 YOU KNOW THAT?

23 A.   I DID KNOW THAT THE LOAN WAS MADE TO HIM.

24 Q.   RIGHT.  AND THEN HE HAD THE FIRM, AS YOU HAVE SAID,

25 GUARANTEE THE LOAN.  AND THE 2014 TAX RETURN SHOWS, OF THE LAW

1    FIRM, THAT THERE IS A DEBT TO MR. HARDWICK OF $4 MILLION.  DO

2    YOU KNOW THAT?

3    A.    NO.

4    Q.    OKAY.  NOW, I BELIEVE YOU SAID THAT MR. HARDWICK SAID --

5    WHEN YOU SAID HE HAD GOTTEN MONEY OUT OF AN ESCROW ACCOUNT,

6    THAT HE SAID THE WITTSTADTS ALSO HAD GOTTEN MONEY OUT OF AN

7    ESCROW ACCOUNT.  HE SAID THAT TO YOU, CORRECT?

8    A.    CORRECT.

9    Q.    ALL OF THEM HAD BEEN LOOKING -- DID YOU ASCERTAIN THAT ALL

10   OF THEM HAD BEEN LOOKING AT THE ACCOUNTS TO FIND OUT WHAT HAD

11   BEEN COMING OUT OF THE ACCOUNTS?  DID YOU FIND THAT OUT?

12   A.    ALL I WAS AWARE OF WAS THAT THEY HAD HIRED AN OUTSIDE

13   AUDITOR TO REVIEW THAT.

14   Q.    ALL RIGHT.  AND THE WITTSTADTS, IN THAT CONVERSATION, SAID

15   THEY DIDN'T KNOW THAT THEY WERE GETTING MONEY, WHEN THEY WERE

16   GETTING THEIR MONEY FROM THE LAW FIRM, THAT IT WAS COMING OUT

17   OF AN ACCOUNT THAT HELD CLIENT FUNDS.  THAT'S WHAT THEY SAID,

18   RIGHT?

19   A.    THEY INDICATED THAT THEY HAD NOT BEEN PRIVY TO THE

20   FINANCIALS.  SO THEY DID RECEIVE THE FUNDS, NOT REALIZING THEY

21   WERE NOT ENTITLED TO THEM.

22   Q.    MR. HARDWICK SAID HE DIDN'T KNOW THE FUNDS WERE COMING OUT

23   OF THE ESCROW ACCOUNT, CORRECT?

24   A.    THAT'S CORRECT.

25   Q.    OKAY.  AND HE ALSO SAID THAT HE DIDN'T KNOW THE AMOUNT OF

1  DISTRIBUTIONS THAT HE HAD GOTTEN WERE OVERDISBURSEMENTS.  AND I

2  BELIEVE YOU'VE SAID THAT YOU HADN'T HEARD THAT TERM,

3  OVERDISBURSEMENTS.

4  A.   NO.  I HAVE A DEFINITION FOR IT NOW, BUT I HAD NEVER HEARD

5  THAT TERM.

6  Q.   WELL, ARE YOU FAMILIAR WITH THE TERM DISBURSEMENTS?

7  A.   I AM.

8  Q.   AND WHAT ARE DISBURSEMENTS?

9  A.   MEANS GENERALLY THAT YOU ARE RECEIVING FUNDS FROM SOME

10  SOURCE.

11  Q.   RIGHT.  AND IN A SUBCHAPTER S LIMITED LIABILITY COMPANY,

12  THERE -- YOU KNOW THAT THERE'S A TERM CALLED DISBURSEMENTS THAT

13  PARTNERS USE TO KEEP UP WITH THEIR SHARE OF WHAT'S GOING TO BE

14  DISBURSED.  YOU KNOW THAT?

15  A.   I DO.

16  Q.   RIGHT.  AND IF ONE PARTNER HAD GOTTEN MORE THAN HIS SHARE,

17  WOULD IT BE CORRECT TO SAY THAT THE TERM IS OVERDISBURSED?

18  WOULD THAT BE A SENSIBLE TERM TO USE?

19  A.   I WOULD NEVER USE THAT TERM.

20  Q.   OKAY.  HAVE YOU EVER BEEN IN A SITUATION OF HAVING A

21  LIMITED LIABILITY COMPANY THAT YOU WERE A PARTNER IN AND HAD TO

22  DEAL WITH THE ISSUE OF UNEQUAL DISBURSEMENTS?

23        MR. GILFILLAN:  OBJECTION.  RELEVANCE.

24        THE COURT:  OVERRULED.  OVERRULED.

25        THE WITNESS:  I HAVE BEEN --

1    THE COURT:  JUST TO ESTABLISH HER FAMILIARITY WITH

2 THE TERM, WHICH SHE'S ALREADY TESTIFIED THAT SHE DIDN'T HAVE

3 ANY.  BUT I'LL OVERRULE IT FOR NOW.  GO AHEAD.

4    THE WITNESS:  I HAVE BEEN A MEMBER OF A LIMITED

5 LIABILITY COMPANY, SO I'M CERTAINLY FAMILIAR WITH DISBURSEMENTS

6 OUT OF LIMITED LIABILITY COMPANIES.

7 BY MR. GARLAND:

8 Q.   AND YOUR FAMILIARITY, HAVE YOU DEALT WITH THE ISSUE OF ONE

9 PARTNER HAVING GOTTEN MORE THAN HIS SHARE AND HAVING AT THE END

10 OF A YEAR TO SETTLE UP?

11 A.   NO.  I'VE NOT HAD THAT SITUATION.

12 Q.   AND YOU DON'T KNOW WHETHER THAT'S A COMMON PRACTICE OR

13 NOT?

14 A.   I DO NOT KNOW.

15 Q.   OKAY.  NOW, WHEN YOU WERE TALKING TO MR. HARDWICK -- YOU

16 TOLD US ABOUT A CALL IN WHICH YOU SAID THAT IF HE GOT OUT OF

17 THE WAY AND GOT OUT OF THE FIRM, THAT HE COULD RETAIN

18 50 PERCENT BEFORE YOU WOULD CONSIDER SALVAGING THE COMPANY.  IS

19 THAT WHAT YOU TOLD HIM?

20 A.   MY RECOLLECTION IS WE HAD INDICATED THAT WE WOULD EXPECT

21 HIM TO PUT UP 50 PERCENT OF HIS SHARES INTO ESCROW, PENDING THE

22 OUTCOME OF THE INVESTIGATION.  BUT THAT WAS SUBJECT TO CHANGE,

23 DEPENDING UPON WHAT THAT OUTCOME WAS.

24 Q.   LET ME SHOW YOU A DOCUMENT, SEE IF IN ANY WAY IT REFRESHES

25 YOUR RECOLLECTION.

1    A.   OKAY.

2         THE COURT:  JUST SO THAT WE KNOW WHAT IS IT THAT YOU

3    SHARED WITH MS. MEINHARDT, WHAT ARE YOU SHOWING HER?

4         MR. GARLAND:  I'M SHOWING HER A DOCUMENT.  MAY I

5    APPROACH THE BENCH?

6         THE COURT:  YES.  I GUESS I'M JUST CONFUSED.  ARE YOU

7    REFRESHING RECOLLECTION?

8         MR. GARLAND:  YES.  YES.  I SAID --

9         THE COURT:  I DIDN'T HEAR HER -- YOU ASKED HER

10   SOMETHING AND SHE DID STATE WHAT HER RECOLLECTION WAS.

11        MR. GARLAND:  RIGHT.  AND I WAS SAYING I WOULD SHOW

12   HER A DOCUMENT TO SEE IF IT REFRESHED HER RECOLLECTION.

13        THE COURT:  OKAY.  IS THERE ANY OBJECTION?

14        MR. GILFILLAN:  THAT'S WHAT I WAS COMING UP TO

15   OBJECT.  SHE DIDN'T SAY SHE HAD A LACK OF MEMORY.

16        THE COURT:  YES.  SUSTAINED.

17        IF YOU WANT, YOU MIGHT BE ABLE TO ASK HER A DIFFERENT

18   QUESTION.  BUT SHE DID GIVE AN ANSWER, AND HER ANSWER DID NOT

19   REFLECT THAT SHE NEEDED HER RECOLLECTION REFRESHED.

20        SO I WILL SUSTAIN THAT.

21   BY MR. GARLAND:

22   Q.   DID YOU SAY AT ANY TIME TO MR. HARDWICK THAT YOU WOULD

23   CONSIDER SALVAGING THE COMPANY IF MR. HARDWICK GAVE UP AT LEAST

24   50 PERCENT OF HIS OWNERSHIP IN THE FIRM?

25   A.   I DON'T RECALL THE EXACT WORDS THAT I USED, BUT I DID

1 CONVEY TO HIM THAT THE ONLY WAY THAT FIDELITY NATIONAL

2 FINANCIAL WOULD BE WILLING TO STEP IN TO ATTEMPT TO SALVAGE

3 WHAT REMAINED OF THE COMPANY WAS IF HE WAS NOT INVOLVED IN ANY

4 CAPACITY.

5 Q.   AND THAT WAS ON A SUNDAY?

6 A.   SUNDAY EVENING.

7 Q.   SUNDAY EVENING.  AND THEN YOU TOLD US ABOUT MR. MORRIS

8 TALKING TO HIM, AND THEN HE GAVE UP HIS INTEREST.

9      DID HE SEND YOU A PROPOSAL BY WHICH HE WOULD CONSIDER YOUR

10 OFFER OF HAVING HIM STEP AWAY?

11 A.   I UNDERSTAND THAT HE DID THAT.  IT DID NOT COME TO ME.

12 Q.   AND YOU WERE MADE AWARE OF THAT PROPOSAL?

13 A.   YES.  BUT I DON'T KNOW WHAT WAS IN IT.  I WAS AWARE THAT

14 THERE WAS A PROPOSAL, BUT I DON'T KNOW WHAT IT SAID.

15 Q.   AND WHO FILLED YOU IN ON WHAT HE HAD PROPOSED BACK?

16 A.   I DON'T RECALL WHETHER IT WAS ART MORRIS OR MARK

17 WITTSTADT.  I ASSUME IT WAS ONE OF THOSE TWO, BUT IT DID NOT

18 COME TO ME.

19 Q.   AND THEN BY SUNDAY, YOUR POSITION CAME THAT YOU WOULD

20 SALVAGE THE FIRM, BUT HE HAD TO GIVE UP ALL OF HIS INTEREST,

21 CORRECT?

22 A.   I DON'T KNOW WHEN THAT DECISION WAS MADE.  ALL I RECALL

23 IS, IN THE SUNDAY EVENING PHONE CALL, WHICH WOULD HAVE BEEN, I

24 BELIEVE, THE 17TH OF AUGUST, THAT I HAD CONVEYED TO HIM THAT IF

25 FIDELITY WAS TO STEP IN AND TRY AND SALVAGE LANDCASTLE TITLE,

1    THAT HE WOULD NEED TO RESIGN FROM ANY INTEREST THAT HE HAD IN

2    THE FIRM AND GIVE -- 50 PERCENT OF HIS SHARES WOULD BE PUT IN

3    ESCROW, PENDING THE OUTCOME OF THE INVESTIGATION.

4    Q.   BUT THEN LATER, DID YOU CONVEY THAT IF FIDELITY WAS TO

5    STEP IN AND SALVAGE THE COMPANY, HE WOULD HAVE TO GIVE UP

6    100 PERCENT OF HIS SHARES?

