1                UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                  ATLANTA DIVISION

3

4 UNITED STATES OF AMERICA,

5        PLAINTIFF,
                      INDICTMENT NO. 1:16-CR-00065-ELR-CMS
6       -VS-           VOLUME 8
                      (PAGES 1978 - 2263)
7

8 NATHAN E. HARDWICK IV,

9        DEFENDANT.

10            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
          BEFORE THE HONORABLE ELEANOR L. ROSS
11            UNITED STATES DISTRICT JUDGE
               OCTOBER 3, 2018
12

13 APPEARANCES:

14 ON BEHALF OF THE GOVERNMENT:

15       RUSSELL PHILLIPS, ESQ.
      ASSISTANT UNITED STATES ATTORNEY
16
      DOUG GILFILLAN, ESQ.
17       ASSISTANT UNITED STATES ATTORNEY

18       LYNSEY BARRON, ESQ.
      ASSISTANT UNITED STATES ATTORNEY
19
ON BEHALF OF THE DEFENDANT:
20
      EDWARD T.M. GARLAND, ESQ.
21
      KRISTIN NOVAY, ESQ.
22
      ROBIN LOEB, ESQ.
23

24 ELIZABETH G. COHN, RMR, CRR
OFFICIAL COURT REPORTER
25 UNITED STATES DISTRICT COURT
ATLANTA, GEORGIA

1                          I N D E X

2                                                  PAGE

3     RULE 29 MOTIONS                              1983

4

5     BRAD LITTLE

6     DIRECT EXAMINATION BY MS. LOEB               2026

7     CROSS-EXAMINATION BY MR. PHILLIPS            2062

8

9     JOEL WEINBACH

10    DIRECT EXAMINATION BY MS. LOEB               2073

11    CROSS-EXAMINATION BY MS. BARRON              2076

12    REDIRECT EXAMINATION BY MS. LOEB             2097

13

14    KEVIN ANDREWS

15    DIRECT EXAMINATION BY MS. LOEB               2098

16    CROSS-EXAMINATION BY MR. PHILLIPS            2105

17    REDIRECT EXAMINATION BY MS. LOEB             2117

18    RECROSS-EXAMINATION BY MR. PHILLIPS          2117

19

20    ALEXANDER HARDWICK

21    DIRECT EXAMINATION BY MS. LOEB               2135

22    CROSS-EXAMINATION BY MR. PHILLIPS            2140

23    REDIRECT EXAMINATION BY MS. LOEB             2147

24

25

1          I N D E X

2  WITNESS                                        PAGE

3  PATRICK MALLOY

4  DIRECT EXAMINATION BY MS. NOVAY                2149

5  CROSS-EXAMINATION BY MR. PHILLIPS              2160

6

7  JOHN REMSEN, JR.

8  DIRECT EXAMINATION BY MR. GARLAND             2164

9  CROSS-EXAMINATION BY MS. BARRON               2197

10  REDIRECT EXAMINATION BY MR. GARLAND           2216

11

12  GERARD WITTSTADT

13  DIRECT EXAMINATION BY MR. GARLAND             2218

14  CROSS-EXAMINATION BY MS. BARRON               2225

15

16

17

18

19

20

21

22

23

24

25

1    (ATLANTA, FULTON COUNTY, GEORGIA; OCTOBER 3, 2018, AT

2  9:12 A.M. IN OPEN COURT.)

3    THE COURT:  THANK YOU, SIR.

4    THANK YOU.  GOOD MORNING.  PLEASE BE SEATED.

5    ALL RIGHT.  LET'S START WITH THE DEFENSE'S MOTION

6  THAT YOU POINTED OUT YESTERDAY EVENING THAT YOU WANTED TO RAISE

7  OUTSIDE OF THE PRESENCE OF THE JURY NOW THAT THE GOVERNMENT HAS

8  RESTED ITS CASE IN CHIEF.

9    MS. NOVAY:  OUR CLIENT JUST WENT TO THE BATHROOM.

10    THE COURT:  I WILL SAY THAT AGAIN, THEN, WHEN HE

11  COMES BACK.  DID NOT NOTICE.  THANK YOU.  ALL RIGHT.

12    MR. GARLAND:  YOUR HONOR?

13    THE COURT:  YES.

14    MR. GARLAND:  IF I MIGHT BE EXCUSED?

15    THE COURT:  SURE.

16    MR. GILFILLAN:  HEY, JUDGE?

17    THE COURT:  YES.

18    MR. GILFILLAN:  WHILE WE'RE WAITING, WE GOT NEWS -- I

19  THINK THIS IS PUBLICLY KNOWN THAT LIKE I THINK AT 2:18 TODAY

20  THERE'S GOING TO BE SOME TEST OF LIKE AN EMERGENCY NOTIFICATION

21  SYSTEM ON CELL PHONES.

22    AND SO I JUST BRING IT UP BECAUSE I CAN GUARANTEE

23  THAT WHAT'S GOING TO HAPPEN IS PEOPLE'S CELL PHONES ARE GOING

24  TO GO OFF, BECAUSE IT'S LIKE AN AMBER ALERT.  AND I DON'T KNOW

25  IF MAYBE THE CSO WANTS TO EMPHASIZE AT WHATEVER POINT THIS

1    AFTERNOON PEOPLE NEED TO HAVE THEIR PHONES TURNED OFF.  BECAUSE

2    I THINK -- FROM WHAT I'VE READ, IT'S GOING TO HAPPEN EVEN IF

3    YOUR PHONE IS ON SILENT.  AND JUST TO AVOID A BIG DISRUPTION

4    WHEN EVERYBODY'S PHONE GOES OFF --

5               THE COURT:  WAS THIS ANNOUNCED ON THE NEWS OR

6    SOMETHING?

7               MR. GILFILLAN:  YES.  I THINK IT'S ACTUALLY THE

8    PRESIDENT'S EMERGENCY NETWORK.  IT'S BEEN A BIG --

9               THE COURT:  I MISSED THIS.  OKAY.

10              MR. GILFILLAN:  YOU'LL GET NOTICE OF IT AT 2:18 THIS

11   AFTERNOON, I THINK.

12              THE COURT:  ALL RIGHT.

13              MS. NOVAY:  IF IT HAPPENS WHEN THE JURY IS IN HERE,

14   THEN WE'RE GOING TO STAND UP AND SAY THIS IS ALL THE

15   GOVERNMENT'S FAULT, THEY'RE HACKING INTO YOUR PHONES.

16              THE COURT:  I WILL MENTION THAT.  AND I JUST ASKED

17   MS. BECK WHETHER THEY KNOW THAT THEY ARE OFF ON MONDAY, AND I

18   WANT TO MAKE SURE THAT THEY KNOW THAT, TOO.  SO I'LL BRING UP

19   BOTH OF THOSE.

20              MS. NOVAY:  ALL RIGHT.  YOUR HONOR, IF THE COURT IS

21   READY --

22              THE COURT:  I THINK WE'RE HERE.

23              MS. NOVAY:  -- I CAN PROCEED.

24              THE COURT:  ALL RIGHT.

25              MS. NOVAY:  AND I THINK -- I DON'T KNOW IF THE --

1   IF -- WHAT THE COURT PREFERS, BUT IT MIGHT BE EASIER IF I --

2   I'M PLANNING ON MAKING MY ARGUMENTS ON COUNT 1 --

3           THE COURT:  WHATEVER YOU WANT TO DO.

4           MS. NOVAY:  -- AND 2 THROUGH 22 TOGETHER.  BUT I JUST

5   WONDER IF IT MIGHT BE EASIER FOR ME AND GOVERNMENT IF I GO

6   AHEAD AND MAKE MY ARGUMENT ON COUNT 1 AND LET THEM RESPOND.

7           THE COURT:  WHATEVER YOU WANT TO DO.

8           MS. NOVAY:  I THINK THAT MIGHT BE THE EASIEST, SO

9   THAT'S WHAT I PREFER.

10          AND I'LL START WITH COUNT 1.  THIS -- AND I'M GLAD

11  I'M STARTING HERE.  COUNT 1 IS THE CONSPIRACY, CONSPIRACY TO

12  COMMIT WIRE FRAUD.  AND THE ALLEGATION IS THAT MY CLIENT

13  ENTERED INTO A CONSPIRACY WITH MS. MAURYA.

14          THIS IS A LITTLE UNIQUE BECAUSE WE HAVEN'T HEARD FROM

15  MS. MAURYA, DON'T KNOW ANYTHING ABOUT THE STATEMENTS AS FAR AS

16  WHAT SHE AGREED TO OR WHAT MY CLIENT AGREED TO, WHAT THEY KNEW,

17  WHAT AGREEMENT THEY CAME TO TOGETHER.

18          REALLY, ALL WE HAVE, FROM WHAT I CAN UNDERSTAND,

19  ESPECIALLY BECAUSE NO OTHER WITNESS HAS TESTIFIED ABOUT WHAT

20  THEY DISCUSSED, IF ANYTHING -- I KNOW THERE'S E-MAILS WHERE HE

21  ASKED TO MEET WITH HER.  I THINK THERE ARE FOUR OR FIVE

22  E-MAILS.  BUT THEY WORKED TOGETHER FOR FIVE YEARS, SO FOUR OR

23  FIVE E-MAILS IN FIVE YEARS --

24          THE COURT:  WELL, THAT'S NOT REALLY UNIQUE BECAUSE,

25  THINK ABOUT IT.  IF THEY HAD NOT FLIPPED HER, SO TO SPEAK, AND

1   SHE WERE ON TRIAL, TOO, WE WOULD HAVE HAD BOTH CODEFENDANTS

2   TOGETHER ON TRIAL, WHICH COMMONLY HAPPENS.  NEITHER ONE OF THE

3   CODEFENDANTS MAY HAVE TAKEN THE STAND.  SO IN THAT INSTANCE,

4   NOBODY WOULD HEAR FROM EITHER ONE OF THEM EXCEPT FOR E-MAILS OR

5   WHATEVER.

6           SO IT'S OFTEN THE CASE THAT YOU WOULD HAVE A

7   CONSPIRACY CHARGE AND NOT HEAR FROM EITHER OF THE

8   COCONSPIRATORS.  AND, I MEAN, I JUST POINT THAT OUT TO SHOW

9   THAT IT'S NOT THAT UNCOMMON.

10          MS. NOVAY:  I AGREE, IT'S NOT THAT UNCOMMON.  AND IN

11  LOOKING AT SUFFICIENCY EVIDENCE IN PRIOR CASES, THAT'S --

12  THAT'S NOT THAT UNCOMMON.  BUT USUALLY THERE'S MORE TO IT THAN

13  THAT.  NORMALLY, THERE'S -- IN THE 11TH CIRCUIT, THERE'S -- A

14  LOT OF TIMES IT COMES UP IN DRUG CONSPIRACIES.  THERE'S TAPES;

15  THERE'S UNDERCOVER BUYS; THERE'S PHONE CALLS, TEXT MESSAGES,

16  OTHER WITNESSES SAYING, WE WERE ALL AT THE DRUG MEETING, HERE'S

17  WHAT HAPPENED.  THAT'S USUALLY VERY COMMON.

18          AND IN LOOKING AT SUFFICIENCY EVIDENCE, A LOT OF --

19  LIKE I SAID, A LOT OF THE DRUG CASES WERE WHAT WAS COMING UP.

20  AND YOU HAD PEOPLE WHO WERE AT THE MEETINGS TOGETHER, THEY WERE

21  MAKING AGREEMENTS TOGETHER, OTHER WITNESSES WERE TALKING ABOUT,

22  WELL, THIS PERSON'S STATEMENT WAS WITH THIS.  THERE WERE A LOT

23  OF TIMES MORE THAN JUST TWO PEOPLE ALLEGED TO BE IN THE

24  CONSPIRACY.

25          THE CASE THAT I WANT TO DRAW THE COURT'S ATTENTION TO

1  IS THE *WILLNER* CASE.  THIS IS *UNITED STATES VERSUS WILLNER*,

2  W-I-L-L-N-E-R.  AND THAT'S 795 F.3D 1297, 11TH CIRCUIT, 2015.

3       AND THAT WAS ABOUT A HEALTH CARE FRAUD CASE.  I

4  BELIEVE THIS IS THE MOST ANALOGOUS TO THE CASE THAT WE HAVE

5  HERE BECAUSE THERE'S NO DIRECT EVIDENCE, THERE IS NO DIRECT

6  EVIDENCE THAT MY CLIENT WAS IN A CONSPIRACY WITH MS. MAURYA OR

7  THAT THERE WAS ACTUALLY A CONSPIRACY GOING ON.

8       WE KNOW THAT MS. MAURYA HAD HER OWN SCHEME GOING ON,

9  AT THE VERY LEAST, BECAUSE WITNESSES HAVE TALKED ABOUT THAT.

10  THEY'VE TALKED ABOUT THE FACT THAT SHE STOLE MONEY.  THEY'VE

11  TALKED ABOUT THE FACT THAT SHE WAS FUNNELING HER CREDIT CARDS

12  THROUGH THE LAW FIRM.  SO NO DOUBT THERE WAS THEFT GOING ON TO

13  SOME DEGREE, AT LEAST EVIDENCE ABOUT THAT.

14       AND THERE'S BEEN EVIDENCE THAT MY CLIENT MAY OR MAY

15  NOT HAVE GOTTEN TOO MUCH MONEY, WHICH I'LL ADDRESS WHEN I TALK

16  ABOUT COUNTS 2 THROUGH 22.

17       BUT THERE'S REALLY NO DIRECT EVIDENCE AT ALL ABOUT AN

18  ACTUAL CONSPIRACY.  SO THE GOVERNMENT SAYS, OKAY, WELL, WE HAVE

19  CIRCUMSTANTIAL EVIDENCE.  AND THAT'S WHAT IT LEAVES US WITH.

20       THIS CASE REALLY DEALS DIRECTLY WITH CIRCUMSTANTIAL

21  EVIDENCE, AND I ASK THE COURT TO LOOK AT IT.  AND I APOLOGIZE.

22  I DON'T HAVE A PRINTED-OUT COPY FOR EVERYBODY.  BUT THE

23  GOVERNMENT REALLY ARGUED A CIRCUMSTANTIAL CASE, THAT THIS

24  DOCTOR, WHO WAS LOOKING AT HOSPITAL CHARTS, LOOKING AT THE

25  HOSPITAL RECORDS, EVEN THOUGH HE WAS AROUND -- AGAIN, A HEALTH

1    CARE FRAUD CASE -- EVEN THOUGH HE WAS LOOKING AT THE CHARTS,

2    EVEN THOUGH HE WAS THERE PRESENT WHEN OTHER MEMBERS WERE

3    DISCUSSING A POSSIBLE CONSPIRACY, THE COURT STILL FOUND THAT

4    THAT'S INSUFFICIENT EVIDENCE AND THAT THE COURT SHOULD HAVE

5    GRANTED THE RULE 29.  THAT'S MY STRONGEST CASE ON THIS POINT.

6              SO I'LL ASK THE COURT TO LOOK AT IT.

7              BUT REALLY, THERE -- THERE'S NO DIRECT EVIDENCE.  AND

8    I THINK THE CIRCUMSTANTIAL EVIDENCE IS NOT SUCH THAT, EVEN

9    DRAWING THE INFERENCES IN FAVOR OF THE GOVERNMENT, A JURY COULD

10   FIND THAT THERE WAS AN AGREEMENT, THAT THERE WAS AN

11   UNDERSTANDING.  THERE'S --

12             THE COURT:  CAN YOU TELL ME A LITTLE BIT MORE ABOUT

13   THE *WILLNER* CASE?

14             MS. NOVAY:  YES.

15             THE COURT:  I KNOW YOU DON'T HAVE COPIES, FOR SOME

16   REASON, FOR ALL OF US --

17             MS. NOVAY:  OF COURSE.

18             THE COURT:  -- BUT CAN YOU TELL ME A LITTLE BIT MORE

19   ABOUT THE COURT'S ANALYSIS AND WHY THEY REJECTED CIRCUMSTANTIAL

20   EVIDENCE OF THE CONSPIRACY?

21             MS. NOVAY:  YES, OF COURSE.  AND I ACTUALLY PULLED

22   OUT A SNIPPET THAT I THOUGHT WAS MOST PROBATIVE WITH WHAT WAS

23   GOING ON HERE, AND I'LL SHORTEN IT.

24             BUT THE COURT BEGAN BY LOOKING AT THE FACT THAT THERE

25   WAS NO DIRECT EVIDENCE.  THERE WAS NO DIRECT EVIDENCE THAT THIS

1  DOCTOR ACTUALLY KNEW OR JOINED IN THE CONSPIRACY.  NO DIRECT

2  EVIDENCE, EXCUSE ME, THAT WITNESSES TESTIFIED -- NO WITNESS

3  TESTIFIED THAT THEY TOLD THIS DOCTOR ABOUT THE CONSPIRACY OR

4  THAT HE WAS INVOLVED, SPOKE ABOUT IT.  NO WITNESS TESTIFIED

5  THAT HE JOINED IT.  NO DOCUMENTS IN THE RECORD THAT HE

6  ALLEGEDLY FALSIFIED DOCUMENTS.  THERE WERE FALSIFIED DOCUMENTS

7  IN THAT CASE SIMILAR TO WHAT WE HAVE HERE.

8          THERE'S ALLEGATIONS OF FALSIFIED DOCUMENTS TO

9  SUNTRUST.  BUT SIMILAR IN THIS CASE, AS THERE IS HERE, THERE'S

10 NO ALLEGATIONS THAT MR. HARDWICK ACTUALLY WAS AWARE THAT THESE

11 DOCUMENTS WERE FALSIFIED OR THAT MS. MAURYA WAS ACTUALLY THE

12 ONE WHO HAD EVEN FALSIFIED THEM UNTIL MUCH LATER ON.

13         NOBODY TESTIFIED THAT HE WAS TOLD ABOUT THE PROGRESS

14 NOTES OF THE PATIENTS.  THIS IS AN ISSUE, LIKE I SAID, OF

15 HEALTH CARE FRAUD.  OVERBILLING, TREATING PATIENTS WHO DIDN'T

16 REALLY NEED TO BE TREATED.  AND THERE WAS NO EVIDENCE THAT HE

17 WAS EVEN AWARE OF THAT.

18         THERE WAS EVIDENCE THAT HE LOOKED OVER THE CHARTS TO

19 SEE IF PATIENTS WERE ELIGIBLE, AND A LOT OF THOSE PATIENTS WERE

20 NOT ELIGIBLE.  BUT THERE WAS ALSO EVIDENCE, AS PART OF HIS JOB,

21 THAT HE WAS TO LOOK OVER THE CHARTS ANYWAY.

22         NO EVIDENCE THAT HE REALLY ALTERED OR, EXCUSE ME,

23 COMPLETED PATIENTS' FILES TO TRY TO MAKE THEM MEDICARE

24 COMPLIANT.  MOST OF THIS WORK WAS REALLY DONE DURING SORT OF

25 MOCK AUDITS OF THE FACILITIES.  THERE WAS ALSO DEALING WITH

1  AUDITS, GOING THROUGH AND LOOKING THROUGH THE CHARTS AND THE

2  PATIENTS' CHARTS AND THE PATIENTS' RECORDS.

3      THE COURT:  WAS THERE ANY EVIDENCE THAT THE DOCTOR

4  DIRECTED HIS CO-CONSPIRATOR TO TAKE CERTAIN ACTIONS?

5      MS. NOVAY:  NO.  MAINLY BECAUSE THEY WERE EQUALS.  A

6  LOT OF THE PHYSICIANS WERE EQUALS.  NOW, I THINK IN THIS CASE,

7  IF I'M REMEMBERING CORRECTLY, THERE WAS EVIDENCE THAT, OF

8  COURSE, HE DIRECTED NURSES TO BRING HIM THE CHARTS, THAT THERE

9  WAS STAFF WORKING IN THE HOSPITAL.  SO IT'S NOT --

10      THE COURT:  OKAY.

11      MS. NOVAY:  -- IN ALL CANDOR, IT'S NOT QUITE EXACTLY

12  PARALLEL.  BUT I WOULD ARGUE THE SAME IS TRUE, SAYING, SEND ME

13  A DISTRIBUTION -- NOT EVEN A DISTRIBUTION, WIRE THIS AMOUNT OF

14  MONEY TO HERE, THANKS FOR YOUR HARD WORK, THESE ARE A LOT OF

15  TYPICAL BUSINESS E-MAILS THAT WE WOULD SEE.  IT'S NOT UNCOMMON

16  FOR A PARTNER TO DIRECT SOMEONE IN ACCOUNTING TO, YOU KNOW,

17  SEND MONEY.

18      GREAT EXAMPLE.  LAST NIGHT, I'M E-MAILING THE HEAD OF

19  OUR ACCOUNTING, SAYING, THIS WITNESS NEEDS A HOTEL ROOM, THIS

20  WITNESS NEEDS LODGING; MAKE SURE THAT WE PAY THE COURT

21  REPORTER, MOST IMPORTANTLY.  COMMON THINGS THAT COME UP.

22      NOW, I AGREE, IT'S NOT UNCOMMON TO SAY, WIRE MONEY TO

23  THE BELLAGIO.  BUT THAT'S A DIFFERENT, IT'S A DIFFERENT

24  BUSINESS AND IT'S DIFFERENT CIRCUMSTANCES.

25      AND DIRECTING SOMEONE TO DO AN ACT ALONE, I WOULD

1    ARGUE, IS NOT SUFFICIENT EVIDENCE, NOT EVEN CIRCUMSTANTIALLY,

2    THAT -- NOW, ACTUALLY, LET ME TAKE THAT BACK, YOUR HONOR.

3           IF HE HAD SAID, GO BUY THIS COCAINE, GO MURDER THIS

4    PERSON, I THINK THAT'S PRETTY CLEAR.  BUT SIMPLY DIRECTING

5    SOMEBODY TO WIRE FUNDS, I DON'T THINK IT'S IN ANY WAY EVIDENCE

6    OF CONSPIRACY.  IT'S NOT EVIDENCE OF AN AGREEMENT, OF AN

7    UNDERSTANDING.  THERE'S BEEN NO DIRECT OR CIRCUMSTANTIAL

8    EVIDENCE, MAYBE SLIGHT, THAT HE HAD ANY AWARENESS REALLY OF

9    WHAT SHE WAS DOING, AND CERTAINLY NO EVIDENCE THAT HE WAS EVEN

10   AWARE OF MS. MAURYA'S THEFT.

11          I KNOW THE DEFENSE HAS DONE THOROUGH

12   CROSS-EXAMINATIONS OF PROBING THAT ISSUE OF WHAT EXACTLY HE

13   KNEW AND WHEN.  BUT IT'S SO SLIGHT AND IT'S SO UNUSUAL --

14   BECAUSE, NORMALLY, WHEN YOU HAVE A CODEFENDANT WHO IS NOT

15   SITTING ON TRIAL, THEY SIT UP THERE.  THEY SAY, WE GOT A DEAL,

16   THIS IS WHAT WE'RE DOING, AND THIS IS WHAT HE SAID TO ME, AND

17   THIS IS WHERE IT WAS SAID, AND THIS IS HOW IT WAS SAID.  BUT

18   THERE'S NONE OF THAT HERE.

19          THE COURT:  OKAY.

20          MS. NOVAY:  SO THOSE WOULD BE MY ARGUMENTS ON

21   COUNT 1.  SHALL I SIT DOWN AND LET THE GOVERNMENT --

22          THE COURT:  SURE.

23          MS. NOVAY:  -- RESPOND?

24          THE COURT:  THAT SOUNDS GOOD.

25          MS. NOVAY:  I'M SORRY.  I'LL MOVE MY THINGS.

1            MR. PHILLIPS:  GOOD MORNING, YOUR HONOR.

2            THE COURT:  GOOD MORNING.

3            MR. PHILLIPS:  FIRST OF ALL, I THINK MS. NOVAY IS

4    INCORRECT WHEN SHE SAYS THAT THERE IS NO DIRECT EVIDENCE IN

5    THIS CASE OF A CONSPIRACY BETWEEN NAT HARDWICK AND ASHA MAURYA.

6            AS THE COURT WILL RECALL, MARK WITTSTADT TESTIFIED

7    THAT BOTH ASHA MAURYA AND NAT HARDWICK LIED TO HIM AND TO HIS

8    BROTHER, ROD WITTSTADT, ABOUT HOW MUCH MONEY NAT HARDWICK WAS

9    TAKING OUT OF THE FIRM.

10           THERE WERE ALSO NUMEROUS E-MAILS FROM MR. HARDWICK TO

11   HIS EQUITY PARTNERS, THAT MR. WITTSTADT IDENTIFIED, WHICH, IN

12   THE LIGHT MOST FAVORABLE TO THE GOVERNMENT, AS THE COURT'S

13   REQUIRED TO LOOK AT THE EVIDENCE FOR PURPOSES OF THIS MOTION,

14   SHOW THAT NAT HARDWICK WAS LYING TO HIS PARTNERS ON MULTIPLE

15   OCCASIONS ABOUT HOW MUCH MONEY HE WAS TAKING OUT OF THE FIRM,

16   ABOUT HOW MUCH MONEY WAS GOING TO BE DISTRIBUTED TO ALL OF THE

17   PARTNERS COMBINED AT CERTAIN TIMES.

18           AND AS THE COURT WILL RECALL, MR. WITTSTADT TESTIFIED

19   IN NO UNCERTAIN TERMS THAT NAT HARDWICK LIED TO HIM AND THAT

20   ASHA MAURYA LIED TO HIM ABOUT ALL OF THESE THINGS CONCERNING

21   HOW MUCH MONEY HARDWICK WAS TAKING OUT OF THE FIRM.

22           SO THAT'S EVIDENCE OF A CONSPIRACY RIGHT THERE.

23           IN ADDITION, THE 11TH CIRCUIT HAS MADE IT CLEAR THAT

24   THE GOVERNMENT DOES NOT HAVE TO RELY ON DIRECT EVIDENCE TO

25   ESTABLISH A FRAUD CRIME OR A CONSPIRACY.

1    IN THE *FOREHAND* CASE, *UNITED STATES VERSUS FOREHAND*,

2    577 FEDERAL APPEALS 942, THE COURT SAID, AND I QUOTE:  PROOF

3    MAY BE ESTABLISHED THROUGH CIRCUMSTANTIAL EVIDENCE OR FROM

4    INFERENCES DRAWN FROM THE CONDUCT OF AN INDIVIDUAL.  STATEMENTS

5    BY THE DEFENDANT -- WHICH WOULD INCLUDE STATEMENTS IN HIS

6    E-MAILS -- IF DISBELIEVED BY THE JURY, CAN BE CONSIDERED

7    SUBSTANTIVE EVIDENCE OF THE DEFENDANT'S GUILT.

8    SO WE HAVE BOTH DIRECT AND CIRCUMSTANTIAL EVIDENCE OF

9    A CONSPIRACY IN THIS CASE.

10    IF THE COURT WOULD LIKE ME TO, I'LL BE HAPPY TO GO

11    THROUGH SOME OF THE EXHIBITS THAT WERE ADMITTED AND TALK ABOUT

12    THOSE IN MORE DETAIL.  OR IF THE COURT HAS ANY SPECIFIC

13    QUESTIONS OR ANY CONCERNS ABOUT THAT ISSUE, I'M HAPPY TO

14    ADDRESS THOSE SPECIFICALLY.

15    THE COURT:  ALL RIGHT.  THANK YOU.  I DON'T HAVE ANY

16    RIGHT NOW.

17    ALL RIGHT.  MS. NOVAY, I WILL HEAR YOU IF YOU HAVE

18    SOMETHING BRIEFLY IN REBUTTAL TO COUNT 1, AND THEN YOU MAY MOVE

19    ON TO THE NEXT SET OF COUNTS.

20    MS. NOVAY:  THANK YOU, YOUR HONOR.  IN ADDRESSING --

21    AND I'M NOT FAMILIAR WITH THE *FOREHAND* CASE.  I'LL HAVE TO LOOK

22    THAT UP.  ALTHOUGH IT SOUNDS LIKE IT'S A GOOD QUOTATION, BUT I

23    DON'T KNOW THE FACTS AND CIRCUMSTANCES OF IT.  BUT I THINK THE

24    *WILLNER* CASE IS REALLY THE BEST LAW THAT WE HAVE ON IT.  THAT'S

25    THE MOST ON POINT WITH THIS PARTICULAR CASE.

1        EVIDENCE OF MY CLIENT AND MS. MAURYA BEING TOGETHER,

2   BEING AROUND EACH OTHER, BEING IN THE SAME WORKPLACE, THE

3   GOVERNMENT'S RIGHT, CIRCUMSTANTIAL EVIDENCE CAN BE ENOUGH.

4        BUT I WOULD ARGUE THERE'S NOT -- THERE'S SIMPLY NOT

5   ENOUGH CIRCUMSTANTIAL EVIDENCE.  THERE'S JUST NOT ENOUGH.

6   THERE'S A FEW SLIGHTLY AMBIGUOUS E-MAILS THAT MAYBE THEY MET A

7   FEW TIMES, WHICH WOULD ALSO BE PERFECTLY REASONABLE TO DO IN

8   LIGHT OF THEIR JOB.

9        THERE'S A GREAT CASE THAT ISN'T ON POINT IN THIS

10  CASE, IT'S ACTUALLY ABOUT A BAD STOP IN THE FOURTH CIRCUIT.

11  THAT'S FORRESTER.  AND I JUST LOVE THE LANGUAGE OF THAT CASE.

12  IT SAYS, WE'RE TIRED OF THE GOVERNMENT LOOKING AT INANE OR

13  MUNDANE CIRCUMSTANCES AND INFERRING SOMETHING NEFARIOUS FROM

14  IT.  AND I THINK THAT'S REALLY WHAT WE HAVE IN THIS PARTICULAR

15  CASE.

16       SO THAT WOULD BE MY ARGUMENT, AND I WOULD MOVE FOR A

17  JUDGMENT OF ACQUITTAL ON COUNT 1.

18       THE COURT:  ALL RIGHT.

19       MS. NOVAY:  WITH RESPECT TO COUNTS 2 THROUGH 22,

20  ESSENTIALLY, I'LL LUMP THEM ALL TOGETHER, BECAUSE I THINK -- I

21  THINK IT IS CLEAR THAT IN THE GOVERNMENT'S EXHIBITS LINEUP,

22  THERE WERE WIRES GOING OUT IN EACH OF THOSE ACCOUNTS.  SO I'M

23  NOT DENYING THAT THAT'S THE CASE, AND I THINK THERE IS EVIDENCE

24  OF WIRES GOING OUT.

25       THE PROBLEM IS IS THAT ESSENTIALLY MY CLIENT IS NOT

1    CHARGED WITH TAKING $500,000 MORE THAN HE SHOULD, 26 MILLION

2    MORE THAN HE SHOULD, 30 MILLION MORE THAN HE SHOULD.  HE'S

3    REALLY CHARGED -- THE ESSENCE OF IT IS THREE THINGS:  HE'S

4    CHARGED WITH TAKING MORE MONEY THAN HE WAS ENTITLED TO, THAT HE

5    MUST HAVE KNOWN THAT IT CAME FROM THE ESCROW ACCOUNTS, AND THAT

6    HE ASKED MS. MAURYA TO LIE.  AND I'M SUMMING IT UP.

7            BUT THE PROBLEM IS THE GOVERNMENT HASN'T ACTUALLY

8    SHOWN HOW MUCH MONEY MY CLIENT IS ENTITLED TO HAVE.  IF YOU

9    TAKE 26 MILLION AND DIVIDE IT BY 4.7, WHICH IS ABOUT THE TIME

10   FRAME THAT WE'RE LOOKING AT, HE'S REALLY GETTING ABOUT 5 AND A

11   MILLION A YEAR WITH A COMPANY THAT'S DOING QUITE WELL.

12           THERE'S BEEN EVIDENCE OF OTHER SOURCES OF INCOME.

13   MS. KORNEGAY-TYLER TALKED ABOUT A FAMILY TRUST AND THAT HIS

14   FATHER PUT UP PLEDGED INTEREST AND THOSE TYPES OF THINGS.

15   THERE'S DEFINITELY EVIDENCE OF HOLABIRD, OF OTHER SOURCES --

16   AND I'M BLANKING ON SOME OF THE NAMES OF THE OTHER COMPANIES --

17   AS WELL AS THE LAW FIRM.

18           THE GOVERNMENT'S ARGUMENT, AS I SEE IT, IS THESE ARE

19   THE PROFITS.  IF HE TOOK MORE THAN THE PROFITS, HE TOOK MORE

20   THAN HE WAS ENTITLED TO.  BUT THAT'S NOT WHAT THE SHAREHOLDERS

21   AGREEMENTS SAY -- WHICH IS ALSO AMBIGUOUS, BECAUSE THERE'S A

22   QUESTION OF WHETHER OR NOT THEY WERE ACTUALLY IN PLAY AND

23   WHEN -- AND THERE'S A MATTER OF HOW MUCH DID THE OTHER PARTNERS

24   EVEN GET.

25           DURING THE CROSS-EXAMINATION OF MS. JOHNSON, A LOT OF

1    TESTIMONY WAS ELICITED ABOUT, WELL, THIS WASN'T INCLUDED, THIS

2    WASN'T INCLUDED.

3            AND IF THEY'RE SAYING THAT -- IF THE GOVERNMENT IS

4    SAYING THAT MR. HARDWICK RECEIVED MORE THAN HIS FAIR SHARE, THE

5    QUESTION IS:  WHAT IS HIS FAIR SHARE?

6            THIS WAS SOMETHING THAT WE ADDRESSED IN DOCUMENT 130

7    WITH RESPECT TO OUR MOTION FOR BILL OF PARTICULARS.  HOW MUCH

8    IS MR. HARDWICK ACTUALLY ENTITLED TO SO THAT WE KNOW HOW MUCH

9    MORE?

10            THE COURT:  BUT IS THE GOVERNMENT SAYING THAT?  AND I

11    REMEMBER THIS BEING AN ISSUE PRETRIAL.  IS THE GOVERNMENT

12    SAYING, WE ARE PROSECUTING HIM BECAUSE HE TOOK THIS MUCH MORE

13    THAN HE WAS ENTITLED TO?  OR ARE THEY SAYING, ON EACH OF THESE

14    DATES HE TOOK WHAT HE WASN'T SUPPOSED TO TAKE AT ALL BECAUSE IT

15    WAS TRUST FUND MONEY?  OR ARE THEY SAYING BOTH?

16            AND THAT VERY QUESTION -- OR THOSE QUESTIONS AND THE

17    ISSUES SURROUNDING THEM LEAVE ME A LITTLE CONFUSED ABOUT WHAT

18    THE DEFENSE IS.  BECAUSE INITIALLY, IT SEEMED LIKE THE DEFENSE

19    WAS, YES, HE TOOK THE MONEY, BUT HE WAS ENTITLED TO TAKE IT,

20    AND WE'LL SHOW THAT BY SHOWING THAT THE GOVERNMENT

21    MISCALCULATED PROPER DISTRIBUTIONS.

22            NOW IT SEEMS LIKE THE DEFENSE HAS EVOLVED TO, HE TOOK

23    MONEY, BUT ONLY BECAUSE HE THOUGHT -- HE -- MAYBE HE WASN'T

24    ENTITLED TO IT, BUT HE REASONABLY THOUGHT HE WAS BECAUSE HE

25    RELIED ON ASHA MAURYA.

1          AND I DON'T KNOW -- I DON'T KNOW WHICH OF THOSE THE

2     DEFENSE IS OR IF IT'S A LITTLE OF BOTH.

3          BUT WHILE YOU ARE SAYING THAT THE GOVERNMENT NEEDS TO

4     ESTABLISH A SET AMOUNT, A SET DOLLAR AMOUNT THAT HE WAS

5     ENTITLED TO SO THAT YOU ALL CAN DEFEND BY SAYING, HE DID NOT

6     TAKE IN EXCESS OF THAT, IS THAT REALLY WHAT THEY NEED TO SHOW?

7     OR CAN THEY JUST SHOW THAT HE TOOK ANY AMOUNT UNLAWFULLY

8     BECAUSE IT WAS FROM A TRUST ACCOUNT THAT HE SHOULD NOT HAVE

9     BEEN TAKING FROM AT ALL?

10         MS. NOVAY:  I UNDERSTAND, AND I COMPLETELY AGREE.

11    AND THAT WAS A HUGE PART OF OUR MOTION FOR A BILL OF

12    PARTICULARS.  NUMBER ONE, WE DON'T KNOW.  IS THE GOVERNMENT

13    SAYING THAT MY CLIENT IS NOT ENTITLED TO THIS MONEY AT ALL,

14    THAT HE'S NOT ENTITLED TO HAVE IT AT ALL, THAT HE'S NOT

15    ENTITLED TO A PERSONAL DISTRIBUTION?

16         BECAUSE OUR POSITION IS THAT IF HE RECEIVED MONEY

17    THAT HE WASN'T ENTITLED TO --

18         THE COURT:  WELL, WHERE DO YOU GET THAT, THOUGH?

19    WHERE DOES THE DEFENSE GET THAT THAT IS WHAT THE GOVERNMENT IS

20    SAYING?  WHERE DOES THE DEFENSE GET THAT THEY ARE SAYING WE

21    WERE ONLY ENTITLED TO A CERTAIN AMOUNT AND WE TOOK MORE, VERSUS

22    THEM SAYING, HE SHOULDN'T HAVE TAKEN ANY OF THIS MONEY BECAUSE

23    ALL OF IT WAS TRUST FUND MONEY IN THESE ACCOUNTS?

24         WHERE DO YOU ALL GET THAT?

25         MS. NOVAY:  IN JUST LISTENING TO THE ARGUMENTS AND IN

1    JUST LISTENING TO THE TESTIMONY THAT'S BEING ELICITED.  AND,

2    TRUTHFULLY, I DON'T EXACTLY KNOW.  I THINK THE COURT MAY HAVE

3    TO HEAR FROM THE GOVERNMENT ON THAT.

4              OUR POSITION, THOUGH, OF COURSE, IS THAT HE WAS -- HE

5    WAS -- I'M SORRY?

6              I'M SORRY, YOUR HONOR.  LISTENING TO MY CO-COUNSEL

7    OVER HERE.

8              MR. GARLAND MADE THE POINT THAT -- HE SAID, WELL,

9    IT'S IN THE INDICTMENT.  THE INDICTMENT SAYS THAT HE RECEIVED

10   MORE TO WHICH HE WAS ENTITLED.  I'M LOOKING FOR MY COPY RIGHT

11   NOW.

12             THE COURT:  AND I'M LOOKING AT MINE HERE, SO JUST

13   TELL ME WHERE IT IS.

14             MS. NOVAY:  I'M LOOKING AT PAGE 3, LETTER E.

15             THE COURT:  OKAY.

16             MS. NOVAY:  OR 4, SUBSECTION E:  THE TOTAL AMOUNT OF

17   MONEY THAT DEFENDANT HARDWICK TOOK FROM MHS GREATLY EXCEEDED

18   THE AMOUNT THAT HE WAS ENTITLED TO RECEIVE, AS HE WELL KNEW AT

19   THE TIME.  SO --

20             THE COURT:  UNDER MANNER AND MEANS.

21             MS. NOVAY:  UNDER MANNER AND MEANS.

22             THE COURT:  OKAY.

23             MS. NOVAY:  SO I THINK THAT'S -- THAT'S PART OF THE

24   ISSUE, IS THAT HE TOOK MORE THAN HE WAS ENTITLED TO TAKE.  WE

25   DON'T KNOW HOW MUCH HE WAS ENTITLED TO TAKE.  SO IF A PARTNER

1   IN A FIRM OR ANY COMPANY PAYS PERSONAL EXPENSES THROUGH THEIR

2   FIRM OR THROUGH THEIR COMPANY, IT'S NORMALLY TURNED INTO A

3   DISTRIBUTION.  AND THE DEFENSE IS PREPARED TO PUT ON EVIDENCE

4   OF THAT.  THAT'S ONE OF THE REASONS WHY OUR EXPERTS ARE SO

5   IMPORTANT TO US.  BUT WE HAVEN'T DONE THAT YET AND THAT'S NOT

6   BEFORE THE COURT.

7           BUT THE QUESTION IS:  IF HE'S USING WIRES FOR HIS OWN

8   PERSONAL BENEFIT, IS HE NOT ALLOWED TO DO THAT?  IF EVERYTHING

9   THAT HE RECEIVED AND EVERY WIRE TO A CASINO OR A CHILDREN'S

10  HOSPITAL OR A YOUNG LADY OR A HOUSE WAS -- FIT EXACTLY WITHIN,

11  FIT EXACTLY WITHIN WHAT HE -- THE PROFITS WERE, LET'S SAY, THEN

12  I DON'T THINK ANYBODY WOULD BE COMPLAINING.  I DON'T THINK IT

13  WOULD BE BAD.

14          IT'S NOT BAD BECAUSE IT WENT TO THE BELLAGIO OR THE

15  SOURCE OF IT.  IT'S NOT BAD -- I MEAN, I MEAN, I THINK IF WE

16  HAD PUT UP EVIDENCE OF ALL THESE CHARITIES THAT HE SENT IT

17  TO -- AND THERE'S BEEN A LOT OF EVIDENCE.  I THINK IT WAS AT

18  LEAST 13 OF THE WITNESSES THE GOVERNMENT CALLED WERE ABOUT

19  SPENDING AND DEBTS.  AND WE ACKNOWLEDGE THAT.  THAT'S -- BUT

20  THAT'S NOT DIRECT EVIDENCE OF EXACTLY WHAT'S GOING ON.  THAT'S

21  JUST EVIDENCE, ARGUABLY, OF MOTIVE.

22          SO WHEN YOU LOOK AT ACTUALLY WHAT'S HAPPENING HERE,

23  THE QUESTION IS:  HOW MUCH WAS HE -- WHAT WAS HE ENTITLED TO

24  RECEIVE?  AND THE GOVERNMENT HASN'T SHOWN THAT.

25          AND BECAUSE THERE'S NOT A NUMBER -- AND I'M NOT EVEN

1    SAYING THAT THEY NEED TO DO IT DOWN TO THE CENTS.  JUST SOME

2    SORT OF INCLINATION, SOME SORT OF IDEA THAT HE SHOULD HAVE

3    GOTTEN THIS.  BECAUSE FROM ONE OF THE ARGUMENTS I HEARD, I

4    THINK THE GOVERNMENT IS JUST BASING IT OFF OF PROFITS.  AND

5    THAT'S NOT AN APPROPRIATE METRIC TO USE.  THERE'S ALSO, BASED

6    ON THE GOVERNMENT'S CHARTS, THERE WAS MONEY GOING BACK TO THE

7    LAW FIRM.  THOSE AREN'T IN THE GOVERNMENT'S CHARTS.

8            SO I THINK THE ISSUE IS -- I AGREE, I UNDERSTAND THE

9    GOVERNMENT'S GENERAL ARGUMENT THAT HE TOOK TOO MUCH.  THIS IS

10   THE PROFITS, THESE WERE THE LOSSES, AND HE TOOK MORE THAN HE

11   SHOULD HAVE.

12           BUT THERE'S NO -- BEEN NO EVIDENCE THAT THAT IS THE

13   APPROPRIATE MEASURE ON HOW TO DETERMINE WHETHER OR NOT A

14   PARTNER RECEIVED MORE THAN THEY SHOULD HAVE RECEIVED OR WHAT

15   THE GOVERNMENT -- OR, EXCUSE ME, WHAT THE INDICTMENT SAYS, IT

16   EXCEEDED THE AMOUNT TO WHICH HE WAS ENTITLED.

17           THE COURT:  AND YOUR POSITION IS, EVEN IF THE

18   GOVERNMENT CAN PROVE, JUST FOR THE SAKE OF ARGUMENT, THAT HE

19   TOOK ANY AMOUNT TO WHICH HE WAS NOT ENTITLED BECAUSE IT WAS

20   TRUST FUND MONEY, THAT THAT DOES NOT SATISFY THAT HE TOOK MORE

21   THAN HE WAS ENTITLED TO?

22           WITHOUT EVEN FOCUSING ON A SPECIFIC AMOUNT, BUT JUST

23   THE KNOWLEDGE THAT HE -- THE ESTABLISHMENT OF THE FACT THAT HE

24   TOOK MORE -- TOOK ANYTHING FROM A TRUST ACCOUNT, WHEN HE

25   SHOULDN'T HAVE GOTTEN ANYTHING FROM A TRUST ACCOUNT, WOULD THAT

1    NOT SATISFY THAT?

2           AND, AGAIN, THAT'S UNDER MANNER AND MEANS.  THAT'S

3    NOT IN ONE OF THE ACTUAL COUNTS TO BE PROVED.

4           MS. NOVAY:  TWO THINGS ON THAT POINT.  THE FIRST

5    THING IS I THINK IT WOULD BE CLOSER.  I THINK THE BEST ANSWER

6    IS I THINK IT WOULD BE A CLOSER ARGUMENT FOR THE GOVERNMENT IF

7    THEY WERE ABLE TO SHOW THIS IS THE AMOUNT, ALMOST, TO WHICH HE

8    WAS ENTITLED, AND THIS IS HOW MUCH ABOVE IT HE WENT.  I THINK

9    IT WOULD BE CLOSER.

10           OF COURSE, I WOULD STILL MAKE THIS ARGUMENT.  WE'RE

11    ALL ON DEFENSE AND OF COURSE WE TRY TO REBUT IT.

12           THE COURT:  WELL, THAT -- SO YOU JUST GAVE A

13    DIFFERENT HYPOTHETICAL THAN MINE.

14           MS. NOVAY:  I'M SORRY.

15           THE COURT:  BECAUSE IN MINE, I'M STILL WITH --

16    THEY'VE NOT SHOWN ANY -- THEY'VE NOT SHOWN ANY AMOUNT TO WHICH

17    HE WAS ENTITLED.  BUT LET'S SAY, FOR THE SAKE OF ARGUMENT, THEY

18    JUST HAVE SHOWN THAT HE TOOK JUST WHATEVER AMOUNT FROM A TRUST

19    FUND, REGARDLESS OF THE SPECIFIC AMOUNT, THAT HE TOOK ANYTHING

20    FROM A TRUST ACCOUNT, DOES THAT NOT IN ITSELF SATISFY THE

21    REQUIREMENT THAT HE TOOK SOMETHING MORE THAN WHAT HE WAS

22    ENTITLED TO BECAUSE HE WAS NOT SUPPOSED TO TAKE ANYTHING FROM A

23    TRUST ACCOUNT?  DOES THAT MAKE SENSE?

24           MS. NOVAY:  IT DOES MAKE SENSE.

25           THE COURT:  OKAY.

1            MS. NOVAY:  YOU HAD SAID SOMETHING EARLIER AND I

2    THINK I WAS TRYING TO GO BACKWARDS AND ANSWER THAT.

3            BUT IN ANSWER TO THAT QUESTION, NOT QUITE.  BECAUSE

4    HE'S NOT ACTUALLY CHARGED WITH KNOWINGLY TAKING MONEY OUT OF

5    THE TRUST ACCOUNT.  WHAT HE'S ACTUALLY CHARGED WITH IS -- I

6    WANT TO MAKE SURE THAT I QUOTE THIS --

7            THE COURT:  OKAY.

8            MS. NOVAY:  -- EXACTLY.  THAT HE KNEW OR HAD REASON

9    TO KNOW MHS.  AND, AGAIN, THIS IS MANNER AND MEANS, AND I'M

10   READING ON PAGE 4, SUBSECTION H -- KNEW OR HAD REASON TO KNOW

11   MHS DID NOT KEEP ENOUGH MONEY IN ITS OPERATING ACCOUNTS TO FUND

12   ALL THE PAYMENTS, AND THE ONLY WAY THAT MS. MAURYA COULD MEET

13   HIS EXCESSIVE DEMANDS WAS BY USING MONEY IN MHS'S TRUST

14   ACCOUNT.

15           SO HE'S NOT -- IT'S CLEVER.  HE'S NOT ACTUALLY

16   CHARGED WITH KNOWINGLY TAKING MONEY OUT OF A TRUST ACCOUNT.

17   HE'S CHARGED WITH KNOWINGLY TAKING MORE THAN HE SHOULD HAVE

18   TAKEN.

19           EVEN IF THAT'S THE CASE, BASED ON YOUR HYPOTHETICAL

20   THE GOVERNMENT HAS PROVEN THAT, YES, MR. HARDWICK GOT MONEY

21   STRAIGHT FROM THE IOLTA TRUST ACCOUNTS, THAT'S NOT SUFFICIENT

22   EVIDENCE.  MR. MORRIS RECEIVED HIS DISBURSEMENTS OUT OF THE

23   TRUST ACCOUNTS.  HE TESTIFIED TO THAT.  MR. WITTSTADT RECEIVED

24   DISBURSEMENTS OUT OF THE SAME 7328 WIRE ACCOUNT THAT WAS A

25   COMMINGLING OF CLIENT FUNDS AND OF FIRM OPERATING FUNDS.  THAT

1    PAYROLL WAS PAID OUT OF THE TRUST ACCOUNT.  ESSENTIALLY,

2    EVERYBODY WHO KNEW THAT WAS THE STANDARD, THAT THERE WAS MONEY

3    COMING OUT OF THE ESCROW ACCOUNT AND THEY RECEIVED IT, THEN WE

4    WOULD HAVE A LOT MORE CODEFENDANTS ON TRIAL.

5            THE COURT:  NOT NECESSARILY.  I MEAN, HE COULD, I

6    GUESS, BUT NOT NECESSARILY.

7            MS. NOVAY:  HE COULD.

8            THE COURT:  YEAH.

9            MS. NOVAY:  SO --

10           THE COURT:  OKAY.  SO --

11           MS. NOVAY:  -- IF I COULD JUST --

12           THE COURT:  -- JUST FINISH UP, YEAH, YOUR POINTS ON

13   COUNTS 2 THROUGH 22, AND THEN I'LL HEAR FROM THE GOVERNMENT.

14           MS. NOVAY:  WELL, I THINK TO WRAP UP AND FINISH WHAT

15   YOU HAD JUST STATED, YOUR HONOR, THAT -- THE OTHER ISSUE IS

16   THAT JUST BECAUSE IT CAME FROM A TRUST ACCOUNT DOESN'T

17   NECESSARILY MEAN IT'S CLIENTS' FUNDS.  THERE'S BEEN A LOT OF

18   EVIDENCE THAT IT WAS COMMINGLED WITH OPERATING FUNDS, AND IT'S

19   HARD TO PARSE THAT OUT.

20           THANK YOU.

21           THE COURT:  ALL RIGHT.

22           MR. PHILLIPS:  YOUR HONOR, I GUESS THE FIRST THING IS

23   THAT WE NEED TO GO BACK TO THE RULE.  WHAT DOES RULE 29 SAY?

24   IT SAYS THAT A MOTION FOR JUDGMENT OF ACQUITTAL SHOULD BE

25   GRANTED ONLY IF, QUOTE, THE EVIDENCE IS INSUFFICIENT TO SUSTAIN

1    A CONVICTION.

2           AND THE COUNTS THAT ARE IN ISSUE HERE NOW, COUNTS 2

3    THROUGH 22, CHARGE DEFENDANT HARDWICK WITH WIRE FRAUD IN

4    VIOLATION OF TWO STATUTES:  THE WIRE FRAUD STATUTE, WHICH IS

5    18 U.S.C. SECTION 1343; AND SECTION 2, WHICH INVOLVES -- WHICH

6    STATES THAT WHOEVER COMMITS AN OFFENSE AGAINST THE UNITED

7    STATES, OR COMMANDS, INDUCES, OR PROCURES ITS COMMISSION, IS

8    PUNISHABLE AS A PRINCIPAL; AND WHOEVER WILLFULLY CAUSES AN ACT

9    TO BE DONE WHICH, IF DIRECTLY PERFORMED BY HIM OR ANOTHER,

10   WOULD BE AN OFFENSE AGAINST THE UNITED STATES, IS PUNISHABLE AS

11   A PRINCIPAL.

12          THUS, AS TO THE WIRE FRAUD COUNTS, IT'S NOT NECESSARY

13   FOR THE JURY TO FIND THAT DEFENDANT HARDWICK PERSONALLY

14   PERFORMED EVERY ACT CHARGED.  HE IS CRIMINALLY RESPONSIBLE FOR

15   THE ACTS OF ASHA MAURYA IF HE WILLFULLY DIRECTED OR AUTHORIZED

16   HER TO COMMIT THOSE ACTS.

17          THE EVIDENCE IS UNCONTRADICTED THAT THESE WIRE

18   TRANSFERS THAT ARE DESCRIBED IN COUNTS 2 THROUGH 22 VIOLATE THE

19   WIRE FRAUD STATUTE BECAUSE THEY WERE INTERSTATE WIRE TRANSFERS.

20   THERE'S NO QUESTION ABOUT THAT.

21          SO WHAT THE GOVERNMENT HAS TO PROVE UNDER 18 U.S.C.

22   SECTION 1343 IS NOT WHAT MS. NOVAY DESCRIBED WHEN SHE WAS

23   READING FROM THE MANNER AND MEANS SECTION OF THE INDICTMENT,

24   WHERE SHE'S TALKING ABOUT THE WAYS IN WHICH THE GOVERNMENT

25   DESCRIBED WHAT WAS CARRIED OUT.  THAT'S NOT OUR BURDEN OF

1    PROOF.

2         WHAT THE JURY HAS TO FIND BEYOND A REASONABLE DOUBT,

3    FOUR THINGS:  THAT DEFENDANT HARDWICK KNOWINGLY DEVISED OR

4    PARTICIPATED IN A SCHEME TO DEFRAUD OR TO OBTAIN MONEY OR

5    PROPERTY BY USING FALSE PRETENSES, REPRESENTATIONS, OR

6    PROMISES; SECOND, THAT THE FALSE PRETENSES, REPRESENTATIONS, OR

7    PROMISES WERE ABOUT A MATERIAL FACT; AND, THIRD, THAT HE ACTED

8    WITH INTENT TO DEFRAUD; AND, FINALLY, THAT HE TRANSMITTED OR

9    CAUSED TO BE TRANSMITTED BY WIRE SOME COMMUNICATION IN

10   INTERSTATE COMMERCE TO HELP CARRY OUT THE SCHEME TO DEFRAUD.

11   THAT'S WHAT THE JURY HAS TO FIND.

12        AND ONCE THEY FIND THAT A SCHEME TO DEFRAUD EXISTED,

13   THEY THEN HAVE TO FIND THAT THE SCHEME WAS EXECUTED THROUGH THE

14   USE OF THE INTERSTATE WIRES.  I THINK THE EVIDENCE IS

15   UNCONTRADICTED THAT THE WIRES WENT INTERSTATE.

16        SO THE QUESTION IS:  DID DEFENDANT HARDWICK HAVE THE

17   INTENT TO DEFRAUD, AND HAS THE GOVERNMENT SHOWN THAT SO A

18   REASONABLE JURY COULD MAKE THAT FINDING?

19        AGAIN, BACK TO THE *FOREHAND* CASE, YOUR HONOR, WHICH

20   IS A WIRE FRAUD CASE, THE 11TH CIRCUIT STATED IN THAT CASE:

21   THERE IS SUFFICIENT EVIDENCE TO DEMONSTRATE THAT FOREHAND HAD

22   THE REQUISITE INTENT REQUIRED FOR WIRE FRAUD.  AT TRIAL, THE

23   CIRCUMSTANTIAL EVIDENCE PRESENTED BY THE GOVERNMENT

24   DEMONSTRATED THAT FOREHAND PERSONALLY AND REPEATEDLY

25   MISREPRESENTED OR OMITTED MATERIAL FACTS IN AN ATTEMPT TO

1    INFLUENCE INVESTORS TO INVEST IN HIS FRAUDULENT SCHEME.

2            THE SAME THING IS TRUE HERE.  THE EVIDENCE SHOWS THAT

3    DEFENDANT HARDWICK REPEATEDLY MISREPRESENTED OR OMITTED

4    MATERIAL FACTS IN STATEMENTS THAT HE MADE TO HIS EQUITY

5    PARTNERS IN AN ATTEMPT TO HIDE THE FACT THAT HE WAS TAKING MORE

6    MONEY OUT OF THE FIRM THAN HE WAS ALLOWED TO.

7            BUT THE LOSS AMOUNT IN THIS CASE IS A SENTENCING

8    ISSUE.  IT IS NOT PART OF THE GOVERNMENT'S BURDEN OF PROOF TO

9    PROVE THE WIRE FRAUD COUNTS OR THE CONSPIRACY COUNT.  THAT IS

10   SIMPLY SOMETHING FOR THE COURT TO TAKE UP IF AND WHEN THE

11   DEFENDANT IS CONVICTED AND HE'S SENTENCED.  SO --

12           THE COURT:  I DON'T -- YOU DON'T HAVE TO PROVE THE

13   CONSPIRACY COUNT?  DID I MISS SOMETHING?

14           MR. PHILLIPS:  I SAID YOU DO NOT HAVE TO PROVE THE

15   LOSS AMOUNT.

16           THE COURT:  OH, JUST THE LOSS AMOUNT.

17           MR. PHILLIPS:  THE LOSS AMOUNT.  THAT IS NOT PART OF

18   THE GOVERNMENT'S BURDEN OF PROOF.

19           BUT WITH RESPECT TO THE EVIDENCE THAT'S BEFORE THE

20   JURY CONCERNING THE AMOUNT THAT DEFENDANT HARDWICK TOOK, IT'S

21   NOT LIKE THE GOVERNMENT MADE THAT ACCUSATION AND THEN DIDN'T

22   BACK IT UP WITH EVIDENCE.

23           AS THE COURT WILL RECALL, THERE ARE MULTIPLE

24   EXHIBITS, INCLUDING GOVERNMENT EXHIBIT 1001, THAT ADDRESSED

25   THIS ISSUE.  FIRST OF ALL, WE CALLED TOMMY THOMPSON, WHO WAS

1    THE LAWYER WHO DRAFTED THE SHAREHOLDER AGREEMENT.  AND HE WENT

2    THROUGH LINE BY LINE AND TOLD THE JURY EXACTLY WHAT DEFENDANT

3    HARDWICK WAS ALLOWED TO DO WITHIN THE FOUR CORNERS OF THOSE

4    AGREEMENTS AS FAR AS GETTING PAID.

5         THEN THE COURT AND THE JURY HEARD FROM JOHN SHURLEY,

6    WHO IS THE CPA WITH WARREN AVERETT.  AND HE TALKED ABOUT THE

7    AUDITED FINANCIAL STATEMENTS THAT HE PREPARED.  AND THAT'S WHAT

8    WAS USED TO CALCULATE THESE NUMBERS HERE IN GOVERNMENT

9    EXHIBIT 1001 THAT SHOWS BETWEEN 2011 AND 2013, MHS HAD A TOTAL

10   NET INCOME OF JUST UNDER $10 MILLION.  AND DURING THAT SAME

11   TIME PERIOD, DEFENDANT HARDWICK TOOK $20 MILLION OUT OF THE

12   FIRM.  THAT ALONE IS EVIDENCE RIGHT THERE THAT THE JURY COULD

13   USE TO DETERMINE THAT THE DEFENDANT ENGAGED IN A SCHEME TO

14   DEFRAUD.

15        AND THEN IF HE EXECUTED THAT SCHEME THROUGH THE USE

16   OF THE INTERSTATE WIRES, THAT'S ALL THE GOVERNMENT HAS TO PROVE

17   TO CONVICT HIM ON THE WIRE FRAUD COUNTS.

18        SO THE EVIDENCE, IN MY HUMBLE OPINION, IS

19   OVERWHELMING OF HIS GUILT.  AND THE DEFENSE IN THIS CASE AND

20   THE GOVERNMENT'S THEORY OF PROSECUTION ARE LIKE TWO SHIPS

21   PASSING IN THE NIGHT.

22        THE COURT:  YES, THEY ARE.

23        MR. PHILLIPS:  THEY DO NOT MEET AT ALL, THAT THE

24   DEFENDANT HAS NOT ATTEMPTED TO REBUT ANYTHING THAT THE

25   GOVERNMENT PROVED THROUGH MARK WITTSTADT OR THROUGH ANY OF THE

1  OTHER EMPLOYEES OF MHS WHO TESTIFIED IN THIS CASE ABOUT THE

2  FALSE STATEMENTS THAT WERE MADE DIRECTLY BY NAT HARDWICK TO

3  MARK WITTSTADT, ROD WITTSTADT, AND IN SOME CASES, ART MORRIS.

4       AND THEY'VE TALKED ABOUT OTHER THINGS, BUT THEY'VE

5  NEVER EVEN ADDRESSED THAT.  THEY DIDN'T EVEN ASK ANY QUESTIONS

6  ON CROSS-EXAMINATION THAT DEALT WITH THAT ISSUE.

7       SO THERE IS OVERWHELMING EVIDENCE THAT DEFENDANT

8  HARDWICK PARTICIPATED IN THE SCHEME TO DEFRAUD AND THAT HIS

9  SCHEME WAS CARRIED OUT THROUGH THE USE OF THE INTERSTATE WIRES.

10       THE COURT:  NOW, LET ME ASK YOU IF I AM CORRECT IN

11  UNDERSTANDING THAT YOUR POSITION IS, FIRST OF ALL, YOU DON'T

12  HAVE TO PROVE A CERTAIN DOLLAR AMOUNT THAT MR. HARDWICK TOOK,

13  BUT THAT THROUGH YOUR EVIDENCE, YOU HAVE IN FACT ESTABLISHED A

14  CERTAIN AMOUNT, WHICH IS REFLECTED BY THIS CHART; AND THAT THE

15  DEFENSE PRESUMABLY JUST DISAGREES WITH THE WAY THAT YOU'VE

16  CALCULATED THAT AMOUNT, SO THEY ARE STILL STICKING TO THE POINT

17  THAT YOU HAVE NEVER ACTUALLY ESTABLISHED THAT AMOUNT?

18       MR. PHILLIPS:  THAT IS CORRECT.

19       THE COURT:  OKAY.  GOTCHA.  ALL RIGHT.  THANK YOU.

20       ALL RIGHT.  MS. NOVAY, I'LL HEAR YOU BRIEFLY ON

21  REBUTTAL ON THOSE COUNTS, AND THEN YOU CAN MOVE TO THE FINAL

22  COUNT.  I THINK IT'S THE FINAL COUNT, OR FINAL TWO.

23       MS. NOVAY:  FINAL TWO.

24       THE COURT:  FINAL TWO.  OKAY.

25       MS. NOVAY:  AND THERE ARE DIFFERENT ARGUMENTS FOR

1 EACH, YOUR HONOR.

2           THE COURT:  OKAY.

3           MS. NOVAY:  MY RESPONSE WOULD SIMPLY BE, I AGREE THE

4 GOVERNMENT DOES NOT HAVE TO PROVE AMOUNT OF LOSS.  BUT THERE

5 HAS TO BE A BASELINE.  HOW MUCH WAS MR. HARDWICK ENTITLED TO

6 RECEIVE IN ORDER TO -- HOW IS THIS JURY SUPPOSED TO KNOW THAT

7 HE GOT TOO MUCH IF THEY DON'T KNOW HOW MUCH HE WAS SUPPOSED TO

8 GET IN THE FIRST PLACE?

9           THE COURT:  AND THEY HAVE TAKEN POSITION THAT, EVEN

10 THOUGH THEY DON'T HAVE TO PROVE THAT, SO YOU ALL MAY NEVER

11 AGREE ON THAT, THAT THEY HAVE IN FACT SHOWN AN AMOUNT AS

12 REFLECTED BY THE CHART THAT WAS JUST ON THE ELMO SYSTEM.

13           MS. NOVAY:  WELL, YOUR HONOR, I WOULD ARGUE THAT THE

14 CHART THAT WAS SHOWN IS THE AMOUNT THAT MR. HARDWICK RECEIVED.

15 I THINK THEY'VE PROVEN THAT HE'S RECEIVED A CERTAIN AMOUNT.

16 BUT I --

17           THE COURT:  GO AHEAD.

18           MS. NOVAY:  I'M SORRY.  BUT THEY HAVEN'T PROVEN THAT

19 HE WASN'T ENTITLED TO THAT MONEY.  THEY HAVEN'T PROVEN ACTUALLY

20 WHAT HE WAS ENTITLED TO RECEIVE.  I MEAN, I KNOW --

21           THE COURT:  WELL, IS THAT NOT A FACTUAL ISSUE?  I

22 THINK THEY'RE SAYING THAT AMOUNT, UNLESS I MISUNDERSTOOD, HE

23 WAS NOT ENTITLED TO THAT AMOUNT AT ALL, THE AMOUNT REFLECTED IN

24 THE CHART.  AND YOU ALL ARE SAYING HE WAS, OR AT LEAST SOME OF

25 IT, BASED ON THINGS THAT THEIR FORENSIC ACCOUNTANT AND THE FBI

1    ANALYST DIDN'T TAKE INTO ACCOUNT.

2            BUT IS THAT NOT FACTUAL ISSUE IN TERMS OF A

3    DISAGREEMENT AS TO HOW MUCH HE WAS ENTITLED TO, OR DO YOU STILL

4    STICK TO THE POINT THAT THEY HAVEN'T EVEN ESTABLISHED ANY

5    AMOUNT?

6            I GUESS I'M CONFUSED.  IS IT NOT JUST A DISAGREEMENT

7    WHICH LENDS ITSELF TO MORE OF A FACTUAL ISSUE OF THE EXACT

8    AMOUNT TO WHICH HE WAS ENTITLED?  AND IF THAT'S THE CASE, IT

9    DOES GO TO THE JURY, AT LEAST.

10           MS. NOVAY:  I AGREE.  IF THAT'S THE CASE, IT GOES TO

11   THE JURY.

12           THE COURT:  OKAY.

13           MS. NOVAY:  BUT OUR ARGUMENT IS THAT THAT'S NOT THE

14   CASE.

15           THE COURT:  OKAY.

16           MS. NOVAY:  AND THAT THEY -- YOU CAN'T SHOW THAT HE

17   GOT -- YOU CAN'T SHOW THAT MR. HARDWICK -- OR THE GOVERNMENT

18   CAN'T SHOW THAT MR. HARDWICK RECEIVED TOO MUCH IF THEY CAN'T

19   SHOW HOW MUCH HE GOT TO BEGIN WITH.

20           AND I -- OUR ARGUMENT IS YOU CAN'T SHOW HOW MUCH HE

21   WAS SUPPOSED TO RECEIVE IF YOU DON'T KNOW HOW MUCH THE OTHER

22   PARTNERS RECEIVED IN THE PROPORTIONAL SHARE.

23           THE COURT:  OKAY.

24           MS. NOVAY:  THERE HAS NOT BEEN EVIDENCE OF THAT.

25           THE COURT:  OKAY.

1          MS. NOVAY:  SO I MOVE FOR A JUDGMENT OF ACQUITTAL ON

2    COUNTS 2 THROUGH 22.

3          THE COURT:  YES, MA'AM.  OKAY.

4          MS. NOVAY:  THE LAST REMAINING COUNT, SINCE COUNT 25

5    HAS BEEN DISMISSED, IS COUNTS 23 AND 24.

6          MY ARGUMENT FOR COUNT 23 -- IF I CAN FIND MY COPY OF

7    THE INDICTMENT, YOUR HONOR.  MY ARGUMENT -- AND NORMALLY, I

8    LIKE TO DO IT IN ORDER OF MY STRONGEST ONES FIRST, BUT I'M JUST

9    GOING DOWN THE LIST.  AND I'LL ADMIT COUNT 23 ISN'T MY

10   STRONGEST ARGUMENT --

11         THE COURT:  IS OR ISN'T?

12         MS. NOVAY:  IS NOT.

13         THE COURT:  OKAY.

14         MS. NOVAY:  BUT WE STILL MOVE.

15         THE COURT:  OKAY.

16         MS. NOVAY:  WE STILL MOVE -- ARGUE THAT THE

17   GOVERNMENT, EVEN LOOKING AT THE EVIDENCE IN THE LIGHT MOST

18   FAVORABLE, THERE ARE TWO LAWSUITS THAT ARE THE SUBJECT OF

19   COUNT 23, AND THAT ON MAY 10TH OF 2011, THE ALLEGATION IS THAT

20   MR. HARDWICK GAVE A FALSE STATEMENT TO MS. KORNEGAY-TYLER, OR

21   MS. TYLER, WHEN IN FACT THE NATIONAL BANK OF GEORGIA HAD A

22   LAWSUIT THAT WAS PENDING AND THE BELLAGIO HAD A LAWSUIT THAT

23   WAS PENDING.

24         THERE HAS BEEN TESTIMONY FROM MR. MANOLL THAT WHEN A

25   SETTLEMENT AGREEMENT HAS BEEN SIGNED, IT WOULD BE REASONABLE

1   FOR A CLIENT TO BELIEVE THAT THE CASE WAS ESSENTIALLY OVER.  A

2   SETTLEMENT AGREEMENT WAS SIGNED ABOUT TWO MONTHS BEFORE THE

3   SIGNING OF THAT LEASE.  SO IT WOULD BE REASONABLE FOR

4   MR. HARDWICK TO BELIEVE THAT IT WAS OVER.  THAT INVOLVES THE

5   BELLAGIO SUIT.

6           AND THE DEFENSE PUT IN AN EXHIBIT -- I DON'T HAVE THE

7   EXHIBIT NUMBER, BUT IT WAS A CHRONOLOGY OF THE EVENTS -- I'LL

8   TRY TO ZOOM IN A LITTLE BIT, AND THIS IS MY COPY THAT I'VE

9   HIGHLIGHTED -- BUT THE CHRONOLOGY OF THE EVENTS THAT THERE WAS

10  A FILED STIPULATION SETTLEMENT AGREEMENT ON 4-5 OF 2011.  AND

11  MR. HARDWICK SIGNED THE ACTUAL LEASE -- OR, EXCUSE ME, SIGNED

12  THE ACTUAL PAPERWORK FOR THE LINE OF CREDIT ONE MONTH LATER.

13  SO IT WOULD BE REASONABLE FOR HIM TO BELIEVE THE CASE WAS OVER.

14          AS FAR AS THE NATIONAL BANK OF GEORGIA, OUR ARGUMENT

15  IS THAT MR. HARDWICK WAS IN NEGOTIATIONS, WAS CLEARING IT UP.

16  THERE WAS SOME CONFUSION ABOUT WHETHER OR NOT HE WAS BEING

17  PERSONALLY SERVED, ALTHOUGH I WILL ADMIT THE GOVERNMENT'S

18  EVIDENCE WAS -- EXCUSE ME, NOT SERVED, SUED, THAT HE WAS ON THE

19  LAWSUIT.  BUT IT WAS ALSO D&H, LLC.

20          I'LL LET THE GOVERNMENT RESPOND, BUT THOSE ARE OUR

21  ARGUMENTS FOR COUNT 23.  AND FOR THAT REASON WE MOVE FOR A

22  JUDGMENT OF ACQUITTAL.

23          THE COURT:  ALL RIGHT.  WHY DON'T YOU GO AHEAD AND DO

24  24 WHILE YOU'RE AT THE PODIUM.

25          MS. NOVAY:  OKAY.  COUNT 24 IS A LITTLE DIFFERENT,

1  AND THE REASONS WHY IS BECAUSE MR. HARDWICK IS NOT ACTUALLY

2  CHARGED WITH AFFIRMATIVELY MAKING A FALSE STATEMENT.  REALLY,

3  WHAT HE'S CHARGED WITH IS MAKING A STATEMENT THAT'S TRUE, BUT

4  IT'S FALSE BECAUSE IT'S AN OMISSION.

5       THIS JUST INVOLVES THE BELLAGIO SUIT.  AND THIS WAS

6  ANOTHER LOAN THAT HE COMPLETED WITH FIRST LANDMARK BANK AND

7  MS. KORNEGAY-TYLER, FEBRUARY 4TH OF 2013.

8       HE -- THE QUESTIONS ON THE LOAN FORM ARE THAT -- HE

9  CHECKS THE BOX, ARE YOU INVOLVED IN A LAW -- ARE YOU CURRENTLY

10  INVOLVED IN A LAWSUIT, AND THE BOX IS CHECKED.  AND IT'S

11  ACTUALLY CHECKED BY MS. KORNEGAY-TYLER, APPARENTLY WHILE SHE'S

12  MEETING WITH MY CLIENT.  SHE CHECKS THE BOX YES -- OR ACTUALLY,

13  EXCUSE ME, THAT'S NOT CORRECT.  CHECKS THE BOX YES TO THE

14  QUESTION, IS THERE AN OUTSTANDING JUDGMENT AGAINST YOU.  AND

15  CHECKS THE BOX YES.  ARE YOU A PARTY TO A LAWSUIT.  CHECKS THE

16  BOX NO.

17       IN FACT, THOSE ANSWERS ARE ABSOLUTELY CORRECT.  THERE

18  WASN'T A PENDING LAWSUIT IN THE BELLAGIO AT THAT POINT.

19  MR. MANOLL TESTIFIED THAT ONCE PARTIES AGREE TO A

20  STIPULATION -- OR, EXCUSE ME, NOT STIPULATION, AN AGREEMENT, HE

21  CAN SEE WHY THE CASE IS OVER.  BUT IT'S NOT REALLY OVER,

22  TECHNICALLY, UNTIL THE CASE IS DISMISSED OR A JUDGMENT HAS BEEN

23  ENTERED.

24       SO AT THIS POINT THE LAWSUIT IS OVER.  A JUDGMENT HAS

25  BEEN ENTERED AT THIS POINT WITH THE BELLAGIO.  THAT JUDGMENT

1    WAS 12-21 OF '11.  SO IT WAS ACTUALLY A FEW YEARS PRIOR TO

2    MR. HARDWICK TAKING OUT THIS LEASE.

3          SO HIS ANSWERS WERE TRUE, BUT THE ALLEGATION IS THAT

4    THEY WEREN'T TOTALLY ACCURATE OR THAT IT WAS FALSE BECAUSE

5    THERE WAS AN OMISSION OF THE BELLAGIO.  THE NETJETS LAWSUIT WAS

6    LISTED IN THE LOAN FORM, BUT THE BELLAGIO WAS NOT.

7          THE REASON WHY THIS IS UNIQUE AND DIFFERENT -- AND I

8    WILL GIVE THE COURT -- I THINK I HAD -- I THOUGHT I HAD PRINTED

9    OUT SEVERAL COPIES AND I PUT THEM IN DIFFERENT STACKS.  AND I

10   CAN SHARE MY COPIES WITH THE GOVERNMENT.

11         BUT THERE'S A LOT OF CASE LAW THAT -- SOME CASE LAW

12   THAT DEALS WITH SECTION 1014.  AND WHAT THEY SAY -- AND I WILL

13   PROVIDE THE COURT COPIES OF THE CASE LAW THAT I'M RELYING ON --

14   IS THAT A FALSE STATEMENT -- OR, EXCUSE ME, AN OMISSION, A

15   HALF-TRUTH IS NOT REALLY A FALSE STATEMENT UNDER 1014.  IT

16   MIGHT BE ANOTHER CRIME.  IT MIGHT BE BANK FRAUD, BUT IT'S NOT

17   ACTUALLY A FALSE STATEMENT, NOT ON 1014.  AND DRAW A HARD

18   DISTINCTION.

19         AND THE CASES THAT I'M RELYING ARE THE *KURLEMANN*

20   CASE, K-U-R-L-E-M-A-N-N, AND THAT'S 736 F.3D 439, 2013.  THAT'S

21   ACTUALLY OUT OF THE SIXTH CIRCUIT, BUT IT CITES TO AND

22   REFERENCES AN 11TH CIRCUIT CASE THAT'S VERY SIMILAR.  AND

23   THAT'S THE *UNITED STATES VERSUS THORN*, T-H-O-R-N, CASE.  AND

24   THAT'S 17 F.3D 325 OF 1994, HERE IN THE 11TH CIRCUIT.

25         SO THESE ARE THE CASES THAT I'M RELYING ON.  I

1    THINK -- I WOULD ASK THE COURT TO REVIEW THESE CASES BEFORE

2    MAKING A DETERMINATION.  THOSE ARE THE STRONGEST ARGUMENTS WE

3    HAVE IN THIS RESPECT AND JUST VERY MUCH ON THE FACT THAT HIS

4    STATEMENTS WERE ACTUALLY TRUE.

5         IT WAS AN OMISSION, IF THAT.  BUT IT WAS AN OMISSION.

6    BUT HIS STATEMENTS WERE CORRECT.  AND THAT MIGHT BE BANK FRAUD,

7    THAT MIGHT BE ANOTHER CRIME.  HE WAS -- MR. HARDWICK WAS

8    ACTUALLY ORIGINALLY CHARGED WITH BANK FRAUD BEFORE THE

9    GOVERNMENT SUPERSEDED.  BUT THIS IS THE WAY THEY'VE CHOSEN TO

10   PURSUE PROSECUTION IN THIS CASE.

11        AND FOR COUNT 24, AN OMISSION IS NOT ENOUGH.  SO I'LL

12   PROVIDE THE COURT WITH THESE CASES.

13        THE COURT:  THANK YOU.

14        MR. GILFILLAN:  I APOLOGIZE.  CAN YOU READ THE CITES

15   AGAIN?  YOU SAID THEM PRETTY QUICKLY.

16        MS. NOVAY:  THESE ARE MY COPIES.  AND THE OTHER TWO

17   CASES ARE *UNITED STATES VERSUS MILLER*.  THIS IS 734 F.3D 530.

18   THIS IS A SIXTH CIRCUIT CASE FROM 2013.

19        AND THE FINAL ONE IS UNITED STATES SUPREME COURT CASE

20   *WILLIAMS VERSUS THE UNITED STATES,* AND THAT'S 558 U.S. 279,

21   1982.

22        THE COURT:  ALL RIGHT.

23        MS. NOVAY:  AND I HAVE COPIES FOR THE COURT, TOO, FOR

24   THOSE AS WELL.

25        THE COURT:  THANK YOU.

1          MS. BARRON:  THANK YOU, YOUR HONOR.  I AM GOING TO

2    PRESENT THE ARGUMENT BECAUSE THESE ARE MY WITNESSES.

3          THE COURT:  OKAY.  AND REMIND ME OF A FEW QUESTIONS,

4    MS. BARRON, THAT WERE ASKED -- I'M MISSING ONE OF THEM -- THAT

5    WERE ASKED ON THAT COUNT -- OR THAT FORM.  PENDING LAWSUIT AND?

6          MS. BARRON:  ARE WE TALKING ABOUT ON COUNT 24?

7          THE COURT:  YES.

8          MS. BARRON:  QUESTION 8-A ON THAT FORM IS, ARE THERE

9    ANY OUTSTANDING JUDGMENTS AGAINST YOU.

10          AND QUESTION 8-D IS, ARE YOU A PARTY TO A LAWSUIT.

11          THE COURT:  OKAY.

12          MS. BARRON:  AND I'M GOING TO GO IN REVERSE ORDER AND

13   START WITH COUNT 24, BECAUSE I BELIEVE WHAT MS. NOVAY IS

14   DOING -- YOU REMEMBER RULE 29 IS WHETHER THE GOVERNMENT HAS

15   PRESENTED ENOUGH FACTS THAT IT CAN GO BACK TO THE JURY.

16          SHE HAS RAISED A QUESTION OF LAW.  IS AN OMISSION A

17   FALSE STATEMENT AS A MATTER OF THE LAW UNDER 1014?  AND THIS IS

18   SOMETHING THAT SHOULD HAVE BEEN RAISED IN A MOTION TO DISMISS.

19   IT'S CLEAR IN THE INDICTMENT WHAT THE FALSE STATEMENT IS.  IT'S

20   CLEAR THAT IT'S AN OMISSION.

21          AND SO THIS IS NOT A TIMELY ISSUE.  IT'S NOT QUESTION

22   OF FACT.  IT'S A LEGAL ISSUE.  BUT IF THE COURT IS INCLINED TO

23   CONSIDER THIS LEGAL ISSUE AT THIS TIME, THEN WE REQUEST THE

24   OPPORTUNITY TO BRIEF IT.

25          SO SETTING THAT ASIDE, I WANT TO GO BACK TO COUNT 23.

1          SO MS. NOVAY ACKNOWLEDGES THAT THERE WERE TWO PENDING

2    LAWSUITS AT THE TIME THAT MR. HARDWICK FILLED OUT THAT MAY 2011

3    LOAN APPLICATION FOR $25,000.  THE FIRST IS THE NATIONAL BANK

4    OF GEORGIA LAWSUIT.  THE QUESTION IS, DID HE KNOW THAT THAT

5    LAWSUIT WAS PENDING.  AND SHE'S SAYING, WELL, IT WAS AGAINST

6    D&H, THERE WAS A SETTLEMENT PENDING, MAYBE HE THOUGHT THAT

7    RESOLVED IT, MR. MANOLL TESTIFIED TO THAT.

8          I WANT TO REMIND THE COURT OF THE MANY DIFFERENT LOAN

9    APPLICATIONS ON WHICH MR. HARDWICK DID LIST LAWSUITS IN WHICH

10   THERE WAS SOME SETTLEMENT PENDING.  THE NETJETS LAWSUIT.

11   ACTUALLY LATER LISTS THE D&H LAWSUIT.  SO HE IS MADE AWARE OF

12   THE FACT THAT JUST BECAUSE THERE IS A TEMPORARY SETTLEMENT

13   AGREEMENT DOESN'T MAKE THE LAWSUIT GO AWAY.

14          AND HE'S A LAWYER.  HE KNOWS WHAT A SETTLEMENT

15   AGREEMENT IS.  HE KNOWS THAT UNTIL THE LAWSUIT IS DISMISSED, IT

16   IS PENDING.  HE IS NOT STANDING HERE AS A PERSON WITHOUT THAT

17   KIND OF KNOWLEDGE IN HIS BACKGROUND.

18          BUT MR. MANOLL ALSO TESTIFIED THAT EVEN BEFORE THE

19   D&H LAWSUIT WAS FILED -- AND IT WAS FILED IN JANUARY 2010.

20   BEFORE THAT LAWSUIT WAS FILED, HE HAD BEEN COMMUNICATING WITH

21   MR. HARDWICK ABOUT THE MISSED PAYMENTS.  MR. HARDWICK KNEW THAT

22   THAT LOAN WAS IN DEFAULT.  IT WAS A $5 MILLION LOAN.  IT WAS IN

23   DEFAULT.  HE KNEW THAT HE HAD BEEN SUED BECAUSE MR. MANOLL SAID

24   THAT HE ENTERED THE COMPLAINT.

25          AND THE REASON WHY WE KNOW THAT THAT STATEMENT ON THE

1  MAY 2011 LOAN APPLICATION IS FALSE IS BECAUSE HE LATER LIED TO

2  MS. TYLER ABOUT IT.  REMEMBER THE MEMO TO FILE THAT MS. TYLER

3  TALKED ABOUT.  WE ACTUALLY INTRODUCED IT.  AND I DON'T REMEMBER

4  THE EXHIBIT NUMBER.  THAT MEMO TO FILE IS BASED ON WHAT

5  MR. HARDWICK TOLD HER.

6          AND HE TOLD HER TWO THINGS.  HE SAID, I DIDN'T EVEN

7  KNOW THAT THIS LOAN WAS IN DEFAULT UNTIL I FILLED OUT THAT LOAN

8  APPLICATION.  AND HE ALSO SAID, I WAS JUST A MINORITY PARTNER.

9  I WAS A 15 PERCENT OR LESS EQUITY PARTNER.  AND WE KNOW THAT IS

10 NOT TRUE.  HE WAS TRYING TO CONCEAL IT FROM HER.

11         ON THE BELLAGIO LAWSUIT, YES, THEY HAD REACHED -- HE

12 AND THE BELLAGIO HAD REACHED A SETTLEMENT AGREEMENT IN

13 APRIL 2011.  SO THIS IS A MONTH BEFORE HE FILLS OUT THAT

14 APPLICATION.  AND IN THAT SETTLEMENT AGREEMENT, WHICH IS ALSO

15 IN EVIDENCE, IN ORDER TO REACH THE SETTLEMENT AGREEMENT,

16 MR. HARDWICK HAD TO SIGN A STIPULATION, A JUDGMENT -- A

17 JUDGMENT OF DEFAULT.  THE BELLAGIO COULD THEN FILE IF HE EVER

18 DEFAULTED ON THOSE PAYMENTS.  AND THAT WAS A CONDITION UNDER

19 THAT SETTLEMENT AGREEMENT.

20         SO AS A LAWYER, OR AS ANYBODY WHO CAN READ, HE WOULD

21 KNOW THAT IF HE DIDN'T MAKE THOSE PAYMENTS, THAT JUDGMENT IN

22 THAT CASE COULD BE FILED, WHICH NECESSARILY MEANS THAT CASE WAS

23 STILL PENDING.

24         NOW, WE KNOW HE DIDN'T MAKE THOSE PAYMENTS AND THAT

25 THE JUDGMENT ULTIMATELY WAS FILED, I THINK IN SEPTEMBER 2011,

1    MAYBE DECEMBER 2011.  IT WAS AT THE END OF THE YEAR.

2            BUT ANOTHER REASON WHY WE KNOW HIS INTENT WAS TO HIDE

3    IT IS BECAUSE HE CONTINUES TO FAIL TO MENTION THAT IN EVERY

4    SINGLE LOAN APPLICATION.  AND THEN WHEN HE'S CAUGHT, WHEN ANGEL

5    OAK FINALLY LEARNS ABOUT THIS JUDGMENT IN 2014, HIS RESPONSE IS

6    INCORRECT ON TWO MAIN POINTS.

7            FIRST OF ALL, HE TELLS MS. TYLER THAT IT WAS A

8    PAYMENT MISTAKE, IT'S REALLY NOT A BIG DEAL, WHEN IN FACT HE

9    KNEW AND ACKNOWLEDGED -- AND THIS IS ALSO INTRODUCED INTO

10   EVIDENCE -- THAT IT WAS FROM BOUNCED CHECKS.  HE ACKNOWLEDGED

11   THE DEBT.  THAT WAS IN THAT COMMUNICATION THAT WE INTRODUCED AT

12   THE VERY END FROM THE BELLAGIO.  HE ACKNOWLEDGED THAT HE OWED

13   THE DEBT.

14           AND THEN, SECONDLY, HE TRIED TO MISLEAD MS. TYLER

15   ABOUT THE ACTUAL DISMISSAL.  HE SAYS -- HE SENDS HER A COPY OF

16   THE DISMISSAL; AND HE SAYS, AS YOU CAN SEE, WE MADE THEM SEE

17   THE LIGHT.  AND THE REASON WHY IT WAS DISMISSED IS BECAUSE HE

18   FINALLY PAID IT.  AND SO I BELIEVE FROM THAT, THE JURY COULD

19   INFER THAT HE HAD THE INTENT TO LIE AND TO HIDE ABOUT THAT

20   JUDGMENT ALL ALONG.

21           NOW, AS TO COUNT 24, THE OMISSION, AGAIN, THERE ARE

22   SO MANY JUDGMENTS THAT -- IN ADDITION TO THE ONES CHARGED, THAT

23   MR. HARDWICK FAILED TO DISCLOSE.  HE INITIALLY FAILED TO

24   DISCLOSE THE NETJETS JUDGMENT.  HE FAILED TO DISCLOSE THE FIRST

25   CITIZENS BANK.  THAT'S THAT $60,000 A MONTH JUDGMENT.  THAT WAS

1    FOR THE COCKABOOSE.  HE FAILED TO IDENTIFY THE D&H LAWSUIT

2    UNTIL HIS WAGES WERE GARNISHED AND FIRST LANDMARK FOUND OUT

3    ABOUT IT.

4              AND WHAT'S MOST IMPORTANT IN THIS WHOLE SCHEME,

5    PERHAPS THE MOST SIGNIFICANT FACT, IS THAT WHEN

6    MS. KORNEGAY-TYLER FOUND OUT ABOUT THE GARNISHMENT AND FOUND

7    OUT ABOUT HIS FAILURE TO DISCLOSE THE D&H LAWSUIT, SHE HAD A

8    CONVERSATION WITH HIM.  AND SHE TESTIFIED TO IT.  IT'S

9    MEMORIALIZED IN HER MEMO:  I TOLD HIM ABOUT THE IMPORTANCE OF

10   BEING HONEST AND BEING TRUTHFUL AND DISCLOSING INFORMATION.

11             SO NOT ONLY IS THERE THAT DISCLAIMER ON EVERY SINGLE

12   LOAN APPLICATION HE SIGNED WHICH SAYS, I HAVE A DUTY TO

13   REPRESENT THE TRUTH, SHE SPECIFICALLY HAD THAT CONVERSATION

14   WITH HIM IN JANUARY OF 2012.

15             SO WHEN HE CONTINUES TO LEAVE THINGS OFF OF HIS

16   APPLICATION, YOUR HONOR, I BELIEVE THE JURY COULD INFER THAT HE

17   HAD THE INTENT TO DEFRAUD AND LEFT IT OFF, MADE THOSE FALSE

18   STATEMENTS, FOR THE PURPOSE OF MISLEADING MS. TYLER AND FIRST

19   LANDMARK BANK.

20             THE COURT:  ALL RIGHT.  THANK YOU.

21             MS. NOVAY, WOULD YOU LIKE TO BRIEFLY REBUT THE

22   ARGUMENTS ON 23 AND 24?

23             MS. NOVAY:  I WOULD.  AND, YOUR HONOR, I'LL REST ON

24   MY ARGUMENTS FOR 23 AND MAKE MY MOTION.

25             BUT WITH RESPECT TO COUNT 24, HE'S NOT CHARGED WITH

1  LEAVING THE NETJETS LAWSUIT OUT.  THAT'S NOT WHAT HE'S CHARGED

2  WITH IN COUNT 24.  HE'S CHARGED WITH MAKING A FALSE STATEMENT.

3  BUT THE FALSE STATEMENT IS AN OMISSION.  AND I ASK THE COURT

4  LOOK AT SPECIFICALLY THE *KURLEMANN* CASE AND THE *THORN* CASE IN

5  REFERENCE TO THAT.  AND I WILL RELY ON THOSE CASES AS MY BEST

6  CASES FOR THAT ARGUMENT.  AND IF THE COURT'S INCLINED TO BRIEF

7  IT, OF COURSE WE WILL, WE WILL COMPLY WITH WHATEVER THE COURT

8  WANTS TO DO.

9        BUT THE ISSUE IS THE STATEMENTS WERE TRUE.  THEY WERE

10  TRUE.  THERE WAS A JUDGMENT.  THERE WAS A JUDGMENT PENDING.

11  THERE WAS NO LAWSUIT PENDING AT THE TIME.  THAT IS A CORRECT

12  STATEMENT.

13        SO I WILL REST ON MY ARGUMENTS FOR THOSE THREE AND

14  MOVE FOR JUDGMENT OF ACQUITTAL.

15        THE COURT:  ALL RIGHT.  THANK YOU SO MUCH.

16        ALL RIGHT.  WITH RESPECT TO COUNT 1, I WILL DENY THE

17  RULE 29 MOTION FOR DIRECTED VERDICT.  I DO FIND THAT THERE IS

18  SUFFICIENT EVIDENCE TO PRESENT TO THE JURY, TO GO FORWARD WITH

19  THE JURY ON WHETHER THERE WAS A CONSPIRACY, ESPECIALLY

20  INCLUDING THE DAILY E-MAILS THAT WERE TESTIFIED TO THAT WERE

21  BETWEEN ASHA MAURYA AND MR. HARDWICK ONLY, THAT DID NOT INCLUDE

22  ANY OTHER RECIPIENTS OR SENDERS ON THOSE E-MAILS.

23        COUNT 2 -- COUNTS 2 THROUGH 22, I ALSO WILL DENY THE

24  MOTION FOR A DIRECTED VERDICT, FINDING THAT THE GOVERNMENT HAS

25  PUT FORWARD ENOUGH EVIDENCE FOR THE JURY TO CONSIDER WITH

1   RESPECT TO WHETHER MR. HARDWICK TOOK MORE THAN HE WAS ENTITLED

2   TO, AND EVEN AN AMOUNT.  LEAVING OPEN THE ISSUE OF WHETHER OR

3   NOT THEY HAVE TO NARROW IT DOWN TO A SPECIFIC DOLLAR AMOUNT, I

4   THINK THERE IS SUFFICIENT EVIDENCE FOR THE JURY TO CONSIDER

5   THERE.

6           COUNT 23, I WILL ALSO DENY THE MOTION FOR DIRECTED

7   VERDICT AND FIND THAT THERE IS SUFFICIENT EVIDENCE FOR THE JURY

8   TO CONSIDER WHETHER HE MADE THOSE, I GUESS, FALSE STATEMENTS.

9           COUNT 24, I WILL TAKE UNDER ADVISEMENT AT THIS TIME,

10  JUST TO GET A CHANCE TO LOOK AT THE CASE LAW, JUST TO SEE WHAT

11  IT SAYS.  TOTALLY UNFAMILIAR WITH THIS PRINCIPLE OR THIS --

12  WHAT'S BEEN PRESENTED HERE IN TERMS OF AN OMISSION NOT BEING

13  SUFFICIENT TO SATISFY A FALSE STATEMENT FOR PURPOSES OF THAT

14  STATUTE.  AND I JUST WANT SOME TIME TO LOOK AT THAT.

15          AND SO THOSE ARE MY RULINGS AT THIS TIME.

16          MS. BARRON:  IF I COULD CORRECT ONE THING.  AND I

17  DIDN'T CATCH THIS DURING MS. NOVAY'S REBUTTAL.  AND IF SHE SAID

18  IT THE FIRST TIME, I APOLOGIZE THAT I DIDN'T CATCH IT.

19          I THINK SHE SAID THAT THE BELLAGIO LAWSUIT HAD BEEN

20  DISMISSED AND THAT HIS STATEMENT WAS ACTUALLY TRUE, THAT THERE

21  WAS NO LAWSUIT PENDING.

22          MS. NOVAY:  NO.  WHAT I SAID WAS THAT THERE WAS A

23  JUDGMENT ENTERED.  AND MR. MANOLL TESTIFIED THAT WHEN A

24  JUDGMENT IS ENTERED, THE CASE IS OVER AND SO ON, THAT IT'S NO

25  LONGER PENDING.

1          MS. BARRON:  I'M TALKING ABOUT QUESTION 8-D, ARE YOU

2     A PARTY TO A LAWSUIT.  YOU'RE SAYING THAT THAT WAS -- THAT HIS

3     ANSWER NO IS A TRUE STATEMENT THERE?

4          MS. NOVAY:  YES.  MR. MANOLL TESTIFIED THAT THE CASE

5     IS OVER WHEN IT'S EITHER DISMISSED OR WHEN A JUDGMENT IS

6     ENTERED.  THAT'S WHEN THE LAWSUIT ENDS.

7          MS. BARRON:  OKAY.  THEN I WOULD LIKE TO POINT OUT,

8     YOUR HONOR, AS TO QUESTION 8-D, THIS LINE APPLICATION THAT WAS

9     FILLED OUT ON FEBRUARY 4TH, 2013.  I DO NOT HAVE THE EXHIBIT

10    NUMBER.  I CAN FIND IT.

11          BUT THE BELLAGIO DISMISSAL DID NOT COME DOWN UNTIL

12    APRIL 2014.  THAT WAS IN THE SECOND-TO-LAST EXHIBIT THAT I

13    ENTERED WITH MS. TYLER.  I BELIEVE IT IS EXHIBIT 966.  HE

14    ATTACHES A COPY OF THE DISMISSAL.  THE DISMISSAL WAS SIGNED BY

15    THE JUDGE I THINK IN MARCH 2014, AND IT WAS ELECTRONICALLY

16    FILED ON APRIL 6TH, 2014.  BUT EITHER DATE IS AFTER

17    FEBRUARY 4TH, 2013.

18          THE COURT:  ANYTHING FURTHER FROM YOU, MS. NOVAY?

19          MS. NOVAY:  ONLY THAT WE'RE DEALING WITH TWO

20    DIFFERENT DATES.  MR. MANOLL TESTIFIED THAT WHEN A JUDGMENT IS

21    ENTERED, THAT THAT'S -- THE CASE IS OVER.  IT IS NO LONGER

22    PENDING.  WE KNOW -- AND THIS IS NOT IN EVIDENCE -- THAT THE

23    CASE WAS REVIVED.  IT WENT AWAY AND THEN WAS REVIVED AGAIN

24    BASED ON DELINQUENT PAYMENTS.  THAT'S NOT IN EVIDENCE.

25          BUT WHAT IS IN EVIDENCE IS THAT, I THINK ABOUT A YEAR

1    AND A HALF BEFORE MR. HARDWICK FILLED OUT THIS FORM, A JUDGMENT

2    WAS ENTERED.  AND THERE IS TESTIMONY BEFORE THIS JURY THAT WHEN

3    A JUDGMENT IS ENTERED, THE CASE IS OVER AND IT IS NO LONGER

4    PENDING.

5            MS. BARRON:  AND TO THE EXTENT THAT THE COURT CREDITS

6    THAT REPRESENTATION, THEN QUESTION 8-A -- ARE THERE ANY

7    OUTSTANDING JUDGMENTS AGAINST YOU -- NECESSARILY HAS TO BE

8    TRUE.  SO EITHER WAY YOU LOOK AT THAT, HE LIED TO FIRST

9    LANDMARK BANK ON FEBRUARY 4TH, 2013.

10           THE COURT:  ALL RIGHT.  THANK YOU.

11           ALL RIGHT.  WHERE DO WE STAND WITH THE JURORS?

12           IS THERE ANYTHING ELSE AT THIS TIME BEFORE JURORS

13   COME IN, ASSUMING THEY ARE HERE?  GOVERNMENT?

14           MR. PHILLIPS:  NO, YOUR HONOR.

15           THE COURT:  DEFENSE?

16           MS. NOVAY:  NO, YOUR HONOR.

17           MS. LOEB:  YOUR HONOR, I WOULD LIKE TO GIVE THE

18   GOVERNMENT A COPY OF THE EXHIBITS WE INTEND TO USE WITH THE

19   FIRST COUPLE OF WITNESSES THIS MORNING TO MAKE SURE WE CAN

20   STREAMLINE THAT EVIDENCE COMING IN.

21           THE COURT:  GREAT.  OKAY.  ALL RIGHT.  IF YOU WILL GO

22   AHEAD AND DO THAT.  I AM BEING TOLD THAT OUR JURORS ARE ALL

23   HERE, SO THEY ARE READY TO START.

24           I'M GOING TO STEP OFF FOR JUST A MOMENT AND COME

25   RIGHT BACK OUT SO Y'ALL WILL HAVE ENOUGH TIME TO DO THAT.

1        THE COURTROOM SECURITY OFFICER:  ALL RISE.

2        (WHEREUPON, A BRIEF RECESS WAS HAD FROM 10:13 A.M. TO

3  10:20 A.M.)

4        MR. GILFILLAN:  I HAVE HAD TO DEAL WITH THESE

5  ALLEGATIONS IN THE PAST, BUT AT THE BEGINNING OF THE RULE 29

6  ARGUMENT, MR. HARDWICK WAS OUT AND WE WAITED FOR HIM.  AND I

7  THINK THAT PART WAS ON THE RECORD.  BUT I DON'T KNOW THAT WE

8  ACTUALLY PUT ON THE RECORD THAT HE WAS BACK FOR THE ENTIRE

9  THING.

10        THE COURT:  I DON'T THINK WE DID.  AND I SAID I WOULD

11  SAY IT AGAIN, BUT I DON'T THINK I ACTUALLY DID.  SO WHAT

12  PORTION DID I NOT DO, JUST ANNOUNCING WHAT IT WAS THAT WE WERE

13  DOING?

14        MR. GILFILLAN:  NO, YOUR HONOR.  I JUST THINK THE

15  RECORD OUGHT TO REFLECT THAT MR. HARDWICK WAS PRESENT BEFORE

16  ANY LAWYERS STARTED ARGUING THE RULE 29.

17        THE COURT:  JUST ANNOUNCING HIS PRESENCE WHEN HE CAME

18  IN.

19        MR. GILFILLAN:  IF IT'S ON THE RECORD NOW, I DON'T

20  THINK WE NEED TO DO ANYTHING ELSE.

21        THE COURT:  ALL RIGHT.  SO NOTED THAT, ALTHOUGH WHEN

22  I FIRST ANNOUNCED WE WERE ABOUT TO TAKE UP RULE 29 ISSUES,

23  MR. HARDWICK WAS NOT PRESENT, BUT WE WAITED UNTIL HE WAS

24  PRESENT BEFORE WE DID GO FORWARD WITH IT.

25        THANK YOU.

1       MR. GILFILLAN:  THANK YOU, JUDGE.

2       THE COURT:  HE IS NOT PRESENT NOW, BUT WE ARE LOOKING

3   FOR HIM?  OKAY.

4       ALL RIGHT.  THERE HE IS.

5       NOW WHERE'S MS. BECK?  ALL RIGHT.

6       SO MR. HARDWICK IS BACK IN, MS. BECK IS BACK IN, AND

7   WE ARE WAITING FOR THE JURORS TO COME IN.

8       ONE JUROR IS STILL IN THE RESTROOM, WE ARE WAITING

9   FOR.

10      (WHEREUPON, THE JURY RETURNED TO OPEN COURT AT

11  10:26 A.M., AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD.)

12      THE COURT:  ALL RIGHT.  THE JURY IS IN PLACE.

13  EVERYONE ELSE MAY BE SEATED.  THANK YOU SO MUCH.

14      AND GOOD MORNING TO YOU, LADIES AND GENTLEMEN.

15      THE JURY:  GOOD MORNING.

16      THE COURT:  A COUPLE OF THINGS BEFORE I FORGET TO

17  TELL YOU.  I HAVE BEEN TOLD, AND APPARENTLY I'VE HAD MY HEAD IN

18  THE SAND AFTER I LEAVE HERE, THAT EVERYONE ELSE KNOWS THAT

19  ABOUT 2:18 THERE IS SOME CELL PHONE TEST, KIND OF ALONG THE

20  LINES OF AN AMBER ALERT, THAT MAY AFFECT PHONES EVEN IF THEY

21  ARE OFF.  I DON'T KNOW THAT EVEN -- THAT YOU ALL HAVE YOUR

22  PHONES.  BUT IF ANYONE DOES -- BECAUSE I KNOW THAT IF YOU DON'T

23  HAVE A CAMERA PHONE, YOU ARE PERMITTED TO KEEP IT WITH YOU --

24  WE ARE, WE DO KNOW THAT AT 2:18 THAT MAY HAPPEN.  SO WE'RE

25  AWARE OF THAT.

1          THEN ALSO, AS YOU PROBABLY KNOW, THE COURTHOUSE IS

2     CLOSED ON MONDAY FOR COLUMBUS DAY, FEDERAL COURTHOUSE.  STATE

3     COURTHOUSES ARE STILL OPEN.  AND SO HAVE THAT IN MIND.

4          BUT ALSO, BECAUSE OF THAT, WE ARE STILL GOING -- MY

5     INTENTION IS TO TRY TO REALLY WORK LATER TOMORROW IF WE CAN.

6     MY UNDERSTANDING IS THAT ON WEDNESDAYS WE NEED TO BE OUT OF

7     HERE BY 5:30 BECAUSE AT LEAST ONE JUROR HAS CHILDCARE ISSUES.

8          ALSO, ON FRIDAY, WE NEED TO BE OUT OF HERE IN TIME

9     FOR ONE JUROR TO CATCH, ON FRIDAY, A 5:10 EXPRESS BUS, IS MY --

10    IS WHAT I'VE BEEN TOLD.

11         IF THOSE STATEMENTS ARE NOT CORRECT OR IF THERE ARE

12    ANY ADDITIONAL ONES THAT I NEED TO BE AWARE OF, PLEASE

13    COMMUNICATE ANY OF THAT TO MS. BECK.

14         BUT BECAUSE OF THAT, BECAUSE WE MIGHT HAVE TO STOP AT

15    A CERTAIN TIME TODAY AS WELL AS FRIDAY, AND BECAUSE WE WON'T BE

16    HERE AT ALL ON MONDAY, MY INTENTION WOULD BE TO REALLY PUSH IT

17    TOMORROW.  ALL RIGHT?

18         SO GOVERNMENT, AS YOU KNOW, RESTED YESTERDAY THEIR

19    CASE IN CHIEF.

20         AND SO NOW I TURN MY ATTENTION TO THE DEFENSE, TO ASK

21    DEFENSE, DO YOU HAVE ANYTHING YOU WOULD LIKE TO PRESENT AT THIS

22    TIME?

23         MS. LOEB:  YES, YOUR HONOR, WE DO.

24         THE COURT:  ALL RIGHT.  YOU MAY CALL YOUR FIRST

25    WITNESS.

1    MS. LOEB:  I'D LIKE TO CALL BRAD LITTLE TO THE STAND.

2    THE COURT:  ALL RIGHT.  THANK YOU, MA'AM.

3    GOOD MORNING, SIR.

4    MR. LITTLE:  GOOD MORNING.

5    THE COURT:  IF YOU WOULD COME RIGHT ON UP HERE, I

6  WILL SWEAR YOU IN.

7    MR. LITTLE:  YES, MA'AM.

8    THE COURT:  AND IF YOU WILL PLEASE RAISE YOUR RIGHT

9  HAND.

10                      BRAD LITTLE,

11  HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

12  FOLLOWS:

13    THE COURT:  ALL RIGHT.  IF YOU WOULD TAKE THE WITNESS

14  SEAT, PLEASE.  AND ONCE YOU ARE SEATED, GO AHEAD AND STATE YOUR

15  NAME AND THEN ALSO SPELL IT FOR THE RECORD.

16    THE WITNESS:  SURE.  MY NAME IS BRAD LITTLE.  AND

17  IT'S B-R-A-D, LAST NAME LITTLE, L-I-T-T-L-E.

18                   DIRECT EXAMINATION

19  BY MS. LOEB:

20  Q.   GOOD MORNING.

21  A.   GOOD MORNING.

22  Q.   HOW ARE YOU TODAY?

23  A.   GOOD.

24  Q.   WHERE DO YOU LIVE, MR. LITTLE?

25  A.   I LIVE IN JOHNS CREEK, HERE IN ATLANTA.

1    Q.   AND HAVE YOU LIVED IN GEORGIA MOST OF YOUR LIFE?

2    A.   I HAVE.  I WAS BORN AND RAISED HERE IN ATLANTA.  AND WENT

3    OFF TO HIGH SCHOOL AND COLLEGE AWAY, BUT CAME BACK TO ATLANTA

4    AND HAVE LIVED HERE EVER SINCE.

5    Q.   ARE YOU CURRENTLY EMPLOYED?

6    A.   I AM.  I WORK FOR A COMPANY CALLED DRUMMOND.

7    Q.   AND WHAT DO YOU DO AT DRUMMOND?

8    A.   I AM A BUSINESS DEVELOPMENT MANAGER.  I SELL COMMERCIAL

9    PRINTING AND PROMOTIONAL ITEMS.

10   Q.   DO YOU KNOW NAT HARDWICK?

11   A.   I DO.

12   Q.   AND HOW LONG HAVE YOU KNOWN HIM?

13   A.   I MET NAT, I BELIEVE, IN 1998.

14   Q.   HOW DID YOU COME TO MEET HIM?

15   A.   I HAD JUST JOINED A DUNWOODY COUNTRY CLUB, AND I WAS ON

16   THE PUTTING GREEN.  DIDN'T KNOW A SOUL.  HIM AND HIS FATHER,

17   BUDDY, HAD BEEN -- COME AROUND THE CORNER, AND THEY KIND OF

18   STOPPED.  AND I SAID, HEY, ARE Y'ALL PLAYING THE BACK NINE?  I

19   WOULD LOVE TO JOIN YOU.  AND HE SAID, ABSOLUTELY, COME ON.  SO

20   I PLAYED GOLF WITH HIM.

21   Q.   WHEN IS THE NEXT TIME YOU HEARD FROM MR. HARDWICK?

22   A.   I THINK THAT WAS ON, LIKE, A FRIDAY MAYBE.  AND THEN THE

23   FOLLOWING WEEK, HE CALLED ME UP AND THEN -- BECAUSE WE HAD

24   EXCHANGED NUMBERS.

25   Q.   AND WHAT DID HE ASK YOU TO DO AT THAT POINT?

1    A.   HE INVITED ME ON A GOLF TRIP.  HE HAD SEVEN GUYS GOING

2    DOWN TO HILTON HEAD AND NEEDED AN EIGHTH, AND WOULD I WANT TO

3    GO.

4    Q.   AND WOULD YOU CALL THAT THE INAUGURAL LOST BOYS TRIP?

5    A.   THAT WAS THE INAUGURAL LOST BOYS TRIP.

6    Q.   WHAT IS THE LOST BOYS?  HOW DID IT GET THAT NAME?

7    A.   SO THE LOST BOYS STARTED -- SO NAT HAD A HOUSE OUT ON LAKE

8    OCONEE.  AND SO GUYS ARE IN THEIR 20'S AND 30'S.  AND SO NAT

9    PUT TOGETHER THIS TOURNAMENT, AND IT WAS THE LAKE OCONEE STUDS

10   TOURNAMENT.  AND SO THEY DUBBED IT THE LOST BOYS.  AND SO HE

11   NEEDED AN EIGHTH.  I JOINED IN.  IT WAS A GROUP OF GUYS FROM

12   NAT'S COLLEGE, GUYS WHO LIVED AT THE LAKE, AND THEN ME IN

13   ATLANTA.

14   Q.   OVER THE YEARS, DID YOU GUYS BECOME GOOD FRIENDS?

15   A.   ABSOLUTELY.

16   Q.   DID A BIT OF TRAVELING TOGETHER?

17   A.   WE HAVE.

18   Q.   NOW, EARLY ON IN YOUR RELATIONSHIP WITH NAT, DID YOU DO

19   SOME MARKETING FOR HIS FIRM?  I THINK BACK THEN IT WAS JACKSON

20   AND HARDWICK.

21   A.   I DID.  SO BACK WHEN I FIRST STARTED WORKING WITH NAT'S

22   FIRM, ALL I WAS DOING WAS SOME PRINT WORK.

23        MR. PHILLIPS:  OBJECTION.  WHAT HAPPENED AT JACKSON

24   AND HARDWICK IS NOT RELEVANT TO THIS CASE.

25        THE COURT:  OVERRULED.

1      THE WITNESS:  I DID SOME PRINT WORK -- POCKET

2  HOLDERS, BROCHURES, THINGS LIKE THAT.

3  BY MS. LOEB:

4  Q.   AND DID YOU CONTINUE TO DO WORK FOR NAT'S LAW FIRM EVEN

5  WHEN HE WENT TO -- WHEN IT TURNED INTO MORRIS HARDWICK

6  SCHNEIDER?

7  A.   YES, MA'AM.

8  Q.   DESCRIBE THE DIFFERENT KINDS OF WORK YOU DID FOR THE LAW

9  FIRM.

10 A.   SO I PRINTED ANYTHING FROM OFFICE LOCATION BROCHURES --

11 THEY WERE HEAVY INTO THE PROMOTIONAL ITEMS AND TRADE SHOW EVENT

12 TYPE THINGS.  SO WHEN THEY TRAVELED AND WENT TO THE TRADE

13 SHOWS -- FOR INSTANCE, IF THEY WENT TO NEW ORLEANS, WE MAY DO A

14 MARDI GRAS THEME PROMOTIONAL ITEMS.  OR WE DID A LOT OF PENS,

15 BATTERY CHARGERS, ANYTHING THAT WOULD PROMOTE THE FIRM.  SOME

16 NICE ITEMS THAT THEY COULD PUT THEIR NAME AND LOGO ON, EITHER

17 LANDCASTLE TITLE OR MORRIS HARDWICK SCHNEIDER.  AND WE ALSO DID

18 QUITE A BIT OF APPAREL.

19 Q.   AND THESE ARE ITEMS THAT PEOPLE THAT GO TO THE CONVENTIONS

20 CAN PICK UP, TAKE WITH THEM, AND USE AND WEAR?

21 A.   YES.

22 Q.   I'M GOING TO PUT A STACK OF EXHIBITS IN FRONT OF YOU, AND

23 WE'LL GO THROUGH THEM ONE AT A TIME.

24      IF YOU COULD PICK UP AND LOOK AT EXHIBIT -- DEFENSE

25 EXHIBIT 554.  DO YOU RECOGNIZE THAT?

1  A.   I DO.

2        MS. LOEB:  IS THERE ANY OBJECTION?  I MOVE IN 554.

3        THE COURT:  OKAY.  ARE YOU -- IS THERE A STACK OF

4  EXHIBITS THAT WE'RE GOING TO DO ONE BY ONE, OR IS THIS

5  SOMETHING THAT HE CAN GO THROUGH COLLECTIVELY?

6        MS. LOEB:  WE'RE GOING TO DO THEM ONE BY ONE.

7        THE COURT:  OKAY.  ALL RIGHT.  IT'S ADMITTED.

8  BY MS. LOEB:

9  Q.   CAN YOU TELL THE JURY WHAT THIS IS A PHOTOGRAPH OF?

10 A.   IT'S AN EMBROIDERED LANDCASTLE TITLE HAT.  I CAN'T TELL

11 YOU WHAT THE BRAND IS, BUT IT IS A LANDCASTLE TITLE EMBROIDERED

12 HAT.

13 Q.   AND IS THAT SOMETHING THAT YOU AND YOUR FIRM DID FOR THE

14 COMPANY?

15 A.   YES, MA'AM.  SO WE DID THE EMBROIDERY.  AND AS A MATTER OF

16 FACT, WE CREATED THE DST FILE, WHICH IS AN EMBROIDERY FILE.  SO

17 WE HAD THAT IN OUR RECORDS AT ALL TIMES.

18 Q.   AND WHAT WOULD YOU DO WITH THE HATS?

19 A.   IT WOULD DEPEND ON WHAT THEY WERE ORDERING THEM FOR.  IT

20 COULD EITHER BE THAT NAT WOULD WEAR THESE AT A GOLF TOURNAMENT,

21 AT AN EVENT, GIVE THEM TO CLIENTS, GIVE THEM TO HIS FRIENDS TO

22 HAVE THE NAME OF HIS FIRM OUT IN PUBLIC.

23 Q.   DID YOU DO SIGNAGE FOR VARIOUS EVENTS?

24 A.   I DID.  SO CORE SIGNAGE, SOME BANNERS, THINGS LIKE THAT.

25 Q.   AND WERE THEY FOR LANDCASTLE AND ALSO FOR THE LAW FIRM?

1  A.  YES, MA'AM.  WE'VE DONE THEM FOR BOTH.

2  Q.  I THINK YOU MENTIONED EARLIER THAT YOU DID A LOCATION MAP.

3  CAN YOU DESCRIBE THAT FOR THE JURY?

4  A.  YES, MA'AM.  SO THE LOCATION MAP BASICALLY HAD THE

5  LOCATION OF EVERY LAW FIRM THEY HAD, EVERY OFFICE, PHONE NUMBER

6  AND CONTACT INFORMATION FOR THAT ADDRESS.

7  Q.  SO IT HAD -- DID IT HAVE INFORMATION FOR EACH OF THE

8  OFFICES ALL OVER THE COUNTRY?

9  A.  YES, MA'AM.  IT HAD A VERY SPECIFIC ADDRESS, CONTACT

10  INFORMATION, AND THEN IT SHOWED IT ON A MAP.  AND SO ATLANTA

11  PORTION OF THAT BROCHURE WAS CERTAINLY A LITTLE MORE RIGOROUS

12  THAN THE OTHER PARTS OF THE COUNTRY.

13  Q.  AND DID IT HAVE ANY INFORMATION ABOUT NAT ON IT?

14  A.  IT DID.  SO ON THE BACK OF THE BROCHURE -- AND I THINK I

15  SHARED THIS TO YOU -- AT ONE POINT I CALLED NAT UP AND SAID,

16  NAT, I THINK WE GOT A PROBLEM.  THEY PUT YOUR PERSONAL CELL

17  PHONE NUMBER ON THE BACK OF THE BROCHURE.  AND HE'S LIKE, NO,

18  NO, NO, I WANT MY CLIENTS TO BE ABLE TO GET IN TOUCH WITH ME

19  WHENEVER THEY CAN.  IF THERE'S A PROBLEM, I WANT TO BE ABLE TO

20  FIX IT.

21  Q.  WHO TYPICALLY ORDERED THE PROMOTIONAL MATERIALS FOR THE

22  FIRM?

23  A.  SO NIKKI BELL WAS THE MARKETING DIRECTOR.  AND THEN SHE

24  WOULD ESSENTIALLY, DEPENDING ON WHAT IT WAS WE WERE ORDERING OR

25  NEEDED TO GET, WE'D GET THAT KIND OF THING APPROVED THROUGH

1  NAT, DEPENDING ON WHAT THE SPIN WOULD BE.

2  Q.   AND SO WAS NAT BASICALLY WHERE THE DECISION WAS MADE ABOUT

3  THE MARKETING MATERIALS?

4  A.   AT THE END OF THE DAY, THE MARKETING, ALL MARKETING

5  DECISIONS RAN THROUGH NAT, WITH NIKKI'S RECOMMENDATION, I WOULD

6  SAY.

7  Q.   OKAY.  BACK TO THE LOST BOYS.  DID YOU CONTINUE TO TAKE

8  TRIPS WITH THIS GROUP OF FRIENDS AFTER THAT FIRST TRIP TO

9  HILTON HEAD?

10  A.   YES, MA'AM.

11  Q.   AND WHAT DID THOSE TRIPS USUALLY INVOLVE?

12  A.   FOR THE LOST BOYS TRIPS, TYPICALLY THOSE ARE GOLF OUTINGS,

13  WHERE WE WOULD GO TO VARIOUS GOLF COURSES AND PLAY GOLF.  AND

14  THEN THERE WERE SOME TRIPS WHERE WE WENT TO CASINO SITES --

15  LAS VEGAS, BILOXI.

16  Q.   LET'S START WITH THE GOLFING EVENTS.  DID THE GROUP OF

17  LOST BOYS GO TO THE MASTERS?

18  A.   NOT AS A GROUP, WE DID NOT.  WE WOULD GO SPARINGLY.  SO I

19  WENT A LOT OF TIMES, PROBABLY FIVE OR SIX TIMES WITH NAT,

20  TYPICALLY ON A SATURDAY.  BUT WE WOULD NOT GO AS A GROUP.  I

21  MEAN --

22  Q.   FOR US NON-GOLFERS, EXPLAIN A LITTLE BIT ABOUT THE

23  MASTERS.

24  A.   THE MASTERS IS THE -- ONE OF THE FOUR MAJORS IN GOLF.

25  IT'S THE ONLY MAJOR THAT'S PLAYED AT THE SAME VENUE EVERY

1  SINGLE YEAR.  AND IT IS THE PINNACLE, I WOULD SAY, OF GOLF

2  TOURNAMENTS.

3  Q.   AND IS IT DIFFICULT TO GET TICKETS TO?

4  A.   IT'S -- THEY DON'T EVEN PUT YOU ON A WAITING LIST ANYMORE.

5  Q.   YOU JUST HAVE TO BE --

6  A.   YOU'RE IN FOR LIFE OR YOU HAVE TO BUY THEM ON THE

7  SECONDARY MARKET.

8  Q.   SO HOW DID NAT USE HIS ABILITY TO GO TO THE MASTERS FOR

9  MARKETING PURPOSES?

10  A.   SO A LOT OF TIMES WE WOULD DO LANDCASTLE GEAR OR MORRIS

11  HARDWICK SCHNEIDER GEAR THAT HE COULD GIVE OUT TO HIS CLIENTS

12  THAT HE INVITED TO -- I THINK HE HAD A HOSPITALITY HOUSE THAT

13  I'VE BEEN.

14     AND SO HE WOULD USE THAT OPPORTUNITY TO MEET SOME CLIENTS

15  IN THE MORNING FOR A BREAKFAST, GO WATCH GOLF WITH A FEW OF

16  THEM.  YOU KNOW, NAT INEVITABLY KNEW SOME OF THE GOLFERS AND

17  KIND OF WOULD TAKE GUYS OVER TO THE COURSE, KIND OF PLANNED IT

18  OUT SO HE'D RUN INTO SOME PEOPLE THAT HE KNEW.  AND THEN HE'D

19  COME BACK A LOT OF TIMES FOR A LUNCH AND MEET WITH SOME PEOPLE

20  AND GO BACK OVER TO THE COURSE.  AND IT WAS AN ALL DAY, EVERY

21  DAY TYPE THING FOR HIM.

22  Q.   TELL US WHAT THE HOSPITALITY HOUSE WAS.

23  A.   IT WAS A HOME, AN OLDER HOME ACROSS THE STREET.  AND THEY

24  HAD BUFFETS OF FOOD, AN OPEN BAR, A PUTTING GREEN IN THE BACK.

25  JUST A REALLY NICE PLACE TO ENTERTAIN CLIENTS.  IT WOULD BE

1  LIKE GOING TO A SMALL COUNTRY CLUB RIGHT ACROSS THE STREET FROM

2  AUGUSTA NATIONAL.

3  Q.   AND IS THIS SOMETHING HE TYPICALLY DID WITH THE CLIENTS?

4  A.   YES.

5  Q.   WERE THERE ALWAYS CLIENTS THERE?

6  A.   AS FAR AS I KNOW.  MOST OF THE TIME WHEN I GOT INVITED, IT

7  WAS THE, HEY, BRAD, I HAD SOMEONE BAIL, CAN YOU GO TOMORROW.

8  AND THE ANSWER IS ALWAYS YES.  RIGHT?  SO IT'S THAT BIG OF A

9  TOURNAMENT.

10  Q.   YOU WOULD NEVER TURN THAT OFFER DOWN?

11  A.   NO, MA'AM.

12  Q.   DID YOU MEET A LOT OF HIS CLIENTS THERE AT THE MASTERS?

13  A.   I HAVE.

14  Q.   AND WHAT WAS THE BIGGEST DAY AT THE MASTERS?

15  A.   THE BIGGEST DAY, TYPICALLY, OF THE MASTERS MOST PEOPLE

16  WOULD THINK WOULD BE SUNDAY.

17  Q.   AND WAS THAT THE DAY -- IT WAS THE LAST DAY, IT WAS THE

18  BIG DAY?

19  A.   YES.

20  Q.   AND WOULD NAT GO ON SUNDAY?

21  A.   NEVER -- WELL, I WOULDN'T SAY NEVER.  NOT THAT I KNOW OF.

22  HE USUALLY DID NOT GO ON SUNDAYS.  IT'S ONE OF THOSE

23  TOURNAMENTS THAT IT'S A LOT MORE FUN TO WATCH ON TV THAN IT IS

24  IN PERSON ON A SUNDAY.

25  Q.   WHAT WOULD HE DO WITH THE SUNDAY TICKETS?

1    A.    SUNDAY TICKETS?  MY UNDERSTANDING WAS THE TICKETS HE HAD,

2    HE WOULD GIVE TO BIGGEST AND BEST CLIENTS.  AND THEN THAT WAS

3    JUST A WAY TO THANK THEM FOR THEIR BUSINESS, AND POSSIBLY

4    PROSPECTS AS WELL, I WOULD ASSUME.

5    Q.    NOW, DID HE PUT ON MARKETING EVENTS AROUND THE MASTERS, ON

6    EITHER SIDE OF IT?

7    A.    HE DID.  SO WE HAD A GOLF TOURNAMENT THE SATURDAY BEFORE

8    CALLED THE NATSTER'S.  AND IT WAS AT LAKE OCONEE, AT

9    CUSCOWILLA.  AND SO WE INVITED A LOT OF PROFESSIONAL GOLFERS,

10   SOME CELEBRITIES PLAYED, AND A LOT OF PEOPLE FROM THE FIRM AND

11   CLIENTS ALL PLAYED IN THE GOLF TOURNAMENT.

12   Q.    AND WHAT -- WERE A LOT OF THE LOST BOYS THERE?

13   A.    YES, MA'AM.

14   Q.    AND WHAT WERE THEY WEARING?

15   A.    ANY TIME WE HAD AN EVENT LIKE THAT, NINE TIMES OUT OF TEN,

16   WE'D HAVE LANDCASTLE TITLE GEAR OR MHS GEAR, CLOTHING -- NIKE

17   OR ADIDAS SHIRTS ON.

18   Q.    YOU ALL HAD LANDCASTLE TITLE SHIRTS?

19   A.    YES, MA'AM.

20   Q.    YOU ALL HAD HATS THAT WERE LIKE THIS OR SOME OTHER KIND OF

21   GEAR?

22   A.    YES, MA'AM.

23   Q.    DID PEOPLE FROM NAT'S OFFICE COME TO THE NATSTER'S?

24   A.    YES, MA'AM.

25   Q.    WHO DO YOU REMEMBER BEING AT THE NATSTER'S FROM THE

1  OFFICE?

2  A.   FOR CERTAIN I KNOW THAT ART MORRIS HAD BEEN SEVERAL TIMES.

3  BOB DRISKELL, I BELIEVE HE WAS THERE ALMOST EVERY YEAR.   I

4  THINK RANDY SCHNEIDER WENT ONE YEAR, BUT I'M NOT 100 PERCENT

5  POSITIVE OF THAT.

6  Q.   AND THEN WHAT ABOUT AFTER THE MASTERS, WAS THERE SOME SORT

7  OF GOLFING EVENT AFTER THE MASTERS?

8  A.   NAT WENT TO -- PLAYED AT THE HOOTIE AND THE BLOWFISH

9  MONDAY AFTER THE MASTERS GOLF TOURNAMENT IN MYRTLE BEACH, SOUTH

10  CAROLINA.

11  Q.   AND DID YOU TYPICALLY GO TO THAT?

12  A.   I PROBABLY WENT FOUR TIMES, I BELIEVE.

13  Q.   AND WHO WAS THERE?   WHO WAS AT THE MONDAY AFTER THE

14  MASTERS?

15  A.   THE MONDAY AFTER THE MASTERS COMPRISES OF A LOT OF

16  PROFESSIONAL GOLFERS.   AND TYPICALLY EACH GROUP THAT PLAYED,

17  YOU GOT A PROFESSIONAL GOLFER AND A CELEBRITY.   AND THAT

18  CELEBRITY MAY BE ANYWHERE FROM A LOCAL PERSONALITY TO DAN

19  MARINO, FOOTBALL PLAYERS; AND THEN WAYNE GRETZKY, THE HOCKEY

20  PLAYER; AND THEN A LOT OF THE GOLF PROFESSIONALS, BUT FROM THE

21  WEB.COM PGA TOUR.

22  Q.   AND DID NAT INVITE CLIENTS AND PROSPECTIVE CLIENTS TO

23  THAT?

24  A.   NOT TO PLAY.   SO TYPICALLY, HE PLAYED WITH HIS FRIENDS.

25  AND I DON'T KNOW WHO ALL WAS THERE, NECESSARILY, IN THE CROWD.

1    7,000 PEOPLE IN THE CROWD.

2    Q.   WOULD HE TYPICALLY INVITE FOLKS TO COME AND WATCH?

3    A.   I'M SURE, YES.

4    Q.   IF YOU WOULD LOOK AT EXHIBITS 338, 340, 341, 342, AND 446

5    IN FRONT OF YOU.

6    A.   338, 340.

7    Q.   341, 342, AND 446.  DEFENDANT'S EXHIBITS.

8    A.   YES, MA'AM.

9    Q.   DO THESE LOOK FAMILIAR TO YOU?  DO YOU KNOW WHAT THESE

10   ARE?

11   A.   THEY DO.  THOSE ARE THE PROGRAMS FOR THE MONDAY AFTER THE

12   MASTERS GOLF TOURNAMENT.

13   Q.   ALL RIGHT.  I AM GOING TO SHOW YOU THESE ON THE ELMO HERE.

14           THE COURT:  HAVE THOSE BEEN ADMITTED?

15           MS. LOEB:  I'M SORRY.

16           DO YOU HAVE ANY OBJECTION?

17           MR. PHILLIPS:  NO OBJECTION.

18           THE COURT:  OKAY.  THOSE ARE ALL ADMITTED.

19           MS. LOEB:  THANK YOU.

20           THE COURT:  AND THAT'S 338, 340, 341, 342, AND 446?

21           MS. LOEB:  CORRECT.  THANK YOU.

22           THE COURT:  OKAY.

23   BY MS. LOEB:

24   Q.   I'M GOING TO SHOW YOU THIS FIRST ONE.  AND IS THAT THE

25   PROGRAM FOR THE MONDAY AFTER THE MASTERS FOR THE YEAR 2005?

1    A.    I APOLOGIZE.  I SHUT THESE DOWN.  YES, MA'AM.

2    Q.    ALL RIGHT.  IF YOU WOULD TURN TO PAGE 2 OF THAT EXHIBIT.

3    CAN YOU TELL US WHAT THAT IS AT THE BOTTOM OF THE PAGE?

4    A.    THAT IS A MORRIS HARDWICK SCHNEIDER ADVERTISING THAT'S IN

5    THE MAGAZINE.

6    Q.    AND IF WE COULD LOOK NOW AT EXHIBIT -- DEFENSE

7    EXHIBIT 340.  RECOGNIZE THAT COVER?

8    A.    YES, MA'AM.  THAT'S FROM 2010.

9    Q.    AND THEN THE SECOND PAGE.  CAN YOU TELL THE JURY WHAT THE

10   SECOND PAGE IS OF THAT EXHIBIT?

11   A.    YEAH.  THAT LOOKS LIKE A FULL-PAGE AD FOR LANDCASTLE TITLE

12   WITHIN THE HOOTIE AND THE BLOWFISH MONDAY AFTER THE MASTERS.

13   Q.    AND THESE WOULD TYPICALLY BE PART OF A BIGGER PROGRAM,

14   CORRECT?

15   A.    YES, MA'AM.  YES, MA'AM.

16   Q.    THESE ARE JUST EXAMPLES.

17   A.    YES.  THE OTHER INDUSTRIES OR COMPANIES THAT HELP SPONSOR

18   THE EVENT WOULD ADVERTISE AS WELL, AND THEN A LIST OF THE

19   EVENTS AND WHAT WAS GOING ON AROUND THE TOURNAMENT.

20   Q.    ALL RIGHT.  IF YOU WOULD LOOK AT DEFENSE EXHIBIT 341.  IS

21   THIS ANOTHER COVER OF A PROGRAM FOR THE MONDAY AFTER THE

22   MASTERS?

23   A.    YES, MA'AM.  IT LOOKS LIKE 2011.  AND IT APPEARS TO BE

24   THE -- IT APPEARS TO BE THE EXACT SAME ADVERTISING FROM THE

25   YEAR BEFORE.

1  Q.   ARE YOU REFERRING TO PAGE 2?

2  A.   YES, MA'AM.

3  Q.   IT'S AGAIN A FULL-PAGE AD FOR LANDCASTLE TITLE?

4  A.   YES, MA'AM.

5  Q.   AND, AGAIN, WE HAVE ANOTHER PROGRAM FOR THE MONDAY AFTER

6  THE MASTERS WITH HOOTIE AND THE BLOWFISH?

7  A.   YES, MA'AM.  2012.

8  Q.   AND THEN THE SECOND PAGE OF EXHIBIT 342?

9  A.   IS A NEW AD -- IN TERMS OF IT WASN'T THE SAME AS THE

10  PREVIOUS TWO YEARS -- FOR LANDCASTLE TITLE, FULL-PAGE AD.

11  Q.   NOW OUR LAST HOOTIE AND THE BLOWFISH MONDAY AFTER THE

12  MASTERS, CAN YOU IDENTIFY THAT?  IT'S EXHIBIT 446.

13  A.   YES, MA'AM.  THAT IS 2014.

14  Q.   THAT'S THE COVER AND THEN --

15  A.   ANOTHER NEW FULL-PAGE AD FOR LANDCASTLE TITLE.

16  Q.   IN ADDITION TO THE ADS THAT WERE IN THE PROGRAMS FOR THE

17  TOURNAMENT, WERE THERE ALSO SIGNS AROUND THE GOLF COURSE?

18  A.   YES, MA'AM.  SO WHEN YOU -- THE TOURNAMENT WAS AT THE

19  BAREFOOT LANDING COURSE, I BELIEVE, IN MYRTLE BEACH.  SO WHEN

20  YOU PULLED UP THE DRIVEWAY, THEY HAD -- ALL THE SPONSORS PUT

21  SIGNS UP PULLING IN THE DRIVEWAY.  SO EVERY SPECTATOR WHO CAME

22  INTO THE EVENT WOULD HAVE SEEN IT.

23       THEN THERE WAS ALSO SIGNAGE OUT ON ONE OF THE HOLES.

24  TYPICALLY, IT WAS A PAR 3.  AND I COULDN'T TELL YOU WHICH HOLE

25  IT WAS, BUT I REMEMBER IT WAS A PAR 3.  AND WE ALWAYS STOPPED

1  AND TOOK PICTURES IN OUR LANDCASTLE TITLE GEAR.

2  Q.   IF YOU WOULD TURN TO DEFENSE EXHIBIT 343.

3  A.   343.  YES, MA'AM.

4  Q.   IT'S A TWO-PAGE EXHIBIT.

5          MS. LOEB:  ANY OBJECTION?

6          MR. PHILLIPS:  NO OBJECTION, YOUR HONOR.

7          THE COURT:  IT'S ADMITTED.

8  BY MS. LOEB:

9  Q.   IT IS NOT THE MOST EASY TO SEE PHOTOS, BUT COULD YOU TELL

10 US WHAT DEFENSE EXHIBIT -- PAGE 1 OF EXHIBIT 343 SHOWS?

11 A.   PAGE 1, THAT IS THE PICTURE OF THE LANDCASTLE TITLE

12 SIGNAGE ON THAT PAR 3.  AND IN THAT PICTURE IS NAT HARDWICK,

13 KYLE THOMPSON, WHO IS A PGA PROFESSIONAL, AND STEVE SPURRIER,

14 WHO IS A FOOTBALL COACH -- NOW RETIRED, BUT WAS THE COACH AT

15 UNIVERSITY OF FLORIDA AND THEN AT SOUTH CAROLINA.

16 Q.   AND I'M GOING TO SHOW YOU PAGE 2 OF EXHIBIT 343.  IS THAT

17 ANOTHER PHOTO OF THAT LANDCASTLE ADVERTISEMENT ON THE GOLF

18 COURSE?

19 A.   IT IS.  IT APPEARS TO BE THE SAME SIGN JUST BECAUSE OF THE

20 MERCEDES SIGN RIGHT BEHIND IT.  SO, AGAIN, IT'S NAT HARDWICK,

21 STEVE SPURRIER, KYLE THOMPSON.  AND THEN IN THIS PICTURE IS ME,

22 BRAD LITTLE, KEVIN ANDREWS, AND JOEL WEINBACH.

23 Q.   WAS THERE OTHER ADVERTISING AT THE MONDAY AFTER THE

24 MASTERS, LIKE ON ANY OF THE EQUIPMENT OR ANY OF THE THINGS THAT

25 THE GOLFERS HAD?

1   A.   I KNOW FOR A WHILE KYLE THOMPSON HAD A MORRIS HARDWICK

2   SCHNEIDER/LANDCASTLE TITLE -- HE MAY HAVE SWITCHED UP WHEN HE

3   SWITCHED BAGS -- ON HIS BAG SOMEWHERE.  I DON'T NECESSARILY

4   KNOW IF IT WAS THE MAIN ADVERTISEMENT ON THE BAG, LIKE GOLFERS

5   WOULD DO, BUT HE DEFINITELY ALWAYS HAD IT ON HIS BAG.

6   Q.   IS HE A PRETTY WELL-KNOWN GOLFER?

7   A.   NOT -- FAIRLY WELL-KNOWN.  I THINK HE'S THE LEADING MONEY

8   WINNER FOR WEB.COM FOR ALL TIME.  BUT HE UNFORTUNATELY GAVE UP

9   GOLF JUST THIS YEAR, SO --

10  Q.   WAS THERE A TOURNAMENT IN NEW ORLEANS THAT YOU FOLKS WENT

11  TO?

12  A.   YES.  WENT TO THE ZURICH CLASSIC.

13  Q.   ALL RIGHT.  TELL US ABOUT THE ZURICH CLASSIC.

14  A.   ZURICH CLASSIC WAS A GOLF TOURNAMENT THAT WAS AT TPC,

15  LOUISIANA.  AND TYPICALLY, WE WOULD GO DOWN ON A SUNDAY AND

16  PLAYED GOLF ON MONDAY, WEDNESDAY.  THERE'S A FEW EVENTS RELATED

17  TO THE TOURNAMENT THAT WE WENT TO, LIKE A PAIRINGS PARTY AND

18  THINGS LIKE THAT.

19  Q.   AND WHEN YOU WEREN'T AT THE GOLFING EVENT, WHAT WOULD NAT

20  BE DOING?

21  A.   WHEN WE WEREN'T GOLFING, WE DID A LITTLE BIT OF

22  SIGHTSEEING.  THERE WERE CERTAINLY TIMES WHEN WE WENT TO THAT

23  EVENT THAT NAT WOULD SAY, HEY, I'VE GOT SOME THINGS I GOT TO

24  DO, I'LL MEET UP WITH YOU 4 OR 5 O'CLOCK, 6 O'CLOCK, WE'LL MEET

25  AT DINNER.  AND SO I WOULD GO EXPLORE THE CITY WITH ONE OF THE

1   OTHER GUYS OR JUST KIND OF DO MY OWN THING OR DO MY WORK.  GET
2   ON MY PHONE, COMPUTER, DO MY STUFF.
3   Q.   AND NAT WOULD GO AND DO HIS WORK?
4   A.   THAT WAS MY UNDERSTANDING.
5   Q.   WAS THERE TYPICALLY A CONVENTION OR TRADE SHOW IN NEW
6   ORLEANS DURING A TOURNAMENT?
7   A.   I DON'T KNOW THE TIMING OF THE TRADE SHOW THAT THEY WENT
8   TO, BUT I KNOW HE DID -- HIS PEOPLE WENT TO A TRADE SHOW EVERY
9   YEAR.  AS A MATTER OF FACT, AS I RECALL, WE DID MARDI GRAS
10  BEADS AND MEDALLIONS FOR THAT TRADE SHOW.
11  Q.   NOW, WHEN YOU WALKED INTO THAT TOURNAMENT, WERE THERE
12  SIGNS OR NAMES OF SPONSORS?
13  A.   THERE WERE.  SO SOME OF THEM WERE PLACED, AGAIN, ON THE --
14  IT'S WALKING IN AND OUT OF THE TOURNAMENT.  SO THAT WAS A PGA
15  TOURNAMENT WHERE THEY BUSED EVERYONE IN.  SO WHEN YOU WALKED IN
16  AND OUT THERE WAS SIGNAGE.  I THINK THERE WAS SIGNAGE IN TWO OR
17  THREE DIFFERENT PLACES THAT MENTIONED LANDCASTLE TITLE.
18  Q.   ALL RIGHT.  IF YOU WOULD LOOK AT EXHIBITS 334, 335, AND
19  336.
20  A.   334, YES, MA'AM.
21  Q.   AND DO YOU RECOGNIZE THOSE AS BROCHURES FROM THE ZURICH
22  CLASSIC?
23  A.   NO.  WHAT I THINK THIS IS, TO BE HONEST WITH YOU, IS
24  ALMOST A RECAP FROM THE ZURICH CLASSIC, PEOPLE TRYING TO GET
25  THE FIRM TO -- OR NAT AND/OR THE FIRM TO SIGN BACK UP TO PLAY

1    AGAIN.  HERE'S WHERE WE -- SPONSORSHIPS, PICTURES OF THE

2    PEOPLE, LOOK HOW MUCH FUN YOU'RE HAVING.  THAT'S WHAT IT LOOKS

3    LIKE TO ME.

4    Q.   OKAY.  WELL, LET'S GO THROUGH THEM FOR A SECOND.

5         MS. LOEB:  DO YOU HAVE ANY OBJECTION?

6         MR. PHILLIPS:  I DO OBJECT, YOUR HONOR.  APPROACH THE

7    BENCH FOR A SECOND?

8         THE COURT:  SURE.

9         (WHEREUPON, A BENCH CONFERENCE OUT OF THE HEARING OF

10   THE JURY PROCEEDED AS FOLLOWS:)

11        THE COURT:  DO YOU HAVE THE SAME EXHIBIT?  OKAY.

12        MR. PHILLIPS:  I OBJECT BECAUSE THEY ARE GETTING INTO

13   IMPROPER CHARACTER EVIDENCE OF THE DEFENDANT WITH RESPECT TO

14   HOW MUCH MONEY THE TOURNAMENT RAISED FOR CHARITY.  AND I THINK

15   THAT'S A VIOLATION OF RULE 404.

16        THE COURT:  ALL RIGHT.  I'M GOING TO OVERRULE IT.

17        (WHEREUPON, PROCEEDINGS RESUMED IN OPEN COURT AS

18   FOLLOWS:)

19        THE COURT:  OVERRULED.

20        MS. LOEB:  ALL RIGHT.  I MOVE FOR THESE TO BE

21   ADMITTED.  MOVE FOR ADMISSION ON THESE THREE EXHIBITS.

22        THE COURT:  OH, OKAY.  I'M SORRY.  I WAS GOING TO SAY

23   I RULED, BUT YOU'RE RIGHT, I JUST RULED ON THE OBJECTION.  SO

24   OVERRULED AND ADMITTED.  THANK YOU.

25        MS. LOEB:  THANK YOU.

1    BY MS. LOEB:

2    Q.   ALL RIGHT.  IS THIS PHOTO OF THE FRONT PAGE OF THAT KIND

3    OF REVIEW OF THE TOURNAMENT FROM 2012?

4    A.   YES, MA'AM.  THAT'S A PICTURE OF THE 18TH HOLE.

5    Q.   AND I'M GOING TO ASK YOU, IF YOU WOULD, TO TURN TO PAGE 5.

6    A.   YES, MA'AM.

7    Q.   AND CAN YOU TELL THE JURY WHAT THIS SHOWS?

8    A.   YEAH.  IT'S THE SIGNAGE FOR PEOPLE THAT SPONSORED THE

9    WEDNESDAY PRO-AM.  I WOULD -- AND THIS IS 2012.  A LOT OF TIMES

10   WE DID TWO EVENTS WITHIN THIS TOURNAMENT AND DID THE MONDAY

11   PRO-AM -- AND YOU CAN SEE ON THERE IT SAYS MONDAY PRO-AM ON THE

12   RIGHT, WEDNESDAY ON THE LEFT.  WE DID BOTH.  AND IT MAY HAVE

13   BEEN THIS YEAR THAT WE DID NOT DO BOTH.

14   Q.   ALL RIGHT.  AND DOES THIS SHOW A SIGN FOR LANDCASTLE

15   TITLE?

16   A.   YES, MA'AM.  AND THAT WOULD HAVE BEEN AT THE ENTRANCE AND

17   THE EXIT.

18   Q.   ALL RIGHT.  AND THEN IF YOU WOULD TURN TO THE NEXT PAGE,

19   PAGE 6.

20   A.   YES, MA'AM.

21   Q.   AND IF YOU COULD TELL THE JURY WHAT THAT SAYS.

22   A.   IT'S LANDCASTLE TITLE, UNDER THE 2012 SPONSORS.  AND IT

23   LOOKS LIKE IT IS A PRINTED PIECE AND ON THEIR WEBSITE.

24   Q.   AND THIS WAS AN ANNUAL EVENT, WASN'T IT?

25   A.   YEAH.  IT'S A REGULAR STOP ON THE PGA TOUR.

1    Q.   WAS IT ALSO AN ANNUAL EVENT FOR MR. HARDWICK?

2    A.   YEAH.  YES, MA'AM.

3    Q.   ALL RIGHT.  I'M GOING TO SHOW YOU DEFENDANT'S EXHIBIT 335.

4    THERE WE GO.  AND WHO WAS THAT ON THE COVER; DO YOU KNOW?

5    A.   I KNEW YOU WERE GOING TO ASK ME THAT.  HE'S A PROFESSIONAL

6    GOLFER, THAT MUCH I DO KNOW.  IT'S NOT BILLY HORSCHEL, IS IT?

7    MAYBE IT IS.  I WOULD ONLY BE GUESSING.

8    Q.   BUT THAT'S THE FRONT COVER OF THE 2013 ZURICH CLASSIC?

9    A.   YES.  YES, MA'AM.  THE PARTNERSHIP REVIEW AGAIN.  AND I'M

10   GOING TO SAY THAT'S BILLY HORSCHEL, BUT I'LL SEE IF MY MEMORY

11   GETS BETTER.

12   Q.   AND THEN IF YOU WOULD LOOK AT PAGE 6.  WHAT DOES THAT

13   SHOW?

14   A.   PAGE 6.  THIS IS THE SPONSORSHIP BOARD AGAIN.  AND SO IN

15   THIS YEAR, MAYBE THE FIRST YEAR, IN 2012, DIDN'T DO THE MONDAY.

16   BUT THIS ONE SHOWS THE MONDAY AND WEDNESDAY SPONSORSHIPS AT THE

17   MAIN ENTRANCE AND EXITS.

18   Q.   ALL RIGHT.  AND THEN PAGE 7 OF THAT SAME EXHIBIT?

19   A.   OH.  YES, MA'AM.

20   Q.   AND WHAT DOES THAT SHOW?

21   A.   IT SHOWS A PRINTED TOURNAMENT MAGAZINE WHERE LANDCASTLE

22   TITLE IS IN THE -- ON THE TOURNAMENT SPONSORS.

23   Q.   AND THEN PAGE 8?

24   A.   THAT APPEARS TO BE THEIR WEBSITE, ELECTRONIC VERSION OF

25   THE MAGAZINE THAT THEY'RE IN.

1    Q.    AND IT SHOWS LANDCASTLE TITLE --

2    A.    YES, MA'AM.

3    Q.    -- BEING ADVERTISED?

4    A.    YES, IN TWO PLACES.

5    Q.    AND THEN IF YOU WOULD LOOK AT PAGE 5 OF EXHIBIT 335.  AND

6    I KNOW YOU RECOGNIZE ONE OF THOSE FAMOUS GOLFERS.  IS THAT YOU?

7    A.    NO.  ON PAGE 5 ON THIS ONE, 2013?  I AM NOT IN THAT

8    PICTURE.

9    Q.    YOU ARE NOT?

10   A.    ON PAGE 5?

11          THE COURT:  WHATEVER YOU ARE LOOKING AT SHOULD BE THE

12   SAME IMAGE ON THE SCREEN.

13          THE WITNESS:  OH, I'M SORRY.

14          THE COURT:  THAT'S ALL RIGHT.  NO, THAT'S FINE.

15   EITHER ONE, BUT IT SHOULD BE THE SAME.

16          THE WITNESS:  MAYBE I HAVE THE WRONG ONE.  HOLD ON.

17   I'M SORRY.

18          OH, YES.  SORRY.  I WAS LOOKING AT THE WRONG PAGE.

19   YES, MA'AM.  THAT IS ME STANDING NEXT TO D.J. TRAHAN.

20   BY MS. LOEB:

21   Q.    AND WAS HE A WELL-KNOWN GOLFER AT THE TIME?

22   A.    YES, MA'AM.

23   Q.    ALL RIGHT.  WE HAVE ONE MORE OF THESE.  THIS IS DEFENSE

24   EXHIBIT 336.  IS THAT THE PARTNERSHIP REVIEW FROM THE ZURICH

25   CLASSIC FOR 2014?

1   A.   YES, MA'AM.

2   Q.   AND IF YOU WOULD TURN TO PAGE 6.  DOES THAT SHOW THE

3   ADVERTISING?

4   A.   YES, MA'AM.  MONDAY, WEDNESDAY PRO-AM SPONSOR.

5   Q.   AND HOW ABOUT PAGE 7?

6   A.   LOOKS LIKE THE LANDCASTLE TITLE IN TWO PLACES FOR THE

7   PRINTED MAGAZINE.

8   Q.   NOW, IN ADDITION TO THOSE TRIPS, DID YOU ALSO GO TO PEBBLE

9   BEACH WITH NAT?

10   A.   YES, MA'AM.

11   Q.   TELL US ABOUT PEBBLE BEACH.

12   A.   IT'S A GREAT PLACE IN THE WORLD.  IT'S -- SPECIFICALLY

13   WHAT DO YOU WANT TO KNOW ABOUT PEBBLE BEACH?  ABOUT THE TRIP?

14   Q.   YES.  TELL US ABOUT THE TRIP AND ABOUT THAT TOURNAMENT.

15   IS IT A SPECIAL TOURNAMENT?

16   A.   YEAH, IT IS, VERY.  PEBBLE BEACH PRO-AM.  SO THEY HAVE

17   PEOPLE -- THE PEOPLE THAT PLAY IN THE TOURNAMENT ARE OBVIOUSLY

18   THE PROFESSIONALS.  THEN THE AMATEURS ARE ANYWHERE FROM

19   CELEBRITIES WHO YOU SEE ON TV AND IN THE MOVIES, SPORTS

20   FIGURES, AND THEN HEADS OF INDUSTRIES AND BUSINESSES THAT PLAY

21   IN IT.  LIKE THE KOHLERS, DAVID KOHLERS OF THE WORLD, HERB

22   KOHLER, PEOPLE LIKE THAT THAT ARE PROMINENT BUSINESS PEOPLE.

23   Q.   IS THAT A SPECIAL THING TO BE INVITED TO?

24   A.   VERY.

25   Q.   DID -- WAS LANDCASTLE TITLE A SPONSOR?

1    A.    YES.

2    Q.    AND WERE PROGRAMS HANDED OUT AT THAT TOURNAMENT?

3    A.    I'M SURE THEY WERE.  I DON'T KNOW IF I'VE EVER SEEN -- IF

4    I EVER GOT ONE MYSELF, BUT I KNOW -- I'M SURE THEY WERE.

5    Q.    ARE YOU FAMILIAR WITH DEFENSE EXHIBIT 347?  LOOK AT IT FOR

6    A SECOND.

7    A.    OH, YES.  I HAVE SEEN THIS.

8    Q.    AND I'M GOING TO ASK YOU TO LOOK AT DEFENSE EXHIBITS 347,

9    349, 350, AND 351.

10              MS. LOEB:  ANY OBJECTION?

11              MR. PHILLIPS:  NO.

12              MS. LOEB:  MOVE FOR ADMISSION.

13              THE COURT:  ALL RIGHT.  THOSE ARE ALL ADMITTED.

14   THANK YOU.

15   BY MS. LOEB:

16   Q.    OKAY.  ONCE AGAIN, DO YOU RECOGNIZE DEFENSE EXHIBIT 347?

17   A.    I DO.

18   Q.    IS THAT THE COVER OF A PROGRAM FOR PEBBLE BEACH?

19   A.    IT IS.  IT IS FOR THE NATIONAL PRO-AM.

20   Q.    ALL RIGHT.  AND THEN IF YOU WOULD TURN TO PAGE 2, DOES

21   THAT SHOW THE SPONSORS?

22   A.    IT DOES.

23   Q.    AND WAS LANDCASTLE TITLE A SPONSOR FOR THAT PRO-AM PEBBLE

24   BEACH TOURNAMENT AS WELL?

25   A.    YES, MA'AM.

1  Q.   AND I BELIEVE THIS IS -- THIS IS 2008; ISN'T THAT RIGHT?

2  A.   YES, MA'AM.

3  Q.   ALL RIGHT.  THE SAME THING FOR EXHIBIT 349.  IS THAT THE

4  COVER OF THE PEBBLE BEACH PROGRAM?

5  A.   YES, MA'AM.  2010.

6  Q.   ALL RIGHT.  AND THEN ON PAGE 2 OF THAT EXHIBIT, DOES IT

7  SHOW THE PARTICIPATING SPONSORS?

8  A.   YES, MA'AM.

9  Q.   AND WAS LANDCASTLE TITLE ONE OF THOSE?

10  A.   YES.

11  Q.   AND THEN THE LAST PAGE, WHAT IS THAT?

12  A.   IT IS A FULL-PAGE AD IN THE PEBBLE BEACH NATIONAL PRO-AM

13  BOOKLET.

14  Q.   AND TO YOUR KNOWLEDGE, WAS NAT HARDWICK TRYING TO START

15  THE BUSINESS IN CALIFORNIA?

16  A.   I THINK -- IN MY OPINION, I DON'T KNOW NECESSARILY IN

17  CALIFORNIA.

18         MR. PHILLIPS:  OBJECTION.  CALLS FOR SPECULATION AND

19  HEARSAY.

20         THE COURT:  OVERRULED AT THIS TIME.

21         IF YOU KNOW.  SHE ASKED IF YOU KNOW.

22         THE WITNESS:  I KNOW THAT NAT WANTED TO EXPAND HIS

23  BUSINESS.  I DON'T NECESSARILY KNOW SPECIFICALLY IF IT WAS

24  CALIFORNIA.  BUT I DID KNOW THAT HE WANTED TO EXPAND MORRIS

25  HARDWICK SCHNEIDER AND LANDCASTLE TITLE BUSINESS.

1   BY MS. LOEB:

2   Q.   AND DO YOU KNOW HE WAS LOOKING TO MOVE THAT OUT WEST?

3   A.   I DID KNOW THAT.

4   Q.   AND IF YOU WOULD LOOK AT DEFENSE EXHIBIT 350.  IS THAT

5   ANOTHER BROCHURE OR PROGRAM FROM PEBBLE BEACH?

6   A.   YES, MA'AM.

7   Q.   FOR THE YEAR 2011 THIS TIME?

8   A.   YES, MA'AM.

9   Q.   AND IF YOU WOULD LOOK AT THE PARTICIPATING SPONSORS ON

10  THIS, IS LANDCASTLE TITLE INCLUDED?

11  A.   YES, MA'AM.

12  Q.   AND THEN THE LAST PAGE.

13  A.   ANOTHER FULL-PAGE AD FOR LANDCASTLE TITLE.

14  Q.   AND THEN THIS IS OUR LAST PEBBLE BEACH COVER.  DO YOU

15  RECOGNIZE THAT?

16  A.   I DO.

17  Q.   AND IS THAT THE PROGRAM FROM 2012?

18  A.   YES, MA'AM.

19  Q.   IT SHOWS BILL MURRAY ON THE COVER; IS THAT RIGHT?

20  A.   THAT IS BILL MURRAY.

21  Q.   AN EXAMPLE OF THE CELEBRITIES THAT WOULD BE OUT THERE?

22  A.   YES, MA'AM.

23  Q.   AND WHAT DOES PAGE 2 SHOW?

24  A.   PAGE 2 ARE PARTICIPATING SPONSORS, AND LANDCASTLE TITLE IS

25  LISTED ON THERE.

1  Q.  AND THEN WHAT DOES PAGE 3 OF DEFENSE EXHIBIT 350 SHOW?

2  A.  PAGE 3 WOULD BE A FULL-PAGE LANDCASTLE TITLE ADVERTISING.

3  Q.  NOW, WHEN YOU AND YOUR FRIENDS WOULD GO TO THESE

4  TOURNAMENTS WITH NAT, AND HE WAS PLAYING, WHAT WOULD Y'ALL BE

5  DOING?

6  A.  A LOT OF TIMES I WAS CADDYING FOR NAT.  OR IF I WASN'T

7  CADDYING ONE DAY, I WOULD, I WOULD FOLLOW AND WATCH HIM PLAY.

8  Q.  AND WHAT WERE Y'ALL WEARING DURING THOSE PERIODS OF TIME?

9  A.  BASICALLY, WHEN WE WERE ON THESE TRIPS, WE ALWAYS WORE

10 LANDCASTLE TITLE GEAR.  NOW, I WOULDN'T SAY IF WE WERE GOING

11 OUT AT NIGHT AND MAYBE GOING TO THE BAR WE WOULD DO THAT.  BUT

12 IF WE WERE OUT ON THE GOLF COURSE OR AT AN EVENT THAT NAT WAS

13 SPONSORING, WE ALWAYS WORE LANDCASTLE TITLE GEAR.

14      AND NOT THAT WE WERE EMPLOYEES OF THE FIRM, BUT WE --

15 SINCE WE WERE ACTING AS NAT'S FRIENDS AND MAYBE AN AGENT OF THE

16 FIRM, IF YOU WILL, KIND OF AS A REPRESENTATIVE, IS HOW WE TOOK

17 THE ROLE.

18 Q.  AND DID Y'ALL FEEL THAT WAY?

19 A.  ABSOLUTELY.

20 Q.  NOW, YOU SAID THAT THERE WERE OTHER THINGS AT THE -- AT

21 THESE TOURNAMENTS OTHER THAN JUST GOLF.  COULD YOU TELL US WHAT

22 A FEW OF THOSE THINGS WERE?  FOR INSTANCE, AT PEBBLE BEACH.

23 A.  THERE WERE.  SO ONE OF THE EVENTS NAT SPONSORED A NIGHT AT

24 THE AQUARIUM.  I KNOW HE GOT UP AND GAVE A SPEECH.  I MISSED

25 THAT NIGHT.  I WAS SICK, UNFORTUNATELY.  DID AN EVENT WITH --

1   THAT I REMEMBER WELL, WAS WITH TOMS SHOES FOR A CHARITY EVENT,

2   WHERE CELEBRITIES AND PROFESSIONALS CAME IN AND DECORATED

3   THESE -- THESE SHOES, THEN THEY WERE AUCTIONED OFF AND THE

4   MONEY WAS GIVEN FOR CHARITY.  AND I BELIEVE IT WAS PROBABLY FOR

5   THE FIRST TEE ORGANIZATION OF MONTEREY.

6   Q.   AND THE TOMS SHOES, THAT'S THE COMPANY WHERE YOU BUY ONE,

7   GET ONE FREE -- BUY ONE, GET ONE SENT TO CHARITY?

8   A.   YES, MA'AM.  SO YOU BUY A PAIR OF SHOES, AND THEY SEND A

9   PAIR OF SHOES TO A NEEDY COUNTRY FOR KIDS OR PEOPLE THAT NEED

10  SHOES.

11  Q.   WHAT ABOUT ADVERTISING ON THE GOLF COURSE ITSELF DURING

12  PEBBLE BEACH?

13  A.   YEAH.  SO THE -- ON THE ELECTRONIC SCOREBOARDS AND ON SOME

14  OF THE STATIC SCOREBOARDS, THERE WERE ADVERTISING.  AND

15  LANDCASTLE TITLE WAS CERTAINLY INVOLVED IN THAT.

16  Q.   AND IF YOU WOULD LOOK AT EXHIBIT 334, SEVERAL-PAGE

17  EXHIBIT.

18  A.   3 --

19  Q.   354.

20  A.   YES, MA'AM.

21  Q.   354.

22          MS. LOEB:  ANY OBJECTION?

23          I MOVE FOR ENTRY OF 354.

24          THE COURT:  ANY OBJECTION?

25          MR. PHILLIPS:  NO, YOUR HONOR.

1        THE COURT:  ALL RIGHT.  IT'S ADMITTED.

2   BY MS. LOEB:

3   Q.   ALL RIGHT.  IF YOU WOULD LOOK AT PAGE 1.  IS THAT NAT

4   PLAYING ON THE RIGHT?

5   A.   THAT IS NAT ON THE RIGHT.  THAT'S THE NUMBER ONE GOLFER IN

6   THE WORLD, DUSTIN JOHNSON, JUST TO HIS LEFT.  THAT'S ME WITH

7   THE HARDWICK CADDY BIB ON, AND OUR GOOD FRIEND KYLE THOMPSON

8   OVER ON THE LEFT.  SO ESSENTIALLY -- AND I BELIEVE OUR OTHER

9   AMATEUR PLAYER THAT YEAR WAS PROBABLY JOE RICE, A FRIEND OF

10  NAT'S AND ALL SOUTH CAROLINA PEOPLE.

11  Q.   AND IS JOE RICE A LAWYER?

12  A.   JOE RICE IS A LAWYER.

13  Q.   WAS HE INVOLVED IN A BIG CASE THAT YOU KNOW OF?

14  A.   I BELIEVE -- HE WAS, AND HE --

15       MR. PHILLIPS:  OBJECTION.  HEARSAY AND RELEVANCY.

16       THE COURT:  SUSTAINED.  HE'S A BIG LAWYER.  WE'LL

17  MOVE ON FROM THAT.

18  BY MS. LOEB:

19  Q.   WAS JOE RICE A FRIEND OF NAT'S?

20  A.   YES.

21  Q.   AND TO YOUR KNOWLEDGE, DID HE HAVE BUSINESS WITH JOE RICE?

22  A.   I BELIEVE SO, YES, MA'AM.

23  Q.   IF YOU WOULD LOOK AT PAGE 2, IS THAT THAT TOMS EVENT YOU

24  WERE TALKING ABOUT?

25  A.   THAT IS THE TOMS EVENT.

1    Q.   AND WHO IS THAT WITH NAT?

2    A.   THAT IS ANN HARDWICK.  THAT IS NAT'S MOTHER.

3    Q.   AND IF YOU WOULD LOOK AT PAGE 3, WHO IS THAT WITH

4    MR. HARDWICK?

5    A.   THAT IS BUDDY HARDWICK.  THAT IS NAT'S FATHER.

6    Q.   YOU SAID THAT YOU AND YOUR FRIENDS WOULD TRAVEL AND YOU

7    WOULD BE REPRESENTATIVES OF THE FIRM.  WAS THAT ALSO TRUE FOR

8    NAT'S PARENTS?

9    A.   YES, MA'AM.

10   Q.   LOOK AT PAGE 4 OF THAT EXHIBIT.  CAN YOU TELL US WHO THAT

11   IS?

12   A.   YEAH.  THAT IS NAT AND A GENTLEMAN NAMED MARK WILSON.  AND

13   IF MY MEMORY SERVES ME RIGHT, THAT YEAR I THINK HE WON LIKE

14   THREE TOURNAMENTS RIGHT IN A ROW, I THINK, OR BACK -- PRETTY

15   CLOSE TO IT.  SO HE WAS A MOVER AND A SHAKER THAT YEAR.

16   Q.   AND THEN, FINALLY, PAGE 5 OF THAT EXHIBIT.

17   A.   THAT IS ANN HARDWICK AT A LADIES OUTING.  I THINK THEY DID

18   A -- IF I'M NOT MISTAKEN, I KNOW ONE YEAR THEY DID A LUNCHEON

19   AT A GOLF COURSE CALLED TEHAMA.  I DIDN'T GO BECAUSE IT WAS A

20   LADIES OUTING, SO --

21   Q.   IS THAT AN EXAMPLE OF NAT'S MOM BEING A REPRESENTATIVE OF

22   THE FIRM?

23   A.   ABSOLUTELY.

24   Q.   SHE WAS NOT AN EMPLOYEE?

25   A.   NO, MA'AM.

1    Q.   JUST A FEW MORE PHOTOS FROM PEBBLE BEACH.  IF YOU WOULD

2    LOOK AT EXHIBIT 353, PLEASE.

3    A.   YES, MA'AM.

4    Q.   DO YOU RECOGNIZE THAT AS PEBBLE BEACH?

5    A.   YES, MA'AM.

6         MS. LOEB:  ANY OBJECTION?

7         MR. PHILLIPS:  NO OBJECTION.

8         THE WITNESS:  YOU KNOW WHAT, ACTUALLY, I DON'T KNOW

9    IF THIS IS PEBBLE BEACH, TO BE QUITE HONEST WITH YOU.  I KNOW

10   WHO THE GOLF PLAYER IS.  IT'S RUSSELL HENLEY.  HE'S A

11   UNIVERSITY OF GEORGIA GRADUATE, I BELIEVE.

12        THE COURT:  STILL NO OBJECTION, MR. PHILLIPS?

13        MR. PHILLIPS:  NO.

14        THE COURT:  OKAY.  IT'S ADMITTED.

15   BY MS. LOEB:

16   Q.   DO YOU RECOGNIZE THIS -- AND IF NOT PEBBLE BEACH, THEN

17   IT'S ONE OF THE --

18   A.   CERTAINLY PROFESSIONAL GOLFER TOURNAMENT, YES, MA'AM.

19   Q.   SO YOU ARE REFERRING TO RUSSELL HENLEY?

20   A.   YES, MA'AM.

21   Q.   AND HE IS A PRO GOLFER?

22   A.   YES, MA'AM.

23   Q.   AND PAGE 2 OF THAT EXHIBIT?

24   A.   THAT IS DEFINITELY PEBBLE BEACH.

25   Q.   OKAY.  AND CAN YOU TELL THE JURY WHO THESE FOLKS ARE?

1  A.   YES.  THIS IS -- I BELIEVE THIS WAS THE SAME DAY THE OTHER

2  PICTURES -- MAYBE NOT, BECAUSE NAT'S SHIRT LOOKS DIFFERENT.

3  BUT -- SO ON THE RIGHT -- WE'LL GO FROM LEFT TO RIGHT -- THAT

4  IS JOE RICE, NAT HARDWICK, IN THE MIDDLE IS ARNOLD PALMER,

5  DUSTIN JOHNSON, AND KYLE THOMPSON.

6  Q.   AND THEY ARE ALL WELL-KNOWN EXCELLENT GOLFERS, PERHAPS

7  INCLUDING MR. HARDWICK?

8  A.   YES.  I THINK SO.  YEAH.  ARNOLD PALMER, THE KING.

9  Q.   PAGE 3 OF THAT EXHIBIT --

10          THE COURT:  THIS IS 354?

11          MS. LOEB:  THIS IS 353.

12          THE COURT:  353, OKAY.

13 BY MS. LOEB:

14 Q.   IS THAT ANOTHER PHOTO OF NAT WITH GOLFERS AT PEBBLE BEACH?

15 A.   IT APPEARS TO BE THE SAME GROUP AT PEBBLE BEACH.  HOLE

16 NUMBER 7, AS A SIDE NOTE.

17 Q.   AND THEN, FINALLY, PAGE 4 OF EXHIBIT 353.

18 A.   IT'S NAT AND DUSTIN JOHNSON ON HOLE NUMBER 7.

19 Q.   OKAY.  AND WAS HE THE WINNER?

20 A.   HE HAD WON -- YOU KNOW, I THINK HE WON THE YEAR BEFORE

21 THIS PICTURE WAS TAKEN, MAYBE.  OR MAYBE IT WAS TAKEN THE SAME

22 YEAR, BUT IT WASN'T TAKEN AFTER HE WON, I WOULDN'T IMAGINE.

23 Q.   NOW, WHAT IS PAGE 5 OF THAT EXHIBIT?

24 A.   IT IS A VERY LARGE MOBILE SCORE -- SCOREBOARD.  AND THEY

25 WERE PROBABLY -- SO THIS GOLF TOURNAMENT WAS PLAYED OVER THREE

1    COURSES. THERE'S PROBABLY AT LEAST TWO OF THESE ON TWO COURSES

2    AND PROBABLY FOUR OR FIVE OF THEM ON THE COURSE AT PEBBLE

3    BEACH, THE ACTUAL PEBBLE BEACH GOLF COURSE. AND THESE TYPE OF

4    THINGS WOULD BE RUNNING THROUGHOUT THE DAY DURING THE

5    TOURNAMENT AND DURING PRACTICE ROUNDS.

6    Q.   HOW LARGE WAS THAT SIGN; DO YOU KNOW?

7    A.   MY GUESS -- THAT'S A GREAT QUESTION. I THINK IT WAS

8    BROUGHT IN ON, LIKE, A TRACTOR-TRAILER TYPE DEAL WHERE THEY

9    JUST HOOKED IT UP. AND I THINK IT HAS WHEELS ON IT, IF I'M NOT

10   MISTAKEN.

11   Q.   AND THEN IS THIS THE SIGNAGE FROM THAT MONTEREY AQUARIUM?

12   A.   IT APPEARS THAT IT IS. AGAIN, I WAS SICK THAT NIGHT,

13   UNFORTUNATELY.

14   Q.   THEN, FINALLY, GOING TO ASK YOU TO LOOK AT EXHIBIT 337.

15   A.   YES, MA'AM.

16            MS. LOEB:  ANY OBJECTION?

17            MR. PHILLIPS:  I DO, YOUR HONOR. I OBJECT TO THIS ON

18   THE GROUNDS THAT IT'S BEYOND THE SCOPE OF THE INDICTMENT. IT

19   PREDATES THE CHARGES IN THE INDICTMENT.

20            THE COURT:  OKAY.

21            MR. PHILLIPS:  I DON'T THINK IT'S RELEVANT.

22            THE COURT:  I DON'T HAVE IT IN FRONT OF ME.

23            MS. LOEB:  MAY I APPROACH?

24            THE COURT:  YES. IS GOVERNMENT APPROACHING, OR NO?

25            (WHEREUPON, A BENCH CONFERENCE OUT OF THE HEARING OF

1    THE JURY PROCEEDED AS FOLLOWS:)

2          MS. LOEB:  THE REASON I THINK THIS IS IMPORTANT IS

3    BECAUSE THERE WAS SOME TESTIMONY FROM MR. WITTSTADT ABOUT BEING

4    AT THIS PARTICULAR OUTING.  TO THE EXTENT THAT THE GOVERNMENT'S

5    ARGUING HE DIDN'T KNOW ABOUT THE MARKETING EVENTS, HE CLEARLY

6    KNEW ABOUT THIS.

7          MR. PHILLIPS:  WE ARE NOT ARGUING THAT HE DIDN'T KNOW

8    ABOUT MARKETING EVENTS.  MR. WITTSTADT TALKED ABOUT THIS.  I

9    DON'T THINK HE WAS TALKING ABOUT 2010.  THE CHARGES IN THE

10   INDICTMENT PERTAIN TO 2011 THROUGH AUGUST OF '14, 2014.

11          (WHEREUPON, PROCEEDINGS RESUMED IN OPEN COURT AS

12   FOLLOWS:)

13          THE COURT:  ALL RIGHT.  OVERRULED.  AND ADMITTED.

14   BY MS. LOEB:

15   Q.   DO YOU RECOGNIZE THIS PROGRAM?

16   A.   I DO.  THIS IS FROM THE TOUR CHAMPIONSHIP HERE IN ATLANTA.

17   THE FIRM ALWAYS, FOR YEARS AND YEARS, HAD A TENT ON THE 14TH

18   HOLE -- I BELIEVE IT WAS THE 14TH HOLE -- WHERE THEY WOULD

19   ENTERTAIN CLIENTS AND FRIENDS AT SOME POINT.  SO I DID PLENTY

20   OF MARKETING CUPS, THINGS -- SO THEY COULD DRINK OUT OF THEIR

21   LOGO CUPS FOR THE TENT, ANY OTHER GIVE-AWAYS, KOOZIES, THINGS

22   LIKE THAT THAT THEY WOULD GIVE TO THEIR CLIENTS THAT WERE

23   COMING TO THIS EVENT.

24   Q.   AND DID PEOPLE FROM THE FIRM COME TO THAT?

25   A.   ABSOLUTELY.  AS A MATTER OF FACT, NIKKI AND THE -- ANOTHER

1  MARKETING PERSON WOULD WORK THE EVENT AND JUST CHECK ON CLIENTS

2  TO MAKE SURE THEY WERE OKAY, DID THEY NEED ANYTHING, DO YOU

3  NEED A REFILL, DO YOU NEED A COURSE MAP, WHATEVER IT MAY BE,

4  JUST TO HELP OUT.

5  Q.   ON PAGE 2 OF THAT EXHIBIT, DOES THIS SHOW THE SPONSORS?

6  A.   YES, MA'AM.

7  Q.   AND INCLUDED IN THOSE SPONSORS IS THE LAW FIRM?

8  A.   YES.  MORRIS HARDWICK SCHNEIDER.

9  Q.   AND THAT WOULD BE RIGHT THERE?

10  A.   YES, MA'AM.

11  Q.   AND WERE CLIENTS AND PROSPECTIVE CLIENTS INVITED TO THAT

12  EVENT?

13  A.   YES.  IF I CAN RECALL CORRECTLY, THEY TYPICALLY DID

14  DIFFERENT DAYS.  BECAUSE I WOULD ASK NAT, HEY, IF YOU HAVE AN

15  EXTRA TICKET, LET ME KNOW.  HE'D BE LIKE, LOOK, I PROBABLY

16  DON'T HAVE ANY ON THURSDAY, BECAUSE THURSDAY IS WHEN I'M

17  BRINGING IN ALL MY BUILDERS, OR WHATEVER IT MAY BE.  AND

18  BANKERS WOULD BE ON FRIDAY.  AND THERE WAS A MIX OF THAT.

19  TYPICALLY I WOULD COME UP WITH A TICKET AT SOME POINT, RIGHT?

20  BUT -- SO THEY WOULD BRING THEM IN IN GROUPS, WAS MY

21  UNDERSTANDING.

22  Q.   AND YOU WENT TO NAT -- WITH NAT TO LAS VEGAS, DIDN'T YOU?

23  A.   I HAVE.

24  Q.   AND WERE YOU TOGETHER WITH NAT THE ENTIRE TIME YOU WERE

25  OUT THERE?

1    A.   NO.

2    Q.   WHAT WOULD THE TYPICAL DAY BE LIKE?

3         THE COURT:  AND I'M SORRY, MS. LOEB.  ARE WE TALKING

4    ABOUT A SPECIFIC TIME FRAME OR A SPECIFIC TRIP?  HE SAID, I

5    HAVE.  SO I DON'T KNOW IF HE'S BEEN ONE OR MORE THAN ONE TIME.

6    BY MS. LOEB:

7    Q.   HOW MANY TIMES DID YOU GO OUT TO LAS VEGAS WITH NAT -- OR

8    WITH NAT OUT THERE?

9    A.   I'D SAY FIVE.

10    Q.   WAS THERE A TYPICAL PATTERN WHEN YOU WOULD GO OUT THERE

11    WITH NAT?

12    A.   TYPICALLY, NAT WOULD GO FROM A SUNDAY TO A SUNDAY.  AND I

13    WOULD TYPICALLY GO OUT ON A THURSDAY, FLY COMMERCIAL AND THEN

14    RIDE BACK WITH NAT.

15    Q.   AND WHY WOULD HE GO EARLIER THAN YOU?

16    A.   MY UNDERSTANDING WAS -- IS THAT NAT WAS -- HE WAS OUT

17    THERE DOING WORK.  I KNOW THAT HE OPENED UP A PRACTICE IN

18    LAS VEGAS.  I THINK IT WAS OUTSIDE OF LAS VEGAS, BUT IN NEVADA.

19    AND SO I THINK HE WAS GOING OUT THERE TRYING TO PUT THAT DEAL

20    TOGETHER.  AND HE WOULD TYPICALLY DO THAT EARLY IN THE WEEK,

21    AND THEN I'D GET THERE LATER IN THE WEEK.  AND WHEN I GOT

22    THERE -- IT WAS MOSTLY FUN AND GAMES ONCE I GOT THERE.

23    Q.   DID YOU ALSO GO TO BILOXI?

24    A.   I HAVE.

25    Q.   AND HOW MANY TIMES DID YOU GO TO BILOXI?

1  A.  I'D SAY PROBABLY THREE TO FOUR.

2  Q.  AND THE SAME QUESTION:  WAS THERE A TYPICAL PATTERN WHEN

3  YOU WOULD GO TO BILOXI WITH NAT?

4  A.  THERE'S ONE TIME IT WAS -- THAT I CAN RECALL, IT WAS

5  STRICTLY GOLF.  THERE WAS ANOTHER TIME THAT WE WENT THAT NAT

6  BASICALLY SAID -- WE HAD BREAKFAST ONE MORNING, AND HE SAID,

7  BRAD, I GOT BUSINESS TO TAKE CARE OF.  GO HANG OUT.  SO I SAT

8  BY THE POOL AND WATCHED THE GOLF TOURNAMENT ALL DAY.

9  Q.  WHAT IS YOUR SENSE OF NAT AND HIS ABILITY TO BUILD

10  RELATIONSHIPS WITH PEOPLE, FROM WHAT YOU'VE OBSERVED?

11  A.  THAT'S WHAT NAT DOES.  HE'S VERY MUCH LOVED.  I THINK

12  THAT'S WHY WE GET ALONG SO --

13        MR. PHILLIPS:  OBJECTION.

14        THE COURT:  SUSTAINED.

15  BY MS. LOEB:

16  Q.  THE LOST BOYS WERE FRIENDS FOR A NUMBER OF YEARS; IS THAT

17  RIGHT?

18  A.  YES, MA'AM.

19  Q.  AND ARE YOU ALL STILL FRIENDS?

20  A.  ABSOLUTELY.

21  Q.  DO YOU FEEL LIKE HE'S A PART -- AN IMPORTANT PART OF THE

22  GROUP?

23  A.  ABSOLUTELY.

24  Q.  AND DO YOU THINK THAT HE'S BEEN A LOYAL FRIEND AND GOOD AT

25  BUILDING A RELATIONSHIP WITH YOU AND, FROM WHAT YOU COULD TELL,

1  WITH HIS CLIENTS?

2  A.  ABSOLUTELY.

3       MS. LOEB:  I HAVE NOTHING FURTHER.

4       I LEFT YOU WITH A LITTLE BIT OF A MESS HERE.

5       THE COURT:  ALL RIGHT.  CROSS-EXAMINATION.

6                    CROSS-EXAMINATION

7  BY MR. PHILLIPS:

8  Q.  GOOD MORNING, MR. LITTLE.  MY NAME IS RUSSELL PHILLIPS.  I

9  REPRESENT THE UNITED STATES.

10      MHS WAS YOUR CLIENT, NOT THE OTHER WAY AROUND, RIGHT?

11 A.  I HAVE CLOSED PROPERTIES WITH THEM.

12 Q.  THAT DOESN'T CHANGE MY QUESTION, THOUGH, SIR.

13      MHS WAS YOUR CLIENT, NOT THE OTHER WAY AROUND, RIGHT?

14 A.  YES, MA'AM -- YES, SIR.  PARDON ME.

15 Q.  THAT'S OKAY.  AND YOU TOLD US MR. HARDWICK LIKED BEING

16 AROUND ALL THESE FAMOUS PEOPLE, CELEBRITIES AND PROFESSIONAL

17 ATHLETES, RIGHT?

18 A.  YES.

19 Q.  AND HE WAS WILLING TO SPEND A LOT OF MONEY TO MAKE THAT

20 HAPPEN, RIGHT?

21 A.  I BELIEVE SO.

22 Q.  WELL, HE HAD TO SPEND A LOT OF MONEY TO GET IN THESE

23 POSITIONS TO RUB ELBOWS WITH THESE PEOPLE, RIGHT?

24 A.  YES, SIR.

25 Q.  ARE YOU AWARE THAT NAT HARDWICK WAS TOLD BY HIS PARTNERS

1  AT HIS LAW FIRM THAT THE FIRM WOULD NOT PAY FOR THESE PEBBLE

2  BEACH EXPENSES?

3         MS. LOEB:  OBJECTION.  CALLS FOR HEARSAY AND

4  SPECULATION.

5         THE COURT:  I'LL OVERRULE.  IF HE KNOWS.

6         THE WITNESS:  I DO NOT KNOW.

7  BY MR. PHILLIPS:

8  Q.   OKAY.  ARE YOU AWARE THAT MR. HARDWICK WAS TOLD BY HIS

9  PARTNERS THAT HIS FIRM WOULD NOT PAY FOR HIM TO FLY ON PRIVATE

10 JETS?

11 A.   I DID NOT KNOW THAT.

12 Q.   OKAY.  YOU DON'T KNOW HOW MUCH MONEY MR. HARDWICK SPENT ON

13 PRIVATE JETS, DO YOU?

14 A.   I DO NOT.

15 Q.   YOU DON'T KNOW HOW MUCH MR. HARDWICK SPENT ON GAMBLING AT

16 CASINOS, DO YOU?

17 A.   I DO NOT.

18 Q.   YOU DON'T KNOW HOW MUCH MONEY MR. HARDWICK SPENT GAMBLING

19 WITH BOOKIES?

20 A.   I DO NOT.

21 Q.   YOU DON'T KNOW HOW MUCH MONEY MR. HARDWICK SPENT ON SOCIAL

22 COMPANIONS?

23 A.   I DO NOT.

24 Q.   AND BY THE SAME TOKEN, YOU DON'T KNOW ANYTHING THAT NAT

25 HARDWICK EVER SAID TO A WOMAN NAMED ASHA MAURYA, DO YOU?  WERE

1  YOU PRESENT FOR ANYTHING THAT HE SAID?

2  A.   I REMEMBER HIM INTRODUCING ME TO HER AT ONE POINT, BUT NO

3  EXCHANGE BETWEEN THEM.

4  Q.   OKAY.  SO YOU WERE INTRODUCED TO HER, BUT YOU DON'T KNOW

5  ANYTHING THAT NAT HARDWICK SAID TO ASHA MAURYA, CORRECT?

6  A.   I DID NOT.

7        THE COURT:  I'M SORRY.  YOU WERE OR WERE NOT

8  INTRODUCED TO HER?

9        THE WITNESS:  I WAS INTRODUCED TO HER, BUT I DON'T

10  KNOW HER AND I DON'T KNOW ANYTHING ABOUT ANY CONVERSATIONS THAT

11  THEY HAD.

12  BY MR. PHILLIPS:

13  Q.   THANK YOU.  AND, LIKEWISE, YOU DON'T KNOW ANYTHING THAT

14  NAT HARDWICK SAID TO MARK WITTSTADT?

15  A.   I DO NOT.

16  Q.   YOU DON'T KNOW ANYTHING THAT NAT HARDWICK SAID TO ROD

17  WITTSTADT?

18  A.   I DO NOT.

19  Q.   YOU DON'T KNOW ANYTHING THAT NAT HARDWICK SAID TO ART

20  MORRIS?

21  A.   I DO NOT.

22  Q.   YOU DON'T KNOW WHAT MHS'S NET INCOME WAS?

23  A.   I DO NOT.

24  Q.   YOU'VE NEVER REVIEWED MHS'S AUDITED FINANCIAL STATEMENTS?

25  A.   I HAVE NOT.

1    Q.   YOU'VE NEVER REVIEWED MHS'S TAX RETURNS?

2    A.   I HAVE NOT.

3    Q.   YOU DON'T KNOW HOW MUCH MONEY MR. HARDWICK TOOK OUT OF THE

4    LAW FIRM, DO YOU?

5    A.   I DO NOT.

6    Q.   YOU DON'T HAVE ANY INFORMATION ABOUT WHAT ASHA MAURYA TOLD

7    NAT HARDWICK ABOUT HOW MUCH MONEY MHS WAS MAKING, DO YOU?

8    A.   I DO NOT.

9    Q.   IF THE SHAREHOLDER AGREEMENT BETWEEN NAT HARDWICK AND HIS

10   PARTNERS AT MHS HAS A $10,000 LIMIT THAT SAYS THE FIRM WILL NOT

11   REIMBURSE YOU FOR ANY EXPENSE OVER THAT AMOUNT WITHOUT

12   UNANIMOUS AGREEMENT OF THE PARTNERS, YOU WOULDN'T HAVE ANY

13   INFORMATION ABOUT WHETHER MR. HARDWICK EVER SOUGHT UNANIMOUS

14   AGREEMENT FROM HIS PARTNERS ABOUT GETTING REIMBURSED FOR THOSE

15   KINDS OF EXPENSES, WOULD YOU?

16   A.   I WOULD NOT, AND I --

17            MS. LOEB:  OBJECTION.

18            THE COURT:  DO YOU KNOW ANYTHING ABOUT --

19            THE WITNESS:  I DON'T KNOW ANYTHING ABOUT THE

20   BUSINESS OTHER THAN THEIR MARKETING EFFORT.

21            THE COURT:  OKAY.  AS FAR AS SHAREHOLDER

22   AGREEMENTS --

23            THE WITNESS:  NO.

24            THE COURT:  I'LL SUSTAIN.

25   BY MR. PHILLIPS:

1    Q.   YOU TOLD US THAT YOU FLEW ON A NUMBER OF FLIGHTS WITH

2    MR. HARDWICK, RIGHT?

3    A.   YES, SIR.

4    Q.   WHEN DID YOU FIRST MEET HIM?  WHAT YEAR?

5    A.   I BELIEVE IT WAS 1998.

6    Q.   AND WHEN DID YOU FIRST START FLYING ON PRIVATE AIRPLANES

7    WITH MR. HARDWICK?

8    A.   IT WAS -- I'M GUESSING.  TO BE HONEST, I WOULD SAY 2008,

9    2007, MAYBE.

10   Q.   OKAY.  AND SO HOW MANY TIMES DO YOU THINK YOU FLEW ON A

11   PRIVATE PLANE WITH NAT HARDWICK FROM 2007 UP THROUGH THE END OF

12   2010?

13   A.   2010?  THAT'S A GREAT QUESTION.  FIFTEEN TO 20 TIMES.

14   Q.   OKAY.  AND I'VE GOT A LIST HERE OF SOME FLIGHTS THAT I

15   BELIEVE YOU WERE ON BEGINNING IN 2011 AND CONTINUING UP THROUGH

16   2014.  I WANT TO ASK YOU ABOUT THOSE.

17   A.   OKAY.

18   Q.   DO YOU RECALL FEBRUARY 6TH, 2011, YOU AND BUDDY HARDWICK

19   AND ANN HARDWICK FLEW WITH NAT HARDWICK FROM ATLANTA TO

20   MONTEREY, CALIFORNIA, ROUND-TRIP, RIGHT?

21   A.   YES, SIR.

22   Q.   THAT WAS ON A PRIVATE PLANE.  ALL OF THESE THAT I'M ASKING

23   YOU ABOUT ARE ON PRIVATE PLANES.  I'M NOT ASKING YOU ABOUT ANY

24   COMMERCIAL FLIGHTS, SO I DON'T WANT TO HAVE TO REPEAT THAT

25   EVERY TIME.

1   A.   YEAH.   SO IF NAT WAS ON THE PLANE, IT WAS A PRIVATE PLANE,

2   BECAUSE MY UNDERSTANDING IS THAT NAT IS VERY CLAUSTROPHOBIC AND

3   WILL NOT FLY ON A COMMERCIAL JET.

4   Q.   SO WHEN YOU WENT TO MONTEREY, IS THAT IN CONNECTION WITH

5   ONE OF YOUR PEBBLE BEACH TRIPS?

6   A.   ABSOLUTELY.

7   Q.   OKAY.   AND THEN FEBRUARY 4TH THROUGH THE 12TH OF 2012, THE

8   NEXT YEAR, YOU FLEW TO MONTEREY AGAIN?

9   A.   CORRECT.   PEBBLE BEACH AGAIN.

10  Q.   PEBBLE BEACH.   OKAY.   AND THAT WAS WITH NAT HARDWICK,

11  BUDDY HARDWICK, ANN HARDWICK; ANOTHER ONE OF YOUR LOST BOYS,

12  TED SMITH; ANOTHER LOST BOY, LARRY BLAIR; AND ANOTHER LOST BOY

13  NAMED KEVIN ANDREWS, RIGHT?

14  A.   YES.

15  Q.   THEN DECEMBER 27 THROUGH JANUARY -- I'M SORRY.

16  DECEMBER 27, 2012, THROUGH JANUARY 4, 2013, YOU FLEW ROUND-TRIP

17  BETWEEN ATLANTA TO LAS VEGAS?

18  A.   I DID NOT.

19  Q.   I'M SORRY.   I APOLOGIZE.   ONLY LEG TWO.   YOU WERE ON THE

20  FLIGHT COMING BACK?

21  A.   YES, SIR.

22  Q.   OKAY.   JANUARY 14 THROUGH THE 20TH, 2013, YOU FLEW

23  ROUND-TRIP FROM ATLANTA TO PALM SPRINGS, CALIFORNIA --

24  A.   CORRECT.

25  Q.   -- WITH NAT HARDWICK, BUDDY HARDWICK, ANN HARDWICK, ALEX

1   HARDWICK, DEBBIE HARDWICK, GREG HODGES, AND PETER BANKS?

2   A.   YES.

3   Q.   WELL, BANKS WAS ONLY ON LEG TWO?

4   A.   YEAH.  SO GREG HODGES --

5   Q.   DID YOU FLY ON THAT FLIGHT?

6   A.   I DID.

7   Q.   OKAY.  FEBRUARY 3RD THROUGH THE 10TH, 2013, YOU FLEW

8   ROUND-TRIP AGAIN FROM ATLANTA TO PEBBLE BEACH, MONTEREY,

9   CALIFORNIA, RIGHT?

10   A.   YES, SIR.

11   Q.   AGAIN, THAT WAS NAT HARDWICK, BUDDY HARDWICK, ANN

12   HARDWICK, AND KEVIN ANDREWS ALONG WITH YOU?

13   A.   YES, SIR.

14   Q.   APRIL 21ST TO 24TH, 2013, YOU FLEW ROUND-TRIP FROM ATLANTA

15   TO NEW ORLEANS?

16   A.   YES, SIR.

17   Q.   WITH NAT HARDWICK, BUDDY HARDWICK, ANN HARDWICK, ALEX

18   HARDWICK, DEBBIE HARDWICK, AND YOU?

19   A.   YES, SIR.

20   Q.   FROM JULY 25TH THROUGH THE 28TH, ON THOSE DATES YOU FLEW

21   ROUND-TRIP FROM ATLANTA TO CHARLESTON?

22   A.   CORRECT.

23   Q.   AND NAT HARDWICK WAS NOT ON THAT FLIGHT, CORRECT?

24   A.   IT DOESN'T APPEAR THAT HE WAS.

25   Q.   AND NAT HARDWICK STILL PAID FOR YOU AND YOUR OTHER FRIENDS

1　THERE -- TED SMITH, KEVIN ANDREWS, BRYAN CARROLL, AND SCOTT

2　ELMORE -- TO FLY ON THAT PLANE?

3　A.　OKAY.

4　Q.　IS THAT CORRECT?

5　A.　YES, SIR.

6　Q.　ALL RIGHT.　DECEMBER 11TH, YOU TOOK A ONE-WAY TRIP FROM

7　ATLANTA TO LAS VEGAS WITH NAT HARDWICK, ALEX HARDWICK, KEVIN

8　ANDREWS, BRYAN CARROLL, AND TED SMITH, RIGHT?

9　A.　CORRECT.

10　Q.　APRIL 20TH TO 23RD, 2014, YOU FLEW ROUND-TRIP WITH NAT

11　HARDWICK, BUDDY HARDWICK, ALEX HARDWICK, DEBBIE HARDWICK, AND

12　KYLE THOMPSON; AND KEVIN ANDREWS WAS ON THE FLIGHT FROM ATLANTA

13　TO NEW ORLEANS BUT NOT COMING BACK?

14　A.　THAT IS CORRECT.

15　Q.　MAY 1ST TO THE 6TH, 2014, YOU -- WELL, ON MAY 1ST, RATHER,

16　YOU WERE ON A FLIGHT FROM ATLANTA TO GULFPORT, MISSISSIPPI,

17　WITH NAT HARDWICK, ALEX HARDWICK, KEVIN ANDREWS, SCOTT ELMORE,

18　AND TED SMITH?

19　A.　I WAS ONLY -- ONLY GETTING THERE.

20　Q.　RIGHT.　THE FLIGHT FROM ATLANTA TO GULFPORT?

21　A.　YES, SIR.

22　Q.　OKAY.　AND THEN MR. HARDWICK AND HIS BROTHER ALEX FLEW

23　BACK ON THE 6TH?

24　A.　CORRECT.

25　Q.　OKAY.　MAY 4TH, 2014, YOU FLEW ON ANOTHER ONE-WAY FLIGHT

1  FROM GULFPORT, MISSISSIPPI, TO ATLANTA WITHOUT NAT HARDWICK.

2  IT WAS JUST KEVIN ANDREWS, WHO WAS THE LEAD PASSENGER, SCOTT

3  ELMORE, AND YOU AND TED SMITH, RIGHT?

4  A.   THAT IS CORRECT.

5  Q.   AND MR. HARDWICK PAID FOR THAT PRIVATE JET, TOO?

6  A.   THAT IS MY UNDERSTANDING.

7  Q.   AND THEN YOU WERE ON THE TRIP TO SCOTLAND THAT

8  MR. HARDWICK CALLED A TRIP OF A LIFETIME 2?

9  A.   I WAS.

10  Q.   AND THAT WAS JULY 18, 21, AND 28 WHEN YOU HAD THE VARIOUS

11  FLIGHTS ON THAT.

12  A.   CORRECT.

13  Q.   AND THEN THE FOLKS WHO WERE ON THAT WERE NAT HARDWICK,

14  KEVIN ANDREWS, LARRY BLAIR, BRYAN CARROLL, JAMES CASH, SCOTT

15  ELMORE, ALEX HARDWICK, MR. HARDWICK'S FATHER, NATHAN III, BUDD

16  LIBBY, YOU, TED SMITH, AND JOEL WEINBACH?

17  A.   YES, SIR.

18  Q.   MR. HARDWICK ALSO PAID FOR YOUR OTHER EXPENSES RELATED TO

19  THAT TRIP, SUCH AS WHERE YOU STAYED, YOUR GOLF, YOUR BRITISH

20  OPEN TICKETS, MEALS, AND THINGS LIKE THAT, RIGHT?

21  A.   A LOT OF THOSE THINGS, A LOT OF THE MEALS, WE PAID FOR.

22  AND --

23  Q.   WOULD YOU AGREE THAT HE PAID THE MAJORITY OF YOUR

24  EXPENSES?

25  A.   YES, SIR.

1  Q.  OKAY.  YOU UNDERSTAND THAT EVEN THOUGH NAT HARDWICK WAS

2  THE CEO AND THE MAJORITY OWNER OF MHS, HE WAS NOT AUTHORIZED TO

3  USE THE FIRM'S ESCROW ACCOUNTS TO PAY HIS PERSONAL DEBTS AND

4  EXPENSES, RIGHT?

5  A.  I DIDN'T KNOW THAT, BUT I AM FAMILIAR WITH ESCROW

6  ACCOUNTS.

7  Q.  YOU DON'T HAVE ANY REASON TO DISAGREE WITH THAT?

8  A.  THAT'S CORRECT.

9         MR. PHILLIPS:  THANK YOU, SIR.

10        THE COURT:  ANY REDIRECT?

11        MS. LOEB:  NO, YOUR HONOR.

12        THE COURT:  ALL RIGHT.  THANK YOU SO MUCH, SIR.  YOU

13  ARE FREE TO GO.

14        THE WITNESS:  THANK YOU.  WHAT DO I DO WITH THESE?

15        THE COURT:  JUST LEAVE IT ALL THERE.  MAKE SURE YOU

16  DON'T TAKE ANY WITH YOU.  ALL RIGHT.  THANK YOU, SIR.

17        LADIES AND GENTLEMEN, I KNOW YOU'VE BEEN DRINKING

18  COFFEE AND WATER.  ANYONE NEED A QUICK BREAK?  ME, TOO.  OKAY.

19  I WAS HOPING YOU WOULD SAY THAT.

20        THE COURTROOM SECURITY OFFICER:  ALL RISE.

21        (WHEREUPON, THE JURY RETIRED FROM THE COURTROOM AND A

22  BRIEF RECESS WAS HAD FROM 11:31 A.M. TO 11:41 A.M.)

23        THE COURT:  ALL RIGHT.  AND LET'S LINE THEM UP.

24        THE COURTROOM SECURITY OFFICER:  OKAY.

25        THE COURT:  AND SINCE WE ARE ALL HERE, I'LL JUST SAY,

1　GOVERNMENT, MAKE SURE YOU CHECK THAT CASE LAW ON THAT ONE

2　COUNT.  FROM WHAT WE'RE FINDING, MS. NOVAY HAS SOME GOOD

3　POINTS.  SO MAKE SURE YOU LOOK AT THAT.

4　　　　　MS. BARRON:  YOUR HONOR, THAT'S A QUESTION OF LAW.

5　　　　　THE COURT:  YEAH.  I DON'T KNOW.  THAT PART WE HAVE

6　NOT GOTTEN TO.

7　　　　　MS. BARRON:  OKAY.

8　　　　　THE COURT:  BUT IF IT -- WELL, I WON'T SAY ANY MORE

9　ABOUT THAT.

10　　　　　(WHEREUPON, THE JURY RETURNED TO OPEN COURT AT

11　11:43 A.M., AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD.)

12　　　　　THE COURT:  ALL RIGHT.  THE JURY IS SEATED.  EVERYONE

13　ELSE MAY BE SEATED.

14　　　　　AND, DEFENSE -- WHERE DID THE DEFENSE GO?

15　　　　　ALL RIGHT.

16　　　　　AND, AGAIN, DEFENSE, YOU MAY CALL YOUR NEXT WITNESS.

17　　　　　MS. LOEB:  I CALL JOEL WEINBACH.

18　　　　　THE COURT:  ALL RIGHT.

19　　　　　COME ON UP, SIR.  I'LL SWEAR YOU IN.  COME ON UP AND

20　RAISE YOUR RIGHT HAND FOR ME, PLEASE.

21　　　　　　　　　　JOEL WEINBACH,

22　HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

23　FOLLOWS:

24　　　　　THE COURT:  ALL RIGHT.  IF YOU WOULD TAKE THE SEAT,

25　PLEASE.  AND ONCE YOU ARE SEATED COMFORTABLY, FIRST STATE YOUR

1    NAME AND THEN SPELL IT FOR THE RECORD.

2              THE WITNESS:  JOEL WEINBACH, J-O-E-L,

3    W-E-I-N-B-A-C-H.

4                         DIRECT EXAMINATION

5    BY MS. LOEB:

6    Q.   GOOD MORNING.  CAN YOU TELL THE JURY WHERE IT IS YOU LIVE?

7    A.   COLUMBIA, SOUTH CAROLINA.

8    Q.   AND DO YOU KNOW NAT HARDWICK?

9    A.   YES.

10   Q.   HOW LONG HAVE YOU KNOWN NAT, AND HOW DID YOU MEET HIM?

11   A.   APPROXIMATELY 35 YEARS.  WE WENT TO COLLEGE TOGETHER.

12   Q.   AND ARE YOU ONE OF WHAT HAS BEEN REFERRED TO AS THE LOST

13   BOYS?

14   A.   YES.

15   Q.   AND HAVE YOU TAKEN A NUMBER OF TRIPS WITH NAT HARDWICK

16   OVER THE YEARS?

17   A.   YES, I HAVE.

18   Q.   ABOUT HOW MANY TRIPS DID YOU TAKE WITH NAT WHERE HE HAD A

19   SPONSORSHIP OF SOME SORT?

20   A.   ABOUT -- SOMEWHERE IN THE BALLPARK OF 35.

21   Q.   HOW WOULD YOU CHARACTERIZE THOSE TRIPS?  BUSINESS,

22   PLEASURE, OR MIX?

23   A.   MIX.  LIKE EVERYBODY ELSE WHO WAS AT THEM, THERE WERE

24   CORPORATE SPONSORSHIPS, AND NAT WAS THERE AS AN EXECUTIVE

25   PLAYING.  AND WE WOULD BE -- I WOULD EITHER PLAY WITH HIM OR

1  CADDY FOR HIM.  AND THOSE TRIPS, SOMETIMES I WOULD TRAVEL WITH

2  HIM.  USUALLY I WOULD MEET HIM THERE.

3  Q.   OKAY.  AND WHY WOULD YOU MEET HIM THERE INSTEAD OF

4  TRAVELING WITH HIM?

5  A.   WELL, FROM COLUMBIA, I'D HAVE TO DRIVE THREE AND A HALF

6  HOURS TO ATLANTA TO TRAVEL WITH HIM, SO IT WAS EASIER FOR ME

7  JUST TO FLY DIRECT IN MOST CASES.  AND, ALSO, I DIDN'T STAY AS

8  LONG.  SOMETIMES I'D STAY TWO OR THREE DAYS, AND HE MIGHT BE

9  THERE FIVE TO SEVEN DAYS.

10  Q.   AND THEN WAS HE TYPICALLY WORKING ON THOSE TRIPS?

11  A.   YEAH.

12  Q.   WHEN HE WOULD TRAVEL, WAS HE ONE OF THE FEW FOLKS THAT

13  WOULD ACTUALLY BRING A SUIT TO THESE TRIPS THAT Y'ALL WERE ON?

14  A.   YES.  YEAH.  HE WAS THE ONLY ONE.  HE AND KEVIN ANDREWS,

15  ON SOME TRIPS, WOULD STAY LATER, STAY AFTER THE EVENT WAS OVER

16  TO DO BUSINESS.  AND THEY WOULD BE THE ONLY ONES WITH SUITS.

17  Q.   ARE YOU FAMILIAR WITH WHAT'S CALLED A COCKABOOSE?

18  A.   YES.

19  Q.   CAN YOU TELL THE JURY WHAT A COCKABOOSE IS?

20  A.   YES.  A COCKABOOSE IS A TRAIN CAR, TRAIN CABOOSE

21  POSITIONED AT THE UNIVERSITY OF SOUTH CAROLINA ON A TRACK BY

22  THE STADIUM.  AND IT'S USED KIND OF LIKE AN RV FOR TAILGATING,

23  EXCEPT THEY DON'T MOVE.

24  Q.   AND HAVE YOU SPENT SOME TIME OVER THE YEARS AT THE

25  COCKABOOSE?

1   A.   YES.

2   Q.   AND IS THAT SOMETHING THAT MR. HARDWICK OWNED?

3   A.   HE DID.  HE BOUGHT IT IN -- SOMETIME IN THE NINETIES AND

4   OWNED IT UNTIL 2014 OR 2015.  AND DURING THAT TIME, IT ALWAYS

5   HAD -- IT WAS ALWAYS LOGO'D UP WITH THE LAW FIRM NAME, AND

6   CLIENTS WOULD COME TO GAMES AND HANG OUT THERE AND TAILGATE

7   THERE AND GET FOOD AND DRINK BEFORE THE GAME.

8   Q.   AND WAS THAT PRIMARILY WHAT HE USED THE COCKABOOSE FOR?

9   A.   YES.  IT'S THE ONLY THING YOU'RE ALLOWED TO USE IT FOR.

10   Q.   SO WAS HE ALWAYS AT THE COCKABOOSE --

11   A.   NO.

12   Q.   -- WHEN CLIENTS WERE THERE?

13   A.   NO.  HE CAME -- BECAUSE OF HIS SCHEDULE, HE WOULD COME TO

14   ANYWHERE FROM, TYPICALLY, ONE TO FOUR GAMES A YEAR.  THE BIGGER

15   THE FIRM GOT, THE LESS HE WAS ACTUALLY THERE IN PERSON.  AND WE

16   WOULD OPEN IT UP, ANOTHER FRIEND OF MINE IN COLUMBIA AND I

17   WOULD OPEN THE COCKABOOSE UP, FILL IT WITH FOOD AND DRINK.  AND

18   HE'D SEND CLIENTS TO COME TAILGATE WITH US AND COME TO THE

19   GAME, AND OFTENTIMES I'D DISTRIBUTE TICKETS FOR HIM TO CLIENTS.

20   Q.   NOW, HAVE YOU EVER BEEN IN A POSITION TO RENT A PRIVATE

21   PLANE?

22   A.   YES.

23   Q.   CAN YOU TELL US HOW THE PRICING WORKS FOR A PRIVATE PLANE?

24   A.   THERE'S TYPICALLY THREE COMPONENTS:  PAY BY THE HOUR OF

25   FLIGHT TIME, YOU PAY FOR FUEL, AND THEN IF YOU -- FOR THE TIME

1    YOU'RE ON THE GROUND, YOU PAY FOR THE CREW.

2    Q.   DOES IT TYPICALLY MATTER HOW MANY PEOPLE ARE ON THE PLANE?

3    A.   NO.

4            MS. LOEB:   THAT'S ALL I HAVE FOR MR. WEINBACH.

5            THE COURT:   CROSS-EXAMINATION?

6                         CROSS-EXAMINATION

7    BY MS. BARRON:

8    Q.   HI, MR. WEINBACH.

9    A.   HI.

10   Q.   IS IT DR. WEINBACH?

11   A.   NOPE.

12   Q.   SOMEONE IS A DOCTOR.  WHO IS THE DOCTOR?

13   A.   I'VE GOT A BROTHER WHO IS A DOCTOR.

14   Q.   OKAY.  I THOUGHT I REMEMBERED ONE OF THE LOST BOYS BEING A

15   DOCTOR, BUT IT'S NOT YOU.

16   A.   NOT ME.

17   Q.   OKAY.  OKAY.  MR. WEINBACH, YOU -- THE LAST THING YOU

18   TESTIFIED IS THAT IT DOESN'T MATTER HOW MANY PEOPLE ARE ON THE

19   PLANE IN TERMS OF HOW MUCH IT COSTS?

20   A.   RIGHT.

21   Q.   BUT IF YOU HAVE A LARGE GROUP OF PEOPLE, YOU NEED A BIGGER

22   PLANE, RIGHT?

23   A.   UH-HUH.

24   Q.   AND SO BIGGER PLANES COST MORE MONEY THAN SMALL PLANES,

25   RIGHT?

1    A.    YEAH.

2    Q.    SO IF YOU WERE TAKING A LARGE CREW OF PEOPLE TO PEBBLE

3    BEACH OR TO MYRTLE BEACH OR TO CHARLESTON OR WHATEVER, YOU'RE

4    GOING TO NEED A BIGGER PLANE THAN IF YOU'RE JUST FLYING

5    YOURSELF, CORRECT?

6    A.    YEAH, BUT THERE'S -- USUALLY, MOST CORPORATE PLANES START

7    AT EITHER SIX OR EIGHT PASSENGERS.  YOU DON'T, YOU DON'T

8    CHARTER A TWO-SEATER OR ANYTHING LIKE THAT.  SO YOU CHARTER A

9    REASONABLE SIZE -- YOU KNOW, WHETHER -- THE CHARTER FLIGHTS --

10    THE CHARTER PLANES THAT ARE AVAILABLE ARE TYPICALLY SIX SEATS

11    AND UP.

12    Q.    OKAY.  THE JURY HAS HEARD A LOT ABOUT THIS TRIP TO

13    SCOTLAND.  AND YOU WERE ON THAT TRIP, RIGHT?

14    A.    UH-HUH.

15    Q.    THE BOEING BUSINESS JET, DID YOU RIDE ON THAT?  IT WAS A

16    BOEING 737.  HOW MANY PEOPLE DID THAT ACCOMMODATE; DO YOU

17    REMEMBER?

18    A.    I DON'T KNOW WHAT THE MAX IS.  WE HAD 12.

19    Q.    I WANT TO ASK YOU ABOUT SOME LOST BOYS EVENTS.  HOW LONG

20    HAVE YOU BEEN A MEMBER OF THE LOST BOYS?

21    A.    SINCE WHENEVER THE -- I THINK I MISSED THE FIRST ONE.  I

22    MISSED SOME OTHERS ALONG THE WAY.  SO GOING BACK TO -- CALL IT

23    THREE MONTHS FROM THE BEGINNING.

24    Q.    AND WHAT WAS THE BEGINNING?

25    A.    I COULDN'T TELL YOU EXACTLY.  LATE NINETIES, EARLY 2000'S.

1   Q.   OKAY.  IT WAS A LONG TIME?

2   A.   YEAH.

3   Q.   OKAY.  I WANT TO ASK YOU ABOUT SOME OF THE EVENTS.  AND I

4   BELIEVE THAT A PRIOR WITNESS TESTIFIED THAT LOST STANDS FOR

5   LAKE OCONEE STUDS TOURNAMENT?

6   A.   YEAH.

7   Q.   IS THAT RIGHT?

8   A.   YEAH.

9   Q.   LAKE OCONEE BEING A LAKE IN GEORGIA WHERE MR. HARDWICK

10   USED TO HAVE A HOUSE --

11   A.   YES.

12   Q.   -- IS THAT RIGHT?

13       STUDS.  WHAT DOES THAT MEAN?  JUST GUYS --

14   A.   IT WAS JUST A JOKE.  EVERYBODY WAS PAST THEIR STUD PERIOD

15   WHEN THIS STARTED.  THEY WERE IN THEIR EARLY THIRTIES AND

16   MARRIED, AND IT WAS KIND OF A JOKE.

17         MS. BARRON:  OKAY.  YOUR HONOR, I'D LIKE TO OFFER

18   INTO EVIDENCE GOVERNMENT'S 1626.

19         THE COURT:  ANY OBJECTION?

20         MS. LOEB:  NO, YOUR HONOR.

21         THE COURT:  OKAY.  IT'S ADMITTED.

22   BY MS. BARRON:

23   Q.   OKAY.  MR. WEINBACH, I'M GOING TO SHOW YOU A SERIES OF

24   DOCUMENTS.  AND NOT BEING A GOLFER, I'M GOING TO ASK YOU TO

25   TELL ME WHAT THIS INFORMATION IS.

1    DO YOU RECOGNIZE THIS SHEET?

2    A.   WHERE AM I LOOKING?  HERE?

3    Q.   YES, SIR.

4    A.   THESE ARE THE SHEETS, WE CALL THEM.

5    Q.   WE SEE HERE THE ACRONYM LOST?

6    A.   YES, MA'AM.

7    Q.   SO UP HERE, THIS HAS MARCH 20TH, 2003 -- 20 THROUGH THE

8    23RD, 2003, HILTON HEAD.  THIS IS STILL SEVERAL YEARS AFTER THE

9    LOST BOYS GOT FORMED; IS THAT RIGHT?

10   A.   YEAH.

11   Q.   AND HILTON HEAD, WOULD THAT MEAN THAT THIS PARTICULAR

12   EVENT, THE 13TH EVENT, WOULD HAVE BEEN IN HILTON HEAD, SOUTH

13   CAROLINA?

14   A.   YEP.

15   Q.   OKAY.  HANDICAP.  I'VE HEARD THAT TERM.  I DON'T KNOW WHAT

16   IT MEANS.  QUOTA -- WHAT DOES HANDICAP AND QUOTA MEAN?

17   A.   SO HANDICAP IS THE WAY YOU RELATE GOLFERS' SKILL AND

18   EXPECTED SCORE AGAINST EACH OTHER.  SO GOLF IS THE ONLY SPORT

19   YOU CAN PLAY HEAD TO HEAD WITH SOMEBODY WHO IS BETTER THAN YOU

20   OR WORSE THAN YOU AND HAVE A FAIR MATCH.

21       SO IN THIS CASE, GERALD CHATHAM WAS A 2.  HIS MATCH --

22   Q.   IS THAT GOOD?

23   A.   HE WAS REALLY GOOD.  LOW IS GOOD.

24   Q.   OKAY.

25   A.   SO IT MEANT OVER 18 HOLES, GERALD CHATHAM WOULD BE

1   EXPECTED TO SHOOT 74.  SO WHATEVER HIS SCORE WAS, YOU WOULD ADD

2   2 TO IT.

3   Q.   DO THE LOST BOYS TYPICALLY TRACK THIS KIND OF INFORMATION?

4   A.   ABSOLUTELY.

5   Q.   OKAY.

6   A.   THAT WAS HALF THE FUN.

7   Q.   I WANT TO SHOW YOU SOME MORE PAGES.  THIS IS 14TH EVENT AT

8   HAWKS RIDGE.  THAT'S IN THE ATLANTA AREA?

9   A.   YEAH.

10  Q.   SAME -- ROUGHLY SAME GROUP OF PEOPLE?

11  A.   SURE.

12  Q.   BRAD LITTLE, BRYAN CARROLL, KEVIN ANDREWS, YOU?

13  A.   YES.

14  Q.   SEA PINES RESORT.  WHERE WAS THAT EVENT?

15  A.   THAT'S HILTON HEAD, TOO.

16  Q.   OKAY.  ANOTHER HILTON HEAD EVENT?

17  A.   YEAH.

18  Q.   UNIVERSITY OF SOUTH CAROLINA.  I ASSUME THAT'S IN

19  COLUMBIA?

20  A.   I DON'T REMEMBER WHERE WE PLAYED THAT.  THE UNIVERSITY OF

21  SOUTH CAROLINA IS IN COLUMBIA.

22  Q.   IS THERE A GOLF COURSE THERE THAT Y'ALL WOULD HAVE PLAYED;

23  DO YOU REMEMBER?

24  A.   IT'S POSSIBLE.  I MEAN, I DON'T KNOW.  WE MIGHT HAVE

25  PLAYED THAT SOMEWHERE ELSE.  THAT MAY HAVE BEEN PLAYED IN

1   PINEHURST, ACTUALLY.

2   Q.   OKAY.  SO IN 2006, WE ACTUALLY ARE IN PINEHURST, RIGHT?

3   A.   YES.

4   Q.   ABERDEEN.  OKAY.  ST. ANDREWS LINKS.  NOW, WAS THIS THE

5   FIRST TRIP OF A LIFETIME?

6   A.   YEAH.

7   Q.   OKAY.  IN 2008.  AND YOU WENT ON THAT TRIP?

8   A.   I DID.

9   Q.   DID MR. HARDWICK PAY FOR MOST OF THAT TRIP AGAIN, 2008?

10  A.   YES.

11  Q.   DID YOU TAKE A 737 TO GET THERE?

12  A.   YEAH.

13  Q.   2008, THIS HAS LEGENDS.  IS THAT MYRTLE BEACH?

14  A.   THAT IS.

15  Q.   THIS ONE'S IN KIAWAH?

16  A.   UH-HUH.  WE TYPICALLY STAYED IN THE SOUTHEAST.

17  Q.   OKAY.  SHADOW CREEK IN LAS VEGAS?

18  A.   YEP.

19  Q.   FOX RIDGE AGAIN.  SEA ISLAND.  CLOISTERS, THAT'S IN

20  GEORGIA, RIGHT?  OFF THE GEORGIA COAST.

21  A.   YEP.

22  Q.   THE CLIFFS.  WHERE IS THE CLIFFS?

23  A.   THE CLIFFS IS IN GREENVILLE, SOUTH CAROLINA.  IT'S IN THE

24  UPSTATE OF SOUTH CAROLINA, WITH SEVERAL COURSES WE USED TO

25  PLAY.

1   Q.   MUSGROVE MILL.  THAT'S IN SOUTH CAROLINA?

2   A.   THAT'S IN GREENVILLE AS WELL.

3   Q.   SEA ISLAND AGAIN.  THE OCEAN COURSE.  IS THAT SOUTH

4   CAROLINA?

5   A.   THAT'S -- YEAH.  OUTSIDE OF CHARLESTON.  KIAWAH.

6   Q.   DO YOU REMEMBER WHERE THE 2014 EVENT WAS?  THERE'S NO LOGO

7   ON HERE.

8   A.   I COULDN'T TELL YOU.  WE PLAYED 40-SOMETHING OF THEM,

9   SO --

10   Q.   AND THIS IS THE SECOND TRIP OF A LIFETIME, RIGHT?

11   ST. ANDREWS?

12   A.   YEAH.

13   Q.   OKAY.  NOW, YOU TESTIFIED ON DIRECT THAT YOU TOOK ABOUT

14   35 TRIPS WITH MR. HARDWICK?

15   A.   YEAH.  THOSE ARE NOT LOST BOYS TRIPS.  THOSE WERE TRIPS

16   WHERE HE WAS DOING BUSINESS.

17   Q.   OKAY.  SO THAT'S WHAT I WANTED TO ASK.  BECAUSE THIS IS A

18   LOT OF TRIPS.  THESE ARE NOT FIRM-SPONSORED EVENTS, RIGHT?

19   A.   NO, THOSE ARE NOT.

20   Q.   THIS IS NOT --

21   A.   AND MOST OF THE TIME, NOBODY FLEW TO THOSE.  MOST OF THE

22   TIME, WE DROVE -- EVERYBODY DROVE AND MET AT THOSE.

23   Q.   OKAY.  LAS VEGAS, DID Y'ALL DRIVE UP TO --

24   A.   NO.  LAS VEGAS WAS FLOWN.  SCOTLAND WAS FLOWN, TOO,

25   OBVIOUSLY.  BUT OUT OF 40-SOMETHING, I MEAN, PROBABLY LESS THAN

1   10 WERE FLOWN TO.

2   Q.   THESE WERE NOT -- THERE WAS NO LAND -- NOBODY WEARING

3   LANDCASTLE GEAR AT THESE EVENTS?

4   A.   PEOPLE WERE WEARING LANDCASTLE GEAR, BUT I'M NOT SURE WHAT

5   BENEFIT IT MIGHT HAVE PROVIDED THERE.   THE 35 TRIPS I MENTIONED

6   WERE ONES WHERE THERE WAS A CORPORATE SPONSORSHIP INVOLVED OR A

7   CHARITABLE SPONSORSHIP, ONE OR THE OTHER.

8         MS. BARRON:   OKAY.   NOW, YOUR HONOR, I OFFER

9   GOVERNMENT'S 1624.

10         MS. LOEB:   NO OBJECTION.

11         THE COURT:   IT'S ADMITTED.

12         MS. BARRON:   THANK YOU.

13         THE WITNESS:   AND THOSE TRIPS, WE PAID FOR OUR -- I

14   MEAN, WITH THE EXCEPTION OF A FLIGHT, EVERYBODY PAID FOR THEIR

15   OWN EVERYTHING ON THOSE LOST BOYS TOURNAMENTS THAT YOU SAID,

16   THAT YOU SHOWED.   THOSE 40, OR HOWEVER MANY WE PLAYED,

17   SOMEWHERE IN THE 40'S, THOSE WERE ALL -- WITH THE EXCEPTION OF

18   SCOTLAND, WHERE NAT PAID FOR THE TRAVEL, WE PAID FOR --

19   EVERYBODY PAID FOR THEIR OWN EVERYTHING ON ALL THE OTHER ONES.

20   BY MS. BARRON:

21   Q.   THAT ACTUALLY RAISES A GOOD POINT.   FOR THE 35 OTHER TRIPS

22   THAT YOU TOOK THAT WERE SPONSORED EVENTS, DID MR. HARDWICK PAY

23   FOR THOSE?

24   A.   THERE WASN'T ANY COST FOR US, REALLY.   I MEAN, LIKE, I

25   WOULD TRAVEL MYSELF.   I WOULD MEET HIM THERE.

1  Q.  YOU DON'T KNOW WHO PAID FOR IT?

2  A.  WHO PAID FOR HIS SPONSORSHIP?

3  Q.  WELL, WHEN YOU SAY THERE WASN'T ANY COST FOR US, YOU MEAN

4  THE PEOPLE WHO WENT, YOU DIDN'T HAVE TO PAY ANYTHING?

5  A.  I DIDN'T -- WELL, I PAID FOR MY OWN TRAVEL.  SO WHEN HE

6  PLAYED IN GREENVILLE, FOR EXAMPLE, I WOULD DRIVE TO GREENVILLE

7  TO CADDY FOR HIM.  WHEN HE PLAYED IN DISNEY, I WOULD FLY MYSELF

8  TO ORLANDO TO CADDY FOR HIM.

9  Q.  OKAY.

10  A.  WHEN HE PLAYED AT PEBBLE, I MIGHT CATCH A RIDE ONE WAY OR

11  THE OTHER, BUT I WOULD FLY MYSELF OUT THERE.

12  Q.  OKAY.

13  A.  AND SO, I MEAN, THERE WASN'T -- THERE WASN'T ANY REAL

14  EXPENSE FOR -- IT DIDN'T COST ANYBODY ANY MORE FOR ME TO BE

15  THERE, REALLY, THAN NOT BE THERE.

16  Q.  OKAY.  LET ME ASK YOU ABOUT THIS:  DO YOU REMEMBER PLAYING

17  IN THE MAY 2010 BMW CHARITY PRO-AM IN GREENVILLE?

18  A.  I CADDIED FOR HIM.  I DIDN'T PLAY IN IT.

19  Q.  OKAY.  YOU AND LARRY BLAIR AND BRAD LITTLE SHARED A ROOM;

20  IS THAT RIGHT?

21  A.  YES.

22  Q.  SO WHO DID PLAY WITH HIM; DO YOU RECALL?  SINCE YOU WERE

23  HIS CADDY.

24  A.  HE WOULD HAVE PLAYED WITH -- PROBABLY KYLE THOMPSON WAS

25  HIS PGA PROFESSIONAL.

1   Q.   THAT'S A FAMOUS GOLFER?

2   A.   I DON'T KNOW HOW FAMOUS HE IS, BUT HE'S A PROFESSIONAL

3   GOLFER.  AND THEN HE PLAYED WITH -- I THINK HIS CELEBRITY

4   PLAYING PARTNER WAS JOSH KELLY, I BELIEVE, A COUNTRY MUSIC

5   SINGER.

6   Q.   AND DO YOU KNOW IF THERE WAS -- SO THERE WAS A

7   PROFESSIONAL GOLFER, A CELEBRITY --

8   A.   TWO PROFESSIONALS.  TWO PROFESSIONALS, A CELEBRITY, AND

9   NAT.

10  Q.   OKAY.  AND WHEN YOU WOULD CADDY FOR HIM, DID HE -- HE GOT

11  TO MEET THESE OTHER FAMOUS PEOPLE, TOO, NOT JUST THE ONES HE

12  WAS PLAYING WITH?

13  A.   YEAH.  THEY WERE EVENTS THAT YOU COULD -- I MEAN, THERE

14  WERE OTHER -- THERE WAS A PAIRING PARTY AND OTHER EVENTS, ALL

15  THE PARTICIPANTS.  AND IN THAT TOURNAMENT, THERE WERE -- THERE

16  WOULD BE -- HOWEVER MANY TEAMS THERE WERE, HALF OF THEM WERE

17  MADE UP OF EXECUTIVES LIKE HIM AND HALF WERE MADE UP OF

18  CELEBRITIES, AND THEN THE OTHER PLAYER ON EACH TEAM WAS A

19  PROFESSIONAL.

20  Q.   AND HE LIKED THAT, RIGHT?  HE LIKED PLAYING WITH FAMOUS

21  PEOPLE?

22  A.   YOU'D HAVE TO ASK HIM.

23          THE COURT:  AND I'M SORRY.  I DON'T WANT TO ASSUME

24  THAT EVERYONE KNOWS.  WE'VE HEARD "TO CADDY" SEVERAL TIMES.  I

25  DON'T THINK ANYONE HAS ACTUALLY EXPLAINED WHAT TO CADDY MEANS.

1          MS. BARRON:  GOOD POINT.  I ONLY KNOW STUFF FROM

2     CADDYSHACK.

3     BY MS. BARRON:

4     Q.   EXPLAIN WHAT CADDY MEANS.

5     A.   SO TO CADDY -- WHEN YOU'RE PLAYING IN A GOLF TOURNAMENT,

6     YOU'RE REQUIRED TO WALK MOST OF THESE TOURNAMENTS.  ANYTHING

7     WITH A PROFESSIONAL GOLFER INVOLVED, YOU ARE REQUIRED TO WALK.

8     THAT'S AT ANY KIND OF A TOURNAMENT WHERE THE -- WHERE THE PROS

9     ARE PLAYING FOR MONEY, EVERYBODY IS REQUIRED TO WALK.

10         SO THE PROS HAVE CADDIES THAT PLAY WITH THEM -- OR THAT

11    COME WITH THEM ALL THE TIME THAT ARE PAID EMPLOYEES THAT CARRY

12    THEIR BAGS AND HELP THEM.

13         THE AMATEURS NEED SOMEBODY TO CARRY THEIR BAG.  AND IT'S A

14    LOT MORE FUN TO HAVE A FRIEND DOING IT FOR YOU, BECAUSE IT'S

15    SOMEBODY YOU KNOW.  THESE TOURNAMENTS TEND TO BE SLOW.  YOU'RE

16    OUT ON THE GOLF COURSE FOR ANYWHERE FROM FIVE TO SIX OR SEVEN

17    HOURS SOMETIMES, SO YOU'D RATHER DO IT WITH SOMEBODY YOU KNOW.

18         SO A LOT OF THE EXECUTIVES THAT PLAY BRING GUYS THAT WORK

19    WITH THEM OR BUDDIES OR FRIENDS TO CADDY FOR THEM, CARRY THEIR

20    BAG.  YOU'RE ALLOWED TO HELP READ PUTTS.  YOU CAN HELP WITH

21    CLUB SELECTION.  YOU'RE, QUOTE, A MEMBER OF THE TEAM, BUT YOU

22    NEVER SWING A CLUB.

23    Q.   IS THAT IN A PRO-AM?

24    A.   IN PRO-AM, YEAH.

25    Q.   AND IS PRO-AM -- I MAY SHOW MY IGNORANCE HERE -- IS THAT

1   PROFESSIONAL/AMATEUR?

2   A.   YEAH.   THERE'S A TEAM.   IT'S A TEAM EVENT.   SO ONE -- EACH

3   PRO PLAYS WITH AN AMATEUR.

4   Q.   OKAY.   DID MR. HARDWICK EVER CADDY FOR YOU?

5   A.   NOPE.   I TYPICALLY DID NOT PLAY IN THOSE EVENTS.

6   Q.   DID YOU EVER SEE HIM CADDY FOR ANYBODY?

7   A.   I DON'T KNOW ANYBODY ELSE WHO'S REALLY PLAYED IN PRO-AMS.

8   Q.   DID MR. HARDWICK HAVE A NICKNAME IN YOUR GROUP, IN THE

9   LOST BOYS?

10  A.   THE CHAIRMAN.

11  Q.   AND WOULD HE REFER TO HIMSELF AS THE CHAIRMAN?

12  A.   SOMETIMES.

13  Q.   YOU TESTIFIED ON DIRECT THAT MR. HARDWICK WOULD INVITE

14  CLIENTS TO VARIOUS EVENTS, THE COCKABOOSE AND WHATNOT.   WERE

15  THEY CLIENTS -- DO YOU KNOW THEY WERE CLIENTS BECAUSE HE TOLD

16  YOU THEY WERE CLIENTS?

17  A.   HE DID AND THEY DID.

18  Q.   OKAY.

19  A.   THEY WERE USUALLY BUILDERS, REAL ESTATE MORTGAGE PEOPLE,

20  PEOPLE LIKE THAT.

21  Q.   AND THEN YOU ALSO SAID THAT SOMETIMES WHEN Y'ALL WOULD

22  TAKE THESE TRIPS, HE WOULD LEAVE -- Y'ALL WOULD LEAVE AND HE

23  WOULD STAY AND DO WORK.   YOU CLEARLY WERE GONE, SO IS YOUR

24  KNOWLEDGE THAT HE WAS DOING WORK BASED ON WHAT HE TOLD YOU?

25  A.   YEAH.   BASED ON WHAT HE TOLD ME AND THE FACT THAT HE

1    CARRIED SUITS.

2    Q.    OKAY.  YOU WERE ACTUALLY FRATERNITY BROTHERS, WEREN'T YOU?

3    A.    SORT OF.  I GRADUATED BEFORE THE FRATERNITY WAS ACTUALLY

4    STARTED.

5    Q.    WAS IT TAU KAPPA EPSILON?

6    A.    YEAH.

7    Q.    OKAY.  ARE YOU AWARE THAT MHS LAW FIRM, SPEAKING OF THE

8    COCKABOOSE, PAID FOR MR. HARDWICK AND HIS FAMILY TO FLY TO

9    COLUMBIA TO TAILGATE IN THE COCKABOOSE FOR A COUPLE HOURS?

10   A.    I WOULD NOT BE AWARE OF THAT.  BUT MOST OF THE TIME WHEN

11   HE CAME -- THE ONLY TIME HE EVER -- THAT I KNEW HE FLEW TO

12   COLUMBIA WERE FOR THURSDAY NIGHT GAMES.  AND HE WOULD ALWAYS

13   FLY IN EARLY -- AS I RECALL, HE WOULD FLY IN EARLY, GO TO HIS

14   COLUMBIA OFFICE, AND THEN COME TO THE GAME LATER.

15   Q.    AND WHEN YOU SAY FLY, WAS HE USUALLY ON A PRIVATE JET?

16   A.    YES.

17   Q.    HOW LONG DOES IT TAKE TO DRIVE TO COLUMBIA?

18   A.    THREE AND A HALF HOURS.  TOOK ME ALMOST FOUR THIS MORNING.

19   Q.    YOU DROVE HERE THIS MORNING?

20   A.    YES.

21   Q.    OKAY.

22   A.    NOW, HE WOULD DRIVE WHENEVER I INVITED HIM FOR A

23   NON-BUSINESS EVENT.  LIKE, HE PLAYED IN MEMBER-GUEST

24   TOURNAMENTS WITH ME.  HE DROVE TO 100 PERCENT OF THOSE.

25   Q.    SO HE WASN'T SO CLAUSTROPHOBIC THAT HE COULDN'T GET IN HIS

1  CAR AND DRIVE?

2  A.   TO GET IN A CAR AND DRIVE?  NO.  HE WOULD DRIVE TO

3  COLUMBIA.

4       MS. BARRON:  OKAY.  YOUR HONOR, AT THIS TIME I'D

5  OFFER GOVERNMENT'S 1620.

6       THE COURT:  ANY OBJECTION?

7       MS. LOEB:  NO, YOUR HONOR.

8       THE COURT:  IT'S ADMITTED.

9  BY MS. BARRON:

10  Q.   I WANT TO SHOW YOU SOME DOCUMENTS RELATED TO THIS.  AND

11  I'LL REPRESENT TO YOU THAT THIS IS A COPY OF A FOLDER, 2013

12  LOST BOYS TOUR.  DO YOU RECALL GOING ON SOME TRIPS IN 2013 WITH

13  THE LOST BOYS?

14  A.   I'M SURE I -- I WENT ON MOST OF THE TRIPS, SO I'M SURE.

15  Q.   DO YOU RECALL GOING TO CHARLESTON?

16  A.   WE WENT TO CHARLESTON MORE THAN ONCE, SO --

17  Q.   IN 2013.  DID YOU GO MORE THAN ONCE IN 2013?

18  A.   NO.  WE WENT TO CHARLESTON MORE THAN ONCE.  I CAN'T TELL

19  YOU WHICH TRIP WAS WHICH, TO BE HONEST WITH YOU.

20  Q.   SO YOU DON'T RECALL WHETHER IN JULY OF 2013 YOU WENT TO

21  CHARLESTON?

22  A.   I WAS ON THAT TRIP.  I MEAN, I KNOW I STAYED AT THE

23  CHARLESTON PLACE.

24  Q.   OKAY.  AND I'M SHOWING YOU THE THIRD PAGE HERE.  THIS IS

25  AN E-MAIL FROM MR. HARDWICK.  ARE YOU JOEL@S2.COM?

1    A.   YEAH.

2    Q.   OKAY.  NOW, IN THIS FIRST PARAGRAPH, HE SAYS THAT THE

3    ORIGINAL PLAN WAS TO GO TO BANDON DUNES THIS YEAR.  IS THAT IN

4    OREGON?

5    A.   IT IS.

6    Q.   OKAY.  AND SOMETHING FELL THROUGH.  NEW DESTINATION WILL

7    BE CHARLESTON AND KIAWAH?

8    A.   UH-HUH.

9    Q.   WE WILL FLY OUT OF PDK AT 6 P.M. AND FLY INTO CHARLESTON.

10   WE WILL STAY AT CHARLESTON PLACE HOTEL AND ENJOY DOWNTOWN, PLAY

11   36 HOLES.

12        SKIPPING DOWN TO THE LAST LINE:  COST OF LODGING AND GOLF

13   GREENS FEES TO YOU, ZERO.  PRICELESS.

14        SO DID YOU HAVE TO PAY FOR THIS TRIP?

15   A.   NOT THAT TRIP, APPARENTLY.

16   Q.   OKAY.

17   A.   I DIDN'T RECALL THAT, BUT --

18   Q.   OKAY.  AND HE SIGNS IT, THE CHAIRMAN?

19   A.   UH-HUH.

20        MS. BARRON:  OKAY.  YOUR HONOR, AT THIS TIME I'D

21   INTRODUCE GOVERNMENT'S 1621.

22        THE COURT:  ANY OBJECTION?

23        MS. LOEB:  NO OBJECTION.

24        THE COURT:  ADMITTED.

25        MS. BARRON:  THANK YOU.

1  BY MS. BARRON:

2  Q.   MR. WEINBACH, I'LL REPRESENT THAT THIS IS ALSO FROM A

3  MANILA FOLDER, TITLED 2013 VEGAS BIRTHDAY TRIP.  DO YOU RECALL

4  GOING TO LAS VEGAS FOR MR. HARDWICK'S BIRTHDAY IN 2013?

5  A.   YOU TELL ME.

6  Q.   I WAS ASKING IF YOU REMEMBER.

7  A.   I MEAN, I'VE BEEN TO VEGAS SEVERAL TIMES, AND I'VE BEEN

8  WHEN HE'S BEEN THERE MULTIPLE TIMES.  SO I CAN'T TELL YOU, FOR

9  INSTANCE, 2013.

10  Q.   DO YOU KNOW A MAN NAMED MARTY KUNKEL?

11  A.   I HAVE MET MARTY.

12  Q.   AND HE WORKS FOR THE COSMOPOLITAN HOTEL IN LAS VEGAS?

13  A.   HE DID WHEN I MET HIM.

14  Q.   OKAY.  SO ON MONDAY, SEPTEMBER 23RD, NAT HARDWICK TELLS

15  MARTY KUNKEL THAT YOU, LARRY BLAIR -- AND THAT'S MR. HARDWICK'S

16  BANKER, RIGHT?  HIS PERSONAL BANKER AT MERRILL LYNCH?

17  A.   HE'S A FRIEND OF OURS FROM COLLEGE WHO HAPPENS TO BE A

18  BANKER AT MERRILL LYNCH.

19  Q.   -- AND ALEX HARDWICK -- THAT'S MR. HARDWICK'S BROTHER,

20  RIGHT?

21  A.   YEAH.

22  Q.   -- AND NAT ARE GOING TO FLY INTO VEGAS.  AND THAT WAS A

23  PRIVATE PLANE, WASN'T IT?

24  A.   YEAH.

25  Q.   THAT WAS A JET.  AND THAT Y'ALL ARE ALL GOING TO FIT IN A

1  PENTHOUSE, RIGHT?

2  A.   YEAH.

3  Q.   OKAY.

4  A.   YEAH.

5  Q.   CONTINUE TO STAY IN THE PENTHOUSE?

6  A.   YEAH.  I REMEMBER THIS TRIP.

7  Q.   OKAY.  AND THEN IT SAYS:  I WILL WIRE IN 500K.  LET'S GET

8  MY DEAL IN PLACE.  THANKS, NAT.

9      WAS MARTY KUNKEL'S ROLE AT THE COSMOPOLITAN KIND OF LIKE A

10  CONCIERGE?  WAS HE THE ONE WHO ORGANIZED THE PACKAGE FOR THE

11  GROUP?

12  A.   THAT'S MY UNDERSTANDING.  I ONLY MET HIM BRIEFLY.

13  Q.   AND THIS $500,000, YOU DON'T KNOW IF THAT WAS

14  MR. HARDWICK'S PERSONAL MONEY OR IF THAT MONEY CAME FROM MORRIS

15  HARDWICK SCHNEIDER?

16  A.   I WOULD HAVE NO IDEA.

17  Q.   AND YOU DON'T KNOW IF THAT CAME OUT OF A FIRM ESCROW?

18  A.   I WOULD HAVE NO IDEA.

19  Q.   OKAY.  THE NEXT PAGE.  MR. HARDWICK -- AGAIN, WE'RE

20  TALKING ABOUT HIS VEGAS BIRTHDAY TRIP.  HE MAY HAVE TO STAY ON

21  THE WEST COAST FOR BUSINESS.

22      DID YOU UNDERSTAND THAT MR. HARDWICK FROM TIME TO TIME DID

23  HAVE BUSINESS ON THE WEST COAST?

24  A.   UH-HUH.

25  Q.   BUT THAT BUSINESS DOESN'T BEGIN UNTIL MONDAY, RIGHT?  AND

1  THAT'S A WEEK AFTER HE TRAVELS THERE.

2      HE'S BEEN IN VEGAS FOR A WEEK, AND HE MAY HAVE TO EXTEND

3  HIS TRIP FOR BUSINESS; IS THAT RIGHT?

4  A.   THAT'S WHAT IT SAYS.

5  Q.   AND THEN HE SAYS:  SO I WILL GET YOU FLIGHTS HOME IN CASE.

6      THAT'S IN CASE YOU DON'T GET TO STAY AND GO HOME ON THE

7  JET WITH HIM; IS THAT RIGHT?

8  A.   YES.

9  Q.   SEND ME YOUR DATES, YOUR NAME, AND YOUR BIRTHDAY SO I CAN

10 GET YOU A FIRST CLASS TICKET BACK.

11     DID HE SEND YOU HOME ON A FIRST CLASS FLIGHT FROM THAT

12 TRIP?

13 A.   I'LL BE HONEST WITH YOU, I AM NOT SURE.  IT'S POSSIBLE.

14 IT'S POSSIBLE HE DID.  IT'S POSSIBLE I PAID FOR IT.  IT'S

15 POSSIBLE THE CASINO PAID FOR IT.

16 Q.   OKAY.

17 A.   I'M NOT SURE.  I DON'T RECALL.

18 Q.   OKAY.  THIS IS FROM PRICELINE.COM TO NAT HARDWICK WITH AN

19 ITINERARY.  AND IF WE SCROLL DOWN, CONTINUES ON TO THE NEXT

20 PAGE.  LEAVING LAS VEGAS AT 6 O'CLOCK ON WEDNESDAY,

21 SEPTEMBER 25TH, ARRIVING IN COLUMBIA, SOUTH CAROLINA.

22     THAT'S WHERE YOU LIVE, RIGHT?

23 A.   YEP.

24 Q.   AND THEN THE NEXT PAGE ACTUALLY HAS YOUR NAME.

25 A.   UH-HUH.

1  Q.   FIRST CLASS.

2  A.   YEAH.

3  Q.   SO MR. HARDWICK PAID FOR YOU TO FLY FIRST CLASS HOME,

4  CORRECT?

5  A.   ACCORDING TO THAT, YES.

6  Q.   OKAY.

7  A.   I AM A MILLION-MILER ON DELTA.  I FLY A LOT.  SO I'M SORRY

8  IF I CAN'T REMEMBER THAT EXACT TRIP.

9  Q.   OKAY.  YOU DON'T KNOW HOW MUCH MONEY MORRIS HARDWICK

10  SCHNEIDER MADE, DO YOU?  YOU DON'T KNOW WHAT THE FIRM INCOME

11  WAS?

12  A.   I WOULD NOT HAVE -- I'VE NEVER SEEN A FINANCIAL STATEMENT

13  OR ANYTHING LIKE THAT.  I COULD SORT OF GUESS.  I COULD --

14  BECAUSE WHAT I DO IS -- SOME OF WHAT I DO IS VALUE BUSINESSES.

15  I CAN KIND OF BALLPARK BASED ON 800 EMPLOYEES THAT -- AND WHAT

16  THAT OUGHT TO GENERATE.  YOU KNOW, IT DID NOT SEEM UNREASONABLE

17  THAT THE FIRM WOULD MAKE 7 TO $15 MILLION A YEAR.

18  Q.   SEVEN MILLION DOLLARS, IT'S A REALLY GOOD GUESS.  BECAUSE

19  THE EVIDENCE IN THIS CASE HAS SHOWN THAT ONE YEAR THE FIRM

20  ACTUALLY DID MAKE $7 MILLION.

21       AND DO YOU KNOW THAT MR. HARDWICK TOOK $11 MILLION OUT OF

22  THE FIRM THAT YEAR?

23  A.   I WOULDN'T HAVE ANY IDEA.

24  Q.   OKAY.  YOU DON'T KNOW WHETHER MR. HARDWICK, IN MORE THAN

25  JUST THAT YEAR BUT IN OTHER YEARS, TOOK MORE MONEY FROM THE

1   FIRM THAN HE WAS ENTITLED TO, DO YOU?

2   A.   NO.   I DON'T HAVE ANY WAY OF KNOWING ANYTHING ABOUT THE

3   FIRM'S ACCOUNTING.

4   Q.   RIGHT.   AND YOU DON'T KNOW IF HE LIED TO HIS PARTNERS

5   ABOUT HOW MUCH HE WAS TAKING?

6   A.   I WOULD HAVE NO IDEA.

7   Q.   YOU DON'T KNOW IF HE LIED TO HIS CREDITORS ABOUT WHAT HIS

8   FINANCIAL POSITION WAS.   YOU WOULD HAVE NO KNOWLEDGE OF THAT,

9   RIGHT?

10   A.   WHY WOULD I HAVE KNOWLEDGE OF THAT?

11   Q.   WELL, THAT'S WHAT I'M ASKING YOU, SIR.   I MEAN, THE

12   ALLEGATIONS IN THIS CASE -- I'M TRYING TO SEE IF YOU HAVE

13   PERSONAL KNOWLEDGE OF ANYTHING THAT IS ALLEGED IN THIS CASE.

14   A.   NO.

15   Q.   YOU HAVE NO KNOWLEDGE OF WHETHER MR. HARDWICK LIED TO

16   BANKERS ABOUT PERSONAL JUDGMENTS AGAINST HIM.   YOU DON'T KNOW

17   ANYTHING ABOUT THAT, RIGHT?

18         MS. LOEB:   OBJECTION, YOUR HONOR.

19         THE COURT:   WHAT'S YOUR OBJECTION?

20         MS. LOEB:   WHETHER HE HAS KNOWLEDGE OF ANYTHING

21   THAT'S ALLEGED IN THIS CASE.

22         THE COURT:   I HEARD THE LINE OF QUESTIONING, BUT

23   WHAT'S YOUR OBJECTION?

24         MS. LOEB:   IT'S SPECULATION.   HE DOESN'T KNOW WHAT'S

25   ALLEGED IN THIS CASE OR WHAT THE EVIDENCE HAS BEEN IN THIS

1  CASE.

2         THE COURT:  OKAY.  OVERRULED.  I THINK HE'S ANSWERED

3  AND STATED WHETHER OR NOT HE HAS KNOWLEDGE.  SO OVERRULED.

4  BY MS. BARRON:

5  Q.   THESE GOLF EXCURSIONS THAT YOU WENT ON, WHETHER THEY WERE

6  SPONSORED OR NOT, THE ONES THAT YOU DIDN'T HAVE TO PAY FOR, YOU

7  DON'T KNOW IF MR. HARDWICK PAID FOR IT OR IF THE FIRM PAID FOR

8  IT, RIGHT?

9  A.   RIGHT.

10  Q.   THESE PRIVATE JETS THAT YOU TOOK, YOU DON'T KNOW IF MORRIS

11  HARDWICK SCHNEIDER PAID FOR THAT JET FLIGHT?

12  A.   I HAVE NO IDEA.

13  Q.   THAT FIRST CLASS TICKET, YOU DON'T EVEN KNOW IF

14  MR. HARDWICK ACTUALLY PAID FOR THAT OR IF THE FIRM ACTUALLY HAD

15  TO PAY FOR THAT?

16  A.   OR IF THE CASINO DID.

17  Q.   WHEN WAS THE LAST TIME YOU TALKED TO MR. HARDWICK?

18  A.   POSSIBLY THIS PAST WEEKEND BEFORE THE FOOTBALL GAME.  I

19  DON'T KNOW.  I CAN'T REMEMBER IF I TALKED OR TEXTED.

20  Q.   HOW OFTEN DO YOU ALL CHAT?

21  A.   REGULARLY.

22  Q.   HAVE YOU CHATTED REGULARLY SINCE FEBRUARY 2016?

23  A.   YEAH, OF COURSE.

24         MS. BARRON:  THAT'S ALL I HAVE.  THANK YOU.

25         THE COURT:  ANYTHING FURTHER, MS. LOEB?

1          MS. LOEB:  ONE FOLLOW-UP QUESTION, YOUR HONOR.

2                    REDIRECT EXAMINATION

3    BY MS. LOEB:

4    Q.   MR. WEINBACH, THERE WAS SOME DISCUSSION ABOUT A TOURNAMENT

5    IN GREENVILLE, SOUTH CAROLINA.  DOES MR. HARDWICK HAVE AN

6    OFFICE IN GREENVILLE, SOUTH CAROLINA?

7    A.   YES.

8    Q.   AND IN YOUR EXPERIENCE, WHEN HE WOULD GO GOLFING IN

9    GREENVILLE, WOULD HE ALSO COMBINE THAT WITH BUSINESS?

10   A.   YES.

11         MS. LOEB:  NOTHING FURTHER.

12         THE COURT:  ANYTHING FURTHER, GOVERNMENT?

13         MS. BARRON:  NO, YOUR HONOR.

14         THE COURT:  THANK YOU, SIR.  YOU ARE FREE TO GO.

15         ALL RIGHT.  DEFENSE, NEXT WITNESS, SHORT OR LONG

16   OR -- IT'S 12:11.  TRYING TO DETERMINE WHEN WE DO LUNCH.

17         MS. LOEB:  MEDIUM, YOUR HONOR.  IT'S HARD TO PREDICT.

18         THE COURT:  OKAY.  I UNDERSTAND.  UNFAIR QUESTION.

19         I TELL YOU WHAT, LET'S GO AHEAD AND GET STARTED SINCE

20   WE GOT STARTED A LITTLE LATE THIS MORNING.  SO GO AHEAD AND

21   CALL YOUR WITNESS.

22         MS. LOEB:  ALL RIGHT.  WE'LL CALL KEVIN ANDREWS.

23         THE COURT:  COME ON UP, SIR.  IF YOU'LL COME AROUND

24   TO THE RIGHT OF THE PODIUM, YES, SIR, AND MAKE YOUR WAY OVER

25   HERE TO THE WITNESS STAND, AND I'LL SWEAR YOU IN.

1    MR. ANDREWS:  THANK YOU.

2    THE COURT:  IF YOU'LL RAISE YOUR RIGHT HAND, PLEASE.

3                         KEVIN ANDREWS,

4  HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

5  FOLLOWS:

6    THE COURT:  ALL RIGHT.  IF YOU WOULD TAKE A SEAT,

7  PLEASE.  AND FIRST STATE YOUR NAME AND THEN ALSO SPELL IT FOR

8  THE RECORD.

9    THE WITNESS:  KEVIN ANDREWS, K-E-V-I-N,

10  A-N-D-R-E-W-S.

11                      DIRECT EXAMINATION

12  BY MS. LOEB:

13  Q.   GOOD MORNING, MR. ANDREWS.  HOW ARE YOU?

14  A.   DOING FINE.  HOW ARE YOU?

15  Q.   FINE, THANK YOU.

16       WHERE DO YOU LIVE, MR. ANDREWS?

17  A.   I LIVE IN SUWANEE.

18  Q.   AND DO YOU KNOW NAT HARDWICK?

19  A.   YES, MA'AM, I DO.

20  Q.   HOW LONG HAVE YOU KNOWN HIM, AND HOW DID YOU MEET HIM?

21  A.   I'VE KNOWN NAT ABOUT 20 YEARS.  I ORIGINALLY MET HIM DOWN

22  AT LAKE OCONEE, WHERE I LIVED FOR ABOUT TEN YEARS.  WE WERE IN

23  THE SAME GOLF COMMUNITY AT ONE POINT.

24  Q.   AND ARE YOU ONE OF THE BOYS KNOWN AS THE LOST BOYS?

25  A.   YES, MA'AM.

1   Q.   YOU WENT ON A LOT OF TRIPS WITH NAT AND THE OTHER FRIENDS

2   TO GOLFING EVENTS AND GAMBLING EVENTS; IS THAT RIGHT?

3   A.   YES, I DID.

4   Q.   NOT GOING TO TAKE YOU BACK THROUGH EVERY ONE OF THOSE

5   TRIPS BECAUSE WE'VE ALREADY DISCUSSED THEM IN COURT.  BUT YOU

6   DID GO ON THE TRIPS TO NEW ORLEANS; IS THAT RIGHT?

7   A.   YES, MA'AM.

8   Q.   DO YOU REMEMBER WHAT HAPPENED DURING THOSE TRIPS, WHAT NAT

9   DID AND WHAT YOU DID?

10  A.   ON THE NEW ORLEANS, USUALLY IT WAS TO PLAY AT ZURICH,

11  WHICH WAS A GOLF TOURNAMENT THAT HE USUALLY SPONSORED, OR HIS

12  COMPANY SPONSORED.  WE'D USUALLY GO DOWN EITHER TO CADDY OR

13  PLAY, DEPENDING ON -- BUT MOST OF THE TRIPS THAT I REMEMBER

14  WERE BASED AROUND THAT ZURICH.  I THINK I WENT MAYBE TWO OR

15  THREE TIMES.

16  Q.   AND WHEN YOU AND NAT AND THE OTHER GUYS WOULD TRAVEL, WERE

17  THERE JUST TWO OF YOU THAT ACTUALLY BROUGHT BUSINESS SUITS WITH

18  YOU?

19  A.   WELL, IT DEPENDS.  I GUESS YOU THINK ABOUT -- LIKE,

20  LAS VEGAS, FOR EXAMPLE, I WOULD -- USUALLY MYSELF, WE HAD A LOT

21  OF CLIENTS IN LAS VEGAS AT THE TIME.  PROBABLY HAD 20-PLUS

22  CASINOS THAT WERE CLIENTS.

23       SO A LOT OF TIMES, NAT AND I WOULD KIND OF SCHEDULE DURING

24  THE WEEK -- HE WOULD SAY, HEY, DUDE, I'VE GOT TO MAKE A TRIP

25  OUT WEST.  DO YOU HAVE, YOU KNOW, DO YOU HAVE ANY INTEREST IN

1    GOING?  AND I'D USUALLY TRY TO GET SOME MEETINGS SCHEDULED OR

2    SET UP DURING THAT PERIOD OF TIME.

3        AND THEN SOME OTHER GUYS WOULD USUALLY COME, AND

4    USUALLY -- EITHER THEY'D FLY IN ON A WEEKEND, MEET DURING THE

5    WEEK.  YOU KNOW, I USUALLY HAD MEETINGS, HE HAD MEETINGS.  WE'D

6    KIND OF DO THAT IN THE MORNING, THEN MEET BACK IN THE AFTERNOON

7    OR FOR -- EVENING FOR DINNERS.

8        BUT, YEAH, I USUALLY -- BOTH OF US HAD SUITS.  WE HAD --

9    YOU KNOW, AS PART OF THE ROUTINE, YOU GET PEOPLE TO COME AND

10   HELP, YOU KNOW, PREP, SAY, OKAY, GET CAR SERVICE FOR THE NEXT

11   DAY, WHERE DO YOU GOT TO BE.  AND THEN ALSO, YOU KNOW, SOMEONE

12   WOULD COME UP AND HAVE STUFF PRESSED THAT WERE WRINKLED FROM

13   TRAVELING OR HAVE YOUR LAUNDRY DONE FOR THE NEXT MEETING,

14   DEPENDING ON WHERE WE WERE BOTH TRAVELING FROM.

15   Q.   AND YOU WERE ON A NUMBER OF THE TRIPS TO PEBBLE BEACH; IS

16   THAT RIGHT?

17   A.   YES, MA'AM.  I WENT TO A FEW OF THOSE.

18   Q.   DO YOU REMEMBER AT ONE POINT AT PEBBLE BEACH GOING TO AN

19   EVENT AT THE AQUARIUM?

20   A.   YES.  SO THE AQUARIUM -- ACTUALLY, WE WENT TO PEBBLE.

21   THERE WAS -- I THINK NAT'S FIRM SPONSORED AN AQUARIUM EVENT ONE

22   OF THE YEARS THAT I WENT.  IT WAS AN EVENT FOR THE FAMILIES.

23   SO A LOT OF PGA TOUR GUYS, THEY NEVER REALLY BROUGHT THEIR

24   FAMILIES ON TOUR MUCH, BUT THAT WAS ONE OF THE TOURNAMENTS THEY

25   DID BECAUSE IT WAS A GOOD FAMILY PLACE.  AND THE -- LANDCASTLE

1  TITLE OR MORRIS HARDWICK SCHNEIDER SPONSORED THAT EVENT THAT

2  WAS AT THE AQUARIUM FOR THE KIDS.  AND I WAS THERE AND KIND OF

3  HELPED AMBASSADOR.  YOU KNOW, I THINK HE ASKED JUST MAKE SURE

4  PEOPLE ARE HAVING A GOOD TIME, WALK AROUND.

5       SO, YEAH, IT WAS PRETTY WELL-ATTENDED.  THERE WAS A LOT OF

6  PEOPLE.  I REMEMBER A LOT OF PEOPLE THANKING HIM FOR THAT

7  EVENT.  IT WAS A NICE EVENT FOR THE FAMILIES.

8  Q.   SO THE PRO PLAYERS WOULD COME WITH THEIR WIVES AND THEIR

9  KIDS.  AND I THINK YOU DESCRIBED YOURSELF AS AN AMBASSADOR FOR

10 THE FIRM?

11 A.   YEAH.  I MEAN, SOMETIMES -- WHEN WE WENT ON TRIPS THAT

12 WERE RELATED TO, YOU KNOW, NOT JUST GOLF OR -- WE DO CALL OUR

13 LOST BOYS TRIPS OUR GOLFING TRIPS.

14      BUT IF WE WENT TO NEW ORLEANS, WHICH YOU MENTIONED, OR

15 PEBBLE BEACH, HE WAS ALWAYS SPONSORING ONE OF THOSE

16 TOURNAMENTS.  SO, YOU KNOW, WE WENT ALONG, USUALLY CADDY.  WE

17 WERE ALWAYS KIND OF WEARING, YOU KNOW, THE FIRM'S LOGO SHIRTS.

18 AND WE WERE KIND OF AMBASSADORS, I GUESS YOU COULD CALL THAT AS

19 A -- YOU KNOW, TO ANY OF THE EVENTS THAT WERE GOING ON, WHETHER

20 WE WERE AT DINNERS -- I WAS EVEN THINKING ABOUT, MONTEREY IS

21 ANOTHER EXAMPLE, AND THEN WE WERE IN PEBBLE.  THERE WAS AN

22 EVENT, BOYS AND GIRLS CLUB, THAT THEY SPONSORED.  I REMEMBER

23 GOING WITH HIM TO THAT AS WELL.

24      SO THOSE ARE THE KIND OF THINGS WE WOULD ATTEND WITH HIM

25 IF WE WERE CADDYING OR DOING SOMETHING ON ONE OF THOSE TRIPS.

1  Q.   THE BOYS AND GIRLS CLUB EVENT, WHAT KIND OF PEOPLE WENT TO

2  THAT EVENT?

3  A.   THE PEBBLE IS PRETTY HIGH PROFILE.  IT'S A TELEVISED

4  EVENT.  YOU KNOW, YOU HAD CEO'S OF FORTUNE 500-TYPE COMPANIES

5  THAT WERE THERE.  AND THIS EVENT IN PARTICULAR FOR THE BOYS AND

6  GIRLS WAS PRETTY UNIQUE BECAUSE IT USED THE MONTEREY PENINSULA

7  AS, I BELIEVE, KIND OF -- IT'S A SMALL HOUSE THAT'S RIGHT ON

8  THE OCEAN, AND KIND OF HONORING SOME OF THOSE PEOPLE THAT

9  HELPED SPONSOR THEIR LOCAL CHARITY, WHICH WAS THE BOYS AND

10  GIRLS CLUB, WHICH I THINK IS ONE OF THE BIG FOUNDATIONS.

11  Q.   NOW, DID YOU AND NAT EVER TALK ABOUT DOING ADVERTISING ON

12  A NASCAR?

13  A.   YES.  HE WAS -- NAT'S ALWAYS MARKETING AND ALWAYS TRYING

14  TO GET HIS LOGO EVERYWHERE, WHETHER WE'RE ON A DRIVING RANGE,

15  HE'S TALKING TO A PRO TO PUT IT ON THEIR GOLF BAG, TO GETTING

16  INTO NASCAR AND SOME OF THOSE OTHER THINGS.

17      I AM NOT A NASCAR GUY.  BUT FROM A MARKETING STANDPOINT,

18  WE'VE ALWAYS SAID, HEY, IT'S A GREAT OPPORTUNITY TO GET SOME

19  NATIONAL EXPOSURE IF IT'S GOING TO BE ON TV.  I KNOW, YOU KNOW,

20  HE SHOWED ME A COUPLE EXAMPLES THAT HE HAD DONE WITH -- YOU

21  KNOW, WHETHER IT WAS THE DRIVER WEARING LOGO STUFF OR THE CAR.

22  AND I ACTUALLY PARTICIPATED IN ONE OF THOSE, AND WE PUT OUR

23  COMPANY LOGO ONE TIME ON THE FRONT HOOD.

24  Q.   I'M GOING TO HAND YOU WHAT'S BEEN MARKED AS DEFENSE

25  EXHIBIT 345.  CAN YOU TAKE A LOOK AT THAT, PLEASE?

1  A.   ALL OF THESE OR --

2  Q.   YES.  I THINK IT'S A FOUR-PAGE EXHIBIT.

3         MS. LOEB:  ANY OBJECTION?

4         MR. PHILLIPS:  NO, YOUR HONOR.

5         THE COURT:  IT'S ADMITTED.

6  BY MS. LOEB:

7  Q.   YOU SAID THAT NAT SHOWED YOU SOME EXAMPLES OF WHAT HE

8  WOULD DO FOR THE NASCAR MARKETING.  ARE THESE EXAMPLES OF THAT?

9  A.   THEY ARE, ACTUALLY.  EVEN ONE OF THESE IS THE ONE THAT HAS

10  OUR LOGO ON IT, OUR COMPANY LOGO ON IT.

11  Q.   SO PAGE 1 OF THIS EXHIBIT, DOES THIS SHOW YOU -- THIS IS

12  EXHIBIT 345.  DOES THIS SHOW YOU THE KIND OF MARKETING ON THE

13  NASCAR THAT NAT HAD DISCUSSED WITH YOU THAT HE SAID HE THOUGHT

14  WAS A GOOD IDEA?

15  A.   YES, MA'AM.  HE TALKED ABOUT DIFFERENT QUARTER PANELS THAT

16  GOT MORE, YOU KNOW, MORE CAMERA TIME OR VIEWAGE AND KIND OF

17  BEST LOCATION TO BE.

18  Q.   AND THEN YOU SAID THAT AT SOME POINT YOUR COMPANY ACTUALLY

19  DID THAT.  IS YOUR COMPANY'S LOGO SHOWN ON THIS?

20  A.   NOT ON PAGE 1, BUT ON PAGE 2.

21  Q.   OKAY.  AND I'M SHOWING IT ON THE SCREEN RIGHT OVER THERE

22  TO YOUR RIGHT.  AND IS YOUR COMPANY SMARTBEN?

23  A.   YES, MA'AM.

24  Q.   AND SO FOR THAT PARTICULAR RACE ON THAT CAR, YOU HAD

25  SMARTBEN ADVERTISED FOR THE NASCAR RACE.

1    A.   YES, I DID.

2    Q.   AND WAS THAT A RACE THAT WAS SHOWN ON TELEVISION?

3    A.   I BELIEVE SO.  I DON'T REMEMBER ALL THE PARTICULARS, BUT I

4    THINK THIS CAR WAS TRYING TO QUALIFY.  I THINK HE HAD A COUPLE

5    DIFFERENT CARS THAT HE DID MARKETING STUFF FOR.  HE WAS ALWAYS

6    JUST SAYING, HEY, DO YOU WANT TO PARTICIPATE?  THIS IS A GREAT

7    OPPORTUNITY.  AND THIS HAPPENED TO BE ONE TIMING-WISE -- IT MAY

8    HAVE BEEN LAS VEGAS, EVEN, WHERE WE'VE GOT A LOT OF CLIENTS.

9    WE WERE TRYING TO GET EXPOSURE.

10   Q.   AND SO YOU ACTUALLY SHARED THIS CAR, AS IT WERE?

11   A.   WE DID -- WELL, WE TOOK THE HOOD; SO, YES.

12   Q.   AND WHEN YOU SAID HE SHOWED YOU SOME OTHER, SOME OTHER

13   IDEAS FOR YOUR MARKETING ON NASCAR -- IF YOU'D TURN -- IT'S

14   MARKED PAGE 6, BUT IT'S REALLY PAGE 3 OF THIS EXHIBIT -- ARE

15   THESE SOME EXAMPLES OF THE OTHER KINDS OF NASCAR MARKETING THAT

16   HE TOLD YOU HE WAS DOING?

17   A.   YES, MA'AM.

18   Q.   AND ARE THOSE SUITS FOR THE DRIVERS?

19   A.   THERE WERE SUITS FOR THE DRIVERS THAT YOU COULD LOGO

20   THERE, OR HELMETS AS WELL.

21   Q.   AND IF YOU'LL TURN TO PAGE 4 OF THE EXHIBIT MARKED

22   PAGE 11, ARE THOSE THE HELMETS THAT WERE DESIGNED FOR USE IN

23   NASCAR?

24   A.   YES.  HE SENT OVER, I THINK, AN E-MAIL WITH SOME OF THE

25   EXAMPLES.

1   Q.   AND DID HE TALK TO YOU ABOUT THE IMPORTANCE OF BRANDING IN

2   THE BUSINESS?

3   A.   I MEAN, NAT ALWAYS WAS -- THAT'S WHO HE WAS.  HE WAS KIND

4   OF A RAINMAKER, AND EVERYTHING HE DID WAS AROUND MARKETING.

5   ANY TIME HE INTRODUCED HIMSELF, IT WAS ALWAYS, NAT HARDWICK

6   AND, YOU KNOW, MORRIS HARDWICK SCHNEIDER, LARGEST LAW FIRM IN

7   THE COUNTRY.  CAN I HELP YOU?  AND THAT'S WHO HE WAS.

8        EVERYBODY KNEW HIM.  HE'D WALKED ON A -- EVEN THE PROS.

9   IF HE'D WALK ON A -- AT THESE EVENTS, ON A DRIVING RANGE

10  BEFORE, HE KNEW EVERYBODY THERE.  SO MARKETING WAS JUST -- YOU

11  KNOW, WHEN YOU THINK OF NAT, YOU THOUGHT OF MARKETING.  BUT OUR

12  BUSINESS, THIS IS ONE OF THE OPPORTUNITIES THAT WE TOOK

13  ADVANTAGE OF THAT.

14       MS. LOEB:  THANK YOU.

15       THE COURT:  CROSS-EXAMINATION.

16                      CROSS-EXAMINATION

17  BY MR. PHILLIPS:

18  Q.   GOOD MORNING.

19  A.   GOOD MORNING.

20  Q.   MY NAME IS RUSSELL PHILLIPS.  I REPRESENT THE UNITED

21  STATES, AND I HAVE A FEW QUESTIONS FOR YOU ABOUT YOUR

22  TESTIMONY.

23       FIRST OF ALL, YOU DON'T HAVE ANY INFORMATION ABOUT A

24  $10,000 LIMIT IN THE MHS SHAREHOLDER AGREEMENT, DO YOU?

25       MS. LOEB:  YOUR HONOR, OBJECTION.

1    THE COURT:  I'LL ALLOW THIS ONE.

2    THE WITNESS:  NO.

3    THE COURT:  OBJECTION IS OVERRULED.

4  BY MR. PHILLIPS:

5  Q.   I WANT TO ASK YOU ABOUT SOME OF THE TRIPS THAT YOU TOOK

6  WITH NAT HARDWICK ON PRIVATE JETS.

7    FIRST OF ALL, WHEN DID YOU SAY YOU FIRST MET MR. HARDWICK?

8  A.   IT WAS APPROXIMATELY ABOUT 20 YEARS AGO.

9  Q.   OKAY.  AND HOW MANY TIMES DID YOU FLY WITH HIM ON A

10  PRIVATE JET BEFORE 2011?

11  A.   I'M NOT SURE.  FROM A DATE STANDPOINT, I'M NOT SURE.

12  Q.   A DOZEN?

13  A.   SPECIFICALLY BEFORE 2011?

14  Q.   RIGHT.

15  A.   I COULDN'T TELL YOU EXACTLY.  I MEAN, I KNOW I'VE BEEN ON

16  QUITE A FEW TRIPS, BUT I DON'T KNOW FROM A TIME STANDPOINT,

17  TIME FRAME.  I KNOW WHEN WE FIRST MET, WE -- A LOT OF TRIPS

18  WE'D GO TO HILTON HEAD, WHICH WE DROVE TO.

19  Q.   I AM JUST ASKING YOU ABOUT THE TRIPS ON PRIVATE JETS, NOT

20  WHEN YOU DROVE.

21  A.   OKAY.  TRIPS ON PRIVATE JETS, I CAN'T TELL YOU A TIME

22  FRAME, BUT PROBABLY WENT ON MAYBE 20 OR 30 TRIPS.

23  Q.   OKAY.  LET'S TALK FEBRUARY OF 2012.  YOU FLEW ROUND-TRIP

24  WITH MR. HARDWICK OUT TO PEBBLE BEACH?

25  A.   I KNOW I WENT OUT THERE, BUT I'M SORRY --

1  Q.   IT'S ON THE SCREEN RIGHT THERE.

2  A.   YES.  IF YOU'VE GOT THE DATE.  I KNOW WE WENT OUT THERE A

3  COUPLE OF TIMES.

4  Q.   AND JULY 6TH TO 15TH, YOU FLEW WITH MR. HARDWICK TO

5  LAS VEGAS?  THAT'S ALSO 2012.

6  A.   I ASSUME THAT'S COMING FROM THE LOG, SO, YES.

7  Q.   ALL RIGHT.  AND FEBRUARY 3RD TO THE 10TH OF 2013, YOU FLEW

8  TO MONTEREY AGAIN WITH MR. HARDWICK.

9  A.   YES.

10 Q.   AND THEN MARCH 20TH TO 24, YOU FLEW ROUND-TRIP WITH

11 MR. HARDWICK FROM ATLANTA TO LAS VEGAS?

12 A.   YES.

13 Q.   JUNE 17 TO 23, 2013, YOU FLEW ROUND-TRIP WITH MR. HARDWICK

14 TO LAS VEGAS AGAIN.

15 A.   I ASSUME, YES.

16 Q.   AND JULY 25TH -- WELL, I'LL ASK YOU SOME MORE ABOUT THAT.

17 YOU DON'T REMEMBER THOSE DATES, JUNE 17 TO THE 23RD, 2013?

18 DOES THAT DATE RING A BELL FOR YOU?

19 A.   IT WAS MY 40TH.

20 Q.   OKAY.  WE'LL TALK MORE ABOUT THAT IN A MINUTE.

21          THE COURT:  I'M SORRY.  WHAT WAS YOUR ANSWER?

22          THE WITNESS:  IT WAS MY 40TH BIRTHDAY.

23          THE COURT:  BIRTHDAY.  OKAY.

24 BY MR. PHILLIPS:

25 Q.   JULY 25TH TO 28TH, YOU FLEW ROUND-TRIP FROM ATLANTA TO

1  CHARLESTON.  AND MR. HARDWICK WAS NOT ON THAT FLIGHT, RIGHT?

2  A.    I HONESTLY DON'T RECALL.

3  Q.    WELL, ASSUMING THAT INFORMATION I'M SHOWING YOU RIGHT HERE

4  ON THE SCREEN, WHICH HAS ALREADY BEEN ADMITTED INTO EVIDENCE IN

5  THIS CASE, IS CORRECT, YOU FLEW FROM ATLANTA TO CHARLESTON

6  ROUND-TRIP JULY 25TH TO 28TH ON A PRIVATE JET THAT NAT HARDWICK

7  PAID FOR?

8  A.    I WOULD HAVE TO AGREE WITH THAT.  I DON'T KNOW THE EXACT

9  DATES, BUT IF YOU HAVE THE ITINERARIES, THEN, YES.

10  Q.    OKAY.  AND THESE OTHER FOLKS HERE WERE ON THAT SAME TRIP:

11  BRAD LITTLE, TED SMITH, BRYAN CARROLL, AND SCOTT ELMORE?

12  A.    YES.

13  Q.    AND MR. HARDWICK WAS NOT EVEN ON THAT FLIGHT.

14  A.    THAT'S POSSIBLE, YES.

15  Q.    AND -- BUT HE PAID FOR IT ANYWAY.

16  A.    YEAH.  I MEAN, THERE COULD BE -- I KNOW AT ONE POINT, THAT

17  ONE OF THE TRIPS THAT HE DID NOT GET ON BECAUSE THE PLANE WAS

18  TOO SMALL, BECAUSE HE WAS PETRIFIED OF FLYING, THAT MAY HAVE

19  BEEN THAT TRIP.  I'M NOT EXACTLY SURE.

20  Q.    HE FLEW A LOT FOR SOMEBODY WHO WAS PETRIFIED OF FLYING,

21  RIGHT?

22  A.    WELL, HE WOULD ONLY FLY PRIVATE, YES.

23  Q.    YEAH.  ALL RIGHT.  LET'S TALK ABOUT OCTOBER 17TH, 2013,

24  FROM ATLANTA TO SALT LAKE CITY.  YOU FLEW ON A TRIP WITH NAT

25  HARDWICK, ALEX HARDWICK, HEATHER INMAN, AND OLIVER THE DOG.

1    A.   I DON'T RECALL THAT.

2    Q.   YOU DON'T REMEMBER BEING ON THE PRIVATE JET WITH OLIVER

3    THE DOG?

4    A.   NO, I DO NOT.

5    Q.   AND DO YOU REMEMBER FLYING BACK FROM THAT TRIP, FROM

6    LAS VEGAS TO ATLANTA, WITH MR. HARDWICK AND HIS BROTHER ON

7    OCTOBER 22ND?

8    A.   YES.  LIKE I SAID, I'M NOT SURE OF THE ITINERARY DATES,

9    BUT --

10   Q.   WELL, THIS STUFF ALL COMES STRAIGHT FROM THE RECORDS THAT

11   WERE PRODUCED BY THE JET COMPANY.

12   A.   CORRECT.  I'M SURE THOSE ARE ACCURATE.

13   Q.   DECEMBER 11TH, 2013, YOU FLEW FROM ATLANTA TO LAS VEGAS

14   WITH MR. HARDWICK AND THAT GROUP SHOWN THERE AT THE TOP OF THIS

15   PAGE?

16   A.   YES.

17   Q.   APRIL 20TH TO 23RD, 2014, YOU FLEW ROUND-TRIP WITH

18   MR. HARDWICK -- I'M SORRY.  YOU FLEW ONE LEG, ATLANTA TO NEW

19   ORLEANS, WITH MR. HARDWICK, REMEMBER?

20   A.   I ASSUME, YES.

21   Q.   OKAY.  AND MAY 1ST TO THE 6TH, 2014, YOU FLEW FROM ATLANTA

22   TO GULFPORT, MISSISSIPPI, WITH MR. HARDWICK.

23   A.   FOR THE ONE LEG?  IS THAT WHAT YOU'RE ASKING?

24   Q.   YES, SIR.

25   A.   YES.

1  Q.  AND THAT WAS THE TRIP TO GO TO THE BEAU RIVAGE IN BILOXI,

2  MISSISSIPPI?

3  A.  YES.

4  Q.  OKAY.  AND THEN YOU FLEW BACK ON MAY 4TH FROM GULFPORT,

5  MISSISSIPPI, TO ATLANTA.  AND YOU WERE THE LEAD PASSENGER ON

6  THAT FLIGHT, RIGHT?  MR. HARDWICK WAS NOT EVEN ON THAT FLIGHT?

7  A.  YEAH.  I THINK HE HAD MEETINGS, SO HE STAYED BEHIND.

8  Q.  I DIDN'T ASK YOU WHY HE DIDN'T DO IT.  I JUST SAID HE'S

9  NOT ON THAT FLIGHT, RIGHT?

10  A.  APPARENTLY NOT.

11  Q.  AND HE PAID FOR YOU AND THIS GROUP TO FLY BACK ON A

12  PRIVATE PLANE FROM BILOXI, MISSISSIPPI -- OR GULFPORT,

13  MISSISSIPPI, TO ATLANTA AFTER YOU HAD BEEN GAMBLING AT THE BEAU

14  RIVAGE?

15  A.  GOLF AND GAMBLING, YES.

16  Q.  GOLFING AND GAMBLING.

17      JUNE 4TH, 2014, YOU FLEW FROM ATLANTA TO LAS VEGAS AGAIN

18  WITH MR. HARDWICK, RIGHT?

19  A.  YES.

20  Q.  AND JUNE 8TH, YOU FLEW FROM LAS VEGAS TO NEW ORLEANS?

21  A.  I DON'T RECALL.  DO YOU HAVE -- WERE WE ON THAT PLANE?

22  Q.  YES.

23  A.  OKAY.  I JUST DIDN'T SEE MY NAME LISTED, SO I SAID NO.

24  Q.  SAME PASSENGERS WERE ON ALL THREE OF THESE FLIGHTS.  NAT

25  HARDWICK, ALEX HARDWICK, AND YOU.

1    A.   OKAY.  THEN, YES.

2    Q.   AND THEN YOU FLEW FROM NEW ORLEANS BACK TO ATLANTA ON

3    JUNE 11TH?

4    A.   YES.

5    Q.   AND THEN YOU WERE ON THE TRIP TO SCOTLAND IN 2014?

6    A.   YES, I WAS.

7    Q.   FLEW ON THE BBJ?

8    A.   YES, SIR.

9    Q.   AND WERE YOU AWARE AT THE TIME THAT MR. HARDWICK PAID

10   $635,000 JUST FOR YOU TO FLY ON THE BBJ BACK AND FORTH?

11   A.   I WAS NOT AWARE OF THAT AT THE TIME.

12   Q.   THAT'S AN EXTRAORDINARY AMOUNT OF MONEY, ISN'T IT?

13        MS. LOEB:  OBJECTION.

14        THE COURT:  SUSTAINED.

15   BY MR. PHILLIPS:

16   Q.   WERE YOU ON THE TRIP OF A LIFETIME NUMBER 1 BACK IN 2008?

17   A.   YES.  THAT WAS A CHRISTMAS GIFT.

18   Q.   AND YOU FLEW ON THE BBJ THEN, TOO, DIDN'T YOU?

19   A.   YES, SIR, I DID.

20   Q.   AND YOU DIDN'T REIMBURSE MR. HARDWICK FOR THE COST OF ANY

21   OF THESE PRIVATE JET FLIGHTS, RIGHT?

22   A.   EXCEPT FOR THE -- NO, I DID NOT REIMBURSE HIM.

23   Q.   AND YOU DIDN'T REIMBURSE HIS LAW FIRM FOR ANY OF THOSE

24   FLIGHTS?

25        MS. LOEB:  OBJECTION.  FOUNDATION.

1          THE COURT:  OVERRULED.

2          THE WITNESS:  CAN I ASK A QUESTION?

3          THE COURT:  IF YOU NEED CLARIFICATION ON THE

4     QUESTION, YES, SIR.

5          THE WITNESS:  SO, RECENTLY, WE HAD SOME EXPOSURE TO

6     THE BANKRUPTCY COURT.  I DON'T KNOW IF THAT HAS ANYTHING TO

7     DO --

8     BY MR. PHILLIPS:

9     Q.   WE'RE NOT TALKING ABOUT THAT, SIR.  WE'RE TALKING ABOUT AT

10    THE TIME --

11    A.   AT THE TIME, NO.

12    Q.   -- BEFORE MR. HARDWICK LEFT HIS LAW FIRM.

13    A.   NO, I DID NOT.

14    Q.   OKAY.  LET ME SHOW YOU A DOCUMENT THAT WAS PREVIOUSLY

15    ADMITTED INTO EVIDENCE.  THIS IS GOVERNMENT EXHIBIT 1501.  AND

16    YOU WERE TELLING US ABOUT YOUR 40TH BIRTHDAY EARLIER.  THAT WAS

17    IN 2013, RIGHT?

18    A.   YES, SIR.

19    Q.   AND YOU SEE PARAGRAPH 2 OF THIS E-MAIL CONCERNING THIS

20    TRIP, KEVIN'S VEGAS BIRTHDAY BASH AND POOL PARTY.  YOU SEE

21    WHERE I AM POINTING RIGHT THERE?

22    A.   YES, SIR.

23    Q.   THAT'S THE TRIP THAT YOU WERE TALKING ABOUT FOR YOUR

24    40TH BIRTHDAY, RIGHT?

25    A.   THAT IS CORRECT.

1   Q.   AND THAT'S THE TRIP THAT WAS HIGHLIGHTED HERE IN THE LIST

2   OF FLIGHTS THAT I ASKED YOU ABOUT, THE ONE THAT'S HIGHLIGHTED

3   THERE IN YELLOW, RIGHT?

4   A.   YES, SIR.

5   Q.   AND BIRTHDAY BASH AND POOL PARTY.  WHAT GOES ON AT A POOL

6   PARTY FOR ADULTS?

7   A.   IF -- WELL, IF YOU'VE BEEN TO VEGAS, THERE'S USUALLY MUSIC

8   AND LOTS OF PEOPLE.

9   Q.   WELL, NOT USUALLY.  WHAT HAPPENED AT YOUR VEGAS BIRTHDAY

10  BASH AND POOL PARTY AT THE COSMOPOLITAN HOTEL AND CASINO IN

11  LAS VEGAS?

12  A.   WE GAMBLED.  WE -- THE POOL PARTY ITSELF, THERE WAS -- YOU

13  HAVE A CABANA AND YOU HAVE LOTS OF FOOD, DRINKS, AND PEOPLE.

14  Q.   OKAY.  AND MS. LOEB ASKED YOU SOME QUESTIONS ABOUT WHETHER

15  YOU AND MR. HARDWICK TOOK YOUR SUITS.  WERE YOU AND

16  MR. HARDWICK WEARING YOUR SUITS AT KEVIN'S BIRTHDAY BASH AND

17  POOL PARTY AT THE COSMOPOLITAN HOTEL AND CASINO IN LAS VEGAS?

18          MS. LOEB:  OBJECTION, YOUR HONOR.  ARGUMENTATIVE.

19          THE COURT:  I'LL SUSTAIN.  I'LL SUSTAIN.

20          THE WITNESS:  I DON'T KNOW THAT --

21          THE COURT:  I SUSTAINED.  I SUSTAINED.

22          THE WITNESS:  OKAY.

23  BY MR. PHILLIPS:

24  Q.   YOU ALSO TOLD US EARLIER ABOUT SOME EVENTS THAT YOU

25  ATTENDED WITH MR. HARDWICK WHICH YOU SAID WERE, QUOTE, A NICE

1    EVENT FOR THE FAMILIES.  DO YOU REMEMBER THAT?

2    A.    AT PEBBLE BEACH?

3    Q.    WHEREVER YOU WERE TALKING ABOUT.

4    A.    YES.

5    Q.    IS THIS ONE OF THOSE NICE EVENTS FOR THE FAMILIES?

6    A.    NO.  THIS WAS NOT PEBBLE.  THIS WAS LAS VEGAS.

7    Q.    ARE YOU AWARE THAT IN CONNECTION WITH THIS TRIP FOR YOUR

8    40TH BIRTHDAY TO THE COSMOPOLITAN, $500,000 WAS WIRED FROM THE

9    MHS ATTORNEY ESCROW ACCOUNT TO THAT HOTEL FOR THE BENEFIT OF

10   NAT HARDWICK?

11   A.    NO, I WAS NOT.

12   Q.    LET ME SHOW YOU WHAT WAS PREVIOUSLY ADMITTED AS GOVERNMENT

13   EXHIBIT 9.  YOU SEE THAT?

14   A.    WHICH ONE?

15   Q.    WHERE IT SAYS $500,000.

16   A.    YES, SIR.

17   Q.    IT CAME FROM THE MHS IOLTA ACCOUNT.  DID MR. HARDWICK TELL

18   YOU THAT HE WAS GETTING MONEY OUT OF HIS IOLTA ACCOUNT FROM HIS

19   FIRM?

20   A.    NO.

21   Q.    LET ME SHOW YOU, THE PART THAT WAS SUBMITTED WITH THAT

22   SAME EXHIBIT, GOVERNMENT EXHIBIT 1004, WHERE NAT HARDWICK WAS

23   E-MAILING ASHA MAURYA ABOUT THAT, AND SHE TOLD HIM SHE WAS

24   GOING TO SEND THAT MONEY FROM THE FIRM'S ACCOUNT TO THE COSMO

25   FOR HIS BENEFIT.  AND HE SAID, YOU ROCK.  DO YOU SEE THAT ON

1  THE SCREEN?

2  A.   I SEE IT, YES.

3  Q.   AND BACK TO GOVERNMENT EXHIBIT 1501, LET'S TALK ABOUT THE

4  DATES OF YOUR BIRTHDAY BASH AND POOL PARTY.  THAT WAS JUNE 17TH

5  THROUGH JUNE 23RD, 2013; IS THAT RIGHT?

6  A.   YES, SIR.

7  Q.   WERE YOU AWARE THAT MR. HARDWICK GAMBLED WITH BOOKIES

8  OUTSIDE OF THE CASINOS?

9  A.   YES, I WAS.

10  Q.   OKAY.  AND WERE YOU AWARE THAT WHILE YOU WERE OUT THERE IN

11  LAS VEGAS FOR YOUR BIRTHDAY, MR. HARDWICK WROTE A CHECK TO A

12  BOOKIE NAMED SCOTT RUNYAN FOR $43,000, WHICH WAS PART OF AN

13  EXHIBIT THAT WAS PREVIOUSLY ADMITTED IN THIS CASE?

14  A.   NO.

15  Q.   WERE YOU AWARE THAT WHILE YOU WERE OUT THERE FOR YOUR --

16  WELL, I'M SORRY.  THAT'S AFTER.

17      WERE YOU ALSO PRESENT FOR MR. HARDWICK'S VEGAS BIRTHDAY

18  BASH AND POOL PARTY, WHICH OCCURRED LATER IN 2013, FROM

19  SEPTEMBER 22ND TO 29TH?

20  A.   IF I WAS ON THE ITINERARY, THEN, YES.  BUT I DON'T RECALL

21  SPECIFICALLY.

22          MR. PHILLIPS:  EXCUSE ME ONE SECOND, YOUR HONOR.

23          THE COURT:  SURE.

24  BY MR. PHILLIPS:

25  Q.   I THINK I SHOWED YOU THE WRONG EXHIBIT A MINUTE AGO, AND

1    THAT WAS MY FAULT.  I APOLOGIZE.  I SHOWED YOU GOVERNMENT

2    EXHIBIT 9.  I SHOULD HAVE SHOWN YOU GOVERNMENT EXHIBIT 3.

3         THIS IS THE $500,000 WIRE.  I GOT MY $500,000 WIRES TO THE

4    COSMO MIXED UP.

5         YOU SEE GOVERNMENT EXHIBIT 3 HERE?  AND YOUR BIRTHDAY WAS

6    THE JUNE 2013 TRIP, RIGHT?

7    A.   YES, SIR.

8    Q.   AND THAT WAS ALSO A $500,000 WIRE FROM THE MORRIS HARDWICK

9    SCHNEIDER IOLTA ACCOUNT.  YOU SEE THAT?

10             MS. LOEB:  OBJECTION, YOUR HONOR.  MAY WE APPROACH?

11             THE COURT:  SURE.

12             (WHEREUPON, A BENCH CONFERENCE OUT OF THE HEARING OF

13   THE JURY PROCEEDED AS FOLLOWS:)

14             MS. LOEB:  I DON'T SEE THE RELEVANCE OF THEM TAKING

15   HIM THROUGH EVERY TRANSACTION.

16             THE COURT:  OKAY.  I OVERRULE.  OKAY.  I UNDERSTOOD

17   YOU.  OVERRULED.

18             (WHEREUPON, PROCEEDINGS RESUMED IN OPEN COURT AS

19   FOLLOWS:)

20   BY MR. PHILLIPS:

21   Q.   I JUST WANTED TO CLEAR THAT UP.  I DIDN'T MEAN TO MISLEAD.

22   I JUST GRABBED THE WRONG EXHIBIT.

23        JUST SO WE'RE CLEAR, THOUGH, YOU SEE GOVERNMENT EXHIBIT 3

24   IS THE ONE THAT SHOWS THE WIRE TRANSFER THAT OCCURRED FOR YOUR

25   BIRTHDAY PARTY, RIGHT?

1   A.   YES.

2        MR. PHILLIPS:  OKAY.  THANK YOU, SIR.  I APPRECIATE

3   YOUR TIME.

4        THE COURT:  ANY REDIRECT?

5        MS. LOEB:  NO, YOUR HONOR.

6        THE COURT:  ALL RIGHT.

7        MS. LOEB:  I'M SORRY.  ONE MOMENT.

8        THE COURT:  HOLD ON ONE SECOND, SIR.

9        MS. LOEB:  I DO HAVE ONE, ONE FOLLOW-UP QUESTION.

10       THE COURT:  ALL RIGHT.

11              REDIRECT EXAMINATION

12   BY MS. LOEB:

13   Q.   I THINK MR. PHILLIPS' LAST QUESTION TO YOU WAS, WERE YOU

14   AWARE OF A $500,000 TRANSFER TO THE CASINO FOR YOUR BIRTHDAY?

15      YOU HAVE NO KNOWLEDGE THAT ANY MONEY WAS TRANSFERRED TO A

16   CASINO FOR YOUR BIRTHDAY, DO YOU?

17   A.   THAT'S CORRECT.  I NEVER DISCUSSED THE MONEY THAT HE WAS

18   GAMBLING WITH.

19        MS. LOEB:  THANK YOU.

20        MR. PHILLIPS:  JUST ONE, YOUR HONOR.

21             RECROSS-EXAMINATION

22   BY MR. PHILLIPS:

23   Q.   YOU DON'T HAVE ANY REASON TO DISAGREE WITH ME WHEN I TELL

24   YOU THAT THAT $500,000 WIRE TRANSFER IN JUNE OF 2013, THAT WE

25   JUST TALKED ABOUT, WAS FOR MR. HARDWICK'S PERSONAL USE AND

1  BENEFIT?

2  A.  LIKE I SAID, I NEVER TALKED ABOUT MONEY.  BUT, YEAH.  I

3  MEAN, IF HE TRANSFERRED MONEY TO GAMBLE AND DO THINGS WITH, I

4  DIDN'T HAVE THAT DISCUSSION.  SO I CAN'T, I CAN'T CLARIFY FOR

5  YOU.  I'M SORRY.

6  Q.  THAT'S OKAY.  SO YOU DON'T HAVE ANY REASON TO DISAGREE

7  WITH THAT, CORRECT?

8  A.  CAN YOU RESTATE THE QUESTION?

9  Q.  YES, SIR.  IF I SAY THAT THE $500,000 WIRE TRANSFER FROM

10  MR. HARDWICK'S LAW FIRM IN JUNE OF 2013, $500,000 GOING FROM

11  THE LAW FIRM TO THE COSMOPOLITAN HOTEL AND CASINO IN LAS VEGAS,

12  THAT WAS DONE FOR MR. HARDWICK'S PERSONAL USE AND BENEFIT, YOU

13  DON'T HAVE ANY REASON TO DISAGREE WITH THAT STATEMENT, DO YOU?

14  A.  I DON'T KNOW, BECAUSE I DON'T -- I DIDN'T -- I WASN'T

15  INVOLVED IN HIM TRANSFERRING MONEY OR FOR WHAT REASON.  SO I

16  DON'T KNOW.

17  Q.  SO THE ANSWER IS YOU DO NOT HAVE ANY REASON TO DISAGREE

18  WITH THAT, CORRECT?

19  A.  I REALLY DON'T KNOW, SO I CAN'T ANSWER IT EITHER WAY.  I'M

20  SORRY.

21       THE COURT:  DO YOU HAVE ANY REASON TO DISAGREE OR

22  AGREE, EITHER WAY?

23       THE WITNESS:  THAT IT WAS FOR -- I MEAN, I'D JUST BE

24  SPECULATING WHAT HE USED IT FOR.

25       MR. PHILLIPS:  THANK YOU, SIR.

1          THE COURT:  THANK YOU.

2          ALL RIGHT.  ANYTHING ELSE?

3          MS. LOEB:  NO.  THANK YOU, YOUR HONOR.

4          THE COURT:  ALL RIGHT.  THANK YOU SO MUCH.

5          ALL RIGHT.  LADIES AND GENTLEMEN, WE ARE RIGHT AT

6   12:40.  I AM GOING TO DISMISS YOU FOR AN HOUR FOR LUNCH.  I

7   WILL SEE YOU BACK AT 1:40.  THANK YOU SO MUCH.

8          (WHEREUPON, THE JURY RETIRED FROM THE COURTROOM AT

9   12:41 P.M., AND THE FOLLOWING PROCEEDINGS WERE HAD.)

10         THE COURT:  ALL RIGHT.  BEFORE WE DEPART FOR LUNCH,

11  DEFENSE, ARE YOU ABLE TO TELL ME ABOUT HOW MANY MORE WITNESSES

12  YOU ANTICIPATE CALLING TODAY?  AND JUST GIVE ME SOME IDEA OF

13  WHETHER THEY ARE SHORT, MEDIUM, LONG, IF YOU KNOW.  JUST ANY

14  INDICATION IF YOU CAN GIVE ME.

15         MS. LOEB:  THREE OR FOUR, YOUR HONOR.

16         THE COURT:  OKAY.  AND, GOVERNMENT, I WANT TO MAKE

17  SURE THAT I UNDERSTAND THIS POINT FROM YOU, MS. BARRON, BECAUSE

18  IT'S CONFUSING ME.

19         DO YOU TAKE THE POSITION THAT IF WE FIND LAW THAT

20  SUPPORTS MS. NOVAY'S ARGUMENT THAT UNDER THAT STATUTE, YOU

21  CANNOT HAVE JUST AN OMISSION, THAT THEY WOULD HAVE WAIVED IT BY

22  NOT MAKING IT BEFORE NOW, SO THAT A COUNT COULD GO FORWARD TO

23  THE JURY THAT WILL ALLOW FOR A CONVICTION UNDER A STATUTE THAT

24  DOES NOT ALLOW FOR A CONVICTION?

25         I JUST WANT TO MAKE SURE I UNDERSTAND YOUR PROCEDURAL

1    POINT.

2           MS. BARRON:  I AM FULLY AWARE THAT A PERSON CANNOT BE

3    CONVICTED OF SOMETHING THAT IS NOT A CRIME.

4           THE COURT:  OKAY.

5           MS. BARRON:  SO IF IT IS NOT A CRIME, AND IF IT'S

6    ESTABLISHED -- 11TH CIRCUIT LAW OR SUPREME COURT LAW, CLEARLY

7    ESTABLISHED, MAKES IT THAT THAT IS NOT A CRIME, I DON'T KNOW

8    WHAT I CAN SAY ABOUT THAT.

9           THE COURT:  OKAY.  SO WHEN YOU SAID, IS IT RIGHT --

10   AND YOU SAID SOMETHING ABOUT TIMELINESS, OF COURSE, EARLIER

11   ON -- YOU MAY HAVE BEEN ADDRESSING A DIFFERENT ARGUMENT OR A

12   DIFFERENT PART OF THE ARGUMENT.  BUT I JUST WANT TO MAKE SURE

13   I'M CLEAR ON THAT.

14          MS. BARRON:  WHAT I'M SAYING IS THAT'S NOT A RULE 29

15   ISSUE.  RULE 29 IS SUFFICIENCY OF THE EVIDENCE.  THAT IS A

16   QUESTION OF LAW.  THAT IS A MOTION TO DISMISS COUNT 23 OF THE

17   INDICTMENT.

18          THE COURT:  OKAY.  SO YOU WEREN'T SAYING THAT IT

19   CANNOT BE RAISED --

20          MS. BARRON:  NO, NO, NO.  IT'S NOT A RULE 29 ISSUE.

21          THE COURT:  GOTCHA.

22          MS. BARRON:  AND WE WOULD LIKE THE OPPORTUNITY TO

23   BRIEF IT, PLEASE, BEFORE THE COURT.

24          THE COURT:  YES.  PLEASE LOOK AT THAT OVER LUNCH, AS

25   I SAID EARLIER.

1    MR. GILFILLAN:  CAN I ASK A QUESTION, YOUR HONOR?

2    THE COURT:  YES.

3    MR. GILFILLAN:  IS IT YOUR HONOR'S INTENTION TO ALLOW

4  THE DEFENSE -- IF THEY RUN OUT OF WITNESSES EARLY, ARE WE GOING

5  TO KNOCK OFF EARLY FOR THE DAY?  IN FACT, I KNOW -- I CAN'T

6  HELP BUT NOTICE THAT THE ONE WITNESS WHO I THINK IS AVAILABLE

7  ALL THE TIME, HE'S NOT HERE TODAY.

8    THE COURT:  I DON'T KNOW, AND I DON'T KNOW WHERE THAT

9  WITNESS IS.  I HAVE NOT -- I'VE NOTICED HE'S NOT IN THE

10  COURTROOM, BUT I DON'T KNOW WHETHER HE IS ELSEWHERE PREPARING

11  SOMETHING.  SO I CAN'T SAY WHAT I PLAN TO DO AT THIS POINT.  I

12  DON'T KNOW.

13    MR. GILFILLAN:  OKAY.  WELL, I HAD TWO THINGS.  ONE

14  IS I WOULD LIKE TO ADDRESS SOME ISSUES WITH REGARD TO HIS

15  POTENTIAL TESTIMONY BEFORE THEY CALL HIM, FIRST OF ALL.

16    BUT THEN, SECONDLY, I WOULD ASK THE COURT THAT THE

17  DEFENSE NOT BE ALLOWED TO JUST RUN OUT OF WITNESSES TODAY AT

18  3 O'CLOCK, FOR EXAMPLE, OR EVEN 3:30.  WE OUGHT TO DO A FULL

19  DAY.  THAT'S ALL I'M ASKING.

20    THE COURT:  I HAVE HEARD YOU, AND I WILL NOT GRANT

21  THOSE REQUESTS AT THIS POINT.

22    ALL RIGHT.  THANK YOU SO MUCH.  I'LL SEE YOU IN AN

23  HOUR FOR LUNCH.

24    THE COURTROOM SECURITY OFFICER:  ALL RISE.  COURT

25  STAND IN RECESS FOR 1 HOUR.

1          (WHEREUPON, THE LUNCH RECESS WAS HAD FROM 12:44 P.M.

2    TO 1:43 P.M.)

3          THE COURT:  ALL RIGHT.  PLEASE BE SEATED.

4          AND I HAVE BEEN TOLD THAT WE ARE STILL MISSING FIVE

5    JURORS, WHICH IS NOT TYPICAL ONCE WE COME BACK.  YOU ALL MAY BE

6    SEATED, THOUGH.

7          I TELL YOU WHAT, IN THE MEANTIME, LET'S GO BACK TO

8    THE MOTION FOR DIRECTED VERDICT PURSUANT TO RULE 29 ON

9    COUNT 24.

10          AND, GOVERNMENT, LET ME HEAR FROM YOU IF YOU HAVE

11    BEEN ABLE TO LOOK ANY FURTHER AT THIS.

12          MR. GILFILLAN:  YOUR HONOR, WE DID BEGIN LOOKING AT

13    CASE LAW.

14          THE COURT:  OKAY.

15          MR. GILFILLAN:  AND I GUESS WHAT I WOULD PROPOSE

16    IS -- CAN WE HAVE SOME TIME TO LOOK AT THAT CASE LAW?  BECAUSE

17    I THINK I KNOW WHAT THE CASE LAW IS GOING TO BE, BUT I WOULD

18    LIKE TO LOOK AT THAT.  AND I THINK IT JUST NEEDS TO BE RESOLVED

19    BY THE TIME OF THE CHARGE CONFERENCE AND CLOSING ARGUMENTS.  I

20    DON'T KNOW --

21          THE COURT:  WELL, I AM STILL CONFUSED ABOUT

22    MS. BARRON'S POSITION THAT THIS IS NOT A RULE 29 ISSUE.  I

23    JUST -- I -- I'M NOT UNDERSTANDING THAT.

24          MR. GILFILLAN:  CAN I ADDRESS IT AS AN OBSERVER?

25          THE COURT:  YES.

1          MR. GILFILLAN:  I THINK MS. BARRON WAS RESPONDING TO

2    MS. NOVAY RAISING WHAT APPEARED TO BE A LEGAL ARGUMENT AND

3    SAYING, UNDER THE CASE LAW, A PURE OMISSION CANNOT FORM THE

4    BASIS FOR A SECTION 1014 OFFENSE.

5          AND I THINK ALL MS. BARRON WAS SAYING IS THAT IF THAT

6    IS CORRECT, YOUR HONOR DOESN'T NEED TO DECIDE IT RIGHT NOW.  WE

7    CAN ALL GO READ THE CASES AND MAKE A DECISION ABOUT THAT.  I

8    THINK THAT'S ALL SHE WAS SAYING.

9          THE COURT:  BUT WHAT SHE SAID CLEARLY WAS, THIS IS

10   NOT A RULE 29 ISSUE.  AND WHETHER A MOTION FOR DIRECTED VERDICT

11   UNDER RULE 29 IS MADE AT THE CLOSE OF THE GOVERNMENT'S CASE OR

12   WHETHER IT'S MADE AT THE CLOSE OF ALL THE PRESENTATION OF

13   EVIDENCE OR JUST *SUA SPONTE*, IT IS A RULE 29 ISSUE AS FAR AS I

14   SEE IT.  AND SO I'M CONFUSED ABOUT THAT.

15         AND WHEN I HEAR A STATEMENT LIKE THAT, IN MY MIND I'M

16   THINKING THAT YOU'RE STILL SAYING THAT IT WAS WAIVED BECAUSE IT

17   WASN'T RAISED IN A MOTION TO DISMISS AND AS A LEGAL ISSUE

18   BEFORE, SO THAT IT -- IT SOUNDS LIKE THERE'S SOME KIND OF

19   WAIVER ARGUMENT BEING MADE.  SO THAT'S WHAT I'M NOT

20   UNDERSTANDING.

21         MS. BARRON:  YOUR HONOR, I APOLOGIZE FOR NOT MAKING

22   THIS CLEAR LAST TIME.  HE CANNOT BE CONVICTED OF SOMETHING THAT

23   IS NOT A CRIME.  I MEAN, IT IS PLAIN ERROR ON APPEAL, PLAIN AS

24   DAY, IF IT IS NOT A CRIME, HE CANNOT BE CONVICTED OF IT.  I GET

25   THAT.  AND THAT'S NOT WHAT I'M SAYING.

1        RULE 29 IS MOTION FOR JUDGMENT OF ACQUITTAL BASED ON

2    THE SUFFICIENCY OF THE EVIDENCE.  THIS IS NOT ABOUT THE

3    SUFFICIENCY OF THE EVIDENCE.  THIS IS ABOUT WHETHER COUNT 24

4    ALLEGES A CRIME AS A MATTER OF LAW.

5        FORGET WHAT THE EVIDENCE WAS.  IF WE LOOK AT WHAT'S

6    ALLEGED, SHE'S SAYING IT WAS AN OMISSION.  AND BY LAW, AN

7    OMISSION CANNOT BE A FALSE STATEMENT FOR 1014, REGARDLESS OF

8    WHAT OUR EVIDENCE IS.

9        AND SO ALL I'M SAYING IS THAT -- I MEAN, IF IT'S NOT

10   A CRIME, THEN OBVIOUSLY HE CAN'T BE CONVICTED OF IT.

11        THE COURT:  AND OBVIOUSLY IT CAN BE DIRECTED OUT,

12   WHICH MAKES IT A RULE 29 ISSUE.  THAT IS -- THAT DOES FALL

13   WITHIN RULE 29.  IF HE CAN'T BE CONVICTED OF IT, WHICH YOU

14   ACKNOWLEDGE IF THE LAW SAYS THAT --

15        MS. BARRON:  IF THAT'S WHAT THE LAW SAYS.

16        THE COURT:  -- THEN THAT IS A RULE 29 ISSUE.  THAT

17   GETS DIRECTED OUT.  THAT IS A RULE 29 ISSUE.  THAT'S EXACTLY

18   WHAT IT IS.

19        MR. PHILLIPS:  YOUR HONOR, WE DID FIND MORE CASES.

20   WE CALLED OUR COURT OFFICIAL.  WE HAVEN'T HAD A CHANCE TO LOOK

21   AT IT EARLIER, BUT --

22        THE COURT:  OKAY.

23        MR. PHILLIPS:  -- WE THINK IT'S IN FAVOR OF KEEPING

24   THIS IN THE CASE AND NOT GRANTING THE MOTION.  IT'S *UNITED*

25   *STATES VERSUS GARDNER*.

1          THE COURT:  GARDNER?

2          MR. PHILLIPS:  G-A-R-D-N-E-R, 716 FEDERAL APPEALS

3   560.  IT'S AN EIGHTH CIRCUIT CASE FROM 2017, JUST A YEAR AGO.

4          MS. BARRON:  AND I WOULD POINT OUT, YOUR HONOR, THAT

5   EVEN IF THAT IS CORRECT, THIS IS A RULE 29 ISSUE, THIS IS THE

6   EXACT SAME ALLEGATION THAT HAS BEEN IN THE INDICTMENT SINCE

7   FEBRUARY 2016.  AND THE LEGAL SUFFICIENCY -- I'M NOT SAYING

8   IT'S WAIVED, BUT I'M SAYING WE SHOULD BE GIVEN MORE THAN AN

9   HOUR TO THINK ABOUT THIS SINCE THEY HAD TWO AND A HALF YEARS TO

10  THINK ABOUT IT.  WE JUST WANT THE OPPORTUNITY BEFORE IT GOES

11  BACK TO THE JURY TO BE ABLE TO --

12         THE COURT:  I DIDN'T SAY YOU COULDN'T HAVE THAT.  AND

13  I TOOK IT UNDER ADVISEMENT.  BUT WHAT I KEPT HEARING IS, THIS

14  ISN'T A RULE 29 ISSUE, THIS ISN'T A RULE 29 ISSUE.  AND THAT

15  JUST MAKES ME THINK THAT -- I'M CONFUSED BY THAT POSITION.  I

16  DON'T UNDERSTAND IT.

17         MS. BARRON:  I'M JUST RELYING ON THE PLAIN LANGUAGE

18  OF RULE 29, THE INSUFFICIENCY OF THE EVIDENCE.  AND MAYBE --

19  I'M SURE THERE IS A MECHANISM FOR --

20         THE COURT:  CAN EVIDENCE BE SUFFICIENT, THOUGH, IF

21  IT'S NOT EVEN A CRIME UNDER THE LAW?  I MEAN, I DON'T KNOW IF

22  YOU'RE THINKING THAT IT HAS TO JUST BE A FACTUAL DISPUTE.  I

23  DON'T KNOW WHAT YOU MEAN BY THAT.  IT IS NOT SUFFICIENT TO GO

24  FORWARD IF IT'S NOT A CONVICTION UNDER -- IF IT COULD NOT BE A

25  CONVICTION UNDER THE LAW.  AND THAT'S EXACTLY, PRECISELY A

1    RULE 29 ISSUE.

2          MS. BARRON:  I DON'T DISAGREE WITH THAT, THAT IT

3    SHOULD NOT GO BACK TO THE JURY WHETHER IT'S RULE 12 OR RULE 29

4    OR -- NOBODY IS DISAGREEING THAT THE JURY SHOULD NOT BE ASKED

5    TO DECIDE SOMETHING THAT IS NOT A CRIME UNDER THE LAW.

6          BUT RULE 29 IS SOMETHING THAT GETS RESOLVED AT THE

7    CLOSE OF THE GOVERNMENT'S CASE.  AND ALL WE'RE ASKING IS THAT

8    WE NOT MAKE THIS JUDGMENT TODAY.  WE NOT MAKE THIS DECISION

9    TODAY.  WE NEED TO -- I MEAN, I THINK THERE IS -- IT'S A TRICKY

10   QUESTION, AND WE JUST WANT TO MAKE ABSOLUTELY SURE BEFORE WE

11   CONCEDE THAT -- BEFORE WE CONCEDE ANYTHING ABOUT WHAT NEEDS TO

12   HAPPEN WITH COUNT 24, THAT WE UNDERSTAND WHAT THE LAW REQUIRES.

13         AND SO WE JUST WANT SOME TIME, YOU KNOW.  AND THE

14   COURT CAN DECIDE THAT LATER.  YOU KNOW, I UNDERSTOOD THE COURT

15   TO SAY, GO RESEARCH THIS OVER LUNCH.  AND, YOUR HONOR, GIVEN

16   THAT THEY'VE HAD TWO AND A HALF YEARS TO THINK ABOUT THAT, I

17   THINK IT'S UNFAIR.

18         THE COURT:  I DIDN'T SAY TO HAVE A DECISION BY LUNCH.

19   AND I COULD HAVE SAID THAT I WAS GOING TO MAKE A RULING TODAY.

20   I NEVER INDICATED THAT.  AGAIN, I JUST TAKE ISSUE WITH WHAT

21   SOUNDED LIKE TO ME THE GOVERNMENT INITIALLY MAKING AN ARGUMENT

22   THAT IT'S BEEN WAIVED.  THAT STARTED -- THAT'S HOW IT SOUNDED

23   AT FIRST.  IT SOFTENED A LITTLE BIT TOWARDS LUNCH.

24         AND I CAN'T EVER SEE ANYONE -- AND MAYBE I

25   MISUNDERSTOOD YOU -- MAKING THE POINT THAT, WELL, IF THEY

1    WAIVED IT, EVEN IF IT WOULDN'T BE A CONVICTION UNDER THE LAW,

2    IT SHOULD GO FORWARD.  THAT'S WHERE I REALLY THOUGHT YOU WERE

3    GOING, AND THAT REALLY BOTHERED ME.

4           MS. BARRON:  NO, YOUR HONOR.  AND I WILL SAY AGAIN

5    THAT HE CANNOT BE CONVICTED OF SOMETHING THAT IS NOT A CRIME.

6    THE CONSTITUTION FORBIDS IT.  AND EVEN IF IT'S NOT RAISED HERE

7    AT ALL, IT WOULD BE PLAIN ERROR, REVERSIBLE ON APPEAL.

8           THE COURT:  CORRECT.

9           MS. BARRON:  AUTOMATIC.  I'M NOT DISPUTING THAT.

10          ALL I WAS ASKING -- I WAS UNDER THE IMPRESSION THE

11   COURT WANTED US TO GO RESEARCH THIS AFTER LUNCH AND THEN LET'S

12   DECIDE THIS, WHICH WE JUST WANT --

13          THE COURT:  WELL, THAT DOESN'T HAVE ANYTHING TO DO

14   WITH WHETHER OR NOT IT'S RULE 29, BECAUSE WE HAVEN'T EVEN

15   TALKED ABOUT WHEN I WAS GOING TO MAKE A RULING.  SO THAT --

16   YOUR POSITION EARLIER DID NOT GO TO WHEN I WAS INDICATING I'D

17   MAKE A RULING.  YOUR POSITION CLEARLY WAS THEY DIDN'T RAISE IT

18   AND IT IS NOT A RULE 29.  I HEARD THOSE WORDS.  WE DIDN'T HAVE

19   ANY DISCUSSION ABOUT WHEN I WAS GOING TO MAKE A DECISION.  I

20   NEVER GAVE ANY INDICATION ABOUT THAT, SO THAT'S NOT WHAT WE

21   WERE TALKING ABOUT BEFORE.

22          MS. BARRON:  I AGREE, YOUR HONOR.  AND TO CLARIFY, I

23   STILL THINK THIS IS PROBABLY MORE A RULE 12 ISSUE.  IT'S

24   DISMISSAL OF A COUNT.

25          THE COURT:  AND SO WHAT'S THE, WHAT'S THE DIFFERENCE

1    THERE?  BECAUSE THE JURY DOESN'T HEAR IT, THEORETICALLY.  ARE

2    YOU JUST SAYING THAT, FOR THE RECORD, IT MIGHT BE BETTER TO DO

3    A 12(B)(6) MOTION TO DISMISS INSTEAD OF DIRECTED VERDICT UNDER

4    RULE 29?  WHAT IS EVEN THE PRACTICAL DIFFERENCE OF THIS

5    ARGUMENT?

6            MS. BARRON:  I THINK THAT'S KIND OF MY POINT, IS THAT

7    IT DOESN'T -- WHEN I HEAR RULE 29 -- AND MAYBE IT'S JUST MY

8    INEXPERIENCE; THIS IS ONLY MY SEVENTH TRIAL -- I HEAR WE HAVE

9    TO DECIDE THIS NOW BEFORE THE DEFENSE PRESENTS A CASE AND THE

10   COURT HAS TO MAKE A DECISION ABOUT WHETHER IT'S --

11           THE COURT:  DO YOU UNDERSTAND THAT THEY -- THAT THAT

12   DIRECTED VERDICT MOTION CAN BE RENEWED AT THE END OF THE WHOLE

13   PRESENTATION?

14           MS. BARRON:  I DO UNDERSTAND THAT, YOUR HONOR.

15           THE COURT:  AND THAT THE COURT CAN ALWAYS DO IT

16   *SUA SPONTE*?  SO, NO, IT DOESN'T HAVE TO BE MADE AT THE END OF

17   THE GOVERNMENT'S CASE.  YOU UNDERSTAND THAT, RIGHT?

18           MS. BARRON:  I DO UNDERSTAND THAT, YOUR HONOR.

19           THE COURT:  OKAY.  ALL RIGHT.  THANK YOU FOR

20   CLARIFYING.  THAT WAS REALLY -- YOU UNDERSTAND WHY I WAS

21   CONCERNED THAT IN THINKING -- AND I MISUNDERSTOOD, PERHAPS,

22   WHERE YOU WERE GOING -- IN THINKING THAT YOU UNDERSTOOD THAT

23   THERE WAS A POSSIBILITY THAT IT SHOULD NOT GO TO THE JURY, BUT

24   AT THE SAME TIME I THOUGHT YOU WERE ARGUING, BUT, HOWEVER, IT'S

25   BEEN WAIVED.  SO YOU UNDERSTAND WHY THAT WOULD BOTHER ME, BUT

1  THAT DOESN'T SOUND LIKE WHAT YOU WERE SAYING.

2          MS. BARRON:  YEAH.  AND I THOUGHT I CLARIFIED THAT

3  BEFORE LUNCH, THAT YOU CANNOT BE CONVICTED OF SOMETHING THAT IS

4  NOT A CRIME.  THAT'S A CONSTITUTIONAL AFFIRMATIVE.  YOU CAN

5  NEVER WAIVE THAT.  I UNDERSTAND THAT.

6          THE COURT:  RIGHT.

7          MS. BARRON:  SO WHETHER WE CALL IT RULE 29, RULE 12,

8  WHATEVER, I GET THAT HE CANNOT BE CONVICTED OF SOMETHING THAT

9  IS NOT A CRIME.  I WAS JUST ASKING THAT WE BE GIVEN A MINUTE TO

10  THINK ABOUT WHETHER WE ARE GOING TO CONCEDE THAT IT'S NOT A

11  CRIME.

12          THE COURT:  OKAY.  AND THAT'S NOT A PROBLEM.  THAT IS

13  NOT A PROBLEM.

14          MS. BARRON:  OKAY.

15          THE COURT:  I HAVE LOOKED AT IT, AND I AM PRETTY

16  CLEAR ON WHERE I'M GOING.  SO UNLESS I SEE SOMETHING TOTALLY

17  DIFFERENT, I HAVE A VERY STRONG INCLINATION ON WHETHER IT IS A

18  CRIME OR MS. NOVAY HAS MADE THE PROPER ARGUMENT.

19          BUT I CERTAINLY WILL GIVE YOU ALL -- I DON'T EVEN

20  KNOW -- I DON'T KNOW THAT ON A PRACTICAL LEVEL WE NEED TO MAKE

21  A RULING BEFORE YOU WOULD HAVE AN OPPORTUNITY TO RENEW RULE 29,

22  BUT I WILL CERTAINLY HEAR FROM YOU.

23          MS. NOVAY:  AND I'M SORRY FOR LURKING.  I'M JUST --

24          THE COURT:  NO, IT'S OKAY.  GO AHEAD AND LURK.  GO

25  AHEAD AND RESPOND, TOO.

1        MS. NOVAY:  BEFORE THE DEFENSE CLOSES, THAT MAY BE

2  SOMETHING THAT WE PUT EVIDENCE UP ON.

3        THE COURT:  THAT'S MY CONCERN, IS WHAT IF -- I MEAN,

4  HOW DOES ANYONE KNOW WHETHER OR NOT TO ASK FURTHER QUESTIONS OR

5  ANYTHING ALONG -- TO SUPPORT THAT COUNT?  THAT'S MY CONCERN

6  THERE.  YES.  I HEAR YOU.  GO AHEAD.

7        MS. NOVAY:  I MEAN, I DON'T HAVE ANY -- MUCH GREATER

8  ARGUMENT THAN THAT.  BUT THAT'S THE CONCERN.  AND I ALSO DON'T

9  WANT IT TO BE -- I DON'T KNOW WHAT THE LAW IS.  I KNOW I'VE

10  DEALT WITH IT ON THE STATE LEVEL.

11        THE COURT:  YES.

12        MS. NOVAY:  BUT I DON'T KNOW WHAT THE LAW IS ON

13  TAKING -- BECAUSE I'VE RAISED IT AS A RULE 29.  AND I DON'T

14  KNOW WHAT THE LAW IS ON TAKING IT UNDER ADVISEMENT AND THEN

15  LETTING THE DEFENSE CONTINUE WITH ITS CASE.  I DON'T KNOW WHAT

16  THAT IS, AND I DON'T HAVE THE ANSWER.

17        AT THE STATE LEVEL, I THINK IT'S AN ISSUE.  AND I

18  THINK THAT A COURT ACTUALLY HAS TO RULE ON IT BEFORE THE

19  DEFENSE CONTINUES.  SO --

20        THE COURT:  I DON'T THINK THAT'S TRUE.

21        MS. NOVAY:  AND I'M SAYING I DON'T KNOW.  I DON'T

22  KNOW IF THAT'S THE CASE FEDERALLY.  I HAVEN'T LOOKED AT IT IN A

23  WHILE AND I DON'T RECALL.  I DIDN'T ANTICIPATE THIS ISSUE TO

24  THIS SPECIFICITY.

25        SO, BUT THE DEFENSE WOULD LIKE TO KNOW, BECAUSE I

1    DON'T -- THE CONCERN IS I DON'T WANT TO PUT UP WITNESSES ON

2    THIS PARTICULAR POINT, DRAW MORE ATTENTION TO THIS PARTICULAR

3    POINT, AND THAT PARTICULAR POINT NEVER GOES TO THE JURY.

4            THE COURT:  RIGHT.

5            MS. NOVAY:  THAT'S MY CONCERN.

6            THE COURT:  I UNDERSTAND.  AND THAT'S LEGITIMATE

7    CONCERN.

8            GOVERNMENT, LET ME HEAR ANY FINAL WORD FROM YOU.  AND

9    THAT IS WHY I ENCOURAGED YOU TO LOOK AT IT AT LUNCH.  BUT,

10   AGAIN, I NEVER DID INDICATE THAT I'D MAKE A RULING WHEN WE CAME

11   BACK.  I SIMPLY TOOK IT UNDER ADVISEMENT EARLIER.

12          MR. GILFILLAN:  YOUR HONOR, I GUESS WHAT I WANT TO

13   POINT OUT IS, ON THE FACTUAL ISSUE -- AND THIS IS WHAT I THINK

14   WE ALL NEED TO LOOK AT THE CASE LAW AND DECIDE, IS BECAUSE --

15          THE COURT:  WELL, WE'VE LOOKED AT IT IN OUR OFFICE,

16   BUT I UNDERSTAND.

17          MR. GILFILLAN:  OKAY.  WELL, IS IT GENERALLY THAT AN

18   OMISSION IS NOT A CRIME UNDER 1014?  BUT I THINK THE CASE LAW

19   IS IS WHERE SOMEONE IS ASKED A QUESTION AND THEY MAKE A

20   STATEMENT AND THE STATEMENT IS FALSE BECAUSE THEY OMITTED.  I

21   THINK THE CASE LAW WILL SUPPORT THAT DOES SUPPORT A CONVICTION

22   UNDER SECTION 1014.

23          AND THAT'S WHAT I WAS GOING TO THEN POINT OUT, THAT I

24   THINK UNDER WHAT THE EVIDENCE IS IN THIS CASE, IS THAT

25   MS. TYLER ASKED MR. HARDWICK IN A CONVERSATION, ARE THERE ANY

1  OUTSTANDING JUDGMENTS AGAINST YOU.  HE ANSWERED YES.  SO HE

2  MADE A STATEMENT.  AND THIS IS AT PAGE 3 OF GOVERNMENT

3  EXHIBIT 753.

4          AND THEN SECTION 9 ON THE NEXT PAGE, PAGE 4, IT'S A

5  CONTINUATION, HE PROVIDED A DESCRIPTION OF JUDGMENTS AGAINST

6  HIM.  AND IN MAKING THAT STATEMENT, HE OMITTED THE BELLAGIO

7  JUDGMENT.

8          AND SO, AGAIN, HAVEN'T LOOKED AT ALL THE CASE LAW,

9  BUT UNDER MY GENERAL UNDERSTANDING, I THINK THIS DOES NOT FALL

10 INTO THIS, WHERE I THINK THE CASES ARE.  IF YOU'RE NEVER ASKED

11 A QUESTION AND YOU TURN THIS IN AND YOU KNOW SOMETHING THAT

12 MIGHT BE IMPORTANT TO THE BANK, THAT'S NOT 1014.

13         BUT WHERE YOU ARE ASKED A QUESTION AND YOU GIVE A

14 STATEMENT AND YOU -- IT'S FALSE BECAUSE YOU OMIT.  SO I THINK

15 THAT'S WHERE WE ARE.  AS MS. BARRON SAYS, IT'S A HALF-TRUTH.

16         THE COURT:  OKAY.

17         MS. NOVAY:  I CAN RESPOND IN THREE SENTENCES.

18         THE COURT:  YEAH, GO AHEAD.

19         MS. NOVAY:  AND I'M GOING TO READ --

20         THE COURT:  AND I'M JUST -- ARE YOU GETTING READY TO

21 READ FROM BLACK'S DICTIONARY THAT SAYS A HALF-TRUTH IS NOT AN

22 ASSERTION?

23         MS. NOVAY:  ACTUALLY, ABOUT TWO SENTENCES BEFORE

24 THAT.  THE *KURLEMANN* DESCRIBES -- THE COURT DESCRIBES THE

25 STATUTE AND SAYS:  IT'S A LONG WAY OF SAYING THAT FALSE

1  STATEMENTS OR REPORTS TO BANKS IN ORDER TO GET A LOAN ARE

2  PROHIBITED.  AND IT'S A LONG WAY OF NOT SAYING THAT THE STATUTE

3  PROHIBITS HALF-TRUTHS, MATERIAL OMISSIONS, OR CONCEALMENTS,

4  WHICH TAKES US TO THE NUB OF THE MATTER.

5          AND THEN I SKIP FORWARD, AND IT GOES ON TO SAY THAT

6  OMISSION, CONCEALMENT, OR THE SILENT PART OF THE HALF-TRUTH IS

7  NOT AN ASSERTION.  QUITE THE OPPOSITE, OMISSIONS ARE FAILURES

8  TO SPEAK.

9          THE COURT:  YEAH.  I HAVE THAT SAME LANGUAGE.

10          MS. NOVAY:  I THINK THAT WAS FIVE SENTENCES, BUT --

11          THE COURT:  OKAY.  ALL RIGHT.  AND WE HAVEN'T EVEN

12  GOTTEN TO IF -- THE FACTUAL ISSUES.  BECAUSE EVEN UNDER THE

13  FACTUAL SCENARIOS, I WOULD STILL BE INCLINED TO -- POSSIBLY TO

14  GRANT A DIRECTED VERDICT.

15          BUT I TELL YOU WHAT, I WILL STILL KEEP IT UNDER

16  ADVISEMENT UNTIL TOMORROW MORNING.  AND I UNDERSTAND THE

17  GOVERNMENT'S POSITION THAT, HEY, THEY'VE HAD THIS FOR A LONG

18  TIME.  THEY COULD HAVE RAISED IT.  THEY DIDN'T.  THEY CAN STILL

19  RAISE IT NOW.

20          AND I AGREE WITH THE CONCERN THAT NOT HAVING A

21  DECISION ON SOMETHING THAT I FEEL PRETTY STRONGLY ABOUT RIGHT

22  NOW IS PROBLEMATIC IN TERMS OF GOING FORWARD AND ESTABLISHING

23  CERTAIN EVIDENCE THROUGH OTHER TESTIMONY, THROUGH OTHER

24  WITNESSES.

25          SO I WILL GIVE YOU UNTIL THE MORNING, AND THEN I WILL

1    GO AHEAD AND RULE.  ALL RIGHT.

2            ALL RIGHT.  IS THERE ANYTHING ELSE -- IS THE JURY ALL

3    HERE?

4            IS THERE ANYTHING ELSE BEFORE THE JURY REENTERS?

5    GOVERNMENT?

6            MR. PHILLIPS:  NO, YOUR HONOR.

7            THE COURT:  ALL RIGHT.  DEFENSE?

8            MS. LOEB:  NO, YOUR HONOR.

9            THE COURT:  ALL RIGHT.  LET'S BRING THEM IN.

10           (WHEREUPON, THE JURY RETURNED TO OPEN COURT AT

11   1:57 P.M., AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD.)

12           THE COURT:  OKAY.  THE JURY IS SEATED.  EVERYONE ELSE

13   MAY BE SEATED.

14           LADIES AND GENTLEMEN, I HOPE YOU HAD A GREAT LUNCH.

15           AND, DEFENSE, PLEASE CALL YOUR NEXT WITNESS.

16           MS. LOEB:  MY NEXT WITNESS WILL BE ALEX HARDWICK.

17           THE COURT:  ALL RIGHT.  COME ON UP, SIR.  I'M SORRY.

18   IF YOU WOULD COME TO THE RIGHT OF THE PODIUM AND COME ON AROUND

19   TO THE WITNESS STAND, I WILL SWEAR YOU IN.

20           IF YOU WOULD RAISE YOUR RIGHT HAND, PLEASE.

21                       ALEXANDER HARDWICK,

22   HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

23   FOLLOWS:

24           THE COURT:  ALL RIGHT.  IF YOU WOULD TAKE THE WITNESS

25   SEAT.  AND IF YOU WOULD STATE AND THEN SPELL YOUR NAME FOR THE

1    RECORD.

2              THE WITNESS:  SURE.  MY NAME IS ALEXANDER ASHLEY

3    HARDWICK, A-L-E-X-A-N-D-E-R, A-S-H-L-E-Y, H-A-R-D-W-I-C-K.

4                        DIRECT EXAMINATION

5    BY MS. LOEB:

6    Q.   GOOD AFTERNOON, MR. HARDWICK.

7    A.   HELLO.

8    Q.   CAN YOU TELL THE JURY WHERE IT IS THAT YOU LIVE CURRENTLY?

9    A.   YES.  I LIVE IN ST. PETERSBURG, FLORIDA.

10   Q.   AND WHAT'S YOUR RELATIONSHIP TO NAT HARDWICK?

11   A.   HE'S MY BROTHER.

12   Q.   AND OVER THE YEARS, DID YOU HAVE THE OCCASION TO GO ON

13   TRIPS WITH YOUR BROTHER?

14   A.   YES.

15   Q.   WHEN YOU WOULD GO ON THOSE TRIPS, HOW MUCH TIME DID YOU

16   SPEND WITH HIM, GENERALLY?

17   A.   WE SPENT SOME TIME TOGETHER.  HE WAS WORKING A LOT, SO

18   DIDN'T SPEND, YOU KNOW, AS MUCH AS I'D LIKE TO.  BUT YOU GOT TO

19   GET THAT IN WHEN YOU CAN.

20   Q.   SO WOULD HE TYPICALLY SEE YOU AT SOME POINT DURING THE

21   DAY, AND THEN YOU WOULD BE APART AND THEN MEET BACK UP LATER IN

22   THE DAY?

23   A.   YES.

24   Q.   GO THROUGH A FEW EXAMPLES.  FOR INSTANCE, DID YOU TRAVEL

25   WITH YOUR BROTHER TO LAS VEGAS FROM TIME TO TIME?

1   A. YES. YEAH. WE WOULD, YOU KNOW, GET TOGETHER IN THE

2   MORNING, AND WE'D EITHER BE IN A SUIT OR WORK ATTIRE. AND THEN

3   WE'D GO OUR SEPARATE WAYS TO OUR MEETINGS AND COME BACK AND,

4   YOU KNOW, MEET AT SOME POINT LATER IN THE EVENING.

5   Q. AND DID YOU HAVE TO LEAVE NAT'S ROOM SEVERAL TIMES DURING

6   THOSE VARIOUS TRIPS BECAUSE OF WORK?

7   A. SURE. YOU KNOW, THERE WERE SEVERAL TIMES THAT THERE WOULD

8   BE CONFERENCE CALLS GOING ON AND THINGS LIKE THAT WHERE

9   BUSINESS WAS HAPPENING. I NEEDED TO LEAVE THE ROOM AND MOVE MY

10   CALLS AROUND SO THAT, YOU KNOW, WE COULD GET TO WHAT WE WERE

11   GOING TO DO TOGETHER, THINGS LIKE THAT.

12   Q. AND DID YOU HAVE KIND OF THE SAME EXPERIENCE IN BILOXI?

13   A. YES. YOU KNOW, IN BILOXI, I REMEMBER HIM RENTING A CAR,

14   HAVING A CAR THAT TOOK HIM TO A TITLE COMPANY. AND HE HAD TO

15   REVIEW SOME PROPERTY TO MAKE SURE IT WAS ON THE BOOKS. I THINK

16   THEY WERE MOVING FORWARD WITH A DEAL. BUT, YES, HE WOULD HAVE

17   A CAR TO GO AND MEET WITH A TITLE COMPANY AND REVIEW PROPERTIES

18   AND THE NUMBERS AND BOOKS AND THINGS LIKE THAT.

19   Q. AND DID SOMETIMES THAT TAKE THE BULK OF THE DAY?

20   A. SURE. I MEAN, IT WOULD, YOU KNOW, BE PLANNED TO HAVE THAT

21   TAKE A FEW HOURS, AND IT WOULD TAKE MOST OF THE DAY. AND, YOU

22   KNOW, WE'D HAVE TO MOVE THINGS AROUND TO -- YOU KNOW, IN ORDER

23   TO FIND EACH OTHER AT THE END OF THE DAY.

24   Q. AND WHAT ABOUT JACKSON, DID YOU HAVE AN OCCASION TO FLY

25   INTO JACKSON, MISSISSIPPI, OR SOME OTHER SMALL AIRPORT?

1  A.   ON ONE OCCASION WE FLEW INTO A SMALL AIRPORT SPECIFICALLY

2  FOR A MEETING THAT TOOK PLACE IN THE AIRPORT, WHERE MY BROTHER

3  MET WITH SOMEBODY WHILE I WENT OFF AND MADE CALLS ON MY OWN.

4  Q.   AND IN THAT PARTICULAR FLIGHT, WERE YOU ON YOUR WAY

5  SOMEWHERE ELSE?

6  A.   YES.  WE WERE -- I THINK IT WAS -- YEAH, WE WERE BETWEEN

7  ATLANTA AND BILOXI.

8  Q.   I WANT TO TALK TO YOU A MINUTE ABOUT NEW ORLEANS.  DID YOU

9  TRAVEL TO NEW ORLEANS WITH YOUR BROTHER?

10 A.   YES, I DID.  HE -- I REMEMBER WE WERE ON THE PLANE AND

11 THERE WERE A COUPLE OF OTHER MHS EMPLOYEES.  THERE WAS A

12 CONVENTION THAT HE WAS SPEAKING AT.  AND THEN WE HAD A

13 LANDCASTLE TITLE EVENT, LIKE A MEET-AND-GREET EVENT, ON BOURBON

14 STREET, WHERE THERE WERE HUNDREDS OF TITLE -- TITLE EMPLOYEES

15 AND MORTGAGE BROKERS AND THINGS LIKE THAT, SO --

16 Q.   AND SO HE ACTUALLY SPOKE AT THE CONFERENCE IN NEW ORLEANS;

17 ISN'T THAT RIGHT?

18 A.   RIGHT.

19 Q.   AND THERE WERE OTHER MHS EMPLOYEES WITH YOU ON THE PLANE,

20 I THINK YOU SAID.

21 A.   YES.

22 Q.   WHAT ABOUT PEBBLE BEACH, DID YOU GO TO PEBBLE BEACH?

23 A.   I WENT TO PEBBLE BEACH ON TWO OCCASIONS.

24 Q.   AND YOU'RE NOT REALLY A FULLY LOST BOY, ARE YOU?

25 A.   NO.  I'M -- I SHOW UP WHEN THEY NEED ME.

1    Q.    YOU'RE A PART-TIME LOST BOY?

2    A.    THAT'S RIGHT.  BECAUSE I'VE LIVED IN DIFFERENT PLACES,

3    SO --

4    Q.    AND WHAT WOULD NAT'S TYPICAL DAY BE WHEN HE WAS AT PEBBLE

5    BEACH?

6    A.    A LOT OF MEETING AND GREETING, A LOT OF, YOU KNOW, TRYING

7    TO -- YOU KNOW, MEETING WITH FOLKS TO TRY TO PROMOTE THE

8    COMPANY, WEARING SHIRTS -- AND EVERYBODY HAD THEIR MHS OR

9    LANDCASTLE TITLE GARB ON AND CLOTHES AND THAT KIND OF THING.

10   Q.    WHAT ABOUT THE MASTERS, DID YOU GO TO THE MASTERS?

11   A.    YES, I DID.

12   Q.    AND WHAT WAS YOUR EXPERIENCE THERE?

13   A.    MY EXPERIENCE THERE, I WOULDN'T SEE NAT AT ALL MOST OF THE

14   TIME BECAUSE HE WOULD BE MEETING WITH CLIENTS AND DIFFERENT

15   CLIENTS WOULD BE COMING IN AND OUT, FLYING IN AND OUT

16   THROUGHOUT THE WEEK.  AND IT WAS HARD TO KNOW WHO HE WAS WITH,

17   WHICH CLIENT HE WAS WITH AT THAT TIME.  I KNOW SOME FOLKS CAME

18   DOWN FROM THE STATES WHERE THERE WERE OTHER OFFICES AND THINGS

19   LIKE THAT.  BUT RARELY SAW HIM AT THE MASTERS.

20   Q.    NOW, HAVE YOU HAD THE OPPORTUNITY OVER THE YEARS TO WORK

21   FOR COMPANIES WHERE YOU TRAVELED FOR BUSINESS?

22   A.    I HAVE BEEN LUCKY ENOUGH TO DO THAT, YES.

23   Q.    AND WHAT'S YOUR EXPERIENCE BEEN WITH THAT ABOUT WHO'S PAID

24   FOR THAT TRAVEL?

25   A.    I'VE BEEN TO SEVERAL CONVENTIONS OR INVITED SPECIFICALLY

1    TO GO TO EVENTS WHERE THEY PAID FOR MY HOTEL OR TO PLAY GOLF

2    TOURNAMENTS OR POKER TOURNAMENTS OR TO HAVE EXCLUSIVE ACCESS TO

3    A PRIVATE CLUB OR THINGS LIKE THAT.

4    Q.   I'D LIKE TO DRAW YOUR ATTENTION TO JULY OF '09, THE FIRST

5    SCOTLAND TRIP.  WERE YOU ON THAT SCOTLAND TRIP?

6    A.   YES, I WAS.

7    Q.   AND WAS ANYBODY ON THAT TRIP THAT WAS A PARTNER AT MORRIS

8    HARDWICK SCHNEIDER?

9    A.   RICHARD MILLER WAS ON THAT TRIP.  YOU KNOW, HE WAS A

10   PARTNER, I BELIEVE.  OPERATIONS OFFICER, I THINK.

11   Q.   AND DID HE FLY ON THE PLANE WITH YOU?

12   A.   YES.  HE FLEW AND TOOK ADVANTAGE OF ALL THE -- YOU KNOW,

13   EVERYTHING THAT WE DID.

14   Q.   WHAT WOULD YOU SAY WAS THE FOCUS OF NAT IN BUSINESS AS YOU

15   OBSERVED HIM OVER THE YEARS?

16   A.   HE'S A RELATIONSHIP PERSON.  THAT'S HIS JOB, TO MONETIZE

17   RELATIONSHIPS WITH BUILDERS AND CLIENTS AND MORTGAGE BROKERS

18   AND TO MAKE MERGERS AND ACQUISITIONS HAPPEN, TO BLOW THE

19   COMPANY UP AS LARGE AS POSSIBLE TO -- FOR AGGRESSIVE GROWTH.

20   Q.   WOULD YOU SAY HE IS THE BUSINESS OPPORTUNITY MARKETING

21   PERSON?

22   A.   YES, OF COURSE.

23              MS. LOEB:  THAT'S ALL I HAVE FOR YOU NOW.

24              THE WITNESS:  THANK YOU.

25              THE COURT:  CROSS-EXAMINATION.

1    MR. PHILLIPS:  THANK YOU, YOUR HONOR.

2                    CROSS-EXAMINATION

3    BY MR. PHILLIPS:

4    Q.   GOOD AFTERNOON, MR. HARDWICK.

5    A.   HELLO.

6    Q.   WOULD YOU AGREE WITH ME THAT FROM 2012 -- LET'S SAY FROM

7    NOVEMBER 2012 THROUGH AUGUST OF 2014, YOU FLEW ON AT LEAST

8    50 SEPARATE PRIVATE JET FLIGHTS WITH YOUR BROTHER?

9    A.   I DON'T KNOW IF IT WAS THAT MANY.  I MEAN, UNLESS YOU HAVE

10   MANIFESTS AND YOU CAN SHOW ME, I WOULD AGREE WITH YOU THAT IT

11   WAS THAT MANY.

12   Q.   OKAY.  WELL, I HAVE A LIST.  I'M HAPPY TO GO THROUGH WITH

13   IT.  BUT YOU WOULD AGREE IT WAS A LOT?

14   A.   YES.

15   Q.   AND YOU WOULD AGREE THAT YOUR BROTHER PAID FOR ALL OF

16   THOSE FLIGHTS?

17   A.   YES.

18   Q.   HE NEVER ASKED YOU TO KICK IN ANY MONEY TO REIMBURSE HIM

19   FOR THE FLIGHT?

20   A.   NO.

21   Q.   OKAY.  AND YOU TOLD US ABOUT BEING IN LAS VEGAS WITH YOUR

22   BROTHER AND HE PARTICIPATED IN SOME CONFERENCE CALLS?

23   A.   YES.

24   Q.   HE DIDN'T NEED TO BE IN LAS VEGAS TO PARTICIPATE IN A

25   CONFERENCE CALL, DID HE?  HE COULD HAVE DONE THAT FROM ATLANTA

1   OR MARIETTA OR SNELLVILLE OR ANY OTHER PLACE, RIGHT?

2   A.   I DON'T KNOW THE NATURE OF THE CALL.   THERE COULD HAVE

3   BEEN A CONTACT IN TOWN THAT HE MET WITH, WHICH I BELIEVE HE

4   DID.   HE HAD A TITLE COMPANY IN LAS VEGAS THAT HE DID BUSINESS

5   WITH.

6   Q.   YOUR TESTIMONY WAS HE PARTICIPATED IN SOME CONFERENCE

7   CALLS, MEANING HE WAS ON THE TELEPHONE, RIGHT?

8   A.   YES.

9   Q.   DO YOU KNOW OF ANY REASON THAT HE COULDN'T HAVE CONDUCTED

10  THOSE SAME CONFERENCE CALLS FROM HIS OFFICE IN ATLANTA?

11  A.   I DO NOT.

12  Q.   THANK YOU.  AND YOU'RE NOT SUGGESTING, ARE YOU, THAT IT

13  WAS OKAY FOR YOUR BROTHER TO WIRE $500,000 FROM MHS'S ATTORNEY

14  ESCROW ACCOUNT TO A CASINO IN LAS VEGAS FOR HIS PERSONAL USE

15  AND BENEFIT SIMPLY BECAUSE HE PARTICIPATED IN SOME TELEPHONE

16  CONFERENCE CALLS WHILE HE WAS THERE?

17          MS. LOEB:  OBJECTION, YOUR HONOR.

18          THE COURT:  SUSTAINED.  SUSTAINED.

19  BY MR. PHILLIPS:

20  Q.   MR. HARDWICK, I'VE HANDED YOU TWO DOCUMENTS THAT I'VE

21  MARKED AS GOVERNMENT EXHIBITS 1632 AND 1633.  DO YOU RECOGNIZE

22  THOSE AS E-MAILS FROM YOUR BROTHER?

23  A.   YES, I DO.

24          MR. PHILLIPS:  MOVE TO ADMIT GOVERNMENT EXHIBITS 1632

25  AND 1633.

1       MS. LOEB:  YOUR HONOR, I DON'T OBJECT TO 1632.  I

2   OBJECT TO THE RELEVANCE OF 1633.

3       THE COURT:  ALL RIGHT.  1632 IS ADMITTED.  I DON'T

4   KNOW WHAT 1633 IS.  YOU ALL NEED TO APPROACH TO SHOW THE COURT.

5       (WHEREUPON, A BENCH CONFERENCE OUT OF THE HEARING OF

6   THE JURY PROCEEDED AS FOLLOWS:)

7       MS. LOEB:  THAT'S BETWEEN NAT AND THE CASINO.  THIS

8   ISN'T ANYTHING FROM ALEX HARDWICK.

9       MR. PHILLIPS:  THIS IS AN E-MAIL FROM NAT HARDWICK

10  WHERE HE IS MAKING ARRANGEMENTS FOR THIS MAN WHO IS ON THE

11  STAND, HIS BROTHER, ALEX HARDWICK, TO GO THERE AND GAMBLE.

12  THAT'S THE SUBJECT OF A LOT OF TESTIMONY THAT'S BEEN INVOLVED

13  IN THE CASE, AND I THINK I HAVE A RIGHT ON CROSS-EXAMINATION TO

14  INQUIRE ABOUT THAT.

15      THE COURT:  AND YOU DO HAVE THE RIGHT TO ASK HIM

16  ABOUT IT, BUT WHAT'S THE BASIS ON WHICH THE EXHIBIT IS

17  ADMISSIBLE?  YOU CAN CROSS ABOUT IT.  HOW DO YOU GET THIS IN,

18  THOUGH?

19      MR. PHILLIPS:  IT'S A STATEMENT OF A PARTY OPPONENT.

20  SO IT COMES IN UNDER THAT SAME RULE WE DISCUSSED YESTERDAY.

21  IT'S ALSO RELEVANT BECAUSE THE DEFENSE IS INSINUATING TO THE

22  JURY THAT MR. HARDWICK WENT TO LAS VEGAS FOR BUSINESS PURPOSES.

23  AND SO I THINK THE GOVERNMENT'S ENTITLED TO PROBE THAT AND FIND

24  OUT IF THIS WITNESS HAS ANY INFORMATION.

25      THE COURT:  I DON'T HAVE ANY PROBLEM WITH YOU PROBING

1    OR QUESTIONING.  THAT'S CLEAR.  YOU CAN ASK HIM.  WHAT WE'RE

2    TALKING ABOUT IS NOT QUESTIONING.  WE'RE TALKING ABOUT -- ONLY

3    ABOUT THE EXHIBIT.

4            MR. PHILLIPS:  MY ANSWER IS BECAUSE THIS IS A

5    STATEMENT OF THE PARTY OPPONENT.

6            THE COURT:  OKAY.

7            MS. LOEB:  IT'S GOT ALL KINDS OF LANGUAGE IN IT ABOUT

8    WIRING IN 200,000.  GOT NOTHING TO DO WITH THIS WITNESS.  THE

9    WITNESS -- HAS A LOT OF LANGUAGE THAT -- IN THIS THAT HAS

10   NOTHING TO DO WITH THIS WITNESS.  IT'S GOING TO LEAD TO MORE

11   QUESTIONING ABOUT WHAT HE KNOWS ABOUT WIRING MONEY, WHICH HE'S

12   NOT GOING TO KNOW ANYTHING ABOUT IT.  IT'S JUST A CLOSING

13   ARGUMENT.

14           THE COURT:  OKAY.  I AM GOING TO SUSTAIN THE

15   OBJECTION TO THE ADMISSIBILITY OF THIS EXHIBIT, BUT HE DOES GET

16   TO QUESTION HIM ABOUT IT.  AND IF THIS WITNESS CAN'T RECALL

17   SOMETHING, HE MAY END UP USING THIS TO REFRESH HIS

18   RECOLLECTION.  THAT STILL WOULDN'T CHANGE THE RULING ABOUT

19   ADMISSIBILITY, BUT HE WILL ABLE TO SHOW THIS.

20           (WHEREUPON, PROCEEDINGS RESUMED IN OPEN COURT AS

21   FOLLOWS:)

22           THE COURT:  ALL RIGHT.  I'LL SUSTAIN THE OBJECTION TO

23   1633.

24   BY MR. PHILLIPS:

25   Q.   MR. HARDWICK, I'M GOING TO SHOW YOU A DOCUMENT THAT WAS

1    JUST ADMITTED AS GOVERNMENT EXHIBIT 1632.  YOU CAN EITHER LOOK

2    AT THE COPY IN FRONT OF YOU OR YOU CAN LOOK AT THE SCREEN IF

3    YOU PREFER.

4    A.   OKAY.

5    Q.   WHEN YOU AND YOUR BROTHER WENT TO LAS VEGAS, WAS IT

6    TYPICAL FOR YOUR BROTHER TO MAKE ARRANGEMENTS WITH THE CASINO

7    THROUGH ONE OF THEIR CASINO HOSTS TO SET UP GOLF MATCHES AND

8    MASSAGES AND FACIALS AND ALL THE THINGS THAT YOU WANTED TO DO

9    WHILE YOU WERE IN LAS VEGAS?

10    A.   I BELIEVE HE WOULD ON OCCASION.

11    Q.   OKAY.  AND YOUR BROTHER WAS SORT OF A DETAIL GUY, WASN'T

12    HE?

13    A.   YES.

14    Q.   AND SO I'M SHOWING YOU PAGE 2 OF THAT EXHIBIT NOW.  YOU

15    CAN SEE THIS IS AN E-MAIL FROM YOUR BROTHER TO SOMEONE AT THE

16    CASINO WHERE YOU WERE STAYING NAMED TERRY VASKNETZ.  DID YOU

17    EVER MEET MR. VASKNETZ?

18    A.   I BELIEVE SO.

19    Q.   OKAY.  AND SO YOU KNOW WHO HE IS IN THIS E-MAIL, RIGHT?

20    A.   I THINK SO, YES.

21    Q.   AND IS THIS AN EXAMPLE OF YOUR BROTHER PROVIDING DETAILS

22    TO THE CASINO HOST CONCERNING YOUR TRIP AND ALSO REQUESTING

23    PARTICULAR ARRANGEMENTS WHILE YOU'RE IN LAS VEGAS?

24    A.   IT LOOKS LIKE AN E-MAIL WHERE HE'S REQUESTING THESE ITEMS,

25    LINE ITEMS.

1   Q.   INCLUDING THE 50-MINUTE MASSAGE.  AND HE TALKS ABOUT

2   WIRING IN 300K ON FRIDAY, PLUS BRINGING ANOTHER 50K IN CASH.

3   DO YOU SEE THAT?  ITEM NUMBER 6?

4   A.   YES.

5   Q.   AND HE'S CONFIRMING THAT YOU'RE GOING TO GET $15,000 IN

6   PROMO CHIPS, TOO, RIGHT?

7   A.   THAT'S WHAT NUMBER 7 SAYS.

8   Q.   RIGHT.  AND THEN NUMBER 8, YOUR BROTHER IS ASKING FOR

9   SPECIAL RULES ON THE VARIOUS GAMBLING GAMES THAT HE'D LIKE TO

10  PLAY?

11  A.   LOOKS LIKE IT, YES.

12  Q.   AND THEN THE LAST ONE, NUMBER 9, YOUR BROTHER IS ASKING

13  FOR $5,000 IN RETAIL SPENDING, PLUS WHATEVER HE GETS THAT'S

14  REIMBURSED TO HIM UP FRONT FOR HIS JET TRAVEL, RIGHT?

15  A.   THAT'S WHAT NUMBER 9 SAYS, YES.

16          MR. PHILLIPS:  JUST ONE SECOND, PLEASE, YOUR HONOR.

17          THE COURT:  SURE.

18  BY MR. PHILLIPS:

19  Q.   DO YOU REMEMBER GOING TO THE BREAKERS, A RESORT IN MIAMI,

20  IN APPROXIMATELY MAY OF 2014?

21  A.   I BELIEVE SO.  IS THAT IN MIAMI?

22  Q.   YES.  PALM BEACH, WHICH IS NEAR MIAMI.

23  A.   YES.

24  Q.   YOU RECALL THAT?

25  A.   YES, I DO.

1  Q.   I'M SORRY.  YOU NEED TO SPEAK UP A LITTLE BIT.

2  A.   YES, I DO.

3  Q.   THANK YOU.  THIS LADY IS TYPING DOWN EVERYTHING THAT WE

4  SAY, SO WE WANT TO MAKE SURE THAT SHE'S ABLE TO HEAR WHAT WE

5  SAY.

6       I'M GOING TO SHOW YOU JUST THE ITINERARY FROM THAT -- NOT

7  AN ITINERARY, THE PASSENGER LIST FROM THAT NIGHT.  IT'S ALREADY

8  IN EVIDENCE AS PART OF THE SUMMARY EXHIBIT FOR THAT FLIGHT.

9       DO YOU RECALL BEING ON THIS FLIGHT WITH YOUR BROTHER AND

10 OLIVER THE DOG AND YOUR DAD AND YOUR MOM AND YOUR WIFE AND

11 MR. HARDWICK'S BABY AND A WOMAN NAMED REBECCA INMAN AND

12 SOMEBODY NAMED HEATHER INMAN?

13 A.   I RECALL BEING ON THE FLIGHT.  I DON'T REMEMBER EVERYBODY

14 THAT WAS ON THE FLIGHT, BUT --

15 Q.   BUT YOU DON'T HAVE ANY REASON TO DISAGREE WITH THIS RECORD

16 THAT WAS PRODUCED BY APOLLO JETS THAT SHOWS THE LIST OF PEOPLE

17 WHO WERE ON THE FLIGHT?

18 A.   NO.

19 Q.   DO YOU RECALL YOUR BROTHER MAKING A RESERVATION FOR A

20 PARTY AT NECKER ISLAND?

21 A.   NOT REALLY.

22           MS. LOEB:  OBJECTION, YOUR HONOR.

23 BY MR. PHILLIPS:

24 Q.   YOU WEREN'T INVITED TO THAT?

25           MS. LOEB:  BEYOND THE SCOPE.

1          THE COURT:  OF YOUR DIRECT?  OKAY.

2          OVERRULED.  I'LL ALLOW IT.  OVERRULED.

3     BY MR. PHILLIPS:

4     Q.   WERE YOU INVITED TO A PARTY THAT YOUR BROTHER WAS GOING TO

5     HAVE AT NECKER ISLAND?

6     A.   I CAN'T RECALL.  THERE WAS A DISCUSSION OF A PARTY AT

7     NECKER ISLAND.

8     Q.   AND THAT WAS AROUND THE SAME TIME THAT YOU WENT TO

9     SCOTLAND IN 2014 FOR THE BBJ -- I MEAN, YOU FLEW ON THE BBJ?

10    A.   I DON'T KNOW IF IT WAS AROUND THE SAME TIME, BUT I DID GO

11    ON THE TRIP TO SCOTLAND IN '14.

12    Q.   ALL RIGHT.  AND DID YOUR BROTHER TELL YOU THAT IT WAS

13    GOING TO COST $186,000 JUST AS A NONREFUNDABLE DEPOSIT FOR

14    NECKER ISLAND?

15    A.   NO, HE DID NOT.

16          MR. PHILLIPS:  ALL RIGHT.  THAT'S ALL I HAVE.  THANK

17    YOU.

18          THE COURT:  ANY REDIRECT?

19          MS. LOEB:  JUST ONE, YOUR HONOR.

20                    REDIRECT EXAMINATION

21    BY MS. LOEB:

22    Q.   YOU SAID YOUR BROTHER WAS DETAILED.  HE WAS DETAILED WHEN

23    IT CAME TO MARKETING; ISN'T THAT RIGHT?

24    A.   YES.

25    Q.   HE WAS VERY PLANFUL.

1    A.   RIGHT.  YES, CORRECT.

2              THE COURT:  ANYTHING FURTHER, GOVERNMENT?

3              MR. PHILLIPS:  NO, YOUR HONOR.

4              THE COURT:  ALL RIGHT.  THANK YOU, SIR.  YOU'RE

5    EXCUSED.

6              IS THIS WITNESS -- ANY REASON THAT HE SHOULD STILL BE

7    SUBJECT TO THE RULE?  IS HE EXCUSED?  AND I ONLY ASK BECAUSE OF

8    HIS RELATIONSHIP TO THE DEFENDANT.

9              MR. PHILLIPS:  YOUR HONOR, HE CAN BE EXCUSED FROM THE

10   GOVERNMENT'S STANDPOINT.  THERE IS NO REASON TO KEEP HIM.

11             THE COURT:  ALL RIGHT.  MR. HARDWICK, AS YOU EXIT,

12   SIR, I JUST TELL YOU THIS, THAT BECAUSE YOU ARE A FAMILY

13   MEMBER, YOU ARE EXCUSED FROM THE RULE.  SO ANY PREVIOUS

14   DIRECTIVES ABOUT REMAINING OUTSIDE OF THE COURTROOM ARE NO

15   LONGER APPLICABLE TO YOU.

16             MR. ALEX HARDWICK:  OKAY.

17             THE COURT:  OKAY.  THANK YOU SO MUCH, SIR.

18             ALL RIGHT.  CALL YOUR NEXT WITNESS, DEFENSE.

19             MS. LOEB:  PATRICK MALLOY.

20             THE COURT:  ALL RIGHT.

21             GOOD AFTERNOON, SIR.  IF YOU WOULD COME ON UP TO THE

22   RIGHT OF THIS PODIUM AND COME UP TO THE WITNESS STAND, I WILL

23   SWEAR YOU IN.  COME ON AROUND.

24             AND IF YOU WOULD PLEASE RAISE YOUR RIGHT HAND.

25                       PATRICK MALLOY,

1  HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

2  FOLLOWS:

3          THE COURT:  ALL RIGHT.  IF YOU WOULD TAKE THE WITNESS

4  SEAT, PLEASE, SIR.  AND ONCE YOU ARE SEATED, GO AHEAD AND STATE

5  YOUR NAME AND THEN IF YOU WOULD SPELL IT FOR THE RECORD AS

6  WELL.

7          THE WITNESS:  SURE.  MY NAME IS PATRICK MALLOY.  LAST

8  NAME IS SPELLED M-A-L-L-O-Y.

9          MS. NOVAY:  MAY I PROCEED?

10          THE COURT:  YES, SIR -- I MEAN, YES, MA'AM.  I'M

11  SORRY.

12                    DIRECT EXAMINATION

13  BY MS. NOVAY:

14  Q.   GOOD AFTERNOON, MR. MALLOY.

15  A.   GOOD AFTERNOON.

16  Q.   MR. MALLOY, WHAT IS IT YOU DO FOR A LIVING?

17  A.   I AM A RESIDENTIAL HOME BUILDER AND DEVELOPER AND RAISE

18  CAPITAL FOR THE DIFFERENT BUSINESSES THAT I'M ASSOCIATED WITH.

19  Q.   ALL RIGHT.  AND TELL ME, DO YOU KNOW MR. HARDWICK, NATHAN

20  HARDWICK?

21  A.   I DO.

22  Q.   HOW DO YOU KNOW HIM?

23  A.   NAT WAS MY CLOSING ATTORNEY FOR 15 OR SO YEARS.

24  Q.   HOW DID YOU GUYS MEET?

25  A.   THROUGHOUT THE -- OUR INDUSTRY OF RESIDENTIAL HOME

1  BUILDING IN ATLANTA.

2  Q.   HOW LONG HAVE YOU KNOWN MR. HARDWICK?

3  A.   PROBABLY 20, 15 TO 20 YEARS.

4  Q.   AND YOU WERE A CLIENT OF HIS?

5  A.   THAT'S CORRECT.

6  Q.   EXPLAIN TO THE JURY WHAT SORT OF BUSINESS YOU DID WITH

7  MR. HARDWICK.

8  A.   SO I'M A HOME BUILDER AND BUILD HOUSES THROUGHOUT ATLANTA

9  AND BUY LAND, DEVELOP IT, AND BUILD AMENITIES AND THEN BUILD

10  THE HOUSES IN THOSE NEIGHBORHOODS.  AND BY LAW, WE HAVE TO,

11  WHEN WE SELL A HOME TO A CUSTOMER, WE CLOSE THE TRANSACTION

12  WITH AN ATTORNEY.  AND SO NAT'S LAW FIRM WAS THE GROUP THAT

13  CLOSED ALL OF OUR HOMES WITH THE CUSTOMERS.

14  Q.   HOW MUCH BUSINESS WOULD YOU SAY -- WELL, ACTUALLY, LET ME

15  ASK YOU THIS FIRST:  DID MR. HARDWICK MARKET TOWARDS YOU

16  SPECIFICALLY AS A CLIENT?

17  A.   YES.  YES, OF COURSE.

18  Q.   ENTERTAIN YOU?

19  A.   YES, HE DID.

20  Q.   DINNERS, THINGS LIKE THAT?

21  A.   YES.

22  Q.   HOW MUCH BUSINESS WOULD YOU SAY IN THE YEARS THAT YOU DID

23  BUSINESS WITH HIM DID YOU BRING TO HIM?

24  A.   PROBABLY -- I'M NOT SURE EXACTLY, BUT PROBABLY 8 OR $900

25  MILLION WORTH OF CLOSINGS.

1    Q.   AND THAT WENT TO MORRIS HARDWICK SCHNEIDER?

2    A.   THAT'S CORRECT.

3    Q.   THAT WAS HIS FIRM?

4    A.   THAT'S CORRECT.

5    Q.   WERE YOU FAMILIAR WITH THE OTHER TWO PARTNERS OF MORRIS

6    HARDWICK SCHNEIDER?

7    A.   NO, I'M NOT.  I DON'T BELIEVE I EVER MET THEM.

8    Q.   JUST MR. HARDWICK?

9    A.   CORRECT.

10   Q.   AND REALLY -- THE TWO OF YOU HAD SOME KIND OF A SOCIAL

11   RELATIONSHIP, BUT REALLY IT WAS A BUSINESS RELATIONSHIP; IS

12   THAT RIGHT?

13   A.   THAT'S CORRECT.

14   Q.   HOW ACCESSIBLE WAS MR. HARDWICK TO YOU?

15   A.   EXTREMELY.  AND THAT'S ONE OF THE REASONS WE FORGED A

16   CLOSE RELATIONSHIP, CLOSE WORKING RELATIONSHIP.  SO, LIKE, I

17   HAD NAT'S CELL PHONE; BUT NOT ONLY WOULD I HAVE HIS CELL PHONE,

18   PROBABLY, YOU KNOW, THE 20 OR SO FOLKS IN OUR FIRM THAT WOULD

19   HAVE, YOU KNOW, BEEN MORE INVOLVED IN THE DAY-TO-DAY OPERATIONS

20   AND THE CLOSING PROCESS WOULD HAVE HAD THE ABILITY TO CONTACT

21   NAT, ALSO.

22   Q.   AND WHY WAS THAT IMPORTANT?

23   A.   BECAUSE THAT'S THE MOST SENSITIVE MOMENT IN THE PROCESS,

24   WHEN A CUSTOMER'S SIGNING THE DOCUMENTATION FOR, YOU KNOW,

25   WHAT'S PROBABLY THE BIGGEST PURCHASE THAT THEY'VE EVER MADE IN

1    THEIR LIFE, WHAT TYPICALLY WOULD BE THE LARGEST FINANCIAL

2    PURCHASE THEY EVER MAKE.  AND SO IT'S VERY IMPORTANT TO HAVE

3    THE PERSON AT THE TOP OF THE FOOD CHAIN, THE DECISION-MAKER,

4    HAVE THE ABILITY TO CORRECT OR FIX A PROBLEM OR COMFORT A

5    CUSTOMER IF SOMETHING'S CONFUSING OR GOES WRONG.  SO THAT'S THE

6    NATURE OF OUR -- THE NATURE OF WHAT WE DO EVERY DAY.

7    Q.   NOW, YOU WERE ALSO SEMI-NEIGHBORS OF MR. HARDWICK; IS THAT

8    RIGHT?

9    A.   CORRECT.

10   Q.   AND WHERE WAS YOUR RESIDENCE?

11   A.   IN THE ST. REGIS HOTEL IN ATLANTA.

12   Q.   I SAY WAS.  IS THAT STILL YOUR RESIDENCE?

13   A.   IT IS.

14   Q.   YOU LIVE THERE WITH YOUR FAMILY?

15   A.   I DO.

16   Q.   AND YOU WERE LIVING THERE AT THE SAME TIME AS

17   MR. HARDWICK; IS THAT RIGHT?

18   A.   THAT'S CORRECT.

19   Q.   TELL ME A LITTLE BIT ABOUT, IF YOU'RE AWARE, OF

20   MR. HARDWICK'S MARKETING AT THE ST. REGIS.

21   A.   YEAH.  SO, SO NAT AND I WOULD HAVE BOTH -- YOU KNOW, MY

22   BUSINESS IS SIGNIFICANTLY DIFFERENT THAN NAT'S BUSINESS WAS.

23   BUT WE'RE BOTH INVOLVED IN THE RELATIONSHIPS WITH THE

24   PRINCIPALS OF OUR OTHER BUSINESS AND OUR IMPORTANT CLIENTS.

25        AND SO, YOU KNOW, THEY USED TO LAUGH AROUND THE HOTEL

1   THAT, YOU KNOW, NAT AND I BOTH KEPT THE HOTEL IN BUSINESS

2   BECAUSE WE WOULD ENTERTAIN THERE CONSTANTLY.  I'D SEE NAT AT

3   BREAKFAST AND LUNCH WITH HIS CLIENTS.  AND I'M THERE WITH GUYS

4   I'M RAISING CAPITAL WITH, BECAUSE I'M IN A BUSINESS THAT HAS TO

5   RAISE CAPITAL CONSTANTLY.  AND SO I BRING MY POTENTIAL

6   INVESTORS OR -- YOU KNOW, THEY WEREN'T THE CLIENTS WHO BOUGHT

7   HOMES FROM ME, BECAUSE THOSE WERE ONE-TIME TRANSACTIONS.  BUT

8   THE PEOPLE WHO WERE INVESTORS IN OUR BUSINESS, BRINGING THEM TO

9   THE HOTEL CONSTANTLY FOR ENTERTAINMENT, GOING OUT TO EAT

10  DINNER, HAVING A BEER, OR DEVELOP -- FRANKLY, JUST DEVELOPING

11  THE RELATIONSHIP TO MAKE SURE THAT THEY FELT THAT THEY COULD

12  CALL ME AND WERE COMFORTABLE WITH THE KIND OF BUSINESS THAT I

13  WAS CONDUCTING.

14      AND SO THEN -- AND I'D -- IT'S VERY DIFFICULT TO DO THAT

15  IN THE NORMAL COURSE OF A WORK DAY.  SO YOU HAVE TO DO THAT --

16  TYPICALLY, YOU DO THAT AFTER HOURS, YOU KNOW, WHEN YOU CAN

17  DEVELOP A PERSONAL RELATIONSHIP WITH THEM.

18  Q.   AND FROM WHAT YOU OBSERVED, IS THAT SIMILAR TO HOW

19  MR. HARDWICK WORKED WITH HIS CLIENTS?

20  A.   VERY MUCH SO, YES.

21  Q.   THERE WERE OTHER TOOLS THAT YOU'VE WITNESSED MR. HARDWICK

22  USE AS WELL FOR MARKETING, ARE THERE NOT?

23  A.   YES.

24  Q.   SUCH AS GOLF MEMBERSHIPS.

25  A.   YES.

1  Q.  TELL THE JURY A LITTLE BIT ABOUT HOW THAT WAS UTILIZED.

2  A.  WHEN NAT TOOK ME A FEW TIMES TO HAWKS RIDGE, MAYBE MORE

3  THAN A FEW TIMES, TO PLAY GOLF -- AND, YOU KNOW, IT'S -- I VIEW

4  GOLF AS A GREAT WAY TO GET TO KNOW, YOU KNOW, THE CHARACTER OF

5  A PERSON, BECAUSE YOU'RE WITH --

6  Q.  LET ME STOP YOU.  HOW IS THAT?  WHY IS THAT A GOOD WAY TO

7  GET TO KNOW SOMEONE?

8  A.  BECAUSE YOU'RE ON THE GOLF COURSE WITH SOMEONE FOR FOUR OR

9  FIVE HOURS.  AND IT'S JUST YOU AND THE OTHER PERSON, AND YOU'RE

10  TALKING ABOUT BUSINESS AND YOUR FAMILY.  AND, YOU KNOW, WE DID

11  A LOT OF BUSINESS WITH THAT FIRM, SO I WANTED TO GET TO KNOW

12  THE PRINCIPAL.  AND EVERY ONE OF MY CUSTOMERS, WHO I CARED FOR

13  PASSIONATELY, IT ADDS A VERY IMPORTANT PROCESS WITH HIS FIRM.

14  AND I WANTED TO KNOW THAT THEY RAN A GOOD BUSINESS, THAT THEY

15  WOULD TREAT OUR CUSTOMERS FAIRLY.  AND SO -- SO I, YOU KNOW,

16  WELCOME THE OPPORTUNITY TO GET TO KNOW HIM, YOU KNOW, IN THAT

17  WAY.

18      AND IN MUCH THE SAME WAY, I DO THAT WITH PEOPLE WHO ARE

19  INVESTORS IN MY BUSINESS.  I TAKE THEM TO MY GOLF COURSE AND

20  GET TO -- SO THEY CAN GET TO KNOW ME AND DECIDE IF THEY'RE

21  COMFORTABLE DOING BUSINESS WITH ME OR NOT.  IT'S JUST -- AGAIN,

22  IN THE COURSE OF A NORMAL DAY AT WORK, YOU REALLY DON'T -- MOST

23  OF US ALL WORK.  YOU DON'T GET TIME TO REALLY DEVELOP A

24  RELATIONSHIP, YOU KNOW, THE SAME WAY THAT YOU WOULD IF YOU'RE

25  AWAY FROM WORK, YOU KNOW, WITH SOMEONE FOR A LONG PERIOD OF

1   TIME.

2       AND SO THAT'S A VERY EFFECTIVE WAY FOR PRINCIPALS,

3   ESPECIALLY PRINCIPALS IN BIG BUSINESSES, TO GET TO KNOW THEIR

4   CLIENTS.

5   Q.  NOW, YOU WERE A CLIENT OF MR. HARDWICK, BUT IT IS YOU ALSO

6   BRING CLIENTS TO MR. HARDWICK?

7   A.  YEAH.  I PROBABLY -- IN OUR BUSINESS, IT'S LIKE A

8   FRATERNITY.  I MEAN, THERE'S NOT THAT MANY, YOU KNOW, BIG

9   BUILDERS OR WHATEVER.  SO BUILDERS WOULD ASK ME ALL THE TIME,

10  WHO'S YOUR CLOSING ATTORNEY?  AND WE'D CLOSE THOUSANDS OF HOMES

11  WITH NAT, SO I WOULD TELL THEM THEY DO A GOOD JOB AND INTRODUCE

12  THEM TO NAT, YEAH.

13  Q.  SO I GUESS -- IS IT FAIR TO SAY THAT THE RETURN ON THE

14  INVESTMENT -- WE'VE HEARD SOMETHING ABOUT THAT -- BUT THE

15  RETURN ON THE INVESTMENT OF INVESTING AND MARKETING TO YOU

16  WASN'T JUST THE 8 OR 900 MILLION IN FEES THAT YOU BROUGHT TO

17  THE LAW FIRM, BUT IT WAS EVEN LARGER THAN THAT WITH OTHER

18  CLIENTS THAT YOU POTENTIALLY BROUGHT TO THE LAW FIRM?

19  A.  YES, DEFINITELY.

20  Q.  OKAY.  NOW, HAVE YOU EVER FLOWN ON A PRIVATE PLANE BEFORE?

21  A.  YES.

22  Q.  OKAY.  HOW MANY TIMES, WOULD YOU GUESS?

23  A.  A LOT.

24  Q.  OKAY.  IN WHAT CAPACITY?

25  A.  I HAVE BEEN THE RECIPIENT OF, YOU KNOW, PEOPLE TAKING ME

1   ON TRIPS ON AIRPLANES.  I HAVE TAKEN PEOPLE A LOT OF TIMES ON

2   TRIPS MYSELF.  AND THEN I USE IT FOR BUSINESS ALSO A LOT OF

3   TIMES, AND MY FAMILY HAS FLOWN ON THEM BEFORE, TOO.

4   Q.   DID YOU EVER FLY PRIVATELY WITH MR. HARDWICK?

5   A.   NO, I DON'T BELIEVE SO.

6   Q.   YOU NEVER HAD THAT OPPORTUNITY?

7   A.   NO.

8   Q.   YOU, YOURSELF -- I KNOW YOU SAID THAT YOUR BUSINESS IS

9   SOMEWHAT DIFFERENT FROM MR. HARDWICK'S BUSINESS, BUT THERE ARE

10  SOME SIMILARITIES IN THE WAY THAT YOU RAISE CAPITAL; IS THAT

11  CORRECT?

12  A.   YES, IN THAT I'M DEALING DIRECTLY WITH PRINCIPALS WHO ARE

13  INVESTING IN OUR FIRM.  YES.

14  Q.   AND THAT'S NOT A ONE-TIME TRANSACTION AS OPPOSED TO

15  BUILDING AND DEVELOPING?

16  A.   THAT'S CORRECT.

17  Q.   AND THAT'S SIMILAR TO WHAT YOU'VE OBSERVED OF

18  MR. HARDWICK'S BUSINESS; IS THAT RIGHT?

19  A.   SURE, WHAT NOW FOR YEARS.  AND THAT'S THE SIMILAR -- I

20  HAVE INVESTORS WHO HAVE BEEN REPEAT INVESTORS, AND I HAVE

21  WORKED WITH THEM FOR DECADES.  SO, YES.

22  Q.   SO YOU EMPLOYED MARKETING TECHNIQUES SIMILAR TO

23  MR. HARDWICK'S?

24  A.   YES, VERY MUCH SO.

25  Q.   I'M SORRY.  I DIDN'T MEAN TO SPEAK OVER YOU.

1   A.   NO.  VERY MUCH SO, YES.

2   Q.   TELL ME A LITTLE BIT ABOUT THE MARKETING TECHNIQUES THAT

3   YOU HAVE EMPLOYED THAT ARE SIMILAR TO WHAT YOU'VE OBSERVED

4   MR. HARDWICK USE.

5   A.   SIMILAR.  SO I'M A MEMBER OF A CLUB, A GOLF CLUB IN

6   ATLANTA THAT I JOINED MAYBE TEN OR 15 YEARS OR SO AGO.  AND IT

7   WAS -- AND IT'S -- I'M ALMOST EMBARRASSED TO SAY BECAUSE IT'S

8   REALLY, REALLY EXPENSIVE AND IT'S A VERY NICE GOLF CLUB.  AND

9   IT IS MY PRIMARY FORM OF ENTERTAINMENT FOR PEOPLE WHO ARE

10   CAPITAL INVESTORS IN OUR BUSINESS.  BECAUSE, AGAIN, IT'S A

11   GREAT -- YOU KNOW, WHEN YOU TRAVEL WITH SOMEBODY AND YOU -- OR

12   YOU GO PLAY GOLF WITH THEM FOR FOUR OR FIVE HOURS, YOU FORM A

13   MUCH DIFFERENT RELATIONSHIP THAN IF YOU JUST TAKE SOMEONE TO

14   LUNCH OR IF YOU MEET THEM AT YOUR OFFICE FOR A CUP OF COFFEE.

15       AND WHEN YOU'RE A PRINCIPAL OF A LARGE BUSINESS, YOU KNOW,

16   OTHER PRINCIPALS OF BUSINESSES HAVE VERY, VERY LIMITED TIME,

17   AND THEY'RE NOT REALLY INTERESTED -- MY INVESTORS REALLY AREN'T

18   INTERESTED IN COMING OVER TO HAVE A CUP OF COFFEE WITH ME.  BUT

19   IF I TELL THEM THAT I CAN GO FLY THEM DOWN TO SEMINOLE IN

20   FLORIDA OR TAKE THEM TO EASTLAKE FOR THE AFTERNOON TO PLAY

21   GOLF, THEN I GET A DIFFERENT LEVEL OF PARTICIPATION.  AND THAT

22   GIVES ME THE OPPORTUNITY TO THEN, YOU KNOW, HAVE A

23   RELATIONSHIP, OR TRY TO HAVE A BUSINESS RELATIONSHIP WITH THEM.

24   Q.   NOW, YOU WORK IN THE BUILDING AND HOUSING MARKET.

25   A.   CORRECT.

1  Q.   SO YOU'RE FAMILIAR WITH THE DOWNTURN IN THE ECONOMY RIGHT

2  AROUND --

3  A.   I'M QUITE FAMILIAR WITH IT, YES.

4  Q.   -- 2008, 2009, RIGHT?

5  A.   YES.

6  Q.   AND THAT AFFECTED YOUR BUSINESS?

7  A.   IT DID.

8  Q.   HAD YOU EVER HAD AN OPPORTUNITY TO -- OR NOT -- I GUESS

9  OPPORTUNITY IS THE WRONG WAY TO PUT IT.  BUT DID YOU EVER HAVE

10  AN OCCASION WHERE YOU MIGHT GO INTO -- TAKE ON A SUBSTANTIAL

11  DEBT IN ORDER FOR A POTENTIAL REALIZED GAIN?

12  A.   YES.

13  Q.   OKAY.  CAN YOU TELL THE JURY ABOUT THAT -- WELL, ACTUALLY,

14  LET ME ASK YOU THIS:  IS IT SIMILAR TO WHAT YOU OBSERVED WITH

15  MR. HARDWICK?

16  A.   YES, I THINK SO.  IT'S -- A LOT OF THESE COSTS ARE -- YES,

17  THEY ARE INVESTMENTS IN WHAT WE -- IN BUSINESS THAT WE HOPE TO

18  GAIN OR THE BENEFITS THAT WE HOPE TO GAIN FROM BUSINESS IN THE

19  FUTURE.  YES.

20  Q.   OKAY.  CAN YOU GIVE AN EXAMPLE, PLEASE?

21  A.   YES.  IN THE MIDDLE OF THE DOWNTURN, I WAS INVITED TO JOIN

22  A VERY PRESTIGIOUS GOLF CLUB.  AND I KNOW -- AND, AGAIN, I

23  DON'T KNOW THAT IT SOUNDS SILLY, BUT IT MAY SOUND SILLY.  THIS

24  GOLF CLUB WAS, YOU KNOW, BETWEEN DUES AND ET CETERA, IT WAS,

25  YOU KNOW, MORE THAN THE PRICE OF A -- MOST OF THE HOMES THAT I

1    SOLD.  AND IT WAS DURING THE DOWNTURN, AND I DID NOT HAVE ANY

2    MONEY.

3        AND A VERY, YOU KNOW, INFLUENTIAL BUSINESS PERSON IN

4    ATLANTA ASKED ME TO JOIN THIS COUNTRY CLUB.  AND THERE'S ONLY

5    100 MEMBERS, AND IT WAS A REAL HONOR.  AND I DID NOT HAVE ANY

6    MONEY, BUT I KNEW THAT I WANTED TO BE IN BUSINESS FOR THE REST

7    OF MY LIFE AND I KNEW HOW IMPORTANT THAT WOULD BE.

8        AND SO I ASKED HIM IF I COULD HAVE A PAYMENT PLAN, BECAUSE

9    IT WAS SO MUCH MONEY.  BUT I DID.  I DID.  I JOINED IT IN THE

10   MIDDLE OF THE DOWNTURN, BECAUSE I THOUGHT IT WAS IMPORTANT.

11   AND IT'S PROBABLY BEEN THE SINGLE GREATEST --

12           MR. PHILLIPS:  OBJECTION.  RELEVANCE.

13           MS. NOVAY:  WE ARE GOING ON A LITTLE BIT.

14           THE COURT:  YEAH.  AND I WILL SUSTAIN TO SO MUCH

15   ABOUT HIS OWN EXPERIENCE.  OF COURSE, HE IS NOT AN EXPERT

16   WITNESS IN MARKETING, BUT SHARING HIS OWN EXPERIENCE AS OPPOSED

17   TO THE LAY PERSON OBSERVATIONS ON THIS CASE, I WILL SUSTAIN AS

18   TO RELEVANCE.

19           MS. NOVAY:  I DIDN'T WANT TO CUT OFF THE WITNESS, BUT

20   WE'LL MOVE ON.  THANK YOU.

21   BY MS. NOVAY:

22   Q.   LET ME GO BACK TO YOUR EXPERIENCE WITH MORRIS HARDWICK

23   SCHNEIDER.  AND, ACTUALLY, BEFORE I DO THAT, HOW BIG IS YOUR

24   BOOK OF BUSINESS, WOULD YOU SAY?

25   A.   HOW BIG IS MY --

1    Q.   IS YOUR BOOK OF BUSINESS?

2    A.   YOU MEAN OUR -- LIKE OUR ANNUAL REVENUES?

3    Q.   YES.

4    A.   PROBABLY AROUND TWO HUNDRED -- NEAR 75 TO 200 MILLION A

5    YEAR.

6    Q.   AND YOU INITIALLY CHOSE MORRIS HARDWICK SCHNEIDER AS YOUR

7    CLOSING FIRM BECAUSE OF YOUR RELATIONSHIP WITH MR. HARDWICK?

8    A.   YES, DEFINITELY.

9    Q.   AND ARE YOU STILL WITH MORRIS HARDWICK SCHNEIDER AS A LAW

10   FIRM?

11   A.   NO, I'M NOT.

12   Q.   OKAY.  WHEN DID YOU LEAVE?

13   A.   MAYBE A YEAR OR SO AFTER NAT LEFT.

14   Q.   IS THAT THE REASON THAT YOU LEFT?

15   A.   YES, BECAUSE NAT WAS NO LONGER THERE.  CORRECT.

16          MS. NOVAY:  IF I COULD HAVE JUST A MOMENT, YOUR

17   HONOR.

18          THE COURT:  SURE.

19          MS. NOVAY:  THANK YOU, YOUR HONOR.  I'LL PASS THE

20   WITNESS.

21          THE COURT:  ALL RIGHT.  CROSS-EXAMINATION.

22                      CROSS-EXAMINATION

23   BY MR. PHILLIPS:

24   Q.   GOOD AFTERNOON, MR. MALLOY.  MY NAME IS RUSSELL PHILLIPS.

25   WE'VE NEVER MET BEFORE, HAVE WE?

1   A.   I DON'T THINK SO, RUSSELL.

2   Q.   YOU SAID THAT NAT HARDWICK WAS YOUR CLOSING ATTORNEY FOR

3   ABOUT 15 YEARS?

4   A.   HE -- YES.  I THINK THAT'S ABOUT THE -- ABOUT THE EXTENT

5   OF IT.

6   Q.   AND YOU SAID YOU CHOSE HIS LAW FIRM, WHICH IN LATER DAYS

7   WAS KNOWN AS MHS, OR MORRIS HARDWICK SCHNEIDER, BECAUSE OF

8   MR. HARDWICK?

9   A.   THAT'S CORRECT.

10   Q.   AND SO YOUR BUILDER AND YOUR CUSTOMERS BOUGHT HOUSES FROM

11   YOU, CORRECT?

12   A.   YES, SIR.

13   Q.   AND THEN BANKS THAT FINANCED MORTGAGES FOR YOUR CUSTOMERS

14   WOULD WIRE TRANSFER MONEY TO CLOSE THOSE LOANS TO

15   MR. HARDWICK'S LAW FIRM?

16   A.   THAT'S CORRECT.

17   Q.   AND NAT HARDWICK WAS THE MANAGING PARTNER OF THE LAW FIRM?

18   A.   THAT'S CORRECT.

19   Q.   AND YOU EXPECTED THAT MR. HARDWICK WOULD KEEP YOUR

20   CUSTOMERS' MONEY SAFE.

21   A.   THAT'S CORRECT.

22   Q.   YOU EXPECTED THAT MR. HARDWICK'S LAW FIRM WOULD HOLD YOUR

23   CUSTOMERS' MONEY IN THE FIRM'S ATTORNEY ESCROW ACCOUNTS UNTIL

24   THEIR LOANS WERE CLOSED.

25   A.   YES.

1    Q.   YOU TRUSTED MR. HARDWICK.

2    A.   YES.

3    Q.   AND YOU EXPECTED THAT MR. HARDWICK WOULD FOLLOW THE RULES

4    OF THE STATE BAR OF GEORGIA THAT APPLY TO HANDLING MONEY FOR

5    CUSTOMERS OF RESIDENTIAL REAL ESTATE TRANSACTIONS, RIGHT?

6    A.   YES.

7              MR. PHILLIPS:  THANK YOU, SIR.  THAT'S ALL I HAVE.

8              THE COURT:  ANY REDIRECT?

9              MS. NOVAY:  NO, YOUR HONOR.

10             THE COURT:  ALL RIGHT.  THANK YOU, SIR.  YOU ARE FREE

11   TO GO.

12             THE WITNESS:  OKAY.  THANK YOU.

13             MR. GARLAND:  YOUR HONOR, AT THIS TIME WE CALL

14   MR. REMSEN.

15             THE COURT:  ALL RIGHT.

16             MS. BARRON:  YOUR HONOR, MAY WE HAVE A MOMENT TO

17   APPROACH?

18             THE COURT:  SURE.

19             MR. REMSEN, IF YOU COULD STEP OUT FOR JUST ONE SECOND

20   SO THAT WE CAN TAKE SOMETHING UP, WE WILL BE WITH YOU SHORTLY,

21   SIR.  BUT DON'T GO TOO FAR.

22             MS. NOVAY:  YOUR HONOR, COULD WE EXCUSE THIS WITNESS?

23             THE COURT:  YES.  YES.  THANK YOU, SIR.  YEAH, YOU'RE

24   FREE TO GO.  YOU'RE EXCUSED.

25             (WHEREUPON, A BENCH CONFERENCE OUT OF THE HEARING OF

1    THE JURY PROCEEDED AS FOLLOWS:)

2         MS. BARRON:  I UNDERSTAND THERE HAS BEEN A

3    SEQUESTRATION VIOLATION, AND I JUST WANT TO UNDERSTAND THE

4    EXTENT OF IT WITH THIS WITNESS.

5         YOU SAID YOU HAD TALKED TO HIM.

6         THE COURT:  YEAH.  I DID SEE HIM IN HERE EARLIER.

7    NOW, I KNOW --

8         MS. BARRON:  HE WANDERED IN, I THINK, DURING THE

9    LATTER PART -- IT WAS ONE OF THE LOST BOYS.

10        THE COURT:  DO YOU KNOW WHICH ONE?

11        MS. NOVAY:  I DON'T RECALL.  WE ALERTED THE

12   GOVERNMENT AS SOON AS WE NOTICED.  I THINK IT WAS DURING THE

13   CROSS AND --

14        MS. BARRON:  IT WAS.  THAT'S ALL I WANTED.

15        THE COURT:  ANYTHING THE GOVERNMENT WANTS TO RAISE ON

16   THAT?

17        MR. GILFILLAN:  IT MAY BE RELEVANT TO THIS.  YOUR

18   HONOR EXCLUDED THIS EXHIBIT A FEW SECONDS AGO, BUT IT IS AN

19   E-MAIL FROM -- AND HE TELLS COSMO HE'S GOING TO SEND 200,000.

20        THE COURT:  WE ARE NOT GOING TO TAKE THAT UP RIGHT

21   NOW.  IS IT PERTAINING TO THE NEXT WITNESS AT ALL?

22        MR. GILFILLAN:  I WOULD LIKE TO BE ABLE TO USE IT

23   WITH SOMEONE, NOT THE NEXT ONE.

24        THE COURT:  NOT THE NEXT ONE?  OKAY.  THEN JUST

25   REMEMBER, MR. GILFILLAN.  THANK YOU.

1    AND I DON'T KNOW -- YOU DIDN'T APPROACH, THOUGH.  I

2  DON'T KNOW IF YOU HEARD ALL MY REASONS FOR DOING SO.

3    (WHEREUPON, PROCEEDINGS RESUMED IN OPEN COURT AS

4  FOLLOWS:)

5    THE COURT:  ALL RIGHT.  COME ON IN, SIR.  IF YOU'LL

6  COME ON UP AND TO THE RIGHT OF THIS PODIUM AND COME UP TO THE

7  WITNESS STAND, I WILL SWEAR YOU IN.

8    ALL RIGHT, SIR.  IF YOU WOULD RAISE YOUR RIGHT HAND,

9  PLEASE.

10    JOHN REMSEN, JR.,

11  HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

12  FOLLOWS:

13    THE COURT:  TAKE THE WITNESS SEAT, PLEASE.  AND ONCE

14  YOU ARE SEATED, IF YOU WOULD STATE YOUR NAME AND THEN ALSO

15  SPELL YOUR NAME FOR THE RECORD.

16    THE WITNESS:  MY NAME IS JOHN REMSEN, R-E-M-S-E-N,

17  JR.

18    DIRECT EXAMINATION

19  BY MR. GARLAND:

20  Q.   AND, MR. REMSEN, WHERE DO YOU LIVE?

21  A.   HERE IN ATLANTA.

22  Q.   HOW LONG HAVE YOU LIVED HERE IN ATLANTA?

23  A.   A DOZEN YEARS.

24  Q.   WHAT BUSINESS ARE YOU IN?

25  A.   WE CONSULT WITH LAW FIRMS ON MARKETING, BUSINESS

1  DEVELOPMENT, STRATEGIC PLANNING, SUCCESSION, THE BUSINESS SIDE

2  OF RUNNING A LAW FIRM.

3  Q.   DOES THAT BUSINESS SIDE INVOLVE HOW TO MARKET LAW FIRM

4  SERVICES?

5  A.   IN A VERY BIG WAY, YES.

6  Q.   ALL RIGHT.  WHAT IS YOUR EDUCATIONAL BACKGROUND?

7  A.   I WENT TO THE UNIVERSITY OF FLORIDA, UNDERGRADUATE.  I'M

8  ORIGINALLY FROM SOUTH FLORIDA.  AND WENT ON TO PURSUE AN MBA AT

9  THE UNIVERSITY OF VIRGINIA AND GRADUATED IN 1985.

10  Q.   AND WHAT WAS YOUR MBA IN?

11  A.   MY CONCENTRATION WAS IN MARKETING AND ORGANIZATIONAL

12  BEHAVIOR.

13  Q.   WHEN YOU SAY ORGANIZATIONAL BEHAVIOR, WHAT DOES THAT MEAN?

14  A.   CULTURE, GROUP DYNAMICS, TEAMING, SHARING, COLLABORATION.

15  Q.   WHAT IS YOUR BACKGROUND IN THE FIELD OF LAW FIRM

16  MARKETING?

17  A.   WELL, I WAS INHOUSE AS A MARKETING DIRECTOR AT A COUPLE OF

18  BIG LAW FIRMS WHEN LAW FIRMS STARTED TO MARKET.

19  Q.   WHAT ARE BIG LAW FIRMS?

20  A.   WELL, BACK THEN, MY FIRST EMPLOYER WAS A 90-LAWYER FIRM

21  BASED IN WEST PALM BEACH, FLORIDA.  AND THAT WAS MY

22  INTRODUCTION TO LAW FIRM MANAGEMENT.  AND I WAS THERE FOR THREE

23  YEARS AND THEN RECRUITED TO WHAT'S REFERRED TO AS AN AM LAW 100

24  FIRM, ONE OF THE HUNDRED LARGEST LAW FIRMS IN THE COUNTRY AT

25  THE TIME, IN COLUMBUS, OHIO.  AND THEY HAD 270 LAWYERS

1    SCATTERED ACROSS SIX OFFICES.

2    Q.   SINCE YOU GOT IN THE BUSINESS, HAS THE SIZE OF THE LAW

3    FIRMS GROWN?

4    A.   ABSOLUTELY.  ABSOLUTELY.  I STARTED CONSULTING IN '97, BY

5    THE WAY, AFTER THOSE TWO INHOUSE.

6    Q.   IN TODAY'S WORLD, DO LAW FIRMS -- ARE THERE NATIONAL LAW

7    FIRMS?  ARE THERE NATIONAL LAW FIRMS?

8    A.   ABSOLUTELY.  THERE'S --

9    Q.   WHAT IS A NATIONAL LAW FIRM?

10   A.   WELL, I WOULD DESCRIBE ONE THAT HAD PRESENCE THROUGHOUT

11   THE COUNTRY.  PERHAPS EIGHT, TEN, 12 OFFICES, MAYBE MORE,

12   DEPENDING ON THE TYPE OF PRACTICE.  BUT THE LARGEST LAW FIRMS

13   NOW ARE RUNNING INTO THE THOUSANDS OF LAWYERS.  AND WE'LL

14   CONTINUE TO SEE THAT CONSOLIDATION, I THINK.

15   Q.   NOW, AFTER SERVING IN THOSE LAW FIRMS, DID YOU START A

16   BUSINESS?

17   A.   I DID.  IN 1997, I STARTED A CONSULTANCY CALLED THE REMSEN

18   GROUP.  WHEN YOU START A COMPANY, YOU CAN CALL IT WHAT YOU

19   WANT.  AND OUR NICHE WAS MIDSIZE LAW FIRMS, SAY 25 TO

20   200 LAWYERS, AND HELPING THEM DEVELOP AND IMPLEMENT EFFECTIVE

21   MARKETING, BUSINESS DEVELOPMENT STRATEGIES TO GROW THE FIRM.

22   Q.   IS THAT THE DEVELOPMENT OF A LONG-TERM STRATEGY?

23   A.   ABSOLUTELY.

24   Q.   NOW, HOW MANY LAW FIRMS HAVE YOU WORKED WITH IN CONNECTION

25   WITH THEIR MARKETING?

1    A.    LAST COUNT, ABOUT 390.

2    Q.    AND HOW MANY LAWYERS HAVE YOU SERVED AS MARKETING

3    CONSULTANT FOR; DO YOU KNOW?

4    A.    OH, BOY.  EASILY TENS OF THOUSANDS, IF YOU COMBINED THEM

5    ALL AND TOTALED IT UP.

6    Q.    HAVE YOU BEEN CALLED UPON TO SPEAK ON THE SUBJECT OF LAW

7    FIRM MARKETING?

8    A.    YES.

9    Q.    TELL US SOME EXAMPLES OF WHERE YOU HAVE BEEN CALLED UPON

10   TO SPEAK.

11   A.    WELL, I ENJOY SPEAKING, SO I'M OUT THERE PURSUING

12   ENGAGEMENTS TO GROUPS LIKE THE AMERICAN BAR ASSOCIATION, THE

13   ASSOCIATION OF LEGAL ADMINISTRATORS.  THERE ARE LAW FIRM

14   NETWORKS NOW THAT ARE POPPING UP, GLOBAL CONSORTIUMS OF LAW

15   FIRMS, SO I'M OFTEN A FEATURED SPEAKER AT THEIR MEETINGS AND

16   CONFERENCES.  I ENJOY SPEAKING, SO I DO A LOT OF IT.

17   Q.    HAVE YOU AUTHORED ANY ARTICLES ON THE SUBJECT OF

18   MARKETING?

19   A.    I HAVE.

20   Q.    PLEASE TELL US ABOUT THE ARTICLES YOU HAVE WRITTEN.

21   A.    WELL, THEY RANGE IN TOPICS FROM THE IMPORTANCE OF CARING

22   ABOUT EXISTING CLIENTS TO HOW TO GO AFTER NEW CLIENTS.  IT'S A

23   BIT MORE CHALLENGING.  HOW TO IMPLEMENT, GET THE LAWYERS OUT

24   DOING THESE THINGS.  IT'S NOT EASY.  BUT MY ARTICLES HAVE

25   APPEARED -- AND IT'S UNBELIEVABLE WHEN YOU THINK ABOUT IT -- IN

1    DOZENS OF PUBLICATIONS, GLOBAL PUBLICATIONS.

2    Q.    WOULD YOU GIVE US AN EXAMPLE?

3    A.    OH, LAW PRACTICE TODAY; LEGAL MANAGEMENT; MARKETING THE

4    LAW FIRM; STRATEGIES, WHICH IS THE LEGAL MARKETING

5    ASSOCIATION'S NEWSLETTER.  THOSE ARE JUST A FEW EXAMPLES.

6    Q.    HAVE YOU PARTICIPATED IN ANY PROFESSIONAL ASSOCIATIONS

7    RELATED TO MARKETING?

8    A.    I HAVE.  I'VE BEEN A MEMBER OF THE LEGAL MARKETING

9    ASSOCIATION SINCE THE MID-EIGHTIES.  THAT ORGANIZATION STARTED

10   IN 1985.  INVOLVED IN THE AMERICAN BAR ASSOCIATION LAW PRACTICE

11   DIVISION.  I'M A MEMBER OF THE COLLEGE OF LAW PRACTICE

12   MANAGEMENT, WHICH IS AN INVITATION-ONLY TYPE ORGANIZATION, A

13   BIG DEAL IN THE PROFESSION.  AND I'VE BEEN RECOGNIZED BY OTHER

14   PUBLICATIONS AND ORGANIZATIONS FOR WHAT I DO.

15   Q.    HAVE YOU BEEN AN OFFICER IN THE LEGAL MARKETING

16   ASSOCIATION?

17   A.    I WAS THE PRESIDENT OF THE SOUTHEASTERN CHAPTER BACK IN

18   THE -- AROUND 2000, 2001.  I WAS ON THE NATIONAL BOARD OF LEGAL

19   MARKETING ASSOCIATION, AND I ALSO EDITED THEIR NEWSLETTER FOR

20   TWO YEARS.  THAT WAS A LONG TIME AGO, PROBABLY 20 YEARS AGO.

21   Q.    HAVE YOU SERVED ON THE FLORIDA BAR'S STANDING COMMITTEE ON

22   ADVERTISING?

23   A.    SIX YEARS, TWO TERMS, YES.

24   Q.    AND WHAT IS THE MANAGING PARTNER FORUM?

25   A.    WELL, I CONCEIVED A CONFERENCE FOR LAW FIRM MANAGING

1  PARTNERS.  IT'S NOT EASY LEADING LAWYERS.  THEY DON'T TEACH THE

2  SKILL SET IN LAW SCHOOL.  BUT IT'S BECOME VERY, VERY IMPORTANT.

3  IT'S GOTTEN VERY COMPETITIVE IN THE LEGAL SERVICES INDUSTRY.

4  AND I THINK SUCCESSFUL FIRMS HAVE STRATEGY LEADERSHIP, AND

5  HELPING THE LEADERS OF THESE FIRMS BE MORE EFFECTIVE IN A VERY

6  CHALLENGING ROLE.

7      SO WE STARTED THE CONFERENCE SERIES IN 2002 AND HOST AN

8  ANNUAL CONFERENCE HERE IN ATLANTA, TO WHICH ABOUT 100 MANAGING

9  PARTNERS FROM AROUND THE COUNTRY PARTICIPATE.

10  Q.  OVER THE YEARS, HAVE YOU TAUGHT TO OVER A THOUSAND

11  MANAGING PARTNERS?

12  A.  EASILY.

13  Q.  OKAY.

14  A.  YES.

15  Q.  AND IN HOW MANY STATES?

16  A.  ATTENDING OUR CONFERENCE, ABOUT 45 STATES HAVE BEEN

17  REPRESENTED, AND SEVERAL FOREIGN COUNTRIES.

18  Q.  AND IS THERE AN ORGANIZATION KNOWN AS THE COLLEGE OF LAW

19  PRACTICE MANAGEMENT?

20  A.  YES.

21  Q.  AND WHAT POSITION HAVE YOU HELD THERE?

22  A.  I'M A FELLOW IN THE COLLEGE OF LAW PRACTICE MANAGEMENT.

23  IT'S NOT AS IMPRESSIVE AS IT SOUNDS.  IF THEY'LL ADMIT ME AS A

24  MEMBER -- NO, I'M KIDDING.

25  Q.  SO YOU'VE BEEN HEAVILY ENGAGED IN THIS FIELD FOR THE LAST

1    25 YEARS, CORRECT?

2    A.    VERY MUCH SO.

3    Q.    AND HAVE YOU BEEN RECOGNIZED BY THE ASSOCIATION OF

4    INTERNATIONAL LAW FIRM NETWORKS?

5    A.    THEY NAME THE TOP HUNDRED CONSULTANTS IN THE WORLD, AND I

6    WAS RECENTLY PUT ON THAT LIST.  THERE'S AN ORGANIZATION CALLED

7    LAW DRAGON THAT NAMES TOP CONSULTANTS AS WELL, AND I'VE BEEN ON

8    THAT LIST FOR A COUPLE OF YEARS.

9    Q.    DO YOU LOVE WHAT YOU DO?

10   A.    I DO.

11        MR. GARLAND:  YOUR HONOR, AT THIS TIME I WOULD ASK

12   THAT MR. REMSEN BE QUALIFIED AS -- TO DELIVER EXPERT TESTIMONY.

13        THE COURT:  IN THE AREA OF?  QUALIFIED IN THE AREA

14   OF?

15        MR. GARLAND:  IN THE AREA OF LAW FIRM MARKETING.

16        THE COURT:  ANY OBJECTION?

17        MS. BARRON:  YOUR HONOR, WE JUST OBJECT ON THE

18   GROUNDS WE PREVIOUSLY RAISED.

19        THE COURT:  ALL RIGHT.  HE IS SO QUALIFIED AN EXPERT

20   IN LAW FIRM MARKETING.

21        MR. GARLAND:  THANK YOU.

22   BY MR. GARLAND:

23   Q.    MR. REMSEN, FIRST I WANT TO ASK YOU:  WHAT ARE THE

24   TECHNIQUES FOR LAW FIRMS THAT ARE EFFECTIVE FOR A LAW FIRM TO

25   DO TO MARKET THEIR SERVICES?

1    A.   WELL, THAT'S A VERY OPEN-ENDED QUESTION, AND IT DEPENDS ON

2    A LOT OF FACTORS -- THE TYPES OF CLIENTS YOU'RE LOOKING TO

3    ATTRACT, THE AREAS OF LAW THE FIRM PRACTICES.   BUT GENERALLY,

4    I'M A SUBSCRIBER IN, FIRST AND FOREMOST, TAKING CARE OF YOUR

5    CURRENT CLIENTS, THE ONES YOU WANT TO KEEP, BY PROVIDING GREAT

6    SERVICE.   YOU GET TO KNOW THEIR BUSINESS, THEIR INDUSTRY.   YOU

7    BECOME A TRUSTED ADVISOR.   AND YOU DO THAT BY BEING ACCESSIBLE,

8    AVAILABLE, RESPONSIVE, HITTING DEADLINES, DELIVERING ON

9    PROMISES, SOMETHING THAT MANY LAWYERS, MANY LAW FIRMS STRUGGLE

10   WITH.

11      BUT I THINK THAT'S THE FIRST THING YOU CAN DO TO

12   DISTINGUISH YOURSELF TO, QUOTE, MARKET THE FIRM.   EXISTING

13   CLIENTS TYPICALLY ARE THE NUMBER ONE SOURCE OF FUTURE BUSINESS.

14   THEY'RE NUMBER ONE SOURCE OF REFERRALS.

15      SO LET'S START THERE BY TAKING DARN GOOD CARE OF WHAT YOU

16   WANT TO KEEP, AND THEN GOING AFTER PROSPECTIVE CLIENTS WITH A

17   LASER BEAM.   YOU KNOW EXACTLY WHAT YOU'RE GOING AFTER AND ARE

18   MARSHALLING RESOURCES AND EFFORTS ACCORDINGLY.

19    Q.   SO IN YOUR EXPERIENCE, WHY DO PEOPLE HIRE LAWYERS?   WHAT

20   CAUSES THEM -- NOT THAT THEY DON'T NEED US, BUT WHAT'S THE

21   PRINCIPAL REASON PEOPLE SELECT ONE LAWYER OVER ANOTHER LAWYER?

22    A.   WELL, I THINK, I THINK THERE ARE CONSUMER-ORIENTED

23   PRACTICES, WHICH ARE STUFF INDIVIDUALS WOULD HIRE A LAWYER

24   FOR -- AN ESTATE PLAN, A DIVORCE, BUYING OR SELLING A HOME.

25      AND THEN THERE ARE BUSINESS LAWYERS THAT ARE MARKETING

1    SERVICES TO BANKS AND DEVELOPERS AND GOVERNMENT, PERHAPS.  AND

2    THE STRATEGIES WOULD BE VERY DIFFERENT IF YOU'RE MARKETING THE

3    BUSINESS VERSUS MARKETING TO INDIVIDUALS.

4    Q.   AND DOES THE FEELING OF FRIENDSHIP PLAY A ROLE?

5    A.   WELL, I SUBSCRIBE TO THE THEORY THAT CLIENTS HIRE

6    LAWYERS -- GENERALLY SPEAKING, THEY HIRE THE INDIVIDUAL IN WHOM

7    THEY HAVE CONFIDENCE AND TRUST.  I OFTEN CATCH MYSELF SAYING

8    CLIENTS HIRE LAWYERS, NOT LAW FIRMS.  THEY HIRE LAWYERS THEY

9    KNOW, THEY LIKE, THEY TRUST.

10        AND I ENCOURAGE ATTORNEYS TO THINK ABOUT BUILDING

11   FRIENDSHIPS AMONG FOLKS IN A POSITION TO HIRE AND REFER.  AND

12   IT TAKES TIME TO CULTIVATE FRIENDSHIPS.  IT TAKES TIME TO BUILD

13   TRUST.  AND IT'S NOT JUST A HANDSHAKE OR A SPEECH.  IT'S A

14   COMBINATION OF FACTORS.

15   Q.   IS THE ABILITY TO DO THAT A SKILL SET?

16   A.   I THINK IT IS A VERY -- YES, VERY MUCH SO.  VERY MUCH SO.

17   Q.   YOUR AVERAGE OLD LAWYER, LIKE MYSELF, HOW DO YOU GET THEM

18   TO JOIN THE MODERN ERA OF MARKETING?

19   A.   IT'S HARD TO TEACH AN OLD DOG NEW TRICKS.  I THINK START

20   WITH STUFF, START WITH EASY STUFF THAT YOU'RE COMFORTABLE WITH,

21   THINGS YOU'RE GOOD AT, THINGS YOU ENJOY AND WILL SUSTAIN.  BUT

22   BEYOND JUST BILLING TIME, WHICH IS HOW LAWYERS MAKE MONEY,

23   INVESTING THE NONBILLABLE TIME IN BUILDING RELATIONSHIPS WITH

24   CLIENTS, WITH YOUR PEOPLE WITHIN THE FIRM.  AND THEN THE FIRM'S

25   CULTURE AS WELL IS REALLY IMPORTANT.

1  Q.   ARE YOU ABLE TO SAY, BASED ON YOUR EXPERIENCE, STUDIES,

2  AND OTHER THINGS, HOW MUCH TIME -- HOW MANY -- HOW MUCH TIME

3  DOES IT TAKE TO GENERATE A NEW CLIENT AS OPPOSED TO JUST

4  PERFORM THE SERVICE?

5  A.   THAT'S HARD TO SAY, AND IT DEPENDS ON A LOT OF FACTORS.

6  AND IT'S VERY DIFFICULT TO ISOLATE, YOU KNOW, BUT FOR THIS

7  ACTIVITY, I GOT THIS CLIENT OR THIS MATTER.  IT'S -- REALLY IS

8  HARD TO SAY.

9      THE STUDIES WILL SUGGEST IT TAKES EIGHT TO 11 IMPRESSIONS

10  TO CONVERT A CLIENT -- OR A PROSPECT TO A CLIENT.  EIGHT TO

11  11 IMPRESSIONS TO BUILD THAT CONFIDENCE, BUILD THAT TRUST.  SO

12  IT'S MORE THAN ONE SPEECH, ONE HANDSHAKE, ONE ARTICLE.  IT'S A

13  COMBINATION OF FACTORS.  IT'S FOLLOW-UP, FOLLOW-UP, FOLLOW-UP.

14  BUILDING RELATIONSHIPS AND BUILDING TRUST.

15  Q.   YOU USED THE TERM, BUT FOR A CERTAIN EVENT?

16  A.   UH-HUH.

17  Q.   WHAT DO YOU MEAN WHEN YOU SAY THAT?

18  A.   WELL, I MEAN THAT FIRMS ARE TRYING TO STRUGGLE WITH WHAT

19  WORKS, WHAT DOESN'T.  AND IT'S HARD TO SAY THIS PARTICULAR

20  ACTIVITY GENERATED THIS NEW CLIENT.  IT TAKES TIME TO BUILD

21  THAT RELATIONSHIP.  THE STUDIES SHOW US EIGHT TO

22  11 IMPRESSIONS.  SO IT'S A COMBINATION OF ACTIVITIES.  THEY'VE

23  READ YOUR ARTICLE.  THEY'VE SEEN YOUR COMMERCIAL ON TV.

24  THEY'VE MET YOU AT A COCKTAIL PARTY.  THEY MET YOU AGAIN AT

25  ANOTHER EVENT.

1     AND SO THESE IMPRESSIONS START TO ACCUMULATE.  AND THE

2   STUDIES SHOW IT TAKES -- IT'S A COURTSHIP TO BUILD THAT TRUST.

3   Q.   YOU MENTIONED GREAT SERVICE.  HOW DOES THAT -- WHEN YOU

4   SAY GREAT SERVICE, WOULD YOU EXPLAIN WHAT YOU MEAN?

5   A.   LET'S START BY RETURNING PHONE CALLS AND RESPONDING TO

6   E-MAIL.  MY FATHER CHAIRED THE GRIEVANCE COMMITTEE IN PALM

7   BEACH COUNTY FOR MANY, MANY YEARS.  AND THIS IS WHERE YOU GO TO

8   COMPLAIN AGAINST A LAWYER.  AND THE NUMBER ONE SOURCE OF

9   GRIEVANCE IS NO RETURN PHONE CALL, NOT KEEPING ME INFORMED ON

10   THE PROGRESS OF THE MATTER.

11     SO I THINK LAWYERS ARE NOTORIOUS FOR NOT RETURNING PHONE

12   CALLS AND NOT BEING RESPONSIVE.  AND I THINK FIRMS CAN REALLY

13   DISTINGUISH THEMSELVES IF THEY PUT CLIENT SERVICE FIRST AND

14   RETURNING THE PHONE CALLS PROMPTLY AND DOING WHAT YOU SAY

15   YOU'RE GOING TO DO.  I THINK IT IS A VERY SIMPLE BUT POWERFUL

16   WAY TO DISTINGUISH YOURSELF FROM OTHER LAWYERS AND OTHER LAW

17   FIRMS.

18   Q.   DO YOU HAVE AN OPINION ABOUT THE EFFECTIVENESS OF

19   ESTABLISHING IN A FIRM CULTURE CERTAIN BASIC PRINCIPLES THAT

20   THE ENTIRE FIRM IS TO OPERATE ON?

21   A.   WELL, ABSOLUTELY.  A NUMBER OF FIRMS WILL HAVE, YOU KNOW,

22   COMMITMENT TO CLIENTS TYPE STATEMENTS.  YOU KNOW, WE PLEDGE TO

23   BE RESPONSIVE.  WE PLEDGE TO GET TO KNOW YOUR BUSINESS.  WE

24   PLEDGE TO FULFILL OUR PROMISES.  WE PLEDGE TO -- WHATEVER IT

25   IS.  BUT YOU GOT TO LIVE IT AND BREATHE IT AND DELIVER THE

1 GOODS.  OTHERWISE, YOU'RE GOING TO CREATE EXPECTATIONS AND HAVE

2 UPSET CLIENTS IF YOU DON'T FOLLOW THROUGH.

3 Q.   IS IT EFFECTIVE TO HAVE ALL OF THE EMPLOYEES PLEDGE TO DO

4 THOSE BASIC THINGS?

5 A.   I THINK WHEN IT COMES TO CLIENT SERVICE, EVERYONE IN THE

6 FIRM HAS A ROLE TO PLAY, FROM THE RECEPTIONIST -- MASTER FIRST

7 IMPRESSIONS, YOU GET ONE SHOT AT THAT -- TO THE MOST SENIOR

8 LAWYER IN THE BUILDING.  WE ALL HAVE A ROLE TO PLAY IN MAKING

9 OUR CLIENTS FEEL VALUED, IMPORTANT, AND SATISFIED.

10 Q.   YOU KNOW THE KIND OF FIRM THAT MORRIS HARDWICK SCHNEIDER

11 AND MORRIS HARDWICK AND WITTSTADT WAS, BEING IN THE CLOSING

12 BUSINESS AND IN THE FORECLOSURE BUSINESS, THE REO BUSINESS.

13 AND I WANT TO ASK YOU SOME QUESTIONS.

14     WOULD THE PRINCIPLE TO TREAT EVERYONE WHO CAME INTO THE

15 FIRM WITH COURTESY AND RESPECT BE AN EFFECTIVE MARKETING

16 PRACTICE?

17 A.   YES.  I'D SAY THAT'S ONE OF THE BASICS, YES.

18 Q.   WHAT ABOUT DEMONSTRATING PROFESSIONALISM AND A POSITIVE

19 ATTITUDE?

20 A.   YES.

21 Q.   HOW ABOUT REFLECTING THE ATTITUDE THAT THE CLIENT IS

22 ALWAYS RIGHT?

23 A.   WITHIN REASON.

24 Q.   WHAT ABOUT MEETING ALL DEADLINES, PROMISED DEADLINES?

25 A.   I THINK COMMITTING TO MEETING DEADLINES AND EXCEEDING YOUR

1   PROMISES.  UNDERPROMISE, OVERDELIVER.

2   Q.   WHAT ABOUT LETTING THE CLIENTS KNOW HOW MUCH YOU

3   APPRECIATE THEM?

4   A.   I THINK THANKING CLIENTS FOR BUSINESS, THANKING REFERRAL

5   SOURCES FOR REFERRING A CLIENT ARE VERY IMPORTANT THINGS TO DO.

6   LET PEOPLE KNOW YOU APPRECIATE IT WHEN THEY HELP YOU OUT.

7   Q.   AND WHAT ABOUT USING THE OPPORTUNITIES, SAY, OF A CLOSING

8   TO SELL THE CLIENT AND SELL THE FIRM?

9   A.   MANY FIRMS DO THAT IN AN EFFORT TO CROSS-SELL.  YOU KNOW,

10  WE KNOW IT'S FOR A CLOSING, BUT WE DO THESE OTHER THINGS AS

11  WELL.  KEEP US IN MIND WHEN YOU NEED A LAWYER DOWN THE ROAD.

12  THAT'S A VERY COMMON AND EFFECTIVE TECHNIQUE.

13  Q.   WHAT ABOUT STAYING IN COMMUNICATION WITH CLIENTS AND

14  BORROWERS AND ADDRESS POTENTIAL PROBLEMS PRIOR TO CLOSING?

15  A.   I THINK THAT'S IMPORTANT AS WELL, YES.

16  Q.   AND IN A CLOSING PRACTICE, WHAT ABOUT WITHIN FOUR HOURS OF

17  RECEIVING CLOSING INSTRUCTIONS, COMPLETE AND FAX OR E-MAIL THE

18  SETTLEMENT STATEMENT TO ALL PARTIES?

19  A.   THAT SEEMS LIKE IT WOULD BE IMPORTANT IF I WERE BUYING OR

20  SELLING A HOME.

21  Q.   AND IF YOU HAVE COMMITMENTS AS TO OTHER PIECES OF WHAT IT

22  TAKES TO CREATE CLIENT SATISFACTION OR A FEELING THAT'S GOOD

23  ABOUT A LAWYER HAVING PROVIDED SERVICES, THERE WOULD BE MANY

24  THINGS, WOULD THERE NOT, THAT YOU WANT TO MAKE A COMMITMENT TO

25  DO; IS THAT RIGHT?

1   A.   YES.

2   Q.   OKAY.  NOW, HOW IMPORTANT IS IT THAT SOMEBODY WHO IS

3   LEADING MARKETING KNOW AND HAVE A PERSONAL RELATIONSHIP WITH

4   THE EMPLOYEES, ALL OF THE EMPLOYEES OF THE COMPANY, IF THEY ARE

5   WILLING TO DO IT?

6   A.   WELL, I THINK GETTING YOUR FOLKS ON BOARD TO JUST OFFER

7   LEGENDARY CLIENT SERVICE IS IMPORTANT.  AND IT -- YOU KNOW, IF

8   IT'S COMING FROM THE TOP, AND THE TOP IS LEADING BY EXAMPLE AND

9   INVESTING TIME AND INSTILLING HOW IMPORTANT THIS IS TO THE FIRM

10  AND ITS CULTURE, TO THE FIRM'S CLIENTS, THAT IS A SIGNIFICANT

11  CONTRIBUTION TO A LAW FIRM'S SUCCESS.

12  Q.   HOW SIGNIFICANT WOULD IT BE FOR THE GUY WHO OCCUPIED THE

13  POSITION AT THE TOP TO GIVE ALL HIS CLIENTS AND ALL OF HIS

14  EMPLOYEES HIS PERSONAL CELL PHONE NUMBER AND TELL THEM, IF

15  THERE'S ANY PROBLEM, YOU CAN CALL ME DIRECT?

16  A.   I THINK IT'S GREAT.  AND YOU DON'T SEE IT VERY OFTEN

17  WITHIN LAW FIRMS.

18  Q.   NOW, IN THE FIELD OF MATTERS THAT MIGHT BE ROUTINE, SUCH

19  AS A CLOSING, HOW CAN A PERSON SET THEMSELVES APART FROM

20  SOMEBODY ELSE THAT'S GOING TO DO A CLOSING, WHERE YOU GO IN AND

21  YOU GET A STACK OF PAPERS AND EVERYBODY SITS AROUND SIGNING

22  PAPERS AND THERE'S -- ARE YOU FAMILIAR WITH CLOSINGS?

23  A.   I AM.

24  Q.   HAVE YOU HAD TO SIT THERE AND GO THROUGH THE PAPERS?

25  A.   IT'S PAINFUL.  DISORGANIZED, PAPERWORK IS NOT READY.  YES,

1    WE'VE EXPERIENCED THOSE THINGS.

2    Q.    SO HOW DOES A LAWYER SELL THAT AND MAKE IT SPECIAL TO THE

3    BUILDER, THE BANKER, THE DEVELOPER?  HOW DO YOU DO THAT?

4    A.    I THINK YOU DELIVER THE GOODS.  IT STARTS WITH THE ENTIRE

5    MEET-AND-GREET PROCESS WHEN YOU SHOW UP AT THE OFFICE FOR YOUR

6    CLOSING.  WHAT'S THE EXPERIENCE?  HOW ARE YOU MET, GREETED?  DO

7    YOU FEEL IMPORTANT?  ARE YOU EXPECTED?  DOES THE OFFICE LOOK

8    NICE?  ARE THE PEOPLE WELL-TRAINED AND ORGANIZED, EFFICIENT,

9    PROFESSIONAL?  I THINK THAT'S HOW YOU DISTINGUISH YOURSELF.

10   Q.    NOW, HOW IMPORTANT IS IT TO MARKET TO DECISION-MAKERS WHO

11   CAN INFLUENCE LARGE AMOUNTS OF BUSINESS?

12   A.    WELL, IT'S EXTREMELY IMPORTANT.  THAT'S WHY I STARTED THE

13   MANAGING PARTNER FORUM, TO GET IN FRONT OF THE DECISION-MAKERS

14   FOR ME.

15   Q.    WOULD YOU EXPLAIN HOW THAT WORKS, WHY GETTING TO -- WHO

16   ARE THE DECISION-MAKERS IN THE FIELD OF REAL ESTATE AND

17   FORECLOSURE AND THOSE THINGS?  IF YOU WERE GOING AFTER

18   DECISION-MAKERS IN THAT FIELD, THE CLOSING SIDE OF THE BUSINESS

19   OR THE FORECLOSURE SIDE OF A REAL ESTATE BUSINESS, WHAT IS --

20   WHY DO YOU GO AFTER THE DECISION-MAKER?

21   A.    WELL, YOU WANT TO DEVELOP A RELATIONSHIP WITH THE PERSON

22   WHO HAS THE AUTHORITY AND THE ABILITY TO PUT WORK ON YOUR

23   PLATE.  TYPICALLY, IN A LARGER COMPANY, THAT'S A GENERAL

24   COUNSEL, PERHAPS.  AND THE INHOUSE LAWYER, WHO MIGHT BE

25   RESPONSIBLE FOR MANAGING THE WORK THAT IS PUT OUT TO OTHER LAW

1   FIRMS AND MAKING SURE IT'S DONE PROPERLY AND EFFICIENTLY.  IN A

2   SMALLER COMPANY, YOU MIGHT BE MARKETING STRAIGHTAWAY TO THE

3   CEO, THE PRESIDENT OF THE COMPANY, THE FOUNDER OF THE COMPANY,

4   WHO HAS THE DECISION-MAKING ABILITY TO DECIDE WHICH FIRM I'M

5   GOING TO USE FOR WHAT MATTER.

6   Q.   IF YOU GET THE DECISION-MAKER TO GIVE A BUSINESS TO YOU,

7   HOW DOES THAT WORK TO YOUR BENEFIT?

8   A.   IF YOU GET THE DECISION-MAKER TO GIVE BUSINESS TO YOU?

9   Q.   THE PERSON WHO SAYS, WELL, I'LL HAVE YOU CLOSE A THOUSAND

10  LOTS IN A DEVELOPMENT.

11  A.   WELL, I WOULD ASSUME, ALONG WITH THAT, COMES SOME DOLLARS.

12  AND THAT'S THE REWARD FOR THE DECISION-MAKER GIVING ME

13  BUSINESS, PROVIDING REVENUE FOR MY FIRM AND ITS EMPLOYEES.  I'M

14  FEEDING A BUNCH OF FAMILIES AS AN OWNER OF A LAW FIRM.

15  Q.   DO YOU ADVISE PEOPLE ON SPENDING MONEY TO TRY TO INFLUENCE

16  DECISION-MAKERS?

17  A.   SURE.

18  Q.   COULD YOU GIVE US SOME EXAMPLES OF WHETHER OR NOT YOU GET

19  A RETURN ON YOUR INVESTMENT FROM SPENDING MONEY TRYING JUST TO

20  GET ONE DECISION-MAKER WHO CAN THROW YOU LOTS OF BUSINESS?

21  A.   WELL, IT'S A TOUGH QUESTION TO FIGURE OUT, YOU KNOW, THAT

22  "BUT FOR" ACTIVITY.  AND SOME PEOPLE LOVE TO BE WINED AND DINED

23  AND ENTERTAINED.  OTHER PEOPLE COULDN'T BE BOTHERED; JUST DO A

24  GOOD JOB, PROVIDE A REASONABLE BILL, AND MORE WORK WILL COME

25  YOUR WAY.  SO EACH CLIENT IS A BIT DIFFERENT AS TO HOW YOU

1    MIGHT APPROACH THEM.

2    Q.   SO IF YOU ARE TARGETING DECISION-MAKERS, WHAT KIND OF

3    ACTIVITIES DO YOU DO TO MAKE YOUR MARKETING EFFECTIVE IF YOU'RE

4    DEALING WITH DECISION-MAKERS?

5    A.   I THINK FACE TIME, IMPORTANTLY.  YOU CAN'T BUY

6    RELATIONSHIPS AND FRIENDSHIPS.  YOU'VE GOT TO BE THERE.  AND I

7    THINK BREAKING BREAD IS A GREAT WAY TO BUILD AND CULTIVATE A

8    RELATIONSHIP.  ENJOYING A MEAL, BE IT BREAKFAST, LUNCH, DINNER.

9    PLAYING SOME GOLF IS A GREAT ACTIVITY.  NOT EVERYONE PLAYS

10   GOLF; BUT YOU GET SOMEBODY ON A COURSE FOR FIVE HOURS, THERE'S

11   A GOOD CHANCE YOU'RE GOING TO COME OFF THAT GOLF COURSE WITH A

12   FRIEND.

13       I THINK SOME PEOPLE LIKE TO FISH.  SOME PEOPLE LIKE TO

14   HUNT.  SOME PEOPLE LIKE GOING TO BALLGAMES.  EACH OF US ENJOYS

15   DIFFERENT ACTIVITIES.  BUT I ENCOURAGE LAWYERS TO SPEND TIME,

16   TIME, FACE TIME WITH FOLKS IN A POSITION TO HIRE AND REFER.

17   Q.   HOW IMPORTANT IS IT TO CREATE SPECIAL EVENTS OR

18   EXPERIENCES FOR A DECISION-MAKER, AND WHY IS IT IMPORTANT?

19   A.   WELL, I HELP A LOT OF FIRMS CONCEIVE EVENTS FOR CLIENTS,

20   AND OFTEN IT'S A SEMINAR ON A TOPIC THEY MAY CARE ABOUT.  IT

21   MIGHT BE -- I SAY THE HOLIDAY PARTY, YOU KNOW, IN THE OFFICE ON

22   DECEMBER 15TH, I DON'T KNOW THAT THAT'S A PARTICULARLY

23   MEMORABLE EXPERIENCE I MIGHT RELISH TO PARTICIPATE IN.

24       YOU OFFER ME A SET OF TICKETS TO THE FINAL FOUR, NOW

25   THAT'S SOMETHING THAT'S UNIQUE, MEMORABLE, AND BUT FOR

1   INVITATION, I MIGHT NOT HAVE A CHANCE TO DO.  AND I LIKE THOSE

2   SORTS OF ACTIVITIES, THAT BUT FOR THE FIRM'S INVITATION, THIS

3   IS A SPECIAL EVENT THAT I MIGHT NOT OTHERWISE GET TO

4   PARTICIPATE IN.  BE IT BALLOON RIDES AT CHATEAU ELAN -- THAT'S

5   KIND OF COOL -- SOMETHING THAT'S DIFFERENT, UNIQUE.

6   Q.   MASTERS?

7   A.   MASTERS IS A HOT TICKET.  NO DOUBT ABOUT IT.

8   Q.   HOW ABOUT FRONT ROW SEATS AT THE HAWKS GAME?

9   A.   NOT BAD.  I'D RATHER SIT THERE THAN UP IN THE NOSEBLEED.

10  YOU KNOW, IF YOU'RE GOING TO DO IT, DO IT RIGHT.

11  Q.   SO WHAT ABOUT SPORTS MARKETING, OR SPORTS AND ATHLETES AND

12  CELEBRITIES, MAKING THEM A PART OF YOUR DECISION-MAKERS'

13  EXPERIENCES, HOW DOES THAT FIT IN?

14  A.   WELL, I THINK -- I GREW UP IN SOUTH FLORIDA, IN A

15  NEIGHBORHOOD WHERE GOLFERS LIVED.  AND JACK NICKLAUS LIVED IN

16  OUR NEIGHBORHOOD.  I TOOK IT FOR GRANTED, BECAUSE I'D SEE

17  MR. NICKLAUS A COUPLE OF TIMES A MONTH.  BUT THERE ARE PEOPLE

18  THAT WOULD GIVE THEIR LEFT ARM TO WATCH JACK NICKLAUS HIT RANGE

19  BALLS.  SO IF YOU COULD GET SOMEONE SOME INTERACTION WITH JACK

20  NICKLAUS IN AN INFORMAL SETTING, THAT'S PRETTY COOL TO FOLKS

21  WHO ARE INTO GOLF.  YOU KNOW, A DAY WITH TIGER WOODS, THAT'S

22  PRETTY COOL IF I'M INTO GOLF.  AND I PROBABLY COULDN'T GET THAT

23  OPPORTUNITY ON MY OWN.

24       SO THROUGH THE TYPES OF THINGS NAT WOULD DO WITH THESE

25  PRO-AMS AND GOLF TOURNAMENTS, THAT'S A WAY TO GET THERE.

1   Q.   ALL RIGHT.  NOW, HOW DO YOU MARKET TO CREATE FOR A LAW

2   FIRM, SUCH AS THESE LAW FIRM, THE LAW FIRM, A NATIONAL

3   IDENTITY?  HOW DO YOU GET THAT GOING?  WHAT DO YOU HAVE TO DO

4   TO TRY TO GO FROM LOCAL OR REGIONAL INTO NATIONAL SPACE?

5   A.   WELL, IT'S NOT EASY.  IT'S NEVER AS EASY AS YOU MIGHT

6   THINK.  I THINK IT TAKES A TREMENDOUS COMMITMENT.  FIRST, A

7   VISION OF WHERE YOU WANT TO TAKE YOUR ORGANIZATION, AND THEN A

8   VERY THOUGHTFUL STRATEGIC SET OF INITIATIVES THAT ARE GOING TO

9   GET YOU THERE.

10  Q.   SO HOW IMPORTANT IS NAME RECOGNITION IN THAT PROCESS?

11  A.   AGAIN, IT DEPENDS ON THE TYPE OF PRACTICE IT IS.  YOU

12  KNOW, YOU LOOK AT MORGAN & MORGAN, FOR THE PEOPLE, FOR EXAMPLE.

13  I MEAN, THIS GUY IS SPENDING TENS OF MILLIONS OF DOLLARS A YEAR

14  ON TELEVISION ADS AND BILLBOARDS.  HE'S MARKETING TO

15  INDIVIDUALS WHO ARE IN AN ACCIDENT AND MIGHT NEED A LAWYER.

16       AND IN A BUSINESS CONTEXT, YOU KNOW, YOUR AUDIENCE IS MUCH

17  MORE DEFINED.  BANKERS, HOME BUILDERS IN NAT'S CASE.  VERY WELL

18  DEFINED.  AND SO YOU USE A DIFFERENT STRATEGY.  HE'S NOT GOING

19  TO BE ON TV, NECESSARILY, BUT MIGHT BE OTHER PLACES WHERE THESE

20  KIND OF FOLKS WANT TO BE AND BUILD RELATIONSHIPS AROUND THESE

21  EVENTS.

22  Q.   WHY DOES A MEMORABLE EVENT BECOME SOMETHING IMPORTANT?

23  A.   WE ALL WANT TO GO TO MEMORABLE EVENTS, I THINK.  BEING

24  INVITED TO SOMETHING SPECIAL AND BEING TREATED AS A VIP IS A

25  PRETTY COOL EXPERIENCE.  AND I THINK ANY OF US WOULD LOVE THAT

1    OPPORTUNITY IF PRESENTED.

2    Q.    WELL, DOES IT CREATE A LASTING MEMORY?

3    A.    SURE IT DOES.  THROW IN SOME PICTURES, ALL GOOD.

4    Q.    ALL RIGHT.  NOW, WHAT KIND OF REVENUE STREAM CAN YOU

5    PRODUCE OUT OF INVESTMENTS AND MARKETING?  IS THERE A WAY TO

6    ANSWER THAT QUESTION?

7    A.    I MEAN, HARD TO SAY.  AGAIN, IT'S HARD TO ISOLATE THAT

8    "BUT FOR" ACTIVITY.  BUT YOU CERTAINLY WANT TO BE SPENDING YOUR

9    RESOURCES WISELY AND HAVE SOME SORT OF HANDLE ON, YOU KNOW, WHY

10   WE'RE GETTING THIS WORK OR WHY WE'RE ATTRACTING THIS NEW

11   CLIENT.

12         I THINK AT INTAKE IS A GOOD POINT TO ASK, WHY DID YOU HIRE

13   OUR FIRM?  AND HEAR THAT OUT.  AND YOU WANT TO DO MORE OF WHAT

14   BRINGS THE CLIENTS TO YOU AND LESS OF WHERE YOU MIGHT BE

15   WASTING TIME AND RESOURCES.

16   Q.    I WANT YOU TO DEAL WITH THE SITUATION OF WHAT EFFECT

17   GETTING A CLIENT AND HAVING A GREAT RELATIONSHIP CAN HAVE ON

18   FUTURE REVENUE STREAMS OF A BUSINESS.  CAN YOU GIVE SOME

19   EXAMPLES AND EXPLAIN HOW THAT WORKS?

20   A.    WELL --

21   Q.    ONCE YOU GET THE BIG DECISION-MAKERS CLIENTS.

22   A.    YEAH.  YOU BRING IN A BIG INSTITUTIONAL CLIENT, THAT

23   CLIENT MIGHT GENERATE FEES IN THE TENS OF MILLIONS OF DOLLARS

24   FOR YEARS TO COME IF YOU'RE DOING A GREAT JOB CONSISTENTLY.

25   GOOD VALUE, GREAT SERVICE, CLIENTS WILL COME BACK TO YOU.

1  GETTING THEM IN THE DOOR THE FIRST TIME IS THE CHALLENGING

2  PART.  BUT DONE WELL, I MEAN, YOU MIGHT BE CREATING AN ANNUITY

3  FOR MANY, MANY, MANY YEARS.

4  Q.  USED TO BE AGAINST THE RULES FOR A LAWYER TO ADVERTISE --

5  A.  YES.

6  Q.  -- BACK WHEN I STARTED.

7  A.  YES.

8  Q.  IN THIS NEW WORLD -- AND YOU WERE TALKING ABOUT PEOPLE

9  SPENDING MONEY -- THEY SPENT A LOT OF MONEY TO GET THE

10  DECISION-MAKER CLIENTS?

11  A.  ABSOLUTELY.  IT'S NOT EASY TO GET TO THE HEAD OF THE

12  SNAKE.

13  Q.  THE HEAD OF THE SNAKE?

14  A.  THE DECISION-MAKER.

15  Q.  OH.

16  A.  THE DECISION-MAKER.

17  Q.  ALL RIGHT.  NOW, DID YOU HAVE OCCASION TO EXAMINE

18  MARKETING MATERIALS THAT --

19  A.  JUST GO THROUGH THESE?  OKAY.

20  Q.  BEFORE YOU IS DEFENDANT'S EXHIBIT 350, 351.

21       THE COURT:  I'M SORRY TO CUT YOU OFF, MR. GARLAND.  I

22  THINK WE HAVE A REQUEST TO GO TO THE RESTROOM.

23       MR. GARLAND:  ALL RIGHT.  I'M READY.

24       THE COURT:  LET'S TAKE A 5-MINUTE BREAK.  SORRY ABOUT

25  THAT.  THANK YOU SO MUCH.

1          I MAY HAVE LOOKED OVER THERE AND THOUGHT I SAW

2   SOMEONE JUST SCRATCHING THEIR HEAD, SO I APOLOGIZE.

3          MR. GARLAND:  IS THERE A SIGN?

4          THE COURT:  YEAH, THERE'S A SIGN.  THEY WERE

5   COMMUNICATING BY SIGN LANGUAGE.  EXACTLY.

6          (WHEREUPON, THE JURY RETIRED FROM THE COURTROOM AT

7   3:08 P.M., AND THE FOLLOWING PROCEEDINGS WERE HAD.)

8          THE COURT:  ALL RIGHT.  WE'LL TAKE ABOUT TEN MINUTES.

9          THE COURTROOM SECURITY OFFICER:  COURT'S IN RECESS.

10         (WHEREUPON, A BRIEF RECESS WAS HAD FROM 3:09 P.M. TO

11  3:17 P.M.)

12         THE COURT:  ALL RIGHT.  AND NOW WE'VE LOST MS. LOEB.

13  OH, OKAY.

14         ALL RIGHT.  MR. GILFILLAN, YOU HAD AN ISSUE YOU

15  WANTED TO TAKE UP AT THAT LAST CONFERENCE AT THE BAR -- OR AT

16  THE BENCH.  I'M SORRY.

17         MR. GILFILLAN:  THANK YOU, JUDGE.  AND I APOLOGIZE

18  FOR RAISING IT.  I THOUGHT IT WAS SOMETHING MS. BARRON COULD

19  DO, BUT WE'RE NOT GOING TO DO IT WITH THIS WITNESS.

20         BUT WITH RESPECT TO GOVERNMENT'S EXHIBIT 1633 --

21         THE COURT:  1633.  OKAY.

22         MR. GILFILLAN:  YES, YOUR HONOR.

23         -- COUNT 11 IN THE INDICTMENT ALLEGES AN OCTOBER 16,

24  2013, WIRE FROM DIVOT HOLDINGS TO THE COSMOPOLITAN IN THE

25  AMOUNT OF $200,000.  AND GOVERNMENT EXHIBIT 1633 IS AN E-MAIL

1  FROM MR. HARDWICK TO HIS REPRESENTATIVE AT THE COSMOPOLITAN

2  THAT TALKS ABOUT HE'S COMING INTO VEGAS ON OCTOBER 17TH, WHICH

3  IS THE DAY AFTER THE ALLEGED WIRE.  AND MR. HARDWICK IS TELLING

4  THE COSMOPOLITAN, I WILL WIRE IN 200,000 PLUS BRING 170K IN

5  CASH, FOR A TOTAL OF 370K.

6          AND THEN IN THIS E-MAIL, THERE'S SOME OTHER LANGUAGE

7  THAT SHOWS THAT MR. HARDWICK GETS THINGS FROM THE COSMO IN

8  RETURN FOR GAMBLING THIS MONEY.

9          AND SO I KNOW YOUR HONOR SUSTAINED THE DEFENSE

10 OBJECTION, BUT I WOULD LIKE THE ABILITY, WITH A LATER WITNESS,

11 TO GO AHEAD AND TENDER THIS AND USE THIS WITH A LATER WITNESS.

12 IT'S AUTHENTIC, IT'S RELEVANT, IT'S NOT HEARSAY.

13         AND I DON'T SEE HOW THIS COULD BE RULE 403 TO SAY

14 THAT A WIRE ALLEGED IN THE INDICTMENT IS NOT FOR THE BUSINESS

15 OF MARKETING, BUT REALLY IT'S FOR GAMBLING, AND HE GETS

16 PERSONAL BENEFITS AS A RESULT.

17         THE COURT:  NOW, HOW IS IT NOT HEARSAY?

18         MR. GILFILLAN:  BECAUSE IT'S AN E-MAIL FROM

19 MR. HARDWICK, A STATEMENT OF A PARTY OPPONENT.

20         THE COURT:  WELL, THAT'S WHAT I KEEP GETTING HUNG UP

21 ON.  I KNOW THAT THERE HAVE BEEN SOME AGREEMENTS BETWEEN THE

22 PARTIES ABOUT E-MAILS, SO A LOT OF THEM HAVE NOT BEEN OBJECTED

23 TO, A LOT OF THEM HAVE COME IN UNDER AGREEMENTS.

24         BUT THERE ARE STATEMENTS FROM OTHER PEOPLE IN THERE,

25 WHICH IS -- I RAISED.  AND I THINK MR. PHILLIPS SAID, YEAH, BUT

1   THAT'S ALL JUST INTERTWINED.  WHICH I DON'T KNOW OF ANY

2   AUTHORITY THAT SAYS JUST BECAUSE IT'S INTERTWINED -- SO THAT'S

3   WHAT I NEED TO SEE, THAT IF IT'S COMPLETING OF A STORY, OR WHAT

4   IS IT?

5            MR. GILFILLAN:  OKAY.  I'M GOING TO ADDRESS THIS IN

6   TWO PARTS.

7            THE COURT:  OKAY.

8            MR. GILFILLAN:  WITH RESPECT TO 1633, 1633 IS ONE

9   E-MAIL FROM MR. HARDWICK TO THE COSMO.  SO I DON'T THINK IT

10  RAISES THIS ISSUE OF OTHER PEOPLE'S E-MAILS.

11           THE COURT:  SO THERE IS NOT ANOTHER DECLARANT,

12  THERE'S NOT ANOTHER SPEAKER WITHIN THAT --

13           MR. GILFILLAN:  NOT ON 1633, YOUR HONOR.

14           THE COURT:  OKAY.  AND IF YOU HAVE ANOTHER COPY OF

15  THAT, LET ME SEE IT.

16           MR. GILFILLAN:  I'M SURE WE HAVE A COPY.

17           THE COURT:  OKAY.

18           MR. GILFILLAN:  BUT I WOULD LIKE TO ADDRESS THE OTHER

19  QUESTION ABOUT OTHER E-MAILS WITH OTHER PEOPLE.

20           THE COURT:  OKAY.  OTHER SPEAKERS.

21           MR. GILFILLAN:  THE E-MAIL CHAINS.

22           THE COURT:  YES.

23           MR. GILFILLAN:  ALL RIGHT.

24           THE COURT:  OKAY.  THIS ONE DOESN'T HAVE ANOTHER

25  DECLARANT IN IT, BUT I THOUGHT CLEARLY THAT IT DID.  BUT OKAY.

1          THE OTHER ONES -- WITH RESPECT TO OTHER ONES, WHAT IS

2     THE POSITION?  AND I THINK THAT'S ONLY COME UP A COUPLE OF

3     TIMES, AGAIN, BECAUSE MANY OF THE E-MAILS THAT HAVE COME IN

4     HAVE COME IN UNDER AGREEMENTS BETWEEN THE PARTIES.

5          MR. GILFILLAN:  SO MR. GARLAND STEPPED OUT, AND I'M

6     NOT TRYING TO SAY ANYTHING THAT HE WOULDN'T AGREE WITH IF HE

7     WERE HERE.

8          BUT THE PARTIES DID DISCUSS E-MAILS FOR A PERIOD OF

9     TIME BEFORE THE TRIAL.  AND WE HAVE AGREED TO AUTHENTICITY, AND

10    THEN WE HAVE AGREED TO THE APPLICATION OF THE BUSINESS RECORDS

11    EXCEPTION FOR E-MAILS THAT WERE PRODUCED BY MORRIS HARDWICK

12    SCHNEIDER.

13         NOW, THESE E-MAILS DO CONTAIN --

14         THE COURT:  I'M SEEING SOME SHAKING HEADS, BUT GO

15    AHEAD.

16         MR. GILFILLAN:  IT'S IN A LETTER THAT WE --

17         THE COURT:  OKAY.

18         MR. GILFILLAN:  BUT, ANYWAY, IN THESE E-MAILS, THERE

19    ARE STATEMENTS FROM OTHER PEOPLE.  AND THOSE OTHER

20    STATEMENTS -- AND, ACTUALLY, MR. HARDWICK OR MS. MAURYA ARE ON

21    MAYBE ALL OF THESE E-MAILS.  OKAY.

22         AND SO THESE OTHER E-MAILS ARE PUT IN NOT FOR THE

23    TRUTH OF THE MATTER ASSERTED, BUT TO PUT IN CONTEXT THE

24    STATEMENTS THAT MR. HARDWICK AND MS. MAURYA MAKE, WHICH IN

25    MR. HARDWICK'S CASE, COME IN BECAUSE THEY ARE STATEMENTS OF A

1   PARTY OPPONENT.  AND THEY ARE ALSO STATEMENTS, WE CONTEND, IN

2   FURTHERANCE OF THE CONSPIRACY, WHICH IS ANOTHER HEARSAY

3   EXCEPTION.  THE SAME IS TRUE WITH E-MAILS FROM MS. MAURYA.

4          AND THEN THERE ARE MANY E-MAILS THAT WOULD COME IN

5   NOT FOR THE TRUTH OF THE MATTER ASSERTED SIMPLY BECAUSE THEY'RE

6   A FALSE REPRESENTATION, WE WOULD CONTEND.  AND SO --

7          THE COURT:  OKAY.  I GUESS I WILL HAVE TO LOOK AT

8   EACH E-MAIL IF THERE ARE OTHERS THAT ARE OBJECTED TO UNDER THAT

9   ARGUMENT.

10         FOR THIS ONE, I CLEARLY, IN MY LOOKING -- MY QUICK

11  REVIEW OF IT, THOUGHT THAT THE CASINO WORKER ALSO WAS

12  COMMUNICATING.  AND THAT WAS AN ISSUE FOR ME, BECAUSE I WASN'T

13  SURE WHERE THIS INTERTWINED ARGUMENT WAS COMING FROM.  AND SO

14  THEN I STARTED ANALYZING IT UNDER HEARSAY EXCEPTION, WHETHER IT

15  WAS BEING OFFERED FOR THE TRUTH OF THE MATTER, AND IT CLEARLY

16  WAS BECAUSE MR. PHILLIPS SAID, WE ARE SHOWING IT -- OR WANT IT

17  IN TO SHOW THAT HE DID MAKE THESE PAYMENTS.  SO IT'S CLEARLY

18  BEING USED FOR THE TRUTH OF THE MATTER.

19         BUT YOU'RE SAYING WE DON'T EVEN GET TO THE HEARSAY

20  EXCEPTION ANALYSIS BECAUSE IT IS EXCLUDED AS NON-HEARSAY UNDER

21  801(A).  IS THAT CORRECT?

22         MR. GILFILLAN:  YES, YOUR HONOR.

23         THE COURT:  IS IT?

24         MR. GILFILLAN:  THIS ONE, 1633, YES.  WHAT I WANTED

25  TO LOOK AT WAS THE OTHER ONE YOU GUYS TOOK UP.  AGAIN, I WASN'T

1    AT THE BENCH, AND I DO APOLOGIZE.  1632.

2              THE COURT:  THAT ONE IS IN.

3              MR. GILFILLAN:  YES, RIGHT.  BUT THAT'S WHAT CONFUSED

4    ME, BECAUSE THAT'S THE ONE WITH THE STATEMENTS BY THE --

5              THE COURT:  WELL, THERE WAS NO OBJECTION TO THAT ONE.

6    AND I DIDN'T UNDERSTAND THAT, EITHER, THAT THE DEFENSE TOOK A

7    POSITION TO ONE AND NOT THE OTHER.  BUT THAT ONE WAS NOT

8    OBJECTED TO, SO THAT CAME IN WITHOUT ANY OPPOSITION.

9              MR. GILFILLAN:  I'M NOT TALKING ABOUT THAT ONE.

10             THE COURT:  OKAY.

11             MR. GILFILLAN:  I JUST WANTED -- LIKE I SAID, I

12   DIDN'T WANT TO USE AN EXHIBIT YOUR HONOR HAS KEPT OUT WITH

13   ANOTHER WITNESS WITHOUT RAISING THIS WITH YOU.

14             THE COURT:  SURE.  OKAY.  WHICH IS WHY I WANTED TO

15   TAKE IT UP NOW, BECAUSE I WASN'T SURE WITH WHOM THE GOVERNMENT

16   WANTED TO USE IT.

17             OKAY.  MS. LOEB, YOU WERE UP HERE FIRST.  SO THIS IS

18   1633 AGAIN.  AND IT DOES APPEAR ONLY TO HAVE STATEMENTS BY

19   MR. HARDWICK, NO ONE ELSE.  SO THERE'S NO CONFRONTATION ISSUE,

20   THERE'S NO NEED TO GET TO WHETHER OTHER STATEMENTS ARE

21   INTERTWINED.  SO WHAT IS YOUR RESPONSE WITH RESPECT TO WHY THIS

22   SHOULD NOT COME IN?

23             MS. LOEB:  THIS IS AN E-MAIL FROM MR. HARDWICK TO THE

24   CONCIERGE AT THE CASINO.

25             THE COURT:  YES, MA'AM.

1        MS. LOEB:  IT WAS GOING TO BE USED TO CROSS-EXAMINE

2   ALEX HARDWICK.  HE KNEW NOTHING ABOUT THIS.

3        THE OTHER E-MAIL, THE ONE TO WHICH WE DID NOT OBJECT,

4   ULTIMATELY MADE ITS WAY -- IT WAS FORWARDED TO ALEX HARDWICK.

5   SEEMED TO ME IT WAS FAIR GAME TO CROSS-EXAMINE HIM ON THAT ONE.

6        THIS ONE, ALEX HARDWICK IS NOT COPIED ON.  AND ALL

7   THAT WAS GOING TO HAPPEN FROM THIS ONE WAS THE GOVERNMENT,

8   DURING THEIR CLOSING ARGUMENT ABOUT WHAT MONEY --

9        THE COURT:  ARE YOU AWARE OF THIS, ARE YOU AWARE OF

10  THIS, ARE YOU AWARE OF ALL THESE THINGS IN THIS E-MAIL ON WHICH

11  YOU WERE NEVER COPIED.  I KNOW.  THAT'S WHAT HAS BEEN HAPPENING

12  ANYWAY WITH SOME OF THE CROSSES.  AND THAT'S -- I DON'T KNOW

13  THAT THAT'S NOT FAIR GAME.  I UNDERSTAND -- I UNDERSTAND YOUR

14  POINT, BUT I DON'T KNOW OF A LEGAL REASON THAT IT COULD NOT

15  COME IN.

16       I MEAN, YOU COULD TRY TO SAY SOMETHING LIKE, IT'S NOT

17  WITHIN THE SCOPE OF HIS KNOWLEDGE, BUT I DON'T KNOW OF ANY

18  LEGAL REASON THEY CAN'T ASK THEM WHETHER OR NOT HE'S AWARE OF

19  THESE THINGS THAT ARE STATEMENTS MADE BY THE DEFENDANT IN THIS

20  CASE.

21       ALL RIGHT.  SO I WILL REVERSE THAT RULING IF THERE IS

22  NO OTHER BASIS ON WHICH I SHOULD CONSIDER AN OBJECTION AND

23  ALLOW 1633 IN.

24       MS. NOVAY, IS THERE SOMETHING YOU WANTED TO ADD?

25       MS. NOVAY:  SOMEWHAT TOUCHING ON THAT, WE ARE AT A

1    LITTLE BIT OF A DIFFERENT BALLGAME RIGHT NOW, BECAUSE AS THE

2    COURT MADE MENTION EARLIER, THAT SOME STATEMENTS ARE COMING IN

3    PROVIDED THAT YOU, AS MEMBERS AND OFFICERS OF THIS COURT, WILL

4    CONNECT IT UP LATER.  FOR EXAMPLE, THERE ARE A LOT OF

5    STATEMENTS BY ASHA THAT CAME IN AS STATEMENTS FROM A

6    CO-CONSPIRATOR.

7            THE COURT:  SAY THAT AGAIN?  A LOT OF?

8            MS. NOVAY:  FOR EXAMPLE, THERE ARE A LOT OF

9    STATEMENTS BY -- I'M SORRY, I SHOULDN'T CALL HER ASHA --

10   MS. MAURYA THAT CAME IN AS STATEMENTS BY A CO-CONSPIRATOR.

11   MS. MAURYA NEVER TESTIFIED.

12           SO IF WE'RE -- THERE'S SOME INSTANCES I THINK -- PART

13   OF THE REASON WHY WE WANT TO BE SURE IS THAT THE GOVERNMENT HAS

14   PRESENTED THEIR CASE.  WE KNOW WHAT WITNESSES THEY'VE NOW

15   DECIDED TO CALL.  IF THESE STATEMENTS WANTED TO COME IN IN

16   THEIR CASE IN CHIEF, THAT'S A LITTLE BIT DIFFERENT THAN PUTTING

17   IT INTO OURS.  THERE MIGHT BE DIFFERENT OBJECTIONS.  SO THAT'S

18   WHY I GUESS I BRING IT TO THE COURT'S ATTENTION.

19           BUT AS FAR AS -- I DON'T THINK THE DEFENSE, WE CAN

20   LOOK BACK ON IT.  BUT I KNOW THERE ARE MORE E-MAILS AND PHONE

21   CALLS WITH THE GOVERNMENT.  IT WAS NOT OUR POSITION THAT EVERY

22   SINGLE E-MAIL IS A BUSINESS RECORD.  THERE WERE SOME E-MAILS

23   CONNECTED WITH CHARTS THAT WE ALL AGREED ON THAT SHOULD COME IN

24   AND THAT WE HAD NO PROBLEM WITH.  BUT THAT DIDN'T MEAN EVERY

25   SINGLE E-MAIL OF MORRIS HARDWICK SCHNEIDER SHOULD GET TO COME

1  IN.  THAT WAS NOT OUR UNDERSTANDING OF THE AGREEMENT.

2      THE COURT:  WELL, I DON'T KNOW WHAT IT IS.  I'VE

3  ASKED A COUPLE OF TIMES WHAT THE AGREEMENT WAS.  AT ONE POINT I

4  THINK EITHER YOU OR MR. GARLAND SAID THAT SOMETHING HAD BEEN

5  AGREED TO, AND THEN THE OTHER ONE SWITCHED THE POSITION.  I

6  DON'T REALLY KNOW WHAT THE AGREEMENT WAS, BUT I'VE TRIED TO

7  UNDERSTAND THAT.  I KNOW THAT AN ARGUMENT WAS BEING MADE

8  EARLIER IN THIS TRIAL THAT BASICALLY -- THAT BASICALLY WAS,

9  EVERY WORK E-MAIL IS A BUSINESS RECORD EXCEPTION.  AND WE ALL

10  KNOW THAT IS NOT THE LAW AT ALL.

11      HOWEVER, IF YOU ALL HAVE REACHED AN AGREEMENT TO

12  TREAT THEM AS BUSINESS RECORD EXCEPTIONS, THAT'S DIFFERENT.

13  BUT, OF COURSE, THAT'S NOT THE LAW, THAT THEY ARE.  THAT WOULD

14  JUST UNDERMINE THE WHOLE HEARSAY EXCEPTION OR HEARSAY RULE.

15      SO, AGAIN, I DON'T KNOW WHAT THE AGREEMENT IS.  MAYBE

16  YOU ALL NEED TO TALK AGAIN AND REESTABLISH WHAT IT IS, AND LET

17  ME KNOW IF YOU ALL ARE IN DISAGREEMENT.  DEFINITELY WITHIN YOUR

18  OWN TRIAL TEAM, YOU NEED TO BE ON ONE PAGE SO THAT YOU DON'T

19  HAVE ONE ATTORNEY ON ONE SIDE SAYING YOU'VE AGREED TO SOMETHING

20  AND THEN THE OTHER ONE SAYING WE DID NOT.  YOU NEED TO BE IN

21  ONE ACCORD NO MATTER WHO'S TAKING WHAT WITNESS.

22      BUT, AGAIN, I'M NOT PRIVY TO THE AGREEMENTS.  MAYBE I

23  SHOULD HAVE HAD YOU ALL TO IRON THOSE AGREEMENTS OUT FOR ME

24  EARLIER ON.

25      MR. GARLAND:  YOUR HONOR, I THINK WE ARE IN AGREEMENT

1   THAT EITHER SIDE MAY OBJECT ON RELEVANCE.

2          THE COURT:  RIGHT.  WELL, THAT HASN'T BEEN THE

3   OBJECTION, THOUGH, FOR MOST OF THE ONES WE'RE TALKING ABOUT

4   NOW.

5          MR. GARLAND:  I'M JUST SAYING WHAT I THINK OUR JOINT

6   UNDERSTANDING WAS.  AND SO IF THEY -- THAT'S WHAT IT WAS.

7          THE COURT:  OKAY.  ALL RIGHT.  IS THERE ANYTHING ELSE

8   BEFORE WE BRING THE JURY IN?

9          SO 1633 IS IN AT THIS POINT.

10         ANYTHING ELSE ON BEHALF OF THE GOVERNMENT?

11         MR. GILFILLAN:  NO, YOUR HONOR.

12         THE COURT:  ANYTHING ELSE ON BEHALF OF THE DEFENSE?

13         MR. GARLAND:  NO, YOUR HONOR.

14         THE COURT:  ALL RIGHT.  LET'S BRING THEM IN.

15         (WHEREUPON, THE JURY RETURNED TO OPEN COURT AT

16  3:28 P.M., AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD.)

17         THE COURT:  ALL RIGHT.  THE JURY IS IN.  EVERYONE

18  ELSE MAY BE SEATED.

19         AND, MR. REMSEN, YOU ARE STILL UNDER OATH, SIR.  IF

20  YOU WOULD BE SEATED AGAIN.

21         AND, MR. GARLAND, YOU MAY CONTINUE.  THANK YOU.

22  BY MR. GARLAND:

23  Q.   MR. REMSEN, DID YOU HAVE OCCASION TO REVIEW MARKETING

24  MATERIALS USED BY NAT HARDWICK AND THE LAW FIRM IN MARKETING

25  THE SERVICES OF THE LAW FIRM?

1  A.   I HAVE REVIEWED QUITE A FEW OF THE COLLATERAL AND SEEN

2  SOME OF THE PHOTOGRAPHS AND SUCH OF THE EVENTS.

3  Q.   AND I HAVE ASKED MS. LOEB TO HELP ME GET THESE SQUARED

4  AWAY.  I WANT TO SHOW YOU DEFENDANT'S EXHIBIT 350.

5       NOW, IS THIS AN EFFECTIVE PIECE -- DEFENDANT'S EXHIBIT 350

6  AN EFFECTIVE PIECE OF MARKETING IN ATTEMPTING TO ESTABLISH A

7  BRAND?

8  A.   WELL, I WOULD WANT TO KNOW WHERE THIS APPEARED.

9  Q.   WELL, IF YOU LOOK THERE, IT SAYS PEBBLE BEACH.

10 A.   UH-HUH.

11 Q.   AND YOU'D WANT TO STUDY ALL THE DETAILS SURROUNDING IT?

12 A.   IS THIS A PART OF THE PROGRAM FOR THE EVENT OR A MAGAZINE

13 OR A BROCHURE?  I'M JUST NOT --

14 Q.   IT'S PART OF THE PROGRAM.

15 A.   WELL, I THINK BEYOND THE AD ITSELF, WHAT'S MORE EFFECTIVE

16 IS THE TIME YOU'RE SPENDING WITH FOLKS AT THE EVENT SURROUNDING

17 THIS GOLF TOURNAMENT.  I THINK THAT'S WHERE THE ACTION IS.

18 Q.   HAVE YOU REVIEWED DEFENDANT'S EXHIBIT 351?

19 A.   OKAY.  LOOKING AT IT NOW.

20 Q.   YOU HAVE LOOKED AT THEM BEFORE RIGHT NOW, CORRECT?

21 A.   350 WAS THE ONE WE WERE JUST ON.  351.

22 Q.   BUT, I MEAN, ON YOUR OWN, YOU HAVE SEEN THIS --

23 A.   YES.  YES.

24 Q.   -- COMING HERE TODAY?

25 A.   YES.

1  Q.   ALL RIGHT.  DID YOU REVIEW 349?

2  A.   UH-HUH.

3  Q.   AND 347?

4  A.   OKAY.

5  Q.   AND 337?

6  A.   OKAY.

7  Q.   IS THE ANSWER YES?

8  A.   YES.

9  Q.   ALL RIGHT.  DEFENDANT'S EXHIBIT 446, 342, 338, 340, 341,

10  333, 335, 336, 345, 353, AND 354 AND 343.  YOU'VE BEEN

11  PRESENTED THESE SOME TIME AGO AS A PART OF OUR EMPLOYING YOU.

12       IS YOUR OPINION THOSE ARE EFFECTIVE OR NOT EFFECTIVE IN

13  THE MARKETING?

14  A.   YOU KNOW, THE PROOF IS IN THE PUDDING AND THE WORK THAT

15  CAME IN THE DOOR AS A RESULT OF THESE ACTIVITIES.  BUT JUST,

16  YOU KNOW, AS FIRST BLUSH TAKING A LOOK AT THIS, YES, I THINK

17  THIS CAN BE A VERY POWERFUL AND EFFECTIVE WAY TO MARKET THE

18  FIRM.  IF YOU LOOK AT THE OTHER COMPANIES INVOLVED HERE, I

19  MEAN, THEY'RE NOT DOING THIS.

20  Q.   WHAT OTHER COMPANIES?

21  A.   OH, THE BIG BOYS.  IF YOU LOOK AT SOME OF THE OTHERS --

22  IBM, AT&T, COCA-COLA, CRANE CAPITAL -- THERE'S SOME -- FRANKLIN

23  TEMPLETON INVESTMENTS -- THESE ARE SUBSTANTIAL ENTITIES, AND

24  THEY'VE DETERMINED THAT THERE IS A RETURN ON THE INVESTMENT IN

25  PARTICIPATING IN THIS ACTIVITY OR THEY WOULDN'T BE THERE.

1   Q.  FROM YOUR REVIEW OF MATERIALS AND TALKING WITH

2   MR. HARDWICK ABOUT HIS MARKETING PLAN, DO YOU HAVE AN OPINION

3   WHETHER OR NOT HIS MARKETING PLAN WAS EFFECTIVE TO ACHIEVE THE

4   GOALS THAT HE WAS ATTEMPTING TO ACHIEVE?

5   A.  WELL, AS AN OUTSIDER LOOKING IN --

6        MS. BARRON:  OBJECTION, YOUR HONOR.  THIS WAS

7   ADDRESSED IN THE DAUBERT HEARING, AND THE COURT MADE A VERY

8   SPECIFIC RULING ON THIS.

9        MR. GARLAND:  I WITHDRAW THE QUESTION.

10       THE COURT:  OKAY.  THANK YOU.

11       MR. GARLAND:  ALL RIGHT.  ALL RIGHT.  THOSE ARE ALL

12   THE QUESTIONS I HAVE.

13       THE COURT:  ALL RIGHT.  CROSS-EXAMINE?

14       MS. BARRON:  THANK YOU, YOUR HONOR.

15               CROSS-EXAMINATION

16   BY MS. BARRON:

17   Q.  GOOD AFTERNOON, MR. REMSEN.

18   A.  GOOD AFTERNOON.

19   Q.  YOU TESTIFIED ON DIRECT THAT YOU HAVE WORKED WITH OVER, I

20   THINK, 390 LAW FIRMS; IS THAT CORRECT?

21   A.  YES, MA'AM.

22   Q.  WAS MORRIS HARDWICK SCHNEIDER ONE OF THEM?

23   A.  NO.

24   Q.  SO THE FIRST TIME MR. HARDWICK EVER PAID YOU ANY MONEY WAS

25   AFTER HE WAS INDICTED IN THIS CASE?

1   A.   I WOULD BELIEVE THAT TO BE THE CASE, YES.

2   Q.   OKAY.  AND WHEN WERE YOU RETAINED TO PROVIDE AN OPINION IN

3   THIS CASE?

4   A.   OH, A SPECIFIC DATE?  IT WOULD HAVE BEEN JULY, AUGUST,

5   SOMEWHERE IN THAT -- IT MIGHT HAVE BEEN BEFORE.  I'D HAVE TO GO

6   BACK TO MY NOTES.  IT'S BEEN SEVERAL MONTHS.

7   Q.   HOW MUCH ARE YOU CHARGING MR. HARDWICK FOR YOUR TIME?

8   A.   $375 AN HOUR.

9   Q.   AND HOW MANY HOURS DID YOU SPEND PREPARING FOR YOUR

10   TESTIMONY TODAY?

11   A.   ALTOGETHER?

12   Q.   YES.

13   A.   PROBABLY 15, 12 TO 15.

14   Q.   AND ARE YOU BEING PAID FOR YOUR TIME HERE TO TESTIFY?

15   A.   I AM.

16   Q.   OKAY.  AND HAVE YOU ALSO BEEN RETAINED BY MR. HARDWICK FOR

17   OTHER, FOR OTHER MATTERS AS WELL NOW?

18   A.   NO.

19   Q.   OKAY.  NOW, TO PREPARE FOR YOUR TESTIMONY TODAY, I KNOW

20   THAT YOU'VE SEEN THE ADVERTISEMENTS AND THINGS THAT WE'VE

21   LOOKED AT.  YOU WEREN'T GIVEN ANY BANK RECORDS, WERE YOU?

22   A.   I HAVE NOT SEEN FINANCIALS, NO.

23   Q.   OKAY.  SO YOU DON'T KNOW HOW MUCH MONEY WAS ACTUALLY SPENT

24   ON ALL OF THIS MARKETING ACTIVITY?

25   A.   I HAVE A NOTION OF WHAT IT MIGHT BE; BUT, NO, I HAVEN'T

1    SEEN HARD DOLLARS.

2    Q.   WELL, AND YOU KNOW FROM YOUR EXPERIENCE THAT IT COSTS A

3    LOT TO BE A SPONSOR AT PEBBLE BEACH, RIGHT?

4    A.   TO PARTICIPATE IN THESE EVENTS, YES, IT'S A SUBSTANTIAL

5    INVESTMENT.

6    Q.   BUT RELATIVE TO THE FIRM'S PROFITS OR ITS INCOME, YOU

7    DON'T KNOW HOW MUCH MONEY THE FIRM ACTUALLY SPENT?

8    A.   I REALLY DON'T KNOW.

9    Q.   NOR DO YOU KNOW IF THE FIRM ACTUALLY HAD ANY KIND OF

10   RETURN ON THAT INVESTMENT?

11   A.   I DO NOT KNOW THAT TO BE A FACT, NO.

12   Q.   YOU DO NOT KNOW IF ANY OF THESE MARKETING EVENTS LED TO A

13   SINGLE CLIENT, A SINGLE NEW CLIENT COMING TO MORRIS HARDWICK

14   SCHNEIDER, DO YOU?

15   A.   NOT DIRECTLY.  BUT AS AN OBSERVER OF THE FIRM'S GROWTH

16   AND -- I GOT TO THINK THERE'S A CORRELATION BETWEEN THESE

17   INVESTMENTS AND THE GROWTH OF THE FIRM.

18   Q.   OKAY.  MR. GARLAND ASKED YOU SEVERAL QUESTIONS ABOUT

19   SOMETHING CALLED THE BASICS.  AND THAT'S A CONCEPT YOU'RE

20   FAMILIAR WITH, CORRECT, FROM THE MORRIS HARDWICK SCHNEIDER LAW

21   FIRM?

22   A.   YES, MA'AM.

23   Q.   AND YOU TALKED ABOUT THINGS LIKE RETURNING PHONE CALLS AND

24   ANSWERING E-MAILS, TREATING PEOPLE WITH RESPECT WHEN THEY COME

25   IN THE DOOR, CORRECT?

1  A.  YES.

2  Q.  AND THESE WERE ALL PRINCIPLES THAT WERE IN EFFECT AT

3  MORRIS HARDWICK SCHNEIDER, CORRECT?

4  A.  THAT'S MY UNDERSTANDING, YES.

5  Q.  BUT NOT INCLUDED IN THE BASICS IS ANYTHING ABOUT PRIVATE

6  JET TRAVEL, RIGHT?

7  A.  I DIDN'T SEE ANY REFERENCE TO JET TRAVEL.

8  Q.  NOTHING ABOUT, IN ORDER TO PROMOTE OUR BUSINESS, WE NEED

9  TO TAKE CLIENTS TO CASINOS TO GAMBLE.

10  A.  WELL, I THINK ENTERTAINING CLIENTS IS A GOOD THING TO BE

11  DOING ON A REGULAR BASIS, AND SOME CLIENTS LOVE IT AND SOME

12  DON'T.

13  Q.  WELL, AND THAT'S ACTUALLY -- LET'S TALK ABOUT THAT,

14  ENTERTAINING.

15       OKAY.  I'M SHOWING YOU DEFENDANT'S EXHIBIT 337.  THIS IS

16  THE PGA TOUR.  AND THAT'S HERE IN ATLANTA, RIGHT?  THAT'S AT

17  EASTLAKE GOLF CLUB?

18  A.  IT IS, YES, MA'AM.

19  Q.  AND IF WE LOOK AT THE SPONSORS, WE SEE MORRIS HARDWICK

20  SCHNEIDER, RIGHT?

21  A.  YES, MA'AM.

22  Q.  AND WE SEE ALSTON & BIRD, JONES DAY, KING & SPALDING,

23  TROUTMAN SANDERS -- LOTS OF OTHER LAW FIRMS, RIGHT?

24  A.  YES.

25  Q.  AND SO THIS IS A COMMON THING FOR LAW FIRMS TO DO.

1  A.   CORRECT.

2  Q.   AND YOU WOULD EXPECT MORRIS HARDWICK SCHNEIDER TO

3  PARTICIPATE IN THIS KIND OF ACTIVITY, RIGHT?

4  A.   NOT EXPECT, BUT IT'S NOT SURPRISING AT ALL.

5  Q.   AND YOU WOULD EXPECT THEM TO MAYBE HAVE TICKETS TO

6  SPORTING EVENTS AND THEY WOULD TAKE CLIENTS, RIGHT?

7  A.   I WOULD THINK THAT WOULD BE PART OF THAT, WHY THEY'D BE

8  SPONSORING THE GOLF TOURNAMENT, TO ENTERTAIN CLIENTS AT THE

9  VENUE.

10 Q.   AND YOU WOULD EXPECT IF THERE ARE PARTNERS IN BALTIMORE,

11 THAT THEY MIGHT HAVE TICKETS TO RAVENS GAMES TO ENTERTAIN

12 CLIENTS?

13 A.   PERHAPS.  THEY MAY DO IT DIFFERENTLY.  YOU KNOW, IT'S NOT

14 A ONE-SIZE-FITS-ALL TYPE OF APPROACH.  DIFFERENT CLIENTS DO

15 THINGS DIFFERENTLY.  DIFFERENT LAWYERS MARKET IN DIFFERENT

16 WAYS.

17 Q.   AND YOU WOULD EXPECT A LAW FIRM TO TAKE CLIENTS OUT FOR

18 DRINKS AT THE ST. REGIS HOTEL OR OTHER PLACES TO GET DRINKS OR

19 DINNER.  THAT'S TYPICAL LAW FIRM MARKETING?

20 A.   THAT'S FAIRLY COMMONPLACE, YES.

21 Q.   AND THEN YOU TALKED ABOUT A DIFFERENT CATEGORY OF THINGS

22 CALLED UNIQUE EXPERIENCES, AND THAT'S ALLOWING THE CLIENT TO DO

23 SOMETHING THEY ORDINARILY MIGHT NOT BE ABLE TO DO.  DO YOU

24 RECALL THAT?

25 A.   I DO.

1    Q.   OKAY.  SO YOU WERE SHOWN SOME EXHIBITS -- LET ME SEE IF I

2    CAN FIND MY COPIES.  HERE'S THE EXHIBITS THAT YOU WERE SHOWN

3    ABOUT THE PEBBLE BEACH --

4    A.   UH-HUH.

5    Q.   -- GOLF EVENT.  AND YOU ARE AWARE THAT THERE WERE

6    CELEBRITIES AT THIS AT THIS EVENT, RIGHT?

7    A.   SURE.

8    Q.   FAMOUS GOLFERS?

9    A.   VERY FAMOUS TOURNAMENT, VERY FAMOUS PLAYERS, AND VERY

10   FAMOUS CELEBRITIES.  ABSOLUTELY.

11   Q.   AND THAT WOULD BE A UNIQUE EXPERIENCE THAT MOST PEOPLE

12   DON'T GET TO DO, RIGHT?

13   A.   I WOULD LIKE TO GO SOMETIME, YES.

14        MS. BARRON:  OKAY.  I WANT TO INTRODUCE, YOUR HONOR,

15   GOVERNMENT'S EXHIBIT 1631.

16        THE COURT:  ANY OBJECTION?  ANY OBJECTION?

17        MR. GARLAND:  NO OBJECTION.

18        THE COURT:  ALL RIGHT.  IT'S ADMITTED.

19   BY MS. BARRON:

20   Q.   OKAY.  SO FOR EACH OF THOSE YEARS OF THE PEBBLE BEACH, I

21   WANT TO SHOW YOU WHO MR. HARDWICK INVITED TO HAVE THIS UNIQUE

22   AND MEMORABLE EXPERIENCE WITH HIM.

23        NOW, THE YEARS ARE NOT GIVEN HERE, BUT I'M GOING TO ASK

24   YOU TO AGREE WITH ME THAT THERE ARE DIFFERENT YEARS FROM THIS

25   ITINERARY IN A MINUTE, AND I'LL SHOW YOU HOW WE GET THERE.

1      OKAY.  SO ON THE FIRST PAGE, DO YOU SEE WHERE IT SAYS

2  HARDWICK AT&T PEBBLE BEACH CELEBRITY PRO-AM?

3  A.   YES, MA'AM.

4  Q.   SO JET LEAVES PEACHTREE-DEKALB AIRPORT.  SCHEDULED ON

5  BOARD:  NAT HARDWICK, BUDDY HARDWICK -- THAT'S HIS DAD, RIGHT?

6  A.   I DON'T KNOW.

7  Q.   THAT'S MR. HARDWICK'S DAD?

8  A.   I DON'T KNOW.

9  Q.   AND ANN HARDWICK.  THAT'S HIS MOM; YOU KNOW THAT, RIGHT?

10  A.   NO.

11  Q.   BRAD LITTLE.  THAT'S HIS BUDDY FROM COLLEGE?

12  A.   I DON'T KNOW WHO BUDDY AND/OR BRAD ARE.

13  Q.   AND IF YOU LOOK AT THE ITINERARY, ALL OF THESE EVENTS THAT

14  MR. HARDWICK IS GOING TO ATTEND WHILE HE'S AT THIS EVENT, WE

15  SEE THOSE SAME PEOPLE:  NAT, BUDDY, AND BRAD; NAT, DAD, BRAD;

16  ATTENDEE'S DAD, ATTENDEE'S MOM.  AND YOU'RE AWARE THAT NONE OF

17  THESE PEOPLE ARE CLIENTS OF MORRIS HARDWICK SCHNEIDER, RIGHT?

18  A.   WELL, YOU SAY THEY AREN'T.  I DIDN'T KNOW WHO THEY WERE,

19  THE NAMES.  BUT BUDDY AND BRAD --

20  Q.   OKAY.  WELL, LET'S LOOK AT A DIFFERENT YEAR.  AND, AGAIN,

21  WE DON'T HAVE YEARS ON HERE, BUT IN THIS YEAR SUNDAY IS ON THE

22  3RD OF FEBRUARY.

23  A.   CHILLY.

24  Q.   AND THIS YEAR -- WELL, THAT'S THE SAME YEAR.  AND THIS

25  YEAR, SUNDAY IS ON THE 7TH OF FEBRUARY.  SO WOULD YOU AGREE

1    THAT'S A DIFFERENT YEAR?  IT WOULD HAVE TO BE, RIGHT?

2    A.   IT WOULD APPEAR TO BE, YES.

3    Q.   OKAY.  AND JET ALSO LEAVING PEACHTREE-DEKALB.  ON BOARD:

4    NAT HARDWICK, BUDDY HARDWICK, ANN HARDWICK, TOM LAPPE -- DO YOU

5    KNOW WHO THAT IS?

6    A.   I DO NOT.

7    Q.   TED SMITH.  DO YOU KNOW WHO THAT IS?

8    A.   I DO NOT.

9    Q.   KEVIN ANDREWS?

10   A.   I DO NOT.

11   Q.   IF WE LOOK AT THE ATTENDEES, WHO IS GOING TO THESE EVENTS?

12   NAT, BUDDY, ANN, TED, KEVIN.  NAT, BUDDY, ANN, TED, KEVIN.

13        ARE YOU FAMILIAR WITH SOMETHING CALLED THE LOST BOYS?

14   A.   I AM NOT FAMILIAR WITH THAT, NO.

15   Q.   SO YOU DON'T KNOW IF THESE ARE ACTUAL CLIENTS OR IF THEY

16   ARE JUST MR. HARDWICK'S FRIENDS WHO HE'S BRINGING FOR THIS

17   UNIQUE AND MEMORABLE EXPERIENCE?

18   A.   I DO NOT KNOW.

19   Q.   OKAY.  THIS YEAR, SUNDAY IS ON FEBRUARY 6TH.  WOULD YOU

20   AGREE THAT'S GOT TO BE A DIFFERENT YEAR?

21   A.   IT WOULD APPEAR TO BE.

22   Q.   OKAY.  AND IT DOESN'T SAY PEBBLE BEACH BUT MONTEREY,

23   CALIFORNIA, PEBBLE BEACH -- CLINT EASTWOOD, HE LIVES IN CARMEL,

24   CALIFORNIA, RIGHT?

25   A.   HE DOES.  I BELIEVE HE WAS THE MAYOR.

1  Q.   HE WAS THE MAYOR.  AND IF WE LOOK AT THE ATTENDEES HERE:

2  NAT AND BRAD; NAT, BUDDY, AND BRAD; NAT, BUDDY, AND BRAD.  NONE

3  OF THESE PEOPLE ARE MORRIS HARDWICK SCHNEIDER CLIENTS WHO ARE

4  BEING INVITED TO EXPERIENCE THIS UNIQUE OPPORTUNITY, CORRECT?

5  A.   FROM WHAT I'M LOOKING AT HERE AND WHAT YOU REPRESENT, IT

6  WOULD SEEM TO BE FAMILY ORIENTED.

7  Q.   OKAY.  THIS YEAR, SUNDAY IS ON FEBRUARY 5TH.  JET ALSO

8  LEAVING PEACHTREE-DEKALB INDUSTRIAL.  NAT HARDWICK, BUDDY

9  HARDWICK, ANN HARDWICK, BRAD LITTLE, TED SMITH, LARRY BLAIR --

10  THAT'S MR. HARDWICK'S PERSONAL BANKER AND FRIEND FROM COLLEGE.

11  YOU KNOW THAT, RIGHT?

12  A.   AGAIN, I DID NOT KNOW THAT.

13  Q.   OKAY.  AND THEN KEVIN ANDREWS, ALSO A BUDDY FROM COLLEGE.

14      AND SO ARE YOU AWARE THAT NONE OF THE PEOPLE WHO GOT TO

15  HAVE THIS UNIQUE AND MEMORABLE EXPERIENCE THIS YEAR ARE CLIENTS

16  OF MORRIS HARDWICK SCHNEIDER?

17  A.   WELL, FROM THE NAMES REPRESENTED HERE AND BASED UPON WHAT

18  YOU'RE SAYING, I WOULD AGREE.  BUT THERE MAY BE OTHERS THAT ARE

19  PART OF THIS THAT AREN'T NECESSARILY ON THESE EVENT SHEETS AND

20  SUCH.  I DON'T KNOW.

21  Q.   AND I BELIEVE THAT YOU TESTIFIED ON DIRECT, SPECIFICALLY

22  WHEN WE WERE TALKING ABOUT THESE ITEMS, PEBBLE BEACH,

23  MR. GARLAND ASKED YOU, IS THIS AN EFFECTIVE PIECE OF MARKETING

24  IN TRYING TO ESTABLISH A BRAND?  AND THAT WOULD BE LANDCASTLE

25  TITLE BEING LISTED HERE AS A SPONSOR.  AND YOUR RESPONSE WAS,

1  WHAT'S MORE EFFECTIVE IS THE TIME YOU'RE SPENDING WITH FOLKS AT

2  THE EVENT.  THAT'S CORRECT, RIGHT?

3  A.   I WOULD BELIEVE THAT TO BE THE CASE, YES, GENERALLY

4  SPEAKING.

5  Q.   AND DO YOU KNOW HOW MUCH MORRIS HARDWICK SCHNEIDER -- WE

6  TALKED EARLIER -- HOW MUCH THEY ACTUALLY PAID FOR THAT EVENT

7  FOR MR. HARDWICK TO TAKE HIS FAMILY AND FRIENDS TO HAVE THAT

8  UNIQUE EXPERIENCE?

9  A.   YOU'RE ASKING ME IF I KNOW HOW MUCH IT COST?

10  Q.   YES, SIR.  DO YOU KNOW?

11  A.   NOT FOR A FACT.  I MIGHT HAVE SOME IDEAS, AND IT'S

12  PROBABLY WELL INTO -- PROBABLY A SIX-FIGURE DEAL, I WOULD

13  THINK.

14        MS. BARRON:  WELL, YOUR HONOR, I'D OFFER

15  GOVERNMENT 1627 AND 1628.

16        THE COURT:  ANY OBJECTION?

17        MR. GARLAND:  NO OBJECTION.

18        THE COURT:  THEY ARE ADMITTED.

19  BY MS. BARRON:

20  Q.   THIS IS A FLYER FROM THE 2015 PEBBLE BEACH PRO-AM.  AND I

21  DON'T KNOW IF YOU CAN SEE THIS; THE PRINT IS VERY BAD.  BUT

22  I'LL SHOW YOU A DOCUMENT IN A MINUTE.

23  A.   YEAH.  130, 1306.

24  Q.   $136,900?

25  A.   SORT OF BLURRY, BUT NOW THAT -- I SEE THAT IN THERE.

1   Q.   SO HERE WE SEE WHAT'S INCLUDED WITH THAT PRICE.   SO ONE

2   AMATEUR PLAYING SPOT.   THAT WENT TO MR. HARDWICK EACH TIME,

3   DIDN'T IT?

4   A.   I'M ASSUMING SO.

5   Q.   OKAY.   AND THEN WE HAVE SOME TICKETS, WE HAVE

6   COMPLIMENTARY PAIRING SHEETS, WE HAVE TICKETS TO GO TO THE

7   EVENT.   BUT THE PEOPLE HE TOOK WAS FAMILY AND FRIENDS, RIGHT?

8   A.   WELL, FROM WHAT YOU SHOWED ME.   BUT WE'RE LOOKING AT EIGHT

9   TICKETS HERE, AND YOU WEREN'T SHOWING ME EIGHT NAMES.   YOU WERE

10  SHOWING ME THREE, FOUR NAMES.

11  Q.   FAIR ENOUGH.

12  A.   COULD BE THAT SOME OF THOSE OTHERS -- YOU KNOW, I DON'T

13  KNOW.

14  Q.   FAIR ENOUGH.   SO LET'S LOOK AT WHO WAS AT SOME EVENTS WITH

15  MR. HARDWICK.   YOU WERE SHOWN GOVERNMENT'S EXHIBIT 353.   DO YOU

16  RECALL THAT?

17  A.   YES.

18  Q.   AND THAT'S A FAMOUS GOLFER WHOSE NAME I CANNOT REMEMBER.

19  DO YOU KNOW WHO THAT IS?

20  A.   RUSSELL HENLEY.

21  Q.   OKAY.

22  A.   I'M GUESSING THAT'S THE SIGNATURE.

23  Q.   AND THAT'S MR. HARDWICK, RIGHT?

24  A.   THAT LOOKS TO BE MR. HARDWICK.

25  Q.   AND YOU BASED YOUR OPINIONS, IN PART, ON REVIEWING THESE

1   DOCUMENTS, RIGHT?

2   A.   YES, MA'AM.

3   Q.   OKAY.  NOW, I'M NOT A GOLFER --

4   A.   I'VE SEEN THESE DOCUMENTS, BUT I HAVEN'T SEEN THESE

5   ROOMING LISTS AND EVENT SHEETS THAT YOU JUST PRESENTED, SO --

6   Q.   SO THE PEOPLE IN THIS PICTURE --

7   A.   YES.

8   Q.   -- THAT'S MR. NICKLAUS -- OR --

9   A.   THAT'S MR. PALMER, THE KING.

10  Q.   THAT'S HOW BAD I AM.  AND THEN THESE ARE SOME FAMOUS

11  PEOPLE, TOO, RIGHT?

12  A.   YOU TELL ME.

13  Q.   WELL --

14  A.   THAT LOOKS TO BE DUSTIN JOHNSON.

15  Q.   THE JURY HAS HEARD THAT THESE ARE SOME FAMOUS GOLFERS.

16  A.   OKAY.

17  Q.   AND THAT THIS IS MR. HARDWICK AND THAT'S HIS BUDDY?

18  A.   OKAY.

19  Q.   OKAY.  NOT A CLIENT.  AND THAT'S MR. HARDWICK AND SOME

20  FAMOUS PEOPLE.  NOT A SINGLE CLIENT HERE, RIGHT?

21  A.   I DON'T KNOW.  I MEAN, THERE ARE SIX PEOPLE, SEVEN PEOPLE

22  IN THE PICTURE.  I WOULDN'T KNOW WHO'S A CLIENT, WHO'S NOT.

23  Q.   I MEAN, THAT'S A PRETTY UNIQUE EXPERIENCE THERE --

24  A.   IT IS NICE, ISN'T IT?

25  Q.   -- GETTING TO PLAY GOLF WITH PROFESSIONAL GOLFERS?

1    MR. HARDWICK AND -- APPARENTLY THAT'S DUSTIN JOHNSON.

2  A.    YES.

3  Q.    ANOTHER FAMOUS PERSON.  AND THERE'S THE BILLBOARD, RIGHT?

4    BUT WHAT'S MORE IMPORTANT IS THE TIME THE CLIENTS ARE

5  SPENDING WITH YOU AT THE EVENT, CORRECT?

6  A.    GENERALLY SPEAKING, YES.

7  Q.    OKAY.  DEFENDANT'S 354, THAT'S ANOTHER PICTURE OF

8  MR. HARDWICK AND SOME FAMOUS PEOPLE AND HIS FRIENDS, RIGHT?

9  A.    AGAIN, THERE ARE SIX PEOPLE IN THE PICTURE.  I RECOGNIZE

10  DUSTIN JOHNSON, BUT THE OTHERS I'M NOT SURE WHO THEY ARE.

11  Q.    WELL, THIS GUY TESTIFIED TODAY.  THAT'S A COLLEGE BUDDY.

12  THIS GUY IS A FRIEND.  NONE OF THESE PEOPLE ARE CLIENTS.  YOU

13  HAVE -- YOU JUST DON'T KNOW, RIGHT?  YOU DON'T KNOW?

14  A.    I DON'T KNOW.  BUT OFTEN I THINK CLIENTS BECOME FRIENDS

15  AND FRIENDS BECOME CLIENTS.  AND THAT'S NOT UNUSUAL AT ALL,

16  WHERE A NUMBER OF VERY SUCCESSFUL RAINMAKERS I'VE WORKED WITH,

17  THEIR BEST FRIENDS ARE THEIR CLIENTS.

18  Q.    OKAY.

19  A.    AND THEIR BEST CLIENTS ARE THEIR FRIENDS, SO --

20  Q.    DO THEY BECOME CLIENTS IN THE RESIDENTIAL BUILDING

21  INDUSTRY?

22  A.    I DON'T KNOW IN THIS PARTICULAR INSTANCE.

23  Q.    OKAY.  MR. HARDWICK, SOME FAMOUS GOLFER I CAN'T REMEMBER,

24  STEVE SPURRIER -- YOU KNOW WHO THAT IS, RIGHT?

25  A.    I WENT TO THE UNIVERSITY OF FLORIDA.  I CERTAINLY DO.

1    Q.    OH, YOU DO KNOW WHO HE IS.

2    A.    YES.

3    Q.    ALL RIGHT. I THINK THAT'S COACH AGAIN, RIGHT? COACH

4    SPURRIER?

5    A.    LOOKS LIKE STEVE SPURRIER, YES, MA'AM.

6    Q.    OKAY. THAT'S KEVIN ANDREWS. DID YOU KNOW THAT?

7    A.    NO.

8    Q.    BRAD LITTLE, RIGHT THERE?

9    A.    OKAY.

10    Q.    COLLEGE FRIENDS OF MR. HARDWICK'S. NOT A SINGLE CLIENT IN

11    THIS PICTURE.

12         THE COURT: ARE YOU ASKING HIM QUESTIONS?

13         MR. GARLAND: YOUR HONOR --

14         THE COURT: YES. YES.

15         MR. GARLAND: I WOULD OBJECT TO HER TESTIFYING.

16         THE COURT: YEAH, I'LL SUSTAIN. I'LL SUSTAIN.

17         MR. GARLAND: ABOUT THE WHOLE LINE OF EXAMINATION

18    ABOUT WHAT HE DOESN'T KNOW.

19         THE COURT: HE'S TESTIFIED HE DOESN'T KNOW THESE

20    PEOPLE. SO I'LL GIVE YOU SOME LEEWAY, BUT HE'S TESTIFIED HE

21    DOES NOT KNOW THESE SAME PEOPLE. SO I SUSTAIN.

22         MS. BARRON: YES, YOUR HONOR.

23         THE WITNESS: I RECOGNIZE SOME OF THE GOLFERS. BUT

24    THE OTHERS, NO.

25    BY MS. BARRON:

1   Q.  YOU WERE SHOWN SEVERAL VERSIONS OF THIS EVENT, THAT HOOTIE

2   AND THE BLOWFISH EVENT?

3   A.  YES, MA'AM.

4   Q.  MONDAY AFTER THE MASTERS, EXHIBIT 340.  AND IF WE LOOK AT

5   THE NEXT PAGE, THAT'S AN ADVERTISEMENT FOR LANDCASTLE.  DO YOU

6   SEE THAT?

7   A.  YES, I DO.

8   Q.  AND THAT WOULD BE THE KIND OF THING THAT IT WOULD BE

9   APPROPRIATE FOR A LAW FIRM TO SPEND MONEY ON, RIGHT?

10   A.  SURE.

11   Q.  I WANT TO TALK ABOUT THE ZURICH CLASSIC.  YOU WERE SHOWN,

12   I BELIEVE, SOME DOCUMENTS -- I THINK COLOR VERSIONS OF

13   DOCUMENTS THAT LOOK LIKE THIS.  DO YOU RECALL?

14   A.  YES.

15        MS. BARRON:  YOUR HONOR, AT THIS TIME I'D OFFER

16   GOVERNMENT'S 1622.

17        THE COURT:  1622.

18        MR. GARLAND:  NO OBJECTION.

19        THE COURT:  ALL RIGHT.  IT'S ADMITTED.

20   BY MS. BARRON:

21   Q.  MR. REMSEN, I WILL REPRESENT TO YOU THAT THIS IS A

22   PHOTOCOPY OF A DOCUMENT THAT WAS RETRIEVED FROM MORRIS HARDWICK

23   SCHNEIDER PERTAINING TO THE 2014 ZURICH CLASSIC.  AND ON THE

24   FIRST PAGE, DO YOU SEE WHAT'S INCLUDED WITH THAT FIRM, FIRM

25   SPONSORSHIP?

1    AND YOU ARE AWARE -- I THINK YOU TESTIFIED THAT THE FIRM

2  DID SPONSOR THIS EVENT, CORRECT?

3  A.   YES.

4  Q.   OKAY.  LET'S LOOK AT WHAT'S INCLUDED.  ONE CONTESTANT

5  BADGE, ONE CONTESTANT GUEST BADGE, ONE CADDY BADGE, SIX SINGLE

6  DAY TICKETS, $7,000 PER TEAM.  DO YOU SEE THAT?

7  A.   I DO.

8  Q.   LET'S LOOK AT WHO WENT ON THIS TRIP FOR THIS UNIQUE

9  MEMORABLE EXPERIENCE.  KEVIN HARDWICK -- I'M SORRY.  NAT

10  HARDWICK, KEVIN ANDREWS, BUDDY HARDWICK, ALEX HARDWICK, DEBBIE

11  HARDWICK, BRAD LITTLE, AND KYLE THOMPSON.

12    YOU DON'T KNOW IF ANY OF THESE PEOPLE ARE CLIENTS OF THE

13  FIRM, DO YOU?

14  A.   NOT FOR A FACT, NO.

15  Q.   OKAY.  MR. REMSEN, YOU TALKED ABOUT THE IMPORTANCE OF

16  TARGETING AND STRATEGIC MARKETING.  I CAN'T REMEMBER IF

17  MR. GARLAND SHOWED YOU THE PICTURE OF THE LANDCASTLE TITLE HAT.

18  A.   YES.

19  Q.   DO YOU RECALL SEEING THAT?

20  A.   YES.  IT WAS IN THE BATCH HERE, YES.

21  Q.   AND THAT WOULD BE TYPICAL, RIGHT, FOR LAW FIRMS TO HAVE

22  T-SHIRTS --

23  A.   BRANDED COLLATERAL.  COFFEE MUGS, GOLF BALLS --

24  Q.   SWAG.

25  A.   SWAG.  THAT'S A GOOD TERM TO USE.

1   Q.   SWAG.  AND SO THAT'S AN APPROPRIATE THING FOR A LAW FIRM

2   TO SPEND MONEY ON, RIGHT?  SWAG?

3   A.   YES, MA'AM.

4   Q.   SO --

5   A.   GET THE PRO V1S.

6   Q.   WOULD IT BE APPROPRIATE MARKETING FOR THE FIRM TO PAY THE

7   EXPENSES OF EMPLOYEES EVERY TIME THEY WEAR THAT SWAG?

8       SO, FOR EXAMPLE, IF I TAKE A VACATION TO LAS VEGAS, AND

9   I'M GOING THERE JUST TO HAVE FUN, ATTEND A POOL PARTY BECAUSE

10   IT'S MY FRIEND'S 40TH BIRTHDAY, BUT I'M WEARING MY LAW FIRM

11   SHIRT, IS THAT NOW A BUSINESS TRIP?

12   A.   ARGUABLY.  IT DEPENDS, AGAIN, WHO WAS WITH YOU, WHERE YOU

13   WERE, WHAT YOU WERE DOING.

14   Q.   MR. REMSEN, IS IT YOUR TESTIMONY THAT, BY MERELY WEARING

15   SOMETHING THAT HAS YOUR COMPANY'S LOGO ON IT, YOU ARE NOW

16   ENGAGING IN BUSINESS ACTIVITY AND CAN WRITE OFF WHATEVER WOULD

17   OTHERWISE BE A PERSONAL EXPENSE?

18   A.   IT DEPENDS WHERE YOU WERE, WHO WAS THERE.  THAT COULD BE

19   VERY IMPACTFUL UNDER THE RIGHT CIRCUMSTANCES, SO I --

20   Q.   WHAT ABOUT A LAS VEGAS POOL PARTY TO CELEBRATE YOUR

21   FRIEND'S 40TH BIRTHDAY?

22   A.   AGAIN, IT DEPENDS ON WHO WAS AT THE PARTY AND ALL THOSE

23   THINGS.  THERE'S A LOT OF INTANGIBLES HERE.

24   Q.   OKAY.  YOU TALKED ABOUT THE IMPORTANCE IN MARKETING YOUR

25   FIRM AND IN ESTABLISHING A BRAND OF STAYING IN COMMUNICATION.

1    THAT'S IMPORTANT, RIGHT?

2    A.    GENERALLY SPEAKING, YES.

3    Q.    AND IT'S ALSO IMPORTANT FOR THE PERSON WHO IS AT THE HEAD

4    OF THE SNAKE TO STAY IN COMMUNICATION WITH THE SNAKE ITSELF,

5    RIGHT?

6    A.    THE SNAKE BEING THE FIRM OR THE CLIENTS OF THE FIRM?

7    Q.    I'M TRYING TO UNDERSTAND THE METAPHOR, AND I MAY HAVE

8    MISUNDERSTOOD IT.

9         BUT THE PERSON AT THE TOP, THE CEO, COMMUNICATING WITH

10   EVERYONE THEY WORK WITH.

11   A.    I THINK AN EFFECTIVE CEO COMMUNICATES THROUGHOUT THE

12   ORGANIZATION, ABSOLUTELY.  UP, DOWN, ACROSS, AND DIAGONALLY.

13   Q.    WOULD IT BE EFFECTIVE FOR THE CEO, ONCE HE HAS FOUND OUT

14   THAT HIS CHIEF FINANCIAL OFFICER HAS FALSIFIED BANK STATEMENTS,

15   THAT THERE IS MONEY MISSING FROM THE FIRM ESCROW ACCOUNT --

16        MR. GARLAND:  THIS IS MOVING TO THE ULTIMATE QUESTION

17   TYPE OF QUESTIONING OF THE WITNESS, WHO CLEARLY WAS NOT

18   INVOLVED IN THE FIRM.  AND IT'S JUST MAKING SPEECHES.  AND I

19   OBJECT TO IT AS IRRELEVANT TYPE OF QUESTIONING WHEN IT'S DONE

20   IN THE FASHION IT'S BEING DONE.

21        THE COURT:  I AGREE.  SHE'S ASKING A LOT OF

22   QUESTIONS.

23        I'LL ALLOW YOU TO FINISH YOUR QUESTION, MS. BARRON.

24   BY MS. BARRON:

25   Q.    MR. REMSEN, DO YOU BELIEVE THAT THE CEO OF A LAW FIRM

1  SHOULD GO ON VACATION TO SCOTLAND ONCE HE'S FOUND OUT THAT HIS

2  CFO HAS BEEN FALSIFYING BANK STATEMENTS AND MOVING MONEY OUT OF

3  THE FIRM'S ESCROW ACCOUNT?

4  A.   I'M NOT IN A POSITION TO REALLY ANSWER THAT QUESTION.

5  Q.   OKAY.

6  A.   I'M REALLY NOT.

7  Q.   FINALLY, I WANT TO TALK ABOUT THE ISSUE OF TRUST, BECAUSE

8  YOU'VE TALKED ABOUT THE MOST IMPORTANT THING IN MARKETING YOUR

9  FIRM AND BUILDING RELATIONSHIPS -- IT'S A LONG PROCESS -- IS

10 ESTABLISHING TRUST WITH YOUR CLIENTS.  IS THAT RIGHT?

11 A.   YES.

12 Q.   AND NOT DOING ANYTHING THAT JEOPARDIZES THEIR BEST

13 INTEREST.  IS THAT RIGHT?

14 A.   THE CLIENT'S BEST INTEREST, YES.

15 Q.   CORRECT.  CORRECT.  AND IN THE REAL ESTATE CLOSING

16 BUSINESS, LAWYERS ARE ENTRUSTED WITH MONEY FROM CLIENTS,

17 CORRECT?

18 A.   TYPICALLY, YES.

19 Q.   AND IT IS THEIR OBLIGATION TO ACT AS FIDUCIARIES AND TO

20 GUARD THAT MONEY, CORRECT?

21 A.   YES, MA'AM.

22 Q.   AND THEY SHOULD NOT DO ANYTHING TO ENDANGER THAT MONEY,

23 CORRECT?

24 A.   THAT'S CORRECT.

25         MS. BARRON:  THANK YOU, SIR.

1      THE COURT:  ANY REDIRECT?

2                    REDIRECT EXAMINATION

3  BY MR. GARLAND:

4  Q.   IF A FIRM PUTS ITS ADS IN THE PEBBLE BEACH TOURNAMENT AND

5  USES THAT OPPORTUNITY TO HOBNOB AND MAKE NEW FRIENDS, IS WHAT'S

6  IMPORTANT IS THE EXPOSURE AND THE RELATIONSHIPS DEVELOPED AS

7  OPPOSED TO JUST WHO FLEW ON A PLANE OR HAD A TICKET?

8  A.   WELL, I THINK SO.  I MEAN, YOU SHOW ME THE LIST OF PEOPLE

9  WHO ARE ON THE AIRPLANE.  BUT AT THE EVENT ITSELF, THERE'S

10 OBVIOUSLY HIGH-FLYING FOLKS.

11 Q.   DO YOU KNOW THAT ABOUT THE PEBBLE BEACH?

12 A.   I THINK THE RELATIONSHIPS THAT MIGHT COME FROM THAT ARE

13 POTENTIALLY WORTHWHILE.

14 Q.   AND WHAT ABOUT THE TV COVERAGE THAT TAKES PLACE AROUND THE

15 COUNTRY AND THE WORLD WHEN THEY HAVE THE PEBBLE BEACH

16 TOURNAMENTS?

17 A.   WELL, YOU KNOW, THESE BIG SOPHISTICATED COMPANIES ARE

18 THERE FOR THAT REASON.  SO THEY FIND VALUE IN IT.  AND FOR SOME

19 LAW FIRMS, THAT CAN BE AN EFFECTIVE INVESTMENT AS WELL.

20 Q.   WOULD THAT BE THE KIND OF EVENT THAT WOULD HELP YOU

21 ESTABLISH A BRAND OR IDENTITY IF YOU WERE MARKETING AT THAT

22 EVENT?

23 A.   CLEARER ON THAT?

24 Q.   HELP YOU BRAND YOUR COMPANY OR YOUR IDENTITY, THE

25 COMPANY'S IDENTITY, TO BE AT A NATIONAL EVENT, HAVING

1    ADVERTISING AMONG THE KIND OF PEOPLE INVOLVED IN THOSE EVENTS?

2    A.    I WOULD THINK IT'S A POWERFUL STATEMENT ABOUT YOUR COMPANY

3    AND ITS STATURE AND ITS NATIONAL, YOU KNOW, NATIONAL KIND OF

4    REACH THAT IT'S LOOKING TO ACHIEVE.

5               MR. GARLAND:  THANK YOU VERY MUCH, MR. REMSEN, FOR

6    BEING HERE.

7               THE COURT:  FURTHER RECROSS?

8               MS. BARRON:  NO, YOUR HONOR.

9               THE COURT:  ALL RIGHT.  THANK YOU, SIR.  YOU ARE FREE

10   TO GO.  THANK YOU SO MUCH.

11              AND LET'S SEE.  THOSE DOCUMENTS YOU ARE TAKING WHERE?

12              THE WITNESS:  I THINK THEY BELONG --

13              THE COURT:  DON'T TAKE THEM TO MR. GARLAND.  RIGHT

14   OVER HERE.  PUT THEM RIGHT UP HERE.  THANK YOU.

15              DEFENSE, CALL YOUR NEXT WITNESS.

16              MR. GARLAND:  YES.  CALL ROD WITTSTADT.

17              THE COURT:  ALL RIGHT.

18              COME ON UP, SIR.  IF YOU'LL JUST GO TO THE RIGHT OF

19   THE PODIUM, COME AROUND, I'LL SWEAR YOU IN.

20              MR. WITTSTADT:  I'M SORRY.  I DIDN'T HEAR YOU.

21              THE COURT:  JUST COME AROUND THROUGH THIS MAZE HERE

22   TO THE RIGHT OF THE PODIUM AND OVER TO THE WITNESS STAND, AND I

23   WILL SWEAR YOU IN, PLEASE.  THERE YOU GO.  GOOD AFTERNOON TO

24   YOU.

25              MR. WITTSTADT:  GOOD AFTERNOON, YOUR HONOR.

1          THE COURT:  RAISE YOUR RIGHT HAND.

2                    GERARD WITTSTADT,

3     HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

4     FOLLOWS:

5          THE COURT:  IF YOU WOULD PLEASE TAKE THAT WITNESS

6     SEAT.  AND ONCE YOU ARE SEATED, PLEASE FIRST STATE YOUR NAME

7     AND ALSO SPELL IT FOR THE RECORD.

8          THE WITNESS:  MY NAME IS GERARD WITTSTADT.  THE FIRST

9     NAME IS SPELLED G-E-R-A-R-D.  THE LAST NAME IS SPELLED

10    W-I-T-T-S-T-A-D-T.  MY ADDRESS IS 29 --

11         THE COURT:  THAT'S OKAY.

12         THE WITNESS:  OH, OKAY.

13         THE COURT:  HE'S A LAWYER FOR SURE.  ALL RIGHT.

14                    DIRECT EXAMINATION

15    BY MR. GARLAND:

16    Q.   AND ARE YOU A LAWYER, SIR?

17    A.   I AM.

18    Q.   ARE YOU THE BROTHER OF MARK WITTSTADT?

19    A.   THAT IS CORRECT.

20    Q.   PRIOR TO THE TIME THAT MR. HARDWICK LEFT THE LAW FIRM, YOU

21    WERE ONE OF THE SHAREHOLDERS IN THE LAW FIRM, CORRECT?

22    A.   THAT IS CORRECT.

23    Q.   IN 2014, AND DURING THE PRIOR YEARS IN WHICH YOU WERE A

24    SHAREHOLDER WITH MR. HARDWICK, DID YOU AND HE AND HIS

25    BROTHER -- AND YOUR BROTHER DISCUSS THE VALUE OF THE LAW FIRM?

1   A.   WELL, YES.  LET ME STATE, THOUGH, THAT I WAS ONLY AN

2   EQUITY PARTNER IN THAT FIRM SINCE JUNE OF 2013.  BUT THERE HAD

3   BEEN CONVERSATIONS WITH POTENTIAL BUYERS OF OUR BUSINESS PRIOR

4   TO THAT.

5   Q.   AND DID YOU TALK ABOUT THOSE POTENTIALS WITH YOUR BROTHER

6   AND MR. HARDWICK?

7   A.   YES, SIR.

8   Q.   NOW, WHEN YOU WERE DISCUSSING THE POTENTIAL VALUE OF THE

9   FIRM WITH YOUR BROTHER, DID YOU -- HAD Y'ALL DISCUSSED

10   POTENTIAL BUYERS?

11   A.   YES, SIR.

12   Q.   ALL RIGHT.  AND AT THAT TIME, BEFORE MR. HARDWICK LEFT,

13   WHAT DID YOU DISCUSS WITH YOUR BROTHER AND MR. HARDWICK AS TO

14   THE VALUE, THE POTENTIAL VALUE OF THE LAW FIRM?

15        MS. BARRON:  YOUR HONOR, I'M GOING TO OBJECT TO

16   HEARSAY, THAT ANYTHING THAT MR. HARDWICK OR MARK WITTSTADT

17   SAID.  MR. HARDWICK'S STATEMENTS ARE NOT BEING OFFERED --

18        MR. GARLAND:  THIS IS BEING OFFERED IN DIRECT

19   IMPEACHMENT, YOUR HONOR.

20        THE COURT:  IMPEACHMENT?

21        MR. GARLAND:  YES.  MAY I APPROACH?

22        THE COURT:  YES.

23        (WHEREUPON, A BENCH CONFERENCE OUT OF THE HEARING OF

24   THE JURY PROCEEDED AS FOLLOWS:)

25        MR. GARLAND:  MARK WITTSTADT SAID HE DID NOT HAVE

1   DISCUSSIONS WITH MR. HARDWICK OR WITH HIS BROTHER CONCERNING

2   THE VALUE OF THE COMPANY.  AND THIS IS DIRECT IMPEACHMENT.  I'M

3   ASKING --

4           THE COURT:  OKAY.  SO ARE YOU ASKING WHAT HIS

5   STATEMENTS WERE?  WHICH YOU CAN CERTAINLY ASK.  ARE YOU ASKING

6   WHAT HIS STATEMENTS WERE?

7           YOU CAN ASK HIM IF HE HAD THESE DISCUSSIONS WITH

8   THESE OTHER PEOPLE.  YOU CAN ASK HIM WHAT HIS STATEMENTS WERE.

9   BUT ARE YOU TRYING TO GET IN --

10          MR. GARLAND:  I'M ESTABLISHING THAT THE CONVERSATIONS

11  TOOK PLACE ABOUT THE SUBJECT MATTER, NOT -- THE IMPEACHMENT IS

12  THAT MR. MARK WITTSTADT SAID THAT THEY DIDN'T.

13          THE COURT:  OKAY.  AND IS MR. MARK WITTSTADT -- AM I

14  CORRECT THAT HE IS STILL -- HE'S NOT BEEN EXCUSED BECAUSE WE

15  TOLD HIM HE COULD BE RECALLED; IS THAT CORRECT?

16          MS. BARRON:  YES.

17          MR. GARLAND:  HE HAPPENS TO BE UNDER OUR SUBPOENA.

18          THE COURT:  IS THAT CORRECT, MS. NOVAY?

19          ALL RIGHT.  I OVERRULE.  THANK YOU.

20          (WHEREUPON, PROCEEDINGS RESUMED IN OPEN COURT AS

21  FOLLOWS:)

22          THE COURT:  OVERRULED.

23          THE WITNESS:  WOULD YOU REPEAT THE QUESTION, SIR?

24  BY MR. GARLAND:

25  Q.  YES.  DID YOU HAVE DISCUSSIONS WITH YOUR BROTHER AND WITH

1　MR. HARDWICK CONCERNING THE POSSIBLE VALUE OF THE FIRM?

2　A.　YES, WE DID.

3　Q.　ALL RIGHT.　AND DID YOU DISCUSS THE FACT THAT THE THREE OF

4　YOU THOUGHT TOGETHER THAT IT WAS WORTH ABOUT $70 MILLION?　DID

5　YOU HAVE SUCH A DISCUSSION WITH YOUR BROTHER AND MR. HARDWICK?

6　A.　THAT BASICALLY WAS MY RECOLLECTION, SIR.　HOWEVER, I'VE

7　BEEN SITTING IN THE HALLWAY FOR THREE HOURS THINKING NOTHING

8　ABOUT THIS QUESTION.

9　　　AND WHEN YOU SAY THE FIRM, THE LAW FIRM COULD NOT BE SOLD.

10　ONLY LAWYERS MAY OWN A LAW FIRM.　SO GOING BACK AND THINKING

11　ABOUT IT, WE WERE SELLING THE BACK OFF -- EXCUSE ME, THE BACK

12　OFFICE OPERATION, THE NONLEGAL PIECE OF THE TITLE BUSINESS AND

13　OF A PORTION OF THE FORECLOSURE BUSINESS.

14　Q.　THANK YOU FOR EXPLAINING IT.

15　　　AND YOU HAD DISCUSSIONS, DID YOU NOT, WITH YOUR BROTHER

16　AND MR. HARDWICK IN WHICH Y'ALL VENTURED THE IDEA THAT THE

17　VALUE WAS $70 MILLION, CORRECT?

18　A.　OF THE PORTION THAT WE WERE --

19　Q.　OF THE PORTION YOU JUST OUTLINED.

20　A.　THAT'S WHAT I RECALL, YES.

21　Q.　NOW, DID YOU HAVE CONTACT WITH A POTENTIAL BUYER FROM

22　SAN FRANCISCO?

23　A.　SO AGAIN --

24　Q.　YES.

25　A.　-- GIVING ME TIME TO THINK WHILE I WAS OUT IN THE HALL,

1    THAT BUYER WAS ACTUALLY FROM NORTH OF SAN FRANCISCO, FROM

2    NORTHWEST PACIFIC REGION.  THEY HAD HIRED A COMPANY OUT OF

3    SAN FRANCISCO, WHICH I NOW REMEMBER TO BE GOLDEN GATE CAPITAL.

4    Q.   AND WHAT WAS THAT POTENTIAL BUYER'S RELATIONSHIP TO GOLDEN

5    GATE CAPITAL?

6    A.   THE POTENTIAL BUYER HAD HIRED GOLDEN GATE CAPITAL TO DO

7    DUE DILIGENCE ON OUR COMPANY -- IN OTHER WORDS, TO LOOK THROUGH

8    THE BOOKS AND RECORDS -- TO DETERMINE FOR THEIR CLIENT WHAT

9    THEY MIGHT BE WILLING TO OFFER US.

10   Q.   AND DO YOU RECALL THAT YOU THOUGHT THERE WAS AN OFFER, OR

11   IT WAS VERY CLOSE TO BECOMING AN OFFER AT SOME POINT IN TIME?

12   A.   YES.  MR. HARDWICK HAD BEEN COMMUNICATING TO US THAT HIS

13   NEGOTIATIONS WITH EITHER GOLDEN GATE CAPITAL OR THE POTENTIAL

14   BUYER THEMSELVES WAS GETTING VERY CLOSE.  AND IN FACT, WE

15   TRAVELED TO ATLANTA THINKING THAT WE WERE ACTUALLY GOING TO

16   SELL THE BUSINESS.

17   Q.   AND WHEN WOULD THAT BE, TO YOUR BEST RECOLLECTION?

18   A.   CERTAINLY AFTER 2010, AND WAY BEFORE -- AND BEFORE JUNE OF

19   2013.

20   Q.   DO YOU REMEMBER ANYTHING ABOUT THE TYPE OF PEOPLE THAT

21   GOLDEN GATE CAPITAL EMPLOYED TO DO THE DUE DILIGENCE?

22   A.   I DO.  I WAS VERY IMPRESSED WITH GOLDEN GATE CAPITAL.  I

23   ACTUALLY GOOGLED THEIR NAME AND LOOKED AT THE -- THEIR

24   EMPLOYEES' RESUME, IF YOU WILL.  MANY OF THOSE PEOPLE WERE

25   CERTAINLY A LOT SMARTER THAN I.  THEY HAD ATTENDED COLLEGES,

1   BUSINESS SCHOOLS SUCH AS WHARTON BUSINESS SCHOOL AT THE

2   UNIVERSITY OF PENNSYLVANIA, CALIFORNIA BERKELEY, AND SCHOOLS

3   LIKE THAT.  THESE GUYS WERE AT THE TOP OF THEIR BUSINESS,

4   GOLDEN GATE CAPITAL.

5   Q.   WAS ALSO ANOTHER COMPANY THAT WAS IN CONTACT OR THAT YOU

6   WERE AWARE OF ALSO LOOKING TO GET INVOLVED IN POTENTIALLY

7   HAVING SOME FORM OF ACQUISITION OF THE THINGS THAT MIGHT BE FOR

8   SALE?

9   A.   THERE WAS ANOTHER COMPANY THAT WE HAD BEEN TOLD WAS

10  INTERESTED IN BUYING THE BACK OFFICE.  I CANNOT REMEMBER THE

11  NAME OF THAT COMPANY.  IT NEVER SEEMED TO BE VERY SERIOUS AND

12  ONLY LASTED FOR A VERY SHORT TIME BEFORE IT WAS NOT EVEN AN

13  ISSUE.

14  Q.   WERE YOU AWARE OF MR. HARDWICK'S ASPIRATIONS TO TAKE

15  LANDCASTLE PUBLIC?

16  A.   YES.

17  Q.   ALL RIGHT.  AND THAT END GOAL WAS SOMETHING THAT YOU WERE

18  INTERESTED IN, WAS IT NOT?

19  A.   I'M SORRY.  THAT I WAS INTERESTED IN?

20  Q.   YES.

21  A.   WHEN MR. HARDWICK FIRST TRAVELED TO BALTIMORE IN LATE

22  2007, BY WAY OF PRIVATE JET, HE TOLD US THAT, IN THE END, HIS

23  GOAL WAS GOING TO BE TO HAVE A PUBLICLY TRADED TITLE INSURANCE

24  COMPANY.

25  Q.   I WANT TO MOVE TO ANOTHER TOPIC.

1  DID YOU AND MR. HARDWICK AND YOUR BROTHER HAVE SOME

2  DISCUSSIONS ABOUT A GROUP IN MAYBE MISSISSIPPI OR LOUISIANA

3  WHERE THERE WAS A TITLE COMPANY AND NAT WAS TALKING ABOUT

4  PURCHASING THEM?

5  A.  NAT HAD TOLD US THAT, YES, THERE WAS A COMPANY IN ONE OF

6  THE EXTREME SOUTHERN STATES, MAYBE -- MISSISSIPPI IS STICKING

7  IN MY HEAD.  IT WAS A SMALL TITLE INSURANCE COMPANY, AND THAT

8  HE WAS TRAVELING TO MISSISSIPPI AND TALKING TO THE OWNER ABOUT

9  OUR COMPANY PURCHASING THAT COMPANY.

10 Q.  WAS THAT -- I THINK I USED THE WRONG TERMS.  WAS THAT AN

11 UNDERWRITER?

12 A.  WAS IT AN UNDERWRITER?  I DON'T RECALL IF IT WAS AN

13 UNDERWRITING COMPANY.  BUT IT WAS A TITLE INSURANCE COMPANY,

14 NOT LIKE WE WERE A TITLE COMPANY.

15 Q.  ONE THAT COULD --

16 A.  ACTUALLY INSURE TITLE.

17 Q.  A COMPANY THAT CAN INSURE TITLES.  WE NORMALLY REFER --

18 THEY ARE OFTEN REFERRED TO AS UNDERWRITERS, ARE THEY NOT?

19 A.  YES, THEY ARE.

20     MR. GARLAND:  THAT'S ALL THE QUESTIONS I HAVE.

21     THE COURT:  OKAY.  ANY CROSS?

22     MS. BARRON:  YES, YOUR HONOR.

23     THE COURT:  OKAY.

24     MR. GARLAND:  COULD I HAVE JUST A MOMENT, PLEASE?

25     THAT'S ALL I HAVE.

1    THE COURT:  ALL RIGHT.  MS. BARRON, COME BACK.

2                CROSS-EXAMINATION

3    BY MS. BARRON:

4    Q.   GOOD AFTERNOON, MR. WITTSTADT.

5    A.   HELLO.

6    Q.   MR. GARLAND WAS ASKING YOU SOME QUESTIONS ABOUT THE VALUE

7    OF THE FIRM BACK IN -- I THINK YOU SAID 2010; IS THAT RIGHT?

8    A.   I WANT TO SAY THAT THAT'S WHEN THOSE -- WHEN WE STARTED

9    TALKING TO PROBABLY -- PROBABLY THAT COMPANY IN THE PACIFIC

10   NORTHWEST.  SOMETIME IN THAT ERA.

11   Q.   I WANT TO ASK YOU ABOUT THE VALUE OF YOUR FIRM ON

12   AUGUST 17TH, 2014.  THAT WAS THE DAY -- OR AROUND THE TIME

13   WHERE YOU LEARNED THE FINAL NUMBER OF WHAT Y'ALL BELIEVED TO BE

14   THE MISSING MONEY, CORRECT?

15                MR. GARLAND:  OBJECTION.  BEYOND THE SCOPE.

16                THE COURT:  OVERRULED.

17                THE WITNESS:  THAT'S CORRECT.

18   BY MS. BARRON:

19   Q.   WHAT'S THE VALUE OF A FIRM THAT IS MISSING ROUGHLY

20   $30 MILLION FROM ITS ESCROW ACCOUNTS?

21   A.   NOTHING.

22   Q.   MR. GARLAND ASKED YOU ABOUT MR. HARDWICK TRAVELING TO

23   MISSISSIPPI TO COURT THIS NEW BUSINESS.  I WANT TO ASK YOU

24   ABOUT THAT TRAVELING.  YOU'RE AWARE THAT HE FLEW ON A PRIVATE

25   JET TO ATTEND THAT MEETING, CORRECT?

1  A.  NO.  I DON'T KNOW IF HE FLEW ON A PRIVATE JET, BUT NAT HAD

2  TOLD US THAT HE BASICALLY REFUSED TO FLY ON COMMERCIAL

3  AIRLINES.

4  Q.  AND WHY DID HE TELL YOU HE REFUSED TO FLY ON COMMERCIAL

5  AIRLINES?

6  A.  HE TOLD US ESSENTIALLY THAT HE WAS CLAUSTROPHOBIC AND THAT

7  HE DIDN'T LIKE SITTING WITH THE PUBLIC.

8  Q.  AND DID YOU HAVE A SPECIFIC CONVERSATION WITH MR. HARDWICK

9  ABOUT HOW, UNDER THE PARTNERSHIP AGREEMENT, THE FIRM WOULD NOT

10  PAY FOR HIS PRIVATE JET TRAVEL?

11  A.  ABSOLUTELY.

12  Q.  WHEN DID THAT CONVERSATION OCCUR?

13  A.  ON MANY OCCASIONS, WHENEVER WE WOULD HAVE BUSINESS

14  MEETINGS CONCERNING EXECUTION OF NEW CORPORATE DOCUMENTS.  BUT

15  IT FIRST CAME UP IN AND ABOUT 2010, '11 AREA, I THINK.

16      BUT SPECIFICALLY, WE TOLD MR. HARDWICK THAT IF HE WANTED

17  TO FLY ON A PRIVATE JET, GO AHEAD AND DO SO, BUT THAT WE DID

18  NOT THINK THAT THE FIRM SHOULD BE INDEBTED FOR THAT.  AND WE

19  TOLD HIM, AND HE AGREED, THAT HE WOULD PURCHASE THE PRIVATE JET

20  HIMSELF, AND HE COULD SEEK REIMBURSEMENT FROM THE FIRM FOR

21  BASICALLY THE HIGHEST FIRST CLASS TICKET THAT WOULD BE

22  AVAILABLE.  AND I THINK WE EVEN WENT TO TWO TICKETS SO THAT HE

23  COULD TAKE TWO SEATS IN FIRST CLASS.

24      MS. BARRON:  THANK YOU, SIR.

25      THE COURT:  ANYTHING FURTHER, MR. GARLAND?

1      MR. GARLAND:  NOTHING FURTHER.

2           THANK YOU, MR. WITTSTADT.

3           THE COURT:  OKAY.  THANK YOU, SIR.  THANK YOU SO

4      MUCH.

5           THE WITNESS:  YOU'RE WELCOME.

6           THE COURT:  SORRY ABOUT THAT THREE-HOUR WAIT.  WE'VE

7      BEEN HERE A LONG TIME, TOO.

8           THE WITNESS:  I UNDERSTAND.

9           THE COURT:  ALL RIGHT.

10          MR. PHILLIPS:  YOUR HONOR, IS THIS WITNESS EXCUSED

11     AND CAN STAY, IF HE CHOOSES TO DO SO?

12          THE COURT:  YOU ALL ASKING -- YOU ALL SUBPOENAED HIM,

13     TOO?

14          MR. PHILLIPS:  NO.

15          THE COURT:  OH, YOU'RE ASKING FOR HIM TO BE RELEASED?

16     YES.  YES.

17          YOU ARE NO LONGER SUBJECT TO THE RULE, SIR, SO

18     WHETHER OR NOT YOU REMAIN IN THE COURTROOM IS UP TO YOU.

19          THE WITNESS:  THANK YOU.

20          THE COURT:  ALL RIGHT.  THANK YOU.  GOT IT.  ALL

21     RIGHT.  THANK YOU.

22          MR. GARLAND:  YOUR HONOR, MAY WE APPROACH THE BENCH?

23          THE COURT:  YES.

24          (WHEREUPON, A BENCH CONFERENCE OUT OF THE HEARING OF

25     THE JURY PROCEEDED AS FOLLOWS:)

1         MR. GARLAND:  YOUR HONOR, WE HAVE RUN OUT.  WE HAVE

2  BEEN TRYING TO MOVE THESE QUICKLY.

3         THE COURT:  I AM PLEASED WITH THE PACE.  TELL ME,

4  GIVE ME AN IDEA OF WHAT YOU HAVE LEFT.  GINGRAS?

5         MR. GARLAND:  I HAVE SHELDON KAY.

6         THE COURT:  OKAY.

7         MR. GARLAND:  AND THEN I HAVE THE 404(B) EVIDENCE

8  WHICH I WOULD PUT IN, TOO.  THIS IS --

9         THE COURT:  ON ASHA MAURYA.

10        MR. GARLAND:  YES.  IT'S AFFIRMATIVE DEFENSE TO SHOW

11  THAT SHE WAS IN THE POSITION TO --

12        THE COURT:  I DON'T WANT TO GO INTO ALL THAT,

13  MR. GARLAND.  LET ME JUST ASK SPECIFIC QUESTIONS.

14        SO YOU'RE SAYING THE WITNESSES THAT YOU WOULD LIKE TO

15  CALL OR THAT YOU PLAN TO CALL ARE SHELDON KAY, J.P. GINGRAS.

16  HOW MANY 404 WITNESSES ARE YOU TRYING TO PUT IN?

17        MR. GARLAND:  JUST PUTTING IN TWO OF THE CRIMES AND

18  FOUR PEOPLE, TWO ON THE FIRST ONE, TWO ON THE SECOND ONE.

19        THE COURT:  YOU JUST LOST ME.  TOTAL OF FOUR ON THE

20  404(B)?

21        MS. NOVAY:  YES.

22        MR. GARLAND:  TOTAL OF FOUR.

23        THE COURT:  OKAY.

24        MR. GARLAND:  THE FIRST ONE IS CALLED SODEXO.

25        THE COURT:  I DON'T WANT ALL THAT RIGHT NOW.

1          MS. NOVAY:  WE MIGHT FINISH FRIDAY.

2          THE COURT:  CAN YOU ME TELL ME WHAT YOU HAVE IN ROUGH

3     FORM?  POTENTIAL 404 AND SHELDON KAY?

4          MS. NOVAY:  I THINK THERE ARE POTENTIAL -- BOB

5     SCHNEIDER.

6          MR. GARLAND:  AND ANOTHER EXECUTIVE.  WE ARE TRYING

7     TO FIGURE OUT THAT FROM --

8          MS. NOVAY:  MHS PEOPLE.

9          MR. GARLAND:  FROM FIDELITY.

10         THE COURT:  OKAY.  SO --

11         MR. GARLAND:  WE HAVE SOME OTHERS THAT WE ARE

12    CONSIDERING, YOUR HONOR.

13         THE COURT:  THAT'S A LOT, THEN.  WHY -- SO WHY DON'T

14    YOU HAVE SOMEONE ELSE THAT'S READY TO GO TODAY?

15         MR. GARLAND:  WE TRIED TO GET THEM ALL HERE.  WE

16    CALLED MORE, SO --

17         THE COURT:  SO DO YOU HAVE SOME THAT ARE CONFIRMED

18    FOR TOMORROW?

19         MR. GARLAND:  YES, WE DO.

20         THE COURT:  ALL RIGHT.  BECAUSE TOMORROW WAS THE DAY

21    WE NEED TO WORK LATE.  I MEAN, WE HAVE -- WE DON'T -- WE CAN'T

22    STAY -- WE COULDN'T STAY LATE TODAY ANYWAY.  WE CAN'T STAY LATE

23    FRIDAY, AND WE DON'T HAVE MONDAY AT ALL.  SO I WANT TO KEEP IT

24    MOVING.

25         MR. GARLAND:  WE ARE DOING OUR VERY BEST.  WE HAVE

1    PEOPLE DRIVING UP, MAN WITH HIS DOG AND WIFE.  THEY ARE ON HIS

2    VACATION, IS DRIVING BACK.

3              THE COURT:  I UNDERSTAND.

4              MS. LOEB:  TWO PEOPLE THAT HAD A CONFLICT TODAY.

5              THE COURT:  OKAY.  I UNDERSTAND.

6              MS. NOVAY:  AND WE HAVE TO ACCOMMODATE NOT JUST THE

7    WITNESS, THEIR ATTORNEYS, TOO.

8              THE COURT:  YES.  I'M GOING TO GIVE YOU SOME LEEWAY.

9    IT'S NOT AN UNREASONABLE REQUEST AT ALL.

10             (WHEREUPON, PROCEEDINGS RESUMED IN OPEN COURT AS

11   FOLLOWS:)

12             THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, WE ARE

13   GOING TO GO AHEAD -- WE'VE MOVED AT A GOOD PACE TODAY.  WE ARE

14   GOING TO GO AHEAD AND BE RELEASED.  IT'S ABOUT 4:18.  AND ASK

15   THAT YOU BE BACK AT 9:20 TOMORROW.  AND, AGAIN, TOMORROW WE'LL

16   BE READY TO GO A LITTLE LATER THAN NORMAL.

17             SO THANK YOU AND HAVE A GREAT EVENING.  THANK YOU SO

18   MUCH.

19             (WHEREUPON, THE JURY RETIRED FROM THE COURTROOM AT

20   4:19 P.M., AND THE FOLLOWING PROCEEDINGS WERE HAD.)

21             THE COURT:  ALL RIGHT.  HAVE A SEAT, PLEASE.

22             OKAY.  I WANT TO GET -- AND I'M SORRY FOR CUTTING YOU

23   OFF THERE, MR. GARLAND, BUT I DIDN'T WANT TO HOLD THE JURY THAT

24   LONG WHILE YOU WERE EXPLAINING, GIVING ME KIND OF A PREVIEW OF

25   WHAT YOU ALL ANTICIPATE IS COMING.  BUT I DO WANT TO GET A

1    BETTER IDEA.

2         I JUST ASKED ABOUT HOW MANY PEOPLE THAT YOU

3    ANTICIPATE CALLING STILL, AND SEVERAL NAMES WERE LISTED.  BUT

4    THEN I ALSO HEARD I THINK MS. NOVAY SAY THAT YOU THINK YOU CAN

5    BE DONE BY FRIDAY.  SO I'M A LITTLE CONFUSED BASED ON THE

6    NUMBER THAT I HEARD TO HEAR BY FRIDAY.

7         SO COULD YOU GIVE ME A BETTER IDEA?  AND, AGAIN, I'M

8    NOT TRYING TO GET YOU TO LAY OUT YOUR WHOLE CASE, BUT JUST GIVE

9    ME A BETTER IDEA.

10        MR. GARLAND:  I THINK WE HAVE SOME CONFUSION ABOUT

11   WHAT ROADS WE'RE GOING DOWN RIGHT NOW AND WHAT WE'RE NOT.

12        THE COURT:  I'M SORRY.  COULD YOU TALK INTO THE MIKE

13   JUST TO MAKE SURE I CAN HEAR YOU?

14        MR. GARLAND:  I'M SORRY.

15        THE COURT:  NO, THAT'S OKAY.

16        MR. GARLAND:  MY VOICE FADES IN THE AFTERNOON.

17        THE COURT:  THAT'S ALL RIGHT.

18        MR. GARLAND:  WE ARE IN A STATE OF SOME CONFUSION OF

19   WHETHER TO HAVE CERTAIN PEOPLE COME AND INCUR THAT EXPENSE, AND

20   WE'RE TRYING TO GET THAT FIGURED OUT.  THE WITNESSES WE'VE

21   TALKED ABOUT APPEAR TO BE THE SUBSTANTIAL WITNESSES.  AND THE

22   DECISION OF WHETHER MR. HARDWICK TESTIFIES OR DOESN'T HAS NOT

23   YET BEEN MADE.

24        AND TO REALLY, IN DETAIL, ANSWER YOUR QUESTION, WE

25   NEED TO GO SIT DOWN -- WE KNOW WE HAVE ENOUGH, I BELIEVE, TO

1  FULLY FILL UP TOMORROW, I THINK, WITH THE TWO EXPERTS.  AND SO

2  I THINK WE'VE -- WITHOUT GOING BACK -- THE PEOPLE THAT ARE

3  TRYING TO KEEP UP WITH OUR WITNESSES AND FIGURING IT OUT.  BUT

4  I THINK WE WILL GO INTO FRIDAY WITH OUR TESTIMONY.

5          THE COURT:  OKAY.  AND I WAS THINKING FROM THE LIST

6  THAT YOU REPRESENTED HERE AT THE BENCH THAT YOU WOULD

7  DEFINITELY GO INTO FRIDAY.  BUT IT SOUNDED LIKE YOU WOULD EVEN

8  GO BEYOND, BECAUSE THERE WERE A LOT OF NAMES LISTED.

9          MR. GARLAND:  WE'RE MOVING PRETTY FAST.  WE GOT SIX,

10 SEVEN TODAY.  I CAN'T REMEMBER EXACTLY.  AND I THINK --

11         THE COURT:  SO BASED ON THE LENGTH THAT YOU WOULD --

12         MR. GARLAND:  YEAH, THE LENGTH.  WE HAVE HAD A LOT OF

13 WITNESSES, A LITTLE -- DON'T HAVE ONE MUCH SHORTER THAN THE

14 LAST ONE.  SO WE'RE TRYING TO FIGURE IT OUT.  BUT I ANTICIPATE

15 THAT WE WOULD GO INTO FRIDAY.  THAT'S MY ANTICIPATION.  BUT

16 WE'RE GOING TO HAVE PEOPLE HERE TILL WE --

17         THE COURT:  OKAY.  AND MY ONLY CONCERN IS -- I DON'T

18 MIND.  I DON'T THINK IT'S AN UNREASONABLE REQUEST AT ALL, SO

19 IT'S OKAY THAT WE ENDED A LITTLE EARLIER TODAY THAN WE

20 EXPECTED.

21         BUT WE DO HAVE SOME CONSTRAINTS ON US.  WE CAN ONLY

22 GO UP TO 5 -- WELL, 5:30 WOULD HAVE BEEN TODAY.  WE CAN GO LATE

23 TOMORROW.  SO I ANTICIPATE THAT WE WILL, BECAUSE ON FRIDAY WE

24 CANNOT GO LATE AND MONDAY WE'RE NOT HERE AT ALL.

25         SO I WANT TO MAKE SURE THAT DAY AFTER DAY WE ARE NOT

1    IN A POSITION OF HAVING TO STOP EARLY, ESPECIALLY IF IT IS

2    POSSIBLE THAT WE COULD WRAP THIS TRIAL UP THIS WEEK, OR AT

3    LEAST GET IT TO THE JURY BY THE END OF THIS WEEK.

4            SO, FIRST OF ALL, IS THERE ANYTHING THAT YOU NEED

5    FROM THE COURT IN TERMS OF ASSISTANCE AND WITNESS MANAGEMENT OR

6    GETTING ANYONE HERE, OR IS IT JUST SOMETHING THAT YOU ALL NEED

7    TO WORK OUT ON YOUR OWN AND DECIDE EXACTLY WHO YOU'RE GOING TO

8    CALL?

9            MR. GARLAND:  DIFFERENT PEOPLE REACT DIFFERENT WAYS

10   AND HAVE DIFFERENT ATTITUDES.  AND SOME OF THEM YOU HAVE TO

11   SAY, YOU HAVE TO BE HERE.

12           THE COURT:  I UNDERSTAND.  IT'S NOT EASY FOR YOU TO

13   GET WITNESSES.  I UNDERSTAND.  I UNDERSTAND.

14           MR. GARLAND:  SO WE'RE JUST DOING OUR VERY BEST.

15           THE COURT:  OKAY.  ALL RIGHT.  ALL RIGHT.  WELL, IF

16   YOU ALL ARE ABLE TO GIVE ME MORE CLARITY IN THE MORNING,

17   BECAUSE I WANT TO MAKE SURE THAT WE ARE -- THAT, AGAIN, JUST SO

18   THAT I'M KEEPING MY EYE ON THINGS FOR PURPOSES OF LETTING THE

19   JURY KNOW WHAT TO ANTICIPATE, THAT WOULD BE GREAT.

20           NOW, I DO WANT TO ASK YOU ABOUT THESE 404(B)

21   WITNESSES THAT YOU'VE SAID THAT YOU INTEND TO CALL.

22           MR. GARLAND:  YES.

23           THE COURT:  AND THERE IS STILL A PENDING MOTION WITH

24   RESPECT TO THAT ISSUE.  SO THIS MIGHT -- WE MIGHT BE GETTING

25   CLOSE TO WHEN WE NEED TO TALK ABOUT THAT.

1          YOU HAVE WHO THAT YOU INTEND TO CALL IN THAT CONTEXT?

2    OR FROM WHERE, AT LEAST?

3          MR. GARLAND:  WE ARE BRINGING WITNESSES IN RESPECT TO

4    THE CRIMES SHE COMMITTED --

5          THE COURT:  MS. MAURYA.

6          MR. GARLAND:  -- MS. MAURYA, EXCUSE ME, IN SODEXO.

7    THAT WAS THE GROUP AT GEORGIA TECH.  WE ANTICIPATE TWO

8    WITNESSES, HER SUPERIORS, AND WE EXPECT TO PROVE THE ELEMENTS

9    OF OUR DEFENSE THAT SHE ENGAGED IN THOSE TYPE OF THINGS THAT

10   WOULD LEAVE SOMEONE UNKNOWING.  AND SO THAT'S OUR DEFENSE.  AND

11   THAT'S THAT ONE.

12         AND THEN WE ANTICIPATE BRINGING WITNESSES FROM

13   PROCARE, WHICH WE'LL TALK ABOUT SIMILAR CRIMES SHE COMMITTED

14   AFTER SHE HAD MADE HER DEAL WITH THE GOVERNMENT AND WHILE SHE

15   WAS -- I'LL JUST SHOW WHAT THEY -- WHAT SHE DID THERE TO SHOW

16   THE SIMILAR TYPE OF SCHEME AND ITS EFFECT AND HOW SHE CARRIED

17   IT OUT IN THE SAME MANNER THAT, WE CONTEND THE EVIDENCE IS

18   SHOWING AND THE INFERENCES CAN BE MADE FROM IT, THAT SHE DID

19   HERE.  THERE'S A LOT OF CIRCUMSTANTIAL EVIDENCE ABOUT HER AND

20   WHO KNEW WHAT WHEN.  AND THIS SHOWS HER MANIPULATIVE SKILL

21   AND --

22         THE COURT:  OKAY.  HOW MANY PEOPLE FROM PROCARE?

23         MR. GARLAND:  TWO.  I THINK IT'S TWO.  I NEED TO

24   CHECK.  IT'S TWO FROM PROCARE.  AND THAT'S IT, OTHER THAN

25   WHETHER OR NOT WE HAVE THE ABILITY TO GET WHAT WE HAVE BEEN

1 TOLD INSOFAR AS BRADY MATERIAL CONCERNING OTHER EMPLOYEES

2 AND -- I MEAN, OTHER PLACES THAT SHE STOLE FROM.

3        THE GOVERNMENT HAS ASSERTED AND I HAVE ASSERTED THAT

4 SHE STOLE FROM OTHER PLACES.  I WANT TO FIGURE OUT HOW TO GET

5 IN -- WHICH MAY MEAN I NEED TO CALL ONE OF THE FBI AGENTS WHO

6 WAS PRESENT AT ONE OF THE INTERVIEWS WITH MS. MAURYA IN WHICH

7 SHE ADMITTED HAVING STOLEN FROM THE OTHER BUSINESSES SHE WORKED

8 FOR, AT LEAST THREE OTHERS.  AND -- BUT THAT WOULD BE A BRIEF

9 WITNESS, JUST TO GET THE GOVERNMENT AGENT TO SAY SHE SAID SHE

10 STOLE.

11        I DON'T KNOW WHICH U.S. ATTORNEY DID THE INTERVIEW.

12 I HAVE THE IMPRESSION IT MIGHT BE MR. GILFILLAN.  AND I DON'T

13 KNOW WHICH AGENT, BUT -- AND IT MAY BE THAT WE COULD ENTER A

14 STIPULATION AND SHORTEN THAT UP, THAT SHE MADE SUCH A

15 STATEMENT.  BUT I WANT TO PROVE THAT.

16        AND THAT'S OUR 404(B) PRESENTATION.

17        THE COURT:  YES, SIR.  OKAY.

18        GOVERNMENT, YOU HAVE FILED A MOTION, WHICH I HAVE NOT

19 LOOKED AT CLOSELY SINCE IT WAS FILED, BUT I THINK AT THE TIME

20 THE MOTION WAS FILED, THE 404 -- WITH RESPECT TO 404(B) ON ASHA

21 MAURYA, I THINK IT WAS WHILE UNDER THE ASSUMPTION THAT SHE

22 WOULD BE TESTIFYING AT THAT TIME.  I WILL LOOK AT THAT MOTION

23 THIS EVENING.

24        BUT IS ANYTHING DUE TO CHANGE IN WHATEVER YOU HAD IN

25 THERE NOW THAT YOU HAVE RESTED WITHOUT HAVING CALLED HER?

1     MR. GILFILLAN:  YOUR HONOR, I THINK WHAT'S CHANGED IS

2   THAT, PRIOR TO TRIAL, THERE WAS AN ISSUE ABOUT THINGS THAT

3   MIGHT COME IN UNDER AN IMPEACHMENT THEORY, OR RULE 608.  SHE

4   HASN'T TESTIFIED, AND SO WHATEVER THE DEFENSE WAS THINKING

5   ABOUT THAT THOSE THINGS COME IN, THEY DON'T COME IN.

6     I THINK OUR ARGUMENT, OUR ARGUMENT THAT SODEXO AND

7   PROCARE ARE NOT SUFFICIENTLY SIMILAR TO THIS CASE IS STILL THE

8   ISSUE, THAT WE WOULD SAY THAT THIS IS -- IT IS NOT RELEVANT.

9   IT ISN'T SIMILAR TO THIS CASE BECAUSE THE AMOUNTS IN THAT CASE

10  ARE DIFFERENT.  AND ALSO, THE OTHER ISSUE OF RULE 403, HAVING A

11  LITTLE MINI-TRIAL ABOUT WHAT MS. MAURYA DID AT SODEXO AND

12  PROCARE -- AND ALTHOUGH MR. GARLAND REFERS TO IT AS CRIMINAL

13  REPEATEDLY, SHE WAS NEVER CHARGED WITH THE FIRST ONE, AT

14  SODEXO.  SHE WAS CHARGED IN CONNECTION WITH THE OTHER ONE, AT

15  PROCARE.

16     BUT I THINK IT'S IMPORTANT FOR THE COURT TO THINK

17  ABOUT THE TIMING OF THESE TWO EVENTS AS WELL.  ONE, THE SODEXO,

18  PRECEDED HER EMPLOYMENT AT MHS BY AT LEAST FIVE YEARS, IF

19  NOT -- RIGHT.  AND MAYBE EVEN MORE THAN TEN YEARS PRIOR TO

20  HER -- WE'LL FIGURE IT OUT.  IT PREDATES HER EMPLOYMENT AT

21  MORRIS HARDWICK SCHNEIDER BY A GOOD PERIOD OF TIME.  AND THEN

22  THE DOLLAR AMOUNT IS NOT -- IS VERY DIFFERENT.

23     AND THEN THE PROCARE COMES AFTER SHE'S UNDER

24  INVESTIGATION IN THIS CASE.  SHE SIGNS A PLEA AGREEMENT, IS

25  AGREEING TO PLEAD GUILTY, AND GOES OUT AND GETS A NEW JOB.  AND

1    SHE STOLE SOMETHING LIKE 10 GRAND OR 12 GRAND. AND WE WOULD

2    SUBMIT THAT'S NOT SUFFICIENTLY SIMILAR TO THIS CASE, WHICH --

3    THIS CASE. BECAUSE IN THIS CASE, SHE STOLE SOMETHING LIKE

4    900,000.

5          THE COURT: I CAN TELL YOU NOW THE AMOUNTS WOULD NOT

6    BE -- JUST BECAUSE THEY ARE DIFFERENT AMOUNTS WOULD NOT MAKE ME

7    SAY THAT THEY ARE DISSIMILAR ENOUGH. I MEAN, BECAUSE I DON'T

8    KNOW OTHER FACTORS. I DON'T KNOW IF SHE HAD ACCESS TO MORE IN

9    ONE SITUATION THAN THE OTHER. SO THAT BY ITSELF WOULD NOT MAKE

10    ME SAY, OH, THESE ARE NOT SIMILAR ENOUGH.

11          MR. GILFILLAN: LET ME ADDRESS ANOTHER ISSUE.

12          THE COURT: OKAY.

13          MR. GILFILLAN: AND I THINK MAYBE THIS ONE IS MORE

14    IMPORTANT. AND THAT IS THE FACT THAT MS. MAURYA, IN THIS CASE

15    AT MORRIS HARDWICK SCHNEIDER, REALLY ENGAGED IN TWO SEPARATE,

16    TWO SEPARATE SCHEMES. ONE WAS HERSELF, WHERE SHE DID THIS

17    THING WITH ALYCE RITCHIE, WHERE SHE GOT ALYCE RITCHIE TO PAY

18    AMEX BILLS AND IT WAS REALLY ASHA MAURYA'S AMEX BILL. AND SHE

19    GOT SOME OTHER THINGS PAID AS WELL. SO SHE DID THAT.

20    MR. HARDWICK WAS NOT INVOLVED IN THAT.

21          HER INVOLVEMENT WITH MR. HARDWICK THE COURT HAS HAD A

22    LOT OF EVIDENCE ON IN TERMS OF MR. HARDWICK DIRECTS HER TO MOVE

23    MONEY, SHE MOVES IT; PROVIDING INFORMATION TO THE PARTNERS,

24    MR. HARDWICK'S PARTNERS. OF COURSE, WELL AWARE OF ALL THAT

25    STUFF.

1          AND SO WE DON'T THINK THAT THE ACTIVITIES AT PROCARE

2    AND SODEXO ARE SUFFICIENTLY SIMILAR -- THEY ARE SIMILAR IN WHAT

3    SHE DID FOR HERSELF IN THIS CASE, BUT THEY'RE NOT --

4          THE COURT:  NOT SIMILAR ENOUGH FOR THE CONSPIRACY IN

5    WHICH HE'S INVOLVED.

6          MR. GILFILLAN:  YES, YOUR HONOR.

7          THE COURT:  OKAY.

8          MR. GILFILLAN:  AND THEN LET ME JUST ALSO ADDRESS

9    WHAT MR. GARLAND SAID ABOUT CALLING AN AGENT TO TESTIFY WHAT

10   ASHA MAURYA SAID IN THE GOVERNMENT INTERVIEW.

11         THAT IS RANK HEARSAY.  AND I DON'T BELIEVE IT

12   WOULD -- AND EVEN IF SHE IS GOING TO ASSERT A PRIVILEGE, I

13   DON'T THINK IT COMES IN UNDER ANY OF THE UNAVAILABILITY

14   EXCEPTIONS.

15         BUT -- AND THEN, ALSO, MR. GARLAND HASN'T COMPLIED

16   WITH HIS 2(E) OBLIGATIONS, EITHER, TO CALL AN AGENT.  IT'S JUST

17   RANK HEARSAY.  YOU CAN'T CALL AN AGENT TO SAY WHAT SOMEBODY

18   SAID IN A GOVERNMENT INTERVIEW.

19         THE COURT:  OKAY.

20         MR. GILFILLAN:  UNDER THIS CIRCUMSTANCE, I WOULD SAY.

21         THE COURT:  OKAY.  ALL RIGHT.  I WILL LOOK AT SOME

22   STUFF ON MS. MAURYA THIS EVENING WITH RESPECT TO THAT.

23         IS THERE ANYTHING ELSE THAT WE NEED TO TAKE UP THIS

24   EVENING BEFORE DEPARTING?

25         ONE THING -- OKAY.  ONE OF MY LAW CLERKS IS MESSAGING

1    ME, AND I DO HAVE ONE OF THE LAW CLERKS WHO IS WORKING ALREADY

2    ON THE PROPOSED COURT'S CHARGE.

3            AND, GOVERNMENT, DID YOU NOT FILE ANY OBJECTIONS TO

4    THE DEFENDANT'S PROPOSED JURY INSTRUCTIONS?  I THINK THERE IS

5    SOME SURPRISE IN OUR OFFICE THAT SOME WERE NOT OBJECTED TO.

6            SO DID WE MISS SOMETHING, OR WHAT?

7            MR. GILFILLAN:  I THINK IT WAS OUR UNDERSTANDING THAT

8    WE DIDN'T HAVE A DEADLINE TO OBJECT TO PROPOSED CHARGES AND

9    THAT WE WERE GOING TO TAKE THAT UP AT THE CHARGE CONFERENCE.

10           I THINK WE OBJECT TO ALL OF THEIR PROPOSALS.  A LOT

11   OF THEIR PROPOSALS ARE CIVIL CASE ISSUES, WHERE THERE -- YOU

12   KNOW, YOU'RE THE JURY, AND YOU HAVE TO FIND THIS FOR ISSUES IN

13   AN S CORPORATION OR AN LLC.  I MEAN, THEY HAVE JURY

14   INSTRUCTIONS RAISING ISSUES UNDER GEORGIA STATE LAW.

15           AND SO IF WE MISSED A DEADLINE, THEN I SINCERELY

16   APOLOGIZE FOR THAT.  BUT I DON'T THINK WE UNDERSTOOD THERE WAS

17   A -- WE DID NOT -- IF WE MISSED IT, WE MISSED IT, AND I REALLY

18   APOLOGIZE.  BUT ALL OF THEIR INSTRUCTIONS ARE NOT APPROPRIATE

19   FOR THIS CASE.

20           THE COURT:  OKAY.

21           MR. GILFILLAN:  AND THEY'RE ALL COVERED BY THE

22   STANDARD PATTERN INSTRUCTION.

23           MR. GARLAND:  THE COURT HAD IMPOSED A DEADLINE, AS I

24   UNDERSTOOD IT.

25           THE COURT:  YEAH, I DID.  DOCUMENT 145, THE TRIAL

1    NOTICE:  ANY OBJECTIONS TO REQUESTS TO CHARGE FILED BY ANOTHER

2    PARTY SHALL BE FILED WITHIN THREE DAYS FOLLOWING THE REQUESTS

3    TO CHARGE THAT ARE FILED.

4          IT MAY BE --

5          THE COURTROOM DEPUTY:  I HAVE SOME E-MAILS WHERE THE

6    DEFENSE SENT SOME CHARGES AND COPIED THE GOVERNMENT, BUT I'M

7    TRYING TO SEE IF THERE WAS SOME RESPONSE.

8          THE COURT:  WELL, THEY'RE SAYING THEY DIDN'T.

9    THEY'RE SAYING THEY DIDN'T BECAUSE THEY DIDN'T REALIZE

10    OBJECTIONS WERE DUE.  AND THAT MIGHT BE BECAUSE, EVEN THOUGH

11    WHAT I SENT CLEARLY SAYS OBJECTIONS WERE DUE, THE ORDER THAT

12    CAME OUT AFTER THE PRETRIAL CONFERENCE MAY NOT HAVE REPEATED

13    THAT LANGUAGE.  I'M NOT SURE IF THAT'S -- YEAH.  I'M NOT SURE.

14    BUT, YEAH, THE SCHEDULING ORDER DEFINITELY SAYS THAT THEY WERE

15    DUE WITHIN THREE DAYS.

16          AND SO I HAVE NOT LOOKED AT ANY OF THEM CLOSELY, BUT

17    THEY WERE DUE, GOVERNMENT.  AND SO THE ONES THAT HAVE BEEN

18    FILED, YOU NEED TO GET THEM IN TO US BY FRIDAY MORNING.

19          MR. GILFILLAN:  OUR OBJECTIONS?

20          THE COURT:  YES.

21          MR. GILFILLAN:  THANK YOU, YOUR HONOR.

22          THE COURT:  YES.  OKAY.  ANYTHING ELSE?  GOVERNMENT?

23          MR. GILFILLAN:  YES, YOUR HONOR.

24          THE COURT:  YES.

25          MR. GILFILLAN:  I WOULD LIKE TO TAKE UP A COUPLE OF

1    ISSUES WITH RESPECT TO MR. GINGRAS.

2            THE COURT:  OKAY.

3            MR. GILFILLAN:  FIRST I'D LIKE TO ASK FOR

4    CLARIFICATION WITH RESPECT TO WHAT THE COURT IS GOING TO ALLOW

5    WITH HIM.

6            THEN, SECONDLY, DEPENDING ON THAT RESOLUTION OR WHAT

7    COMES OUT OF THAT, I MAY HAVE EITHER A MOTION UNDER RULE 16 OR

8    A MOTION FOR -- TO EXCLUDE WHATEVER HIS NEW OPINIONS ARE OR A

9    RULE 16 DISCOVERY MOTION.

10           TAKING UP THE FIRST ISSUE, WHAT HE GETS TO DO AND TO

11   CLARIFY, I THINK HE'S GOT -- I WOULD BREAK DOWN HIS TESTIMONY

12   INTO THREE SECTIONS --

13           THE COURT:  HOLD ON ONE SECOND.

14           MR. GILFILLAN:  YES, YOUR HONOR.

15           THE COURT:  OKAY.  GO AHEAD.  I'M SORRY.

16           MR. GILFILLAN:  THE FIRST SECTION IS, HE'S GOT THIS

17   METHODOLOGY THAT HE HAS DEVELOPED FOR THIS CASE.  MY

18   UNDERSTANDING IS THE COURT HAS RULED HE GETS TO TESTIFY TO

19   THAT.

20           THE SECOND THING IS THAT -- AND HE SAID THIS ON THE

21   17TH, AND THEN MR. GARLAND HAD SAID SOME THINGS TO ME YESTERDAY

22   EVENING, THIS -- WHAT I CALL HIS EVIDENCE REVIEW OPINIONS,

23   WHERE HE WANTS TO SAY, I SAT HERE IN THE COURTROOM AND, YOU

24   KNOW, THE GOVERNMENT'S EVIDENCE DOESN'T ALLOW YOU TO DO THIS OR

25   DOESN'T ALLOW YOU TO DO THAT.

1    AND MY UNDERSTANDING WAS THAT THE COURT SAID BEFORE

2  TRIAL ON SEPTEMBER 17TH, BEFORE WE PICKED A JURY, THAT THE

3  COURT WAS NOT, PROBABLY NOT INCLINED TO ALLOW HIM TO DO THOSE

4  THINGS.

5    AND I HAD RAISED THE ISSUE OF, WELL, YOU KNOW, THE

6  DEFENSE IS JUST GOING TO COME AT THIS, ASK IT DIFFERENT WAYS.

7  BUT THIS IDEA THAT HE GETS TO OPINE ON WHAT YOU CAN AND CANNOT

8  DO WITH THE EVIDENCE THAT HAS BEEN ADMITTED AT TRIAL -- I MEAN,

9  ALL HE'S DONE IS SIT HERE IN COURT AND WATCH A SCENE AND WATCH

10  THE WITNESSES.  THE JURY GETS TO DELIBERATE AND LOOK AT THE

11  STUFF AND READ IT.

12    AND THEN THE THIRD THING, YOUR HONOR, THE THIRD PART

13  OF HIS OPINIONS, HE'S GOT THIS OPINION -- WHICH HE ADMITS HE IS

14  A LAY PERSON.  BUT HE WANTS TO TELL THE JURY, I READ THE

15  GEORGIA BAR HANDBOOK, AND I WANT TO OPINE THAT AN IOLTA ACCOUNT

16  THAT GETS FIRM MONEY INTO -- CLIENT MONEY -- I MEAN, FIRM MONEY

17  INTO IT SOMEHOW DOESN'T BECOME AN IOLTA ACCOUNT ANYMORE.

18    BECAUSE MR. GARLAND HAS KIND OF WORKED AROUND THIS

19  ISSUE A FEW TIMES.  BUT WHAT MR. GINGRAS AND THE DEFENSE WANTS

20  TO TELL THIS JURY IS THAT, WELL, IF YOU HAVE AN IOLTA ACCOUNT

21  AND YOU BREAK THE RULES, IT'S NOT AN IOLTA ACCOUNT ANYMORE.

22    AND THE COURT'S A LAWYER.  I MEAN, THAT'S -- THAT'S

23  OFFENSIVE.  AND ESPECIALLY TO COME FROM SOMEBODY WHO IS A CPA

24  AND HE'S NOT A LAWYER.  SO THAT ONE, YOU KNOW, WE AGAIN WOULD

25  MOVE TO EXCLUDE THAT ONE IN ITS ENTIRETY.

1          AND I WOULD ASK THE COURT CAN WE TALK ABOUT THE

2     SECOND PIECE, THIS EVIDENCE REVIEW PIECE.  BECAUSE MY

3     UNDERSTANDING IS -- I'VE BEEN TOLD ONE REASON HE'S NOT HERE

4     TODAY IS HE'S OFF PREPARING NEW CHARTS, WHICH I THINK RAISES

5     RULE 16 ISSUES.

6          I MEAN, THIS COURT HAS HAD SO MANY DEADLINES FOR

7     EXPERT DISCLOSURE, AND THE DEFENSE -- THE DEFENSE REPEATEDLY,

8     REPEATEDLY, REPEATEDLY BLEW ALL OF THEM AND HAS BACKED, I

9     THINK, EVERYBODY INTO A CORNER WHEN IT COMES TO MR. GINGRAS.

10    AND JUST BACKED US ALL INTO A CORNER BY HIDING THE BALL.

11         AND SO, YOU KNOW, I WOULD MOVE TO EXCLUDE ANY NEW

12    OPINIONS OR NEW CHARTS OR ANY KIND OF NEW TESTIMONY FROM

13    MR. GINGRAS THAT THE COURT -- THE COURT SAID, YOU CAN TESTIFY

14    ABOUT THIS METHODOLOGY, BUT THIS BUSINESS OF APPLYING IT TO

15    GOVERNMENT SUMMARIES THAT ARE IN EVIDENCE AND TELLING THE JURY

16    WHAT THOSE SUMMARIES SHOW OR DON'T SHOW, FIRST OF ALL, DOESN'T

17    SATISFY DAUBERT, DOESN'T SATISFY THE RULES OF EVIDENCE, IT

18    INVADES THE PROVINCE OF THE JURY.  ALL OF THAT -- AND NONE OF

19    THAT PRESENTS A CONSTITUTIONAL ISSUE.  ALL OF THAT AUTHORITY IS

20    FULLY CONSISTENT WITH THE CONSTITUTION.

21         AND MR. GINGRAS IS NOT QUALIFIED.  HE'S A CPA.  HE

22    HAS RECEIVED NO TRAINING IN HOW DO YOU SIT IN A COURTROOM, AND

23    WHAT'S YOUR METHODOLOGY FOR EVALUATING WHAT YOU CAN AND CAN'T

24    DO WITH THE EVIDENCE.  AND HOW IS THAT BEYOND THE KEN OF AN

25    AVERAGE JUROR?  THAT'S EXACTLY WHAT WE ASK THE JURORS TO DO.

1          SO I WOULD MOVE TO EXCLUDE ANY OF THIS NEW EVIDENCE

2    REVIEW TYPE OPINION, YOUR HONOR.

3          THE COURT:  WELL, LET ME ASK YOU THIS -- AND THIS

4    IS -- IT IS RELATED, BUT IT MAY NOT BE APPARENT RIGHT NOW IN MY

5    ASKING:  WHAT IS YOUR UNDERSTANDING RIGHT NOW OF WHAT THE

6    DEFENSE IS IN THIS CASE?

7          BECAUSE MY UNDERSTANDING INITIALLY WAS -- AND I THINK

8    I SAID THIS EARLIER, I JUST CAN'T REMEMBER -- THAT THE DEFENSE

9    WAS THAT THE DISTRIBUTIONS HAD BASICALLY BEEN MISCALCULATED AND

10   THAT MR. GINGRAS WAS GOING TO COME TELL US WHY YOU COULD NOT

11   HAVE CALCULATED THEM PROPERLY BECAUSE THESE THINGS WERE NOT

12   TAKEN INTO ACCOUNT.  AND I HEARD QUESTIONS ASKED ALONG THOSE

13   LINES.  DID YOU LOOK AT THESE TAX FORMS?  DID YOU LOOK AT

14   DISTRIBUTIONS OF THE SHAREHOLDERS?  I HEARD QUESTIONS LIKE

15   THAT.

16         BUT NOW IT SEEMS LIKE THE DEFENSE IS MORE JUST

17   RELIANCE ON ASHA MAURYA, AND THAT LEAVES ME CURIOUS AS TO HOW

18   MR. GINGRAS' TESTIMONY FITS IN.

19         SO I JUST WANT TO ASK YOU:  FROM THE GOVERNMENT'S

20   STANDPOINT, WHAT IS YOUR UNDERSTANDING, WHEN IT COMES TO

21   MR. GINGRAS -- WHAT IS YOUR UNDERSTANDING OF THE DEFENSE AT

22   THIS POINT?

23         MR. GILFILLAN:  CAN I ASK MR. PHILLIPS ONE THING?

24         THE COURT:  SURE, SURE, SURE, SURE.

25         MR. GILFILLAN:  ALL RIGHT.  YOUR HONOR, I WOULD

1    ABSOLUTELY AGREE WITH YOUR HONOR THAT -- WELL, NOT AGREE WITH

2    YOU, BECAUSE YOU'VE ASKED ME A QUESTION.  BUT MY UNDERSTANDING

3    OF THE DEFENSE AT THIS POINT, AND THE WAY THE EVIDENCE HAS COME

4    IN, IF WE WERE WRITING ON A CLEAN SLATE, I WOULD SAY

5    MR. GINGRAS SHOULD NOT TESTIFY AT ALL.

6          HOWEVER, MR. GARLAND TOLD THE JURY IN OPENING THAT HE

7    WAS GOING TO CALL MR. GINGRAS.  AND SO -- YOU KNOW, BASED ON

8    THE COURT'S RULING THAT HE COULD TALK ABOUT HIS METHODOLOGY.

9    AND SO --

10         THE COURT:  ON HOW DISTRIBUTIONS ARE PROPERLY

11    CALCULATED.

12         MR. GILFILLAN:  WELL, HERE'S THE NUB, YOUR HONOR.

13    HERE IS WHERE I THINK THE CONFUSION COMES IN.  AND THIS CLICKED

14    FOR ME KIND OF THE FIRST TIME THE WEEKEND OF SEPTEMBER 17TH.  I

15    FINALLY REALIZED WHAT IT IS MR. GINGRAS IS DOING.

16         HE HAS NEVER -- THEY HAVE NEVER BEEN INTENDING FOR

17    HIM TO SAY, IN 2011, 2012, 2013, 2014, THIS IS HOW YOU DO THE

18    DISTRIBUTIONS.  THAT HAS NEVER BEEN WHAT -- IT HAS ALWAYS BEEN

19    THAT THEY WANT HIM TO SAY, AS A FORENSIC PERSON, LOOKING

20    BACKWARDS, BASED ON WHAT THE GOVERNMENT HAS DONE, YOU JUST

21    CAN'T FIGURE IT OUT.

22         AND SO IT'S A HINDSIGHT THING.  AND I THINK THAT'S

23    PARTLY WHY THERE'S BEEN KIND OF THIS HIDING THE BALL AND THIS

24    DIFFICULTY GETTING DISCLOSURE FROM THEM.

25         BUT WHERE WE ARE TODAY, MR. GARLAND SAID THAT IN

1    OPENING AND, YOU KNOW -- AND THIS GETS BACK TO, YOU KNOW, THESE

2    MONIES AREN'T DISTRIBUTIONS, WE CONTEND.  THEY ARE STOLEN

3    MONIES.  BECAUSE NONE OF THE THINGS THAT ARE SUPPOSED TO HAPPEN

4    WITH RESPECT TO DISTRIBUTIONS HAPPENED.

5         MR. GINGRAS HAS THIS METHODOLOGY THAT I THINK -- YOU

6    KNOW, HIS WHOLE POINT IS, YOU HAVE TO OVERLAY MY METHODOLOGY ON

7    THIS TRIAL EVIDENCE TO FIGURE OUT WHAT ARE DISTRIBUTIONS AND

8    WHAT ARE NOT.  AND I THINK AT THIS POINT WE'D RATHER JUST

9    CROSS-EXAMINE HIM ON HIS METHODOLOGY.

10        BUT I DON'T THINK THAT -- ALMOST NO MATTER WHAT THE

11   DEFENSE IS, IT'S NOT APPROPRIATE FOR HIM TO SIT HERE AND SAY,

12   THESE SUMMARY CHARTS, YOU KNOW, DON'T HAVE THIS, THEY DON'T

13   HAVE THAT, YOU KNOW.

14        THE COURT:  AND THE ONLY REASON I ASKED YOU THAT IS

15   I -- YOU KNOW, MY RULINGS ON MR. GINGRAS HAVE BEEN EXTREMELY

16   CLOSE CALLS.  AND, AGAIN, I GAVE MUCH DEFERENCE TO THE DEFENSE

17   BECAUSE WE'RE DEALING WITH A DEFENDANT IN A CRIMINAL TRIAL.

18   BUT I'M TOTALLY -- I'M A LITTLE CONFUSED NOW AS TO WHAT

19   MR. GINGRAS IS GOING TO TESTIFY ABOUT.

20        AND I'M NOT SAYING IN THAT REGARD I'M GOING TO CHANGE

21   MY RULING AGAIN.  BUT JUST BASED ON WHAT HAS BEEN ARGUED IN

22   DAUBERT AND WHAT HAS BEEN PRESENTED IN OPENING AND THEN WHAT

23   HAS DEVELOPED IN TRIAL, I'M TRYING TO FIGURE OUT WHAT HE CAN

24   TESTIFY TO AND WHAT THEY -- WHAT HE MIGHT TESTIFY TO.  AND I'M

25   HAVING DIFFICULTY UNDERSTANDING.

1          SO I POSE THAT QUESTION TO THE DEFENSE AS WELL.  I

2    JUST WANTED TO SEE IF THE GOVERNMENT HAD SOME THOUGHTS THERE OF

3    WHAT YOU'RE EXPECTING.  I GUESS YOU'VE LAID IT OUT IN THESE

4    THREE AREAS, THESE THREE CATEGORIES.

5          MR. GILFILLAN:  WELL, THAT'S WHAT I AM EXPECTING.

6    BUT WHAT I WOULD ASK THE COURT TO DO IS TO LIMIT MR. GINGRAS TO

7    THAT WRITTEN, WRITTEN PROFFER.  AND THERE'S A WRITTEN Q/A.

8          THE COURT:  YES.

9          MR. GILFILLAN:  AND THERE'S A WRITTEN Q/A.  AND --

10   BUT, YOU KNOW, THERE ARE THESE LITTLE NUGGETS IN THERE, THERE

11   ARE THESE LITTLE NUGGETS ABOUT HOW HE CAN'T DO THAT BASED ON

12   THE GOVERNMENT EVIDENCE.  OKAY.

13         NOW, IF THEY WANT TO ASK HIM, THE DISCOVERY IN THIS

14   CASE, ALL THE RECORDS YOU GOT AND ALL, COULD YOU REACH AN

15   OPINION FROM YOUR -- THE DISCOVERY, I'M NOT SURE THAT'S BEEN

16   DISCLOSED, BUT THAT'S DIFFERENT.

17         AND SO I WOULD ASK THAT HE BE RESTRICTED TO WHAT IS

18   IN THAT WRITTEN SUMMARY AND THAT Q&A THAT THEY TOLD THE COURT

19   WAS WHAT HE'S GOING TO TESTIFY TO AND THE COURT MADE ITS PRIOR

20   RULING ON, AND THAT THE COURT LIMIT HIM OPINING ON WITNESSES OR

21   DOCUMENTS OR CHARTS ENTERED IN THIS CASE.

22         THE COURT:  OKAY.  THANK YOU.

23         DEFENSE?

24         MR. GARLAND:  I WANT TO START NOT FIRST WITH THE

25   THEORY OF THE DEFENSE, BUT TO START WITH -- WE ARE CONFRONTING

1    WHAT WE CONTEND IS A DECEPTIVE, MISLEADING, AND INCORRECT

2    COMPARISON IN THEIR CHART, THAT THEY CAME WITH AT THE END, THAT

3    SAYS YOU CAN LOOK AND COMPARE DISTRIBUTIONS TO NET PROFIT.  AND

4    THEY PRODUCED A LOT OF TESTIMONY ABOUT IT.  SO WE HAVE THE

5    RIGHT, CONSTITUTIONALLY, TO CONFRONT THE EVIDENCE THAT CAME IN

6    THE CASE.

7          NOW, I'D LIKE -- AND THE METHODOLOGY -- AND WHAT IS

8    APPROPRIATE IN DETERMINING WHAT IS A DISTRIBUTION GIVES LIVE TO

9    THAT CHART.  AND I EXPECT -- BUT BEFORE I GET TO HIM, I WANT TO

10   GO OVER TO THE THEORY OF THE DEFENSE IN THIS CASE.

11         THIS CASE PARALLELS EXACTLY WHAT YOU HEARD FROM ALYCE

12   RITCHIE.  OUR DEFENSE.  SHE DID ACTS UNKNOWINGLY -- SHE SAID

13   EXACTLY THAT -- BROUGHT ABOUT BY THE CONNIVANCE AND SCHEME AND

14   MISREPRESENTATIONS OF ASHA MAURYA.

15         WE ARE NOT TAKING A POSITION HE DIDN'T RECEIVE MONEY.

16   WE ARE NOT EVEN GOING DOWN INTO ALL OF THE UN -- THE PAYMENTS

17   THAT WERE NOT INCOME THAT ARE INCLUDED IN THE GOVERNMENT'S

18   NUMBER.  THEY ARE DEALING WITH A CERTAIN NUMBER.

19         SO IN DEFENSE, WITH 5 MILLION DOCUMENTS OUT THERE, WE

20   COULD NOT GO ANY FURTHER IN APPLYING THE FORMULA TO THE

21   EVIDENCE.  BUT NOW MR. GINGRAS HAS NOT ONLY HEARD ALL TESTIMONY

22   BUT READ THROUGH EVERY EXHIBIT THAT HAD ANY FINANCIAL

23   IMPLICATION AND SHOULD BE ALLOWED --

24         THE COURT:  ARE YOU SAYING THAT HE HAS JUST RECENTLY

25   BEEN EXPOSED TO CERTAIN -- OR HAD ACCESS TO CERTAIN DOCUMENTS,

1    IN PARTICULAR SINCE THE BEGINNING OF THIS TRIAL, THAT HE DID

2    NOT HAVE BEFORE IN PREPARATION FOR HIS EXPERT OPINION?  I GUESS

3    I'M NOT FOLLOWING.

4            MR. GARLAND:  YES.  BECAUSE THE MASS OF MATERIAL, AS

5    WE PUT IN WHEN YOU HEARD OUR PRESENTATION ABOUT HIM, IS SO

6    LARGE THAT WHAT IS RELEVANT IS WHAT CAME INTO EVIDENCE.  AND WE

7    HAVE THE RIGHT TO CONFRONT THAT EVIDENCE.

8            HE HAS READ ALL THE UNDERLYING EXHIBITS, DOCUMENTS,

9    TAX RETURNS, ALL OF THOSE THINGS, WHICH HE SAID, THIS IS

10   WHAT -- WE HAVE TO KNOW WHAT THE BODY OF INFORMATION IS.

11           THE COURT:  BUT ARE YOU SAYING THAT BODY WAS NOT

12   IDENTIFIED UNTIL TRIAL?  THAT'S WHAT I'M MISSING.

13           MR. GARLAND:  NO.  I'M --

14           THE COURT:  I KNOW IT'S A VOLUMINOUS CASE.  BUT ARE

15   YOU SAYING THAT HE COULD NOT HAVE RENDERED A MORE SPECIFIC

16   EXPERT OPINION BEFORE THE TRIAL STARTED BECAUSE YOU DIDN'T KNOW

17   WHICH DOCUMENTS HE NEEDED TO REVIEW?  I GUESS I'M NOT FOLLOWING

18   THE POINT.

19           MR. GARLAND:  YES.  YES.  I'M SAYING THAT THE MASS OF

20   MATERIAL WAS SO GREAT, AND THEN THE COMPARISONS THAT THE

21   GOVERNMENT WOULD MAKE USING THEIR SUMMARY CHARTS, WE COULD NOT

22   HAVE ANTICIPATED.

23           NOW, WE'RE GOING TO A CENTRAL ISSUE.  WE'RE TAKING

24   THE POSITION THAT THE COMPARISON CHARTS BETWEEN DISTRIBUTION

25   AND NET INCOME, THAT'S WHAT GOT DONE HERE IN THE COURTROOM.  WE

1    COULDN'T SEE THAT FROM SUMMARY CHARTS.

2            AND SO THE ISSUE IS THE JURY SHOULD BE EDUCATED ON

3    WHAT FACTORS GO INTO A DISTRIBUTION.  WE HAVE TWO WITNESSES

4    TALKING ABOUT DISTRIBUTIONS.  MR. SHELLY KAY, HOW THEY ARE

5    DONE, HOW THEY ARE TO BE CALCULATED.  AND MATHEMATICALLY, WITH

6    THE EVIDENCE THAT THEY WERE PUTTING IN, HE CAN APPLY HIS

7    METHODOLOGY.

8            BUT THE FIRST THING IS TO PUT UP EVIDENCE THAT IT IS

9    NOT PROPER TO FIGURE OUT A COMPARISON BETWEEN NET PROFITS --

10   AND HE'S USING EVERYTHING THAT'S COME IN, ALL THE TAX RETURNS,

11   ALL OF THE STUFF THAT WE HAVE THAT'S IN EVIDENCE.  YOU

12   COULDN'T -- UNTIL YOU KNOW WHAT YOU'RE APPLYING IT TO, YOU

13   CAN'T APPLY IT.  AND THAT IS --

14           THE COURT:  SO SPECIFIC -- SO TELL ME -- TELL ME

15   SPECIFICALLY WHAT IT IS THAT YOU ALL DID NOT KNOW OR COULD NOT

16   HAVE KNOWN BEFORE THE GOVERNMENT'S EVIDENCE WAS PRESENTED.  I'M

17   MISSING THAT PIECE.

18           MR. GARLAND:  COULD NOT HAVE KNOWN HOW THEY WERE

19   GOING TO DO THE COMPARISON --

20           THE COURT:  OF DISTRIBUTIONS TO NET INCOME.

21           MR. GARLAND:  RIGHT.  AND THE WAY THEY DID IT, WHICH

22   WE CONTEND IS COMPLETELY DECEPTIVE AND MISLEADING TO THE JURY,

23   INCORRECTLY.  YOUR HONOR KNOWS THE POINT BECAUSE I HEARD YOU

24   PICK UP ON IT.  DISTRIBUTIONS ARE ENTIRELY DIFFERENT.

25           THE COURT:  WELL, I THINK I'VE REPEATED WHAT YOUR

1  ARGUMENT WOULD BE.

2        MR. GARLAND:  BUT, I MEAN, THAT'S OUR EXPERT, SHELLY

3  KAY, WHO IS 20 YEARS WITH THE IRS.  YOU'VE ALLOWED HIM -- HE IS

4  GOING TO EXPLAIN THOSE DIFFERENTIALS.  AND THEN PEOPLE THAT PUT

5  NUMBERS TOGETHER TO DO A CALCULATION ON DISTRIBUTIONS, THERE IS

6  A METHODOLOGY.

7        NOW, GIVING THE GOVERNMENT THE BENEFIT OF INCOME THAT

8  THEY CONTEND HE GOT, THAT IS A TRANSFER OF MONEY.  AND THEY ARE

9  CONTENDING THAT THAT'S ALL DISTRIBUTIONS.  AND WE -- OUR

10 APPROACH IS TO SAY, WE'LL ACCEPT THAT, INSTEAD OF GOING OFF AND

11 FIGHTING OVER WHETHER A JET WAS DEDUCTIBLE, AND HE WAS DUE

12 REIMBURSEMENT.  TAKE THEIR NUMBER.  AND, ESSENTIALLY, WHAT YOU

13 DO IS YOU APPLY THE METHODOLOGY.

14       HE'S NOT GOING TO OPINE ON THE ULTIMATE ISSUE.  HE'S

15 GOING TO SAY -- EXCUSE ME.  HE'S -- THE ULTIMATE ISSUE AS IT

16 RELATES TO WHAT FINANCIAL RECORDS THAT ARE IN THIS CASE.  AND

17 YOUR HONOR GAVE THE GOVERNMENT THE OPPORTUNITY TO GET THEIR OWN

18 EXPERT, AND I DON'T KNOW IF THEY SAID THEY HAD ONE.

19       BUT IF YOU TAKE THE FACTUAL EVIDENCE IN THE CASE THAT

20 THEY HAD RELIED ON TO MAKE COMPARISONS, WE WANT TO INTRODUCE

21 TESTIMONY FROM AN EXPERT ABOUT THE DECEPTIVENESS -- THE

22 INCORRECTNESS, NOT DECEPTIVENESS, THE INCORRECTNESS -- NOT

23 GOING TO USE THE WORD DECEPTIVE IN HIS TESTIMONY, BUT HOW IT IS

24 ACCOUNTING-WISE INCORRECT SERIES OF COMPARISONS.  THAT'S THE

25 FIRST ESSENTIAL PART OF IT.

1          AND, SECONDLY, EXAMINING THE EVIDENCE IN THIS CASE,

2    HOW THE METHODOLOGY, APPLIED BASED ON THE FACTS IN THE RECORD,

3    WHAT RESULT DOES IT COME TO AS TO WHAT THE APPROPRIATE

4    DISTRIBUTIONS WERE IN THIS CASE.

5          THE COURT:  AND HOW IS THAT RECONCILED WITH -- AND HE

6    JUST RELIED ON ASHA MAURYA.  ARE YOU USING TWO DIFFERENT

7    DEFENSES TO DIFFERENT PORTIONS OF THE MONEY?

8          BECAUSE IF HE -- IF YOUR BOTTOM LINE ARGUMENT IS HE

9    RECEIVED WHAT HE WAS ENTITLED TO, THE DISTRIBUTIONS HAVE JUST

10   BEEN MISCALCULATED, THEN HOW DOES THE FACT THAT ASHA MAURYA WAS

11   DECEPTIVE COME INTO THIS ANALYSIS AT ALL?

12         MR. GARLAND:  THAT THEY ARE RELYING -- AND WE ARE

13   CONFRONTING A THEORY THAT THEY HAD PEOPLE JUST TALK ON AND ON

14   ABOUT, THAT YOU HAD A DISTRIBUTION TO MR. HARDWICK GREATER THAN

15   THE NET EARNINGS.  I MEAN, WE HEARD IT OVER AND OVER.  WOULDN'T

16   DO THAT, NEVER WOULD DO THAT.

17         HOWEVER, WHEN YOU DO THE -- BASED ON THE EVIDENCE

18   THAT CAME IN, THE CALCULATION -- THE AUDITED FINANCIAL

19   STATEMENTS, WHEN YOU DO THAT CALCULATION, MR. MORRIS HIMSELF

20   RECEIVED THE ALLEGED -- WAS ALLEGED TO BE A VICTIM MORE THAN

21   110 PERCENT.  WHAT THEY'VE DONE IS JUST TAKE DISTRIBUTIONS

22   WHICH ARE NOT ASSOCIATED WITH NET INCOME.

23         AND IF YOU TAKE THE WITTSTADTS, YOU'LL FIND THE SAME

24   PROBLEM.  IT POINTS OUT THAT DISTRIBUTIONS ARE NOT PROFITS.

25   DISTRIBUTIONS ARE WHAT COMES OUT OF A BLENDING, WHETHER IT

1  COMES --

2       THE COURT:  OKAY.  AND, AGAIN, AND SO WHAT DOES

3  THIS -- EVEN IF I ACCEPT ALL OF THAT, WHAT DOES THAT THEN HAVE

4  TO DO WITH, WELL, HE ONLY RELIED ON ASHA MAURYA?  OR IS THAT A

5  SEPARATE DEFENSE FOR ANOTHER PART OF --

6       MR. GARLAND:  THEY ARE TIED -- THOSE TWO KNOWLEDGE --

7       THE COURT:  SO THEY -- I DON'T KNOW.  BECAUSE I'M

8  TRYING TO RECONCILE THESE TWO DEFENSES, AND YOU JUST KEEP

9  TALKING ABOUT DISTRIBUTIONS AND NET INCOME.  AND I'M LIKE,

10  WELL, OKAY, SO HOW DOES ASHA MAURYA COME INTO THIS?

11       MR. GARLAND:  SO THE ALLEGATION IS HE TOOK MONEY FROM

12  THE LAW FIRM HE SHOULD NOT BE ENTITLED TO TAKE, TOOK SO MUCH

13  OUT OF IT THAT HE WASN'T ENTITLED TO TAKE IN THE FORM OF

14  DISTRIBUTIONS.  THEY'VE REFERRED TO IT AS TRANSFERS, BUT THEN

15  THEY -- ON THE CHART, THEY GO OVER AND MAKE IT A COMPARISON OF

16  DISTRIBUTIONS.

17       AND WE INTEND TO SHOW FROM THE EVIDENCE IN THE RECORD

18  THAT YOU CANNOT -- THAT THE DETERMINATION IS FAR, FAR LESS WHEN

19  YOU APPLY THE PROPER METHODOLOGY.  AND THAT IS TO THE ELEMENT

20  AS ALLEGED IN THE INDICTMENT THAT HE KNEW HE WAS GETTING MORE.

21       NOW, DEFENSE RELATES TO MS. RITCHIE'S PERSPECTIVE,

22  WHICH WAS SHE WAS UNKNOWINGLY DUPED.  THAT RELATES TO

23  MS. MAURYA, WHO WE CONTEND KNOWINGLY DUPED HIM INTO TAKING

24  FUNDS THAT HE BELIEVED WERE LAW FIRM FUNDS.  HE UNKNOWINGLY

25  TOOK FUNDS FROM AN ESCROW OR THE IOLTA.  AND THE EVIDENCE IS

1    THAT THEY WERE LAW FIRM FUNDS IN THE ACCOUNT.  THERE HAS BEEN

2    NO PROOF IN THIS RECORD OF A BEGINNING POINT AS TO WHAT WAS IN

3    THIS MASSIVE ACCOUNT, OR AN ENDING POINT.

4            SO FROM AN ACCOUNTING STANDPOINT, APPLYING A

5    METHODOLOGY, WE CAN SHOW WHAT IS IN THE EVIDENCE AND WHETHER OR

6    NOT FROM THAT EVIDENCE YOU CAN DETERMINE THAT THE FUNDS

7    RECEIVED BY ALL OF THESE PARTNERS WERE ESCROW FUNDS OR LAW FIRM

8    FUNDS.  BUT WE KNOW WE HAVE A MIXED POT.

9            AND SO HE IS -- WILL SAY, I LOOKED AT THIS TAX

10   RETURN.  I'VE SEEN THIS.  I'VE SEEN THAT.  I'VE READ THE

11   UNDERLYING DOCUMENTS THAT ARE IN EVIDENCE.  AND HE WILL THEN

12   SAY, APPLYING THE METHODOLOGY HERE -- HE'LL FIRST EXPLAIN THE

13   LACK OF CORRELATION BETWEEN DISTRIBUTIONS.  IN OTHER WORDS --

14           THE COURT:  OKAY.  OKAY.  I UNDERSTAND WHAT YOU'RE

15   SAYING HE WILL DO.  LET ME, LET ME JUST UNDERSTAND AGAIN.

16           SO YOU PRESENT ALL THIS EVIDENCE WITH GINGRAS, WITH

17   WHATEVER RESTRICTIONS, IF ANY, I PLACE ON HIM.  HAVEN'T HEARD

18   THE GOVERNMENT.  AND SO LET'S SAY THE JURY HEARS GOVERNMENT

19   COULD NOT POSSIBLY HAVE FIGURED OUT THAT THESE WERE -- THIS

20   DOLLAR AMOUNT WERE DISTRIBUTIONS.  HOW THEN DOES ASHA MAURYA

21   PLAY INTO YOUR DEFENSE?

22           AND, AGAIN, WHEN I ASK, IS IT BECAUSE YOU'RE USING

23   HER FOR CERTAIN MONIES THAT YOU'RE SAYING MAYBE HE DID

24   RECEIVE --

25           MR. GARLAND:  NO.

1          THE COURT:  -- AND HE WASN'T ENTITLED TO, BUT HE

2    THOUGHT HE WAS BASED ON HER, AND THERE ARE OTHER MONIES THAT HE

3    DID RECEIVE AND HE DOES CONTEND HE WAS ENTITLED TO?

4          ARE YOU USING THOSE DEFENSES FOR DIFFERENT PORTIONS

5    OF THE POT, SO TO SPEAK?

6          MR. GARLAND:  NO.  I'M SAYING ALL THE MONEY --

7          THE COURT:  TRY ONE MORE TIME.  I'M SORRY,

8    MR. GARLAND.  I'M NOT FOLLOWING YOU.  AND I APOLOGIZE IF IT'S

9    ME, THAT I'M CONFUSED.

10          I AM TRYING TO UNDERSTAND WHAT MR. GINGRAS WOULD

11    TESTIFY TO.  AND I THOUGHT A GOOD STARTING POINT FOR MY

12    UNDERSTANDING WOULD BE WHAT THE DEFENSE IS.  I CERTAINLY WASN'T

13    TRYING TO GET YOU TO, LIKE, REVEAL ANY SECRETS.  I'M JUST

14    TRYING TO UNDERSTAND WHERE YOU'RE GOING SO THAT I CAN RULE ON

15    THIS.  RIGHT NOW, I AM TOTALLY CONFUSED TO THE POINT THAT I

16    DON'T EVEN THINK I CAN RULE ON WHAT THE GOVERNMENT IS

17    REQUESTING WITHOUT TRYING TO DISSECT IT MYSELF.

18          SO TRY ONE MORE TIME TO EXPLAIN TO ME.  AND, AGAIN, I

19    APOLOGIZE IF IT'S ME THAT DOESN'T GET IT.

20          MR. GARLAND:  AN ELEMENT OF THE GOVERNMENT'S CASE IS

21    PROOF OF KNOWLEDGE, KNOWLEDGE THAT HE WAS RECEIVING MONEY HE

22    WAS NOT ENTITLED TO RECEIVE.

23          THE COURT:  AN ELEMENT?  OKAY.

24          MR. GARLAND:  YOU HAVE TO HAVE KNOWLEDGE --

25          THE COURT:  OKAY.  GO AHEAD.

1    MR. GARLAND:  -- THAT HE WASN'T GETTING FUNDS OUT OF

2  THE LAW FIRM.  AND THE DEFENSE IS THAT WE ARE ESTABLISHING --

3  AND MS. RITCHIE SAID EXACTLY THE SAME THING -- THAT SHE DIDN'T

4  KNOW SHE WAS SIGNING CHECKS ON AN IOLTA ACCOUNT.  AND YOU GET

5  THE SIMILARITY.

6    SO WE ARE SAYING THAT EVIDENCE, JUST LIKE THE

7  GOVERNMENT PUT IN -- OH, HE GOT MORE THAN HE WAS ENTITLED TO

8  BECAUSE HIS DISTRIBUTIONS EXCEEDED NET PROFITS -- WE ARE

9  ENTITLED TO SHOW THAT YOU CAN'T USE THAT KIND OF COMPARISON.

10    AND, SECOND, WE ARE ENTITLED TO SHOW THAT WHEN YOU

11  APPLY THE METHODOLOGY TO THE KNOWN FACTS, HE DID NOT GET MORE

12  THAN HE WAS ENTITLED TO.

13    AND THAT WILL BE THE DEFENSE THAT WE PRESENT, NOT

14  WHETHER -- GINGRAS IS NOT GOING TO OPINE ON WHETHER HE KNEW.

15  HE'S GOING TO OPINE ON THE ISSUE OF WHAT -- THE FACTS IN THIS

16  CASE APPLIED TO THE METHODOLOGY OF HOW YOU DETERMINE

17  DISTRIBUTIONS AMONG PARTNERS.

18    THE COURT:  SO WHY ARE THESE 404(B) WITNESSES ON ASHA

19  MAURYA NECESSARY, THAT -- IF THE WHOLE PUNCHLINE TO THE CASE IS

20  THE DISTRIBUTIONS WERE JUST MISCALCULATED, WEREN'T CALCULATED

21  PROPERLY, WHY DO YOU EVEN NEED TO TALK ABOUT ASHA MAURYA

22  ANYMORE?

23    I MEAN, IT'S ALREADY COME OUT THAT SHE'S A THIEF AND

24  DISHONEST HERSELF.  WHY DO YOU NEED TO PRESENT ALL THIS OTHER

25  EVIDENCE ABOUT WHAT ASHA MAURYA DID IF THAT'S NOT A FACTOR

1    TO -- IN YOUR DEFENSE?

2         MR. GARLAND:  IT IS TOTALLY DEFENSE BASED ON

3    KNOWLEDGE.  AND THE ACCOUNTING SHOWS -- THE PROPER ACCOUNTING

4    SHOWS WHY -- IS ANOTHER FACT THAT WOULD SHOW HE WOULD NOT THINK

5    HE WAS GETTING MORE THAN HE WAS ENTITLED TO, WHICH IS THE

6    GOVERNMENT'S ASSERTION --

7         THE COURT:  OKAY.

8         MR. GARLAND:  -- BECAUSE OF THE WAY DISTRIBUTIONS

9    WORK --

10        THE COURT:  I AM GOING TO CUT YOU OFF HERE, BECAUSE

11   YOU'VE TAKEN LONG ENOUGH.  AND I'M SORRY.  I NEED TO GIVE EQUAL

12   TIME, AND I DON'T THINK WE'RE GETTING ANYWHERE.  SO THANK YOU

13   SO MUCH.

14        LET ME HEAR FROM THE GOVERNMENT AND THEN WE'LL

15   ADJOURN FOR THE EVENING.

16        MR. GILFILLAN?  TRY TO BE CLEAR.

17        MR. GILFILLAN:  THANK YOU, JUDGE.  I WILL DO MY BEST.

18        FIRST, WITH RESPECT TO -- I'M JUST GOING TO TRY TO

19   ADDRESS THESE NOT IN THE ISSUE OF IMPORTANCE BUT IN THE ISSUE

20   IN WHICH THEY HAVE COME UP.

21        FIRST, WITH RESPECT TO THE TIMING ISSUE AND THE

22   VOLUME OF MATERIALS IN THIS CASE, THEY'VE HAD DISCOVERY FOR TWO

23   YEARS.  WE PRODUCED -- AND I'LL BRING IT TO COURT AND SHOW IT

24   TO YOU TOMORROW.  THEY GOT -- I THINK IT'S A 55-PAGE INDEX OF

25   DISCOVERY THAT, YOU WANT TO FIND SOMETHING, YOU TYPE IT IN AND

1　WE CAN SEARCH IT AND FIND IT.

2　　　　　THE COURT:  AND MR. GINGRAS HAS BEEN ON THE CASE

3　SINCE THE BEGINNING.

4　　　　　MR. GILFILLAN:  MID-2017.  HE'S BEEN WORKING ON THIS

5　CASE NOW FOR OVER A YEAR AND A HALF.  AND, JUDGE, WITH RESPECT,

6　IF THEY CAN'T GET THROUGH THE MASS OF DISCOVERY -- THEY PAID

7　HIM TO SIT IN THIS COURTROOM SINCE THE BEGINNING OF JURY

8　SELECTION, AND SO THEY COULD HAVE PAID HIM TO DO THIS THREE

9　MONTHS AGO.

10　　　　　AND SO THE TIMING ISSUE IS, IS -- THE DEFENSE IS NOT

11　BEING AN HONEST BROKER WITH THE COURT ON THAT ONE.

12　　　　　THE ARGUMENT THAT THEY COULDN'T ANTICIPATE WHAT OUR

13　ARGUMENTS ARE, LET ME TELL YOU WHAT.  THE FIRST ARGUMENT, HOW

14　HE GOT MORE MONEY THAN HE'S ENTITLED TO, YOU KNOW HOW HE KNEW

15　HE WASN'T ENTITLED TO IT?  BECAUSE HE LIED TO GET IT.  THAT'S

16　THE WAY IT ALWAYS IS IN EVERY FRAUD CASE.  ALL RIGHT?  AND THEY

17　KNOW THAT'S OUR THEORY OF THE CASE.

18　　　　　NOW, WITH RESPECT TO THE DETAILS OF DOLLAR FLOWS AND

19　MONIES, YOUR HONOR HAS HEARD -- MR. GARLAND HAS DEPOSED A

20　NUMBER OF THE GOVERNMENT WITNESSES AND DEPOSED A NUMBER OF

21　OTHER PEOPLE, BECAUSE THERE'S THESE PENDING CIVIL SUITS.

22　　　　　THEY HAVE DEPOSED A MAN NAMED STEVE HAMLIN, WHO THEY

23　MAY EVEN WANT TO CALL IN THIS CASE AND THEY HAVE HIM UNDER

24　SUBPOENA.  HE WORKS AT FIDELITY.  HE HAS PREPARED A CHART THAT

25　SHOWS TO THE PENNY WHAT MR. HARDWICK GOT THAT HE WASN'T

1    ENTITLED TO.  THEY DEPOSED HIM.  RIGHT?

2         AND THEY HAVE ALSO SOMETHING CALLED A ROYSTER REPORT.

3    THAT'S IN MR. GINGRAS' -- IT'S IN HIS LIST OF THINGS HE RELIED

4    ON.  THAT'S ANOTHER EXPERT REPORT IN THAT CIVIL LITIGATION THAT

5    LAYS OUT WHAT MR. HARDWICK'S EXCESS DISTRIBUTIONS ARE.

6         AND SO WHILE WE CONTEND, WE CONTEND WE DON'T HAVE TO

7    PROVE A DOLLAR AMOUNT OF A LOSS HERE, OKAY, THERE IS NO

8    SURPRISE ABOUT WHAT THE GOVERNMENT'S CONTENTION IS AS TO HOW

9    YOU LOOK AT WHAT MR. HARDWICK GOT VERSUS WHAT HE'S ENTITLED TO.

10        ALL RIGHT.  SECONDLY -- AND THIS IS PROBABLY THE MOST

11    IMPORTANT THING WITH RESPECT TO MR. GINGRAS.  MR. GARLAND STOOD

12    HERE AND HE JUST TOLD YOUR HONOR THAT THEY WANT TO PUT ON AN

13    EXPERT WITNESS, A MAN THAT THE DEFENDANT HAS PAID PROBABLY TENS

14    OF THOUSANDS OF DOLLARS, TO OPINE ON THE DECEPTIVENESS OF THE

15    GOVERNMENT CASE.

16        WHERE DOES THAT STOP?  FELON IN POSSESSION CASE,

17    HOBBS ACT ROBBERY CASE, LET'S JUST PARK DEFENDANT'S CPA OR

18    WHOEVER BACK HERE, AND THEN THEY CAN TAKE THIS STAND AND SAY,

19    WELL, THE GOVERNMENT'S CASE IS DECEPTIVE, THEY DIDN'T DO IT

20    RIGHT.

21        THAT'S NOT PROPER EXPERT TESTIMONY.

22        ARE THEY ENTITLED TO PROBE AND TO SHOW THE

23    GOVERNMENT'S CASE IS DECEPTIVE?  ABSOLUTELY.  YOU KNOW HOW THEY

24    SHOULD DO IT AND HOW THEY'RE ENTITLED TO DO IT?  FACT

25    WITNESSES, EVIDENCE, CROSS-EXAMINATION.

1          THIS IS ALL GOING ON BECAUSE THEY CAN'T DO IT THAT

2     WAY.  AND SO THEY'RE TRYING TO MAKE AN END RUN WITH A PAID

3     WITNESS, WHO THEY HAVE PAID TO SIT HERE IN TRIAL AND TRY TO

4     BECOME A 13TH JUROR.

5          YOUR HONOR, I WOULD SUBMIT, IS NOT GOING TO

6     UNDERSTAND THEIR POSITION.  BECAUSE THEIR DEFENSE IS, LOOK OVER

7     HERE, LOOK OVER HERE, LOOK OVER HERE.  DO NOT LOOK AT THE

8     EVIDENCE THAT SHOWS MR. HARDWICK TOLD THE WITTSTADTS, I'M

9     GETTING ONE THING, AND HE TOOK ANOTHER.  ALL RIGHT.

10          THEY WANT TO SHOW THAT OUR CASE IS DECEPTIVE?  COME

11     FORWARD WITH SOME EXPENSE REIMBURSEMENT CLAIMS.  COME FORWARD

12     WITH SOME E-MAILS WHERE, HEY, I SPENT $60,000 ON THE PEBBLE

13     BEACH PRO-AM MARKETING THE FIRM.  YOU WANT TO SHOW OUR CASE IS

14     DECEPTIVE?  THAT'S HOW YOU DO IT.  OKAY?  THAT'S THE KIND OF

15     EVIDENCE THAT IF THEY WANT TO SHOW OUR CASE IS DECEPTIVE, THEY

16     CAN PUT THAT IN.

17          FINAL POINT.  FINAL POINT.

18          MR. GINGRAS HAS BEEN OVER HERE THROUGHOUT COURT.  ON

19     BREAKS, HE GOES UP AND HE WHISPERS TO THEM.  HE'S A CONSULTING

20     EXPERT, HE'S NOT A TESTIFYING EXPERT.  I LOVED, YOUR HONOR,

21     WHEN YOU SAID HE COULD STAY IN THE COURTROOM -- I THOUGHT IT

22     WAS BECAUSE HE -- SO IT WAS WITH RESPECT TO HIS OPINIONS.  BUT

23     HE'S BEEN SITTING HERE IN THE COURTROOM.  HE'S A CONSULTING

24     EXPERT, HELPING THEM SHAPE THEIR DEFENSE AND WORKING WITH THEM.

25          WE'VE ALL SEEN IT.  MR. GARLAND SITS UP HERE AND HE

1  CROSS-EXAMINES KIM JOHNSON, THE GOVERNMENT'S SUMMARY WITNESS,

2  NOT AN EXPERT.  AND MR. GARLAND READS FROM A PREPARED LIST OF

3  QUESTIONS.  IF I HAD MR. GINGRAS UNDER OATH, I THINK HE'D ADMIT

4  HE WROTE THAT FOR MR. GARLAND.

5          WHY DON'T WE SKIP THE PRETENSE AND WE'LL JUST SWEAR

6  IN MR. GARLAND AND PUT HIM ON THE STAND.

7          THE COURT:  ALL RIGHT.

8          MS. NOVAY:  WHY DON'T YOU SWEAR ME IN?

9          MR. GILFILLAN:  OR MS. NOVAY.

10         THE COURT:  CALM DOWN.  CALM DOWN.  ALL RIGHT.

11         MR. GARLAND:  JUDGE --

12         THE COURT:  VERY BRIEFLY, MR. GARLAND, BECAUSE I'VE

13 GIVEN YOU MORE THAN ENOUGH TIME, AND I'M NOT UNDERSTANDING IT.

14 AND, AGAIN, IT'S ME.

15         I DON'T KNOW IF YOU WANT TO TRY, CO-COUNSEL, TO OFFER

16 UP AN EXPLANATION, BUT I'M NOT GETTING ANSWERS TO MY QUESTIONS.

17         MR. GARLAND:  YOUR HONOR, THE OBJECT OF THE

18 CONSPIRACY IS TO STEAL MONEY.  IF YOU RECEIVE DISTRIBUTIONS

19 THAT ARE APPROPRIATE, IT GOES TO THE FACTOR WHETHER YOU HAVE

20 THE INTENT TO STEAL THE MONEY.  JUST LIKE MS. RITCHIE.

21         AND WHEN THEY PUT IN EVIDENCE TO SUPPORT THAT IDEA,

22 THESE COMPARATIVE CHARTS, AND THE COMPARISON IS WHAT CAME

23 FORTH -- HAD NOT BEEN DONE BEFORE THIS TRIAL, OR ON THE EVE,

24 VERY EVE OF THIS TRIAL -- AND ALL THE TESTIMONY ABOUT IT, WE

25 HAVE THE RIGHT TO REBUT THAT, TO DEFEND AGAINST THAT.

1          SO OUR -- IF SOMEBODY ACCUSES ME OF STEALING, AND I

2   SAY, I WAS ENTITLED TO THE MONEY, OR, UNDER THE LAW, RELATED

3   THE METHODOLOGY FOR TAX PURPOSES OF DETERMINING DISTRIBUTIONS

4   SHOWS THAT I DID NOT TAKE MONEY THAT I WASN'T ENTITLED TO.

5          AND THAT'S OUR DEFENSE.  SO -- AND THAT IS OUR

6   DEFENSE PLUS WHAT WE DID.

7          THE COURT:  OKAY.

8          MR. GARLAND:  HE DIDN'T KNOWINGLY DO THIS BLEND

9   TOGETHER, AND THAT'S OUR DEFENSE.

10          THE COURT:  THANK YOU, SIR.

11          ALL RIGHT.  I'LL HAVE TO, I'LL HAVE TO GIVE SOME

12   RULINGS IN THE MORNING.  I'M NOT PREPARED TO DO THAT THIS

13   EVENING.

14          EVERYONE HAVE A GREAT EVENING.

15          THE COURTROOM SECURITY OFFICER:  ALL RISE.  COURT IS

16   IN RECESS.

17          (WHEREUPON, THE PROCEEDINGS WERE ADJOURNED FOR THE

18   DAY AT 5:10 P.M., TO BE RECONVENED AS ORDERED BY THE COURT.)

19

20

21

22

23

24

25

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF GEORGIA

3    CERTIFICATE OF REPORTER

4

5

6           I DO HEREBY CERTIFY THAT THE FOREGOING PAGES ARE A

7    TRUE AND CORRECT TRANSCRIPT OF THE PROCEEDINGS TAKEN DOWN BY

8    ME IN THE CASE AFORESAID.

9           THIS, THE 24TH DAY OF DECEMBER, 2018.

10

11

12

13                              /S/ *ELIZABETH G. COHN*
                                _____
14                              ELIZABETH G. COHN, RMR, CRR
                                OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25