3120

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


UNITED STATES OF AMERICA,

       PLAINTIFF,

                           INDICTMENT NO. 1:16-CR-00065-ELR-CMS
       -VS-              VOLUME 12
                           (PAGES 3120 - 3425)

NATHAN E. HARDWICK IV,

       DEFENDANT.


TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE ELEANOR L. ROSS
UNITED STATES DISTRICT JUDGE
OCTOBER 10, 2018


APPEARANCES:

ON BEHALF OF THE GOVERNMENT:

     RUSSELL PHILLIPS, ESQ.
     ASSISTANT UNITED STATES ATTORNEY

     DOUG GILFILLAN, ESQ.
     ASSISTANT UNITED STATES ATTORNEY

     LYNSEY BARRON, ESQ.
     ASSISTANT UNITED STATES ATTORNEY

ON BEHALF OF THE DEFENDANT:

     EDWARD T.M. GARLAND, ESQ.

     KRISTIN NOVAY, ESQ.

     ROBIN LOEB, ESQ.


ELIZABETH G. COHN, RMR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
ATLANTA, GEORGIA

3121

1                        I N D E X

2    WITNESS                                       PAGE

3    NATHAN E. HARDWICK IV

4    CONTINUED DIRECT EXAMINATION BY MR. GARLAND    3128

5    CROSS-EXAMINATION BY MR. PHILLIPS              3133

6    REDIRECT EXAMINATION BY MR. GARLAND            3263

7

8    RULE 29 MOTION                                3319

9

10   REBUTTAL WITNESS

11   MARK WITTSTADT

12   DIRECT EXAMINATION BY MS. BARRON               3325

13   CROSS-EXAMINATION BY MR. GARLAND               3362

14   REDIRECT EXAMINATION BY MS. BARRON             3378

15   RECROSS-EXAMINATION BY MR. GARLAND             3378

16

17   CHARGE CONFERENCE                              3382

18

19

20

21

22

23

24

25

3122

1          (ATLANTA, FULTON COUNTY, GEORGIA; OCTOBER 10, 2018,

2     AT 9:13 A.M. IN OPEN COURT.)

3          THE COURT:  THANK YOU.  GOOD MORNING.  PLEASE BE

4     SEATED.

5          SO APPARENTLY WE ARE NOT QUITE READY TO START.  I

6     THINK WE'RE MISSING SEVERAL OF OUR JURORS.  BUT I DID WANT TO

7     COVER A COUPLE OF THINGS WITH YOU ALL BEFORE WE STARTED.

8          FIRST OF ALL, THANK YOU FOR --

9          MR. HARDWICK IS NOT HERE.  ALL RIGHT.

10         ALL RIGHT.  AS I SAID, AND I'LL REPEAT NOW THAT

11    MR. HARDWICK IS IN THE COURTROOM, WE'RE NOT QUITE READY TO

12    START THIS MORNING BECAUSE WE ARE STILL MISSING A COUPLE OF

13    JURORS.  I DID TELL THEM WE WERE GOING START AT 9:20.  BUT IT'S

14    9:14, SO APPARENTLY A COUPLE OF THEM ARE NOT HERE.

15         I DO WANT TO THANK YOU ALL FOR PARTICIPATING IN THE

16    INFORMAL CHARGE CONFERENCE.  FOR THOSE OF YOU WHO MAY HAVE

17    SOMEHOW FELT IT WAS A WASTE OF YOUR TIME OR YOU WERE READY TO

18    GO, I JUST HOPE THAT YOU UNDERSTAND HOW IMPORTANT THIS PROCESS

19    IS.

20         AND, AGAIN, I TRY TO DO THINGS AS EFFICIENTLY AS

21    POSSIBLE.  BUT IF YOU DISAGREE, THINK THERE'S A BETTER WAY TO

22    DO THINGS, CERTAINLY YOU ARE ENTITLED TO YOUR OPINION.  BUT I

23    JUST ASK THAT YOU CONTINUE TO BE RESPECTFUL NOT ONLY TO THE

24    COURT BUT TO THE COURT'S STAFF AS WELL.  SO THANK YOU FOR THAT.

25         ALSO, I WANTED TO REVISIT THE ISSUE FROM YESTERDAY

3123

1    REGARDING THE PARTIES' RESPECTIVE POSITIONS ON THE COLLAPSE OF

2    MHS.  I'VE THOUGHT ABOUT THIS A LOT BECAUSE, AS I RECALL, WHEN

3    WE -- THERE WAS A PRETRIAL MOTION IN LIMINE RAISED WITH RESPECT

4    TO THIS, AND A RULING.  BUT SUBSEQUENT TO THAT, THE

5    GOVERNMENT -- AND I THINK IT WAS MR. GILFILLAN -- AGREED THAT

6    THE GOVERNMENT WOULD NOT EVER GET UP AND ARGUE IN THIS TRIAL

7    THAT MR. HARDWICK'S ACTIONS COLLAPSED THE FIRM.

8              AM I CORRECT IN THAT, MR. GILFILLAN?

9              MR. GILFILLAN:  YES, YOUR HONOR.

10             THE COURT:  OKAY.  ALL RIGHT.  AND I DON'T THINK THAT

11   THAT HAS BEEN DONE.  BUT CERTAINLY THERE WAS TESTIMONY FROM

12   MR. MORRIS THAT HE WAS CONCERNED ABOUT SAVING THE FIRM SO THAT

13   800 PEOPLE DIDN'T LOSE THEIR JOBS.  AND, OF COURSE, THE JURY IS

14   AWARE FROM DIFFERENT TESTIMONY THAT THE FIRM DID ULTIMATELY

15   COLLAPSE, SO THEY CAN DRAW SOME INFERENCES.

16             AND, GIVEN THAT, I DO THINK THAT IT IS ONLY FAIR TO

17   ALLOW THE DEFENSE TO ESTABLISH SOMETHING.  BUT, AGAIN, FROM

18   YESTERDAY'S POSITION IN TERMS OF ASKING MR. HARDWICK, DIDN'T

19   CLIENTS TELL YOU THAT THEY LEFT THE FIRM BECAUSE OF THE

20   NEGATIVE PUBLICITY DUE TO THE LAWSUIT, THAT'S JUST CLASSIC

21   HEARSAY, SO WE CAN'T DO IT THAT WAY.

22             WHAT I THINK IS MOST FAIR AND JUST IS FOR THE DEFENSE

23   TO BE ABLE TO ASK MR. HARDWICK TWO QUESTIONS:  ONE, WAS A

24   LAWSUIT FILED; AND, TWO, WAS THERE NEGATIVE PUBLICITY AS A

25   RESULT -- WHICH HE WOULD HAVE PERSONAL KNOWLEDGE OF -- AND THEN

1    NOT GO ANY FURTHER THAN THAT IN TERMS OF THAT ANY CLIENTS TOLD

2    HIM THAT THAT'S IN FACT WHY THEY LEFT, WHICH, AGAIN, IS

3    HEARSAY.

4            SO THAT WOULD BE MY POSITION, TO ALLOW THOSE TWO

5    QUESTIONS AND NOT TO GO ANY FURTHER INTO THE LAWSUIT OR

6    ANYTHING THAT ANY INDIVIDUAL CLIENTS SAID.

7            MR. GARLAND, YOU'RE STANDING FIRST, SO I'LL LET YOU

8    WEIGH IN ON IT, AND THEN I'LL LET THE GOVERNMENT.

9            MR. GARLAND:  YOUR HONOR AT ONE POINT SAID --

10           THE COURT:  EXCUSE ME.  I'M SORRY.

11           MR. GARLAND:  YOUR HONOR AT ONE POINT SAID WE COULD

12   GO INTO JUST A LITTLE BIT.  WHAT I WANT TO SHOW IS THE

13   WIDESPREAD PUBLICITY AND THAT THE ACCUSATION THAT HE WAS A

14   CROOK AND THE BOOKKEEPER WERE CROOKS AND HAD PILFERED THE

15   ESCROW ACCOUNTS WAS WIDELY DISSEMINATED.

16           THE COURT:  ALL RIGHT.  I DON'T -- I MEAN, LOOKING AT

17   IT NOW -- I GUESS I DIDN'T UNDERSTAND THE FULL SCOPE AT THE

18   TIME WE VISITED THIS ISSUE IN THE MOTION IN LIMINE.  MY FEELING

19   IN CONSIDERING IT ALL NOW IS REALLY NOT RELEVANT.  HOWEVER, I

20   UNDERSTAND WE'VE GOTTEN THERE TO SOME EXTENT.  BUT IN TERMS OF

21   WHETHER OR NOT MR. HARDWICK IS GUILTY OF THE CHARGES IN THE

22   INDICTMENT, WHAT ULTIMATELY HAPPENED TO THE FIRM DOESN'T MAKE

23   HIM LESS OR MORE GUILTY.

24           BUT, AGAIN, HAVING SAID THAT, I UNDERSTAND THAT SOME

25   THINGS HAVE COME OUT AND ARE NOW BEFORE THIS JURY.  AND, AGAIN,

3125

1    I JUST WANT TO BE JUST AND BALANCE IT.

2              SO I DON'T HAVE AN ISSUE WITH WHAT YOU'VE JUST

3    PROPOSED, MR. GARLAND.

4              LET ME HEAR FROM THE GOVERNMENT.

5              MS. BARRON:  MR. GILFILLAN MAY WANT TO WEIGH IN, TOO,

6    BUT I'M HANDLING THE REBUTTAL WITNESS.

7              THE COURT:  OKAY.

8              MS. BARRON:  I WOULD ASK YOUR HONOR'S PERMISSION TO

9    ASK THE EXACT SAME QUESTION TO THE REBUTTAL WITNESS, WHO WILL

10   BE MARK WITTSTADT, REGARDING THE PRITCHARD AND THE JOHNSON

11   LAWSUITS, PARTICULARLY IN LIGHT OF MR. GINGRAS'S TESTIMONY

12   THAT -- AND I JUST WANT TO ASK HIM, DID MR. JOHNSON AND

13   MR. PRITCHARD ULTIMATELY SUE THE LAW FIRM, AND DID THOSE

14   LAWSUITS GENERATE -- BASICALLY, WHATEVER MR. GARLAND ASKS.

15             THE COURT:  ALL RIGHT.  I HAVE NO PROBLEM WITH THAT.

16   I JUST WANT BOTH SIDES TO UNDERSTAND THAT THE GOAL HERE IS

17   SIMPLY NOT TO LITIGATE THE UNDERLYING ALLEGATIONS AND CLAIMS IN

18   THESE OTHER LAWSUITS THAT ARE NOT RELEVANT HERE.  BUT I HAVE NO

19   PROBLEM WITH WHAT EACH OF YOU HAS PROPOSED HERE, SO I AM OKAY

20   WITH THAT.

21             MR. GILFILLAN?

22             MR. GILFILLAN:  YOUR HONOR, I JUST WANTED TO CLARIFY.

23   WITH RESPECT TO CLOSING ARGUMENT, I'VE DESCRIBED MY POSITION IN

24   MY OPENING CLOSING.  I JUST WANTED TO MAKE SURE NOBODY IS

25   SURPRISED THAT IN THE REBUTTAL CLOSING, IN RESPONDING TO

3126

1    MR. GARLAND'S ARGUMENT THAT -- IF HE MAKES THIS ARGUMENT THAT

2    FIDELITY DID THIS AS A BIG MONEY-MAKING OPPORTUNITY AND THEY

3    CRATERED THE FIRM, I DO INTEND TO ARGUE IN CLOSING, DOES

4    ANYBODY HAVE ANY DOUBTS ABOUT WHAT THE FIRST DOMINO TO FALL

5    WAS.  I JUST DON'T WANT THERE TO BE SOME SURPRISE.

6         THE COURT:  I THINK THAT WE ALL SHOULD EXPECT THAT.

7    AGAIN, MY RULINGS ARE ALSO BASED ON THE CHARGE THAT THE JURY

8    WILL BE GIVEN IN TERMS OF SYMPATHY AND ALL.  THEY ARE

9    INSTRUCTED TO NOT MAKE A VERDICT FINDING BASED ON SYMPATHY FOR

10   EITHER SIDE.  AND SO WHILE THEY ARE INSTRUCTED NOT TO HAVE

11   SYMPATHY FOR MR. HARDWICK, THEY ALSO SHOULDN'T BE MAKING A

12   VERDICT BASED ON SYMPATHY FOR THESE 800 PEOPLE WHO HAVE LOST

13   THEIR JOBS.  SO I'M TAKING ALL OF THAT INTO CONSIDERATION.

14        BUT, AGAIN, THE WAY THAT I HAVE PROPOSED AND THE WAY

15   THAT THE PARTIES HAVE PROPOSED TO HANDLE THIS I THINK IS

16   REASONABLE AND FAIR UNDER THE CIRCUMSTANCES.  SO I AM SATISFIED

17   WITH THE UNDERSTANDING THAT WE'VE REACHED.

18        AND I HEAR YOU, MR. GILFILLAN.  WHATEVER COMES OUT IN

19   CLOSING, IT'S UP TO YOU ALL TO REBUT.  SO I GET THAT AND I

20   UNDERSTAND IT, AND I THINK THE DEFENSE DOES, TOO.

21        ALL RIGHT.  IS THERE ANYTHING ELSE BEFORE WE DO A

22   CHECK ON OUR JURORS?  GOVERNMENT?

23        MR. PHILLIPS:  NO, YOUR HONOR.

24        THE COURT:  DEFENSE?

25        MR. GARLAND:  NO, YOUR HONOR.

3127

1            THE COURT:  ALL RIGHT.  HOW WE DOING?

2            GOOD MORNING, TONEY.

3            THE COURTROOM SECURITY OFFICER:  GOOD MORNING.  HOW

4   YOU DOING?

5            THE COURT:  FINE.  HOW ARE YOU?

6            THE COURTROOM SECURITY OFFICER:  CAME IN ON THE SPUR

7   OF THE MOMENT.

8            THE COURT:  ALL RIGHT.

9            THE COURTROOM SECURITY OFFICER:  YOUR HONOR, WE'RE

10  MISSING ONE.

11            THE COURT:  MISSING ONE.  ALL RIGHT.  I AM GOING TO

12  SIT HERE FOR JUST A SECOND; HOPEFULLY, THAT ONE JUROR WILL

13  REPORT.  BUT YOU ALL MAY BE AT EASE UNTIL WE GO AHEAD AND HEAR

14  THAT ALL OF THEM ARE PRESENT.

15            THE COURTROOM SECURITY OFFICER:  STILL MISSING ONE.

16            THE COURT:  OKAY.

17            THE COURTROOM SECURITY OFFICER:  WE HAVE EVERYONE,

18  JUDGE.

19            THE COURT:  ALL RIGHT.  WE'RE READY FOR THE JURY.

20            MR. GARLAND AND HARDWICK, AS SOON AS YOU ALL ARE

21  FINISHED TALKING, MR. HARDWICK CAN TAKE THE STAND AGAIN.

22            AND, MR. HARDWICK, I REMIND YOU THAT YOU ARE STILL

23  UNDER OATH.

24            MR. HARDWICK:  YES, MA'AM.

25            (WHEREUPON, THE JURY RETURNED TO OPEN COURT AT

3128

1    9:29 A.M., AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD.)

2              THE COURT:  ALL RIGHT.  THE JURY IS IN PLACE.

3    EVERYONE MAY BE SEATED.  THANK YOU SO MUCH.

4              GOOD MORNING TO YOU, LADIES AND GENTLEMEN.

5              THE JURY:  GOOD MORNING.

6              THE COURT:  AND, MR. HARDWICK, AS I JUST REMINDED

7    YOU, SIR, YOU ARE STILL UNDER OATH.

8              MR. HARDWICK:  YES, MA'AM.

9              THE COURT:  MR. GARLAND, YOU MAY CONTINUE YOUR DIRECT

10   EXAMINATION.

11                   NATHAN E. HARDWICK IV,

12   HAVING BEEN PREVIOUSLY SWORN, WAS EXAMINED AND TESTIFIED AS

13   FOLLOWS:

14                 CONTINUED DIRECT EXAMINATION

15   BY MR. GARLAND:

16   Q.   MR. HARDWICK, I WANT TO BRING YOUR ATTENTION TO THE TIME

17   PERIOD SHORTLY AFTER YOU WERE -- SURRENDERED YOUR STOCK IN THE

18   FIRM AND TRANSFERRED IT TO THE WITTSTADTS.

19   A.   YES, SIR.

20   Q.   I'M BRINGING YOUR ATTENTION, WITHIN ABOUT TEN DAYS, DID

21   SOMETHING SIGNIFICANT HAPPEN?

22   A.   YES, SIR.  THERE WAS A LAWSUIT FILED AGAINST MYSELF AND

23   ASHA BY THE FIRM SAYING THAT -- THERE WAS A LAWSUIT FILED.

24   Q.   WHAT -- AND THAT LAWSUIT, DID IT RECEIVE PUBLICITY IN THE

25   LOCAL MEDIA COMMUNITY?

1    A.   YES.  IT WAS ALL OVER THE NEWS, ALL OVER THE PAPERS,

2    THE -- IT WAS, IT WAS A VERY BAD DAY, YES.

3    Q.   AND WHEN YOU SAY ALL OVER THE NEWS AND OVER THE PAPERS,

4    WOULD YOU DESCRIBE HOW INFORMATION ABOUT EVENTS AFFECTING THE

5    REAL ESTATE AND BANKING, MORTGAGE, AND DEVELOPMENT COMMUNITY IS

6    FREQUENTLY DISSEMINATED?

7    A.   WELL, THERE'S A LOT OF -- THERE'S A COUPLE INTERNAL

8    THINGS, LIKE THE HOUSING WIRE, THAT'S USED.  IT WAS ACTUALLY

9    ON, YOU KNOW, THE LOCAL NEWS.  AND A LOT OF IT IS WORD OF

10   MOUTH.  A LOT OF IT'S, YOU KNOW, JUST THE VARIOUS NEWSPAPERS.

11   IT WAS, IT WAS EVERYWHERE.

12   Q.   WHAT IS HOUSING WIRE?

13   A.   HOUSING WIRE IS JUST AN EXAMPLE OF A LOCAL -- NOT A LOCAL,

14   A NATIONAL ONLINE INDUSTRY NEWSLETTER.

15   Q.   DID IT RECEIVE WIDESPREAD COVERAGE IN THAT MEDIUM?

16   A.   IT DID.

17   Q.   AND THE ALLEGATIONS IN THE LAWSUIT, DID IT ACCUSE YOU OF

18   BEING A CROOK AND HAVING PILFERED THE ESCROW ACCOUNTS?

19   A.   YES, IT DID.

20   Q.   AND DID IT MAKE THE ALLEGATION THAT THE FUNDS OF CLIENTS

21   IN THE ESCROW ACCOUNTS OF THE FIRM WERE UNSAFE?

22   A.   IT DID.

23   Q.   NOW, I WANT TO TURN TO ANOTHER TOPIC.  IN CONNECTION WITH

24   YOUR DEALINGS WITH -- DURING THE TIME WITH MR. MORRIS,

25   SCHNEIDER, AND THE WITTSTADTS, WERE THERE WHAT YOU HAVE

3130

1   REFERRED TO AS EVEN-UPS?

2   A.   YEAH.  ALL THE TIME.  ABSOLUTELY.

3   Q.   AND WHEN YOU SAY ALL THE TIME, HOW FREQUENTLY?

4   A.   WELL, IF YOU LOOK AT THE GOVERNMENT'S, THE GOVERNMENT'S

5   EXHIBIT, I THINK IT'S THE ONE THAT HAS THE 26 MILLION IN IT, IN

6   2011, PROBABLY IN THE E-MAILS BEHIND IT, PROBABLY THERE'S 20 OF

7   THEM THAT REFERENCE SOME SORT OF EVEN-UP.

8   Q.   IN TERMS OF THESE VARIOUS AND VARIED AGREEMENTS --

9   A.   UH-HUH.

10  Q.   -- WERE THOSE AGREEMENTS FOLLOWED?

11  A.   NO.  I MEAN, THE INTENT WHEN EVERYBODY SIGNED IT WAS TO

12  FOLLOW THEM.  THEN IT GOT TO A POINT WHERE THERE WAS --

13  CONSTANTLY THERE WERE CHANGES DONE TO THE AGREEMENTS AS FAR AS

14  HOW THEY WERE DONE.

15  Q.   AND AS YOU UNDERSTOOD IT, WHO WAS THE OWNER OF THE CREDIT

16  FACILITY WITH ACTION CAPITAL?

17  A.   IT WAS IN THE NAME OF THE LAW FIRM.  IT WAS A LAW FIRM

18  FACILITY.

19  Q.   AND ARE YOU FAMILIAR WITH THE FACT THAT MR. SCHNEIDER WAS

20  THE CONTACT POINT UNDER THE AUTHORIZATIONS?

21  A.   WELL, MR. SCHNEIDER IS THE ONE THAT ACTUALLY BROUGHT IT TO

22  THE, TO THE FIRM.

23  Q.   ALL RIGHT.  AND DID YOU HAVE EXPERIENCE WHERE ASHA MAURYA

24  WAS ARRANGING TRANSFERS OUT OF ACTION CAPITAL?

25  A.   YES.

3131

1    Q.    OKAY.  AND WERE THOSE TRANSACTIONS REFLECTED IN INTERNET

2    COMMUNICATIONS WITH THE WITTSTADTS?

3    A.    YES.  OR, YOU KNOW, AGAIN, IT'S USUALLY ASHA WAS TALKING

4    TO FRANK.  THEY WERE THE ONES THAT WERE HAVING A LOT OF THE

5    CONVERSATIONS ABOUT WHAT WAS GOING ON.

6    Q.    AND YOU WERE AWARE OF FREQUENT COMMUNICATIONS BETWEEN

7    FRANK RITTERMAN AND ASHA?

8    A.    YES, I WAS.  I MEAN, THE WAY IT WAS SUPPOSED TO WORK WAS

9    BOB DRISKELL IS THE CFO OF EVERYTHING OVER THOSE TWO.  AND THEY

10   WERE ALL CONSTANTLY COMMUNICATING.

11   Q.    NOW, MR. HARDWICK --

12   A.    YES, SIR.

13   Q.    -- YOU'VE BEEN ON THE STAND A WHILE.

14   A.    YES, SIR.

15   Q.    AND THESE ARE GOING TO BE MY LAST QUESTIONS TO YOU.

16   A.    OKAY.

17   Q.    AT THE TIME YOU SURRENDERED YOUR STOCK, YOU WERE

18   55 PERCENT STOCKHOLDER IN THAT FIRM?

19   A.    THAT IS CORRECT.

20   Q.    WERE YOU INTENDING TO STEAL FROM THE LAW FIRM, YOUR LAW

21   FIRM, OF WHICH YOU WERE 55 PERCENT OWNER?

22   A.    ABSOLUTELY NOT.

23   Q.    WERE YOU --

24   A.    IT DIDN'T MAKE SENSE.

25   Q.    WERE YOU INTENDING TO STEAL FROM ANYONE?

3132

1   A.   NO.  ABSOLUTELY NOT.

2   Q.   WHAT WAS YOUR INTENTION AS IT RELATED TO YOUR LAW FIRM

3   THAT YOU'RE HERE ACCUSED OF STEALING MONEY FROM YOUR OWN LAW

4   FIRM?

5   A.   MY INTENTION WAS TO GROW IT INTO THIS AMAZING -- I MEAN,

6   FIRST OF ALL, I THOUGHT AT THAT POINT IT WAS AN AMAZING FIRM.

7   BUT MY POINT WAS TO TURN IT INTO AN UNDERWRITER -- YOU KNOW,

8   TAKE IT ALL TO 50 STATES, GROW IT INTO SOMETHING BIGGER AND

9   BETTER, AND MAKE IT TO WHERE EVERYBODY IS GOING TO MAKE A LOT

10  OF MONEY.

11  Q.   WHAT WAS YOUR INTENTION AS IT RELATED TO THE WITTSTADTS?

12  A.   WELL, THEY WERE -- AT THAT TIME THEY WERE PARTNERS AND

13  THEY WOULD HAVE MADE A LOT OF MONEY, TOO.

14  Q.   AND WHAT WAS YOUR INTENTION AS IT RELATED TO THE

15  EMPLOYEES?

16  A.   I WANTED THEM TO HAVE THE ABILITY TO -- WHEN WE HIT IT

17  BIG, THAT THEY HAD OWNERSHIP AND THEY HAD A STOCK OPTION PLAN

18  AND THEY MADE A LOT OF MONEY.

19  Q.   DID YOU EVER, EVER HAVE ANY INTENTION TO TAKE ANY MONEY

20  OUT OF AN ESCROW ACCOUNT?

21  A.   ABSOLUTELY NOT.

22  Q.   DID YOU KNOW THAT FUNDS OF THE LAW FIRM WERE GOING INTO AN

23  ACCOUNT LABELED IOLTA?

24  A.   I DID NOT.

25  Q.   DID YOU KNOW YOU WERE RECEIVING ANY MONEY OUT OF AN

3133

1    ACCOUNT LABELED IOLTA?

2    A.   THE ONLY TIME WAS THE ONE TIME IN JUNE THAT WE TALKED

3    ABOUT.  AND I REPRIMANDED EVERYBODY.  THEY DID AN

4    INVESTIGATION, SAID IT WAS A MISTAKE.  THAT WAS THE ONLY TIME.

5    Q.   DID YOU SEND AN E-MAIL DIRECTING ASHA MAURYA TO FIND OUT

6    WHETHER SHE HAD EVER MADE SUCH A MISTAKE BEFORE?

7    A.   I DID.  AND I ALSO ASKED BOB DRISKELL TO ALSO DO THAT.

8    Q.   MR. HARDWICK --

9    A.   YES, SIR.

10   Q.   -- ARE YOU GUILTY OR INNOCENT OF THESE CHARGES?

11   A.   I AM ABSOLUTELY INNOCENT OF ALL THESE CHARGES.

12   ABSOLUTELY.

13           MR. GARLAND:  I HAVE NO FURTHER QUESTIONS.

14           THE COURT:  THANK YOU.

15           CROSS-EXAMINATION.

16                     CROSS-EXAMINATION

17   BY MR. PHILLIPS:

18   Q.   MR. HARDWICK, YOUR LAWYER ASKED YOU A LOT OF QUESTIONS

19   YESTERDAY ABOUT WHAT ASHA SAID TO YOU.  DO YOU REMEMBER THAT?

20   A.   I DO REMEMBER HIM ASKING ME A LOT OF QUESTIONS.

21   Q.   YOU TALKED A LOT ABOUT THE DASHBOARDS AND THE CASH FLOW

22   STATEMENTS AND YOUR CONVERSATIONS WITH ASHA ABOUT THAT, RIGHT?

23   A.   YES, SIR.

24   Q.   BUT YOU'RE NOT CHARGED WITH MAKING FALSE STATEMENTS TO

25   ASHA, ARE YOU?

3134

1    A.   I DON'T BELIEVE SO.

2    Q.   AND ASHA WASN'T CHARGED WITH MAKING FALSE STATEMENTS TO

3    YOU?

4    A.   I DON'T KNOW THE ANSWER TO THAT QUESTION BECAUSE I DON'T

5    KNOW HOW THAT COMES IN WITH THIS ALLEGED CONSPIRACY.

6    Q.   BUT YOU'RE BOTH CHARGED WITH MAKING FALSE STATEMENTS TO

7    YOUR LAW PARTNERS, RIGHT?

8    A.   I DON'T KNOW THE ANSWER TO THAT QUESTION, IF THAT'S WHAT

9    YOU ARE ASKING ME.

10   Q.   HAVE YOU READ THE INDICTMENT?

11   A.   I'VE READ THE INDICTMENT, YEAH.

12   Q.   YOU UNDERSTAND THAT THE INDICTMENT CHARGES YOU WITH

13   CONDUCTING A SCHEME TO DEFRAUD YOUR LAW PARTNERS?

14   A.   I UNDERSTAND INSTEAD THAT I WAS, I WAS -- I HAD GOTTEN

15   GREATLY MORE MONEY THAN I THOUGHT I WAS SUPPOSED TO GET.

16   THAT'S WHAT I UNDERSTOOD.

17   Q.   WELL, I WANT TO ASK YOU SOME QUESTIONS ABOUT

18   REPRESENTATIONS AND STATEMENTS THAT WERE MADE TO YOUR LAW

19   PARTNERS.

20   A.   SURE.

21   Q.   FIRST OF ALL, DO YOU AGREE THAT THE PERCENTAGES FOR YOUR

22   OWNERSHIP IN THE FIRM ARE CORRECTLY STATED IN GOVERNMENT

23   EXHIBIT 1002?

24   A.   I AGREE THAT THOSE WERE THE PERCENTAGES THAT WERE ON THE

25   DOCUMENTS.  I DON'T NECESSARILY AGREE WHEN EACH DOCUMENT WAS IN

3135

1    EFFECT.

2    Q.    BUT ACCORDING TO THE DOCUMENTS THAT WERE ENTERED INTO

3    EVIDENCE THAT ARE DESCRIBED HERE IN THIS EXHIBIT, THOSE WERE

4    YOUR OWNERSHIP PERCENTAGES ON THOSE DAYS.

5    A.    AGAIN, I AGREE --

6    Q.    IS THAT CORRECT OR NOT?

7    A.    I GET TO TELL THE WHOLE TRUTH, RIGHT?  I'M TRYING TO

8    ANSWER THE QUESTION.  I DON'T KNOW.  I CAN'T ANSWER --

9    Q.    JUST ANSWER THE QUESTION.

10   A.    IT'S NOT A YES OR NO ANSWER.

11   Q.    WELL, LET ME RESTATE IT FOR YOU.

12   A.    OKAY.  I'M HAPPY TO ANSWER THE QUESTION.  OKAY.

13   Q.    DO YOU AGREE THAT THE DOCUMENTS THAT ARE DESCRIBED HERE

14   STATE THAT YOU HAD THESE OWNERSHIP PERCENTAGES ON THESE

15   EFFECTIVE DATES?

16   A.    I AGREE THE DOCUMENTS DO, YES.

17   Q.    OKAY.  GOVERNMENT EXHIBIT 232 WAS PREVIOUSLY ADMITTED WHEN

18   MR. WITTSTADT TESTIFIED, MARK WITTSTADT.  AND THE LAST PAGE OF

19   THAT EXHIBIT HAS THIS CHART ON THERE.  DO YOU REMEMBER SEEING

20   THAT?

21   A.    I HAVE SEEN IT BEFORE, YES.

22   Q.    ALL RIGHT.  I'M GOING TO FOCUS YOUR ATTENTION ON THE

23   SECTION ENTITLED DISTRIBUTIONS.  AND IF YOU ADD UP THESE

24   NUMBERS IN THIS COLUMN FOR JANUARY, FEBRUARY, MARCH, APRIL, AND

25   MAY, YOU GET THE SUM OF THESE THREE NUMBERS.  WOULD THAT BE

3136

1    CORRECT?

2        ONE OF THEM'S ALREADY DONE FOR YOU HERE, THE SECOND

3    COLUMN, IN THE FEBRUARY COLUMN.  YOU ADD THESE THREE NUMBERS --

4    336,785 PLUS 134,744 PLUS 134,744 -- YOU GET 606,273, RIGHT?

5    A.   YES.  THOSE ADD UP TO THAT NUMBER.

6    Q.   OKAY.  SO WOULD YOU AGREE, THEN -- I'LL LET YOU HAVE A

7    CALCULATOR IF YOU'D LIKE AND YOU CAN ADD UP THESE NUMBERS AND

8    YOU CAN SEE THAT THE SUM IS WHAT'S STATED HERE IN THIS FIRST

9    COLUMN THAT I'M SHOWING YOU.  DO YOU WANT TO DO THAT?

10   A.   NO.

11   Q.   OKAY.

12   A.   AND I SEE THE SUM.

13   Q.   OKAY.

14   A.   THANK YOU.

15   Q.   THAT WAS GOVERNMENT EXHIBIT 232 THAT I'M SHOWING YOU, THIS

16   CHART.  AND TO REFRESH EVERYBODY'S RECOLLECTION, THIS IS AN

17   E-MAIL THAT YOU RECEIVED FROM ASHA MAURYA?

18   A.   I'M SORRY.  THIS IS 232-A?

19   Q.   THE ONE I'M SHOWING YOU ON THE SCREEN IS 232.

20   A.   GOT IT.  GOT IT.  GOT IT.

21   Q.   THAT'S AN E-MAIL FROM ASHA TO YOU ON JUNE 19TH, RIGHT?

22        MR. GARLAND:  YOUR HONOR, MAY HE HAVE A COPY SO HE

23   CAN SEE THE WHOLE DOCUMENT?

24        DO YOU HAVE A COPY?

25        THE WITNESS:  I GOT SOMETHING.  I DON'T KNOW IF IT'S

3137

1    THIS.

2    BY MR. PHILLIPS:

3    Q.   I HAVEN'T ASKED YOU ANY QUESTIONS ABOUT 232-A.  I'M

4    SHOWING YOU THE DOCUMENT THAT'S ON THE SCREEN.

5    A.   GOT IT.

6              THE COURT:  WHAT DOCUMENT IS IT AGAIN?

7              MR. PHILLIPS:  232.

8              THE COURT:  DO YOU HAVE 232?

9              MR. PHILLIPS:  IT'S ON THE SCREEN.

10             THE COURT:  I UNDERSTAND THAT.

11             THE WITNESS:  NO, I DO NOT.

12             THE COURT:  AND YOU'RE ASKING IF HE CAN HAVE A HARD

13   COPY.

14             MR. GARLAND:  YES.

15             THE COURT:  I DON'T KNOW IF WE HAVE ANOTHER HARD

16   COPY, MR. GARLAND.

17             MR. GARLAND:  SO HE CAN SEE OTHER THAN SEE JUST PART.

18             THE COURT:  I DON'T -- I DON'T HAVE A PROBLEM WITH

19   THAT.  I JUST DON'T HAVE A COPY OF IT TO GIVE TO HIM.

20             MR. GARLAND:  THANK YOU.

21             THE WITNESS:  THANK YOU.

22   BY MR. PHILLIPS:

23   Q.   YOU'LL SEE ON PAGE 3 OF THAT EXHIBIT THAT THIS CHART THAT

24   I SHOWED YOU IN THE BEGINNING WAS FORWARDED TO YOU BY ASHA

25   MAURYA ON JUNE 20TH, 2014, RIGHT?

3138

1    A.    OKAY.  I'M SORRY.  I'M ON THE WRONG PAGE.

2    Q.    IT'S PAGE 3.

3    A.    I SEE A FED REFERENCE NUMBER.

4    Q.    IT WAS FORWARDED TO MARK WITTSTADT THE SAME DAY.

5    A.    GOT IT.

6    Q.    THAT'S PAGE 4.

7    A.    OKAY.

8    Q.    AND IT WAS FORWARDED TO ROD WITTSTADT THE SAME DAY, AND

9    THAT'S PAGE 6.  DO YOU SEE THAT?

10   A.    I DO.

11   Q.    ON PAGE 8, THE LAST PAGE --

12   A.    UH-HUH.

13   Q.    FIRST OF ALL, WE NEED TO CLARIFY SOMETHING.  WHEN YOU'RE

14   TALKING ABOUT MAKING DISTRIBUTIONS, IF YOU'RE TALKING ABOUT --

15   IF YOU'RE IN, LET'S SAY, FEBRUARY OF 2014 AND YOU'RE TALKING

16   ABOUT MAKING A DISTRIBUTION, YOU'RE LOOKING AT JANUARY'S

17   NUMBERS, YOUR PERFORMANCE IN JANUARY, RIGHT?

18   A.    NOT NECESSARILY.  AND THAT'S ONE OF THE MISNOMERS IN THIS

19   WHOLE THING.  YOU CAN'T TAKE SNAPSHOTS.

20   Q.    WOULD YOU AGREE THAT THAT'S WHAT'S BEING REPRESENTED HERE,

21   THOUGH, IS HOW MUCH MONEY YOU MADE IN JANUARY, AND THEN

22   FEBRUARY, MARCH, APRIL, MAY?  AND THOSE ARE THE DISTRIBUTIONS

23   THAT ARE BEING DESCRIBED THERE?

24   A.    IT CERTAINLY SAYS THAT.  I DON'T KNOW IF --

25   Q.    AND SO, FOR EXAMPLE, WHEN YOU'RE LOOKING AT THE MAY

3139

1    NUMBERS --

2    A.    RIGHT.

3    Q.    -- THIS E-MAIL IS DATED JUNE.

4    A.    YES.

5    Q.    SO YOU'RE LOOKING BACK TO MAY, RIGHT?

6    A.    WELL, COULD BE APRIL, MAY, ALL THE WAY BACK.  I DON'T KNOW

7    HOW FAR BACK IT GOES.  IT'S ALL ABOUT WHEN THE CASH COMES IN.

8    Q.    OKAY.  AND WHAT ASHA TOLD YOU IN THIS E-MAIL ON PAGE 1 IS:

9    WE CAN DO A TOTAL OF 605,000.  AND THAT WOULD MEAN 242,000 TO

10   YOU.  RIGHT?

11   A.    YEAH.  ON THAT DATE, YES.

12   Q.    AND THEN 96,000 TO MARK AND ROD EACH.

13   A.    CORRECT.

14   Q.    AND THEN 60 OFF THE TOP TO ART.

15   A.    RIGHT.  THAT'S WHAT IT SAYS.

16   Q.    AND SO IN THE DISTRIBUTION COLUMN, IF YOU LOOK -- LOOKING

17   BACK AT MAY, THIS IS THE 242 I'M SHOWING YOU IN THIS COLUMN ON

18   THE FAR RIGHT, RIGHT?  PAGE 8?

19   A.    RIGHT.

20   Q.    AND THEN THOSE ARE THE NUMBERS FOR THE WITTSTADTS, THE

21   96,939 FOR EACH OF THEM.  RIGHT?

22   A.    RIGHT.  THAT WAS WHAT SHE WAS ESTIMATING AT THAT TIME.

23   Q.    OKAY.  AND IF YOU GO BACK TO THE E-MAIL THAT ASHA SENT TO

24   THE WITTSTADTS, LOOK AT PAGE 5, IF YOU WANT TO LOOK AT YOUR

25   HARD COPY INSTEAD OF LOOKING AT THE SCREEN.

3140

1   A.   I CAN SEE FROM THIS ONE.

2   Q.   YOU CAN SEE SHE WIRED MARK WITTSTADT $96,939, RIGHT?

3   A.   FROM THAT DISTRIBUTION, CORRECT.

4   Q.   THERE'S A FED REFERENCE NUMBER ON THERE TO CONFIRM THAT.

5   AND SHE WIRED THE SAME AMOUNT TO ROD WITTSTADT, AND THAT'S

6   SHOWN ON PAGE 6.

7   A.   RIGHT.  FOR THAT DISTRIBUTION, CORRECT.

8   Q.   AND YOU WERE SUPPOSED TO GET 242.  LET'S TALK ABOUT HOW

9   MUCH YOU ACTUALLY GOT.

10       NOW IF YOU'LL LOOK AT GOVERNMENT EXHIBIT 232-A.

11   A.   UH-HUH.

12   Q.   THIS IS TAKEN FROM A DOCUMENT THAT'S ALREADY IN EVIDENCE.

13   A.   RIGHT.

14   Q.   THE ONE THAT YOU KEEP REFERRING TO AS THE 26 MILLION, THIS

15   JUST PULLS OUT THAT -- THAT ONE MONTH AND HIGHLIGHTS THAT.

16       WHAT'S THE TOTAL AMOUNT OF MONEY THAT YOU GOT IN FEBRUARY

17   20 -- I'M SORRY.  I LOOKED AT THE WRONG ONE.

18   A.   SO IT'S NOT 232-A?

19   Q.   HOLD ON A SECOND.  NO.

20   A.   IT'S CONFUSING.

21       ALL RIGHT.  THANK YOU.

22   Q.   SHOULD BE 232-E.

23   A.   E.  OKAY.

24   Q.   SO WHAT'S THE TOTAL AMOUNT OF MONEY THAT YOU GOT IN JUNE

25   OF 2014?

3141

1   A.    $1,350,375.73.

2   Q.    IS THAT MORE OR LESS THAN THE 242,000 THAT WAS REPRESENTED

3   IN THOSE E-MAILS THAT WE JUST LOOKED AT?

4   A.    IT'S, IT'S MORE.  IT'S JUST NOT A COMPARISON.

5   Q.    AND IF YOU LOOK AT GOVERNMENT EXHIBIT 232-E, HERE ARE ALL

6   THE DIFFERENT PAYMENTS THAT WERE MADE TO YOU OR FOR YOUR

7   BENEFIT FOR THAT MONTH; IS THAT RIGHT?

8   A.    THAT IS CORRECT.

9   Q.    WE'VE GOT ON JUNE 2ND, $25,000 TO COLONY BANK.  THAT WAS

10  ON YOUR JUDGMENT THAT YOU HEARD ROY MANOLL AND BETH

11  KORNEGAY-TYLER TALK ABOUT, RIGHT?

12  A.    CORRECT.

13  Q.    AND THEN WE'VE GOT $32,930.77 PAYABLE TO FORTUNA.  AND

14  THAT WAS FOR THE LOAN THAT YOU GOT TO BUY OUT DALE JACKSON,

15  YOUR FORMER PARTNER, RIGHT?

16  A.    YES, THAT WAS CORRECT.  PAID BY THE FIRM, TAKEN OUT OF MY

17  BONUS.

18  Q.    AND THEN YOU HAD TO PAY YOUR JUDGMENT TO NETJETS, AND THAT

19  WAS $33,444.24?

20  A.    OKAY.

21  Q.    IS THAT RIGHT?

22  A.    THAT'S CORRECT.

23  Q.    THEN YOU HAD A PERSONAL DEBT TO SUNTRUST, WHERE YOU MADE A

24  CATCH-UP PAYMENT OF $59,685.72, RIGHT?

25  A.    I DON'T KNOW IF THAT'S THE PERSONAL LOAN OR NOT.

3142

1    Q.    WELL --

2    A.    I'M TRYING TO GET TO THE DOCUMENT.  IT IS.

3    Q.    YOU AGREE THAT WAS --

4    A.    I AGREE.  I JUST HAD TO GET TO THE PAGE.

5    Q.    OKAY.

6    A.    I AGREE.

7    Q.    ALL RIGHT.  AND THEN THE NEXT THING IS THERE'S $400,000

8    THAT WAS PAID TO THE VENETIAN ON JUNE 3RD?

9    A.    OKAY.

10   Q.    CORRECT?

11   A.    I BELIEVE THAT'S CORRECT.

12   Q.    THEN THERE WAS, ON JUNE 4TH, $96,810 PAID TO APOLLO JETS?

13   A.    CORRECT.

14   Q.    THEN ON JUNE 19TH, THERE WAS $12,500 PAID DIRECTLY TO YOU?

15   A.    I HAVEN'T FOUND THAT ONE YET.  WHAT PAGE IS THAT ON?  I

16   DON'T SEE THAT ONE.  DOESN'T MEAN IT'S NOT THERE.

17   Q.    IT'S BATES STAMPED STB-15231, AND IT'S TOWARD THE BACK OF

18   THE DOCUMENT.  DO YOU SEE THAT FROM THE MHS LAW PC MASTER

19   ACCOUNT, YOU GOT $12,500?

20   A.    HOLD ON ONE SECOND.

21   Q.    PAYABLE TO YOU?

22   A.    I'M SORRY.  JUST GIVE ME ONE SECOND.  I'LL FIND IT.  I

23   WANT TO LOOK AT IT.

24   Q.    I'M SHOWING IT TO YOU ON THE SCREEN, MR. HARDWICK.

25   A.    I'M SORRY.  YEAH, I SEE THAT.

3143

1   Q.   ALL RIGHT.  SO YOU AGREE THAT WAS PAID TO YOU?

2   A.   WELL, NO, I DO NOT AGREE THAT WAS PAID TO ME.  BUT IT WAS

3   PAID, YES.

4   Q.   IT WAS PAID TO YOU, WASN'T IT?  IT JUST SAID TO NAT

5   HARDWICK.

6   A.   DOESN'T IT SAY CHASE?  I'M SORRY.  DOESN'T IT SAY CHASE?

7   Q.   SO YOU'RE SAYING IT WAS PAID TO CHASE FOR YOUR BENEFIT?

8   A.   NO.  I'M SAYING IT'S PAID TO CHASE.

9   Q.   FOR YOUR BENEFIT?

10  A.   IT WAS ON A CARD.  I DON'T KNOW WHAT THE -- IT'S BUSINESS

11  EXPENSES OR PERSONAL EXPENSES ARE ON THAT CARD.

12  Q.   IT WAS FOR YOUR BENEFIT?

13  A.   IT WAS PAID TO A CARD, BUT I DON'T KNOW IF IT WAS FOR MY

14  BENEFIT OR NOT.

15  Q.   IT'S GOT YOUR NAME ON IT, DOESN'T IT?

16  A.   IT DOES HAVE -- YES.  IT CLEARLY HAS MY NAME ON IT, YES.

17          THE COURT:  EXCUSE ME FOR ONE SECOND.  ATTORNEYS,

18  APPROACH REAL QUICKLY FOR ME.

19          (WHEREUPON, A BENCH CONFERENCE OUT OF THE HEARING OF

20  THE JURY PROCEEDED AS FOLLOWS:)

21          THE COURT:  I JUST WANT TO MAKE SURE THAT YOU ALL ARE

22  KEEPING AN EYE ON WHO REENTERS THE COURTROOM BASED ON WHO YOU

23  PLAN TO CALL FOR REBUTTAL.  JUST TO KEEP AN EYE.

24          MR. PHILLIPS:  OKAY.

25          THE COURT:  JUST AS LONG AS YOU ALL ARE OKAY.  ALL

3144

1    RIGHT.  THANK YOU.

2              ALL RIGHT.  THANK YOU.

3              MR. GARLAND:  YOUR HONOR --

4              THE COURT:  MOVE AWAY FROM THE BENCH.

5              MR. GARLAND:  CAN WE COME --

6              THE COURT:  MOVE AWAY FROM THE BENCH.

7              ALL RIGHT.  COME BACK.  COME ON BACK.

8              MR. GARLAND:  WE STILL HAVE BOTH THOSE INDIVIDUALS

9    UNDER SUBPOENA, AND WE'D LIKE TO EXCLUDE THEM.

10             MS. BARRON:  WE HAVE BEEN TOLD THAT NAT HARDWICK IS

11   THEIR LAST WITNESS.  WE ARE NOT CALLING THEM, SO I DON'T SEE

12   ANY REASON THEY CAN'T BE RELEASED.

13             MR. GARLAND:  IF THEY PUT UP REBUTTAL, IT'S SOMETHING

14   THEY CAN REBUT, I THINK THEY WOULD HAVE A RIGHT TO CALL THEM.

15             MS. BARRON: THE GOVERNMENT GETS THE RIGHT.

16             MR. GARLAND:  WE WOULD TAKE THE POSITION WE HAVE THE

17   RIGHT TO CONFRONT THE CHARGE AGAINST US, INCLUDING THE RIGHT --

18             THE COURT:  TO DO A SURREBUTTAL.  I'VE JUST NEVER

19   SEEN IT.

20             MR. GARLAND:  SURREBUTTAL.

21             THE COURT:  I'VE SEEN IT IN PLEADINGS, NOT IN TRIAL.

22   I'VE NEVER SEEN IT.

23             MR. GARLAND:  UNDER THE CONSTITUTION, IT'S AN

24   ESSENTIAL RIGHT AND MATERIAL.  AND THEN WE THINK WE HAVE THAT

25   RIGHT NOW.  I'M NOT SAYING WE'RE GOING TO DO THAT.

1           THE COURT:  AND YOU PROBABLY WON'T, I UNDERSTAND

2     THAT.  BUT I CAN'T DO ANYTHING THAT IS GOING TO TRIGGER

3     MISTRIAL.  I DON'T KNOW.  I HAVE NEVER SEEN SURREBUTTAL IN

4     TRIAL, BUT I'M NOT PREPARED TO SAY IT DOESN'T EXIST.  I JUST

5     DON'T KNOW SITTING HERE RIGHT NOW.

6           MR. GARLAND:  IT'S A QUESTION OF ITS SIGNIFICANCE.

7     IF THERE WAS SOMETHING SAID CLEARLY.

8           MS. BARRON:  ROD WITTSTADT WAS A DEFENSE WITNESS.

9     SPECIFICALLY WE SAID YES AND HE SAT IN.

10          THE COURT:  THAT'S WHAT I DON'T RECALL, IS SOME OF

11    THESE WITNESSES.  I ASKED BOTH SIDES IF YOU HAD ANY PROBLEM.

12    SOME WERE EXCUSED, BUT I DON'T KNOW WHICH ONES RIGHT NOW.

13    OKAY.  SO ROD.  WHAT ABOUT MORRIS?

14          MS. BARRON:  WE'RE NOT CALLING HIM.

15          YOU'VE TOLD US THAT THIS IS YOUR LAST WITNESS.

16          MR. GARLAND:  IT IS MY LAST WITNESS, DEPENDING ON

17    WHAT YOU DO.

18          THE COURT:  I UNDERSTAND THAT, MS. BARRON.  I

19    UNDERSTAND THAT.  AND I'M NOT SAYING YOU'RE WRONG.  WHAT I AM

20    SAYING, AS THE JUDGE, I DON'T WANT TO ALLOW SOMETHING THAT

21    COULD CAUSE A REVERSAL OR MISTRIAL.  SO THAT'S WHAT I AM TRYING

22    TO AVOID.  THE BOTTOM LINE IS WHAT'S PROPER.

23          I DON'T KNOW WHAT THE RULE IS ON SURREBUTTAL,

24    MR. GARLAND.  I DO WONDER SERIOUSLY IF YOU ARE ANTICIPATING

25    CALLING THEM AGAIN.  AND YOU DO UNDERSTAND THEIR INTEREST IN

3146

1    WANTING TO HEAR THE PRESENTATION OF THIS EVIDENCE.

2           MR. GARLAND:  YES.

3           THE COURT:  I WISH I HADN'T EVEN RAISED IT AT THIS

4    POINT, BUT IT'S JUST --

5           MR. GARLAND:  HOW THIS CROSS-EXAMINATION GOES, THERE

6    COULD BE SOMETHING THAT THEY ASSERT THAT COULD CAUSE ME TO WANT

7    TO CALL THEM.

8           THE COURT:  BUT THEN YOU HAVE THAT RIGHT -- EVEN IF

9    YOU WANT TO, DO YOU HAVE THAT RIGHT ON A SURREBUTTAL AT TRIAL,

10   BECAUSE I HAVE NOT HEARD OF IT.

11          MR. GARLAND:  BEFORE I REST MY CASE, IF THIS

12   CROSS-EXAMINATION REVEALS SOMETHING THAT I WANT TO --

13          MS. BARRON:  ASK TO RECALL HIM.

14          MR. GARLAND:  I COULD.  I'M NOT SAYING I WILL.

15          THE COURT:  OKAY.  OKAY.  OKAY.  OKAY.

16          MS. BARRON:  WHAT IS CLEAR IS THAT THE GOVERNMENT HAS

17   THE BURDEN OF PROOF, AND BECAUSE WE HAVE THAT BURDEN, WE GO

18   LAST.

19          THE COURT:  RIGHT.  BUT WHAT HE'S SAYING IS,

20   NOTWITHSTANDING WHETHER OR NOT THEY HAVE A RIGHT TO

21   SURREBUTTAL, HE MIGHT RECALL THEM IN HIS CASE, CALL THEM BACK

22   TO THE STAND.  SO THE ISSUE NOW WILL COME DOWN TO WHO ACTUALLY

23   HAS BEEN RELEASED AND WHO HAS NOT.  WE ARE IN AGREEMENT THAT

24   ROD WITTSTADT WAS.  WHAT ABOUT ART MORRIS?

25          MS. BARRON:  WE RELEASED HIM.  WE'RE NOT CALLING HIM.

3147

1          MR. GARLAND:  TO MY KNOWLEDGE, WE HAVE NOT RELEASED

2     HIM.

3          (WHEREUPON, PROCEEDINGS RESUMED IN OPEN COURT AS

4     FOLLOWS:)

5          THE COURT:  OKAY.  LADIES AND GENTLEMEN, THERE IS A

6     DISCREPANCY OR DISAGREEMENT AS TO WHICH WITNESSES THAT HAVE

7     BEEN CALLED HAVE ACTUALLY BEEN RELEASED AND ARE THUS NOT

8     SUBJECT TO THE RULE.

9          MR. GERARD WITTSTADT, EVERYONE IS IN AGREEMENT, WAS

10    ACTUALLY EXCUSED AND SO MAY REMAIN IN THE COURTROOM.

11         MR. ART MORRIS, I DON'T KNOW RIGHT NOW WITHOUT

12    LOOKING BACK ON THE RECORD WHETHER OR NOT MR. MORRIS WAS

13    ACTUALLY EXCUSED.

14         SO, MR. MORRIS, SIR, I'M SORRY.  YOU ARE STILL

15    SUBJECT TO THE RULE UNTIL THAT DETERMINATION IS MADE, WHICH

16    MEANS YOU HAVE TO SIT OUTSIDE OF THE COURTROOM IN THE EVENT

17    THAT YOU BE CALLED BACK.  MY APOLOGIES.  WE JUST ARE IN

18    DISAGREEMENT AS TO WHAT YOUR STATUS WAS WHEN YOU LEFT THE

19    STAND.

20         ALL RIGHT.  SORRY ABOUT THAT.

21    BY MR. PHILLIPS:

22    Q.   MR. HARDWICK, THE NEXT PAYMENT FOR THAT MONTH IN JUNE OF

23    2014 WAS $300,000 PAID TO DIVOT HOLDINGS, LLC, RIGHT?

24    A.   THAT IS CORRECT.

25    Q.   YOU WERE THE SOLE OWNER OF DIVOT?

3148

1    A.    THAT IS CORRECT.

2    Q.    THE NEXT PAYMENT WAS ON JUNE 27TH TO DIVOT FOR $68,653.

3    DO YOU SEE THAT?

4    A.    THAT IS CORRECT.

5    Q.    THE NEXT PAYMENT WAS JUNE 30TH TO DIVOT FOR $321,352,

6    RIGHT?

7    A.    THAT IS CORRECT.

8    Q.    AND IF YOU ADD ALL THOSE NUMBERS UP, YOU GET

9    $1,350,375.73.  THAT'S WHAT YOU GOT FOR THE MONTH OF JUNE 2014,

10   RIGHT?

11   A.    THAT IS CORRECT.

12   Q.    AND DO YOU ADMIT THAT YOUR PARTNERS DIDN'T KNOW THAT YOU

13   GOT ALL OF THESE DISTRIBUTIONS?

14   A.    NO, I DO NOT ADMIT THAT.  AND THIS IS A PERFECT EXAMPLE OF

15   WHAT WE'VE BEEN TALKING ABOUT THIS ENTIRE TIME.  OKAY.  TAKE A

16   SNAPSHOT.

17         HERE'S ONE SITUATION.  YOU LOOKED AT THIS NUMBER.  THE

18   321,352 WAS A SEPARATE BONUS THAT THE WITTSTADTS GOT PAID

19   $107,000 EACH FOR THE 321,352 CAME STRAIGHT OFF OF THE

20   DASHBOARD SHEETS -- OR EXCUSE ME, THE CASH DISTRIBUTION SHEETS.

21         THE 68,653 CAME FROM PRESIDENTIAL TITLE.  THAT WAS A

22   BUSINESS, AND EVERYBODY GOT PAID THEIR PART.  THAT WAS A

23   BUSINESS THAT WE HAD THAT THEY SHUT -- THAT WE SHUT DOWN --

24   IT'S ONE OF THE JOINT VENTURES WE TALKED ABOUT -- THEN

25   EVERYBODY GOT PAID THEIR PART.

3149

1          I DON'T KNOW WHAT -- I DON'T KNOW WHAT OF THESE -- I DON'T

2     KNOW WHAT THE $300,000 IS OR WHAT THE POINT WAS.  I DON'T -- I

3     HAVEN'T -- YOU'VE LISTED EVERY SINGLE DOLLAR THAT I HAVE, BUT

4     HAVE NOT GONE INTO FIGURING OUT WHAT IT'S FOR.

5          BUT I DO -- BUT I ADMIT THAT THE 242 IS BIGGER THAN THIS

6     NUMBER BECAUSE THAT'S SIMPLE MATH.  BUT I'M NOT SAYING THEY'RE

7     NOT COMPARABLE.

8     Q.   SO WHEN MARK WITTSTADT TESTIFIED THAT YOU GOT

9     DISTRIBUTIONS THAT HE DIDN'T KNOW ANYTHING ABOUT, HE WAS JUST

10    MISTAKEN?

11    A.   WELL, NO.  OKAY.  THAT WASN'T THE QUESTION YOU ASKED ME.

12    I DON'T KNOW WHAT HE KNOWS.  I DON'T KNOW WHAT HE KNOWS ABOUT.

13    ALL I KNOW IS MY INFORMATION.  I GOT INFORMATION FROM ASHA, I

14    GOT INFORMATION FROM DIFFERENT THINGS, AND THAT'S WHAT -- HOW I

15    GOT PAID.  I HAD NO INTENT TO HARM ANYONE.

16    Q.   YOU KEEP SAYING THAT.  BUT YOU RECOGNIZE THAT --

17    A.   I DO HAVE THE RIGHT TO SAY IT.  YES, I DO.

18              MR. GARLAND:  OBJECTION.

19              THE COURT:  DISREGARD, DISREGARD THE PROSECUTOR'S

20    SIDEBAR COMMENT, YOU KEEP SAYING THAT.

21    BY MR. PHILLIPS:

22    Q.   YOU DIDN'T TELL MARK WITTSTADT OR ROD WITTSTADT THAT YOU

23    GOT THESE EXTRA PAYMENTS WHEN THEY DIDN'T GET ANY, DID YOU?

24    A.   I HAD NO IDEA WHAT -- I DIDN'T -- THERE WAS SOME OF THESE,

25    I PERSONALLY TOLD THEM, SOME OF THESE, I PERSONALLY DIDN'T.

3150

1    THAT'S BECAUSE THEY WERE -- ASHA, FRANK, AND BOB DRISKELL WERE

2    DOING THE COMMUNICATION.  IT'S NOT MY JOB TO EVEN-UP THE

3    NUMBERS.

4    Q.   YOU'RE NOT AWARE OF ANY E-MAILS BETWEEN YOU AND ANY OF

5    YOUR PARTNERS THAT JUSTIFY ANY OF THESE PAYMENTS THAT ARE

6    DESCRIBED IN GOVERNMENT EXHIBIT 232-E, ARE YOU?

7    A.   YOU TALKING ABOUT THE E-MAILS -- YEAH.  THERE'S E-MAILS

8    ABOUT THE 68,653 AND THE $321,000, FOR SURE.

9    Q.   THEY'RE IN HERE?

10   A.   WELL, ONE OF THEM IS ACTUALLY IN HERE, YES.

11   Q.   WELL, LET'S SEE THAT.  WHICH ONE IS IT?

12   A.   IT WOULD BE NUMBER 09 -- OKAY.  OKAY.  HIS RESPONSE -- WE

13   ACTUALLY HAVE THE E-MAIL AT OUR TABLE.  BUT, YES, IT'S

14   MAURYA-0964843.  IT'S THIS ONE.  THERE'S -- WE HAD -- WE HAVE

15   THE COPY.  THE RESPONSE FROM MARK IS, OKAY, GREAT, OR SOMETHING

16   TO THAT EFFECT.

17   Q.   WHAT PAGE ARE YOU ON?

18   A.   THERE'S NO PAGE NUMBERS ON THIS, BUT IT'S ON BATES STAMP

19   NSW-E-MAURYA-0964843.

20   Q.   YOU'RE TALKING ABOUT THIS ONE.

21   A.   THE 321,000, YES.  YES.  SO THIS WAS SENT TO ME.  THIS

22   321,352 IS ONE OF THE COUNTS.  AND WHEN WE WENT OVER THE CASH

23   DISTRIBUTION YESTERDAY, THE DAY -- ON THE 6-30-14, IT SHOWS ALL

24   THIS 535,980 IN THERE.  THEN THE NEXT DAY, IT COMES OUT AND

25   EVERYBODY IS PAID.

3151

1   Q.   AND MARK WITTSTADT TESTIFIED ABOUT THIS IN HIS TESTIMONY

2   HERE IN COURT.   YOU HEARD THAT, RIGHT?

3   A.   I HAVE NO IDEA WHAT HE SAID ABOUT HIS TESTIMONY.   WHAT DID

4   HE SAY?

5   Q.   ALL RIGHT.   I'M GOING TO GO BACK TO 232-A.   THIS IS FOR

6   FEBRUARY.

7   A.   OKAY.

8   Q.   YOU GOT $10,000 PAID TO COLONY BANK.

9   A.   YES.

10   Q.   32,930.77 PAID TO FORTUNA?

11   A.   UH-HUH.   PER THE AGREEMENT, YES.

12   Q.   33,424 PAID TO NETJETS?

13   A.   CORRECT.

14   Q.   55,000 PAID TO SUNTRUST?

15   A.   THAT'S CORRECT.   THAT'S WHAT THIS SAYS, YES.

16   Q.   $2,000 PAID TO DIVOT HOLDINGS, LLC?

17   A.   CORRECT.

18   Q.   AND $30,000 PAID TO COLONY BANK?

19   A.   CORRECT.

20   Q.   AND $250,000 PAID TO DIVOT HOLDINGS?

21   A.   CORRECT.

22   Q.   AND 113,818.98 PAID TO DIVOT.

23   A.   CORRECT.

24   Q.   AND THE TOTAL FOR THAT MONTH WAS 547,193.99, RIGHT?

25   A.   THE TOTAL OF THOSE NUMBERS IS THAT NUMBER, YES.

3152

1    Q.   AND THOSE ARE PAYMENTS THAT YOU RECEIVED IN FEBRUARY BASED

2    ON --

3    A.   THOSE ARE PAYMENTS I RECEIVED.

4    Q.   -- JANUARY CASH?

5    A.   WELL, NOT NECESSARILY.  THOSE ARE PAYMENTS I RECEIVED.  I

6    DON'T KNOW WHAT THE PAYMENTS ARE NECESSARILY FOR, AND I DON'T

7    KNOW THAT IT'S BASED ON JANUARY CASH AND WAS NOT BASED ON

8    DECEMBER CASH OR OCTOBER CASH.

9    Q.   LOOK BACK AT GOVERNMENT EXHIBIT 232 AT PAGE 8.

10   A.   I SEE WHAT --

11   Q.   WHAT WAS REPRESENTED TO THE WITTSTADTS IS THAT YOU WERE

12   GOING TO GET $152,608, RIGHT?

13   A.   ON THIS DOCUMENT FOR THAT ONE DISTRIBUTION, CORRECT.

14   Q.   AND I THINK YOU TESTIFIED YESTERDAY THAT YOU HAD NO IDEA

15   THAT YOU EVER GOT ANY MONEY OUT OF THE ESCROW ACCOUNTS.  DO YOU

16   RECALL THAT?

17   A.   WHAT I SAID, EXCEPT FOR THE ONE IN JUNE.

18   Q.   TALKING ABOUT THE 400,000 TO THE VENETIAN?

19   A.   YES, SIR.

20   Q.   ALL RIGHT.  I'M GOING TO DIRECT YOUR ATTENTION TO

21   GOVERNMENT EXHIBIT 232-A.

22   A.   OKAY.

23   Q.   THE CHECK FOR $2,000 PAYABLE TO DIVOT HOLDINGS.

24   A.   OKAY.

25   Q.   YOU SEE THAT?  $2,000 PAYABLE TO DIVOT HOLDINGS.

3153

1    A.   ON THE FRONT PAGE?  I SEE IT ON THE FRONT -- THE 2,000 ON

2    THE FRONT PAGE.  I'M SORRY.  UH-HUH.

3    Q.   YOU SEE THAT?  IS THAT YOUR SIGNATURE?

4    A.   NOPE.

5    Q.   SO SOMEBODY JUST WROTE YOUR N ON THERE AND DEPOSITED IT?

6    A.   YES.  THAT'S ACTUALLY BOBBIE'S WRITING.

7    Q.   RIGHT.  AND SO IT SAYS FROM AN IOLTA ACCOUNT.  DO YOU SEE

8    THAT?

9    A.   YEAH, I SEE IT.

10   Q.   AND THAT'S NOT YOUR SIGNATURE.  THAT'S WHAT YOU'RE SAYING?

11   A.   WHAT I'M SAYING IS, NO, THAT'S -- I'M SAYING THAT'S NOT MY

12   SIGNATURE, NUMBER ONE.  AND, NUMBER TWO, I'M SAYING JUST

13   BECAUSE THAT CAME FROM AN IOLTA ACCOUNT, THAT COULD HAVE BEEN

14   PART OF A CLOSING.  I DON'T KNOW WHAT THAT'S FROM.  THAT'S NOT

15   TRUE.

16   Q.   AND YOU ADMIT THAT THESE NUMBERS THAT ARE BEING SHOWN TO

17   THE WITTSTADTS ABOUT WHAT'S GOING TO BE DISTRIBUTED ARE BASED

18   ON THE FIRM'S NET INCOME, RIGHT?

19   A.   NO, I DO NOT AGREE WITH THAT.  AND I DON'T KNOW -- I DON'T

20   THINK I WAS ON THE ONES THAT WERE SHARED TO THE WITTSTADTS, WAS

21   I?  I'M NOT SURE HOW THIS WAS DISSEMINATED.

22   Q.   ALL RIGHT.  LET ME DIRECT YOUR ATTENTION BACK TO

23   GOVERNMENT EXHIBIT 230 AT PAGE 1.  DO YOU SEE THAT THIS WAS

24   SENT TO BOTH YOU AND MARK WITTSTADT AT THE SAME TIME?

25   A.   I DO.

3154

1  Q.   AND THE NUMBER THAT WAS REPRESENTED ON PAGE 2, THE FIRM'S

2  ENTIRE NET INCOME YEAR TO DATE, WAS 1 -- JUST A LITTLE BIT OVER

3  1.4 MILLION, $1,426,792, RIGHT?

4  A.   THAT'S WHAT IT SAYS.

5  Q.   AND WOULD YOU AGREE THAT THE SHAREHOLDER AGREEMENTS ALL

6  STATE -- IT DOESN'T MATTER WHICH VERSION YOU LOOK AT, THEY ALL

7  STATE THAT THE BONUS PLAN, THE BONUSES ARE TO BE PAID BASED ON

8  TAXABLE INCOME?

9  A.   I'M SURE THAT'S WHAT THE AGREEMENT SAID, BUT --

10 Q.   THAT'S WHAT THE AGREEMENT SAYS?

11 A.   -- WE WERE PAID OFF CASH.

12 Q.   AND TAXABLE INCOME IS THE SAME THING AS NET INCOME, RIGHT?

13 A.   I DON'T KNOW.  I AM NOT AN ACCOUNTANT.  I KNOW THAT NET

14 INCOME IS NOT THE SAME AS DISTRIBUTION.

15 Q.   ALL RIGHT.  I'M JUST GOING TO DIRECT YOUR ATTENTION REAL

16 FAST TO --

17 A.   OKAY.

18 Q.   -- GOVERNMENT EXHIBIT 980.

19 A.   OKAY.

20 Q.   LET ME SHOW YOU WHERE IT TALKS ABOUT BONUSES.  AND YOU SEE

21 THAT IT'S SUPPOSED TO BE BASED ON THE CORPORATION'S TAXABLE

22 INCOME, RIGHT?

23 A.   IT DOES SAY THAT.  BUT IT ALSO SAYS THAT WE'RE SUPPOSED TO

24 ONLY GET PAID QUARTERLY, AND WE WERE GETTING PAID -- WE HAD

25 LEFT THAT AGREEMENT.

3155

1   Q.   AND YOU HEARD MR. WITTSTADT TALK ABOUT THAT.   HE SAID THAT

2   HE AND HIS BROTHER AGREED THAT YOU WOULD STOP PAYING BONUSES

3   QUARTERLY AND GO TO MONTHLY, RIGHT?

4   A.   NO.   THAT'S NOT WHAT HAPPENED.

5   Q.   IS THAT WHAT HE TESTIFIED TO?

6   A.   I DON'T REMEMBER.

7   Q.   OKAY.

8   A.   I BELIEVE HE MAY HAVE.

9   Q.   BUT YOU DIDN'T HAVE A DISCUSSION LIKE THAT WITH THE

10  WITTSTADTS ABOUT NOT PAYING BONUSES BASED ON TAXABLE INCOME,

11  DID YOU?

12  A.   I DIDN'T HAVE A DISCUSSION WITH ANYBODY, BECAUSE THAT WAS

13  WHAT ASHA, BOB, AND FRANK WERE TALKING ABOUT.

14  Q.   SO YOU ADMIT YOU DIDN'T DO THAT?

15  A.   I DIDN'T HAVE ANY DISCUSSION?

16  Q.   WITH THE WITTSTADTS ABOUT SWITCHING YOUR BONUS PLAN FROM

17  TAXABLE INCOME TO AVAILABLE CASH.

18  A.   I THOUGHT THAT WAS A DIFFERENT QUESTION.   NO.   IT WAS

19  ALWAYS TAXABLE INCOME.   WE WERE -- THE AGREEMENTS WERE WHAT WE

20  WERE INTENDING TO FOLLOW AT THE TIME.   THEN AT SOME POINT THE

21  THINGS WERE CHANGED OVER, AND I WAS TOLD WHAT WAS BEING

22  DISTRIBUTED BY ASHA, FRANK, AND BOB DRISKELL.

23  Q.   LET'S MAKE SURE WE'VE GOT A REALLY CLEAR QUESTION AND

24  ANSWER.

25       DID YOU HAVE A CONVERSATION WITH MARK AND ROD WITTSTADT

3156

1    WHERE YOU CONTEND THAT ALL OF YOU AGREED THAT BONUSES WOULD NOT

2    BE BASED ON TAXABLE INCOME BUT WOULD BE BASED ON AVAILABLE

3    CASH?

4    A.   IT WAS NOT NECESSARILY A --

5    Q.   CAN YOU ANSWER THE QUESTION YES OR NO AND THEN EXPLAIN IT?

6         DID YOU HAVE THAT CONVERSATION OR NOT?

7    A.   IT WAS MORE THAN A CONVERSATION.  IT WAS MORE THAN A

8    CONVERSATION.

9    Q.   IT'S YOUR CONTENTION THAT YOU GOT THEIR AGREEMENT --

10             MR. GARLAND:  BE ALLOWED TO EXPLAIN HIS ANSWER.

11             THE COURT:  I'VE GOT MY EYE ON IT, MY EAR ON IT,

12   MR. GARLAND.  BUT I THINK THEY'RE OKAY RIGHT NOW.

13             GO AHEAD.

14             MR. GARLAND:  OKAY.

15   BY MR. PHILLIPS:

16   Q.   IS IT YOUR CONTENTION, MR. HARDWICK, THAT THE WITTSTADT

17   BROTHERS AGREED WITH YOU THAT BONUSES WOULD BE PAID FROM THAT

18   POINT FORWARD BASED ON AVAILABLE CASH RATHER THAN ON TAXABLE

19   INCOME?  THAT'S YOUR TESTIMONY?

20   A.   MY TESTIMONY IS WHEN THE WITTSTADTS BECAME PARTNERS, WE

21   WERE ALREADY PAYING ON -- ON THAT, ON THE CASH.

22   Q.   BUT THE DOCUMENTS THAT THE WITTSTADTS SIGNED, THE

23   SHAREHOLDER AGREEMENTS, ALL SAY BONUSES ARE TO BE BASED ON

24   TAXABLE INCOME, RIGHT?

25   A.   AND THEY ALSO SAY THEY'RE TO BE PAID EVERY 70 DAYS.  I

3157

1    MEAN, IT'S JUST -- THE CONTRACTS -- THERE'S ALL KIND OF

2    DIFFERENTIAL THINGS IN THE CONTRACT.  THERE'S FOUR TO FIVE

3    DIFFERENT THINGS THAT ACTUALLY CONTRADICT THEMSELVES IN THE

4    CONTRACT.  WE DID THE BEST WE COULD TO FOLLOW THE CONTRACT.

5    WITH THEM HAVING TWO SETS OF BOOKS, US HAVING ONE SET OF BOOKS,

6    WE'RE JUST TRYING TO OPERATE THE COMPANY.

7    Q.   YOU UNDERSTAND THAT WHEN YOU WERE TESTIFYING YESTERDAY

8    ABOUT THE ACTION CAPITAL LINE OF CREDIT, THAT YOU CAN'T JUST

9    DRAW ON THE ACTION CAPITAL LINE OF CREDIT WILLY-NILLY LIKE YOU

10   COULD IF YOU HAD A LINE OF CREDIT BASED ON THE EQUITY IN YOUR

11   HOME, RIGHT?

12   A.   ACTUALLY, I DID NOT UNDERSTAND THAT.  I WAS TOLD BY ASHA

13   IT WAS DISTRIBUTABLE CASH.  IT GOES ALL THE WAY BACK TO OUR

14   DASHBOARDS.  WHEN ART, RANDY, AND I LOOKED AT DASHBOARDS, THE

15   ACTION CAPITAL WAS ON THERE, AS WERE ALL THE CLOSINGS.  THAT

16   WAS -- I WAS TOLD THAT WAS DISTRIBUTABLE CASH BY ASHA.  AND IT

17   WAS -- AND SHE WAS ALWAYS, ALWAYS DRAWING DOWN.  SHE WOULD HAVE

18   MONEY COMING DOWN FOR PAYROLL, MONEY COMING DOWN FOR ALL KIND

19   OF DIFFERENT THINGS.

20   Q.   ISN'T IT TRUE THAT IN ORDER TO GET A DRAW ON THE ACTION

21   CAPITAL LINE OF CREDIT, YOU HAD TO HAVE RECEIVABLES FROM THE

22   DEFAULT BUSINESS UP IN BALTIMORE THAT YOU COULD PLEDGE AS

23   COLLATERAL FOR THAT DRAW?

24   A.   WELL, THAT'S TRUE, BUT THAT'S WHY WE HAD THE NUMBER OF

25   WHAT WAS AVAILABLE.  THERE WAS ALWAYS PLENTY OF RECEIVABLES.

3158

1    THERE WAS NEVER -- IT NEVER TURNED UPSIDE DOWN.

2    Q.    AND ISN'T IT TRUE THAT IN ORDER TO MAKE A DRAW ON THE

3    ACTION CAPITAL LINE OF CREDIT, YOU HAD TO HAVE MARK WITTSTADT'S

4    PERMISSION TO DO IT?

5    A.    NO.  I DON'T THINK THAT'S TRUE.

6    Q.    SO YOUR CONTENTION IS THAT YOU COULD DO THAT FROM DOWN

7    HERE IN ATLANTA?

8    A.    IT WAS A MORRIS HARDWICK SCHNEIDER LOAN.  IT WAS NOT UNDER

9    MARK WITTSTADT, ROD WITTSTADT, OR NAT HARDWICK.  I WAS TOLD

10   THAT THAT WAS DISTRIBUTABLE CASH.  AND I DON'T KNOW IF OR WHEN

11   SHE DREW THAT DOWN OR IF MORE MONEY CAME IN THE NEXT DAY.  I

12   DON'T KNOW.  YOU HAVE 10 DAYS BETWEEN SOME OF THESE CHARTS.  I

13   DON'T KNOW WHEN SHE DID WHAT.  I'M JUST BEING TOLD BY HER, HERE

14   IS THE DISTRIBUTABLE CASH.  PLUS, WE KNEW THERE WAS A BUNCH OF

15   OTHER THINGS THAT WERE DISTRIBUTABLE.

16   Q.    YOU DID NOT HAVE THE POWER TO SIGN ON THE ACTION CAPITAL

17   LINE OF CREDIT TO MAKE A DRAW YOURSELF?

18   A.    I HAVE NO IDEA.  I NEVER DID.

19   Q.    YOU NEVER DID.

20   A.    I NEVER DID.  THAT'S FOR SURE.

21   Q.    ASHA DIDN'T HAVE THE POWER TO DRAW ON THE ACTION CAPITAL

22   LINE OF CREDIT EITHER, DID SHE?

23   A.    THAT'S NOT WHAT I UNDERSTOOD.  I'M NOT SAYING IT'S NOT

24   TRUE.  THAT'S NOT WHAT I UNDERSTOOD.

25   Q.    ALL RIGHT.  LET'S MOVE ON AND LOOK AT THE NEXT MONTH ON

3159

1   GOVERNMENT EXHIBIT 232, WHERE IT WAS REPRESENTED THAT YOU WOULD
2   GET A TOTAL OF $336,785, RIGHT?
3   A.   FOR THAT ONE DISTRIBUTION, CORRECT.
4        ARE WE FINISHED WITH 232-A?  FINISHED WITH THAT ONE?  YES,
5   NO, MAYBE?  OKAY.
6   Q.   I'M HANDING YOU A DOCUMENT THAT I'VE MARKED AS GOVERNMENT
7   EXHIBIT 232-B.
8   A.   RIGHT.
9   Q.   AND DO YOU ADMIT THAT THESE ARE THE DISTRIBUTIONS YOU GOT
10  IN MARCH OF 2014?  $18,363.44 PAYABLE TO DIVOT?
11  A.   YES.
12  Q.   $55,000 PAYABLE TO SUNTRUST?
13  A.   CORRECT.
14  Q.   $25,000 PAYABLE TO COLONY BANK?
15  A.   YES.
16  Q.   32,930.77 PAYABLE TO FORTUNA?
17  A.   I'M TAKING YOUR WORD FOR IT, YES.
18  Q.   WELL, I DON'T WANT YOU TO TAKE MY WORD FOR IT.  LOOK AT
19  THE DOCUMENTS I'VE HANDED YOU.
20  A.   WHAT IF I CAN'T READ DOWN THE THING.  OKAY?
21  Q.   TAKE ALL THE TIME YOU WANT AND LOOK THROUGH THE DOCUMENTS
22  I HANDED YOU BEFORE YOU ANSWER.
23  A.   I THINK I WILL.
24  Q.   OKAY.  IS EVERYTHING THAT YOU'VE SAID SO FAR --
25  A.   YES.

3160

1   Q.   -- REPRESENTED IN THOSE DOCUMENTS?

2   A.   YEP.  IF I SAID IT, YES.

3   Q.   OKAY.  THEN ON MARCH 14TH, YOU GOT 255,974 THAT WAS PAID

4   TO DIVOT?

5   A.   CORRECT.

6   Q.   THEN ON MARCH 20TH, YOU GOT 43,159 THAT WAS PAID TO APOLLO

7   JETS?

8   A.   CORRECT.

9   Q.   THEN ON MARCH 20TH, THE SAME DAY, YOU GOT 300,000 PAYABLE

10  TO THE BEAU RIVAGE?

11  A.   CORRECT.

12  Q.   AND THEN FOUR DAYS LATER, ON MARCH 24TH, YOU GOT ANOTHER

13  90,000 PAID TO THE BEAU RIVAGE?

14  A.   CORRECT.

15  Q.   AND THE TOTAL AMOUNT THAT YOU GOT FOR THAT MONTH WAS

16  853,871.45, RIGHT?

17  A.   YEAH, UH-HUH.

18  Q.   DID YOU -- DO YOU ADMIT THAT YOU DID NOT TELL THE

19  WITTSTADTS THAT YOU WERE GETTING ALL OF THESE EXTRA

20  DISTRIBUTIONS?

21  A.   I HAVE NO IDEA WHAT CONVERSATIONS WE HAD AS FAR AS EVERY

22  ONE OF THESE DISTRIBUTIONS.  I DO -- I DO KNOW THAT EVERY ONE

23  OF THESE DISTRIBUTIONS I THOUGHT WAS MY MONEY OR IT WAS USED

24  FOR SOMETHING ELSE AND ASHA SAID THE MONEY WAS AVAILABLE.  AND

25  THEY SHOWED ME DOCUMENTATION THAT SHOWS THAT.

3161

1   Q.   ALL RIGHT.  I'M HANDING YOU A DOCUMENT THAT I HAVE MARKED
2   AS GOVERNMENT EXHIBIT 232-C.
3   A.   OKAY.
4   Q.   DOES THIS ACCURATELY REFLECT THE DISTRIBUTIONS THAT YOU
5   RECEIVED IN APRIL OF 2014?
6   A.   YOU HAVE TO GIVE ME ONE SECOND.  I'LL TAKE A LOOK AT IT.
7        YES, IT IS.
8   Q.   ALL RIGHT.  AND WHAT'S THE AMOUNT THAT'S REPRESENTED IN
9   GOVERNMENT EXHIBIT 232 ON PAGE 8 THAT YOU WOULD RECEIVE IN YOUR
10  DISTRIBUTION FOR THAT MONTH?
11  A.   THAT IS 281,039.
12  Q.   281,039?
13  A.   YES.
14  Q.   AND SO GOVERNMENT EXHIBIT 232-C SHOWS THAT YOU ACTUALLY
15  RECEIVED HOW MUCH?
16  A.   IF YOU ADD THESE TOGETHER, IT WOULD BE 1,055,709.
17  Q.   AND 99 CENTS?
18  A.   I'M SORRY.  AND 99 CENTS.
19  Q.   ALL RIGHT.  AND SO THAT INCLUDES A PAYMENT FOR $25,000 TO
20  COLONY BANK?
21  A.   CORRECT.
22  Q.   A PAYMENT FOR 32,930.77 TO FORTUNA SERVICE COMPANY?
23  A.   CORRECT.
24  Q.   A PAYMENT OF $55,000 TO SUNTRUST?
25  A.   CORRECT.

3162

1    Q.   A PAYMENT OF 33,444.24 ON YOUR NETJETS JUDGMENT?

2    A.   CORRECT.

3    Q.   A PAYMENT OF 300,000 TO DIVOT?

4    A.   CORRECT.

5    Q.   A PAYMENT OF 35,318.40 TO APOLLO JETS?

6    A.   CORRECT.

7    Q.   A PAYMENT OF 199,980 TO DIVOT?

8    A.   CORRECT.

9    Q.   A PAYMENT OF 37,463.03 TO APOLLO JETS?

10   A.   CORRECT.

11   Q.   A PAYMENT OF 8,158.05 TO APOLLO JETS?

12   A.   CORRECT.

13   Q.   A PAYMENT OF 28,415.50 TO APOLLO JETS?

14   A.   CORRECT.

15   Q.   AND, FINALLY, A TOTAL OF $300,000 PAYABLE TO THE BEAU

16   RIVAGE, RIGHT?

17   A.   UH-HUH.  CORRECT.

18   Q.   AND YOU DID NOT HAVE ANY CONVERSATIONS WITH THE WITTSTADTS

19   WHERE YOU TOLD THEM THAT YOU WERE GOING TO BE GETTING OVER A

20   MILLION DOLLARS, WHICH IS DOUBLE THE AMOUNT THAT WAS

21   REPRESENTED THAT THE ENTIRE FIRM WOULD RECEIVE IN GOVERNMENT

22   EXHIBIT 232, RIGHT?

23   A.   I HAVE NO IDEA WHAT CONVERSATIONS WE HAD.  BUT, AGAIN,

24   ASHA, FRANK, AND BOB ARE THE ONES DOING THE ACCOUNTING.

25   Q.   ALL RIGHT.  I'VE JUST HANDED YOU GOVERNMENT EXHIBIT 232-D.

3163

1   DOES THAT ACCURATELY REFLECT DISTRIBUTIONS THAT YOU RECEIVED IN

2   MAY OF 2014?

3   A.   WELL, I'M NOT -- I DON'T KNOW IF THEY'RE DISTRIBUTIONS.   I

4   DON'T KNOW WHAT THESE -- EACH OF THESE ARE FOR.   YOU'VE GOT

5   DIVOT HOLDINGS.  I DON'T KNOW WHAT THOSE ARE FOR, SO I CAN'T

6   USE THE WORD DISTRIBUTION.

7        YES, THAT AMOUNT OF MONEY CAME INTO WHATEVER IT SAID IT

8   WAS GOING.

9   Q.   AND GOVERNMENT EXHIBIT 232 SHOWS THAT THE AMOUNT THAT WAS

10  REPRESENTED TO THE WITTSTADTS THAT YOU WOULD RECEIVE FOR THAT

11  MONTH WAS 178,225, CORRECT?

12  A.   YES, THAT'S WHAT IT SAYS.  SO THAT WAS DISTRIBUTION, YES.

13  Q.   ALL RIGHT.  LET'S LOOK AT THE PAYMENTS THAT YOU RECEIVED

14  FOR THAT MONTH.

15  A.   OKAY.

16  Q.   $25,000 TO COLONY BANK?

17  A.   CORRECT.

18  Q.   32,930.77 TO FORTUNA?

19  A.   CORRECT.

20  Q.   $55,000 TO SUNTRUST?

21  A.   CORRECT.

22  Q.   33,444.24 ON YOUR NETJETS JUDGMENT?

23  A.   WENT TO NETJETS, CORRECT.

24  Q.   AND THAT WAS TO PAY A JUDGMENT THAT YOU OWED, RIGHT?

25  THAT'S NOT FOR A NEW FLIGHT?

3164

1   A.   I BELIEVE THAT'S CORRECT.

2   Q.   22,491 TO DIVOT?

3   A.   CORRECT.

4   Q.   12,314.56 TO DIVOT?

5   A.   CORRECT.

6   Q.   48,493 TO APOLLO JETS?

7   A.   CORRECT.

8   Q.   AND 219,304 TO DIVOT?

9   A.   CORRECT.

10  Q.   AND $55,000 ON ONE OF YOUR PERSONAL LOANS AT SUNTRUST?

11  A.   THAT IS CORRECT.

12  Q.   AND THE TOTAL IS WHAT?

13  A.   503,977.57.

14  Q.   AND SO THAT'S --

15  A.   TOTAL TRANSFERS, CORRECT.

16  Q.   AND THAT'S MORE THAN DOUBLE THE AMOUNT THAT YOU STATED TO

17  THE WITTSTADTS IN GOVERNMENT EXHIBIT 232 THAT YOU WERE GOING TO

18  RECEIVE FOR THE MONTH, RIGHT?

19  A.   THAT'S WHAT, THAT'S WHAT THIS SAYS, CORRECT.  BUT IT'S

20  NOT -- THESE ARE NOT ALL RELATING TO THAT.

21        MR. PHILLIPS:  I MOVE TO ADMIT GOVERNMENT

22  EXHIBITS 232-A, B, C, D, AND E.

23        THE COURT:  ANY OBJECTION TO ANY OF THOSE,

24  MR. GARLAND?

25        MR. GARLAND:  YOUR HONOR, THERE ARE MULTIPLE PAGES

3165

1    WITH HIGHLIGHTING ON THEM.  THESE ARE IN EVIDENCE, AREN'T THEY?

2              THE COURT:  I THOUGHT -- I GUESS I THOUGHT THAT THESE

3    ALREADY WERE IN EVIDENCE.

4              THEY ARE NOT, MR. PHILLIPS?

5              MR. PHILLIPS:  NOT LIKE THIS.  THE WITNESS HAS

6    ALREADY TESTIFIED THAT THEY'RE --

7              THE COURT:  I'M JUST ASKING RIGHT NOW IF THEY'RE IN

8    EVIDENCE.

9              MR. PHILLIPS:  NO.

10             THE COURT:  NO?

11             MR. PHILLIPS:  THEY ARE PART OF A BIGGER EXHIBIT

12   THAT'S THE ONE THAT COMPILES THE $26 MILLION.

13             THE COURT:  OKAY.  I DON'T KNOW, BUT --

14             MR. PHILLIPS:  THESE ARE BROKEN OUT.

15             THE COURT:  I DON'T KNOW IF THEY'RE PRECISE EXTRACTS

16   OR WHAT OF EXHIBITS THAT ARE ALREADY IN.  I'M NOT SURE WHAT

17   THEY ARE.

18             MR. GARLAND:  I'M NOT, EITHER.  AND THEY HAVE

19   NUMEROUS HIGHLIGHTING FEATURES THAT ARE NOT CONTAINED ON --

20             THE COURT:  ALL RIGHT.  I WILL TAKE THESE UNDER

21   ADVISEMENT.  I THINK HE'S BEEN REFERRING TO THEM WITH THE

22   WITNESS, AND SO I HAVEN'T HEARD ANY OBJECTION TO THAT.

23             BUT IN TERMS OF ADMITTING THEM, I WILL TAKE UNDER

24   ADVISEMENT 232-A, B, AND C JUST UNTIL I CAN LOOK AT THEM MORE

25   CLOSELY AND HEAR A LITTLE BIT MORE ABOUT WHAT THEY ARE.

3166

1          MR. PHILLIPS:  AND JUST FOR THE RECORD, YOUR HONOR --

2     WELL, LET ME -- CAN I ASK THE WITNESS SOME MORE QUESTIONS ABOUT

3     THEM?

4     BY MR. PHILLIPS:

5     Q.   MR. HARDWICK, DO YOU AGREE THAT THE NUMBERS THAT ARE

6     STATED ON THE SUMMARY PAGE OF EACH OF THESE FIVE EXHIBITS,

7     232 --

8          THE COURT:  MR. GARLAND?

9          MR. GARLAND:  OBJECT TO HIM BEING ASKED TO DO

10    CALCULATIONS.

11         THE COURT:  OVERRULED.  HE CAN ASK QUESTIONS ABOUT

12    THESE.  HE MAY BE LAYING A BETTER FOUNDATION.  SO OVERRULED AT

13    THIS TIME.

14    BY MR. PHILLIPS:

15    Q.   MR. HARDWICK, DO YOU AGREE THAT THE CALCULATIONS ON THE

16    SUMMARY PAGE OF EACH OF THESE FIVE EXHIBITS THAT YOU'VE JUST

17    TESTIFIED ABOUT IS AN ACCURATE MATHEMATICAL CALCULATION?

18    A.   I DIDN'T ADD THEM UP.  I CAN'T --

19    Q.   YOU DON'T HAVE ANY REASON TO DISAGREE WITH THAT?

20    A.   I DON'T HAVE ANY REASON TO DISAGREE WITH YOU.

21    Q.   AND YOU LOOKED THROUGH THE DOCUMENTS AND SAW THEY WERE

22    SUPPORTING DOCUMENTS FOR EACH ONE OF THE CHARGES YOU TESTIFIED

23    ABOUT, RIGHT?

24    A.   THEY ARE SUPPORTING DOCUMENTS OF THE TRANSFERS, CORRECT.

25    NOT NECESSARILY THAT THEY ARE DISTRIBUTIONS.

3167

1          MR. PHILLIPS:  MOVE TO ADMIT.

2          THE COURT:  THE FACT THAT HE DOESN'T HAVE REASON TO

3    DISAGREE DOESN'T MEAN THAT HE'S SEEN THEM SUFFICIENTLY.  SO,

4    AGAIN, UNDER ADVISEMENT UNTIL I GET TO LOOK AT THEM.  THANK

5    YOU.

6          JURY, LET ME HAVE YOU GO OUT FOR A SECOND, PLEASE.

7    THANK YOU SO MUCH.

8          (WHEREUPON, THE JURY RETIRED FROM THE COURTROOM AT

9    10:23 A.M., AND THE FOLLOWING PROCEEDINGS WERE HAD.)

10          THE COURT:  ALL RIGHT.  OH, WAIT A MINUTE.  YOU ALL

11    MAY BE SEATED, BECAUSE I'VE ALREADY LET THEM OUT NOW.  I WAS

12    GOING TO CHECK, BECAUSE I THOUGHT WE WERE AT A BREAK DOING

13    SOMETHING ON THE EXHIBITS, AND I WAS ALSO GOING TO CHECK THE

14    RECORD EARLIER TO SEE WHETHER OR NOT THE OTHER MR. WITTSTADT --

15    EXCUSE ME, MR. MORRIS HAD BEEN EXCUSED.  BUT WE ARE NEEDING TO

16    CHECK WITH THE OTHER COURT REPORTER, BECAUSE MR. MARRONE TOOK

17    DOWN THE TRIAL THAT DAY.

18          ALL RIGHT.  WHERE ARE WE WITH THESE EXHIBITS, 232-A,

19    B, AND C?  MR. PHILLIPS --

20          MR. PHILLIPS:  B, C, AND D?

21          THE COURT:  B, C, AND D?

22          MR. PHILLIPS:  YES.  A, B, C, D, AND E.

23          THE COURT:  A, B, C, D, AND E.

24          MR. PHILLIPS:  RIGHT.

25          THE COURT:  ARE THESE EXACT EXTRACTIONS FROM OTHER

3168

1    EXHIBITS THAT ARE IN?

2           MR. PHILLIPS:  CORRECT.

3           THE COURT:  OKAY.  SO, MR. GARLAND, HAVE YOU HAD

4    SUFFICIENT TIME TO LOOK AT THEM AND COMPARE THEM TO WHATEVER

5    THEY HAVE BEEN EXTRACTED FROM, WHICH MR. PHILLIPS SAYS IS

6    ALREADY IN EVIDENCE?

7           MR. PHILLIPS:  THEY ARE PART OF THIS DOCUMENT, YOUR

8    HONOR.  THIS IS GOVERNMENT EXHIBIT 1004.

9           THE COURT:  OKAY.

10          HE'S GOING TO LET MS. NOVAY HANDLE THIS OBJECTION.

11          MS. NOVAY?

12          MS. NOVAY:  HERE'S THE PROBLEM.  NUMBER ONE, THESE

13   EXHIBITS ARE ALREADY IN EVIDENCE, SO IT'S CUMULATIVE TO NOW

14   READMIT THE SAME EXHIBITS.

15          THE COURT:  I AGREE, BUT I THINK YOU ALL HAVE DONE

16   THE SAME THING.  I DON'T KNOW WHY.  BUT I AGREE THAT IT IS

17   CUMULATIVE AND UNNECESSARY.  BUT I THINK THE DEFENSE HAS DONE

18   THE SAME THING.  I REMEMBER MR. GARLAND USING AN EXCERPT FROM

19   SOMETHING.  BUT GO AHEAD.

20          MS. NOVAY:  I WOULD SAY USING AN EXCERPT FROM

21   SOMETHING IS A WHOLE LOT DIFFERENT THAN ADMITTING MULTIPLE

22   DIFFERENT EXHIBITS WITH 30 PAGES ATTACHED TO THEM THAT WE ARE

23   JUST NOW SEEING FOR THE FIRST TIME.

24          NOW, I AGREE WE'VE HAD THESE DOCUMENTS FOR A LONG

25   TIME.  BUT NOW PUT TOGETHER, WITH THE HIGHLIGHTING GOING

3169

1    THROUGH EVERY SINGLE PAGE, THIS IS THE FIRST TIME WE'RE SEEING

2    THIS.  AND I WILL REMIND THE COURT THAT WHEN THE DEFENSE

3    LITERALLY DID THAT, TOOK EXACTLY THE GOVERNMENT'S EXHIBITS AND

4    ADDED NOT JUST ANOTHER TITLE ON IT BUT THREE OTHER NUMBERS, THE

5    GOVERNMENT LOST IT AND SAID WE SANDBAGGED THEM.

6         SO WHAT'S GOOD FOR THE GOOSE IS GOOD FOR THE GANDER

7    IN THIS SENSE.

8         THE COURT:  AND YOU'LL RECALL THAT I OVERRULED THEM

9    WHEN THEY LOST IT, CORRECT?  YOU DO RECALL THAT AS WELL.

10        MS. NOVAY:  I DO.  YOU KNOW WHAT, I APOLOGIZE.  I

11   APOLOGIZE TO THE GOVERNMENT.

12        THE COURT:  THANK YOU.

13        MS. NOVAY:  THAT WAS NOT FAIR.

14        THE COURT:  THANK YOU.

15        MS. NOVAY:  THEY OBJECTED.  SO I'LL REPHRASE LIKE

16   THAT.  SO MY APOLOGIES.

17        BUT THE GOVERNMENT OBJECTED AND OUR CHARTS STAYED

18   OUT.

19        THE COURT:  ALL RIGHT.  LET ME ASK YOU THIS.  LET ME

20   ASK YOU A DIFFERENT QUESTION.  WHAT ARE YOUR OBJECTIONS HERE?

21        ONE, I HEAR CUMULATIVE.  TWO, IS THERE AN ISSUE WITH

22   RESPECT TO WHETHER THERE ARE HIGHLIGHTS ON THESE EXHIBITS THAT

23   YOU'RE OBJECTING TO, MR. GARLAND?  I THOUGHT MS. NOVAY WAS

24   GOING TO BE ENTRUSTED WITH THIS ONE.

25        MS. NOVAY:  HE IS TELLING ME, YES, AND I'M SAYING

3170

1   YES.  IT'S CUMULATIVE.  IT'S PULLING OUT DIFFERENT PIECES OF

2   EVIDENCE.  IF THE JURY WANTS TO LOOK BACK ON IT AND REVIEW IT

3   FOR THEMSELVES, THAT'S FINE.  THEY CAN LOOK BACK AT THE

4   TESTIMONY, LOOK BACK AT THEIR NOTES.

5            BUT THIS IS MULTIPLE PAGES TAKEN OUT OF WHAT'S

6   ALREADY BEEN ADMITTED, SO CUMULATIVE, WITH AN ADDED ADDITIONAL

7   HIGHLIGHTS THAT WASN'T ON THE ORIGINAL DOCUMENT.

8            AND WE NEED TO EITHER HAVE TIME TO FLIP THROUGH ALL

9   THESE TO MAKE SURE WHAT THESE HIGHLIGHTS ARE, WHAT THEY MEAN,

10  AND WHAT THEY ARE REFERENCING OR -- YEAH.  WELL, WE OBJECT TO

11  THE HIGHLIGHTS.

12           THE COURT:  SO YOUR OBJECTIONS, IN RESPONSE TO MY

13  QUESTION, ARE CUMULATIVE AND THEN THE HIGHLIGHTS.  YOU HAVEN'T

14  HAD SUFFICIENT TIME TO REVIEW THE HIGHLIGHTS TO SEE IF YOU HAVE

15  ANY OBJECTION TO THE WAY THAT THEY ARE HIGHLIGHTED?

16           MS. NOVAY:  YES.

17           THE COURT:  OKAY.

18           MS. NOVAY:  WELL, NOT JUST THE WAY THAT THEY ARE

19  HIGHLIGHTED, BUT THE FACT THAT THEY ARE BEING HIGHLIGHTED.

20           THE COURT:  TO EMPHASIZE CERTAIN POINTS?

21           MS. NOVAY:  CORRECT.

22           THE COURT:  ALL RIGHT.  GOVERNMENT'S RESPONSE WITH

23  RESPECT TO BOTH OF THOSE.

24           THE HIGHLIGHTS.  WHAT'S YOUR POSITION WITH RESPECT TO

25  WHETHER MR. HARDWICK HAS BEEN ABLE TO ESTABLISH THE FOUNDATION

3171

1    FOR THE MANNER IN WHICH YOU'VE HIGHLIGHTED WHATEVER YOU'RE

2    EMPHASIZING THERE WITH THE HIGHLIGHTS?

3          MR. PHILLIPS:  YOUR HONOR, I DON'T RECALL ASKING

4    MR. HARDWICK ANY QUESTIONS ABOUT ANY HIGHLIGHTING.

5          THE COURT:  OKAY.

6          MR. PHILLIPS:  I ASKED HIM IF THE DOCUMENTS THAT WERE

7    ATTACHED TO THE SUMMARY PAGES ACCURATELY SUPPORTED THE SUMMARY.

8    HE SAID THEY DID.

9          THE COURT:  SO WHAT WOULD BE THE SIGNIFICANCE, THEN,

10   OF YOUR PUTTING BEFORE THIS JURY EXHIBITS, ESPECIALLY EXHIBITS

11   THAT ARE ALREADY IN IN SOME OTHER MANNER, WITH HIGHLIGHTS WHEN

12   NO WITNESS HAS REALLY GIVEN US A FOUNDATION FOR WHY CERTAIN

13   INFORMATION IS HIGHLIGHTED?

14         MR. PHILLIPS:  WELL, TWO THINGS, YOUR HONOR.  IF THE

15   COURT WILL ADMIT THE EXHIBITS, I'M HAPPY TO TAKE THE

16   HIGHLIGHTING OFF.  I CAN BRING BACK A NEW COPY LATER TODAY OR

17   TOMORROW BEFORE THE JURY GETS THE EVIDENCE.  IT WILL JUST

18   REMOVE ALL THE HIGHLIGHTING.  THAT'S EASILY DONE.

19         BUT THE REASON THAT I WAS USING THESE SMALLER

20   EXHIBITS IS BECAUSE THEY ARE JUST SO MUCH EASIER TO HANDLE THAN

21   THIS BIG NOTEBOOK THAT'S GOVERNMENT 1004.

22         BUT IF THE COURT WILL SEE, I JUST PULLED THIS PAGE

23   OUT OF GOVERNMENT EXHIBIT 1004.  AND I'LL SHOW IT TO THE COURT

24   ON THE SCREEN NOW.  THIS IS A DUPLICATE OF WHAT I MARKED AS

25   GOVERNMENT EXHIBIT 232-A.  THE COURT CAN SEE THAT THESE ARE THE

1    SAME DOCUMENT.

2            THE COURT:  ALL RIGHT.  THEN I WILL SUSTAIN AND FIND

3    THAT IT IS CUMULATIVE.  IT MAY BE INCONVENIENT TO PULL THOSE

4    OUT, BUT ESPECIALLY IF THOSE ARE ALREADY IN UNHIGHLIGHTED FORM

5    AND YOU'RE OFFERING TO UNHIGHLIGHT THESE ONES YOU'RE WORKING

6    WITH NOW, I SEE NO REASON WHY YOU CAN'T USE DOCUMENTS THAT ARE

7    ALREADY IN EXHIBIT -- IN EVIDENCE, EXCUSE ME.

8            AGAIN, IT MAY BE INCONVENIENT, BUT YOU CAN REFER TO

9    BATES STAMP NUMBERS, AS WE HAVE BEEN DOING DURING THIS TRIAL,

10   BUT I SEE NO REASON TO READMIT THESE.

11           SO I'LL SUSTAIN AS CUMULATIVE.

12           MR. PHILLIPS:  WOULD THE COURT PERMIT ME TO USE THEM

13   AS DEMONSTRATIVE AIDS FOR WHEN I'M CROSS-EXAMINING THIS

14   WITNESS?

15           THE COURT:  I HAVE NO PROBLEM WITH THAT, ESPECIALLY

16   SINCE THEY ARE IN EVIDENCE, AND I DON'T HAVE ANY ISSUE WITH YOU

17   HAVING HIGHLIGHTS ON THEM AS DEMONSTRATIVE AIDS.

18           MR. PHILLIPS:  OKAY.  THANK YOU.

19           THE COURT:  ALL RIGHT.  ANYTHING ELSE BEFORE WE BRING

20   THIS JURY BACK IN?  DOES ANYONE WANT TO AVAIL YOURSELVES OF

21   THIS QUICK TIME FOR A BREAK YOURSELVES?  BECAUSE I PROBABLY

22   WON'T GIVE ANOTHER ONE AS SOON AS I ORDINARILY WOULD.

23           TEN MINUTES.  TEN MINUTES.  THANK YOU SO MUCH.

24           THE COURTROOM SECURITY OFFICER:  ALL RISE.  COURT

25   STANDS IN RECESS FOR 10 MINUTES.

3173

1          (WHEREUPON, A BRIEF RECESS WAS HAD FROM 10:30 A.M. TO

2     10:39 A.M.)

3          THE COURT:  I'M SORRY, MR. HARDWICK.  I LOOKED OVER

4     THERE AND I WAS GETTING READY TO SAY, MR. HARDWICK IS NOT IN

5     HERE.

6          INCIDENTALLY, WE DID CHECK THE RECORD AND MR. MORRIS

7     WAS NOT RELEASED.  THE DEFENSE DID SAY AT THE TIME THAT THEY

8     DID NOT WANT TO RELEASE HIM SUBJECT TO RECALL, THAT THEY MIGHT

9     EVEN RECALL HIM IN THEIR CASE.  SO HE MUST STAY OUTSIDE OF THE

10    COURTROOM.

11         (WHEREUPON, THE JURY RETURNED TO OPEN COURT AT

12    10:42 A.M., AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD.)

13         THE COURT:  ALL RIGHT.  THE JURY IS IN PLACE.

14    EVERYONE MAY BE SEATED.

15         AND YOU MAY CONTINUE, MR. PHILLIPS.

16    BY MR. PHILLIPS:

17    Q.   MR. HARDWICK, I'M SHOWING YOU ON THE SCREEN NOW GOVERNMENT

18    EXHIBIT 203, WHICH WAS PREVIOUSLY ADMITTED.  THIS IS AN E-MAIL

19    FROM ASHA MAURYA TO YOU DATED OCTOBER 17TH, 2011; IS THAT

20    RIGHT?

21    A.   YES, IT IS.

22    Q.   AND IN THE FIRST LINE OF THIS E-MAIL, ASHA SAID THAT THE

23    AMOUNT THAT WAS GOING TO BE DISTRIBUTED WAS 62,717.84, RIGHT?

24    A.   YEAH.  AT THAT TIME, CORRECT.

25    Q.   AND THAT 40 PERCENT OF THAT, WHICH WAS YOUR PERCENTAGE AT

3174

1    THE TIME, WOULD BE $25,087.14, RIGHT?

2    A.    THAT'S WHAT IT SAYS.

3    Q.    AND THAT WOULD INCLUDE THIS $10,000 CATCH-UP PAYMENT FOR

4    SALARY THAT YOU MISSED IN 2010, RIGHT?

5    A.    YEAH.  I THINK THAT'S COMING OFF THE TOTAL.

6    Q.    BUT YOU WEREN'T SATISFIED WITH THE 62,000; YOU WANTED HER

7    TO DISTRIBUTE MORE, RIGHT?

8              MR. GARLAND:  HE WAS IN THE MIDDLE OF ANSWERING THE

9    QUESTION.

10             THE COURT:  OKAY.  YEAH.

11             MR. PHILLIPS, GO AHEAD AND ALLOW HIM TO FINISH

12   ANSWERING --

13             THE WITNESS:  I WAS JUST SAYING THAT --

14             THE COURT:  HOLD ON ONE SECOND.

15             AND IF YOU FEEL THAT HE'S NOT ANSWERING YOUR

16   QUESTION, YOU MAY OBJECT TO NONRESPONSIVE.  BUT LET HIM

17   COMPLETE HIS ANSWERS.  THANK YOU.

18             ANYTHING ELSE, MR. GARLAND?

19             MR. GARLAND:  NO.

20             THE COURT:  OKAY.

21             THE WITNESS:  MAY I ANSWER?

22             THE COURT:  GO AHEAD.

23             THE WITNESS:  OKAY.  WELL, THE THINGS I -- WOULD YOU

24   PUT IT BACK UP ON THE FIRST PAGE, PLEASE?  WE WERE

25   DISCUSSING -- YOU ASKED ME IF MY DISTRIBUTION OF THIS AMOUNT

3175

1    INCLUDED THE 10,000.  IT DOESN'T.  SHE JUST SUBTRACTED THAT OUT

2    OF -- THAT HAD NOTHING TO DO WITH A DISTRIBUTION.  IT'S ANOTHER

3    EXAMPLE OF AN EVEN-UP THAT HAD NOTHING TO DO WITH A

4    DISTRIBUTION.

5    Q.   (BY MR. PHILLIPS)  SO YOU'RE AWARE THAT THE SHAREHOLDER

6    AGREEMENT SAYS THAT IF YOU RECEIVED ANY CATCH-UP SALARY

7    PAYMENTS, THAT THEY WERE SUPPOSED TO BE HELD FOR THE IRS IN A

8    SEPARATE ESCROW ACCOUNT TO PAY OFF THE $431,000 IN WITHHOLDING

9    TAXES THAT YOU OWED FROM YOUR DAYS BACK AT JACKSON HARDWICK,

10   RIGHT?

11   A.   THAT WAS THE ORIGINAL INTENT OF WHAT WE SIGNED, BUT THAT

12   WAS CHANGED, ALSO.

13   Q.   AND WHO WAS INVOLVED IN THAT CHANGE, MR. HARDWICK?

14   A.   I BELIEVE IT WAS MR. MORRIS.

15   Q.   REALLY.

16   A.   UH-HUH.

17   Q.   AND SO EVEN THOUGH THE SHAREHOLDER AGREEMENT SAYS THAT

18   YOU'RE SUPPOSED TO HAVE A SEPARATE ESCROW ACCOUNT TO HOLD

19   431,000 TO GIVE BACK TO THE IRS BECAUSE YOU HAD NOT PAID THEM

20   THE WITHHOLDING TAXES THAT YOU OWED, YOUR TESTIMONY IS THAT YOU

21   AND ART MORRIS JUST GOT TOGETHER AND DECIDED IT WOULD BE OKAY

22   IF YOU DIDN'T HOLD THAT MONEY, RIGHT?

23   A.   THAT WAS THE ORIGINAL INTENT, AND THAT WAS MY TESTIMONY.

24   Q.   AND YOU NEVER TALKED TO THE WITTSTADTS ABOUT THAT, DID

25   YOU?

3176

1   A.   I DON'T BELIEVE THE WITTSTADTS WERE -- HAD OWNERSHIP

2   INTEREST AT THAT POINT.

3   Q.   DO YOU REMEMBER MAKING A STATEMENT IN ONE OF YOUR E-MAILS

4   WHERE YOU TOLD THE WITTSTADTS AND ART MORRIS THAT WE'RE ALL

5   GOING TO BE TRUE PARTNERS FROM NOW ON?

6   A.   I REMEMBER MAKING THAT STATEMENT AT SOME POINT.

7   Q.   YOU DO REMEMBER?

8   A.   YES.  WE WERE TRYING TO -- WE WERE TRYING TO STOP THE

9   PRACTICE OF THE WITTSTADTS JUST GETTING THE BENEFITS BUT NOT

10  HAVING -- NOT HAVING THE BAD PARTS OF BEING OWNERS.  IT DIDN'T

11  HAVE ANYTHING TO DO WITH ANY OTHER POINT.

12  Q.   BUT YOU WEREN'T SATISFIED WITH THE 62,000 THAT ASHA SAID

13  YOU WERE GOING TO DISTRIBUTE; YOU TOLD HER THAT YOU HAD ALREADY

14  HAD A CONVERSATION WITH PEOPLE WHERE YOU TOLD THEM THAT YOU

15  WERE GOING TO DISTRIBUTE 85,000, RIGHT?  YOU SAID, LET'S TALK

16  TOMORROW.  I TOLD EVERYONE 85K.  RIGHT?

17  A.   THAT'S WHAT IT SAYS, YES.

18  Q.   OKAY.  SO THEN ASHA E-MAILED YOU AGAIN ON OCTOBER 18TH,

19  WHICH IS THE NEXT DAY, AND SUMMARIZED YOUR $85,000 DISTRIBUTION

20  FOR ALL THE PARTNERS COMBINED, SAYING THAT YOUR PORTION WOULD

21  BE 34,000, RIGHT?

22  A.   THAT'S WHAT IT SAYS.

23  Q.   AND THAT INCLUDED 21,087.14 TO FIRST LANDMARK?

24  A.   YES.  OVER HERE, YES.

25  Q.   5,000 TO YOUR EX-WIFE, JULIE HARDWICK?

3177

1   A.   UH-HUH.

2   Q.   $3,912.96 TO RBC?

3   A.   RIGHT.

4   Q.   AND ANOTHER $4,000 TO RBC, RIGHT?

5   A.   THAT'S CORRECT.

6   Q.   SO YOUR TOTAL WAS SUPPOSED TO BE 34,000.  LET'S TAKE A

7   LOOK AT WHAT YOU ACTUALLY GOT THAT MONTH.

8   A.   OKAY.  I THINK WE SHOULD.

9   Q.   OKAY.  LOOK AT GOVERNMENT EXHIBIT 1004, WHICH IS ALREADY

10  IN EVIDENCE.  AND I'LL SHOW YOU PAGE 10 FROM THAT EXHIBIT.

11  A.   MR. PHILLIPS, EXCUSE ME.  IS THAT THE SAME AS 203-B?

12  Q.   NO, SIR.

13  A.   IT'S NOT.  OKAY.

14  Q.   YOU SEE PAGE 10 OF GOVERNMENT EXHIBIT 1004 THAT I'VE PUT

15  ON THE SCREEN IN FRONT OF YOU?

16  A.   THE ONE EXACTLY THE SAME AS 232-B.  GOT IT.

17  Q.   WHAT'S THE TOTAL AMOUNT THAT YOU GOT IN --

18  A.   ONE HUNDRED --

19  Q.   -- OCTOBER 2011?

20  A.   109,000.

21  Q.   AND THERE'S NOT ANY E-MAIL OR ANY CONVERSATION BETWEEN YOU

22  AND THE WITTSTADTS OR ART MORRIS WHERE YOU SAID THAT YOU WERE

23  NOT GOING TO BE TAKING JUST 34,000, BUT YOU WERE GOING TO TAKE

24  109,000?

25  A.   NO, THAT'S NOT TRUE.

3237301cb517ad17

3178

1    Q.    REALLY.  WHERE IS IT?

2    A.    WELL, AGAIN, BACK TO THE PROBLEM, YOU'VE ADDED UP

3    $26 MILLION AND YOU HAVEN'T LOOKED AT TRANSFERS.  SO IF YOU

4    LOOK AT THE $42,000, FOR EXAMPLE, IT SAYS ON THE E-MAIL IN

5    HERE, UNITED HEALTH CARE EVEN-UP.  WE HAD HAD, AS PART OF THE

6    NEGOTIATION, THE UNITED HEALTH CARE EVEN-UP WAS INVOLVED IN

7    THERE.  THAT'S WHAT THE 42,000 IS.

8          AND THERE'S EXAMPLE AFTER EXAMPLE AFTER EXAMPLE.  THE

9    EVEN-UPS, AS YOU SAW FROM THE FIRST PAGE I WAS TRYING TO SHOW

10   YOU BEFORE WE HAD TO GO BACK, EVEN-UPS CAME OUT FIRST.  OKAY.

11   THERE WAS CONSTANTLY EVEN-UPS.  BUT THAT'S WHERE THE $42,000

12   WAS, AND THAT WAS A NEGOTIATED ITEM.

13   Q.    AND THAT WAS PAID FOR YOUR BENEFIT, RIGHT?

14   A.    THE 42,000 WAS, YES -- WELL, I DIDN'T GET ALL OF IT.  IT

15   ACTUALLY WENT TO RANDY, ART, AND MYSELF AS PART OF THE 2010

16   NEGOTIATION.  OR 2011 NEGOTIATION, I THINK.

17   Q.    THE $42,000 AS SHOWN ON THIS EXHIBIT, WHICH IS ALREADY IN

18   EVIDENCE --

19   A.    RIGHT.

20   Q.    -- PART OF GOVERNMENT EXHIBIT 1004, SHOWS THAT THAT 42,000

21   WENT TO FIRST LANDMARK BANK TO YOUR ACCOUNT?

22   A.    THAT'S CORRECT.  AND YOU COME DOWN, AND IT SAYS UHC,

23   UNITED HEALTH CARE, REPAY.

24   Q.    WHERE DID THE MONEY GO?

25   A.    THE MONEY WENT TO ME.  BUT, AGAIN, THAT'S A TRANSFER,

3179

1   THAT'S NOT A DISTRIBUTION.  THAT WAS AN EVEN-UP.  THAT'S WHERE

2   YOUR MISNOMER IS.

3   Q.   ALL RIGHT.  LET'S TAKE A LOOK AT GOVERNMENT EXHIBIT 214,

4   WHICH IS ALREADY IN EVIDENCE.  THIS IS AN E-MAIL FROM YOU TO

5   MARK WITTSTADT, ROD WITTSTADT, AND ART MORRIS, DATED

6   NOVEMBER 14, 2012, RIGHT?

7   A.   I BELIEVE SO, YES.

8   Q.   ASHA MAURYA IS NOT A PART OF THIS E-MAIL, IS SHE?

9   A.   NO, SHE IS NOT.

10  Q.   AND YOU TOLD THE WITTSTADT BROTHERS AND ART MORRIS:  WE'RE

11  PROBABLY GOING TO DO ABOUT 300K.

12       THAT MEANS YOU'RE GOING TO DISTRIBUTE A TOTAL OF 300,000

13  TO ALL OF THE SHAREHOLDERS COMBINED, RIGHT?

14  A.   YES.  IT SAYS PROBABLY.  THAT WAS THE PROFIT IN CLOSING.

15  Q.   RIGHT.  BUT THAT'S WHAT YOU'RE TELLING THEM, WE'RE GOING

16  TO DISTRIBUTE A TOTAL OF 300,000 TO ALL OF US -- ART, RANDY --

17  I'M SORRY -- ART, ROD, MARK, AND YOU?

18  A.   THAT'S WHAT THE PLAN WAS ON THAT DAY, AT THAT TIME.

19  Q.   THAT'S WHAT YOU SAID.  THOSE ARE YOUR WORDS, RIGHT?

20  A.   THAT'S WHAT I WAS TOLD ON THAT DAY ON THAT SIDE.  I DON'T

21  COME UP WITH THESE THINGS RANDOMLY.  I DIDN'T COME UP WITH THE

22  INFORMATION.

23  Q.   I DIDN'T ASK YOU WHAT IT WAS FOR.  I ASKED THAT THAT'S

24  WHAT YOU SAID.  ARE THESE YOUR WORDS TO YOUR PARTNERS ON

25  NOVEMBER 14, 2012?

3180

1   A.   YES.  PROBABLY, AT THAT TIME, WE WOULD DO THAT AMOUNT,

2   YES.

3   Q.   OKAY.

4   A.   PROBABLY.

5   Q.   AND YOU RECOGNIZED AT THAT TIME THAT FORECLOSURE -- THAT'S

6   MR. WITTSTADT'S GROUP UP IN BALTIMORE -- HAD LOST $850,000,

7   RIGHT?

8   A.   YES, BUT I DIDN'T KNOW WHICH BOOK.  YOU KNOW, THEY HAD TWO

9   BOOKS.  SO I DIDN'T KNOW IF THAT WAS THE ACTUAL, ACTUAL LOSS OR

10  THAT WAS THE CASH LOSS.

11  Q.   BUT THOSE WERE YOUR WORDS TO YOUR PARTNERS ON THAT DAY,

12  RIGHT?

13  A.   AS BEING REGURGITATED FROM MY CONVERSATION WITH BOB AND

14  ASHA.  THAT'S WHERE I GOT THAT INFORMATION.  I DON'T -- YOU

15  KNOW, I DON'T -- I JUST -- ALL I DO IS LISTEN TO WHAT THEY SAY.

16  Q.   LET'S GO BACK TO GOVERNMENT EXHIBIT 1004 --

17  A.   OKAY.

18  Q.   -- AND LOOK AT THE SUMMARY FROM NOVEMBER OF 2012.

19  A.   OKAY.

20  Q.   THIS IS PAGE 23 OF THE 44-PAGE SUMMARY.

21  A.   OKAY.

22  Q.   WOULD YOU AGREE THAT IN NOVEMBER 2012 YOU ACTUALLY GOT

23  $417,930.77?

24  A.   OF TRANSFERS, I WOULD AGREE.  NOT OF DISBURSEMENTS.  I

25  WOULD NOT -- TRANSFERS.

3181

1    Q.    SO THERE WAS A $50,000 PAYMENT TO JULIE CALLAWAY, YOUR

2    EX-WIFE?

3    A.    THAT'S CORRECT.

4    Q.    A $60,000 PAYMENT TO FIRST CITIZENS BANK.  THAT WAS FOR A

5    JUDGMENT WHERE YOU DIDN'T MAKE GOOD ON A LOAN THAT YOU HAD FOR

6    SOME REAL ESTATE, RIGHT?

7    A.    I'M NOT SURE IF THAT WAS THE FIRST CITIZENS -- IF THAT'S

8    WHAT THAT WAS OR NOT.  BUT, YES, IT WAS DEFINITELY --

9    Q.    A PERSONAL LOAN.

10   A.    YEAH.  I DON'T KNOW IF IT HAD TO DO WITH REAL ESTATE.

11   Q.    $150,000 PAYABLE TO DIVOT?

12   A.    YES.  THAT WAS A TRANSFER TO ME.

13   Q.    $5,000 PAYABLE TO COLONY BANK?

14   A.    CORRECT.

15   Q.    AND 32,930.77 PAYABLE TO FORTUNA?

16   A.    CORRECT.

17   Q.    AND $120,000 PAYABLE TO DIVOT?

18   A.    YES.  A TRANSFER, CORRECT.

19   Q.    YOU DIDN'T TELL THE WITTSTADTS OR ART MORRIS THAT YOU WERE

20   GOING TO BE TAKING ANY OF THOSE PAYMENTS IN ADDITION TO WHAT

21   WAS STATED IN YOUR E-MAIL, RIGHT?

22   A.    DID I PERSONALLY -- I HAVE NO IDEA IF I DID THAT OR NOT.

23   I KNOW THAT ASHA, FRANK, BOB WERE DOING ALL THE TALKING, AND WE

24   CONSTANTLY HAD EVEN-UPS.  I MEAN, THAT'S WHAT I THOUGHT WAS

25   GOING ON AT THAT TIME.

3182

1   Q.   SO WHEN YOU SAID, WE'RE GOING TO DIVIDE $300,000, YOUR

2   PERCENTAGE AT THE TIME WAS 40 PERCENT, RIGHT?

3   A.   YES, I BELIEVE SO.

4   Q.   AND SO 40 PERCENT OF $300,000 IS $120,000, RIGHT?

5   A.   I WILL TAKE YOUR WORD FOR IT.

6   Q.   CAN YOU DO THAT MATH?

7   A.   TAKE ME A SECOND, BUT, YEAH.  120,000.

8   Q.   IS THAT RIGHT?

9   A.   YEP.

10  Q.   OKAY.

11  A.   FOR THAT DISBURSEMENT, CORRECT.

12  Q.   LET'S TALK ABOUT THE DIFFERENT CATEGORIES OF PAYMENTS THAT

13  YOU RECEIVED, THE DIFFERENT PAYEES FROM THIS BOOK RIGHT HERE,

14  1004.

15       $63,000 WENT TO AMERICAN EXPRESS?

16  A.   I'M SORRY.  THIS IS -- SO THIS IS MONEY THAT WAS, THAT WAS

17  PAID --

18  Q.   AS PART OF THE $26 MILLION THAT'S IN THIS BOOK RIGHT HERE,

19  1004.

20  A.   PERFECT.  PERFECT.  GO ON.

21  Q.   IS THAT RIGHT?

22  A.   I MEAN, I DON'T KNOW THAT, BUT I BELIEVE YOU.

23  Q.   AND A TOTAL OF $600,000 WAS PAID TO ANGEL OAK STRATEGIC

24  MORTGAGE INCOME FUND?

25  A.   CORRECT.

3183

1    Q.   THAT WAS A PERSONAL INVESTMENT THAT YOU MADE, RIGHT?

2    A.   THAT IS CORRECT.

3    Q.   THEN THERE ARE A NUMBER OF PAYMENTS LISTED TO APOLLO JETS?

4    A.   CORRECT.

5    Q.   AND THE TOTAL THAT WAS PAID TO APOLLO JETS WAS

6    $445,030.83, RIGHT?

7    A.   OKAY.

8    Q.   I'M SORRY.

9    A.   YES.

10   Q.   THAT'S JUST FROM THE ESCROW ACCOUNT.  THE TOTAL IS

11   602,840.83.

12   A.   OKAY.

13   Q.   IS THAT RIGHT?

14   A.   YES.  UH-HUH.

15   Q.   I'M SORRY.  I DIDN'T UNDERSTAND.

16   A.   I SAID YES.  I'M SORRY.  I SAID YES.

17   Q.   THEN THE NEXT PAYEE WAS THE BEAU RIVAGE CASINO.  AND YOU

18   SENT A TOTAL OF $1,590,000 TO THE BEAU RIVAGE, RIGHT?

19   A.   THAT'S WHAT IT SAYS.  CORRECT.

20   Q.   AND ALL OF THAT CAME OUT OF THE IOLTA ACCOUNT?

21   A.   I HAD NO KNOWLEDGE THAT THAT HAPPENED.

22   Q.   YOU PAID $22,050 TO BRYAN CARROLL?

23   A.   OKAY.

24   Q.   IS THAT CORRECT?

25   A.   YES.  I'M SORRY.  YES.

3184

1    Q.   HE WAS ONE OF YOUR BOOKIES?

2    A.   HE WAS A FRIEND OF MINE.

3    Q.   AND A BOOKIE?  YOU WERE BETTING WITH HIM?

4    A.   YES, I WAS BETTING WITH HIM.  I WOULD NOT CONSIDER HIM A

5    BOOKIE.

6    Q.   YOU ADMIT THAT THAT $22,050 REPRESENTED HERE -- OR

7    IDENTIFIED HERE WAS FOR A GAMBLING LOSS THAT YOU OWED TO

8    MR. CARROLL?

9    A.   I MEAN, I HAVE NO IDEA, BUT I WOULD BET THAT IT WAS.

10   Q.   WELL, HE TESTIFIED THAT IT WAS.  DO YOU HAVE ANY REASON TO

11   DOUBT WHAT HE SAID?

12   A.   NO.  THAT'S WHY I SAID I WOULD AGREE THAT IT WAS.

13   Q.   ALL RIGHT.  THEN THERE WAS $680,000 THAT WAS PAID TO

14   CAMPBELL & BRANNON, LLC, RIGHT?

15   A.   THAT IS CORRECT.

16   Q.   AND I THINK YESTERDAY YOU WERE TELLING US ABOUT THE FORGED

17   BANK STATEMENT, WHERE ASHA HAD TRANSFERRED $680,000 FROM ONE

18   ACCOUNT TO ANOTHER ONE.  REMEMBER THAT?

19   A.   I DO REMEMBER THAT.  THAT WASN'T THE SAME 680,000, BUT --

20   Q.   JUST A COINCIDENCE, RIGHT?

21   A.   YES, VERY MUCH A COINCIDENCE.

22   Q.   AND SO THIS $680,000 THAT YOU TOOK FROM THE FIRM HERE,

23   THAT WAS TO PAY YOUR DOWN PAYMENT ON YOUR CONDO AT THE

24   ST. REGIS?

25   A.   THAT WAS A DISTRIBUTION, CORRECT.

3185

1    Q.   YES, BUT THAT'S YOUR DOWN PAYMENT ON YOUR ST. REGIS CONDO?

2    A.   RIGHT.  A DISTRIBUTION TO ME.

3    Q.   AND YOU WERE TELLING US YESTERDAY ABOUT ALL THE GREAT

4    THINGS THAT HAPPENED THERE.  YOU CAN GO THERE AND GET A DRINK

5    IN THE BAR AND YOU CAN MEET PEOPLE THERE AND YOU CAN ENTERTAIN

6    AND ALL THAT STUFF.

7    A.   RIGHT.

8    Q.   THAT'S PART OF WHAT THIS $680,000 DOWN PAYMENT WAS?

9    A.   THAT'S CORRECT.

10   Q.   AND THEN THERE WAS SEVERAL MILLION DOLLARS OF LOAN ON TOP

11   OF THAT TO BUY THAT PLACE, RIGHT?

12   A.   I'M SORRY.  WHAT WAS THE QUESTION?

13   Q.   YOU PAID SEVERAL MILLION DOLLARS IN THE FORM OF A LOAN IN

14   ADDITION TO THIS $680,000 DOWN PAYMENT?

15   A.   THAT'S CORRECT, YES.

16   Q.   AND THEN WE'VE HEARD A LOT ABOUT PAYMENTS TO COLONY BANK,

17   AND THERE ARE A LOT OF THEM LISTED HERE.  AND TOTAL THAT YOU

18   PAID TO COLONY BANK WAS $375,000, RIGHT?

19   A.   THAT'S WHAT IT SAYS.  CORRECT.

20   Q.   THEN THERE WERE LOTS AND LOTS OF TRANSFERS TO DIVOT

21   HOLDINGS.  REMEMBER THAT?

22   A.   THAT'S CORRECT.  TRANSFERS, CORRECT.

23   Q.   YOU HEARD KIM JOHNSON FROM THE FBI SAY THAT THE TOTAL

24   AMOUNT THAT WENT FROM MHS TO DIVOT HOLDINGS WAS OVER

25   $12 MILLION, RIGHT?

3186

1   A.   I MEAN, I DON'T RECALL THAT, BUT I BELIEVE YOU.

2   Q.   WELL, I'M GOING TO SHOW YOU WHAT IT SAYS HERE IN THE

3   DOCUMENTS.  IT'S ACTUALLY $12,395,466.08, RIGHT?

4   A.   OKAY.  CORRECT.

5   Q.   THEN YOU MADE PAYMENTS TO FIRST CITIZENS BANK --

6   A.   CORRECT.

7   Q.   -- THAT TOTALED 645,000?

8   A.   CORRECT.

9   Q.   THEN THERE ARE LOTS OF PAYMENTS TO FORTUNA ON YOUR LOAN

10   WHERE YOU GOT MONEY TO BUY OUT YOUR PARTNER, DALE JACKSON?

11   A.   CORRECT.

12   Q.   SEVERAL PAGES OF THOSE.  AND SO THE TOTAL THAT WAS PAID TO

13   FORTUNA FROM MHS WAS $1,210,601.56, RIGHT?

14   A.   THAT'S WHAT IT SAYS.

15   Q.   AND DO YOU AGREE THAT THE SHAREHOLDER AGREEMENTS ALL TALK

16   ABOUT YOUR FORTUNA LOAN AND THAT THEY SAY YOUR BONUSES HAVE TO

17   BE REDUCED BY THE AMOUNT THAT MHS PAID ON YOUR BEHALF TO

18   FORTUNA, RIGHT?

19   A.   I AGREE THAT IT SAYS THAT, AND I AGREE THERE WERE A LOT OF

20   EVEN-UPS FOR THAT FORTUNA STUFF.

21   Q.   ALL RIGHT.  THEN THE NEXT CATEGORY IS HARRAH'S NEW ORLEANS

22   CASINO, ALSO SOMETIMES KNOWN AS JCC, LLC.  AND YOU PAID THEM A

23   TOTAL OF $252,000?

24   A.   THAT'S CORRECT.

25   Q.   THEN YOU GOT LOTS OF PAYMENTS TO JULIE CALLAWAY ON YOUR

3187

1    ALIMONY?

2    A.   THAT'S CORRECT.

3    Q.   AND THE TOTAL TO HER WAS 1,089,813.42.  THAT'S JUST THE

4    PART THAT CAME OUT OF MHS, RIGHT?

5    A.   THAT'S CORRECT.

6    Q.   YOU MADE ADDITIONAL PAYMENTS --

7    A.   YES.  THAT'S CORRECT.

8    Q.   -- FROM OTHER ACCOUNTS?

9    A.   THAT IS CORRECT.

10   Q.   THEN THERE'S $1500 THAT WAS PAID TO KATRENA CORCORAN.  SHE

11   IS THE YOUNG LADY WHO TESTIFIED HERE EARLY IN THE TRIAL, RIGHT?

12   A.   THAT'S CORRECT.

13   Q.   AND THEN YOU ALSO PAID ANOTHER THOUSAND DOLLARS TO

14   SOMEBODY NAMED MARIAH MILLS ON THE SAME DATE.  DO YOU SEE THAT?

15   A.   I SEE THAT.  I DON'T KNOW WHO THAT IS.

16   Q.   THEN THERE'S LOTS OF PAYMENTS TO YOU PERSONALLY, RIGHT?

17   A.   TRANSFERS.  CORRECT.

18   Q.   SEVERAL PAGES.

19   A.   CORRECT.

20   Q.   AND THE TOTAL THAT WAS PAID TO YOU, $1,297,156.87, RIGHT?

21   A.   CORRECT.

22   Q.   THEN THERE ARE A NUMBER OF PAYMENTS TO NETJETS ON YOUR

23   JUDGMENT, WHERE THEY WERE COLLECTING AGAINST YOU, RIGHT?

24   A.   TO NETJETS, CORRECT.

25   Q.   AND THE TOTAL AMOUNT THAT WAS PAID HERE TO NETJETS WAS

3188

1   $569,552.08.

2   A.   OKAY.  CORRECT.

3   Q.   AND THAT WAS A PERSONAL JUDGMENT AGAINST YOU; IT HAD

4   NOTHING TO DO WITH MONEY THAT THE LAW FIRM OWED, RIGHT?

5   A.   HAD NOTHING TO DO WITH MONEY THAT THE LAW FIRM OWED.

6   Q.   I'M SORRY.  THAT WAS A BAD QUESTION.

7   A.   YES.

8   Q.   THANK YOU FOR POINTING THAT OUT.  THIS IS A PERSONAL DEBT

9   TO YOU, RIGHT?

10  A.   IT'S A PERSONAL DEBT TO ME.

11  Q.   YOU AGREE WITH THAT?

12  A.   I SAID THE STATEMENT, YES.

13  Q.   THEN THERE'S $84,668 THAT WAS PAID TO SOMEBODY CALLED

14  PHOENIX PCB?

15  A.   I THINK THAT IS A REAL ESTATE TRANSACTION, BUT I'M NOT

16  SURE.  BUT, YES, THEY WERE.

17  Q.   AGAIN, PERSONAL TO YOU.

18  A.   I HAVE NO IDEA.

19  Q.   YOU PAID $150,000 TO RENASANT BANK?

20  A.   YEAH.  THAT WAS ANOTHER -- THAT WAS A REAL ESTATE DEAL

21  ALSO.

22  Q.   AGAIN, PERSONAL TO YOU?

23  A.   WELL, IT COMES OUT OF A REAL ESTATE TRANSACTION.  IT'S NOT

24  PERSONAL TO ME.  IT'S A PAYOFF.

25  Q.   IT WAS A PAYOFF.  OKAY.  THEN THERE WERE A NUMBER OF

3189

1  PAYMENTS TO SUNTRUST BANK THAT TOTALED $844,319.06, RIGHT?

2  A.   THAT'S CORRECT.

3  Q.   AND THOSE WERE ALL FOR THE MONEY THAT YOU OWED ON YOUR

4  LINE OF CREDIT AND THE OTHER $750,000 LOAN THAT WE HEARD NEAL

5  BARTON FROM SUNTRUST TALK ABOUT, RIGHT?

6  A.   YEAH.  I DON'T KNOW IF -- THEY WERE ALSO PAYING MONEY --

7  THE FIRM LOAN.  SO I DON'T KNOW WHICH IS WHICH, BUT --

8  Q.   WELL, YOU HEARD MR. BARTON SAY THAT THE $9,947.62 PAYMENT

9  WAS FOR THE $750,000 LOAN THAT YOU HAD, RIGHT?

10  A.   RIGHT.

11  Q.   AND THAT WAS PERSONAL TO YOU, RIGHT?

12  A.   IT WAS.

13  Q.   ALL RIGHT.  AND THEN THE $55,000, THAT WAS ON YOUR LINE OF

14  CREDIT THAT WAS OVER A MILLION THREE, RIGHT?

15  A.   I DON'T KNOW THE NUMBERS, BUT -- BUT WHAT ABOUT -- WHAT

16  WERE THE TEN THOUSANDS?

17  Q.   DO YOU AGREE WITH THAT, SIR?  $55,000 WAS A PAYMENT ON

18  YOUR LINE OF CREDIT TO SUNTRUST?

19  A.   I THINK SO.  I THINK IT IS.  I THINK IT IS.

20  Q.   AND THEN THERE ARE SEVERAL PAYMENTS HERE TO SUNTRUST FOR

21  BENEFIT OF NAT HARDWICK?

22  A.   YEAH.  THOSE ARE THE FIRM LOANS THAT ARE BEING PAID.

23  Q.   NOW, THESE ARE PAYMENTS DIRECTLY TO YOU.  THESE ARE NOT

24  THE FIRM LOANS.

25  A.   NO.  THOSE --

3190

1   Q.   THESE ARE FOR BENEFIT OF NAT HARDWICK.

2   A.   THEY SHOW --

3   Q.   DEPOSITED IN YOUR ACCOUNT.

4   A.   AGAIN, IT SAYS FOR BENEFIT OF ON THE TRANSFER.  BUT THOSE

5   $10,000 WERE MONIES THAT WENT TO PAY THE FIRM LOAN.  I SAW THEM

6   IN THE DOCUMENTATION.

7   Q.   AND THAT'S A TOTAL OF $30,000?

8   A.   THAT IS CORRECT.

9   Q.   AND SO THEN YOU HAVE A LOT OF PAYMENTS TO THE

10  COSMOPOLITAN, WHICH IS A CASINO IN LAS VEGAS?

11  A.   THAT IS CORRECT.

12  Q.   AND THE TOTAL AMOUNT THAT YOU PAID TO THE COSMOPOLITAN OUT

13  OF THE FIRM'S ACCOUNTS WAS $3,350,000?

14  A.   THAT IS CORRECT.

15  Q.   THEN YOU PAID $400,000 TO THE VENETIAN CASINO?

16  A.   THAT'S CORRECT.

17  Q.   ALSO KNOWN AS THE SANDS, RIGHT?

18  A.   I DON'T -- I MEAN, I NEVER HEARD IT CALLED THE SANDS,

19  BUT --

20  Q.   AND THEN YOU HAD PAYMENTS TO A COMPANY CALLED UBS THAT

21  TOTALED $250,000?

22  A.   THAT'S CORRECT.

23  Q.   AND SO IF YOU ADD ALL THAT UP, THE TOTAL IS

24  $26,503,428.61, RIGHT?

25  A.   I'LL TAKE YOUR WORD FOR IT.

3191

1    Q.   AND ALL OF THOSE PAYMENTS WERE FOR YOUR PERSONAL BENEFIT.

2    A.   NO.

3    Q.   EXCEPT FOR THE $30,000 THAT YOU CLAIM WAS PAID TO SUNTRUST

4    FOR A LOAN THAT YOU GAVE TO THE FIRM?

5    A.   NO.

6    Q.   HOW ARE ANY OF THESE THINGS NOT PERSONAL TO YOU?

7    A.   YOU HAVE TO GO --

8            MR. GARLAND:  YOUR HONOR, HE'S --

9            THE COURT:  WELL, AT THAT POINT HE HAD ANSWERED.

10           SO GO AHEAD AND ASK YOUR NEXT QUESTION.  OVERRULED.

11           MR. GARLAND:  HE WAS MID-ANSWER TO THE PRIOR

12   QUESTION.

13           THE COURT:  HE HAD ANSWERED NO.  OVERRULED.

14           ASK YOUR NEXT QUESTION, MR. PHILLIPS.

15   BY MR. PHILLIPS:

16   Q.   LET'S TALK ABOUT THE JACKSON & HARDWICK LEGACY ESCROW

17   ACCOUNTS.

18   A.   SURE.

19   Q.   PRIOR TO MERGING WITH MORRIS & SCHNEIDER IN 2005, YOU

20   OPERATED A FIRM CALLED JACKSON & HARDWICK?

21   A.   I DID, YES.

22   Q.   YOU WERE A PARTNER IN THAT FIRM?

23   A.   MOST OF THE TIME, YEAH.  WELL, JACKSON & HARDWICK, YES.

24   Q.   AND YOU OBTAINED A $3 MILLION LOAN FROM FORTUNA TO BUY OUT

25   YOUR PARTNER, DALE JACKSON?

1    A.   YES.   IN 2005.

2    Q.   AND AFTER YOU BOUGHT HIM OUT, YOU DIRECTED ASHA MAURYA TO

3    CONSOLIDATE DOZENS OF DORMANT ESCROW ACCOUNTS THAT WERE IN THE

4    NAME OF JACKSON & HARDWICK, RIGHT?

5    A.   THAT'S CORRECT.

6    Q.   AND MOST OF THOSE ACCOUNTS WERE ESCROW ACCOUNTS, BUT A

7    COUPLE OF THEM WERE OPERATING ACCOUNTS, RIGHT?

8    A.   I'LL TAKE YOUR WORD FOR IT.

9    Q.   WELL, YOU HEARD MR. MOCK AND MR. DEATON TESTIFY ABOUT

10   THAT, RIGHT?

11   A.   RIGHT.

12   Q.   OKAY.  AND THE TOTAL AMOUNT OF THE CONSOLIDATED ACCOUNTS

13   WAS $631,276.71, RIGHT?

14   A.   I THINK IT WAS CLOSER TO 680, BUT --

15   Q.   ALL RIGHT.  AND YOU SET UP NEW ACCOUNTS AT BRAND BANK

16   THROUGH MICHAEL MOCK TO CONSOLIDATE THOSE OLD JACKSON &

17   HARDWICK ESCROW ACCOUNTS AND PUT IT AT BRAND BANK?

18   A.   I THINK THAT'S CORRECT, YES.

19   Q.   AND ALMOST IMMEDIATELY AFTER DOING THAT, YOU WIRE

20   TRANSFERRED THAT MONEY TO MR. DEATON'S BANK AT CRESCENT BANK,

21   RIGHT?

22   A.   I BELIEVE IT WAS CRESCENT AT THE TIME, YES.

23   Q.   THEY WERE LATER BOUGHT OUT BY RENASANT, MAYBE?

24   A.   I BELIEVE THAT'S CORRECT.

25   Q.   OKAY.  AND THEN ON -- THAT WAS DECEMBER 30TH, 2009, WHEN

3193

1   YOU WIRE TRANSFERRED ALL OF THAT DORMANT ESCROW MONEY TO BRAND

2   BANK -- OR FROM BRAND BANK TO CRESCENT?

3   A.   WE TRANSFERRED THOSE ACCOUNTS.   I WOULDN'T CALL IT DORMANT

4   ESCROW MONEY.   BUT GO AHEAD.

5   Q.   WELL, THAT'S WHAT MR. MOCK TESTIFIED TO, RIGHT?

6   A.   I MEAN, I DON'T KNOW THAT HE UNDERSTANDS WHAT WAS IN THE

7   ACCOUNTS.   I THINK HE ACTUALLY TESTIFIED HE DIDN'T KNOW WHAT

8   WAS IN THE ACCOUNTS.

9   Q.   LET ME SHOW YOU GOVERNMENT EXHIBIT 1301, WHICH IS ALREADY

10   IN EVIDENCE.

11   A.   OKAY.

12   Q.   THIS IS AN E-MAIL FROM YOU TO ASHA MAURYA DATED

13   SEPTEMBER 17TH, 2009 --

14   A.   THAT'S CORRECT.

15   Q.   -- WITH A COPY TO MR. MOCK.   AND YOU SAID:   I'M GOING TO

16   MOVE THESE ACCOUNTS VALUED AT 620K TO BRAND BANK.   MICHAEL MOCK

17   IS MY NEW PRIVATE BANKER AND IS COPIED ON THIS E-MAIL.   CAN WE

18   SEND HIM A LIST OF THE ACCOUNTS AND GET WITH HIM TO GET THESE

19   ACCOUNTS MOVED ASAP?

20       AND THEN ATTACHED TO YOUR E-MAIL IS A LIST OF ALL THOSE

21   DORMANT ACCOUNTS, RIGHT?

22   A.   YES.

23   Q.   YOU CAN SEE THAT THE WORDS IOLTA, IOLTA, IOLTA, AND SO

24   FORTH, ALL THROUGH THESE ACCOUNTS?

25   A.   CORRECT.

3194

1    Q.   AND SO AFTER YOU TRANSFERRED THE MONEY TO CRESCENT BANK --

2    A.   UH-HUH.

3    Q.   -- YOU USED THAT MONEY TO BUY A CD, A CERTIFICATE OF

4    DEPOSIT, IN THE NAME OF YOUR PRESENT LAW FIRM, MHS, RIGHT?

5    A.   YEAH.  I DON'T THINK I BOUGHT A CD.  I THINK IT WAS USED

6    AS COLLATERAL.

7    Q.   OKAY.

8    A.   WELL, I GUESS I BOUGHT A CD AND THEN THAT WAS USED AS

9    COLLATERAL.  YOU'RE CORRECT.  YOU'RE CORRECT.  YOU'RE CORRECT.

10   Q.   OKAY.  AND SO YOU GOT THE $631,000 IN THE FORM OF A

11   LOAN -- OR 680,000, I THINK YOU SAID, IN A LOAN FROM CRESCENT,

12   RIGHT?

13   A.   WELL, I THINK IT ACTUALLY -- I THINK IT STARTED OUT BEING

14   680, IS HOW MUCH WAS IN THE TOTAL.  AND THEN -- BUT I THINK THE

15   ACTUAL LOAN ENDED UP BEING 630.

16   Q.   OKAY.  SO CRESCENT LOANED YOU $630,000?

17   A.   RIGHT.

18   Q.   THAT WAS A PERSONAL LOAN TO YOU; THAT WAS NOT A FIRM LOAN?

19   A.   CORRECT.

20   Q.   AND THEY TOOK AS COLLATERAL THAT CERTIFICATE OF DEPOSIT

21   THAT CAME -- OR THAT WAS PURCHASED WITH THE DORMANT ESCROW

22   MONEY?

23   A.   WELL, WITH THE MONEY THAT WAS IN THOSE ACCOUNTS, CORRECT.

24   Q.   THEY WERE DORMANT ESCROW ACCOUNTS?

25   A.   THEY WERE DORMANT ESCROW ACCOUNTS, BUT I HAD FUNDED THOSE

3195

1   ACCOUNTS.

2   Q.   YOU AGREE THAT THE WORDS ON THOSE ACCOUNTS WERE IOLTA,

3   RIGHT?  THAT WAS THE NAME ON MOST OF THOSE ACCOUNTS, IOLTA?

4   A.   I MEAN, IT'S CLEAR THAT IT SAID IOLTA.  BUT IF YOU HAVE

5   YOUR MONEY IN AN IOLTA ACCOUNT THAT YOU FUNDED, AND THEY ARE

6   NOW DONE --

7   Q.   ALL RIGHT.  WELL, LET'S TALK ABOUT THAT.

8   A.   OKAY.

9   Q.   YOU'RE FAMILIAR WITH THE STATE BAR OF GEORGIA?  YOU'RE A

10   MEMBER OF THE STATE BAR OF GEORGIA?

11   A.   YES, AND YES.

12   Q.   OKAY.  AND WHEN YOU GOT YOUR LICENSE TO BECOME A LAWYER,

13   YOU HAD TO TAKE THE MULTI-STATE PROFESSIONAL RESPONSIBILITY

14   EXAM?

15   A.   THAT WAS A LONG TIME AGO, BUT I DID TAKE IT.

16   Q.   YOU DID?  AND YOU WERE BOUND BY THE RULES OF THE STATE BAR

17   OF GEORGIA THE WHOLE TIME YOU WERE PRACTICING LAW IN THE STATE

18   OF GEORGIA, RIGHT?

19   A.   THAT IS CORRECT.

20   Q.   ALL RIGHT.  AND YOU'RE FAMILIAR WITH THE RULES THAT THE

21   STATE BAR HAS CONCERNING HOW ATTORNEYS ARE REQUIRED TO HANDLE

22   ESCROW MONEY AND IOLTA MONEY?

23   A.   SURE.

24   Q.   WOULD YOU AGREE THAT THOSE RULES STATE THAT NO PERSONAL

25   FUNDS SHALL EVER BE DEPOSITED IN A LAWYER'S TRUST ACCOUNT

3196

1  EXCEPT THAT UNEARNED ATTORNEY'S FEES MAY BE SO HELD UNTIL THE

2  SAME ARE EARNED?

3  A.   I WOULD AGREE WITH THAT.

4  Q.   AND IT ALSO STATES THAT NO FUNDS SHALL BE WITHDRAWN FROM

5  SUCH TRUST ACCOUNTS FOR THE PERSONAL USE OF THE LAWYER

6  MAINTAINING THE ACCOUNT?

7  A.   IF THAT'S WHAT IT SAYS, THAT'S WHAT IT SAYS.

8  Q.   WELL, YOU KNOW THE RULES, AND YOU AGREE THAT WAS ONE OF

9  THE RULES YOU WERE REQUIRED TO FOLLOW, RIGHT?

10  A.   THAT IS CORRECT.

11  Q.   AND THE RULES ALSO STATE THAT NO EARNINGS FROM AN IOLTA

12  ACCOUNT SHALL EVER BE MADE AVAILABLE TO A LAWYER OR LAW FIRM,

13  RIGHT?

14  A.   NO EARNINGS, CORRECT.

15  Q.   THE RULES ALSO STATE THAT THE PERSONAL MONEY PERMITTED TO

16  BE KEPT IN THE ACCOUNT TO PAY THOSE NOMINAL FEES SHALL NOT BE

17  USED FOR ANY PURPOSE OTHER THAN TO COVER THE BANK FEES; AND IF

18  USED FOR ANY OTHER PURPOSE, THE LAWYER SHALL HAVE VIOLATED THIS

19  RULE.

20  A.   I HEAR YOU.

21  Q.   DO YOU AGREE THAT THE RULES ALSO PROVIDE THAT A LAWYER

22  DIRECTING THE CLOSING OF A REAL ESTATE TRANSACTION HOLDS MONEY

23  WHICH BELONGS TO ANOTHER, EITHER A CLIENT OR A THIRD PARTY, AS

24  AN INCIDENT TO THAT PRACTICE AND MUST KEEP THAT MONEY IN AN

25  IOLTA ACCOUNT?

3197

1    A.   I AGREE WITH THAT.

2    Q.   AND UNDER NO CIRCUMSTANCES MAY THE CLOSING PROCEEDS BE

3    COMMINGLED -- THAT MEANS MIXED, RIGHT?

4    A.   THAT DOES MEAN MIXED, CORRECT.

5    Q.   UNDER NO CIRCUMSTANCES MAY THE CLOSING PROCEEDS BE

6    COMMINGLED WITH THE FUNDS BELONGING TO THE LAWYER, THE LAW

7    OFFICE, OR ANY ENTITY OTHER THAN AS EXPLICITLY PROVIDED IN THE

8    RULE.  RIGHT?

9    A.   YOU'RE READING STRAIGHT FROM THE BOOK.

10   Q.   BUT YOU KNEW THAT WAS THE RULE, RIGHT?

11   A.   SURE.

12   Q.   AND YOU'RE ALSO AWARE THAT THE STATE BAR, IN ITS BOOKS AND

13   ON ITS WEBSITE, PROVIDES INFORMATION TO ATTORNEYS TO TRY TO

14   HELP ATTORNEYS STAY OUT OF TROUBLE, RIGHT?

15   A.   I'M SURE THAT'S TRUE.

16   Q.   AND ONE OF THE PIECES OF ADVICE THAT THEY GIVE YOU IS

17   ASKING THIS QUESTION:  ARE THERE ANY SITUATIONS WHERE I OR MY

18   FIRM CAN KEEP THE INTEREST EARNED ON A TRUST ACCOUNT?

19        AND THE ANSWER IS:  ABSOLUTELY NOT.  RIGHT?

20   A.   RIGHT.

21   Q.   THE RULES ALSO STATE THAT -- OR THEY POSE THIS QUESTION

22   AND THIS ANSWER:  WHAT IF I JUST WANT TO HIRE A BOOKKEEPER OR

23   CPA TO RECONCILE RATHER THAN DOING IT MYSELF?

24        AND THE ANSWER IS:  THIS IS FINE, BUT YOU'RE STILL

25   PERSONALLY RESPONSIBLE FOR ACCOUNTING TO YOUR CLIENTS AND TO

3198

1    THE STATE BAR FOR THE MONEY IN YOUR CLIENT TRUST ACCOUNTS.

2    RIGHT?

3    A.   IF THAT'S WHAT IT SAYS.

4    Q.   BUT YOU KNEW THAT WAS THE RULE AT THE TIME, DIDN'T YOU?

5    A.   I MEAN, I DON'T KNOW THAT I KNEW EVERY SINGLE ONE OF THOSE

6    RULES.  I KNEW ALL THE FIRST ONES YOU WERE TALKING ABOUT.  THAT

7    ONE --

8    Q.   YOU KNEW IT WAS NOT YOUR MONEY?

9    A.   NO.  NO.  THAT MONEY IN THAT ACCOUNT THAT WE'RE TALKING

10   ABOUT WAS MY MONEY.

11   Q.   IN THOSE IOLTA ACCOUNTS?

12   A.   NOT -- YES.  IN THE JACKSON & HARDWICK ONES, YES.  WE'LL

13   GET TO THE FACTS WHENEVER WE GET TO THIS PART OF THE SHOW.

14   Q.   WOULD YOU AGREE THAT THEFT OCCURS MORE FREQUENTLY WHEN AN

15   UNSUPERVISED PERSON HAS TOTAL RESPONSIBILITY FOR THE IOLTA

16   TRUST ACCOUNT, OFFICE OPERATING, AND/OR PAYROLL ACCOUNT?

17           MR. GARLAND:  THAT CALLS FOR HEARSAY AND COMMENTARY

18   ABOUT LAWS, AND IT'S NOT RELEVANT HERE.

19           THE COURT:  THE READING OF THE RULES HERE?

20           MR. GARLAND:  READING OF THAT INTERPRETATION ABOUT

21   WHAT HAPPENS WHEN --

22           THE COURT:  HOLD ON ONE SECOND.  I'LL ALLOW IT IF HE

23   CAN SAY WHETHER OR NOT HE KNOWS.  I WILL OVERRULE AT THIS TIME.

24           THE WITNESS:  YOU HAVE TO SAY IT AGAIN.

25           MR. PHILLIPS:  CAN YOU READ THE QUESTION BACK, MA'AM?

3199

1    I DON'T HAVE IT IN FRONT OF ME.

2              (WHEREUPON, THE RECORD WAS READ AS REQUESTED.)

3              THE COURT:  ON SECOND -- I SUSTAIN.  I SUSTAIN.  ON

4    SECOND THOUGHT, I SUSTAIN THAT OBJECTION.

5              IF YOU WANT TO REPHRASE, YOU MAY, MR. PHILLIPS.

6    BY MR. PHILLIPS:

7    Q.   I THINK MR. GARLAND'S ASKED YOU SEVERAL TIMES WHETHER YOU

8    KNEW THAT MONEY IN THE INCOMING WIRE ACCOUNT, THE ONE THAT ENDS

9    IN 7328, WAS AN IOLTA ACCOUNT.  RIGHT?  AND YOU SAID YOU

10   DIDN'T.

11   A.   NO.  I THINK HE'S ASKED IF I WAS AWARE OF THE ACCOUNT.

12   Q.   ALL RIGHT.  BUT ISN'T IT TRUE, MR. HARDWICK, THAT YOU

13   ACTUALLY GOT MONEY FROM FIVE DIFFERENT IOLTA ACCOUNTS?

14        THIS IS GOVERNMENT EXHIBIT 1003 THAT I'M SHOWING YOU ON

15   THE SCREEN.  NOT JUST 7328, THE INCOMING WIRE ACCOUNT, BUT FIVE

16   DIFFERENT ESCROW ACCOUNTS, OR IOLTA ACCOUNTS.

17   A.   THAT'S WHAT IT SAYS ON THE SCREEN.  BUT, AGAIN -- HOLD ON.

18   BUT, AGAIN, THESE ONES, THESE SINGLE ONES THAT CAME OUT WERE --

19   PROBABLY HAD TO DO WITH A REAL ESTATE TRANSACTION.  AND I

20   WASN'T AWARE OF ANY BESIDES A REAL ESTATE TRANSACTION.

21   Q.   SO THIS ONE RIGHT HERE THAT ENDS IN 2633, YOU GOT

22   1.7 MILLION, 1,788,682.76?

23   A.   I WAS NOT AWARE THAT I GOT MONEY FROM THAT ACCOUNT, UNLESS

24   IT WAS A REAL ESTATE TRANSACTION.

25   Q.   THERE WAS NO REAL ESTATE TRANSACTION THAT YOU TOLD US

3200

1   ABOUT WHEN YOU DESCRIBED WHERE YOU GOT THAT $26 MILLION A

2   MINUTE AGO, WAS THERE?

3   A.   THERE WAS -- ACTUALLY, I DID.  THERE WAS A COUPLE WE

4   LOOKED AT THAT COULD HAVE BEEN REAL ESTATE TRANSACTIONS.

5   Q.   THE $680,000?

6   A.   150,000, THE 68,000 -- THERE WAS ACTUALLY TWO OR THREE WE

7   TALKED ABOUT.

8   Q.   IT'S YOUR TESTIMONY THAT REAL ESTATE TRANSACTIONS MAKE UP

9   ALL OF THE MONEY THAT CAME TO YOU OUT OF THESE IOLTA ACCOUNTS?

10  A.   THAT IS NOT MY TESTIMONY.  THAT'S NOT THE QUESTION YOU

11  ASKED ME.

12  Q.   WELL, I'M ASKING NOW.

13  A.   IT'S MY TESTIMONY THAT I HAD NO IDEA THAT IT WAS COMING

14  OUT OF THE ACCOUNT EXCEPT FOR THE ONE TIME IN JUNE.  AND,

15  AGAIN, UNLESS IT WAS A REAL ESTATE TRANSACTION, THEN I WOULD

16  HAVE KNOWN.

17  Q.   DID YOU TELL YOUR PARTNERS, MARK WITTSTADT AND ROD

18  WITTSTADT, IN 2013 THAT YOU WERE TAKING $680,000 OUT OF THE

19  FIRM TO MAKE YOUR DOWN PAYMENT ON THE ST. REGIS?

20  A.   NO.  THAT WAS FROM -- THAT WAS -- I DIDN'T -- NO, I DID

21  NOT TELL THEM THAT, WHAT I WAS DOING WITH THE MONEY.  THAT WAS

22  MY PERSONAL MONEY.  THEY KNEW ABOUT THE ST. REGIS, OF COURSE.

23  Q.   DO YOU REMEMBER YESTERDAY WHEN YOU TALKED ABOUT THE

24  CULTURE OF YOUR FIRM, YOU TALKED ABOUT THE BASICS?  REMEMBER

25  THAT?

3201

1    A.    YES, SIR.

2    Q.    WOULD YOU AGREE THAT IT'S A FUNDAMENTAL PRINCIPLE OF BEING

3    A LAWYER THAT YOU'RE ALWAYS SUPPOSED TO TELL THE TRUTH?

4    A.    I THINK EVERYBODY SHOULD ALWAYS TELL THE TRUTH.

5    Q.    AND WOULD YOU ALSO AGREE THAT IT'S A FUNDAMENTAL PRINCIPLE

6    OF BEING A LAWYER THAT YOU SHOULD NOT CHEAT YOUR PARTNERS?

7    A.    I BELIEVE -- I DON'T BELIEVE ANYBODY SHOULD CHEAT.  IT HAS

8    NOTHING TO DO WITH BEING A LAWYER OR NOT.

9    Q.    AND YOU WOULD AGREE THAT IT'S A FUNDAMENTAL PRINCIPLE OF

10   BEING A LAWYER THAT YOU SHOULD NOT USE MONEY IN THE CLIENT

11   ESCROW ACCOUNTS FOR PERSONAL PURPOSES?

12   A.    I DON'T THINK YOU SHOULD EVER KNOWINGLY USE MONEY FROM THE

13   ESCROW ACCOUNT OF ANYBODY FOR PERSONAL PURPOSES.

14   Q.    THEN BACK TO THE MONEY THAT YOU GOT FROM THE DORMANT

15   ESCROW ACCOUNTS.  AFTER YOU GOT THE LOAN FROM MR. DEATON'S

16   BANK, CRESCENT, FOR 631,000, YOU DEFAULTED ON THAT LOAN?

17   A.    I DEFAULTED ON THAT LOAN BECAUSE OF THE SITUATION, YES.

18   Q.    SOMEBODY ELSE'S FAULT THAT YOU DEFAULTED --

19   A.    IT WASN'T SOMEBODY ELSE'S FAULT.  IT WAS JUST -- THE

20   PAYMENTS WERE UP TO DATE UNTIL THEN.

21   Q.    AND AS A RESULT, CRESCENT BANK THEN TOOK THE COLLATERAL

22   THAT ORIGINALLY CAME OUT OF THOSE DORMANT ESCROW ACCOUNTS TO

23   SATISFY THE $631,000 PERSONAL LOAN THAT YOU GOT, RIGHT?

24   A.    YES.  THEY USED MY MONEY TO SATISFY THE PERSONAL LOAN,

25   CORRECT.

3202

1    Q.   JUST TO BE CLEAR -- AND I THINK WE'VE SEEN THIS FROM YOUR

2    DEPOSITION, BUT I WANT TO ASK YOU THIS QUESTION.

3    A.   SURE.

4    Q.   YOU AGREE THAT MONEY THAT IS IN ESCROW ACCOUNTS, IOLTA

5    ACCOUNTS, AND TRUST ACCOUNTS, THAT'S NOT YOUR MONEY, RIGHT?

6    A.   I AGREE UNLESS THE SITUATION YOU HAD PUT MONEY IN THERE.

7    IT'S LIKE RANDY SCHNEIDER SAID THE OTHER DAY, HE DIDN'T HAVE AN

8    ESCROW -- HE DIDN'T HAVE AN ACCOUNT, SO HE PUT THE MONEY, HIS

9    PERSONAL MONEY IN THE ESCROW ACCOUNT AND PULLED IT OUT.

10   Q.   REMEMBER IN EARLY 2007 WHEN YOU RECEIVED A LUMP SUM FROM

11   SELLING OFF PART OF YOUR BUSINESS THAT YOU TOLD US ABOUT?

12   A.   I'M SORRY.  IN 2007?

13   Q.   YEAH.

14   A.   WHATEVER, 12 OR $13 MILLION?  DO I REMEMBER IT?  YES, I

15   REMEMBER IT.

16   Q.   BUT YOU DIDN'T PAY ANY INCOME TAXES ON THAT, DID YOU?

17   A.   I HAVE NO IDEA.  I DIDN'T DO THE TAXES.  YOU HAVE TO ASK

18   MR. ADAMS ABOUT THAT.

19   Q.   YOU GOT A LUMP SUM OF $11.8 MILLION IN FEBRUARY OF 2007,

20   AND YOU DON'T REMEMBER WHETHER YOU PAID THE TAXES ON IT?

21   A.   NO.  THAT WAS 2007, AND TONY ADAMS DID MY TAXES.  I KNOW

22   THERE WERE SOME THINGS THAT HE WAS WORKING THROUGH ON THE

23   TAXES.  I DON'T KNOW.  I'M SURE WE PAID SOMETHING.

24   Q.   AND THAT'S DIFFERENT THAN THE 431,000 THAT YOU OWED THE

25   IRS FROM YOUR PAST DUE WITHHOLDING TAXES, RIGHT?

3203

1    A.    WELL, I DIDN'T --

2    Q.    YES OR NO.  DIFFERENT OR NOT?

3    A.    ASK THE QUESTION AGAIN, PLEASE.

4    Q.    THE $11.8 MILLION THAT YOU GOT IN 2007 AND YOU SAID YOU

5    DON'T REMEMBER WHETHER YOU PAID TAXES ON THAT, THAT HAS NOTHING

6    TO DO --

7              MR. GARLAND:  OBJECTION.

8    BY MR. PHILLIPS:

9    Q.    -- WITH THE $431,000 --

10             MR. GARLAND:  OBJECTION, YOUR HONOR.  403.  OUTSIDE

11   THE TIME PERIOD OF THESE CHARGES AND --

12             THE COURT:  AS TO THE 2007?

13             MR. GARLAND:  YES.  AND ASKING FOR COMPARISONS OF

14   TAXES IS IRRELEVANT.

15             THE COURT:  OVERRULED BASED ON PRETRIAL MOTION.

16             MR. GARLAND:  MAY WE APPROACH, YOUR HONOR?

17             THE COURT:  YES.

18             (WHEREUPON, A BENCH CONFERENCE OUT OF THE HEARING OF

19   THE JURY PROCEEDED AS FOLLOWS:)

20             MS. NOVAY:  I MAY BE MISTAKEN.  I THOUGHT HIS 2007

21   TAX RETURNS WERE RULED OUT, THE 2007 TAX RETURNS WERE RULED OUT

22   AND IT WAS ONLY DURING THE PENDENCY OF THIS CASE.

23             MR. PHILLIPS:  YOUR HONOR, HE'S PUT HIS CREDIBILITY

24   AT ISSUE BY TESTIFYING IN THE CASE.  I HAVE A RIGHT TO ASK HIM

25   ABOUT THAT BECAUSE IT AFFECTS HIS CREDIBILITY AS A WITNESS.

3204

1          THE COURT:  WELL, THIS IS THE THING.  I KNOW THAT I

2    DID RULE, I RULED TAXES WERE OUT.  BUT THEN -- I THINK THEY

3    THEN TURNED AROUND AND GAVE 404(B) NOTICE OF THE TAXES.  I

4    THINK WHEN I RULED ON THEM, THEY WERE IN THE FORM OF A MOTION

5    IN LIMINE.  BUT I THINK THAT WAS PRIOR TO THAT RULING ON -- I

6    MEAN, SUBMITTING A 404(B) NOTICE.

7          MR. GARLAND:  404(B) WAS IN 2012, IF I REMEMBER.

8          MS. NOVAY:  WE FILED A MOTION IN LIMINE SPECIFICALLY

9    TO KEEP IT OUT.  THE COURT RULED ON -- IT'S AT THE TOP OF

10   PAGE 8.

11         THE COURT:  OF THE TRIAL MATTER?

12         MS. NOVAY:  OF THE TRIAL.  THE COURT THEN SAID TO THE

13   GOVERNMENT, WELL, THEY SAID THERE'S THINGS THAT ARE

14   INTERTWINED, GIVE THE DEFENSE NOTICE.

15         MR. PHILLIPS:  IT'S DIFFERENT WHEN HE TESTIFIES.

16   HE'S PUT HIS CREDIBILITY AT ISSUE.  HE'S SAT UP HERE AND TOLD

17   THE JURY THAT HE DID NOTHING WRONG, THAT HE'S AS PURE AS THE

18   DRIVEN SNOW.

19         THE COURT:  THAT'S NOT AN ARGUMENT FOR THIS.  THAT'S

20   WHY IT WAS RAISED IN A MOTION IN LIMINE.  HE SAID JUST BY

21   TESTIFYING IT UNDERMINES ALL THE ROUTES OF THE MOTION IN LIMINE

22   UNLESS IT'S 404(B).  I THEN THINK THAT YOU ALL THEN TURNED

23   AROUND AND FILED IT AS 404(B) AND IT COULD COME IN.

24         MR. GILFILLAN:  YOUR HONOR RULED IT OUT.  WE DID NOT

25   PUT IT IN IN OUR CASE IN CHIEF.  WE LISTED IT ON THE 404(B) OUT

3205

1    OF AN ABUNDANCE OF CAUTION.  404(B) GOES TO CASE IN CHIEF

2    STUFF.  THIS IS SIMPLY HIS CREDIBILITY.

3            AND WE ARE NOT PUTTING IN TAX RETURNS.  HE IS JUST

4    ASKING HIM THE QUESTION ABOUT HIS CREDIBILITY.

5            THE COURT:  WHAT COMES IN UNDER CREDIBILITY, OF

6    COURSE, YOU CAN IMPEACH SOMEBODY UNDER CREDIBILITY.  ARE YOU

7    SAYING THAT ANYTHING ABOUT THE DEFENDANT, DESPITE PRIOR RULINGS

8    OR NO OTHER BASIS AT ALL, COULD COME IN JUST BECAUSE HE TAKES

9    THE STAND?  HOW DOES IT COME IN JUST BECAUSE HE TOOK THE STAND?

10           MR. GILFILLAN:  PRIOR INSTANCES AND PRIOR CONDUCT

11   THAT GO TO WHETHER HE'S TRUTHFUL ARE RELEVANT TO HIS

12   CREDIBILITY.

13           THE COURT:  UNDER 404(B).

14           MR. GILFILLAN:  NO.  I THINK UNDER 608.

15           THE COURT:  IMPEACHMENT.

16           MR. GILFILLAN:  YES, YOUR HONOR.  AND PRIOR CONDUCT

17   THAT GOES TO TRUTHFULNESS.  AND NOT PAYING YOUR TAXES, HE

18   SIGNED TAX RETURNS WHEREIN, YOU KNOW, THEY ARE UNDER PENALTY OF

19   PERJURY, TRUE OR CORRECT.  I THINK THAT'S A PROPER SUBJECT FOR

20   IMPEACHMENT CREDIBILITY.

21           MR. GARLAND:  YOUR HONOR, WELL --

22           THE COURT:  AND THIS IS THE PROBLEM, THOUGH.  I MADE

23   A RULING ON IT PRETRIAL.  SO I DIDN'T HEAR ANYTHING BACK FROM

24   THE GOVERNMENT THAT, WELL, WE COULD STILL USE IT.  I DIDN'T

25   KNOW THIS WAS GOING TO BE AN ISSUE BECAUSE I DIDN'T KNOW MY

3206

1   RULING --

2           MR. GARLAND:  AND, YOUR HONOR, WE ARE CHECKING THE

3   NOTICE UNDER 404(B).  WE CAN'T PUT OUR HANDS ON IT.

4           THE COURT:  I THINK THEIR ARGUMENT DOESN'T SUGGEST

5   THAT IT HAS TO BE IN THERE.  I THINK THEY ARE SAYING GENERALLY

6   UNDER 608 IMPEACHMENT.

7           MR. GILFILLAN:  CAN I ASK YOUR HONOR, WHEN YOUR HONOR

8   RULED THEM OUT, WERE YOU RULING THEM OUT IF HE TESTIFIED?

9           THE COURT:  YEAH.  I WAS RULING THEM OUT BASED ON THE

10  AGE OF THEM, BECAUSE I SAID OTHER ONES COULD COME IN.

11  SPECIFICALLY, I SAID THE ONES FOR A TIME PERIOD AROUND THE TIME

12  OF THE INDICTMENT COULD.  SO I WAS LOOKING AT THE AGE OF THEM,

13  WHICH IS SIMILAR TO IF YOU USED AN OLD CONVICTION TO IMPEACH,

14  WHICH USUALLY YOU CAN, BUT IT'S BEYOND A CERTAIN AGE, SOMETIMES

15  YOU CAN'T.

16          AND SO IN MY RULING, MS. NOVAY SAID I SAID 2007

17  THROUGH 2009 COULD NOT COME IN, BUT I ALLOWED THE OTHER ONES TO

18  COME IN.

19          MR. GILFILLAN:  WE DIDN'T PUT THEM IN.  THESE ARE

20  JUST QUESTIONS.

21          THE COURT:  THAT'S PUTTING IT IN.  THAT'S PUTTING IT

22  IN.  WHEN YOU ASK A QUESTION, THAT'S THE SAME THING.  THAT'S

23  MOTION IN LIMINE.

24          I SUSTAIN.  I SUSTAIN.

25          MR. GARLAND:  YOUR HONOR, JURY BE INSTRUCTED TO

3207

1    DISREGARD THOSE --

2              THE COURT:  ALL RIGHT.

3              (WHEREUPON, PROCEEDINGS RESUMED IN OPEN COURT AS

4    FOLLOWS:)

5              THE COURT:  ALL RIGHT.  I'LL SUSTAIN THE OBJECTION

6    AFTER THAT LONG SIDEBAR.  SORRY, LADIES AND GENTLEMEN.  AND I

7    WILL INSTRUCT YOU TO DISREGARD ANY INFORMATION THAT YOU'VE JUST

8    HEARD REGARDING THE 2007 TAXES THAT WE JUST HEARD ABOUT.  THANK

9    YOU.

10   BY MR. PHILLIPS:

11   Q.   WHY DID YOU NOT PAY THE $431,468.78 IN WITHHOLDING TAXES

12   THAT YOU OWED WHEN YOU WERE WITH JACKSON & HARDWICK?

13   A.   WELL, LET'S GET THE FACTS STRAIGHT.  IT WAS A NAT

14   HARDWICK PC WHICH WAS THE OWNER OF THE COMPANY.  MY ACCOUNTANT,

15   TONY ADAMS, SAID WE HAD PAID THOSE.  OKAY?  AND SO THE PROBLEM

16   WAS WHEN NAT HARDWICK -- NAT HARDWICK PC IS WHAT WAS MERGED IN

17   WITH MORRIS & SCHNEIDER, AND THEN NAT HARDWICK PC REMAINED AS

18   THE ENTITY.  SO IT WAS GOING TO ATTACH TO THAT, BUT WE WEREN'T

19   GOING TO PAY IT BECAUSE THEY WERE ALREADY PAID, ACCORDING TO

20   THE ACCOUNTANTS.

21   Q.   YOU SIGNED THE SHAREHOLDER AGREEMENT THAT SAID THAT YOU

22   OWED $431,468.78 IN WITHHOLDING TAXES, RIGHT?

23   A.   THAT'S NOT WHAT IT SAYS.  IT SAYS THE CORPORATION HAS AN

24   OBLIGATION -- JUST LIKE I EXPLAINED ABOUT NAT HARDWICK PC -- TO

25   THE IRS -- THE PARTNERS DIDN'T WANT TO BE RESPONSIBLE FOR IT,

3208

1   WHICH MADE PERFECT SENSE.  MY ACCOUNTANT'S SAYING IT WASN'T

2   OWED.  HE WAS GOING TO LOOK INTO IT AND GET IT TAKEN CARE OF,

3   WHICH THEY DID.  AND THAT WAS IT.

4   Q.   DO YOU SEE THE SENTENCE THAT I'VE HIGHLIGHTED, THAT I AM

5   POINTING TO?

6   A.   YEAH.  BETWEEN THE PARTNERS, I WAS SOLELY RESPONSIBLE,

7   CORRECT.  NOT --

8   Q.   IT SAYS HARDWICK IS SOLELY RESPONSIBLE FOR THE IRS

9   OBLIGATION.

10  A.   THAT'S CORRECT.

11  Q.   DID I READ THAT CORRECTLY?

12  A.   YEAH.  THAT'S CORRECT.  THAT'S WHAT I JUST SAID.  BUT WHAT

13  I'M SAYING IS, THE ENTITY NAT HARDWICK PC BECAME MORRIS

14  HARDWICK SCHNEIDER.  SO, THEREFORE, IT WAS ATTACHING TO MORRIS

15  HARDWICK SCHNEIDER, BUT IT WAS NOTHING TO DO WITH THE

16  WITTSTADTS OR THE MORRIS OR SCHNEIDER.

17  Q.   YOU FILED A TAX RETURN FOR 2012, RIGHT?

18  A.   I BELIEVE SO.

19  Q.   LET ME SHOW YOU GOVERNMENT EXHIBIT 1401, WHICH WAS

20  PREVIOUSLY ADMITTED INTO EVIDENCE WHEN THE IRS WITNESS

21  TESTIFIED.

22  A.   OKAY.

23  Q.   IS THIS A COPY OF YOUR 2012 INCOME TAX RETURN?

24  A.   I BELIEVE IT IS.

25  Q.   AND LINE 7, WHERE IT SAYS WAGES, SALARIES, AND TIPS, YOU

3209

1   REPORTED THAT YOU MADE A LITTLE BIT OVER $2.7 MILLION, RIGHT?

2   A.   THAT'S WHAT IT SAYS.

3   Q.   AND YOU TOLD THEM THAT YOUR TOTAL INCOME WAS $1.4 MILLION.

4   A.   THAT'S WHAT IT SAYS.  I DIDN'T DO THE TAX RETURN, BUT,

5   YES.

6   Q.   THAT WAS PREPARED BY TONY ADAMS, YOUR CPA?

7   A.   I BELIEVE -- YES, I BELIEVE IT WOULD BE.

8   Q.   YOU WANT TO CHECK IT, MR. HARDWICK, TO SEE IF HE --

9   A.   HE'S DONE IT FOR A LONG TIME, SO I DON'T THINK I NEED TO

10  CHECK IT.

11  Q.   LET ME SHOW YOU PAGE 2 OF GOVERNMENT EXHIBIT 1005.

12  A.   OKAY.

13  Q.   WHAT'S THE TOTAL AMOUNT THAT YOU RECEIVED FROM MHS IN

14  2012?

15  A.   THE TOTAL TRANSFER IN 2012 WAS $7,495,093.50.

16  Q.   THAT'S IN ADDITION TO YOUR $600,000 SALARY, RIGHT?

17  A.   YEAH, I ASSUME SO.

18  Q.   YOU KNOW SO, RIGHT?

19  A.   I DON'T -- I DON'T KNOW WHAT'S IN YOUR NUMBERS.  NOBODY

20  DOES.

21  Q.   WE JUST WENT THROUGH, LINE BY LINE, EVERY PAYEE THAT MADE

22  UP THE $26 MILLION.

23  A.   NAT HARDWICK WAS ONE OF THE PAYEES, RIGHT?

24  Q.   NONE OF THOSE WERE SALARY PAYMENTS, WERE THEY?

25  A.   I DON'T -- I HAVE NO IDEA.  IF YOU TELL ME THEY'RE NOT

3210

1   SALARY PAYMENTS, I'LL BELIEVE YOU.

2   Q.   THEY WERE NOT SALARY PAYMENTS.

3   A.   OKAY.

4   Q.   DO YOU ADMIT THAT DIVOT HOLDINGS WAS A PASSIVE COMPANY?

5   IT DIDN'T DO ANY BUSINESS, RIGHT?

6   A.   DIDN'T DO ANY BUSINESS?

7   Q.   IT WAS JUST A COMPANY THAT YOU SET UP TO HOLD INVESTMENT

8   MONEY.

9   A.   I'M TRYING TO THINK.  I DON'T WANT TO SAY ANYTHING THAT'S

10  NOT TRUE.  I KNOW WE WERE PLANNING ON DOING BUSINESS WITH IT,

11  BUT I DON'T KNOW THAT -- LIKE, ARE YOU SAYING THAT -- LIKE, DID

12  I SELL A PRODUCT OUT OF DIVOT?  IS THAT WHAT YOU'RE ASKING ME?

13  Q.   THAT'S ONE WAY TO DO BUSINESS.  DID YOU DO THAT?

14  A.   I DID NOT SELL A PRODUCT.

15  Q.   DID YOU DO ANY OTHER KIND OF BUSINESS?

16  A.   I THINK AT TIMES WE HAD MAYBE SOME RENTAL PROPERTIES OR

17  DID SOME LOANS OR SOMETHING.  BUT BESIDES THAT, NO.

18  Q.   OKAY.  DIVOT DIDN'T GENERATE ANY INCOME, DID IT?  OTHER

19  THAN --

20  A.   NOT MUCH, NO.

21  Q.   -- INTEREST INCOME FROM THE MONEY THAT YOU FUNNELED FROM

22  MHS TO MERRILL LYNCH?

23  A.   WELL, I THINK FUNNELED IS NOT THE RIGHT WORD.  BUT MONEY

24  WAS TRANSFERRED TO THE ACCOUNT, TO THE ACCOUNT.  BUT THERE WAS

25  GROWTH -- YOU KNOW, THERE'S BROKERAGE ACCOUNTS, SO THERE WAS

3211

1    GROWTH.  THERE WAS INTEREST.  I MEAN, THERE WAS MONEY MADE

2    BESIDES INTEREST, OBVIOUSLY.

3    Q.   EVEN THOUGH DIVOT NEVER GENERATED ANY INCOME AND NEVER DID

4    ANY BUSINESS, YOU TRIED TO GET YOUR CPA, TONY ADAMS, TO HELP

5    YOU CHEAT THE IRS BY TREATING YOUR GIRLFRIEND, JULIA OLIVARES,

6    AS AN EMPLOYEE OF DIVOT, RIGHT?

7    A.   I ASKED THE QUESTION IF THERE WERE THINGS -- BECAUSE SHE

8    WAS, YOU KNOW, DOING THINGS FOR THE COMPANY, I ASKED THE

9    QUESTION.

10   Q.   I'M SHOWING YOU --

11   A.   I WASN'T TRYING TO GET ANYBODY TO CHEAT ANYBODY.  I WAS

12   ASKING MY ACCOUNTANT A QUESTION.

13   Q.   AND THAT QUESTION IS IN THIS E-MAIL, GOVERNMENT

14   EXHIBIT 1505, MAY 8TH, 2013.  YOU SAID TO TONY ADAMS:  I'VE

15   BEEN DATING THE SAME GIRL NOW FOR SIX YEARS, JULIA OLIVARES.

16   A.   CORRECT.

17   Q.   I GIVE HER MONEY ON A MONTHLY BASIS AND PAY SOME EXPENSES.

18   A.   CORRECT.

19   Q.   CAN I MAKE HER AN EMPLOYEE OF DIVOT HOLDINGS AND SAVE SOME

20   MONEY BY WRITING IT OFF AND JUST PAYING HER TAXES?

21   A.   RIGHT.  BECAUSE WE WERE DOING SOME LOANS AND CERTAIN

22   THINGS.  SHE WAS GOING TO DO SOME WORK, CORRECT.

23   Q.   AND TONY ADAMS RESPONDED:  ABSOLUTELY.

24       AND YOU SAID:  CAN WE DO IT RETROACTIVE, IT MOVING

25   FORWARD?  I'VE BEEN PAYING HER FOR YEARS.

3212

1     AND THEN TONY'S RESPONSE WAS:  SURE, NO PROBLEM AT ALL.

2     RIGHT?

3   A.   THAT'S WHAT IT SAYS.

4   Q.   I'LL SHOW YOU GOVERNMENT EXHIBIT 1012.

5   A.   RIGHT.

6   Q.   BETWEEN JANUARY 2011 AND AUGUST OF 2014, YOU PAID JULIA

7   OLIVARES $2,712,193.81.

8   A.   MONEY WENT TO HER FOR THOSE AMOUNTS.  I WOULDN'T USE THE

9   WORD PAID.  I MEAN, SHE BOUGHT -- SOME STUFF WAS BOUGHT, SOME

10  STUFF WAS FOR HER COMPANY.  THERE ARE ALL KIND OF DIFFERENT

11  THINGS THAT WERE GOING ON THERE.

12  Q.   REMEMBER TALKING TO YOUR PARTNERS IN JANUARY OF 2011,

13  INCLUDING MARK WITTSTADT AND ROD WITTSTADT, JANUARY 16, 2011,

14  AND YOU WERE SAYING THAT YOU WANTED TO HAVE SOLE DISCRETION TO

15  RUN SUPPORT SERVICES, RIGHT?

16  A.   YES.  THAT'S WHAT IT SAYS.

17  Q.   AND THAT'S GOVERNMENT EXHIBIT 925 THAT'S ALREADY IN

18  EVIDENCE.

19     YOU ALSO TOLD YOUR PARTNERS IN GOVERNMENT EXHIBIT 926, ON

20  JANUARY 23RD, 2011, THAT YOU WERE BROKE, YOU HAD PUT OFF YOUR

21  CREDITORS ALL THAT YOU COULD, RIGHT?

22  A.   I DIDN'T SAY I WAS BROKE.  I SAID I PUT MY CREDITORS OFF,

23  BECAUSE WE WERE -- I WAS NEGOTIATING SOME DEALS.  WE WERE

24  TRYING TO GET THAT DONE.

25  Q.   DO YOU AGREE THAT GOVERNMENT EXHIBIT 1006 ACCURATELY

3213

1    STATES YOUR BANK BALANCE AT THE END OF DECEMBER OF 2010 AS

2    NEGATIVE $38,070.58?

3    A.    I MEAN, I AGREE WITH THOSE -- USING THOSE ACCOUNTS, THAT'S

4    WHAT IT EQUALS, CORRECT.  I DON'T AGREE THAT'S ALL THE

5    ACCOUNTS.

6    Q.    I SHOW YOU GOVERNMENT EXHIBIT 942 THAT'S ALREADY IN

7    EVIDENCE.

8    A.    OKAY.

9    Q.    JULY 3RD, 2013, YOU TOLD TOMMY THOMPSON, THE LAWYER WHO

10   DRAFTED THE SHAREHOLDER AGREEMENTS, THAT YOU WANTED TO BE THE

11   SOLE MANAGER OF THE CLOSING SIDE, RIGHT?

12   A.    WELL, IT'S -- I WANTED TO BE THE SOLE MANAGER AND MARK

13   WANTED TO BE THE SOLE MANAGER.  THAT WAS THE CONVERSATION THAT

14   WE HAD HAD.  AND WE WERE FINALLY GETTING THEM IN AS EQUITY

15   PARTNERS, CORRECT.

16   Q.    AND YOU TOLD TOMMY THOMPSON ON THIS DATE, JULY 3RD, 2013:

17   CAN YOU MAKE NUMBER ONE SAY SOLE MANAGER, NOT MANAGER?  RIGHT?

18   A.    RIGHT.  FOR BOTH OF US, CORRECT.

19   Q.    FIVE DAYS LATER, GOVERNMENT EXHIBIT 943, YOU SENT AN

20   E-MAIL TO TOMMY THOMPSON WHERE YOU SAID:  PLEASE FIND ENCLOSED

21   WHERE I HAVE LISTED EVERYTHING THAT IS IN SUPPORT SERVICES,

22   CLOSING SIDE, AND DEFAULT SIDE FOR DEFINITIONAL PURPOSES.

23   NOTICE I WANT THE CLOSING SIDE TO BE THE CATCH-ALL SO THAT

24   ANYTHING NOT SPECIFICALLY LISTED IN DEFAULT FALLS UNDER

25   CLOSING.

3214

1       DID I READ THAT CORRECTLY?

2   A.   I THINK SO.  THAT MAKES SENSE.

3   Q.   AND THEN ATTACHED TO THAT E-MAIL, YOU INCLUDED THIS

4   DEFINITION OF SUPPORT SERVICES.  IT INCLUDES ACCOUNTING,

5   HYPHEN, ESCROW AND OPERATING; IS THAT RIGHT?

6   A.   THAT'S CORRECT.

7   Q.   I'LL SHOW YOU GOVERNMENT EXHIBIT 303.

8   A.   OKAY.

9   Q.   ON JUNE 2ND, 2011, YOU TOLD ART MORRIS, QUOTE:  NO MONEY

10  IS TAKEN OUT EVER UNLESS THE PARTNERS ARE PAID THEIR

11  PROPORTION, CLOSED QUOTE.

12      DID I READ THAT CORRECTLY?

13  A.   THAT WAS A NEGOTIATION THAT WE WERE TALKING ABOUT THAT WE

14  NEVER GOT TO.

15  Q.   I JUST ASKED YOU IF I READ IT CORRECTLY.

16  A.   THAT WAS EXCELLENT READING, YES.

17  Q.   LET ME SHOW YOU GOVERNMENT EXHIBIT 304 --

18  A.   OKAY.

19  Q.   -- WHICH WAS PREVIOUSLY ADMITTED.  AND YOU SAID TO MARK

20  WITTSTADT AND ROD WITTSTADT, ON AUGUST 22ND, 2011:  TRUE

21  PARTNERS FROM NOW ON.  RIGHT?

22  A.   THAT'S WHAT I SAID.  THAT'S NOT WHAT THE AGREEMENT

23  APPARENTLY SAID.

24  Q.   THAT'S WHAT YOU TOLD YOUR PARTNERS IN THIS E-MAIL, RIGHT?

25  A.   THEY WEREN'T MY PARTNERS IN 2011.  I'M JUST TELLING YOU

3215

1   THAT'S -- YEAH.  I MEAN --

2   Q.    THESE ARE YOUR WORDS?

3   A.    THAT'S MY E-MAIL.

4   Q.    YOUR WORDS?

5   A.    THAT IS MY -- MY WORDS.

6   Q.    I'M GOING TO SHOW YOU SOME OF THE SHAREHOLDER AGREEMENTS.

7   LET'S LOOK AT THE MARYLAND AGREEMENT --

8   A.    OKAY.

9   Q.    -- THAT SAYS IT'S EFFECTIVE JANUARY 1, 2011.

10  A.    OKAY.

11  Q.    AND THE DATE IT WAS SIGNED IS MAY 17TH OF 2011, RIGHT?

12  A.    RIGHT.  IS THAT THE ONE THAT THEY NEVER FORMED THE COMPANY

13  FOR?

14  Q.    THIS IS GOVERNMENT EXHIBIT 980.

15  A.    SO IT NEVER WENT INTO EFFECT.  GOT IT.  IS THAT THE ONE

16  YOU'RE TALKING ABOUT?

17  Q.    IS THAT YOUR SIGNATURE ON PAGE 29?

18  A.    ABSOLUTELY.

19  Q.    AND ARE THOSE THE SIGNATURES OF MARK WITTSTADT AND ROD

20  WITTSTADT AND ART MORRIS ON PAGE 30?

21  A.    YES.  IT IS RANDY SCHNEIDER, BUT HE WAS ALREADY OUT OF THE

22  CORPORATION, ACCORDING TO THE DOCUMENTS.

23  Q.    I'LL SHOW YOU PAGE 9 --

24  A.    OKAY.

25  Q.    -- OF THAT EXHIBIT.

3216

1   A.   OKAY.

2   Q.   DO YOU SEE WHERE IT SAYS, ADDITIONAL COMPENSATION?

3   A.   YES.

4   Q.   FOLLOW ALONG WITH ME WHILE I READ THIS.  ANY ADDITIONAL

5   COMPENSATION OR DISTRIBUTIONS PAID BY THE CORPORATION TO A

6   SHAREHOLDER -- SKIPPING AHEAD -- MUST BE APPROVED IN ADVANCE BY

7   THE UNANIMOUS VOTE OF THE BOARD OF DIRECTORS.  RIGHT?

8   A.   YES.  WE NEVER HAD A BOARD OF DIRECTORS MEETING.

9   Q.   THEREFORE, YOU COULDN'T HAVE HAD ANY OF YOUR DISTRIBUTIONS

10  APPROVED, RIGHT?

11  A.   I'M JUST SAYING WE JUST NEVER HAD ANY -- WE DIDN'T FOLLOW

12  THE CONTRACT.  THAT'S JUST -- THAT'S NOT WHAT IT WAS.  THOSE

13  PEOPLE WERE NOT IN EFFECT.

14  Q.   I'LL SHOW YOU PAGE 11 OF THAT AGREEMENT.

15  A.   OKAY.

16  Q.   IT TALKS ABOUT MANAGEMENT OF THE FIRM.

17  A.   UH-HUH.

18  Q.   AND IT SAYS:  A UNANIMOUS VOTE OF THE BOARD OF DIRECTORS

19  IS REQUIRED TO DO ANY OF THE FOLLOWING THINGS.

20       AND ONE OF THEM, ONE OF THEM IN RULE 5 IS:  MAKE ANY

21  DISTRIBUTION TO A SHAREHOLDER EXCEPT AS OTHERWISE PROVIDED IN

22  THIS AGREEMENT.  RIGHT?

23  A.   THAT'S WHAT IT SAYS.

24  Q.   IT ALSO SAYS ON PAGE 12 THAT A SHAREHOLDER CANNOT INCUR

25  ANY EXPENSE OVER $10,000 UNLESS THESE CONDITIONS ARE MET HERE

3217

1   AND EXPECT THE FIRM TO PAY FOR IT, UNLESS YOU HAVE APPROVAL OF

2   THE ENTIRE BOARD OF DIRECTORS, RIGHT?

3   A.   THAT'S WHAT IT SAYS.

4   Q.   AND YOU NEVER GOT APPROVAL OF THE ENTIRE BOARD OF

5   DIRECTORS FOR ANY OF YOUR PRIVATE JET TRIPS OR YOUR CASINO

6   PAYMENTS OR YOUR BOOKIE PAYMENTS OR THE PAYMENTS TO YOUR SOCIAL

7   COMPANIONS, DID YOU?

8   A.   I THINK WE TESTIFIED YESTERDAY WE WERE NOT CLAIMING THOSE

9   AS PERSONAL -- THOSE WERE NOT EXPENSES.

10  Q.   AND THOSE PROVISIONS THAT WE JUST LOOKED AT IN GOVERNMENT

11  EXHIBIT 980, THE MARYLAND AGREEMENT, THOSE ARE ALSO IN THE

12  GEORGIA AGREEMENT FROM 2011, WHICH IS GOVERNMENT EXHIBIT 976 --

13  A.   OKAY.

14  Q.   -- AND ALSO GOVERNMENT EXHIBIT 979, WHICH IS THE 2013

15  AGREEMENT.  YOU AGREE WITH THAT, RIGHT?

16  A.   I'D HAVE TO SEE THEM, BUT --

17  Q.   ALL RIGHT.  WELL, LET'S PUT THEM UP.

18  A.   THAT WOULD BE GREAT.

19  Q.   ALL RIGHT.  I'M GOING TO SHOW YOU FIRST GOVERNMENT

20  EXHIBIT 976.  THIS IS THE GEORGIA AGREEMENT FROM 2011, RIGHT?

21  A.   THAT'S THE ONE BETWEEN ART, RANDY, AND MYSELF?

22  Q.   YOU SIGNED THAT, RIGHT?

23  A.   I ASSUME I DID.  YOU SHOWED ME THINGS --

24  Q.   ALL RIGHT.  PAGE 29 OF THAT EXHIBIT, THAT'S YOUR

25  SIGNATURE?

3218

1    A.    YES, IT IS.

2    Q.    ALL RIGHT.  LOOKING AT PAGE 7, YOU SEE WHERE IT SAYS,

3    ADDITIONAL COMPENSATION?

4    A.    UH-HUH.

5    Q.    IS THAT THE SAME RULE THAT WAS IN THE AGREEMENT THAT WE

6    JUST LOOKED AT A MINUTE AGO?

7    A.    I BELIEVE SO.  CLOSE TO IT.

8    Q.    IT'S EXACTLY THE SAME, RIGHT?

9    A.    I MEAN, I DON'T KNOW IF IT'S EXACTLY THE SAME.

10   Q.    YOU WANT TO PUT THEM UP SIDE BY SIDE AND COMPARE THEM?

11   A.    I DON'T THINK SO.  IF YOU THINK IT'S EXACTLY THE SAME,

12   IT'S EXACTLY THE SAME.  I'M JUST SAYING I -- IF SOMETHING'S A

13   LITTLE BIT OFF, I DON'T WANT TO SAY SOMETHING THAT'S NOT TRUE.

14   Q.    PAGE 9 OF THAT EXHIBIT HAS THE SAME PROVISIONS CONCERNING

15   MANAGEMENT OF THE FIRM AND REQUIRING UNANIMOUS VOTE OF THE

16   BOARD OF DIRECTORS TO MAKE ANY DISTRIBUTION TO A SHAREHOLDER

17   EXCEPT AS PROVIDED IN THE AGREEMENT, RIGHT?

18   A.    OKAY.

19   Q.    YES?

20   A.    YES, IT'S IN THE AGREEMENT.

21   Q.    AND, ALSO, THE $10,000 SPENDING LIMIT IS IN THIS

22   AGREEMENT, RIGHT?

23   A.    YES.

24   Q.    THAT'S PAGE 10.

25         AND THEN, FINALLY, THERE'S THE 2013 AGREEMENT.

3219

1    A.   CORRECT.

2    Q.   THIS IS GOVERNMENT EXHIBIT 979.  YOU SIGNED THIS

3    AGREEMENT, TOO, RIGHT?

4    A.   I BELIEVE SO.

5    Q.   I SHOW YOU PAGE 44 OF THAT EXHIBIT.  ARE THOSE YOUR

6    SIGNATURES?

7    A.   THAT IS.

8    Q.   IN ADDITION TO SIGNING THESE DOCUMENTS, YOU INITIALED EACH

9    PAGE, CORRECT?

10   A.   I BELIEVE YOU COULD SAY THAT.  I MEAN, I CAN'T SEE IT.  I

11   DON'T WANT TO --

12   Q.   WELL, IS THIS YOUR SIGNATURE AT THE BOTTOM OF EACH PAGE

13   WHERE IT HAS YOUR N?

14   A.   THAT IS MY N.  IF THAT'S ON EVERY PAGE, THEN, YES, I

15   INITIALED EACH PAGE.

16   Q.   ALL RIGHT.  SHOW YOU PAGE 13 OF THIS EXHIBIT.  DO YOU SEE

17   THE ADDITIONAL COMPENSATION PROVISION?  IT'S BLURRY IN THIS

18   ONE, BUT CAN YOU SEE THAT IT'S THE SAME?  REQUIRES UNANIMOUS

19   VOTE OF THE BOARD OF DIRECTORS IN ADVANCE, RIGHT?

20   A.   RIGHT.

21   Q.   FOR ANY ADDITIONAL COMPENSATION OR DISTRIBUTIONS PAID BY

22   THE CORPORATION TO A SHAREHOLDER IN EXCESS OF THE ANNUAL SALARY

23   AND BONUS, RIGHT?

24   A.   RIGHT.

25   Q.   ALSO INCLUDES THE SAME MANAGEMENT LANGUAGE --

3220

1    A.    UH-HUH.

2    Q.    -- AT THE BOTTOM OF PAGE 16, REQUIRING A UNANIMOUS VOTE OF

3    THE DIRECTORS --

4    A.    OKAY.

5    Q.    -- TO MAKE ANY DISTRIBUTION TO A SHAREHOLDER, EXCEPT AS

6    OTHERWISE PROVIDED IN THE AGREEMENT, OR INCUR ANY EXPENSE OVER

7    $10,000.  RIGHT?

8    A.    UH-HUH.

9    Q.    ALL RIGHT.  MR. HARDWICK, YOU'VE TESTIFIED A COUPLE TIMES

10   ABOUT NOT FOLLOWING THE AGREEMENT.  DO YOU REMEMBER THAT?

11   A.    THAT WE HAD NOT FOLLOWED THE AGREEMENT A LOT OF TIMES?

12   YES.

13   Q.    BUT YOU KNEW HOW TO FOLLOW THE AGREEMENT AND GET THE VOTE

14   OF YOUR PARTNERS WHEN YOU WANTED TO, RIGHT?  YOU DID IT SEVERAL

15   TIMES?

16   A.    THERE WERE SEVERAL TIMES WHEN WE HAD DISCUSSIONS ABOUT

17   THINGS, BUT IT WASN'T BECAUSE OF THE AGREEMENT; IT WAS JUST

18   BECAUSE WE WERE DISCUSSING IT.

19   Q.    ALL RIGHT.  LET ME SHOW YOU WHAT'S ALREADY IN EVIDENCE AS

20   GOVERNMENT EXHIBIT 307.

21   A.    OKAY.

22   Q.    PAGE 3 OF THAT EXHIBIT.  ARE THESE YOUR WORDS HERE?

23         FROM AUGUST 16, 2013, FROM NAT HARDWICK.  THAT'S PAGE 2 AT

24   THE BOTTOM.

25   A.    THOSE ARE.

3221

1    Q.    PAGE 3, YOU SAID --

2    A.    YES, ABOUT THE SALARIES.  CORRECT.

3    Q.    THIS REQUIRES A UNANIMOUS DECISION OR THE SALARIES STAY

4    THE SAME.  I VOTE YES.  WHAT SAY YE?

5    A.    THAT'S RIGHT.  YEAH.

6    Q.    OKAY.

7    A.    ABOUT THE SALARIES, CORRECT.

8    Q.    I'M SHOWING YOU NOW GOVERNMENT EXHIBIT 215, WHICH WAS

9    PREVIOUSLY ADMITTED.

10   A.    OKAY.

11   Q.    THIS IS AN E-MAIL FROM YOU TO ROD WITTSTADT, MARK

12   WITTSTADT, AND A COPY TO ART MORRIS, RIGHT?

13   A.    CORRECT.

14   Q.    THIS IS DATED NOVEMBER 26TH, 2012.

15   A.    CORRECT.

16   Q.    AND YOU SAID:  IF ART GETS PAID, WE GOT TO GET PAID.

17   RIGHT?

18   A.    WELL, THE POINT OF THAT WAS HE WAS RETIRING.

19   Q.    DID YOU SAY THAT?  I DIDN'T ASK YOU WHAT THE POINT WAS.

20   I JUST SAID DID YOU SAY THAT.

21   A.    DID I TYPE THAT?  IS THAT WHAT YOU'RE ASKING ME?

22   Q.    ARE THOSE YOUR WORDS?

23   A.    I TYPED THAT, CORRECT.

24   Q.    AND SO IF THAT APPLIES, WOULD YOU ALSO AGREE THAT IF NAT

25   GETS PAID, THE OTHER SHAREHOLDERS ALSO HAVE TO GET PAID?

3222

1    A.    NO, BECAUSE NAT WASN'T RETIRING.

2    Q.    THAT'S A DIFFERENT RULE FOR YOU?

3    A.    NOT A DIFFERENT RULE, IT'S A DIFFERENT SITUATION.  AGAIN,

4    YOU'RE TRYING TO PUT FACTS THAT AREN'T THE FACTS.

5    Q.    YOU'VE REVIEWED THE AUDITED FINANCIAL STATEMENTS THAT WERE

6    PREPARED BY WARREN AVERETT?

7    A.    I HAVE.

8    Q.    AND WOULD YOU AGREE THAT THE FINANCIAL STATEMENTS FROM

9    WARREN AVERETT STATE THAT THE FIRM'S NET INCOME FROM 2011

10   THROUGH 2013 IS WHAT'S STATED HERE IN GOVERNMENT EXHIBIT 1001?

11   THAT'S WHAT THE FINANCIAL STATEMENTS SAY?

12   A.    IF THAT'S WHAT THEY SAY.  I DON'T KNOW HOW ACCURATE THEY

13   ARE, BUT THAT'S WHAT THEY SAY.

14   Q.    YOU AGREE THAT'S WHAT'S STATED IN THE FINANCIAL

15   STATEMENTS?

16   A.    IF YOU TELL ME THAT'S WHAT'S STATED, RIGHT NOW I AGREE.

17   I WANT TO GO BACK AND LOOK AT THE STATEMENT.  I CAN'T -- YOU'RE

18   ASKING ME STATEMENTS, LIKE, DO I AGREE.  I DON'T HAVE THESE

19   NUMBERS MEMORIZED.  ARE YOU TELLING ME THOSE ARE THE NUMBERS?

20   Q.    THOSE ARE THE NUMBERS.

21   A.    THEN I WILL SAY THAT I WILL AGREE.

22   Q.    MR. HARDWICK, I'VE JUST PUT ON THE WITNESS STAND IN FRONT

23   OF YOU THE SUMMARIES THAT WERE PREVIOUSLY ADMITTED SHOWING

24   PAYMENTS THAT WERE MADE ON YOUR BEHALF OR BY YOU TO PRIVATE JET

25   COMPANIES, TO CASINOS, TO BOOKIES, AND TO SOCIAL COMPANIONS.

3223

1      DO YOU AGREE THAT ALL OF THOSE PAYMENTS IN THOSE DOCUMENTS

2   RIGHT IN FRONT OF YOU WERE FOR YOUR PERSONAL USE AND BENEFIT?

3   A.   I AGREE -- YEAH.  I AGREE.  WE'VE ALREADY SAID THEY WERE.

4   A FEW TIMES.

5   Q.   DO YOU REMEMBER TESTIFYING YESTERDAY THAT THE PROBLEM WITH

6   MOST CLOSING ATTORNEYS IS THEY DON'T KNOW HOW TO SAY THEY MADE

7   A MISTAKE?  THAT'S ONE OF THE FIRST THINGS YOU TOLD US, RIGHT?

8   A.   THAT IS VERY TRUE.

9   Q.   AND WAS IT JUST A MISTAKE THAT YOU TOOK $32.5 MILLION OUT

10  OF THE FIRM'S ESCROW ACCOUNTS?

11  A.   WASN'T A MISTAKE.  I DIDN'T HAVE ANY KNOWLEDGE OF ANY

12  MONEY COMING OUT OF THE FIRM'S ESCROW ACCOUNTS EXCEPT FOR THAT

13  ONE TIME IN JUNE.

14  Q.   YOU ALSO TESTIFIED YESTERDAY ABOUT TAKING A MEETING WITH

15  RANDY AND ART WHEN YOU WERE THINKING ABOUT -- WELL, RIGHT AFTER

16  YOU BOUGHT OUT MR. JACKSON.  DO YOU REMEMBER THAT?  YOU SAID

17  YOU TOOK THAT MEETING OUT OF RESPECT FOR THEM?

18  A.   YES.  BECAUSE THEY WERE ELDER STATESMEN IN THE COMMUNITY.

19  Q.   AND SO IT'S YOUR TESTIMONY THAT THE WAY YOU CONDUCTED

20  THESE FINANCIAL TRANSACTIONS, TAKING MONEY OUT OF THE FIRM, THE

21  $26 MILLION, ALL OF THAT WAS DONE WITH COMPLETE RESPECT FOR ALL

22  OF YOUR PARTNERS?

23  A.   YES.  I HAD NO, NO KNOWLEDGE THAT THIS WAS HAPPENING.  I

24  WAS BEING TOLD BY ASHA MAURYA, SHE'S SHOWING ME DOCUMENTATION

25  AND -- YES.  ABSOLUTELY.

3224

1   Q.   YOU ALSO SAID THE FIRM ALWAYS CAME FIRST, RIGHT?

2   A.   IN MY MIND, YES.  ABSOLUTELY.  THAT'S WHY I GOT THAT D&H

3   ISSUE.

4   Q.   YOU ALSO TOLD US YESTERDAY THAT YOU DIDN'T LIKE THE

5   FORECLOSURE BUSINESS.  YOU SAID, I WAS NEVER A FORECLOSURE

6   SPECIALIST.

7        THAT'S THE SAME BUSINESS THAT PUT $11.8 MILLION IN YOUR

8   POCKET IN FEBRUARY OF 2007, WASN'T IT?

9   A.   NO.

10  Q.   REALLY?

11  A.   I WASN'T A PART -- I WASN'T A PART OF THE -- ART AND RANDY

12  SOLD THE FORECLOSURE BUSINESS.  WE HAD THE CLOSING SIDE PART OF

13  THE REO BACK OFFICE.  THAT'S TOTALLY DIFFERENT.  IT WAS NOT THE

14  CLOSING SIDE.  BUT, NO.  OBVIOUSLY, I LIKED GETTING THE CHECK.

15  Q.   YOU'VE TESTIFIED ABOUT WHAT HAPPENED IN AUGUST OF 2014

16  AFTER THE STORY OF THIS HUGE SHORTFALL IN YOUR FIRM'S ESCROW

17  ACCOUNTS BECAME PUBLIC, RIGHT?

18  A.   YES, I DID.

19  Q.   AND YOU TESTIFIED YESTERDAY ABOUT WHAT YOU THOUGHT THE

20  VALUE OF YOUR FIRM WAS RIGHT BEFORE THAT, RIGHT?

21  A.   YES.

22  Q.   WHAT HAPPENED TO THE VALUE OF YOUR FIRM AFTER THIS HUGE

23  HOLE IN YOUR ATTORNEY ESCROW ACCOUNTS WAS DISCOVERED?  DID THE

24  FIRM BECOME MORE VALUABLE OR LESS VALUABLE?

25  A.   I ASSUME IT WOULD BE LESS VALUABLE.

3225

1    Q.    ALL RIGHT.

2    A.    I DON'T KNOW HOW MUCH LESS VALUABLE, BUT I ASSUME IT WOULD

3    BE LESS VALUABLE.

4    Q.    THE COUNT THAT YOU WENT OVER WITH MR. GARLAND YESTERDAY,

5    COUNTS 2 THROUGH 22 OF THE INDICTMENT, EACH ONE OF THOSE IS A

6    WIRE FRAUD COUNT.  YOU UNDERSTAND THAT, RIGHT?

7    A.    YES, SIR.

8    Q.    AND WOULD YOU AGREE THAT EACH ONE OF THOSE COUNTS WAS AN

9    INTERSTATE WIRE TRANSFER?

10   A.    I BELIEVE WE STIPULATED THAT.

11   Q.    AND WOULD YOU ALSO AGREE THAT YOU DIRECTED ASHA MAURYA TO

12   MAKE EACH OF THOSE WIRE TRANSFERS ON YOUR BEHALF?

13   A.    THAT I DIRECTED HER TO MAKE THEM ON MY BEHALF.

14   Q.    RIGHT.  YOU'VE SEEN E-MAILS --

15   A.    YES.

16   Q.    -- WHERE YOU E-MAILED HER AND SAID, PLEASE WIRE X AMOUNT

17   TO SO-AND-SO?

18   A.    I DIDN'T -- YES.  BUT I DIDN'T SAY TAKE IT OUT OF AN

19   ESCROW ACCOUNT OR TAKE -- ANY OF THAT STUFF, NO.

20   Q.    ALL OF THOSE WIRES WERE DONE AT YOUR DIRECTION.

21   A.    I BELIEVE MOST OF THEM WERE.  I DON'T KNOW IF ALL OF THEM

22   WERE, BUT I BELIEVE THEY WERE.

23   Q.    YOU'RE NOT CONTENDING, THEN, THAT ASHA MAURYA WIRED MONEY

24   TO VARIOUS PLACES FOR YOUR PERSONAL USE AND BENEFIT WITHOUT YOU

25   ASKING HER TO DO THAT?

3226

1    A.   NO.  I'M NOT CONTENDING THAT, NO.

2    Q.   I WANT TO ASK YOU ABOUT GOVERNMENT EXHIBIT 1155 --

3    A.   OKAY.

4    Q.   -- WHICH IS SOMETHING THAT MICHAEL MOCK TESTIFIED ABOUT.

5    HE WAS YOUR PERSONAL BANKER AT BRAND BANK?

6    A.   YES.

7    Q.   RIGHT?

8    A.   UH-HUH, YES.

9    Q.   AND HE WAS CHASING YOU TO GET YOU TO PAY SOME MONEY TO THE

10   BANK, RIGHT?

11   A.   YES.  CORRECT.

12   Q.   AND ON SEPTEMBER 18, 2013, MR. MOCK E-MAILED YOU AND HE

13   SAID:  BELOW ARE THE WIRING INSTRUCTIONS.  THE AMOUNT TODAY --

14   OR AMOUNT I NEED TODAY IS $62,385.35.  RIGHT?

15   A.   THAT'S WHAT HE SAYS.

16   Q.   AND HE TOLD YOU TO WIRE THAT TO THE BRAND BANKING COMPANY?

17   A.   CORRECT.

18   Q.   ALL RIGHT.  BUT YOU WERE OUT OF TOWN.  YOU WERE AT ONE OF

19   THE CASINOS WHILE THIS WAS HAPPENING, RIGHT?

20   A.   IF YOU SAY SO.  I MEAN, I DON'T HAVE A CALENDAR IN FRONT

21   OF ME.

22   Q.   WELL, LET'S LOOK AT YOUR WORDS AND SEE WHAT YOU TELL

23   MR. MOCK.  YOU SAID:  I AM IN VEGAS FOR MY BIRTHDAY.

24        THAT'S YOUR BIRTHDAY BASH AND POOL PARTY, RIGHT?

25   A.   YEP.  POOL PARTY, EXACTLY.

3227

1    Q.   AND MR. MOCK SAID ON SEPTEMBER 24TH:  WE STILL DON'T HAVE

2    THE WIRE.  I REALLY NEED TO GET THIS RENEWAL BOOKED.  CAN YOU

3    GIVE ME AN ETA ON WHEN I SHOULD RECEIVE IT?

4    A.   OKAY.

5    Q.   AND SO THEN YOU SAID:  I'M IN VEGAS.  BUT CAN YOU SEND ME

6    A SEPARATE E-MAIL WITH THE AMOUNT AND WIRING INSTRUCTIONS I CAN

7    FORWARD TO MY BANK?

8    A.   CORRECT.

9    Q.   RIGHT.  AND THEN WHAT DID YOU DO?  YOU TURNED AROUND AND

10   SENT IT TO ASHA MAURYA AND TOLD HER TO WIRE THE MONEY FROM MHS

11   TO BRAND BANK, RIGHT?

12   A.   RIGHT.  BECAUSE I WAS TOLD I HAD A DISTRIBUTION.

13   Q.   YOU WERE USING MHS AS YOUR PERSONAL PIGGY BANK.

14   A.   ABSOLUTELY NOT.

15   Q.   LET'S LOOK AT PAGE 8 OF THAT EXHIBIT.

16   A.   OKAY.

17   Q.   SO YOU E-MAILED ASHA ON SEPTEMBER 25TH AND SAID:  CAN YOU

18   SEND THIS WIRE FOR ME AND TAKE OUT OF MY OCTOBER MONEY?  AS YOU

19   KNOW, I'M OUT OF TOWN.  THANKS, AND I MISS YOU GUYS.

20        AND THEN YOU GAVE HER THE WIRING INSTRUCTIONS TO BRAND

21   BANK, RIGHT?

22   A.   RIGHT.  AND I PREVIOUSLY HAD GOTTEN THESE --

23   Q.   THERE'S NOT A QUESTION BEFORE YOU.

24   A.   -- CHARTS.

25   Q.   AND THIS IS A COPY OF THE WIRE THAT SHOWS THE $62,000

3228

1   COMING OUT OF THE IOLTA ACCOUNT GOING TO BRAND BANK, RIGHT?

2   A.   THAT'S WHAT IT SAYS, UH-HUH.

3   Q.   I THINK YESTERDAY YOU TESTIFIED THAT YOU THOUGHT YOU WERE

4   ENTITLED TO WHATEVER YOUR PERCENTAGE WAS AT THE TIME OF THE

5   CASH ON HAND, NOT WHAT THE FIRM'S TAXABLE INCOME WAS, RIGHT?

6   A.   I DON'T KNOW IF I TESTIFIED TO THAT, BUT THAT IS -- THE

7   CASE WAS I GOT THE INFORMATION FROM ASHA, SHE WOULD TELL US

8   THERE WAS PLENTY OF CASH, IT WAS TIME FOR DISTRIBUTIONS AND

9   EVERYBODY WAS GETTING PAID.  I THINK THAT'S WHAT I TESTIFIED.

10  Q.   AND YOU AGREE THAT'S NOT WHAT THE SHAREHOLDER AGREEMENTS

11  SAY?

12  A.   THAT'S HOW WE WERE OPERATING.

13  Q.   YOU AGREE THAT'S NOT WHAT THE SHAREHOLDERS AGREEMENTS SAY?

14  A.   I BELIEVE THAT'S CORRECT.

15  Q.   I THINK YOU TESTIFIED YESTERDAY ALSO THAT YOU HAD NO

16  REASON TO NOT TRUST ASHA, RIGHT?

17  A.   THAT'S CORRECT.

18  Q.   ISN'T IT TRUE THAT ALYCE RITCHIE CAME TO YOU AND TOLD YOU

19  THAT SHE THOUGHT ASHA WAS DISHONEST AND SHE WANTED YOU TO FIRE

20  ASHA?

21  A.   RIGHT.  AND WE PUT AN AD FOR A CONTROLLER; WE WERE MAKING

22  THAT MOVE.  THAT'S WHY I SAID WE CAN'T -- WE COULDN'T JUST GET

23  RID OF HER BECAUSE WE DIDN'T KNOW WHAT WAS GOING ON IN THE

24  ACCOUNTS.  JUST LIKE FIDELITY HAD KEPT HER DOWN THERE FOR

25  90 DAYS BECAUSE THEY DIDN'T HAVE ANY IDEA WHAT WAS GOING ON

3229

1    WITH THE ACCOUNTS.

2    Q.   YOUR RESPONSE WHEN ALYCE BROUGHT THAT UP TO YOU WAS, I'LL

3    HAVE A TALK WITH HER.

4    A.   WHICH I DID.

5    Q.   YOU REMEMBER TESTIFYING YESTERDAY ABOUT THE BREAK-EVEN

6    NUMBER?

7    A.   YES.

8    Q.   AND DO YOU REMEMBER TESTIFYING THAT THE BREAK-EVEN NUMBER

9    WAS 1150?

10   A.   IT WAS 11 -- THAT WAS THE CONVERSATIONS THAT WE HAD WITH

11   THE PARTNERS.  IT WAS 1150.  I MEAN, OBVIOUSLY, IT'S GOING TO

12   FLUCTUATE AT DIFFERENT TIMES, BUT THAT WAS KIND OF THE NUMBER

13   OVER THAT ENTIRE, THAT ENTIRE TIME.

14   Q.   WELL, WHILE WE FIND THAT EXHIBIT, I'LL MOVE ON TO

15   SOMETHING ELSE.

16   A.   OKAY.

17   Q.   YOU TESTIFIED YESTERDAY, QUOTE, EVERYBODY WE TALKED TO,

18   CLOSED QUOTE, WANTED ASHA TO BE PROMOTED TO CFO WHEN BOB

19   DRISKELL RETIRED.  DO YOU REMEMBER THAT?

20   A.   I DO.

21   Q.   ISN'T IT TRUE THAT THE WITTSTADTS WERE FURIOUS THAT YOU

22   WANTED TO PROMOTE ASHA TO CFO?

23   A.   THAT WAS TOTALLY -- THAT WAS NOT TRUE.

24   Q.   ISN'T IT TRUE --

25   A.   EARLIER ON -- I MEAN, THERE WAS A BATTLE ABOUT THAT

3230

1    EARLIER ON WHEN WE -- WHO WAS GOING TO DO IT.  BUT BOB WAS

2    STILL THERE AT THAT POINT.  AND THE WHOLE POINT WAS THAT FRANK

3    WAS GOING TO COME DOWN, HAVE COMPLETE ACCESS, AND COME TO

4    ATLANTA FOR A WEEK A MONTH SO THAT HE COULD COME DOWN THERE.

5    AND, NOW, WHETHER HE DID THAT OR NOT, I DON'T KNOW.  THERE WAS

6    AN ISSUE, BUT IT WAS EARLIER ON THAN THAT.

7    Q.   DO YOU AGREE THAT WHEN YOU FIRST LEARNED ABOUT THE FORGED

8    BANK STATEMENT, YOU DIDN'T IMMEDIATELY TELL YOUR PARTNERS?

9    A.   I TOLD THE PEOPLE THAT COULD FIX THE PROBLEM.

10   Q.   YOU DIDN'T IMMEDIATELY TELL THE WITTSTADTS, DID YOU?

11   A.   I DID NOT, NO.

12   Q.   YOU DIDN'T TELL ART MORRIS?

13   A.   NO, I DID NOT TELL ART MORRIS.  HE COULD NOT HELP FIX THE

14   PROBLEM.

15   Q.   AND ISN'T IT TRUE THAT YOU TRIED TO KEEP FIDELITY FROM

16   SENDING IN ITS TEAM OF FORENSIC AUDITORS?

17   A.   ABSOLUTELY NOT.  ONCE FIDELITY CAME IN, THEY WOULD COME IN

18   THE NEXT DAY.

19   Q.   AND WHEN MARK WITTSTADT FINALLY LEARNED ABOUT THE PROBLEM,

20   YOU TRIED TO KEEP HIM FROM COMING DOWN TO ATLANTA.  YOU TOLD

21   HIM, I'VE GOT THIS.

22   A.   I TOLD HIM HE DIDN'T NEED TO RUN DOWN TO THE AIRPORT THAT

23   SECOND AND GET ON AN AIRPLANE; HE COULD COME THE NEXT DAY.

24   THAT'S WHAT WE WERE TALKING ABOUT.

25   Q.   YOU TOLD HIM THERE WAS NO NEED FOR HIM TO GET INVOLVED?

3231

1    A.   I DON'T REMEMBER HAVING THAT STATEMENT.  I MEAN, EVERYBODY

2    HAD TO GET INVOLVED.  EVERYBODY WAS GOING TO GET INVOLVED.  WE

3    WERE ALL TRYING TO GET MONEY -- PUT MONEY BACK IN.

4    Q.   SO YESTERDAY YOU TOLD US, ON JULY 18TH, 2014, YOU GOT A

5    TEXT FROM ALYCE RITCHIE.  AND YOU SAID, QUOTE, THAT WAS THE END

6    OF MY LIFE AS I KNEW IT.  DO YOU REMEMBER THAT?

7    A.   YES.

8    Q.   AND YOUR RESPONSE AFTER GETTING THAT TEXT THAT YOU THOUGHT

9    MEANT THE END OF YOUR LIFE WAS TO GET ON THE BOEING BUSINESS

10   JET AND TO FLY TO SCOTLAND WITH YOUR GROUP OF GOLF BUDDIES TO

11   GO TO THE BRITISH OPEN.  THAT'S WHAT YOU DID, RIGHT?

12   A.   THAT IS WHAT I DID.  THE STATEMENT WAS MADE LOOKING

13   BACKWARDS, OBVIOUSLY.

14   Q.   SO IT JUST NEVER OCCURRED TO YOU WHEN THIS PROBLEM FIRST

15   AROSE, OR FIRST WAS REALIZED BY OTHER PEOPLE, THAT YOU NEEDED

16   TO SPEAK UP AND TELL THEM ABOUT ALL OF THESE EXCESS AND UNEQUAL

17   DISTRIBUTIONS THAT YOU WERE RECEIVING?

18   A.   I HAD NO IDEA THERE WAS ANY EXCESS OR UNEQUAL

19   DISTRIBUTIONS.  WE HAD EVEN-UPS ALL THE OVER THE PLACE.  I

20   HONESTLY HAD NO IDEA.

21   Q.   ISN'T IT TRUE THAT ASHA ALTERED THAT BANK STATEMENT

22   BECAUSE YOU TOLD HER THAT SHE NEEDED TO DO WHATEVER SHE HAD TO

23   DO TO PASS THE AUDIT?

24   A.   THAT IS AN ABSOLUTE LIE.

25   Q.   I THINK YESTERDAY YOU TOLD US WHEN YOU CAME BACK FROM

3232

1    SCOTLAND ON JULY 28TH, TEN DAYS LATER, YOU GOT A TEXT FROM

2    ALYCE THAT SAID -- YOU SAID, WHAT'S THE PROBLEM?  AND SHE SAID,

3    OVERDISBURSED TO PARTNERS.  YOU REMEMBER SAYING THAT?

4    A.   YES.  THAT'S CORRECT.

5    Q.   AND NO LIGHTS WENT ON, YOU THOUGHT, GEE, I'VE BEEN SENDING

6    ALL THIS MONEY TO CASINOS AND TO -- I'VE BEEN PAYING BOOKIES

7    AND ALL THESE OTHER THINGS, PRIVATE JETS.  MAYBE IT'S RELATED

8    TO THAT.  JUST NEVER OCCURRED TO YOU?

9    A.   IT NEVER OCCURRED TO ME BECAUSE I HAD THE BACKUP

10   DOCUMENTATION.

11   Q.   AND SO YOU TOLD MR. GARLAND YESTERDAY THAT THE MONEY THAT

12   YOU USED TO PAY FOR THE BBJ AND THE REST OF THE SCOTLAND TRIP

13   WAS YOUR MONEY, THAT DIDN'T COME FROM THE FIRM.  YOU REMEMBER

14   SAYING THAT?

15   A.   YES.  IT WAS NOT GOING TO BE -- IT WASN'T A BUSINESS

16   WRITE-OFF.

17   Q.   BUT ISN'T IT TRUE THAT WHAT YOU DID WAS JUST WIRE THE

18   MONEY FROM THE FIRM TO DIVOT AND THEN PAY THOSE EXPENSES OUT OF

19   DIVOT?

20   A.   THAT'S HOW EVERYBODY GETS THEIR PERSONAL MONEY THAT WENT

21   TO THESE THINGS.

22   Q.   AND DO YOU REMEMBER YESTERDAY TALKING ABOUT THE LOANS THAT

23   YOU GOT FROM MR. PRITCHARD AND DUSTIN JOHNSON TO PLUG A SMALL

24   PART OF THE HOLE IN THE ESCROW ACCOUNTS?

25   A.   AT THE TIME WE THOUGHT THAT WAS THE ENTIRE HOLE.  BUT,

3233

1    YES.

2    Q.    JUST REFRESH EVERYBODY'S RECOLLECTION.   THE TOTAL YOU GOT

3    FROM MR. PRITCHARD WAS WHAT?

4    A.    TWO MILLION FROM MR. PRITCHARD.

5    Q.    AND FROM DUSTIN JOHNSON?

6    A.    THREE MILLION.

7    Q.    SO YOU GOT $5 MILLION COMBINED.   DID YOU TELL EITHER ONE

8    OF THOSE MEN BEFORE YOU GOT THE LOANS FROM THEM THAT THERE WAS

9    A HUGE HOLE IN YOUR FIRM'S ATTORNEY TRUST ACCOUNTS?

10   A.    NOBODY -- FIRST OF ALL, NOBODY KNEW THERE WAS A HUGE HOLE

11   AT THE TIME.   THEY THOUGHT IT WAS 6.4 MILLION.   I PUT IN 1.4.

12   THEY BORROWED THE -- WE BORROWED THE 5.   AND THEIR ACCOUNTANT

13   WAS IN THERE LOOKING AT THEM AND BASICALLY TALKED TO BOTH OF

14   THEM.   SO THEY HAD -- SO, YES, THEY HAD ALL THAT -- THEY HAD

15   THE INFORMATION THAT TONY TOLD THEM.

16   Q.    YOU DIDN'T TELL THEM?

17   A.    NO.   BECAUSE TONY WAS THE ONE BRINGING THEM TO THE TABLE.

18   Q.    AND SO YOU THOUGHT YOU COULD JUST PUT 5 OR $6 MILLION BACK

19   IN THE ATTORNEY TRUST ACCOUNTS AND THE STATE BAR WOULD JUST

20   FORGET ALL ABOUT IT AND IT WOULD BE LIKE IT NEVER HAPPENED?

21   A.    WE HIRED JEFF SMITH, WHO WAS DEALING WITH STATE BARS.   NO,

22   WE WERE NOT ACTING LIKE IT NEVER HAPPENED.

23   Q.    ISN'T IT TRUE THAT YOU DID NOT REPAY THOSE LOANS TO

24   MR. PRITCHARD AND MR. JOHNSON?

25   A.    THAT'S CORRECT.

3234

1    Q.   IN FACT, YOUR LEGAL MALPRACTICE INSURANCE COMPANY PAID

2    THOSE LOANS BACK FOR YOU, RIGHT?

3    A.   A PORTION.

4    Q.   I THINK YOU SAID YESTERDAY THAT YOU DIDN'T TALK TO THE

5    WITTSTADTS ALL THAT OFTEN, RIGHT?

6    A.   THAT'S TRUE.

7    Q.   AND THEY --

8    A.   IT WASN'T LIKE RANDY.  GO AHEAD.

9    Q.   THEY WERE YOUR PARTNERS?

10   A.   IN 2013, THEY WERE MY PARTNERS, YES.

11   Q.   AND THEY SIGNED SHAREHOLDER AGREEMENTS BACK IN 2011?

12   A.   THEY WERE PARTNERS IN 2013.

13   Q.   OKAY.  THAT'S YOUR TESTIMONY?

14   A.   THAT'S ACTUALLY THEIR TESTIMONY, TOO.

15   Q.   YOU KNEW HOW TO E-MAIL THEM.  YOU KNEW HOW TO PICK UP THE

16   PHONE AND CALL THEM.  YOU COULD TALK TO THEM ANY TIME YOU

17   WANTED TO.

18   A.   I KNEW HOW TO E-MAIL AND CALL, YES.

19   Q.   YESTERDAY, YOU TOLD US ABOUT A LAUNDRY LIST OF PEOPLE WHO

20   SCREWED YOU.

21        NETJETS.  REMEMBER THEM?  YOU TOLD NETJETS THAT THEY

22   SCREWED YOU.

23   A.   IT WASN'T NETJETS.

24             MR. GARLAND:  OBJECTION.  THAT'S ARGUMENTATIVE.

25             THE COURT:  I DON'T RECALL.  I'M SITTING HERE TRYING

3235

1    TO THINK OF WHETHER OR NOT THAT WORD WAS USED.

2              THE WITNESS:  I DIDN'T USE THAT WORD.

3              THE COURT:  IF NOT, THEN IT'S SUSTAINED.

4    BY MR. PHILLIPS:

5    Q.   OKAY.  DO YOU REMEMBER TELLING TOM SHEDLOCK FROM NETJETS

6    THAT ONE OF HIS FELLOW EMPLOYEES AT NETJETS DUPED YOU INTO THE

7    LEASE?

8    A.   YES.  AND THAT DID HAPPEN.

9    Q.   AND YOU'VE MADE THE SAME ACCUSATIONS ABOUT VARIOUS

10   BUILDERS DEALING WITH THESE REAL ESTATE LOANS THAT YOU HAD?

11   ONE OF THEM, QUOTE, STUCK ME.  RIGHT?  DO YOU REMEMBER MAKING

12   THAT STATEMENT?

13   A.   WELL, THEY STUCK ME BECAUSE THEY STOPPED PAYING.  IT

14   WASN'T -- THERE WASN'T ANY INTENT, ANY ISSUE WITH THAT EXCEPT

15   THEY JUST -- IT WAS JUST A BAD MARKET.

16   Q.   AND YOUR EX-WIFE, YOU CALLED HER THE WITCH?

17   A.   EXCUSE ME?

18   Q.   DIDN'T YOU TELL --

19   A.   I DON'T REMEMBER CALLING ANYBODY A WITCH, NO.

20   Q.   REALLY?

21             THE COURT:  EXCUSE ME.

22             THE WITNESS:  I MEAN, I DON'T --

23             THE COURT:  HOLD ON ONE SECOND.

24             THE WITNESS:  IN TESTIMONY?

25             THE COURT:  HOLD ON ONE SECOND, MR. HARDWICK.

3236

1           MR. GARLAND:  OBJECTION.  AND IRRELEVANT AND --

2           THE COURT:  BEFORE WE -- BEFORE WE GET THERE.

3           MR. PHILLIPS, IS THIS BASED ON SOMETHING THAT CAME

4    OUT YESTERDAY OR ARE YOU ASKING ABOUT SOME OTHER TIME?

5           MR. PHILLIPS:  DIFFERENT TIME.  THAT HE MADE THAT

6    STATEMENT TO ONE OF HIS BANKERS.

7           MR. GARLAND:  MAY WE APPROACH?

8           THE COURT:  YES.  YES.

9           THE WITNESS:  NO.

10          (WHEREUPON, A BENCH CONFERENCE OUT OF THE HEARING OF

11   THE JURY PROCEEDED AS FOLLOWS:)

12          THE COURT:  ARE YOU ABOUT TO IMPEACH HIM WITH

13   SOMETHING?  WHEN DID HE MAKE THIS STATEMENT?

14          MR. PHILLIPS:  YOUR HONOR, HE HAS TESTIFIED THAT ASHA

15   MAURYA --

16          THE COURT:  WHERE IS THIS TESTIMONY WHERE HE CALLED

17   HER A WITCH?  BECAUSE YOU MUST HAVE A GOOD-FAITH BASIS.

18          MR. PHILLIPS:  I HAVE A WITNESS WITH THE FBI WHO TOLD

19   US THAT, YOUR HONOR.

20          THE COURT:  A WITNESS WHO WAS -- SO YOU HAVE NOTHING

21   TO IMPEACH HIM WITH.  YOU'RE JUST ASKING HIM -- PUTTING IT IN

22   IN FRONT OF THE JURY WHEN YOU HAVE NO GOOD-FAITH REASON THAT

23   YOU CAN ESTABLISH HERE?

24          MR. PHILLIPS:  I INTERVIEWED THE WITNESS WITH THE

25   FBI.

3237

1          THE COURT:  ARE YOU GOING TO TAKE THE -- IS THE FBI

2    AGENT GOING TO TAKE THE STAND?

3          MR. PHILLIPS:  I'M ASKING THE WITNESS IF HE SAID IT,

4    YOUR HONOR.  IF HE DENIES IT, THEN I HAVE A CHOICE WHETHER I

5    WANT TO IMPEACH HIM.

6          THE COURT:  WHAT DOES IT HAVE TO DO -- WHY ARE YOU

7    ALL OVER THE PLACE, ASKING HIM IF HE CALLED HIS WIFE A WITCH?

8          MR. PHILLIPS:  HE HAS MADE REPEATED ASSERTIONS THAT

9    ALL THESE PEOPLE SCREWED HIM OR DUPED HIM, AND THERE IS A LONG

10   LIST OF THOSE PEOPLE.

11         THE COURT:  SUSTAINED.  SUSTAINED.  I DON'T WANT TO

12   HEAR ANYTHING ELSE ABOUT IT.  SUSTAINED.

13         (WHEREUPON, PROCEEDINGS RESUMED IN OPEN COURT AS

14   FOLLOWS:)

15         THE COURT:  LADIES AND GENTLEMEN, DISREGARD THAT.

16   YOU HAVE NOT HEARD THAT TESTIMONY.  YOU ARE TO DISREGARD THAT

17   QUESTION.

18   BY MR. PHILLIPS:

19   Q.   YOU TESTIFIED YESTERDAY THAT FIDELITY SCREWED YOU OVER IN

20   YOUR DEALINGS WITH THEM, TOO?

21         MR. GARLAND:  OBJECTION.

22         THE WITNESS:  I DON'T REMEMBER.

23         THE COURT:  DID YOU USE THAT WORD, MR. HARDWICK?

24         THE WITNESS:  I DON'T REMEMBER EVER USING THAT WORD.

25         THE COURT:  SUSTAIN.  SUSTAIN.

3238

1    BY MR. PHILLIPS:

2    Q.    DO YOU REMEMBER TESTIFYING, MR. HARDWICK, THAT FIDELITY

3    TRIED TO TAKE OVER YOUR BUSINESS AND TAKE YOUR OWNERSHIP

4    INTEREST IN YOUR FIRM THAT WAS SO VALUABLE?

5    A.    I HAD THAT TESTIMONY.  I DIDN'T SAY THEY SCREWED ME.  I

6    DIDN'T SAY THEY --

7    Q.    YOU DIDN'T USE THOSE WORDS, BUT THAT'S WHAT YOU ARE

8    CONTENDING, THAT THEY SOMEHOW CHEATED YOU, RIGHT?

9    A.    THEY MADE A BUSINESS DECISION TO TAKE, TO TAKE THE STUFF.

10   IT WAS THEIR DECISION.  IT WASN'T SCREWING OR WITCHING OR

11   CHEATING.  NOTHING.

12   Q.    AND YESTERDAY YOU ALSO SAID THAT ART MORRIS HAD DONE THE

13   SAME TO YOU?

14   A.    WHEN DID I SAY THAT?

15   Q.    THAT HE WAS SOMEHOW IN CAHOOTS WITH FIDELITY IN TAKING

16   OVER YOUR INTEREST IN THE FIRM?

17   A.    I WAS JUST, I WAS JUST ANSWERING QUESTIONS FROM

18   MR. GARLAND.  I DON'T THINK I SAID ART MORRIS WAS SCREWING

19   ANYTHING.  YES, HE WAS TALKING TO FIDELITY ABOUT TAKING OVER

20   THE FIRM.  THAT'S A FACT.  IT'S NOT AN OPINION.

21   Q.    AND YOU ALSO TOLD US ABOUT THE FAMILY THAT YOU PARTNERED

22   UP WITH IN THE D&H DEVELOPMENT DEAL.  AND YOU SAID, QUOTE, I

23   GOT STUCK WITH THIS LOAN.  I WAS STUCK WITH THE WHOLE BAG.

24   REMEMBER?

25   A.    WE ALREADY TALKED ABOUT THAT.  THAT WAS THE BUILDERS.  WE

3239

1  TALKED ABOUT THAT.

2  Q.   AND YOU SAID ALSO YESTERDAY THE BELLAGIO, QUOTE, DIDN'T

3  HONOR MY DEAL.  RIGHT?

4  A.   WELL, THEY DIDN'T, BUT THEY WENT BACK AND FIXED IT.

5  Q.   AND THEN YOU'VE ALSO SAID THAT, OF COURSE, ASHA SCREWED

6  YOU OVER AND DUPED YOU.  YOU USED THOSE WORDS.

7  A.   ASHA ABSOLUTELY DID.  AND I WASN'T THE ONLY PERSON WHO GOT

8  SCREWED BY ASHA.

9  Q.   I THINK YOU TESTIFIED YESTERDAY THAT BETH KORNEGAY-TYLER

10 WAS JUST A NICE LADY.  NOT SURE YOU USED THOSE EXACT WORDS, BUT

11 YOU REMEMBER SOMETHING TO THAT EFFECT?

12 A.   YEAH.  SHE IS A VERY NICE LADY.

13 Q.   OKAY.  AND YOU REMEMBER HAVING CONVERSATIONS WITH

14 MS. KORNEGAY-TYLER ABOUT YOUR PAYMENT TO NETJETS?

15 A.   I MEAN, I'M SURE WE TALKED ABOUT IT, YEAH.  I DON'T

16 REMEMBER ANY CONVERSATIONS AT THIS POINT.

17         THE COURT:  LADIES AND GENTLEMEN, I'M ACTUALLY GOING

18 TO GO AHEAD AND STOP NOW.  I'M NOT SURE HOW MUCH MORE --

19         MR. PHILLIPS, DO YOU HAVE A SIGNIFICANT AMOUNT MORE?

20         MR. PHILLIPS:  I'M NOT SURE, YOUR HONOR.  I NEED TO

21 LOOK AT MY NOTES.

22         THE COURT:  OKAY.  WELL, THEN LET'S GO AHEAD AND TAKE

23 A LUNCH BREAK.  IT'S ABOUT 12:25.  LADIES AND GENTLEMEN, PLEASE

24 BE BACK ON TIME SO WE CAN START ON TIME.  PLEASE BE BACK AT

25 1:20 SO WE CAN GO FORWARD AT 1:25 AND WE'RE READY TO GO.  THANK

3240

1    YOU.  BECAUSE WE CAN'T GO FORWARD UNTIL ALL OF YOU ARE BACK.

2              THANK YOU SO MUCH.  HAVE A GREAT LUNCH.

3              (WHEREUPON, THE JURY RETIRED FROM THE COURTROOM AT

4    12:24 P.M., AND THE FOLLOWING PROCEEDINGS WERE HAD.)

5              MS. NOVAY:  YOUR HONOR, WHAT TIME DID YOU SAY?  I'M

6    SORRY.

7              THE COURT:  1:20.

8              MR. GARLAND:  SETTING THE ALARM FOR 1:10.

9              THE COURT:  ALL RIGHT.  IF YOU ALL WILL BE SEATED FOR

10   JUST A SECOND.  THANK YOU.

11             AND THE REST OF YOU, IF YOU NEED TO BE AT EASE, IF

12   YOU'D LIKE TO LEAVE, BUT THE ATTORNEYS ON THIS CASE, I JUST

13   WANT TO TALK TO YOU.

14             I HAVE BEEN LOOKING AT THE ISSUE THAT WE TALKED ABOUT

15   EARLIER ABOUT THE 2007 TAXES.  AND I WILL JUST SAY THIS IS WHAT

16   I FOUND HERE.  THE DEFENSE DID FILE A MOTION IN LIMINE WITH

17   RESPECT TO MR. HARDWICK'S NONPAYMENT OF TAXES.  THAT WAS

18   DOCUMENT 154.

19             THE GOVERNMENT SET FORTH SEVERAL ARGUMENTS ABOUT IT

20   BEING INTERTWINED WITH THE INDICTMENT.  THAT WAS IN

21   DOCUMENT 175.  I CONSIDERED THOSE ARGUMENTS.

22             I DID ISSUE A TRIAL ORDER, WHICH IS DOCUMENT 215,

23   SPECIFICALLY PROHIBITING THE USE OF 2007 TAXES, ALTHOUGH I DID

24   ALLOW IN USE OF OTHER TAXES.

25             THE GOVERNMENT THEN FILED A 404(B) NOTICE, THAT'S

3241

1   DOCUMENT 217, TO ADMIT NONPAYMENT OF TAXES ASIDE FROM THE ORDER

2   THAT I ISSUED.  BUT NOTHING REGARDING 2007 WAS MENTIONED.

3   2010, '11, AND '12.

4           AND SO I GUESS THE GOVERNMENT'S POSITION AT THIS

5   POINT IS THAT MY RULING DOESN'T MATTER ANYMORE BECAUSE THE

6   DEFENDANT HAS TAKEN THE STAND; AND UNDER THESE CIRCUMSTANCES,

7   THE GOVERNMENT WOULD AUTOMATICALLY BE ENTITLED TO GO INTO THIS

8   JUST BY VIRTUE OF HIM TAKING THE STAND.  I WANT TO MAKE SURE I

9   UNDERSTAND YOUR POSITION SO THAT I UNDERSTAND WHY IT IS

10  CONTRADICTING THE RULING.

11          AND SO -- AND I HAVE NOT BEEN ABLE TO FIND ANYTHING

12  ON THAT.  THE ONLY OTHER TIME I'VE SEEN THIS COME UP IS IN A

13  MONEY LAUNDERING CASE, WHICH HAS SOME SIMILARITIES.  BUT I HAVE

14  NOT BEEN ABLE TO FIND THAT.

15          SO, AGAIN, THE RULING CLEARLY WAS THAT, ALTHOUGH

16  OTHER TAXES COULD GO INTO IT, BECAUSE I DID FIND THAT THOSE

17  WERE INTERTWINED, I DID NOT ALLOW 2007.

18          MR. PHILLIPS:  AS WE EXPLAINED AT THE BENCH

19  CONFERENCE, YOUR HONOR, OUR UNDERSTANDING WAS THAT THAT APPLIED

20  TO THE GOVERNMENT'S CASE IN CHIEF.  WHEN THE DEFENDANT TAKES

21  THE STAND, WE BELIEVE THAT WE'RE ENTITLED TO CONDUCT A THOROUGH

22  AND SIFTING CROSS-EXAMINATION, WHICH INCLUDES EXPLORING THE

23  DEFENDANT'S CREDIBILITY.

24          THE FACT THAT HE HASN'T PAID HIS TAXES, AND HE HAS A

25  PATTERN OF DOING THIS, WE THINK IS FAIR GAME.

3242

1           THE COURT:  OKAY.  AND SO JUST BECAUSE A DEFENDANT

2    TAKES THE STAND AND HIS CREDIBILITY IS AT ISSUE, THAT OPENS THE

3    DOOR TO ANY ISSUE OF CREDIBILITY?  I JUST WANT TO UNDERSTAND

4    THE GOVERNMENT'S POSITION.  ARE THERE NO PARAMETERS BECAUSE A

5    DEFENDANT TAKES THE STAND?

6           MR. PHILLIPS:  I'M NOT PREPARED TO SAY THAT, BUT I

7    THINK THE QUESTION THAT WE ASKED IS FAIR GAME.  THE DEFENDANT

8    TESTIFIED UNDER OATH MULTIPLE TIMES THAT HE DID NOTHING WRONG,

9    THAT HE'S INNOCENT, THAT EVERYBODY ELSE IS TO BLAME, THAT HE'S

10   NOT TO BLAME AT ALL.  AND I THINK HIS CREDIBILITY IS A HUGE

11   PART OF THIS CASE.  I THINK IT'S FAIR GAME.

12          THE COURT:  HIS CREDIBILITY IS, BUT CREDIBILITY

13   DOESN'T OPEN THE DOOR TO EVERYTHING A DEFENDANT HAS DONE.  SO I

14   GUESS I'M ASKING FOR SOME GUIDANCE ON WHETHER THERE'S AUTHORITY

15   TO SAY THAT HIS NONPAYMENT OF TAXES -- AND I THINK IT WAS

16   ACTUALLY A DELAYED PAYMENT.  I THINK HE PAID IT, MAYBE, LATER,

17   IF I HAVE IT CORRECT.

18          MR. PHILLIPS:  NO.

19          THE COURT:  SO I JUST WANTED TO KNOW IF THERE WAS

20   SOME AUTHORITY POINTING ME IN THAT WAY, OR IF YOUR POSITION IS

21   JUST GENERALLY, BY TAKING THE STAND AND PUTTING HIS CREDIBILITY

22   AT ISSUE, ANYTHING, BASICALLY, THAT HE'S DONE, OR ALLEGEDLY

23   DONE, IN THE PAST CAN BE ASKED ABOUT.  IS THAT YOUR POSITION?

24          MR. PHILLIPS:  I DON'T KNOW ABOUT ANYTHING.  BUT I

25   THINK WITH RESPECT TO THE 2007 TAX RETURN, THAT'S FAIR GAME.

3243

1          THE COURT:  ALL RIGHT.  I WILL LOOK AT THAT.  I WILL

2    JUST TELL YOU THAT I DO HAVE SOME CONCERNS, BECAUSE THIS IS THE

3    THIRD MOTION IN LIMINE ON WHICH I HAVE RULED --

4          HOLD ON ONE SECOND, MS. BARRON, BECAUSE I WANT TO

5    MAKE SURE MR. PHILLIPS HEARS THIS.

6          THIS IS THE THIRD MOTION IN LIMINE ON WHICH I'VE

7    RULED THAT HAS BEEN VIOLATED, I WOULD SAY.  THIS ONE, THE AGE

8    OF WHATEVER WOMEN MR. HARDWICK SAW FIT TO ASSOCIATE WITH, AND

9    THEN THE CONTEMPT ACTION.

10          AND I JUST URGE THE GOVERNMENT -- AGAIN, I URGE

11    EVERYONE TO REVIEW THE COURT'S ORDERS.  IF YOU HAVE SOME REASON

12    THAT I'VE NOT CONSIDERED OR SOMETHING THAT I NEEDED TO

13    RECONSIDER, WHICH I'VE ALWAYS DONE WHEN YOU ALL HAVE ASKED, I'M

14    HAPPY TO DO IT.  BUT TO JUST GO AGAINST AN ORDER THAT I PUT IN

15    PLACE CONCERNS ME.

16          AND SO I'M NOT SAYING THAT ANYONE DID ANYTHING

17    INTENTIONALLY.  BUT, AGAIN, THIS IS THE THIRD ONE THAT HAS COME

18    UP.

19          SO I WILL LOOK AT IT AGAIN MORE CLOSELY AT LUNCH.

20          MR. PHILLIPS:  MAY I RESPOND, YOUR HONOR?

21          THE COURT:  CERTAINLY.  CERTAINLY.  AND ANY GUIDANCE,

22    I'M WILLING TO LOOK AT.

23          MR. PHILLIPS:  FEDERAL RULE OF EVIDENCE 608(B),

24    CONCERNING SPECIFIC INSTANCES OF CONDUCT:  EXCEPT FOR A

25    CRIMINAL CONVICTION UNDER RULE 609, EXTRINSIC EVIDENCE IS NOT

3244

1    ADMISSIBLE TO PROVE SPECIFIC INSTANCES OF A WITNESS'S CONDUCT

2    IN ORDER TO ATTACK OR SUPPORT THE WITNESS'S CHARACTER OR

3    TRUTHFULNESS.  BUT THE COURT MAY, ON CROSS-EXAMINATION, ALLOW

4    THEM TO BE INQUIRED INTO IF THEY ARE PROBATIVE OF THE CHARACTER

5    FOR TRUTHFULNESS OR UNTRUTHFULNESS OF THE WITNESS.

6             WE THINK --

7             THE COURT:  BUT I DIDN'T ALLOW THAT.  I DIDN'T

8    ALLOW -- I SPECIFICALLY DISALLOWED IT IN A PRETRIAL RULING.

9    AND SO I GUESS IF YOU WERE TAKING A DIFFERENT POSITION, IT

10   COULD HAVE BEEN BROUGHT TO MY ATTENTION SO I COULD HAVE

11   RECONSIDERED OR CONSIDERED SOMETHING I HAVE NOT CONSIDERED

12   BEFORE.

13            BUT I MADE A SPECIFIC RULING BEFORE TRIAL THAT THAT

14   SPECIFIC YEAR WE COULD NOT GO INTO.  ALTHOUGH I DID ALLOW THE

15   GOVERNMENT TO GO INTO OTHER YEARS FOR OTHER REASONS.

16            MR. PHILLIPS:  AND AS I EXPLAINED, OUR UNDERSTANDING

17   WAS THAT THAT APPLIED TO THE GOVERNMENT'S CASE IN CHIEF.  SO WE

18   WOULD ASK THE COURT TO CONSIDER RULE 60(B) AND ALLOW THE

19   TESTIMONY --

20            THE COURT:  608(B)?

21            MR. PHILLIPS:  IF I MISSPOKE, I APOLOGIZE.  608(B),

22   WE THINK THAT'S APPLICABLE.

23            THE COURT:  THANK YOU SO MUCH.

24            YES?

25            MS. NOVAY:  MAY WE RESPOND?

3245

1          THE COURT:  YES.

2          MS. NOVAY:  HERE'S THE CONCERN THAT THE DEFENSE HAS.

3   AND I KNOW THAT THE COURT HAS MENTIONED THIS IS THE THIRD TIME

4   THAT THE COURT'S ORDER HAS BEEN VIOLATED.  AND THERE WAS ALSO

5   ANOTHER INSTANCE WHERE THE GOVERNMENT STARTED TO STRAY INTO THE

6   SEXUAL HARASSMENT BY ASKING MS. BOBBIE CHRISTIAN -- OR BOBBIE

7   TAPP IF SHE WAS SLEEPING WITH MY CLIENT.  SO THIS IS --

8   ACTUALLY, WE'RE NOW STRAYING INTO THE FOURTH.

9          AND I THINK THE ARGUMENT OF -- THAT THE GOVERNMENT

10  MAKES OF, WELL, WE WEREN'T REALLY -- WE THOUGHT IT WAS FAIR

11  GAME ISN'T ACCURATE.  BECAUSE THEY ARE CLEARLY ASKING THE COURT

12  BEFORE THEY GO INTO SEXUAL HARASSMENT STUFF.  THEY'RE ALERTING

13  IT, WHICH IS IN THE COURT'S ORDER, IN THE SAME PARAGRAPH ON THE

14  SAME PAGE.  AND NOW THEY'RE JUST GOING INTO THIS.  PERHAPS IT

15  WAS AN OVERSIGHT.  I'M NOT SURE AND I DON'T WANT TO ASSUME.

16         BUT THE PROBLEM IS THAT THE COURT RULED IT OUT.  THE

17  DEFENSE RELIED ON THE COURT'S RULING.  THE GOVERNMENT THEN GAVE

18  US 404(B) NOTICE, AND THAT WASN'T IN THERE.

19         SO IN DETERMINING -- AND ADVISING OUR CLIENT HOW --

20  WHAT IT MEANS TO TAKE THE STAND, IN PREPARING HIM FOR

21  CROSS-EXAMINATION AND THE QUESTIONS HE'S GOING TO BE ASKED,

22  WE'RE RELYING ON WHAT THE COURT'S ORDER SAYS AND WHAT -- THE

23  NOTICE THAT WAS GIVEN TO US.

24         ALSO, 608 DOESN'T SAY EVERYTHING COMES IN.

25         THE COURT:  CORRECT.

3246

1          MS. NOVAY:  AND I KNOW THAT THAT'S NOT WHAT

2     MR. PHILLIPS SAID.  I'M NOT TRYING TO --

3          THE COURT:  CAN'T BE.  CAN'T BE WHAT HE MEANS.

4          MS. NOVAY:  BUT THAT'S THE PROBLEM THAT WE HAVE, IS

5     THAT NOW WE'RE -- HE'S ALREADY IN.  HE'S ALREADY TESTIFIED.

6     HE'S DONE DIRECT.  I THINK WE'RE MOST OF THE WAY THROUGH CROSS.

7     AND NOW THE GOVERNMENT SAYS, WELL, WE GET TO GET INTO IT, EVEN

8     THOUGH THE COURT'S ORDER SAID NO AND EVEN THOUGH WE DIDN'T GET

9     404(B) NOTICE ABOUT IT.

10          THE COURT:  I UNDERSTAND.  HOLD ON.  I HAVE

11     INSTRUCTED THE JURY ON THAT, BUT I UNDERSTAND THE CONCERNS.

12          I'M NOT PREPARED TO SAY, EVEN THOUGH IT HAS BEEN SAID

13     EARLIER IN THIS CASE WHEN THINGS HAVE HAPPENED, WE KNOW THEY

14     DID THIS INTENTIONALLY.  WE KNOW THAT THEY DID THIS ON PURPOSE

15     TO KEEP US FROM CALLING THIS WITNESS.  I'M NOT SO QUICK TO

16     ASSUME THAT.  I LIKE TO GIVE ATTORNEYS, AS OFFICERS OF THE

17     COURT, THE BENEFIT OF THE DOUBT.  AND SO I'D URGE YOU TO DO

18     THAT AS WELL.

19          BUT I'D ALSO URGE YOU TO REVIEW THE COURT'S RULINGS.

20     AND, AGAIN, IF YOU FEEL THERE'S SOMETHING THE COURT HASN'T

21     CONSIDERED PROPERLY OR FULLY, OR YOU NEED THE COURT TO

22     RECONSIDER SOMETHING, DO THAT.  BUT DON'T JUST GO AGAINST THE

23     COURT'S RULING AND LATER ARGUE, WELL, THIS IS THE REASON WE

24     THOUGHT WE COULD DO THAT.

25          SO WE'RE ADJOURNED FOR LUNCH.  THANK YOU.

3247

1          THE COURTROOM SECURITY OFFICER:  ALL RISE.  COURT

2     STANDS IN RECESS TILL 1:20.

3          (WHEREUPON, THE NOON RECESS WAS HAD FROM 12:33 P.M.

4     TO 1:24 P.M.)

5          THE COURT:  ALL RIGHT.  YOU MAY BE SEATED --

6     ACTUALLY, BEFORE YOU ARE SEATED, WE'RE GOING TO BRING THE JURY

7     IN.

8          MR. PHILLIPS:  YOUR HONOR, BEFORE YOU DO THAT --

9          THE COURT:  OKAY.  YOU MAY BE SEATED, THEN.  WE GOT

10    AN ISSUE.  BUT YOU CAN GO AHEAD AND START LINING THEM UP.

11         YES, SIR?

12         MR. PHILLIPS:  I JUST WANTED TO BRING A COUPLE OF

13    THINGS TO THE COURT'S ATTENTION.  IN THE BRIEF TIME WE HAD

14    AVAILABLE OVER LUNCH, I FOUND A COUPLE OF CASES THAT SUPPORT

15    WHAT I WAS TELLING YOU ABOUT RULE 608(B).

16         THE COURT:  LET ME ASK YOU THIS:  IN THOSE CASES --

17    BECAUSE I LOOKED AT IT ALSO OVER LUNCH -- WAS IT NOT THAT

18    SOMETHING SPECIFIC IN DIRECT TESTIMONY CALLED FOR IMPEACHMENT?

19    IT WASN'T JUST GENERALLY THAT THE DEFENDANT HAS TAKEN THE STAND

20    AND THEREFORE HAS OPENED UP HIMSELF TO CREDIBILITY IMPEACHMENT,

21    CORRECT?

22         MR. PHILLIPS:  I BELIEVE THE CASES THAT I HAVE ARE

23    BROADER THAN THE ONES THAT MAYBE YOU'RE DESCRIBING.

24         THE COURT:  OKAY.

25         MR. PHILLIPS:  FIRST OF ALL, THERE'S *UNITED STATES*

3248

1   *VERSUS ZAK*, Z-A-K.  IT'S A 1994 CASE, 46 F.3D 1134.

2           THE COURT:  ONE MORE TIME.  SORRY.  THE CITE, JUST

3   THE CITE.

4           MR. PHILLIPS:  46 F.3D 1134.

5           THE COURT:  OKAY.

6           MR. PHILLIPS:  THE COURT SAID, BY ELECTING TO

7   TESTIFY, ZAK PUT HIS CREDIBILITY AT ISSUE; AND IN REBUTTAL, THE

8   GOVERNMENT COULD INTRODUCE EVIDENCE RELEVANT TO WHETHER ZAK WAS

9   TESTIFYING TRUTHFULLY.

10          AND THEN I CITE A CASE, THE *UNITED STATES VERSUS*

11  *WILSON*, FROM THE SEVENTH CIRCUIT, THAT SAID BRIBERY, PERJURY,

12  AND FAILURE TO FILE INCOME TAX RETURNS ARE ACTS OF DISHONESTY

13  WITHIN THE SCOPE OF CROSS-EXAMINATION UNDER RULE 608(B).

14          THERE ARE ALSO A COUPLE OF CIVIL CASES THAT I FOUND

15  THAT HOLD THE SAME THING.  *FIRST AMERICAN* --

16          THE COURT:  CIVIL?  DID YOU SAY SAID CIVIL?

17          MR. PHILLIPS:  RIGHT.

18          THE COURT:  OKAY.  I DIDN'T HEAR YOU.

19          MR. PHILLIPS:  YES.  I'M SORRY.  *FIRST AMERICAN BANK*

20  *VERSUS WESTERN DUPAGE LANDSCAPING*, 205 WESTLAW 2284265.  THE

21  COURT SAID, FAILURE TO FILE INCOME TAX RETURNS OR PAY INCOME

22  TAXES, QUOTE, BEARS DIRECTLY ON A PLAINTIFF'S PROPENSITY FOR

23  TRUTHFULNESS AND MUST BE ADMITTED FOR IMPEACHMENT PURPOSES IF

24  PLAINTIFF TAKES THE STAND, CLOSED QUOTE.

25          THE COURT:  I WILL LOOK AT THOSE CASES.

3249

1              MR. PHILLIPS:  I'VE GOT ONE MORE, YOUR HONOR, IF YOU

2    LIKE.

3              THE COURT:  YES.  YES.  GIVE ME ALL --

4              MR. PHILLIPS:  *CHAMBLEE*, C-H-A-M-B-L-E-E, *VERSUS*

5    *HARRIS & HARRIS*, 154 F. SUPP. 2D 670.

6              THE COURT:  ALL RIGHT.

7              MR. PHILLIPS:  IT SAYS FAILURE TO FILE A TAX RETURN

8    IS A MATTER WHICH AFFECTS A WITNESS'S CREDIBILITY.  IT'S CITING

9    CASES NOTING THAT THE FAILURE TO PAY INCOME TAXES BEARS

10   DIRECTLY TO THE PLAINTIFF'S PROPENSITY FOR TRUTHFULNESS AND

11   MUST BE ADMITTED FOR IMPEACHMENT PURPOSES IF PLAINTIFF TAKES

12   THE STAND.

13             THE COURT:  OKAY.  AND THOSE ARE NOT -- AGAIN, I WANT

14   TO MAKE SURE; I WILL LOOK AT THEM -- ARE NOT CONTINGENT ON

15   PLAINTIFF -- ON -- ON THE -- AND I DON'T KNOW IF -- THE

16   APPLICABILITY OF THE CIVIL ONES.  I'M NOT SURE.  I'LL HAVE TO

17   LOOK AT THAT.

18             BUT THE CRIMINAL ONE IN PARTICULAR WAS NOT CONTINGENT

19   ON A PARTICULAR AREA OF TESTIMONY THAT THE DEFENDANT HAD GOTTEN

20   INTO?

21             MR. PHILLIPS:  ALL I KNOW ABOUT IT, YOUR HONOR, WAS

22   WHAT I JUST READ.  I HAD A VERY BRIEF TIME TO --

23             THE COURT:  OKAY.

24             MR. PHILLIPS:  -- LOOK UP THESE, AND I CAN'T TELL YOU

25   THAT I KNOW EVERYTHING ABOUT THE CASE.

3250

1            THE COURT:  ALL RIGHT.  FAIR ENOUGH.  I WILL LOOK AT

2     THEM AGAIN.

3            THE ONES I LOOKED AT CITED SPECIFIC TESTIMONY THAT

4     THE GOVERNMENT WAS ABLE TO USE AS A REASON FOR WHY THEY COULD

5     THEN IMPEACH THE WITNESS ON SOMETHING.  BUT THOSE CERTAINLY DID

6     NOT SUPPORT THAT, JUST BY VIRTUE OF TAKING THE STAND, YOU CAN

7     GET INTO THAT.  THAT REMAINS MY CONCERN.

8            BUT I DEFINITELY WILL LOOK AT THESE CASES AS WELL.

9            ALL RIGHT.  IS THERE ANYTHING ELSE BEFORE THE JURY

10    COMES IN?  GOVERNMENT?

11            MR. PHILLIPS:  NO, YOUR HONOR.

12            THE COURT:  DEFENSE?

13            MR. GARLAND:  NO, YOUR HONOR.

14            THE COURT:  ALL RIGHT.  LET'S BRING THEM IN.

15            (WHEREUPON, THE JURY RETURNED TO OPEN COURT AT

16    1:28 P.M., AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD.)

17            THE COURT:  ALL RIGHT.  THE JURY IS IN PLACE.

18    EVERYONE MAY BE SEATED.

19            AND, MR. PHILLIPS, YOU MAY CONTINUE.

20            MR. PHILLIPS:  THANK YOU.

21            THE WITNESS:  THANK YOU, SIR.

22    BY MR. PHILLIPS:

23    Q.   MR. HARDWICK, I'VE HANDED YOU A DOCUMENT THAT I'VE MARKED

24    AS GOVERNMENT EXHIBIT 312.  IS THAT AN E-MAIL EXCHANGE THAT YOU

25    HAD WITH BETH KORNEGAY-TYLER OF FIRST LANDMARK BANK IN MARCH OF

3251

1    2014?

2              MR. GARLAND:  MAY WE APPROACH?

3              THE COURT:  I'M SORRY?

4              MR. GARLAND:  MAY WE APPROACH?

5              THE COURT:  YES.

6              (WHEREUPON, A BENCH CONFERENCE OUT OF THE HEARING OF

7    THE JURY PROCEEDED AS FOLLOWS:)

8              MS. NOVAY:  THE DOCUMENT THAT I BELIEVE MR. PHILLIPS

9    IS GETTING INTO, MAY THE COURT TAKE A LOOK.

10             MR. PHILLIPS:  THIS IS MARKED UP.

11             MS. NOVAY:  THIS IS THE DOCUMENT THAT MS. BARRON

12   TRIED TO GET IN WITH MS. KORNEGAY-TYLER.  AND I OBJECTED AND

13   SAID THAT BECAUSE THE NETJETS ACCOUNT HAS BEEN DROPPED, THERE

14   SHOULD BE -- SHOULD NOT -- THE GOVERNMENT SHOULDN'T GO INTO

15   THIS.  AND THE COURT SUSTAINED MY OBJECTION AND KEPT IT OUT.

16             MY UNDERSTANDING, WHAT THEY ARE TRYING TO ADMIT NOW,

17   THIS WAS THE ENTIRE PIECE.  AND IF THE COURT WILL RECALL, IT

18   WAS NOT AS CLEAR THAT IT WAS THIS FALSE STATEMENT, AS THE

19   GOVERNMENT ALLEGES.

20             THE COURT:  HE HAD -- HE STATED THE MONTHLY AMOUNT

21   THAT HE WOULD HAVE TO PAY OR SOMETHING LIKE THAT.

22             MS. NOVAY:  CAN I -- DO YOU MIND IF I -- IF THE COURT

23   WILL TAKE A LOOK, SHE SAID --

24             THE COURT:  WELL, I TELL YOU WHAT, I'M GOING TO ALLOW

25   THIS.  THE REASON I DID NOT LET IT IN WITH HER AT THAT TIME WAS

3252

1    SHE WAS ON THE STAND.  SHE -- AND SHE WAS GOING TO BE

2    QUESTIONED ABOUT IT.  AND FOR HER TO EXPLAIN ANY AMBIGUITY

3    WOULD BE PROBLEMATIC TO ME.  BUT HE'S THE WITNESS ON THE STAND.

4    HE WAS PART OF THE COMMUNICATION.  AND ANY POSSIBLE CONFUSION I

5    THINK HE CAN CLEAR UP.  SO IF THE ONLY -- I MEAN, IF THE ONLY

6    BASIS WERE THAT IT DEALS WITH NETJETS AND NETJETS ISN'T IN

7    THERE, I'LL LOOK AT IT.  BUT THERE MUST BE SOMETHING ELSE IN

8    THERE BESIDES THE COUNT THAT HAS BEEN DISMISSED THAT YOU WANT

9    IT FOR.

10              MR. PHILLIPS:  WE CONTEND IT'S A FALSE STATEMENT FROM

11   MR. HARDWICK TO THIS BANKER REGARDING -- WHETHER THERE WAS EVER

12   A COUNT PENDING IN THE INDICTMENT PERTAINING TO THIS, I THINK

13   IT'S FAIR GAME ON CROSS.

14              MS. NOVAY:  WHAT IS THE BASIS OF IT?  IS 404(B) --

15   WHAT'S THE BASIS?

16              MR. PHILLIPS:  I'M ENTITLED TO IMPEACH HIS

17   CREDIBILITY.

18              THE COURT:  WELL --

19              MR. PHILLIPS:  BECAUSE HE'S TAKEN THE STAND AND PUT

20   HIS CHARACTER IN ISSUE.

21              MR. GARLAND:  DOESN'T BRING HIS CHARACTER IN ISSUE.

22              MR. PHILLIPS:  CREDIBILITY.

23              THE COURT:  YEAH.  BECAUSE YOU'RE NOT ALLOWED --

24              MR. PHILLIPS:  I MISSPOKE.

25              THE COURT:  OKAY.  I'M GOING TO ALLOW IT.  I'M GOING

3253

1    TO ALLOW IT.  HE CAN CLARIFY WHATEVER HE WANTS TO.

2            (WHEREUPON, PROCEEDINGS RESUMED IN OPEN COURT AS

3    FOLLOWS:)

4            THE COURT:  ALL RIGHT.

5    BY MR. PHILLIPS:

6    Q.   MR. HARDWICK, IS THIS DOCUMENT THAT I'VE HANDED YOU,

7    GOVERNMENT EXHIBIT 312, IS THIS AN E-MAIL EXCHANGE THAT YOU HAD

8    WITH BETH KORNEGAY-TYLER OF FIRST LANDMARK BANK IN MARCH OF

9    2014?

10   A.   YES, IT IS.

11           MR. PHILLIPS:  ALL RIGHT.  I MOVE TO ADMIT GOVERNMENT

12   EXHIBIT 312.

13           MR. GARLAND:  WE HAVE THE SAME OBJECTION.

14           THE COURT:  OKAY.  OVERRULED.  IT'S ADMITTED.

15   BY MR. PHILLIPS:

16   Q.   MR. HARDWICK, I'M GOING TO DIRECT YOUR ATTENTION TO PAGE 3

17   OF THE EXHIBIT.

18   A.   OKAY.

19   Q.   AND MS. KORNEGAY-TYLER ASKED YOU ABOUT HOW MUCH YOU WERE

20   PAYING TO NETJETS; IS THAT RIGHT?

21   A.   THAT IS CORRECT.

22   Q.   AND SHE WANTED TO KNOW WHETHER YOU JUST THROW AS MUCH AS

23   YOU CAN AT NETJETS OR WHETHER YOU HAVE A SET MONTHLY AMOUNT,

24   RIGHT?

25   A.   SHE ASKED ME HOW MUCH I WAS PAYING THEM, YES.

1   Q.   AND YOU TOLD HER:  I'M PAYING 33K PER MONTH.

2   A.   CORRECT.

3   Q.   AND THEN SHE FOLLOWED UP ON THAT BY ASKING YOU

4   SPECIFICALLY:  ARE YOU -- ARE THEY REQUIRING YOU TO PAY THAT

5   MUCH?  DO YOU SEE THAT?

6   A.   YES, I DO.

7   Q.   AND YOU SAID:  I CUT A DEAL TO PAY IT IN FIVE YEARS

8   BECAUSE I WANTED IT DONE.

9   A.   CORRECT.

10  Q.   AND THEN OVER ON PAGE 1 OF THE EXHIBIT, MS. KORNEGAY-TYLER

11  SAID:  SO THAT WOULD BE $120,000 A YEAR FOR A TOTAL OF

12  $600,000, AND THAT WOULD BE $10,000 A MONTH.  BUT YOU JUST PAY

13  MORE.

14       AND YOUR RESPONSE WAS WHAT?

15  A.   YES.

16  Q.   AND SHE SAID:  GREAT.  DIDN'T WANT TO COUNT $30,000 A

17  MONTH IF WE DON'T HAVE TO.

18       THAT WASN'T TRUE, WHAT YOU SAID, WAS IT?

19  A.   AGAIN, IT'S ANOTHER EXAMPLE OF PHONE CALLS BEING LEFT OUT.

20  IF YOU READ THE FIRST THING, IT SAYS, YOU'RE ON THE GOLF

21  COURSE.  I TOLD HER IT WAS 33,000.  SHE DID SOME KIND OF MATH

22  PROBLEM.  I SAID, YES.  AND THEN IMMEDIATELY AFTER SHE WROTE

23  THIS THING, THEN WE'RE MAKING PHONE CALLS TALKING ABOUT IT.

24  Q.   SO THE PROBLEM --

25  A.   THE 33 -- THE ANSWER WAS 33, LIKE I SAID.

3255

1    Q.   RIGHT.  IT WAS 33.  BUT THEN YOU TOLD HER THAT YOU WERE

2    ONLY REQUIRED TO PAY 10, AND YOU WERE JUST PAYING MORE BECAUSE

3    YOU COULD.

4    A.   SHE DID THAT MATH PROBLEM -- YES.  THEN I DID SAY, YES,

5    BECAUSE I WAS ON THE GOLF COURSE.  THEN WHEN SHE DID THIS

6    NUMBER THING, WE HAD A TELEPHONE CALL.

7    Q.   SO, AGAIN, IT'S SOMEBODY ELSE'S FAULT.  IN THIS CASE --

8    A.   I'M NOT BLAMING ANYBODY ELSE'S FAULT.  I'M JUST EXPLAINING

9    WHAT HAPPENED.  IT'S A GOOD -- YOU KNOW, IT'S A GOOD LINE OF

10   QUESTIONING, BUT THAT'S NOT WHAT I'M -- THAT'S NOT WHAT

11   HAPPENED.  I'M TELLING YOU WHAT HAPPENED.  I WAS ON THE GOLF

12   COURSE.  I SAID $33,000.

13   Q.   I'M GOING TO SHOW YOU THE GOVERNMENT EXHIBIT 7 --

14   GOVERNMENT EXHIBIT 770.  THAT IS THE FORBEARANCE AGREEMENT THAT

15   YOU SIGNED WITH NETJETS.  DO YOU SEE THAT?

16   A.   I DO.

17   Q.   I'M GOING TO FOCUS IN ON PAGE 2.  WHAT IS THE AMOUNT THAT

18   YOU WERE REQUIRED TO PAY PER MONTH?

19   A.   THE AMOUNT I SAID, 33,000.  I DIDN'T SAY FOUR FORTY-FOUR.

20   BUT, YEAH, 33K.

21   Q.   ALL RIGHT.  IT DOESN'T SAY 10,000, DOES IT?

22   A.   NOPE.

23   Q.   WAS IT JUST COINCIDENCE THAT EVERY TIME YOU NEEDED A

24   DISTRIBUTION TO GO TO A CASINO OR TO RENT A PRIVATE JET, YOU

25   GOT A BIG DISTRIBUTION FROM MHS?

3256

1    A.    IT WAS NOT A COINCIDENCE.  THE PAPERWORK AND CONVERSATIONS

2    CAME BEFORE ME GETTING DISTRIBUTIONS.  THERE WERE TIMES THAT I

3    WAS GOING TO DO STUFF OR I WAS GOING TO HEAD SOMEWHERE, AND WE

4    SAW THERE WASN'T ENOUGH AVAILABLE FOR EVERYBODY AND WE DIDN'T

5    DO DISTRIBUTIONS.  OR TRANSFERS, DEPENDING ON THE SITUATION.

6    Q.    I'M GOING TO SHOW YOU GOVERNMENT EXHIBIT 1024, WHICH IS

7    ALREADY IN EVIDENCE.

8    A.    OKAY.

9    Q.    I WILL REFER YOU TO PAGE 113 OF THE EXHIBIT.

10   A.    OKAY.  I'M HAVING A HARD TIME SEEING IT.

11   Q.    YOU SEE WHERE YOU GOT A DISTRIBUTION FROM MORRIS HARDWICK

12   & SCHNEIDER ON 6-20-14 FOR $300,000?

13   A.    THAT'S WHAT IT SAYS THERE.

14   Q.    AND RIGHT BEFORE THAT, YOUR BALANCE IN THAT ACCOUNT WAS

15   DOWN -- THIS IS THE DIVOT ACCOUNT -- WAS DOWN TO 63,874, RIGHT?

16   A.    OKAY.  I BELIEVE YOU.

17   Q.    AND THEN YOU HAD A BIG PAYMENT TO APOLLO JETS RIGHT AFTER

18   THAT FOR $100,000.

19   A.    OKAY.

20   Q.    IS THAT RIGHT?  THREE DAYS LATER?

21   A.    THAT'S WHAT IT SAYS.

22   Q.    ON 7-11-14, YOU GOT ANOTHER $300,000, BOOSTING YOUR

23   BALANCE UP TO 564.  AND THEN ON THE SAME DAY, YOU PAID OUT

24   $200,000 TO APOLLO JETS, RIGHT?

25   A.    RIGHT.

3257

1   Q.   AND THAT WAS ONE OF THE PAYMENTS ON YOUR BBJ GOING TO

2   SCOTLAND, RIGHT?

3   A.   YES, IT WAS.

4   Q.   AND THEN ALSO, SIMILARLY, ON -- SIX DAYS LATER, ON

5   JULY 17TH, 2014, YOU GOT A $400,000 DISTRIBUTION FROM MHS.

6        AND YOU PAID $235,000 TO APOLLO JETS, ALSO RELATED TO THE

7   BBJ, RIGHT?

8   A.   WELL, I HAD 368,000 BEFORE THAT, SO IT HAD NOTHING TO DO

9   WITH HOW YOU'RE SAYING IT CAME FROM -- YES.  I GOT A $400,000

10  PAYMENT, BUT THERE WAS $355,000 ALREADY IN THERE.

11  Q.   AND --

12  A.   I DON'T GET THE POINT.

13  Q.   -- LIKE THAT, RIGHT?  I MEAN, THE PAYMENTS TO THE CASINOS

14  FOR YOUR BIRTHDAY BASH AND POOL PARTY AND FOR KEVIN'S BIRTHDAY

15  BASH AND POOL PARTY, THOSE WERE ALL PRECEDED BY BIG PAYMENTS

16  FROM MHS, RIGHT?

17  A.   ARE YOU ASKING ME IF MONEY THAT I SPENT PERSONALLY CAME

18  FROM MY TRANSFERS FROM THE FIRM?  THAT ANSWER IS YES.

19  Q.   OKAY.  YOU KEEP REFERRING TO THE PAPERWORK THAT YOU

20  CONTEND SUPPORTS YOUR DISTRIBUTIONS.

21  A.   UH-HUH.

22  Q.   ARE YOU REFERRING TO THE DASHBOARDS AND THE CASH FLOW

23  STATEMENTS?

24  A.   WELL, THAT'S SOME OF THE PAPERWORK, BUT SHE ALSO BROUGHT

25  PAPERWORK IN WITH HER WHEN SHE CAME IN.  EVERYTHING IS NOT IN

3258

1    E-MAIL FORM.

2    Q.   THESE TWO CHECKS ARE ALREADY IN EVIDENCE.   DO YOU REMEMBER

3    SIGNING THESE CHECKS IN AUGUST OF 2014 AFTER YOU HAD FOUND OUT

4    THAT THERE WAS A BIG HOLE IN YOUR FIRM'S ATTORNEY TRUST

5    ACCOUNT?

6         THIS FIRST ONE THAT I AM SHOWING YOU IS TO FORTUNA ON

7    8-1-14 FOR 32,930.77.   THAT'S YOUR SIGNATURE RIGHT THERE?

8    A.   THAT IS MY SIGNATURE.   AT THAT TIME BOB DRISKELL HAD LEFT,

9    AND I HAD A BIG OLD STACK OF CHECKS THAT I SIGNED.

10   Q.   AND THIS WAS ONE OF THEM?

11   A.   THAT IS.   ABSOLUTELY.

12   Q.   AND THIS IS AFTER YOU KNEW THERE WAS A BIG HOLE IN YOUR

13   ATTORNEY TRUST ACCOUNT, 8-1-14?

14   A.   YES.

15   Q.   OKAY.

16   A.   IT WASN'T A BIG HOLE --

17   Q.   YOU HAD TOLD US ALL ABOUT HOW THE FIRM WAS THE MOST

18   IMPORTANT THING TO YOU AND HOW THE FIRM CULTURE AND HONESTY AND

19   ALL THAT WAS SO IMPORTANT, RIGHT?

20   A.   THAT'S RIGHT.

21   Q.   AND THEN THE SAME DAY, YOU SIGNED A CHECK PAYABLE TO

22   COLONY BANK --

23   A.   THAT'S CORRECT.

24   Q.   -- FOR $25,000, RIGHT?

25   A.   RIGHT.   IT SAYS FBO NAT HARDWICK.

3259

1    Q.    THAT'S YOUR SIGNATURE?

2    A.    WHAT HAPPENED -- YEAH.  WHAT HAPPENED IN THAT MONTH IS THE

3    WITTSTADTS TOOK HALF SALARY, BECAUSE THEY NEEDED TO TAKE

4    SALARY, AND I DIDN'T TAKE ANY SALARY.  AND THAT WAS MY PAYMENT.

5    Q.    AND YOU DID THAT KNOWING THAT THERE WAS A HUGE HOLE IN

6    YOUR ATTORNEY TRUST ACCOUNTS?

7    A.    THE ONLY HOLE THAT WE -- ON THE 1ST, WE WERE STILL TRYING

8    TO FIGURE OUT WHAT WAS GOING ON.  THAT WAS EXACTLY WHAT HOLE,

9    WE DIDN'T KNOW ABOUT A HUGE HOLE.  BUT THE WITTSTADTS TOOK

10   THEIR HALF SALARY ALSO.

11   Q.    BUT YOU KNEW THAT IT WAS, AT THAT POINT, IT WAS AT LEAST

12   5 OR $6 MILLION, IS WHAT YOU SAID WAS BEING TALKED ABOUT,

13   RIGHT?

14   A.    WE THOUGHT IT WAS 5.9, PLUS OR MINUS 500,000, THE ONE

15   ACCOUNT THAT HAD A LOT OF EXTRA MONEY IN IT, SUPPOSEDLY.

16   Q.    ALL RIGHT.

17   A.    BUT, YES, I DID SIGN THAT CHECK.

18   Q.    DID YOU SEND THIS TEXT TO ROD WITTSTADT ON AUGUST 1ST, THE

19   SAME DAY YOU SIGNED THOSE CHECKS?

20   A.    I MEAN, I CAN'T SEE.  BUT IF YOU SAY IT IS, I BELIEVE YOU.

21   Q.    IT'S ALREADY IN EVIDENCE.

22   A.    YEAH.  I BELIEVE YOU.  I JUST CAN'T SEE WHAT IT IS ON THIS

23   SCREEN.

24   Q.    WELL, LET ME SHOW YOU, MR. HARDWICK.

25   A.    WELL, I BELIEVE YOU IF YOU SAY.  I'M JUST SAYING -- YOU

3260

1   ASKED ME A QUESTION --

2   Q.   GOVERNMENT EXHIBIT 315 --

3            THE COURT:  MR. HARDWICK, DO YOU UNDERSTAND, SIR --

4   AND I THINK YOU DO AS AN ATTORNEY -- MR. PHILLIPS CAN'T

5   TESTIFY.  SO I KNOW YOU KEEP SAYING, IF YOU TELL ME THIS, AND

6   THEN HE'LL MAKE AN ASSERTION.

7            THE WITNESS:  I UNDERSTAND.  YES, MA'AM.

8            THE COURT:  BUT TO SOME EXTENT, HE'S GOT TO GET YOUR

9   RESPONSE, SO -- AND YOUR RESPONSE IS BASED ON WHATEVER IT IS,

10  NOT JUST IF YOU SAY SO.  SO THAT'S THE IMPORTANCE OF THIS.

11           THE WITNESS:  I UNDERSTAND.  I JUST -- WHEN I HAD

12  THAT ON THE SCREEN -- I'M TRYING TO ANSWER.

13           THE COURT:  THEN LET US KNOW IF THERE'S SOMETHING WE

14  CAN DO SO THAT YOU CAN SEE IT BETTER OR IF YOU NEED TO REVIEW

15  SOMETHING BEFORE YOU ANSWER.  BUT THE ANSWER NEEDS TO COME FROM

16  YOU.

17           THE WITNESS:  YES, MA'AM.

18           THE COURT:  ALL RIGHT.

19           THE WITNESS:  YES.

20  BY MR. PHILLIPS:

21  Q.   THIS IS A TEXT THAT YOU SENT TO ROD WITTSTADT.

22  A.   YES.

23  Q.   AND WHY DON'T YOU READ FOR US WHAT YOU SAID THERE?

24  A.   SURE.  SHE TOTALLY SCREWED ME AND TOLD ME WE WERE MAKING

25  ALL THIS MONEY AND OVERDISBURSED TO ME, FOR SURE.  I'M SO

3261

1   UPSET.  WELL, UPSET.

2   Q.   AND THEN I THINK YOU TESTIFIED ON DIRECT THAT AS A RESULT

3   OF THIS BIG HOLE IN THE ESCROW ACCOUNTS, FIDELITY CAME IN AND

4   PUT IN A LOT OF MONEY TO TRY TO SAVE THE FIRM, RIGHT?

5   A.   NO.  I DIDN'T TESTIFY TO THAT.  I TESTIFIED THERE WAS --

6   6.5 WAS MISSING.  WHEN THEY CAME IN, THE 6.5 HAD ALREADY BEEN

7   PUT IN.

8   Q.   BUT YOU KNOW THAT FIDELITY CAME IN AND PUT IN OVER

9   $30 MILLION?

10  A.   I DON'T KNOW THAT.  I KNOW THEY PUT MONEY -- I DON'T KNOW

11  IF IT WENT TO PLUG THE LEAK, TO PAY FOR SALARIES, TO PAY FOR

12  AIRPLANES.  I DON'T KNOW WHAT IT WENT FOR.

13  Q.   SO WHEN YOU TOLD ROD WITTSTADT ON AUGUST 1ST THAT ASHA

14  TOTALLY SCREWED YOU AND TOLD ME WE WERE MAKING ALL THIS MONEY

15  AND OVERDISBURSED ME, THAT'S WHAT YOU BELIEVED AT THE TIME,

16  RIGHT?

17  A.   IT WAS AT THE TIME.

18  Q.   AND SINCE THEN, YOU'VE HIRED AN EXPERT, MR. GINGRAS, WHO'S

19  BEEN SITTING HERE IN THE COURT, AND YOU PAID HIM $65,000.  AND

20  HE TESTIFIED THAT YOU WERE UNDERDISBURSED, RIGHT?

21  A.   YES.

22  Q.   HE TESTIFIED THAT THE FIRM OWES YOU AT LEAST $400,000 AND

23  MAYBE AS MUCH AS $3 MILLION, RIGHT?

24  A.   THAT'S CORRECT.  NOW, TO ANSWER YOUR QUESTION --

25  Q.   YOU HAVE ANSWERED THE QUESTION, SIR.

3262

1    A.   -- AT THAT TIME -- OKAY.

2              MR. GARLAND:  YOUR HONOR, ALLOW HIM TO EXPLAIN,

3    BECAUSE HE HAS AN EXPLANATION TO AN INFERENCE IN THE QUESTION.

4              THE COURT:  WELL, HE DID ANSWER THE QUESTION.  IF YOU

5    WANT TO BRING OUT SOMETHING ELSE, YOU CAN DO SO IF YOU WANT TO

6    REDIRECT.  BUT HE HAS ANSWERED IT.

7              MR. GARLAND:  THAT'S FINE.

8    BY MR. PHILLIPS:

9    Q.   AND SO IF THERE WAS NOT A HUGE HOLE IN THE ESCROW ACCOUNT,

10   WHY WOULD FIDELITY HAVE PUT $30 MILLION INTO THE FIRM?

11             MR. GARLAND:  OBJECTION, YOUR HONOR.  HE SAID HE

12   DIDN'T KNOW FOR A FACT.

13             THE WITNESS:  I DIDN'T SAY --

14             THE COURT:  HOLD ON, MR. HARDWICK.

15             WHAT IS YOUR OBJECTION?

16             MR. GARLAND:  HE SAID -- HIS ANSWER TO HIS QUESTION

17   WAS HE DIDN'T KNOW IN FACT THEY DID THAT OR WHERE THE MONEY

18   WENT.  AND THERE IS NO DOCUMENTATION IN THIS RECORD.

19             THE COURT:  OVERRULED.

20             GO AHEAD AND ASK THE QUESTION.

21             THE WITNESS:  CAN YOU ASK IT AGAIN?

22   BY MR. PHILLIPS:

23   Q.   IF THERE WASN'T A HUGE HOLE IN YOUR ESCROW ACCOUNTS, WHY

24   WOULD FIDELITY HAVE PUT $30 MILLION OR MORE INTO YOUR FIRM TO

25   TRY TO PLUG THAT LEAK?

3263

1    A.    OKAY.  I DIDN'T KNOW WHAT THEY PUT IN THERE.  I HAVE SEEN

2    LOTS OF DIFFERENT E-MAILS THAT SHOW A LOT OF THE ACCOUNTS WERE

3    OVERFUNDED.

4    Q.    ALL RIGHT.  THIS IS THE LAST THING I WANT TO ASK YOU

5    ABOUT.

6         THIS IS A COUPLE OF WEEKS AFTER THE TEXT THAT YOU SENT TO

7    ROD WITTSTADT WHEN YOU SAID YOU WERE OVERDISBURSED.  THIS IS

8    GOVERNMENT EXHIBIT 963 THAT'S ALREADY IN EVIDENCE.

9    A.    UH-HUH.

10   Q.    THIS IS AN E-MAIL THAT YOU SENT TO MARK WITTSTADT, RIGHT?

11   A.    CORRECT.

12   Q.    AND AT THAT TIME YOU TOLD MARK WITTSTADT THAT YOU BELIEVED

13   THAT THE MONEY THAT YOU RECEIVED CAME FROM YOUR SHARE OF THE

14   PROFITS, RIGHT?

15   A.    THAT'S WHAT IT SAYS.

16   Q.    AND YOU DIDN'T SAY FROM MY SHARE OF THE AVAILABLE CASH OR

17   CASH ON HAND OR MONEY IN ACTION CAPITAL.  YOU SAID FROM THE

18   PROFITS, RIGHT?

19   A.    THAT'S WHAT THE E-MAIL SAYS.

20              MR. PHILLIPS:  THANK YOU.

21              THE COURT:  ANY REDIRECT?

22              MR. GARLAND:  YES, YOUR HONOR.

23                        REDIRECT EXAMINATION

24   BY MR. GARLAND:

25   Q.    MR. HARDWICK, ARE YOU FAMILIAR WITH COUNT 21 OF THE

3264

1    INDICTMENT AGAINST YOU?

2    A.    YES, I AM.

3    Q.    ALL RIGHT.  AND YOU WERE QUESTIONED ABOUT A TRANSFER

4    RELATING TO MERRILL LYNCH OF 321,352 SET FORTH AS A TRANSFER IN

5    COUNT 21 FROM THE SUNTRUST ACCOUNT IN THE NAME OF MORRIS

6    HARDWICK & SCHNEIDER.  YOU MENTIONED THAT YOU ARE AWARE OF THE

7    FACTS SURROUNDING THAT ACCOUNT?

8    A.    YES, SIR.

9    Q.    WHAT ARE THE FACTS SURROUNDING THAT TRANSFER?

10   A.    WELL, IT'S A PERFECT EXAMPLE OF WHAT I WAS TALKING ABOUT.

11   THERE WAS, THERE WAS A DISTRIBUTION OF THE 321 -- I DON'T HAVE

12   THE EXACT NUMBER, THE $321,000.  THERE'S A DISTRIBUTION.  OKAY.

13   IT ACTUALLY WASN'T A DISTRIBUTION.  IT WAS ACTUALLY A BONUS

14   PAYMENT.  BOTH THE WITTSTADTS GOT THEIR PAYMENT, OR WERE

15   SUPPOSED TO HAVE GOTTEN THEIR PAYMENT.

16        ON THE DAILY CASH SHEET FOR JUNE 30TH, I BELIEVE WAS THE

17   DATE, IT SHOWS ON THE DAILY CASH SHEET BONUS ACCOUNT $535,000

18   THAT'S PAID OUT TO THE WITTSTADTS AND MYSELF.  THE NEXT DAY,

19   THAT BONUS ACCOUNT HAS $200 IN IT.

20        SO IT SHOWS THE DISTRIBUTABLE CASH, WHERE THE DISTRIBUTION

21   WAS MADE, AND THAT, THAT -- THAT'S THE INFORMATION THAT I WAS

22   GETTING AND, YOU KNOW, GAVE ME REASON TO FEEL LIKE IT WAS

23   ACCURATE.

24   Q.    ALL RIGHT.  NOW, DID THE OTHER PEOPLE RECEIVE THEIR SHARE

25   AT THAT TIME?

3265

1   A.   I THINK ROD GOT HIS SHARE, BUT I THINK THAT -- I THINK

2   THEN LATER ON -- I DON'T KNOW WHY HE DIDN'T AT THE TIME, BUT

3   LATER ON HE CLAIMED THAT -- MARK WITTSTADT CLAIMED HE WAS

4   HAVING HIS SHARE SENT FOR A PERSONAL BILL TO THE IRS.  AND I

5   DON'T KNOW -- HE CLAIMED THAT ASHA DIDN'T SEND IT.

6   Q.   BUT AT THE TIME, DID HE AUTHORIZE GETTING HIS SHARE AND

7   YOU GETTING YOUR SHARE?

8   A.   YES.

9   Q.   AND YOU HAVE SEEN THE E-MAILS -- HAVE YOU LOOKED -- HAVE

10  YOU SEEN THE E-MAILS THAT REFLECT THAT?

11  A.   I HAVE.  YES, I HAVE.

12  Q.   ALL RIGHT.  AND DID YOU LOOK AT THE CASH REPORT THAT

13  REFLECTS THAT?

14  A.   YES, I DID.

15  Q.   AND WHAT DOES THE CASH REPORT SHOW -- NOT THE DASHBOARD,

16  BUT THE CASH REPORT SHOW IN RESPECT TO THE DISTRIBUTION OF THAT

17  BONUS ACCOUNT?

18  A.   WELL, THE ONE ON JUNE 30TH, WHEN MY MONEY CAME OUT AND THE

19  WITTSTADTS' MONEY CAME OUT, IT SHOWED FIVE HUNDRED AND -- I

20  CAN'T REMEMBER THE EXACT AMOUNT -- 535,000.  AND THEN THE NEXT

21  DAY, IT'S DOWN TO 200.  SO THE MONEY WAS DISBURSED OUT, AND

22  DISBURSED OUT TO EVERYBODY CORRECTLY, AND THERE WAS A -- YOU

23  KNOW, THE BOTTOM LINE WAS TO $200.

24  Q.   AND THE E-MAIL SHOWS THAT EVERYBODY AGREED TO DO IT THAT

25  WAY?

3266

1    A.   THAT'S CORRECT -- WELL, I THINK MARK DID.  I DON'T KNOW

2    THAT ROD DID, BUT I KNOW MARK DID.

3    Q.   ALL RIGHT.  AND MARK GOT HIS MONEY.

4    A.   WELL, I THINK THAT'S WHERE MARK SAID HE -- TOLD HER TO PAY

5    A PERSONAL BILL TO THE IRS FOR HIM.

6    Q.   HER, MEANING?

7    A.   I'M SORRY.  ASHA TO PAY A PERSONAL BILL TO THE IRS FOR

8    HIM.  AND THEN LATER, A FEW MONTHS LATER, HE CLAIMS SHE DIDN'T

9    SEND IT.  WHICH I DON'T HAVE ANY REASON TO DOUBT THAT SHE

10   DIDN'T.

11   Q.   OKAY.  NOW, YOU'RE INDICTED IN THAT COUNT FOR SOMETHING

12   THAT EVERYBODY AGREED TO DO, CORRECT?

13   A.   THAT'S CORRECT.

14             MR. GARLAND:  ALL RIGHT.  JUST A MOMENT.

15             MOVE IN DEFENDANT'S EXHIBIT 21, YOUR HONOR.

16             THE COURT:  ANY OBJECTION?

17             MR. PHILLIPS:  NO OBJECTION.

18             THE COURT:  IT'S ADMITTED.

19             THE WITNESS:  OKAY.

20   BY MR. GARLAND:

21   Q.   DO YOU RECOGNIZE DEFENDANT'S EXHIBIT 21?

22   A.   YES, I DO.

23   Q.   I'M DISPLAYING FOR YOU AND THE JURY DEFENDANT'S

24   EXHIBIT 21.  WHAT IS THIS DOCUMENT?

25   A.   THIS IS BASICALLY SHOWING, IN 2011, WHEN THE WITTSTADTS

3267

1    WERE GETTING SOME DISTRIBUTIONS AND TRANSFERS BUT WEREN'T

2    LEGALLY, I GUESS, OWNERS, UNTIL 2013, HOW THEIR DISTRIBUTIONS

3    WERE EITHER MOVED TO PAYROLL OR BEING PAID IN A DIFFERENT

4    MANNER TO MHS DISTRIBUTION.

5    Q.   IT SAYS, MOVED TO PAYROLL.  AND OVER HERE WHERE I'M

6    POINTING, IS THIS WHERE THEY HAD GOTTEN DISTRIBUTIONS AND THEN

7    TURNED AROUND AND SAID, WE'RE GOING TO TAKE OUR DISTRIBUTIONS

8    AND PUT THEM INTO PAYROLL?

9    A.   THAT IS CORRECT.

10   Q.   BUT, IN FACT, WHEN THEY HAD RECEIVED THEM, THEY HAD

11   RECEIVED THEIR SHARE OF DISTRIBUTIONS, CORRECT?

12   A.   THAT IS CORRECT.

13   Q.   AND TO DETERMINE WHAT THEIR DISTRIBUTIONS WERE DURING THE

14   40-SOMETHING MONTHS, OR THE TIME PERIOD INVOLVED IN THIS CASE,

15   THOSE AMOUNTS OF MONEY WOULD BE NEEDED TO BE ADDED TO THEIR

16   DISTRIBUTIONS, CORRECT?

17   A.   THAT IS CORRECT.

18   Q.   HAD THIS NOT BEEN DONE, YOU WOULD HAVE BEEN PAYING TAXES

19   ON THEIR DISTRIBUTIONS, RIGHT?

20   A.   THAT IS CORRECT.

21           MR. GARLAND:  ALL RIGHT.  I MOVE IN DEFENDANT'S

22   EXHIBIT 721.

23           MR. PHILLIPS:  OBJECTION.  IT'S HEARSAY.

24           THE COURT:  I DON'T KNOW WHAT IT IS.  I DON'T KNOW IF

25   A FOUNDATION HAS BEEN LAID OR ANYTHING, BUT I DON'T HAVE ANY

3268

1    IDEA WHAT IT IS.

2            MR. GARLAND:  I WILL SHOW HIM -- THE DOCUMENT TO THE

3    DEFENDANT.

4    BY MR. GARLAND:

5    Q.    I'M SHOWING YOU DEFENDANT'S EXHIBIT 721.

6    A.    OKAY.

7    Q.    DID YOU RECEIVE THAT E-MAIL?

8    A.    I DID.

9    Q.    AND THIS WAS RECEIVED BY YOU AS FAR AS THE COMMUNICATIONS

10   WITHIN YOUR FIRM?

11   A.    YES.

12           MR. PHILLIPS:  I OBJECT, YOUR HONOR.  IT'S HEARSAY.

13   IT'S AN E-MAIL THAT --

14           THE COURT:  AT THIS POINT I WOULD NOT ALLOW IT IN.

15   I JUST DON'T HAVE ENOUGH OF A FOUNDATION.  IF YOU ALL WANT ME

16   TO LOOK AT IT AND CONSIDER IT, I WILL.  BUT I DON'T KNOW WHAT

17   IT IS.

18           BASED ON HIS FOUNDATION, THOUGH, I SUSTAIN THE

19   OBJECTION.

20   BY MR. GARLAND:

21   Q.    NOW, MR. HARDWICK?

22   A.    YES.

23   Q.    YOU TESTIFIED CONCERNING COMMUNICATIONS THAT WERE TAKING

24   PLACE BETWEEN MR. WITTSTADT, MR. RITTERMAN, AND MR. DRISKELL

25   CONCERNING THE FINANCIAL AFFAIRS OF THE BUSINESS.

3269

1   A.   CORRECT.

2   Q.   YOU WERE AWARE OF THOSE COMMUNICATIONS?

3   A.   ABSOLUTELY.

4   Q.   AND YOU HAVE TESTIFIED THAT THERE WERE FREQUENTLY

5   COMMUNICATIONS TAKING PLACE?

6   A.   BETWEEN ASHA AND THE WITTSTADTS AND BOB DRISKELL?

7   Q.   YES.

8   A.   YES.  CORRECT.

9   Q.   ALL RIGHT.  NOW, DOES THIS DEFENDANT'S EXHIBIT 721 REFLECT

10  COMMUNICATIONS TAKING PLACE?

11  A.   YES, IT IS.

12          MR. GARLAND:  YOUR HONOR, I WOULD OFFER IT NOT FOR

13  THE TRUTH OF IT BUT TO SHOW THAT COMMUNICATIONS CONCERNING

14  SUBJECT MATTERS TOOK PLACE.

15          THE COURT:  I'LL LOOK AT IT.  I'LL BE GLAD TO LOOK AT

16  IT.  I'M NOT SURE WHAT'S ON IT.

17          MR. GARLAND:  WE SUBMIT IT'S --

18          THE COURT:  AND IT'S NOT BEING OFFERED FOR THE TRUTH

19  OF THE MATTER; IT IS BEING OFFERED FOR WHAT PURPOSE INSTEAD?

20          MR. GARLAND:  FOR THE PURPOSE OF ESTABLISHING THAT

21  COMMUNICATIONS CONCERNING FINANCIAL MATTERS WERE TAKING PLACE,

22  THAT THE COMMUNICATIONS WERE TAKING PLACE.  WE OFFER IT AS A --

23          THE COURT:  JUST THAT CERTAIN PEOPLE WERE

24  COMMUNICATING, IN COMMUNICATION WITH EACH OTHER?

25          MR. GARLAND:  I OFFER IT AS -- WE HAVE ESTABLISHED,

3270

1    ONE, IT'S STIPULATED IT'S AUTHENTIC AS TO ITS SOURCE, AND THAT

2    THIS IS A BUSINESS RECORD REGULARLY KEPT IN THE REGULAR COURSE

3    OF BUSINESS, ALSO.

4             THE COURT:  OKAY.  BUSINESS RECORD EXCEPTION

5    DEFINITELY HAS NOT BEEN MET, SO I WILL SUSTAIN THE OBJECTION.

6             MR. PHILLIPS:  MY OBJECTION IS IT'S HEARSAY AND

7    IMPROPER FOUNDATION.

8             THE COURT:  OKAY.  I WOULD SUSTAIN ON THOSE GROUNDS,

9    BUT FROM WHAT I UNDERSTAND YOU'RE SAYING --

10            MR. GARLAND:  I OFFER IT ALSO --

11            THE COURT:  HOLD ON ONE SECOND.  THERE'S NO ISSUE AS

12   FAR AS AUTHENTICATION BASED ON YOUR PRIOR AGREEMENT, IS WHAT I

13   UNDERSTAND YOU TO SAY.

14            MR. GARLAND:  THAT'S CORRECT.

15            THE COURT:  OKAY.  AND SO YOU'RE OFFERING IT FOR?

16            MR. GARLAND:  TO PROVE THAT COMMUNICATIONS TAKE PLACE

17   BETWEEN MR. RITTERMAN, THE CFO OF THE CLOSING -- I MEAN, THE

18   FORECLOSURE DIVISION, AND GERARD WITTSTADT AND BOB DRISKELL AND

19   MR. HARDWICK, THAT THESE COMMUNICATIONS WERE TAKING PLACE.

20            THE COURT:  OKAY.

21            MR. GARLAND:  THERE'S A CONTENTION THAT THEY WERE

22   SHUT OUT FROM THE INFORMATION.

23            THE COURT:  ALL RIGHT.  I WILL SUSTAIN THE OBJECTION

24   BASED ON THIS.  THERE IS HEARSAY IN HERE THAT I DON'T THINK HAS

25   OVERCOME, AND I DON'T SEE HOW THAT WOULDN'T BE OFFERED FOR THE

3271

1    TRUTH OF THE MATTER BASED ON THE CONTENT HERE.  SO I WOULD

2    SUSTAIN THE OBJECTION.

3              MR. GARLAND:  I'D LIKE TO ATTEMPT TO MAKE THE

4    BUSINESS RECORDS EXCEPTION FOUNDATION AT THIS POINT.

5              THE COURT:  USING MR. HARDWICK AS THE CUSTODIAN?

6              MR. GARLAND:  I WILL SEE IF HE CAN ESTABLISH THAT

7    THESE WERE KEPT IN THE REGULAR COURSE OF BUSINESS, REGULARLY

8    KEPT, AND THAT WAS THE POLICY OF THE COMPANY.

9              THE COURT:  BY SOMEONE WITH PERSONAL KNOWLEDGE AND

10   THE WHOLE -- OKAY.

11             MR. GARLAND:  RIGHT.

12             THE COURT:  GO AHEAD AND SEE IF YOU CAN ESTABLISH THE

13   BUSINESS RECORD EXCEPTION.

14   BY MR. GARLAND:

15   Q.   MR. HARDWICK, ARE YOU FAMILIAR WITH THE RECORDKEEPING

16   PRACTICES THAT WERE IN PLACE IN THE LAW FIRM OF MORRIS HARDWICK

17   & SCHNEIDER?

18   A.   AS FAR AS E-MAIL RECORDS?

19   Q.   YES.

20   A.   YES.

21   Q.   WERE THEY KEPT IN THE REGULAR COURSE OF BUSINESS?

22   A.   YES.

23   Q.   WERE THEY -- WAS IT THE REGULAR PRACTICE OF THE BUSINESS

24   TO REGULARLY KEEP THOSE RECORDS IN THE FILE SERVERS OF THE

25   BUSINESS?

3272

1  A.   YOU TALKING ABOUT THE E-MAILS?

2  Q.   YES.

3  A.   YES.

4  Q.   AND AT THE TIME THAT E-MAILS WERE KEPT, WAS IT THE

5  PRACTICE OF THE LAW FIRM TO KEEP THOSE IN AN ACCURATE FASHION

6  IN THE SERVERS OF MORRIS HARDWICK & SCHNEIDER?

7  A.   YES.

8        MR. GARLAND:  I WOULD OFFER IT AS A BUSINESS RECORD

9  EXCEPTION AT THIS POINT.

10        THE COURT:  SUSTAIN THE OBJECTION.

11        MR. PHILLIPS:  SAME OBJECTIONS AS BEFORE.  AND THE

12  COURT HAS PREVIOUSLY NOT ALLOWED DOCUMENTS BUT ALLOWED THE

13  WITNESS TO TESTIFY ABOUT THE FACTS IN THE DOCUMENT.  WE DON'T

14  HAVE A PROBLEM WITH THAT.  I JUST THINK IT'S THE DOCUMENT

15  ITSELF THAT IS HEARSAY.

16        MR. GARLAND:  VERY WELL, YOUR HONOR.

17        THE COURT:  I DON'T THINK THAT HE CAN MEET THE

18  PERSONAL KNOWLEDGE PRONG OF THE CONTENT OF THAT, SO I'LL

19  SUSTAIN.

20  BY MR. GARLAND:

21  Q.   ALL RIGHT.  NOW, DID YOU PARTICIPATE IN COMMUNICATIONS

22  CONCERNING FINANCIAL MATTERS WHERE MR. RITTERMAN, WHERE

23  MR. GERARD WITTSTADT, WHERE MR. MARK WITTSTADT, WHERE YOU AND

24  BOB DRISKELL WERE ALL PART OF THOSE COMMUNICATIONS?

25  A.   YES.  GERARD WITTSTADT, MARK WITTSTADT, MYSELF.

3273

1        I'M JUST FIXING IT.

2    Q.    AND DID THOSE TYPE OF COMMUNICATIONS TAKE PLACE ON A

3    REGULAR BASIS?

4    A.    I WOULD SAY SEMI-REGULAR, YES.

5    Q.    AND DID IT INVOLVE A WHOLE LOT OF DIFFERENT KIND OF

6    MATTERS?  DID IT ALSO INVOLVE EVEN-UPS?

7    A.    IT DEFINITELY DID, YES.

8    Q.    AND WERE THERE FREQUENT EVEN-UPS?

9    A.    YES.

10   Q.    NOW, THERE'S -- I BELIEVE YOU -- WHAT IS THE COMPANY HB?

11   WHAT DOES THAT REFER TO?

12   A.    HOLABIRD.

13   Q.    OKAY.  AND WOULD THERE BE DIFFERENT COMMUNICATIONS

14   CONCERNING MONEY DUE TO YOU FROM HOLABIRD?

15   A.    YES.

16   Q.    WERE YOU DUE MONEY FROM HOLABIRD ON A FREQUENT BASIS?

17   A.    YES.

18   Q.    WAS THAT -- WERE THOSE FUNDS FUNDS YOU, AS AN OWNER OF

19   25 PERCENT OF HOLABIRD, WERE ENTITLED TO RECEIVE?

20   A.    YES.  AND I HAD -- ACTUALLY, I THINK IT WAS BETWEEN 25 AND

21   32 PERCENT DURING THAT TIME.

22   Q.    ALL RIGHT.  AND WAS HOLABIRD A SOURCE OF INCOME FOR YOU

23   FROM WHICH YOU COULD PAY YOUR BILLS?

24   A.    ABSOLUTELY.

25   Q.    AND WOULD HOLABIRD'S MONEY COME TO YOU FROM MR. RITTERMAN?

3274

1    HOW WOULD IT COME TO YOU?

2    A.    I MEAN, LIKE WITH THE FIRM, DIFFERENT WAYS.  SOMETIMES

3    THEY WOULD SEND A WIRE.  SOMETIMES FOLKS SENT A CHECK DOWN.

4    SOMETIMES THEY WOULD, THEY WOULD, YOU KNOW, MAIL A CHECK.

5    SOMETIMES THEY WOULD JUST HAVE A COURIER DROP IT BY, LIKE IF

6    SOMEBODY WAS COMING FROM BALTIMORE DOWN -- JUST ALL DIFFERENT

7    KINDS OF WAYS.  DIFFERENT TIMES, DIFFERENT WAYS.  SAME WITH THE

8    FIRM.

9    Q.    WAS HOLABIRD USED AT TIMES TO EVEN UP MATTERS THAT RELATED

10   TO THE LAW FIRM?

11   A.    WELL, THAT'S -- WHEN -- THERE WERE TIMES WHEN HOLABIRD HAD

12   TO CARRY THEIR FORECLOSURE SIDE -- NOT CARRY, THAT'S A BAD

13   WORD -- HAD TO CONTRIBUTE TO THE FORECLOSURE SIDE BECAUSE THEY

14   WERE HAVING THIS ACCRUAL AND CASH, TWO BOOKS, CASH FLOW ISSUES.

15   AND SO HOLABIRD WOULD HELP OUT WITH THAT, SO -- AS FAR AS

16   HOLABIRD.

17        BUT THERE WERE TIMES WHEN I GOT A CHECK FROM HOLABIRD

18   THAT, THAT WENT INTO AN ESCROW ACCOUNT, THAT ESCROW ACCOUNT

19   THAT THEY SET UP FOR THE $431,000 THAT WAS LATER PAID OUT TO

20   ME.

21   Q.    EXPLAIN THE 431,000.

22   A.    WELL, MR. PHILLIPS WENT THROUGH THIS WHOLE THING ABOUT THE

23   $431,000 TAX.  THERE WAS AN ESCROW SET UP FOR THAT, AND SOME

24   HOLABIRD MONEY WOULD GO INTO THAT ESCROW.  AND THEN,

25   EVENTUALLY, I GOT THAT MONEY BACK BECAUSE THERE WAS NO MONEY

3275

1    OWED.

2    Q.   SO THE FIRM NEVER PAID OUT ANY MONEY ON THAT $441,000 TAX

3    BILL, RIGHT?

4    A.   I THINK IT'S 431.  BUT THERE WAS NOTHING OWED.  SO, NO,

5    THEY NEVER PAID.  THE ACCOUNTANTS MADE THE CALLS AND FOUND OUT

6    ABOUT IT.  THERE WAS NOTHING OWED, SO THE $431,000 PROBLEM

7    WASN'T THERE.

8    Q.   THAT WAS THE --

9    A.   WE DIDN'T NEED AN ESCROW ANYMORE.

10   Q.   THAT WAS THE ONE THAT SAID IT WOULD BE DEDUCTED FROM YOUR

11   SHARE?

12   A.   THAT IS CORRECT.

13   Q.   YOUR MONEY FROM HOLABIRD HAD BEEN PUT INTO AN ESCROW

14   ACCOUNT OF THE LAW FIRM FOR THE PURPOSE OF ENSURING THAT

15   PAYMENT WAS MADE?

16   A.   YES.  SOME MONEY.  THAT'S CORRECT.

17   Q.   SOME MONEY.  PAYMENTS WERE TO BE MADE?

18   A.   AND THEN WHEN IT CAME OUT, IT WAS PUT IN THAT $26 MILLION

19   LIST.

20   Q.   SO MONEY YOU EARNED FROM HOLABIRD --

21   A.   RIGHT.

22   Q.   -- WOUND UP GOING THROUGH THESE FIGURES AND YOU'RE GETTING

23   TAGGED WITH IT IN THE 26 MILLION?

24   A.   THAT IS CORRECT.

25   Q.   IS THERE OTHER MONEY IN THERE?

3276

1   A.   WELL, THERE'S TONS OF EVEN-UPS THAT ARE, THAT ARE IN THERE

2   FOR 2010 SALARY, FOR THE UNITED HEALTH CARE CREDIT, FOR -- AT

3   ONE POINT THEY -- I ACTUALLY OWNED 55.55 PERCENT.  AT ONE POINT

4   THEY HAD TO EVEN-UP THE .55 PERCENT.

5   Q.   WHAT WAS UNITED HEALTH CARE -- WOULD YOU EXPLAIN THAT

6   AGAIN?

7   A.   THAT IS -- THAT WAS A MISTAKE.  I DON'T WANT TO -- THERE

8   WAS A MISTAKE MADE WHERE, WHERE -- AND I DON'T WANT TO SAY WE

9   CAUGHT IT THAT UNITED HEALTH CARE -- I DON'T WANT TO SAY UNITED

10  HEALTH CARE MADE THE MISTAKE, BECAUSE IT WASN'T UNITED HEALTH

11  CARE'S MISTAKE.

12      WE HAD A BROKER WHO WAS TAKING CARE OF ALL OF OUR, OUR

13  BENEFITS.  AND WHAT HAPPENED WAS, WE WERE TELLING THE BROKER,

14  WHEN WE EITHER HAD SOMEBODY THAT LEFT THE FIRM OR WAS FIRED,

15  TAKE THESE PEOPLE OFF BENEFITS.  BUT THEY WEREN'T TAKING THEM

16  OFF BENEFITS.  SO WE ENDED UP PAYING BENEFITS FOR A DECENT

17  PERIOD OF TIME FOR PEOPLE WHO WEREN'T WORKING FOR US.

18      SO WE HAD TO GO THROUGH AND WORK AND ACTUALLY SPENT A LOT

19  OF TIME GOING THROUGH THE PROCESS OF GETTING THAT MONEY BACK.

20      BUT THE MONEY CAME OUT OF THE FIRM PRIOR TO THE WITTSTADTS

21  HAVING ANY ARGUMENT OF ANY OWNERSHIP.  SO THAT MONEY ACTUALLY

22  WAS -- CAME BACK IN PERCENTAGE TO ART, RANDY, AND MYSELF.  SO

23  THAT -- AND THAT MONEY WENT -- THERE'S TWO CHUNKS OF THAT THAT

24  CAME OUT IS IN THE 26 MILLION.

25  Q.   NOW, DO YOU RECALL WHETHER OR NOT THE LAW FIRM DEALT WITH

3277

1    SHARED COSTS OF THE INTEREST ON THE ACTION CAPITAL ACCOUNT?

2    A.   YES.  WHAT HAPPENED WAS -- OKAY.  SO THAT -- THE ACTION

3    CAPITAL LOAN WAS ACTUALLY A MORRIS HARDWICK SCHNEIDER LOAN.

4    AND AT THE FIRST, THE INTEREST ON THAT LOAN, WHICH ESPECIALLY

5    MR. ROD WITTSTADT WAS ALWAYS CONCERNED ABOUT THAT INTEREST, THE

6    INTEREST ON THAT LOAN WAS BEING CHARGED TO JUST THE FORECLOSURE

7    SIDE AND NOT A SHARED CORPORATE COST.

8         VERY EARLY ON, I THINK SOMETIME IN MAYBE 2011, FRANK GOT

9    WITH BOB DRISKELL AND SAID, THIS IS NOT FAIR, THIS IS, THIS IS

10   BEING USED FOR THE FIRM.  WE JUST SHARE THE CORPORATE COSTS AND

11   SHARE THE INTEREST.  SO THEY MADE THAT ADJUSTMENT.

12              MR. GARLAND:  YOUR HONOR, I OFFER IN DEFENDANT'S

13   EXHIBIT 53.

14              MR. PHILLIPS:  NO OBJECTION.

15              THE COURT:  IT'S ADMITTED.

16   BY MR. GARLAND:

17   Q.   MR. HARDWICK?

18   A.   UH-HUH.

19   Q.   HAND YOU DEFENDANT'S EXHIBIT 53 AND ASK YOU, WHAT IS THAT?

20   A.   THIS IS A SHEET THAT ASHA WOULD SHOW ME -- SOMETIMES SHE

21   CAME IN MY OFFICE -- THAT I GUESS IT'S PRODUCED FROM A -- FROM

22   AN ACTION CAPITAL -- EITHER WEBSITE, PORTAL -- I'M NOT SURE

23   WHERE IT CAME FROM.

24        BUT, BASICALLY, WHAT IT SHOWS IS ALL THE ACTIVITY,

25   INCLUDING THE ACCOUNTS RECEIVABLE AT THIS TIME, WHICH IS ALMOST

3278

1    $5.5 MILLION.  AND IT SHOWED, YOU KNOW, HOW MUCH WAS AVAILABLE

2    AS FAR AS, YOU KNOW, AVAILABLE ON THE -- FROM OUR RECEIVABLES

3    THAT WE HAD AVAILABLE.

4    Q.    AND YOU KNEW THAT MR. SCHNEIDER WAS AN AUTHORIZED

5    SIGNATURE ON ACTION CAPITAL, DIDN'T YOU?

6    A.    I MEAN, THAT'S -- TO MY KNOWLEDGE, YES.

7    Q.    NOW, AT THE TOP OF THE DOCUMENT, DEFENDANT'S EXHIBIT 53 --

8    A.    UH-HUH.

9    Q.    -- IT SAYS, LINE OF CREDIT DAILY REPORT, MORRIS HARDWICK &

10   SCHNEIDER, LLC?

11   A.    THAT'S CORRECT.

12   Q.    AND I BELIEVE YOU'VE TESTIFIED THIS WAS A LINE OF MONEY

13   WHERE RECEIVABLES -- A COMPANY HAD TAKEN THEM AND AGREED TO

14   PROVIDE MORRIS HARDWICK & SCHNEIDER CASH AVAILABILITY, IF

15   NEEDED, OFF OF THAT LINE, CORRECT?

16   A.    THAT IS CORRECT.

17   Q.    SO WAS IT YOUR UNDERSTANDING THAT IT WAS SOMETHING OWNED

18   BY THE FIRM, WASN'T OWNED BY THE FORECLOSURE DIVISION?

19   A.    THAT'S CORRECT.

20   Q.    THE FIRM OWNED THE FORECLOSURE DIVISION, RIGHT?

21   A.    THAT'S CORRECT.

22   Q.    AND THE FORECLOSURE DIVISION HAD BANK ACCOUNTS WITH MONEY

23   IN IT, RIGHT?

24   A.    THAT'S CORRECT.

25   Q.    AND THEY WOULD SEND MONEY FROM THEIR BANK ACCOUNTS AT

3279

1    TIMES DOWN FOR THE PURPOSE OF BEING USED TO COVER THE -- THEIR

2    SHARE OF THE OVERHEAD, THE GENERAL OVERHEAD, RIGHT?

3    A.   THAT AND PROFITS, YES.

4    Q.   AND THEY WOULD SEND PROFITS DOWN?

5    A.   UH-HUH.  CASH, PROFITS, THE WHOLE THING.

6    Q.   FROM THAT WHOLE SERIES OF ACCOUNTS WHERE THEY KEPT MONEY,

7    RIGHT?

8    A.   THAT'S CORRECT.

9    Q.   AND DID YOU KNOW THAT WHEN THEIR MONEY CAME DOWN, IT WOUND

10   UP GETTING IN THE WIRE ACCOUNT?

11   A.   NO, I DID NOT KNOW THAT.

12           MR. PHILLIPS:  YOUR HONOR, OBJECT.  THIS IS BEYOND

13   THE SCOPE OF THE CROSS-EXAMINATION.

14           THE COURT:  I'LL OVERRULE IT.

15   BY MR. GARLAND:

16   Q.   AND WERE YOU AWARE OF FREQUENT COMMUNICATIONS BETWEEN ASHA

17   MAURYA, FRANK RITTERMAN, AND THE REPRESENTATIVES OF ACTION

18   CAPITAL, A BEAU BOYETT?

19   A.   I WAS ABOUT TO SAY I THINK HIS NAME IS BEAU.  YES, I SAW

20   LOTS OF E-MAILS SHOWING THAT.

21   Q.   ALL RIGHT.  NOW, IN YOUR EXPERIENCE WITH ASHA MAURYA --

22   A.   UH-HUH.

23   Q.   -- DID SHE PLAY A ROLE IN CAUSING DISTRIBUTIONS TO BE MADE

24   TO THE WITTSTADTS, TO YOU, MR. MORRIS, OR PAYMENTS TO

25   MR. MORRIS, OUT OF THE LINE AT ACTION CAPITAL?

3280

1   A.   YES, SHE DID DO THAT.  AND SHE ALSO ALWAYS SAID THAT WAS A

2   BIG PART OF DISTRIBUTABLE CASH.  IN FACT, IT'S THE FIRST THING

3   THAT'S ON THE DASHBOARDS GOING ALL THE WAY BACK, BESIDES THE

4   TITLE ORDERS.

5   Q.   ALL RIGHT.  NOW --

6        MR. GARLAND:  YOUR HONOR, LET ME LAY A FOUNDATION.

7   BY MR. GARLAND:

8   Q.   I HAND YOU DEFENDANT'S EXHIBIT 1203.

9   A.   OKAY.

10  Q.   DO YOU RECOGNIZE THIS DOCUMENT?

11  A.   OKAY.

12  Q.   IS THAT AN E-MAIL THAT YOU SENT AND COPIED MARK WITTSTADT,

13  ASHA MAURYA, BOB DRISKELL, AND FRANK RITTERMAN, THE CEO OF THE

14  FORECLOSURE DIVISION?

15  A.   YES.

16       MR. GARLAND:  YOUR HONOR, THERE'S NO ISSUE ABOUT ITS

17  AUTHENTICITY.  AND I OFFER IT TO SHOW A COMMUNICATION MADE BY

18  HIM IN CONNECTION WITH HIS ACTIVITIES DEALING WITH

19  DISTRIBUTIONS.

20       MR. PHILLIPS:  NO OBJECTION.

21       THE COURT:  IT'S ADMITTED.

22  BY MR. GARLAND:

23  Q.   MR. HARDWICK?

24  A.   YES.

25  Q.   WHAT IS THIS COMMUNICATION?

3281

1    A.   WELL, THIS IS A -- THIS IS ANOTHER EXAMPLE OF WHERE -- A

2    COUPLE OF THINGS ARE HAPPENING HERE.  ONE, THERE'S A TRUE-UP,

3    YOU KNOW, TALKING AS FAR AS GOING ON; TWO, THEY'RE DRAWING

4    $2.2 MILLION OFF THE LINE; AND, THREE, THEY'RE ALSO SENDING

5    MORE MONEY DOWN JUST TO COVER SOME OF THEIR EXPENSES.

6        THERE WAS A SET -- AND I DON'T KNOW THE NUMBERS, BUT IT

7    WAS -- BECAUSE OF THE TWO SETS OF BOOKS, IT WAS ALWAYS

8    DIFFICULT TO REALLY UNDERSTAND WHAT WAS GOING ON UP IN

9    FORECLOSURE.  AND -- AT LEAST FOR ME, AND I THINK FOR A COUPLE

10   OTHER PEOPLE.  RANDY ALWAYS MENTIONED THE SAME THING.

11       BUT, SO WE ENDED UP GETTING SOME SET NUMBERS, LIKE, HEY,

12   YOU GOT TO SEND X AMOUNT DOWN EVERY, EVERY MONTH.  SO WE HAD

13   MONEY COMING FROM THE OPERATING ACCOUNTS, MONEY COMING FROM

14   ACTION CAPITAL, LOTS OF DIFFERENT THINGS.

15   Q.   NOW, WHEN THIS SAYS, WE HAVE THE ACTION CAPITAL INCREASE,

16   WHAT DOES THAT MEAN?

17   A.   WELL, IT MEANS ONE OF TWO THINGS.  IT EITHER MEANS THEY

18   HAVE ADDED MORE -- SEE, ORIGINALLY, WE ONLY HAD -- THEY HAD A

19   CERTAIN AMOUNT OF CLIENTS, AND THERE'S ONLY A CERTAIN AMOUNT

20   THAT WAS BIG ENOUGH TO MAKE A DIFFERENCE WITH ACTION CAPITAL.

21   LIKE, YOU KNOW, A BANK OF AMERICA, YOU KNOW, A CHASE, A

22   BIG-SIZE COMPANY.  AND SO YOU COULD BORROW OFF JUST THOSE

23   RECEIVABLES.  SO IF THE TOTAL RECEIVABLES -- LIKE, IF IT SAYS

24   ON THIS ACTION CAPITAL RECEIVABLES ARE 5.5 MILLION, THERE MIGHT

25   HAVE BEEN 7 MILLION, BUT ONLY 5.5 QUALIFIED.

3282

1      SO AT THIS TIME WE GOT THE INCREASE, WE GOT THE INCREASE

2   IN AVAILABILITY DUE TO EITHER ADDING MORE CLIENTS OR A BUNCH, A

3   BUNCH OF WORK CAME IN AND WE GOT PAID AND PAID THE LINE DOWN,

4   ONE OF THE TWO.

5   Q.   SO DO YOU HAVE A MEMORY WHETHER AT SOME POINT ACTION

6   CAPITAL INCREASED THE AMOUNT OF MONEY THEY WOULD MAKE AVAILABLE

7   FOR USE TO THE LAW FIRM AT SOME POINT IN DEALING WITH THEM?

8   A.   YEAH.  ABSOLUTELY.  THEY ADDED MORE -- MORE CLIENTS WERE

9   QUALIFIED TO -- MORE OF THE RECEIVABLES QUALIFIED, YES.  SO

10  THAT INCREASED THE AVAILABILITY.

11  Q.   THEY AGREED TO GO UP HIGHER --

12  A.   THAT IS CORRECT.

13  Q.   -- IN OTHER WORDS?

14  A.   WELL, IT WASN'T THEY AGREED TO GO UP HIGHER.  THERE WAS

15  JUST MORE RECEIVABLES FOR THEM TO TAKE OFF OF.

16  Q.   ALL RIGHT.  AND DID THAT INCREASE THE AMOUNT OF MONEY

17  AVAILABLE TO THE LAW FIRM?

18  A.   YES.

19  Q.   NOW, IT SAYS:  WE'RE READY TO FINALIZE ON FRIDAY.

20  A.   THAT'S CORRECT.

21  Q.   PLEASE DRAW THE 2.2 MILLION FOR TAXES.

22      ARE Y'ALL PULLING OUT THE 2.2 MILLION FOR TAXES?

23  A.   I THINK THIS WAS IN 2012, WE DID A PRETTY BIG

24  DISTRIBUTION.  I THINK IT WAS CLOSE TO, I DON'T KNOW, 4 TO 6 --

25  BETWEEN 4 TO 6 MILLION.  PART OF IT WAS TO PAY TAXES, PART OF

3283

1    IT WAS END OF THE YEAR ACCOUNT THAT SHE WAS HOLDING UP.  YOU

2    KNOW, AGAIN, IT WAS SOME OF THE NUMBERS ON THOSE CASH

3    AVAILABILITY SHEETS.

4    Q.   ALL RIGHT.  AND THEN IT SAYS:  PLUS THE TRUE-UP FOR

5    DEFAULT FOR OCTOBER AND NOVEMBER EXPENSES ON FRIDAY.

6         WHAT IS THAT ABOUT?

7    A.   I THINK WHAT THAT -- WHAT I WAS SAYING WAS, WE HAD SOME

8    ESTIMATED NUMBERS.  WE'D SAY, OKAY, EVERY MONTH YOU SEND

9    800,000 -- THIS IS A TOTALLY RANDOM NUMBER -- $800,000 DOWN.

10   AND THEN IN THE MONTHS WHEN THEY DIDN'T KNOW WHAT THEY WERE, AT

11   THAT POINT, ONCE THEY -- I GUESS FRANK THOUGHT HE KNEW THE

12   ACTUAL EXPENSES, THEN THEY WOULD TRUE-UP.

13         MR. GARLAND:  YOUR HONOR, I MOVE INTO EVIDENCE

14   DEFENDANT'S EXHIBIT 722.

15         THE COURT:  ANY OBJECTION?

16         MR. PHILLIPS:  NO, YOUR HONOR.

17         THE COURT:  IT'S ADMITTED.

18   BY MR. GARLAND:

19   Q.   WOULD YOU LOOK OVER DEFENDANT'S EXHIBIT 722?

20   A.   OKAY.

21   Q.   AND LOOK OVER TO THE BACK OF THAT E-MAIL.

22   A.   OKAY.

23   Q.   ALL RIGHT.  NOW, WHAT IS GOING ON IN THIS E-MAIL?

24   A.   WELL, THERE'S A LOT OF -- THERE'S A FEW THINGS.  THE MAIN

25   TOPIC IS THE 2011 EVEN-UP.  WE DID EVEN-UPS AT LOTS OF

3284

1    DIFFERENT TIMES.  ONE, IF THERE WAS JUST SOME JUST RANDOM THING

2    HAPPENED, LIKE THE UNITED HEALTH CARE; TWO, IF A TAX -- YOU

3    KNOW, WHEN A TAX RETURN WAS DONE SO THEY COULD KIND OF TRY TO

4    SEE -- YOU KNOW, BY THE END OF THE YEAR WE'D HAVE SOME NUMBERS,

5    MAYBE NOT, YOU KNOW, BASED ON THE CASH THAT HAD BEEN

6    DISTRIBUTED.  IF THERE'S ANY PERSONAL CREDIT CARDS, ANY

7    PERSONAL ITEMS WERE DONE -- THERE WAS JUST -- THERE WERE TONS

8    OF DIFFERENT THINGS THAT HAPPENED.

9        WHAT HAPPENED HERE WAS -- IT GOES BACK TO THE PART ABOUT

10   MARK -- AGAIN, MARK AND ROD WERE GETTING PAID AS PARTNERS BUT

11   WERE NOT LEGALLY PARTNERS.  AND, THEREFORE, TOMMY THOMPSON WAS

12   ALWAYS TRYING TO FIGURE OUT, IN ALL THE -- AND THE ACCOUNTANTS

13   WERE ALWAYS TRYING TO FIGURE OUT HOW TO MAKE THE TAXES RIGHT.

14       LIKE, FOR EXAMPLE, YOU KNOW, THERE WAS, THERE WAS CLOSE TO

15   $2 MILLION THAT WENT ONTO MY SALARY THAT, THAT IS ACTUALLY IN

16   THIS CHART THAT BASICALLY TALKS ABOUT WHERE I'M PAYING TAXES

17   AND IT'S DONE AS AN EVEN-UP.  SO IT'S KIND OF A -- IT WAS KIND

18   OF A TAX SITUATION.

19   Q.   AND WHEN YOU SAY EVEN-UP, BECAUSE OF THE WAY THEY HAD BEEN

20   PAID, WAS IT CREATING POTENTIAL TAX LIABILITY TO YOU SINCE YOU

21   AND MR. MORRIS WERE THE STOCKHOLDERS?

22   A.   THAT'S RIGHT.  THAT'S EXACTLY WHAT THIS WHOLE THING IS

23   ABOUT.

24   Q.   ALL RIGHT.  AND --

25   A.   THEY WEREN'T DOING IT ON PURPOSE.  IT WAS JUST THE RESULT

3285

1    OF WHAT HAPPENED.

2    Q.    TURN TO THE SECOND PAGE.  AND THERE'S, DOWN AT THE BOTTOM

3    OF THE PAGE, A DISCUSSION OF ALL OF THE TAX RAMIFICATIONS AND

4    THE PERCENTAGES.  DID YOU RECEIVE A COPY OF THIS WORK BY

5    MR. DRISKELL?

6    A.    YES.

7    Q.    AND DID YOU -- YOU RESPONDED TO IT ABOVE -- IT GOES ON TO

8    THE NEXT PAGE -- WITH EVEN MORE DETAIL OF THE NUMBER MECHANICS

9    AND WHAT WOULD HAPPEN.

10   A.    THAT'S RIGHT.  IN HERE IT TALKS ABOUT -- AGAIN, ABOUT

11   DOING ANOTHER DISTRIBUTION OFF THE LINE.

12   Q.    ALL RIGHT.  SO YOU WERE ACCUSTOMED, IN DEALING WITH THESE

13   EVEN-UPS, FOR THE MONEY TO COME OFF OF THE LINE WHEN IT WAS

14   AVAILABLE; IS THAT RIGHT?

15   A.    YEAH.  I MEAN, IT WAS A PLACE FOR DISTRIBUTABLE CASH.

16   Q.    AND THEN THERE'S UP ABOVE:  I CHAT CASH.

17         WHAT DOES THAT MEAN?

18   A.    I THINK, I THINK THAT MR. ROD WITTSTADT JUST -- THE I

19   WASN'T SUPPOSED TO BE THERE.  THERE WAS JUST A TYPO.  IT JUST

20   SAYS -- I THINK WHAT HE WAS TRYING TO SAY IS, WHAT CASH ARE WE

21   HOLDING IN THE RESERVE ACCOUNT AS OF TODAY.  NOT, I CHAT.

22   Q.    AND THEN ASHA RESPONDS:  1,101,692.  RIGHT?

23   A.    THAT IS CORRECT.

24   Q.    AND THEN YOU RESPOND THAT WE USUALLY ALSO DISTRIBUTE THE

25   MONEY FROM THE LINE NECESSARY TO PAY THE TAXES.

3286

1       WHEN YOU USE THE WORD "LINE" THERE, WHAT DO YOU MEAN?

2   A.   THE ACTION CAPITAL.

3   Q.   IT WOULD BE REFERRED TO AS THE LINE?

4   A.   IT DEPENDS.  IN SOME CASES, YES.

5   Q.   OKAY.  AND THEN YOU SAY:  THINK WE DID AN ADDITIONAL

6   1.4 MILLION LAST YEAR.

7        WAS THAT 1.4 MILLION OFF THE LINE?

8   A.   YES, IT WAS.  BUT I THINK IT WAS ACTUALLY -- ACTUALLY --

9   YEAH, THAT'S RIGHT.  2011, YES.

10  Q.   AND THEN MARK WITTSTADT RESPONDS:  I WOULD LOVE THAT.

11  A.   THAT IS CORRECT.

12  Q.   AND YOU WROTE:  SO MY PLAN WOULD BE TO DISTRIBUTE MOST OF

13  THE 1.2 --

14  A.   UH-HUH.

15  Q.   -- OR SO RESERVE ACCOUNT, PLUS TAKE 1.4 OFF THE LINE TO

16  PAY TAXES WITH ALL IN DECEMBER?

17  A.   THAT IS CORRECT.

18  Q.   AND SO WHEN YOU TALKED ABOUT EVEN-UPS, DRAWING MONEY OFF

19  THE LINE, WERE EVEN-UPS OFTEN DONE OFF THE LINE?

20  A.   YES.

21  Q.   NOW, LET ME -- I WANT TO HAND YOU GOVERNMENT EXHIBIT 1401.

22  A.   OKAY.

23  Q.   THIS IS YOUR 2012 TAX RETURN?

24  A.   OKAY.

25  Q.   AND YOU WERE ASKED QUESTIONS IMPLYING THAT THERE WAS

3287

1    SOMETHING MISSING FROM THAT TAX RETURN, WEREN'T YOU?  REMEMBER

2    THOSE QUESTIONS?

3    A.    YES.

4    Q.    AND A CHART WAS PUT UP THAT SHOWED $7 MILLION OF TRANSFERS

5    TO YOU IN 2012, AND YOU WERE QUESTIONED ABOUT THE AMOUNT OF

6    WHAT YOU RECEIVED AS INCOME IN THAT YEAR, RIGHT?

7    A.    YES.

8    Q.    AND THERE WAS A COMPARISON BETWEEN WHAT YOUR TAXABLE

9    INCOME WAS AND WHAT WERE TRANSFERS TO YOU?

10   A.    CORRECT.

11   Q.    AND THE INFERENCE WAS THAT, THEREFORE, YOU HADN'T PROPERLY

12   PREPARED YOUR TAXES IN '12?

13   A.    THAT IS DEFINITELY THE INFERENCE.

14   Q.    ALL RIGHT.  YOU HAVE A CPA PREPARE YOUR TAXES?

15   A.    ABSOLUTELY.

16   Q.    AND YOU UNDERSTAND THAT DISTRIBUTIONS DO NOT SHOW UP ON A

17   TAX RETURN?

18   A.    THAT IS CORRECT.

19   Q.    AND DISTRIBUTIONS ARE NOT TAXABLE?

20   A.    THAT IS CORRECT.

21   Q.    AND THE INFERENCE ATTEMPTING TO BE DRAWN HERE BY PUTTING

22   UP THAT CHART -- DID YOU INFER THAT THEY WERE TRYING TO SAY

23   BECAUSE THOSE DISTRIBUTIONS OR TRANSFERS WERE NOT ON YOUR TAX

24   RETURN, THAT YOU HAD FILED AN INCORRECT TAX RETURN?

25   A.    THAT'S WHERE I THINK THEY WERE HEADED, YES.

3288

1    Q.   ALL RIGHT.  NOW, MR. MORRIS ALSO REPORTED HIS TAXES,

2    DIDN'T HE?

3    A.   I DON'T KNOW THAT.

4             MR. PHILLIPS:  OBJECTION.

5             THE WITNESS:  I ASSUME HE DID.

6             THE COURT:  I'M GOING TO OVERRULE.  I'LL GIVE YOU

7    SOME LATITUDE HERE, MR. GARLAND.

8    BY MR. GARLAND:

9    Q.   TO YOUR KNOWLEDGE, NONE OF YOUR PARTNERS PUT ON THEIR TAX

10   RETURNS TRANSFERS TO THEM THAT THEY TREATED AS DISTRIBUTIONS,

11   RIGHT?

12   A.   I BELIEVE THAT IS CORRECT.

13   Q.   EXCEPT THE WITTSTADTS HAD TO REPORT THEIRS AS SALARY

14   BECAUSE THEY WERE OPERATING UNDER THIS FICTION THAT THEY

15   WEREN'T GETTING DISTRIBUTIONS, RIGHT?

16   A.   YES.  THE WITTSTADTS, YES.

17   Q.   THE WITTSTADTS.  I MISPRONOUNCED IT.  MY APOLOGY.

18   A.   NO PROBLEM.

19   Q.   WE'VE HAD TESTIMONY FROM TWO ACCOUNTANTS ABOUT THE FACT

20   THAT DISTRIBUTIONS CAN'T BE COMPARED TO NET INCOME.  YOU'VE

21   HEARD THAT TESTIMONY?

22   A.   I HAVE.  CORRECT.

23   Q.   I'M SHOWING YOU THE GOVERNMENT'S CHART 1001.

24   A.   OKAY.

25   Q.   THAT'S WHAT THIS CHART WAS ATTEMPTING TO DO.

3289

1   A.   RIGHT.

2   Q.   COMPARE NET INCOME FOR TAX PURPOSES TO TRANSFERS PAID TO

3   YOU.

4   A.   I UNDERSTAND THAT, YES.

5   Q.   NOW, IF YOUR TRANSFERS WERE $11 MILLION, WOULD YOU HAVE TO

6   PUT THAT ON YOUR TAX RETURN?

7   A.   NOT THE -- NOT THE -- YOU MEAN -- DEPENDING ON WHAT IT

8   WAS.  PARTS THAT WERE DISTRIBUTIONS, NO.

9   Q.   THE PARTS THAT WERE DISTRIBUTIONS?

10  A.   RIGHT.

11  Q.   FOR INSTANCE, THOSE TRANSFERS COULD BE WHERE YOUR SALARY

12  WAS PAID TO YOU?

13  A.   COULD BE.

14  Q.   WHERE BONUSES WERE PAID TO YOU --

15  A.   YES.

16  Q.   -- THAT WOULD BE INCLUDED IN THERE, SHOWN ON YOUR TAX

17  RETURN.  ON YOUR TAX RETURN, YOU GET TO DEDUCT YOUR LOSSES,

18  DON'T YOU?

19  A.   YOU DO.

20  Q.   YOU HAD SOME LOSSES, DIDN'T YOU, MR. HARDWICK?

21  A.   I HAD SOME LOSSES.

22  Q.   THEY WOULD SHOW UP ON THE TAX RETURNS?

23  A.   YES, SIR.

24  Q.   THAT MIGHT CAUSE YOU NOT ONLY NOT TO OWE TAXES BUT TO GO

25  NEGATIVE AS FAR AS WHAT YOUR -- YOU'D HAVE -- YOU MIGHT HAVE

3290

1  TAX LOSS CARRY-FORWARDS TO PROTECT YOU FROM ADDITIONAL TAXES.

2  YOU'RE FAMILIAR WITH THAT, THAT CERTAIN LOSSES --

3  A.   POTENTIALLY.  YEAH, POTENTIALLY.

4  Q.   -- CERTAIN LOSSES CAN BE CARRIED FORWARD --

5       MR. PHILLIPS:  OBJECT.  THIS IS ARGUMENTATIVE AND

6  IT'S LEADING.

7       THE COURT:  SUSTAINED.

8       MR. GARLAND:  ALL RIGHT.  YOUR HONOR SUSTAINED IT?

9       THE COURT:  YES.

10      MR. GARLAND:  I'LL MOVE ON.

11  BY MR. GARLAND:

12  Q.   MR. HARDWICK?

13  A.   YES, SIR.

14  Q.   YOU'VE BEEN ASKED QUESTIONS ABOUT YOUR ETHICAL DUTIES --

15  A.   YES, SIR.

16  Q.   -- IN CONNECTION WITH THE MONEY IN THOSE ESCROW ACCOUNTS,

17  WHERE YOU TESTIFIED YOUR MONEY WAS IN THOSE ACCOUNTS.

18  A.   YOU TALKING ABOUT THE JACKSON HARDWICK?

19  Q.   THE JACKSON HARDWICK.

20  A.   YES.  THAT IS CORRECT.

21  Q.   AT THE TIME YOU TOOK THE MONEY OUT OF THOSE ACCOUNTS, DID

22  YOU TAKE YOUR MONEY OUT OF THOSE ACCOUNTS?

23  A.   THAT IS CORRECT.

24  Q.   AND AT THE TIME YOU TOOK IT OUT, WAS THERE ANY CLIENT

25  MONEY IN THOSE ACCOUNTS?

3291

1    A.   NO.

2    Q.   AND YOU RECOGNIZE THAT COULD BE AN ETHICAL VIOLATION,

3    PERHAPS?

4    A.   IT COULD BE.

5    Q.   NOW --

6             MR. GARLAND:  ANY OBJECTION TO THIS ONE?

7             MR. PHILLIPS:  NO.  NO OBJECTION.

8             THE COURT:  I'M SORRY.  WAS THERE AN OBJECTION?

9             MR. PHILLIPS:  NO.

10            THE COURT:  OH, OKAY.

11            MR. GARLAND:  I HAVE ANOTHER EXHIBIT I WANT TO PUT

12   FORWARD, DEFENDANT'S EXHIBIT 729.

13   BY MR. GARLAND:

14   Q.   ASK YOU TO LOOK AT THIS EXHIBIT.

15   A.   OKAY.

16   Q.   YOU MENTIONED ON CROSS-EXAMINATION THAT ONE OF THE FIRST

17   THINGS YOU DID WAS HIRE A LAWYER BY THE NAME OF JESS -- JEFF

18   SMITH.  AND YOU PREVIOUSLY IDENTIFIED HIM IN YOUR DIRECT

19   EXAMINATION AS AN ETHICS EXPERT; IS THAT RIGHT?

20   A.   THAT IS CORRECT.

21   Q.   I BELIEVE YOU'VE TOLD US ABOUT CALLING HIM IN CHINA.

22   A.   YEAH.  THAT IS CORRECT.

23   Q.   AND YOU AND MR. MARK WITTSTADT DRAFTED A LETTER TO SEND TO

24   THE STATE BAR OF GEORGIA ON AUGUST 4TH, 2014, CORRECT?

25   A.   THAT'S CORRECT.

3292

1    Q.   AND YOU SIGNED IT?

2    A.   I DID.

3    Q.   AND MARK WITTSTADT SIGNED IT?

4    A.   HE DID.

5    Q.   AND THIS WAS AFTER YOU HAD EMPLOYED MR. SMITH, RIGHT?

6    A.   THAT'S CORRECT.

7    Q.   AND THAT DOCUMENT WAS A REPRESENTATION BY BOTH OF YOU TO

8    THE STATE BAR AS TO WHAT EXACTLY YOU KNEW AT THAT TIME ABOUT

9    THESE PROBLEMS, RIGHT?

10   A.   THAT IS CORRECT.

11         MR. GARLAND:  I MOVE INTO EVIDENCE DEFENDANT'S

12   EXHIBIT 729.

13         MR. PHILLIPS:  AS I SAID, WE DON'T HAVE ANY

14   OBJECTION.

15         THE COURT:  ALL RIGHT.  ADMITTED.

16   BY MR. GARLAND:

17   Q.   ALL RIGHT.  I WANT TO PUBLISH 729.  FIRST, MOVING OVER TO

18   PAGE ON THE OTHER SIDE, IS THAT YOUR SIGNATURE?

19   A.   IT IS.

20   Q.   WHOSE SIGNATURE IS THIS?

21   A.   IT LOOKS LIKE MR. WITTSTADT'S SIGNATURE -- MR. MARK

22   WITTSTADT.  SORRY.

23   Q.   WERE YOU PRESENT WHEN HE SIGNED IT; OR DO YOU KNOW?

24   A.   I DON'T KNOW.

25   Q.   ALL RIGHT.  NOW, IN THAT LETTER, THIS -- DO YOU KNOW

3293

1    WHETHER THIS LETTER WAS SENT OR NOT?

2    A.    I BELIEVE IT WAS SENT, YES.

3    Q.    AND DID MR. SMITH CONFER WITH BOTH OF YOU ABOUT WHAT FACTS

4    YOU KNEW AT THAT POINT BEFORE THIS LETTER WAS DRAFTED?

5    A.    ABSOLUTELY.

6    Q.    DID HE DRAFT IT?

7    A.    YOU KNOW, I DON'T KNOW.  I THINK, I THINK MARK MIGHT HAVE

8    ACTUALLY DRAFTED IT.

9    Q.    OKAY.  NOW, IT SAYS:  WE'RE WRITING THIS LETTER TO INFORM

10   YOU OF A POTENTIAL ISSUE REGARDING THIS FIRM'S ESCROW ACCOUNTS.

11   AS THIS FIRM'S MANAGING PARTNERS, WE FEEL IT'S OUR PROFESSIONAL

12   RESPONSIBILITY TO KEEP THE STATE BAR INFORMED AS WE INVESTIGATE

13   THIS ISSUE.

14        ON FRIDAY, JULY 18TH, ONE OF THE FIRM'S PARTNERS WERE MADE

15   AWARE OF AN ISSUE INVOLVING WHAT APPEARED TO BE AN ALTERED BANK

16   STATEMENT.  UPON IMMEDIATE INVESTIGATION, IT WAS DETERMINED

17   THAT THE CHIEF FINANCIAL OFFICER OF OUR FIRM'S CLOSING

18   OPERATION HAD MADE THE ALTERATION.  HER NAME IS ASHA MAURYA.

19        WHEN QUESTIONED BY MR. HARDWICK ON JULY 18TH, MS. MAURYA

20   ADMITTED ALTERING THE BANK STATEMENT AND VOLUNTARILY ADMITTED

21   THAT SHE MAY HAVE -- THAT FUNDS MAY HAVE BEEN INADVERTENTLY

22   MOVED FROM AN ESCROW ACCOUNT INTO A FIRM OPERATING ACCOUNT.

23   SHE REPRESENTED THE AMOUNT TO BE 689,018.93.  BASED SOLELY ON

24   THE AMOUNT STATED IN HER ADMISSION, THAT AMOUNT WAS IMMEDIATELY

25   MOVED FROM THE OPERATING ACCOUNT TO THE ESCROW ACCOUNT.

3294

1       THE INDIVIDUAL WAS PLACED ON ADMINISTRATIVE LEAVE PENDING

2   FURTHER INVESTIGATION, AS MR. HARDWICK WAS IN EUROPE JULY 18 TO

3   28.  DURING MR. HARDWICK'S ABSENCE, THE FIRM BEGAN LOOKING --

4              THE COURT:  CAN YOU MOVE THE EXHIBIT UP, MR. GARLAND?

5              MR. GARLAND:  OH, EXCUSE ME.

6              THE COURT:  THAT'S OKAY.

7              MR. GARLAND:  I NEED TO APOLOGIZE.

8              THE COURT:  GO AHEAD, SIR.  I DIDN'T MEAN TO

9   INTERRUPT YOU.

10  BY MR. GARLAND:

11  Q.   DURING MR. HARDWICK'S ABSENCE, THE FIRM BEGAN LOOKING AT

12  MANY OTHER ACCOUNTS TO DETERMINE WHETHER THERE WERE ANY OTHER

13  IMPROPRIETIES.  DUE TO THE VOLUME OF TRANSACTIONS AND THE

14  NUMBER OF ACCOUNTS OUR FIRM HANDLES, THE INVESTIGATION TO THIS

15  MATTER WAS AND WILL CONTINUE TO BE A VERY TIME-CONSUMING

16  PROCESS.

17       AFTER REVIEWING SEVERAL ACCOUNTS, NUMEROUS IRREGULAR

18  TRANSFERS BETWEEN TRUST ACCOUNTS WERE RECOGNIZED.  MR. HARDWICK

19  WAS NOTIFIED LATE IN THE EVENING OF MONDAY, JULY 28, THAT THERE

20  MAY BE FURTHER ISSUES WITH THE ACCOUNTS.

21       ON TUESDAY, THE 29TH, MR. HARDWICK RETURNED TO THE OFFICE

22  AND IMMEDIATELY INFORMED THE OTHER EQUITY PARTNERS, MR. MARK

23  WITTSTADT, MR. GERARD WITTSTADT, OF THE POTENTIAL ISSUES.

24  OUTSIDE AUDITORS AND OUTSIDE COUNSEL WERE IMMEDIATELY RETAINED.

25       THE FIRM OF ALLIANCE OF FINANCIAL PROFESSIONALS IS

3295

1    HANDLING THE ACCOUNTING INVESTIGATION, AND TONY ADAMS, CPA OF

2    THAT FIRM, IS THE LEAD PARTNER.  HE CAN BE CONTACTED.

3         OUR FIRM IS BEING REPRESENTED BY JEFFREY SMITH.

4         I WON'T READ ALL THAT.

5         TONY AND JEFF HAVE OUR PERMISSION TO DISCLOSE ALL THE DATA

6    THEY OBTAIN.  WE WANT TO BE COMPLETELY TRANSPARENT WITH THE

7    STATE BAR.  SINCE OUR INVESTIGATION IS ONGOING, WE HAVE NOT

8    DETERMINED IF EVERY STATE'S ESCROW ACCOUNT HAS IN FACT BEEN

9    AFFECTED.  ACCORDINGLY, OUT OF AN ABUNDANCE OF CAUTION, WE ARE

10   NOTIFYING EACH STATE BAR SO AS TO BE FULLY TRANSPARENT.

11        OUR FIRM'S EQUITY PARTNERS ARE FULLY PREPARED AND

12   FINANCIALLY SOLVENT ENOUGH TO FUND ANY AMOUNT IF ANY ARE

13   DETERMINED TO BE MISSING.  IN ADDITION, IN THE EVENT A

14   DEFALCATION IS UNCOVERED, OUR FIRM IS INSURED UP TO $3 MILLION.

15   OUR INVESTIGATION IS ONGOING.  OUR FIRM WILL CONTINUE TO FULLY

16   COOPERATE.

17        DID YOU AND MR. WITTSTADT JOINTLY GIVE THE STATE BAR

18   PERMISSION TO LOOK INTO ANYTHING AND WAIVE ATTORNEY-CLIENT

19   PRIVILEGE?

20   A.   YEAH.  I THINK WHAT HAPPENED WAS, I THINK MARK WROTE THE

21   ORIGINAL LETTER, AND THEN I SENT AN E-MAIL, SAYING, HEY,

22   THERE'S A COUPLE OF THINGS WE NEED TO DO.  ONE OF THEM IS TO

23   LET THEM -- LET'S WAIVE OUR PRIVILEGE SO THEY CAN TALK TO OUR

24   EXPERTS.

25   Q.   YOU COULD HAVE NOT BEEN OPEN AND NOT HAVE TO LET THEM HAVE

3296

1    THE RIGHT TO TALK TO THE LAWYER ABOUT EVERYTHING --

2                MR. PHILLIPS:  OBJECTION.  LEADING, ARGUMENTATIVE.

3                THE COURT:  I'LL OVERRULE.  OVERRULE.  GO AHEAD.

4                MR. GARLAND:  THANK YOU.

5    BY MR. GARLAND:

6    Q.   YOU COULD HAVE INVOKED ATTORNEY-CLIENT PRIVILEGE, RIGHT?

7    A.   OF COURSE.

8    Q.   EVEN THOUGH YOU WEREN'T A PRACTICING ATTORNEY, YOU

9    UNDERSTOOD THAT COMMUNICATIONS TO YOUR LAWYER ARE CONFIDENTIAL.

10   A.   OF COURSE, YES.

11   Q.   UNLESS YOU WAIVE IT, RIGHT?

12   A.   THAT'S RIGHT.

13   Q.   AND YOU WAIVED IT?

14   A.   WE WAIVED IT.

15   Q.   ALL RIGHT.  I SHOW YOU DEFENDANT'S EXHIBIT 728, ASK YOU TO

16   TAKE A LOOK AT THAT.

17   A.   OKAY.

18   Q.   IN --

19   A.   OKAY.

20   Q.   -- TUESDAY -- EXCUSE ME, TUESDAY, 8-13-2010, DID YOU HAVE

21   COMMUNICATION WITH ASHA MAURYA CONCERNING EVEN-UP CHECKS MADE

22   TO A VARIETY OF PEOPLE?

23   A.   WELL, FIRST, I THINK IT WAS AUGUST 3RD, 2010.

24   Q.   EXCUSE ME.

25   A.   BUT I THINK THIS WAS ACTUALLY SET UP ALMOST LIKE A, LIKE

3297

1   AN OUTLOOK, AN OUTLOOK INVITATION, WHERE SHE'S BASICALLY, SHE'S

2   BASICALLY TELLING -- SAYING THAT, YOU KNOW, THEY'RE DOING AN

3   EVEN-UP.

4            MR. PHILLIPS:  THE WITNESS IS TESTIFYING ABOUT THE

5   DOCUMENT BEFORE IT'S ADMITTED.

6   BY MR. GARLAND:

7   Q.   WERE THERE EVEN-UPS --

8            THE COURT:  I'LL SUSTAIN.  THAT'S 728, CORRECT?

9            MR. GARLAND:  THAT'S CORRECT.

10           THE COURT:  OKAY.

11  BY MR. GARLAND:

12  Q.   WERE THERE EVEN-UPS THAT TOOK PLACE IN AUGUST OF 2010

13  INVOLVING --

14  A.   YES.

15  Q.   -- RANDY SCHNEIDER, MARK AND ROD?  DID THOSE EVENTS TAKE

16  PLACE?

17  A.   YES, THEY DID.

18  Q.   AND WERE THE DOCUMENTS RELATED TO HOW IT WAS TO BE DONE,

19  HANDLED BY ASHA MAURYA?

20  A.   YES.  THAT'S CORRECT.

21  Q.   MR. HARDWICK, I HAND YOU DEFENDANT'S EXHIBIT 38.

22  A.   OKAY.

23  Q.   ASK YOU TO LOOK OVER THAT DOCUMENT AND THEN ASK YOU SOME

24  QUESTIONS.

25  A.   OKAY.

3298

1           THE COURTROOM DEPUTY:  MR. GARLAND, MR. GARLAND, DID

2    YOU SAY 38 OR 238?

3           MR. GARLAND:  EXCUSE ME.  DEFENDANT 38.

4    BY MR. GARLAND:

5    Q.   HAVE YOU READ IT?

6    A.   I'M SORRY.  DID YOU ASK ME A QUESTION?  I'VE READ IT, YES.

7    Q.   OKAY.  PUT THE DOCUMENT DOWN.

8    A.   OKAY.

9    Q.   ALL RIGHT.  NOW, IN JUNE OF 2011, DID YOU HAVE

10   CONVERSATIONS AND COMMUNICATIONS WITH GERARD WITTSTADT AND ART

11   MORRIS AND ROBERT DRISKELL AND MARK WITTSTADT ABOUT FRANK

12   RITTERMAN?

13   A.   YES.  YES.  YES.

14   Q.   I JUST WANT YOU TO ANSWER MY QUESTIONS.  I DON'T WANT YOU

15   TO READ FROM THE DOCUMENT.  I'M ASKING YOU ABOUT YOUR MEMORY.

16   A.   YES.

17   Q.   WHAT YOU REMEMBER.

18           ALL RIGHT.  AND AT THAT TIME, DID YOU SUGGEST THAT

19   MR. RITTERMAN COME DOWN TO CHECK HIS INFORMATION AND ANSWER

20   QUESTIONS THAT HE MIGHT HAVE?  DID YOU --

21   A.   YES.

22   Q.   -- SUGGEST THAT?

23   A.   YES.  YES.

24   Q.   AND DID YOU SUGGEST BACK THEN IN JUNE OF 2011 THAT HE COME

25   TO ATLANTA --

3299

1          MR. PHILLIPS:  YOUR HONOR, I OBJECT TO THE CONTINUED

2     LEADING OF THE WITNESS ON REDIRECT EXAMINATION.

3          THE COURT:  SUSTAINED.

4     BY MR. GARLAND:

5     Q.   WHAT, IF ANYTHING, DID YOU SUGGEST ABOUT MR. RITTERMAN

6     COMING TO ATLANTA AND BEING IN ATLANTA?

7     A.   WELL, I MEAN, I SUGGESTED THAT HE COME DOWN FOR A WEEK A

8     MONTH, YOU KNOW.  YOU KNOW, HE COULD -- IF THEY WANTED TO HAVE

9     ACCESS TO INFORMATION, HAVE YOUR CFO COME DOWN FOR A WEEK A

10    MONTH AND DO EVERYTHING THAT THEY COULD DO.  JUST MADE SENSE TO

11    ME.

12    Q.   ALL RIGHT.  NOW, AND WERE YOUR SUGGESTION -- DID YOU MAKE

13    ANY SUGGESTION THAT HE COULD COME DOWN, MEET WITH MR. DRISKELL

14    AND MEET WITH ASHA AND BE THERE FOUR DAYS A WEEK?

15    A.   YES.  I MADE THAT SUGGESTION.

16    Q.   AND DID YOU AND MR. WITTSTADT DEBATE THE ISSUE OF WHETHER

17    BOB DRISKELL SHOULD BE THE HEAD PERSON OVER ACCOUNTING OR

18    WHETHER FRANK RITTERMAN SHOULD BE?

19    A.   THERE WAS A LOT MORE DEBATE GOING ON ON THAT.  THERE WAS A

20    LOT OF DIFFERENT PARTS OF THE ISSUE, BECAUSE WE DIDN'T KNOW

21    WHAT BOB WAS DOING.  BOB EVENTUALLY SAID HE WASN'T GOING TO

22    LEAVE.

23          AND SO WE PUT BOB OVER FRANK AND, AS KIND OF THE FIRM CFO,

24    OVER FRANK AND ASHA, AND THEN THEY WERE ALL SUPPOSED TO BE

25    WORKING TOGETHER.  AND THE POINT WAS THEY NEEDED TO SPEND SOME

3300

1    TIME -- I MEAN, ASHA WENT TO BALTIMORE A NUMBER OF TIMES.  AND,

2    YOU KNOW, FRANK WAS SUPPOSED TO COME DOWN TO ATLANTA.  AND, I

3    MEAN, I DIDN'T KEEP UP WITH THAT, OBVIOUSLY, BUT I DID SEE HIM

4    DOWN THERE.  SO I ASSUMED THEY WERE HAVING ALL THESE

5    CONVERSATIONS.

6    Q.   NOW, WERE THERE ISSUES ALSO ABOUT HAVING POSITIVE STAFF

7    CHANGES IN CONNECTION WITH THE ACCOUNTING DEPARTMENT?

8    A.   YEAH.  I THINK, I THINK PART OF THE PROBLEM WAS, AGAIN,

9    COMMUNICATION, YOU KNOW, BETWEEN THE ACTUAL STAFF MEMBERS.

10   BECAUSE THEY HAD AN ACCOUNTING STAFF -- THEY, BEING THE

11   WITTSTADTS -- HAD AN ACCOUNTING STAFF DOING THEIR BOOKS.  WE

12   HAD, WE HAD, YOU KNOW, A GROUP.  AND THEY WERE TRYING TO FIGURE

13   OUT HOW TO DO ALL THE -- HOW TO INTERACT ON THE LOWER LEVEL, I

14   BELIEVE IS WHAT WE WERE TALKING ABOUT WITH THAT PART.

15        WE FIGURED OUT THAT FRANK WAS GOING TO COME DOWN AND BOB

16   WAS GOING TO BE OVER BOTH OF THEM AT THAT POINT.

17   Q.   AND WAS IT THE UNDERSTANDING THAT FRANK WOULD BE ABLE TO

18   CHECK THE RECORDS AND ASK QUESTIONS OF --

19             MR. PHILLIPS:  OBJECTION.  LEADING.

20   BY MR. GARLAND:

21   Q.   WAS THERE AN UNDERSTANDING AS TO WHETHER OR NOT FRANK

22   WOULD BE ABLE TO ASK QUESTIONS OF ASHA, OF BOB DRISKELL, AND

23   CHECK THE RECORDS?

24   A.   WELL, THAT WAS THE WHOLE POINT.  I MEAN, HE WASN'T COMING

25   DOWN HERE FOR ANY OTHER REASON.  HE WAS COMING DOWN HERE TO --

3301

1    YOU KNOW, FOR THE ACCOUNTANTS TO GET ON THE SAME PAGE AND SHARE

2    THEIR THOUGHTS.

3    Q.   AND WHOSE SUGGESTION WAS IT THAT HE COME AND BE HERE FOUR

4    DAYS A MONTH?

5    A.   THAT WAS MINE.

6    Q.   DID HE WANT TO BE DOWN HERE FOUR DAYS A MONTH AND NOT AT

7    HOME IN BALTIMORE?

8    A.   YOU KNOW, I NEVER COULD FIGURE THAT OUT.  BECAUSE MARK AND

9    ROD TOLD ME A COUPLE OF TIMES HE MAY EVEN BE THINKING ABOUT

10   MOVING DOWN THERE.  BUT WHEN I TALKED TO HIM ABOUT IT, HE

11   DIDN'T SEEM LIKE HE WAS THAT EXCITED ABOUT IT.

12   Q.   NOW, HAD THERE BEEN SOME EMOTIONAL COMMUNICATIONS GOING ON

13   BETWEEN VARIOUS STAFF MEMBERS OR BETWEEN YOU AND OTHERS OR --

14   OTHERS?

15   A.   YEAH.  IN MY CAREER, I CAN ONLY THINK OF THAT -- THAT WE

16   EVER HAD A PROBLEM AND -- YOU KNOW, EVERYBODY HANDLES THINGS

17   DIFFERENTLY.  AND I STRUCK A NERVE, I BELIEVE, ON ROD AND --

18   WHICH I WAS TRYING TO APOLOGIZE FOR.

19        AND, BUT WE GOT BACK ON THE SAME PAGE AND FIGURED IT OUT

20   AND SAID FRANK WAS GOING TO -- FRANK WOULD COME DOWN AND LOOK

21   AT THE BOOKS.

22   Q.   WAS THERE ANY EFFORT BY YOU TO CONCEAL OR NOT HAVE THE

23   BOOKS TRANSPARENT AND OPEN?

24   A.   NO.  ABSOLUTELY NOT.

25   Q.   THERE'S BEEN REPEATED QUESTIONING OF YOU ON

3302

1  CROSS-EXAMINATION ABOUT THE MONEY GOING TO INDIVIDUAL PLACES

2  OUT OF THE FIRM TO PAY BILLS OR YOUR REQUEST, RIGHT?

3  A.   CORRECT.  UH-HUH.  CORRECT.

4  Q.   FROM YOUR OUTLOOK, WAS THERE ANYTHING WRONG WITH THAT?

5  A.   NO.  JUST COMING OUT OF MY -- OUT OF MY TRANSFERS, COMING

6  OUT OF MY DISTRIBUTIONS.

7  Q.   ALL RIGHT.  WHEN THOSE TRANSFERS WENT OUT, DID YOU

8  CONSIDER THEM TO BE BEING PAID WITH MONEY THAT WAS YOURS?

9  A.   YES.  AND WE HAD HAD THE CONVERSATION WITH ASHA WHERE SHE

10 BRINGS IN THE SHEETS, HER LITTLE STICKIES, AND GOES THROUGH ALL

11 THE INFORMATION ABOUT HOW GREAT EVERYTHING IS AND SAYS

12 EVERYBODY IS GETTING PAID.  SO I THINK THAT'S MONEY THAT'S

13 COMING TO ME PERSONALLY THAT I'M DOING THESE DIFFERENT THINGS

14 WITH, APPARENTLY.

15 Q.   OKAY.  AND DID YOU -- AT THAT POINT, DID YOU EXPECT

16 THERE -- THE CHIEF FINANCIAL OFFICER, THE CONTROLLER, THE

17 BOOKKEEPERS TO KEEP A RECORD OF WHAT HAD BEEN PAID ON YOUR

18 BEHALF?

19 A.   YES, I DID.  AND I THINK THERE HAS BEEN SOME EVIDENCE THAT

20 THEY DID.

21 Q.   AND DID YOU EXPECT, DID YOU EXPECT THAT TO BE CHARGED

22 AGAINST YOU?

23 A.   OH, ABSOLUTELY.  ABSOLUTELY.  IT'S -- YOU KNOW, I EXPECTED

24 THERE TO BE SOMEBODY KEEPING THE RECORDS, SOMEBODY DOING, DOING

25 THE EVEN-UPS, SOMEBODY MAKING SURE EVERYTHING IS, YOU KNOW,

3303

1   GOING THE RIGHT DIRECTION AT -- YOU KNOW, THE 2013 AND '14 TAX

2   RETURNS HADN'T BEEN DONE YET, SO THEY HADN'T REALLY -- I DON'T

3   KNOW IF THEY FINALLY GOT TO DO THOSE EVEN-UPS.

4        BUT, I MEAN, THEY SHOULD HAVE KNOWN WHAT WAS GOING ON.

5   ABSOLUTELY.  SOMEBODY SHOULD HAVE STEPPED FORWARD AND SAID,

6   HEY, HERE'S WHERE WE'RE AT, HERE'S WHAT'S GOING ON.

7   Q.   NOW, YOU WERE PRETTY FRIVOLOUS IN YOUR SPENDING.

8   A.   NOW THAT I'VE SEEN SOME CHARTS, I WOULD HAVE TO AGREE WITH

9   THAT.

10  Q.   AND YOU WEREN'T -- WERE YOU KEEPING UP WITH HOW MUCH YOU

11  WERE SPENDING?

12  A.   NO.

13            THE COURT:  ANYTHING ELSE, MR. GARLAND?

14            MR. GARLAND:  JUST, JUST A LITTLE, YOUR HONOR.

15  BY MR. GARLAND:

16  Q.   IN THE JUNE 1ST -- 21ST, 2013, SHAREHOLDERS AGREEMENT,

17  PARAGRAPH 7(G), PAGE 18, WHICH IS IN EVIDENCE --

18  A.   CORRECT.

19  Q.   -- IT PROVIDES BENEFITS AND COST.  UNLESS OTHERWISE

20  APPROVED BY OFFICIAL ACT OF THE BOARD, THE CORPORATION SHALL

21  CONTINUE TO PAY FOR THOSE BENEFITS AND EXPENSES OF THE

22  SHAREHOLDERS THAT ARE BEING PAID BY THE CORPORATION AS OF THE

23  EFFECTIVE DATE.

24        WERE YOU AWARE OF THAT PROVISION?

25  A.   YES, I AM.  OR, YES, I WAS.

3304

1   Q.   AND WHAT WAS YOUR UNDERSTANDING OF THE MEANING OF THAT

2   PROVISION?

3   A.   WELL, I THOUGHT THE POINT WAS THAT ANYTHING WE HAD DONE

4   PREVIOUSLY, WE WOULD CONTINUE TO DO UNLESS THERE WAS A -- SOME

5   KIND OF MEETING ABOUT IT.

6   Q.   AND THE "WE" BEFORE WERE YOU AND ART MORRIS, RIGHT?

7   A.   THAT'S CORRECT.

8   Q.   AND Y'ALL HAD AN AGREEMENT THAT YOU COULD CHARGE ON YOUR

9   CREDIT CARDS, AND THAT WOULD JUST BE A BENEFIT THAT YOU WOULD

10  RECEIVE, AND OTHER THINGS LIKE THAT, RIGHT?

11  A.   THAT'S WHAT ART TESTIFIED TO, YES.

12  Q.   NOW, YOU WERE CROSS-EXAMINED ON YOUR STATEMENT THAT WHEN

13  YOU DISCOVERED THAT ALTERED BANK STATEMENT, YOU HAD SAID THAT

14  DATE WAS THE END OF YOUR LIFE AS YOU HAD KNOWN IT.  WHAT DID

15  YOU MEAN BY THAT STATEMENT?

16  A.   WHAT I MEANT BY THAT STATEMENT, LOOKING BACK, AS I'VE

17  SPENT THE LAST FOUR, FOUR YEARS DEALING WITH THE FALLOUT,

18  LOOKING AT DOCUMENTS, LOOKING AT E-MAILS, LOOKING AT THIS

19  STUFF, I -- YOU KNOW, I KNOW WHAT REALLY HAPPENED AND I KNOW

20  WHAT I'VE BEEN DEALING WITH.  AND I'M JUST -- IT -- EVERYTHING

21  CHANGED.  I LOST EVERYTHING I HAD.  I LOST EVERYTHING.

22  Q.   WHEN YOU LEARNED ABOUT THE BANK STATEMENT, IN THAT MOMENT,

23  DID YOU KNOW THAT IT WAS THE END OF THE LIFE AS YOU KNEW IT?

24  A.   NO.  NO.  NOT AT THAT MOMENT.  GOING BACK AND LOOKING AT

25  IT, THAT WAS THE FIRST MATCH.  BUT AT THAT POINT, YOU KNOW, WE

3305

1   WERE HOPING THAT SHE WAS -- WHAT SHE SAID WAS TRUE, THAT SHE

2   HAD JUST MADE A MISTAKE.  AND WE HAD PUT THE MONEY IN, WE FIXED

3   IT, WE WOULD HAVE GOT A NEW CONTROLLER, AND WE WOULD HAVE MOVED

4   ON.  BUT, UNFORTUNATELY, IT WAS BIGGER THAN THAT.

5   Q.   NOW, YOU'VE HEARD THE TESTIMONY OF PROFESSOR GINGRAS --

6   A.   UH-HUH.

7   Q.   -- WHO TESTIFIED THAT HE WENT TO THE TAX RETURNS AND THE

8   FINANCIAL RECORDS --

9   A.   UH-HUH.

10  Q.   -- AND DETERMINED THAT THE DISTRIBUTIONS THAT WENT TO THE

11  PARTNERS DURING THE RELEVANT TIME PERIOD TOTAL --

12          MR. PHILLIPS:  OBJECT.  THIS IS ARGUMENTATIVE AND

13  LEADING.

14          MR. GARLAND:  I'M GOING TO ASK ABOUT HIS

15  UNDERSTANDING.  AND HE CROSS-EXAMINED --

16          THE COURT:  I OVERRULE RIGHT NOW.  GO AHEAD AND

17  FINISH YOUR QUESTION.

18  BY MR. GARLAND:

19  Q.   TESTIFIED THAT THE TOTAL DISTRIBUTION --

20          MR. PHILLIPS:  ALSO IRRELEVANT, YOUR HONOR.  IT'S

21  BOLSTERING.  HIS OPINION ABOUT WHAT ANOTHER WITNESS TESTIFIED

22  TO HERE IS NOT RELEVANT.

23          THE COURT:  OVERRULED.

24          MR. GARLAND:  ALL RIGHT.  THANK YOU.

25          THE COURT:  YOU CAN ASK IN THE CONTEXT OF WHETHER HE

3306

1    AGREES WITH IT, SO I'M GOING TO OVERRULE IT AT THIS POINT.

2            GO AHEAD AND ASK YOUR QUESTION, MR. GARLAND.

3    BY MR. GARLAND:

4    Q.   DO YOU AGREE THAT THE FIGURES THAT PROFESSOR GINGRAS

5    PRESENTED CONCERNING WHAT DISTRIBUTIONS WERE ATTRIBUTABLE TO

6    YOUR PARTNERS ARE CORRECT?

7    A.   I MEAN, I WOULD SAY THAT'S AT LEAST, AT LEAST CORRECT.

8    I'M NOT SAYING THERE WAS MORE, BUT AT LEAST THAT WAS CORRECT.

9    Q.   ALL RIGHT.  AND WHY DO YOU SAY AT LEAST CORRECT?

10   A.   WELL, BECAUSE NOBODY'S -- YOU KNOW, NOBODY'S DONE THE --

11   DONE WHAT SHOULD HAVE HAPPENED.  NOBODY'S ADDED UP EVERY

12   SINGLE -- LIKE THEY DID THE CHART FOR ME, THERE SHOULD BE A

13   CHART FOR ALL THE OTHER PARTNERS SO WE CAN GO THROUGH AND SEE

14   WHAT IS ACTUALLY DISTRIBUTIONS, WHAT IS ACTUALLY -- YOU KNOW,

15   WHAT IS EVERYTHING SO WE COULD ACTUALLY SEE IF THERE WAS AN

16   OVERDISBURSEMENT AND WHO IT WAS TO.

17   Q.   YOU HEARD THE TESTIMONY OF THE GOVERNMENT SUMMARY WITNESS

18   IN WHICH SHE SAID THEY HAD NEVER CHECKED THE FORECLOSURE BANK

19   ACCOUNTS, CORRECT?  YOU HEARD THAT?

20   A.   I DID.

21           MR. PHILLIPS:  OBJECTION.  THIS IS BEYOND THE SCOPE

22   OF CROSS.  THERE'S NOT ONE WORD ON CROSS-EXAMINATION.

23           THE COURT:  I AM GOING -- I HAVE GIVEN YOU SOME

24   LATITUDE --

25           MR. GARLAND:  I WITHDRAW THAT QUESTION.

3307

1        THE COURT:  HOLD ON ONE SECOND.

2        -- AS I'VE GIVEN BOTH SIDES SOME LATITUDE ON BOTH.

3        BUT I DO AGREE, MR. GARLAND, YOU NEED TO REIN IT IN

4   NOW AND MAKE POINTS THAT ARE BASED ON BEING TRUE REBUTTAL.

5        SO SUSTAINED.

6   BY MR. GARLAND:

7   Q.   IF YOUR GENERAL AVERAGED PERCENTAGE WAS 50 PERCENT -- OR,

8   EXCUSE ME, 55.3 OR 4 PERCENT, IS IT YOUR UNDERSTANDING THAT YOU

9   WOULD BE ENTITLED TO AT LEAST MORE DISTRIBUTION THAN YOUR

10  PARTNERS GOT?

11  A.   SURE.

12  Q.   OKAY.  AND THIS 26 MILLION DOESN'T INCLUDE THE

13  DISTRIBUTIONS THAT THEY GOT, RIGHT?

14  A.   NO.  THERE'S NO, THERE'S NO INFORMATION ON ANYBODY ELSE.

15  Q.   AND THERE'S NO DEDUCTION ON THE 26 MILLION FOR YOUR

16  LEGITIMATE SHARE OF DISTRIBUTIONS, CORRECT?

17  A.   THAT IS CORRECT.

18  Q.   NOW, DID YOU PAY OUT -- HOW MUCH MONEY DID YOU PAY OUT FOR

19  EXPENSES THAT WERE FOR THE BENEFIT OF THE FIRM AND YOUR

20  MARKETING THAT YOU DID NOT TURN IN AND ASK FOR REIMBURSEMENT

21  FOR?

22  A.   IT'S A BIG NUMBER.  IT'S A BIG NUMBER.

23  Q.   ALL RIGHT.  WELL, LET'S --

24  A.   I MEAN, JUST -- YOU KNOW, JUST BUSINESS THAT WE DID AT THE

25  ST. REGIS.

3308

1   Q.   WE'RE NOT TALKING ABOUT JETS, WE'RE NOT TALKING ABOUT --

2   A.   NO PERSONAL EXPENSES.

3   Q.   -- NOT ANY GAMBLING?

4   A.   NO.  NOTHING PERSONAL.  NO GAMBLING, NO BOOKIES, NO --

5   Q.   WHAT DO YOU ESTIMATE IT TO BE?

6   A.   $10 MILLION, IN THAT RANGE.

7   Q.   ALL RIGHT.  NOW, YOU TALKED ABOUT THE ST. REGIS.  AND YOU

8   GOT A FOOD AND BEVERAGE CREDIT, RIGHT?

9   A.   YES, SIR.

10   Q.   DID YOU SPEND THAT CREDIT THAT YOU PAID FOR WHEN YOU

11   BOUGHT THE CONDOMINIUM FOR THE BENEFIT OF THE LAW FIRM AND YOUR

12   MARKETING?

13   A.   ABSOLUTELY.  A BIG PORTION OF IT.

14   Q.   IN OTHER WORDS, WHEN YOU INVITED THESE PEOPLE OVER, YOU

15   WERE SPENDING THAT MONEY?

16   A.   CORRECT.

17   Q.   ALL RIGHT.  SO IF YOU LOOK AT THIS 26 MILLION FIGURE, IS

18   IT YOUR POSITION, IN FAIRNESS, YOU WOULD HAVE TO TAKE WHAT YOUR

19   PROPER SHARE OF DISTRIBUTIONS AND ADD INTO IT YOUR PROPER SHARE

20   OF WHAT YOU SHOULD HAVE BEEN REIMBURSED?

21   A.   WELL, CERTAINLY THAT'S THE CASE.

22   Q.   ALL RIGHT.  AND IS IT YOUR POSITION THAT YOU WOULD HAVE TO

23   DEDUCT --

24           MR. PHILLIPS:  OBJECTION.  LEADING.

25   BY MR. GARLAND:

3309

1    Q.   WHAT IS YOUR POSITION ABOUT WHETHER THESE THINGS YOU HAVE

2    TALKED ABOUT THAT DIDN'T RELATE TO DISTRIBUTIONS THAT ARE

3    INCLUDED, WHAT SHOULD BE DONE WITH THOSE?

4    A.   WELL, THE BOTTOM LINE IS WE SHOULD -- EVERYTHING SHOULD

5    COME OUT THAT SHOULDN'T BE IN THE $26 MILLION THAT'S SOMETHING

6    ELSE.  AND EVEN A TRANSFER, A REAL ESTATE DEAL, WHATEVER IT IS,

7    THAT SHOULD ALL COME OUT, GET IT TO ACTUAL DISTRIBUTIONS.  GET

8    EVERYBODY ELSE'S ACTUAL DISTRIBUTIONS, PUT THEM IN A POT, AND

9    THEN DO THE PERCENTAGES.  THEN YOU'D KNOW WHAT THE SITUATION

10   IS.

11   Q.   BASED ON THE DATA, THE FACTS, AND THE TESTIMONY OF THE

12   ACCOUNTING PROFESSIONAL, DO YOU BELIEVE YOU WERE OVERDISBURSED?

13           MR. PHILLIPS:  OBJECTION.  LEADING, ARGUMENTATIVE.

14           THE COURT:  OVERRULED.  OVERRULED.

15           THE WITNESS:  NO.  WHEN I -- I'VE HAD TWO PEOPLE LOOK

16   AT IT.  MY PERSONAL ACCOUNTANT, TONY ADAMS, LOOKED AT IT ABOUT

17   FOUR OR FIVE MONTHS AFTER IT HAPPENED.  AND HE SAID ONCE YOU

18   WENT THROUGH ALL THIS STUFF, THAT I WAS NOT OVERDISBURSED.  AND

19   NOW MR. GINGRAS SAID THE SAME THING.  HAD TWO PEOPLE TELL ME

20   THAT.

21   BY MR. GARLAND:

22   Q.   AND TO YOUR KNOWLEDGE, MR. GINGRAS HAS NEVER TALKED TO

23   TONY ADAMS?

24   A.   TO MY KNOWLEDGE, THEY HAVE NEVER TALKED.

25           MR. GARLAND:  YOUR HONOR, THAT'S ALL MY QUESTIONS.

3310

1          THE COURT:  OKAY.  RIGHT ON TIME.  WE'RE GOING TO

2     TAKE A QUICK BREAK, 10 MINUTES.  THANK YOU SO MUCH.

3          (WHEREUPON, THE JURY RETIRED FROM THE COURTROOM AT

4     3:00 P.M., AND THE FOLLOWING PROCEEDINGS WERE HAD.)

5          THE COURT:  OKAY.  YOU MAY BE SEATED.  WE'LL TAKE A

6     10-MINUTE BREAK.

7          BEFORE WE DO, I WILL TELL YOU THAT, MR. PHILLIPS, AND

8     HOPEFULLY WE WON'T HAVE TO BELABOR THIS ANYMORE, I DID LOOK AT

9     THE *ZAK* CASE.  I HAVE NOT FOUND ANY CASE IN ANY CIRCUIT THAT

10    AUTOMATICALLY ALLOWS THE GOVERNMENT TO ASK QUESTIONS ABOUT

11    WHETHER A DEFENDANT FAILED TO PAY TAXES BASED ON HIS TAKING THE

12    STAND AND OPENING HIS CREDIBILITY UP.  AND THAT REALLY JUST --

13    THAT ARGUMENT CUTS COMPLETELY AGAINST THE RULE ON CHARACTER

14    EVIDENCE.

15         THE *ZAK* CASE IS DISTINGUISHABLE.  IT'S NOT A TAX

16    CASE.  IT IS A CASE WHERE THE DEFENDANT WAS CHARGED WITH BANK

17    FRAUD, AND HIS DEFENSE WAS THAT HE MADE A MISTAKE ON SOMETHING

18    THAT HE SUBMITTED TO THE BANK.  SO THEY MADE A 404(B) ARGUMENT

19    SHOWING THAT IN 1989 HE HAD DONE THE SAME THING.

20         NOW, IT WAS ANALYZED UNDER 404(B).  IT SHOULD HAVE

21    BEEN ANALYZED UNDER 608(B), IMPEACHMENT, BECAUSE IT WAS IN

22    CROSS.

23         BUT IN ANY EVENT, IT'S CLEAR, BOTH FROM THE TEXT AND

24    THE *ZAK* CASE AND 608(B), THAT IT HAS TO BE APPROVED BY THE

25    COURT.  IT'S IN THE COURT'S DISCRETION.  AND IF YOU LOOK AT

3311

1   FOOTNOTE 2 OF THE *ZAK* CASE, THE COURT HAD MADE A RULING IN THAT

2   CASE WHICH ALLOWED THEM TO GET INTO THAT.  I ALSO MADE A RULING

3   INTO THIS CASE WHICH SPECIFICALLY SAID YOU COULD NOT GET INTO

4   IT.

5           SO I URGE YOU TO LOOK AGAIN NOT ONLY AT THE CASES

6   THAT YOU HAVE CITED TO ME -- AND THE OTHER ONES WERE CIVIL

7   CASES, WHICH ARE VERY DIFFERENT -- WHEN A CRIMINAL DEFENDANT, A

8   DEFENDANT IN A CRIMINAL CASE TAKES THE STAND AND THE GOVERNMENT

9   THINKS THEY CAN JUST GO INTO ANYTHING BECAUSE HE HAS TAKEN THE

10  STAND.  SO I URGE YOU TO LOOK AT THAT.  LOOK AT THE RULE AGAIN.

11  AND, AGAIN, IF YOU NEED TO, REVIEW MY PRETRIAL RULINGS.

12          IT CONCERNS ME THAT AN ARGUMENT HAS BEEN MADE THAT

13  BECAUSE A DEFENDANT HAS TAKEN THE STAND, HE HAS JUST OPENED THE

14  DOOR TO HIS CREDIBILITY CARTE BLANCHE.  THAT IS JUST NOT THE

15  CASE, AND THAT'S A DANGEROUS POSITION TO TAKE.  SO, AGAIN, I

16  JUST URGE YOU TO REEVALUATE THIS.

17          WE'LL TAKE A 10-MINUTE BREAK.

18          THE COURTROOM SECURITY OFFICER:  ALL RISE.  COURT'S

19  IN RECESS.

20          (WHEREUPON, A BRIEF RECESS WAS HAD FROM 3:03 P.M. TO

21  3:14 P.M.)

22          MR. GILFILLAN:  JUDGE, I APOLOGIZE.  CAN WE TAKE UP A

23  MATTER BEFORE THE JURY COMES IN?

24          THE COURT:  OKAY.  YES, GOVERNMENT.

25          MR. GILFILLAN:  I HAVE TWO QUESTIONS.  MY FIRST

3312

1    QUESTION IS WHETHER THE DEFENSE HAS TENDERED MR. HARDWICK.

2            MR. GARLAND:  YES.

3            THE COURT:  OKAY.  BUT YOU DID SAY THAT WAS YOUR LAST

4    QUESTION AT THE SAME TIME THAT I WAS GIVING A BREAK.  SO, YES.

5            MR. GILFILLAN:  SECOND QUESTION IS WHETHER -- OH, I'M

6    SORRY.  MR. GARLAND TOLD ME -- AND I WANT TO -- I WOULD LIKE TO

7    TAKE IT UP IF THIS IS CORRECT.  MR. GARLAND TELLS ME THAT THEY

8    INTEND TO CALL J.P. GINGRAS TO THE STAND AFTER MR. HARDWICK.

9    AND IF THAT'S THE CASE, THEN I'D LIKE TO TAKE THAT UP WITH THE

10   COURT.

11           THE COURT:  OKAY.  MR. GARLAND?

12           EVERYBODY FEEL FREE TO BE SEATED.  SORRY.  I'M GOING

13   TO STAND BECAUSE I'M GOING TO BE SEATED FOR A WHILE COMING UP,

14   SO --

15           MS. NOVAY:  CAN WE STAND?

16           THE COURT:  NO, YOU CAN STAND OR BE SEATED.  THAT

17   GOES FOR EVERYONE.

18           MR. GARLAND?

19           MR. GARLAND:  YOUR HONOR, DURING CROSS-EXAMINATION,

20   AN EXAMINATION WAS DONE CONCERNING THE 2012 TAX RETURN, AND THE

21   2012 TAX RETURN -- I MEAN, THE TAXABLE INCOME WAS COMPARED TO

22   THE $7 MILLION IN TRANSFERS TO MR. HARDWICK.  AND THE INFERENCE

23   WAS MADE THAT THERE WAS SOMETHING WRONG WITH HIS TAX RETURN

24   BECAUSE HE GOT 7 MILLION AND IT'S NOT ON HIS TAX RETURN.  THAT

25   HAD NOT OCCURRED BEFORE NOW.

3313

1        I WILL CALL MR. GINGRAS TO TESTIFY ON THAT SINGLE

2   SUBJECT, THAT THIS TAX RETURN IS PERFECT AND ABSOLUTELY CORRECT

3   AND SHOULD NOT SHOW THOSE DISTRIBUTIONS.

4        THIS HAS BEEN A POSITION TAKEN BY THE GOVERNMENT IN

5   THEIR CHARTS WHICH IS INCORRECT, AND THEY PROCEEDED TO DO IT

6   AGAIN.  AND THEY'VE HEARD TWO EXPERTS TESTIFY THAT IT'S --

7        THE COURT:  WELL, LET ME ASK YOU THIS, MR. GARLAND --

8   AND I DON'T REMEMBER ALL THE TESTIMONY THAT WAS OFFERED ON THAT

9   POINT, AND I'M NOT SURE THAT I INTERPRET THE INSINUATION THE

10  SAME WAY AS YOU.

11       BUT IF IT DID EXIST ON THESE CHARTS, WAS IT NOT

12  SOMETHING THAT YOU DID OR COULD HAVE COVERED WITH MR. GINGRAS

13  THIS FIRST TIME ON THE STAND, OR ARE YOU SAYING THAT IT JUST

14  CAME UP ON A CHART THAT WE JUST SAW?

15       MR. GARLAND:  THE FIRST PART OF THIS CASE, WHERE THEY

16  ATTEMPTED TO ESTABLISH PROOF DIRECTED AT THE 2012 TAX RETURN,

17  AND IT HAD NOT BEEN DONE IN THEIR PRESENTATIONS BEFORE I

18  BROUGHT -- BEFORE THEY DID IT NOW.

19       THE COURT:  BUT IT WAS ON THEIR CHART, IT JUST WASN'T

20  EMPHASIZED IN COURT?  I'M NOT SURE I UNDERSTAND YOUR POINT.

21       MR. GARLAND:  IT WAS NOT -- WITH THE DEFENDANT ON THE

22  STAND --

23       THE COURT:  YES.

24       MR. GARLAND:  -- THERE WAS NOT THE INFERENCE MADE

25  ABOUT THE CORRECTNESS OF THIS TAX RETURN DIRECTLY UNTIL THAT

3314

1    TIME.

2              THE COURT:  OKAY.  LET ME HEAR FROM THE GOVERNMENT.

3              ALL RIGHT.  GOVERNMENT.

4              MR. GILFILLAN:  YOUR HONOR, THE ISSUE OF MR. HARDWICK

5    NOT REPORTING INCOME ON HIS TAX RETURNS WAS ADDRESSED IN THE

6    GOVERNMENT'S 404(B) NOTICE.  THE TAX RETURN AT ISSUE CAME IN IN

7    THE GOVERNMENT'S CASE IN CHIEF.  MR. GINGRAS HAD PLENTY OF

8    OPPORTUNITY TO ADDRESS IT DURING HIS TESTIMONY.

9              AND THEN THE OTHER ISSUE IS THAT THE OPPORTUNITY FOR

10   THE DEFENSE TO ADDRESS THIS IS IN REDIRECT OF MR. HARDWICK.

11             AND THEN, FINALLY -- AND I -- IT'S IMPROPER FOR THE

12   DEFENSE TO PAY SOMEBODY TO SIT IN THE COURTROOM.  YOUR HONOR

13   HAS EXCUSED HIM FROM THE RULE OF SEQUESTRATION.

14             THE COURT:  YES, I HAVE.  WE'VE TAKEN THAT UP.  AND

15   THAT'S AGAIN BECAUSE WE HAVE -- AGAIN, I COULD NOT CLEARLY

16   UNDERSTAND WHAT DOCUMENTS HE HAD RECEIVED BEFORE TRIAL AND

17   WHICH HE HADN'T.  SO I UNDERSTAND THIS POINT KEEPS GETTING

18   EMPHASIZED.  BUT YOU'RE RIGHT.  AND THAT WAS PART OF THE BASIS,

19   IS THAT I COULD NOT MAKE THAT DETERMINATION FROM WHAT I KNEW.

20             MR. GILFILLAN:  WHAT THIS HAS TRANSFORMED INTO IS

21   THAT THE DEFENSE HAS A PAID WITNESS WHO IS GOING TO SIT IN THE

22   COURTROOM AND IS GOING TO TAKE THE STAND AND DELIVER TESTIMONY

23   WITH -- THEY'RE NOW CALLING HIM A PROFESSOR.  HE'S A CPA.  HE'S

24   GOING TO LOOK AT THE JURY AND PERSUADE THEM.  IN --

25             THE COURT:  OKAY.  THANK YOU.

3315

1              MR. GILFILLAN:  -- WHAT WORLD IS THAT PROPER UNDER

2     DAUBERT?

3              MR. GARLAND:  YOUR HONOR, IF THE GOVERNMENT WILL

4     STIPULATE THERE IS NO --

5              THE COURT:  YEAH.  GO AHEAD, MR. GARLAND.  GO AHEAD,

6     RESPECTFULLY.  GO AHEAD.

7              MR. GARLAND:  IF THE GOVERNMENT WILL STIPULATE THAT

8     THEY MAKE NO CONTENTION THAT THERE IS ANYTHING WRONG WITH THE

9     2012 TAX RETURN, THAT WOULD END THE ISSUE.

10             BUT IF THEY ARE GOING TO GET UP AND ARGUE TO THIS

11    JURY THAT HE FILED A FALSE TAX RETURN, THEN -- AND THEY DID A

12    DELIBERATE EMPHASIS OF IT IN EXAMINATION -- WE HAVE A

13    CONSTITUTIONAL RIGHT TO MEET THAT ISSUE --

14             THE COURT:  ALL RIGHT.

15             MR. GARLAND:  -- CERTAINLY THAT ISSUE.

16             THE COURT:  MR. GARLAND, I DO NOT FIND THAT I AM

17    VIOLATING ANY CONSTITUTIONAL RIGHT BY NOT PERMITTING YOU TO

18    RECALL HIM AT THIS POINT.  I FIND THAT YOU HAVE BEEN

19    KNOWLEDGEABLE ABOUT THESE -- OF THESE ARGUMENTS.  THERE WERE

20    SEVERAL PRETRIAL MOTIONS MADE WITH RESPECT TO NOT FILING TAXES

21    AND THE DIFFERENT TAX RETURNS FOR THE DIFFERENT YEARS.

22             AND WHAT I FEAR IS THAT FOR EVERYTHING THAT COMES UP,

23    WHETHER IT'S NOW, IN MR. HARDWICK'S TESTIMONY, OR IN THE

24    GOVERNMENT'S REBUTTAL EXPERT, ANY TIME YOU WANT TO REVISIT AN

25    ISSUE, YOU'RE GOING TO ASK TO RECALL A WITNESS.

3316

1          AND, SIMPLY, I WOULD TAKE THAT INTO ACCOUNT IF I

2   THOUGHT THERE WAS SOME REASON THAT YOU COULD NOT HAVE

3   ESTABLISHED THAT LINE OF QUESTIONING THE FIRST TIME AROUND.

4   I'VE HEARD YOUR POSITION, BUT I DON'T FIND THAT THAT IS THE

5   CASE.

6          AND SO BASED ON WHAT I'VE HEARD THUS FAR, I'M NOT

7   GOING TO PERMIT YOU TO RECALL MR. GINGRAS TO ASK HIM QUESTIONS

8   THAT I THINK YOU COULD HAVE ASKED HIM THE FIRST TIME AROUND.

9          MR. GARLAND:  I MOVE THAT THE GOVERNMENT --

10         THE COURT:  AND THAT'S IN THIS WORLD.  THAT'S THE

11  WORLD WE'RE DEALING WITH RIGHT NOW, MR. GILFILLAN, IF IT'S OKAY

12  WITH YOU.

13         MR. GARLAND.

14         MR. GARLAND:  I WOULD MOVE THAT THE GOVERNMENT BE

15  BARRED FROM MAKING AN ARGUMENT THAT THERE'S PROOF IN THE RECORD

16  FROM WHICH THEY COULD INFER THAT MR. HARDWICK INCORRECTLY FILED

17  HIS 2012 TAX RETURN.

18         AND IN THE REAL WORLD, AND IN THIS COURTROOM, THIS

19  COURT KNOWS THAT, IN FACT, A COMPARISON BETWEEN THE TAXABLE

20  INCOME AND DISTRIBUTIONS IS, BY ITS NATURE, INCORRECT.  IN

21  OTHER WORDS, COULD BE USED TO DESCRIBE HOW IT IS MISLEADING.

22  AND THIS COURT SHOULD NOT ALLOW THAT BASED ON THIS RECORD.  AND

23  I --

24         THE COURT:  ALL RIGHT.  THANK YOU FOR YOUR RECORD.  I

25  WILL NOT SO INSTRUCT THE GOVERNMENT.  I HAVE HEARD YOU.  I HAVE

1    ALLOWED YOU TO MAKE THE RECORD.  IF YOU WANT TO COMPLETE THE

2    RECORD BRIEFLY, YOU MAY DO SO, AND THEN WE WILL RECEIVE THE

3    JURY AGAIN.

4            MR. GARLAND:  I WANT THE RECORD CLEAR THAT NOWHERE IN

5    THE GOVERNMENT'S PRESENTATION UP TO THIS MOMENT OF EXAMINATION

6    HAVE THEY TAKEN ANY POSITION THAT THE 2012 TAX RETURN WAS

7    INCORRECT.  IT WAS NOT AN ISSUE.

8            WE PUT THE DEFENDANT UP WHEN THEY HAD NOT MADE IT AN

9    ISSUE.  AND THEN THEY MADE IT AN ISSUE ON HIS

10   CROSS-EXAMINATION.  IT'S THEREFORE, IN YOUR DISCRETION, WE

11   SHOULD BE ALLOWED, IN FAIRNESS, TO MEET THAT.  AND I ASK YOU TO

12   RECONSIDER YOUR RULING.

13           THE COURT:  THANK YOU, SIR.  OKAY.  I WILL NOT DO SO

14   AT THIS TIME.

15           LET'S RECEIVE THE JURY.

16           LET ME SAY ONE MORE THING, AND I'M GOING TO -- I'M

17   GOING TO SAY THIS ONE MORE TIME.  I'VE SAID IT A COUPLE OF

18   TIMES, BUT I'LL SAY IT AGAIN.

19           I -- AND THIS IS NOT MEANT FOR YOU JUST BECAUSE YOU

20   SPOKE LAST.  I STRIVE TO TREAT YOU ALL WITH THE UTMOST RESPECT

21   AND PROFESSIONALISM.  I CERTAINLY APPRECIATE THE SAME FOR

22   MYSELF AND MY STAFF.  AND SOME OF THE THINGS I'VE SEEN, I JUST

23   CAN'T BELIEVE.  I CANNOT FATHOM.

24           BUT CONTINUE TO CONDUCT YOURSELVES THE WAY THAT YOU

25   ARE ACCUSTOMED TO DOING.  BUT I WILL JUST TELL YOU THAT IT JUST

3318

1    BOGGLES MY MIND THAT SOME OF YOU HAVE GOTTEN TO THIS POINT

2    BEING AS DISRESPECTFUL AS YOU ARE.

3              LET'S GET THE JURY IN.

4              (WHEREUPON, THE JURY RETURNED TO OPEN COURT AT

5    3:23 P.M., AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD.)

6              THE COURT:  ALL RIGHT.  THE JURY IS IN PLACE.

7    EVERYONE MAY BE SEATED.

8              AND, MR. PHILLIPS, DO YOU HAVE ANY RECROSS?

9              MR. PHILLIPS:  NO, YOUR HONOR.

10             THE COURT:  ALL RIGHT.  THANK YOU SO MUCH.

11             MR. HARDWICK, YOU MAY STEP DOWN AND REJOIN YOUR

12   COUNSEL AT COUNSEL TABLE, SIR.

13             THE WITNESS:  THANK YOU.

14             THE COURT:  ALL RIGHT.  THANK YOU.

15             ALL RIGHT.  DEFENSE, CALL YOUR NEXT WITNESS.

16             MR. GARLAND:  YOUR HONOR, AT THIS TIME THE DEFENSE

17   RESTS ITS DEFENSE.

18             THE COURT:  ALL RIGHT.  GOVERNMENT, DO YOU HAVE ANY

19   ISSUES TO BE TAKEN UP BEFORE YOU MAKE AN ANNOUNCEMENT WITH

20   RESPECT TO WHETHER YOU WILL PRESENT REBUTTAL?

21             MR. PHILLIPS:  NO, YOUR HONOR, BUT WE DO HAVE A

22   REBUTTAL WITNESS.

23             THE COURT:  ALL RIGHT.  ALL RIGHT.

24             MR. GARLAND:  YOUR HONOR, AT THIS TIME I WOULD HAVE A

25   MOTION SUBJECT -- WE WOULD REST SUBJECT TO GETTING OUR EVIDENCE

3319

1    IN, CHECKING OUR EXHIBITS.

2              THE COURT:  UNDERSTOOD.

3              MR. GARLAND:  AND PRIOR TO THE COMMENCEMENT OF A

4    REBUTTAL CASE, WE HAVE A MOTION WE WISH TO MAKE TO THE COURT.

5              THE COURT:  ALL RIGHT.  YOU WISH TO MAKE A MOTION NOW

6    OUTSIDE THE PRESENCE OF THE JURY.  IS THAT WHAT YOU'RE SAYING?

7              MR. GARLAND:  YES, WE DO.

8              THE COURT:  ALL RIGHT.

9              LADIES AND GENTLEMEN, SORRY.  IF YOU WILL GO BACK

10   OUT.

11             (WHEREUPON, THE JURY RETIRED FROM THE COURTROOM AT

12   3:25 P.M., AND THE FOLLOWING PROCEEDINGS WERE HAD.)

13             THE COURT:  ALL RIGHT.  YOU MAY BE SEATED.

14             AND, MR. GARLAND, YOU MAY MAKE YOUR MOTION.

15             MS. NOVAY:  YOUR HONOR, I'M ACTUALLY GOING TO BE

16   ARGUING THE MOTION.  IT'S ALL RIGHT IF I DO IT FROM COUNSEL

17   TABLE, I ASSUME.

18             THE COURT:  YES.  DEFINITELY.  THANK YOU, MA'AM.

19             MS. NOVAY:  FAIRLY QUICKLY.  SO AT THIS TIME THE

20   DEFENSE WOULD MOVE FOR A RULE 29 ON A DIRECTED VERDICT OF

21   ACQUITTAL ON ALL 23 COUNTS OF THE INDICTMENT.

22             IF I COULD JUST GO IN ORDER, THAT WOULD BE BEST.

23             THE FIRST COUNT IS THE CONSPIRACY COUNT, COUNT 1.  I

24   MOVE FOR A DIRECTED VERDICT BECAUSE THE GOVERNMENT HAS NOT MET

25   ITS BURDEN.  AND, LARGELY, I MAKE THE SAME ARGUMENTS, WHICH I

3320

1    WON'T REPEAT TO THE COURT.  BUT THE CONCERN, AGAIN, IS THAT

2    THERE HAS TO BE, THERE HAS TO BE SOME, SOME COORDINATED

3    CONSPIRACY.

4            I THINK THE GOVERNMENT HAS SHOWN CERTAINLY, AND THE

5    EVIDENCE HAS SHOWN, THAT THERE IS SOME SCHEME ON THE PART OF

6    MS. MAURYA.  EVEN LOOKING AT THE EVIDENCE IN THE LIGHT MOST

7    FAVORABLE TO THE GOVERNMENT, PERHAPS SOME SCHEME ON BEHALF OF

8    MR. HARDWICK, ALTHOUGH THERE'S STILL NO EVIDENCE OF ANY

9    CONSPIRACY BETWEEN THE TWO.  WE HAVEN'T HEARD FROM MS. MAURYA.

10   THERE'S JUST BEEN A FEW E-MAILS.  THE SUM TOTAL I THINK IS FOUR

11   E-MAILS THAT THE GOVERNMENT HAS PUT IN, AS WELL -- SAYING,

12   LET'S HAVE A MEETING, SEND THIS CASH, SEND THIS DISTRIBUTION,

13   SEND THIS TRANSFER TO WHEREVER.

14           BUT MR. HARDWICK HAS TESTIFIED THERE WAS NO

15   CONSPIRACY.  MS. MAURYA HAS NOT TESTIFIED THAT THERE WAS ONE.

16   SO, LARGELY, ALL WE HAVE ARE THESE STATEMENTS WHICH ARE, AT

17   BEST, AMBIGUOUS.

18           THE COURT:  ALL RIGHT.

19           MS. NOVAY:  THAT WOULD BE MY ARGUMENT FOR COUNT 1.

20   SHOULD I JUST GO THROUGH ALL OF THEM OR --

21           THE COURT:  YES, MA'AM.

22           MS. NOVAY:  OKAY.  THE NEXT, 2 THROUGH 22, I WILL DO

23   IN A BATCH.  THOSE ARE THE WIRE COUNTS.  AGAIN, I WON'T REPEAT

24   ALL OF MY ARGUMENTS.  BUT THE GOVERNMENT HAS TO SHOW THAT

25   MR. HARDWICK WAS NOT ENTITLED TO THE MONEY THAT WAS RECEIVED.

1           OUR ARGUMENT IS THAT, EVEN LOOKING AT THE EVIDENCE IN

2    THE LIGHT MOST FAVORABLE TO THE GOVERNMENT, IT HAS FALLEN

3    SHORT.  THAT THE ALLEGATION MR. HARDWICK HAS RECEIVED JUST TOO

4    MUCH IS STILL NOT ENOUGH TO MEET THAT STANDARD.

5           THE COURT AT THIS POINT HAS HEARD FROM MR. GINGRAS,

6    AND MR. GINGRAS HAS TESTIFIED IN FACT THAT IT'S ACTUALLY QUITE

7    THE OPPOSITE.  WHATEVER THE MATH COMES OUT TO, THE THEORY THAT

8    MR. HARDWICK SIMPLY RECEIVED TOO MUCH AND RECEIVED MORE THAN TO

9    WHICH HE WAS ENTITLED TO, AND CERTAINLY THAT HE KNOWINGLY

10   RECEIVED TOO MUCH, IS UNCLEAR, AT BEST.

11          THE COURT:  AND ON THAT ARGUMENT -- AND, AGAIN, WE

12   TALKED ABOUT THIS SOME TIME -- FOR SOME LENGTH OF TIME THE

13   FIRST DIRECTED VERDICT MOTION.  IT'S YOUR POSITION THAT, EVEN

14   THOUGH THE COUNTS THEMSELVES ONLY ALLEGE CERTAIN WITHDRAWALS

15   FROM IOLTA ACCOUNTS, THE GOVERNMENT MUST PROVE THE AMOUNT TO

16   WHICH MR. HARDWICK WAS ENTITLED BECAUSE THAT LANGUAGE APPEARS

17   IN THE MANNER AND MEANS, EVEN THOUGH NOT IN THE EXACT COUNTS?

18          MS. NOVAY:  YES.

19          THE COURT:  OKAY.

20          MS. NOVAY:  YES.

21          THE COURT:  ALL RIGHT.

22          MS. NOVAY:  THAT IS OUR POSITION.

23          THE COURT:  ALL RIGHT.

24          MS. NOVAY:  AGAIN, I WON'T RELITIGATE MY POINTS THAT

25   I'VE ALREADY MADE TO THE COURT.

3322

1          AND THEN, FINALLY, WE HAVE COUNT 23, WHICH IS THE

2    FALSE STATEMENT COUNT.

3          THE COURT:  ALL RIGHT.

4          MS. NOVAY:  WE'VE STIPULATED THAT THE BANK WAS FDIC

5    INSURED, SO REALLY THAT PRONG IS NOT AN ISSUE.  BUT THERE'S

6    STILL THE CONCERN THAT HE KNOWINGLY MADE A FALSE STATEMENT TO

7    THE BANK WITH THE INTENT TO INFLUENCE THE BANK.

8          AFTER HEARING FROM THE BANK OFFICER AND HEARING FROM

9    MR. HARDWICK, EVEN AFTER DISCLOSING THIS D&H LOAN -- AND IF THE

10   COURT WILL RECALL, THERE WERE ACTUALLY TWO LAWSUITS THAT WERE

11   AT ISSUE IN COUNT 3.  THAT WAS THE D&H LOAN LAWSUIT AND THE

12   BELLAGIO LAWSUIT.  WITH RESPECT TO THE D&H LOAN, THERE WERE --

13   EVEN AFTER IT WAS DISCLOSED A FEW MONTHS AFTER THE LOAN WAS

14   MADE -- AND, AGAIN, I CALL IT A LOAN; IT'S REALLY A LINE OF

15   CREDIT WAS MADE -- THERE WERE STILL LOANS THAT CONTINUED TO BE

16   MADE TO MR. HARDWICK.  I THINK THERE WERE FOUR MORE LOANS THAT

17   WERE CONTINUED TO BE MADE.

18         SO THE ARGUMENT THAT IT INFLUENCED HER OR ATTEMPTED

19   TO INFLUENCE HER OR IN FACT DID INFLUENCE HER I THINK DOESN'T

20   HOLD WATER.

21         THE SECOND ISSUE WOULD BE THE BELLAGIO MATTER.

22   MR. MANOLL TESTIFIED, AGAIN, THAT THIS WAS A -- THERE WAS --

23   GENERALLY, WHEN THERE'S A SIGNED, NOT EVEN SIGNED, BUT WHEN

24   THERE'S A SETTLEMENT AGREEMENT IN PLACE, IT WOULD BE REASONABLE

25   TO CONSIDER THE LITIGATION NO LONGER PENDING.  CONSIDER IT

3323

1    OVER, I THINK WERE HIS WORDS.

2           MR. HARDWICK TESTIFIED ROUGHLY AS TO THE SAME.  AND A

3    MONTH BEFORE THIS LOAN WENT THROUGH, MAY 10TH OF 2011, I THINK

4    IT WAS IN APRIL OF 2011 THAT A SIGNED SETTLEMENT AGREEMENT WAS

5    IN PLACE IN THAT LAWSUIT.

6           I REALIZE I'M REPEATING MYSELF SOMEWHAT, BUT FOR ALL

7    THOSE REASONS WE MOVE FOR A DIRECTED VERDICT.

8           THE COURT:  ALL RIGHT.  THANK YOU.

9           GOVERNMENT'S RESPONSE.

10          MR. PHILLIPS:  YOUR HONOR, THE EVIDENCE THAT THE

11   GOVERNMENT PUT IN TO GET PAST RULE 29 AT THE END OF THE

12   GOVERNMENT'S CASE IN CHIEF DIDN'T GO AWAY.  THE ONLY THING THAT

13   HAPPENED IS THE DEFENDANT PUT UP SOME EVIDENCE, INCLUDING THE

14   DEFENDANT HIMSELF, WHO TESTIFIED.  AND THE CASE LAW IS QUITE

15   CLEAR THAT THE JURY IS ENTITLED TO REJECT THE DEFENDANT'S

16   TESTIMONY AND FIND THAT HE TESTIFIED FALSELY AND FIND THAT HIS

17   TESTIMONY WAS THE OPPOSITE OF THE TRUTH.

18          SO THE COURT IS NOT REQUIRED TO GRANT A JUDGMENT OF

19   ACQUITTAL NOR SHOULD THE COURT GRANT A JUDGMENT OF ACQUITTAL

20   JUST BECAUSE THE DEFENDANT TESTIFIED THAT HE'S INNOCENT OR THAT

21   THE GOVERNMENT'S EVIDENCE DOESN'T MAKE SENSE OR THAT, FOR

22   WHATEVER REASON, HE HAS AN EXPLANATION FOR IT.

23          THERE'S ENOUGH EVIDENCE FOR ALL OF THESE COUNTS TO GO

24   TO THE JURY.  AND NOTHING HAS CHANGED ON THAT FRONT SINCE THE

25   COURT DENIED THE RULE 29 MOTION AT THE END OF THE GOVERNMENT'S

3324

1    CASE.

2            THE COURT:  ALL RIGHT.  FOR THE REASONS PREVIOUSLY

3    STATED, THE COURT DOES DENY THE DEFENSE'S MOTIONS FOR DIRECTED

4    VERDICT ON THE COUNTS JUST NOW LAID OUT.

5            IS THERE ANYTHING ELSE BEFORE WE TURN TO THE

6    GOVERNMENT FOR REBUTTAL?  GOVERNMENT?

7            MR. PHILLIPS:  NOT FROM THE GOVERNMENT, YOUR HONOR.

8            THE COURT:  DEFENSE?

9            MR. GARLAND:  NO, YOUR HONOR.

10           THE COURT:  ALL RIGHT.  ALL RIGHT.  GOVERNMENT, YOU

11   ARE GOING TO -- AT THIS TIME YOU PLAN TO CALL HOW MANY

12   WITNESSES IN REBUTTAL, PLEASE?

13           MR. PHILLIPS:  JUST ONE, YOUR HONOR.

14           THE COURT:  ALL RIGHT.  ALL RIGHT.  LET'S BRING THE

15   JURY IN.

16           (WHEREUPON, THE JURY RETURNED TO OPEN COURT AT

17   3:32 P.M., AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD.)

18           THE COURT:  ALL RIGHT.  THE JURY IS IN PLACE.

19   EVERYONE MAY BE SEATED.  THANK YOU SO MUCH.

20           LADIES AND GENTLEMEN, BEFORE THE BREAK, YOU HEARD THE

21   DEFENSE RESTED ITS CASE.  AS I TOLD YOU AT THE BEGINNING OF

22   THIS CASE IN MY PRELIMINARY INSTRUCTIONS, UNDER SOME

23   CIRCUMSTANCES, THE GOVERNMENT MAY ELECT TO PRESENT REBUTTAL

24   EVIDENCE.  THEY HAVE INDICATED THAT THEY INTEND TO CALL ONE

25   WITNESS.

3325

1          AND SO, GOVERNMENT, I TURN MY ATTENTION TO YOU TO DO

2     THAT AT THIS TIME.

3          MS. BARRON:  THANK YOU, YOUR HONOR.  THE GOVERNMENT

4     RECALLS MR. MARK WITTSTADT.

5          THE COURT:  ALL RIGHT.  MR. WITTSTADT?

6          HELLO, AGAIN, MR. WITTSTADT.

7          MR. WITTSTADT:  GOOD AFTERNOON, YOUR HONOR.

8          THE COURT:  AND IF YOU COULD COME AROUND.  AND EVEN

9     THOUGH YOU HAVE PREVIOUSLY BEEN SWORN IN THIS TRIAL, I WILL

10    SWEAR YOU AGAIN SINCE THAT WAS DAYS AGO, PERHAPS NOT EVEN THE

11    SAME WEEK.

12          SO IF YOU WILL RAISE YOUR RIGHT HAND.

13                    MARK WITTSTADT,

14    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

15    FOLLOWS:

16          THE COURT:  ALL RIGHT.  IF YOU WOULD TAKE THE SEAT,

17    PLEASE.  AND, AGAIN, IF YOU WOULD FIRST STATE AND THEN PLEASE

18    SPELL YOUR NAME FOR THE RECORD.

19          THE WITNESS:  MARK WITTSTADT, W-I-T-T-S-T-A-D-T.

20                    DIRECT EXAMINATION

21    BY MS. BARRON:

22    Q.   GOOD AFTERNOON, MR. WITTSTADT.

23    A.   GOOD AFTERNOON, MA'AM.

24    Q.   I WANT TO START BY TALKING ABOUT WHETHER DISTRIBUTIONS TO

25    PARTNERS WERE MADE OR WERE -- COULD HAVE BEEN MADE FROM

3326

1   AVAILABLE CASH AS OPPOSED TO NET INCOME.  AND I'M GOING TO

2   START BY SHOWING YOU WHAT HAS PREVIOUSLY BEEN ADMITTED AS

3   GOVERNMENT'S EXHIBIT 1035.  DO YOU RECALL TALKING ABOUT THIS

4   EXHIBIT ON YOUR DIRECT EXAM?

5   A.   I DO.

6   Q.   OKAY.  AND DO YOU RECALL TESTIFYING THAT THE AMOUNTS IN

7   THE COLUMN HERE IN THE MIDDLE CORRESPOND WITH THE SPECIFIC WIRE

8   TRANSFERS MENTIONED IN EACH OF THESE GOVERNMENT EXHIBITS?

9   A.   I DO.

10  Q.   AND THEN DO YOU RECALL LOOKING AT A DOCUMENT CALLED THE

11  DAILY DASHBOARD?

12  A.   YES, MA'AM.

13  Q.   I SAY A DOCUMENT.  IT WAS ACTUALLY A VERY LARGE BINDER?

14  A.   YES, MA'AM.

15  Q.   AND DID YOU PERSONALLY OBSERVE OR DID YOU PERSONALLY

16  VERIFY THAT THE AMOUNTS LISTED AS AVAILABLE CASH AND CHECKS

17  HOLDING FOR EACH OF THESE DAYS CORRESPOND WITH WHAT WAS LISTED

18  IN THE DAILY DASHBOARD --

19  A.   I DID.

20  Q.   -- WHICH IS GOVERNMENT'S EXHIBIT 1031 AND THEN THE CASH

21  FLOW IN 1032?

22  A.   I DID.

23  Q.   OKAY.  SO I WANT TO SHOW YOU AN EXCERPT FROM GOVERNMENT'S

24  EXHIBIT 1031.  AND THIS ACTUALLY REFERS TO THE DAILY DASHBOARD

25  ON MARCH 18TH FROM ASHA MAURYA TO NAT HARDWICK.  AND THIS IS,

3327

1    FOR THE RECORD, PAGES 358 AND 359 OF THAT DASHBOARD.  OKAY.

2    AND AS YOU'LL SEE, IT REFERS TO THE AMOUNT HERE, 3-18-2013, ON

3    GOVERNMENT'S 1035.  DO YOU SEE THAT?

4    A.   I SEE THE DATES MATCH.

5    Q.   OKAY.

6    A.   OKAY.

7    Q.   OKAY.  NOW, THE AMOUNT ON GOVERNMENT'S 1035 FOR AVAILABLE

8    CASH, $228,689, IS THAT THE SAME AMOUNT THAT'S LISTED HERE AS

9    CASH ON HAND?

10   A.   THAT'S -- THOSE TWO NUMBERS MATCH, YES, MA'AM.

11   Q.   OKAY.  I WANT TO ASK YOU ABOUT THIS FIGURE THREE LINES

12   DOWN HERE, RESERVE BALANCE.  WHAT DOES THAT REFER TO?

13   A.   THERE WAS A -- PURSUANT TO OUR AGREEMENTS, CERTAIN AMOUNTS

14   OF MONEY WOULD NEED TO BE WITHHELD SO THAT WE WOULD HAVE MONEY

15   AT THE END OF THE YEAR TO PAY OUR EMPLOYEES' BONUSES, TO PAY

16   TAX PAYMENTS, TO -- IT WAS A WITHHOLDING, A RAINY DAY FUND.

17   THERE WAS TWO FUNDS.  ONE WAS A TAX, ANOTHER WAS FOR BONUSES TO

18   OUR EMPLOYEES AND SUCH.

19   Q.   AND IS THE CREATION OF THAT RESERVE ACCOUNT SPECIFICALLY

20   MENTIONED IN THE SHAREHOLDER AGREEMENTS?

21   A.   YES.

22   Q.   OKAY.  NOW, I WANT TO ASK YOU, IF WE SCROLL DOWN THIS

23   DOCUMENT, DO YOU SEE WHERE IT SAYS DEFAULT STATISTICS?

24   A.   YES.

25   Q.   AND ACTION CAPITAL?

3328

1   A.   YES.

2   Q.   YOU TESTIFIED ON DIRECT ABOUT THE ACTION CAPITAL LINE OF

3   CREDIT.  BUT REMIND THE JURY WHAT IS UNIQUE ABOUT THIS

4   PARTICULAR TYPE OF LINE OF CREDIT.

5   A.   TRADITIONALLY, THERE'S TWO TYPES OF LINES OF CREDIT IN

6   BUSINESS.  ONE IS YOU GO TO YOUR BANK, YOUR REGULAR BANK --

7   BANK OF AMERICA, WELLS, CHASE -- AND YOU HAVE A LINE OF CREDIT

8   WITH THEM, WHICH IS BASICALLY SECURED BY THE SIGNATURE OF THE

9   FIRM AND POSSIBLY WITH PERSONAL GUARANTEES OF THE EQUITY OWNERS

10  OF IT.

11      AND BASICALLY IT SAYS, YOU HAVE A LINE OF CREDIT OF A

12  MILLION DOLLARS OR 3 MILLION OR 100,000 -- IT REALLY DOESN'T

13  MATTER.  THERE ARE A LOT OF DIFFERENT BUSINESSES.  AND YOU CAN

14  DRAW DOWN OFF OF THAT LINE OF CREDIT FOR ANY REASON WHATSOEVER

15  THAT YOU WANT TO.  AND YOU'RE NOT -- YOU DON'T HAVE TO POST ANY

16  ADDITIONAL SECURITY OTHER THAN WHATEVER IT WAS WHEN YOU SET

17  THAT LINE OF CREDIT UP.

18      THE TYPE OF LINE OF CREDIT THAT WE HAD ON THE DEFAULT SIDE

19  WAS CALLED A FACTORING LINE OF CREDIT, WHICH WE HAD A MAXIMUM

20  AMOUNT OF MONEY THAT WAS ON -- THAT WAS -- THAT THE LINE WAS

21  THERE, BUT IT ALSO CORRESPONDED TO HOW MUCH OF A RECEIVABLE WE

22  HAD AND WHAT THE ELIGIBLE RECEIVABLE WAS.

23      NOT EVERY SINGLE INVOICE THAT THE DEFAULT SIDE OF OUR

24  BUSINESS CREATED WOULD BE ELIGIBLE TO BE POSTED AS SECURITY FOR

25  THE LOAN.  THEY ONLY WANTED RECEIVABLES THAT WERE WITH A

1    TRADITIONAL FINANCIAL INSTITUTION THAT HAD A TRACK RECORD OF

2    PAYING.  SO NOT EVERY SINGLE INVOICE WE GENERATED ON DEFAULT

3    WOULD QUALIFY.

4         AND IN ORDER TO DRAW DOWN ON THE LINE, AGAIN, YOU WOULD

5    HAVE TO GO TO -- AND THE NAME OF THE COMPANY WAS ACTION

6    CAPITAL.  YOU WOULD HAVE TO SEND TO ACTION CAPITAL A LIST OF

7    INVOICES.

8    Q.   AND, MR. WITTSTADT, CAN I STOP YOU RIGHT THERE?

9         OKAY.  SO IF WE LOOK OVER ON THIS GRID, AND IF WE LOOK

10   TO -- THE PRINT IS SO SMALL, BUT DO YOU SEE WHERE IT SAYS

11   AVAILABILITY MARCH 2013 AND THEN DRAWN LOAN BALANCE?

12   A.   YES.

13   Q.   OKAY.  IF WE SCROLL OVER TO THE NUMBER THAT'S INCLUDED

14   THERE, SO AVAILABILITY, A LITTLE OVER 2.3 MILLION.  IS THAT --

15   OR 2.3 MILLION AND THEN A LITTLE OVER 1.1 MILLION DRAWN.  IS

16   THAT WHAT THAT MEANS?

17   A.   IT LOOKS LIKE THAT WHAT THAT'S SAYING IS IF YOU ADD THOSE

18   TWO NUMBERS TOGETHER -- I DIDN'T BRING MY -- I DIDN'T BRING IT

19   IN.  BUT IF YOU ADDED THOSE TWO NUMBERS TOGETHER, THAT'S GOING

20   TO COME TO, WHAT, ABOUT 3.5 MILLION, ROUGHLY?

21   Q.   ROUGHLY.

22   A.   THAT MAY HAVE BEEN -- AND 3.5 MILLION AT THAT TIME MAY

23   HAVE BEEN THE MAXIMUM AMOUNT THAT ACTION CAPITAL WAS GOING TO

24   ALLOW TO BE ADVANCED.

25   Q.   LIKE THE EQUIVALENT OF YOUR CREDIT LIMIT?

3330

1    A.   YES.

2    Q.   OKAY.  SO LET ME ASK YOU:  IF WE FOCUS ON THE AVAILABILITY

3    NUMBER RIGHT HERE, THE 2.3 MILLION, FOR A FACTORING LINE OF

4    CREDIT, CAN YOU JUST GO BORROW THAT MONEY WITHOUT PLEDGING SOME

5    KIND OF COLLATERAL, LIKE A RECEIVABLE?

6    A.   YOU -- AS I WAS SAYING, YOU HAVE TO -- IN ORDER TO DRAW

7    DOWN ON IT, YOU WOULD MAKE A CALL, YOU WOULD MAKE -- BASICALLY,

8    YOU'D CALL THEM ON THE PHONE AND SAY, I NEED TO DRAW DOWN

9    $500,000 OFF OF THE LINE.  AND THEY -- AND THEN YOU WOULD

10   SUBMIT TO THEM A SPREADSHEET WITH INVOICES, THE INVOICE AMOUNTS

11   AND THE INVOICE NUMBERS.  I'M SIMPLIFYING THIS A LITTLE BIT.

12        BUT BASICALLY, YOU WOULD SAY, HERE ARE THE INVOICES THAT

13   EQUAL -- IF YOU WERE PULLING DOWN 500,000, YOU COULD BRING

14   DOWN -- YOU COULD ONLY PULL OFF 90 PERCENT OF THE INVOICES.  SO

15   YOU WOULD -- YOU'D HAVE TO GIVE THEM $550,000 WORTH OF INVOICES

16   SO THAT WHEN THEY GOT PAID, YOU DIDN'T GET TO KEEP THAT MONEY,

17   THAT MONEY WENT STRAIGHT TO ACTION CAPITAL TO PAY THAT

18   FACTORING LINE BACK.

19   Q.   I'M GOING TO SHOW YOU A DIFFERENT DOCUMENT.  THIS IS AN

20   EXCERPT FROM GOVERNMENT'S 1032, WHICH WAS THE CASH FLOW

21   SPREADSHEETS THAT YOU TESTIFIED.  AND SPECIFICALLY, FOR THE

22   RECORD, PAGES 22 AND 23.

23        OKAY.  WELL, AND LET ME -- DO YOU SEE THAT THIS IS AN

24   E-MAIL FROM ASHA MAURYA TO NAT HARDWICK ON MAY 23RD, 2014?

25   A.   YES.  YES.

3331

1   Q.   OKAY.  AND IF WE LOOK HERE AT THE NUMBERS THAT MS. MAURYA

2   IS SENDING TO MR. HARDWICK, DO YOU SEE WHERE IT SAYS A LITTLE

3   OVER 1.1 MILLION CASH ON HAND?

4   A.   YES.

5   Q.   OKAY.  AND THEN DOWN HERE WHERE IT SAYS YEAR-END ACCOUNT

6   AND SHAREHOLDER BONUS, ARE THESE THE RESERVE ACCOUNTS THAT YOU

7   WERE TALKING ABOUT EARLIER?

8   A.   YES.

9   Q.   OKAY.  AND THEN THE ACTION CAPITAL AVAILABLE, THAT -- DOES

10  THAT REFER TO THE AMOUNT THAT COULD BE DRAWN DOWN ON THAT

11  FACTORING LINE?

12  A.   YES.

13  Q.   OKAY.  NOW, I WANT TO ASK YOU:  YOU DIDN'T RECEIVE THESE,

14  CORRECT?

15  A.   NO, I DID NOT RECEIVE THAT.

16  Q.   IF YOU HAD, IF YOU HAD BEEN GIVEN THIS AMOUNT OF

17  INFORMATION, WOULD YOU HAVE, IN ORDER TO FIGURE OUT WHAT WAS

18  AVAILABLE FOR DISTRIBUTIONS, SAID, LET ME ADD 1.1 MILLION PLUS

19  576,000 PLUS 426,000 PLUS 1.7 MILLION, AND THAT GIVES ME

20  SEVERAL MILLION DOLLARS, AND THAT'S CASH THAT WE CAN TAKE OUT

21  FOR DISTRIBUTIONS?

22  A.   NO.

23  Q.   VERBAL.  THANK YOU, SIR.  AND WHY NOT?

24  A.   RESERVE ACCOUNTS WERE SET UP FOR VERY SPECIFIC REASONS,

25  AND THEY REQUIRED OUR AGREEMENTS TO DO ANYTHING WITH IT.  AND

3332

1    THEY WERE, THEY WERE FOR, THEY WERE FOR A NUMBER OF REASONS.

2    SO THEY WEREN'T, THEY WEREN'T THERE TO BE ABLE TO TAKE.  THEY

3    WERE RAINY DAYS IF WE NEEDED THEM.  YOU CAN'T -- YOU COULDN'T

4    JUST GO TAKE IT.  THAT'S WHY WE SET THESE THINGS UP IN OUR

5    OPERATING AGREEMENT, SO WE WOULD HAVE RULES TOGETHER.

6    Q.   WELL, AND I WANT TO ASK YOU ABOUT ONE OF THOSE RAINY DAYS.

7    OKAY.  I'M GOING TO SHOW YOU A DOCUMENT THAT'S BEEN ADMITTED AS

8    GOVERNMENT'S EXHIBIT 313.  OKAY?  AND THIS IS A DOCUMENT THAT I

9    SHOWED YOU ON YOUR DIRECT EXAMINATION.

10        DO YOU SEE THAT IT IS AN E-MAIL FROM MR. HARDWICK TO YOU

11   AND YOUR BROTHER ON JUNE 30TH, 2014?

12   A.   YES.

13   Q.   OKAY.  NOW, IN THIS E-MAIL, IS MR. HARDWICK SUGGESTING

14   THAT Y'ALL ACTUALLY TAKE THAT MONEY IN THE RESERVE ACCOUNT,

15   THIS BONUS POOL, AND DISTRIBUTE IT?

16   A.   YES.  THAT'S WHAT WE WERE DISCUSSING THERE.

17   Q.   OKAY.  AND --

18   A.   ONE OF THE ACCOUNTS.  NOT BOTH, BUT ONE.

19   Q.   ONE OF THE RESERVE ACCOUNTS.  SO -- AND IT LOOKS LIKE HERE

20   IN HIS -- IN THE LAST LINE OF HIS E-MAIL TEXT, HE'S REFERRING

21   TO THE ACCOUNT WITH THE $535,980; IS THAT RIGHT?

22   A.   THAT'S EXACTLY CORRECT.

23   Q.   OKAY.  AND DO YOU REMEMBER, DID YOU AND YOUR BROTHER

24   AGREE, YOU KNOW WHAT, LET'S GO AHEAD AND DISTRIBUTE THIS MONEY?

25   A.   I AGREED TO IT.

3333

1   Q.   OKAY.  AND HOW MUCH IS MR. HARDWICK SUPPOSED TO RECEIVE?

2   WHAT IS HIS PORTION HERE?

3   A.   $321,352.

4   Q.   OKAY.  AND WHAT'S THE DATE OF THAT?

5   A.   JUNE 30TH.

6   Q.   OKAY.  AND DOES THAT CORRESPOND WITH WHAT'S PREVIOUSLY

7   BEEN ADMITTED AS GOVERNMENT'S EXHIBIT 21, THE SAME CHART WITH

8   THE SAME AMOUNT?

9   A.   YES.

10  Q.   OKAY.  AND IF YOU SEE UP HERE, DOES IT LOOK LIKE ASHA

11  MAURYA ACTUALLY DID DISBURSE THAT AMOUNT TO MR. HARDWICK?

12  A.   THAT'S WHAT IT LOOKS LIKE.  THAT'S WHAT -- THAT WOULD BE

13  THE FED REFERENCE NUMBER SHOWING THAT THE MONEY HAD BEEN WIRED.

14  Q.   OTHER THAN THIS ONE INSTANCE, DID MR. HARDWICK EVER SAY,

15  WE'VE GOT THIS MONEY IN OUR RESERVE ACCOUNT, LET'S ACCESS IT

16  AND MAKE A DISTRIBUTION?

17  A.   NO.  WE DIDN'T NEED TO.  WE WERE MAKING PLENTY OF MONEY.

18  THAT'S THE REASON TO HAVE THESE THINGS PUT BACK.  THERE WASN'T

19  ANY REASON TO DO THAT.

20  Q.   DID HE EVER SAY TO YOU, YOU KNOW WHAT, I KNOW WE'VE GOT

21  THIS MONEY IN CASH, SO I'M JUST GOING TO START MAKING

22  DISTRIBUTIONS TO MYSELF?

23  A.   NO.

24  Q.   AND WHAT IS IT ABOUT THIS SITUATION RIGHT HERE THAT

25  CONVINCED YOU, YOU KNOW WHAT, MAYBE THIS IS A GOOD IDEA, LET'S

3334

1    GO AHEAD AND DISTRIBUTE?

2    A.   WE HAD 726,701 IN THE OTHER ACCOUNT, WHICH WAS

3    SIGNIFICANTLY HIGHER THAN WHAT I -- WHEN WE STARTED OFF IN, IN

4    JANUARY TO WHERE I THOUGHT IT WOULD BE.  I ALSO KNEW WHAT MY

5    FORECAST LOOKED LIKE FOR DEFAULT THROUGH -- WHICH I THOUGHT

6    I -- IT WOULD LOOK LIKE THROUGH THE END OF DECEMBER.  AND I

7    KNEW WHERE WE WERE ON HOW MUCH MONEY WAS AVAILABLE ON THE LINE

8    OF CREDIT, WHERE OUR RECEIVABLES WERE PLEDGED.  I KNEW HOW

9    MUCH -- WHAT THE DEFAULT SIDE LOOKED LIKE THROUGH THE END OF

10   THE YEAR.  AND WHAT MR. HARDWICK HAD TOLD ME, AND WHAT MY

11   KNOWLEDGE WAS OF RETAIL CLOSINGS, WHAT THEY LOOKED LIKE.  THEY

12   WERE ON THE UPTAKE.  I DIDN'T SEE A PROBLEM WITH DOING THIS.

13   Q.   WELL, AND LET'S LOOK AT THE DATE.  IS THIS ABOUT --

14   JUNE 30TH, 2014, IS THAT ABOUT A MONTH BEFORE YOU DISCOVERED

15   THAT THERE WERE SOME ISSUES WITH THE ESCROW ACCOUNT?

16   A.   YES, MA'AM.

17   Q.   AND DID MR. HARDWICK SAY, YOU KNOW WHAT, I HAVE CONSIDERED

18   THIS TO BE CASH AVAILABLE FOR YEARS THAT I COULD USE TO MAKE

19   DISTRIBUTIONS FROM, I'M ONLY NOW LETTING YOU KNOW ABOUT IT?

20            MR. GARLAND:  OBJECTION.  LEADING, ARGUMENTATIVE.

21            THE COURT:  I WILL OVERRULE.

22            THE WITNESS:  THERE WAS ONE DISCUSSION.  I DON'T --

23   THERE WAS ONE TIME AND THIS WAS IT.  WE NEVER DISCUSSED THESE

24   ACCOUNTS EXCEPT FOR THE FACT THAT MONEY WAS GOING INTO THEM.

25   BY MS. BARRON:

3335

1   Q.   OKAY.  LET'S TALK ABOUT THE ACTION CAPITAL LINE.  WELL,

2   LET ME, LET ME ASK YOU ONE MORE QUESTION ON THAT CHART THAT WE

3   JUST LOOKED AT, WHICH IS THE SAME CHART AS IN GOVERNMENT'S

4   EXHIBIT 21.

5        OKAY.  SO MR. HARDWICK, IF I'M UNDERSTANDING THIS RIGHT,

6   IN ADDITION TO WHATEVER HIS MONTHLY DISTRIBUTION WOULD HAVE

7   BEEN FOR JUNE, IS GETTING HIS SHARE OF WHAT YOU'VE ALL AGREED

8   TO DISTRIBUTE; IS THAT RIGHT?

9   A.   WELL, WHAT HE WOULD HAVE RECEIVED IN JUNE WOULD HAVE BEEN

10  WHAT THE FIRM WAS SUPPOSED TO HAVE MADE IN MAY.  SO WHAT HE

11  RECEIVED IN JUNE, WHAT I THOUGHT HE -- WHEN I RECEIVED MY CHECK

12  IN JUNE, I THOUGHT THAT'S WHAT HE WAS GETTING IN JUNE FOR MAY.

13  AND THEN THIS WOULD BE IN ADDITION TO WHATEVER WAS SUPPOSED TO

14  HAVE BEEN MADE IN MAY OF 2014.  BOOKS WEREN'T CLOSED YET FOR

15  JUNE TO DECIDE HOW MUCH JUNE SHOULD BE.

16  Q.   OKAY.  SO I'M GOING TO SHOW YOU A DOCUMENT THAT I SHOWED

17  YOU ITERATIONS OF ON DIRECT.  I DON'T KNOW IF I SHOWED YOU THIS

18  SPECIFIC PAGE.  THIS IS GOVERNMENT'S 1004, PAGE 42.

19       OKAY.  SO THAT E-MAIL WAS DATED JUNE 30TH.  AND DO YOU SEE

20  HERE THAT THAT'S WHERE HE GETS THAT 321,000?

21  A.   YES, MA'AM.

22  Q.   OKAY.  AND DO YOU SEE THAT TOTAL FOR THE MONTH, HE GETS A

23  LITTLE OVER 1.3 MILLION?

24  A.   I SEE IT.

25  Q.   IF YOU HAD KNOWN ON JUNE 30TH, WHEN HE'S ASKING TO

3336

1    DISTRIBUTE FROM THE RESERVE ACCOUNT, THAT HE HAD ALREADY

2    RECEIVED ABOUT A MILLION DOLLARS THAT MONTH, WOULD YOU HAVE

3    AGREED TO ALLOW THAT DISTRIBUTION OUT OF THE RESERVE ACCOUNT?

4    A.    NO.  NO.  AND I WOULD HAVE DONE A LOT OF OTHER -- I WOULD

5    HAVE BEEN -- I WOULD HAVE BEEN IN ATLANTA THEN IF I HAD KNOWN

6    HE HAD TAKEN $1.3 MILLION.

7    Q.    OKAY.  NOW, I WANT TO TALK A LITTLE BIT MORE ABOUT THAT

8    ACTION CAPITAL LINE OF CREDIT.  I'M GOING TO SHOW YOU A

9    DOCUMENT THAT IS ALREADY IN EVIDENCE AS GOVERNMENT'S

10   EXHIBIT 213.  AND THIS IS ACTUALLY -- IT'S A DEFENSE EXHIBIT,

11   TOO.  I DON'T REMEMBER THE EXACT NUMBER.

12         BUT DO YOU RECALL THIS E-MAIL FROM BOB DRISKELL --

13   A.    YES.

14   Q.    -- ABOUT THE TOTAL AMOUNT OF INCOME?  AND I WANT TO ZOOM

15   IN HERE.  DO YOU SEE WHERE MR. DRISKELL SAYS THE K-1'S SHOW NAT

16   WITH 53.15 PERCENT AND 811,957 OF ORDINARY INCOME?  DO YOU SEE

17   THAT?

18   A.    YES, MA'AM.

19   Q.    AND WHAT IS ORDINARY INCOME?

20   A.    IT MEANS HOW MUCH MONEY THE FIRM MADE.  HOW MUCH FIFTY --

21   SAY THAT HIS SHARE OF WHAT THE FIRM MADE FOR 2011, ABOVE AND

22   BEYOND HIS SALARY, SHOULD HAVE BEEN 811,000 AND CHANGE --

23   957 DOLLARS.

24   Q.    AND SO DID YOU UNDERSTAND THIS TO BE CONSISTENT WITH THE

25   SHAREHOLDER AGREEMENT SAYING THAT DISTRIBUTIONS ARE BASED ON

3337

1   TAXABLE INCOME?

2   A.   DISTRIBUTIONS -- WHAT WE GOT ABOVE AND BEYOND OUR SALARY

3   WAS COVERED IN THE SHAREHOLDERS AGREEMENT.  THERE WAS NO --

4   THAT'S -- THERE WASN'T ANY ABILITY TO TAKE MONEY OTHER THAN

5   WHAT THE FIRM MADE.

6   Q.   AND IS THAT DIFFERENT -- IS ORDINARY INCOME, AS IS

7   MENTIONED HERE IN THIS E-MAIL AND IN THE SHAREHOLDER AGREEMENT,

8   DIFFERENT THAN HOWEVER MUCH CASH MAY HAPPEN TO BE AVAILABLE ON

9   ANY GIVEN DAY?

10  A.   YOU RUN A BUSINESS.  WHAT'S -- WHAT YOU ACTUALLY HAVE IN

11  THE CHECKING ACCOUNT DOES NOT MEAN WHAT YOU MADE OR DIDN'T MAKE

12  FOR A MONTH.  THAT DOESN'T MEAN THAT.  ALL THAT MEANS IS THAT'S

13  WHAT MONEY YOU HAVE.  IT'S -- IT'S THE SAME --

14            MR. GARLAND:  OBJECTION.  NONRESPONSIVE.

15            THE COURT:  I'LL SUSTAIN.

16  BY MS. BARRON:

17  Q.   SIR, I'M JUST GOING TO ASK MY QUESTION AGAIN.

18       IS TAXABLE ORDINARY INCOME, AS IT IS HERE, IS THAT

19  SOMETHING DIFFERENT THAN HOW MUCH CASH THERE MAY BE AVAILABLE

20  ON A GIVEN DAY?

21  A.   I THINK I UNDERSTAND YOUR QUESTION, AND I THINK THE ANSWER

22  TO THAT QUESTION IS YES, THERE IS A BIG DIFFERENCE BETWEEN

23  ORDINARY INCOME AND CASH AVAILABLE.

24  Q.   AND DOES MR. HARDWICK AFFIRM THAT THIS IS RIGHT WHEN HE

25  SAYS "SOUNDS RIGHT" IN RESPONSE?

3338

1    A.    THAT'S WHAT HE'S TELLING ME.

2    Q.    NOW, I WANT TO ASK YOU ABOUT WHY CASH AVAILABILITY, HOW

3    MUCH CASH THERE IS, IS DIFFERENT FROM THAT.   SO LET'S LOOK AT

4    THIS DATE HERE, MAY 23RD, 2014.   THERE ARE STILL DAYS TO COME

5    IN MAY, CORRECT?

6    A.    YES, MA'AM.

7    Q.    OKAY.  AND THERE ARE SOME OUTSTANDING CHECKS AND PAYABLES

8    LISTED HERE.   BUT IS IT ALSO POSSIBLE THAT THERE COULD BE EVEN

9    MORE OUTSTANDING RECEIVABLES OUT THERE -- OR, I'M SORRY,

10   OUTSTANDING CHECKS, LIABILITIES, PAYABLES, OTHER THINGS THAT

11   JUST HAVEN'T HIT YET?

12   A.    WELL, I MEAN, YOU HOPE THAT YOU UNDERSTAND WHAT YOUR

13   PAYABLES ARE COMING UP TO BE.   AND IF I SAW THIS, I WOULD THINK

14   THAT THOSE NUMBERS WOULD BE CORRECT, THAT WE HAVE OUTSTANDING

15   CHECKS AGAINST THAT, WE HAVE CERTAIN PAYABLES THAT ARE DUE, AND

16   WE HAVE CERTAIN OTHER CURRENT LIABILITIES, GIVING ME WHAT THE

17   NET AVAILABLE CASH BEING 668,000.

18   Q.    SO A SIMILAR QUESTION, RELEVANT TO THE ACTION CAPITAL LINE

19   OF CREDIT, WHAT IS THE ENTIRE PURPOSE OF HAVING A FACTORING

20   LINE ON THE DEFAULT SIDE?   WHY DO YOU EVEN DO THAT?

21   A.    WE HAVE DEMANDS FOR CASH TO ADVANCE FOR CLIENTS.   AND WE

22   INVOICE THE BANKS.   AND UNLIKE OTHER THINGS THAT -- YOU GO INTO

23   A STORE AND YOU BUY A PIECE OF CANDY, AND YOU -- THEY GIVE YOU

24   A PIECE OF CANDY AND YOU GIVE THEM A DOLLAR, WE HAVE TO

25   INVOICE.

3339

1      AND SOMETIMES BANKS DON'T PAY REALLY QUICKLY.  SOMETIMES

2  THEY WERE 30, 40, 45, 50, 60 DAYS OUT.  AND IN ORDER TO BE ABLE

3  TO RUN OUR BUSINESS EFFICIENTLY, WE NEEDED TO BE ABLE TO HAVE

4  ACCESS TO THE MONEY THAT WAS DUE ON THE INVOICES SO THAT WE

5  COULD ADVANCE NEW COURT COSTS, WE COULD PAY OUR RENTS, WE COULD

6  MAKE OUR PAYROLL.

7  Q.   OKAY.  SO LET ME ASK YOU ABOUT THAT.  IS THE WHOLE POINT

8  OF HAVING AVAILABILITY THERE THAT YOU DON'T ALWAYS GET PAID ON

9  TIME BY YOUR --

10 A.   WE DON'T -- WE NEVER GOT -- PAID ON TIME -- YOU HAVE A

11 CONTRACT, AND THE CONTRACT SAID THAT THEY HAD 30 DAYS TO PAY.

12 Q.   JUST ANSWER THE QUESTION, PLEASE.

13 A.   CAN YOU ASK IT TO ME AGAIN?

14 Q.   IS THE WHOLE POINT OF HAVING A FACTORING LINE THAT YOU

15 DON'T ALWAYS GET PAID?

16          MR. GARLAND:  OBJECTION.  LEADING.

17          THE COURT:  OVERRULED.

18 BY MS. BARRON:

19 Q.   THAT YOU DON'T ALWAYS GET PAID.  SOMETIMES THERE CAN BE A

20 DELAY -- 30 DAYS, 60 DAYS, 90 DAYS -- BEFORE YOU GET PAID FOR

21 THE WORK THAT YOU DO?

22 A.   YES.

23 Q.   AND IN THE MEANTIME, YOU DO HAVE TO MAKE PAYROLL, PAY YOUR

24 RENTS, FULFILL WHAT OTHER OBLIGATIONS YOU HAVE TO DO?

25 A.   YES.

3340

1   Q.   AND SO IF YOU WERE TO TAKE AVAILABLE FUNDS FROM A

2   FACTORING LINE AND --

3           MR. GARLAND:  OBJECTION.  LEADING.

4           MS. BARRON:  I HAVEN'T ASKED THE QUESTION YET.

5           THE COURT:  I HAVEN'T HEARD ENOUGH OF IT TO RULE ON

6   YET, BUT I'LL LISTEN.  GO AHEAD.

7   BY MS. BARRON:

8   Q.   IF YOU TAKE THE FUNDS AVAILABLE FROM A FACTORING LINE AND

9   TREAT THAT AS CASH THAT IS DISTRIBUTABLE AMONG THE

10  SHAREHOLDERS, IS IT POSSIBLE THAT YOU COULD GET IN A PINCH AND

11  NOT HAVE MONEY AVAILABLE TO PAY THOSE THINGS LIKE PAYROLL AND

12  RENTS THAT YOU TALKED ABOUT?

13          MR. GARLAND:  OBJECTION.  LEADING.

14          THE COURT:  OVERRULED.

15          THE WITNESS:  ABSOLUTELY.

16  BY MS. BARRON:

17  Q.   AND SO GOING BACK TO GOVERNMENT'S EXHIBIT 213,

18  MR. DRISKELL SAYS THAT NAT IS ACTUALLY ENTITLED TO 811,000.  DO

19  YOU SEE THAT THERE?

20  A.   YES.

21  Q.   AND THAT SO FAR HE'S RECEIVED 561?

22  A.   YES.

23  Q.   AND SO HE'S ENTITLED TO AN ADDITIONAL 250?

24  A.   THAT'S WHAT THAT SAYS.

25  Q.   AND THIS IS FOR TAX YEAR 2011, CORRECT?

3341

1   A.   THAT IS CORRECT.

2   Q.   OKAY.  I'M GOING TO SHOW YOU WHAT'S BEEN PREVIOUSLY

3   ADMITTED AS GOVERNMENT'S EXHIBIT 1005, PAGE 1.

4        HOW MUCH DID -- TRANSFERS, DISTRIBUTIONS, WHATEVER WE WANT

5   TO CALL IT, HOW MUCH MONEY WENT TO MR. HARDWICK FROM MHS IN

6   2011?

7   A.   1.2 MILLION.

8   Q.   AND IF YOU HAD KNOWN THAT HE RECEIVED THIS MUCH MONEY,

9   WHEN HE AFFIRMS --

10            MR. GARLAND:  OBJECTION.  ARGUMENTATIVE, CALLING --

11            MS. BARRON:  IT GETS TO MATERIALITY.

12            THE COURT:  OVERRULED.

13  BY MS. BARRON:

14  Q.   IF YOU HAD KNOWN THAT HE RECEIVED OVER 1.2 MILLION IN

15  2011, WHEN HE HAD AFFIRMED THAT HE WAS ONLY ENTITLED TO

16  811,000, WHAT WOULD YOU HAVE DONE?

17  A.   I WOULD HAVE PACKED UP MY STUFF AND LEFT.

18  Q.   LEFT THE FIRM?

19  A.   I WOULD HAVE LEFT THE FIRM.  I WOULD HAVE LEFT THE FIRM,

20  AND I WOULD HAVE TAKEN MY CLIENTS WITH ME AND I WOULD HAVE

21  LEFT.

22  Q.   OH.  ANOTHER THING I WANT TO POINT OUT ON THIS E-MAIL.

23  WHAT ARE THE DATES OF THESE E-MAILS?  WHAT IS -- WHAT'S THE

24  DATE ON THE VERY TOP?

25  A.   OCTOBER 4TH, 2012.

3342

1    Q.   AND DOWN HERE, SAME DATE?

2    A.   YES, MA'AM.

3    Q.   OKAY.  AND DO YOU SEE WHERE IT SAYS ROD AND MARK WERE

4    GIVEN A 1099 -- IS THAT A TAX FORM?

5    A.   YES, IT IS.

6    Q.   -- FOR 175,000 TO CONVERT THE DISTRIBUTIONS THEY RECEIVED

7    TO INCOME.

8         IS THAT CONSISTENT WITH THE WAY THE PARTNERSHIP AGREEMENT

9    WAS WORKING AT THE TIME?

10   A.   YES.

11   Q.   SO IN THIS E-MAIL, IS NAT HARDWICK ACKNOWLEDGING THAT YOU

12   ARE IN FACT PARTNERS OF THIS FIRM?

13   A.   YES.

14   Q.   AND IS HE ALSO FOLLOWING THE SHAREHOLDER AGREEMENT THAT

15   WAS IN PLACE?

16   A.   I THOUGHT, I THOUGHT SO.  BUT I THOUGHT, I THOUGHT -- AT

17   THE TIME THAT I RECEIVED THIS, I BELIEVED THAT TO BE TRUE.

18   Q.   OKAY.  NOW, WERE THERE INSTANCES WHERE YOU ACTUALLY HAD TO

19   DRAW DOWN ON THE ACTION CAPITAL LINE OF CREDIT IN ORDER TO MAKE

20   DISTRIBUTIONS?

21   A.   WE DID.

22   Q.   AND HOW MANY TIMES DID YOU DO IT?

23   A.   WE DID IT TWICE AND -- WE DID IT TWICE FOR TAXES.  I

24   THINK, I THINK WE TALKED ABOUT THAT.

25   Q.   OKAY.  AND ON THAT SAME EXHIBIT, PAGE 213, IS THAT WHAT

3343

1    MR. HARDWICK IS REFERRING TO?  WE USUALLY DISTRIBUTE THE MONEY

2    FROM LINE NECESSARY TO PAY TAXES.

3        WAS THAT CONSISTENT WITH YOUR UNDERSTANDING OF WHEN THAT

4    LINE WOULD BE USED TO MAKE DISTRIBUTIONS?

5    A.   THAT'S WHEN WE HAD THE CONVERSATION THIS YEAR, DURING THIS

6    PERIOD OF TIME IN 2012 AND THE YEAR BEFORE.

7    Q.   DID HE EVER SAY, OH, I CONSIDER THAT LINE OF CREDIT TO BE

8    CASH AVAILABLE TO MAKE DISTRIBUTIONS WHENEVER, NOT JUST AT TAX

9    TIME?

10   A.   NO.

11   Q.   AND OTHER THAN THOSE TWO INSTANCES TO PAY TAX, DID YOU

12   EVER TAKE A DISTRIBUTION THAT YOU'RE AWARE OF OFF THE ACTION

13   CAPITAL LINE OF CREDIT?

14   A.   NOT THAT I AM AWARE OF.  NO, MA'AM.

15   Q.   OKAY.  I WANT TO SHOW YOU WHAT'S ALREADY BEEN ADMITTED AS

16   GOVERNMENT'S 214.  WHAT'S THE DATE OF THIS E-MAIL?

17   A.   NOVEMBER 14TH, 2012.

18   Q.   SO IS THIS STILL BEFORE YOU ARE OFFICIALLY A PARTNER OF

19   THE GEORGIA CORPORATION?

20   A.   YES.

21   Q.   OKAY.  AND IS THIS AN E-MAIL FROM MR. HARDWICK TO YOU AND

22   YOUR BROTHER AND MR. MORRIS?

23   A.   YES, MA'AM.

24   Q.   AND IF YOU WILL READ THE HIGHLIGHTED SENTENCE HERE.

25   A.   WE'RE GOING TO DO A DISBURSEMENT ON FRIDAY FOR OCTOBER.

3344

1    THE PLAN WAS TO DO ABOUT 600,000.  AFTER THE NUMBERS CAME IN,

2    WE'RE PROBABLY GOING TO DO ABOUT 300,000.  THIS WAS THE PROFIT

3    THAT CLOSINGS DID.  I WAS NOT EXPECTING THE LOSS TO BE SO BIG

4    IN FORECLOSURE.

5    Q.   OKAY.  SO LET'S FOCUS ON THE WORD THAT HE CHOOSES HERE.

6    THIS WAS THE PROFIT THAT CLOSING DID.  IS THAT CONSISTENT WITH

7    YOUR UNDERSTANDING THAT DISTRIBUTIONS WERE MADE ON PROFITS AND

8    NOT CASH AVAILABLE ON ANY GIVEN DAY?

9    A.   THE WAY I -- YES.  YES, MA'AM.

10   Q.   AND IS THAT CONSISTENT WITH ACTUALLY WHAT THE SHAREHOLDER

11   AGREEMENT SAYS?

12   A.   THE SHAREHOLDER AGREEMENT CONTROLLED HOW WE COULD TAKE

13   MONEY, HOW WE WERE ENTITLED TO PROFITS.  AND, YES, MA'AM, IT

14   DID.

15            MR. GARLAND:  OBJECTION.  NONRESPONSIVE.

16            THE COURT:  SUSTAINED.

17   BY MS. BARRON:

18   Q.   MR. WITTSTADT, DOES THIS E-MAIL ALSO INDICATE THAT

19   MR. HARDWICK, IN 2012, IS TREATING YOU LIKE AN EQUITY PARTNER

20   OF THIS LAW FIRM?

21   A.   YES, MA'AM.

22   Q.   AND NOW I'M SHOWING YOU PAGE 23 OF GOVERNMENT'S 1004.  HOW

23   MUCH MONEY DID MR. HARDWICK RECEIVE IN A MONTH WHERE HE SAID

24   THE TOTAL DISTRIBUTIONS WERE 300,000?

25   A.   $417,930.77.

3345

1   Q.   AND IF YOU HAD KNOWN HE WAS RECEIVING THAT MUCH INSTEAD OF

2   HIS SHARE OF 300,000, WHAT WOULD YOU HAVE DONE?

3   A.   I WOULD HAVE -- I WOULDN'T -- I WOULD HAVE LEFT THE FIRM.

4   Q.   I WANT TO ASK YOU ABOUT TRUE-UPS.  WE TALKED A LITTLE BIT

5   ABOUT IT ON YOUR DIRECT.

6        HOWEVER IT IS THAT THE FIRM DID TRUE-UPS -- TAX TRUE-UPS,

7   PAYROLL TRUE-UPS -- WAS THERE EVER A TRUE-UP, EVEN-UP,

8   SETTLE-UP, ANY KIND OF UP, IN WHICH MR. HARDWICK SAID, YOU KNOW

9   WHAT, I GOT OVERDISBURSED AND I NEED TO PAY MONEY BACK?

10  A.   NEVER.  NEVER.

11  Q.   OKAY.  WAS THERE EVER ANYTHING SAID TO YOU, MR. HARDWICK

12  GOT OVERDISBURSED, SO WE NEED TO GIVE YOU EXTRA MONEY TO BRING

13  YOU UP TO HIS LEVEL?

14  A.   NO.

15  Q.   I WANT TO TALK ABOUT YOUR MONTHLY CONVERSATIONS WITH

16  MR. HARDWICK.  HOW OFTEN -- I SAID MONTHLY.  IS THAT ACCURATE?

17  DID YOU TALK MONTHLY?

18  A.   THAT IS CORRECT, MA'AM.

19  Q.   DID YOU SOMETIMES TALK MORE THAN ONCE A MONTH?

20  A.   YES, MA'AM, WE DID.

21  Q.   AND WHEN YOU WOULD HAVE THESE CONVERSATIONS, WOULD YOU

22  DISCUSS HOW MUCH WAS GOING TO BE AVAILABLE FOR DISTRIBUTION,

23  HOW MUCH YOU EXPECTED TO BE AVAILABLE FOR DISTRIBUTION IN A

24  GIVEN MONTH?

25  A.   I'M NOT FOLLOWING YOUR QUESTION.

3346

1   Q.   SO IN THESE, IN THESE CALLS, WOULD YOU TALK ABOUT INCOME

2   ON BOTH SIDES, HOW MUCH THE FORECLOSURE WAS MAKING AND HOW MUCH

3   THE CLOSING SIDE WAS MAKING?

4   A.   YES.  WE ABSOLUTELY TALKED ABOUT HOW MUCH MONEY WE MADE

5   THE MONTH BEFORE, HOW MUCH MONEY WE ANTICIPATED MAKING IN THE

6   CURRENT MONTH.

7   Q.   AND WOULD YOU TALK ABOUT WHAT YOU THINK THE DISTRIBUTIONS

8   MIGHT LOOK LIKE BASED ON THE PROFIT NUMBERS THAT YOU'RE SEEING?

9   A.   WHAT MR. HARDWICK AND I WOULD DISCUSS WAS THE FIRM --

10  FORECLOSURE WOULD MAKE X, CLOSINGS MAKE Y, THAT WOULD EQUAL Z.

11  AND THAT'S WHAT WE WOULD DISTRIBUTE, WOULD BE Z.

12  Q.   AND DID HE EVER SAY, WELL, IN ADDITION TO Z, ASHA IS

13  TELLING ME WE'VE GOT ALL THIS AVAILABLE CASH IN THE RESERVE

14  BALANCE AND ON THE ACTION CAPITAL LINE OF CREDIT AND IN FEES

15  AND SOME OTHER AREAS, AND SO WE'RE ACTUALLY GOING TO DISTRIBUTE

16  ON THAT OTHER AMOUNT?  DID HE EVER SAY THAT?

17  A.   NEVER.

18  Q.   AND IF HE HAD, WHAT WOULD HAVE BEEN YOUR RESPONSE?

19  A.   NO.

20  Q.   OKAY.  AND I WANT TO TALK ABOUT ONCE -- FAST-FORWARDING TO

21  AUGUST -- JULY, AUGUST 2014, ONCE EVERYTHING CAME TO LIGHT.

22  YOU TESTIFIED ON DIRECT THAT YOU LEARNED THAT SOME OF THE MONEY

23  THAT YOU HAD RECEIVED CAME FROM AN ESCROW ACCOUNT.  DO YOU

24  RECALL THAT?

25  A.   I DO.

3347

1    Q.    WHY WAS THAT A -- WAS THAT A SURPRISE TO YOU?

2    A.    A HUNDRED PERCENT SURPRISE TO ME.

3    Q.    AND WHY WAS IT A SURPRISE TO YOU?

4    A.    I WAS TRANSFERRING -- NEVER SHOULD MONEY COME TO ANYBODY

5    OUT OF THE ESCROW ACCOUNT.  IT'S A VIOLATION OF RULES OF

6    PROFESSIONAL CONDUCT.

7              MR. GARLAND:  OBJECTION.  NARRATIVE RESPONSE.

8              MS. BARRON:  LET ME CHANGE MY QUESTION.

9              THE COURT:  OKAY.

10             MS. BARRON:  I'LL WITHDRAW IT.  LET ME TRY AND NARROW

11   THIS.

12   BY MS. BARRON:

13   Q.    OKAY.  WERE YOU AWARE AT ANY TIME, WHEN YOU WERE EITHER

14   UNDER THE -- WHAT WE'VE BEEN CALLING THE MARYLAND AGREEMENT,

15   THE 2011 AGREEMENT, OR THE 2013 AGREEMENT, WERE YOU EVER AWARE

16   THAT YOU WERE GETTING MONEY OUTSIDE OF YOUR SHARE OF PROFITS?

17   A.    NO.

18   Q.    OKAY.  SO I'M GOING TO SHOW YOU WHAT'S BEEN ADMITTED AS

19   GOVERNMENT'S EXHIBIT 1634.  AND I WILL REPRESENT TO YOU THAT

20   THIS IS A COLLECTION OF 19 SEPARATE E-MAILS FROM MR. HARDWICK

21   TO MS. MAURYA.

22         OKAY.  SO IF WE LOOK AT THE FIRST PAGE, DO YOU SEE THE

23   DATE IS APRIL 2ND, 2012?

24   A.    I DO.

25   Q.    DO YOU SEE THAT MS. MAURYA SAYS:  NORMALLY, I WOULD COVER

3348

1    THE DISTRIBUTIONS UNTIL THEY SEND THE FUNDS, BUT I NEED TO PAY

2    RENTS AND AM ANTICIPATING THE KENN-TEX FIRST PAYMENT THIS WEEK.

3    A.   I SEE, I SEE THAT.

4    Q.   OKAY.  AND WHAT DOES MR. HARDWICK RESPOND?

5    A.   OKAY.  I MAY HAVE TO JUST DO 50K TO ME ON TUESDAY BECAUSE

6    I MADE A PROMISE.  I'LL LET YOU KNOW.

7    Q.   DID YOU EVER SAY ANYTHING LIKE THAT TO MS. MAURYA?  DID

8    YOU EVER SAY, I DON'T KNOW IF WE HAVE THE MONEY AVAILABLE TO

9    MAKE DISTRIBUTIONS, BUT I MAY JUST HAVE TO TAKE SOME MONEY

10   RIGHT NOW?

11   A.   NO.  NEVER.

12   Q.   SKIPPING FORWARD, THIS IS AN E-MAIL DATED AUGUST 8TH.  DID

13   YOU EVER ASK MS. MAURYA, OUTSIDE OF WHAT YOU WERE RECEIVING

14   FROM YOUR SHARE OF THE PROFITS EVERY MONTH, TO JUST PUT MONEY

15   IN YOUR ACCOUNT?

16   A.   NO.  NEVER.

17   Q.   THIS IS AN E-MAIL DATED MARCH 8TH, 2013.  SAME QUESTION:

18   DID YOU EVER ASK HER TO TRANSFER MONEY; AND IF SHE CAN'T, MAYBE

19   JUST DO SOME PORTION OF THAT MONEY AND THEN DO THE OTHER

20   PORTION LATER?

21   A.   NO, MA'AM.  NEVER.

22   Q.   MR. WITTSTADT, DID YOU EVER ASK FOR ANY MONEY AT ALL

23   OUTSIDE OF WHAT YOU BELIEVED TO BE YOUR SHARE OF THE PROFITS OF

24   THE FIRM?

25   A.   AS I TESTIFIED BEFORE, THERE WAS THE ONE TIME WHEN I WAS

1    GETTING -- BORROWED MY -- BUYING MY HOUSE IN FLORIDA.  I RAN

2    INTO THE PROBLEM WHERE I COULDN'T WIRE FROM MY ACCOUNT.  AND I

3    CONTACTED ASHA AND I ASKED HER HOW MUCH MONEY WAS IN THE

4    OPERATING ACCOUNT.  SHE TOLD ME.  I SAID, PLEASE WIRE 990,000

5    AND SOME CHANGE TO THIS TITLE COMPANY.  AND I PULLED MY

6    CHECKBOOK OUT, AND I OVERNIGHTED A CHECK BACK TO THE FIRM.

7    THAT WAS THE ONLY TIME.

8    Q.   AND WAS THAT -- DID YOU DO THAT PRETTY SOON AFTER YOU HAD

9    ASKED FOR THE MONEY?

10   A.   I DID IT IMMEDIATELY.

11   Q.   THE SAME DAY?

12   A.   I THINK IT WAS THE NEXT DAY OR THE DAY AFTER.  I THINK IT

13   WAS, LIKE, ON A THURSDAY.  BUT I KNOW -- YOU KNOW, THE WEEKEND

14   WAS THERE, BUT I MADE SURE THEY HAD THE MONEY THE BEGINNING OF

15   THE WEEK.

16   Q.   SO IF YOU BELIEVED THAT YOUR MONEY WAS COMING OUT OF

17   PROFITS, WOULD YOU HAVE HAD ANY REASON TO THINK THAT MAYBE SOME

18   OF YOUR MONEY WAS COMING OUT OF ESCROW?

19   A.   I NEVER, EVER THOUGHT IT WAS COMING OUT OF THE ESCROW

20   ACCOUNT.  THERE WAS NEVER ANYTHING ON MY BANK STATEMENTS THAT

21   SHOWED IT TO ME.  NO INDICATION THAT IT WAS ANYWHERE FROM

22   THERE.

23   Q.   AND SO, AGAIN, GOING BACK TO THAT TIME IN AUGUST 2014, DID

24   MR. HARDWICK CONFIRM -- AND I'M SHOWING YOU WHAT'S BEEN

25   ADMITTED AS GOVERNMENT'S EXHIBIT 963.  DID HE CONFIRM WITH YOU

1  AGAIN ON AUGUST 17TH, 2014, THAT HE BELIEVED THE MONEY HE GOT

2  CAME FROM PROFITS AND NOT WHATEVER CASH HAPPENED TO BE

3  AVAILABLE ON A GIVEN DAY?

4  A.   YES, MA'AM.  THAT'S WHAT HE SAID.

5  Q.   WHOSE DECISION WAS IT TO BRING IN AN OUTSIDE AUDITING FIRM

6  TO LOOK AT THE FIRM'S ACCOUNTS?

7  A.   AT WHAT TIME?

8  Q.   IN AUGUST 2014.

9  A.   IT WAS MY -- IT WAS MY INSISTENCE.

10  Q.   WHOSE DECISION WAS IT TO NOTIFY THE STATE BARS OF THE

11  IRREGULARITIES IN THE ESCROW ACCOUNTS?

12  A.   I SAID WE WERE GOING TO DO IT, AND I CONVINCED

13  MR. HARDWICK TO AGREE.

14  Q.   AND AT THE TIME THAT Y'ALL WERE HAVING THESE

15  CONVERSATIONS, EARLY AUGUST, WHAT DID YOU BELIEVE THE HOLE --

16  HOW BIG DID YOU BELIEVE THE HOLE WAS?

17  A.   I WAS RELYING UPON WHAT MR. HARDWICK WAS TELLING ME.  TWO,

18  COULD HAVE BEEN TWO, MAYBE -- I DIDN'T -- NEVER IN MY WILDEST

19  DREAMS DID I BELIEVE IT TO BE AS BIG AS IT WAS.

20  Q.   AND DID THE NUMBER ACTUALLY FLUCTUATE THE MORE THAT Y'ALL

21  DUG IN THAT MONTH?

22  A.   THE NUMBER KEPT MOVING.  IT WAS A MOVING TARGET.

23  Q.   AND DID YOU HAVE A CONVERSATION WITH MR. HARDWICK ABOUT

24  HOW Y'ALL WERE GOING TO PLUG THAT HOLE, REGARDLESS OF HOW BIG

25  IT WAS?

3351

1   A.   MR. HARDWICK AND I HAD A CONVERSATION VERY EARLY ON ABOUT

2   HIM PUTTING THE MONEY BACK THAT HE RECEIVED.

3   Q.   OKAY.  AND WHAT DID YOU TELL HIM -- WELL, FIRST OF ALL,

4   LET ME ASK YOU:  DID HE ACKNOWLEDGE THAT HE WAS THE ONE WHO HAD

5   BEEN OVERDISBURSED?

6   A.   OH, YES.

7   Q.   AND DID HE ACKNOWLEDGE THAT IT WAS HIS OBLIGATION TO

8   FIGURE OUT A WAY TO PAY THAT MONEY BACK?

9   A.   I TOLD HIM IF HE -- YOU TOOK THE MONEY, YOU NEED TO GET IT

10  BACK.

11  Q.   AND SO DID HE TELL YOU THAT HE WAS GOING TO RAISE SOME

12  MONEY IN ORDER TO HELP PLUG THE HOLE?

13  A.   HE SAID HE WAS WIRING -- HE WAS GOING TO WIRE $1.4 MILLION

14  FROM HIS ACCOUNT AND HE WAS GOING TO MAKE A LOAN FOR 2 MILLION.

15  Q.   OKAY.  THAT HE WAS GOING TO GET MONEY FROM OTHER PEOPLE?

16  A.   YES.

17  Q.   AND DID HE ULTIMATELY GET MONEY FROM OTHER PEOPLE?

18  A.   HE DID.

19  Q.   HOW MUCH MONEY DID HE GET?

20  A.   $5 MILLION.

21  Q.   DID THAT COME FROM TWO DIFFERENT SOURCES?

22  A.   YES, MA'AM.

23  Q.   WHO?

24  A.   GENTLEMAN BY THE NAME OF MR. JIM PRITCHARD.  AND HIS

25  FRIEND AND PROFESSIONAL GOLFER, DUSTIN JOHNSON.

3352

1    Q.   I'M SHOWING YOU WHAT'S BEEN ADMITTED AS GOVERNMENT'S

2    EXHIBIT 1636.  THIS IS AN AFFIDAVIT OF MR. HARDWICK.

3         CAN YOU TELL THE JURY WHAT AN AFFIDAVIT IS?

4    A.   IT'S A SWORN DOCUMENT UNDER -- JUST -- IT'S A SWORN

5    DOCUMENT.  YOU TAKE AN OATH TO SWEAR TO TELL THE TRUTH.

6    Q.   I'M GOING TO READ THIS TO YOU.

7         IN PARAGRAPH 2, ON PAGE 1:  AT ALL TIMES DURING MY TENURE

8    AS MANAGING PARTNER FOR MHS, I ENGAGED IN ALL PROFESSIONAL

9    ACTIVITIES ON BEHALF OF MHS WITH FULL LEGAL AUTHORITY FROM THE

10   FIRM AND CONDUCTED BUSINESS WITH THE KNOWLEDGE AND CONSENT FROM

11   MY PARTNERS, INCLUDING MARK WITTSTADT, M. WITTSTADT, AND GERARD

12   WITTSTADT, JR., G. WITTSTADT.

13        MR. WITTSTADT, DO YOU AGREE WITH THAT STATEMENT, THAT

14   MR. HARDWICK CONDUCTED BUSINESS WITH THE KNOWLEDGE AND CONSENT

15   FROM YOU?

16   A.   NO.  THAT'S -- NO, I DO NOT AGREE WITH THAT.

17   Q.   AND LET'S LOOK AT PARAGRAPH 11 IN THIS DOCUMENT.

18   MR. HARDWICK STATES:  M. WITTSTADT, G. WITTSTADT, ART MORRIS,

19   RANDY SCHNEIDER, AND I AGREE THAT MHS NEEDED TO OBTAIN FUNDS TO

20   COVER THE SHORTFALL.

21        DO YOU AGREE WITH THAT SO FAR?

22   A.   YES AND NO.

23   Q.   WHAT DO YOU NOT AGREE WITH?

24   A.   IT'S THE TERMINOLOGY, AGREE THAT MHS NEEDED TO OBTAIN

25   FUNDS TO COVER THE SHORTFALL.

3353

1    Q.   WE HAD AN UNDERSTANDING -- IT GOES ON.  WE HAD AN

2    UNDERSTANDING THAT WE HAD TO DO WHATEVER WAS NECESSARY TO

3    BORROW THE MONEY TO COVER THE SHORTFALL, AND I WAS TOLD TO DO

4    WHATEVER WAS NECESSARY TO OBTAIN THE MONEY.

5         DO YOU AGREE WITH THAT STATEMENT?

6    A.   NO.

7    Q.   AND WHAT DO YOU NOT AGREE WITH?

8    A.   I DON'T -- WHATEVER WAS NECESSARY TO BORROW, THAT WE WOULD

9    DO WHATEVER WAS NECESSARY TO BORROW MONEY TO COVER THE

10   SHORTFALL, AND I WAS TOLD TO DO WHATEVER WAS NECESSARY TO

11   OBTAIN THE MONEY.

12        "WHATEVER IS NECESSARY" IMPLIES ALL KINDS OF THINGS.

13   Q.   AND DID YOU GIVE HIM SOME OPTIONS OF THINGS HE COULD DO TO

14   RAISE MONEY?

15   A.   HE SAID HE NEEDED TO BORROW THE MONEY.

16   Q.   AND DID YOU SUGGEST WAYS THAT HE COULD LIQUIDATE SOME

17   ASSETS AND FIND MONEY?

18   A.   I ASKED HIM WHAT -- I WANTED TO KNOW WHAT HE HAD.  WHAT --

19   IF YOU'RE GOING TO BORROW THAT KIND OF MONEY, WHAT ARE YOU

20   GOING TO -- HOW ARE YOU GOING TO PAY IT BACK?  WHAT DO YOU

21   HAVE?  WHAT DO YOU HAVE OF ANY VALUE?

22   Q.   LET'S SKIP THE NEXT SENTENCE.  IT GOES ON:  I ADVISED THAT

23   THE FIRM WOULD HAVE TO GUARANTEE THE LOAN, AND IT WAS

24   UNDERSTOOD THAT I WOULD PROCEED WITH THE TRANSACTIONS.

25        DID HE TELL YOU THAT THE FIRM WOULD HAVE TO GUARANTEE THE

3354

1    LOANS?

2    A.    THAT IS JUST SIMPLY NOT TRUE.

3    Q.    AND WAS IT UNDERSTOOD AMONG THESE PEOPLE LISTED UP HERE --

4    YOU AND YOUR BROTHER, MR. MORRIS AND MR. SCHNEIDER -- THAT IT

5    WAS UNDERSTOOD THAT HE WOULD PROCEED WITH THE TRANSACTIONS AND

6    GUARANTEE -- HAVE THE FIRM GUARANTEE THE LOANS?

7    A.    NO.  NEVER.

8    Q.    MOVING ON, PARAGRAPH 13:  M. WITTSTADT, G. WITTSTADT, AND

9    I UNDERSTOOD AND AGREED THAT MHS WOULD GUARANTEE ANY LOANS WE

10   OBTAINED TO COVER THE SHORTFALL, AND MHS WOULD GUARANTEE TO PAY

11   LOANS BACK ON THE TERMS I COULD NEGOTIATE.

12         DID THAT CONVERSATION HAPPEN?

13   A.    NO, IT DID NOT.

14   Q.    DID YOU SPECIFICALLY TELL HIM, DO NOT HAVE THE FIRM

15   GUARANTEE THESE LOANS?

16   A.    YES, MA'AM, I DID.

17   Q.    I JUST WANT TO ASK YOU ONE QUESTION REGARDING THOSE LOANS.

18   DID MR. JOHNSON AND MR. PRITCHARD EVENTUALLY SUE MHS FOR

19   NONPAYMENT ON THOSE LOANS?

20   A.    YES, MA'AM, THEY DID.

21   Q.    OKAY.  I WANT TO TALK ABOUT -- FAST-FORWARDING A LITTLE

22   BIT IN AUGUST UNTIL THE DAY THAT YOU FIND OUT FROM JEFF MOORE

23   WHAT THE FINAL NUMBER -- HOW BIG THAT HOLE IS.  WHAT DAY WAS

24   THAT?

25   A.    AUGUST 14TH, 2014.

1    Q.   AND WHO TOLD YOU?

2    A.   MR. MOORE DID.

3    Q.   OKAY.  AND DID YOU AND MR. HARDWICK HAVE A CONVERSATION

4    THAT DAY ABOUT WHAT YOU HAD LEARNED FROM MR. MOORE AND THE SIZE

5    OF THE SHORTFALL?

6    A.   NOT THAT DAY.

7    Q.   DID YOU HAVE A CONVERSATION THE NEXT DAY?

8    A.   YES, I DID.

9    Q.   OKAY.  AND DID YOU SPECIFICALLY TALK TO HIM ABOUT SOME

10   WITHDRAWALS, DISBURSEMENTS, TRANSACTIONS, TRANSFERS, WHATEVER

11   HE HAD RECEIVED AT THE BEGINNING OF JULY 2014?

12   A.   I DID.

13   Q.   AND WHAT DID HE SAY?

14   A.   HE SAID -- I TOLD HIM, I SAID, YOU TOOK A MILLION DOLLARS

15   BETWEEN JULY 1 AND JULY 17TH FROM OUR FIRM'S OPERATING ACCOUNT.

16   AND I SAID, WHAT GAVE YOU THE RIGHT TO DO THAT?

17   Q.   AND WHAT WAS HIS RESPONSE?

18   A.   HE SAID, I TOOK AN ADVANCE AGAINST MY AUGUST DISTRIBUTION.

19   Q.   AND I WANT TO SHOW -- WHEN YOU SAY YOU CONFRONTED HIM

20   WITH, YOU TOOK A MILLION DOLLARS -- THIS IS AGAIN

21   GOVERNMENT'S 1004, PAGE 43 -- IS THIS WHAT YOU WERE TALKING

22   ABOUT, $1.2 MILLION, A LITTLE OVER THAT, BY JULY 17TH?

23   A.   YES, MA'AM.

24   Q.   WELL, I'M GOING TO SHOW YOU WHAT THE DEFENSE HAS OFFERED

25   AS DEFENSE EXHIBIT 53.  DOES THIS APPEAR TO BE A REPORT FROM

3356

1    ACTION CAPITAL, THE LINE OF CREDIT?

2    A.    THOSE WERE THE, THOSE WERE THE DAILY TYPE OF REPORTS THAT

3    WE WOULD RECEIVE FROM ACTION CAPITAL.

4    Q.    AND WHAT'S THE DATE OF THIS PARTICULAR REPORT?

5    A.    JULY 1, 2014.

6    Q.    DID MR. HARDWICK SAY, WELL, I KNEW FROM THE ACTION CAPITAL

7    LINE THAT WE HAD $954,000 IN CASH AVAILABLE, SO THAT'S WHY I

8    TOOK A MILLION DOLLARS?

9    A.    NO.

10   Q.    DID HE EVER OFFER UP THAT LINE OF CREDIT AS THE EXCUSE FOR

11   WHY HE BELIEVED HE WAS ENTITLED TO TAKE THAT MONEY?

12   A.    NO.  I ASKED HIM WHERE THE MONEY -- WHERE HE THOUGHT THE

13   MONEY CAME FROM.

14   Q.    DID HE EVER TELL YOU THAT, I THOUGHT WE, I THOUGHT WE HAD

15   THIS CASH IN THE RESERVE BALANCE, AND SO THAT'S WHERE IT CAME

16   FROM?

17   A.    NO, MA'AM.

18   Q.    AND WHAT WAS THE EXCUSE HE GAVE?

19   A.    HE SAID, HE SAID THAT HE TOOK IT AS AN ADVANCE AGAINST HIS

20   AUGUST DISTRIBUTION.

21   Q.    WE TALKED ON YOUR DIRECT EXAM ABOUT FIDELITY.  AND REMIND

22   THE JURY, WHAT WOULD HAVE HAPPENED IF FIDELITY HAD DECIDED TO

23   PULL ITS CLOSING PROTECTION LETTERS RIGHT THERE IN AUGUST 2014?

24   A.    THE FIRM WOULD HAVE BEEN FORCED TO FILE BANKRUPTCY THE

25   NEXT DAY.

3357

1   Q.   AND DID YOU ULTIMATELY REACH AN AGREEMENT WITH FIDELITY

2   WHERE THEY WOULD HELP FUND THE SHORTFALL?

3   A.   I DID.

4   Q.   OKAY.  SO WE TALKED ABOUT THE $37 MILLION FIGURE.  HOW

5   MUCH WAS MR. HARDWICK ABLE TO RAISE?  YOU SAID HE PUT IN 1.4?

6   A.   YES, MA'AM.

7   Q.   PLUS 5 FROM PRITCHARD AND JOHNSON?

8   A.   YES.

9   Q.   SO 6.4?

10  A.   YES.

11  Q.   OKAY.  AND SO THE BALANCE OF WHAT ELSE WAS MISSING, WAS

12  FIDELITY THE ONLY ONE CONTRIBUTING TO THAT?

13  A.   YES.

14  Q.   OKAY.

15  A.   WELL, NO.  NO.  THERE WAS AN ADDITIONAL $1.5 MILLION THAT

16  MR. MORRIS LENT TO THE FIRM FOR THE FIRM TO PUT INTO THE ESCROW

17  ACCOUNT.

18  Q.   OKAY.  SO I WANT TO ASK YOU ABOUT THOSE PAYMENTS FROM

19  FIDELITY.  DO YOU KNOW IF FIDELITY ACTUALLY EVER DID MAKE THOSE

20  PAYMENTS TO THE LAW FIRM?

21  A.   A HUNDRED PERCENT THEY DID.

22  Q.   AND HOW DO YOU KNOW THAT?

23  A.   I SAW THE INFUSION OF MILLIONS OF DOLLARS INTO THE TRUST

24  ACCOUNTS.  MILLIONS.  TENS OF MILLIONS OF DOLLARS.

25  Q.   YOU ACTUALLY SAW THE MONEY COMING IN?

3358

1   A.   MONEY -- I SAW THE BANK STATEMENTS.  I SAW THE ESCROW

2   RECONCILIATION REPORTS.  I SAW THE MONEY COMING IN.  ALMOST

3   $30 MILLION.

4   Q.   AND ARE YOU ALSO FAMILIAR WITH DOCUMENTS THAT FIDELITY

5   FILED, PUBLIC DOCUMENTS THAT THEY FILED WITH THE SECURITIES AND

6   EXCHANGE COMMISSION?

7   A.   YES.

8   Q.   AND DO THOSE DOCUMENTS ALSO DISCUSS AN INFUSION OF MONEY?

9   A.   YES, MA'AM, THEY DO.

10  Q.   AND SO I'M GOING TO SHOW YOU A COUPLE OF EXHIBITS.  THIS

11  WAS INTRODUCED AS DEFENSE EXHIBIT 710.

12  A.   OKAY.

13  Q.   AND I WILL REPRESENT TO YOU THAT THIS IS THE MORRIS

14  HARDWICK SCHNEIDER 2014 TAX RETURN.  WERE YOU INVOLVED IN THE

15  PREPARATION OF THIS TAX RETURN?

16  A.   I WAS.

17  Q.   WERE YOU ACTUALLY THE ONE WHO WAS WORKING WITH THE CPA AT

18  BENNETT THRASHER TO FILE THIS DOCUMENT?

19  A.   I WAS.

20  Q.   DOES THIS DOCUMENT REFER TO THE SHORTFALL IN THE ESCROW

21  ACCOUNT?

22  A.   NO, IT DOES NOT.

23  Q.   WHY NOT?

24  A.   FIDELITY HAD PLUGGED THE HOLE.  THE -- THERE WASN'T ANY

25  MORE -- THERE WAS NO LONGER A LOSS.  THE ONLY WAY THAT THAT

3359

1    WOULD SHOW IT IS IF THERE WAS A CORRESPONDING EXPENSE, BUT

2    THAT'S NOT THE WAY THE TRANSACTION WAS SET UP.

3        THE TRANSACTION WAS SET UP WITH -- WHERE FIDELITY TOOK A

4    70 PERCENT STAKE IN LANDCASTLE FOR $1, THE ASSIGNMENT OF

5    CERTAIN CLAIMS, AND THE AGREEMENT TO GIVE A CAPITAL

6    CONTRIBUTION TO LANDCASTLE, FOR WHICH THEN LANDCASTLE THEN

7    PUMPED INTO THE ESCROW ACCOUNTS OF THE FIRM.

8        SO THE FIRM NEVER RECEIVED THE MONEY FROM LANDCASTLE.  IT

9    NEVER -- IN A TECHNICAL SENSE, THERE WAS NOT A SALE, SO THERE

10   WAS NEVER MONEY THAT IT RECEIVED FROM THE SALE.

11   Q.   IS THAT INCOME FROM THE SALE OF ASSETS?

12   A.   YEAH.  IT WAS NOT INCOME FROM THE SALE.  IT WASN'T INCOME

13   FROM THE SALE.  AND SO, THEREFORE, THE FIRM NEVER TOOK A

14   DEDUCTION OR AN EXPENSE TO ITS ESCROW ACCOUNTS.  THERE WOULD

15   NEVER BE A HOLE, THERE WOULD NEVER BE THAT KIND OF LOSS BASED

16   UPON THE MANNER IN WHICH THE TRANSACTION OCCURRED.

17   Q.   SO DOES THE FACT THAT THE 2014 TAX RETURN, WHICH YOU

18   HELPED PREPARE, DOES THE FACT THAT IT DOESN'T MENTION THE HOLE

19   IN THE ESCROW THAT FIDELITY PLUGGED MEAN THAT THAT HOLE DIDN'T

20   EXIST?

21   A.   THAT HOLE EXISTED.  THAT HOLE 100 PERCENT EXISTED.

22   Q.   I WANT TO SHOW YOU WHAT IS NOT IN EVIDENCE BUT WAS OFFERED

23   AS A DEMONSTRATIVE EXHIBIT THROUGH ANOTHER WITNESS.  AND THIS

24   IS -- IT CONTAINS CALCULATIONS THAT WERE DONE BY THIS WITNESS,

25   AND IT INCLUDES -- WELL, I'LL -- LET'S JUST GET TO THE

3237301cb517ad17

3360

1    PUNCHLINE.

2        THE AMOUNT MR. HARDWICK WAS UNDERDISTRIBUTED AND THE

3    AMOUNT THAT MHS TODAY OWES MR. HARDWICK IS $470,000.  SO LET'S

4    TALK ABOUT HOW THAT NUMBER IS CALCULATED.

5        AND THE NUMBER I WANT YOU TO FOCUS ON RIGHT HERE IS DUE TO

6    MR. HARDWICK BASED ON TAX RETURNS, 2014.  AND WHAT'S THE AMOUNT

7    THERE?

8    A.   IT SAYS $6.4 MILLION.

9    Q.   OKAY.  AND SO IT'S REFERRING TO THE TAX RETURNS FOR 2014.

10   I WANT TO DIRECT YOUR ATTENTION TO WHAT HAS BEEN OFFERED AS

11   DEFENSE EXHIBIT 711.

12        MR. GARLAND:  YOUR HONOR, HE IS NOT AN EXPERT.  HE IS

13   OFFERING EXPERT TESTIMONY.

14        THE COURT:  SO WHAT'S YOUR OBJECTION?  OUTSIDE THE

15   SCOPE OF HIS KNOWLEDGE?

16        MR. GARLAND:  THAT HE'S OFFERING TESTIMONY AS AN

17   EXPERT.

18        THE COURT:  OKAY.  OVERRULED.

19   BY MS. BARRON:

20   Q.   AND, MR. WITTSTADT, JUST TO REMIND THE JURY, ARE YOU THE

21   PERSON AT MORRIS HARDWICK SCHNEIDER THAT WORKED WITH BENNETT

22   THRASHER TO PREPARE THIS TAX RETURN?

23   A.   YES, MA'AM.  AT THAT POINT IN TIME, I WAS.

24   Q.   OKAY.  SO I'M GOING TO SHOW YOU --

25   A.   YES.

3361

1    Q.   -- ONE OF THE SCHEDULES ON THIS TAX RETURN.  DO YOU SEE

2    WHERE IT SAYS, LOAN FROM NAT HARDWICK, 6.458 -- $6,458,000?

3    A.   I SEE THAT.

4    Q.   OKAY.  AND DO YOU BELIEVE THAT NUMBER TO REPRESENT THE 1.4

5    THAT HE PAID AND THEN THE 5 MILLION THAT THE FIRM PAID?

6    A.   YES.

7    Q.   OKAY.  AND SO ON THE ASSUMPTION THAT MR. HARDWICK MADE

8    THAT CONTRIBUTION, THE PRIOR WITNESS CALCULATES -- AND SOME

9    OTHER MATH -- THE PRIOR WITNESS CALCULATES THAT HE IS OWED THAT

10   MUCH MONEY.

11       MR. WITTSTADT, BASED ON THE FACTS AS YOU LIVED THROUGH

12   THEM, IS THERE ANY WAY THAT MORRIS HARDWICK SCHNEIDER OWES

13   MR. HARDWICK $470,101?

14   A.   NO WAY.

15   Q.   DOES IT OWE HIM A PENNY?

16   A.   NO, IT DOESN'T.  NO.  NO.  NO.

17   Q.   AND I WANT TO LOOK HERE AT THE TOP.  BECAUSE THE PREMISE

18   OF THIS ENTIRE CALCULATION IS THAT MR. HARDWICK WAS ENTITLED TO

19   26 MILLION, BUT THAT YOU AND YOUR PARTNERS SHOULD ALSO HAVE

20   RECEIVED ENOUGH MONEY TO TRUE-UP HIS OVERAGE.

21       DO YOU SEE THAT AMOUNT THAT OTHER OWNERS SHOULD HAVE

22   RECEIVED, $21,684,623?

23   A.   I SEE IT.

24   Q.   SO BETWEEN 2011 AND 2014, DID THE FIRM EVER MAKE PROFITS

25   TO SUSTAIN DISTRIBUTIONS OF $48,188,052?

3362

1          MR. GARLAND:  OBJECTION.  FORM OF THE QUESTION.  IT'S

2    MISLEADING.  DISTRIBUTIONS AND PROFITS ARE DIFFERENT.

3          THE COURT:  I'LL OVERRULE.

4    BY MS. BARRON:

5    Q.   DID THE FIRM EVER MAKE PROFITS TO -- LET ME ASK YOU THIS:

6    LET'S USE THE LANGUAGE OF THE SHAREHOLDER AGREEMENT.

7          DID THE FIRM EVER HAVE TAXABLE INCOME THAT WOULD SUPPORT

8    DISTRIBUTIONS TO THE PARTNERS IN THE AMOUNT OF $48,188,052?

9    A.   NO.

10   Q.   OKAY.  SO LET'S ASSUME THERE WAS SOME OTHER METRIC THAT

11   YOU COULD DISTRIBUTE.  LET'S ASSUME THAT THIS CAME OUT OF

12   AVAILABLE CASH ON ANY GIVEN DAY.

13         IF THE FIRM HAD DISTRIBUTED $48 MILLION OUT OF CASH

14   AVAILABLE, WHAT WOULD HAVE HAPPENED TO THE FIRM?

15   A.   WE WOULD NEVER HAVE BEEN ABLE TO DISTRIBUTE THAT MUCH

16   MONEY.  WE WOULD HAVE GONE BANKRUPT BEFORE THAT.

17         MS. BARRON:  THANK YOU, MR. WITTSTADT.  I HAVE NO

18   FURTHER QUESTIONS.

19         THE COURT:  CROSS-EXAMINATION?

20                    CROSS-EXAMINATION

21   BY MR. GARLAND:

22   Q.   GOOD AFTERNOON, MR. WITTSTADT.

23   A.   GOOD AFTERNOON, MR. GARLAND.

24   Q.   DID YOU SEND MONEY FROM THE FORECLOSURE OPERATING AND BANK

25   ACCOUNTS TO MORRIS HARDWICK & SCHNEIDER'S ACCOUNTS IN ATLANTA?

3363

1    A.   WE DID, YES, SIR.

2    Q.   AND DID THAT MONEY GO INTO THE WIRE ACCOUNT, THE ESCROW

3    ACCOUNT?

4    A.   I UNDERSTAND THAT IT ULTIMATELY GOT THERE, SOME OF IT,

5    YES.

6    Q.   YOU TRACED IT, AND -- SUBSTANTIAL AMOUNT OF MONEY HAVING

7    COME FROM UP IN FORECLOSURE, AND THAT MONEY WOUND UP BEING IN

8    THE MONEY THAT WENT INTO THE ESCROW ACCOUNT, RIGHT?

9    A.   THAT IS CORRECT, SIR.

10   Q.   ALL RIGHT.  NOW, YOU SIGNED THE TAX RETURN THAT WAS FILED

11   FOR 2014?

12   A.   I THINK I DID, YES, SIR.  I KNOW I HELPED PREPARE IT.

13   WHETHER -- I THINK IT GOT ELECTRONICALLY FILED.  I DON'T KNOW

14   IF MY SIGNATURE IS ACTUALLY ON IT.

15   Q.   AND YOU FILED THAT RETURN THAT SAID MR. HARDWICK WAS OWED

16   $6 MILLION, DIDN'T YOU?

17   A.   IF IT WENT THAT WAY THAT -- AND I SIGNED IT, THEN THAT'S

18   WHAT I DID.

19   Q.   THAT'S WHAT THE NUMBERS SHOWED, RIGHT?

20   A.   NO.  THAT'S INCORRECT.

21   Q.   BUT --

22   A.   I THINK THAT'S INCORRECT ON THERE.

23   Q.   YOU DON'T THINK THAT'S WHAT THE TAX RETURN SAYS?

24   A.   NO, SIR.  THAT'S NOT WHAT I SAID.

25   Q.   YOU KNOW THAT WHAT'S ON A TAX RETURN, YOU SWEAR UNDER

3364

1    PENALTY OF PERJURY IS CORRECT, DON'T YOU?

2    A.   I DON'T THINK YOU SWEAR UNDER THE PENALTY OF PERJURY IT'S

3    CORRECT.

4    Q.   YOU THINK YOU CAN FILE -- YOU DON'T THINK YOU DO?

5    A.   I DON'T REMEMBER.  I DON'T REMEMBER WHAT THE BOTTOM OF THE

6    TAX RETURN SAYS.  IF IT DOES, IT DOES.  BUT I DON'T RECALL IT

7    SAYING THAT YOU SWEAR UNDER THE PENALTY OF PERJURY.  BUT I

8    KNOW --

9    Q.   YOU KNOW IT'S A CRIME TO MAKE A FALSE STATEMENT TO THE

10   GOVERNMENT?

11   A.   TO KNOWINGLY MAKE A FALSE STATEMENT.  THAT'S CORRECT.

12   Q.   YOU KNOW ON YOUR TAX RETURN, IT REQUIRES YOU TO TELL THE

13   TRUTH ON YOUR TAX RETURN, RIGHT?

14   A.   YOU'RE SUPPOSED TO TELL THE TRUTH ON THE TAX RETURN.

15   THAT'S CORRECT, SIR.

16   Q.   AND WHEN YOU SIGNED THAT TAX RETURN, YOU THOUGHT YOU WERE

17   TELLING THE TRUTH, RIGHT?

18   A.   YES, SIR.

19   Q.   AND THAT TAX RETURN, AS YOU SAID, YOU WENT OUT AND WORKED

20   WITH BENNETT THRASHER TO PREPARE THAT TAX RETURN, CORRECT?

21   A.   NO.  I DIDN'T GO OUT TO WORK WITH HIM.  THEY -- WE

22   TRANSFERRED THROUGH OUR ACCOUNTING UNITS THE INFORMATION TO

23   BENNETT THRASHER.  THEY WORKED THE TAX RETURNS, THEY WORKED

24   WITH THE FOLKS THAT I HAD LEFT IN ACCOUNTING AND THEN PRESENTED

25   TO ME WHAT THEY SAID WAS THE TAX RETURN.

3365

1    Q.    YOU JUST HAD TO RELY ON THEM, RIGHT?

2    A.    I RELIED ON THEM AND I LOOKED AT IT.

3    Q.    AND YOU KNEW WHEN YOU SIGNED IT THAT THAT TAX RETURN SAID

4    THAT NAT HARDWICK, AFTER YOU'VE DONE ALL THE ACCOUNTING, WAS

5    OWED $6 MILLION?

6              MS. BARRON:  OBJECTION.  MISSTATES THE DOCUMENT.

7              THE COURT:  OVERRULED.

8              THE WITNESS:  NO, SIR.  THAT'S NOT -- I SIGNED IT.

9    WHETHER I -- DID I -- DID I REMEMBER SEEING THAT PARTICULAR

10   LINE ITEM ON THE TAX RETURN?  NO, I DO NOT.  I DO NOT REMEMBER

11   SEEING THAT PARTICULAR LINE ITEM ON THE TAX RETURN.

12   BY MR. GARLAND:

13   Q.    IF THE TAX RETURN AND THE WORK PAPERS SHOW AN ENTRY THAT

14   SAYS MR. HARDWICK IS OWED $6 MILLION, ARE YOU SAYING THE TAX

15   RETURN IS WRONG?

16             MS. BARRON:  YOUR HONOR, I OBJECT.  I WOULD ASK THAT

17   MR. GARLAND SHOW HIM THE ENTRY HE'S REFERRING TO.

18             THE COURT:  OVERRULED.

19             THE WITNESS:  MR. GARLAND, I'M NOT, I AM NOT AN

20   EXPERT IN ACCOUNTING.  I HIRED BENNETT THRASHER TO DO THE TAX

21   RETURN.  IF YOU'RE ASKING ME DO I BELIEVE THAT THE LAW FIRM

22   OWES MR. HARDWICK $6.4 MILLION --

23   BY MR. GARLAND:

24   Q.    I DIDN'T ASK YOU THAT.

25   A.    OKAY.

3366

1    Q.   BUT WHETHER THE TAX RETURN IS CORRECT, IT WAS FILED, THAT

2    YOU SIGNED AND SENT AUTHORITY FOR BENNETT THRASHER TO FILE IT?

3    A.   AS I SIT HERE TODAY, WHEN I, WHEN I AUTHORIZED IT TO BE

4    FILED, I BELIEVED THAT IT WAS CORRECT.

5    Q.   ALL RIGHT.  NOW, LET'S TALK ABOUT THE TRANSACTION WITH

6    FIDELITY.  FIDELITY MADE AN INVESTMENT, DIDN'T THEY?

7    A.   I WOULDN'T CALL IT AN INVESTMENT, SIR.

8    Q.   WELL, ARE YOU FAMILIAR WITH DEFENDANT'S EXHIBIT 672,

9    LIMITED LIABILITY COMPANY MEMBERSHIP INTEREST CONTRIBUTION

10   AGREEMENT?  ARE YOU FAMILIAR WITH THAT DOCUMENT?

11   A.   YES, SIR.  I DID SIGN THIS.

12   Q.   ALL RIGHT.  NOW, I WANT TO SHOW YOU PAGE 4, PARAGRAPH D.

13   A.   OKAY.

14   Q.   ASK YOU TO READ OVER PARAGRAPH D TO YOURSELF, AND THEN

15   I'LL HAVE SOME QUESTIONS FOR YOU.

16   A.   OKAY.  YES, SIR.

17   Q.   I'M GOING TO DISPLAY PAGE 4 OF -- WELL, FIRST, YOU SIGNED

18   THAT AGREEMENT, RIGHT?

19   A.   YES, SIR, I DID.  THAT'S MY SIGNATURE ON THERE.

20   Q.   AND FIDELITY SIGNED THAT, RIGHT?

21   A.   I BELIEVE I SAW THEIR SIGNATURE ON THAT, ON THE COPY THAT

22   YOU HAVE THERE, TOO.

23   Q.   AND YOU READ IT BEFORE YOU SIGNED IT, CORRECT?

24   A.   YES, SIR, I DID.

25   Q.   AND THEY READ IT BEFORE THEY SIGNED IT?  THE BEST YOU

3367

1   KNOW.  YOU NEGOTIATED WITH THEM.

2   A.   I WOULD THINK THAT THEY DID, SIR, BUT I --

3   Q.   I WOULD THINK SO.  EXCUSE ME.  I SHOULDN'T SAY THAT.  I

4   WOULD AGREE WITH YOU.

5        NOW, IN PARAGRAPH D, IT SAID THAT FNF IS ACQUIRING THE

6   MEMBERSHIP INTEREST FOR INVESTMENT ONLY AND NOT WITH A VIEW TO

7   RESELL.

8   A.   RIGHT, UH-HUH.

9   Q.   AND THEY SAY THEY ARE ACQUIRING IT FOR INVESTMENT,

10  CORRECT?

11  A.   THAT'S WHAT THAT SENTENCE SAYS.

12  Q.   THAT'S WHAT THEY SAID AND THAT'S WHAT YOU SIGNED AND THEIR

13  REPRESENTATIVE SIGNED.

14       NOW, IT GOES ON TO SAY THEY WILL NOT OFFER FOR RESALE OR

15  OTHERWISE DISPOSE OF ANY PART OF SUCH SECURITIES EXCEPT IN

16  ACCORDANCE WITH APPLICABLE LAW.  FNF ACKNOWLEDGES THAT FOR THE

17  RECEIPT OF THE ACQUIRED MEMBERSHIP INTEREST IS A SPECULATIVE

18  RISK.  RIGHT?

19  A.   THAT'S WHAT THAT SAYS.

20  Q.   THEY WERE ACKNOWLEDGING THAT THEY WERE MAKING AN

21  INVESTMENT, BUYING 70 PERCENT OF THE INTEREST IN THE TITLE

22  COMPANY, IN RETURN FOR SAYING THEY'LL FILL WHATEVER HOLE IS

23  THERE.  ISN'T THAT WHAT THE EFFECT OF THIS DOCUMENT WAS?

24  A.   THEY WERE TAKING A 70 PERCENT STAKE IN LANDCASTLE AND

25  AGREEING TO THAT CAPITAL CONTRIBUTION.

3368

1    Q.    LANDCASTLE HAD -- WAS AN ASSET OF THE LAW FIRM, RIGHT?

2    A.    THAT IS TRUE.  WELL, IT'S AN ASSET OF THE PARENT COMPANY;

3    BUT, YES.

4    Q.    AND YOU AND YOUR BROTHER WERE 100 PERCENT OWNERS OF THE

5    LAW FIRM AND THUS 100 PERCENT OWNER OF LANDCASTLE TITLE AT THAT

6    MOMENT, RIGHT?  BEFORE THE SALE?

7    A.    I'M NOT -- I'LL AGREE WITH YOU IN THAT WE WERE

8    100 PERCENT -- WE OWNED 100 PERCENT OF THE OUTSTANDING STOCK IN

9    THE PARENT COMPANY, NOT THE LAW FIRM.

10   Q.    AND YOU TOOK 70 PERCENT OF YOUR OWNERSHIP INTEREST IN

11   LANDCASTLE TITLE, THAT YOU HAD 100 PERCENT OWNERSHIP OF THROUGH

12   THE LAW FIRM AT THAT POINT, AND SOLD IT AS AN INVESTMENT TO

13   FNF, CORRECT?

14   A.    INCORRECT.

15   Q.    WELL, YOU SOLD IT TO ONE OF -- WHO BOUGHT IT?

16   A.    NOBODY BOUGHT IT.  IT WASN'T A SALE.  THERE'S A BIG

17   DIFFERENCE IN THE TYPE OF TRANSACTION THAT HAPPENED HERE AS

18   BETWEEN A SALE AND THE MEMBERSHIP INTEREST BEING TRANSFERRED IN

19   EXCHANGE FOR THAT NEEDED CAPITAL CONTRIBUTION.

20   Q.    IF I SELL 70 PERCENT OF AN OWNERSHIP INTEREST IN A LIMITED

21   LIABILITY COMPANY WHERE I OWN 100 PERCENT, AND I SAY YOU CAN

22   HAVE 70 PERCENT, AND YOU IN TURN GIVE CASH, THAT'S A SALE,

23   ISN'T IT?

24   A.    NO, SIR.  YOU'RE, YOU'RE CONFUSING THE TWO IN THE LAW.

25   ONE IS A SALE, ONE WAS A TRANSFER OF THE MEMBERSHIP INTEREST

3369

1    WITH A CAPITAL CONTRIBUTION.  IT WAS NOT A SALE OF 70 PERCENT.

2    Q.   SO, STAND CORRECTED.  IT WASN'T A SALE.  THEY PUT THE

3    CAPITAL CONTRIBUTION IN, WHICH IS MONEY; AND IN RETURN, THEY

4    GET THE MEMBERSHIP INTEREST.

5    A.   THAT IS CORRECT, SIR.

6    Q.   SO IT'S -- IN THAT -- THEY TRANSFER MONEY, AND THEY WIND

7    UP THE OWNER.  DO YOU AGREE WITH THAT?

8    A.   THEY WOUND UP WITH AN OWNER OF 70 PERCENT, YES, SIR.

9    Q.   SO WE'RE CLEAR, MONEY CHANGES HANDS AS AN INVESTMENT; AND

10   IN RETURN, THEY GET THE 70 PERCENT OWNERSHIP INTEREST IN AN

11   ASSET THAT YOU HAD OWNED 100 PERCENT OF, CORRECT?

12   A.   EFFECTIVELY, THAT OCCURRED.

13   Q.   EFFECTIVELY, THAT'S RIGHT.  OKAY.  AND IT SAYS, FNS [SIC]

14   CAN BEAR THE ECONOMIC RISK OF ITS INVESTMENT FOR AN INDEFINITE

15   PERIOD OF TIME AND HAS SUCH KNOWLEDGE AND EXPERIENCE IN

16   FINANCIAL OR BUSINESS MATTERS THAT IT IS CAPABLE OF EVALUATING

17   THE MERITS AND RISKS OF AN INVESTMENT IN THE ACQUIRED

18   MEMBERSHIP INTEREST.

19       YOU AGREE THAT THAT'S WHAT THEY AFFIRMATIVELY PUT IN THIS

20   DOCUMENT, CORRECT?

21   A.   YOU READ IT.  THAT'S WHAT IT SAYS.

22   Q.   ALL RIGHT.  SO THE INVESTMENT AND ITS RISK IS WHAT FNF

23   ACQUIRED, RIGHT?

24   A.   THEY ACQUIRED WHAT THE DOCUMENT SAYS THEY ACQUIRED.

25   Q.   RIGHT.  THEY COULD HAVE SIMPLY MADE A LOAN IN AN AMOUNT

3370

1    SUFFICIENT TO COVER THE HOLE IF THEY WANTED TO, RIGHT?

2    A.   COULD -- WOULD THEY HAVE MADE IT?  I DON'T KNOW.

3    Q.   I DON'T KNOW.

4    A.   I DON'T KNOW.

5    Q.   I AGREE YOU DON'T KNOW.  AND THE -- BENNETT THRASHER WAS

6    FULLY AWARE OF ALL THESE DOCUMENTS AND TRANSACTIONS AT THE TIME

7    THEY PREPARED THOSE TAX RETURNS, CORRECT?

8    A.   I BELIEVE THEY WERE.

9    Q.   ALL RIGHT.  NOW, I WANT TO TALK ABOUT THE HOLE IN THE

10   ESCROW ACCOUNT.  NO ONE EVER ESTABLISHED A BEGINNING POINT FOR

11   THE ACCOUNTING OF WHAT WAS IN THE ESCROW ACCOUNT, CORRECT,

12   BECAUSE OF THE --

13   A.   NO.  THAT'S NOT CORRECT.

14   Q.   FROM WHAT POINT IN TIME WAS A DETERMINATION MADE AS TO THE

15   EXISTENCE OF A HOLE IN THE ESCROW ACCOUNT?

16   A.   OH, I SEE YOUR QUESTION.  THAT'S DIFFERENT.  THERE WAS --

17   YOU KNOW, IT STARTED OFF WITH ZERO BALANCE.  AT SOME POINT IN

18   TIME IT BECAME UPSIDE DOWN.

19   Q.   WHEN DID IT HAVE A ZERO BALANCE?

20   A.   WHEN IT STARTED.

21   Q.   WHEN DID IT START?

22   A.   I BELIEVE IT WAS IN 2009 OR 2008, 2009.

23   Q.   AND IT WAS NEVER RECONCILED FROM 2009 UP UNTIL

24   MR. HARDWICK WAS REMOVED, RIGHT?

25   A.   MR. HARDWICK RESIGNED.

3371

1    Q.   RESIGNED.  AND WHETHER THERE WAS A HOLE IN IT DURING THAT

2    TIME, YOU DON'T KNOW WHAT CAUSED THE HOLE?

3    A.   I DIDN'T KNOW THAT THAT ESCROW ACCOUNT EXISTED UNTIL I GOT

4    TO ATLANTA IN JULY OR THE BEGINNING OF AUGUST OF 2014.  I

5    HADN'T -- I HAVE NOT SEEN A RECONCILIATION OF THAT ACCOUNT.

6    Q.   RIGHT.  AND YOU HAVEN'T EVER SEEN AN ENDING POINT

7    RECONCILIATION, HAVE YOU, EITHER?

8    A.   YES, SIR, I -- YES, I HAVE.

9    Q.   YOU SAW THAT WHEN IT WOUND DOWN, RIGHT?

10   A.   THAT'S CORRECT, SIR.

11   Q.   ALL RIGHT.  NOW, BUT THERE NEVER WAS AN ASCERTATION -- IT

12   WAS NEVER ANY MOMENT WHERE IT WAS ASCERTAINED -- NOT

13   ASCERTAINED -- WHEN IT WAS ANALYZED IN A WAY WHERE YOU COULD

14   KNOW WHOSE MONEY WENT OUT OF THAT ESCROW ACCOUNT, CORRECT?

15   A.   I -- I'M NOT FOLLOWING YOUR QUESTION, SIR.  PLEASE, IF YOU

16   COULD ASK IT TO ME AGAIN, PLEASE.  I'M NOT SURE EXACTLY --

17   Q.   YOU DID FIND OUT THAT THE LAW FIRM HAD PUT MILLIONS OF

18   DOLLARS INTO THAT ESCROW ACCOUNT OVER THE YEARS, DID YOU NOT?

19   A.   YES, SIR, IT DID.

20   Q.   AND YOU FOUND OUT, OUT OF THAT ESCROW ACCOUNT, THAT

21   LAWYERS IN THE LAW FIRM, INCLUDING YOURSELF AND YOUR BROTHER

22   AND OTHERS, AND CLERICAL STAFF, RECEIVED PAYMENTS OF MILLIONS

23   AND MILLIONS OF DOLLARS OUT OF THAT ACCOUNT.

24   A.   PAYROLL WAS THEN -- PAYROLL WAS MADE OUT OF THAT ACCOUNT.

25   Q.   HOW MANY MILLIONS OF DOLLARS WAS PAYROLL OVER A FOUR-YEAR

3372

1    PERIOD?

2    A.   I'M NOT REALLY SURE, SIR.

3    Q.   WELL, HOW MUCH WAS YOUR YEARLY PAYROLL; DO YOU KNOW?

4    A.   YEAH.  YES, SIR.  I BELIEVE -- IT FLUCTUATED.  OKAY.  I

5    MEAN, AS EMPLOYEES GO UP, YOUR PAYROLL GOES UP.

6    Q.   CERTAINLY.

7    A.   BUT YOU COULD PROBABLY SAY, ON AN AVERAGE, IT WAS ABOUT

8    $1.2 MILLION, 1.1 MILLION OVER A PERIOD OF TIME, MAYBE EVERY

9    TWO WEEKS.  SO MAYBE 2.2, 2.3 MILLION, 2.4 MILLION A MONTH.  SO

10   YOU HAVE A CALCULATOR.

11   Q.   I'M NOT THAT GOOD AT IT.  BUT LET'S JUST ROUND IT OFF TO

12   2 MILLION A MONTH, TIMES ONE YEAR, IT WOULD BE, WHAT,

13   24 MILLION?

14   A.   $24 MILLION, YES, SIR.

15   Q.   TIMES FOUR YEARS WOULD BE CLOSE TO 100 MILLION, SINCE WE

16   WROTE OFF 400,000, RIGHT?

17   A.   I'M NOT, I'M NOT SURE HOW LONG THAT, THAT --

18   Q.   IT WAS AT THAT LEVEL?

19   A.   -- THAT, THAT PAYROLL WAS BEING MADE OUT OF THE ACCOUNT.

20   BUT I WILL AGREE WITH YOU, SIR, THAT PAYROLL WAS MADE OUT OF

21   THAT ACCOUNT.  FOR EXACTLY HOW LONG AND FOR EXACTLY HOW MANY

22   TIMES, THAT I AM UNSURE.

23   Q.   BECAUSE NOBODY EVER COULD DO THE ACCOUNTING ON THAT

24   ACCOUNT TO DETERMINE, RIGHT?

25   A.   NO, THAT'S NOT THE REASON.  I JUST DON'T KNOW.

3373

1   Q.   OKAY.  SO WAS THE HOLE CREATED BY THE LAW FIRM LIVING OUT

2   OF THAT ESCROW ACCOUNT?

3   A.   NO.  THE HOLE WAS CREATED BECAUSE OF MR. HARDWICK LIVING

4   OUT OF THAT ESCROW ACCOUNT.

5   Q.   WHOSE MONEY CAME OUT OF THE ESCROW ACCOUNT, LAW FIRM MONEY

6   OR CLIENTS' MONEY?

7   A.   I WOULD SAY BOTH.

8   Q.   UH-HUH.  HOW MUCH WAS LAW FIRM MONEY THAT CAME OUT OF THE

9   ACCOUNT AS OPPOSED TO CLIENT MONEY?

10  A.   WELL, I WOULD SAY THAT CLIENT MONEY WAS 37 MILLION,

11  BECAUSE THAT'S THE AMOUNT, WHEN THAT -- THAT WAS THE AMOUNT

12  THAT ENDED UP NEEDING TO BE PLUGGED INTO THE, INTO THE ESCROW

13  ACCOUNT IN TOTAL TO SATISFY ALL THE, ALL OF THE ESCROW

14  LIABILITIES OF THOSE ACCOUNTS.

15  Q.   AND IF THE LAW FIRM HAD TAKEN THAT MONEY OUT, IT WOULD

16  CREATE A HOLE, RIGHT?

17  A.   IF -- ANY MONEY COMING OUT OF AN ESCROW ACCOUNT THAT'S NOT

18  ASSOCIATED WITH THE, WITH THE FILE THAT IS -- THAT MONEY IS

19  SUPPOSED TO BE IN THERE WILL CREATE A HOLE IN THE ESCROW

20  ACCOUNT, YES, SIR.

21  Q.   SO 75 MILLION IN PAYROLL TO THE LAW FIRM CAME OUT.  THAT

22  COULD CREATE A HOLE, COULDN'T IT?

23  A.   WELL, BUT THEN YOU WOULD HAVE TO LOOK AT HOW MUCH MONEY

24  WENT IN.  IT WAS -- YOU AND I ARE GOING TO AGREE ON ONE THING,

25  MR. GARLAND, WITH REGARDS TO THIS.  THAT ESCROW ACCOUNT WAS A

3374

1    MESS.

2    Q.   IT WAS A MESS THAT COULD NOT BE RECONCILED, RIGHT?

3    A.   OH, NO.  IT COULD BE RECONCILED.

4    Q.   BUT RECONCILING WOULD MEAN, WOULD IT NOT, DETERMINING BY A

5    THREE-WAY RECONCILIATION WHAT MONEY WAS WHAT CLIENT'S AND WHAT

6    MONEY WAS LAW FIRM MONEY, RIGHT?  THAT'S WHAT IT WOULD TAKE.

7    YOU WOULD HAVE TO SEPARATE OUT WHOSE MONEY WAS WHOSE.  YOU

8    WOULD AGREE WITH THAT, RIGHT?

9    A.   WHEN YOU DO A RECONCILIATION, YES, YOU HAVE TO, YOU HAVE

10   TO, YOU HAVE TO FIGURE OUT WHOSE MONEY CAME IN AND FOR WHAT

11   PURPOSE, AND PUT THAT THERE AND PUT THIS OVER HERE.  AND THEN

12   FIGURE OUT WHAT CAME OFF OF THAT AND DID IT COME OFF CORRECTLY.

13   AND THEN WAS THERE MONEY COMMINGLED IN THAT ACCOUNT FROM THE

14   OPERATING ACCOUNTS AND FIGURE OUT WHAT WAS PAID AND TRY TO

15   SYPHON IT THAT WAY.

16       YES, THERE WAS A WAY TO DO THAT.  BUT IN ORDER TO DO THAT,

17   THE MANPOWER ASSOCIATED WITH DOING THAT, IT WAS -- YOU NEEDED

18   TO JUST ALLOW THE ACCOUNT TO COLLAPSE.

19       BUT WHEN YOU LOOK AT THAT AND THEN YOU LOOK AT WHAT THE

20   LIABILITIES ARE TO IT, THEN IT CAUSED A $37 MILLION HOLE.

21   Q.   IF ANYBODY CREATED A HOLE IN THE ACCOUNT, THEN THERE WOULD

22   BE LIABILITIES TO WHOEVER STILL HADN'T GOTTEN THEIR MONEY OUT

23   OF THE ACCOUNT, RIGHT?

24   A.   IF YOU, IF YOUR ESCROW ACCOUNT IS IN THE HOLE, YOU GOT

25   LIABILITY.  THERE'S -- AN ESCROW ACCOUNT, BY DEFINITION, IS NOT

3375

1    AN ASSET OF THE FIRM BUT A LIABILITY.

2    Q.   I WANT TO MOVE TO ANOTHER TOPIC WITH YOU.  YOU HAVE GOTTEN

3    DISTRIBUTIONS, HAVE YOU NOT?

4    A.   WHEN?

5    Q.   AT ANY TIME DURING THE TIME YOU WERE A PARTNER OR BEING

6    PAID AS A PARTNER IN -- WHEN YOU WORKED -- WHEN YOU WERE PART

7    OF THE LAW FIRM?

8    A.   YES, SIR, I DID.  I DID RECEIVE MY PERCENTAGE AND SHARE OF

9    THE PROFITS.

10   Q.   AND THOSE CAME IN TO YOU AS DISTRIBUTIONS, RIGHT?

11   A.   JUST BASED UPON PROFIT, YES, SIR.

12   Q.   THE DISTRIBUTIONS CAME TO YOU AS DISTRIBUTIONS, DID THEY

13   NOT?

14   A.   THEY -- DISTRIBUTIONS BASED UPON PROFITS, SIR, YES.

15   Q.   AND WHEN THOSE DISTRIBUTIONS CAME IN TO YOU, YOU DIDN'T

16   REPORT THOSE DISTRIBUTIONS ON YOUR TAX RETURN, DID YOU?

17   A.   YES, I DID, SIR.

18   Q.   DO YOU KNOW WHERE THERE'S A LINE ON THE TAX RETURN THAT

19   SAYS DISTRIBUTIONS?  DON'T YOU KNOW THERE'S NO SUCH LINE ON

20   THERE?

21   A.   IT COMES FROM A K-1 STATEMENT, SIR.  THAT AND MY K -- AND

22   THE AMOUNTS OF MONEY THAT MATCHED UP FROM THE K-1 STATEMENT TO

23   THE AMOUNTS OF MONEY THAT I RECEIVED.

24   Q.   THE K-1 STATEMENT WOULD REFLECT DISTRIBUTIONS, RIGHT?

25   A.   YOUR K-1 STATEMENT REPRESENTS THE PROFIT OF THE FIRM.

3376

1   THAT'S WHAT IT REPRESENTS.

2   Q.   NOW, I WANT TO GO BACK WITH MY QUESTIONS AND SEE IF YOU

3   AND I CAN GET ON THE SAME PAGE.

4   A.   OKAY.  PLEASE.

5   Q.   ARE YOU FAMILIAR WITH THE TERM DISTRIBUTION, SIR?

6   A.   I KNOW WHAT THE TERM MEANS.

7   Q.   WHAT DOES IT MEAN?

8   A.   IT MEANS MONEY THAT YOU'VE RECEIVED FROM THE FIRM.  OR

9   NOT -- DISTRIBUTIONS FROM -- I'M NOT FOLLOWING EXACTLY WHERE

10  YOU'RE GOING, SO MAYBE YOU COULD BE A LITTLE MORE CLEAR WITH

11  ME.

12  Q.   TAKE IT A STEP AT A TIME.

13  A.   OKAY.

14  Q.   IF YOU GET A DISTRIBUTION, DO YOU PAY TAX ON THE

15  DISTRIBUTION?  DO YOU KNOW THE ANSWER TO THAT QUESTION?

16  A.   I THINK I UNDERSTAND.

17  Q.   AND WHAT IS THE ANSWER?

18  A.   THE ANSWER IS IS THAT YOU ARE TAXED ON THE K-1 STATEMENT

19  THAT YOU RECEIVE, WHICH IS THE PROFIT OF THE FIRM.  THERE MAY

20  BE A POINT IN TIME THAT YOU RECEIVE MORE OR LESS MONEY ON

21  YOUR -- THAN WHAT YOUR K-1 STATEMENT SHOWS.  SO YOU COULD

22  RECEIVE -- IF THE K-1 STATEMENT SAID $1 MILLION, YOU MAY ONLY

23  HAVE RECEIVED $900,000, YOU MAY HAVE RECEIVED $1.1 MILLION.

24  Q.   OR YOU MAY HAVE RECEIVED $10 MILLION AND IT WOULD NOT BE

25  TAXABLE.  YOU KNOW THAT AS A LAWYER AT THIS PART -- AT THIS

3377

1    TIME IN YOUR CAREER, DON'T YOU?

2    A.   I'LL TELL YOU ONE THING, MR. GARLAND.   I THINK, TO ANSWER

3    YOUR QUESTION --

4    Q.   YOU KNOW THE ANSWER TO MY QUESTION IS YES.   YOU KNOW IT'S

5    NOT TAXABLE, DON'T YOU, SIR?

6    A.   IF YOU RECEIVE $10 MILLION, AND YOUR K-1 SAID THAT -- I

7    HAVE NEVER SEEN THAT IN MY CAREER, SIR.   SO I WOULD, I WOULD

8    QUESTION IT TO -- FROM HERE TO ETERNITY IF I RECEIVED

9    $10 MILLION AND MY K-1 SAID 1 MILLION.

10        IF THE ACCOUNTANTS ACTUALLY CAME TO ME AND I GOT AN

11   EXPLANATION FROM THEM THAT MADE 100 PERCENT SENSE, THEN I WOULD

12   GO ALONG WITH WHAT MY ACCOUNTANTS SAID, AND I WOULD -- BUT I

13   WOULD QUESTION IT FROM HERE TO WHEREVER IF I GOT THAT KIND OF

14   DISTRIBUTION.

15   Q.   WELL, LET ME ASK YOU:   IF YOU HAD A COMPANY AND YOU OWNED

16   IT, AND YOU WENT TO THE BANK AND YOU BORROWED $10 MILLION, AND

17   THEN YOU DISTRIBUTED THAT $10 MILLION OUT OF THE COMPANY TO

18   ANOTHER COMPANY YOU OWN, WOULD YOU BE TAXED ON THE MONEY YOU

19   BORROWED, PUT INTO YOUR COMPANY AND TOOK OUT?   YES OR NO?   DO

20   YOU KNOW THE ANSWER TO THAT?

21   A.   I JUST DON'T KNOW.   I'M NOT REALLY SURE ABOUT THAT.

22             MR. GARLAND:   I UNDERSTAND.   THANK YOU.

23             THE COURT:   ANYTHING FURTHER, GOVERNMENT?

24             MS. BARRON:   ONE QUESTION, YOUR HONOR.

25                     REDIRECT EXAMINATION

3378

1    BY MS. BARRON:

2    Q.   MR. WITTSTADT, MR. GARLAND ASKED YOU QUESTIONS ABOUT

3    PAYROLL AND YOUR DISTRIBUTIONS COMING OUT OF ESCROW.

4         DO YOU KNOW IF THE REASON WHY YOUR PAYROLL AND

5    DISTRIBUTIONS WERE COMING OUT OF ESCROW IS BECAUSE NAT HARDWICK

6    TOOK SO MUCH EXTRA MONEY FROM THE FIRM THAT THERE WASN'T

7    ENOUGH --

8              MR. GARLAND:  OBJECTION.  LEADING.

9              THE COURT:  I'LL SUSTAIN AS TO THE FORM.

10   BY MS. BARRON:

11   Q.   WAS THERE ENOUGH MONEY IN THE MHS OPERATING ACCOUNT TO

12   SUPPORT THE AMOUNT OF MONEY THAT MR. HARDWICK WAS TAKING OUT OF

13   IT?

14   A.   NO.  NO.

15             MS. BARRON:  THANK YOU.

16             THE COURT:  ANYTHING FURTHER, MR. GARLAND?

17                       RECROSS-EXAMINATION

18   BY MR. GARLAND:

19   Q.   WHEN YOU HAVE AVAILABLE CREDIT ON A FACTORING LINE, THAT'S

20   CASH AVAILABLE TO THE LAW FIRM, CORRECT?

21   A.   IS IT AVAILABLE TO THE LAW FIRM?  THE ANSWER IS YES, TO

22   THE LAW FIRM.

23             MR. GARLAND:  THANK YOU.  THAT'S ALL.

24             THE COURT:  ANYTHING FURTHER, GOVERNMENT?

25             MS. BARRON:  NO, YOUR HONOR.

3379

1           THE COURT:  THANK YOU AGAIN, MR. WITTSTADT.

2           THE WITNESS:  THANK YOU VERY MUCH, YOUR HONOR.  THANK

3    YOU.

4           THE COURT:  GOVERNMENT, CALL YOUR NEXT REBUTTAL.

5           THE WITNESS:  AM I RELEASED OFFICIALLY NOW SO I MAY

6    SIT IN THE COURTROOM?

7           THE COURT:  IS THERE ANY REASON --

8           MR. GARLAND:  YES.

9           THE COURT:  -- THAT HE CANNOT BE RELEASED?

10          MR. GARLAND:  YES.

11          THE COURT:  YOU ARE OFFICIALLY RELEASED.  YOU MAY

12   TAKE YOUR PICK OF THE SEATS THAT ARE LEFT IN THE COURTROOM,

13   SIR.  ALL RIGHT.

14          MR. PHILLIPS:  THE GOVERNMENT RESTS.

15          THE COURT:  ALL RIGHT.  THANK YOU SO MUCH.

16          LET ME HAVE ATTORNEYS APPROACH REAL QUICKLY JUST SO

17   THAT I GET SOME DIRECTION BEFORE I RELEASE THE JURY.

18          CAN YOU HOLD ON ONE SECOND?  BECAUSE I MIGHT BE

19   SENDING YOU OUT.  I JUST WANT TO CHECK THAT.  THANK YOU,

20   THOUGH.

21          (WHEREUPON, A BENCH CONFERENCE OUT OF THE HEARING OF

22   THE JURY PROCEEDED AS FOLLOWS:)

23          THE COURT:  I AM INCLINED TO STAY AND DO THE CHARGE

24   CONFERENCE.  IS THERE ANY REASON WE NEED THEM ANY MORE TODAY?

25          MS. NOVAY:  ONE THING THAT I WANTED TO ACTUALLY BRING

3380

1  UP WITH EVERYBODY, THE DELAYED CLOSINGS TOMORROW -- OPENING

2  BECAUSE OF THE HURRICANE.

3          THE COURT:  OKAY.  I DON'T KNOW ABOUT THAT.

4          ANYTHING ELSE FOR THIS JURY?

5          MS. NOVAY:  THAT'S IT.

6          (WHEREUPON, PROCEEDINGS RESUMED IN OPEN COURT AS

7  FOLLOWS:)

8          THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, YOU NOT

9  ONLY MAY TAKE A BREAK, BUT YOU MAY TAKE A BREAK ON YOUR WAY

10  OUT.  SO YOU ARE RELEASED FOR THE DAY.  TOMORROW -- LET ME JUST

11  GIVE YOU A SNAPSHOT OF WHAT I EXPECT.  WE'RE GOING TO STAY HERE

12  AND WORK ON WHAT WE NEED TO DO TO BE PREPARED FOR CLOSING

13  ARGUMENT.  AND SO -- Y'ALL ARE FINE.

14          SO FOR TOMORROW, WHEN YOU COME IN, WHICH I WOULD LIKE

15  YOU TO BE HERE AT 9:30, I'M GOING TO SAY, BUT I KNOW THERE ARE

16  SOME WEATHER ISSUES, SO PLEASE CALL IN --

17          MS. BECK, WHERE SHOULD THEY CALL JUST TO MAKE SURE?

18          THE COURTROOM DEPUTY:  THE CARD I GAVE THEM.

19          THE COURT:  MS. BECK HAS GIVEN YOU ALL NEW CARDS.

20  PLEASE CALL IN.  BUT I'M GOING TO TELL YOU --

21          SO CAN WE SAY 9:30 OR DO I NEED TO SAY 10:00?

22          THE COURTROOM DEPUTY:  9:30.

23          THE COURT:  -- 9:30.  WHEN YOU COME IN, I EXPECT US

24  TO GO STRAIGHT INTO CLOSING ARGUMENTS FOR YOU.  AND AFTER

25  CLOSING ARGUMENTS, YOU WILL DELIBERATE.

3381

1          THANK YOU SO MUCH.  HAVE A SAFE EVENING.  PLEASE CALL

2    IN, LET US KNOW IF THERE ARE ANY ISSUES THAT COME UP.  JUST NOT

3    KNOW WHAT TO EXPECT WITH THE WEATHER.  BUT I HOPE YOU HAVE A

4    SAFE AND GREAT EVENING.  THANK YOU SO MUCH.

5          (WHEREUPON, THE JURY RETIRED FROM THE COURTROOM AT

6    4:52 P.M., AND THE FOLLOWING PROCEEDINGS WERE HAD.)

7          THE COURT:  ALL RIGHT.  YOU ALL MAY BE SEATED, YOU

8    MAY REMAIN STANDING, JUST MAY BE AT EASE IN ANY WAY.

9          AND ATTORNEYS ON THIS CASE, I'M PREPARED TO START THE

10   CHARGE CONFERENCE.  IF YOU NEED A FEW MINUTES TO LOOK AT THE

11   CHANGES THAT WE HAVE MADE BASED ON THE INFORMAL CHARGE MEETING

12   THAT YOU HAD WITH MY LAW CLERK, THEN THAT'S FINE.  WE HAVE

13   COPIES OF THE CHARGES UP HERE, AS THEY HAVE BEEN REVISED.  HERE

14   ARE -- LET'S SEE.

15         MS. NOVAY:  MAY I APPROACH?

16         THE COURT:  YES.  YES, YES, YES.

17         I THINK WE ONLY HAVE -- I DON'T KNOW WHY WE HAVE AN

18   UNEVEN NUMBER, BUT THERE ARE FIVE.  SO, YEAH, THAT'S ALL I

19   HAVE.  IF WE NEED TO MAKE ANOTHER COPY, WE CAN, I'M SURE.

20         I ALSO WANT TO GIVE YOU -- AND I DON'T THINK THAT YOU

21   HAD THESE BEFORE -- COPIES OF THE VERDICT FORM AND ALSO THE

22   REDACTED INDICTMENT THAT WOULD GO BACK WITH THE JURY.  AND I

23   KNOW THAT WE DISCUSSED THESE EARLIER IN THIS PROCESS, BUT THAT

24   WAS BEFORE -- AT LEAST BEFORE ONE OF THE COUNTS WAS OUT.  I

25   CAN'T REMEMBER IF THE OTHER COUNT WAS ALREADY OUT OR NOT.

3382

1          SO LET ME GIVE YOU A FEW MINUTES TO LOOK AT THAT.  I

2     TELL YOU WHAT, IT'S ALMOST 4:55.  LET'S TAKE 10 MINUTES, TILL

3     5:05.  PLEASE LOOK AT ALL THREE OF THESE -- THE COURT'S REVISED

4     CHARGE, THE COURT'S PROPOSED VERDICT FORM, AND THE COURT'S

5     PROPOSED REDACTED INDICTMENT.  LET'S COME BACK AT 5:05 AND GO

6     AHEAD AND HAVE OUR CHARGE CONFERENCE ON THE RECORD.

7          THE COURTROOM SECURITY OFFICER:  ALL RISE.  COURT'S

8     IN RECESS.

9          THE COURT:  THANK YOU.

10          (WHEREUPON, A BRIEF RECESS WAS HAD FROM 4:54 P.M. TO

11     5:05 P.M.)

12          THE COURT:  ALL RIGHT.  ALL RIGHT.  LET'S GO AHEAD

13     WITH THE -- WE'LL START WITH THE JURY CHARGE.

14          AND, GOVERNMENT, WE WILL START WITH YOUR OBJECTIONS.

15          MS. BARRON:  THE CHARGES LOOK GOOD TO US, YOUR HONOR.

16          THE COURT:  OKAY.  DEFENSE, WE WILL NOW GO TO YOU FOR

17     YOUR OBJECTIONS AS TO THE CHARGE.

18          MS. LOEB:  I'M GOING TO ADDRESS THE DELIBERATE

19     IGNORANCE CHARGE, AND THEN THE STATE LAW CHARGES THAT WE

20     PROPOSED.

21          THE COURT:  OKAY.

22          MS. LOEB:  WITH RESPECT TO THE DELIBERATE IGNORANCE

23     CHARGE, WE OBJECT TO THAT CHARGE BEING GIVEN.  WE DON'T THINK

24     THAT THE -- EITHER THE ALLEGATIONS IN THE INDICTMENT OR THE

25     EVIDENCE THAT'S BEEN PRESENTED DURING THE CASE GIVE RISE TO

3383

1    THAT CHARGE.

2            THE GOVERNMENT HAS ALLEGED THAT MR. HARDWICK

3    KNOWINGLY TOOK THIS MONEY AND THAT HE KNEW IT CAME FROM THE

4    ESCROW ACCOUNT.  IN ORDER FOR DELIBERATE KNOWLEDGE TO BE AN

5    APPROPRIATE JURY INSTRUCTION, THERE NEEDS TO BE DEMONSTRATED

6    THAT THERE WAS SOME AFFIRMATIVE ACT, SOME ARTIFICE, SOME

7    MANIPULATION THAT THE DEFENDANT WAS USING SO THAT HE COULD

8    ULTIMATELY RELY ON SOME SORT OF, OF PLAUSIBILITY OF HIS

9    DEFENSE.

10           AND THERE'S NONE OF THAT IN THIS CASE.  THEY ALLEGED

11   KNOWLEDGE.  THEY ALLEGED THAT HE HAS SEEN WIRE REPORTS THAT

12   SHOW THE MONEY CAME FROM AN IOLTA ACCOUNT.  THEY ARE BASICALLY

13   SAYING HE KNEW IT, AND HE'S LYING IF HE SAYS HE DIDN'T KNOW IT.

14   AND THAT'S NOT A CASE WHERE DELIBERATE IGNORANCE OUGHT TO BE

15   CHARGED.

16           IF IT IS CHARGED, WE THINK THAT THE COURT'S CHARGE IN

17   THE REVISED CHARGE, WHICH SEEMS TO BE THE ONE I THINK THAT

18   MR. GILFILLAN WAS SUGGESTING YESTERDAY, THE LANGUAGE IN THE

19   SECOND PARAGRAPH THAT BEGINS WITH "SO WITH RESPECT," WE DON'T

20   THINK THAT THAT IS AN ACCURATE STATEMENT OF THE DELIBERATE

21   IGNORANCE CHARGE, EVEN IF IT IS GIVEN.

22           THE COURT:  ALL RIGHT.

23           MS. LOEB:  AND WE HAVE SUBMITTED OUR OWN, YOUR HONOR,

24   TODAY.

25           THE COURT:  THE E-MAIL?

3384

1          MS. LOEB:  WE SENT IT BY E-MAIL TO MS. BECK LAST

2     NIGHT, AND THEN WE WENT AHEAD AND FILED IT ON PACER THIS

3     MORNING SO THERE WOULD BE A RECORD OF IT.

4          THE COURT:  OKAY.  AND THAT I HAVE SEEN.

5          ALL RIGHT.  GOVERNMENT'S RESPONSE?

6          MS. BARRON:  YOUR HONOR, I ACTUALLY -- I'M GOING TO

7     SUBMIT A CASE THAT I FOUND.  I KNOW THAT MS. LOEB SUBMITTED A

8     CASE.  THIS IS *UNITED STATES VERSUS GOLD*.  AND THE REASON WHY I

9     THINK THAT THIS CASE IS INSTRUCTIVE IS THAT THE CASE THAT WAS

10    CITED BY THE DEFENSE, I THINK IT WAS RIVERA.  IT'S A DRUG

11    CONSPIRACY CASE.

12         THIS IS A FRAUD CASE, AND IT'S VERY SIMILAR IN THE

13    SENSE THAT THIS WAS A DOCTOR WHO OPERATED A BUNCH OF CLINICS.

14    THEY WERE MEDICARE CLINICS, AND THERE WAS SOME FRAUDULENT

15    BILLING GOING ON.  AND HE WAS NOT DIRECTLY INVOLVED IN THE

16    DAY-TO-DAY OPERATIONS OF THAT FIRM, OF THE -- OF WHAT WAS GOING

17    ON, BUT HE HAD RECEIVED HINTS, HAD RECEIVED SOME INFORMATION

18    THAT THERE WAS SOMETHING SUSPICIOUS.

19         AND SO THE PART THAT I HAVE TAGGED FOR THE COURT --

20    AND THIS IS ON -- I'M TRYING TO FIND PINCITE HERE.  THIS IS AT

21    743 F.2D, PINCITE IS 822.  IT SAYS:  THE ENTIRE DEFENSE CASE,

22    AFTER ALL, RESTED ON THE ARGUMENT THAT THE DEFENDANTS, DESPITE

23    THEIR SUPERVISORY RESPONSIBILITIES AND HANDS-ON MANAGEMENT

24    STYLE, WERE INNOCENTLY OBLIVIOUS TO THE ENDEMIC FRAUD THAT

25    PERMEATED OPTI-CENTER'S ENTIRE TAMPA BAY OPERATION, DESPITE

3385

1   WARNINGS FROM A NUMBER OF EMPLOYEES THAT THEIR CLAIMS PRACTICE

2   WAS ILLEGAL.  FOR EXAMPLE, NONE OF THE DEFENDANTS EVEN PICKED

3   UP A TELEPHONE TO CALL BLUE CROSS'S TOLL FREE NUMBER -- BLAH,

4   BLAH, BLAH.

5           AND THE REASON WHY I THINK IT APPLIES IN THIS CASE,

6   YOUR HONOR, IS THAT THERE HAS BEEN AMPLE EVIDENCE FROM WHICH

7   THE JURY COULD CONCLUDE THAT MR. HARDWICK FOUND OUT ON A DAILY

8   BASIS HOW MUCH MONEY WAS IN THAT FIRM -- IN ADDITION TO WHAT

9   MS. MAURYA WAS TELLING HIM THROUGH THE DAILY DASHBOARDS, THE

10  SIGNIFICANT EVIDENCE FROM MR. JONES AND MS. RITCHIE ON THESE

11  CRYSTAL REPORTS, THE CLOSING NUMBERS THAT HE RECEIVED ON A

12  DAILY BASIS -- AND THAT HE COULD CALCULATE IN HIS HEAD WHAT THE

13  FIRM PROFITABILITY WAS.  HE COULD EASILY DEDUCE -- TAKE THAT

14  INFORMATION, PLUS THE DOCUMENTS THAT CAME IN FROM MR. WITTSTADT

15  ABOUT THE DEFAULT NUMBERS COMING IN FROM MR. RITTERMAN, AND HE

16  COULD FIGURE OUT WHAT THE PROFITS WERE, WHAT THE EXPECTED

17  PROFITS WERE.

18          NOW, I KNOW HE HAS OFFERED TESTIMONY THAT, YOU KNOW,

19  HE BELIEVED THERE WAS THIS CASH AVAILABILITY.  THAT'S HOW HE

20  WAS LOOKING AT DISTRIBUTIONS.  BUT I THINK THE JURY COULD INFER

21  THAT WHEN HE IS ASKING FOR MONEY, SIGNIFICANT AMOUNTS OF MONEY

22  THAT FAR OUTPAYS WHAT HE IS BEING TOLD FROM SOURCES, NOT JUST

23  ASHA MAURYA, OF WHAT THE FIRM'S PROFITABILITY IS, THAT HE IS

24  TURNING A BLIND EYE TO THE FACT THAT THERE IS MONEY IN THE

25  OPERATING ACCOUNT TO SUPPORT THOSE.

3386

1          IN ADDITION, WE INTRODUCED SOME DOCUMENTS -- THERE

2     ARE TWO SPECIFIC WIRES THAT I REMEMBER.  MR. PHILLIPS SHOWED A

3     CHECK, I THINK TODAY, WHERE HE'S SPECIFICALLY TOLD THAT HE'S

4     GETTING MONEY FROM THE ESCROW ACCOUNTS.

5          AND SO FOR THAT REASON, YOUR HONOR, I THINK THERE'S

6     AMPLE REASON WHY THE JURY COULD CONCLUDE THAT HE IS CHOOSING

7     NOT TO QUESTION ASHA MAURYA ABOUT WHERE THIS MONEY IS COMING

8     FROM, BECAUSE HE HAS TO KNOW THAT THERE'S NOT ENOUGH IN

9     OPERATING TO COVER IT.

10          THE COURT:  OKAY.  AND WHAT IS YOUR SECOND PART OF

11     THE RESPONSE IN TERMS OF -- AND I AGREE THAT, BASED ON -- BASED

12     ON THAT, THAT THERE IS ENOUGH FOR THIS CHARGE TO BE INCLUDED.

13          BUT WHAT IS YOUR RESPONSE WITH RESPECT TO IF A CHARGE

14     ON DELIBERATE IGNORANCE IS GIVEN, THAT THIS SECOND PARAGRAPH,

15     WHICH I THINK IS THE ONLY ONE OF THE THREE THAT IS NOT PATTERN,

16     SHOULD NOT BE GIVEN AND INSTEAD THE LANGUAGE PROPOSED BY THE

17     DEFENSE SHOULD BE GIVEN?

18          MS. BARRON:  RIGHT.  AND IT'S SUGGESTING THAT THERE

19     IS SOME KIND OF AFFIRMATIVE, AFFIRMATIVE STICKING YOUR HEAD IN

20     THE SAND.  I'M JUST NOT SURE THAT THE LAW REQUIRES THAT, YOUR

21     HONOR.  I MEAN, IF WE LOOK AT THE -- THE PATTERN INSTRUCTION,

22     THE REASON WHY WE DON'T LIKE IT, IT'S NOT THAT THERE'S

23     ANYTHING -- THERE'S NO MISSTATEMENT OF THE LAW.  IT'S THAT IT

24     GIVES AN EXAMPLE OF A DRUG CONSPIRACY, AND IT'S JUST NOT

25     HELPFUL IN A WIRE FRAUD CASE.

3387

1          BUT I DON'T THINK THERE IS ANYTHING IN THE PATTERN

2    INSTRUCTION S-8 THAT REQUIRES THAT THEY FIND THAT HE TOOK SOME

3    AFFIRMATIVE STEP TO AVOID FINDING OUT.  I JUST DON'T THINK

4    THAT'S WHAT THE LAW REQUIRES.  IT'S NOT WHAT THE *GOLD* CASE I

5    CITED -- AND IT SPECIFICALLY SAYS, HE'S CLAIMING HE'S

6    INNOCENTLY OBLIVIOUS.

7          AND THAT'S THEIR ENTIRE DEFENSE.  HE HAD NO IDEA.

8    AND I THINK THE JURY COULD CONCLUDE THAT HE TRIED TO STAY

9    IGNORANT AND NOT DIG INTO THE DETAILS WHEN HE HAD PLENTY OF

10   WARNING SIGNS THAT THAT MONEY WAS NOT COMING OUT OF OPERATING.

11         THE COURT:  ALL RIGHT.  MS. LOEB, I DO AGREE WITH THE

12   GOVERNMENT ON THIS ONE AND THINK THAT IT IS APPROPRIATE TO

13   GIVE.  AND I ALSO -- I'M NOT SURE, I'M NOT SURE WHERE THE

14   PURPOSELY CONTRIVED TO AVOID LEARNING ALL LANGUAGE CAME FROM.

15   BUT I DON'T KNOW THAT THAT IS SUPPORTED BY, BY THE CHARGE, EVEN

16   THOUGH, AGAIN, I AGREE THAT THE EXAMPLE GIVEN IS A DRUG CASE,

17   SO THAT ONE DEFINITELY WOULD NOT APPLY TO OUR FACTS.  BUT IF

18   YOU JUST LOOK AT WHAT THEY ARE GETTING AT WITH THAT EXAMPLE, I

19   DON'T SEE THAT IT MATCHES UP WITH THE PROPOSED LANGUAGE BY THE

20   DEFENSE.

21         SO YOUR OBJECTION IS NOTED.  I WILL GIVE THE

22   DELIBERATE IGNORANCE CHARGE THAT IS OUTLINED ON PAGES 14 AND

23   15.

24         MS. LOEB:  I WOULD JUST LIKE ONE MORE TIME TO HAVE MY

25   OBJECTION NOTED ON THE RECORD TO THE LANGUAGE OF -- ON PAGE 15,

3388

1    BEGINNING WITH THE WORD "SO." IT TALKS ABOUT FINDING BEYOND A

2    REASONABLE DOUBT THAT THE DEFENDANT WAS PRESENTED WITH FACTS

3    THAT PUT THE DEFENDANT ON NOTICE THAT CRIMINAL ACTIVITY WAS

4    OCCURRING.

5         I DON'T SEE THAT LANGUAGE IN THE 11TH CIRCUIT CASES.

6    AND, AGAIN, I WOULD PROPOSE THAT THE COURT USE THE INSTRUCTION

7    THAT WE PROPOSE TO THE COURT.

8         THE COURT: WHAT -- IS THERE LANGUAGE, SPECIFIC

9    LANGUAGE WITHIN THERE THAT YOU ARE GETTING AT OR JUST -- I

10   MEAN, I UNDERSTAND YOU TAKE ISSUE WITH THE WHOLE SECOND

11   PARAGRAPH. BUT YOUR POINT THAT YOU'RE MAKING RIGHT NOW TO

12   REITERATE THAT, IS THERE SPECIFIC LANGUAGE WITHIN THAT SECOND

13   PARAGRAPH THAT YOU'RE FOCUSING ON?

14        MS. LOEB: I THINK IT'S PARTICULARLY THE "ON NOTICE

15   THAT CRIMINAL ACTIVITY WAS OCCURRING." I DON'T SEE ANY REAL

16   SUPPORT FOR THAT IN CASES.

17        IF WE'RE GOING TO HAVE LANGUAGE LIKE THAT AT ALL, IT

18   FEELS THAT IT SHOULD SAY SOMETHING MORE LIKE, IF THE DEFENDANT

19   BELIEVES THAT FACTS EXIST BUT DELIBERATELY AVOIDS LEARNING

20   WHETHER THAT FACT EXISTS, INSTEAD OF ASSUMING THAT THE

21   DEFENDANT'S ON NOTICE OF CRIMINAL ACTIVITY. I MEAN, THAT'S

22   ALREADY ASSUMING THAT THE CRIME IS OCCURRING.

23        MS. BARRON: YOUR HONOR, IF I CAN JUST BRIEFLY

24   RESPOND?

25        THE COURT: YES.

3389

1          MS. BARRON:  THE PATTERN CHARGE ACTUALLY -- IT

2   BASICALLY SAYS THAT -- IT BASICALLY SAYS PRETTY MUCH THIS.  IT

3   SAYS, SO YOU MAY FIND THAT A DEFENDANT KNEW ABOUT THE

4   POSSESSION OF A CONTROLLED SUBSTANCE, WHICH IS THE CRIME, IF

5   YOU DETERMINE BEYOND A REASONABLE DOUBT THAT HE ACTUALLY KNEW

6   ABOUT THE CONTROLLED SUBSTANCE AND HAD EVERY REASON TO KNOW BUT

7   DELIBERATELY CLOSED HIS EYES.

8          AND THAT'S BASICALLY WHAT THIS IS, EXCEPT THAT RATHER

9   THAN CONTROLLED SUBSTANCE, WE'RE TALKING ABOUT SOME OTHER

10  CRIMINAL ACTIVITY.

11         THE COURT:  I THINK WE PATTERNED THAT AFTER A CASE

12  FROM JUDGE DUFFEY, THE *JENSEN* CASE?  IS THAT *U.S. V JENSEN*?  I

13  DON'T -- YES.  OKAY.

14         OKAY.  THAT OBJECTION IS NOTED, THEN.  I WILL, I WILL

15  GIVE THIS CHARGE AS-IS HERE.  AND I THINK EVEN THAT PHRASE, ON

16  NOTICE THAT CRIMINAL ACTIVITY WAS OCCURRING, IS APPROPRIATE.

17  AGAIN, OBJECTION NOTED.

18         OKAY.  DEFENSE, YOUR NEXT OBJECTION?

19         MS. LOEB:  MS. NOVAY WILL ADDRESS THE NEXT ISSUE

20  THAT'S IN THE CHARGE.  AND THEN I'LL GO BACK TO THE CHARGES

21  THAT WE PROPOSE THAT AREN'T IN HERE, THE STATE LAW.

22         THE COURT:  OKAY.

23         MS. NOVAY:  IF THAT'S ALL RIGHT WITH THE COURT.

24         THE COURT:  THAT'S FINE.

25         MS. NOVAY:  THE OTHER ISSUE THAT I RAISED AT THE

3390

1    PRETRIAL CONFERENCE IS THAT IN THE JURY INSTRUCTIONS, THERE'S

2    NOTHING MENTIONED ABOUT MS. MAURYA IN THAT THAT'S WHO HE

3    CONSPIRED WITH.  THE ACTUAL LANGUAGE OF THE INDICTMENT SAYS

4    THAT -- SPECIFICALLY WITH COUNT 1 -- THAT HE CONSPIRED WITH

5    MS. MAURYA AND OTHERS.

6             THE COURT:  YEAH.  I HAD NEVER NOTICED THAT BEFORE

7    UNTIL PREPARATION OF THIS.  OKAY.

8             MS. NOVAY:  AND THE LANGUAGE -- OR THE -- EXCUSE ME,

9    I CAN'T TALK -- THE CASE THAT I'LL REFER THE COURT TO IS THE

10   *KELLER* CASE.

11            THE COURT:  OKAY.

12            MS. NOVAY:  IT'S *UNITED STATES VERSUS KELLER*, 916

13   F.2D 628, THE 11TH CIRCUIT, 1990.  THAT'S A CASE WHERE JUDGE

14   FORRESTER WAS REVERSED.

15            AND THE ARGUMENT WAS THAT THE TRIAL COURT ERRED IN

16   ALLOWING A JURY INSTRUCTION WHERE THE DEFENDANT COULD HAVE BEEN

17   CONVICTED WITH CONSPIRING WITH ANYONE, WHERE AN ACTUAL

18   COCONSPIRATOR WAS NAMED IN THE INDICTMENT.

19            HERE, MS. MAURYA IS NAMED IN THE INDICTMENT.  I DON'T

20   KNOW WHO ELSE THE GOVERNMENT WOULD ARGUE THAT MY CLIENT

21   CONSPIRED WITH.

22            THE COURT:  MAYBE MR. DAVENPORT.  I DON'T KNOW.

23            MS. NOVAY:  YEAH.  AND PARTLY, THAT'S THE CONCERN.

24   HE'S THIS UNKNOWN PARTY WHO'S NOT HERE, NO ONE'S HEARD FROM

25   HIM.  ALTHOUGH THE SAME THING WITH MS. MAURYA.

3391

1          BUT AS MS. MAURYA IS THE PERSON THAT'S NAMED IN THE

2   INDICTMENT, JUST BEING ABLE TO FIND MR. HARDWICK GUILTY OF

3   CONSPIRING WITH ANYONE, UNDER THE RULE OF THE *KELLER* CASE, WE

4   ARGUE IS IMPROPER.

5          THE COURT:  OKAY.  AND THE RULE OF THE *KELLER* CASE

6   AGAIN IS WHAT, MS. NOVAY?  THE HOLDING WAS WHAT WITH RESPECT --

7   WHAT WAS BEING CHARGED THERE, AND HOW DID IT RELATE TO HOW IT

8   WAS INDICTED?

9          MS. NOVAY:  SO THAT WAS A ROBBERY -- IF I CAN GIVE

10  JUST A LITTLE BIT OF BACKGROUND.

11         THE COURT:  YES.

12         MS. NOVAY:  THAT WAS A ROBBERY CASE.  AND THE ISSUE

13  WAS WHETHER OR NOT THERE WAS -- THE ISSUE WAS WITH THE FACT

14  THAT THE JURY WAS CHARGED, ESSENTIALLY -- AND, I'M SORRY, I

15  DON'T HAVE THE EXACT LANGUAGE IN FRONT OF ME -- THAT THE

16  DEFENDANT COULD HAVE BEEN FOUND GUILTY FOR CONSPIRING WITH

17  ANYONE, NOT JUST THE PARTY -- I THINK HIS LAST NAME WAS

18  SMITH -- WHO WAS CHARGED IN THE INDICTMENT.

19         SO OUR ARGUMENT IS THAT IT'S VERY SIMILAR TO THIS

20  CASE IN THAT MS. MAURYA IS THE ONE WHO IS ALLEGED IN THE

21  INDICTMENT, AND FINDING MR. HARDWICK GUILTY OF CONSPIRING WITH

22  JUST ANYONE, ANYONE ELSE -- WHETHER IT'S ALYCE RITCHIE, JOE

23  DAVENPORT, ANYONE ELSE -- WOULD BE A MATERIAL ALTERATION IN

24  WHAT HE'S ACTUALLY CHARGED IN THE INDICTMENT.

25         SO I WOULD ASK THAT THE LANGUAGE THAT HE CONSPIRED

3392

1    WITH ASHA MAURYA BE INCLUDED IN THE INSTRUCTIONS TO THE JURY AS

2    IT IS INCLUDED IN THE INDICTMENT.

3            THE COURT:  ALL RIGHT.  AND I'M TRYING TO PUT MY EYES

4    ON THAT EXACT LANGUAGE AS I'M LOOKING AT THE SUPERSEDING

5    INDICTMENT.

6            OKAY.  DID KNOWINGLY AND WILLFULLY COMBINE, CONSPIRE,

7    CONFEDERATE, AGREE, AND HAVE A TACIT UNDERSTANDING WITH ASHA R.

8    MAURYA AND WITH OTHERS KNOWN AND UNKNOWN TO THE GRAND JURY.

9            OKAY.  GOVERNMENT, YOUR RESPONSE.

10            MS. BARRON:  YOUR HONOR, THE ONLY THING THAT I REALLY

11   WOULD SAY IS, I DON'T THINK THERE WAS SUFFICIENT EVIDENCE IN

12   THIS CASE TO PROVE THAT THERE WAS ANYONE OTHER THAN MS. MAURYA

13   WHO CONSPIRED WITH HIM.  I THINK IT'S PROBABLY OBVIOUS TO THE

14   JURY, AND I'M SURE IT WILL BE OBVIOUS IN CLOSING ARGUMENT.

15            I WILL SAY THAT YOU DON'T HAVE TO ACTUALLY IDENTIFY

16   THE COCONSPIRATOR TO CHARGE CONSPIRACY.  YOU DON'T EVER HAVE TO

17   SHOW WHO THE PERSON WAS.  YOU JUST HAVE TO SHOW AN ILLEGAL

18   AGREEMENT WITH SOMEBODY.

19            THIS IS NOT A FIGHT THAT I THINK THAT WE NEED TO

20   EXPEND OUR CAPITAL ON.  IF THEY WANT TO PUT THE NAME IN

21   THERE -- I THINK THAT'S WHAT THE EVIDENCE SHOWS, IS THAT THEY

22   WERE CONSPIRING WITH EACH OTHER.  AND I DON'T THINK THERE'S ANY

23   ARGUMENT, FROM OUR STANDPOINT, THAT HE CONSPIRED WITH ANYONE

24   ELSE.

25            SO, I MEAN, IF THE COURT THINKS IT NEEDS TO BE IN

3393

1    THERE --

2              THE COURT:  I DO, ONLY BECAUSE I THINK IT SHOULD

3    TRACK THE LANGUAGE OF THE INDICTMENT.  AND AS I SAID -- SO

4    GOVERNMENT IS SAYING THAT YOU WOULD NOT HAVE A PROBLEM JUST

5    WITH MS. MAURYA BEING -- HER NAME BEING INCLUDED.

6              MS. BARRON:  WELL, AND I WOULD LIKE TO GO FOR THE

7    PATTERN CHARGE, THE ONE THAT BEGINS ON PAGE 9, I WOULD LIKE FOR

8    THAT TO SAY THE SAME.

9              BUT WHAT I UNDERSTAND IS THAT -- IT WOULD BE ON

10   PAGE 7, I THINK, WHERE IT SAYS -- THE VERY TOP OF THE PAGE,

11   SAYS, COUNT 1 OF THE INDICTMENT CHARGES THAT THE DEFENDANT

12   KNOWINGLY AND WILLFULLY CONSPIRED TO COMMIT WIRE FRAUD, IF YOU

13   INSERTED "WITH ASHA R. MAURYA" AFTER CONSPIRED, THAT -- IT

14   SEEMS LIKE THAT WOULD SOLVE THE PROBLEM.  BUT I THINK THE

15   PATTERN CHARGE SHOULD STAY THE WAY IT IS.

16             I'M SORRY.  PAGE 7.

17             THE COURT:  PAGE 7, AT THE TOP, COUNT 1 OF THE

18   INDICTMENT CHARGES THAT THE DEFENDANT KNOWINGLY AND WILLFULLY

19   CONSPIRED TO COMMIT WIRE FRAUD, IS WHERE IT ENDS RIGHT NOW.

20   AND WE WOULD ADD "WITH ASHA R. MAURYA."

21             MS. NOVAY?

22             MS. NOVAY:  YES.  I'M JUST REFERRING TO THE NAMES.

23   YES.  THAT IT WOULD SAY "CONSPIRED WITH ASHA R. MAURYA."

24             AND THEN I ALSO ADDED IN THE THIRD PARAGRAPH DOWN,

25   WHICH IS JUST A SENTENCE, THAT HE'S CHARGED WITH CONSPIRING,

3394

1   AGAIN, WITH ASHA R. MAURYA TO COMMIT THAT OFFENSE.

2           THE COURT:  GOVERNMENT?

3           MS. BARRON:  THAT'S FINE.

4           THE COURT:  OKAY.  THE CONSPIRING THAT IS UNDERLINED,

5   ALSO WITH ASHA R. MAURYA.  ALL RIGHT.  I WILL MAKE THOSE TWO

6   INSERTIONS.

7           MS. NOVAY:  YOUR HONOR, I THINK ALSO, FOR THE RECORD,

8   WE ALSO WANT TO CONTINUE TO OBJECT TO THE COURT'S INSTRUCTION

9   ABOUT LAVISH SPENDING.  WE HAD SUGGESTED ANOTHER ONE.

10          THE COURT:  OKAY.  THAT I'M NOT CLEAR ON, BECAUSE --

11  AND WHEN MS. TRUELOVE DISCUSSED THAT WITH ME, I WAS A LITTLE

12  CONFUSED.

13          IT WAS MY UNDERSTANDING THAT THE DEFENSE WANTED THAT

14  GIVEN AT THE BEGINNING AND AT THE END AND EVEN ADDITIONALLY

15  WITH VARIOUS WITNESSES WHO WERE GOING TO SPEAK OF SPENDING.

16  AND I DID NOT AGREE TO DO -- TO GIVE IT WITH MULTIPLE WITNESSES

17  BUT TO DO IT AT THE BEGINNING AND THE END AND THEN WITH ONE

18  WITNESS OF YOUR CHOOSING.

19          DID I MISUNDERSTAND THAT?  DID YOU NOT TAKE THE

20  POSITION THAT YOU WANTED IT ALSO INCLUDED IN THE CONCLUDING

21  CHARGE?  I MAY HAVE MISUNDERSTOOD THAT.

22          MS. NOVAY:  NO, YOU'RE CORRECT.

23          THE COURT:  OKAY.

24          MS. NOVAY:  THE REASON I'M OBJECTING IS BECAUSE WE

25  HAD OBJECTED TO THIS INSTRUCTION THAT THE GOVERNMENT HAD

3395

1    SUGGESTED AND WANTED OUR INSTRUCTION.

2              THE COURT:  GOTCHA.  OKAY.  SO NOT THE -- YOU DON'T

3    OBJECT TO THE INCLUSION OF A SPENDING CHARGE, BUT STILL THAT

4    THE DEFENSE'S PROPOSED ONE SHOULD BE USED OVER THE

5    GOVERNMENT'S?

6              MS. NOVAY:  YES.

7              THE COURT:  OKAY.  GOTCHA.  THAT MAKES SENSE, THEN.

8         ALL RIGHT.  I DON'T SEE THE NEED TO ASK THE

9    GOVERNMENT TO RESPOND OR TO REVISIT THAT BECAUSE THIS IS

10   SOMETHING THAT I CONSIDERED EARLIER ON, SINCE THIS CHARGE HAS

11   BEEN GIVEN EARLIER IN THE TRIAL.

12             SO YOUR OBJECTION THERE IS NOTED.  BUT I WILL GIVE

13   THE CHARGE ON THE SPENDING THAT HAS ALREADY BEEN GIVEN AND THAT

14   IS INCLUDED HERE IN THE COURT'S PROPOSED CHARGE.

15             OKAY.  DEFENSE, YOUR NEXT OBJECTION?

16             MS. LOEB:  ALL RIGHT.  JUDGE, I'D LIKE TO ADDRESS THE

17   PROPOSED INSTRUCTIONS THAT WE SUBMITTED WHEN WE SUBMITTED THE

18   ONES THAT WERE NOT THE PATTERN INSTRUCTIONS.

19             THE COURT:  OKAY.

20             MS. LOEB:  THE INDICTMENT ALLEGES IN PARAGRAPH 4(J)

21   THAT MR. HARDWICK LULLED THE WITTSTADTS INTO A FALSE SENSE OF

22   SECURITY AND DELAYED DISCOVERY OF THE FRAUD BY SIGNING A

23   SHAREHOLDERS AGREEMENT THAT SAID THAT NO DISTRIBUTIONS WERE

24   GOING TO BE TAKEN OUT UNLESS THERE WAS A UNANIMOUS VOTE BY THE

25   BOARD OF DIRECTORS AND THEY ALL TOOK THEIR DISTRIBUTIONS OUT IN

3396

1    THE CORRECT PROPORTIONS.

2              AND THEN IN PARAGRAPH 4(G) OF THE INDICTMENT, IT SAYS

3    THAT MR. HARDWICK WAS NOT AUTHORIZED TO USE MHS'S TRUST

4    ACCOUNTS.

5              AND IN PARAGRAPH 4(A), 4(B), AND 4(C), IT SAYS THAT

6    MR. HARDWICK SYPHONED OFF AND TRANSFERRED TO VARIOUS CREDITORS

7    AND PRIVATE JET CHARTER COMPANIES MONIES FROM THE LAW FIRM.

8              DURING TRIAL, ALL OF THESE SUBJECTS CAME UP.  AND THE

9    PROSECUTION SHOWED THE SHAREHOLDERS AGREEMENT, SHOWED THE

10   PARAGRAPH OF THE SHAREHOLDERS AGREEMENT THAT SAID IT WAS GOING

11   TO BE A UNANIMOUS VOTE BY THE BOARD.  THERE WAS CERTAINLY A LOT

12   OF QUESTIONING ABOUT IMPROPER TAKING MONIES FROM THE ESCROW

13   ACCOUNT.  AND THEN IT'S BEEN IMPLIED FROM THE BEGINNING THAT

14   TRANSFERS FOR PERSONAL DEBTS COMING FROM THE LAW FIRM WERE

15   IMPROPER BUSINESS EXPENSES AND THAT NAT BILLED THOSE TO THE

16   FIRM FRAUDULENTLY.

17             SINCE INTENT AND KNOWLEDGE ARE ELEMENTS OF THE CRIME

18   THAT WAS CHARGED IN THIS CASE, IT SEEMS AS IF THE JURY COULD BE

19   CONFUSED THAT THOSE ELEMENTS THAT HAVE BEEN DISCUSSED -- THE

20   SHAREHOLDERS AGREEMENT LANGUAGE, THE TAKING MONEY FROM ESCROW,

21   AND THE VARIOUS TRIPS THAT WERE PAID FOR FROM THE LAW FIRM,

22   ALTHOUGH NOT NECESSARILY ATTRIBUTED TO LAW FIRM AS BUSINESS

23   EXPENSES -- WOULD BE CONFUSING TO THE JURY.

24             AND SO WE PROPOSE THAT THESE JURY INSTRUCTIONS WOULD

25   CLARIFY CERTAIN ISSUES FOR THEM.

3397

1          FOR INSTANCE, THE FIRST CHARGE THAT WE SUBMITTED WAS

2    THE ONE ON MUTUAL DEPARTURE.  UNDER GEORGIA LAW, IF PARTIES TO

3    A CONTRACT MUTUALLY DEPART FROM THE SPECIFIC TERMS OF THE

4    CONTRACT, THEN THOSE ARE NO LONGER ENFORCEABLE, JUST THOSE

5    TERMS, UNTIL THE PARTIES COME BACK AND SAY, HEY, YOU KNOW, WE

6    WANT TO GO BACK TO THE ACTUAL BLACK LETTER LANGUAGE OF THE

7    AGREEMENT.

8          AND THAT'S PART OF THE DEFENSE IN THIS CASE.

9    MR. HARDWICK HAD THE RIGHT TO RELY ON THE GEORGIA LAW THAT

10   THESE PARTIES WERE MUTUALLY DEPARTING FROM THE LANGUAGE OF THE

11   AGREEMENT WHERE THEY WERE GOING TO HAVE A BOARD OF DIRECTORS

12   MEETING AND THEY WERE GOING TO HAVE AN AGREEMENT THAT ALL OF

13   THESE DISTRIBUTIONS WERE TAKEN OUT IN EQUAL PROPORTIONS.

14         THERE IS NO EVIDENCE IN THE RECORD THAT ANYBODY EVER

15   FOLLOWED THE SHAREHOLDERS AGREEMENT LANGUAGE AS FAR AS TAKING

16   DISTRIBUTIONS WERE CONCERNED.

17         WE THINK THAT WOULD CLARIFY FOR THE JURY THAT THE

18   FACT THAT MR. HARDWICK TOOK THESE DISTRIBUTIONS WITHOUT

19   UNANIMOUS BOARD APPROVAL DOESN'T MEAN HE'S GUILTY OF A CRIME.

20         THE COURT:  OKAY.  GO AHEAD AND COVER YOUR OTHER --

21   WHAT YOU PROPOSE AS INCLUSIONS.  BUT MUTUAL DEPARTURE.

22         MS. LOEB:  OKAY.  SO THAT'S NUMBER 1.  AND THE

23   ARGUMENTS ARE SIMILAR FOR THE REMAINDER.

24         THE REQUEST TO CHARGE NUMBER 2 HAD TO DO WITH

25   SUBCHAPTER S DISTRIBUTIONS.  THE LANGUAGE IN THE SHAREHOLDERS

3398

1   AGREEMENT ITSELF SAYS THAT THE PARTIES, BECAUSE IT IS A

2   SUBCHAPTER S CORPORATION, HAVE A DUTY AND RESPONSIBILITY TO

3   MAINTAIN THAT SUBCHAPTER S STATUS.  IF ONE PARTY GETS

4   OVERDISTRIBUTED, IF ONE PARTY GETS A DISPROPORTIONATE AMOUNT OF

5   THE MONEY, THAT WOULD BE PERCEIVED BY THE IRS TO CREATE TWO

6   DIFFERENT STATUSES OF THE STOCK.  AND IF THAT HAPPENED, IT

7   WOULD DESTROY THE SUBCHAPTER S STATUS.

8            FOR THAT REASON, THE PARTIES HAD A RESPONSIBILITY TO

9   EVEN-UP.  AND, IN FACT, THERE IS A LOT OF EVIDENCE IN THE

10  RECORD THAT THEY DID.  MR. HARDWICK ALSO HAD THE RIGHT TO RELY

11  ON THAT TAX LAW AND THAT PROVISION IN THE SHAREHOLDERS

12  AGREEMENT THAT THE PARTIES WERE TO EVEN-UP IF THERE WERE

13  IMPROPER -- OR UNEQUAL DISTRIBUTIONS TAKEN.

14           THE THIRD CHARGE IS ON THE BUSINESS JUDGMENT RULE.

15  AND THERE'S EVIDENCE ABOUT MARKETING DECISIONS IN THE RECORD,

16  THE PURCHASE OF UNDERWRITERS.  THE JURY COULD BE INSTRUCTED

17  THAT THE BUSINESS JUDGMENT THAT WAS EXERCISED BY MR. HARDWICK

18  FALLS UNDER THE BUSINESS JUDGMENT RULE, WHICH SAYS THAT THERE'S

19  A PRESUMPTION THAT A DIRECTOR OR OFFICER ACTED IN GOOD FAITH

20  AND ON AN INFORMED BASIS.

21           REQUESTS 4, 5, AND 6 ARE ALL LANGUAGE FROM THE IRS

22  CODE ABOUT BUSINESS EXPENSES, WHAT IS AN ORDINARY AND WHAT IS A

23  NECESSARY BUSINESS EXPENSE.  THERE WAS CERTAINLY A LOT OF

24  TESTIMONY ABOUT NAT TAKING ELABORATE TRIPS AND THE MONEY BEING

25  FUNDED BY THE FIRM FOR THE TRIPS.

3399

1          THE JURY SHOULD BE INSTRUCTED THAT THE FEDERAL

2     GOVERNMENT, THROUGH THE CODE AND THE CONSTRUCTION OF THE CODE,

3     ALLOWS BUSINESSES TO -- ALLOWS BUSINESSMEN TO HAVE THE COMPANY

4     PAY FOR BUSINESS EXPENSES, FROM THE BUSINESS, IF THEY ARE

5     ENGAGED IN SOME SORT OF ACTIVITY THAT -- EITHER BEFORE, DURING,

6     OR AFTER THE TRIP.  WE HAVE TESTIMONY ON THAT AS WELL.

7          AND THEN REQUESTS TO CHARGE 8, 9, AND 10 HAVE TO DO

8     WITH TRUST ACCOUNTS.  IT'S THE DEFINITION OF A TRUST ACCOUNT,

9     TRUST ACCOUNT CONFORMS TO THE EVIDENCE, AND IS AN EXPLANATION

10    THAT TAKING MONEY FROM A TRUST ACCOUNT IS NOT A CRIME.  IT MAY

11    BE AN ETHICAL VIOLATION, BUT IT'S NOT A CRIME.

12          THERE WAS A LOT OF TESTIMONY ABOUT MR. HARDWICK

13    TAKING MONEY OUT OF THE TRUST ACCOUNT, AND THE JURY COULD BE

14    CONFUSED ABOUT WHETHER THAT IS PROOF OF A CRIME.  THEY SHOULD

15    BE INSTRUCTED THAT TAKING MONEY FROM A TRUST ACCOUNT MAY BE AN

16    ETHICAL VIOLATION BUT ITSELF IS NOT A CRIME.

17          I SKIPPED OVER NUMBER 7 BECAUSE THAT ACTUALLY IS VERY

18    AKIN TO REQUEST TO CHARGE NUMBER 1, WHICH IS THAT BREACH OF A

19    CONTRACT IS ALSO NOT A CRIME.  IF THEY FIND THAT MR. HARDWICK

20    BREACHED THE CONTRACT BY TAKING A DISTRIBUTION THAT WAS NOT

21    UNANIMOUSLY APPROVED BY THE BOARD, THAT DOESN'T MEAN THAT HE'S

22    GUILTY OF A CRIME.

23          THE COURT:  I MAY HAVE MISSED ONE OF THEM.  ONE, TWO,

24    THREE, FOUR, FIVE -- I HAVE MUTUAL DEPARTURE, SUBCHAPTER 7,

25    BUSINESS JUDGMENT RULE, ORDINARY AND BUSINESS EXPENSE, TRUST

3400

1    ACCOUNT, AND BREACH OF CONTRACT.

2            HAVE I COVERED ALL THE -- I JUST NOW LISTED ALL OF

3    THE ONES THAT YOU JUST STATED?

4            MS. LOEB:  I BELIEVE SO.  ONE AND 7 HAVE TO DO WITH

5    THE CONTRACT.  TWO IS SUBCHAPTER S.  THREE IS BUSINESS JUDGMENT

6    RULE.  FOUR, 5, AND 6 HAVE TO DO WITH BUSINESS EXPENSES.

7    EIGHT, 9, AND 10 ARE TRUST ACCOUNT.

8            THE COURT:  OKAY.  GOVERNMENT?

9            MS. BARRON:  THANK YOU, YOUR HONOR.

10           REGARDING MUTUAL DEPARTURE --

11           THE COURT:  AND LET ME, LET ME SAY THIS.  I HAVE

12   MIXED THOUGHTS HERE.  A LOT OF THIS STUFF CAME UP, AND I DON'T

13   KNOW THAT IT WAS ADEQUATELY EXPLAINED TO THEM.  A LOT OF THESE

14   TERMS WERE THROWN OUT THERE.  SOME OF THEM WERE EXPLAINED, SOME

15   NOT.

16           BUT THEY ARE ALSO NOT CHARGED IN THE INDICTMENT,

17   WHICH I THINK LEADS TO MORE CONFUSION.  BECAUSE I'M NOT SO SURE

18   THAT THESE -- THE POINTS THAT WERE MADE THROUGH QUESTIONING

19   SHOULD NOT JUST BE ARGUED.  I DON'T KNOW THAT THEY SHOULD BE

20   INCLUDED IN THE CHARGE.

21           SO I'M OPEN TO -- I'M INTERESTED TO HEAR WHAT YOU'RE

22   GOING TO SAY, BECAUSE I SEE ARGUMENTS ON BOTH SIDES HERE.

23           MS. BARRON:  THANK YOU, YOUR HONOR.

24           AND IF WE LOOK JUST -- I MEAN, THE TESTIMONY OF

25   SHELDON KAY COVERS A LOT OF THESE.  I MEAN, AND THIS IS A

3401

1    LAWYER, WHO TESTIFIED NOT ONLY ON TAX LAW AND HOW CORPORATIONS,

2    AND GEORGIA CORPORATIONS SPECIFICALLY, WORK, HE TALKED ABOUT

3    MUTUAL DEPARTURE, HE TALKED ABOUT EVEN-UPS.  THE JURY HEARD ALL

4    OF THIS EVIDENCE ABOUT THIS IS, THIS IS ALLOWED UNDER GEORGIA

5    LAW.  I DON'T REMEMBER IF HE SPECIFICALLY CITED THE GEORGIA

6    CODE, BUT HE DID SPECIFICALLY SAY, THIS IS ALLOWED UNDER

7    GEORGIA LAW.  AND WE NEVER ARGUED TO THE CONTRARY.

8            BUT HERE'S, REALLY, THE RELEVANT ISSUE AND WHY IT

9    SHOULDN'T BE IN A JURY INSTRUCTION.  MR. HARDWICK TOOK THE

10   STAND, AND NOT ONLY DID HE NOT TESTIFY, NOBODY TESTIFIED THAT

11   HE KNEW ABOUT GEORGIA LAW ON MUTUAL DEPARTURE OR GEORGIA LAW

12   ABOUT EVEN-UP, TRUE-UP.

13           NOW, MAYBE IT WOULD BE RELEVANT IF THERE WERE

14   TESTIMONY THAT HE KNEW ABOUT AND RELIED ON THAT, BUT THERE WAS

15   NO TESTIMONY ON THAT AT ALL.  AND SO FOR THE JURY TO SAY,

16   REGARDLESS OF WHETHER HE KNEW IT AND MANIFESTED THE INTENT TO

17   DEFRAUD, NOTWITHSTANDING GEORGIA LAW, GEORGIA LAW SAYS THAT YOU

18   CAN DO THIS; THEREFORE, HE'S NOT GUILTY.

19           AND THAT'S JUST IMPROPER.  THE ONLY THING THAT

20   MATTERS IN THIS CASE IS, DID HE INTEND TO STEAL MONEY BY MEANS

21   OF FALSE REPRESENTATIONS.

22           AND SO EVEN IF THIS IS A -- AND I CONCEDE -- I MEAN,

23   FORGET GEORGIA LAW, THE SHAREHOLDER AGREEMENT ALLOWS FOR MUTUAL

24   DEPARTURE.  IT ALLOWS FOR EVEN-UPS, TRUE-UPS.

25           BUT THE QUESTION IS:  WERE HIS ACTIONS GUIDED BY HIS

3402

1    UNDERSTANDING OF GEORGIA LAW?  AND THERE'S NOT A SHRED OF

2    EVIDENCE IN THIS CASE THAT IT IS, AND SO THAT'S WHY I THINK IT

3    SHOULD BE OUT.

4            MS. LOEB SAID THERE'S NO EVIDENCE THAT ANYONE EVEN

5    FOLLOWED THE SHAREHOLDER AGREEMENT, THAT THERE WAS JUST THIS

6    KIND OF LIKE WILD WEST.

7            AND, YOUR HONOR, MR. WITTSTADT, BOTH IN HIS ORIGINAL

8    TESTIMONY AND TODAY, TALKED ABOUT HOW WHEN THEY CHOSE TO

9    DEVIATE FROM THE SHAREHOLDER AGREEMENT, THEY HAD A PROCESS OF

10   DOING IT.  THEY TALKED ABOUT MOVING FROM QUARTERLY TO MONTHLY

11   DISTRIBUTIONS.  THEY TALKED ABOUT AND VOTED IN UPPING THEIR

12   SALARIES.  THEY TALKED ABOUT AND VOTED ON DRAWING DOWN MONEY

13   FROM THE ACTION CAPITAL LINE OF CREDIT TWICE.  AND THEY TALKED

14   ABOUT AND VOTED ON TAKING MONEY OUT OF THE RESERVE BALANCE.

15   AND SO --

16           THE COURT:  SO IF YOU INCLUDED SOMETHING ON MUTUAL

17   DEPARTURE, YOU'D HAVE TO INCLUDE ESSENTIALLY ALL THE DIFFERENT

18   SCENARIOS UNDER WHICH YOU COULD MUTUALLY DEPART.

19           MS. BARRON:  WELL, AND I THINK THE SHAREHOLDER

20   AGREEMENT -- AND HERE'S WHAT MR. KAY ACTUALLY SAID ON

21   CROSS-EXAMINATION:  THE LAW ALLOWS FOR THIS, BUT YOU LOOK TO

22   THE AGREEMENT.  THE AGREEMENT GOVERNS THE RELATIONSHIP.

23           THE COURT:  YEAH.

24           MS. BARRON:  AND SO I THINK IT IS IMPROPER TO SAY,

25   NOTWITHSTANDING THE AGREEMENT, WE LOOK TO GEORGIA LAW, WHICH

3403

1   HE -- THERE'S NO TESTIMONY THAT HE EVEN KNEW ABOUT OR RELIED ON

2   IT IN MAKING HIS DECISIONS IN THIS CASE.

3           REGARDING THE SUBCHAPTER S TESTIMONY, THERE WERE TWO

4   EXPERTS.  BOTH MR. KAY AND MR. GINGRAS TALKED ABOUT

5   SUBCHAPTER S STATUS.  I THINK EVEN MR. WITTSTADT, IN HIS

6   ORIGINAL DIRECT, TALKED ABOUT SUBCHAPTER S AND HOW THAT WORKS.

7           THE COURT:  HE TALKED ABOUT IT A LITTLE BIT TODAY.

8           MS. BARRON:  AND THE WHOLE PROCESS OF EVEN-UP, I

9   MEAN, I THINK THE JURY, THE JURY UNDERSTANDS HOW THAT WORKS.

10  THERE'S REALLY NO DISPUTE THAT THAT IS HOW YOU MAINTAIN YOUR

11  SUBCHAPTER S STATUS.

12          BUT, AGAIN, THERE'S NOTHING IN EVIDENCE THAT SAYS

13  THAT MR. HARDWICK WAS RELYING ON EVEN-UP UNDER GEORGIA LAW TO

14  SOMEHOW -- I'M NOT EVEN SURE WHAT THE PURPOSE OF THE

15  INSTRUCTION WOULD BE, BECAUSE THE JURY HAS BEEN TOLD WHAT THE

16  LAW REQUIRES BY AN ACCOUNTANT AND A LAWYER.  AND NOBODY HAS

17  DISPUTED THAT.

18          AND SO -- AND MR. WITTSTADT SAID, YEAH, WE KNEW IF

19  WE'RE AN S CORP, WE GOT TO DO IT THIS WAY.  MR. HARDWICK TALKED

20  ABOUT, WE HAD TRUE-UPS, EVEN-UPS.  AND SO I DON'T KNOW THAT THE

21  JURY NEEDS ANY MORE INSTRUCTION ON WHAT THE LAW REQUIRES.

22          REGARDING THE BUSINESS JUDGMENT RULE, YOUR HONOR, I

23  THINK THAT KIND OF BEGS THE QUESTION OF THE ENTIRE CASE.

24  BECAUSE THE BUSINESS JUDGMENT RULE SAYS YOU GIVE AN INFERENCE

25  OF GOOD FAITH.  THAT IS NOT WHAT THE LAW IN A CRIMINAL CASE

3404

1    REQUIRES.  THERE'S NO -- THE WHOLE ISSUE IN THIS CASE IS, DID

2    HE HAVE GOOD FAITH.

3              IN FACT, THERE'S AN INSTRUCTION ON IT.  IT'S ALREADY

4    INCLUDED.  THEY HAVEN'T OBJECTED.  EVERYBODY AGREES THE JURY

5    SHOULD BE INSTRUCTED ON GOOD FAITH.

6              AND SO NOT ONLY DOES THAT OBVIATE THE NEED OF THE

7    BUSINESS JUDGMENT RULE, IN A CRIMINAL CASE, THAT'S JUST WRONG

8    AS A MATTER OF LAW.  IF THE JURY FINDS THAT HE ACTED WITH THE

9    INTENT TO DEFRAUD, IT DOESN'T MATTER WHAT GEORGIA LAW SAYS

10   ABOUT THE BUSINESS JUDGMENT RULE BECAUSE THOSE TWO THINGS

11   CANNOT SIMULTANEOUSLY BE TRUE.

12             AND SO I THINK BY BEING INSTRUCTED ON THE ELEMENT OF

13   WIRE FRAUD, WHICH REQUIRES THAT INTENT TO DEFRAUD, AND I THINK

14   CONSPIRACY IS KNOWINGLY AND WILLFULLY, THEY ARE TOLD THE

15   MENS REA THAT THEY HAVE TO FIND.  AND SO THIS JUST IS

16   SUPERFLUOUS.

17             THE COURT:  WITH RESPECT TO MUTUAL DEPARTURE, I AGREE

18   WITH YOU THAT THEY WERE TOLD BY AT LEAST MORE THAN ONE WITNESS

19   THE PARTNERS COULD MUTUALLY DEPART.

20             WERE THERE NOT A LOT OF QUESTIONS ABOUT WHAT THE

21   SHAREHOLDERS AGREEMENT ACTUALLY STATED?  OR WOULD YOU CONCEDE

22   THAT THERE WERE; HOWEVER, THAT THERE WAS ALSO QUESTIONING

23   ABOUT, BUT IF YOU DID DEPART FROM IT, YOU SEE THIS PHRASE THAT

24   SAYS ALL OF US WOULD HAVE TO UNANIMOUSLY AGREE.

25             MS. BARRON:  AND THAT'S THE ISSUE, YOUR HONOR, AND

3405

1    THAT'S WHAT WE'VE BEEN HARPING ON, IS THAT MUTUAL DEPARTURE HAS

2    TO BE MUTUAL.  AND THE LANGUAGE IN THE SHAREHOLDER AGREEMENT IS

3    BASICALLY CONSISTENT WITH LAW, THAT IF WE'RE GOING TO DEPART

4    FROM THE FOUR CORNERS OF THIS AGREEMENT, WE'VE ALL GOT TO

5    AGREE.  AND SO I DON'T THINK THAT'S IN DISPUTE.

6            THE QUESTION ON WHETHER JUST BREACH OF CONTRACT AT

7    ALL -- AND I THINK THIS IS -- I CAN'T REMEMBER WHICH ONE THIS

8    IS.  MAYBE 7.  I DON'T REMEMBER WHICH INSTRUCTION THIS IS.

9            BUT THAT IS SOMETHING THAT MR. KAY -- MR. GARLAND

10   ASKED HIM -- I THINK MAY HAVE BEEN THE LAST QUESTION HE ASKED

11   HIM:  CAN -- BREACH OF CONTRACT, IS THAT A CIVIL CASE OR A

12   CRIMINAL CASE?  AND MR. KAY SAID, THAT'S A CIVIL CASE.

13           AND SO THE JURY HAS HEARD TESTIMONY THAT SIMPLY

14   BREACHING A CONTRACT IS NOT A CRIME.  BUT, AGAIN, I THINK BY

15   GIVING THE ELEMENTS OF THE CRIME -- YOU CAN TAKE MONEY.  YOU

16   CAN TAKE MONEY THAT YOU'RE NOT ENTITLED TO.  BUT IT IS NOT A

17   CRIME UNLESS YOU DO IT BY MEANS OF FALSE MISREPRESENTATIONS,

18   FALSE STATEMENTS, OMISSIONS -- EVERYTHING THAT'S IN THE ELEMENT

19   OF THAT CRIME, SO THAT THE ELEMENTS OF WIRE FRAUD TELL THE JURY

20   THAT IF ALL THEY FIND IS THAT HE BREACHED THE CONTRACT, THEN

21   HE'S NOT GUILTY.  AND MR. KAY ALREADY TOLD THEM THAT.

22           REGARDING BUSINESS EXPENSES -- I THINK THIS IS 4, 5,

23   AND 6 -- I THINK IT'S STRANGE THAT THEY STILL WANT THIS

24   INSTRUCTION WHEN MR. HARDWICK TOOK THE STAND AND SAID, THIS

25   26 MILLION IS ALL PERSONAL.  I CONCEDE THAT.  THIS WAS ALL

3406

1    PERSONAL MONEY.

2            BUT, FURTHERMORE, THERE WAS NOT A SINGLE PERSON WHO

3    TESTIFIED -- MR. KAY SAID THAT GENERICALLY, YES, TRAVEL COULD

4    BE BUSINESS, THIS COULD BE MARKETING.  BUT NOBODY TESTIFIED

5    THAT THIS SPECIFIC EXPENSE WAS BUSINESS.

6            AND MR. HARDWICK CONCEDED THAT THE MONEY THAT THE

7    GOVERNMENT IS CLAIMING HE WAS OVERDISBURSED, THEY WERE PERSONAL

8    EXPENSES.  I MEAN, HE EVEN SAID, I GET TO SPEND MY MONEY THE

9    WAY THAT I WANT TO.

10            BUT MR. KAY TALKED EXTENSIVELY -- AND A LOT OF IT ON

11    CROSS.  I ASKED HIM A LOT ABOUT, YOU KNOW, WHAT DOES ORDINARY

12    MEAN, WHAT DOES NECESSARY MEAN; AND REGARDING TRAVEL, CAN IT BE

13    LAVISH?  THE JURY HAS HEARD EXTENSIVE TESTIMONY FROM A TAX

14    LAWYER TELLING THEM HOW BUSINESS EXPENSES WORK AND WHAT IS AND

15    IS NOT DEDUCTIBLE.

16            AND THEN, FINALLY, REGARDING THE TRUST ACCOUNT -- I

17    THINK THIS IS 8, 9, AND 10 -- TAKING MONEY FROM A TRUST ACCOUNT

18    IS NOT A CRIME.  NOBODY IS DISPUTING THAT.  IT'S A BREACH OF,

19    YOU KNOW, THE RULES OF PROFESSIONAL ETHICS.

20            BUT, AGAIN, I KEEP GOING BACK TO THE PRESUMPTION -- I

21    THINK IT'S *UNITED STATES VERSUS STONE*, 11TH CIRCUIT, AND I

22    DON'T REMEMBER THE PINCITE.  BUT WE PRESUME IN THIS CIRCUIT

23    THAT JURIES FOLLOW THE INSTRUCTIONS THAT THEY ARE GIVEN.

24            AND SO WHAT THAT MEANS IN THIS CASE IS THAT IF A JURY

25    IS TOLD THAT THEY CANNOT FIND THAT HE BROKE THE LAW UNLESS THEY

3407

1   FOUND THAT HE TOOK MONEY OUT OF THAT TRUST ACCOUNT BY LYING AND

2   OMITTING MATERIAL FACTS TO HIS PARTNERS, IF THEY DON'T FIND

3   THAT ELEMENT, THEY CANNOT FIND HIM GUILTY OF THIS CRIME.

4           AND SO THE FACT THAT HE TOOK MONEY FROM IOLTA, I

5   MEAN, NOT ONLY DO WE HAVE TO PROVE THAT, YOU KNOW, HE INTENDED

6   TO LIE -- I MEAN, THE JURY HAS HEARD AMPLE EVIDENCE ABOUT HOW

7   THOSE TRUST ACCOUNTS WORK AND ABOUT HOW THERE SHOULD NOT BE

8   COMMINGLING.

9           BUT EVEN MR. WITTSTADT, PAYROLL, EVERY EMPLOYEE AT

10  MHS RECEIVED MONEY FROM ESCROW.  NO ONE IS SAYING THAT THEY

11  COMMITTED A CRIME.  THE ONLY PERSON WHO COMMITTED A CRIME, THE

12  GOVERNMENT SAYS, IS THE PERSON WHO TOOK MONEY FROM THE FIRM BY

13  MEANS OF FALSE STATEMENTS, OMISSIONS, AND HALF-TRUTHS.

14          AND SO IF THE JURY DOESN'T FIND THAT ELEMENT, THEN IT

15  DOESN'T MATTER THAT THEY'RE TOLD -- WHETHER THEY'RE ALSO TOLD

16  THAT TAKING MONEY FROM A TRUST ACCOUNT IS NOT A CRIME.

17          THE COURT:  OKAY.  MS. -- I CAN'T REMEMBER --

18  MS. LOEB, I WILL GIVE YOU, IF YOU WANT, THE OPPORTUNITY FOR ANY

19  CONCLUDING REMARKS.

20          I DO, I DO AGREE WITH THAT.  AND I GO BACK TO MY

21  FIRST POINT, THAT THESE THINGS CAME UP THROUGH TESTIMONY.  BUT

22  THEY ARE NOT PART OF THE CHARGE -- THEY ARE NOT PART OF THE

23  COUNTS, I SHOULD SAY, AND I DON'T KNOW THAT THEY SHOULD BE

24  INCLUDED IN THE CHARGE.  AND I THINK TO DO SO CREATES MORE

25  CONFUSION FOR THE JURORS AND WHAT THEY NEED TO BE FOCUSED ON

3408

1    AND WHAT MR. HARDWICK IS ACTUALLY ACCUSED OF.

2          AND BY SAYING THAT, I'M NOT SAYING THAT THESE ISSUES

3    ARE NOT RELEVANT AND WEREN'T DISCUSSED IN THIS CASE.  CERTAINLY

4    THEY WERE, AND THEY ARE RELEVANT.  BUT I DON'T THINK -- I

5    DON'T, I DON'T SEE A BASIS FOR WHICH IT IS APPROPRIATE TO

6    INCLUDE THEM IN THE JURY CHARGES.

7          MS. LOEB:  IF I CAN JUST BRIEFLY SAY --

8          THE COURT:  SURE.

9          MS. LOEB:  -- INTENT IS AN IMPORTANT ELEMENT OF WHAT

10   MR. HARDWICK HAS BEEN CHARGED WITH, AND THE GOVERNMENT HAS THE

11   BURDEN OF PROVING INTENT.

12         AND THE FEAR IS THAT THE JURY WILL BE CONFUSED BY THE

13   LANGUAGE OF THE SHAREHOLDERS AGREEMENT AND ALL THIS TALK ABOUT

14   THE ESCROW ACCOUNT, THAT MERELY TAKING MONEY FROM THE ESCROW

15   ACCOUNT MEANS HE HAD THE INTENT TO DEFRAUD, OR THAT MERELY

16   GETTING A DISTRIBUTION WHEN THERE WAS NO UNANIMOUS VOTE OF THE

17   SHAREHOLDERS MEANS THAT HE HAD AN INTENT TO DEFRAUD.

18         IT SEEMS THAT IT WOULD BE -- IT WOULD CLARIFY THE

19   ISSUES FOR THE JURY IF THE COURT INSTRUCTED THEM THAT THE

20   INTENT TO DEFRAUD WAS AN ELEMENT THAT NEEDED TO BE PROVED, AS

21   THE COURT'S GOING TO DO, BUT THAT MERELY VIOLATING THE TERMS OF

22   THE SHAREHOLDERS AGREEMENT OR MERELY TAKING MONEY OUT OF A

23   TRUST ACCOUNT DOESN'T MEAN HE'S GUILTY OF FRAUD.

24         THE COURT:  AND SO YOUR PROPOSAL IS TO DO WHAT?  TO

25   MAKE SOME STATEMENT SIMILAR TO WHAT YOU JUST SAID, MERELY

3409

1    VIOLATING TERMS OF SHAREHOLDERS AGREEMENT OR TAKING MONEY OUT

2    OF A TRUST ACCOUNT DOESN'T MEAN HE'S GUILTY OF FRAUD, AND TO,

3    WHAT, PLUG A STATEMENT LIKE THAT INTO THE INSTRUCTION ON

4    INTENT?

5            I'M NOT SURE I UNDERSTAND -- I'M -- I'M NOT SURE I'M

6    FOLLOWING WHAT YOU'RE PROPOSING.

7            MS. LOEB:  WELL, ALONE -- UNLESS COUPLED WITH THE

8    INTENT TO DEFRAUD, VIOLATING THE SHAREHOLDERS AGREEMENT ALONE

9    OR TAKING MONEY FROM THE ESCROW ACCOUNT ALONE IS NOT EVIDENCE

10   OF A CRIME WITHOUT THE INTENT TO DEFRAUD.

11           THE COURT:  AND WHY IS IT THAT YOU THINK THAT THAT

12   SHOULD BE INCLUDED IN THE CHARGE AS OPPOSED TO BEING

13   APPROPRIATE FOR CLOSING ARGUMENT?

14           MS. LOEB:  WELL, IT'S PART OF THE THEORY OF THE

15   DEFENSE.  AND WE HAVEN'T DONE A SEPARATE THEORY OF THE DEFENSE

16   CHARGE, BUT THE JURY SHOULD UNDERSTAND WHAT THE THEORY OF THE

17   DEFENSE IS.

18           THE COURT:  WHAT IS THE THEORY OF THE DEFENSE?

19           MS. LOEB:  THAT HE HAD, THAT HE HAD NO INTENT --

20   FIRST OF ALL, THAT HE DID NOT TAKE MORE MONEY THAN HE WAS

21   ENTITLED TO TAKE, THAT IT DID NOT COME FROM A TRUE ESCROW

22   ACCOUNT, AND THAT HE HAD ABSOLUTELY NO INTENT TO DEFRAUD HIS

23   LAW PARTNERS.

24           THE COURT:  OKAY.  AND I KNOW I ASKED THIS EARLIER,

25   AND SO THIS IS KIND OF GOING OFF ON A TANGENT A LITTLE BIT.

3410

1  THE WHOLE ASHA MAURYA -- NEVER MIND.  I WON'T, I WON'T REVISIT

2  THAT BECAUSE I'M NOT GOING TO TRY TO PIN YOU DOWN ON THAT

3  AGAIN.  I'LL SEE HOW IT PLAYS OUT IN CLOSING.

4         OKAY.  I UNDERSTAND WHAT YOU'RE SAYING.  AND, AGAIN,

5  I DON'T FIND THAT THOSE THINGS -- THOSE ARE PRIME AREAS OF

6  CLOSING ARGUMENT.  I MEAN, DEFINITELY.  BUT I DON'T FIND THAT

7  THOSE DEFINITIONS OR THOSE AREAS NEED TO BE INCLUDED IN THE

8  JURY CHARGE.  THEY ARE NOT CHARGED IN THE INDICTMENT AND THE

9  COUNTS OF THE INDICTMENT.  THE JURORS HAVE HEARD TESTIMONY FROM

10 MULTIPLE WITNESSES ON MANY OF THESE THINGS.

11        AND SO YOUR OBJECTIONS ARE NOTED FOR INCLUSION OF ALL

12 THOSE CHARGES, BUT I AM NOT GOING TO INCLUDE THOSE IN THE JURY

13 CHARGE.

14        OKAY.  ARE THERE ANY OTHER OBJECTIONS, ISSUES,

15 EXCEPTIONS TO THE CHARGE AT THIS POINT?

16        SO THE ONLY THING THAT I'VE INDICATED THAT WOULD BE

17 CHANGED IS ON PAGE 7, THE ADDITION OF "WITH ASHA R. MAURYA" IN

18 TWO SEPARATE PLACES.  THAT WOULD BE IN THE SECOND AND THIRD

19 PARAGRAPHS ON PAGE 7.

20        ANYTHING ELSE AT THIS TIME, DEFENSE?

21        MS. NOVAY:  NO, YOUR HONOR.

22        THE COURT:  OKAY.  LET'S MOVE NOW TO THE INDICTMENT

23 AND THE VERDICT FORM.

24        AND I DON'T KNOW THAT THERE IS A LOT THAT NEEDS TO BE

25 TALKED ABOUT WITH THE FIRST PART OF THE INDICTMENT.  I THINK WE

3411

1    CAN PRETTY MUCH GO TO THE BACK.

2           I THINK THAT THE GOVERNMENT SUBMITTED, MAYBE BY

3    E-MAIL, A REDACTED INDICTMENT THAT POSSIBLY -- CORRECT ME IF

4    I'M WRONG -- JUST DIDN'T MENTION 24 AND 25, WHICH CONCERNED ME

5    BECAUSE, OF COURSE, THE INDICTMENT WAS READ IN FULL TO THE

6    JURORS.  I CAN'T REMEMBER IF 25 WAS STILL IN AT THAT TIME; 24

7    DEFINITELY WAS.

8           MR. PHILLIPS:  IT WAS NOT.

9           THE COURT:  IT WAS NOT.  OKAY.  AND, YOU KNOW, THEY

10   HAD THEIR NOTE PADS.  I DON'T KNOW HOW MANY OF THEM WERE TAKING

11   THINGS DOWN.  AND I THINK SEVERAL TIMES THEY WERE TOLD OF THE

12   DIFFERENT COUNTS THAT WERE IN THERE.  SO THAT WAS MY CONCERN

13   JUST TO NOT INCLUDE ANYTHING ABOUT THEM AT ALL.

14          SO THIS IS WHAT I PROPOSE.  SO, DEFENSE, I'LL TELL

15   YOU WHAT, LET'S START WITH YOU ON THIS ONE FIRST.  AND IT'S

16   PROBABLY GOING TO BE A SIMILAR ARGUMENT FOR THE INDICTMENT AND

17   VERDICT FORM BECAUSE, AS YOU SEE, WE'VE DONE THE SAME THING FOR

18   BOTH OF THEM.

19          MS. NOVAY:  IT IS, YOUR HONOR.  AND I'M PREPARED TO

20   ADDRESS THAT.  THAT WAS MY CONCERN AS WELL, IS THAT IT DRAWS

21   ATTENTION TO WHAT IS NOT THERE.

22          THE COURT:  OKAY.

23          MS. NOVAY:  I AGREE THAT 25 WAS NOT IN THERE.  I

24   WOULD PREFER TO HAVE 24 AND 25 JUST TAKEN OUT AND IT'S JUST

25   1 THROUGH 23.

3412

1          THE COURT:  WELL, AND YOU ALL MAY BE ON THE SAME

2     PAGE, THEN.  WE MAY NOT HAVE ANYTHING TO ARGUE HERE.

3          SO, DEFENSE, YOU WOULD PROPOSE JUST TO STOP WITH

4     COUNT 23?

5          MS. NOVAY:  YES, YOUR HONOR.

6          THE COURT:  GOVERNMENT?

7          MS. BARRON:  WE AGREE.

8          THE COURT:  YOU AGREE WITH THAT?

9          MS. BARRON:  YES.

10         THE COURT:  ALL RIGHT.  OKAY.  SO PAGE 4 AND PAGE 5

11    WILL COME OUT, AND PAGE 6 WILL THEN BECOME PAGE 4.

12         IS THAT RIGHT, MS. BECK?

13         ALL RIGHT.  THEN ON THE VERDICT FORM --

14         MR. GARLAND:  YOUR HONOR?

15         THE COURT:  YES.

16         MR. GARLAND:  EXCUSE ME.

17         THE COURT:  YES, SIR.

18         MR. GARLAND:  I DON'T THINK WE ARE ON THE SAME PAGE.

19         MS. NOVAY:  WITH THIS ISSUE, WE ARE ON THE SAME PAGE.

20         MR. GARLAND:  IS THE COPY WE HAVE HERE WHAT IS

21    PROPOSED?

22         THE COURT:  I DON'T KNOW WHAT YOU HAVE THERE.

23         MR. GARLAND:  I DON'T, EITHER.  I MEAN, IS THIS WHAT

24    IS BEING PROPOSED?

25         MR. GILFILLAN:  I BELIEVE THAT IS WHAT THE COURT HAS

3413

1    GIVEN US.  IS THAT RIGHT?

2         MR. GARLAND:  WE -- I UNDERSTOOD -- I'M SORRY, IT'S

3    MY FAULT -- THAT THE ONLY CHANGE WAS TAKING OUT THE COUNTS.

4    AND WHAT I HAVE BEEN GIVEN DOESN'T HAVE ANY OF THE MANNER AND

5    MEANS OR ANYTHING THAT WAS CHARGED IN THE INDICTMENT.

6         THE COURT:  WAIT A MINUTE.  OH.  THIS ONE DOESN'T

7    HAVE THAT.  I DIDN'T NOTICE THAT.  YEAH, THIS IS, THIS IS THE

8    ONE, THE CONDENSED ONE FOR PURPOSES OF READING IT AT THE

9    BEGINNING.  THIS IS NOT THE ONE THAT HASN'T -- THE FULL

10   INDICTMENT, THE MANNER AND MEANS.  YOU'RE CORRECT.

11        MR. GARLAND:  I JUST ASSUMED IT WAS WHAT -- DOUG AND

12   I DISCUSSED IT, AND I THINK --

13        THE COURT:  I DIDN'T NOTICE THAT BEFORE.

14        THE COURTROOM DEPUTY:  YEAH.  I'LL CHANGE IT.

15        MR. GARLAND:  YOUR HONOR, THE PROSECUTION AND THE

16   DEFENSE ARE ON THE SAME PAGE IF WE CAN FIND THE RIGHT DOCUMENT.

17        THE COURT:  THE COURT NEEDS TO GET ON THE PAGE,

18   MR. GARLAND.

19        MR. GARLAND:  I HAVE REACHED AN AGREEMENT WITH A

20   SMILE WITH MY OPPONENT, MR. GILFILLAN.  HE IS SMILING AT ME.

21        MR. GILFILLAN:  AFTER FOUR WEEKS, HE'S WORN ME DOWN.

22        THE COURTROOM DEPUTY:  OKAY.  I'LL CHANGE THAT.  I

23   HAVE THE WRONG ONE.

24        THE COURT:  OKAY.  SO, AND WE ACTUALLY -- I REMEMBER

25   US TALKING ABOUT THIS BEFORE.  WE ACTUALLY WERE REFERRING TO

3414

1    THESE WITH TWO DIFFERENT TERMS, A REDACTED INDICTMENT AND A

2    CONDENSED INDICTMENT, SO THAT WE WOULD NOT GET THEM CONFUSED.

3    BUT IT LOOKS LIKE WE GOT THEM CONFUSED HERE.

4            THE COURTROOM DEPUTY:  SO I WILL REMOVE IT FROM THE

5    INDICTMENT, THE 24 AND 25.

6            THE COURT:  RIGHT.  THAT'S THE FIRST THING.  BUT

7    THERE WAS ANOTHER ONE THAT WAS DONE THAT STILL HAD THE MANNER

8    AND MEANS.  IS THAT -- THE ONE THAT THE GOVERNMENT HAS JUST

9    SENT US RECENTLY, DOES THAT HAVE ALL THE MANNER AND MEANS?

10           MR. GARLAND:  YES, IT DOES.

11           THE COURT:  IT DOES?  OKAY.  SO LET'S PRINT THAT ONE

12   OUT AND HAVE EVERYONE LOOK AT IT TO MAKE SURE THAT WE'RE ON THE

13   SAME PAGE.

14           AND IN THE MEANTIME, LET ME FLIP OVER TO THE VERDICT

15   FORM.

16           SO FOR THE VERDICT FORM, WE WOULD TAKE OUT COMPLETELY

17   24 AND 25, AND THEN MOVE THE "SO SAY WE ALL" TO THAT PAGE, TO

18   THE BOTTOM HALF OF THE PAGE THAT HAS COUNT 22 ON IT.

19           MS. BARRON:  WE AGREE WITH THAT, YOUR HONOR.

20           MS. NOVAY:  WE AGREE AS WELL.

21           THE COURT:  OKAY.  IF YOU ALL CAN GIVE US A COUPLE OF

22   MINUTES, JUST BECAUSE I WANT YOU TO HAVE IN HAND WHAT YOU'LL BE

23   USING TOMORROW.  AND SO WHILE WE'RE DOING THAT, LET'S TALK

24   ABOUT TOMORROW A LITTLE BIT.

25           SO WHEN THEY COME IN -- AND HOPEFULLY THEY'LL BE

3415

1    READY TO GO AT 9:30, AND HOPEFULLY THE WEATHER WILL NOT PREVENT

2    THAT.  I MAY HAVE TOLD YOU ALL, I HOPE I DID, AT PRETRIAL

3    CONFERENCE, THAT I ACTUALLY READ THE BULK OF THE CHARGE BEFORE

4    ARGUMENT.  I DON'T READ IT AFTER.  BECAUSE I JUST STARTED

5    NOTICING AT SOME POINT THAT THE ATTORNEYS WOULD ARGUE, AND IN A

6    FEW MINUTES, JUDGE ROSS WILL TELL YOU THIS AND TELL YOU THAT.

7    AND IT JUST MAKES MORE SENSE TO ME IF I'VE TOLD THEM ALREADY SO

8    THEY CAN SAY, AS YOU JUST HEARD JUDGE ROSS SAY, WHATEVER, AND

9    REFER TO THAT.

10            SO WHAT I DO IS, IF YOU LOOK AT YOUR COURT'S

11   INSTRUCTION -- THERE SHOULD HOPEFULLY BE A BREAK IN HERE.

12   OKAY.  YES.  IF YOU'LL SEE -- IF YOU LOOK ON PAGE 16, THERE IS

13   AN UNDERLINED ALL CAPS TITLE SAYING, CONCLUDING CHARGES.

14            WHAT I DO IS READ ALL THE WAY UP TO BEFORE THAT

15   POINT, AND THEN I DO GO OVER THE VERDICT FORM -- YOU SEE THE

16   VERDICT FORM IS MENTIONED RIGHT ABOVE CONCLUDING CHARGES --

17   JUST BECAUSE I KNOW THAT YOU ALL MAY REFERENCE THE VERDICT FORM

18   IN YOUR ARGUMENT.

19            THEN WE HAVE THE ARGUMENTS.

20            AND THEN THE ONLY THING I SAY AFTER THE LAST ARGUMENT

21   IS, I GIVE THEM A LITTLE MORE INSTRUCTION ABOUT THEIR VERDICT

22   FORM, WHICH IS WHAT YOU SEE UNDER CONCLUDING CHARGES.  UNDER

23   CONCLUDING CHARGES IS THE LAST THING I SAY SO THAT MY VOICE IS

24   THE LAST ONE THEY HEAR.  I DID HAVE DEFENSE COUNSEL OBJECT THAT

25   THEY DID NOT WANT THE PROSECUTION'S VOICE TO BE THE LAST HEARD

3416

1    BEFORE GOING BACK.  SO THAT WILL NOT BE THE CASE, IF THAT

2    CONCERNS ANYONE.  BUT I WILL GIVE THAT CONCLUDING CHARGE.

3              THEY WILL GET ONE COPY OF THE CHARGE THAT THEY WILL

4    SHARE.  THEY WILL NOT GET 12 COPIES.  AND, OF COURSE, WE WILL

5    TAKE OUT -- AT THIS TIME WE HAVE TWO ALTERNATES WHO ARE LEFT.

6    WE WILL TAKE THEM OUT, PUT THEM IN A SEPARATE ROOM.

7              AND THEN THEY WILL GO BACK TO DELIBERATE WITH ONE

8    COPY OF THE CHARGE, VERDICT FORM, ONE COPY OF THE INDICTMENT,

9    WHICH IS BEING REPRINTED.  AND THEN I TELL THEM TO DO NOTHING

10   EXCEPT TO SELECT THEIR FOREPERSON UNTIL THEY GET ALL OF THE

11   PHYSICAL DOCUMENTS, THE EXHIBITS, WHICH I HAVE YOU ALL AGREE TO

12   ON THE RECORD ARE IN ORDER.

13             ARE THERE ANY QUESTIONS, CONCERNS, OR ANYTHING ABOUT

14   THAT PROCESS?  GOVERNMENT?

15             MS. BARRON:  NO, YOUR HONOR.

16             THE COURT:  DEFENSE?

17             MR. GARLAND:  NO, YOUR HONOR.

18             THE COURT:  OKAY.  SO LET'S JUST HOLD OFF FOR A

19   SECOND UNTIL WE GET THOSE TWO REPRINTS JUST TO MAKE SURE THERE

20   ARE NO ISSUES WITH THOSE.

21             MR. GARLAND:  YOUR HONOR, WE HAD RESTED SUBJECT TO

22   MAKING SURE THAT OUR EVIDENCE IS IN.

23             THE COURT:  I'M SORRY?

24             MR. GARLAND:  WE HAD RESTED SUBJECT TO MAKING SURE --

25             THE COURT:  OKAY.

1          MR. GARLAND:  -- GOING THROUGH THE EVIDENCE.  AND WE

2     WOULD ASK WE BE GIVEN ENOUGH TIME TO LOOK AT THE DOCUMENTS.

3          THE COURT:  MY UNDERSTANDING -- YES, YOU'LL HAVE

4     THAT.  MY UNDERSTANDING IS THAT YOU ALL HAVE BEEN DOING THAT,

5     OR AT LEAST SOMEONE FROM EACH SIDE, EVERY EVENING TO TRY

6     TO KEEP THINGS IN ORDER.

7          MR. GARLAND:  WE GOT TO MAKE SURE WE'VE COVERED

8     EVERYTHING.

9          THE COURT:  YES.  THE -- AND IF YOU ALL CAN DO THAT

10    BEFORE ARGUMENT SO THAT -- I KNOW THAT PEOPLE MIGHT --

11    ATTORNEYS MAY PULL OUT AN EXHIBIT HERE OR THERE FOR ARGUMENT,

12    BUT SO THAT THE BULK OF IT IS IN ORDER, THAT WOULD MAKE IT

13    EASIER, SINCE THERE ARE SO MANY EXHIBITS IN THIS ONE.

14          AND ALSO CHECK TO MAKE SURE THAT THE RIGHT VERSION IS

15    IN.  BECAUSE I KNOW WE HAD SOME EXHIBITS THAT WERE HIGHLIGHTED

16    AND WRITTEN ON AND THINGS LIKE THAT.

17          OKAY.  MS. BECK, YOU'VE HANDED TO ME A REPRINTED

18    INDICTMENT AND VERDICT FORM.

19          THE COURTROOM DEPUTY:  YES.  AND I DON'T THINK I MADE

20    ENOUGH COPIES.  I MADE JUST ONE SET OF EACH.

21          THE COURT:  OKAY.  WHY DON'T YOU GIVE THOSE FIRST,

22    AND THEN IF THEY WANT MORE COPIES, WE WILL GO AHEAD AND PRINT

23    THEM.  OR THEY CAN PRINT THEIR OWN.  BUT LET'S JUST GIVE ONE

24    SIDE -- ONE COPY TO EACH SIDE RIGHT NOW.

25          OKAY.  ANY ISSUES WITH THE INDICTMENT NOW AND THE

3418

1    VERDICT FORM THAT WILL GO BACK?  GOVERNMENT?

2              MS. BARRON:  NONE FOR US, YOUR HONOR.

3              THE COURT:  DEFENSE?

4              MR. GARLAND:  NO, YOUR HONOR.

5              THE COURT:  OKAY.  ALL RIGHT.  IN TERMS OF LENGTH OF

6    ARGUMENT, I CANNOT RECALL WHETHER OR NOT -- I REMEMBER THAT YOU

7    ALL HAD AN AGREEMENT AS TO OPENING, BUT THERE WAS NO REQUEST

8    FOR ADDITIONAL CLOSING ARGUMENT TIME, WAS THERE?

9              MR. GARLAND:  I THINK WE BOTH AGREED TO ONE HOUR.

10             THE COURT:  ONE HOUR.

11             MR. GARLAND:  WE HAVE A SECOND AGREEMENT.

12             THE COURT:  OKAY.  THANK YOU, MR. GARLAND, FOR

13   KEEPING TALLY OF THOSE.

14             GOVERNMENT, ARE YOU GOING TO SPLIT YOUR ARGUMENT?

15             MR. GILFILLAN:  YES, YOUR HONOR.  WE'LL RESERVE SOME

16   PORTION FOR REBUTTAL.

17             THE COURT:  OKAY.  SO ARE YOU GOING TO DO BOTH PARTS,

18   MR. GILFILLAN?

19             MR. GILFILLAN:  YES, YOUR HONOR.

20             THE COURT:  OKAY.  AND, DEFENSE, WHO WILL BE DOING

21   ARGUMENT ON YOUR BEHALF, IF YOU KNOW?

22             MR. GARLAND:  MS. NOVAY WILL LEAD OFF AND I'LL

23   CONCLUDE.

24             THE COURT:  OKAY.  Y'ALL ARE GOING TO SPLIT YOURS IN

25   THE MIDDLE THERE?

3419

1          MR. GARLAND:  WE ARE GOING TO SPLIT IT.  WE HAVEN'T

2     DECIDED EXACTLY HOW MUCH TIME AMONG US.

3          THE COURT:  OKAY.  ALL RIGHT.  SO IF WE COME IN

4     TOMORROW, ASSUMING WE START AT 9:30 AND I READ THE FIRST PART

5     OF THE CHARGE, I'M ANTICIPATING -- LET'S SEE.  HOLD ON ONE

6     SECOND FOR ME.

7          I WAS THINKING, FOR SOME REASON, THAT THERE WERE TWO

8     HOURS, THAT YOU ALL HAD AGREED TO TWO HOURS EACH SIDE FOR

9     CLOSING.  BUT I'M HAPPY TO HEAR THAT YOU DID NOT.  SO LET ME

10    JUST REDO THIS REAL QUICK.

11         OKAY.  I USUALLY GIVE, LIKE, A QUICK BREAK -- AND I

12    MEAN JUST A QUICK STRETCH, I MEAN NOT EVEN 10 MINUTES LIKE

13    WE'VE BEEN DOING, BUT FIVE MINUTES BETWEEN DIFFERENT ARGUMENTS.

14         AND SO WITH THAT AND MY READING OF THE CHARGE, BOTH

15    THE FIRST PART AND THE CONCLUDING, I THINK WE WOULD FINISH ALL

16    THE ARGUMENTS BY 12:30, BUT THEN WE WOULD BE DISMISSING FOR

17    LUNCH RIGHT THEN, AT 12:30.

18         SO I WANT TO MAKE SURE THAT EVERYONE IS AWARE THAT

19    THAT'S PROBABLY WHAT WE'RE GOING TO END UP DOING, ASSUMING WE

20    START AT 9:30.

21         AND WE'LL HEAR FROM YOU.  I'D LIKE TO DEFER TO THE

22    ATTORNEYS, IF YOU HAVE ANY SUGGESTIONS OR REQUESTS.

23         MR. GARLAND:  I SUGGEST 10 MINUTES BETWEEN ARGUMENTS

24    TO ASSEMBLE ALL THE PAPERWORK IN THE RIGHT ORDER.

25         THE COURT:  WELL, IF WE DO THAT, AND ASSUMING

3420

1    EVERYONE TAKES THEIR FULL HOUR, THAT'S GOING TO PUSH US

2    POSSIBLY UNTIL 1 O'CLOCK.  AND I THINK MY CONCERN IS --

3              WHAT TIME DOES THE CAFETERIA --

4              THE COURTROOM DEPUTY:  1:30.

5              THE COURT:  THE CAFETERIA CLOSES AT 1:30?  SO I THINK

6    WE SHOULD STILL BE GOOD.

7              OKAY.  I'M ALL FOR DOING THAT IF THAT'S WHAT YOU

8    NEED, BUT 10 MINUTES WOULD MEAN 10 MINUTES.

9              MR. GARLAND:  YOUR HONOR, I HAVE STARTED SETTING MY

10   ALARM.

11             THE COURT:  TEN MINUTES WOULD BE 9 MINUTES, BUT,

12   OKAY.  YOU'RE RIGHT.  YOU'RE RIGHT.  AND I ALMOST FUSSED AT

13   MR. HARDWICK ONE TIME FOR NOT BEING OVER THERE, BUT HE WAS OVER

14   HERE ON THE STAND ALREADY.  SO, OKAY.

15             GOVERNMENT, LET ME HEAR FROM YOU.

16             MR. GILFILLAN:  ON WHICH ISSUE, YOUR HONOR?

17             THE COURT:  SAY THAT AGAIN?

18             MR. GILFILLAN:  ON WHICH ISSUE?

19             THE COURT:  ANY ONE THAT -- YOU WERE ABOUT TO STAND

20   UP.  SO I THINK THE FIRST ONE WAS THE REQUEST FOR 10 MINUTES

21   INSTEAD OF FIVE MINUTES.

22             MR. GILFILLAN:  I WOULD ASK WE JUST GO FOR FIVE

23   MINUTES.

24             THE COURT:  TO KEEP IT GOING?

25             MR. GILFILLAN:  JUST HAD A THREE-DAY WEEKEND.  I

3421

1    WOULD ACTUALLY JUST ASK FOR JUST THE FIVE MINUTES.

2          MR. GARLAND:  IT'S JUST TO ASSEMBLE THE DOCUMENTS AND

3    MAKE SURE -- FOR OUR ARGUMENT.

4          THE COURT:  OKAY.  I WILL GIVE THE 10.  I DON'T THINK

5    THAT'S UNREASONABLE WITH THE AMOUNT OF MATERIAL IN THIS CASE.

6    I DO USUALLY GIVE FIVE.  AND, AGAIN, IT'S REALLY JUST FOR THE

7    PURPOSE -- IT'S REALLY JUST FOR THE PURPOSE OF THEM STRETCHING

8    AND BEING REFRESHED AND GETTING UP AND COMING BACK DOWN BEFORE

9    THEY HEAR ANOTHER SPEAKER.

10          BUT IF THE REQUEST FOR 10 IS MADE, SINCE IT HAS BEEN

11    MADE, I WILL GIVE THAT.

12          OKAY.  IS THERE ANYTHING ELSE?

13          MR. GARLAND:  NO.  I'M JUST STILL STANDING.

14          THE COURT:  ANYTHING ELSE?  ALL RIGHT.

15          ANYTHING ELSE, GOVERNMENT?

16          ALL RIGHT.  I WILL SEE YOU IN THE MORNING.  LOOK

17    FORWARD TO YOUR ARGUMENTS.  THANK YOU.

18          THE COURTROOM SECURITY OFFICER:  ALL RISE.  COURT'S

19    IN RECESS.

20          MR. GARLAND:  OH.  YOUR HONOR, I'M SORRY.  THERE IS

21    SOMETHING.

22          THE COURT:  YES.

23          MR. GARLAND:  I MEANT TO MENTION.  MY INTENTION WOULD

24    BE TO TAKE THE GOVERNMENT'S CHART THAT RELATES TO AMOUNT

25    HARDWICK REQUESTS AND CASH POSITION PER MONTH --

3422

1           THE COURT:  OKAY.

2           MR. GARLAND:  -- AND TO HAVE A VISUAL AID THAT PUTS

3   THE DOLLAR AMOUNTS AS TESTIFIED TO BY MR. HARDWICK IN A COLUMN,

4   LIKE I HAD PROPOSED TO DO BEFORE HE TESTIFIED.

5           THE COURT:  USE IT FOR CLOSING.

6           MR. GARLAND:  TO USE IT AS A DEMONSTRATIVE AID FOR

7   CLOSING.  I DON'T WANT TO VIOLATE ANY RULING OF THE COURT IF I

8   DO SO.

9           THE COURT:  I DO NOT SEE A PROBLEM WITH THAT.  BUT I

10  DO THINK YOU NEED TO SHOW THAT, BEFORE USING IT, TO THE

11  GOVERNMENT TO GIVE THEM AN OPPORTUNITY TO SAY WHETHER OR NOT

12  THEY THINK THAT ACCURATELY REFLECTS THE TESTIMONY THAT WAS

13  PRESENTED.

14          MS. NOVAY:  I THINK, YOUR HONOR, I HAD GIVEN A

15  WRITTEN PROFFER FOR VERN JOHNSON'S TESTIMONY AS DEFENSE

16  EXHIBIT 1200, NOT TO GO BACK WITH THE JURY.  YOU SAID WE WOULD

17  ADDRESS IT LATER.  I WASN'T SURE WHETHER --

18          THE COURT:  I DON'T THINK SO.  WHAT DID YOU END UP

19  DECIDING TO DO?  WAS IT FILED, OR HOW WAS IT MADE PART OF THE

20  RECORD?

21          MS. NOVAY:  I THINK I JUST ASKED THE COURT IF I COULD

22  JUST USE IT AS AN EXHIBIT AND JUST MAKE IT AN EXHIBIT AS PART

23  OF THE RECORD.

24          THE COURT:  DOES IT HAVE AN EXHIBIT NUMBER?

25          MS. NOVAY:  IT DOES.  IT'S 1200.

3423

1            THE COURT:  OKAY.  SO IT IS ADMITTED FOR THE RECORD
2    ONLY AND IS PART OF THIS RECORD.
3            AND MS. TRUELOVE IS REPRINTING THE CHARGE NOW WITH
4    THE ONLY TWO CHANGES WE MADE.  YOU MAY HAVE WRITTEN THEM IN ON
5    YOURS, BUT, AGAIN, JUST THE ADDITION OF THE "WITH ASHA R.
6    MAURYA" IN THOSE TWO PLACES.
7            OKAY.  SO AM I CORRECT IN UNDERSTANDING THAT,
8    MR. GARLAND, YOU HAVE NOW PROVIDED THE GOVERNMENT WITH A COPY
9    OF THE CHART YOU WILL USE FOR CLOSING?
10            MR. GARLAND:  YES.
11            THE COURT:  OKAY.  GOVERNMENT, HAVE YOU HAD -- DID
12    YOU JUST GET THAT OR HAVE YOU HAD TIME TO LOOK AT THAT YET TO
13    SEE WHETHER OR NOT YOU TAKE ISSUE WITH ANYTHING ON THERE?
14            MR. GILFILLAN:  IT LOOKS LIKE THE ONE THAT
15    MR. GARLAND GAVE MR. PHILLIPS DURING MR. HARDWICK'S TESTIMONY.
16            THE COURT:  OKAY.  AND THUS?
17            MS. BARRON:  THUS, WE HAD IT YESTERDAY.
18            THE COURT:  OKAY.  OKAY.
19            MR. GARLAND:  EXCUSE ME.  I WILL REMOVE THE PAGE
20    NUMBERS.  BECAUSE THESE ARE THE PAGE NUMBERS IN DISCOVERY AND
21    NOT THE PAGE NUMBERS -- SO WHERE IT SAYS PAGE SO-AND-SO, I WILL
22    REMOVE THOSE IF I AM ABLE TO PUT AN IDENTIFYING PAGE ON THE
23    DASHBOARD OR ON THE CASH THING.  THEY DON'T HAVE PAGE NUMBERS,
24    THEY HAVE DATE NUMBERS.  SO IT'S JUST THESE PAGES WERE IN
25    DISCOVERY, AND I WILL REMOVE THOSE.

3424

1          THE COURT:  ALL RIGHT.

2          ALL RIGHT.  SO I THINK THAT'S IT.  IF ANYONE DOES

3   WANT TO WAIT FOR A FINALIZED COPY OF THE CHARGE FROM

4   MS. TRUELOVE, YOU ARE WELCOME TO DO SO.  BUT IF YOU DON'T WANT

5   TO, THAT'S FINE AS WELL.

6          ALL RIGHT.  THANK YOU.  WE ARE ADJOURNED.

7          (WHEREUPON, THE PROCEEDINGS WERE ADJOURNED AT

8   6:01 P.M., TO BE RECONVENED AS ORDERED BY THE COURT.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3425

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF GEORGIA

3    CERTIFICATE OF REPORTER

4

5

6         I DO HEREBY CERTIFY THAT THE FOREGOING PAGES ARE A

7    TRUE AND CORRECT TRANSCRIPT OF THE PROCEEDINGS TAKEN DOWN BY

8    ME IN THE CASE AFORESAID.

9         THIS, THE 6TH DAY OF JANUARY, 2019.

10

11

12

13                              /S/ ELIZABETH G. COHN

                                _____
14                              ELIZABETH G. COHN, RMR, CRR
                                OFFICIAL COURT REPORTER
15

16

17

18

19

20

21

22

23

24

25