7    A.   AT A LATER DATE, YES.

8    Q.   ON MONDAY OR SUNDAY NIGHT?

9    A.   IT WASN'T SUNDAY NIGHT.  I DON'T RECALL.  IT WOULD HAVE

10   BEEN SOMETIME THAT WEEK, THAT FOLLOWING WEEK.

11   Q.   WELL, ARE YOU FAMILIAR WITH HE TURNED OVER HIS SHARES THAT

12   MONDAY?  YOU DID FIND THAT OUT?

13   A.   I DON'T RECALL WHAT DAY --

14   Q.   WHAT DAY IT WAS.  OKAY.  BUT WHENEVER HE GAVE UP HIS

15   SHARES, IT HAD BEEN CONVEYED TO HIM THAT IF HE GAVE UP HIS

16   SHARES, FIDELITY WOULD SALVAGE THE COMPANY, RIGHT?  THAT WAS

17   THE --

18   A.   THE AGREEMENT WAS THAT WE WOULD STEP IN AND FUND ALL OF

19   THE SHORTAGES IN THE ESCROW ACCOUNTS SO THAT THE FIRM -- THE

20   LAW FIRM AND THE TITLE AGENCY COULD CONTINUE TO OPERATE.

21   Q.   AND BY DOING SO, HE UNDERSTOOD THAT YOU WOULDN'T PULL THE

22   AGENCY AGREEMENT, CORRECT?  I MEAN, THAT WAS THE -- WHAT HE --

23   WHEN HE GAVE UP HIS STOCK, HE UNDERSTOOD THAT YOU WEREN'T GOING

24   TO PULL THE AGENCY AGREEMENT WITH LANDCASTLE AND ALL THESE

25   PEOPLE WEREN'T GOING TO GET PUT OUT OF WORK, RIGHT?

1    A.    I DON'T KNOW WHAT HE UNDERSTOOD.

2    Q.    WELL, YOU HAD -- BEFORE HE GAVE UP HIS STOCK, YOU HAD LET

3    IT BE KNOWN THAT IF HE DIDN'T GIVE UP HIS STOCK, FIDELITY --

4    AND I BELIEVE YOU MENTIONED IT -- WOULD PULL THE AGENCY, RIGHT?

5    A.    I HAD INDICATED THAT WE WOULD NOT STEP IN AT THAT POINT

6    AND FUND ALL OF THE SHORTAGES IN THE ESCROW ACCOUNT IF HE

7    REMAINED AS EITHER PARTNER OR EMPLOYEE OF THE COMPANY.

8    Q.    I JUST WANT TO BE CLEAR.  IF HE DIDN'T GET OUT, YOU'D PULL

9    THE AGENCY, WHICH I THINK IS -- IS THAT CORRECT?

10   A.    WE DID NOT DETERMINE WHAT WE WERE GOING TO DO UNTIL LATER

11   THAT WEEK.  WE WERE STILL WEIGHING OUR OPTIONS.  BUT WE KNEW

12   THAT FOR US TO EVEN CONSIDER OPTION ONE, WHICH WAS CONTINUING

13   TO FUND THE ESCROW ACCOUNTS, HE WOULD HAVE TO LEAVE THE FIRM.

14   Q.    YOU CONVEYED THAT, I BELIEVE YOU JUST SAID, THAT IF HE'D

15   GIVE UP HIS STOCK, Y'ALL WOULD FUND THE SHORTFALLS AND THE

16   PEOPLE WOULDN'T BE PUT OUT OF WORK.  I MEAN, THAT'S WHAT WENT

17   ON, WASN'T IT?

18   A.    THAT WAS OPTION ONE ON THE TABLE.

19   Q.    SO DO YOU THINK HE GAVE UP HIS STOCK WITHOUT ANY

20   UNDERSTANDING THAT FIDELITY WOULD FUND AND SALVAGE THE COMPANY?

21   IS THAT WHAT YOU'RE SAYING?

22   A.    I DON'T KNOW.

23   Q.    OKAY.  YOU DID TELL US THAT YOU HAD TOLD HIM ABOUT THE

24   CONDITIONS IF FIDELITY WAS TO SALVAGE THE COMPANY.  SO LET ME

25   ASK IT THIS WAY:  HE GAVE UP HIS STOCK, AND YOU ENTERED -- AND

1 THE COMPANY THEREAFTER ENTERED AN AGREEMENT IN CONSIDERATION

2 FOR THE 70 PERCENT OWNERSHIP IN LANDCASTLE TITLE, THAT

3 FIDELITY, THE MULTIBILLION DOLLAR A YEAR EARNING COMPANY,

4 BILLION DOLLAR COMPANY, WOULD GUARANTEE THAT NO CLIENT LOST ANY

5 MONEY.  THAT WAS THE EFFECT OF WHAT THE ULTIMATE AGREEMENT WAS,

6 CORRECT?

7 A.  I APOLOGIZE.  CAN YOU REPEAT THE QUESTION?

8 Q.  WELL, I'LL JUST -- FIDELITY AGREED TO MAKE SURE THAT NO

9 ACCOUNTS OF CLIENTS OF THE LAW FIRM WHO HAD MONEY IN ESCROW

10 LOST ANY MONEY, RIGHT?

11 A.  WE DID AGREE TO DO THAT, YES.

12 Q.  RIGHT.  AND IF HE HADN'T GIVEN UP HIS STOCK, YOU WOULD

13 HAVE PULLED THE AGENCY AGREEMENT AND HAD ALL OF THE

14 CONSEQUENCES THAT YOU TALKED ABOUT, RIGHT?

15 A.  WE HAD NOT MADE THAT DECISION AT THAT TIME.  WE WERE STILL

16 WEIGHING OUR OPTIONS, AND THAT CONTINUED THROUGH THAT FOLLOWING

17 WEEK.

18 Q.  I SEE.  NOW, AT THE TIME THESE DECISIONS WERE MADE, YOU

19 DIDN'T KNOW THAT THE CHIEF FINANCIAL OFFICER OF THE LAW FIRM

20 HAD A CRIMINAL HISTORY OF EMBEZZLEMENT AND THEFT AT ALL OF HER

21 LISTED EMPLOYERS?

22       MR. GILFILLAN:  OBJECT TO THE FORM OF THE QUESTION.

23 MAY WE APPROACH?

24       THE COURT:  YES, YOU MAY APPROACH.

25       (WHEREUPON, A BENCH CONFERENCE OUT OF THE HEARING OF

1    THE JURY PROCEEDED AS FOLLOWS:)

2              THE COURT:  I GUESS SO I'M CLEAR, YOU ARE TALKING

3    MS. MAURYA AT THIS POINT.  ARE YOU ASKING ABOUT MS. MAURYA?

4              MR. GARLAND:  YEAH.

5              THE COURT:  OKAY.  YES.

6              MR. GILFILLAN:  THE QUESTION WAS ABOUT CRIMINAL

7    HISTORY.  SHE HAD NOT BEEN PROSECUTED BY ANYBODY PRIOR TO THAT

8    POINT.  SHE DID A LOT OF BAD THINGS, BUT NO CRIMINAL HISTORY.

9              THE COURT:  ALL RIGHT.  HOLD ON.

10             MR. GARLAND:  EXCUSE ME.  YOU ARE RIGHT.  AT THAT

11   POINT SHE HADN'T BEEN PROSECUTED.  I'LL REPHRASE MY QUESTION.

12             THE COURT:  OKAY.  ALL RIGHT.

13             (WHEREUPON, PROCEEDINGS RESUMED IN OPEN COURT AS

14   FOLLOWS:)

15             THE COURT:  ALL RIGHT.  I'LL SUSTAIN THAT.  JUST TO

16   REPHRASE IT, THOUGH.

17   BY MR. GARLAND:

18   Q.   YOU DIDN'T KNOW THAT ASHA MAURYA HAD AN EXTENSIVE HISTORY

19   OF STEALING FROM HER PRIOR EMPLOYERS, DID YOU?

20   A.   AT WHAT POINT ARE YOU TALKING ABOUT?

21   Q.   AT THE TIME YOU SAID, THE ONLY WAY WE'LL SALVAGE THIS

22   COMPANY IS FOR MR. HARDWICK TO GIVE UP 100 PERCENT OF HIS

23   STOCK.  AT THAT TIME, YOU DIDN'T KNOW THAT ABOUT THE

24   BOOKKEEPER, DID YOU?

25   A.   MY CONVERSATION WITH NAT WAS WITH RESPECT TO 50 PERCENT OF

1     HIS SHARES TO BE PUT INTO ESCROW.

2         BUT TO ANSWER YOUR QUESTION, AT THAT TIME DID I HAVE THAT

3     CONVERSATION WITH NAT HARDWICK ON SUNDAY EVENING?  NO.  I WAS

4     NOT AWARE.

5     Q.   AND THEREAFTER, YOU DID BECOME AWARE THAT FIDELITY AND THE

6     LAW FIRM HIRED ASHA MAURYA FOR SOME TWO MONTHS AFTER

7     MR. HARDWICK GAVE UP HIS INTEREST, RIGHT?

8     A.   I DON'T KNOW WHETHER ASHA MAURYA WAS HIRED OR WHAT THE

9     CIRCUMSTANCES WERE.  I DO KNOW THAT SHE WAS RETAINED IN SOME

10    CAPACITY IN ORDER TO HELP SORT THROUGH THE HUGE MESS THAT THOSE

11    ESCROW ACCOUNTS WERE.

12    Q.   YOU'RE NOT FAMILIAR WITH WHATEVER THE PAYMENT ARRANGEMENT

13    WAS --

14    A.   THAT'S CORRECT.

15    Q.   -- THAT WAS MADE WITH HER.  OKAY.

16        NOW, WERE YOU AWARE THAT SHE HAD EMBEZZLED FROM THE LAW

17    FIRM AROUND $800,000 BY DECEIVING VARIOUS EMPLOYEES OF THE LAW

18    FIRM INTO SIGNING CHECKS AND MAKING PAYMENTS AND OTHER WAYS --

19    THAT SHE HAD STOLEN THAT MUCH MONEY, WHEN FIDELITY HAD,

20    FIDELITY AND THE LAW FIRM HAD HER IN THE BASEMENT DOING WORK?

21    YOU DIDN'T KNOW THAT EITHER, DID YOU?

22             MR. GILFILLAN:  OBJECT TO THE FORM OF THE QUESTION.

23             THE COURT:  I'LL SUSTAIN.  LET ME, LET ME JUST MAKE

24    SURE THAT I UNDERSTAND.

25             DO YOU HAVE ANY KNOWLEDGE OF THE CIRCUMSTANCES OF

1    ASHA MAURYA?  MAYBE I'M MISUNDERSTANDING.

2           HOW MUCH DID YOU KNOW ABOUT HER -- OR THAT MAY BE TOO

3    GENERAL.

4           AT WHAT POINT DID YOU LEARN SPECIFICS ABOUT WHAT WAS

5    GOING ON WITH ASHA MAURYA?

6           THE WITNESS:  YOUR HONOR, I LEARNED SOME WEEKS OR

7    MONTHS LATER THAT SHE WAS CLEARLY INVOLVED.  I KNEW THAT AT THE

8    OUTSET IN TERMS OF ASSISTING TO FACILITATE THIS.  BUT WHAT HER

9    SITUATION WAS WITH PRIOR EMPLOYERS AND THAT SORT OF THING I WAS

10   NOT AWARE OF UNTIL SOMETIME LATER.

11          THE COURT:  OKAY.  SO AT SOME POINT YOU DID BECOME

12   AWARE OF IT.

13          AND I DON'T KNOW.  BECAUSE SOME OF THESE QUESTIONS,

14   MR. GARLAND, ARE CONFUSING ME JUST IN TERMS OF NOT NARROWING

15   DOWN A SPECIFIC TIME.

16          MR. GARLAND:  I UNDERSTAND, YOUR HONOR, AND I'LL TRY

17   TO --

18          THE COURT:  OKAY.  OKAY.  SO I'LL SUSTAIN THAT ONE,

19   BUT I'LL SUSTAIN IT THE WAY THAT IT WAS ASKED.

20          MR. GARLAND:  I'LL TRY TO MAKE IT SIMPLE.

21   BY MR. GARLAND:

22   Q.   IS IT CORRECT THAT AT THE TIME MR. HARDWICK GAVE UP HIS

23   STOCK, YOU DIDN'T KNOW WHETHER OR NOT MS. MAURYA HAD BEEN

24   STEALING FROM THE LAW FIRM?

25   A.   I BELIEVE THAT OUR -- WE HAD BROUGHT IN OUR FORENSIC AUDIT

1  TEAM, AS I'D MENTIONED EARLIER.  AND I BELIEVE THAT ON THE

2  FIRST DAY, THEY IDENTIFIED AT LEAST SOME DISBURSEMENTS TO HER.

3  SO I WAS AWARE OF -- NOT TO THE FULL EXTENT, BUT I WAS AWARE OF

4  SOME.

5  Q.   THAT SHE HAD GOTTEN SOME PERSONAL MONEY?

6  A.   I WAS AWARE THAT THERE WERE SOME DISBURSEMENTS THAT

7  APPEARED TO HAVE GONE DIRECTLY TO HER.

8  Q.   ALL RIGHT.  NOW, IN CONNECTION WITH THIS AGREEMENT WITH

9  LANDCASTLE TITLE, FIDELITY ACQUIRED CERTAIN ADDITIONAL RIGHTS

10  IN ADDITION TO THE STOCK, CORRECT?

11  A.   I DON'T RECALL THE SPECIFIC TERMS OF THE AGREEMENT.

12  Q.   LET ME -- BUT YOU WERE THE PERSON SUPERVISING HOW THE

13  AGENCIES -- LANDCASTLE TITLE WAS AN AGENT, RIGHT?

14  A.   THE -- YES.  THEY WERE AN AGENT.  I WAS NOT DIRECTLY

15  INVOLVED IN RUNNING THAT AGENCY.

16  Q.   DID YOU BECOME AWARE OF WHAT THE SPLIT WAS BETWEEN

17  LANDCASTLE TITLE AND FIDELITY ON THE PREMIUMS THAT WOULD COME

18  INTO LANDCASTLE TITLE?  WERE YOU AWARE OF WHAT THOSE

19  ARRANGEMENTS WERE?

20  A.   AT WHAT POINT IN TIME?

21  Q.   PRIOR TO MR. HARDWICK GIVING UP HIS STOCK.

22  A.   BEFORE THIS ALL SURFACED.  I MEAN, I WAS -- I'M FAMILIAR

23  WITH THE GENERAL TERMS.  I DON'T KNOW THE SPECIFICS, BUT --

24  Q.   SO EXPLAIN IN GENERAL TERMS --

25  A.   OKAY.

1    Q.   -- WHAT YOU UNDERSTOOD ABOUT LANDCASTLE TITLE'S PAYMENTS

2    TO FIDELITY.

3    A.   UNDER THEIR AGENCY AGREEMENT.

4    Q.   UNDER THEIR AGENCY AGREEMENT.

5    A.   OKAY.  SO, AS I MENTIONED, WE HAVE ABOUT 5,000 INDEPENDENT

6    AGENTS, AND THE AGREEMENTS ARE ALL PRETTY SIMILAR.  THERE CAN

7    BE SOME VARIATION IN THE DIVISION OF PREMIUM.

8         SO, AS I'D MENTIONED EARLIER, ON AVERAGE, IT RUNS ABOUT

9    80 PERCENT OF THE PREMIUM GOES TO THE AGENT -- BECAUSE THEY

10   CARRY THE COST OF PERSONNEL, MARKETING, A LOT OF THE SEARCH

11   FEES, THE CLOSING FEES, SO ON AND SO FORTH -- AND THEN

12   20 PERCENT GOES TO THE UNDERWRITER, WHICH WOULD BE US, WHICH IS

13   GENERALLY USED TO COVER CLAIMS AND THAT SORT OF THING.

14   Q.   SO AN AGENCY, IS IT SIMILAR TO SOMEONE WHO HAS AN

15   INSURANCE AGENCY AND SELLS INSURANCE?

16   A.   YES.  IT WOULD BE VERY SIMILAR TO -- IF YOU ARE FAMILIAR

17   WITH STATE FARM, WHERE THEY ARE THE UNDERWRITER, AND THEY MIGHT

18   HAVE AN INDEPENDENT AGENT THAT'S RESPONSIBLE FOR DEVELOPING THE

19   BUSINESS, SERVICING THE CUSTOMER, AND SO ON.

20   Q.   AND YOU USE THE TERM UNDERWRITER.  THAT STANDS FOR

21   FIDELITY?

22   A.   YES.  I'M USING THAT.

23   Q.   IS IT, IN SIMPLE TERMS, THAT YOU INSURE THE TITLE?  IS

24   THAT -- YOU ISSUE AN INSURANCE POLICY.  I'M NOT TALKING ABOUT

25   THE CLOSING PROTECTION LETTER, BUT YOU'RE SELLING AN INSURANCE

1   POLICY, RIGHT?

2   A.   WE -- THE POLICY IS INTENDED TO INSURE THE RIGHTS OF --

3   WHETHER IT'S THE LENDER OR THE PURCHASER, SO ON, IN THAT --

4   REAL PROPERTY IN THAT TRANSACTION.

5   Q.   SO IT IS AN INSURANCE POLICY?

6   A.   IT IS, CORRECT.  WE HAVE CLAIMS RESERVES AND SO ON.

7   Q.   AND YOU GET FEES FOR SENDING A PIECE OF PAPER TO THE

8   LAWYERS WHO ARE CLOSING THE LOAN, SAYING, THINGS GO BAD, AND IF

9   YOU LAWYERS DON'T DO A GOOD JOB, THEN WE WILL MAKE SURE THAT

10   THE PERSON CLOSING THE LOAN GETS WHAT THEY WERE ENTITLED TO.

11   THAT'S THE ESSENCE OF IT, ISN'T IT?

12   A.   ACTUALLY, I THINK YOU'RE REFERRING TO THE CLOSING

13   PROTECTION LETTER.

14   Q.   WELL, I'M REFERRING TO THE TITLE INSURANCE POLICY.

15   A.   NO.  THEY ARE TWO DIFFERENT THINGS.

16   Q.   I AGREE THEY ARE TWO DIFFERENT THINGS.  UNDER YOUR TITLE

17   INSURANCE POLICY THAT YOU GET, ON THE AVERAGE, 20 PERCENT OF

18   THE SPLIT OF, WHAT SERVICE DO YOU PROVIDE AS AN INSURANCE

19   POLICY?

20   A.   WE ESTABLISH THE CLAIMS RESERVE TO BACK UP THAT TITLE

21   INSURANCE POLICY IN THE EVENT OF A CLAIM.  AND THEN WE -- THE

22   OTHER PART OF IT GOES TO COVER OUR OVERHEAD COSTS AND THE

23   SUPPORT WE PROVIDE TO AGENTS.

24   Q.   RIGHT.  SO YOU ISSUE A PIECE OF PAPER -- IS IT REFERRED TO

25   AS AN INSURANCE POLICY? -- AND YOU GET 20 PERCENT OF THE FEE

1    FOR DOING SO?

2    A.    THE PREMIUM, 20 PERCENT OF THE PREMIUM.

3    Q.    AND YOU HAVE -- THERE ARE OTHER INSURANCE COMPANIES THAT

4    COMPETE WITH Y'ALL, CORRECT?

5    A.    YES.

6    Q.    AND ARE YOU THE LARGEST IN AMERICA?

7    A.    YES, WE ARE.

8    Q.    AND SO WHEN YOU -- WHEN THIS CONTRACT WAS ENTERED INTO

9    THAT WE'VE IDENTIFIED HERE, YOU UPPED THE PREMIUM CUT FOR THE

10   UNDERWRITER, DIDN'T YOU?  FOR FIDELITY?

11   A.    AND YOU'RE REFERRING TO THE AGREEMENT THAT FIDELITY

12   ENTERED INTO RELATIVE TO LANDCASTLE TITLE.

13   Q.    AFTER HARDWICK IS OUT, THE NEW DEAL PROVIDED THAT

14   FIDELITY, AS OPPOSED TO GETTING A LESSER AMOUNT, 15 OR

15   20 PERCENT, GOT 40 PERCENT.  THAT WAS ANOTHER BENEFIT THAT

16   FIDELITY GOT --

17             MR. GILFILLAN:  OBJECTION.  IS THERE A QUESTION,

18   JUDGE?

19             MR. GARLAND:  I'M FINISHING THE QUESTION.

20             THE COURT:  I'LL OVERRULE.  GO AHEAD.

21   BY MR. GARLAND:

22   Q.    THAT WAS ANOTHER BENEFIT FIDELITY GOT WHEN IT GOT IN A

23   POSITION TO ACQUIRE 70 PERCENT OF THE TITLE COMPANY, RIGHT?

24   A.    YES.  WE DID REQUEST AN INCREASED SPLIT TO -- SO THAT WE

25   COULD BEGIN TO RECOUP THE 29 AND A HALF MILLION DOLLARS WE HAD

1    PUT IN.

2    Q.   YOU HADN'T PUT IT IN YET.

3    A.   WE HAD ALREADY STARTED FUNDING SIGNIFICANT DOLLARS,

4    MILLIONS OF DOLLARS INTO THAT ACCOUNT BY THAT TIME.

5    Q.   BY THE WAY, HAVE YOU GOT A LIST, A DOCUMENT, A CHART THAT

6    SHOWS YOUR COMPANY PUTTING MONEY INTO ESCROW ACCOUNTS?  DO YOU

7    HAVE ONE OF THOSE?

8    A.   I DO NOT PERSONALLY HAVE IT WITH ME, BUT I'M CONFIDENT OUR

9    ACCOUNTING TEAM COULD PUT THAT TOGETHER FOR YOU OR HAS IT

10   AVAILABLE.

11   Q.   HAVE YOU EVER SEEN IT?

12   A.   NO, I PERSONALLY HAVE NOT SEEN IT.

13   Q.   SO WHEN YOU'RE HERE SAYING WHAT THE COMPANY LOST, YOU'RE

14   TALKING ABOUT WHAT YOU'VE BEEN TOLD; AND YOU HAVEN'T BROUGHT

15   WITH YOU HERE TODAY ANY DOCUMENTARY PROOF THAT THAT HAS

16   OCCURRED, CORRECT?

17   A.   I DID NOT BRING ANY PROOF WITH ME TODAY.

18   Q.   AND AS I BELIEVE YOU SAID, YOU'VE NEVER EVEN SEEN SUCH A

19   DOCUMENT.

20   A.   I HAVE NOT.

21   Q.   OKAY.

22   A.   I WAS PROVIDED THAT INFORMATION BY OUR LEGAL TEAM.

23   Q.   HAVE YOU EVER BEEN PROVIDED A DOCUMENT THAT SHOWS HOW MUCH

24   MONEY OF THE LAW FIRM WAS IN THE ACCOUNT ON THE DAY

25   MR. HARDWICK GAVE UP HIS INTEREST?

1    A.    NO.    I HAVE NOT HAD ACCESS TO LAW FIRM FINANCIALS.

2    Q.    THERE WAS A -- OKAY.    SO I WANT TO ASK YOU, BASED ON YOUR

3    EXPERIENCE, A HYPOTHETICAL QUESTION.

4         YOU HAVE AN ESCROW ACCOUNT AND THERE'S $20 IN IT.    AND $10

5    BELONGS TO A CLIENT, AND $10 BELONGS TO THE LAW FIRM.    AND YOU

6    TAKE OUT $5.

7         WHOSE MONEY DID YOU TAKE OUT?    CAN YOU ANSWER THAT

8    QUESTION?

9              MR. GILFILLAN:    OBJECTION.    FOUNDATION, WITNESS NOT

10   QUALIFIED TO ANSWER THIS, RELEVANCE.

11             MR. GARLAND:    AND I WOULD SUBMIT --

12             THE COURT:    I'LL SUSTAIN ALL OF THOSE.    I SUSTAIN.

13             MR. GARLAND:    ALL RIGHT.

14   BY MR. GARLAND:

15   Q.    WELL -- I'LL MOVE ON TO ANOTHER TOPIC.    THAT'S BEEN

16   SUSTAINED.

17        NOW, DO YOU KNOW WHETHER OR NOT, ON THE BOOKS OF THE

18   COMPANY THAT ACQUIRED LANDCASTLE TITLE, WHETHER OR NOT THE

19   MONEY THAT WENT INTO LANDCASTLE TITLE WAS LISTED AS AN

20   INVESTMENT?

21   A.    ON FIDELITY'S BOOKS?

22   Q.    YES.

23   A.    I DON'T KNOW THAT.

24   Q.    AND YOUR -- BUT YOU HAVE SAID THAT FIDELITY HAS TREATED IT

25   AS A LOSS; IS THAT RIGHT?

1    A.   I DON'T KNOW FROM AN ACCOUNTING PERSPECTIVE HOW IT'S BEEN

2    TREATED.   I KNOW WE VIEW IT AS A LOSS FROM A BUSINESS

3    STANDPOINT.

4    Q.   SO YOU DON'T KNOW WHETHER FIDELITY HAS TREATED IT AS A

5    LOSS ON THE BOOKS AND RECORDS OF THE COMPANY, DO YOU?

6    A.   I DO NOT.

7    Q.   OKAY.  ARE YOU FAMILIAR WITH THE FACT THAT THE COMPANY HAS

8    TO FILE WITH THE SECURITY AND EXCHANGE COMMISSION REVEALING THE

9    NATURE OF ITS BUSINESS TRANSACTIONS?

10   A.   YES.  THEY DON'T HAVE TO FILE EVERY SINGLE TRANSACTION;

11   BUT, YES, THEY DO HAVE TO FILE.

12   Q.   AND YOU KNOW THEY HAD TO FILE IN CONNECTION WITH THIS

13   TRANSACTION, DON'T YOU?

14   A.   I DON'T KNOW OFFHAND.

15   Q.   YOU'VE NEVER READ WHAT THE COMPANY FILED ABOUT THIS

16   TRANSACTION?

17   A.   NO, I HAVE NOT.

18   Q.   ALL RIGHT.  AND YOU DON'T KNOW -- EXCUSE ME.  YOU'VE

19   ANSWERED THE QUESTION.  YOU DON'T KNOW WHETHER OR NOT IT WAS

20   LISTED ON THE BOOKS AS AN INVESTMENT OR NOT.

21        NOW, HOW MUCH DID YOU FUND INTO THESE ESCROW ACCOUNTS IN

22   THE FIRST MONTH?

23   A.   I DON'T KNOW THAT AMOUNT.

24   Q.   IN THE FIRST WEEK?

25   A.   I DON'T KNOW THAT.

1  Q.  DO YOU KNOW MECHANICALLY HOW IT WAS DONE?

2  A.  NO.

3  Q.  DO YOU KNOW WHETHER FROM DAY ONE ENTIRELY NEW ACCOUNTS

4  WERE SET UP TO HANDLE THE CLIENT FUNDS THAT WERE IN THE ACCOUNT

5  OR NOT?

6  A.  I DON'T BELIEVE THAT NEW ACCOUNTS WERE OPENED.  I THINK WE

7  WERE RECONCILING THE OLD ACCOUNTS.  AND IT WAS MY UNDERSTANDING

8  THAT WE WOULD WIRE FUNDS INTO THAT ACCOUNT AT THE END OF EVERY

9  DAY WHEN WE DETERMINED WHAT THE SHORTAGES WERE THAT DAY.

10  Q.  AND DID YOU FIND OUT THAT SOMEBODY HAD BEEN MOVING FUNDS

11  AMONG MANY ACCOUNTS FREQUENTLY, THAT THERE WAS KIND OF A KITE

12  GOING ON?

13      MR. GILFILLAN:  OBJECT TO FORM OF THE QUESTION.

14      MR. GARLAND:  EXCUSE ME.

15      THE COURT:  OKAY.

16  BY MR. GARLAND:

17  Q.  WHAT DID YOU LEARN ABOUT HOW FUNDS WERE BEING MOVED AMONG

18  ACCOUNTS?

19  A.  ALL I RECALL IS THAT WE WERE TOLD THAT -- I WAS TOLD THAT

20  THINGS WERE VERY, VERY COMPLICATED, WHICH WAS THE REASON THAT

21  ASHA MAURYA REMAINED INVOLVED IN HELPING US TO TRY AND

22  DETERMINE WHAT HAD OCCURRED.  BUT I WAS NOT INVOLVED IN THE

23  DAY-TO-DAY AUDIT PROCESS, ACCOUNTING PROCESS, AND RECONCILING

24  PROCESS WITH THE FIRMS.

25  Q.  DO YOU KNOW HOW LONG A PERIOD OF TIME WENT ON OF FUNDING

1    ACCOUNTS?  HOW MANY MONTHS?

2    A.   MY RECOLLECTION IS WE CONTINUED TO FUND UNTIL --

3    APPROXIMATELY THREE OR FOUR MONTHS.

4    Q.   IS IT CORRECT THAT BEFORE YOU MADE THE DECISION -- EXCUSE

5    ME, BEFORE THE COMPANY MADE THE DECISION, YOU PROVIDED THE

6    COMPANY DECISION-MAKERS WITH YOUR ESTIMATE OF WHAT YOU THOUGHT

7    LANDCASTLE TITLE COULD GENERATE IN TERMS OF FEES IF Y'ALL

8    PURCHASED 70 PERCENT, BENEFIT TO FIDELITY?

9    A.   I'M SURE THERE WAS SOME DISCUSSION ALONG THOSE LINES IN

10   CONJUNCTION WITH ART MORRIS AND RANDY SCHNEIDER AND MARK

11   WITTSTADT AS TO WHAT THE POTENTIAL WAS FOR THE FIRM.

12   Q.   WELL, YOU KEPT YOUR NOTES, DIDN'T YOU, WHEN YOU WERE --

13   YOU KEPT NOTES DURING A LOT OF THESE CONVERSATIONS ABOUT WHAT

14   DECISION WOULD BE MADE INSOFAR AS WHETHER TO MAKE SURE NOBODY

15   GOT PAID AND ACQUIRE THE INTEREST.  DID YOU MAKE NOTES OF YOUR

16   THOUGHT PROCESS AS YOU DID THAT?

17   A.   I TOOK NOTES, SOME NOTES DURING THAT -- THE SEVERAL-WEEK

18   PERIOD THAT I WAS WORKING AT THE OFFICE THERE, AT THE

19   LANDCASTLE, MORRIS HARDWICK SCHNEIDER OFFICE.  BUT I DON'T

20   RECALL OFFHAND WHETHER I HAD NOTES ON THAT SPECIFIC TOPIC.

21   Q.   COULD YOU TELL ME WHAT ORI -- RIO MEANS?

22   A.   PARDON ME?

23   Q.   DO YOU KNOW WHAT THE TERM --

24   A.   ROI?

25   Q.   YES.  RETURN ON INVESTMENT.  IS THAT WHAT IT MEANS?

1   A.   YES.  THAT'S MY UNDERSTANDING OF IT.

2   Q.   THAT WOULD BE SOMETHING THAT YOU WOULD HAVE BEEN

3   ANALYZING, CORRECT?

4   A.   I DON'T RECALL SPENDING TIME LOOKING AT ROI.

5   Q.   WHAT CONSIDERATIONS DID YOU CONSIDER IN TERMS OF WHETHER

6   OR NOT TO SALVAGE THE COMPANY?

7   A.   OUR PRIMARY CONCERN WAS WHETHER WE HAD THE POTENTIAL TO

8   MITIGATE OUR LOSSES AND ULTIMATELY RECOUP SOME OF THE MONEY

9   THAT WE WERE PUTTING INTO THE ESCROW ACCOUNTS.

10  Q.   WELL, YOU MADE A -- DID YOU MAKE A CHECKLIST, PRO REASONS

11  TO DO IT AND THE CON REASONS TO DO IT?

12  A.   MR. GARLAND, I RECALL THIS FROM MY DEPOSITION.  AND AS I

13  RECALL FROM THE DOCUMENT THAT YOU HAVE OR -- WHICH ARE MY

14  NOTES, THAT WAS FROM A MEETING THAT I HAD WITH ART MORRIS AND

15  MARK WITTSTADT.  I'M NOT SURE WHETHER RANDY SCHNEIDER WAS

16  PRESENT OR NOT.  AND THEY CERTAINLY WERE ADVOCATING STRONGLY

17  FOR US TO STEP IN AND TRY AND FUND THE ACCOUNTS AND TRY AND

18  KEEP THIS AS A GOING CONCERN.  AND MY RECOLLECTION IS THAT, AS

19  THEY WERE TALKING, I WAS JOTTING DOWN THEIR COMMENTS.  THOSE

20  WERE NOT NECESSARILY MY OWN THOUGHTS.

21  Q.   WELL, DID YOU ESTIMATE OR WRITE DOWN THE ESTIMATED FEES

22  THAT WOULD BE MADE NET IN PREMIUMS BY FIDELITY?

23  A.   I DON'T KNOW.  YOU'D HAVE TO REFRESH MY MEMORY IF IT'S ON

24  THE NOTE.

25           MR. GARLAND:  DO YOU HAVE ANY OBJECTION TO 64?

1    (WHEREUPON, THE ATTORNEYS ARE CONFERRING.)

2    BY MR. GARLAND:

3    Q.    I'M HANDING YOU A DOCUMENT.  SEE IF THIS DOCUMENT

4    REFRESHES YOUR MEMORY.

5    A.    YES.

6    Q.    NOW, UNDER THE PROS, WHAT DID YOU JOT DOWN UNDER THE PRO

7    REASONS TO MAKE THIS PURCHASE OF STOCK IN LANDCASTLE TITLE?

8    A.    I'M HAPPY TO READ THEM, BUT I'D LIKE TO POINT OUT THAT,

9    AGAIN --

10           MR. GILFILLAN:  I OBJECT, YOUR HONOR.  IF THE

11   WITNESS'S MEMORY HAS BEEN REFRESHED, MR. GARLAND SHOULD

12   RETRIEVE THE DOCUMENT AND THEN ASK HIS QUESTION.

13           MR. GARLAND:  YES.

14           THE COURT:  SO YOU'RE GOING TO CHANGE THE WAY THAT

15   YOU'RE DOING IT?

16   BY MR. GARLAND:

17   Q.    DOES THIS DOCUMENT REFRESH YOUR MEMORY?

18   A.    I RECALL SEEING THIS DOCUMENT FROM MY DEPOSITION.  AND AS

19   I MENTIONED, MY RECOLLECTION OF THAT -- OF THOSE NOTES IS THAT

20   I WAS IN A MEETING AND, AGAIN, THE ATTORNEYS THERE WERE

21   ATTEMPTING TO CONVINCE ME THAT THIS WOULD BE A GOOD OPPORTUNITY

22   FOR FIDELITY AND THAT I WAS WRITING DOWN WHAT THEY WERE

23   OFFERING UP AS PROS AND CONS.

24   Q.    BUT DOES THIS DOCUMENT REFRESH YOUR RECOLLECTION AS TO

25   WHAT YOU WROTE DOWN?

1   A.   YES.

2   Q.   NOW, WAS ONE OF THE PROS THE OPPORTUNITY TO ENTER

3   RESIDENTIAL RETAIL MARKETS IN MULTIPLE STATES?

4   A.   THAT IS ONE OF THE THINGS THAT HAD BEEN SUGGESTED TO ME,

5   YES.

6   Q.   AND WAS THAT TRUE?  WAS IT AN OPPORTUNITY TO ENTER THE

7   RESIDENTIAL RETAIL MARKET IN MULTIPLE STATES?

8   A.   NO.  WE WERE ALREADY DOING BUSINESS IN MULTIPLE STATES.

9   WE COULD NOT ENTER INTO THE RESIDENTIAL REAL ESTATE CLOSING

10   PRACTICE HERE IN GEORGIA, WHICH WAS THE PRIMARY OPERATION FOR

11   LANDCASTLE TITLE, BECAUSE THIS IS AN ATTORNEY STATE.  THEY HAVE

12   WHAT THEY CALL UNAUTHORIZED PRACTICE OF LAW RULES, AND A

13   CORPORATION CAN'T PRACTICE LAW.

14   Q.   WELL, IF YOU -- AS THE OWNER OF 70 PERCENT OF LANDCASTLE

15   TITLE, YOU KNEW THAT YOU WOULD GET ALL OF THE BUSINESS OF THE

16   LAW FIRM IN ALL OF THE STATES WHERE IT DID BUSINESS WHEN IT

17   CAME TIME TO DETERMINE WHO WOULD GET TO WRITE THE TITLE

18   INSURANCE.  YOU KNEW THAT?

19   A.   THAT WAS CERTAINLY SOMETHING THAT HAD BEEN SUGGESTED BY

20   THE ATTORNEYS INVOLVED, YES, ON BEHALF OF THE LAW FIRM.

21   Q.   RIGHT.  AND, ULTIMATELY, YOU KNOW, IN YOUR POSITION

22   SUPERVISING ALL THESE AGENCIES, THAT IN THE AGREEMENT WITH

23   FIDELITY, FIDELITY GOT 100 PERCENT OF THE BUSINESS OF WRITING

24   TITLE POLICIES FOR THE LAW FIRM THAT WAS OPERATING IN MULTIPLE

25   STATES.  YOU KNEW THAT WAS PART OF THE CONDITION OF THE

1    AGREEMENT, DIDN'T YOU?

2    A.   I DON'T RECALL THAT BEING A PART OF THE AGREEMENT.  IT MAY

3    HAVE BEEN, BUT I DON'T RECALL.

4    Q.   IF IT WAS, THAT WOULD BE A SUBSTANTIAL BENEFIT THAT

5    FIDELITY WOULD GET FROM BECOMING THE PERSON WHO CONTROLLED

6    LANDCASTLE TITLE, CORRECT?

7    A.   THIS WAS NOT A SIGNIFICANT BUSINESS OPPORTUNITY.  IT WAS

8    ONLY AN OPPORTUNITY TO POTENTIALLY RECOUP ALL OF OUR

9    SIGNIFICANT INVESTMENT INTO THOSE ESCROW ACCOUNTS.  THIS WAS

10   PROBABLY THE WORST DEAL EVER.

11   Q.   I SEE.  NOW, YOU SAY YOU DIDN'T MAKE THE DECISION ON THE

12   DEAL.  HIGHER-UPS MADE THE DECISION; IS THAT RIGHT?

13   A.   I WAS INVOLVED IN THE DISCUSSIONS, ALONG WITH SOME OF OUR

14   OTHER SENIOR EXECUTIVES, YES.

15   Q.   AND WHO GOT INVOLVED?  WHO WERE THOSE SENIOR EXECUTIVES

16   WHO GOT INVOLVED?

17   A.   THERE WERE QUITE A FEW PEOPLE INVOLVED.  BUT CERTAINLY

18   RANDY QUIRK, WHO WAS OUR CHIEF EXECUTIVE OFFICER, WAS INVOLVED.

19   TONY PARK, WHO WAS OUR CHIEF FINANCIAL OFFICER, WAS INVOLVED.

20   PETER SADOWSKI, OUR CHIEF LEGAL OFFICER; MIKE GRAVELLE, OUR

21   GENERAL COUNSEL; AND ANY NUMBER OF OTHER PEOPLE WERE INVOLVED.

22   Q.   WHO OWNS FIDELITY?

23   A.   IT'S A PUBLICLY TRADED COMPANY.  IT'S OWNED BY ITS

24   SHAREHOLDERS.

25   Q.   AND WHO IS THE MAJORITY SHAREHOLDER?

1    A.   I DON'T KNOW WHO THE FIRM IS THAT HOLDS THE MAJORITY

2    STAKE.  WE'RE HELD BY MANY, MANY COMPANIES.

3    Q.   DID MR. FOLEY GET INVOLVED --

4         MR. GILFILLAN:  OBJECTION.  RELEVANCE.

5    BY MR. GARLAND:

6    Q.   -- IN THE DISCUSSIONS ABOUT THE BUSINESS?

7         THE COURT:  I'LL SUSTAIN AT THIS POINT.  I'LL

8    SUSTAIN.

9         MR. GARLAND:  OKAY.

10   BY MR. GARLAND:

11   Q.   SO OF THE PEOPLE THAT WERE ALL BEING CONSULTED, THEY CAME

12   UP WITH THE TERMS OF -- WELL, WHO DECIDED ON THE FINAL TERMS?

13   YOU SAID YOU DIDN'T DO THAT BUT WERE PART OF THE DISCUSSIONS.

14        WHO MADE THE FINAL DECISIONS ON THE TERMS?

15   A.   I'M NOT SURE WHO ULTIMATELY MADE THE FINAL DECISIONS, BUT

16   I THINK CERTAINLY MIKE GRAVELLE WAS INSTRUMENTAL IN HELPING TO

17   DEVELOP THE AGREEMENT.  AS TO WHO ULTIMATELY SAID, YES, THIS IS

18   EXACTLY WHAT WE'LL DO, I DON'T KNOW.

19        THE COURT:  I'M SORRY.  WHAT WAS THE SPELLING OF THE

20   LAST NAME?  RAVELLE?

21        THE WITNESS:  GRAVELLE.  G-R-A-V-E-L-L-E.  HE'S OUR

22   GENERAL COUNSEL AND OUR CORPORATE SECRETARY.

23   BY MR. GARLAND:

24   Q.   BEFORE THIS EVENT CAME UP, AT THE TIME YOU WERE TALKING TO

25   MR. HARDWICK ABOUT POTENTIALLY RESTRUCTURING HIS LOAN, YOU WERE

1   AWARE, IN YOUR POSITION, THAT FIDELITY DID NOT HAVE ALL OF THE

2   TITLE BUSINESS WITH THE LAW FIRM, CORRECT?

3   A.   THAT'S CORRECT.

4   Q.   AND DID YOU SEE ANY FIGURES OR FACTS BACK THEN AS JUST TO

5   WHAT PERCENTAGE OF THE BUSINESS, PRIOR TO MR. HARDWICK LEAVING,

6   THAT FIDELITY WAS ABLE TO ISSUE INSURANCE POLICIES AS TO THE

7   PERCENTAGE OF THE BUSINESS THEY HAD?

8   A.   NO.  I ONLY DETERMINED THAT AFTER WE STEPPED IN TO FUND

9   THE LOSSES.

10   Q.   WELL, WHAT DID YOU DETERMINE?  WHAT PERCENTAGE, PRIOR TO

11   MR. HARDWICK LEAVING, DID FIDELITY HAVE OF THE BUSINESS OF THE

12   LAW FIRM?

13   A.   I DON'T KNOW THAT WE KNEW THAT EXACT PERCENTAGE UNTIL

14   LATER, BECAUSE WE HAD TO DETERMINE THAT BASED ON THE VOLUME OF

15   POLICIES THAT WERE ISSUED AND WHICH UNDERWRITERS.  BUT I DID

16   DETERMINE IT LATER, APPROXIMATELY.

17   Q.   WHAT WAS THAT?

18   A.   IT WAS APPROXIMATELY 60 TO 65 PERCENT CAME TO ONE OF OUR

19   UNDERWRITERS RATHER THAN A COMPETITOR.

20   Q.   NOW, Y'ALL WOULD ISSUE THESE INSURANCE POLICIES UNDER

21   DIFFERENT UNDERWRITERS THAT FIDELITY OWNED?

22   A.   THAT'S CORRECT.  OUR COMPANY HAS ACQUIRED DIFFERENT

23   UNDERWRITERS THROUGH THE YEARS, AND SO WE HAVE SEVERAL

24   UNDERWRITERS.  AND THEY ARE SEPARATE AND DISTINCT ENTITIES WITH

25   SEPARATE CLAIMS FOR SERVICE.

1  Q.  SO IF A FEE COMES TO THE TITLE COMPANY, LANDCASTLE TITLE,

2  AFTER Y'ALL MADE YOUR ACQUISITION, AND LANDCASTLE TITLE TAKES

3  IN THE FEE, HOW IS THAT --

4  A.  THE PREMIUMS?

5  Q.  PREMIUMS, YES.

6  A.  OKAY.

7  Q.  EXPLAIN HOW THE PREMIUMS GET PAID TO THE TITLE COMPANY.

8         MR. GILFILLAN:  OBJECTION.  RELEVANCE.

9         MR. GARLAND:  IT'S RELEVANT AS TO WHAT WENT ON HERE.

10        MR. GILFILLAN:  CHECK, WIRE?  WHY IS THAT RELEVANT,

11  YOUR HONOR?

12        MR. GARLAND:  NO, NOT A CHECK OR WIRE --

13        THE COURT:  WHAT IS THE RELEVANCE HERE?

14        MR. GARLAND:  THE RELEVANCE HERE RELATES TO THIS

15  TRANSACTION AND WHAT WAS --

16        THE COURT:  GO AHEAD.  OVERRULE.  ASK YOUR QUESTION.

17  GO AHEAD AND ASK YOUR QUESTION.

18  BY MR. GARLAND:

19  Q.  AND I DIDN'T MEAN WHETHER IT WAS PAID BY CHECK OR CASH OR

20  SOMETHING.

21     HOW DOES THE HOMEOWNER PAY TO THE TITLE COMPANY -- WHAT'S

22  THE MECHANICS OF HOW THAT HAPPENS?

23  A.  OKAY.  SO THE MECHANICS HERE IN GEORGIA IS THAT THE LAW

24  FIRM WOULD ACTUALLY CLOSE THE TRANSACTION.  SO THEY WOULD

25  HANDLE THE CLOSING OF THE REAL ESTATE TRANSACTION, WHETHER IT'S

1   A LOAN OR A PURCHASE OR BOTH. AND THE PREMIUM WOULD BE PAID AT

2   THE CLOSING. SO IT'S ON THE CLOSING STATEMENT.

3      AND THEN, ULTIMATELY, THE TITLE AGENT SENDS THE

4   UNDERWRITER THEIR PORTION OF THE PREMIUM. SO 100 PERCENT GOES

5   TO THE TITLE AGENCY INITIALLY, AND THEN THE TITLE AGENCY, IN

6   TURN, PAYS THE UNDERWRITER THEIR PORTION OF THE PREMIUM.

7   Q. WE'VE BEEN TALKING ABOUT, TYPICALLY, IT WAS 20 PERCENT

8   DIVISION BETWEEN THE INSURANCE COMPANY UNDERWRITER AND THE

9   TITLE COMPANY; IS THAT CORRECT?

10   A. THAT'S CORRECT.

11   Q. NOW, WHEN FIDELITY ACQUIRED 70 PERCENT OF LANDCASTLE

12   TITLE, WHEN THAT PREMIUM CAME IN, FIDELITY NOW GOT 70 PERCENT

13   OF THAT PREMIUM AS AN OWNER, CORRECT?

14   A. ACTUALLY, IF I RECALL CORRECTLY, WHAT WOULD HAVE HAPPENED

15   IS 20 PERCENT WOULD HAVE COME OFF THE TOP TO BE PAID TO THE

16   UNDERWRITER. AND THEN THE BALANCE, THE 80 PERCENT, WOULD HAVE

17   BEEN -- BASED ON THE OWNERSHIP, WOULD HAVE BEEN DIVIDED.

18   Q. SO IN THE FIRST CONTRACT -- SO FIDELITY, IF $100 CAME

19   IN -- AND FIDELITY WAS THE INSURER THAT ISSUED THIS PAPER

20   SAYING THAT -- PICK UP A PROBLEM IF IT OCCURRED -- 20 PERCENT

21   OF THAT HUNDRED DOLLARS WOULD GO OVER TO FIDELITY. AND THEN

22   WHEN FIDELITY BECAME -- THEN THAT WOULD LEAVE $80, RIGHT?

23   A. CORRECT.

24   Q. OKAY. AND OUT OF THE $80, AFTER FIDELITY BECAME

25   70 PERCENT OWNER, FIDELITY GOT 70 PERCENT OF THE $80, SOMETHING

1    LIKE 65 OR SOMETHING.  DO YOU KNOW WHAT 80 PERCENT OF --

2    A.   I'LL DO THE MATH LATER, BUT ESSENTIALLY YOU'RE CORRECT.

3    OBVIOUSLY, AS THEN A PART OWNER OF LANDCASTLE TITLE, THEN WE

4    WOULD BE CARRYING 70 PERCENT OF THE EXPENSES ASSOCIATED WITH

5    RUNNING THAT FIRM AS WELL.

6    Q.   BUT BEFORE MR. HARDWICK GAVE UP HIS OWNERSHIP, YOU KNEW

7    THAT THE LAW FIRM OWNED THE TITLE COMPANY.  YOU KNEW THAT,

8    DIDN'T YOU?

9    A.   YES.

10   Q.   OKAY.  AND WHEN THAT HUNDRED DOLLARS CAME IN BEFORE

11   FIDELITY ACQUIRED ITS 70 PERCENT, THE LAW FIRM GOT $80 IN OUR

12   EXAMPLE, DIDN'T IT?

13   A.   YES.  AND THEN THEY CARRIED ALL OF THE EXPENSES, YES.

14              THE COURT:  ALL RIGHT.  I'M SORRY.

15              LADIES AND GENTLEMEN, I'M GOING TO TRY TO PUSH US A

16   LITTLE LATER TONIGHT SINCE WE CAN'T GO LATE ON MONDAYS AND

17   WEDNESDAY AND FRIDAYS.  SO I'M GOING TO ASK YOU TO TAKE ONE

18   MORE QUICK BREAK, AND THEN WE ARE GOING TO COME BACK AND

19   HOPEFULLY BE ABLE TO WRAP THIS WITNESS UP BEFORE WE GO.

20              BUT PLAN TO STAY PERHAPS UNTIL 5:30, IF IT TAKES THAT

21   LONG.

22              ALL RIGHT.  THANK YOU SO MUCH.  TAKE A QUICK BREAK.

23              (WHEREUPON, THE JURY RETIRED FROM THE COURTROOM, AND

24   A BRIEF RECESS WAS HAD FROM 4:17 P.M. TO 4:25 P.M.)

25              THE COURT:  ALL RIGHT.  BEFORE WE BRING THE JURY IN,

1   LET ME JUST TRY TO GET A STATUS OF WHERE WE ARE -- NOT WITH

2   THIS WITNESS, BUT IN THE TRIAL.

3          BASED ON WHAT WAS REPRESENTED TO ME AT SOME POINT

4   EARLIER, I HAVE THREE REMAINING NAMES FOR POSSIBLE WITNESSES

5   THAT THE GOVERNMENT MIGHT CALL.  THOSE WOULD BE NUMBERS 43, 44,

6   AND 45 ON YOUR ORIGINAL LIST.

7          HOW CLOSE OR FAR OFF ARE WE FROM THAT?

8          MR. GILFILLAN:  OUR INTENTION, YOUR HONOR, IS THAT --

9          THE COURT:  MR. PHILLIPS IS SHAKING HIS HEAD NO, NO,

10  NO.  LIKE, NOT FAR OFF, OR WAY OFF?

11         MR. PHILLIPS:  WE DON'T PLAN ON CALLING THEM.

12         THE COURT:  OKAY.  ALL RIGHT.  AND, AGAIN, I'M

13  JUST -- I'M TRYING TO GET AN IDEA FOR SOMETHING TO GIVE TO THE

14  JURORS JUST TO GIVE THEM SOME IDEA.

15         SO WE'RE PRETTY CLOSE AS FAR AS THE GOVERNMENT'S

16  CONCERNED.

17         MR. PHILLIPS:  THIS IS OUR LAST WITNESS, YOUR HONOR.

18         THE COURT:  EXTREMELY CLOSE.  GOTCHA.

19         ALL RIGHT.  MR. GARLAND, WHERE IS THAT GOING TO LEAVE

20  YOU?  AS MR. GILFILLAN POINTED OUT AT SOME POINT OR ANOTHER,

21  YOU DO HAVE A WITNESS WHO'S HERE.  WE KNOW THAT HE'S ALREADY

22  AVAILABLE.

23         MR. GARLAND:  I HAVE A -- NOT PUTTING HIM UP NOW.  I

24  HAVE A WITNESS I BELIEVE HAS ARRIVED.  RELATIVELY SHORT

25  WITNESS.

1    THE COURT:  THAT WOULD BE READY TO START AS SOON AS

2  TOMORROW?

3    MR. GARLAND:  OH, YES.  WE'LL BE READY TO GO

4  TOMORROW.

5    THE COURT:  OKAY.  ALL RIGHT.

6    MR. GARLAND:  I MEAN, I HAVE A NUMBER OF WITNESSES.

7    THE COURT:  WILL YOU BE ABLE TO FILL TOMORROW WITH

8  YOUR WITNESSES?

9    MR. GARLAND:  I BELIEVE I WILL.

10    THE COURT:  OKAY.

11    MR. GARLAND:  YOU KNOW, I'M GETTING THE TYPICAL KIND

12  OF THINGS PEOPLE SAY -- I CAN'T COME THEN -- AND I'M TELLING

13  THEM THEY GOT TO COME.  THEY'VE ALL BEEN SUBPOENAED.  THEY'VE

14  ALL BEEN PAID.

15    THE COURT:  OKAY.  ALL RIGHT.

16    MR. GARLAND:  THERE IS ONE THING --

17    THE COURT:  YES.

18    MR. GARLAND:  -- I'D LIKE TO PUT ON THE RECORD.  THAT

19  IS THAT IT WOULD BE MY INTENTION -- OR I WOULD HAVE ATTEMPTED

20  TO CALL ASHA MAURYA AS AN ADVERSE WITNESS AND ASK FOR THE RIGHT

21  OF CROSS-EXAMINATION.

22    THE COURT:  TREAT HER AS A HOSTILE WITNESS, PRETTY

23  MUCH?  OKAY.

24    MR. GARLAND:  YES.  I'M ASKING TO CALL HER AS A

25  HOSTILE WITNESS.  I CALLED HER LAWYER AND ASKED HIM, IF I CALL

1       HER, WILL SHE TESTIFY?  AND HE SAYS SHE WOULD TAKE THE FIFTH.

2                  THE COURT:  THIS IS MR. PATE.

3                  MR. GARLAND:  MS. MAURYA.

4                  THE COURT:  YES.  BUT WHO IS HER ATTORNEY?  PAGE

5       PATE?

6                  MR. GARLAND:  PAGE PATE.

7                  THE COURT:  OKAY.

8                  MR. GARLAND:  PAGE PATE.  WE SENT HIM A TEXT, TOLD

9       HIM WHAT --

10                 THE COURT:  AND JUST FOR THE RECORD, THE WITNESS,

11      MS. MEINHARDT, IS STILL IN HERE.  I ASSUME THAT THAT'S OKAY

12      WITH THIS DISCUSSION.

13                 MR. GARLAND:  THAT'S NOT A PROBLEM.

14                 THE COURT:  OKAY.  GO AHEAD.

15                 MR. GARLAND:  AND HE SENT BACK, YES, SHE WOULD.  SO,

16      THEREFORE, AS I UNDERSTAND THE LAW, IT WOULD BE IMPROPER FOR ME

17      TO CALL HER --

18                 THE COURT:  JUST --

19                 MR. GARLAND:  -- TO THE STAND.  YOUR HONOR WOULDN'T

20      ALLOW THAT AND I WOULDN'T TRY TO DO IT.  BUT I WANTED TO PUT

21      THAT ON THE RECORD.  THAT OCCURRED YESTERDAY AFTERNOON.

22                 THE COURT:  OKAY.  ALL RIGHT.  LET'S GET THE JURORS.

23                 MR. PHILLIPS:  WE DO HAVE ONE MORE THING.  AFTER THIS

24      WITNESS, WE HAVE A STIPULATION THAT WE NEED TO PUT IN.

25                 THE COURT:  OKAY.  IS IT IN WRITTEN FORM?

1    MR. PHILLIPS:  YES.

2    THE COURT:  OKAY.

3    MR. GILFILLAN:  I ACTUALLY DON'T WANT TO READ IT.

4  CAN WE JUST DESCRIBE IT?  I'LL JUST DESCRIBE IT AND PUT IT IN.

5  BECAUSE IT'S THE FDIC CERTIFICATE.  AND THEN IT SAYS CERTAIN

6  WIRES TRAVEL FROM THE NORTHERN DISTRICT OF GEORGIA TO OTHER

7  STATES ON OR ABOUT THE DATES DESCRIBED.

8    THE COURT:  NOW, WHEN YOU SAY DESCRIBE IT, DO YOU

9  MEAN IN THE PRESENCE OF THE JURY, JUST GIVE A SUMMARY OF IT?

10    MR. GILFILLAN:  YES, YOUR HONOR, BECAUSE IT -- WE'RE

11  TENDERING IT AS AN EXHIBIT.

12    THE COURT:  ALL RIGHT.

13    MR. GARLAND:  NO OBJECTION.

14    THE COURT:  ALL RIGHT.  THAT'S FINE.

15    MS. NOVAY:  HOLD ON.  I THINK THAT THOSE ARE MY

16  WITNESSES.  MAYBE I CAN TALK TO MR. GILFILLAN JUST TO GET AN

17  IDEA OF WHAT HE'S GOING TO SAY, BUT I THINK WE'RE PROBABLY

18  OKAY.  WE'LL JUST MEET AND TALK ABOUT IT BEFORE HE DOES IT.

19  THAT WOULD BE MY REQUEST.  BECAUSE I DON'T KNOW WHAT IT MEANS

20  TO DESCRIBE IT.  AND I THOUGHT IT ALREADY CAME IN WITH THE LAST

21  WITNESS.

22    THE COURT:  ALL RIGHT.  DO YOU ALL NEED A MOMENT NOW?

23  BECAUSE IF IT'S -- I DON'T KNOW HOW LONG -- HOW MUCH LONGER

24  MS. MEINHARDT WILL BE ON THE STAND, BUT I'D RATHER NOT SEND

25  THEM OUT JUST FOR YOU ALL TO HAVE THAT DISCUSSION THEN.

1       SO DO YOU ALL WANT TO TALK ABOUT THAT FOR A MINUTE

2   NOW?

3       MR. GILFILLAN:  WELL, LET ME -- I WILL JUST DO IT

4   REAL QUICKLY.

5       THE COURT:  IF IT CAN BE ACCOMPLISHED, LET'S TRY TO.

6       MS. NOVAY:  WE'RE GOOD, JUDGE.

7       THE COURT:  ALL RIGHT.  LET'S BRING THEM IN.  THANK

8   YOU.

9       (WHEREUPON, THE JURY RETURNED TO OPEN COURT AT

10  4:30 P.M., AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD.)

11      THE COURT:  ALL RIGHT.  THE JURY IS SEATED.  EVERYONE

12  ELSE MAY BE SEATED.

13      AND YOU MAY CONTINUE, MR. GARLAND.

14  BY MR. GARLAND:

15  Q.   SO I THINK WE LEFT OFF WITH ME HAVING THAT HUNDRED-DOLLAR

16  HYPOTHETICAL ABOUT HOW THE MONEY WAS CUT UP BEFORE LANDCASTLE

17  TITLE ACQUIRED IT.

18      NOW, LANDCASTLE TITLE ALSO ACQUIRED THE RIGHT AS PART OF

19  THAT TRANSACTION, DID THEY NOT, TO HAVE THE RIGHT TO BRING ALL

20  LAWSUITS AGAINST ANYONE WHO HAD DONE SOMETHING WRONG TO THE LAW

21  FIRM, RIGHT?  YOU KNEW THAT?

22  A.   I DON'T KNOW.

23  Q.   YOU DON'T KNOW THAT.  HAVE YOU BEEN INVOLVED -- OR WERE

24  YOU INVOLVED IN DECISIONS OF WHETHER LANDCASTLE TITLE OR

25  FIDELITY WOULD BRING LAWSUITS AGAINST OTHER PEOPLE?

1    A.   NO.  I WAS NOT INVOLVED IN THAT.

2    Q.   ALL RIGHT.  DO YOU KNOW WHEN LANDCASTLE TITLE ACQUIRED ITS

3    MEMBERSHIP -- I MEAN, FIDELITY ACQUIRED ITS MEMBERSHIP INTEREST

4    IN LANDCASTLE TITLE?  WAS IT A WEEK AFTER MR. HARDWICK LEFT

5    OR --

6    A.   MY RECOLLECTION IS IT WAS SOMETIME PROBABLY APPROXIMATELY

7    A WEEK AFTER HE LEFT, SOMEWHERE IN THAT TIME FRAME.  FIVE TO

8    SEVEN DAYS, I THINK.

9    Q.   ALL RIGHT.  AND DID YOU SEE THE DOCUMENT INVOLVED IN THAT

10   ACQUISITION OR EXAMINE ITS TERMS?

11   A.   NO, I DID NOT.

12   Q.   OKAY.  I WANT TO SHOW YOU WHAT'S BEEN MARKED DEFENDANT'S

13   EXHIBIT 672 AND ASK YOU WHETHER OR NOT YOU'VE SEEN THAT

14   DOCUMENT TITLED, LIMITED LIABILITY COMPANY MEMBERSHIP INTEREST

15   CONTRIBUTION AGREEMENT, LANDCASTLE TITLE, AUGUST 25TH, 2014.

16   HAVE YOU SEEN THAT DOCUMENT BEFORE?

17   A.   I DON'T RECALL SEEING THIS BEFORE.

18   Q.   WERE YOU MADE AWARE AFTER THIS TRANSACTION THAT YOU WOULD

19   CONTINUE TO BE OVER THAT AGENCY, THAT LANDCASTLE TITLE WOULD

20   OPERATE AS AN AGENT OF FIDELITY?

21   A.   I WAS ULTIMATELY RESPONSIBLE FOR ALL OF OUR INDEPENDENT

22   AGENTS.  SO THIS WOULD HAVE BEEN PART OF MY RESPONSIBILITIES,

23   YES.

24   Q.   ALL RIGHT.  AND WERE YOU ADVISED IN CONNECTION WITH THAT

25   RESPONSIBILITY WHAT RIGHTS FIDELITY HAD INSOFAR AS HAVING THE

1    LAW FIRM DO ITS UNDERWRITING SERVICES WITH LANDCASTLE TITLE?

2    A.    YOUR QUESTION IS DID I KNOW WHAT OBLIGATIONS THE LAW FIRM

3    HAD TO UNDERWRITE WITH LANDCASTLE?  IS THAT CORRECT?

4    Q.    MAY I REPHRASE THE QUESTION.

5        DID YOU KNOW THAT, UNDER THE AGREEMENT, THAT LANDCASTLE

6    TITLE WAS TO BE THE PREFERRED PROVIDER OF ALL TITLE

7    UNDERWRITING SERVICES FOR THE COMPANY?  DID YOU KNOW THAT?

8    A.    FOR THE LAW FIRM?

9    Q.    YES.

10   A.    YES, I THINK I WAS MADE AWARE OF THAT.

11   Q.    AND YOU KNEW ALSO THAT THE COMPANY WOULD BE THE EXCLUSIVE

12   PROVIDER OF TITLE SERVICES FOR THE LAW FIRM, DID YOU NOT?

13   A.    I RECALL BEING TOLD THAT, YES.

14   Q.    AND THAT MHS WILL CAUSE THE LAW FIRM TO USE THE COMPANY

15   FOR ALL SUCH TITLE SERVICES REQUIREMENTS OF THE LAW FIRM.  YOU

16   KNEW THAT, DIDN'T YOU?

17   A.    I DON'T KNOW THE SPECIFIC LANGUAGE, BUT I WAS AWARE THAT

18   THAT WAS THE EXPECTATION, YES.

19   Q.    AND DID YOU KNOW THAT, AS PART OF THE AGREEMENT, WHAT

20   WOULD HAPPEN TO A COMPANY CALLED HOLABIRD?

21   A.    NO.

22   Q.    OKAY.  DID YOU KNOW THAT IT WAS AGREED THAT FIDELITY WOULD

23   RECEIVE A CERTAIN AMOUNT OF PAYMENTS EACH MONTH FROM THE TITLE

24   COMPANY AND THE LAW FIRM?

25   A.    ARE YOU SPEAKING OF THE MANAGEMENT FEE THAT WE WERE TO BE

1  PAID?

2  Q.  NO.  BUT WHILE WE'RE ON THAT SUBJECT, THAT WAS 25,000 A

3  MONTH; IS THAT RIGHT?

4  A.  THAT WAS IN THE ORIGINAL AGREEMENT, YES.  THAT WAS CHANGED

5  SUBSEQUENTLY; BUT, YES.

6  Q.  RIGHT.  ORIGINALLY, THE CHANGE IN THE DIVISION OF WHAT I

7  REFER TO AS THE HUNDRED-DOLLAR EXAMPLE OCCURRED, AND A $25,000

8  FEE WAS GOING TO BE PAID FOR HELPING MANAGE THE LAW FIRM'S

9  ACCOUNTING AND THE BUSINESS OF THE TITLE COMPANY -- OR JUST THE

10  LAW FIRM, 25 TO THE LAW FIRM?

11  A.  I DON'T RECALL WHO WAS RESPONSIBLE, WHICH ENTITY WAS

12  RESPONSIBLE.  BUT THE 25,000 WAS INITIALLY SET TO COVER -- WE

13  HAD AN ENTIRE ACCOUNTING TEAM WORKING TO RECONCILE THE

14  ACCOUNTS, AND SO THAT WAS INTENDED TO COVER THE EXPENSES.

15      BUT, AGAIN, THAT WAS LATER ADJUSTED DOWN BECAUSE IT WASN'T

16  BEING PAID ANYWAY.

17  Q.  SO THERE WAS A SEPARATE SERVICE AGREEMENT, WAS THERE NOT,

18  WHAT WAS CALLED A SERVICES AGREEMENT, THAT SPELLED OUT HOW THE

19  MANAGEMENT OF THE DAY-TO-DAY OPERATIONS OF THE RETAIL DIVISION

20  WOULD BE DONE UNDER THE MANAGEMENT OF LANDCASTLE ACQUISITION

21  CORPORATION.

22      ARE YOU FAMILIAR THAT THERE WAS SUCH AN AGREEMENT?

23  A.  I'M NOT SURE IF WE'RE REFERRING TO THE SAME AGREEMENT THAT

24  I JUST TALKED ABOUT OR SOMETHING DIFFERENT.

25  Q.  I'D LIKE TO SHOW YOU DEFENDANT'S EXHIBIT 666, MANAGEMENT

1  SERVICE AGREEMENT, AND ASK WHETHER YOU RECOGNIZE THAT DOCUMENT

2  AS ONE THAT YOU HAD SUPERVISION -- THAT WAS IN THE AGENCY OVER

3  WHICH YOU HAD SUPERVISION.

4  A.   I THINK THIS IS THE SAME AGREEMENT THAT I WAS JUST

5  SPEAKING OF.

6  Q.   OKAY.  AND LOOK THROUGH THAT.

7  A.   OKAY.  DO I NEED TO READ IT --

8  Q.   NO.

9  A.   -- IN ITS ENTIRETY OR JUST THE HIGHLIGHTED PORTION?

10 Q.   NO.

11      SO WAS THERE -- DO YOU KNOW WHETHER IN THE ORIGINAL

12 AGREEMENT THERE WAS A PROVISION FOR A MINIMUM AMOUNT OF

13 EARNINGS TO COME FROM THE TITLE COMPANY TO FIDELITY OR FROM THE

14 LAW FIRM BY REFERRAL OF CLIENTS TO THE TITLE -- TO LANDCASTLE

15 TITLE?  DO YOU KNOW WHETHER THERE WAS A MINIMUM FEE?

16 A.   I DON'T RECALL ANY MINIMUMS.

17 Q.   NOW, THERE'S A COMPANY CALLED LANDCASTLE TITLE ACQUISITION

18 CORPORATION, ISN'T THERE?

19 A.   I SAW THAT REFERRED TO IN ONE OF THE AGREEMENTS.

20 Q.   RIGHT.  DO YOU KNOW WHEN IT WAS FORMED?

21 A.   NO, I DON'T.

22 Q.   OKAY.  DO YOU KNOW WHETHER IT WAS FORMED PRIOR TO

23 MR. HARDWICK -- DO YOU KNOW WHETHER IT WAS FORMED PRIOR TO

24 JULY OF 2014?

25           MR. GILFILLAN:  YOUR HONOR, I OBJECT UNDER RULE 403,

1    WHICH SPECIFICALLY REFERS TO UNDUE DELAY AND WASTING TIME.

2              MR. GARLAND:  WELL, I'LL CONNECT THIS UP.

3              THE COURT:  I'LL OVERRULE.

4    BY MR. GARLAND:

5    Q.   WHEN YOU MET WITH MR. HARDWICK THE FIRST TIME TO

6    RENEGOTIATE THE LOAN THAT HE HAD WITH FORTUNA, DID YOU DISCUSS

7    GETTING RID OF THAT LOAN BY ACQUIRING 20 PERCENT OF LANDCASTLE

8    TITLE?

9    A.   YEAH.  I MENTIONED EARLIER THAT DURING OUR LUNCH, I DID

10   SUGGEST THAT ONE OPTION, SINCE THE LOAN WAS SERIOUSLY IN

11   DEFAULT, WAS FOR FIDELITY TO TAKE AN EQUITY STAKE IN LANDCASTLE

12   TITLE THAT WOULD BE EQUIVALENT TO THE OUTSTANDING BALANCE, OR

13   1.3 MILLION APPROXIMATELY, AND THAT WE WOULD NOW HAVE EQUITY

14   RATHER THAN DEBT.

15   Q.   AND WHY DID YOU WANT EQUITY IN LANDCASTLE TITLE?

16   A.   FOR A COUPLE OF REASONS.  ONE WAS, AS I MENTIONED, THE

17   LOAN WAS SERIOUSLY IN DEFAULT.  AND WE WERE GETTING READY TO

18   HAVE TO CHARGE IT OFF ON OUR BOOKS, WRITE IT OFF, AND I DID NOT

19   WANT US TO HAVE TO DO THAT.  SO IF WE TOOK AN EQUITY STAKE,

20   THAT WOULD RESOLVE THAT ISSUE.  THE LOAN WOULD GO AWAY, AND WE

21   WOULD HAVE AN ASSET RATHER THAN DEBT THAT WAS NOT BEING PAID.

22   Q.   AND YOU WANTED TO HAVE A STOCK OWNERSHIP IN THE TITLE

23   COMPANY WHEN YOU MADE THAT PROPOSAL, DIDN'T YOU?

24   A.   IF THAT WAS OF INTEREST TO NAT HARDWICK IN ORDER TO MAKE

25   THE LOAN GO AWAY, YES, THAT WAS SOMETHING WE WOULD CONSIDER.

1    Q.   ONE OF THE REASONS WAS IT WOULD CAUSE THEM -- YOU'D HAVE A

2    CLOSER CLIENT RELATIONSHIP, CORRECT?

3    A.   I DON'T KNOW WHETHER IT WOULD HAVE RESULTED IN THAT.

4    CERTAINLY, WHEN YOU HAVE A PARTNERSHIP WITH SOMEONE, YOU HOPE

5    THAT THE RELATIONSHIP DEVELOPS FURTHER.

6    Q.   RIGHT.  AND IT WOULD HAVE ALLOWED FIDELITY TO GET

7    20 PERCENT OF THE AMOUNT OF MONEY THAT THE LAW FIRM WAS GETTING

8    FROM THE TITLE FEES HAD YOU DONE THAT, RIGHT?

9    A.   ACTUALLY, I DON'T RECALL A SPECIFIC DISCUSSION REGARDING

10   20 PERCENT.  BECAUSE, NORMALLY, WHAT WE WOULD DO IF WE WERE

11   ACQUIRING AN INTEREST IN A COMPANY, WHETHER IT'S A TITLE AGENCY

12   OR ANY OTHER COMPANY, WE WOULD DO A VALUATION ON THAT COMPANY

13   TO DETERMINE WHAT THE COMPANY WAS WORTH.  AND THEN IF WE WERE

14   PUTTING IN $1.3 MILLION, THE PERCENTAGE WOULD BE BASED ON THAT.

15         IN THIS CASE, WE HADN'T DONE A VALUATION.  AND IT WAS A

16   MOOT POINT BECAUSE IT WAS NOT SOMETHING THAT NAT WAS INTERESTED

17   IN.  HE THOUGHT HIS COMPANY WAS VALUED TOO HIGH.

18   Q.   HOW MANY INTEREST IN TITLE COMPANIES DOES FIDELITY OWN?

19   A.   MANY.

20   Q.   WELL, WE'VE BEEN TALKING IN -- 5,000 AGENCIES THAT THEY

21   HAVE RELATIONSHIPS WITH.  HOW MANY TITLE COMPANIES -- I MEAN,

22   HUNDREDS?  THOUSANDS?

23   A.   ACTUALLY, PROBABLY -- I SHOULD CLARIFY.  IN TERMS OF JUST

24   AN EQUITY INTEREST, IT WOULD BE A RELATIVELY SMALL NUMBER.  I

25   WOULD SAY FEWER THAN 50.  WE HAVE ACQUIRED MANY, MANY TITLE

1    AGENCIES THROUGH THE YEARS.

2    Q.   HOW MANY HAVE YOU ACQUIRED SINCE YOU'VE BEEN WORKING FOR

3    THEM -- THAT THEY HAVE ACQUIRED?

4    A.   I DON'T KNOW HOW -- AN EXACT NUMBER.  I WOULD SAY 100 OR

5    MORE.

6    Q.   OKAY.

7    A.   SO --

8    Q.   HOW MANY TITLE AGENCIES HAVE YOU ACQUIRED IN GEORGIA OTHER

9    THAN LANDCASTLE TITLE?

10   A.   NONE THAT I RECALL OFFHAND.

11   Q.   OTHER THAN LANDCASTLE TITLE.

12   A.   OTHER THAN OUR INTEREST IN LANDCASTLE, YES.

13   Q.   OKAY.  NOW, DID YOU KNOW WHAT PERCENT OF THE CLOSING

14   BUSINESS MORRIS HARDWICK SCHNEIDER HAD OF THE CLOSING BUSINESS

15   THAT WAS BEING UNDERWRITTEN BY UNDERWRITERS IN THE STATE OF

16   GEORGIA?  WHAT PERCENT OF THE MARKET DID THEY CONTROL?

17   A.   I DON'T KNOW THAT, AND I DON'T KNOW THAT ANYONE COULD

18   ANSWER THAT QUESTION.

19   Q.   OKAY.  THEY HAVE -- WELL, I THINK YOU SAID THEY WERE ONE

20   OF YOUR TOP AGENTS; IS THAT RIGHT?

21   A.   YES.

22   Q.   IS THAT IN GEORGIA OR NATIONALLY?

23   A.   CERTAINLY ONE OF OUR TOP AGENTS IN GEORGIA AND IN THE

24   SOUTHEAST.

25   Q.   AND WERE THEY IN THE TOP TEN?

1    A.   IN GEORGIA, I WOULD EXPECT THEY WERE THE TOP TEN, YES.

2    Q.   OKAY.  I WANT TO HAND YOU WHAT'S BEEN MARKED AS

3    DEFENDANT'S EXHIBIT 95 AND ASK YOU TO LOOK THROUGH THAT.

4    A.   DO I NEED TO READ IT IN DETAIL OR JUST KIND OF GLANCE

5    THROUGH IT?

6    Q.   SEE IF YOU'RE FAMILIAR WITH THE CONTENTS OF THAT EXHIBIT.

7    A.   THESE E-MAILS, I BELIEVE, RELATE TO THE PERIOD OF TIME

8    WHEN I WAS FIRST NOTIFIED THAT THERE -- THAT WE HAD IDENTIFIED

9    AN ISSUE WITH THE BANK STATEMENT DURING THE COURSE OF AN AUDIT.

10           MR. GARLAND:  OKAY.  I MOVE IN DEFENDANT'S

11   EXHIBIT 95.

12           THE COURT:  ANY OBJECTION?

13           MR. GILFILLAN:  NO, YOUR HONOR.

14           THE COURT:  IT'S ADMITTED.

15   BY MR. GARLAND:

16   Q.   AND IN DEFENDANT'S EXHIBIT 95, THIS E-MAIL IS FROM ANDI

17   STROUD TO STEVE HAMLIN, AND A COPY TO YOU -- BAUM, DAVID; ERIKA

18   MEINHARDT; IS THAT RIGHT?

19   A.   YES.

20   Q.   DID YOU RECEIVE A COPY?

21   A.   THAT'S CORRECT.

22   Q.   AND THAT IS DATED AUGUST 7TH, 2014, CORRECT?

23   A.   YES.

24   Q.   ALL RIGHT.  NOW, IN THAT E-MAIL THAT YOU GOT COPIED ON,

25   ANDI STROUD TELLS STEVE HAMLIN HE HAD JUST SPOKEN TO NAT.  THEY

1    ARE TAKING THIS VERY SERIOUSLY.

2        THIS IS ON AUGUST 7TH; YOU AGREE, RIGHT?

3    A.    I AGREE.

4    Q.    ALL RIGHT.  AND THAT THEY HAVE HIRED AN AUDITING FIRM TO

5    CONDUCT A FORENSIC AUDIT OF THIS MATTER AND I BELIEVE OF ALL

6    ACCOUNTS.  ASHA IS ON ADMINISTRATIVE LEAVE UNTIL THEY GET TO

7    THE BOTTOM OF THIS, AND THEY'VE HIRED A NEW CFO.

8        THAT'S WHAT MR. STROUD [SIC] REPORTED TO YOU THAT

9    MR. HARDWICK TOLD HIM IN AUGUST OF 2014, CORRECT?

10   A.    THAT'S WHAT THAT E-MAIL INDICATES, YES.

11   Q.    ALL RIGHT.  AND IT GOES ON TO SAY:  I'M NOT CERTAIN WHEN

12   ASHA WAS PUT ON LEAVE AND THEIR INTERNAL INVESTIGATION STARTED,

13   BUT IT SOUNDS LIKE IT IS WELL UNDERWAY.  THE LAST TIME I SPOKE

14   TO ALYCE ABOUT THIS MATTER, MIDDLE OF JULY, AND EXPRESSED OUR

15   CONCERNS WITH THE BANK STATEMENT, SHE SAID SHE WAS GOING TO

16   START HER OWN INVESTIGATION, BEGINNING WITH A LOOK AT THE

17   SERVER RECORDS.  PERHAPS AFTER ERIKA'S MEETING WITH NAT, THINGS

18   REALLY GOT SERIOUS.

19       PUTTING ASHA ON LEAVE MEANS TO ME THAT THEY FOUND ENOUGH

20   TO BELIEVE THAT SHE CREATED THE STATEMENT AND ARE COMBING

21   THROUGH EVERYTHING ELSE SHE HAS TOUCHED.  I TOLD NAT WE DIDN'T

22   HAVE A WHOLE LOT OF CONFIDENCE IN SUNTRUST AT THE MOMENT SINCE

23   THEY CIRCLED THIS FOR AS LONG AS THEY DID WITH NO DEFINITIVE

24   ANSWER.  HE AGREES, BUT READING BETWEEN THE LINES, I BELIEVE

25   THEY HAVE FOUND ENOUGH TO KNOW THAT SUNTRUST HAD NO

1    INVOLVEMENT.  HE WILL FOLLOW UP WITH ME WHEN THEY HAVE THE

2    RESULTS FOR AUDIT.  THAT IS ALL I KNOW AT THIS TIME.

3        YOU GOT THIS PIECE OF INFORMATION, DIDN'T YOU?

4    A.   YES.

5    Q.   YOU HAD THIS PIECE OF INFORMATION IN YOUR MIND WHEN YOU

6    WERE ASKED LATER TO RECALL ABOUT WHAT YOU KNEW AT THE TIME YOU

7    HAD LUNCH WITH MR. HARDWICK, WHICH OCCURRED ON THE 11TH OF

8    JULY.

9        LET ME WITHDRAW THAT QUESTION.

10   A.   OKAY.

11   Q.   YOU HAD LUNCH WITH MR. HARDWICK ON THE 11TH OF JULY,

12   CORRECT?

13   A.   YES.  I BELIEVE THAT WAS THE DATE.

14   Q.   OKAY.  AND THEN AT THAT TIME, BEFORE YOU WENT TO THAT

15   LUNCH, YOU HAD PREVIOUSLY CONTACTED PEOPLE IN THE ACCOUNTING

16   DIVISION WHO WERE INVOLVED IN THE AUDIT THAT HAD BEEN GOING ON

17   SOME MONTHS, CORRECT?

18   A.   I DON'T KNOW THAT I SPOKE DIRECTLY TO ANYBODY IN THE AUDIT

19   GROUP.

20   Q.   EXCUSE ME.  WHO DID YOU SPEAK TO BEFORE YOU WENT TO LUNCH

21   WITH MR. HARDWICK?

22   A.   I BELIEVE I HAD A CONVERSATION WITH ANDI STROUD, WHO WROTE

23   THAT E-MAIL.

24   Q.   RIGHT.  AND YOU HAD LEARNED SOMETHING ABOUT ISSUES WITH

25   THE BANK RECORDS BEFORE YOU WENT TO THE LUNCH WITH

1  MR. HARDWICK, HADN'T YOU?

2  A.   YES.

3  Q.   AND YOU HAD LEARNED THAT SUNTRUST SAID THAT THEY HAD

4  PRODUCED AND WERE RESPONSIBLE FOR A FAULTY BANK STATEMENT.  YOU

5  KNEW THAT WHEN YOU WENT TO LUNCH WITH MR. HARDWICK, DIDN'T YOU?

6  A.   I DON'T RECALL THAT.  I KNOW THAT THAT CAME OUT EARLIER.

7  I BELIEVE BY THE TIME I HAD LUNCH WITH HIM, WE HAD DETERMINED

8  FROM SUNTRUST THAT THEY WERE MISTAKEN; AND THEY INDICATED TO US

9  THAT THEY HAD NOT GENERATED THAT STATEMENT, THAT IT HAD BEEN

10  ALTERED.

11  Q.   YOU KNOW THAT AT SOME TIME SUNTRUST SAID, WAIT A MINUTE,

12  WE SAID IT WAS OUR FAULT, BUT LATER THEY CAME FORWARD AND SAID

13  IT WAS NOT THEIR FAULT.

14  A.   I DO RECALL SOMETHING ABOUT THAT, YES.

15  Q.   AND DO YOU KNOW THE DATE THAT FIDELITY'S AUDITORS,

16  MR. STROUD AND THE REST OF THE TEAM, FOUND OUT THAT SUNTRUST

17  WAS SAYING, OH, NO, IT WASN'T OUR FAULT?  DO YOU KNOW THAT

18  DATE?

19  A.   NO.

20  Q.   WOULD IT SURPRISE YOU IF THAT DATE WAS OVER IN AUGUST AND

21  THAT FIDELITY HAD NOT GOTTEN AN ACKNOWLEDGMENT AT THE TIME YOU

22  HAD LUNCH?  WOULD THAT BE A SURPRISE TO YOU?

23  A.   I DON'T KNOW EXACTLY WHEN WE FOUND OUT THAT SUNTRUST HAD

24  DETERMINED THAT IT WAS NOT -- THAT THAT BANK STATEMENT HAD BEEN

25  ALTERED.  BUT I'M CONFIDENT THAT IT WAS NOT BY THE TIME I WAS

1  INFORMED OF THE DEFALCATION IN AUGUST.  IT WAS PRIOR TO THAT,

2  CERTAINLY PRIOR TO THAT.

3      I'M NOT CLEAR WHERE YOU'RE GOING WITH THIS.  MAYBE I NEED

4  TO GET --

5  Q.   WHAT YOU ACTUALLY KNEW --

6  A.   WHEN I HAD LUNCH?

7  Q.   -- WHEN YOU HAD LUNCH WITH MR. HARDWICK.

8  A.   I WOULD -- I THOUGHT THAT I KNEW AT THAT TIME THAT THE

9  BANK STATEMENT HAD BEEN ALTERED, BUT I COULD BE MISTAKEN ON THE

10 DATE.

11 Q.   AND THIS DEFENDANT'S EXHIBIT 95 FROM MR. STROUD DOESN'T

12 INDICATE ANYTHING ABOUT KNOWING THAT SUNTRUST HAD ACKNOWLEDGED

13 THEIR ERROR AT THAT POINT, DOES IT?

14      MR. GILFILLAN:  YOUR HONOR, CAN I JUST ASK

15 MR. GARLAND TO PUBLISH THIS EXHIBIT AND TO GO OVER THE DATE OF

16 IT?  BECAUSE HE -- IT'S AUGUST 7TH, AND HE'S TYING IT TO A

17 MEETING THAT'S THREE WEEKS BEFORE.

18      THE COURT:  ON JULY 11TH?

19      MR. GILFILLAN:  YES, YOUR HONOR.  IT'S MISLEADING.

20      THE COURT:  IS THIS 95 STILL?

21      MR. GARLAND:  YES, THIS IS 95.

22      THE COURT:  OKAY.  I'M NOT GOING TO -- YOU HEARD THE

23 REQUEST, BUT I'M NOT GOING TO DIRECT YOU TO DO THAT.

24 MR. GILFILLAN CAN USE IT ON REDIRECT IF HE WANTS.

25      BUT I'M A LITTLE CONFUSED ABOUT WHERE YOU'RE GOING AS

1    WELL.  BUT DO WHAT YOU WILL WITH 95.

2              MR. GARLAND:  I'M GOING TO PUT ON HERE --

3              THE COURT:  OKAY.

4              MR. GARLAND:  -- THIS IS PAGE 5 OF EXHIBIT 95.

5              THE COURT:  THIS IS WHAT, SIR?

6              MR. GARLAND:  PAGE 5 --

7              THE COURT:  OKAY.  OF 95.

8              MR. GARLAND:  -- OF EXHIBIT 95.

9    BY MR. GARLAND:

10   Q.   NOW, AT THE TOP, THIS IS AN E-MAIL FROM LINDA HAYWOOD TO

11   STEVE HAMLIN, COPY TO DAVID BENNETT, SUNTRUST STATEMENT.  WHO

12   IS STEVE HAMLIN?

13   A.   STEVE HAMLIN HEADS OUR -- THAT FORENSIC AUDIT TEAM THAT I

14   REFERRED TO WITH FIDELITY.

15   Q.   AND WHO IS LINDA HAYWOOD?

16   A.   I HAVE NO IDEA.  SHE APPEARS TO WORK FOR SUNTRUST.

17   Q.   ALL RIGHT.  TO -- AND THEN COPY TO DAVID BENNETT.  DO YOU

18   KNOW WHETHER DAVID BENNETT IS AN OFFICER AT SUNTRUST OR NOT?

19   A.   I DON'T KNOW.

20   Q.   AND THEN IT SAYS:  GOOD AFTERNOON, STEVE.  YOU WILL BE

21   HAPPY TO KNOW THAT WE HAVE COMPLETED OUR FINAL INVESTIGATION

22   ABOUT THE CORRECT STATEMENT SENT TO YOU BY SUNTRUST.  I HAVE

23   CLOSED THE LOOP WITH DAVID AS WELL, AND HE AGREES THAT THE

24   CORRECTED SUNTRUST SENT TO YOU HAS AN ENDING BALANCE OF $3,000

25   FOR LANDCASTLE TITLE, DATED 3-31-2014.  I APOLOGIZE FOR ANY

1  CONFUSION WE MIGHT HAVE CAUSED IN VARIOUS COMMUNICATIONS YOU

2  RECEIVED FOR US.  THANK YOU FOR YOUR PATIENCE AND

3  UNDERSTANDING.  PLEASE FEEL FREE TO REACH OUT IF YOU HAVE ANY

4  QUESTIONS.

5      DO YOU KNOW WHAT THAT REFERRED TO?

6  A.    I HAVE NO IDEA.

7  Q.    YOU DO KNOW THAT THERE WERE SOME ISSUES ABOUT WHAT WAS

8  GOING ON IN THE AUDIT?

9  A.    BUT I DON'T KNOW WHAT THAT E-MAIL TELLS US RELATIVE TO THE

10  AUDIT OR ANY ALTERED BANK STATEMENT.

11  Q.    WELL, AND THEN THERE'S A RESPONSE FROM STEVE HAMLIN AT THE

12  BOTTOM OF THE PAGE:  LINDA, THANK YOU FOR GETTING BACK TO ME.

13  I UNDERSTAND THERE WERE SOME INCONSISTENCIES IN THE BALANCES

14  SHOWN ON THE VARIOUS VERSIONS OF THE MARCH 24TH STATEMENT, THAT

15  THOSE HAVE BEEN CORRECTED AND SUNTRUST IS CONFIDENT ABOUT THE

16  CURRENT ACCOUNT BALANCES AND HISTORY.  THAT'S NOT WHAT I'M

17  ASKING.  I'M JUST TRYING TO FIND OUT IF ANDY CRAIS OR ANYONE AT

18  SUNTRUST PREPARED THE ATTACHED MARCH 2014 STATEMENT.  THAT'S

19  IT.  I UNDERSTAND THAT THIS STATEMENT BALANCE IS INCORRECT AND

20  A SUBSEQUENT MARCH 14TH STATEMENT PREPARED BY SUNTRUST SHOWS

21  THE CORRECT AMOUNT.  BUT DID THIS ATTACHED STATEMENT COME FROM

22  SUNTRUST?  I'M NOT INQUIRING ABOUT ANY INTERNAL SUNTRUST

23  PROCESSES OR HOW OR WHY THIS STATEMENT MIGHT HAVE BEEN

24  INCORRECT --

25          THE COURT:  AND WE CAN'T SEE THE REST, AS YOUR

1  CO-COUNSEL HAS POINTED OUT.  BUT WE CAN'T SEE THE REST.  THANK

2  YOU.

3  BY MR. GARLAND:

4  Q.   I'M NOT INQUIRING ABOUT ANY INTERNAL SUNTRUST PROCESSES OR

5  HOW OR WHY THIS STATEMENT MIGHT BE INCORRECT, JUST WHETHER THE

6  STATEMENT FIDELITY RECEIVED FROM THE ACCOUNTHOLDER WAS

7  ORIGINALLY PREPARED BY SUNTRUST.

8       NOW, YOU KNOW WHAT THAT WAS TALKING ABOUT?

9  A.   IT'S THE -- I'M ASSUMING IT'S THE ALTERED BANK STATEMENT

10  THAT WAS AT ISSUE.

11  Q.   AND YOU CAN TELL FROM THAT THAT MR. HAMLIN IS TRYING TO

12  GET TO THE BOTTOM, ON AUGUST 5TH, OF WHO PREPARED THE INCORRECT

13  BANK STATEMENT, CORRECT?

14  A.   THAT'S CORRECT.  BUT WE HAD SEEN THE BANK STATEMENT, AND

15  WE WERE PRETTY CONFIDENT THAT IT WAS AN ALTERED BANK STATEMENT.

16  AND SO WE WERE TRYING TO GET CONFIRMATION, BUT I THINK ALL OF

17  US BELIEVED THAT THAT BANK STATEMENT HAD BEEN ALTERED BY

18  SOMEONE.

19  Q.   AND --

20  A.   AND THAT WAS BACK IN JULY.

21  Q.   RIGHT.  BUT SUNTRUST, AT THAT POINT, YOU KNEW THIS, HAD

22  SAID THEY PREPARED IT AND IT WAS THEIR FAULT, RIGHT?

23  A.   I SEE THAT FROM THE E-MAILS, YES.

24  Q.   OKAY.  AND YOU --

25  A.   BUT, NONETHELESS, IT WAS AN ALTERED BANK STATEMENT THAT WE

1  WERE AWARE OF IN JUNE OR JULY, WHICH IS WHAT REALLY

2  PRECIPITATED OUR WANTING TO COME IN AND DO AN AUDIT WITH OUR

3  FORENSIC AUDIT TEAM.

4  Q.   WELL, YOU HAD BEEN DOING AN AUDIT --

5  A.   CORRECT.

6  Q.   -- FOR MONTHS, RIGHT?

7  A.   CORRECT, YES.  BUT WE WERE LOOKING TO BRING IN OUR

8  FORENSIC AUDIT TEAM THAT SPECIALIZES IN THESE SITUATIONS.

9  Q.   AND YOU KNEW ANDI STROUD WAS DEALING WITH ALYCE RITCHIE,

10 TRYING TO GET TO THE BOTTOM OF WHO IT WAS THAT PREPARED THE

11 STATEMENT.  YOU KNEW THAT WAS GOING ON, RIGHT?

12 A.   WE WERE MORE CONCERNED ABOUT WHO ALTERED THE STATEMENT,

13 YES.

14 Q.   NOW, AFTER YOU MET WITH MR. HARDWICK AT LUNCH, YOUR

15 COMMUNICATIONS WITH HIM WERE ABOUT THE RESTRUCTURING OF HIS

16 LOAN.  YOU WOULD AGREE WITH THAT, RIGHT?

17 A.   THAT WAS PART OF OUR CONVERSATION, YES.

18 Q.   AND YOU AGREE YOU CAN'T BE SURE WHETHER OR NOT -- YOU

19 CAN'T BE SURE AS TO THE DETAILS OF THE CONVERSATION THAT TOOK

20 PLACE BETWEEN YOU AND MR. HARDWICK AT LUNCH ABOUT PUTTING ASHA

21 ON ADMINISTRATIVE LEAVE AND HAVING AN AUDIT TEAM COME IN AT A

22 TIME WHEN Y'ALL WERE STILL INVESTIGATING WHO PREPARED THE

23 STATEMENT, RIGHT?

24 A.   AGAIN, WE WERE PRETTY CONFIDENT WE HAD AN ALTERED BANK

25 STATEMENT AND THAT WE HAD A POTENTIAL ISSUE AT THE TIME.  WE

1    THOUGHT IT WAS TIED SOLELY TO THE BOOKKEEPER.  AND I DID

2    OFFER -- I'M VERY CLEAR IN MY MEMORY OF OFFERING TO HAVE OUR

3    FORENSIC AUDIT TEAM COME IN.

4    Q.   MS. RITCHIE HAD BEEN IN ACTIVE COMMUNICATION WITH PEOPLE

5    AT FIDELITY, RIGHT?

6    A.   I BELIEVE SHE WAS TALKING TO ANDI STROUD, YES.

7    Q.   I'M SHOWING YOU WHAT'S BEEN ADMITTED AS EVIDENCE,

8    DEFENDANT'S EXHIBIT 355.  THIS APPEARS THAT FIDELITY NATIONAL

9    TITLE INSURANCE LISTED LANDCASTLE TITLE AS A 2013 TOP AGENT; IS

10   THAT RIGHT?

11   A.   THAT'S WHAT IT SAYS, YES.

12   Q.   AND WHAT DO YOU HAVE TO DO TO RECEIVE THIS AWARD?

13   A.   I DON'T KNOW.  THAT'S SOMETHING THAT OUR LOCAL OPERATION

14   GIVES OUT TO SOME OF THEIR KEY AGENTS.

15   Q.   OKAY.  YOU GIVE A LOT OF THESE, OR IS THIS --

16   A.   I DON'T KNOW.

17   Q.   TOP AGENT, IS IT JUST ONE?

18   A.   I DON'T KNOW.  I WOULD LIKE TO POINT OUT THAT THAT IS ONE

19   OF OUR UNDERWRITERS, FIDELITY NATIONAL TITLE.  WE HAVE MULTIPLE

20   UNDERWRITERS DOING BUSINESS IN THE STATE OF GEORGIA.

21   Q.   HOW MANY UNDERWRITERS DO YOU HAVE DOING BUSINESS IN

22   GEORGIA?

23   A.   FOUR, CURRENTLY.

24   Q.   OKAY.  AND HOW MANY COMPETITORS DO YOU HAVE IN GEORGIA?

25   A.   WELL, THERE ARE A NUMBER.  THERE ARE THREE LARGE

1    COMPETITORS AND SEVERAL SMALLER ONES.

2         MR. GARLAND:  204.

3         YOUR HONOR, WE HAVE A MATTER --

4    BY MR. GARLAND:

5    Q.  WELL, LET ME HAND YOU DEFENDANT'S EXHIBIT 204 AND ASK YOU

6    WHETHER OR NOT YOU RECOGNIZE THAT DOCUMENT.

7    A.  I RECOGNIZE IT BECAUSE YOU SHOWED IT TO ME DURING MY

8    DEPOSITION.

9         MR. GARLAND:  ALL RIGHT.  I OFFER DEFENDANT'S

10   EXHIBIT 204.

11        THE COURT:  I DON'T THINK A FOUNDATION HAS BEEN LAID

12   YET, SO I DON'T KNOW -- I KNOW MS. MEINHARDT MAY HAVE SEEN IT

13   PREVIOUSLY IN DEPOSITION.  I HAVE NO IDEA WHAT IT IS.

14        MR. GARLAND:  COULD WE APPROACH THE BENCH ABOUT IT?

15        THE COURT:  SURE.

16        (WHEREUPON, A BENCH CONFERENCE OUT OF THE HEARING OF

17   THE JURY PROCEEDED AS FOLLOWS:)

18        THE COURT:  OKAY.  IS THERE GOING TO BE OBJECTION

19   TO --

20        MR. GILFILLAN:  I OBJECT ON RELEVANCY GROUNDS AND

21   RULE 403.  IT'S NOT UNTIL AUGUST 29 OF 2014.  IT'S TALKING

22   ABOUT THE STOCK, THE STOCK OF A $10 BILLION COMPANY.  IT'S

23   IRRELEVANT, AND IT'S RULE 403.

24        MR. GARLAND:  IT RELATES TO THE MOTIVE THAT THEY HAD

25   TO ACQUIRE THIS COMPANY IN THE WAY THEY DID IT, IN KICKING HIM

1   OUT, AND THE BENEFITS THEY SAW THEY COULD GET.

2           THE COURT:  SAY THAT AGAIN.  BECAUSE WE TALKED

3   EARLIER -- I KEPT SOMETHING OF THE GOVERNMENT'S OUT, SOME

4   E-MAIL CORRESPONDENCE, THAT WAS OUTSIDE OF THIS PERIOD.  AND SO

5   WHAT IS THIS -- JUST BECAUSE THEY FORESAW THAT THIS -- THE

6   STOCK WAS GOING TO GO UP?

7           MR. GARLAND:  YES.  THE ACQUISITION OF LANDCASTLE,

8   WHICH OCCURRED ON THE 25TH, WOULD HAVE THIS KIND OF EFFECT

9   BECAUSE THEY HAD AN INVESTMENT -- AT LEAST THAT'S THE WAY THEY

10  REPORT IT -- THAT CAUSED THE STOCK TO GO UP.  AND IT'S JUST

11  ANOTHER PART OF WHAT WAS THEIR REAL MOTIVE HERE, WHICH WAS TO

12  MAKE A LOT OF MONEY FOR THEMSELVES.

13          THE COURT:  OKAY.  I SUSTAIN THE OBJECTION ON

14  RELEVANCY GROUNDS.

15          (WHEREUPON, PROCEEDINGS RESUMED IN OPEN COURT AS

16  FOLLOWS:)

17          THE COURT:  SUSTAINED.

18  BY MR. GARLAND:

19  Q.   NOW, ULTIMATELY, DID LANDCASTLE TITLE CHANGE ITS NAME?

20  A.   WE CURRENTLY DO BUSINESS -- THAT -- THE TITLE AGENCY NO

21  LONGER EXISTS.  THE ONLY ASSET THAT CAME OUT OF THIS MATTER WAS

22  AN ENTITY CALLED TITLEWAVE, WHERE WE NOW PROVIDE TITLE SEARCHES

23  TO OTHER TITLE AGENTS AROUND GEORGIA.

24  Q.   ALL RIGHT.  AND DID THE NAME OF LANDCASTLE TITLE CHANGE TO

25  TITLEWAVE?

1    A.   WELL, TITLEWAVE EXISTED ALREADY, THAT NAME AND THAT

2    ENTITY.  WE TOOK THE TITLE PLANT, WHICH WAS THE ONE REMAINING

3    ASSET, AND PUT IT INTO THE TITLEWAVE ENTITY.

4    Q.   AND WHEN YOU SAY TITLE PLANT, WHAT IS THAT?

5    A.   SO IT'S A -- WE GATHER REAL ESTATE RECORDS THAT YOU MIGHT

6    OTHERWISE GET AT THE COURTHOUSE.  AND WE MAINTAIN WHAT IS

7    REFERRED TO AS A TITLE PLANT, WHERE YOU CAN GET ACCESS TO THE

8    REAL ESTATE RECORDS ONLINE.  SO WE HAVE THOSE REAL ESTATE --

9    SOME OF THOSE REAL ESTATE RECORDS ACCUMULATED AND CAN DO

10   SEARCHES ONLINE, TITLE SEARCHES THAT WE CAN THEN PROVIDE TO

11   OTHER AGENTS.

12   Q.   AND MORRIS HARDWICK SCHNEIDER HAD A VERY SUBSTANTIAL TITLE

13   PLANT, DIDN'T THEY?

14   A.   YEAH.  ART MORRIS AND RANDY SCHNEIDER, OVER THE YEARS, HAD

15   BUILT A GOOD PLANT, A GOOD TITLE PLANT, YES.

16   Q.   ALL RIGHT.  NOW, AFTER THE ACQUISITION BY FIDELITY OF

17   LANDCASTLE TITLE, WAS ONE OF THE FIRST THINGS THAT WAS DONE WAS

18   TO MOVE EMPLOYEES FROM THE LAW FIRM INTO LANDCASTLE TITLE?

19             MR. GILFILLAN:  OBJECTION.  RELEVANCE.

20             THE COURT:  SUSTAINED.

21             MR. GARLAND:  IT'S RELEVANT TO WHAT HAPPENED, YOUR

22   HONOR --

23             THE COURT:  MR. GARLAND --

24             MR. GARLAND:  -- TO THE LAW FIRM.

25             THE COURT:  -- I'M GOING TO ASK THAT YOU APPROACH AT

1    THIS POINT.  AND, MS. NOVAY, WHY DON'T YOU COME UP AS WELL.

2            (WHEREUPON, A BENCH CONFERENCE OUT OF THE HEARING OF

3    THE JURY PROCEEDED AS FOLLOWS:)

4            THE COURT:  WE SEEM TO BE ALL OVER THE PLACE, ALL

5    OVER THE PLACE.  ARE THERE POINTS HERE -- I MEAN, SERIOUSLY,

6    YES.  YES.

7            MR. GARLAND:  THIS RELATES TO WHAT CAUSED THE LOSS TO

8    THE LAW FIRM.  THEY TOOK THE BACK OFFICE OPERATIONS INTO THIS

9    BECAUSE THAT'S WHAT HAD THE VALUE IN THE LAW FIRM.

10           THE COURT:  OKAY.  MR. GILFILLAN.  GO AHEAD.

11           MR. GILFILLAN:  THE ONLY LOSS THIS WITNESS TESTIFIED

12   TO IS THE 29 MILLION TO PLUG THE HOLE IN ESCROW.  I DIDN'T ASK

13   ABOUT ANY OTHER LOSSES.

14           THE COURT:  THAT'S THE ISSUE, IS I UNDERSTAND ALL

15   THESE POINTS AND SOME OF THEM WILL COME OUT.  BUT YOU ARE

16   ASKING THEM OF MS. MEINHARDT, WHO HAS NOT GIVEN US ANY

17   INCLINATION SHE WOULD HAVE ANY BASIS TO TESTIFY TO ANY OF THIS.

18   SO THEN YOU GO DOWN A TRAIL OF WOULD IT SURPRISE YOU TO KNOW

19   THIS IF THIS HAPPENED, THAT, BUT SHE HAS SAID SEVERAL TIMES IN

20   DIFFERENT AREAS THAT SHE DOESN'T HAVE KNOWLEDGE.

21           MR. GARLAND:  I'LL ASK HER DOES SHE HAVE KNOWLEDGE OF

22   IT.

23           THE COURT:  OKAY.  OKAY.

24           (WHEREUPON, PROCEEDINGS RESUMED IN OPEN COURT AS

25   FOLLOWS:)

1   BY MR. GARLAND:

2   Q.   DO YOU HAVE KNOWLEDGE OF WHETHER LANDCASTLE TITLE CAUSED

3   EMPLOYEES OF THE LAW FIRM TO GO OFF THE LAW FIRM'S PAYROLL,

4   ADMINISTRATIVE PEOPLE, AND ONTO THE PAYROLL OF LANDCASTLE

5   TITLE?

6   A.   I DON'T RECALL THAT SPECIFICALLY.  IT'S POSSIBLE.  THERE

7   WERE LOTS OF MOVING PARTS AT THAT POINT IN TIME WITH THIS

8   MATTER.

9            MR. GARLAND:  ALL RIGHT.

10           YOUR HONOR, THOSE ARE ALL THE QUESTIONS WE HAVE.

11           THE COURT:  ALL RIGHT.  THANK YOU, MR. GARLAND.

12           REDIRECT?

13           MR. GILFILLAN:  YES, YOUR HONOR.

14           MR. GARLAND, CAN I HAVE YOUR EXHIBIT 95?

15           MR. GARLAND:  SURE.

16                     REDIRECT EXAMINATION

17   BY MR. GILFILLAN:

18   Q.   MS. MEINHARDT --

19   A.   YES.

20   Q.   -- WITH RESPECT TO MR. GARLAND'S QUESTIONS CONCERNING

21   DEFENSE EXHIBIT 95, JUST TO BE VERY CLEAR, THIS IS AN E-MAIL

22   STRING THAT BEGINS ON AUGUST 1ST, CORRECT?

23   A.   YES.

24   Q.   OF 2014.  AND THEN THE LAST E-MAIL IS AUGUST 7 OF 2014,

25   RIGHT?

1    A.    YES.

2    Q.    ALL RIGHT.  NOW -- SO THIS IS -- THIS E-MAIL STRING IS

3    SEVERAL WEEKS AFTER YOUR MEETING WITH MR. HARDWICK AT THE

4    ST. REGIS ON JULY 11TH, 2014; YES?

5    A.    YES.

6    Q.    DID YOU KNOW OR DID MR. HARDWICK EVER TELL YOU WHAT

7    COMMUNICATIONS HE WAS HAVING WITH ASHA MAURYA FROM THE TIME OF

8    YOUR MEETING AT THE ST. REGIS IN BUCKHEAD TO THE TIME OF THESE

9    E-MAILS?

10   A.    NO.

11   Q.    SO YOU WEREN'T AWARE OF THOSE THINGS?

12   A.    NO.

13   Q.    NOW, LET'S ALSO LOOK AT -- THIS IS AUGUST 7, 2004.  AND

14   IT'S ACTUALLY MS. STROUD, RIGHT?  SHE'S A SHE?

15   A.    THAT'S CORRECT.

16   Q.    MS. STROUD SAYS:  JUST SPOKE TO NAT.  CORRECT?

17   A.    YES.

18   Q.    THEY ARE TAKING THIS VERY SERIOUSLY.  YES?

19   A.    YES.

20   Q.    THE THIRD BULLET SAYS WHAT?

21   A.    THEY HAVE HIRED A NEW CFO.

22   Q.    OKAY.  ALL RIGHT.  NOW, WERE YOU AWARE THAT FOUR DAYS

23   LATER -- I'M GOING TO PUT UP GOVERNMENT EXHIBIT 962, WHICH IS

24   ALREADY IN EVIDENCE.

25         WERE YOU AWARE THAT FOUR DAYS LATER, MR. HARDWICK WAS

1  DIRECTING JOE DAVENPORT TO, QUOTE, GO AHEAD AND PAY ASHA AGAIN

2  ON THIS PAYROLL?

3  A.   NO.

4  Q.   AND WHEN YOU GOT TO ATLANTA ON AUGUST 15TH OF 2014, AFTER

5  RECEIVING THE CALL FROM MR. MORRIS, WHEN YOU GOT TO ATLANTA AND

6  YOU HAD THE MEETING WITH MR. HARDWICK WITH THE LARGE GROUP AND

7  THEN YOU HAD THE MEETING WITH MR. HARDWICK PRIVATELY, DID HE

8  EVER INTRODUCE YOU TO THE NEW CFO THAT HE TOLD MS. STROUD HAD

9  BEEN HIRED?

10 A.   NOT THAT I RECALL.

11 Q.   DO YOU THINK YOU WOULD HAVE RECALLED MEETING A NEW CFO?

12 A.   YES.

13 Q.   AND IN THE SUBSEQUENT COMMUNICATIONS WITH MR. HARDWICK ON

14 SATURDAY THE 16TH AND SUNDAY THE 17TH, DID HE TELL YOU ABOUT

15 THIS NEW CFO?

16 A.   NO.

17 Q.   NOW, LET'S GO BACK TO AUGUST -- THIS IS AUGUST 7TH WHEN

18 MR. HARDWICK TELLS MS. STROUD THAT THEY'VE HIRED A NEW CFO.

19 THAT'S AUGUST 7TH OF THIS -- ON DEFENSE 95, CORRECT?

20 A.   YES.

21 Q.   ALL RIGHT.  THEN LET'S LOOK AT GOVERNMENT EXHIBIT 1602,

22 WHICH WE TALKED ABOUT EARLIER.  TWO DAYS LATER, TWO DAYS LATER

23 IS THE E-MAIL FROM MR. HARDWICK IN WHICH HE ASKED TO HAVE A

24 CALL WITH YOU, CORRECT?

25 A.   YES.

1    Q.    AND THIS WAS WHEN -- THIS WAS -- YOU GUYS MET ON THE 11TH

2    OF JULY.  AND THEN WE SAW THERE WAS AN E-MAIL WHERE YOU GUYS

3    WERE GOING TO TALK THE 1ST OF AUGUST.  AND THEN ON AUGUST 9TH,

4    MR. HARDWICK REACHES OUT TO YOU IN THIS E-MAIL, CORRECT?

5    A.    YES.

6    Q.    AND THEN THIS WAS WHAT LEADS TO THE DISCUSSION OF

7    MR. HARDWICK TELLING YOU HE WANTS 1.7 MORE, 1.7 MILLION MORE

8    FROM FORTUNA AND FIDELITY, CORRECT?

9    A.    YES.

10   Q.    OKAY.  ALL RIGHT.  AND THEN -- AND THAT'S IN -- THAT'S --

11   TWO DAYS AFTER TELLING MS. STROUD THEY HIRED A NEW CFO,

12   MR. HARDWICK IS TELLING YOU IN THAT E-MAIL AND THOSE

13   CONVERSATIONS ALSO THAT THE PURPOSE OF THE ADDITIONAL FUNDS WAS

14   FOR WHAT?

15   A.    TO BUY OUT A MINORITY PARTNER AND TO FINANCE AN

16   ACQUISITION.

17   Q.    AND SO WERE YOU AWARE AT THE TIME THAT MR. HARDWICK WAS

18   TALKING TO MS. STROUD AND THEN WHEN HE WAS TALKING TO YOU ABOUT

19   ADDITIONAL MONEY, DO YOU KNOW, DO YOU KNOW WHETHER MR. HARDWICK

20   KNEW WHETHER THERE WAS AN ISSUE WITH RESPECT TO JUST AN ALTERED

21   BANK STATEMENT OR WHETHER THERE WAS A BIGGER ISSUE WITH RESPECT

22   TO MONIES THAT HAD COME OUT OF ESCROW ACCOUNTS?

23   A.    I BELIEVE HE WAS ABSOLUTELY AWARE THAT THERE WAS A MUCH

24   BIGGER ISSUE.

25   Q.    BUT IT LOOKS LIKE FROM THIS E-MAIL WHAT HE'S TALKING

1    ABOUT WITH -- WELL, I'LL MOVE ON.

2         MR. GILFILLAN:  LET ME JUST ASK MY CO-COUNSEL A

3    QUESTION.

4         YOUR HONOR, I TENDER GOVERNMENT EXHIBIT 982 AT THIS

5    TIME.

6         MR. GARLAND:  NO OBJECTION.

7         THE COURT:  IT'S ADMITTED.

8    BY MR. GILFILLAN:

9    Q.   MS. MEINHARDT, LET ME SHOW YOU -- NOW, THIS IS AN E-MAIL

10   FROM MR. HARDWICK TO ASHA MAURYA ON MONDAY, JULY 21ST, CORRECT?

11   A.   YES.

12   Q.   OF 2014.  THIS IS AFTER YOUR MEETING WITH MR. HARDWICK

13   THERE AT THE ST. REGIS ON JULY 11TH, CORRECT?

14   A.   YES.

15   Q.   ALL RIGHT.  WHAT DOES MR. HARDWICK TELL MS. MAURYA ON

16   JULY 21ST, 2014?

17   A.   I WANT YOU TO KNOW THAT I ALWAYS APPRECIATED YOUR HARD

18   WORK AND TREATED YOU AS ONE OF MY INNER CIRCLE.  PLEASE HELP

19   RANDY AND BOB FIX THIS.  THANK YOU.  WE WILL FIGURE IT OUT.

20   Q.   AND DO YOU REMEMBER FROM YOUR DISCUSSIONS WITH

21   MR. HARDWICK THERE AT THE ST. REGIS WHETHER MR. HARDWICK --

22   THAT WAS WHILE HE WAS IN SCOTLAND ON HIS VACATION?

23   A.   I'M SORRY.  CAN YOU REPEAT THE QUESTION?

24   Q.   DO YOU RECALL FROM YOUR DISCUSSIONS WITH MR. HARDWICK

25   THERE AT THE ST. REGIS WHETHER HE WAS IN SCOTLAND ON HIS

1  VACATION AT THE TIME OF THAT E-MAIL, JULY 21, 2014?

2  A.   THAT WOULD PROBABLY BE ABOUT RIGHT.

3  Q.   NOW, MR. HARDWICK -- MR. GARLAND, MR. GARLAND HAS ASKED A

4  LOT OF QUESTIONS ABOUT POTENTIAL BENEFITS TO FIDELITY

5  NATIONAL -- FIDELITY IN RESPECTS TO STEPPING IN TO -- STEPPING

6  IN TO PLUG THE HOLE, RIGHT?

7  A.   YES.

8  Q.   AND I BELIEVE YOU'VE TESTIFIED THAT THOSE BENEFITS WERE

9  ALL THINGS THAT FIDELITY VIEWED AS JUST A WAY TO MITIGATE ITS

10  LOSS, CORRECT?

11  A.   THAT'S CORRECT.

12  Q.   WAS ANY OF THOSE THE REASON THAT FIDELITY WAS WILLING TO

13  STEP IN AND PLUG THIS HOLE?

14  A.   ALL THESE POTENTIAL BENEFITS?  ABSOLUTELY NOT.

15  Q.   AND I THINK YOU USED THE TERM "WORST" -- TERMS "WORST DEAL

16  EVER."  DID YOU SAY THAT ON CROSS-EXAMINATION?

17  A.   IT WAS THE WORST DEAL EVER.

18  Q.   FOR WHO?

19  A.   FOR FIDELITY.

20  Q.   WHY?

21  A.   BECAUSE WE HAVE PUT IN IN EXCESS OF $35 MILLION.  WE LOST

22  MARKET SHARE IN THE PROCESS.  IT WAS A TREMENDOUS STRAIN.  FOR

23  ME PERSONALLY, I COULD TELL YOU IT WAS THE WORST PERIOD IN MY

24  36-YEAR PROFESSIONAL CAREER.  AND THERE HAS BEEN ALMOST NO

25  UPSIDE AT ALL.

1    THE COMPANY, THE ASSET THAT WE RETAINED HAS LOST MONEY

2    EVERY YEAR UNTIL THIS YEAR.  WE MIGHT MAKE $200,000 OUT OF THAT

3    TITLEWAVE ASSET THIS YEAR, AFTER PUTTING IN WELL IN EXCESS OF

4    $35 MILLION.

5    Q.   I'M TEMPTED TO ASK SOME QUESTIONS ABOUT RETURN ON

6    INVESTMENT OF 40 MILLION IF YOU GET 200,000 THAT MR. GARLAND

7    WAS ASKING ABOUT, ROI, RETURN ON INVESTMENT.  BUT I'M NOT GOING

8    TO ASK THOSE QUESTIONS, SO LET ME MOVE ON.

9    MR. GARLAND ASKED SOME QUESTIONS ABOUT MR. HARDWICK'S

10   STATEMENTS TO YOU ABOUT THE FACT THAT THE WITTSTADTS HAD

11   RECEIVED SOME MONEY FROM ESCROW, CORRECT?

12   A.   YES.

13   Q.   AND YOUR RESPONSE TO MR. HARDWICK, WHEN MR. HARDWICK

14   BROUGHT THAT UP TO YOU, WAS WHAT?  WHAT DID YOU TELL

15   MR. HARDWICK?

16   A.   WELL, THERE WAS A SIGNIFICANT DIFFERENCE, SIGNIFICANT

17   FINANCIAL DIFFERENCE BETWEEN WHAT THEY RECEIVED AND WHAT

18   MR. HARDWICK RECEIVED.  AND I BELIEVE IT OCCURRED ONE, ONE TIME

19   VERSUS MULTIPLE DISBURSEMENTS TO NAT HARDWICK OVER AN EXTENDED

20   PERIOD OF TIME.

21   Q.   YOUR CONVERSATION WITH MR. HARDWICK ON SUNDAY,

22   AUGUST 17TH, 2014, IN WHICH YOU EXPLAINED TO HIM THAT HE

23   BASICALLY HAD TO STEP OUT AND BE GONE FROM THE LAW FIRM IF

24   FIDELITY WAS GOING TO CONSIDER PLUGGING THE HOLE, RIGHT?

25   A.   YES.

1  Q.   DID YOU EVER HAVE A CONVERSATION LIKE THAT WITH MARK

2  WITTSTADT?

3  A.   NO.

4  Q.   DID YOU EVER HAVE A CONVERSATION LIKE THAT WITH ROD

5  WITTSTADT?

6  A.   NO.

7  Q.   DID YOU EVER EVEN CONSIDER IT?

8  A.   NO.

9  Q.   BECAUSE OF THE REASONS THAT YOU HAD TOLD TO MR. HARDWICK,

10 RIGHT?

11 A.   THAT'S CORRECT.

12 Q.   ALL RIGHT.  WITH RESPECT TO MR. GARLAND'S QUESTIONS THAT,

13 INITIALLY, THE NUMBER WAS -- THE NUMBER OF -- THE MONEY THAT

14 WAS MISSING, THE NUMBER WAS LIKE 6 TO 6 AND A HALF MILLION, AND

15 THEN IT EVENTUALLY GREW; IS THAT RIGHT?

16 A.   YES.

17 Q.   AND I THINK YOU -- AND YOU'VE BEEN ASKED A LOT OF

18 QUESTIONS ABOUT YOUR EXPERIENCE BY MR. GARLAND.  BUT IS THAT

19 COMMON IN YOUR EXPERIENCE WITH MONEY THAT'S BEEN TAKEN FROM AN

20 ESCROW ACCOUNT?

21 A.   THAT THE NUMBER INCREASES AS WE CONTINUE OUR

22 INVESTIGATION?  IT HAPPENS EVERY TIME.

23 Q.   SO NOTHING UNUSUAL THAT WHEN THE ISSUE IS DISCOVERED,

24 WHAT'S KNOWN AS THIS MUCH -- I'M HOLDING UP MY HANDS ABOUT

25 2 INCHES APART -- AND THEN LATER, AS MORE WORK IS DONE, WHAT'S

1  KNOWN AS THIS MUCH?  AND I HAVE MY ARMS SPREAD WIDE, RIGHT?

2  A.   THAT'S CORRECT.

3  Q.   NOW, LET ME ASK A FINAL -- OH, TWO FINAL QUESTIONS.  ALL

4  RIGHT.

5       MR. GARLAND ASKED QUESTIONS ABOUT MR. HARDWICK'S

6  STATEMENTS TO YOU I BELIEVE IN THE PRIVATE MEETING AND THEN ON

7  THE PHONE WITH HIM.  BUT HE MADE STATEMENTS TO YOU ABOUT THAT

8  HE DID NOT KNOW HE WAS OVERDISBURSED, RIGHT?

9  A.   YES.

10 Q.   AND HE ALSO -- MR. HARDWICK TOLD YOU THAT HE ALSO DID NOT

11 KNOW THAT THE MONEY CAME FROM ESCROW ACCOUNTS, RIGHT?

12 A.   YES.

13 Q.   NOW, AT THAT TIME WHEN MR. HARDWICK MADE THOSE STATEMENTS

14 TO YOU, DID YOU HAVE ANY KNOWLEDGE OR WERE YOU AWARE OF HOW

15 MR. HARDWICK COMMUNICATED WITH ASHA MAURYA OVER THE LAST THREE

16 YEARS, BACK TO 2011?

17 A.   NO.

18 Q.   DID YOU HAVE ANY INFORMATION ABOUT HOW MR. HARDWICK ASKED

19 HER TO MOVE MONEY ON HIS BEHALF?

20 A.   NO.

21 Q.   DID YOU -- WHEN HE MADE THOSE STATEMENTS TO YOU, DID YOU

22 HAVE ANY INFORMATION ABOUT HOW MS. MAURYA INFORMED MR. HARDWICK

23 THAT SHE WAS MOVING MONEY ON HIS BEHALF?

24 A.   NO.

25 Q.   ALL RIGHT.  THE LAST SET OF QUESTIONS.

1    FIDELITY INSURES THE CLOSING, THE TITLE, RIGHT?

2    A.   YES.

3    Q.   AND THE CLOSING PROTECTION LETTER OBLIGATES FIDELITY WITH

4    RESPECT TO THE LENDER AND THE CLOSING PROCEEDS, RIGHT?

5    A.   YES.

6    Q.   SO AS A TITLE AGENT, DOES FIDELITY INSURE MORRIS HARDWICK

7    SCHNEIDER'S OPERATING ACCOUNTS?

8    A.   NO, WE DON'T.

9    Q.   DOES IT -- SO, IN OTHER WORDS, IF SOMEBODY TOOK MONEY OUT

10   OF AN OPERATING ACCOUNT, IF SOMEBODY TOOK MONEY OUT OF AN

11   OPERATING ACCOUNT, THERE'S NO CLAIM THAT ANYBODY HAS AGAINST

12   FIDELITY FOR THAT MISSING MONEY, RIGHT?

13   A.   YOU'RE CORRECT.

14   Q.   SO IF AN EMPLOYEE OR A PARTNER OR ANYBODY AT A LAW FIRM

15   TOOK MONEY OUT OF AN OPERATING ACCOUNT, FIDELITY WOULDN'T HAVE

16   ANY EXPOSURE AND WOULDN'T HAVE TO PAY OUT ANY MONEY UNDER

17   EITHER THE TITLE INSURANCE POLICY OR THE CREDIT PROTECTION

18   LETTER, RIGHT?

19   A.   THAT'S CORRECT.

20   Q.   ALL RIGHT.  AND SO THE 29.5 MILLION THAT FIDELITY DID

21   COVER, THAT CAME OUT OF AN ESCROW ACCOUNT, THE REASON YOU GUYS

22   COVERED THAT IS BECAUSE --

23            MR. GARLAND:  OBJECTION.  LEADING.

24            MR. GILFILLAN:  I'LL ASK A BETTER QUESTION.

25            MR. GARLAND:  AND SHE'S PREVIOUSLY ANSWERED THERE'S

1    NO --

2          THE COURT:  SUSTAINED AS TO LEADING.

3    BY MR. GILFILLAN:

4    Q.   WHY WOULD FIDELITY PLUG THE HOLE IN THE ESCROW ACCOUNT OF

5    29.5 MILLION BUT NOT PLUG OPERATING FUNDS?

6          MR. GARLAND:  OBJECTION.  IT ASSUMES FACTS NOT IN

7    EVIDENCE.  THE ACQUISITION AGREEMENT WAS IN AUGUST OF 2014 --

8          THE COURT:  OVERRULED.  OVERRULED.  OVERRULED.

9    SPEAKING OBJECTION.  OVERRULED.

10          THE WITNESS:  SO WE WOULD HAVE NO RESPONSIBILITIES

11    RELATIVE TO THE OPERATING ACCOUNTS.  BUT UNDER THE CLOSING

12    PROTECTION LETTERS THAT WE HAVE ISSUED -- WOULD HAVE ISSUED TO

13    LENDERS, BORROWERS, OTHER PARTIES TO THESE TRANSACTIONS, WE

14    WOULD HAVE HAD LIABILITY THAT CORRESPONDED TO WHAT PERCENTAGE

15    OF THE BUSINESS WE GOT.

16          SO WE HAD ESTIMATED THAT TO BE AT 60 OR 65 PERCENT.

17    SO WHATEVER THE LOSS WAS IN THE ESCROW ACCOUNTS, WE WOULD HAVE

18    BEEN OBLIGATED, IN ALL LIKELIHOOD, TO PAY CLAIMS ON AT LEAST

19    60 OR 65 PERCENT OF THAT.  SO WE KNEW WE HAD A MASSIVE

20    OBLIGATION THERE FROM A CLAIMS PERSPECTIVE.

21          IF WE HAD ALSO ALLOWED THE TITLE COMPANY TO SHUT DOWN

22    AT THAT POINT IN TIME BY VIRTUE OF IT NO LONGER HAVING A TITLE

23    AGENCY, I TRULY FELT IT WOULD CREATE A CRISIS IN THE

24    RESIDENTIAL REAL ESTATE MARKET IN ATLANTA AND BEYOND.

25    BY MR. GILFILLAN:

1  Q.   BUT WITH RESPECT TO MR. GARLAND'S QUESTIONS OF WHAT KIND

2  OF FUNDS IN THE ESCROW ACCOUNT -- WAS FIDELITY PLUGGING A HOLE

3  OF LAW FIRM MONEY OR CLIENT MONEY?

4  A.   CLIENT MONEY.

5          MR. GILFILLAN:  NOTHING FURTHER, JUDGE.

6          THE COURT:  MR. GARLAND?

7                  RECROSS-EXAMINATION

8  BY MR. GARLAND:

9  Q.   THE AGREEMENT TO COVER ANY SHORTFALL IN THE ESCROW ACCOUNT

10 WAS MADE JULY 25TH, 2014, RIGHT?

11 A.   I BELIEVE IT WAS AUGUST.

12 Q.   I MEAN AUGUST 2014.  AND AT THAT TIME, FIDELITY SAID, IF

13 THESE ACCOUNTS -- THERE'S NOT ENOUGH MONEY IN THESE ACCOUNTS,

14 WE WILL COVER IT, CORRECT?  WHATEVER MONEY THESE ACCOUNTS COME

15 UP SHORT, WE WILL COVER IT.  THAT WAS THE COMMITMENT, WASN'T

16 IT?

17 A.   THAT WAS OUR COMMITMENT.

18 Q.   AND IF THOSE ACCOUNTS CAME UP SHORT, AND THEY HAD HAD LAW

19 FIRM MONEY IN THEM AT SOME POINT IN TIME, UNDER YOUR COMMITMENT

20 AND AGREEMENT, YOU'D BE OBLIGATED TO COVER THOSE ACCOUNTS,

21 CORRECT?

22 A.   I'M STILL CONFUSED AS TO HOW THERE WOULD BE LAW FIRM MONEY

23 IN THE ESCROW ACCOUNTS.  IT'S ALL CLIENT MONEY.

24 Q.   YOU'VE TOLD US YOU DON'T KNOW ABOUT WHAT MONEY WAS IN

25 THOSE ACCOUNTS.  SO A DECISION WAS MADE, WE WON'T COVER ANY

1  SHORTFALLS IN THESE ACCOUNTS.  AND THAT'S WHAT Y'ALL DID,

2  RIGHT?

3  A.   THAT'S CORRECT.

4  Q.   RIGHT.  AND WHAT MONEY YOU COVERED IN THOSE ACCOUNTS AND

5  ITS SOURCE, YOU DON'T KNOW TO THIS DAY, CORRECT?

6  A.   I DON'T -- I MEAN, I VIEWED THEM AS CLIENT FUNDS IF THEY

7  ARE IN THE ESCROW ACCOUNTS.  I'M NOT SURE WHAT YOU'RE ASKING,

8  MR. GARLAND.

9  Q.   THAT'S WHAT YOU ASSUMED, THAT THE FUNDS IN THOSE ACCOUNTS

10  WERE ALL CLIENTS' FUNDS, RIGHT?  THAT'S WHAT YOU ASSUMED,

11  RIGHT?

12  A.   I GUESS.  I FEEL IT'S A SAFE ASSUMPTION.

13  Q.   OKAY.  AND WHATEVER LANDCASTLE DID, IT REACHED THE

14  AGREEMENT AND THEN LIVED UP TO THAT AGREEMENT IN CONNECTION

15  WITH THESE ACCOUNTS, RIGHT?

16  A.   WE MET OUR OBLIGATION TO FUND THE ESCROW ACCOUNTS FOR ANY

17  SHORTAGES, YES.

18           MR. GARLAND:  THANK YOU VERY MUCH.

19           THE COURT:  ANYTHING FURTHER, GOVERNMENT?

20           MR. GILFILLAN:  NO, YOUR HONOR.

21           THE COURT:  ALL RIGHT.  THANK YOU SO MUCH.  YOU'RE

22  EXCUSED.  THANK YOU.

23           THE WITNESS:  THANK YOU, YOUR HONOR.

24           THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, AGAIN,

25  SORRY FOR KEEPING YOU LATE, BUT I WANTED TO SEE IF WE COULD GET

1  THROUGH MS. MEINHARDT SO THAT WE DIDN'T HAVE TO CONTINUE HER

2  TILL TOMORROW.

3          SO AT THIS TIME I AM GOING TO EXCUSE YOU FOR THE DAY.

4  SEE YOU BACK HERE TOMORROW ABOUT 9:20.

5          MR. PHILLIPS:  YOUR HONOR, MAY WE HAVE A WORD AT THE

6  BENCH BEFORE YOU DO THAT?

7          THE COURT:  QUICKLY.  A POSSIBLE ANNOUNCEMENT?  NO?

8          (WHEREUPON, A BENCH CONFERENCE OUT OF THE HEARING OF

9  THE JURY PROCEEDED AS FOLLOWS:)

10          MR. PHILLIPS:  YOUR HONOR, ALL WE NEED TO DO IS JUST

11  READ THIS BRIEF STIPULATION AND THEN ANNOUNCE THAT WE REST.

12  AND THEN AT THAT POINT, IF THERE IS GOING TO BE A MOTION, THE

13  COURT CAN GO AHEAD AND ENTERTAIN THAT WITHOUT HAVING TO BRING

14  THE JURY BACK.

15          THE COURT:  YEAH, LET'S DO THAT.

16          MR. GARLAND AND MS. NOVAY, HAVE YOU ALL WORKED OUT

17  WHETHER OR NOT THERE'S ANY DISAGREEMENT WITH RESPECT TO THE

18  STIPULATION?

19          MS. NOVAY:  OH, THERE WAS NO DISAGREEMENT.

20          THE COURT:  THAT WAS THE ONE YOU ALL DISCUSSED

21  BEFORE?

22          (WHEREUPON, PROCEEDINGS RESUMED IN OPEN COURT AS

23  FOLLOWS:)

24          THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, I'M

25  GOING TO HOLD YOU FOR A FEW MINUTES MORE JUST TO DO TWO QUICK

1    THINGS.

2              SO, GOVERNMENT?

3              MR. GILFILLAN:  YOUR HONOR, THE GOVERNMENT DOES NOT

4    HAVE ANOTHER WITNESS.  BUT AT THIS TIME I WOULD TENDER A

5    STIPULATION BETWEEN THE PARTIES.  IT'S MARKED AS GOVERNMENT

6    EXHIBIT 1800.  AND IT IS A STIPULATION THAT FIRST LANDMARK BANK

7    WAS INSURED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION, AND

8    THEN IT IS A STIPULATION THAT 22 WIRE TRANSFERS OF FUNDS MOVED

9    FROM THE NORTHERN DISTRICT OF GEORGIA TO BANK ACCOUNTS IN OTHER

10   STATES ON OR ABOUT THE DATES DESCRIBED MORE SPECIFICALLY IN THE

11   STIPULATION.

12             I WOULD TENDER GOVERNMENT EXHIBIT 1800 AT THIS TIME.

13             THE COURT:  ALL RIGHT.

14             MS. NOVAY:  NO OBJECTION.

15             THE COURT:  SO STIPULATED, ADMITTED BY STIPULATION.

16             GOVERNMENT'S ANNOUNCEMENT?

17             MR. PHILLIPS:  YOUR HONOR, SUBJECT TO THE DEPUTY

18   CLERK CONFIRMING THAT ALL OF THE EXHIBITS THAT WE HAVE TENDERED

19   HAVE BEEN ADMITTED INTO EVIDENCE, GOVERNMENT RESTS.

20             THE COURT:  ALL RIGHT.  THANK YOU SO MUCH.

21             LADIES AND GENTLEMEN, THE GOVERNMENT HAS RESTED, HAS

22   INDICATED THAT THEY WILL CALL NO MORE WITNESSES AT THIS TIME.

23             SO AT THIS TIME WE WOULD TURN OUR ATTENTION

24   ELSEWHERE.  WE'VE GOT TO TAKE UP SOME THINGS TO SEE HOW ELSE --

25   TO SEE WHERE THIS TRIAL GOES FROM HERE ON OUT.

1      SO THE GOVERNMENT HAS WRAPPED UP ITS CASE SOONER THAN

2  THEY ESTIMATED.  SO THAT'S A GOOD THING, THAT WE'RE AHEAD OF

3  SCHEDULE.

4      WHAT I'M GOING TO ASK IS THAT YOU BE BACK, NOT AT

5  9:20 TOMORROW, BECAUSE AT THIS POINT THERE ARE SOME THINGS THAT

6  I WILL NEED TO TAKE UP OUTSIDE OF YOUR PRESENCE, AND I WANT TO

7  MAKE SURE WE DON'T CUT OURSELVES SHORT ON TAKING THOSE ISSUES

8  UP.

9      SO PLEASE BE BACK TOMORROW AT 10 A.M.  EVERYBODY SAY

10  IT WITH ME.  10 A.M.  ALL RIGHT.  I DON'T WANT ANYBODY MAD AT

11  ME FOR GETTING HERE EARLY.  I'LL SEE YOU TOMORROW AT 10:00.

12  THANK YOU SO MUCH, LADIES AND GENTLEMEN.

13      (WHEREUPON, THE JURY RETIRED FROM THE COURTROOM AT

14  5:32 P.M., AND THE FOLLOWING PROCEEDINGS WERE HAD.)

15      THE COURT:  DEFENSE, DO YOU HAVE ANY MOTIONS TO TAKE

16  UP OUTSIDE THE PRESENCE OF THE JURY; AND IF SO, ARE YOU READY

17  TO PROCEED ON SUCH MOTIONS AT THIS TIME?

18      MS. NOVAY:  YES, WE DEFINITELY DO.

19      THE COURT:  OKAY.

20      MS. NOVAY:  AND, I MEAN, IT'S LATER, BUT I CAN MOVE

21  FORWARD IF THAT'S WHAT THE COURT AND THE GOVERNMENT WANT TO DO.

22  THAT'S FINE EITHER WAY.

23      THE COURT:  IT'S UP TO YOU.  I'VE ASKED THE JURY TO

24  BE BACK AT 10:00.  WE CAN DO IT NOW.  I'M HAPPY TO.  WE CAN DO

25  IT AT 9 A.M. IN THE MORNING.

1    MS. NOVAY:  I THINK I WOULD PREFER TO DO IT IN THE

2  MORNING JUST SO I CAN HAVE A CHANCE TO DISCUSS WITH MR. GARLAND

3  AND TALK TO MS. LOEB --

4    THE COURT:  YES.

5    MS. NOVAY:  -- AND REVIEW.  SO IF THAT'S ALL RIGHT,

6  TOMORROW AT A CERTAIN TIME, THAT WOULD BE MY PREFERENCE.

7    THE COURT:  9 A.M. IN THE MORNING FOR ANY DEFENSE

8  MOTION, AND THEN WE WILL PROCEED.

9    THE DEFENSE NEEDS TO BE READY, THOUGH, IN THE EVENT

10  THAT THAT MOTION IS NOT GRANTED, TO PRESENT EVIDENCE.

11    MS. NOVAY:  WE ARE NOT EVER THAT CONFIDENT TO BE SO

12  BOLD AS TO DO THAT, EVEN WHEN IT WORKS OUT.

13    THE COURT:  OKAY.  ALL RIGHT.

14    ANYTHING BEFORE WE DEPART?  GOVERNMENT?

15    MR. PHILLIPS:  NO, YOUR HONOR.

16    THE COURT:  DEFENSE?

17    MS. NOVAY:  NO, YOUR HONOR.

18    THE COURT:  ALL RIGHT.  THANK YOU.  HAVE A GREAT

19  EVENING.

20    THE COURTROOM SECURITY OFFICER:  COURT'S IN RECESS.

21    (WHEREUPON, THE PROCEEDINGS WERE ADJOURNED FOR THE

22  DAY AT 5:34 P.M., TO BE RECONVENED AS ORDERED BY THE COURT.)

23

24

25

1 UNITED STATES DISTRICT COURT

2 NORTHERN DISTRICT OF GEORGIA

3 <u>CERTIFICATE OF REPORTER</u>

4

5

6          I DO HEREBY CERTIFY THAT THE FOREGOING PAGES ARE A

7 TRUE AND CORRECT TRANSCRIPT OF THE PROCEEDINGS TAKEN DOWN BY

8 ME IN THE CASE AFORESAID.

9          THIS, THE 23RD DAY OF DECEMBER, 2018.

10

11

12

13                          /S/ *ELIZABETH G. COHN*
                          _____
14                          ELIZABETH G. COHN, RMR, CRR
                          OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25