1

1                    UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF GEORGIA
2                          ATLANTA DIVISION

3

4    UNITED STATES OF AMERICA

5
         -VS-                      DOCKET NO. 1:16-CR-00065-ELR-CMS
6

7    NATHAN E. HARDWICK IV,

8
              DEFENDANT.
9

10                  TRANSCRIPT OF SENTENCING PROCEEDINGS
                    BEFORE THE HONORABLE ELEANOR L. ROSS
11                     UNITED STATES DISTRICT JUDGE
                          FEBRUARY 11, 2019
12

13   APPEARANCES:

14   ON BEHALF OF THE GOVERNMENT:

15       JOHN RUSSELL PHILLIPS, ESQ.
         ASSISTANT UNITED STATES ATTORNEY
16
         LYNSEY MORRIS BARRON, ATTORNEY AT LAW
17       ASSISTANT UNITED STATES ATTORNEY

18       KELLY KATHLEEN CONNORS, ATTORNEY AT LAW
         ASSISTANT UNITED STATES ATTORNEY
19
     ON BEHALF OF THE DEFENDANT:
20
         EDWARD T. M. GARLAND, ESQ.
21       ROBIN N. LOEB, ATTORNEY AT LAW
         KRISTEN WRIGHT NOVAY, ATTORNEY AT LAW
22

23
     ELIZABETH G. COHN, RMR, CRR
24   OFFICIAL COURT REPORTER
     UNITED STATES DISTRICT COURT
25   ATLANTA, GEORGIA

2

1                             I N D E X

2      WITNESS                                          PAGE

3      MICHELE VELCHECK

4      DIRECT EXAMINATION BY MR. GARLAND                  46

5      CROSS-EXAMINATION BY MS. BARRON                    67

6

7      J. P. GINGRAS

8      DIRECT EXAMINATION BY MR. GARLAND                  83

9      CROSS-EXAMINATION BY MS. BARRON                   100

10     REDIRECT EXAMINATION BY MR. GARLAND               130

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (ATLANTA, FULTON COUNTY, GEORGIA; FEBRUARY 11, 2019,

2      AT 10:02 A.M. IN OPEN COURT.)

3              THE COURT:  THANK YOU, SIR.

4              THANK YOU.  GOOD MORNING.  PLEASE BE SEATED.

5              ALL RIGHT.  THIS IS THE CASE OF THE UNITED STATES OF

6      AMERICA VERSUS MR. NATHAN HARDWICK.  THIS IS ACTION 16-CR-65.

7              ON OCTOBER 12TH, 2018, MR. HARDWICK WAS FOUND GUILTY,

8      FOLLOWING A JURY TRIAL, OF ONE COUNT OF CONSPIRACY TO COMMIT

9      WIRE FRAUD, 21 COUNTS OF WIRE FRAUD -- THOSE ARE, OF COURSE,

10     THE SUBSTANTIVE COUNTS -- AND THEN ONE COUNT OF FALSE STATEMENT

11     TO A FEDERALLY INSURED FINANCIAL INSTITUTION.

12             GOOD MORNING AGAIN.  ON BEHALF OF THE GOVERNMENT,

13     PLEASE ANNOUNCE YOUR APPEARANCE FOR THE RECORD AND IDENTIFY

14     EVERYONE ON YOUR SIDE OF COUNSEL TABLE, PLEASE.

15             MR. PHILLIPS:  GOOD MORNING, YOUR HONOR.  RUSSELL

16     PHILLIPS AND LYNSEY BARRON AND KELLY CONNORS FOR THE UNITED

17     STATES.  MS. CONNORS IS HERE TO TALK ABOUT THE FORFEITURE

18     ISSUE.  SHE'S A SPECIALIST IN THAT.

19             THE COURT:  ALL RIGHT.

20             MR. PHILLIPS:  WE'VE GOT SCOTT CARUANA AND CHIP

21     CROMER FROM THE FBI.

22             AND THIS GENTLEMAN HERE IS FROM THE PROBATION OFFICE.

23     I BELIEVE YOU KNOW HIM.

24             THE COURT:  OFFICER ALEXANDER MOODY.

25             GOOD MORNING TO ALL OF YOU.  THANK YOU.

4

1        MR. PHILLIPS:  THANK YOU.

2        THE COURT:  AND ON BEHALF OF MR. HARDWICK, WHO IS

3   PRESENT, PLEASE ANNOUNCE YOUR APPEARANCE FOR THE RECORD AND

4   IDENTIFY EVERYONE ON THIS SIDE OF THE COURTROOM, SIR.

5        MR. GARLAND:  GOOD MORNING, YOUR HONOR.  I'M ED

6   GARLAND.  WITH ME TODAY IS KRISTEN WRIGHT NOVAY, ALSO COUNSEL

7   FOR HARDWICK.  OF COURSE, MR. HARDWICK.  AND ROBIN LOEB, WHO

8   ALSO APPEARS.  AND MIA FULKS, WHO WILL NOT BE SPEAKING.  BUT

9   ALL OF US WILL BE SPEAKING IF PERMITTED.

10        THE COURT:  ALL RIGHT.  GOOD MORNING TO ALL OF YOU.

11        ALL RIGHT.  MR. HARDWICK, SIR, I HAVE REVIEWED THE

12   PRESENTENCE INVESTIGATION REPORT.  HAVE YOU REVIEWED IT WITH

13   YOUR ATTORNEYS?

14        THE DEFENDANT:  YES, MA'AM.

15        THE COURT:  ALL RIGHT, SIR.  THE ADVISORY CUSTODY

16   GUIDELINE RANGE WAS CALCULATED BY PROBATION AS 210 TO

17   262 MONTHS, WITH A FINE GUIDELINE RANGE OF $20,000 TO

18   $1 MILLION AND A SUPERVISED RELEASE RANGE OF ONE TO FIVE YEARS.

19        MR. HARDWICK'S CRIMINAL HISTORY CATEGORY WAS FOUND TO

20   BE I.

21        THESE CALCULATIONS ARE BASED ON A TOTAL OFFENSE LEVEL

22   OF 37 THAT STARTS WITH A BASE OFFENSE LEVEL OF SEVEN.  THAT'S

23   PURSUANT TO U.S.S.G. 2B1.1(A)(1).

24        THEN THERE IS A 20-LEVEL INCREASE BASED ON A -- THE

25   LOSS AMOUNT, WHICH I'M SURE WE'RE GOING TO TALK ABOUT QUITE A

5

1    BIT AT TODAY'S HEARING.  BUT FOR THESE PURPOSES, THE LOSS

2    AMOUNT WAS DETERMINED TO BE GREATER THAN $9.5 MILLION BUT LESS

3    THAN $25 MILLION FOR PURPOSES OF THE GUIDELINES.  AND THAT'S

4    PURSUANT TO 2B1.1(B)(1)(K).

5            THEN THERE IS ALSO A TWO-LEVEL INCREASE FACTORED IN

6    DUE TO FINANCIAL HARDSHIP TO OTHERS.

7            THERE IS ALSO A FOUR-LEVEL INCREASE FACTORED IN BASED

8    ON ROLE IN THE OFFENSE, THAT MR. HARDWICK WAS AN ORGANIZER OR

9    LEADER OF CRIMINAL ACTIVITY INVOLVING FIVE OR MORE PARTICIPANTS

10   OR WAS OTHERWISE EXTENSIVE.

11           ALSO A TWO-LEVEL INCREASE FOR ABUSING A POSITION OF

12   TRUST AS AN ATTORNEY.  THAT'S PURSUANT TO 3B1.3.

13           AND THEN THE TWO-LEVEL INCREASE FOR OBSTRUCTION,

14   WHICH I'M SURE WE'LL ALSO TALK QUITE A BIT ABOUT TODAY.

15           ARE THERE ANY OBJECTIONS TO THESE CALCULATIONS AND/OR

16   THE FACTUAL FINDINGS IN THE PSR?

17           AND WE'LL START WITH THE GOVERNMENT.

18           MR. PHILLIPS:  NO, YOUR HONOR.

19           THE COURT:  ALL RIGHT.  AND ON BEHALF OF

20   MR. HARDWICK.

21           MS. NOVAY:  YES, YOUR HONOR.

22           THE COURT:  ALL RIGHT.  AND I TELL YOU WHAT.  WHY

23   DON'T WE SKIP OVER FOR NOW LOSS AMOUNT AND GO TO THE OTHER

24   OBJECTIONS RELATED TO -- WELL, I WON'T CHARACTERIZE THEM, BUT

25   I -- JUST ASSUMING BASED ON THE PLEADINGS AND THE PSR.

6

1              BUT, MS. NOVAY, WILL YOU BE RESPONDING OR PRESENTING

2    ON BEHALF OF THE DEFENSE ON ALL OF THOSE OBJECTIONS?

3              MS. NOVAY:  NO, YOUR HONOR.

4              THE COURT:  OKAY.  THEN GO AHEAD AND TELL ME WHAT

5    THEY ARE NOW JUST SO I KNOW THAT THEY ARE -- WHETHER THEY ARE

6    THE SAME AS PREVIOUSLY RAISED.

7              MS. NOVAY:  THEY ARE.  SO AS FAR AS THE

8    ENHANCEMENTS --

9              THE COURT:  YES.

10             MS. NOVAY:  -- OUR OBJECTIONS ARE GOING TO BE THE

11   LOSS AMOUNT, WHICH MR. GARLAND WILL BE ADDRESSING WITH

12   MR. GINGRAS.

13             THE COURT:  OKAY.

14             MS. NOVAY:  WE ALSO HAVE THE ROLE ENHANCEMENT.  I

15   WILL BE ADDRESSING THAT.

16             THE HARDSHIP TO ONE OR MORE VICTIMS, MR. GARLAND WILL

17   KIND OF BE ADDRESSING THAT, BECAUSE I THINK THAT KIND OF GOES A

18   LITTLE BIT INTO LOSS AMOUNT.

19             AND THEN THERE'S THE OBSTRUCTION ENHANCEMENT.

20             THE COURT:  ALL RIGHT.  LET'S GO AHEAD AND -- UNLESS

21   IT DISTURBS YOUR PRESENTATION, THE FLOW OF YOUR PRESENTATION;

22   AND IF IT DOES, THEN WE'LL GO AHEAD AND SWITCH IT UP.  BUT FOR

23   NOW I'D LIKE TO GO AHEAD AND DEAL WITH ROLE AND HARDSHIP.

24             SO I COULD HEAR FROM YOU ON YOUR OBJECTIONS IF YOU

25   HAVE ANYTHING FURTHER TO ARGUE BEYOND THE SENTENCING MEMO.

1          MR. PHILLIPS:  YOUR HONOR, COULD I ASK ONE THING?

2  WOULD IT BE POSSIBLE FOR US TO TAKE EACH ONE, EACH GUIDELINE

3  RECOMMENDATION ONE AT A TIME AND LET THE GOVERNMENT RESPOND SO

4  THAT WE DON'T GET CONFUSED AND HAVE TO DO TWO OR THREE AT ONE

5  TIME?

6          THE COURT:  THAT'S FINE.  SINCE YOU'RE STANDING AND

7  YOU'VE ADDRESSED THAT, TELL ME WHO ON BEHALF OF THE GOVERNMENT

8  WILL BE RESPONDING TO THE OBJECTIONS.

9          MR. PHILLIPS:  I AM, YOUR HONOR.  AND MS. BARRON IS

10 GOING TO TALK ABOUT THE LOSS AMOUNT SPECIFICALLY WITH RESPECT

11 TO MR. GINGRAS'S TESTIMONY.  IF HE TESTIFIES TODAY, SHE'LL TALK

12 ABOUT MR. GINGRAS.  AND MS. CONNORS IS GOING TO DEAL WITH THE

13 FORFEITURE ISSUES.

14         THE COURT:  ALL RIGHT.  THANK YOU.

15         ALL RIGHT.  SO WE WILL START WITH EITHER ROLE OR

16 HARDSHIP.

17         MR. GARLAND, YOU HAVE SOMETHING?

18         MR. GARLAND:  I WAS GOING TO SAY THAT SOME OF OURS

19 BLEED OVER INTO EACH OTHER, AND I EXPECT EVERYONE TO SPEAK AT

20 DIFFERENT POINTS.

21         THE COURT:  OKAY.  WELL, THEN, LET ME STEP BACK THEN.

22 I DEFINITELY UNDERSTAND HOW LOSS AMOUNT AND HARDSHIP GO HAND IN

23 HAND, BUT I DON'T WANT TO DISRUPT THE FLOW OF ANYBODY'S

24 PRESENTATION.  SO LET ME HEAR FROM YOU ALL WITH RESPECT TO

25 WHETHER YOU THINK THERE IS A DIFFERENT WAY TO PRESENT IT THAT

8

1    MIGHT BE MORE EFFECTIVE.

2         MR. GARLAND, SINCE YOU'RE STANDING, I'LL HEAR FROM

3    YOU FIRST, SIR.

4         MR. GARLAND:  I THINK WE SHOULD GO RIGHT INTO LOSS

5    AMOUNT.

6         THE COURT:  OKAY.

7         MR. GARLAND:  THAT IS WHAT I HAD PLANNED TO DO.  I DO

8    HAVE TWO WITNESSES THAT TOUCH, MR. GINGRAS AND MICHELE

9    VELCHECK.  I DON'T KNOW IF SHE HAS ARRIVED YET.  SHE HAS.

10        THE COURT:  OKAY.  ALL RIGHT.  WELL, WHAT -- I'LL

11   DEFER TO THE PARTIES, THEN.  SINCE YOU ALL HAVE PRESENTED,

12   YOU'VE PROBABLY DISCUSSED IT MAYBE EVEN WITH EACH OTHER.  WE'LL

13   GO AHEAD AND START WITH LOSS AMOUNT -- OR START WITH THE

14   DEFENSE'S PRESENTATION, AND WE'LL SEE HOW MUCH OF YOUR INITIAL

15   PRESENTATION COVERS THESE.

16        I WILL TELL YOU AS A STARTING POINT WHAT MY, WHAT MY

17   INCLINATION IS HERE.

18        AND, MR. GARLAND, I'M GOING TO SPEAK FOR JUST A

19   SECOND.  SO THERE YOU GO.  TAKE THAT SEAT FOR ME.  THANK YOU.

20   YEAH.  YOU KNOW HOW -- I WON'T TALK TOO LONG.

21        BUT LET ME TELL YOU THAT THIS -- THIS, OF COURSE, IS

22   AN AREA WITH WHICH WE HAVE DEALT A LOT, AND STARTED DEALING

23   WITH BEFORE THE PRETRIAL HEARINGS, THE LOSS AMOUNT AND WHETHER

24   THE GOVERNMENT HAD ESTABLISHED PRETTY MUCH, NOT NECESSARILY TO

25   A SPECIFIC DOLLAR AMOUNT BUT A GOOD FAITH ESTIMATE OF HOW MUCH

1    LOSS COULD BE ATTRIBUTED TO THE CONDUCT OF MR. HARDWICK.

2            I DO REMEMBER, AS THE DEFENSE POINTED OUT IN ITS

3    PLEADINGS, THAT THE GOVERNMENT RESPONDED SEVERAL TIMES BY

4    SAYING, HEY, WE DON'T HAVE TO PROVE THAT, AND THIS IS NOT A

5    TRIAL ISSUE; THIS IS A SENTENCING ISSUE.

6            AND THE GOVERNMENT WAS RIGHT BASED ON THE WAY THAT

7    THE INDICTMENT WAS CHARGED, WHICH WAS A SERIES OF WIRE

8    TRANSFERS.  AND WITH THE INDIVIDUAL WIRE TRANSFERS, IT REALLY

9    DIDN'T MATTER THE AMOUNT IF THE GOVERNMENT ESTABLISHED FOR THE

10   JURY THAT MR. HARDWICK HAD NO BUSINESS TAKING OUT MONEY FOR

11   PERSONAL USES FROM THOSE ACCOUNTS AT ALL.  BECAUSE THEY WERE

12   IOLTA ACCOUNTS AND THE NATURE OF THE ACCOUNTS, REALLY DIDN'T

13   MATTER THE AMOUNT.

14           AND SO TO SOME EXTENT, WE DIDN'T GET THERE, ALTHOUGH

15   I UNDERSTAND THE GOVERNMENT SAYS, WE KIND OF DID.  BUT WHAT I

16   RECALL FROM TRIAL IS THAT THE IN EXCESS OF $20 MILLION CAME

17   PRIMARILY FROM TWO SOURCES:  ONE, THE AMOUNT THAT FIDELITY SAID

18   THAT THEY INFUSED INTO THE LAW FIRM.  AND MY ISSUE FOR THAT --

19   OR TO TRY TO SAVE THE LAW FIRM, TO COVER THE LOSSES.  MY ISSUE

20   WITH THAT WAS I DEFINITELY HEARD CLEAR EVIDENCE ON WHETHER ALL

21   OF THAT LOSS COVERAGE WAS ATTRIBUTED TO MR. HARDWICK'S CONDUCT

22   OR WHETHER IT ALSO COULD HAVE BEEN FROM OTHER SOURCES.

23           ALSO, WE, OF COURSE, HEARD AND SAW DOCUMENTARY

24   EVIDENCE TO SUPPORT THAT MR. HARDWICK DID TAKE AN AMOUNT THAT

25   WAS IN EXCESS OF $20 MILLION.  BUT WHAT THE DEFENSE ALWAYS

1   RAISED WAS, TO KNOW WHAT -- HE WAS DEFINITELY ENTITLED TO

2   CERTAIN AMOUNTS AS DISTRIBUTIONS.  EVERYONE AGREED TO THAT.

3   AND TO KNOW HOW MUCH IN EXCESS HE TOOK, WE WOULD HAVE TO KNOW

4   HOW MUCH HE WAS ACTUALLY ENTITLED TO.  AND WE DIDN'T REALLY GET

5   A FIGURE ON THAT AMOUNT.

6           NOW, GOVERNMENT, YOU TAKE A POSITION, I THINK, IN

7   YOUR MEMO THAT WE DO HAVE A CLOSER ESTIMATE TO THAT BASED ON

8   THE TOTAL INCOME THAT WAS MADE BY THE FIRM WITHIN A PERIOD OF

9   TIME AND THEN, BASED ON SHAREHOLDERS AGREEMENT, HOW MUCH OF A

10  PERCENTAGE MR. HARDWICK WAS ENTITLED TO.  AND SO HE -- WE CAN

11  TAKE THOSE FIGURES TO SHOW THAT HE DEFINITELY TOOK WAY MORE

12  THAN WHAT SHOULD HAVE BEEN HIS SHARE.

13          I UNDERSTAND THAT'S WHAT YOU'RE GOING TO ARGUE.  I'M

14  NOT SURE THAT I AM THERE YET.  SO I NEED TO HEAR EVIDENCE ON

15  THAT.

16          MY FEELING, THOUGH, DEFENSE, IS, EVEN IF I GO WITH

17  YOUR POSITION, THAT THE GOVERNMENT REALLY HASN'T GIVEN ME

18  ENOUGH TO SAY THEY HAVE SHOWN BY A PREPONDERANCE OF THE

19  EVIDENCE THE LOSS AMOUNT, THAT I SHOULD AT LEAST, AT THE VERY

20  LEAST, BE ABLE TO GO WITH THE AMOUNTS THAT ARE CONTAINED IN THE

21  INDICTMENT COUNTS THAT MR. HARDWICK WAS CONVICTED ON.

22          AND IF YOU LOOK AT THOSE COUNTS, THERE'S NO AMOUNT IN

23  ONE, BECAUSE THAT'S CONSPIRACY.  THERE'S NO AMOUNT IN 23,

24  BECAUSE THAT'S FINANCIAL -- FALSE STATEMENTS TO FINANCIAL

25  INSTITUTION.

1           BUT THE OTHER COUNTS, EACH HAS AN AMOUNT.  AND IF I

2    LOOK AT THOSE AMOUNTS IN TOTAL AMOUNT, IT COMES TO IN EXCESS OF

3    $6 MILLION.  THAT DOESN'T GET ME TO THE 20-LEVEL ENHANCEMENT

4    UNDER SUBSECTION (K); BUT IT GETS ME TO THE NEXT ONE DOWN,

5    WHICH IS SUBSECTION (J), AN 18-LEVEL ENHANCEMENT.

6           SO EVEN IF MR. GINGRAS TESTIFIES AND WE HEAR

7    ARGUMENTS THAT THE GOVERNMENT NEVER ESTABLISHED LOSS AMOUNT, I

8    CAN'T SEE A GOOD ARGUMENT FOR WHY I WOULD NOT AT LEAST BE ABLE

9    TO RELY ON THAT AMOUNT, BECAUSE THOSE ARE REFLECTED BY THE

10   COUNTS IN THE INDICTMENT ON WHICH THE JURY RETURNED VERDICTS OF

11   GUILTY.

12          SO THAT'S -- I JUST WANT EACH SIDE TO UNDERSTAND

13   WHERE I'M STARTING FROM.

14          ALL RIGHT.  GOVERNMENT -- EXCUSE ME.  DEFENSE, SINCE

15   IT'S YOUR OBJECTION, I'LL LET YOU START.

16          MR. GARLAND:  IN LIGHT OF YOUR RECENT REMARKS THERE,

17   COULD I HAVE JUST A MOMENT?

18          THE COURT:  SURE.  YES, PLEASE.

19          AND I REALIZE THE POSITION I JUST SET FORTH IS NOT

20   ONE ANYONE HAS ARGUED, SO THAT MAY BE A SIDE TO ME THAT PERHAPS

21   IS NOT A VALID ONE.  BUT THAT WAS JUST WHAT CAME UP IN MY

22   THINKING.

23          MR. GARLAND:  TO ADDRESS THE POINT YOUR HONOR JUST

24   BROUGHT UP --

25          THE COURT:  YES.

12

1        MR. GARLAND:  -- THOSE COUNTS SIMPLY SHOW TRANSFERS,

2   DO NOT SHOW LOSS.  THEY JUST -- THE CRIME WE'RE CONVICTED OF IS

3   CONSPIRING TO TAKE TOO MUCH AND TAKING TOO MUCH, BUT THAT

4   DOESN'T ESTABLISH THE LOSS THAT CERTAIN FUNDS WERE TRANSFERRED.

5        THE COURT:  WERE THERE LOSS AMOUNTS CONTAINED IN

6   THOSE COUNTS?

7        MR. GARLAND:  IT'S -- THEY ARE NOT ALLEGED TO BE

8   LOSS.  THEY ARE ALLEGED TO BE TRANSFERS IN FURTHERANCE OF THE

9   CRIME.  AND SO --

10       THE COURT:  I'M SORRY.  BUT SO, ARE THERE -- I'M JUST

11  ASKING BEFORE I PULL THE INDICTMENT BACK OUT.  I UNDERSTAND

12  YOUR POSITION.  BUT DO YOU AGREE THAT THERE ARE AMOUNTS THAT

13  ARE IN THOSE INDICTMENT COUNTS?

14       MR. GARLAND:  THERE ARE AMOUNTS THAT WERE

15  TRANSFERRED.

16       THE COURT:  OKAY.

17       MR. GARLAND:  BUT THE MERE TRANSFERRING -- THEY'RE

18  IRRELEVANT.  THE GOVERNMENT'S THEORY IS HE GOT TOO MUCH, AND

19  THIS IS -- OF ONE -- THESE ARE A LIST OF WHERE HE GOT TOO MUCH.

20  BUT IT DOESN'T PROVE LOSS UNDER THE REQUIREMENTS.  AND I WILL

21  BEGIN BY SAYING THAT THE BURDEN TO SHOW THIS LOSS, UNDER THE

22  RULES, IS UPON THE GOVERNMENT.

23       BUT I THINK TO PUT IT -- THAT IS MY IMMEDIATE

24  RESPONSE TO WHAT YOUR HONOR HAS ADVANCED AS A POTENTIAL BASIS

25  AT SIX MILLION.  I WOULD LIKE TO ADDRESS THE BALANCE OF THEM

1    AND HAVE PERHAPS A LITTLE TIME TO DISCUSS THAT ONE FURTHER.

2    HOPEFULLY WE'LL HAVE A SHORT BREAK AT SOME POINT.

3            MAY I MAKE A BRIEF OPENING --

4            THE COURT:  YES.

5            MR. GARLAND:  -- ABOUT LOSS, YOUR HONOR?

6            THE COURT:  I'M GOING TO LET YOU MAKE A BRIEF

7    OPENING.  AND THEN I'D LIKE TO HEAR THE GOVERNMENT JUST BRIEFLY

8    BEFORE THEY CALL A WITNESS, JUST MAINLY TO ADDRESS THE COMMENTS

9    I JUST MADE.

10           OKAY.  YES, MR. GARLAND.

11           MR. GARLAND:  THE ISSUE OF LOSS WE WISH TO ADDRESS IN

12   TWO PARTS.  FIRST, THE EVIDENCE PRESENTED IN THE TRIAL AND SUCH

13   ADDITIONAL INFORMATION THAT HAS COME IN THE PRESENTENCE REPORT,

14   WHICH REALLY CONSISTS OF A DETAILED LIST RECEIVED FROM FIDELITY

15   OF 29,000 -- $29,500,000, MORE OR LESS, THAT THEY SENT TO THE

16   LAW FIRM OVER A PERIOD -- I WANT TO SAY 16 MONTHS, 18 MONTHS,

17   SOMETHING LIKE THAT.

18           AND THE -- SO THAT -- WHAT'S IN THE RECORD, THE

19   ECONOMIC EVIDENCE IN THE RECORD AND THE TESTIMONY, DOES NOT

20   PROVIDE A BASIS TO DETERMINE A LOSS, ACTUAL OR INTENDED, BY A

21   PREPONDERANCE OF THE EVIDENCE.

22           IN ADDITION TO TESTIMONY DELIVERED BY MR. GINGRAS,

23   WHICH WE RELIED UPON, WE HAVE SUBMITTED ADDITIONAL EXPLANATIONS

24   OF THE FACTS THAT NO EVIDENCE EXISTS IN THE RECORD TO SHOW THE

25   FOLLOWING:  THE AMOUNT OF SHORTFALL IN THE ACCOUNTS, BOTH

1    ESCROW AND OPERATIONAL.  SO THERE HASN'T BEEN EVER EVIDENCE AND

2    TESTIMONY, OR ACCOUNTING TESTIMONY, SAYING, THIS IS A SHORTFALL

3    IN THE ACCOUNTS, MEANING OPERATIONAL ACCOUNTS, ESCROW ACCOUNTS.

4          WHAT'S SIGNIFICANT IS IT IS UNDISPUTED, AND THE

5    RECORD HAS FILLED UP THE TRANSCRIPT, THAT ALL OF THESE FUNDS

6    WERE COMMINGLED.  I REFERRED TO IT AS LIKE A SCRAMBLED EGG.

7          BUT THEY -- YOU HAD, JUST UNDISPUTED IN THE RECORD,

8    MONEY OF THE LAW FIRM PUT INTO THE ESCROW ACCOUNTS.  YOU HAD

9    MONEY FROM THE ESCROW ACCOUNTS GOING BACK INTO THE LAW FIRM

10   OPERATING ACCOUNTS.  YOU HAD MONEY GOING FROM THE MAIN, QUOTE,

11   ESCROW ACCOUNT.  I'M GOING TO REFER TO THEM AS COMMINGLED

12   ACCOUNTS, BECAUSE THE EVIDENCE IS UNDISPUTED THE ACCOUNTS WERE

13   COMMINGLED.

14         MONEY WENT FROM THESE COMMINGLED MAIN ESCROW, WHICH

15   NO LONGER HAD THE CHARACTER, INTO OTHER ESCROW ACCOUNTS.  MONEY

16   WENT FROM OTHER ESCROW ACCOUNTS BACK INTO THE MAIN ESCROW

17   ACCOUNT AND BACK UP TO THE LAW FIRM.  MONEY WENT INTO THE

18   COMMINGLED ESCROW ACCOUNT FROM THE BALTIMORE OPERATIONS,

19   PROFITS SENT DIRECTLY DOWN INTO THAT ACCOUNT.  SO YOU HAVE A

20   TOTAL COMMINGLING.

21         YOU HAVE MONEY THAT SUBSEQUENTLY COMES FROM FIDELITY.

22   BUT WHAT YOU DON'T HAVE IS WHAT CAUSED THE SHORTFALL.  AND THAT

23   IS BECAUSE IT IS UNDISPUTED IN THE RECORDS THAT, ONE, THE

24   ACCOUNTS WERE COMMINGLED; TWO, THAT THE FUNDS WERE, AS I JUST

25   SAID, MOVED FROM ACCOUNT TO ACCOUNT IN THE FASHION I HAVE JUST

1    DESCRIBED, AND THAT THAT OCCURRED BETWEEN 2011 AND 2014.

2            WHO GOT MONEY OUT OF THE ESCROW ACCOUNTS.  THIS ALSO

3    IS UNDISPUTED.  ALL THE PARTNERS GOT MONEY OUT OF THE

4    COMMINGLED ACCOUNTS.  ALL OF THE EMPLOYEES OF THE FIRM GOT

5    MONEY OUT OF THE COMMINGLED ACCOUNTS.  CREDITORS GOT MONEY OUT

6    OF THE COMMINGLED ACCOUNTS.  AND THE LIST JUST GOES ON INTO

7    EVERY EXPENDITURE THAT YOU WOULD HAVE IN A FIRM OPERATING THIS

8    WAY.

9            IT IS UNDISPUTED THAT NO RECONCILIATION, REFERRED TO

10   AS THIRD-PARTY RECONCILIATION, PROCEDURE WAS IN FACT PERFORMED.

11   IT WAS NOT.  THE TESTIMONY IN THE RECORD IS, TO KNOW WHAT THE

12   CAUSE OF A SHORTFALL, YOU HAVE TO RECONCILE ALL OF THE

13   ACCOUNTS.  AND BECAUSE THERE WAS NEVER A RECONCILIATION OF THE

14   ACCOUNTS, YOU CANNOT DETERMINE THE CAUSE OF THE SHORTFALL IN

15   THE ACCOUNTS.

16           AND THE GOVERNMENT SAID, WELL, FIDELITY PUT IN 30;

17   AND, THEREFORE, THERE WAS A LOSS.

18           BUT WHAT IS MISSING IS THE CAUSE LINK, THE PROXIMATE

19   CAUSE BETWEEN THE SHORTFALL AND THE CONDUCT OF THE DEFENDANT.

20   SO, IN ESSENCE, THERE'S NO PROOF SHOWING WHAT CAUSED THE

21   SHORTFALL.

22           WELL, IN THE -- IN THAT ABSENCE, YOU CAN'T DETERMINE

23   A BEGINNING BALANCE.  IF WE'RE GOING TO SAY WHAT'S IN THE

24   ACCOUNT, WE GOT TO HAVE A BEGINNING BALANCE.  IT WAS NEVER PUT

25   IN THE RECORD ON ALL OF THESE ACCOUNTS.  I CAN'T ADD 1 AND 1

16

1    AND 1 AND GET 3 WHEN THE FIRST 1 IS A QUESTION MARK.  SO

2    THERE'S A VOID IN ALL OF THE FIGURES IN ALL OF THE DOCUMENTS.

3              SECONDLY, DID ERRORS OCCUR IN CLOSINGS.  LET'S TAKE

4    AN EXAMPLE OF A CLOSING.  A CLIENT PUTS A MILLION DOLLARS INTO

5    THE ACCOUNT, THERE'S A CLOSING, AND THE CLIENT IS DUE SOME

6    RETURN OF FUNDS.

7              WERE THOSE FUNDS RETURNED ONCE OR TWICE OR THREE

8    TIMES?  WAS THERE AN ERROR?  INSTEAD OF SENDING BACK $200 OR

9    $20, THEY SENT BACK 200,000?  OUT OF THE HUNDREDS OF THOUSANDS

10   OF CLOSINGS HERE, THERE'S NO RECONCILIATION AS TO WHAT WAS

11   GOING ON.

12             WAS THIS FIRM OPERATING AT A LOSS, AND THE HOLE IN

13   THE ACCOUNT IS THE RESULT OF THE FIRM ACTUALLY LIVING OUT OF

14   THE FLOAT IN THESE ACCOUNTS?

15             YOU HAVE NO RECONCILIATION.  YOU CANNOT DETERMINE

16   WHAT CAUSED THE HOLE, NOR CAN YOU DETERMINE THE AMOUNT OF ANY

17   HOLE THAT WAS THERE.

18             AND, FINALLY, YOU HAVE NO CAUSAL CONNECTION TO SAY A

19   LOSS IS PROXIMATELY CAUSED, BY A PREPONDERANCE OF THE EVIDENCE,

20   BY THE CONDUCT OF HARDWICK.

21             IN OTHER WORDS, YOU CAN'T, YOU CAN'T DETERMINE

22   WHETHER THE ACCOUNTS WERE POSITIVE OR NEGATIVE.  YOU CAN'T

23   DETERMINE WHETHER HARDWICK WAS RECEIVING LAW FIRM FEES AND WAS

24   SIMPLY GETTING MORE THAN HIS SHARE.

25             THE BURDEN OF THE PROOF -- AND THE GOVERNMENT JUST

1   DIDN'T DO IT.  NOW, THEY COULD HAVE A THOUSAND EXCUSES WHY THEY

2   DIDN'T DO IT, BUT THEY DIDN'T DO IT.

3           AND WHEN THEY FAILED TO DO IT, THEY ARE NOT ENTITLED

4   TO COME HERE AND SPECULATE AS TO AN AMOUNT OF LOSS WHERE IT

5   MUST BE ASCERTAINABLE, IT MUST -- IT -- OBVIOUSLY, THE AMOUNT

6   AFFECTS WHAT THE GUIDELINE CALCULATIONS ARE.  AND THEY SIMPLY

7   HAVE NOT PUT THE PROOF IN THAT WOULD ALLOW IT TO BE

8   ESTABLISHED.

9           AND, FURTHER, NO WITNESS TESTIFIED THAT NAT HARDWICK

10  KNEW ABOUT THIS IMPROPER USE OF THE TRUST ACCOUNT.  ALL --

11          MR. PHILLIPS:  I OBJECT.  WE'RE RELITIGATING THE

12  ISSUE OF GUILT HERE.  NOT TALKING ABOUT --

13          THE COURT:  I'LL OVERRULE, AND I'LL HEAR HIM OUT.

14          MR. GARLAND:  THE ISSUES -- THERE'S NO EVIDENCE IN

15  THE RECORD AS TO THE KNOWLEDGE OR CAUSATION OF A SPECIFIC

16  AMOUNT BECAUSE NO ONE SAID THAT HE KNEW ALL THE SCRAMBLING WAS

17  GOING ON.

18          WE DO HAVE MR. WITTSTADT, WHO SAID HE DIDN'T KNOW.

19  BOTH OF THEM.  MR. MORRIS SAID HE DIDN'T KNOW.  MR. SCHNEIDER

20  SAID HE DIDN'T KNOW.  MS. RITCHIE SAID -- WHO WAS -- SHE DIDN'T

21  KNOW.  SHE KNEW MONEY WAS GOING IN THERE, BUT SHE DIDN'T KNOW.

22          NOW, THE JURY HAS FOUND US GUILTY OF TAKING MORE THAN

23  OUR SHARE.  AND WE STAND HERE CONVICTED ON THAT AND ACCEPT THAT

24  IS THE DETERMINATION OF A JURY IN THIS CASE.  BUT THAT IS NOT A

25  DETERMINATION AS TO AN AMOUNT.  THAT IS SIMPLY, HE SHOULDN'T

1    HAVE GOTTEN AS MUCH AS HE GOT IN COMPARISON TO HIS PARTNERS.

2    THAT'S NOT AN ESTABLISHMENT OF LOSS.

3            AS YOU JUST POINTED OUT TO THE GOVERNMENT, THEY, THEY

4    WERE VOCIFEROUS THAT THEY DIDN'T HAVE TO PROVE LOSS, WEREN'T

5    PROVING LOSS, DIDN'T NEED TO PROVE LOSS.  AND YOU KNOW WHAT?

6    THEY DIDN'T.  AND IT'S NOT IN THESE RECORDS.

7            NOW, WHAT THE EVIDENCE DOES SHOW IS HE GOT MONEY OUT

8    OF -- HE, THE DEFENDANT, GOT MONEY OUT OF COMMINGLED ACCOUNTS.

9            I NEXT WOULD CALL -- THOSE ARE MY ARGUMENTS AT THIS

10   POINT ON LOSS.  AND I NEXT WOULD CALL MR. GINGRAS, UNLESS YOU

11   WANT TO HEAR FROM THE GOVERNMENT.

12           THE COURT:  YES.  I'M GOING TO HEAR FROM THE

13   GOVERNMENT, AS I JUST SAID A MOMENT AGO.  I WILL ADDRESS JUST A

14   COUPLE OF THINGS THAT YOU JUST SAID.

15           I DO AGREE WITH YOU WITH RESPECT TO THE PARTICULAR

16   EVIDENCE POINTED OUT BY THE GOVERNMENT.  I THINK IN THE

17   GOVERNMENT'S MEMO, IN PARTICULAR THEY RELIED ON TESTIMONY FROM,

18   I THINK, MS. MEINHARDT, MR. MORRIS, AND THE WITTSTADTS.

19           I'VE ALREADY ADDRESSED MY ISSUE WITH MS. MEINHARDT'S

20   TESTIMONY.  SHE CLEARLY ESTABLISHED THE AMOUNT THAT CAME FROM

21   FIDELITY; BUT MY ISSUE IS MORE, WAS IT EVER ESTABLISHED THAT

22   ALL OF THAT WAS ATTRIBUTABLE TO MR. HARDWICK'S CONDUCT.

23           WITH MR. WITTSTADT, I'M A LITTLE CONFUSED.  HE

24   SUBMITTED SOMETHING FOR SENTENCING PURPOSES THAT SAID THAT I,

25   AS THE JUDGE, SHOULD AT LEAST BE ABLE TO FIND $6 MILLION LOSS

1    TO HIM.  HE BASES THAT NOT ON THE $6 MILLION THAT IS TOTAL FROM

2    THE INDICTMENT COUNTS -- THAT JUST HAPPENS TO BE ABOUT THE SAME

3    FIGURE, SIX MILLION.  HE BASES HIS SIX MILLION ON THE FACT THAT

4    WHEN HE AND MR. HARDWICK ENTERED INTO AN EMPLOYMENT AGREEMENT,

5    MR. HARDWICK TELLS HIM, IF THIS GOES SOUTH AND YOU'RE

6    WRONGFULLY TERMINATED, I AGREE TO PAY YOU $6 MILLION.

7              AND IN HIS MIND, BECAUSE HIS FIRM DID GO SOUTH,

8    THAT'S HOW MUCH MR. HARDWICK VALUED HIS FIRM.

9              BUT THAT DOESN'T SEEM LIKE AN ACCURATE WAY OF

10   CALCULATING LOSS.  THERE COULD BE MANY REASONS WHY THEY

11   NEGOTIATED ON THAT AMOUNT OF MONEY.  AND I DON'T KNOW THAT THAT

12   ESTABLISHES -- THAT IT WAS ESTABLISHED THAT MR. HARDWICK'S

13   CONDUCT WAS THE SOLE REASON FOR THE DEMISE OF MR. WITTSTADT'S

14   INTEREST.

15             MR. WITTSTADT GOES ON IN THAT SAME E-MAIL TO SAY,

16   BUT, REALLY, I THINK THE LOSS TO ME WAS MORE LIKE $15 MILLION.

17             WELL, THERE'S A BIG DIFFERENCE BETWEEN SIX MILLION

18   AND $15 MILLION.  SO, FOR ME, HE DOESN'T REALLY DEFINE EVEN A

19   GOOD ESTIMATE OF LOSS FOR ME TO USE.

20             AND MR. MORRIS, I DON'T RECALL ANYTHING SPECIFIC FROM

21   HIM THAT WOULD HAVE HELPED ME WITH LOSS AMOUNT AT ALL.  JUST

22   DON'T RECALL THAT FROM HIS TESTIMONY.  BUT, GOVERNMENT, I'M

23   SURE YOU'LL REMIND ME IF I'VE JUST FORGOTTEN SOMETHING.

24             BUT, MR. GARLAND, EXPLAIN TO ME VERY QUICKLY BEFORE I

25   JUMP OFF OF THE DEFENSE AND GO TO THE GOVERNMENT, AGAIN, WHY IT

20

1    IS THAT YOU THINK I SHOULD NOT AT LEAST BE ABLE TO ALLOW ON THE

2    INDICTMENT AMOUNTS IN THE COUNTS.

3            IS IT BECAUSE YOUR POSITION IS THAT THOSE AREN'T

4    ELEMENTS OF THE CRIME; THE REAL ELEMENT IS JUST THE UNDERLYING

5    TRANSFER?  OR ARE YOU URGING ME TO BASICALLY DISREGARD SOME

6    PORTION OF THE JURY'S FINDINGS WITH RESPECT TO THOSE INDICTMENT

7    COUNTS?  I'M NOT CLEAR ON THAT.

8            MR. GARLAND:  YOUR HONOR, IF I COULD HAVE JUST A

9    MOMENT.

10           THE COURT:  CERTAINLY.

11           MR. GARLAND:  YOUR HONOR, MY RESPONSE IS, LOOKING AT

12   THE EXACT LANGUAGE OF THE COUNTS, IT MERELY REFERS TO THESE AS

13   WIRE TRANSFERS.  WELL, THE THEORY IS HE GOT TOO MUCH.  BUT

14   THESE WIRE TRANSFERS AND THE ELEMENTS ARE NOT, THIS IS THE

15   AMOUNT OF THE LOSS.  IT'S JUST THAT MONEY WAS TRANSFERRED.

16           THE COURT:  BUT IN THESE SPECIFIC AMOUNTS.

17           MR. GARLAND:  THEY ARE AMOUNTS THAT WERE TRANSFERRED,

18   BUT IT DOESN'T MEAN THOSE WERE LOST MONIES.  IF HE WAS ENTITLED

19   TO FUNDS -- WHICH IS UNDISPUTED -- ENTITLED TO SALARY, HE WAS

20   ENTITLED TO DISTRIBUTIONS, THEN IT'S JUST EVIDENCE OF SOME OF

21   THE FUNDS HE RECEIVED, BUT IT'S NOT EVIDENCE OF LOSS.  AND IN

22   THE ELEMENTS AS SET FORTH IN THE COUNT --

23           THE COURT:  ALL RIGHT.  I UNDERSTAND YOUR ARGUMENT.

24   GOVERNMENT?

25           MR. PHILLIPS:  THANK YOU, YOUR HONOR.

1          YOUR HONOR, MR. GARLAND IS TRYING TO RELITIGATE THE

2    ISSUE OF GUILT.  A JURY HEARD TESTIMONY FOR FOUR WEEKS IN THIS

3    CASE, AND THEY CONVICTED THIS MAN ON EVERY COUNT BEYOND A

4    REASONABLE DOUBT.  SO WE'RE NOT HERE TO RELITIGATE THE ISSUE OF

5    GUILT.

6          IT IS OBVIOUS THAT THE AMOUNT THAT MR. HARDWICK GOT

7    IN EACH OF THOSE COUNTS THAT THE COURT DESCRIBED EARLIER, TWO

8    THROUGH 22, THE WIRE FRAUD COUNTS, IS A LOSS TO THE FIRM.

9    THAT'S WHAT THE JURY FOUND.

10          AND IT'S OBVIOUS THAT HE TOOK THAT MONEY UNDER FALSE

11    PRETENSES.  THE JURY CONVICTED HIM OF THAT.  THEY FOUND HIM

12    GUILTY BEYOND A REASONABLE DOUBT.

13          BUT I THINK MR. GARLAND AND I, FROM DAY ONE, THE

14    FIRST TIME WE EVER TALKED ABOUT THIS CASE, WERE LIKE TWO SHIPS

15    PASSING IN THE NIGHT.  HIS THEORY OF THE DEFENSE AND OUR THEORY

16    OF PROSECUTION DON'T MEET.

17          FIRST OF ALL, I'D LIKE TO SAY THAT THE GUIDELINE THAT

18    WE'RE DEALING WITH HERE IS EXTREMELY BROAD, 9.5 MILLION TO

19    $25 MILLION.  THAT'S A HUGE RANGE.  AND THE GUIDELINES SAY THAT

20    THE GOVERNMENT CAN PROVE THE GREATER OF THE ACTUAL LOSS OR THE

21    INTENDED LOSS AND THAT THE COURT NEED ONLY MAKE A REASONABLE

22    ESTIMATE OF THE LOSS BASED ON AVAILABLE INFORMATION.  AND THE

23    CASE LAW FROM THE 11TH CIRCUIT SAYS, INDEED, THE AMOUNT OF THE

24    LOSS IS OFTEN DIFFICULT TO DETERMINE ACCURATELY.

25          MR. GARLAND IS TRYING TO PLACE ON THE GOVERNMENT A

1    BURDEN TO PROVE BEYOND ALL DOUBT, WITH MATHEMATICAL CERTAINTY,

2    THE LOSS AMOUNT.  AND THAT IS SIMPLY INAPPROPRIATE.  THAT IS

3    NOT THE GOVERNMENT'S BURDEN.  IT'S NOT SUPPORTED BY THE

4    GUIDELINES.  IT'S NOT SUPPORTED BY THE 11TH CIRCUIT CASE LAW.

5    IT'S SIMPLY SOMETHING THAT HE'S CREATED IN ORDER TO TRY TO MAKE

6    THIS MORE DIFFICULT FOR THE GOVERNMENT TO CONVICT HIS CLIENT

7    AND NOW FOR THIS COURT TO IMPOSE A FAIR AND REASONABLE SENTENCE

8    AND TO DETERMINE AN APPROPRIATE LOSS AMOUNT.

9          THE 11TH CIRCUIT ALSO SAYS THAT THE COURT IS

10   PERMITTED TO CONSIDER, AMONG OTHER THINGS, THE EVIDENCE HEARD

11   AT THE TRIAL.  SO LET'S TALK ABOUT THAT.

12         FIRST OF ALL, MR. HARDWICK, WHEN HE TESTIFIED -- THIS

13   IS DOCUMENT NUMBER 310 OF THE TRIAL TRANSCRIPT, AT PAGES 3225

14   TO 3226.  THE QUESTION I ASKED WAS:  YOU'RE NOT CONTENDING,

15   THEN, THAT ASHA MAURYA WIRED MONEY TO VARIOUS PLACES FOR YOUR

16   PERSONAL USE AND BENEFIT WITHOUT YOU ASKING HER TO DO THAT?

17         AND THE ANSWER WAS UNEQUIVOCAL:  NO, I'M NOT

18   CONTENDING THAT.  NO.

19         SO THERE'S NO DOUBT THAT MR. HARDWICK IS THE ONE WHO

20   DIRECTED THESE WIRE TRANSFERS THAT HE WAS CONVICTED OF IN

21   COUNTS TWO THROUGH 22.  THIS IS NOT ASHA'S DOING.  HE TOLD HER

22   TO DO IT.  IT WAS FOR HIS BENEFIT.  IT IS UNDISPUTED THAT HE IS

23   THE ONE WHO GOT THE BENEFIT OF ALL OF THAT MONEY.

24         THE COURT:  LET ME STOP YOU THERE FOR A SECOND JUST

25   SO THAT I UNDERSTAND WHERE THIS IS GOING.

1           I UNDERSTAND THAT YOU ARE STILL GOING TO ARGUE TO ME

2     THAT (K), SUBSECTION (K), SHOULD APPLY, THE LARGER AMOUNT.

3           BUT IS IT YOUR POSITION THAT EVEN IF I -- BEFORE I

4     EVEN GET TO (K), THAT I CAN RELY ON (J), AS I SAID EARLIER, THE

5     AMOUNTS THAT ARE IN THE INDICTMENT?  OR DO YOU AGREE THAT

6     THAT'S NOT REALLY -- THAT THOSE WOULD NOT HELP ME, THE AMOUNTS

7     THAT ARE IN EACH OF THOSE COUNTS HE WAS FOUND GUILTY ON?

8           MR. PHILLIPS:  I THINK THAT'S AN APPROPRIATE

9     CONSIDERATION, BUT IT'S NOT AN EITHER/OR.  THE COURT IS ONLY

10    REQUIRED TO MAKE A REASONABLE ESTIMATE OF THE LOSS.

11          SO, YES, THE INFORMATION THAT THE COURT TALLIED UP IN

12    COUNTS TWO THROUGH 22, WHEN THE COURT SAID, I THINK YOU SAID

13    ABOUT $6 MILLION OR SOMETHING LIKE THAT, CERTAINLY THAT IS A

14    PART OF IT.  THAT'S AN IMPORTANT PART OF IT.  BUT MY POSITION,

15    OBVIOUSLY, IS THAT IT GOES WAY BEYOND THAT.

16          THE COURT:  I UNDERSTAND THAT.  THAT'S WHAT I SAID.

17          MR. PHILLIPS:  BUT I THINK THE COURT CAN RELY ON THAT

18    IN PART IN DETERMINING THE LOSS AMOUNT, CERTAINLY, BECAUSE HE

19    WAS CONVICTED OF THOSE COUNTS.

20          THE COURT:  OKAY.  I GUESS I'M -- LET ME TRY TO ASK

21    MY QUESTION AGAIN, THEN.  I'M NOT ASKING ALL OF THE FACTORS AND

22    IF THAT'S JUST ONLY ONE FACTOR.

23          I'M SAYING, WOULD THAT ACCURATELY REFLECT AT LEAST A

24    BASE, BASED ON WHAT THE JURY FOUND?

25          WE CAN TALK LATER, AND I'M GETTING READY TO ALLOW YOU

24

1  TO DO THIS, ABOUT WHETHER IT'S EVEN MORE THAN THAT.

2          BUT CAN I RELY ON THAT, THOSE AMOUNTS AS A TOTAL, AS

3  AT LEAST A STARTING POINT, YES OR NO?

4          MR. PHILLIPS:  YES, YOUR HONOR.

5          THE COURT:  OKAY.  ALL RIGHT.

6          MR. PHILLIPS:  IN ADDITION, THE GOVERNMENT PROVED

7  THROUGH KIM JOHNSON, AND WE SUBMITTED SUMMARIES OF THE BANK

8  RECORDS, GOVERNMENT EXHIBIT 1000, THAT SHOWS FROM 2011 THROUGH

9  BEGINNING OF AUGUST 2014, MR. HARDWICK TOOK $26,503,428.61 FROM

10  THE FIRM.

11          MR. HARDWICK TESTIFIED -- I WALKED HIM THROUGH THOSE

12  PAYMENTS.  HE ADMITTED ALL OF THOSE.  HE ADMITTED THAT HE GOT

13  ALL OF THAT MONEY.  SO WE KNOW BEYOND A REASONABLE DOUBT THAT

14  MR. HARDWICK, DURING THAT PERIOD OF TIME, GOT $26.5 MILLION.

15          WE ALSO KNOW BEYOND A REASONABLE DOUBT, BASED ON THE

16  AUDITED FINANCIAL STATEMENTS THAT WERE PREPARED BY WARREN

17  AVERETT -- AND THE COURT HEARD FROM JOHN SHURLEY FROM WARREN

18  AVERETT.  HE TESTIFIED THAT THOSE AUDITED FINANCIAL STATEMENTS

19  WERE ACCURATE.  WE KNOW THAT MR. HARDWICK RELIED ON THOSE

20  FINANCIAL STATEMENTS.  HE SENT THEM TO VARIOUS BANKS AND OTHER

21  PEOPLE CONCERNING HIS REQUESTS FOR PERSONAL LOANS, SAYING, THIS

22  IS HOW MUCH MONEY MY FIRM MADE.

23          THERE ARE NUMEROUS E-MAILS AND OTHER DOCUMENTS IN THE

24  FILE THAT WERE ADMITTED AT TRIAL THAT SHOW MR. HARDWICK RELIED

25  ON THOSE.  AND THEY SHOW THAT IN THE THREE YEARS THAT WE HAD

1   THE AUDITED FINANCIAL STATEMENTS, THE FIRM'S NET INCOME WAS A

2   LITTLE BIT LESS THAN $10 MILLION -- $9,982,477.

3           DURING THAT SAME PERIOD OF TIME, WE KNOW THAT

4   MR. HARDWICK TOOK MORE THAN DOUBLE THAT OUT OF MHS.  HE TOOK

5   $20,563,746.65.  THAT'S FOR THAT THREE-YEAR PERIOD, COMPARING

6   BANK RECORDS THAT WERE SUMMARIZED BY THE FBI TO THE AUDITED

7   FINANCIAL STATEMENTS THAT WERE PREPARED BY WARREN AVERETT AND

8   TESTIFIED TO AND ADMITTED THROUGH JOHN SHURLEY.

9           SO WHEN MR. GARLAND SAYS THAT WE'RE SPECULATING ABOUT

10  THE LOSS AMOUNT, HE'S COMPLETELY IGNORING THE FACT THAT WE HAVE

11  PROVIDED AUDITED FINANCIAL STATEMENTS, WE'VE PROVIDED THE

12  SUMMARIZED BANK RECORDS OF THE LAW FIRM, AND WE HEARD TESTIMONY

13  FROM AN EXTREMELY CREDIBLE FBI WITNESS.  THERE WAS VIRTUALLY NO

14  CROSS-EXAMINATION FROM MR. GARLAND OF THAT WITNESS CONCERNING

15  HER WORK.  THE COURT WILL RECALL HER TESTIMONY AND THOSE

16  EXHIBITS THAT WERE PUT IN.

17          THERE WAS ALSO TESTIMONY FROM THE VICTIMS IN THIS

18  CASE.  THE COURT HEARD FROM MARK WITTSTADT AND ROD WITTSTADT

19  AND ART MORRIS, AND ERIKA MEINHARDT ON BEHALF OF FIDELITY.  AND

20  EACH OF THOSE LAW PARTNERS WHO WORKED WITH MR. HARDWICK AT THE

21  LAW FIRM SHOWED THAT THEY WERE NOT PAID AT TIMES THAT

22  MR. HARDWICK WAS TAKING PAYMENTS FOR HIMSELF.

23          THEY TESTIFIED, ESPECIALLY MARK WITTSTADT, THAT HE

24  HAD NO IDEA -- AND ART MORRIS, TOO -- HAD NO IDEA THAT NAT

25  HARDWICK WAS USING THE LAW FIRM'S ACCOUNTS TO PAY HIS PERSONAL

1    DEBTS AND EXPENSES.

2              THE COURT:  LET ME STOP YOU THERE FOR A SECOND.

3    BECAUSE IT SEEMS TO ME, MR. PHILLIPS, THAT YOU ARE DOING A

4    LITTLE BIT OF WHAT I AGREE WITH YOU THAT MR. GARLAND WAS DOING,

5    AND THAT'S REARGUING THE CASE.

6              I DON'T HAVE ANY PROBLEM, I DON'T HAVE ANY PROBLEM

7    FOLLOWING THE JURY'S FINDING THAT HE TOOK THIS -- MADE THESE

8    TRANSFERS WRONGFULLY.  THAT'S WHAT YOU SEEM TO BE ARGUING.  I'M

9    JUST KEYED IN ON LOSS AMOUNT, SPECIFIC LOSS AMOUNT.

10             SO I UNDERSTAND THE TESTIMONY THAT YOU'RE GOING OVER

11   NOW.  BUT IT ESTABLISHES MORE THAN ANYTHING THAT MR. HARDWICK

12   SHOULD NOT HAVE BEEN MAKING SUCH LARGE TRANSFERS TO HIMSELF.

13             WHAT I AM TRYING TO FOCUS IN ON IS HOW MUCH OF A LOSS

14   CAN BE ATTRIBUTED DIRECTLY TO HIM.  SO I LIKED THE INFORMATION

15   THAT YOU WERE GIVING ME THAT IS REFLECTED IN EXHIBIT 1000 AND

16   BASED ON THE FIRM'S INCOME AND THE PERCENTAGE HE WAS SUPPOSED

17   TO TAKE, BECAUSE THAT GETS US THERE SPECIFICALLY.

18             MR. PHILLIPS:  I'M SORRY, YOUR HONOR.

19             THE COURT:  I KNOW IT'S HARD TO MULTI-TASK LIKE THAT.

20             MR. PHILLIPS:  I UNDERSTAND WHAT THE COURT'S SAYING.

21             THE COURT:  OKAY.  OKAY.

22             MR. PHILLIPS:  AND WE ALSO PUT IN EVIDENCE OF EXACTLY

23   WHAT MR. HARDWICK'S PERCENTAGE OF OWNERSHIP IN THE FIRM WAS ON

24   GIVEN DATES.  MR. HARDWICK ADMITTED ON CROSS-EXAMINATION THAT

25   THOSE NUMBERS ARE ACCURATELY REFLECTED AND SUMMARIZED FROM

1    WHAT'S IN THE PARTNERSHIP AGREEMENTS.

2         AND SO THOSE PARTNERSHIP AGREEMENTS, OR SHAREHOLDER

3    AGREEMENTS, I BELIEVE THEY ARE APPROPRIATELY CALLED, THEY

4    DEFINE SPECIFICALLY WHEN THE PARTNERS ARE SUPPOSED TO BE PAID

5    AND HOW THEY ARE SUPPOSED TO BE PAID.

6         AND SO WE KNOW THAT MR. HARDWICK WAS TAKING

7    DISTRIBUTIONS AND PAYING HIS PERSONAL DEBTS AND EXPENSES AT

8    TIMES THAT WERE NOT AUTHORIZED BY THOSE SHAREHOLDER AGREEMENTS

9    AND AT TIMES WHEN HIS OTHER PARTNERS WERE NOT GETTING PAID.

10        SO THE METHOD THAT WE USE TO CALCULATE THE LOSS

11   AMOUNT THAT GETS US WELL WITHIN THAT 9.5 MILLION TO $25 MILLION

12   RANGE IS THE AMOUNT THAT WE PROVED IN THOSE EXHIBITS 1000 AND

13   1001 THAT WE HEARD THE TESTIMONY ABOUT.

14        NOW, THE PROBATION OFFICER, IN THE PSR, GOES ABOUT IT

15   A LITTLE BIT DIFFERENTLY.  AND THAT'S OKAY TOO.  THERE'S MORE

16   THAN ONE WAY TO DO IT.  AND EITHER WAY, WE WIND UP IN THE SAME

17   PLACE.  AND THAT IS AT SUBSECTION (K), BETWEEN 9.5 MILLION AND

18   25 MILLION.

19        AND SO WHAT MR. MOODY DID IN THE PSR IS HE TALKED

20   ABOUT IT IN TERMS OF THE AMOUNT OF MONEY THAT FIDELITY PUT INTO

21   THE FIRM TO PLUG THE HOLE IN THE ESCROW ACCOUNTS.  SO THAT'S

22   DIFFERENT THAN THE METHODOLOGY THAT I EXPLAINED AND WHAT I

23   ARGUED IN OUR SENTENCING MEMO.  HE'S NOT WRONG.  IT'S JUST A

24   DIFFERENT WAY OF LOOKING AT IT.

25        AND IF THE COURT PREFERS THAT AND FEELS MORE

```
1   COMFORTABLE WITH THAT METHOD AT DETERMINING THE LOSS AMOUNT,

2   THAT'S PERFECTLY APPROPRIATE.

3          THE COURT:  WELL, I'VE ALREADY INDICATED I DO NOT,

4   BECAUSE -- AND MR. MOODY DOES GREAT WORK, BUT HE WASN'T HERE TO

5   HEAR THE TRIAL TESTIMONY.  HE DIDN'T HEAR FROM THE WITNESS FROM

6   FIDELITY.  SO HE IS REALLY NOT IN A VIABLE POSITION TO SAY, AND

7   THE TESTIMONY SUPPORTS THAT ALL OF THAT LOSS SHOULD BE

8   ATTRIBUTED TO MR. HARDWICK.

9          I THINK THE WAY THAT HE ANALYZES IT IS, BECAUSE

10  FIDELITY HAD TO INFUSE X NUMBER OF DOLLARS -- 29 MILLION OR

11  WHATEVER -- INTO THE FIRM TO COVER LOSS, THEY ARE A VICTIM,

12  TOO, SO THEY SHOULD BE -- THEIR LOSS SHOULD BE LOOKED AT AS

13  SOMETHING ATTRIBUTABLE TO MR. HARDWICK.

14         SO THAT -- NO DISRESPECT TO ANY OF HIS ANALYSIS, BUT

15  THAT'S -- I'M NOT COMFORTABLE RELYING ON THAT PARTICULAR

16  ANALYSIS.  THE ONE --

17         MS. BARRON, IF YOU COULD JUST HOLD OFF FOR A SECOND

18  BECAUSE I NEED HIM TO HEAR WHAT I'M SAYING.

19         THE ONE THAT I FEEL MOST COMFORTABLE WITH THUS FAR IS

20  THE ONE -- THE WAY OF DEDUCING AN AMOUNT THAT INVOLVES LOOKING

21  AT THE EXHIBIT THAT SHOWS HOW MUCH MR. HARDWICK GOT, HOW MUCH

22  THE FIRM MADE IN A CERTAIN PERIOD OF TIME, AND AN ESTIMATE

23  BASED ON WHAT WE KNOW HIS PERCENTAGE SHOULD HAVE BEEN BASED ON

24  THE SHAREHOLDERS AGREEMENT.  TO ME, THAT WOULD BE THE MOST

25  RELIABLE WAY.
```

1          JUST GOING ON WHAT FIDELITY PUT IN OR WHAT

2     MR. WITTSTADT SAYS IT SHOULD BE, SOMEWHERE BETWEEN SIX AND

3     $15 MILLION, JUST BASED ON A TOTAL OF WHAT MR. HARDWICK GOT,

4     THOSE TO ME ARE NOT AS RELIABLE AS THE ANALYSIS THAT I'VE JUST

5     STATED.

6          MR. PHILLIPS:  I AGREE WITH YOUR HONOR.  THAT'S WHY I

7     ARGUED THAT METHOD IN OUR SENTENCING MEMO.

8          BUT I THINK THAT THERE'S A LITTLE BIT OF CONFUSION

9     ABOUT THE E-MAIL THAT THE COURT DESCRIBED THAT IT RECEIVED FROM

10    MARK WITTSTADT.

11         THE COURT:  OKAY.

12         MR. PHILLIPS:  WHAT HE'S ASKING FOR IS RESTITUTION.

13    AND I THINK THAT, AS SOMEBODY WHO DOESN'T PRACTICE CRIMINAL

14    LAW, HE MIGHT BE CONFUSING RESTITUTION WITH THE LOSS AMOUNT.

15         THE GOVERNMENT'S BURDEN TO PROVE THE RESTITUTION

16    AMOUNT IS DIFFERENT THAN THE GOVERNMENT'S BURDEN TO PROVE THE

17    LOSS AMOUNT.  HERE, ALL WE'VE GOT TO DO IS GET BETWEEN 9.5 AND

18    25, AND THAT'S IT.  THAT'S ALL THE COURT HAS TO FIND.

19         THE COURT:  ALL RIGHT.  I ONLY REFERRED TO HIM

20    BECAUSE YOU REFERRED TO HIM IN THE SENTENCING MEMO.  BUT I

21    UNDERSTAND YOUR POINT, AND YOU'RE PROBABLY CORRECT.  BUT I

22    REMEMBER YOU HIGHLIGHTING --

23         MR. PHILLIPS:  I DID.

24         THE COURT:  -- HIS TESTIMONY, ERIKA MEINHARDT, AND

25    MR. MORRIS'S.  BUT THAT'S THE REASON.  BUT THAT MAKES SENSE,

1    WHAT YOU JUST SAID.

2         MR. PHILLIPS:  HIS TRIAL TESTIMONY IS A LITTLE BIT

3    DIFFERENT THAN THAT E-MAIL TALKING ABOUT HOW MUCH HE WANTS THE

4    COURT TO AWARD HIM IN RESTITUTION.

5         THE COURT:  OKAY.

6         MR. PHILLIPS:  AND SO I THINK THAT THE SAME THING

7    WOULD BE TRUE ABOUT FIDELITY, THAT 29.5 MILLION GOES TO

8    FIDELITY'S RESTITUTION CLAIM.  AND I THINK THAT EVIDENCE OF

9    THAT IS SOLID.  MINUS THE AMOUNT THAT THEY GOT BACK THAT WE PUT

10   IN THE PSR FROM THE VARIOUS INSURANCE COMPANIES.

11        THE COURT:  OKAY.

12        MR. PHILLIPS:  BUT THE COURT WILL RECALL, TOO, THAT

13   AT TRIAL THE DEFENSE POSITION WAS THAT THE FIRM ACTUALLY OWES

14   MR. HARDWICK MONEY.

15        THE COURT:  I DO RECALL THAT.

16        MR. PHILLIPS:  AND I THINK THEY INTEND TO PUT UP

17   EVIDENCE AGAIN TODAY FROM MR. GINGRAS TO HAMMER THAT POINT HOME

18   AGAIN.  AND SO THE DEFENDANT'S POSITION IS NOT ONLY IS HE NOT

19   WITHIN THAT 9.5 TO $25 MILLION RANGE, IT'S ACTUALLY WAY WELL ON

20   THE OTHER SIDE; THE FIRM STILL OWES HIM MONEY.

21        AND SO -- THAT'S NOT WHAT THE EVIDENCE IS, YOUR

22   HONOR.  AND SO WE BELIEVE THAT THE EVIDENCE PUTS HIM

23   COMFORTABLY IN THAT 9.5 TO $25 MILLION RANGE.

24        AND AS I SAID, THE DOCUMENTS THAT WE RELIED ON

25   PRIMARILY ARE THOSE EXHIBITS THAT CAME IN THROUGH KIM JOHNSON,

1  THE FBI FINANCIAL ANALYST, SUMMARIZING THE FIRM'S BANK RECORDS,

2  SUMMARIZING MR. HARDWICK'S BANK RECORDS; AND THE TESTIMONY OF

3  JOHN SHURLEY, TALKING ABOUT THE AUDITED FINANCIAL STATEMENTS;

4  AND THEN THE TESTIMONY OF VARIOUS WITNESSES, THE LAW FIRM

5  PARTNERS, TALKING ABOUT THE SHAREHOLDER AGREEMENTS AND THOSE

6  PARTICULAR REQUIREMENTS AS WELL.

7           I THINK MS. BARRON HAS SOMETHING SHE'D LIKE TO ADD,

8  UNLESS THE COURT HAS A QUESTION FOR ME.

9           THE COURT:  I HAVE TWO QUESTIONS, AND THEY COULD BE

10  FOR EITHER OF YOU.

11          MY FIRST QUESTION WOULD BE WHETHER OR NOT THE

12  GOVERNMENT ANTICIPATES PUTTING ON ANY ADDITIONAL EVIDENCE OR

13  CALLING ANY WITNESSES FOR TODAY'S SENTENCING HEARING.  I KNOW

14  THERE WAS A NOTE THAT I THINK AGENT JOHNSON WILL TESTIFY AT

15  MS. MAURYA'S, BUT I CAN'T REMEMBER FOR THIS ONE.

16          AND, SECOND, WHETHER THE GOVERNMENT TAKES THE

17  POSITION THAT YOU ARE READY TO PRESENT TODAY TO THE COURT A

18  RESTITUTION AMOUNT OR WHETHER YOU THINK YOU SEE THAT HAPPENING

19  AT A FUTURE DATE, WITHIN THE 90-DAY PERIOD, THAT WOULD BE --

20  THAT IS PRESCRIBED UNDER THE LAW.

21          MR. PHILLIPS:  LET ME TAKE THE SECOND ONE.  I THINK

22  MS. BARRON IS GOING TO TAKE THE FIRST ONE.

23          AS FAR AS THE RESTITUTION AMOUNT, I THINK IT VERY

24  WELL MAY BE APPROPRIATE TO HOLD THAT OPEN.  THE COURT CAN HOLD

25  THAT OPEN FOR 90 DAYS, WHERE WE CAN DEAL WITH THAT IN A MORE

32

1   LEISURELY FASHION TO MAKE SURE WE GET THAT RIGHT.

2           THE COURT:  ALL RIGHT.

3           MR. PHILLIPS:  SO I DON'T HAVE ANY OBJECTION TO

4   HOLDING THAT OPEN AND DEALING WITH THAT AT A LATER DATE.

5           THE COURT:  THANK YOU, SIR.

6           MS. BARRON?

7           MS. BARRON:  THANK YOU, YOUR HONOR.  I'M GOING TO

8   ADDRESS YOUR FIRST QUESTION, THEN I WANT TO GO BACK AND ADDRESS

9   THE SEPARATE QUESTION THAT YOU HAD THAT I DON'T THINK WE'VE

10  ANSWERED YET.

11          THE COURT:  AND, MR. PHILLIPS, TRY NOT TO PASS HER

12  TOO MANY NOTES.

13          MR. PHILLIPS:  I WILL, YOUR HONOR.

14          MS. BARRON:  THAT'S HOW WE ROLL, YOUR HONOR.

15          WE'RE NOT GOING TO PUT ON ANY ADDITIONAL WITNESSES.

16  THE REASON WHY IS THAT WE MAY CALL MS. JOHNSON IN BECAUSE IN

17  MS. MAURYA'S CASE, WE HAVE NOT ESTABLISHED YET THAT THOSE ARE

18  ACCURATE SUMMARIES.  AND SO IT'S JUST TO CREATE A CLEAN RECORD

19  IN THAT CASE THAT THE SUMMARY EXHIBITS THAT WE DO BELIEVE

20  ESTABLISH LOSS AMOUNT WOULD BE ADMISSIBLE.

21          MS. BECK, DO YOU MIND IF I HAVE THE ELMO FOR A

22  MINUTE?

23          I WANT TO GIVE YOUR HONOR -- IT SOUNDS LIKE THE COURT

24  WANTS A VERY CLEAR, EASY, CONSERVATIVE WAY OF CALCULATING THE

25  LOSS IN THIS CASE.

1              THE COURT:  CORRECT.  AND AGAIN, AS I SAID EARLIER,

2       I'M NOT EXPECTING A DOLLAR-AND-CENT AMOUNT BUT A GOOD FAITH

3       ESTIMATE, SOMETHING THAT'S MORE THAN JUST SPECULATIVE.

4              MS. BARRON:  THAT'S WHAT I'M ABOUT TO DO, YOUR HONOR.

5       AND I ACTUALLY -- I MEAN, I'M A BIG FAN OF OCCAM'S RAZOR.  I

6       THINK THAT THE SIMPLEST ANSWER THAT REQUIRES US TO MAKE THE

7       FEWEST NUMBER OF ASSUMPTIONS IS CORRECT.  PARSIMONY AT ALL

8       TIMES.

9              AND SO WHAT I AM GOING TO ENCOURAGE THE COURT TO DO,

10      LET'S JUST LOOK AT 2011 THROUGH 2013.  THOSE ARE THE YEARS THAT

11      WE HAVE THE WARREN AVERETT AUDITED FINANCIALS.

12             THE COURT:  ALL RIGHT.  AND BEFORE WE GO THERE -- I'M

13      SORRY TO INTERRUPT YOU -- LET ME ASK YOU THE SAME QUESTION I'VE

14      ASKED MR. GARLAND AND MR. PHILLIPS:  WHAT IS YOUR POSITION ON

15      WHETHER OR NOT, AS A BASE AMOUNT, I WOULD BE ABLE TO RELY ON

16      THE AMOUNTS IN COUNTS TWO THROUGH 22 OF THE INDICTMENT?

17             MS. BARRON:  ONE HUNDRED PERCENT.  THAT'S A FLOOR.

18      WE BELIEVE THAT'S HIGHER, AND I'M ABOUT TO EXPLAIN WHY.

19             THE COURT:  THANK YOU.

20             MS. BARRON:  AND THEN TO ANSWER THE COURT'S EARLIER

21      QUESTION, THE COURT HAD ASKED ABOUT, YOU KNOW, THE ESCROW

22      ACCOUNT INCLUDED MONEY THAT MAY BE -- THE HOLE IN THE ESCROW,

23      WHEN IT WAS DISCOVERED, INCLUDED AMOUNTS THAT MAY OR MAY NOT BE

24      ATTRIBUTED TO MR. HARDWICK.  AND I 100 PERCENT AGREE.

25             WHEN THAT HOLE IS DISCOVERED IN AUGUST -- AND I CAN'T

1  REMEMBER WHICH TRIAL EXHIBIT IT WAS, BUT IT WAS CLEAR THAT

2  MS. MAURYA HAD BEEN MAKING PAYROLL OUT OF THAT ESCROW ACCOUNT,

3  THAT OTHER PARTNERS HAD BEEN RECEIVING DISTRIBUTIONS.

4        SO JUST LOOKING AT THE HOLE IN THE ESCROW ACCOUNT AS

5  IT EXISTED IN AUGUST 2014 DOESN'T REALLY FULLY ANSWER OUR

6  QUESTION.

7        SO WHAT WE'RE GOING TO ASK THE COURT TO DO IS LOOK AT

8  INTENDED LOSS.  THAT'S A MUCH EASIER WAY TO FIGURE OUT THE LOSS

9  AMOUNT RATHER THAN GOING BACK AND FIGURING WHAT WAS THE ACTUAL

10  HARM CAUSED BY HIS CONDUCT.  AN ACTUAL LOSS IS AN EASY

11  CALCULATION.

12        SO, RATHER THAN STARTING WITH GOVERNMENT'S 1001, I'M

13  GOING TO START WITH GOVERNMENT'S 1000.  OKAY.  AND THIS IS THE

14  UNDISPUTED AMOUNT.  MR. HARDWICK CONCEDED, MR. GINGRAS CONCEDED

15  IN HIS TRIAL NUMBER THAT THIS MONEY RIGHT HERE, 26,000 AND

16  CHANGE, REPRESENTS THE TOTAL AMOUNT --

17        THE COURT:  MILLION.

18        MS. BARRON:  I'M SO SORRY.

19        THE COURT:  I KEEP DOING THE SAME THING, SO LET'S

20  CORRECT EACH OTHER WHEN WE HEAR IT.  TWENTY-SIX MILLION, IN

21  EXCESS OF THAT.

22        MR. GARLAND:  COULD I INTERRUPT?  THIS EXHIBIT NUMBER

23  YOU'RE USING IS?

24        MS. BARRON:  1000.

25        -- REPRESENTS THE TOTAL AMOUNT OF MONEY TO

1   MR. HARDWICK.  NOW, THIS IS NOT THE LOSS FIGURE.  HE'S ENTITLED

2   TO SOME CHUNK OF THAT.  WE DON'T DISAGREE.  MR. GINGRAS SAYS

3   IT, AND I THINK WE EVEN ADMITTED IT DURING TRIAL.  THIS IS JUST

4   WHAT HE GOT.

5            SO THEN THE QUESTION IS:  WHAT WAS HE ENTITLED TO,

6   AND THEN WHAT ABOVE THAT DID HE AND MS. MAURYA CONSPIRE TO

7   STEAL.

8            SO LET'S KEEP THIS NUMBER IN OUR MIND, $26.5 MILLION

9   AND CHANGE, AND COMPARE IT TO GOVERNMENT'S 1001.  AND AGAIN,

10  LET'S JUST LOOK AT -- OKAY.  SO I TOLD YOU TO LOOK AT THE 26.5.

11  I'M GOING TO TAKE THAT BACK IN A MINUTE.

12           BUT LET'S JUST LOOK AT THIS.  THIS IS BASED ON THE

13  WARREN AVERETT AUDITED FINANCIAL STATEMENTS.  THIS IS MHS NET

14  INCOME.  NOW, WHY IS NET INCOME SIGNIFICANT?  WHY DOES THAT

15  TERM MATTER?

16           BECAUSE GOVERNMENT'S 979 -- AND THIS IS THE 2013

17  AMENDED AND RESTATED SHAREHOLDER AGREEMENT THAT WAS SIGNED IN

18  JUNE OF 2013, PAGE 13, PARAGRAPH -- WE'VE GOT UNDER BONUSES,

19  2(A) HERE TALKS ABOUT BONUSES.  AND THE COURT MAY REMEMBER THAT

20  MR. WITTSTADT AND I THINK MR. MORRIS, TOO, BOTH TESTIFIED THAT

21  THIS DISCUSSES DISTRIBUTIONS.  THEY CALL IT BONUSES IN THE

22  SHAREHOLDER AGREEMENT, BUT IT'S REFERRING TO SHAREHOLDER

23  DISTRIBUTIONS.  AND IT SAYS THE DISTRIBUTIONS ARE TO BE BASED

24  ON THE CORPORATION'S TAXABLE INCOME.

25           SO WHAT AMOUNT OF MONEY DID THE CORPORATION MAKE THAT

1    IT CAN THEN DISTRIBUTE?  AND SO FOR THE THREE YEARS HERE, NET

2    INCOME 9.9 MILLION.

3            NOW, WHAT IS MR. HARDWICK ENTITLED TO?

4            GOVERNMENT'S 1002.  THIS WAS A SUMMARY EXHIBIT,

5    BUT -- OH, AND I WANT TO SAY, THAT SHAREHOLDER AGREEMENT I JUST

6    SHOWED, 979, THAT LANGUAGE APPEARS IN EVERY VERSION OF THE

7    SHAREHOLDER AGREEMENT THAT WAS ADMITTED.  GOVERNMENT'S 980,

8    GOVERNMENT'S 976, AND 979, WHICH WERE THE VARIOUS YEARS,

9    CONTAINED THE EXACT SAME LANGUAGE IN TERMS OF BONUSES,

10   DISTRIBUTIONS BEING A FUNCTION OF TAXABLE INCOME.

11           SO THIS SHOWS -- GOVERNMENT'S 1002 SHOWS

12   MR. HARDWICK'S PERCENTAGE THAT HE WAS ENTITLED TO OVER TIME,

13   WITH THE MOST GENEROUS PERCENTAGE BEING 55 PERCENT.  NOW,

14   55 PERCENT IS THE FIGURE THAT MR. GINGRAS RELIES ON IN HIS

15   EXPERT -- HIS EXPERT REPORT AND WHICH I ASSUME HE WILL TESTIFY

16   TO.  THAT'S THE MOST CONSERVATIVE.  THAT IS GIVING ALL BENEFITS

17   TO MR. HARDWICK.  AND WE'LL AGREE WITH THAT.

18           LET'S GO WITH THE 55 PERCENT AND ASSUME FOR THE SAKE

19   OF ARGUMENT THAT HE WAS ENTITLED TO 55 PERCENT OF TAXABLE

20   INCOME FROM 2011 TO 2013.  HE WAS ACTUALLY ENTITLED TO LESS,

21   BUT WE'RE GIVING HIM THE BENEFIT OF THE DOUBT HERE.

22           SO GOING BACK TO THIS 9.98 FIGURE -- MR. GARLAND CAN

23   CHECK ME ON MY MATH, BUT THIS IS JUST THE BACK-OF-THE-NAPKIN

24   MATH I DID -- 55 PERCENT OF THAT FIGURE IS 5.4 MILLION AND

25   CHANGE.  SO THAT'S 55 PERCENT OF THE TAXABLE INCOME JUST FOR

1 THOSE THREE YEARS THAT MR. HARDWICK WAS ENTITLED TO.  AND AS --

2          MR. GARLAND:  COULD WE MARK THAT DEMONSTRATIVE,

3 PLEASE?

4          MS. BARRON:  SURE.

5          MR. GARLAND:  NUMBER?

6          MS. BARRON:  I HAVE GOVERNMENT'S SENTENCING

7 EXHIBIT 1.  AND I'LL PUT A STICKER ON IT LATER.

8          BUT IF WE LOOK BACK AT GOVERNMENT'S 1004 -- 1001, I'M

9 SORRY, MR. HARDWICK ACTUALLY RECEIVES 20.5 MILLION.  FIFTY-FIVE

10 PERCENT OF 9.9 MILLION, AS I JUST SAID, IS 5.4 MILLION.  HE

11 GETS 20 MILLION.

12          SO GOING BACK TO THE EXHIBIT THAT MR. GARLAND HAS

13 REQUESTED BE MARKED, IF WE TAKE THE 20 MILLION -- 20,553,645

14 THAT MR. HARDWICK ACTUALLY RECEIVED -- AGAIN, JUST FOR THOSE

15 THREE YEARS; THIS ISN'T EVEN COUNTING 2014 -- AND DEDUCT WHAT

16 HE WAS ENTITLED TO RECEIVE, HE RECEIVED $15,063,300 IN EXCESS

17 OF WHAT HE WAS ENTITLED TO RECEIVE UNDER THE SHAREHOLDER

18 AGREEMENT.  AND THAT IS MONEY THAT HE HID FROM HIS PARTNERS.

19          WE REMEMBER SEEING ALL OF THOSE E-MAILS BETWEEN

20 MR. -- WELL, LET ME SHOW THE COURT.  THIS WAS GOVERNMENT'S

21 EXHIBIT 1034.  THIS IS OCTOBER 2012.  THIS IS WHAT HE TELLS HIS

22 PARTNERS HE'S GETTING:  110,000.  THIS IS WHAT HE ACTUALLY

23 GETS:  706,000.

24          SO CONSERVATIVELY GIVING HIM THE BENEFIT OF A

25 55 PERCENT OWNERSHIP, WHICH IS GENEROUS, AND CONSERVATIVELY

1    JUST LOOKING AT THREE YEARS OF THE CONSPIRACY, MR. HARDWICK

2    RECEIVED $15 MILLION HE WAS NOT ENTITLED TO, WHICH SQUARELY

3    PUTS US INTO SUBSECTION (K), BETWEEN 9.5 MILLION AND

4    25 MILLION, YOUR HONOR.

5            SO I ASK THE COURT TO USE THE SIMPLEST METHODOLOGY.

6    THE SIMPLEST ANSWER IS OFTEN THE CORRECT ONE.  IT'S EASY.  IT

7    DOESN'T REQUIRE TO US DO ANY FUZZY MATH.  IT TOOK MR. GINGRAS

8    33 PAGES TO EXPLAIN THE MATH THAT HE HAS TRIED TO DOCTOR UP.

9            THIS IS A SIMPLE FRAUD CASE.  HE WAS ENTITLED TO X.

10   HE TOLD HIS PARTNERS HE WAS GETTING X.  HE TOOK X TIMES FOUR.

11   AND THAT CONSERVATIVE LOSS AMOUNT IS 15 MILLION, COMFORTABLY

12   WITHIN SUBSECTION (K).

13           THANK YOU.

14           THE COURT:  ALL RIGHT.

15           MS. BARRON:  OH, CAN I JUST ADD ONE MORE THING?

16           THERE'S KIND OF THIS LINGERING QUESTION THAT

17   MR. GINGRAS BRINGS UP IN HIS REPORT, AND I WANT TO KIND OF

18   FINISH THAT.  AND THAT IS WHETHER WE SHOULD REDUCE THE LOSS

19   AMOUNT BY 6.4 MILLION.  WE'LL ARGUE -- I'M SURE I WILL DEAL

20   WITH MR. GINGRAS ABOUT WHETHER THAT NUMBER IS ACCURATE.

21           BUT THAT IS BASED ON THE 1.4 MILLION THAT

22   MR. HARDWICK INFUSES INTO THE FIRM AFTER THE FRAUD IS

23   DISCOVERED AND THEN THE ADDITIONAL FIVE MILLION THAT IS

24   BORROWED FROM MR. PRITCHARD, JIM PRITCHARD, AND DUSTIN JOHNSON.

25   AND SO MR. GINGRAS WANTS TO GIVE HIM CREDIT FOR THAT.

1          I ASK THE COURT TO LOOK AT APPLICATION NOTE 3(E)(1)

2    OF THE SENTENCING GUIDELINES, WHICH ADDRESSES CREDITS AGAINST

3    LOSS.  AND IT'S VERY CLEAR, YOUR HONOR, THAT THE COURT IS NOT

4    TO REDUCE LOSS BY AMOUNTS THAT A DEFENDANT OR THEIR

5    COCONSPIRATOR INFUSED AFTER THE FRAUD IS DISCOVERED.  THEY

6    DON'T GET CREDIT FOR THAT.

7          HE PUTS THAT MONEY BACK AFTER THE HOLE IS FOUND, ONCE

8    THEY'RE TRYING TO FIGURE OUT HOW BIG IT IS AND, REGARDING THE

9    6.4 SPECIFICALLY, AFTER MR. WITTSTADT SAID, HEY, YOU'RE

10   RESPONSIBLE FOR THIS LOSS, YOU WERE OVER-DISBURSED, YOU GO

11   RAISE THE MONEY.

12         THAT IS MONEY THAT IS INFUSED AFTER THE FRAUD IS

13   DISCOVERED.  3(E)(1) MAKES IT CLEAR HE DOES NOT GET CREDIT FOR

14   THAT.  AND SO I ASK THE COURT, REGARDLESS OF WHAT MR. GINGRAS

15   HAS TO SAY ABOUT HOW WE GET THERE, NOT TO REDUCE THE LOSS BY

16   THAT AMOUNT.

17         THANK YOU.

18         THE COURT:  ALL RIGHT.  THANK YOU.

19         ALL RIGHT.  MR. GARLAND, IF YOU WANT TO CALL

20   MR. GINGRAS, YOU MAY DO SO.

21         MR. GARLAND:  IN LIGHT OF THAT PRESENTATION, COULD I

22   ASK FOR A FIVE-MINUTE RECESS?

23         THE COURT:  CERTAINLY.

24         ALL RIGHT.  IT'S ABOUT 10:57.  LET'S SAY -- IT'S

25   CLOSE ENOUGH TO 11:00.  LET'S SAY WE COME BACK AT 11:05.

1           WE ARE IN RECESS.  THANK YOU.

2           THE COURTROOM SECURITY OFFICER:  ALL RISE.

3           (WHEREUPON, A BRIEF RECESS WAS HAD FROM 10:57 A.M. TO

4      11:09 A.M.)

5           THE COURT:  THANK YOU SO MUCH.  THANK YOU.  PLEASE BE

6      SEATED.

7           MR. GARLAND:  YOUR HONOR, BEFORE CALLING THE WITNESS,

8      I'D LIKE TO BRIEFLY RESPOND TO THE REMARKS OF THE --

9           THE COURT:  OKAY.

10          MR. GARLAND:  -- PROSECUTOR.

11          THE COURT:  IF YOU WOULD PULL THAT MICROPHONE DOWN

12     JUST A LITTLE, MR. GARLAND.  THANK YOU, SIR.

13          MR. GARLAND:  YES, MA'AM.

14          THE ASSERTION THAT A SIMPLE ANSWER IS THE WAY TO DO

15     THINGS IS FINE, UNLESS THAT SIMPLE ANSWER IS SIMPLY WRONG.

16          SO OUR RESPONSE TO THE VARIOUS STATEMENTS THAT WERE

17     MADE GOES BACK TO THE FUNDAMENTAL THAT WHAT IS -- YOU CAN'T

18     DETERMINE LOSS FROM A VIOLATION OF AN AGREEMENT.  YOU CAN

19     DETERMINE FRAUDULENT CONDUCT, WHICH THE GOVERNMENT ALWAYS

20     EMPHASIZED THAT THEY DON'T HAVE TO PROVE LOSS.  LOSS IS NOT AN

21     ELEMENT OF ANY COUNT, THEY HAVE TOLD YOU.  THE COURT FOUND

22     THAT.  I AGREE.  I DON'T THINK THEY DISAGREE.

23          SO TAKING THOSE -- THE FIRST PRINCIPLE THAT YOU ASKED

24     ABOUT, CAN'T WE JUST USE THESE NUMBERS, AND IT COMES UP TO LESS

25     LOSS, IT IS BECAUSE THAT WHEN YOU READ THE ELEMENT OF THAT

1  OFFENSE, OF THOSE OFFENSES, IT'S FRAUDULENT THAT HE'S CHARGED

2  THERE, THAT THAT MONEY WAS RECEIVED FRAUDULENTLY.  THE FRAUD IS

3  TAKING MORE THAN YOUR SHARE.

4          BUT IT IS NOT -- WHEN YOU SAY, WELL, YOU TOOK MORE

5  THAN YOUR SHARE, THAT DOESN'T ESTABLISH THE LOSS.  IT JUST SAYS

6  YOU TOOK MORE THAN YOUR SHARE.  AND YOU HAD A SHARE YOU WERE

7  ENTITLED TO, AND THIS ADDS UP TO SOME OF IT YOU GOT.

8          SO BECAUSE OF THE ABSENCE OF THE ELEMENT OF LOSS, THE

9  CONVICTIONS ON THOSE COUNTS DOESN'T ESTABLISH LOSS.

10          BUT I WANT TO FOCUS IN ON WHAT WAS JUST ARGUED.  WHAT

11  IS RELEVANT, YOUR HONOR, THAT WE OFTEN TALKED ABOUT, IS THE

12  SIMPLE FACT THAT THE OTHER PARTNERS GOT MORE THAN WHAT THOSE

13  TAX RETURNS WOULD SAY THEY WERE ENTITLED TO.  THEY GOT MORE

14  THAN THE AGREEMENT WOULD SAY THEY WERE ENTITLED TO -- THAT IS,

15  THE OPERATING AGREEMENT.

16          SO IN ORDER TO DETERMINE WHAT HARDWICK IS ENTITLED

17  TO, YOU DON'T LOOK AT THE OPERATING AGREEMENT.  YOU LOOK AT

18  WHAT DID THE WITTSTADTS AND MORRIS GET.  WE BUMPED INTO THIS

19  ISSUE ALL THROUGH THE TRIAL.

20          ALL RIGHT.  SO IF WE HAVE A POT OF MONEY, AND THE

21  WITTSTADTS GOT SO MUCH AND HARDWICK GOT SO MUCH OUT OF THAT

22  POT, THE QUESTION BECOMES:  WHAT IS THE BALANCE BETWEEN THEM?

23          SO, YES, THE AGREEMENT SAID THEY WERE TO DO IT A

24  CERTAIN WAY.  BUT THE FACTS --

25          THE COURT:  THEY DIDN'T ALWAYS FOLLOW THE AGREEMENT.

1              MR. GARLAND:  THAT'S CORRECT.

2              NOW, THEY SAY, WE DIDN'T KNOW HARDWICK WASN'T

3     FOLLOWING THE AGREEMENT.  WE WERE DEFRAUDED.  THE JURY FOUND

4     THEY WERE DEFRAUDED.  THE FRAUD IS THAT THEY DIDN'T KNOW HE WAS

5     ACTUALLY GETTING MORE.

6              BUT IF YOU'RE GOING TO LOOK AT WHAT HE -- YOU HAVE TO

7     LOOK THERE AND SEE, WHAT WAS HE ENTITLED TO GET?  NOW, HERE'S

8     THE WAY IT WORKS.  AND I DON'T THINK I HAVE ANY OBJECTION TO

9     HER MATH --

10             THE COURT:  I HOPE NOT.  YOU'RE ABOUT TO USE IT.

11             MR. GARLAND:  -- EXHIBIT NUMBER 1.  BUT THE POINT IS

12    THAT YOU CAN FIGURE OUT WHAT MR. HARDWICK WAS ENTITLED TO BY

13    DETERMINING WHAT THE WITTSTADTS GOT.  IF THEY GOT 45 PERCENT,

14    THEN YOU CAN DO THE CALCULATION AND SAY MR. HARDWICK WAS

15    ENTITLED TO THE DIFFERENCE.

16             THE RECORD SHOWS, AS TESTIFIED TO BY MR. GINGRAS, AND

17    IN OUR REPORT BY MR. GINGRAS THAT WE HAVE SUBMITTED AS OF

18    FEBRUARY THE 4TH AS PART OF OUR SUBMISSIONS, AND IN THE RECORD,

19    ADDRESSES THIS ISSUE AGAIN AND FURTHER.

20             AND SO, I MEAN, YOU DON'T DETERMINE LOSS BY SAYING,

21    WELL, THE AGREEMENT SAID IT SHOULD BE ONE WAY.  YOU DETERMINE

22    HOW MUCH MORE HE TOOK THAN HE SHOULD BY DETERMINING WHAT THEY

23    TOOK, APPLY THAT PERCENTAGE TO IT.

24             AND THAT'S IN THE RECORD AND IN THE FACTS AND IN THE

25    LIMITED ACCOUNTING.  BUT THE GOVERNMENT DIDN'T GO ABOUT A

1    CORRECT PROOF.  THEY DIDN'T PROVE UP ALL THE MONEY THAT THE

2    WITTSTADTS GOT.

3            AND, FURTHER, YOUR HONOR, TALKING ABOUT MS. JOHNSON,

4    I CROSS-EXAMINED HER EXTENSIVELY ON WHAT SHE DID NOT DO.  THE

5    IMPORTANCE OF WHAT SHE DID NOT DO WAS SHE DIDN'T DETERMINE,

6    ANALYZE, OR GO THROUGH ANY OF THE LAW FIRM ACCOUNTS UP IN THE

7    BALTIMORE AREA.  AND THE EVIDENCE IS THERE WERE MANY.  AND

8    THERE'S A WHOLE LIST OF QUESTIONS I ASKED HER, ONE AFTER THE

9    OTHER.  DID YOU DO THIS, DID YOU DO THIS, DID YOU DO -- ALL OF

10   THOSE FACTS SHOW THAT THE GOVERNMENT, WHEN IT COMES TO LOSS,

11   THAT THE RECORD FAILS BECAUSE IT DOESN'T SHOW ALL THEY MAY HAVE

12   GOTTEN, NOR DOES IT ELIMINATE THEY MAY HAVE GOTTEN MORE.

13           FORGETTING THAT FAILURE OF THEIR PROOF AND THE

14   ABILITY TO ESTABLISH A PREPONDERANCE, BECAUSE -- AND I ASK YOU

15   TO LOOK AT MS. JOHNSON'S CROSS-EXAMINATION.  IT TELLS YOU,

16   WELL, THEY DIDN'T CHECK -- THEY NOT ONLY DIDN'T DO THE

17   THIRD-PARTY RECONCILIATION, BUT THEY DIDN'T CHECK ALL THE

18   BALTIMORE ACCOUNTS TO DETERMINE WHAT THE WITTSTADTS GOT.

19           SO WE'RE SAYING, LET'S LOOK AT WHAT THEY GOT,

20   CALCULATE WHAT MR. HARDWICK WAS ENTITLED TO, AND WE WOULD BE

21   ABLE TO CLOSE IN ON A NUMBER.

22           THEN THERE'S THE NEXT POINT THEY MAKE; AND THAT IS,

23   WELL, YOU CAN'T COUNT THE FACT THAT HE PUT HIS MONEY BACK IN

24   BECAUSE, QUOTE, THE FRAUD WAS DISCOVERED.

25           THE ONLY THING THAT WAS KNOWN AT THE TIME HE PUT HIS

1    MONEY BACK IN WAS THAT THE ACCOUNTS WERE OUT OF BALANCE.  AND

2    HE WAS TOLD, AND THE EVIDENCE SHOWS, THAT IT WAS 5 POINT -- 5

3    AND A HALF TO 6 THAT THEY WERE OUT OF BALANCE.  AND HE GETS --

4    HE BORROWS MONEY AND PUTS IT IN.

5              SO WE BELIEVE WE ARE ENTITLED; THAT THE, QUOTE,

6    FRAUD -- THE THEORY OF THE FRAUD WAS NOT DISCOVERED.  THE

7    FACT -- WHAT HAD BEEN TOLD TO EVERYONE, AND WHICH THEY RECITE

8    IN THE RECORD, IS THAT SHE HAD SAID THE PARTNERS HAD BEEN

9    OVER-DISBURSED.  AT THAT POINT, OUR ARGUMENT IS THAT THE FRAUD

10   WASN'T DISCOVERED AND THE MONEY WAS PUT BACK, THAT AMOUNT.

11             AND SO MY POINT IS, IN ADDITION TO WHAT I'VE SAID, IS

12   THAT NOT FOLLOWING THE AGREEMENT DOESN'T PROVE LOSS.

13             AND WITH THAT, YOUR HONOR, I'D LIKE TO CALL

14   MR. GINGRAS TO TESTIFY.

15             THE COURT:  ALL RIGHT.  MR. GINGRAS MAY COME UP.

16             MR. GARLAND:  EXCUSE ME JUST A SECOND, YOUR HONOR,

17   MR. GINGRAS.

18             I HAVE A WITNESS HERE WHO JUST WAS OPERATED ON, AND

19   SHE'S -- IF I COULD GO OUT OF ORDER.

20             THE COURT:  WOULD YOU LIKE TO LEAVE THE BOX UP OR

21   TAKE IT BACK WITH YOU?  BECAUSE I'LL LEAVE IT TO YOU.

22             ALL RIGHT.  THANK YOU.  WE'LL SEE YOU SHORTLY, I

23   GUESS.

24             YES, SIR.

25             MR. GARLAND:  ALL RIGHT.  THANK YOU.  MICHELE

45

1    VELCHECK.

2              THE COURT:  AND COME ON UP, MA'AM -- GOOD MORNING TO

3    YOU -- AND I WILL SWEAR YOU IN.

4              MS. VELCHECK:  THANK YOU.

5              THE COURT:  IF YOU WOULD RAISE YOUR RIGHT HAND,

6    PLEASE.

7                          MICHELE VELCHECK,

8    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

9    FOLLOWS:

10             THE COURT:  ALL RIGHT.  IF YOU WOULD TAKE A SEAT,

11   PLEASE.

12             THE WITNESS:  THANK YOU.

13             THE COURT:  AND ONCE YOU ARE COMFORTABLY SEATED, IF

14   YOU WOULD FIRST STATE YOUR NAME AND THEN SPELL IT FOR THE

15   RECORD.

16             THE WITNESS:  OKAY.  MICHELE VELCHECK.

17   M-I-C-H-E-L-E, V-E-L-C-H-E-C-K.

18             THE COURT:  ALL RIGHT.  AND, MA'AM, AND DID YOU

19   TESTIFY AT TRIAL?

20             THE WITNESS:  I DID NOT.

21             THE COURT:  OKAY.  GREAT.  OKAY.  THANK YOU.

22             THE WITNESS:  THANK YOU.

23             MR. GARLAND:  JUST --

24             THE COURT:  SURE.

25                          DIRECT EXAMINATION

1    BY MR. GARLAND:

2    Q.    WHAT IS YOUR OCCUPATION?

3    A.    I AM THE OWNER AND FOUNDER OF SOLID SOURCE REALTY, A REAL

4    ESTATE COMPANY IN METRO ATLANTA.

5    Q.    ALL RIGHT.  AND HOW LONG HAVE YOU BEEN IN THE REAL ESTATE

6    BUSINESS?

7    A.    THIRTY YEARS ALTOGETHER IN DIFFERENT CAPACITIES, BUT WE'VE

8    BEEN OPENED FOR 16 YEARS.

9              MR. GARLAND:  ALL RIGHT.

10             YOUR HONOR, I'M OFFERING THIS TESTIMONY ON

11   FORESEEABILITY OF -- SOME OF THE FORESEEABILITY ARGUMENTS THAT

12   IS IN THE GOVERNMENT'S PAPERS ABOUT THE CONSEQUENCES TO THE LAW

13   FIRM, THAT WHOLE SECTION.  AND SHE ALSO HAS WRITTEN A LETTER.

14             SO WHILE SHE'S HERE, SHE MIGHT BRIEFLY COMMENT ON

15   THOSE THINGS THAT ARE RELEVANT.

16             THE COURT:  YES, SIR.

17             MR. GARLAND:  ALL RIGHT.

18   Q.   (BY MR. GARLAND)  WHEN DID YOU FIRST GET TO KNOW NAT

19   HARDWICK?

20   A.    IT WAS AROUND -- WOW, I DIDN'T KNOW I WAS GOING TO GET

21   THAT QUESTION.  IT WAS IN THE EARLY NINETIES.  I WAS INVESTING

22   IN REAL ESTATE WITH A DAY JOB, AND NAT WAS MY CLOSING ATTORNEY.

23   Q.    ALL RIGHT.  WHEN DID YOU BECOME -- WHEN DID YOU START YOUR

24   OWN COMPANY?

25   A.    SO WHEN I OPENED MY BUSINESS, SOLID SOURCE REALTY, IN

1    2003, THEN I APPROACHED NAT IN 2004, WHEN IT LOOKED LIKE IT WAS

2    GOING TO WORK, AND ASKED HIM IF HE WOULD CONSIDER PARTNERING

3    WITH OUR FIRM.  SO WE HAD CLOSE TO 50 AGENTS AT THE TIME.  AND

4    I WAS STILL WORKING AS A MORTGAGE LOAN OFFICER DURING THE DAY,

5    AND THAT WAS MY PART-TIME JOB AT NIGHT WHEN I WAS ABOUT TO GO

6    LIVE.

7    Q.   ALL RIGHT.  YOU SAID YOU AT THAT POINT HAD 50 AGENTS

8    WORKING FOR YOUR COMPANY?

9    A.   CORRECT.

10   Q.   HOW MANY DO YOU HAVE WORKING FOR IT NOW?

11   A.   OVER 1700.

12   Q.   AND AT THE TIME MR. HARDWICK LEFT MORRIS HARDWICK

13   SCHNEIDER, HOW MANY AGENTS DID YOU HAVE AT THAT TIME?

14   A.   OVER 2,000.

15   Q.   OVER 2,000 AT THAT TIME.

16        AND HAS YOUR COMPANY BEEN A SUCCESS?

17   A.   YES.

18   Q.   DOES IT HAVE ANY DEBT?

19   A.   NO.  WE'VE BEEN DEBT-FREE SINCE WE OPENED.

20   Q.   ALL RIGHT.  AND DO YOU GIVE PART OF THE PROFITS TO

21   CHARITY?

22   A.   WE GIVE A LOT TO CHARITY, YES.  IT'S A LOT.

23   Q.   WHAT PERCENT OF YOUR PROFITS DO --

24   A.    IT'S NEVER REALLY A PERCENT FOR US.  IT'S, IT'S THE NEED.

25   BUT IT'S MUCH MORE THAN A TITHE.

1    Q.   ALL RIGHT.  IT'S MORE THAN 10 PERCENT?

2    A.   YEAH.  IT'S A LOT MORE THAN THAT.

3    Q.   ALL RIGHT.  NOW, GO BACK TO THE CREATION OF YOUR COMPANY

4    AND TELL US -- TAKE US FORWARD ABOUT YOUR CONTACT WITH NAT

5    HARDWICK.

6    A.   SO, SO WHEN WE OPENED, MOST REAL ESTATE COMPANIES HERE

7    ARE -- LARGER FIRMS WILL PARTNER WITH AN ATTORNEY FIRM TO DO

8    TITLE WORK, TO ULTIMATELY HAVE A JOINT VENTURE.  BUT IT MAKES

9    YOU LOOK GOOD TO PARTNER WITH A FIRM OF HIGH INTEGRITY AND A

10   NAME.

11        SO, OF COURSE, SOLID SOURCE WAS NOT A FRANCHISE OR

12   ANYTHING LIKE THAT.  AND SO, SO I JUST REACHED OUT TO NAT

13   BECAUSE HE WAS MY FRIEND.  I SAY MY FRIEND.  IT'S NOT LIKE WE

14   TALKED ON THE PHONE OR ANYTHING SINCE THEN.  BUT HE WAS ALWAYS

15   MY CLOSING ATTORNEY AS A REAL ESTATE INVESTOR.

16        SO I WENT IN -- I WORKED AT PFIZER PHARMACEUTICALS AND

17   C.R. BARD OUT OF COLLEGE.  AND SO I HAD MY BOOK TOGETHER WITH

18   ALL THE PAGE PROTECTORS SHOWING NAT HOW WE WERE GOING TO BE

19   FAMOUS, BUT WE JUST NEEDED HIS HELP TO GET ON THE MAP.

20        BECAUSE NAT, AT THE TIME, WAS WITH JACKSON & HARDWICK.

21   THIS WAS BEFORE HE WAS EVEN WITH MHS.  BUT NAT HAD DEFINITELY

22   THE GREATEST REPUTATION THAT I WAS AWARE OF, EVEN WITH THE

23   CLOSINGS THAT WE ALREADY WERE DOING IN THE ATLANTA AREA.  SO

24   THAT IS WHY I SAID, HEY, I'M BACK.  GUESS WHAT, I HAVE A NEW

25   REAL ESTATE COMPANY.

1    Q.   AND DID THAT RELATIONSHIP GO ON?

2    A.   IT DID.  SO I WENT IN, AND NAT WAS VERY RECEPTIVE.  WE

3    HADN'T SEEN EACH OTHER PROBABLY IN, I DON'T KNOW, EIGHT YEARS

4    OR SO, BECAUSE I MOVED TO ARIZONA, HAD A CHILD, GOT DIVORCED,

5    MOVED BACK.  AND SO, SO WHEN I REACHED OUT TO NAT, HE SAID,

6    WELL, YEAH, COME IN, PITCH ME, PITCH ME.

7         AND SO I CAME IN WITH, YOU KNOW, OUR PLANS, WHAT -- WE HAD

8    A DIFFERENT COMMISSION STRUCTURE.  AS OPPOSED TO PAYING, LIKE

9    PAYING A PERCENTAGE, IT WAS -- IT'S JUST PAYING A FLAT FEE.

10   AND SO I ASKED HIM IF HE WOULD BASICALLY ALLOW ME TO USE HIS

11   REPUTATION UNTIL I HAD ONE.

12        AND, AND SO I WAS WRITING AN INVESTOR SERIES.  I'D BEEN A

13   REAL ESTATE INVESTOR AT THAT POINT FOR EIGHT TO TEN YEARS-ISH,

14   AND SO I HAD WRITTEN AN INVESTOR SERIES TO TEACH AT A REAL

15   ESTATE SCHOOL.  AND I ASKED IF WE COULD USE HIS SUPPORT, SAYING

16   THAT HE WAS SUPPORTING THE FIRST CLASS OF THE THREE-CLASS

17   SERIES, AND IF HE WOULD COME IN TO OUR AGENTS, DO A -- DO SOME

18   TEACHING.

19        BUT BASICALLY, WHEN NAT HARDWICK -- MAYBE EVERYBODY WAS

20   HERE BUT ME FOR THE COURT.  BUT, YOU KNOW, NAT HARDWICK MAKES

21   IT RAIN, YOU KNOW.  AND WHEN HE IS TALKING, HE'S MAGNET.

22        AND SO WHEN NAT SAYS THAT YOU'RE GOOD AS A REAL ESTATE

23   COMPANY, YOU KNOW, IT'S LIKE, YOU'RE GOOD.  AND EVERYBODY IS

24   JUST, OH, NAT HARDWICK, YOU KNOW, AGREES, SO THAT'S -- SO WE

25   WERE VERY -- I WAS VERY THANKFUL.

1      AND DURING THAT TIME, WE -- SOME OF THE THINGS THAT I GAVE

2  YOU, BUT WE HAVE A BIG PROGRAM EVERY YEAR.  IT'S CALLED AGENT

3  APPRECIATION DAY.  AND SO --

4  Q.   LET ME ASK YOU A COUPLE OF QUESTIONS.

5  A.   OH, I'M SORRY.  YES.  I'M SORRY.

6  Q.   DID YOUR ASSOCIATION CONTINUE WITH HIM UP UNTIL EVENTS

7  WHEN HE LEFT THE FIRM?

8  A.   OH, ABSOLUTELY.

9  Q.   DESCRIBE, IN THE BIG PICTURE, PLEASE, WHAT NAT HARDWICK

10 DID FOR YOU, WHAT YOUR CONTACT WITH HIM WAS, WHAT HE DID FOR

11 YOUR COMPANY, WHAT YOU SAW FIRSTHAND.

12 A.   RIGHT.  SO THAT'S IN THE BEGINNING.  SO IN THE

13 BEGINNING -- SO AFTER I GOT IN TOUCH WITH NAT, SO WE HAD

14 50 AGENTS ON -- WE OPENED, WE INCORPORATED IN JANUARY OF 2003

15 AND THEN WENT LIVE IN APRIL OF 2003.  IN 2004, AROUND JUNE 1ST,

16 WE HAD 50 REAL ESTATE AGENTS.  AND THAT'S SOMEWHERE AROUND THE

17 TIME THAT I GOT IN TOUCH WITH NAT.

18      BY THE END OF THE YEAR, WE HAD 200.  BY THE END OF THE

19 NEXT YEAR, WE HAD 800.  BY THE END OF THE FOLLOWING YEAR, WE

20 HAD 1200, 1800, 2200.

21      SO, YOU KNOW, OF COURSE, I WAS WORKING THERE, TOO.  BUT,

22 BUT I DO WANT TO SAY THAT IT WAS A TREMENDOUS INSTANT IMPACT TO

23 BE ABLE TO USE HIS NAME AND HIS SUPPORT SHOWING UP.

24      AND SO SOME OF THE DIFFERENCES THAT NAT WOULD MAKE THAT

25 WERE DIFFERENT FROM OTHER ATTORNEYS IN THE CITY WERE,

1    SPECIFICALLY, THAT HE WOULD GIVE OUT HIS CELL PHONE NUMBER TO

2    EVERY AGENT, TO 2,000 AGENTS ON THE STAGE OF THE FOX THEATRE.

3    THAT'S ONE OF THE PICTURES THAT I GAVE YOU.  THAT'S HIM AT THE

4    FOX THEATRE DURING THE AGENT APPRECIATION DAY.

5        AND WHEN I SAY GAVE OUT HIS CELL PHONE NUMBER, HE WOULD

6    STAND UP AT ALL OF THESE EVENTS DURING THE YEAR.  TYPICALLY HE

7    WOULD COME IN FOR AT LEAST TWO TO THREE, SOMETIMES, IN THE

8    BEGINNING ESPECIALLY, MORE, JUST BECAUSE WE HAD MORE SMALL

9    THINGS THAT HE WOULD COME AND MAKE A DIFFERENCE.

10       HE WOULD GET ALL OF HIS ATTORNEYS.  HE WOULD COME UP WITH

11   IDEAS.  THIS IS AN EXAMPLE OF HIM COMING TO THE RESCUE AT ONE

12   POINT.  BUT IN THE VERY BEGINNING, HE ACTUALLY DID A PROGRAM

13   WITH HIS ATTORNEYS THAT HE HAD EVERY ONE OF HIS ATTORNEYS CALL

14   OUR AGENT WHEN THEY CAME ON BOARD, THE WEEK THAT THEY CAME ON

15   BOARD AND INTRODUCED HIMSELF AS THE ATTORNEY THAT WAS GOING TO

16   BE THEIR PERSONAL ATTORNEY, YOU KNOW, THAT THEY COULD ALWAYS

17   CALL.  HE WOULD DECIDE THAT BY THE PERSON THAT LIVED CLOSEST TO

18   THEIR HOUSE.  AND THEN NAT WOULD REACH OUT AND GIVE THEM HIS

19   PERSONAL CELL PHONE NUMBER AND SAY, IF ANYTHING DOESN'T WORK

20   OUT, PLEASE LET ME KNOW.

21       AND, AND THE EXAMPLE I GAVE YOU IS JUST ONE EXAMPLE OF

22   WHEN SOMEBODY DROPPED THE BALL.  THIS IS WHAT HE DID EVERY TIME

23   FOR 13 YEARS.

24   Q.   ASK YOU TO SLOW DOWN JUST A LITTLE BIT.

25   A.   OKAY.

52

```
1    Q.   DID HE LIVE UP TO WHAT HE PROMISED HE WOULD DO?
2    A.   OH, YEAH.  HE DIDN'T EVEN PROMISE THAT HE WOULD DO ANY OF
3    THIS.
4    Q.   WELL --
5    A.   RIGHT.  THAT'S NOT WHAT ATTORNEYS DO.  RIGHT.  WHAT I'M
6    GIVING YOU AS EXAMPLES, THESE ARE ALL WAY OUTSIDE OF WHAT AN
7    ATTORNEY FIRM WOULD EVER REALLY DO WITH A REAL ESTATE FIRM.
8    THAT'S ALL OF NAT -- EXCUSE ME.  ALL OF THAT'S WAY, WAY OUTSIDE
9    OF WHAT PEOPLE WOULD DO.
10   Q.   YOU HAVE WRITTEN A LETTER IN HIS BEHALF, HAVE YOU NOT?
11   A.   YES, SIR.
12   Q.   AND YOU ATTACHED A LETTER TO YOUR LETTER FROM DECEMBER 11,
13   2004?
14   A.   I FORGOT THAT.  YES, I DID.
15              MR. GARLAND:  ALL RIGHT.
16              YOUR HONOR --
17              THE COURT:  YES.
18              MR. GARLAND:  -- MAY I HAND THIS UP TO THE COURT?
19              THE COURT:  YES.
20              MR. GARLAND:  I HAVE MARKED IT DEFENDANT'S EXHIBIT 1
21   AND DEFENDANT'S EXHIBIT 2 FOR THE SENTENCING.
22              THE COURT:  OKAY.  AND ARE THESE THE ONES THAT WERE
23   PREVIOUSLY SUBMITTED?
24              MR. GARLAND:  YES.
25              THE COURT:  OKAY.
```

53

1              MR. GARLAND:  YES, THEY ARE.

2              THE COURT:  ALL RIGHT.

3              MR. GARLAND:  PARTICULARLY LIKE TO PASS THEM UP TO

4     THE COURT AT THIS TIME --

5              THE COURT:  OKAY.

6              MR. GARLAND:  -- TO PUT THIS IN CONTEXT.

7     Q.   (BY MR. GARLAND)  YOU SAID A LOT OF WONDERFUL THINGS ABOUT

8     NAT HARDWICK IN THAT LETTER.  WERE THOSE ALL TRUE BASED ON

9     YOUR --

10    A.   MY PERSONAL --

11    Q.   -- YEAR-TO-YEAR EXPERIENCE WITH HIM?

12    A.   YES, SIR.

13    Q.   NOW, I'M GOING TO SHOW YOU AN EXHIBIT, DEFENDANT'S

14    SENTENCING EXHIBIT NUMBER 4, FIRST PAGE OF A FORBES MAGAZINE

15    ARTICLE.

16    A.   RIGHT.

17    Q.   AND JANUARY 28, 2008.

18    A.   I BROUGHT THEM.

19    Q.   OH, YOU HAVE A COPY.

20             MR. GARLAND:  MAY I PASS THIS UP TO THE COURT, YOUR

21    HONOR?

22             THE COURT:  YES.

23             MR. GARLAND:  AND I ALSO HAVE SENTENCING EXHIBIT

24    NUMBER 3.  I'D LIKE TO PASS IT UP ALSO.

25             THE COURT:  THANK YOU.

1  Q.   (BY MR. GARLAND)  SO THE ARTICLE IN FORBES HAD YOU EXPRESS

2  YOUR ADMIRATION FOR THE MANNER THAT NAT HARDWICK HANDLED

3  MATTERS; IS THAT CORRECT?

4  A.   RIGHT, IT IS.  BUT THE GREATER IMPACT OF THIS IS THERE IS

5  REALLY NOT A LOT OF PEOPLE, I THINK, THAT TALK ABOUT OR PUT

6  OTHER FIRM'S PICTURES IN THERE WITHOUT THEM PAYING HALF OR,

7  QUITE FRANKLY, ALL OF IT.  BUT WE ALWAYS PAID FOR IT.  WE --

8  MHS NEVER PAID FOR HALF OF IT.  OUR JOINT VENTURE DID NOT PAY

9  FOR IT.  IT WAS ALL SOLID SOURCE.

10       THE REASON THAT WE PUT NAT HARDWICK -- AND BY THE WAY, I

11  GOT HERE ON SHORT NOTICE, SO THIS IS JUST ONE THING I WAS ABLE

12  TO GRAB.

13       WE HAD THIS -- WE WERE IN MAGAZINES EVERY -- ONCE EVERY

14  TWO YEARS, SOMETIMES EVERY YEAR.  THEY USUALLY COST -- THIS IS

15  PAID ADVERTISING.  THE REASON THAT WE PAID FOR THE ADVERTISING

16  AND THAT WE WOULD PUT NAT IN IT IS BECAUSE OF THE VALUE THAT

17  HIS REPUTATION BROUGHT TO OUR FIRM.  SO THAT'S WHY WE PAID, AND

18  WE NEVER EVEN ASKED HIM TO PAY.

19  Q.   SO WAS HIS REPUTATION CONSISTENT WITH HIS ACTUAL

20  PERFORMANCE?

21  A.   WELL, HIS REPUTATION WAS -- ABSOLUTELY.  THAT'S WHERE HIS

22  REPUTATION CAME FROM, WAS HIS PERFORMANCE.

23  Q.   NOW, WHAT DID HE DO IN TERMS OF BEING A FORCE TO CREATE

24  BUSINESS FOR YOU?  HOW DID YOUR REPUTATION AND HIS REPUTATION

25  WORK WITH EACH OTHER WHERE YOU'RE PUTTING HIM IN YOUR

1    ADVERTISING?

2    A.   WELL, BECAUSE HIS REPUTATION, EVERYONE KNEW HIM IN THE

3    CITY.  AND SOLID SOURCE WAS NEW.  I MEAN, IT WAS A NEW COMPANY

4    IN 2003.  AND SO IN THE BEGINNING, IT WAS BECAUSE THEY ONLY

5    KNEW HIM, NOT US.  SO, SO HIM ENDORSING US IS WHAT VALIDATED

6    US, I WOULD SAY.  AND THEN AS WE --

7    Q.   DID THAT RELATIONSHIP CONTINUE UP TO 2014?

8    A.   ABSOLUTELY.  AND PEOPLE EXPECTED NAT THERE.  YOU KNOW,

9    THEY JUST -- I MEAN, HE -- NAT WAS THE FACE OF MHS FOR US.  HE

10   WAS THE FACE OF JACKSON & HARDWICK.  AND, CERTAINLY, THEY HAD

11   RELATIONSHIPS WITH OTHER ATTORNEYS.  IT'S JUST THAT NAT WAS

12   ALWAYS THAT PERSON.  I MEAN, HE WAS THE DRIVING FORCE.  PEOPLE

13   USED TO ASK US IF HE OWNED PART OF THE FIRM.  I MEAN, THAT'S

14   HOW AVAILABLE AND PRESENT HE WAS.

15   Q.   NOW, IN TERMS OF SIZE OF CLIENTS, HOW MANY CLOSINGS WAS

16   MORRIS HARDWICK SCHNEIDER DOING FOR YOU AT THE TIME -- ON AN

17   ANNUAL BASIS AT THE TIME NAT LEFT THE FIRM?

18   A.   I SAID THIS THE OTHER DAY.  I NEVER LIKE TO GIVE OUT

19   NUMBERS THAT I HAVEN'T PERSONALLY SEEN.  SO TO -- BUT IN MY

20   OPINION, IT WAS AROUND APPROXIMATELY 200.  SOMETIMES IT WOULD

21   BE A LOT MORE -- I DON'T MEAN A LOT MORE.  LIKE 350.

22   Q.   TWO HUNDRED HOW OFTEN?

23   A.   TWO HUNDRED CLOSINGS A MONTH.

24   Q.   A MONTH?

25   A.   RIGHT.  BUT I DON'T THINK THERE WERE MANY TIMES THAT IT

1    WAS LESS THAN THAT.  AND MAYBE THERE WERE SOME TIMES THAT WE

2    WERE REPORTED THAT THERE WERE 125, AND THEN SOMETIMES IT WOULD

3    BE LIKE 275.  SO I WOULD -- IF I HAD TO GIVE MY BEST GUESS THAT

4    I HAVE NOT LOOKED AT BECAUSE WE DIDN'T GET REPORTING.

5    Q.   ALL RIGHT.  AND YOU WERE USING THAT FIRM BECAUSE OF NAT

6    HARDWICK?

7    A.   RIGHT.

8    Q.   ALL RIGHT.  NOW --

9    A.   WELL, WE MOVED TO THAT FIRM BECAUSE OF HIM.  I MEAN, WE

10   WERE WITH JACKSON & HARDWICK.  WE MOVED THERE WHEN HE MOVED

11   THERE.

12   Q.   AND YOU STAYED WITH HIM --

13   A.   OF COURSE.

14   Q.   -- AFTER IT MERGED WITH --

15   A.   RIGHT.

16   Q.   -- MORRIS AND SCHNEIDER?

17   A.   RIGHT.

18   Q.   RIGHT.  NOW, DID THERE COME A TIME WHEN YOU FOUND OUT THAT

19   NAT HAD ISSUES WITH HIS PARTNERS, THE WITTSTADTS?

20   A.   I FOUND OUT BY WHAT I WAS TOLD THE DAY AFTER THIS, YOU

21   KNOW, SIGNING OVER A PAPER OR WHATEVER.  SO, NO, I DIDN'T EVEN

22   KNOW MARK WITTSTADT'S NAME.

23   Q.   YOU HADN'T MET HIM?

24   A.   OR RODDY.  NO.  I NEVER DID MEET RODDY.

25   Q.   DID YOU GO MEET MARK WITTSTADT?

1    A.    YES.

2    Q.    AND WHERE DID YOU MEET HIM?

3    A.    AT BONES RESTAURANT.

4    Q.    ALL RIGHT.  AND TELL ME WHY YOU WENT TO MEET HIM.

5    A.    OKAY.  WELL, BASED ON EVERYTHING I'VE JUST SAID, I'M SURE

6    YOU CAN THINK ABOUT WE WERE FREAKING OUT AT MY FIRM WHEN, WHEN

7    NAT CALLED ME AND SAID, I NEED TO TELL YOU SOMETHING.  I MEAN,

8    I HAD NO IDEA ANY OF THIS WAS -- I MEAN, ZERO IDEA.

9          BUT NOT ONLY THAT, IN REAL ESTATE, IN A TRANSACTION WHEN

10   YOU PUT DOWN EARNEST MONEY WHEN YOU'RE PURCHASING A HOUSE, YOU

11   KNOW, IT CAN BE ANYWHERE FROM LIKE A THOUSAND DOLLARS TO

12   $20,000 TO 50,000.  WELL, MHS WAS HOLDING -- THAT WAS ONE OF

13   THE OPTIONS THAT AGENTS COULD USE AS PART OF THIS RELATIONSHIP,

14   THAT THEY COULD PUT THEIR -- THE CLIENT COULD PUT THEIR TRUST

15   FUNDS WITH MHS.

16         SO OUR QUICKEST CALCULATION IS THAT WE HAD OVER $850,000

17   THERE, JUST DEPENDING ON THE CLOSINGS.  IT COULD HAVE BEEN OVER

18   A MILLION.  SO, OF COURSE, I MEAN, I HAD AN INSTANT MELTDOWN

19   OF, YOU KNOW, I NEED TO JUST THINK, THINK, THINK, THINK, THINK.

20   YOU KNOW.  I MEAN, JUST -- BECAUSE WE HAVE TO DO SOMETHING

21   RIGHT NOW BECAUSE OUR CLIENTS WERE AT RISK.

22   Q.    ALL RIGHT.  DID YOU GO MEET WITH --

23   A.    AND THAT IS WHY -- THAT WAS -- WELL, AND IT WAS SOMEWHAT

24   OF A SURPRISE TO ME THAT NAT SAID -- HE CALLED ME ON THE PHONE,

25   AND IT WAS IN THE MORNING.  I WAS AT HOME DEPOT PARKING LOT.  I

1    STILL REMEMBER.

2         AND I GO, HEY, WHAT ARE YOU DOING?  HE GOES, I GOT TO TELL

3    YOU SOMETHING, AND YOU'RE NOT GOING TO LIKE IT.  YOU KNOW,

4    THERE'S A MATTER WITHIN MHS THAT I NEED TO TALK TO YOU BECAUSE

5    I NEED YOU TO STAY WITH THEM.  AND I GO, HOW CAN YOU NOT -- I

6    MEAN --

7    Q.   HE ASKED YOU TO STAY WITH THEM?

8    A.   OH, MY GOSH, YES.  I MEAN --

9    Q.   NOW, I WANT TO MOVE TO YOUR CONVERSATION WITH

10   MR. WITTSTADT.

11   A.   OKAY.  GO AHEAD.

12   Q.   JUST TELL US GENERALLY ABOUT THAT CONVERSATION, WHAT YOU

13   SAID TO HIM, WHAT HE SAID TO YOU.

14   A.   SO MARK AND I MET AT BONES.  AND WE -- WHEN HE -- I MEAN,

15   WE HAD JUST MET, YOU KNOW, FOR THE FIRST TIME.  AND I SAID I

16   WAS SURPRISED THAT NOBODY FROM THERE CALLED ME.  JUST BEING A

17   LARGE CLIENT AND HAVING THAT MUCH -- YOU KNOW, THAT MANY CLIENT

18   FUNDS THERE, YOU KNOW, SURELY SOMEBODY WOULD KNOW I'M

19   CONCERNED.

20        AND HE SAID, WELL, YOU KNOW WHAT, WE HAVE A LOT OF PEOPLE

21   TO CALL RIGHT NOW.  AND I SAID, I'M SURE YOU DO.

22        I'M SURE HE WAS MELTING DOWN, TOO, YOU KNOW, JUST FROM ALL

23   THE HAPPENINGS.

24   Q.   WAS HE USING PROFANITY?

25   A.   HE WAS.  HE WAS DROPPING THE F BOMB A LOT.  AND I KNOW

1    HE'S FROM THE NORTHEAST.

2    Q.   WAS THAT YOUR FIRST MEETING?

3    A.   YES.

4         I KNOW.  YES.  SORRY ABOUT THAT.  BUT, YEAH, IT -- YES.

5              THE COURT:  WE'LL GET HIM LATER.  DON'T WORRY.  WE'LL

6    GET HIM LATER.

7              THE WITNESS:  OKAY.  I'M SORRY.  YES.  OKAY.

8    Q.   (BY MR. GARLAND)  AND WHAT DID YOU TELL HIM?  DID YOU GIVE

9    HIM ANY ADVICE?

10   A.   WELL, AT THE END OF OUR MEETING, I JUST SAID, I JUST SAID,

11   LISTEN, JUST AS A FRIENDLY PIECE OF ADVICE, IN THE SOUTH, YOU

12   PROBABLY WANT TO LET -- ESPECIALLY FEMALE, BUT YOU WANT TO LET

13   US DROP THE F BOMB BEFORE YOU DO.  JUST BECAUSE IT, YOU KNOW,

14   BECAUSE, I SAID, YOU'RE JUST DOING THAT A LOT, AND I CAN'T HEAR

15   THE OTHER THINGS YOU'RE SAYING, YOU KNOW.

16   Q.   YOU WERE THE HEAD OF YOUR COMPANY AT THAT TIME, AND THIS

17   WAS YOUR FIRST MEETING WITH THE NEW --

18   A.   RIGHT.  WELL, AND MY CONCERN, AND MY CONCERN, OF COURSE,

19   WAS THAT HE WAS -- WAS HE SUPPOSED TO REPLACE NAT?  I MEAN --

20   Q.   WHAT DID YOU ADVISE HIM, WHAT DID YOU ADVISE HIM ABOUT

21   WHAT WOULD HAPPEN IF -- IF YOU --

22   A.    I BELIEVE --

23             THE COURT:  I'M SORRY.  JUST LET HIM GO AHEAD AND ASK

24   THE QUESTION.  IT'S OKAY.  JUST MADAM COURT REPORTER CAN ONLY

25   TAKE DOWN ONE OF YOU AT A TIME.

1            THE WITNESS:  I'M SORRY.

2            THE COURT:  IT'S OKAY.

3   Q.   (BY MR. GARLAND)   WHAT DID YOU ADVISE HIM WOULD HAPPEN IF

4   WHAT HE WAS SAYING TO YOU IN PRIVATE WAS MADE PUBLIC?

5   A.   I SAID SPECIFICALLY THAT IF HE -- IF ANY OF THIS CAME OUT,

6   THAT WE WOULD HAVE TO LEAVE THE FIRM WITHIN AN HOUR.  BECAUSE

7   WE CAN'T -- I MEAN, SOLID SOURCE CAN'T TOLERATE THIS PUBLICITY.

8   SOLID SOURCE IS HERE BECAUSE OF NAT.  OUR EARNEST MONEY IS

9   HERE.  AND I WAS SUGGESTING OPTIONS THAT INCLUDED REVERSING

10  SOMETHING THAT HAD HAPPENED THAT HAD NOTHING TO DO WITH

11  ANYTHING GOING PUBLIC.

12       BECAUSE IF OUR FIRM STAYED -- I MEAN, YOU HAVE TO

13  UNDERSTAND, I DIDN'T WANT IT TO LEAVE EITHER.  I MEAN, I DIDN'T

14  WANT IT TO LEAVE BECAUSE, THINK ABOUT THE WHOLE MELTDOWN AND

15  ALL OF THAT THAT HAPPENS.  AND IT MAKES MY LEADERSHIP LOOK

16  SHAKY AND EVERYTHING.  SO I WANTED TO HELP MARK KEEP IT

17  TOGETHER.  AND THAT'S WHAT I WAS SAYING TO HIM.

18  Q.   DID YOU ADVISE HIM NOT TO GO PUBLIC?

19  A.   I SPECIFICALLY SAID, DO NOT GO PUBLIC.

20  Q.   AND WHAT DID YOU TELL HIM WOULD HAPPEN IF HE MADE THE

21  ACCUSATIONS IN --

22  A.   I SAID, IF IT GOES PUBLIC, OUR FIRM, SOLID SOURCE REALTY,

23  WILL LEAVE WITHIN AN HOUR.  AND HE DIDN'T EVEN CALL ME WHEN IT

24  DID GO PUBLIC.  AND THEN I CALLED WEISSMAN ATTORNEYS WITHIN AN

25  HOUR.

1   Q.   AND YOU --

2   A.   AND I MEANT IT.

3   Q.   -- CHANGED?

4   A.   WITHIN --

5   Q.   DID YOU TELL HIM WHAT EFFECT GOING PUBLIC WOULD HAVE ON

6   HIS LAW FIRM?

7   A.   I SPECIFICALLY DID.

8   Q.   WHAT DID YOU TELL HIM THE EFFECT WOULD BE?

9   A.   WELL, I SAID THAT WE WOULD LEAVE.  BUT THERE'S NO

10  WAY THAT -- THAT THE ONLY CLIENTS I KNEW, WHO WERE BUILDERS,

11  ET CETERA, THAT I'VE MET THROUGH THE YEARS WITH NAT -- NAT IS

12  THE FACE OF THE FIRM.  I MEAN, NAT IS THE FACE OF THE FIRM.

13  WHY NOT PUT HIM IN A -- IF YOU WANT TO PUNISH HIM, PUT HIM IN A

14  BROOM CLOSET AND MAKE THAT HIS CLOSET AND PAY HIM SOMETHING

15  JUST TO SIT THERE AND TALK TO PEOPLE ON THE PHONE.

16       BUT DON'T LET HIM GO.  BECAUSE IF HE GOES, IT'S GOING TO

17  BE A MELTDOWN.  IT WOULD BE A NUCLEAR MELTDOWN.  AND IT WILL

18  ALL GO.  I MEAN, JUST AS FAR AS I KNEW.  I MEAN, I DON'T KNOW

19  ALL THEIR BUSINESS, OF COURSE, BUT JUST AS FAR AS MY BUSINESS

20  WITH THEM.

21  Q.   NOW, THE MAN YOU KNOW, THAT YOU'VE WRITTEN ABOUT IN THE

22  LETTERS, YOU WROTE ONE OF THOSE LETTERS BACK -- IT WAS AN

23  ATTACHMENT --

24  A.   UH-HUH.

25  Q.   -- IN 2004?

1  A.   RIGHT.

2  Q.   DID YOUR FEELINGS BASED ON -- DID YOU HAVE A LOT OF

3  PERSONAL CONTACT WITH HIM OVER A PERIOD OF TIME, A LOT OF

4  PERSONAL CONTACT WHERE YOU WOULD TALK TO HIM?

5  A.   YOU MEAN PERSONAL OUTSIDE OF BUSINESS OR JUST --

6  Q.   WELL, OTHER THAN BUSINESS.

7  A.   RIGHT.  WELL, I MEAN, YOU KNOW WHAT, WE WOULD SPEND -- WE

8  HAVE ONE OTHER FRIEND, KELLY, THAT WE WOULD SPEND ALL OF OUR

9  BIRTHDAYS -- HER BIRTHDAY IS A WEEK FROM MINE, SO -- AND HIS

10 BIRTHDAY IS SEPTEMBER 25.  WE WOULD ALL SPEND BIRTHDAYS

11 TOGETHER EVERY YEAR.  BUT, NO.  OUTSIDE THAT, LIKE, WE'VE NEVER

12 HUNG OUT, WE'VE NEVER HAD AN ALCOHOLIC BEVERAGE TOGETHER.  I

13 MEAN, WE DIDN'T HAVE THAT KIND OF --

14 Q.   WAS THERE ANY KIND OF ROMANTIC --

15 A.   OH, MY GOD, NO, NO, NO.  I MEAN, NO OFFENSE.

16 Q.   AND BACK IN 2004, YOU DESCRIBED WHAT KIND OF PERSON HE WAS

17 IN THE LETTER GIVEN TO THE JUDGE --

18 A.   I WROTE THAT TO HIM.

19 Q.   RIGHT, BECAUSE OF HIS EXTRAORDINARY EFFORTS.

20      NOW, IN TERMS OF WHAT YOU SAW HIM DO FOR HIS FIRM, WHAT

21 WAS HIS ROLE, AS YOU UNDERSTOOD IT, INSOFAR AS MARKETING THE

22 FIRM?

23 A.   I MEAN, I DIDN'T WORK THERE.  I MEAN, I'M JUST THE

24 RECEIVER, RIGHT?

25 Q.   JUST WHAT YOU SAW.

1    A.    SO TO ME, HE WAS MORRIS HARDWICK SCHNEIDER.  I MEAN, HE

2    WAS THE PERSON -- YOU KNOW, HE HAD AUTHORITY TO FIX THINGS.  I

3    MEAN, THAT'S WHAT HE DID.  HE FIXED THINGS.  HE CREATED THINGS.

4    HE TALKED TO PEOPLE.  HE ATTRACTED PEOPLE TO OUR FIRM.  HE TOLD

5    PEOPLE, SOLID SOURCE IS GREAT, TOLD THEM THE REASONS THAT HE

6    CHOSE -- THAT HE THINKS SOLID SOURCE IS GREAT, THINGS THAT HE

7    THINKS SEPARATE OUR FIRM FROM OTHER FIRMS, WHAT MORRIS HARDWICK

8    SCHNEIDER WOULD DO FOR OUR AGENTS VERSUS WHAT, YOU KNOW,

9    JUST -- I MEAN, IT JUST MADE A HUGE DIFFERENCE, YOU KNOW, JUST

10   EVEN THAT THEY ARE AVAILABLE.

11   Q.    IS IT YOUR OPINION THAT THE TRUE NAT HARDWICK THAT YOU

12   KNOW IS A GOOD MAN?

13   A.    ABSOLUTELY.  I WROTE AN E-MAIL TO GLADYS LINK IN YOUR

14   STACK.

15   Q.    ALL RIGHT.

16   A.    THIS IS A GOOD EXAMPLE.  ON FRIDAY, JUNE 27, 2014 --

17   Q.    LET ME MARK THAT AS AN EXHIBIT.

18   A.    OKAY.  AND THIS IS ONE OF -- THERE ARE SO MANY OF THESE.

19   THERE ARE SO MANY OF THESE.  LIKE I SAY, I WAS CONTACTED AT THE

20   END OF LAST WEEK, SO I JUST -- THESE ARE THINGS I COULD FIND

21   QUICKLY THAT WOULD REPRESENT WHAT I'M SAYING, OR VALIDATE IT.

22   IT'S THIS ONE.

23   Q.    I'M GOING TO SHOW YOU WHAT HAS BEEN MARKED AS DEFENDANT'S

24   EXHIBIT --

25            THE COURT:  MARKED AS WHAT?

64

1           MR. GARLAND:  DEFENDANT'S SENTENCING 4.  MAY I?

2           THE COURT:  OKAY.

3           THE COURTROOM DEPUTY:  WE HAVE ANOTHER 4,

4    MR. GARLAND.  SHOULD IT BE 5?

5           MR. GARLAND:  WHAT IS THIS NEXT NUMBER HERE?

6           THE COURTROOM DEPUTY:  FIVE.

7           MR. GARLAND:  FIVE.  THANK YOU.  EXCUSE ME.

8           THE COURT:  I HAVE SOMETHING UP HERE THAT SAYS 5,

9    TOO.  YEAH, THIS ONE IS 5.

10           MR. GARLAND:  I'LL JUST MAKE IT 8 SO WE'RE --

11           THE COURT:  ALL RIGHT.  SO THIS IS DEFENDANT'S 8.

12   OKAY?

13           MR. GARLAND:  YES.  I JUST MADE IT 8.

14           THE COURT:  ALL RIGHT.

15   Q.   (BY MR. GARLAND)  WHAT -- WHY DID YOU WRITE THAT E-MAIL

16   BACK THEN?

17   A.   OKAY.  SO THIS IS JUST AN EXAMPLE.  OKAY.  I MEAN, DO YOU

18   WANT ME TO SAY ANYTHING ABOUT WHAT HE SAID?  I MEAN, THE REAL

19   EXAMPLE IS WHAT HE SAID.

20   Q.   GIVE US EXAMPLE OF --

21   A.   OKAY.  RIGHT.  THIS IS AN EXAMPLE OF MHS DROPPING THE BALL

22   ON 20 SOLID SOURCE AGENTS GETTING PAID, OKAY, FROM A CLOSING.

23   TWENTY.  ALL RIGHT.  AND, OF COURSE, NAT HARDWICK IS NOT DOING

24   THE CLOSINGS.  HOWEVER, WHEN -- AND REBECCA IS THE PRESIDENT OF

25   OUR FIRM.  SHE'S THE PERSON REFERENCED IN THERE.

1      AND SO THIS IS WHAT NAT DID.  SO INSTEAD OF REBECCA, THE

2   PRESIDENT OF OUR FIRM, HAVING TO FIND EACH ONE OF THE

3   ATTORNEYS, THE CLOSER OR WHOEVER DROPPED THE BALL ON THESE

4   20 SOLID SOURCE AGENTS GETTING PAID -- IN DIFFERENT OFFICES.

5   I MEAN, THEY WEREN'T ALL IN THE SAME OFFICE.  AND THAT'S WHAT

6   WE DID, IS WE WOULD -- SHE PROBABLY CALLED NAT.  NAT ANSWERED

7   THE PHONE, AND THEN THIS IS WHAT HE DID.  NOT ONLY DID HE FIX

8   IT AND GET THE PEOPLE PAID LIKE THAT, BUT HE ALSO ASKED HER AND

9   CALLED ALL 20 SOLID SOURCE AGENTS.

10      AND HE SAYS, OF THE 20 AGENTS I CALLED, ALL WERE AMAZING.

11   SIX DID NOT EVEN KNOW THERE WAS AN ISSUE.  ALL UNDERSTOOD AND

12   WILL CONTINUE TO USE MHS.  THE ONLY NUMBER INCORRECT WAS --

13   MICHELE AND REBECCA, I'M TRULY SORRY THIS HAPPENED.  IT WAS A

14   COMBO OF A FEW FACTORS.  BUT I CAN ASSURE YOU IT WON'T HAPPEN

15   AGAIN.  MISTAKES ARE MADE IN ALL ORGANIZATIONS, BUT I BELIEVE

16   IT IS HOW YOU TAKE RESPONSIBILITY AND HOW YOU FIX THESE

17   MISTAKES THAT MATTER.  THANK YOU FOR ALL YOU DO FOR US.  YOU

18   ARE APPRECIATED.  THANKS, NAT.

19      OKAY.  SO I WRITE BACK AND I SAY, THANK YOU, NAT -- I

20   MEAN, OF THE FIRM -- OKAY -- FOR TAKING THE TIME TO DO THIS.  I

21   AGREE THAT THE MARKETING IMPACT OF TAKING RESPONSIBILITY IS

22   SHOCKING THESE DAYS AS IT IS A RARITY.  I REALLY APPRECIATE YOU

23   CALLING THEM AND FOLLOWING UP.  HAVE A GREAT WEEKEND.

24   Q.   NOW, DO YOU HAVE -- DID YOU BECOME AWARE OF A TIME WHEN A

25   LAWSUIT WAS FILED AGAINST MR. HARDWICK ACCUSING HIM OF FRAUD

1    AND OTHER THINGS?

2    A.    I DID.

3    Q.    AND WHAT, IN YOUR OPINION, WAS THE EFFECT OF THAT ACT OF

4    GOING PUBLIC AND MAKING THOSE ACCUSATIONS ON THE LAW FIRM?

5    A.    WELL, I MEAN, I KNOW IN AT LEAST 200 CLOSINGS -- SO, YOU

6    KNOW, OVER 2,000 CLOSINGS A YEAR, THEY WENT AWAY IN AN HOUR.

7    Q.    AND DID YOU BECOME AWARE OF REACTIONS IN THE REAL ESTATE

8    COMMUNITY?

9    A.    OF COURSE.

10   Q.    AND DID IT HAVE A NEGATIVE IMPACT ON THE FIRM?

11   A.    EVIDENTLY.  I MEAN, I THINK THEY, YOU KNOW -- YOU KNOW,

12   THEY WERE STILL DOING SOME THINGS AFTER THAT.  AND THEY STILL

13   KEPT OUR EARNEST MONEY, BECAUSE WE CAN'T JUST MOVE IT.  YOU

14   WOULD HAVE TO HAVE ALL THE CLIENTS SIGN DOCUMENTS.  SO I KNEW

15   THAT THEY WERE STILL DOING THAT.

16        BUT FOR US, AS FAR AS PARTNERING AND REFERRING THEM AND

17   THEM BEING OUR ATTORNEY, YOU KNOW, WE COULDN'T WALK WITH THEM

18   THROUGH THAT.  I MEAN, AFTER MARK'S AND MY MEETING -- YOU KNOW,

19   RANDY AND ART WERE GONE.  I MEAN, WAS I SUPPOSED TO BE, YOU

20   KNOW, CONNECTING WITH MARK?  I MEAN, WAS MARK GOING TO DO THIS?

21   NO, IN MY OPINION.

22   Q.    AS YOU UNDERSTOOD NAT'S ROLE, HE GOT THE CLIENTS AND HE

23   HELPED KEEP THE CLIENTS?

24   A.    HE MAINTAINED THE BUSINESS, TOO.  I MEAN, HE ATTRACTED AND

25   MAINTAINED.

1  Q.   AND DID YOU -- HOW HARD, IN YOUR -- FROM WHAT YOU SAW, DID

2  HE WORK AT HIS ROLE?

3  A.   I MEAN, HE WORKED EXTREMELY HARD, AS FAR AS I KNOW.  I

4  MEAN, I DON'T WORK THERE.  SO, I MEAN, I DON'T WANT TO MAKE

5  STATEMENTS THAT I'M NOT SURE OF.  ALL I KNOW IS WHAT HE DID FOR

6  OUR FIRM IS -- I MEAN, LOOK AT THE GROWTH THAT WE -- I MEAN, I

7  LITERALLY MET NAT -- WITH NAT IN 2004, PARTNERED, AND WE WENT

8  FROM 50 TO 200 AGENTS BY THE END OF THE YEAR AND 800 BY THE END

9  OF THE NEXT YEAR.

10  Q.   AND WERE YOU CONCERNED WHEN YOU MET WITH MR. WITTSTADT, IF

11  HE MADE THOSE KIND OF ACCUSATIONS, WHAT EFFECT IT WOULD HAVE ON

12  YOU AS A LONG-TIME CLIENT?

13  A.   THERE'S NO WAY THAT MARK WOULD EVER STAND IN FRONT OF MY

14  AGENTS.

15          MR. GARLAND:  ALL RIGHT.

16          THAT'S ALL WE HAVE OF THIS WITNESS.

17          THE COURT:  ALL RIGHT.  ANY CROSS-EXAMINATION?

18          MS. BARRON:  YES, YOUR HONOR.

19          THE COURT:  ALL RIGHT.

20                      CROSS-EXAMINATION

21  BY MS. BARRON:

22  Q.   GOOD MORNING, MS. VELCHECK.

23  A.   GOOD MORNING.

24  Q.   MY NAME IS LYNSEY BARRON.  I WORK FOR THE U.S. ATTORNEY'S

25  OFFICE.

1      I WANT TO TALK ABOUT THE COMPANY THAT SOLID SOURCE FORMED

2   WITH MHS.  THAT WAS CALLED CREDENCE, WASN'T IT?

3   A.   IT WAS.

4   Q.   AND IT WAS YOUR UNDERSTANDING THAT CREDENCE WAS A JOINT

5   VENTURE BETWEEN YOUR COMPANY AND BETWEEN THE LAW FIRM AT ALL

6   TIMES, WASN'T IT?

7   A.   I HAVE NO IDEA.  LET THE -- THEIR FIRM, FRED BOYNTON IS

8   THE PERSON THAT DID THAT.  I'M NOT AN ATTORNEY, SO I'M NOT SURE

9   EXACTLY WHAT THAT MEANS.  FOR REAL ESTATE COMPANIES THAT

10  PARTNER WITH ATTORNEY FIRMS, WE JUST SIGN A DOCUMENT.

11      SO TO BE HONEST WITH YOU, I'M NOT -- THEY WERE -- I

12  TRUSTED THEM WITH EVERYTHING I HAD.  SO I JUST -- I WILL BE

13  HONEST WITH YOU AND TELL YOU, I DIDN'T PREPARE OR READ THAT

14  DOCUMENT NOW.  AND EVEN WHEN WE DID IT, THEY REPRESENTED TO US

15  ON EVERYTHING.  SO I'M SURE I JUST SIGNED IT.

16  Q.   OKAY.  I'M GOING TO ASK THE QUESTION --

17  A.   YEAH.  WOULD YOU?  YES.  I'M SORRY.  BECAUSE, LIKE, WHEN

18  YOU'RE SAYING --

19  Q.   I'M NOT TALKING ABOUT THE LEGAL DOCUMENTS.  I'M TALKING --

20  A.   ALL RIGHT.  OKAY.  I'M SORRY.  I JUST DON'T WANT TO SAY

21  ANYTHING I'M NOT SURE OF.

22  Q.   I'M SORRY.  I'M JUST TALKING ABOUT WHAT YOUR UNDERSTANDING

23  WAS.

24  A.   OKAY.

25  Q.   WAS IT YOUR UNDERSTANDING THAT YOU WERE IN A JOINT VENTURE

1   WITH MHS?

2   A.   RIGHT.

3   Q.   OKAY.  AND DID THERE COME A -- WELL, THERE DID COME A TIME

4   WHERE MR. HARDWICK APPROACHED YOU ABOUT CHANGING THE JOINT

5   VENTURE SO THAT IT WOULD BE BETWEEN YOUR COMPANY, SOLID SOURCE,

6   AND A COMPANY CALLED DIVOT HOLDING.  DO YOU RECALL THAT?

7   A.   THAT IS NOT WHAT HAPPENED.

8   Q.   DO YOU RECALL MEETING WITH SPECIAL AGENT --

9   A.   I DO.  AND THEY'RE VERY AWARE --

10          THE COURT:  HOLD ON.  LET HER GO AHEAD AND ASK THE

11   QUESTION SO WE HAVE A COMPLETE RECORD.

12          THE WITNESS:  I'M SORRY.

13          THE COURT:  IT'S OKAY.

14          THE WITNESS:  THANK YOU.

15   Q.   (BY MS. BARRON)  DO YOU RECALL MEETING WITH SPECIAL

16   AGENT --

17   A.   I DO.

18          THE COURT:  OKAY.  ONE MORE TIME.  LET HER GO AHEAD

19   AND TELL US WHO YOU MET WITH, EVEN.  YOU KNOW ALREADY, BUT LET

20   US HEAR WHERE SHE'S GOING.  SO LET HER ASK HER WHOLE QUESTION.

21          THE WITNESS:  OKAY.

22          THE COURT:  GO AHEAD.

23          MS. BARRON:  THANK YOU, YOUR HONOR.

24   Q.   (BY MS. BARRON)  YOU MET WITH SPECIAL AGENT CHIP CROMER ON

25   SEVERAL OCCASIONS, DIDN'T YOU?

1  A.   NO.

2  Q.   YOU DIDN'T MEET WITH HIM IN 2016 TWICE AND THEN AGAIN IN

3  2015?

4  A.   WE ONLY MET ONE TIME WITH MY ATTORNEY.

5  Q.   WELL, YOU HAD CONVERSATIONS WITH HIM?

6  A.   I TALKED TO HIM ON THE PHONE.

7  Q.   OKAY.  SO YOU HAD MORE THAN ONE CONVERSATION WITH SPECIAL

8  AGENT CROMER?

9  A.   WE TALKED ON THE PHONE ABOUT MEETING, AND THEN WE MET.

10 AND THEN WE HAD A FOLLOW-UP MEETING ON THE PHONE.

11 Q.   AND YOU DISCUSSED WITH SPECIAL AGENT CROMER THE NATURE OF

12 THE AGREEMENT BETWEEN SOLID SOURCE AND MHS TO FORM THIS JOINT

13 VENTURE, DIDN'T YOU?

14 A.   AND BROUGHT DOCUMENTATION.

15 Q.   CORRECT.  AND YOU TOLD SPECIAL AGENT CROMER THAT AT SOME

16 POINT MR. HARDWICK, THROUGH MR. BOYNTON, PROPOSED THAT THE

17 JOINT VENTURE BE BETWEEN SOLID SOURCE AND A COMPANY CALLED

18 DIVOT HOLDING?

19 A.   AND THAT'S WHAT I WAS SAYING, IS THAT IS NOT THE WAY THAT

20 IT HAPPENED.  AND THAT DID HAPPEN DURING IT, BUT THE REASON --

21 IS THIS A GOOD TIME FOR ME TO -- OKAY.

22      OKAY.  SO OUR JOINT VENTURE WAS BETWEEN SOLID SOURCE

23 REALTY AND WHATEVER THEIRS WAS, MHS.  OR A LOT OF TIMES WHEN

24 PEOPLE HAVE JOINT VENTURES, THEY HAVE HOLDING COMPANIES THAT

25 HAVE JOINT VENTURES.  WE HAVE SEVERAL.  AND SO THERE'S MANY

1    HOLDING COMPANIES.  JUST, YOU KNOW, IF SOMEBODY HAS RIGHTS TO

2    DO THAT, JUST -- A LOT OF TIMES THERE'S TAX BENEFITS AND, QUITE

3    FRANKLY, IT AVOIDS PIERCING THE CORPORATE VEIL IF THERE ARE

4    SEVERAL COMPANIES USING THE SAME JOINT VENTURE.

5         SO AT FIRST WE WERE ONLY ONE COMPANY, SOLID SOURCE REALTY.

6    AND SO THAT'S WHEN IT WAS FORMED.  AND THEN WE -- IN 2008, WE

7    PROBABLY ALL REMEMBER, REGARDLESS OF YOUR ROLE -- EVEN AS A

8    HOME BUYER, SELLER -- REMEMBER THE RECESSION.  AND SO A LOT OF

9    REAL ESTATE AGENTS COULD NOT PAY BOARD DUES.  AND THE BOARD

10   DUES ARE AROUND $450.

11        AND SO BECAUSE OF THAT, THEY WERE GOING TO LEAVE OUR FIRM

12   AND OTHER FIRMS TO JOIN THESE POP-UP FIRMS THAT DID NOT REQUIRE

13   BOARD MEMBERSHIP.  AND THE WAY THAT BOARD MEMBERSHIP WORKS IN

14   GEORGIA IS THAT YOU'RE EITHER ALL BOARD MEMBERS OR NO BOARD

15   MEMBERS.  SO THEY DIDN'T HAVE A CHOICE.

16        SO SOLID SOURCE, SO NOT TO LOSE THESE AGENTS, OPENED

17   ANOTHER FIRM CALLED SOLID SOURCE REALTY GEORGIA, WHICH I STILL

18   OWN.  OKAY.  I MEAN, IT WAS THE SAME OWNERSHIP, BUT I OPENED

19   ANOTHER FIRM SO THAT THESE AGENTS THAT DID NOT WANT TO DO --

20   WANT TO PAY THE BOARD DUES, SO THAT THEY WOULDN'T LEAVE OUR

21   SOLID SOURCE FAMILY.  THEY WOULD BE ABLE TO MOVE TO THIS

22   NON-BOARD FIRM, AT WHICH POINT OUR AFFILIATED BUSINESS

23   ARRANGEMENT DISCLOSURE BECAME -- IT DID NOT ENCOMPASS SOLID

24   SOURCE REALTY GEORGIA.  IT WAS BETWEEN SOLID SOURCE REALTY AND

25   WHATEVER THEIR ENTITY WAS THAT HELD THEIRS.  SO, I MEAN, OUR

1    PART WAS SOLID SOURCE REALTY.

2         BUT, SO I SAID, LISTEN, YOU KNOW, SOLID SOURCE REALTY

3    GEORGIA IS NOW A PART OF THIS.  AND IT'S NOT IN THE -- IT'S NOT

4    IN THE ABAD, AFFILIATED BUSINESS ARRANGEMENT DISCLOSURE, THAT

5    ALL CLIENTS HAVE TO SIGN.  BUT EVEN IF WE CHANGE THE AFFILIATED

6    BUSINESS ARRANGEMENT DISCLOSURE, THEN WE'RE PIERCING THE

7    CORPORATE VEIL IN AN ACCOUNTING FUNCTION FOR SOLID SOURCE

8    REALTY TO GET PAID ON CLOSINGS THAT SOLID SOURCE REALTY GEORGIA

9    DID, BECAUSE THEY ARE TWO SEPARATE ENTITIES IN EVERYTHING.  I

10   MEAN, THEY FILE DIFFERENT TAX RETURNS, THEY HAVE DIFFERENT TAX

11   I.D.'S.

12        SO I SAID THAT I AM GOING TO CHANGE MINE, YOU KNOW, MY

13   50 PERCENT TO A DIFFERENT ENTITY THAT BOTH OF THEM COULD BE

14   REFERENCED IN THE ABAD.  SO MY PART HAD TO CHANGE.  SO THAT IS

15   HOW WE STARTED.

16   Q.   AND MR. HARDWICK CHANGED HIS PART TO DIVOT HOLDING

17   COMPANY, DIDN'T HE?

18   A.   AS FAR AS I KNOW.  I MEAN, I DON'T KNOW HIS PART.

19   Q.   AND DID HE DISCLOSE TO YOU THAT DIVOT HOLDING COMPANY WAS

20   NOT AFFILIATED WITH MHS AT ALL, BUT IT WAS HIS OWN PERSONAL --

21   AND I'LL USE YOUR WORD -- ALTER EGO COMPANY?  DID HE EVER

22   DISCLOSE THAT TO YOU?

23   A.   DID YOU SAY ALTER EGO?

24   Q.   YES, MA'AM.

25   A.   DIVOT WAS HIS DOG.  NO, IT WAS.  IT WAS HIS DOG.

73

1   Q.   DID HE DISCLOSE TO YOU THAT HE HAD A COMPANY CALLED DIVOT

2   HOLDING COMPANY?

3   A.   YES, MA'AM.  I'M SORRY.  I JUST DIDN'T KNOW ABOUT THE

4   ALTER EGO PART.

5   Q.   OKAY.  DID HE DISCLOSE TO YOU THAT HE HAD A COMPANY

6   PERHAPS THAT HE NAMED AFTER HIS DOG?

7   A.   HE DID SAY THAT HE NAMED IT AFTER HIS DOG.

8   Q.   OKAY.  AND DID HE DISCLOSE TO YOU THAT DIVOT HOLDING

9   COMPANY WAS NOT AFFILIATED WITH MHS IN ANY WAY?

10  A.   I DIDN'T THINK THAT IT WAS, BUT WE NEVER REALLY TALKED

11  ABOUT THAT, BECAUSE THAT'S NOT REALLY WHAT WE TALKED ABOUT.

12  Q.   OKAY.  YOU DISCUSSED WITH MR. GARLAND THINGS LIKE

13  MR. HARDWICK GIVING OUT HIS PERSONAL PHONE NUMBER ON THE STAGE

14  OF THE FOX THEATRE.  HE WAS RESPONSIVE, WASN'T HE?

15  A.   EXTREMELY RESPONSIVE.

16  Q.   HE WAS AVAILABLE WHEN PEOPLE NEEDED HIM?

17  A.   YES, MA'AM.

18  Q.   AND DURING THIS TIME WHEN YOU WERE WORKING WITH HIM,

19  BETWEEN 2011, 2014, YOU HAD NO IDEA THAT HE WAS STEALING

20  MILLIONS OF DOLLARS FROM HIS LAW FIRM, DID YOU?

21  A.   I HAVE NO IDEA OF ANY SIDE OF THIS.  THAT'S PROBABLY WHY I

22  WASN'T IN THE COURTROOM PART, BECAUSE I JUST DIDN'T -- I MEAN,

23  WE'RE WAY OVER HERE DOING REAL ESTATE TRANSACTIONS.  WE DO

24  5,000-PLUS TRANSACTIONS A YEAR.  I DON'T KNOW WHAT WAS GOING ON

25  IN THE LAW FIRM.

1   Q.   OKAY.  AND YOU HAVE NO IDEA THAT HE WAS LYING TO HIS

2   PARTNERS ABOUT HOW MUCH MONEY HE WAS TAKING?

3   A.   OF COURSE.  I DON'T EVEN KNOW ANYTHING.  I DON'T KNOW

4   ANYTHING ABOUT ANY OF THIS.  I THINK I WAS JUST BEING BROUGHT

5   IN TO SAY WHAT HE DID FOR OUR FIRM.  SO I'M NOT TRYING TO

6   CHALLENGE YOU.  I JUST REALLY DON'T KNOW.

7   Q.   BUT THE POINT IS YOU DIDN'T KNOW THAT HE --

8   A.   NO, I DEFINITELY DIDN'T KNOW.

9   Q.   BUT YOU DO KNOW THAT HE LIED TO YOU, DON'T YOU?

10  A.   REGARDING?

11  Q.   AUGUST 2014, MR. HARDWICK APPROACHED YOU ABOUT A LOAN,

12  DIDN'T HE?  ABOUT BORROWING A $500,000 LOAN FROM YOUR COMPANY?

13  A.   I DON'T THINK IT WAS '14.

14  Q.   WHAT YEAR WAS IT?

15  A.   I DON'T KNOW.  I DIDN'T KNOW I WAS GOING TO BE QUESTIONED.

16  I THOUGHT I WAS JUST BEING A CHARACTER WITNESS.  I'M SORRY.  I

17  WOULDN'T KNOW.  BUT I HAVE NO WAY OF KNOWING.  I THINK YOU GUYS

18  SHOWED ME A CHECK.  I DON'T KNOW.

19  Q.   OKAY.

20  A.   I'M SORRY.

21  Q.   I APOLOGIZE.  DO YOU RECALL TELLING SPECIAL AGENT CHIP

22  CROMER THAT MR. HARDWICK APPROACHED YOU IN AUGUST 2014 ASKING

23  TO BORROW $500,000 BECAUSE MHS WAS OWED ABOUT A MILLION DOLLARS

24  IN BACK TAXES?  DO YOU RECALL THAT?

25  A.   OH, NO, NO, NO, NO, NO, NO, NO.  NO, NO.  NO, NO.  NUMBER

1   ONE, IT WAS NOT -- THEY SHOWED ME A CHECK THAT THAT -- OR

2   WHATEVER, THAT I HAD DONE.  BUT I DON'T EVEN THINK IT WAS 500.

3   I THINK IT WAS 300-AND-SOME.  BUT IT WAS BEFORE THAT.  THAT

4   WAS -- I'M SORRY.  I'M SORRY.  BUT, NO, IT WASN'T ABOUT ANY

5   KIND OF BACK TAXES AT MHS OR ANYTHING.  THIS WAS ABOUT A

6   DIVORCE.

7   Q.   I APOLOGIZE.  I MAY BE CONFUSING YOU BECAUSE THERE ARE --

8   A.   I'M SORRY.  I WAS GOING TO SAY, WAIT, WAIT.  OKAY.

9   Q.   LET'S GO TO 2010.

10  A.   OKAY.  YES.  THAT -- RIGHT.

11  Q.   IN 2010, MR. HARDWICK APPROACHES YOU AND ASKS TO BORROW

12  ROUGHLY $200,000?

13  A.   WHATEVER IT WAS, YES.

14  Q.   AND HE SAYS THAT IT'S BECAUSE THAT HE HAS TO PAY A LOT OF

15  MONEY IN ALIMONY BECAUSE OF HIS DIVORCE?

16  A.   GOING THROUGH A DIVORCE, RIGHT.

17  Q.   OKAY.  AND IT TOOK HIM A WHILE TO PAY THAT MONEY BACK,

18  CORRECT?

19  A.   RIGHT.

20  Q.   BUT HE ULTIMATELY DID IN 2011?

21  A.   HE DID.  HE DID.

22  Q.   OKAY.  FAST-FORWARD A FEW MORE YEARS.

23  A.   OKAY.

24  Q.   IN AUGUST 2014, HE TOLD YOU THAT MHS LAW OWED ABOUT A

25  MILLION DOLLARS IN BACK TAXES, AND HE ASKED TO TAKE OUT A

1  $500,000 LOAN?

2  A.   I DON'T REMEMBER THAT.  AND I'M NOT SAYING IT DIDN'T

3  HAPPEN.  I JUST DID NOT LOOK OVER -- ARE WE SAYING HE SAID THAT

4  TO ME IN PERSON OR ON THE PHONE?

5  Q.   MS. VELCHECK, DID YOU --

6  A.   I DO NOT REMEMBER --

7  Q.   -- OR DID YOU NOT TELL SPECIAL AGENT CROMER THAT YOU --

8  A.   THAT WAS FOUR YEARS AGO.  I MEAN, A LOT'S HAPPENED IN FOUR

9  YEARS.  AND I'M SORRY THAT I DON'T REMEMBER THE DETAILS, BUT I

10  DO APOLOGIZE FOR THAT.

11  Q.   MS. VELCHECK, YOU REMEMBER WITH PRECISION THINGS THAT

12  HAPPENED IN 2004.

13  A.   THAT WAS DEVASTATING MY FIRM.  I MEAN, IT WAS DEVASTATING

14  MY FIRM.  I MET WITH HIM -- WAS IT TWO YEARS AFTER THIS

15  HAPPENED, OR A YEAR AND A HALF AFTER IT HAPPENED?  I REMEMBER

16  THAT MEETING WITH MARK WITTSTADT WITH PRECISION BECAUSE I WAS

17  DEVASTATED.

18  Q.   LET'S TALK ABOUT THAT MEETING.

19  A.   OKAY.

20  Q.   YOU TALKED WITH MR. GARLAND ABOUT HOW YOU TOLD

21  MR. WITTSTADT, DON'T MAKE THIS GO PUBLIC BECAUSE IT'S GOING

22  TO -- WE'RE GOING TO STOP GIVING YOU OUR BUSINESS AND IT'S

23  GOING TO DEVASTATE THE LAW FIRM.

24  A.   WELL, I DIDN'T TELL HIM NOT TO.  WE WERE BOTH DISCUSSING

25  OUR OPINIONS ABOUT THINGS THAT COULD HAPPEN.  HE SAID THAT

77

1    THERE WERE SEVERAL BUYERS, YOU KNOW, THAT HE WAS LOOKING AT,

2    ET CETERA.  AND I TOLD YOU WHAT MY SUGGESTION WAS, IS, EVEN IF

3    HE JUST GOT PAID $50,000 IN A BROOM CLOSET, WHY NOT JUST KEEP

4    HIM THERE TO HELP MAKE THE MONEY BACK.  I WASN'T TELLING HIM

5    WHAT TO DO.  I WAS TRYING TO HELP.

6    Q.   AND THAT'S BECAUSE IT'S YOUR OPINION THAT MR. HARDWICK WAS

7    CRITICAL TO THE FIRM'S SUCCESS, RIGHT?

8    A.   IT WAS MY OPINION THAT MY -- THAT IF -- I WOULD HAVE NO

9    IDEA IF HE WAS CRITICAL TO THE FIRM'S SUCCESS.  ALL I KNOW IS

10   WHO HE WAS TO MY FIRM, MY LITTLE TINY PIECE OF WHAT THEY DO.

11   I JUST KNOW THAT HE WAS CRITICAL TO MY FIRM.  THAT IF THIS WENT

12   PUBLIC, THE THINGS THAT MARK WAS TELLING ME -- BECAUSE, OF

13   COURSE, I HAD NO IDEA ANYTHING -- I MEAN, IT WAS JUST MARK

14   TELLING ME.

15        AND I SAID, WELL, I MEAN, YOU CAN'T -- I MEAN, YOU CAN'T

16   PURSUE THIS LIKE IN THE NEWSPAPER, CAN YOU?  I MEAN, JUST --

17   WHAT'S YOUR PLAN?  AND THAT WAS -- RIGHT.

18   Q.   LET'S TALK ABOUT THIS GOING PUBLIC.  YOU'RE AWARE, AREN'T

19   YOU, THAT WITHIN A COUPLE OF MONTHS OF HAVING THAT CONVERSATION

20   WITH MR. WITTSTADT, THAT THE GOLFER DUSTIN JOHNSON SUED

21   MR. HARDWICK AND MR. WITTSTADT AND THE LAW FIRM?  YOU'RE AWARE

22   OF THAT PUBLIC LAWSUIT, AREN'T YOU?

23   A.   I KNEW THAT THEY -- THAT THAT HAPPENED, BECAUSE I MOVED IN

24   NEXT TO ART MORRIS AND I AM NOW HIS NEIGHBOR.  SO WE TALKED

25   ABOUT IT.

1  Q.   YOU KNOW THAT THAT PUBLIC THING HAPPENED JUST A COUPLE OF

2  MONTHS AFTER YOUR CONVERSATION WITH MR. WITTSTADT, RIGHT?

3  A.   I DIDN'T KNOW WHEN IT HAPPENED BECAUSE I WASN'T FOLLOWING

4  IT, BUT I DID FIND OUT LATER FROM ART.

5  Q.   AND YOU ALSO KNOW THAT MR. JIM PRITCHARD ALSO FILED A

6  PUBLIC LAWSUIT IN FULTON COUNTY NAMING MR. HARDWICK AND THE LAW

7  FIRM, CORRECT?

8  A.   NO, I DO NOT.  I DON'T KNOW WHO JIM PRITCHARD IS.

9  Q.   WELL, YOU'RE AWARE THAT THE UNITED STATES GOVERNMENT

10  BROUGHT THIS PROSECUTION --

11  A.   I AM AWARE OF THAT.

12  Q.   -- IN A PUBLIC PROCEEDING?

13      YOU'RE AWARE THAT FIDELITY ACTUALLY STEPPED IN AND HELPED

14  FILL THE GAP IN THE ESCROW ACCOUNT, CORRECT?

15  A.   THIS IS THE VERY FIRST DAY THAT I HAVE HEARD THE THINGS

16  THAT I JUST HEARD IN THIS COURTROOM.  SO I KNEW THAT FIDELITY

17  CAME IN.  AND I'M JUST GOING TO BE CANDID WITH YOU.  I THOUGHT

18  THAT THEY TOOK NAT'S SHARE, LIKE HIS 51 PERCENT; THAT HE SIGNED

19  IT OVER IN LIEU OF WHATEVER.

20      I HAD NO IDEA HOW MUCH MONEY -- I DIDN'T EVEN KNOW HOW

21  MUCH -- I SAW THE AD WHEN IT CAME OUT IN THE PAPER.  IT CAME

22  OUT ON SOMETHING -- WIRE OR WHATEVER, YOU KNOW, SOMETHING THAT

23  COMES ACROSS THE REAL ESTATE NEWS, AND I READ IT.  BUT I DIDN'T

24  KNOW.

25      AND JUST FROM TALKING TO MARK THAT DAY AT BONES, HE SAID

1    THAT THERE WERE SEVERAL BUYERS OUT THERE, YOU KNOW, AND THAT HE

2    THOUGHT, YOU KNOW, THAT IT WAS GOING TO BE OKAY.  AND FIDELITY

3    WAS ONE OF THEM.

4        BUT HE DIDN'T EVEN KNOW.  I MEAN, THIS WAS LIKE WHEN IT

5    WAS FRESH.  I MEAN, IT WAS BEFORE IT WAS EVEN ANNOUNCED.  SO HE

6    WAS, HE JUST SAID THAT THEY WERE ONE OF THE POTENTIAL PEOPLE,

7    THAT I SHOULDN'T WORRY, THAT IT WAS GOING TO BE -- THEY WERE

8    GOING TO FIND SOMEBODY TO, YOU KNOW, FILL IN WHATEVER IT WAS.

9    BUT, NO, I DID NOT KNOW.

10   Q.   YOU WEREN'T AWARE THAT FIDELITY STEPPED IN UNTIL SOME NOW.

11   CORRECT?

12   A.   RIGHT.  RIGHT.

13   Q.   YOU'RE AWARE THAT FIDELITY --

14   A.   IN ADDITION TO WHAT I READ.

15   Q.   YOU'RE AWARE THAT FIDELITY IS A PUBLICLY TRADED COMPANY

16   THAT'S REQUIRED TO FILE CERTAIN THINGS WITH THE SEC ABOUT THESE

17   KINDS OF TRANSACTIONS WHERE THEY STEP IN AND FILL HOLES LIKE

18   THIS?

19   A.   ARE YOU ASKING ME IF I'M AWARE THAT IT'S REQUIRED FOR THEM

20   TO SAY SOMETHING SPECIFIC FOR THE SEC?  NO, I WAS NOT AWARE OF

21   THAT.  BUT I DO BELIEVE YOU.

22   Q.   OKAY.  SO THEN YOU'RE AWARE THAT THERE HAVE BEEN MANY,

23   MANY TIMES WHEN NEWS OF WHAT MR. HARDWICK DID HAVE BEEN MADE

24   PUBLIC OTHER THAN JUST WHAT MR. WITTSTADT MIGHT HAVE SAID?

25   A.   OH, NO.  I'M NOT BLAMING.  I JUST SAID MARK TOLD ME FIRST,

1    LIKE AFTER I TALKED TO NAT.  I MEAN, AFTER IT WAS IN THE PAPER,

2    OF COURSE EVERY REAL ESTATE COMPANY IN TOWN, BUILDER AND

3    EVERYBODY ELSE, KNEW, I MEAN, JUST BECAUSE IT WAS IN THE

4    NEWSPAPER.  WE READ IT IN THE AJC LIKE EVERYBODY ELSE.

5    Q.   IF SPECIAL AGENT CROMER PREPARED A REPORT ABOUT THE

6    CONVERSATIONS THAT HE HAD WITH YOU DISCUSSING WHAT HE SAID, YOU

7    HAVE NO REASON TO BELIEVE THAT THAT REPORT WOULD BE INACCURATE,

8    DO YOU?

9    A.   I HAVE NO IDEA.  I WAS NEVER -- I WAS NEVER GIVEN A

10   REPORT.

11   Q.   DID MR. GARLAND TELL YOU THAT HE HAS THE REPORT THAT AGENT

12   CROMER PREPARED --

13   A.   NO.

14   Q.   -- OF YOUR CONVERSATION?

15   A.   NO.

16   Q.   HE DIDN'T SHARE THAT WITH YOU?

17   A.   I WAS JUST CONTACTED AT 4:30 ON WEDNESDAY.

18   Q.   THANK YOU.

19   A.   I HAD SURGERY ON FRIDAY, AND I'VE BEEN LAID UP.  AND I

20   HAVE A --

21           THE COURT:  SO THAT'S A NO?

22           THE WITNESS:  IT'S A NO.  THANK YOU, MA'AM.

23           I'M SORRY.  I'M SORRY.

24           THE COURT:  OKAY.  IT'S ALL RIGHT.  I'M JUST TRYING

25   TO MAKE SURE.  WE GOT A LOT TO HEAR ABOUT MR. HARDWICK, AND

1   IT'S VERY IMPORTANT THAT I DO SO.  I'M NOT BEING RUDE TO YOU.

2   I JUST WANT TO MAKE SURE WE GET AS MUCH INFORMATION --

3            THE WITNESS:  I'M SORRY.

4            THE COURT:  YOU'RE FINE.

5            OKAY.  ANYTHING ELSE, MS. BARRON?

6            MS. BARRON:  NO, YOUR HONOR.

7            THE COURT:  ANYTHING ELSE, MR. GARLAND?

8            MR. GARLAND:  NO.

9            AND THANK YOU VERY MUCH.

10           THE WITNESS:  THANK YOU.

11           THE COURT:  OUR BEST WISHES FOR A GOOD RECOVERY.

12           THE WITNESS:  OKAY.  THANK YOU.

13           THE COURT:  ALL RIGHT.  LET ME GET AN IDEA OF A

14  COUPLE OF THINGS.

15           SO, MR. GARLAND, TELL ME A LITTLE BIT ABOUT WHAT ELSE

16  YOUR PRESENTATION WILL ENTAIL.  MY UNDERSTANDING FROM THE

17  PLEADINGS IS THAT MR. GINGRAS IS EXPECTED TO BE ON THE STAND

18  FOR AT LEAST AN HOUR, AND THEN WE HAVE SEVERAL BRIEF WITNESSES.

19  IS THAT CORRECT?

20           MR. GARLAND:  THAT'S CORRECT.  WE JUST HAVE HIS

21  PARENTS.

22           THE COURT:  OKAY.

23           MR. GARLAND:  AND MR. GINGRAS.

24           THE COURT:  OKAY.

25           MR. GARLAND:  THERE ARE OTHER PEOPLE WHO CAME IN

82

1    SUPPORT.  WE WILL MENTION THEM, BUT -- WRITTEN LETTERS AND --

2    NO, WE ARE NOT PUTTING THEM UP.

3            THE COURT:  SURE.  I'M JUST ASKING FOR SCHEDULING

4    PURPOSES.  AND THE COURT DOESN'T HAVE ANYTHING ELSE SCHEDULED

5    FOR TODAY.  I JUST AM HOPING THAT WE CAN GET THROUGH ALL OF

6    THIS TODAY, SO I'M JUST TRYING TO SEE WHERE WE'RE GOING FROM

7    HERE.

8            GOVERNMENT, WHAT ELSE DO YOU HAVE FOR TODAY?  DID YOU

9    TELL ME THAT YOU DON'T HAVE ANY WITNESSES WITH RESPECT TO

10   OBJECTIONS AND/OR SENTENCING, OR DO YOU HAVE SOME?

11           MR. PHILLIPS:  WE DON'T HAVE ANY WITNESSES WHO WOULD

12   BE CALLED AND SWORN, TESTIFY UNDER OATH.  WE HAVE THE VICTIMS

13   AND A REPRESENTATIVE FROM FIDELITY WHO ALL WOULD LIKE TO

14   ADDRESS THE COURT TO DISCUSS THE HARM THAT THIS CAUSED THEM AT

15   THE APPROPRIATE TIME.

16           THE COURT:  ALL RIGHT.  SO LET'S GO AHEAD AND -- IF

17   MR. GINGRAS IS YOUR NEXT WITNESS, LET'S GO AHEAD AND AT LEAST

18   START WITH HIM BEFORE WE DO A LUNCH BREAK.  AND THEN I'LL TELL

19   YOU A COUPLE OF THINGS THAT I WANT YOU TO CONSIDER OVER THE

20   LUNCH BREAK THAT I'D LIKE YOU TO LOOK AT.

21           MR. GARLAND?

22           MR. GARLAND:  MR. GINGRAS, WOULD YOU TAKE THE STAND,

23   PLEASE?

24           THE COURT:  ALL RIGHT.

25           MR. GINGRAS:  THANK YOU, YOUR HONOR.

83

1              THE COURT:  THANK YOU.

2              IF YOU WOULD RAISE YOUR RIGHT HAND.

3                        J.P. GINGRAS,

4    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

5    FOLLOWS:

6              THE COURT:  ALL RIGHT.  IF YOU WOULD PLEASE TAKE THE

7    WITNESS SEAT.  AND ONCE YOU ARE SEATED COMFORTABLY, IF YOU

8    WOULD STATE AND THEN SPELL YOUR NAME FOR THE RECORD.

9              THE WITNESS:  MY NAME IS JEAN-PASCAL, J-E-A-N, DASH,

10   P-A-S-C-A-L -- I GO BY J.P. -- AND GINGRAS, G-I-N-G-R-A-S.

11                     DIRECT EXAMINATION

12   BY MR. GARLAND:

13   Q.   PROFESSOR GINGRAS, YOU'VE ALREADY TESTIFIED IN THIS CASE

14   DURING THE TRIAL, CORRECT?

15   A.   YES.

16   Q.   AND YOU SUBMITTED A REPORT AT THAT TIME, CORRECT?

17   A.   AT THE TIME OF TESTIMONY AT TRIAL, I DON'T RECALL.  I

18   BELIEVE THAT I HAD A PROFFER THAT WE FILED WITH THE COURT.

19   Q.   AND YOU'VE ALSO PREPARED AN EXPERT REPORT DATED

20   FEBRUARY 4TH, 2019, CONCERNING FURTHER ANALYSIS OF THE EVIDENCE

21   THAT WAS PRESENTED IN THIS CASE, CORRECT?

22   A.   THAT'S CORRECT.  I BELIEVE MY REPORT IS ACTUALLY DATED

23   JANUARY 29, 2019.  AND IT WAS FILED WITH THE COURT ON

24   FEBRUARY 4TH.

25   Q.   AND YOU PREVIOUSLY SAT THROUGH THE EVIDENCE IN THE CASE,

1    CORRECT, ALL THE ACCOUNTING EVIDENCE?

2    A.   THAT'S CORRECT.  WITH THE EXCEPTION OF SOME EXPERT

3    WITNESSES, I WAS THERE THROUGHOUT THE TRIAL.  THAT'S CORRECT.

4    Q.   AND THOSE EXPERTS WEREN'T ACCOUNTING WITNESSES.

5    A.   DON'T KNOW IF THEY WERE ACCOUNTING IN SCOPE.  I BELIEVE

6    THERE WAS A TAX ATTORNEY, BUT THAT WAS THE ONLY WITNESS THAT I

7    WAS NOT -- I WAS EXCUSED FROM THE COURTROOM.

8    Q.   YOU EXAMINED THE EXHIBITS IN THIS CASE, THE ACCOUNTING

9    EXHIBITS?

10   A.   YES.

11   Q.   ALL RIGHT.  NOW, TODAY, ARE YOU PREPARED TO DISCUSS WHAT

12   THE ACCOUNTING EVIDENCE ALLOWS TO BE DETERMINED CONCERNING THE

13   AMOUNT OF LOSS?

14   A.   YES.

15   Q.   ALL RIGHT.  WOULD YOU TELL, IN GENERAL, WHAT YOU ARE

16   PREPARED TO DISCUSS?

17   A.   WELL, AS I STATED AT TRIAL, I SEE NO EVIDENCE THAT THERE

18   WAS AN ESCROW SHORTFALL.  I SEE NO EVIDENCE THAT WAS PRESENTED,

19   AS THE COURT DETERMINED BEFORE, TO COMPARE THE LEVEL OF

20   DISTRIBUTION THAT MR. HARDWICK RECEIVED TO OTHER OWNERS.  ANY

21   DISTRIBUTION COMPARISON BETWEEN DISTRIBUTION RECEIVED BY ANYONE

22   AS COMPARED TO NET INCOME WOULD LEAD TO VERY ERRONEOUS

23   CONCLUSIONS.

24   Q.   NOW, PREVIOUSLY, WE HAD EXHIBITS THAT WERE DEMONSTRATIVE

25   EVIDENCE AT THE TRIAL, CORRECT?

1   A.   THAT'S CORRECT.  THERE WERE SEVERAL, YES.

2   Q.   WOULD IT HELP YOU TO BE ABLE TO HOLD THOSE EXHIBITS UP FOR

3   THE COURT TO SEE AND EXPLAIN, EXPLAIN THEM?

4   A.   SOME OF THE TOPIC THAT WERE DISCUSSED BY THE GOVERNMENT

5   THIS MORNING, YES.

6   Q.   ALL RIGHT.  NOW, I WANT TO SHOW YOU GOVERNMENT'S EXHIBIT

7   NUMBER 1 FOR THIS HEARING.  CAN -- MAKE SURE.  CAN YOU COMMENT

8   ON THIS EXHIBIT, PLEASE?

9   A.   YES.

10  Q.   ALL RIGHT.  TELL ME, IS THERE SOMETHING WRONG WITH THAT

11  EXHIBIT?

12  A.   THE NUMBERS ARE -- THE 20,553,645 IS COMING FROM A

13  GOVERNMENT EXHIBIT THAT WAS PRESENTED -- I HAVE THAT EXHIBIT --

14  IN TERMS OF THE THREE YEARS OF THE NET INCOME OF THE

15  DISTRIBUTION RECEIVED BY MR. HARDWICK.  HOWEVER, DISTRIBUTIONS

16  WERE NEVER DISCUSSED.

17       AND THERE'S A TERM THAT'S USED SOMETIMES, BONUSES, WITH

18  DISTRIBUTIONS.  AND I EXPLAINED IN MY REPORT THAT THESE TWO

19  TERMS COULD NOT BE EQUAL BECAUSE THE AGREEMENT SPECIFICALLY

20  STATES THAT ANY BONUSES WOULD BE TAXABLE, OR WITHHELD, BUT

21  DISTRIBUTIONS SHOULD NOT BE.

22  Q.   ALL RIGHT.  I WANT TO SHOW YOU WHAT IS GOVERNMENT EXHIBIT

23  NUMBER 1000.  DO YOU HAVE THAT ON YOUR CHART?

24  A.   YES.  AND THAT WOULD BE REPLICATED IN MY REPORT, ON PAGE 5

25  OF MY REPORT, WHICH I BELIEVE THAT WAS THE MAIN EXHIBIT OF THE

1  GOVERNMENT DURING TRIAL.

2  Q.   I'M GOING TO HAND YOU YOUR CHART THAT REFLECTS THAT

3  EXHIBIT.  WILL YOU EXPLAIN THE RELEVANCE TO THE CONCLUSIONS

4  REACHED IN YOUR REPORT CONCERNING THAT EXHIBIT?

5  A.   THERE ARE A COUPLE OF THINGS.  FOR THIS SPECIFIC

6  DEMONSTRATIVE, IT IS TRYING TO PROVE THAT SOMEBODY RECEIVED

7  26.5 MILLION, BUT IT DOES NOT COMPARE IT TO ANYTHING.

8       NOW, WE HAVE TWO NUMBERS HERE IN THIS CASE THAT ARE

9  RELEVANT.  THE $29.5 MILLION, WHICH WAS ALLEGEDLY FUNDED BY

10  FIDELITY, WHICH IS ASSUMABLY A SHORTAGE IN ESCROW, OR THE

11  26.5 MILLION THAT WAS ALLEGEDLY RECEIVED AS DISTRIBUTION.

12       SO THIS DEMONSTRATIVE CLEARLY INDICATES THAT -- AND,

13  AGAIN, I HAVE THE OPINION THAT I DON'T SEE ANY EVIDENCE THAT

14  THERE IS AN ESCROW SHORTAGE.  BUT EVEN IF YOU ASSUME THAT, EVEN

15  IF YOU ASSUME THAT THERE WAS A 29.5 MILLION ESCROW SHORTAGE,

16  THE MAXIMUM THAT COULD BE ATTRIBUTED TO MR. HARDWICK IS

17  19.5 MILLION.  BECAUSE WE KNOW THAT 6.9 IS COMING FROM OTHER

18  SOURCES OTHER THAN THE ESCROW ACCOUNT, LEAVING YOU IMMEDIATELY,

19  ON ITS FACE, A 10.5 MILLION UNACCOUNTED FOR.

20       SO THAT IS THE PURPOSE OF THIS DEMONSTRATIVE, IS TO SHOW

21  YOU THAT EVEN ASSUMING THAT THERE WAS A 29.5 MILLION SHORTAGE,

22  YOU ARE MISSING 10.5 MILLION IMMEDIATELY, JUST LOOKING AT THIS

23  DEMONSTRATIVE.  THAT IS BEFORE MR. HARDWICK PUT IN MONEY TO

24  COVER ANY ESCROW AND ANY MONEY THAT HE WOULD BE ENTITLED TO IN

25  TERMS OF DISTRIBUTIONS.

1      SO THAT IS THE PURPOSE, AND THAT'S HOW YOU WOULD TAKE THIS

2  DEMONSTRATIVE AND COMPARE IT TO THE ALLEGED ESCROW SHORTAGE.

3  Q.   WHAT WOULD YOU COMPARE IT TO?

4  A.   TO THE ALLEGED ESCROW SHORTAGE?

5  Q.   YES.

6  A.   THE 29 MILLION -- 29.5 MILLION ALLEGEDLY THAT WAS PUT IN

7  BY FIDELITY TO COVER SOME ESCROW SHORTAGE.

8  Q.   NOW, YOU SAID ASSUMING.  IN ACCOUNTING, DO YOU REACH

9  CONCLUSIONS BASED ON ASSUMPTIONS?

10  A.   SOMETIMES.  IF YOU WANT TO DO A HYPOTHESIS, IF SOMEBODY

11  TELLS ME, I THINK YOU WANT TO ASSUME SOMETHING, THEN I WOULD BE

12  WILLING TO ASSUME THAT.  BUT IF YOU WANTED ME TO DETERMINE IF

13  IN FACT THERE WAS A SHORTAGE, I WOULD NOT ASSUME IT.  I WOULD

14  TRY TO DETERMINE IT FROM THE FACTS.

15  Q.   TO DETERMINE A SHORTAGE OR A HOLE IN THE MULTIPLE ESCROW

16  ACCOUNTS, WHAT WOULD HAVE TO BE DONE?

17  A.   SO WE TALKED ABOUT THAT AT TRIAL.  AND WE TALKED ABOUT THE

18  FACT THAT WE WOULD HAVE TO ESTABLISH A STARTING POINT.  IN

19  FACT, THAT'S NOT MY EXPERT OPINION.  THE COMPANY, MHS, WHEN THE

20  FORENSIC ACCOUNTANT CAME IN, ACTUALLY DETERMINED THAT.  THAT

21  FOR US TO DETERMINE WHO GOT WHAT, IF THERE WAS A HOLE, WE NEED

22  TO RECONCILE ALL ACCOUNT FROM THE TIME THAT MS. MAURYA CAME IN,

23  BECAUSE WE KNOW THAT SHE WAS MAKING MOVEMENT OF MONEY THAT WE

24  CANNOT UNDERSTAND ANYMORE.

25      SO IT WAS -- IT'S MY EXPERT OPINION, YES, BUT THEY HAD THE

1    CORRECT DETERMINATION TO SAY, LET'S GO BACK TO DAY ONE AND

2    ESTABLISH IF THERE WAS AN ESCROW SHORTAGE AT THAT POINT.

3    Q.   WAS THE RECONCILIATION EVER DONE AND PUT INTO EVIDENCE IN

4    THIS CASE?

5    A.   NO.

6    Q.   WITHOUT THAT RECONCILIATION, CAN YOU MAKE ANY

7    DETERMINATION AS TO THE AMOUNT OF THE HOLE IN THESE RESPECTIVE

8    COMMINGLED ESCROW OPERATING ACCOUNTS?

9    A.   NO.

10   Q.   WHY NOT?

11   A.   BECAUSE IF -- LET'S ASSUME THAT THERE WAS A SHORTAGE IN

12   THAT ACCOUNT.

13   Q.   MAKE AN ASSUMPTION?

14   A.   IT'S AN ASSUMPTION, BECAUSE I HAVE NO FACTS TO SUPPORT

15   THAT THERE WAS THEN ANY -- IN FACT, WE HAVE EVIDENCE THAT THERE

16   WAS NOT AN ESCROW SHORTAGE.

17        FOR EXAMPLE, IN THE TAX RETURN, YOU HAVE A LINE ITEM THAT

18   SAYS, ESCROW SHORTAGE, $1.1 MILLION.  CLEARLY, IF THERE WAS A

19   SHORTAGE OF $30 MILLION, YOU WOULD TAKE THAT AS A LOSS BECAUSE,

20   AS THE ACCOUNTANT HAS TESTIFIED, THE AUDITORS, HE SAID, YES, IF

21   THERE IS A SHORTAGE IN ESCROW, THERE WOULD BE A LOSS IN THE

22   FINANCIAL STATEMENTS.  AND WE KNOW THAT BECAUSE IT OCCURRED;

23   1.1 MILLION IN 2014, FOR EXAMPLE.  SO WE WOULD KNOW THAT.

24        NOW, YOU HAVE TO DO THE RECONCILIATION, BECAUSE EVEN IF

25   THERE WAS A SHORTAGE -- AND LET'S ASSUME THAT IT WAS EXACTLY

1   THE SAME AMOUNT, WHICH WE HAVE NO EVIDENCE, BUT I'M GOING TO

2   ASSUME THAT FOR ONLY THIS PURPOSE -- IT WOULD BE INCORRECT TO

3   SAY THAT THE ENTIRE SHORTAGE WOULD BE SITTING HERE.

4   Q.   WHY WOULD IT BE INCORRECT?

5   A.   BECAUSE WE KNOW THAT MR. HARDWICK WAS ENTITLED TO

6   DISTRIBUTIONS.  SO THIS NUMBER HERE, I KNOW THAT SOME OF THIS

7   AMOUNT IS WHAT HE WAS ENTITLED TO.  AND THE ONLY WAY TO

8   DETERMINE WHAT HE WAS ENTITLED TO IS TO COMPARE IT TO THE OTHER

9   OWNERS OF THE COMPANY, NOT TO THE ESCROW SHORTAGE.  THAT WOULD

10  BE COMPLETELY IMPROPER, BECAUSE THE ESCROW SHORTAGE ANALYSIS IS

11  COMPLETELY DIFFERENT THAN THE ANALYSIS THAT, DID MY INDIVIDUAL

12  RECEIVE TOO MUCH, TOO LITTLE, OR ENOUGH DISTRIBUTION, BECAUSE

13  THE COMPARISON ARE TWO DIFFERENT SILOS.

14  Q.   ALL RIGHT.  IF YOU KNOW WHAT ONE PERSON -- IN THIS CASE,

15  THE WITTSTADTS AND MORRIS -- WHAT THEY GOT, CAN YOU MAKE A

16  DETERMINATION AS TO WHAT HARDWICK WOULD BE ENTITLED TO?

17  A.   OF COURSE.

18  Q.   WHY?

19  A.   IF YOU'LL RECALL AT MY DAUBERT HEARING, WE TESTIFIED -- I

20  TESTIFIED THAT HERE IS THE METHODOLOGY FOR YOU TO DETERMINE IF

21  SOMEBODY HAS RECEIVED TOO MUCH, TOO LITTLE.  AND I RECALL

22  MR. GILFILLAN SAYING, YOU KNOW, WE ARE NOT SAYING THAT HE GOT

23  26 MILLION THAT HE WAS NOT ENTITLED TO.  TO WHICH I SAID, OKAY,

24  WELL, THEN, IF YOU DON'T DO THAT, THAT'S OKAY.  BUT IF YOU

25  WANTED TO MAKE A DETERMINATION AS TO THE RIGHT AMOUNT, HERE ARE

1    THE SIX OR SEVEN STEPS.  AND I HAD A DEMONSTRATIVE AT THE TIME

2    TO HOW TO DETERMINE WHAT AMOUNT IS MR. HARDWICK ENTITLED TO.

3    BECAUSE CLEARLY THIS NUMBER IS OVERSTATING THE AMOUNT OF ANY

4    LOSS, BECAUSE THE MAJORITY OF THIS AMOUNT WAS ENTITLED TO BE

5    RECEIVED BY MR. HARDWICK.  AND THAT'S UNDISPUTED.

6    Q.   OKAY.  DO YOU HAVE A CHART THAT HELPS YOU EXPLAIN HOW THIS

7    WORKS AND ILLUSTRATES WHY IT'S FAULTY?

8    A.   NO.  I HAVE A CHART PROVING THAT THE GOVERNMENT'S APPROACH

9    INTO THE LOSS AMOUNT WOULD LEAD YOU TO THE WRONG CONCLUSION

10   BECAUSE OF WHAT THE FACTS OF THIS CASE SUPPORT.

11   Q.   ALL RIGHT.

12   A.   SO, YES, THAT WOULD BE THE --

13   Q.   THIS WAS A DEMONSTRATIVE AT THE TRIAL?

14   A.   I'M NOT SURE IF WE USED IT AT TRIAL OR NOT, BUT IT WAS

15   AVAILABLE AT TRIAL, YES.

16        MR. GARLAND:  I NEED TO GIVE IT A NUMBER.  AND IF I

17   REMEMBER MY NUMBERS RIGHT, I CAN GIVE IT DEFENDANT'S SENTENCING

18   DEMONSTRATIVE AID NUMBER 9.

19        THE COURT:  AND WAS THE YELLOW SHEET THAT THE

20   GOVERNMENT ACTUALLY INITIATED MARKED?  DID IT -- DOES IT HAVE A

21   NUMBER?

22        MR. GARLAND:  YES, IT DOES.  GOVERNMENT EXHIBIT

23   NUMBER 1.

24        THE COURT:  GOVERNMENT'S NUMBER 1.  OKAY.  THANK YOU.

25   Q.   (BY MR. GARLAND)  ALL RIGHT.  WOULD YOU GO AHEAD AND

1   EXPLAIN DEFENDANT'S SENTENCING EXHIBIT NUMBER 9.

2   A.   YES.  SO THIS IS IN MY REPORT ON PAGE 22 TO 26.  AND IT

3   SHOWS YOU, I HAVE UNDER OPINION NUMBER 5 THE ACTUAL LANGUAGE OF

4   THE AGREEMENT, WHAT DID THE AGREEMENT TELL US TO DO.

5        SO IF YOU LOOK ON PAGE 23 AND 24, IT TELLS YOU THAT THE

6   CORPORATION SHALL PAY EACH SHAREHOLDER A BONUS EQUAL TO

7   70 PERCENT OF THE CORPORATION'S TAXABLE INCOME.

8        OKAY.  SO WE KNOW THAT -- AND THE GOVERNMENT HAS USED THAT

9   SEVERAL TIMES.  WE KNOW THAT NET INCOME IS $549,000.  AND THIS

10  MORNING YOU HEARD THAT THOSE WERE AUDITED FINANCIAL STATEMENTS.

11       NOW, THE ISSUE WITH THAT IS WE KNOW THAT THERE IS AN

12  ACCOUNT THAT HAD A FLOW BETWEEN 200 AND 400 MILLION AT ANY

13  POINT IN TIME THAT IS NOT ACCOUNTED FOR THAT.  EVERYBODY HAS

14  TESTIFIED, FROM THE AUDITORS' PERSPECTIVE, WE HAD NO IDEA THAT

15  THIS ACCOUNT EVEN EXISTED.  AND, THEREFORE, IF YOU BELIEVE THE

16  AUDITED FINANCIAL STATEMENTS, YOU KNOW THAT THAT NUMBER IS, AT

17  BEST, QUESTIONABLE.  BUT LET'S ASSUME THAT THAT NUMBER IS

18  ACCURATE FOR NOW.

19       NOW, OF COURSE, EVERYBODY SHOWS THAT MR. HARDWICK RECEIVED

20  673,000.  AND IF THE GOVERNMENT'S LOGIC WOULD APPLY, YOU WOULD

21  SAY, OKAY, I'M GOING TO DISTRIBUTE, AT MOST, 70 PERCENT OF

22  550,000.  LET'S CALL IT, WHAT, FIVE TIMES SEVEN, $350,000.

23  SEVENTY PERCENT OF 550 IS ABOUT 350.  BOTH OF THESE INDIVIDUALS

24  RECEIVED A LOT MORE THAN WHAT THE AGREEMENT SAYS.

25       SO IF AT TRIAL I WOULD HAVE PRESENTED ONLY WHAT MR. MORRIS

1  RECEIVED, THEN YOU WOULD HAVE SAID, WELL, WAIT A MINUTE, HE'S

2  RECEIVING MORE THAN 100 PERCENT OF THE NET INCOME.

3  Q.   YOU'RE TALKING ABOUT THIS LINE?

4  A.   THAT IS CORRECT.

5  Q.   OKAY.

6  A.   HOW IS THAT POSSIBLE?  THAT'S BECAUSE THEY WERE NOT

7  FOLLOWING THE AGREEMENT.

8       NOW, HERE'S THE KICKER TO THIS.  IN 2011, MR. WITTSTADTS

9  WERE RECEIVING DISTRIBUTIONS TOO.  I'VE NOT EVEN ACCOUNTED FOR

10 DISTRIBUTION FOR MR. WITTSTADTS.  BECAUSE, REMEMBER, THEY WERE

11 GOING AROUND THE RULES OF GEORGIA TO DISTRIBUTE TO OWNERS,

12 QUOTE/UNQUOTE, THAT WERE W-2 EMPLOYEES.

13      SO ON THIS, IT WOULD SHOW, WELL, IF I'M COMPARING THIS TO

14 NET INCOME, BOTH MR. MORRIS AND MR. HARDWICK RECEIVED A LOT

15 MORE THAN THEY WERE SUPPOSED TO.  AND THE GOVERNMENT'S

16 CONCLUSION IS THAT MUST COME FROM ESCROW ACCOUNTS, WHICH IS

17 INACCURATE BECAUSE, CLEARLY, MR. MORRIS HAS NEVER BEEN ACCUSED

18 OF RECEIVING ANY FUNDS FROM ESCROW.  BUT NOW WE'RE LOOKING AT

19 MR. HARDWICK AND SAYING, THIS IS MY CALCULATION.  BY

20 DEFINITION, IT'S GOT TO COME FROM ESCROW.

21      AND IN FACT, IF YOU LOOK AT THE TOTAL DISTRIBUTION -- IT'S

22 1.6 MILLION -- YOU CAN SEE THAT MR. MORRIS RECEIVED EXACTLY

23 WHAT HE WAS SUPPOSED TO AND MR. HARDWICK RECEIVED EXACTLY WHAT

24 HE WAS SUPPOSED TO.  AND THAT IS THE CONFUSION AND THE RISK OF

25 LOOKING AT DISTRIBUTION AS COMPARED TO NET INCOME.

1   Q.   ALL RIGHT.  DO YOU HAVE ANOTHER CHART THAT HELPS YOU

2   EXPLAIN IT?

3   A.   NO.  I BELIEVE THAT THAT CHART DESCRIBES IN DETAIL HOW

4   DANGEROUS IT IS TO COMPARE THE DISTRIBUTION.

5        NOW, THE OTHER POINT THAT I WOULD MAKE -- NOW, THE 673,000

6   IS NOT THE AMOUNT THAT IS DEPICTED ON THE DEMONSTRATIVE THAT

7   THE GOVERNMENT IS USING.

8   Q.   THE 1000?

9   A.   THE 1000.  THEY HAVE 1,275,999.  OKAY.  SO WHAT IS THE

10  DIFFERENCE?  THE DIFFERENCE IS THAT THEY PUT THAT ASIDE, AND

11  THEY LOOKED AT EVERY SINGLE PAYMENT THAT MR. HARDWICK EVER

12  RECEIVED.  BUT YET, THEY ARE STILL COMPARING THAT TO NET

13  INCOME, WHICH I'VE JUST PROVEN THAT THAT WOULD BE INACCURATE.

14  YOU HAVE TO COMPARE IT TO WHAT THE OTHER PERSON -- WELL, IF YOU

15  ARE GOING TO DO THIS FOR MR. HARDWICK, LOOK AT ALL THE

16  PAYMENTS, TO HAVE A TRUE COMPARATIVE AMOUNT, YOU WOULD HAVE TO

17  DO THE SAME THING WITH MR. MORRIS AND DETERMINE WHICH AMOUNTS

18  THEY WERE ENTITLED TO.

19       FOR EXAMPLE, MR. HARDWICK WAS ENTITLED TO THE REPAYMENT OF

20  THE LOAN.  WE HAVE EXTENSIVE TESTIMONY ON THAT.  MAYBE

21  MR. MORRIS RECEIVED OTHER PAYMENTS THAT HE WAS ENTITLED TO ALSO

22  BY AGREEMENT.  I WOULD HAVE TO ISOLATE THOSE PAYMENTS AND THEN

23  AT THAT POINT DETERMINE IF THE DISTRIBUTIONS ARE TOO HIGH OR

24  TOO LOW.

25       BUT, CLEARLY, AT ANY POINT, NOT ONLY I KNOW THAT MY NET

1   INCOME IS ASSUMED TO BE CORRECT BECAUSE I HAVE A MAJOR ACCOUNT

2   NOT INCLUDED IN MY AUDITED FINANCIAL STATEMENTS, BUT TO SIMPLY

3   NOW RECREATE THE WHEEL AND TO RECALCULATE WHAT MR. HARDWICK'S

4   DISTRIBUTIONS WOULD BE IN A DIFFERENT CALCULATION AND THEN

5   STILL COMPARING IT TO NET INCOME IS INAPPROPRIATE.

6           MR. GARLAND:  YOUR HONOR, I THINK I CAN STREAMLINE

7   THINGS IF WE TOOK A BREAK AT THIS TIME.

8           THE COURT:  ALL RIGHT.  YOU TALKING ABOUT A LUNCH

9   BREAK?

10          MR. GARLAND:  YES.

11          THE COURT:  OKAY.  I DON'T KNOW HOW CONFIDENT I AM

12  THAT YOU'RE GOING TO TRY TO STREAMLINE THINGS, BUT I DO THINK

13  THIS IS A GOOD BREAKING TIME.

14          SO WE ARE GOING TO -- AND, OF COURSE, THAT'S NOT TO

15  SAY THAT YOU SHOULD THINK I'M TRYING TO MAKE YOU STREAMLINE

16  THINGS.  THIS IS A SERIOUS HEARING.  AND SO I WANT YOU, BOTH

17  SIDES, TO TAKE THE TIME THAT YOU ALL NEED TO PRESENT TO ME.

18          WE ARE GOING TO TAKE AN HOUR FOR LUNCH.  WE WILL BE

19  BACK IN SESSION AT 1:30.

20          A COUPLE OF THINGS THAT I WANT TO GO OVER BEFORE WE

21  DEPART.  I'M LOOKING AT A TENTATIVE DATE OF APRIL 17TH FOR

22  RESTITUTION HEARING.  I DO NOT HAVE ANYTHING SCHEDULED THAT

23  DAY.  SO IT WOULD BE -- WE COULD START AS EARLY AS WE NEED TO

24  START.

25          ALSO, MS. BARRON, WHEN YOU SPOKE EARLIER, YOU SPOKE

1   OF CREDITS IN ANTICIPATION OF MR. GINGRAS'S TESTIMONY.  TELL ME

2   AGAIN WHAT SECTION YOU WERE LOOKING AT.  BECAUSE I'M LOOKING AT

3   NOW 2B1.1 UNDER, LET'S SEE, APPLICATION NOTE (3)(E), LITTLE I,

4   WHICH TALKS ABOUT MONEY RETURNED AND FAIR MARKET VALUE AND

5   CREDITS AGAINST LOSS.  SO I JUST WANT TO LOOK AT WHATEVER YOU

6   WERE LOOKING AT AND TRY TO RECONCILE THOSE OVER THE LUNCH

7   BREAK.

8               MS. BARRON:  THAT'S CORRECT, YOUR HONOR.  SO AS I

9   UNDERSTAND WHAT MR. GINGRAS HAS SAID IN HIS REPORT AND WHAT HE

10  WILL SAY IS THAT MR. HARDWICK SHOULD BE CREDITED WITH THE SIX

11  POINT -- THAT IT SHOULD ACT AS AN OFFSET.  AND SO WE BELIEVE

12  THAT THAT PROVISION THAT YOU JUST POINTED OUT TO SAYS THAT YOU

13  ONLY REDUCE LOSS IF THE DEFENDANT MAKES THAT PAYMENT BEFORE THE

14  FRAUD IS DISCOVERED.

15              THE COURT:  OKAY.  SO YOU WERE REFERRING TO THAT SAME

16  SECTION THAT I JUST SAID?

17              MS. BARRON:  YES, YOUR HONOR.

18              THE COURT:  OKAY.  I HAD A DIFFERENT NUMBER DOWN FOR

19  SOME REASON.

20              OKAY.  IS THERE ANYTHING ELSE BEFORE WE DISMISS FOR

21  LUNCH ON BEHALF OF THE GOVERNMENT?

22              MR. PHILLIPS:  NO, YOUR HONOR.

23              THE COURT:  AND ON BEHALF OF MR. HARDWICK.

24              MR. GARLAND:  NO, YOUR HONOR.

25              THE COURT:  ALL RIGHT.  I WILL SEE YOU ALL BACK AT

1    1:30.  THANK YOU SO MUCH.

2            THE COURTROOM SECURITY OFFICER:  ALL RISE.  COURT

3    WILL BE IN RECESS UNTIL 1:30.

4            (WHEREUPON, THE LUNCH RECESS WAS HAD FROM 12:28 P.M.

5    TO 1:35 P.M.)

6            THE COURT:  THANK YOU.  PLEASE BE SEATED.

7            MR. GINGRAS, I OF COURSE REMIND YOU THAT YOU ARE

8    STILL UNDER OATH, SIR.

9            THE WITNESS:  YES, YOUR HONOR.

10           THE COURT:  ALL RIGHT.  YOU MAY PROCEED.

11   Q.  (BY MR. GARLAND)  MR. GINGRAS, IN CONNECTION WITH THE

12   FINANCIAL RECORDS IN THIS CASE, DID THE GOVERNMENT PRESENT AN

13   ANALYSIS OF WHAT HARDWICK RECEIVED AND WHAT ALL OF THE OTHER

14   OWNERS RECEIVED?

15   A.   THE GOVERNMENT PRESENTED EVERY TRANSFERS FROM ANY ACCOUNT

16   THAT WENT TO MR. HARDWICK BUT DID NOT REPRODUCE THAT EXERCISE

17   TO ANY OF THE OTHER OWNERS AT ANY POINT IN TIME.

18   Q.   AND IF YOU WERE TRYING TO FIGURE OUT A DIFFERENTIAL TO

19   DETERMINE WHETHER YOU GOT MORE THAN YOU WERE ENTITLED TO, WOULD

20   YOU HAVE TO DO THAT?

21   A.   YOU WOULD.  AND YOU WOULD HAVE TO NOT ONLY DO THAT

22   EXERCISE BUT IDENTIFY WHAT ARE DISTRIBUTIONS OF THE, FOR

23   EXAMPLE, $26.5 MILLION THAT MR. HARDWICK RECEIVED.  WE KNOW

24   THAT LOAN PAYMENTS, PER AGREEMENT, WERE MADE ON BEHALF OF

25   MR. HARDWICK ARE INCLUDED IN THIS AMOUNT.  I WOULD HAVE TO

1   STRIP THOSE AMOUNTS TO CALCULATE OR DETERMINE WHAT THE TRUE

2   DISTRIBUTIONS FOR THAT INDIVIDUALS WERE.  I WOULD DO THE SAME

3   EXERCISE THROUGHOUT THE PERIOD FOR EVERY OWNER AT ANY POINT IN

4   TIME.

5        NOW, THE COMPLICATION HERE, AS I SAY BEFORE,

6   MR. WITTSTADTS, THE TWO BROTHERS, WERE NOT OWNERS AND,

7   THEREFORE, THEY WERE PSEUDO DISTRIBUTIONS.  BUT THEY WENT

8   THROUGH W-2 PAYMENTS, WHICH INCURRED WITHHOLDING OF TAXES FROM

9   AN EMPLOYEE.  AND THAT WAS A TRUE-UP BETWEEN THE PARTNERS.

10       IT WOULD BE VERY DIFFICULT TO DO THAT.  IT CAN BE DONE.

11   BUT THE GOVERNMENT HAS NOT PRODUCED ANY EVIDENCE WHATSOEVER IN

12   TERMS OF WHAT THE OTHER PARTNERS RECEIVED.

13   Q.   DID YOU DO A CALCULATION TO DETERMINE, AT THE END OF THE

14   DAY, WHETHER MR. HARDWICK WAS OWED MONEY?

15   A.   YES, I DID.  AS I EXPLAINED AT TRIAL, IT WAS A VERY

16   CONSERVATIVE CALCULATION.  BUT I --

17   Q.   CAN YOU EXPLAIN HOW YOU DID THAT AND WHAT YOU DID?

18   A.   YES.  SO I STARTED WITH THE -- REMEMBER, THERE ARE TWO

19   ANALYSES.  ONE STARTS WITH THE ESCROW ACCOUNT, 29.5 MILLION.

20   THE OTHER CALCULATION WOULD BE -- PROPORTIONAL DISTRIBUTION

21   WOULD HAVE TO START WITH THE 26.5 MILLION.

22       OUT OF THAT AMOUNT, INSTEAD OF DETERMINING WHAT AMOUNTS

23   ARE INCLUDED IN DISTRIBUTION, I APPROACHED IT DIFFERENTLY.

24   SINCE NONE OF THE OWNERS WERE INDICTED, OR THERE WAS NO

25   ALLEGATION THAT ANY OF THE DISTRIBUTIONS RECEIVED BY THE OTHER

1    OWNERS WERE ILLEGITIMATE, I USED THEIR CALCULATIONS TO ESTIMATE

2    WHAT THEY RECEIVED OVER THE ENTIRE PERIOD.

3         NOW, REMEMBER, I HAVE THE ISSUE OF MR. WITTSTADTS.  THE

4    BROTHERS HAVE A W-2 AS OPPOSED TO TRUE DISTRIBUTIONS.  BUT IN

5    MY SCHEDULE PRESENTED AT TRIAL, I ATTEMPTED TO DO THAT.  AND

6    THAT'S WHERE I -- CONSERVATIVELY SPEAKING, I BELIEVE THAT THE

7    WITTSTADTS RECEIVED APPROXIMATELY $12 MILLION IN DISTRIBUTIONS,

8    WHICH I -- IF YOU KNOW THAT THE OTHER OWNERS RECEIVED

9    $12 MILLION, OR 45 PERCENT, WHAT WOULD BE THE COMPARATIVE

10   AMOUNT FOR 55 PERCENT?  AND I ATTEMPTED TO DO THAT.

11   Q.   AND WHAT WAS THAT NUMBER?

12   A.   IT WAS $470,000 THAT I BELIEVE WAS OWED TO MR. HARDWICK IF

13   YOU COUNT THE ADJUSTMENTS THAT I HAD ON MY SCHEDULE.  AND, OF

14   COURSE, THAT OPINION DOESN'T STAND ALONE.  IF I --

15   Q.   WHEN YOU SAY IT DOESN'T STAND ALONE, WHAT DO YOU MEAN?

16   A.   RIGHT.  SO IF I WAS RETAINED ON THE MATTER LIKE THIS, AS

17   BEING A CERTIFIED FRAUD EXAMINER, THE FIRST DOCUMENT THAT I

18   WOULD REQUEST WOULD BE THE TAX RETURNS.  THE TAX RETURN, ON ITS

19   FACE, STATES THAT MR. HARDWICK IS OWED $6.4 MILLION, WHICH IS

20   15 TIMES WHAT MY CALCULATION WOULD SHOW.  SO --

21   Q.   YOUR CALCULATION YOU SAID WOULD SHOW 400,000?

22   A.   THAT'S RIGHT, APPROXIMATELY 400,000.  HE'S OWED ABOUT

23   6.5 MILLION FROM THE TAX RETURN THAT WAS PREPARED A YEAR AND A

24   HALF AFTER THIS INCIDENT OCCURRED AND IS SIGNED BY THE OWNER OF

25   MHS, MR. WITTSTADT, UNDER PERJURY OF LAW.  SO I WOULD PUT A

99

1    HIGH LEVEL OF CERTAINTY ONTO THAT DOCUMENT.

2    Q.    AND THAT WAS IN THE EXHIBITS INTRODUCED IN THE TRIAL,

3    IDENTIFIED AT THE TIME?

4    A.    THE TAX RETURN.  AND, OF COURSE, IT IS INCLUDED IN MY

5    REPORT, AND THE SUPPORTING DOCUMENTATION TO SHOW THAT THE DUE

6    TO -- OR THE AMOUNT DUE TO MR. HARDWICK IS ACTUALLY TO

7    MR. HARDWICK.

8    Q.    SO YOU'VE TOLD US THAT THE GOVERNMENT DIDN'T RECONCILE AND

9    MAKE A LIST AND PRESENT IT IN THE TRIAL OF THE MONIES RECEIVED

10   BY THE OTHER PARTNERS, CORRECT?

11   A.    THAT'S CORRECT.

12   Q.    AND THEY DIDN'T MAKE A COMPARISON OF THE DAYS ON WHICH

13   THEY RECEIVED DISTRIBUTIONS, DID THEY?

14   A.    THAT'S CORRECT.  BY DEFINITION, IF YOU DON'T RECONCILE

15   WHAT EVERYBODY GOT, THEN YOU DON'T HAVE A BY DATE.

16   Q.    IF THEY RECEIVED MONEY ON DAYS THAT MR. HARDWICK DIDN'T

17   RECEIVE MONEY?

18   A.    YES.  AS PRESENTED AT TRIAL, WE HAD EVIDENCE TO SHOW THAT

19   OTHER OWNERS RECEIVED AMOUNTS OF MONEY ON DAYS THAT

20   MR. HARDWICK APPARENTLY DID NOT RECEIVE HIS TRANSFERS.

21   Q.    AND YOU SAW PRESENTED HERE A LIST OF DAYS WHEN HARDWICK

22   RECEIVED MONEY, NOT ON DAYS THEY DIDN'T RECEIVE MONEY, RIGHT?

23   A.    AT TRIAL, A SCHEDULE WAS PRESENTED SHOWING MR. HARDWICK'S

24   TRANSFERS OF MONEY AND THE ASSOCIATED DATE TO THOSE TRANSFERS.

25   Q.    IN ORDER TO MAKE A COMPLETE ANALYSIS, YOU WOULD NEED THAT

1   SAME SCHEDULE FOR THE OTHER PARTNERS, WOULD YOU NOT?

2   A.   WELL, TWOFOLD.  COMPLETE ANALYSIS IN TERMS OF DETERMINING

3   WHAT THE PERCENTAGE OF DISTRIBUTIONS.  SO, YES, IN THAT SENSE,

4   TOO.  YOU WOULD HAVE TO HAVE THE SAME SCHEDULE TO DETERMINE --

5   FOR EXAMPLE, THE INDICTMENT.  IF YOU WOULD SHOW A TRANSFER ON A

6   SPECIFIC DATE, YOU COULDN'T SAY IF THE OTHERS RECEIVED THE SAME

7   TYPE OF PAYMENTS; THAT JUST BECAUSE SOMEBODY RECEIVED A PAYMENT

8   ON DAY ONE, FOR EXAMPLE, AND THE OTHERS DIDN'T RECEIVE IT,

9   THAT, BY DEFINITION, THAT WAS AN IMPROPER TRANSFER.

10              MR. GARLAND:  JUST A MOMENT, PLEASE.

11              THE COURT:  YES, SIR.

12              MR. GARLAND:  THAT'S ALL THE QUESTIONS OF THIS

13   WITNESS.

14              THE COURT:  ALL RIGHT.  CROSS-EXAMINATION.

15              MS. BARRON:  THANK YOU.

16                      CROSS-EXAMINATION

17   BY MS. BARRON:

18   Q.   GOOD AFTERNOON, MR. GINGRAS.

19   A.   GOOD AFTERNOON.

20   Q.   SIR, YOU UNDERSTAND THAT THIS IS A FRAUD CASE, RIGHT?

21   A.   CORRECT.

22   Q.   AND YOU'VE READ THE INDICTMENT.

23   A.   CORRECT.

24   Q.   SO YOU UNDERSTAND THAT WHAT MR. HARDWICK WAS CHARGED

25   WITH -- AND, THEREFORE, WHAT HE WAS FOUND GUILTY OF -- IS

1   TRYING TO GET MONEY THAT HE'S NOT OTHERWISE ENTITLED TO BY

2   LYING.  YOU UNDERSTAND THAT THAT'S WHAT WIRE FRAUD CHARGES --

3   THAT'S WHAT MR. HARDWICK WAS CHARGED WITH.

4   A.   I READ THE INDICTMENT, AND I HAVE SECTIONS OF THE

5   INDICTMENT IN MY REPORT.  AS POINTED OUT IN MY REPORT, IT TALKS

6   ABOUT EXCESS DISTRIBUTIONS AND MONEY THAT HE WAS NOT ENTITLED

7   TO.  BY DEFINITION, THAT IS A COMPARATIVE STATEMENT.  EXCESSES.

8   EXCESS TO WHAT?

9        AND, THEREFORE, THAT'S WHY AT THE DAUBERT HEARING, WE WERE

10  TALKING ABOUT COMPARING WHAT MR. HARDWICK RECEIVED AS OPPOSED

11  TO THE OTHERS.

12  Q.   SIR, I'M GOING TO ASK MY QUESTION AGAIN.  YOU UNDERSTAND

13  THAT THE INDICTMENT CHARGES MR. HARDWICK WITH ATTEMPTING TO GET

14  MONEY, CONSPIRING WITH MS. MAURYA TO GET MONEY BY LYING.  YOU

15  UNDERSTAND THAT?

16  A.   DON'T KNOW IF I UNDERSTOOD THAT FROM READING THE

17  INDICTMENT.  IT LOOKED LIKE TO ME IT WAS A COMPARATIVE

18  STATEMENT.  I HAVE A SUMMARY IN MY REPORT.  I DO NOT BELIEVE

19  THAT THE WORD LYING IS IN THERE.

20  Q.   MR. GINGRAS, I'M NOT TALKING ABOUT HOW MUCH, I'M NOT

21  TALKING ABOUT NUMBERS, I'M NOT TALKING ABOUT MATH.  I'M JUST

22  SAYING THAT WIRE FRAUD, AND SPECIFICALLY THE INDICTMENT IN THIS

23  CASE, CHARGED MR. HARDWICK WITH CONSPIRING WITH MS. MAURYA TO

24  OBTAIN MONEY AND/OR PROPERTY BY MISSTATEMENTS, FALSE

25  STATEMENTS, LIES, OMISSIONS -- BASICALLY, BY LYING.  YOU WOULD

1    AGREE WITH THAT, WOULDN'T YOU?

2    A.   IT TALKS ABOUT UNEQUAL DISTRIBUTIONS AND HARDWICK USED

3    MHS'S TRUST ACCOUNT BY MAKING FALSE STATEMENTS.  SO I WOULD

4    ASSUME BY READING THE INDICTMENT -- AGAIN, I'M NOT AN ATTORNEY,

5    WOULD NEVER MAKE A LEGAL CONCLUSION.  BUT AS A CERTIFIED FRAUD

6    EXAMINER, I WOULD READ THIS -- WHEN IT STATES, UNEQUAL

7    DISTRIBUTION BY LYING, I WOULD WANT TO SEE A COMPARISON BETWEEN

8    TWO INDIVIDUALS AND THEN SOMEBODY IS LYING ABOUT THE AMOUNT

9    THAT THEY RECEIVED AS A COMPARATIVE STATEMENT, NOT AS A ONE-OFF

10   TRANSACTION.

11   Q.   I UNDERSTAND THAT THAT'S WHAT YOU WANT TO SEE, SIR.  BUT

12   I'M ASKING YOU -- AND, SPECIFICALLY, I'M LOOKING AT

13   PARAGRAPH I -- I'M SORRY.  THIS IS ON PAGE 4 OF THE INDICTMENT,

14   WHICH SAYS, THE DEFENDANTS HARDWICK AND MAURYA COVERED UP

15   DEFENDANT HARDWICK'S UNEQUAL DISTRIBUTIONS -- WHATEVER THEY

16   ARE, AND I KNOW WE DISAGREE -- AND DEFENDANT HARDWICK'S USE OF

17   MHS'S TRUST ACCOUNTS BY MAKING FALSE STATEMENTS, BY TELLING

18   HALF-TRUTHS, AND BY OMITTING MATERIAL FACTS IN THEIR

19   COMMUNICATIONS WITH MHS'S MINORITY OWNERS.

20        YOU UNDERSTAND THAT IS WHAT THE INDICTMENT CHARGED AND

21   THAT IS WHAT THE JURY FOUND MR. HARDWICK GUILTY OF?

22   A.   AND THAT'S WHAT I WAS READING FROM MY REPORT THAT TALKS

23   ABOUT UNEQUAL DISTRIBUTION.  UNEQUAL, BY DEFINITION, IS A

24   COMPARATIVE STATEMENT.

25   Q.   AND SO YOU WOULD AGREE THAT THE QUESTION AT SENTENCING

1   HERE IS, WHAT IS THE AMOUNT OF MONEY THAT HE RECEIVED THAT HE

2   SHOULDN'T HAVE AS A RESULT OF THOSE LIES, RIGHT?

3   A.   AS A COMPARATIVE STATEMENT, THAT'S CORRECT.

4   Q.   OKAY.

5   A.   YOU HAVE TO COMPARE IT TO SOMETHING.

6   Q.   OKAY.  AND YOU TESTIFIED, I THINK JUST NOW, THAT THE

7   REASON WHY YOU PUT SO MUCH FAITH IN THAT TAX RETURN IS BECAUSE

8   IT WAS SIGNED UNDER PENALTY OF PERJURY.  IS THAT CORRECT?

9   A.   AND IT WAS PREPARED, I BELIEVE, MORE THAN A YEAR AFTER

10  THIS SITUATION OCCURRED.  SO -- AND IT WAS PREPARED BY A

11  REPUTABLE ACCOUNTING FIRM.

12  Q.   OKAY.  AND IT WAS SIGNED UNDER PENALTY OF PERJURY BY

13  MR. MARK WITTSTADT, WASN'T IT?

14  A.   I BELIEVE SO.  IT'S IN MY REPORT, YES.

15  Q.   AND YOU TESTIFIED -- I TRIED TO GET YOUR WORDS DOWN, AND I

16  DIDN'T GET IT ENTIRELY -- BUT BECAUSE IT WAS SIGNED UNDER

17  PENALTY OF PERJURY, THAT LEADS YOU TO GIVE IT A HIGH LEVEL OF

18  CREDIBILITY, CORRECT?

19  A.   AS AN INITIAL CONTACT, ABSOLUTELY.

20  Q.   OKAY.  SO YOU'RE ALSO AWARE THAT MR. WITTSTADT TESTIFIED

21  TWICE AT TRIAL, RIGHT?

22  A.   I DON'T REMEMBER IF IT WAS MORE THAN ONCE, BUT HE

23  TESTIFIED AT TRIAL, YES.

24  Q.   AND HE TESTIFIED UNDER PENALTY OF PERJURY?

25  A.   THAT'S MY UNDERSTANDING, CORRECT.

1   Q.   YOU SAW HIM RAISE HIS RIGHT HAND?

2   A.   ABSOLUTELY.

3   Q.   BUT YOU DIDN'T CREDIT ANYTHING THAT HE SAID AT TRIAL, DID

4   YOU?

5   A.   I BELIEVE I CONSIDERED IT, YES.

6   Q.   DID YOU CONSIDER THE FACT THAT HE TALKED ABOUT THE

7   SHAREHOLDER AGREEMENTS?  AND WHAT YOU SAID, THEY DEVIATED ALL

8   THE TIME FROM THE SHAREHOLDER AGREEMENTS.

9        DID YOU RECALL HIM TESTIFYING ABOUT THE THREE TIMES THAT

10  THEY DEVIATED FROM THE SHAREHOLDER AGREEMENT REGARDING

11  DISTRIBUTIONS?

12  A.   I RECALL THAT, BUT, CLEARLY, IT WAS WRONG, BECAUSE WE JUST

13  SAW FROM MY SCHEDULE THAT THROUGHOUT 2011 THEY DEVIATED FROM

14  THAT.

15  Q.   WELL, AND THE REASON WHY YOU'RE ABLE TO CREATE THAT NUMBER

16  IS BECAUSE YOU'VE REVIEWED THE DOCUMENTS IN THIS CASE, RIGHT?

17  A.   CORRECT.

18  Q.   YOU'VE REVIEWED THE E-MAILS INVOLVING MR. MORRIS SAYING

19  WHAT AMOUNT HE'S GOING TO GET.  AND IT'S WAY MORE THAN HIS

20  PERCENTAGE OF THE DISTRIBUTION; IS THAT RIGHT?

21  A.   BECAUSE YOU ARE ONLY, IN THAT CASE -- LET'S STEP BACK FOR

22  A SECOND.  IF YOU LOOK AT THE DOCUMENTS, THE FINANCIAL

23  STATEMENTS THAT YOU RELIED UPON, YOU CAN SEE THAT IT SAYS

24  APPROXIMATELY $550,000, RIGHT?

25  Q.   UH-HUH.

1    A.   IF YOU LOOK AT THE K-1, WHICH ALL OWNERS RECEIVED K-1'S,

2    THAT IS THE AMOUNT THAT SAYS, HERE'S THE DISTRIBUTION FOR THIS

3    PARTNER.   THAT WAS ON MY SCHEDULE.

4         WHAT OCCURRED IS THE GOVERNMENT LOOKED AT THIS AND SAY, I

5    DON'T WANT TO DO IT THIS WAY.   I WANT TO GO THROUGH ALL THE

6    PAYMENT, AND I'M GOING TO TABULATE THEM, AND I'M GOING TO STILL

7    COMPARE THAT TO NET INCOME.

8         FOR EXAMPLE, IF THERE WAS A PAYMENT FOR $100,000 TO

9    MR. HARDWICK THAT WAS EXPENSED IN THE FINANCIAL STATEMENTS, I'M

10   REDUCING THAT INCOME.   BUT NOW I'M GOING TO RECLASSIFY IT AS A

11   DISTRIBUTION.   YOUR NET INCOME IS NOT 550 ANYMORE, IT'S 650.

12   Q.   MR. GINGRAS?

13   A.   BECAUSE YOU HAVE REDUCED THE EXPENSE AND RECLASSIFIED IT

14   BY DOING THAT IN THE FIRST PLACE, YOU ARE MISMATCHING.   I HAVE

15   PROVEN TO YOU THAT THAT WOULD STILL BE INCORRECT, BECAUSE I

16   WOULD HAVE TO DO THE SAME THING TO THE OTHER PARTNERS.   WHAT

17   DID THEY RECEIVE?   AND THAT IS WHY, WHEN I COMPARED WHAT AN

18   OWNER RECEIVED IN DISTRIBUTION AT THE TIME, IT IS MUCH HIGHER

19   THAN NET INCOME, PROVING THAT THEY WERE DEVIATING FROM THE

20   AGREEMENT.

21        BUT IF YOU COMPARE OWNERS TO OWNERS, THEN YOU HAVE THE

22   APPROPRIATE AMOUNT OF DISTRIBUTION.   THE ISSUE IS THAT YOU

23   CAN'T DO THIS EXERCISE FOR ONLY ONE PARTNER AND NOT DO IT FOR

24   OTHERS.

25   Q.   SO BACK TO MY QUESTION, TALKING ABOUT MR. MORRIS AND WHAT

106

1   THE OTHER PARTNERS WERE GIVEN, YOU LOOKED AT THE K-1'S, RIGHT?

2   A.   I DID.

3   Q.   I PRESUME YOU LOOKED AT THE E-MAILS BETWEEN ALL THE

4   PARTNERS ABOUT, YOU'RE GOING TO GET THIS MUCH, YOU'RE GOING TO

5   GET THIS MUCH, YOU'RE GOING TO GET THIS MUCH.  YOU REVIEWED

6   THOSE E-MAILS, RIGHT?

7   A.   SOME E-MAILS, THAT'S CORRECT.

8   Q.   RIGHT.  AND IF YOU ADD UP ALL THOSE NUMBERS, FOR SOME

9   YEARS, THEY -- ALL OF THEM GOT MORE THAN THEY SHOULD HAVE.  ALL

10  OF THEM GOT MORE THAN THE NET INCOME FOR THAT PARTICULAR YEAR.

11  RIGHT?  YOU WOULD AGREE WITH THAT?

12  A.   THAT'S FACTUALLY CORRECT, AS I SHOWED ON MY DEMONSTRATIVE.

13  THAT'S CORRECT.

14  Q.   AND THAT'S ACTUALLY ALSO IN THE WARREN AVERETT AUDITED

15  FINANCIAL STATEMENTS, RIGHT?  DIDN'T WARREN AVERETT FIND THAT

16  MHS WAS DISTRIBUTING MORE THAN THEY ACTUALLY MADE?

17  A.   I DON'T KNOW IF THEY, THEY MADE THAT DETERMINATION OR NOT.

18  I DON'T RECALL WARREN AVERETT -- I BELIEVE -- OKAY.  WARREN

19  AVERETT IS THE AUDITORS.  I DO NOT BELIEVE THAT THERE WAS ANY

20  DISCLOSURE OR ANYTHING OF THAT NATURE.

21  Q.   AND I CAN'T REMEMBER IF IT WAS YOU OR MR. SHELDON KAY, BUT

22  ONE OF YOU TESTIFIED -- AND IT MAY HAVE BEEN YOU THAT TESTIFIED

23  THAT A FIRM CAN DECIDE TO OPERATE IN THE RED, RIGHT?  THEY CAN

24  CHOOSE TO DISTRIBUTE MORE MONEY THAN THEY GET, CORRECT?

25  A.   CORRECT.

1   Q.   AND THE SHAREHOLDER AGREEMENT SPECIFICALLY ADDRESSES THAT.

2   THERE WAS A PROVISION IN THE SHAREHOLDER AGREEMENT -- AND I CAN

3   SHOW IT TO YOU -- WHICH SAYS THAT IF THE FIRM IS GOING TO MAKE

4   DISTRIBUTIONS ABOVE WHAT IS IN THAT BONUS LANGUAGE, WHICH YOU

5   CITE IN YOUR REPORT, THERE HAS TO BE UNANIMOUS CONSENT OF ALL

6   THE PARTNERS.  YOU RECALL THAT, RIGHT?

7   A.   YES.  CLEARLY THERE WAS TESTIMONY THAT THAT DIDN'T OCCUR.

8   Q.   YOU HEARD MR. WITTSTADT TESTIFY UNDER OATH THAT THERE WERE

9   THREE OCCASIONS WHERE THEY ALL DISCUSSED DISTRIBUTING OUTSIDE

10  OF NET INCOME, CORRECT?

11  A.   THAT'S MY UNDERSTANDING.  THAT'S CORRECT.

12  Q.   ONE OF THOSE TIMES IS WHEN THEY DECIDED TO DRAW DOWN ON

13  THE RESERVE BALANCE.

14  A.   THAT IS MY RECOLLECTION.  THAT'S CORRECT.

15  Q.   AND THE OTHER TWO TIMES WERE WHEN THEY DECIDED TO DRAW

16  DOWN ON THE FACTORING LINE.  THAT WOULD BE ACTION CAPITAL LINE

17  OF CREDIT.

18  A.   THAT'S WHAT HE TESTIFIED TO.  THAT IS CORRECT.

19  Q.   OKAY.  AND THEN YOU ALSO --

20  A.   THERE'S NO EVIDENCE WHATSOEVER TO SAY THAT THAT WAS THE

21  ONLY THREE TIMES.  BECAUSE, AGAIN, THERE IS NO RECONCILIATION

22  THAT SHOWS ME ALL THE TRANSFERS OUT.  I ONLY HAVE THAT FOR

23  MR. HARDWICK.

24  Q.   NO.  BUT WHAT WE DO KNOW, AND WHAT YOU'VE SEEN AND WHAT

25  YOU'VE HEARD BECAUSE YOU'VE SAT THROUGH THE ENTIRE TRIAL, WAS

1    THE TESTIMONY ABOUT THE NUMEROUS TIMES THAT MR. HARDWICK TOLD

2    MS. MAURYA TO SEND HIM MONEY, AND THERE ARE NO OTHER PARTNERS

3    COPIED ON THOSE E-MAILS, CORRECT?

4    A.   AND, AGAIN, IT OCCURRED WITH OTHER PARTNERS.  WE HAD AT

5    TRIAL MR. MORRIS DIRECTING MS. MAURYA TO TRANSFER AMOUNTS

6    OUTSIDE OF AN ACCOUNT WITHOUT ANY OF THE OTHER PARTNERS ON THAT

7    E-MAIL.  ISOLATING THAT TRANSACTION WOULD LEAD YOU TO THE SAME

8    CONCLUSION THAT YOU'RE TRYING TO DRAW.

9    Q.   SO IT'S YOUR OPINION THAT MR. HARDWICK WAS NOT ACTUALLY

10   OVER-DISBURSED BECAUSE THERE'S REALLY NO WAY TO DETERMINE WHAT

11   HE WAS OWED BECAUSE OTHER PEOPLE GOT MORE MONEY THAN THEY

12   SHOULD HAVE, TOO.  IS THAT YOUR OPINION?

13   A.   NO.  I HAVE NO IDEA WHAT THE OTHER PEOPLE RECEIVED.  THERE

14   WAS NO RECONCILIATION OF THAT.  IF THE OTHER PARTNERS RECEIVED

15   $50 MILLION, CLEARLY MR. HARDWICK WAS UNDER-DISBURSED.  IF THEY

16   RECEIVED $3 MILLION, MR. HARDWICK GOT OVER-DISBURSED.  WE DON'T

17   HAVE THAT.  YOU CANNOT MAKE THAT DETERMINATION BECAUSE, BY

18   DEFINITION, DISTRIBUTIONS BETWEEN OWNERS HAVE TO BE

19   COMPARATIVE, BUT NOT TO NET INCOME, AS I'VE PROVEN EARLIER

20   TODAY.

21   Q.   IT WAS YOUR TESTIMONY AT TRIAL THAT MR. HARDWICK WAS

22   ACTUALLY UNDER-DISBURSED BY $3.3 MILLION, WASN'T IT?

23   A.   HE WAS OWED $470,000 IF YOU CONSIDER THAT HE INFUSED THE

24   ALLEGED ESCROW SHORTAGE BY 6.4 MILLION.  THAT'S CORRECT.

25   Q.   OKAY.  THE $3.3 MILLION, CORRECT, THAT HE WAS

1    UNDER-DISBURSED?

2    A.   NO.  $470,000 THAT HE WAS OWED CONSIDERED THE

3    6.4 MILLION -- 6,458,000 THAT HE PUT IN TO COVER AN ALLEGED

4    ESCROW ACCOUNT.

5    Q.   MR. GINGRAS, I'M GOING TO SHOW YOU YOUR TRIAL TESTIMONY.

6    THIS IS DOCUMENTARY 308.  I'D ASK THAT YOU TURN TO PAGE 2800,

7    PLEASE.

8    A.   2800?

9    Q.   YES, SIR.  OKAY.  DO YOU SEE, BEGINNING AT LINE 17 ON

10   PAGE 2800?

11   A.   YES.

12   Q.   YOU REMEMBER MR. GILFILLAN, RIGHT?

13   A.   YES.

14   Q.   MR. GILFILLAN ASKS YOU:  ALL RIGHT.  AND NOW LET'S LOOK

15   AND CONSIDER.  SO, ACTUALLY, YOUR OPINION IS -- AND USED THE

16   WORD YOUR OPINION -- AS YOU SIT HERE TODAY, YOU SIT HERE TODAY

17   AFTER BEING PAID 65,000, TALKING TO MR. HARDWICK OVER THE LAST

18   TWO AND A HALF YEARS --

19        AND, ACTUALLY, I SKIPPED A SENTENCE.

20        IF YOU START AT 14:  SO THAT'S YOUR EXPERT OPINION, THAT

21   THE LAW FIRM OWES HIM $3.3 MILLION?

22   A.   YES.  SO I BELIEVE --

23   Q.   AND YOU SAY:  ABSOLUTELY.

24   A.   TO PUT IT IN CONTEXT, I BELIEVE THAT THAT WAS A DIFFERENT

25   DEMONSTRATIVE THAT I HAD AT TRIAL THAT MR. GILFILLAN WENT AND

1    PULLED OUT THAT HAD A DIFFERENT CALCULATION.

2    Q.    OKAY.

3    A.    AND WE DID NOT PRESENT IT AS MY DIRECT.

4    Q.    AND THAT'S MY POINT, SIR.  SO THE NIGHT BEFORE YOUR

5    TESTIMONY, I THINK AROUND 9:30, THE GOVERNMENT RECEIVED SOME

6    EXHIBITS WITH A NEW CALCULATION SHOWING THAT THE FIRM OWED

7    MR. HARDWICK AROUND $400 -- $400,000.  YOU REMEMBER THAT,

8    RIGHT?  THAT'S WHAT YOU ACTUALLY TESTIFIED TO AT TRIAL.

9    A.    I DO.

10   Q.    THE NIGHT BEFORE, YOUR OPINION WAS THAT THE LAW FIRM OWED

11   HIM 3.3 MILLION, CORRECT?

12   A.    NO.  THOSE ARE DIFFERENT CALCULATIONS.  SO, FOR EXAMPLE,

13   IF SOMEBODY -- IF I HAVE A HUNDRED DOLLARS IN DISTRIBUTIONS,

14   AND I OWN 75 PERCENT -- LET'S MAKE IT EASY -- I'M GETTING $75.

15   AND I HAVE 75 PERCENT, AND I WANT TO CALCULATE WHAT THE OTHERS

16   SHOULD HAVE RECEIVED.  THEN IT'S 25 PERCENT, RIGHT?

17   TWENTY-FIVE PERCENT.  LET'S ASSUME THAT.

18         OKAY.  SO THERE'S A WAY TO SHOW, IF MR. HARDWICK RECEIVED

19   26 MILLION, WHAT IS MY TOTALITY OF DISTRIBUTION THAT SHOULD

20   HAVE OCCURRED AT THAT TIME?  IF 26 IS 55, WHAT'S 100 PERCENT OF

21   IT?  THAT'S THE WAY TO DO THE CALCULATION.  IT'S ONE WAY TO DO

22   THE CALCULATION.

23         ALTERNATIVELY, YOU CAN SAY, IF HE GOT 26 MILLION -- LET ME

24   PUT THAT ASIDE FOR A SECOND BECAUSE I HAVE NO CONFIDENCE ON

25   THAT NUMBER.  I'M ASSUMING.  SO THEN I'M GOING TO GO TO THE K-1

1   AND DETERMINE WHAT THE OTHERS RECEIVED AND BACKTRACK TO COMPARE

2   THAT TO THE 26 MILLION.  THE METHODOLOGY IS TOTALLY DIFFERENT.

3        MR. GILFILLAN PULLED A DIFFERENT EXHIBIT.  AND, BY THE

4   WAY, THE TAX RETURN SHOWED 6.4 MILLION.  THE 3.3 MILLION WAS

5   REPRESENTING OF BASING IT, IF 26 MILLION IS 55 PERCENT, WHAT'S

6   100 PERCENT.

7   Q.   SO I KNOW THE WAY WE CALCULATE IT.  AND I'M NOT SMART

8   ENOUGH TO FIGURE OUT WHICH WAY IS BEST.  BUT EITHER WAY WE

9   CALCULATE IT, YOUR OPINION IS THAT THE LAW FIRM OWED

10  MR. HARDWICK MONEY; IS THAT RIGHT?

11  A.   THAT IS CORRECT, BASED ON FACTS OF THIS CASE.

12  Q.   AND THAT IS STILL YOUR OPINION, CORRECT?

13  A.   ABSOLUTELY.

14  Q.   AND YOU UNDERSTAND THAT 12 PEOPLE SITTING IN THAT BOX

15  NECESSARILY HAD TO DISAGREE WITH YOU IN ORDER TO FIND

16  MR. HARDWICK GUILTY?

17  A.   NO.  ABSOLUTELY NOT.  SO, OKAY.  THERE'S A DIFFERENCE

18  BETWEEN SOMEBODY BEING OVER-DISBURSED OR UNDER-DISBURSED OR

19  DISBURSED CORRECTLY AND THE MANNER IN WHICH SOMEBODY ACQUIRES

20  THOSE FUNDS.

21       THE JURY COULD HAVE COMPLETELY AGREED WITH ME AND SAY

22  THERE IS NO ESCROW SHORTAGE BECAUSE THERE IS NO EVIDENCE, THERE

23  IS NO SHORTAGE IN DISTRIBUTION; HOWEVER, DISAGREED IN THE

24  MANNER IN WHICH THOSE FUNDS WERE OBTAINED.

25       NOW, IN MY REPORT, I STATE SPECIFICALLY THAT, IN MY

1    OPINION, IT'S NOT A FRAUDULENT TRANSFER THAT AN OWNER RECEIVES

2    MONEY WITHOUT TELLING HIS PARTNER IF HE CAN PROVE THAT THE

3    MONEY HE RECEIVED WAS OWED TO HIM.

4    Q.   IN YOUR OPINION, CORRECT?

5    A.   AS A FRAUD EXAMINER, SURE.

6    Q.   BUT IF THE JURY, IN ORDER TO CONVICT MR. HARDWICK, HAD TO

7    FIND THAT IN RECEIVING THOSE MONIES HE TOLD LIES TO HIS

8    PARTNERS TO GET IT -- AND YOU UNDERSTAND THAT'S WHAT HAPPENED?

9    A.   YOU'RE MAKING AN ASSUMPTION ON -- TO DETERMINE WHAT THE

10   TRIER OF FACT HAD IN THEIR HEADS IN TERMS OF CONVICTING AN

11   INDIVIDUAL.  I AM NOWHERE NEAR CAPABLE OF MAKING THAT

12   ASSUMPTION.  BUT IT'S VERY POSSIBLE THAT THE TRIER OF FACT DID

13   NOT BELIEVE THAT THE MANNER IN WHICH IT WAS OBTAINED WAS

14   APPROPRIATE.

15   Q.   OKAY.

16   A.   THAT HAD NOTHING TO DO WITH OVER-DISBURSED,

17   UNDER-DISBURSED, IF THERE WAS AN ESCROW SHORTAGE OR NOT.

18   Q.   OKAY.  I'M GOING TO STEP BACK AND ASK YOU A MORE BROAD

19   QUESTION.

20       YOUR NUMBERS, YOUR CALCULATIONS ARE BASED ON -- THE

21   STARTING POINT BASED ON THE ESCROW SHORTAGE; IS THAT RIGHT?

22   A.   WELL --

23   Q.   YOU START FROM DETERMINING, THIS IS THE ESCROW SHORTAGE.

24   IF I UNDERSTOOD WHAT YOU AND MR. GARLAND JUST TALKED ABOUT,

25   $29 MILLION IN ESCROW SHORTAGE.  AND THEN YOU SAY THAT

1   MR. HARDWICK RECEIVED 19 MILLION, AND SO THERE'S 10 MILLION

2   THAT'S UNACCOUNTED FOR IN THE ESCROW SHORTAGE; IS THAT CORRECT?

3   A.   IT DEPENDS WHAT ANALYSIS YOU'RE DOING.  IF YOU ARE GOING

4   TO ANALYZE AND ANSWER THE QUESTION, IS THERE AN ESCROW

5   SHORTAGE, NUMBER ONE; AND, NUMBER TWO, WHAT IS THE SOURCE OF

6   THIS -- OF THE SHORTAGE, IF ANY, THEN YOU WOULD START WITH THE

7   $30 MILLION, ABSOLUTELY.  29,503,000, EXACTLY.

8   Q.   THE CHARTS, ALL THE MATH THAT YOU DID, IF THAT'S THE

9   QUESTION YOU'RE GOING TO ANSWER, THAT'S THE METHODOLOGY YOU

10  WOULD USE; IS THAT RIGHT?

11  A.   THE CHART THAT YOU HAVE GOES TO COMPARISON, COMPARISON

12  BETWEEN OWNERS OF DISTRIBUTIONS.  IT HAS NOTHING TO DO WITH

13  ESCROW.

14  Q.   LET ME ASK THE QUESTION A LITTLE DIFFERENTLY.  IF THE

15  QUESTION IS, HOW MUCH MONEY DID MR. HARDWICK GET BY

16  PARTICIPATING IN A SCHEME TO LIE, IF THAT'S THE QUESTION, THEN

17  WHAT MR. WITTSTADT AND MR. WITTSTADT AND MR. MORRIS RECEIVED IS

18  IRRELEVANT, ISN'T IT?  THE FOCUS IS ON WHAT MR. HARDWICK GOT

19  AND WHAT HE GOT BY LYING.

20  A.   LET'S ASSUME THAT THE OTHERS RECEIVED A HUNDRED DOLLARS

21  AND MR. HARDWICK RECEIVED 50.  CLEARLY HE'S UNDER-DISBURSED,

22  CORRECT?  THEY RECEIVED 100.  HE RECEIVED 50.  HE OWNS

23  55 PERCENT.  HE WAS UNDER-DISBURSED.  IF HE GOT THAT MONEY

24  WITHOUT TELLING THE OTHER, IS THAT IMPROPER?  I WOULD ASSUME

25  THAT IT'S NOT.

1      SO YOU'RE TRYING TO -- FOR ME TO LOOK AT THE TRIER OF FACT

2  AND DECIDE WHAT THEY THOUGHT WHEN THEY SAID THAT MR. HARDWICK

3  IS GUILTY.

4  Q.    SIR, THE ONLY QUESTION I'M ASKING YOU IS:  IF THE PROBLEM

5  BEFORE US IS JUST TRYING TO PUT A NUMBER VALUE ON THE AMOUNT OF

6  MONEY THAT MR. HARDWICK RECEIVED BY LYING, THEN WHAT DOES THE

7  COMPARISON VALUE WITH HIS PARTNERS, HOW DOES THAT EVEN BEAR ANY

8  RELEVANCE ON ANSWERING THAT QUESTION IF THE ONLY QUESTION IS

9  WHAT DID HE GET BY LYING?

10  A.    I'M NOT SURE I ADDRESS THAT QUESTION.

11  Q.    WELL, I AGREE WITH THAT.

12  A.    CLEARLY I SHOW YOU THAT THERE IS A VERY LOW LIKELIHOOD

13  THAT THERE'S AN ESCROW SHORTAGE.  AND I SHOW YOU FROM THE TAX

14  RETURN AND FROM MY CALCULATION THAT MR. HARDWICK WAS NOT

15  OVER-DISBURSED.

16  Q.    OKAY.  I WANT TO TALK ABOUT SOME OF THE ASSUMPTIONS THAT

17  YOU MADE.  OKAY.  SO YOU LOOK AT THE AMOUNT OF MONEY THAT YOU

18  BELIEVE HE WAS ENTITLED TO RECEIVE, AND THEN YOU -- I THINK

19  THIS IS ON -- OKAY.  DO YOU HAVE A COPY OF YOUR EXPERT REPORT

20  IN FRONT OF YOU?

21  A.    I DO.

22  Q.    OKAY.  IF WE LOOK AT THE BOTTOM OF PAGE 9 --

23  A.    NINE.

24  Q.    -- YOU SAY IT IS YOUR EXPERT OPINION, BASED ON THE

25  EVIDENCE IN THIS CASE, THAT MR. HARDWICK WAS ENTITLED TO,

1   APPROXIMATELY AND CONSERVATIVELY, $13 MILLION AND SOME CHANGE.

2   AND THAT'S AFTER YOU DO YOUR PROPORTIONAL DISTRIBUTION, RIGHT?

3   A.   THAT'S CORRECT.   THAT IS BASED ON THE K-1'S OF THE OTHER

4   OWNERS.   SO I'M PUTTING -- I'M MAKING AN ASSUMPTION NOW.   I'M

5   ASSUMING THAT THE K-1'S ARE CORRECT.   WHICH IS AN ASSUMPTION,

6   RIGHT, BECAUSE WE HAVEN'T PROVEN THAT.

7   Q.   AND THEN YOU ADD TO THAT NUMBER BY LOOKING AT SOME OTHER

8   THINGS LIKE, FOR EXAMPLE, THE FORTUNA PAYMENTS.

9   A.   CORRECT.

10   Q.   OKAY.   NOW, LET'S TALK ABOUT THE FORTUNA PAYMENTS.   YOU

11   SAY THAT THE FIRM PAID APPROXIMATELY $900,000 FOR HIS FORTUNA

12   LOAN AND THAT HE SHOULD -- THAT THAT IS ON TOP OF THE

13   13 MILLION.   SO THAT'S ALSO MONEY HE WAS DUE, CORRECT?

14   A.   BECAUSE YOU ARE NOW TRYING TO -- SO NOW THE -- THE

15   13 MILLION IS DISTRIBUTIONS.

16   Q.   UH-HUH.

17   A.   NOW, IF I HAVE THE NUMBER OF THE OTHER PARTNERS, I WOULD

18   COMPARE THAT NUMBER TO THE OTHER PARTNERS, RIGHT?   BUT HE

19   GOT -- I'M NOW TRYING TO COMPARE IT TO THE 26 MILLION.

20   Q.   SO MY QUESTION --

21   A.   IN THE 26 MILLION, THERE ARE PAYMENTS TO FORTUNA THAT ARE

22   INCLUDED IN THAT, SO I'M ADDING THE NUMBER.

23   Q.   SO WE START WITH YOUR 13 AND WE ADD 900?

24   A.   THAT'S CORRECT.

25   Q.   AND THE REASON WE ADD IT IS BECAUSE IT'S SPECIFICALLY

1   ADDRESSED IN THE SHAREHOLDER AGREEMENT, CORRECT?

2   A.   THAT IS CORRECT.  AND WE SAW AT TRIAL THAT MR. HARDWICK

3   RECEIVED PAYMENTS FOR FORTUNA AND THE OTHER OWNERS RECEIVED

4   CHECKS.

5       NOW, IT WASN'T DONE LIKE THE AGREEMENT STATED.  THE

6   AGREEMENT STATED THAT IF YOU RECEIVE THE DISTRIBUTIONS, FOR

7   EXAMPLE, A HUNDRED DOLLARS, I SHOULD REDUCE THE PAYMENT OF THAT

8   HUNDRED DOLLARS BY THE FORTUNA LOAN, AND THE OTHER PARTNERS

9   SHOULD RECEIVE THE SHARE, THE SAME SHARE THAT THEY WOULD HAVE.

10      THAT'S NOT HOW IT WAS DONE.  THAT'S ANOTHER DEPARTURE.

11  AND WE SAW CHECKS GOING BACK AND FORTH BETWEEN THE FIRM AND THE

12  OWNER.

13  Q.   WE SAW ONE CHECK, CORRECT?  THERE WAS ONE CHECK WHERE

14  THERE WAS A CHECK TO MR. WITTSTADT TO MAKE UP FOR THE AMOUNT OF

15  MONEY THAT WAS GIVEN TO MR. HARDWICK FOR THAT ONE MONTH FOR THE

16  FORTUNA PAYMENT.  BUT OTHER THAN THAT, THERE WAS NOT A SHRED OF

17  EVIDENCE IN THIS CASE THAT THE OTHER PARTNERS WERE COMPENSATED

18  FOR THE FORTUNA LOAN.

19  A.   BECAUSE WE HAVEN'T DONE THE ACCOUNTING TO SEE IF THERE WAS

20  ANY OTHER PAYMENT MADE.

21  Q.   SO YOU CAN'T SAY THAT THE OTHER PARTNERS WERE MADE WHOLE,

22  CAN YOU?  YOU KNOW OF ONE CHECK.

23  A.   SPECIFICALLY TO THAT?  NO, I DON'T KNOW THAT.  HOWEVER, IT

24  WASN'T DONE.

25  Q.   BUT WHAT WE DO KNOW --

1   A.   I HAVE EVIDENCE THAT IT WAS DONE.

2   Q.   BUT WHAT WE DO --

3   A.   I THINK IT WAS MORE THAN ONE TIME.

4   Q.   YOU JUST SAID YOU ONLY SAW ONE CHECK, BUT YOU THINK --

5   A.   AT TRIAL THERE WAS ONE -- ONE TIME AT TRIAL THAT WE --

6   THAT COUNSEL SHOWED MR. WITTSTADT, AFTER SAYING THAT HE DID NOT

7   RECEIVE ANY PAYMENT, THAT THERE WAS AN ACTUAL PAYMENT THAT HE

8   RECEIVED AND HE DIDN'T RECALL IT.

9   Q.   OKAY.  SO YOU UNDERSTAND THAT MR. HARDWICK RECEIVED THE

10  BENEFIT OF THESE $900,000 PAYMENTS, CORRECT?

11  A.   YES.  THAT'S WHY IT'S ACCOUNTED FOR IN MY REPORT.

12  Q.   AND YOU UNDERSTAND THAT THE SHAREHOLDER AGREEMENT SAYS

13  THAT THAT AMOUNT IS TO BE DEDUCTED FROM HIS DISTRIBUTION.  IT'S

14  NOT ADDED TO.  YOU UNDERSTAND THAT, RIGHT?

15  A.   YES.  HOWEVER, AGAIN, IT'S METHODOLOGY.  I HEARD YOU WERE

16  GOING TO REDUCE THE 26.5 MILLION BECAUSE IT'S THE AMOUNT THAT

17  HE SHOULD HAVE RECEIVED, JUST LIKE SALARY IS NOT IN THIS

18  26.5 MILLION, RIGHT?  SO EITHER I'M REDUCING THE 26.5 OR I'M

19  ADDING IT TO HIS DISTRIBUTION.  EITHER WAY, I'M ACCOUNTING FOR

20  IT.

21  Q.   OKAY.  THE SECOND CATEGORY OF THINGS THAT YOU WANT TO GIVE

22  HIM BENEFIT OF ARE ACCOUNTS RECEIVABLE OUTSTANDING AS OF AUGUST

23  2014.  AND IF I'M UNDERSTANDING WHAT YOU'VE DONE HERE IS,

24  YOU'VE SAID THE FIRM MADE ABOUT 5 MILLION IN 2014.  HE'S

25  ENTITLED TO 55 PERCENT OF THAT.  IS THAT CORRECT?

1    A.    NO.  THEIR ACCOUNTS RECEIVABLE OUTSTANDING.

2    Q.    OKAY.

3    A.    FOR EXAMPLE, IF YOU AND I OWN A FIRM AND THERE IS $100,000

4    IN ACCOUNTS RECEIVABLE, IT'S REASONABLE THAT IF YOU LEAVE, I

5    DON'T GET TO KEEP 100 PERCENT OF THOSE ACCOUNTS RECEIVABLE.

6    WHEN IT'S COLLECTED, I WOULD WRITE YOU A CHECK FOR $50,000.

7    THAT'S REASONABLE, RIGHT?

8    Q.    SO THAT'S MONEY THAT'S GOING TO BE COMING INTO THE FIRM

9    AFTER HE'S GONE, RIGHT?

10   A.    THAT'S CORRECT.  AND MY EXPERT REPORT TALKS ABOUT THE FACT

11   THAT I SEE NO EVIDENCE THAT THAT WASN'T COLLECTED.

12   Q.    AND BECAUSE IT'S ACCOUNTS RECEIVABLE, YOU UNDERSTAND THAT

13   THAT'S MONEY THAT WOULD BE GOING INTO THE FIRM'S OPERATING

14   ACCOUNT, RIGHT?

15   A.    WELL, NORMALLY IT WOULD BE.  IN THIS CASE, IF THERE WAS AN

16   ESCROW ACCOUNT THAT WAS SHORT, YOU COULD COVER THOSE SHORTAGES

17   BY THAT AMOUNT.  SO EITHER/OR, YES.

18   Q.    AND FROM THE AMOUNT IN ANY GIVEN MONTH, AUGUST 2014 OR ANY

19   OTHER GIVEN MONTH, WHEN A FIRM RECEIVES MONEY, WHEN IT RECEIVES

20   ITS ACCOUNTS PAYABLE, WHEN THAT MONEY COMES IN, THE FIRM HAS TO

21   PAY RENT, RIGHT?

22   A.    THAT'S CORRECT.

23   Q.    THEY HAVE TO MAKE PAYROLL?

24   A.    ABSOLUTELY.

25   Q.    THEY HAVE TO PAY THE LIGHT BILL?

1    A.    ABSOLUTELY.

2    Q.    AND YOU HAVEN'T ACCOUNTED FOR THAT AT ALL IN THE ACCOUNTS

3    RECEIVABLE.  YOU'RE TREATING IT ALL AS PROFIT TO WHICH HE'S

4    ENTITLED TO 55 PERCENT?

5    A.    OKAY.  SO NOW YOU'RE GETTING INTO -- ARE YOU GOING TO

6    ISOLATE AN ITEM THAT I HAVE HIGH CONFIDENCE ON OR I'M GOING TO

7    START VALUING THE COMPANY AND START VALUING THE SHARES THAT HE

8    TENDERED, FOR EXAMPLE.  I COULD HAVE PUT A VALUE TO THAT.  I

9    DIDN'T DO THAT.  AND, THEREFORE, I'M TAKING 55 PERCENT OF THE

10   CASH THAT WENT IN IN THE NEXT 30 TO 45 DAYS IN ACCOUNTS

11   RECEIVABLE.

12         BUT YOU ARE CORRECT.  MY NUMBER COULD BE MUCH HIGHER IF I

13   SAID, YOU KNOW WHAT, MR. HARDWICK HAS RIGHTS TO 55 PERCENT OF

14   ALL THE EQUIPMENT, OF ALL THE I.T. THAT THEY HAVE, OF ALL THE

15   FUTURE CASH FLOW.  I DIDN'T DO THAT --

16   Q.    I KNOW YOU WANT TO MAKE THIS NUMBER AS BIG AS POSSIBLE.

17   BUT MY QUESTION IS VERY SIMPLE.

18   A.    I DON'T.

19   Q.    YOU ARE GIVING HIM THE BENEFIT OF 55 PERCENT OF ACCOUNTS

20   RECEIVABLE, MONEY COMING INTO THE FIRM, AND YOU'RE NOT

21   DEDUCTING FROM THAT WHAT WE WOULD NORMALLY DEDUCT WHEN WE'RE

22   CONSIDERING WHAT THE FIRM'S PROFIT FOR THAT MONTH IS, RIGHT?

23   THINGS LIKE RENT, THINGS LIKE PAYROLL, THINGS LIKE LIGHTS.  YOU

24   HAVEN'T DEDUCTED ANY OF THAT.

25         YOU'RE JUST SAYING, THIS IS MONEY THE FIRM CAME IN.  THIS

120

1    IS GROSS.  HE GETS 55 PERCENT OF GROSS.  AND THERE'S NOT A

2    DOCUMENT IN EVIDENCE THAT SUGGESTS THAT HE'S ENTITLED TO

3    55 PERCENT OF GROSS, IS THERE?

4    A.    AN OWNER OF A COMPANY, JUST LIKE WE HAD IN MY EXAMPLE,

5    WOULD OWN 55 PERCENT OF A LOT MORE THAN ACCOUNTS RECEIVABLE.

6    SO I'M BEING CONSERVATIVE WHEN I DO THAT.

7    Q.    LET'S TALK ABOUT --

8    A.    AND IF -- HE TENDERED HIS SHARES OF A BUSINESS THAT WAS

9    WORTH A LOT OF MONEY.  SO I'M BEING VERY CONSERVATIVE OF USING

10   ACCOUNTS RECEIVABLE ONLY AND NOT THE OTHER ASSETS OF THE

11   BUSINESS.

12   Q.    BECAUSE YOU LISTENED TO MR. WITTSTADT TESTIFY, YOU HEARD

13   HIM SAY THAT THE DAY AFTER THEY DISCOVERED THE FRAUD, HAD

14   FIDELITY NOT STEPPED IN, THAT FIRM WOULD HAVE HAD TO FILE

15   BANKRUPTCY.  YOU HEARD HIM SAY THAT, RIGHT?

16   A.    YES.

17   Q.    THE FIRM WAS WORTHLESS BECAUSE OF MR. HARDWICK'S FRAUD.

18   YOU WOULD AGREE WITH THAT, RIGHT?

19   A.    THAT'S WHAT HE SAID.  HOWEVER, THERE'S EVIDENCE THAT HE

20   WAS SAYING AT THE SAME TIME THAT IT'S WORTH -- LANDCASTLE ALONE

21   WAS GENERATING $300,000 IN PROFIT A MONTH.

22   Q.    I WANT TO TALK ABOUT THE 6.4 MILLION.  OKAY.  NOW, THIS IS

23   THE AMOUNT OF MONEY THAT -- YOU SAY YOU PUT A TREMENDOUS AMOUNT

24   OF FAITH IN THESE TAX RETURNS, AND THEY SAY THAT THAT IS A LOAN

25   FROM MR. HARDWICK, SO HE SHOULD RECEIVE CREDIT FOR THAT,

1    CORRECT?

2    A.   NO.  I'M LOOKING AT CASH FLOWS.  SO, OF COURSE, THE TAX

3    RETURN, I LOOKED AT THE TAX RETURN.  I WOULD HAVE A HIGH LEVEL

4    OF CERTAINTY THAT IT IS CORRECT.  BUT I WOULDN'T SAY, BY

5    DEFINITION, HERE'S A TAX RETURN -- JUST LIKE THE AUDITED

6    FINANCIAL STATEMENTS.  I DON'T LOOK AT AN AUDITED FINANCIAL

7    STATEMENT AND SAY, BY DEFINITION, IF IT'S AUDITED, IT'S RIGHT.

8    WE ALL KNOW THAT AUDITED FINANCIAL STATEMENTS ARE WRONG.  IN

9    THIS CASE, WE KNOW THEY ARE WRONG.

10   Q.   MR. GINGRAS, YOUR PAID OPINION GIVES MR. HARDWICK THE

11   BENEFIT OF $6.4 MILLION, DOESN'T IT?

12   A.   NO.  I'M LOOKING AT CASH FLOWS.  FOR EXAMPLE, IF YOU AND

13   I HAD A --

14           THE COURT:  I'M SORRY.  THERE IS LIKE A WHISPERING, A

15   MURMURING.  IF YOU HAVE TO CARRY ON CONSTANT CONVERSATION, JUST

16   OUT OF RESPECT, PLEASE JUST GO AHEAD AND STEP OUTSIDE OF THE

17   COURTROOM.  THANK YOU SO MUCH.

18           GO AHEAD.

19           THE WITNESS:  SO I'M NOT MAKING A LEGAL

20   DETERMINATION.  I'M LOOKING AT CASH FLOWS.  FOR EXAMPLE, IF YOU

21   AND I HAD A BUSINESS TOGETHER, AND SOMEBODY STOLE A HUNDRED

22   DOLLARS FROM OUR ESCROW ACCOUNT, AND YOU AND I WOULD SAY

23   MR. THIRD PARTY, YOU STOLE MONEY FROM OUR ACCOUNT, PUT IT BACK

24   IN OUR ESCROW, WHAT IS THE SHORTAGE IN ESCROW ACCOUNT AFTER HE

25   PUTS IT BACK?  ZERO.  WE DON'T HAVE A SHORTAGE ANYMORE.

122

1      THAT'S WHY I AM TAKING INTO CONSIDERATION THAT

2  6.4 MILLION BECAUSE, ASSUMING THAT HE GOT SOME MONEY, HE'S

3  RETURNED IT.

4  Q.   OKAY.  SO LET'S TALK ABOUT WHERE YOU PLUG THAT NUMBER IN.

5  AND WE'LL GET INTO IN A MINUTE WHETHER YOU SHOULD GIVE HIM

6  CREDIT AT ALL.  I WANT TO TABLE THAT FOR A MINUTE.  LET'S TALK

7  ABOUT WHERE IN THE NUMBERS YOU PLUG IT IN.

8      SO STARTING WITH THE 29 MILLION ESCROW SHORTAGE THAT

9  FIDELITY HAD TO FUND, IS THAT KIND OF THE BASELINE OF WHAT THE

10  ESCROW SHORTAGE WAS?  AND WOULD YOU SAY WE NEED TO REDUCE THAT

11  BY 6.4?

12  A.   OKAY.  SO NOW YOU'RE TALKING ABOUT THE SCHEDULE THAT WAS

13  PRODUCED BY FIDELITY.  AND IN MY REPORT, I SPECIFICALLY STATE

14  THAT THAT SCHEDULE IS UNRELIABLE.  WE CAN TALK ABOUT WHY.

15  Q.   NO.  I'M TALKING ABOUT YOUR NUMBERS.  YOU SAY, PAGE 14 OF

16  YOUR REPORT, $30 MILLION ESCROW SHORTAGE ASSUMED AS ACCURATE?

17  A.   THAT'S CORRECT.

18  Q.   SO YOU'RE ASSUMING THAT THAT $30 MILLION IS AN ACCURATE

19  NUMBER FOR WHAT THE ESCROW SHORTAGE WAS?

20  A.   AGAIN, I SEE NO EVIDENCE OF AN ESCROW SHORTAGE, IN THE

21  FINANCIAL STATEMENTS OR ANYWHERE ELSE.  BUT LET'S ASSUME FOR A

22  SECOND, JUST FOR A SECOND, THAT THERE IS AN ESCROW SHORTAGE OF

23  $29,530,393, ABOUT $30 MILLION.

24  Q.   OKAY.  AND YOU UNDERSTAND THAT WE GET THAT NUMBER BECAUSE

25  THAT'S THE AMOUNT THAT FIDELITY HAD TO INFUSE, CORRECT?

123

1    A.    THAT IS MY UNDERSTANDING.  CLEARLY THE SCHEDULE IS

2    INACCURATE.

3    Q.    AND YOU UNDERSTAND THAT FIDELITY MADE THAT INFUSION AFTER

4    MR. HARDWICK DONATED THAT $6.4 MILLION, CORRECT?  MR. HARDWICK

5    DONATES 1.4.  HE CONVINCES MR. PRITCHARD AND MR. JOHNSON TO

6    GIVE AN ADDITIONAL FIVE.  THAT LOWERS THE HOLE.  AND THEN

7    FIDELITY STEPS IN.  CORRECT?

8    A.    OKAY.  SO, NOW, IF YOU SAY -- I DON'T HAVE ANY EVIDENCE OF

9    THAT.  HOWEVER, IF YOU CONCEDE THAT AS AN ASSUMPTION, LET'S

10   ASSUME THAT FOR A SECOND, THAT WOULD NOW MEAN THAT YOU WOULD

11   HAVE APPROXIMATELY $36 MILLION --

12   Q.    THAT'S RIGHT.

13   A.    -- IN ESCROW SHORTAGE.

14   Q.    AND SO TO GET TO THE 29 MILLION, WE'RE USING AS A BASELINE

15   WHAT FIDELITY GAVE, RIGHT?  THAT IS AFTER THE INFUSION OF 6.4.

16   A.    OKAY.

17   Q.    RIGHT?

18   A.    SO IF YOU ASSUME A $36 MILLION ESCROW SHORTAGE, AND THE

19   MAXIMUM EXPOSURE THAT MR. HARDWICK COULD HAVE CAUSED IS

20   19 MILLION, NOW YOU HAVE A $17 MILLION ESCROW SHORTAGE THAT YOU

21   HAVE NO IDEA WHERE IT'S COMING FROM.

22   Q.    OKAY.  THAT'S NOT AN ANSWER TO MY QUESTION.

23   A.    ALMOST 50 PERCENT OF THE ESCROW IS UNDETERMINED AT SOME

24   POINT.  I WOULD PAUSE TO SAY, WHO'S THE CAUSE OF THIS?

25   Q.    OKAY.  BACK TO MY QUESTION.  IF WE START WITH THE BASELINE

124

1    THAT THE ESCROW SHORTAGE THAT FIDELITY FUNDED WAS

2    29-POINT-SOMETHING MILLION, ROUGHLY 30, AS YOU SAY ON PAGE 14,

3    AND THAT IS AFTER THE CAPITAL CONTRIBUTION FROM MR. HARDWICK

4    AND THEN THE LOANS FROM MR. PRITCHARD AND MR. JOHNSON, THEN THE

5    SHORTAGE IS ACTUALLY MUCH HIGHER THAN 29, CORRECT?

6    A.    ABOUT 36 MILLION.  THAT'S CORRECT.

7    Q.    OKAY.  AND YOUR NUMBERS, THE CHART ON PAGE 14, IT STARTS

8    AT 30; IT DOESN'T START AT 36, RIGHT?

9    A.    THAT'S CORRECT.  BECAUSE WE KNOW THAT THE MONEY THAT CAME

10   IN THE COMPANY WAS NOT RECORDED IN -- WHAT WAS THE ENTRY?  THE

11   ENTRY WAS DEBIT CASH AND CREDIT, A LIABILITY TO MR. HARDWICK.

12   THAT'S WHERE THE MONEY WENT, NOT IN THE ESCROW ACCOUNT.

13        IF IT WAS MONEY THAT WAS OWED TO A THIRD PARTY, I WOULD

14   NEVER RECORD THAT IN MY FINANCIAL STATEMENTS.  IN FACT, I WOULD

15   TAKE A LOSS IN MY FINANCIAL STATEMENTS FOR 6.5 MILLION.

16   Q.    AND I UNDERSTAND THAT YOU WOULD DO THAT.  BUT I WANT TO

17   ASK YOU ABOUT THE FACTS IN THIS CASE.  AND I'M GOING TO SHOW

18   YOU A DOCUMENT THAT MR. GILFILLAN SHOWED YOU AT TRIAL.  THIS IS

19   GOVERNMENT'S EXHIBIT 1636.  AND REGARDLESS OF WHAT'S ON THE TAX

20   RETURN, THIS IS WHAT MR. HARDWICK HAD TO SAY.

21        THIS IS AN AFFIDAVIT -- YOU MAY REMEMBER MR. GILFILLAN

22   ASKING YOU ABOUT THIS -- THAT MR. HARDWICK FILED IN THE

23   PRITCHARD LAWSUIT.

24        AND BEFORE WE GET THERE, LET'S TALK ABOUT THE PRITCHARD

25   LAWSUIT.  YOU UNDERSTAND THAT JIM PRITCHARD FILED LAWSUIT IN

1   OCTOBER 2014, CORRECT?

2   A.   DON'T KNOW SPECIFICALLY.  I KNOW TANGENTIALLY THAT THERE

3   WERE SOME LAWSUITS ABOUT WHERE THE 6.4 MILLION WAS COMING FROM.

4   THAT'S CORRECT.

5   Q.   AND YOU UNDERSTAND THAT THE REASON WHY HE FILED LAWSUIT

6   AGAINST THE COMPANY, MHS, IS BECAUSE SOMEONE HAD OBLIGATED MHS

7   TO PAY THAT LOAN THAT MR. PRITCHARD GAVE.

8   A.   DON'T KNOW THAT SPECIFICALLY.

9   Q.   WELL, I THINK YOU TALKED ABOUT IT AT TRIAL.  I'M GOING TO

10  SHOW YOU -- ACTUALLY, YOU KNOW WHAT --

11  A.   I'VE NEVER REVIEWED THE PLEADINGS OR ANYTHING LIKE THAT.

12  Q.   WELL, BUT YOU HAVE REVIEWED THIS AFFIDAVIT, RIGHT?  YOU

13  REMEMBER MR. GILFILLAN SHOWING YOU THIS AFFIDAVIT?

14  A.   AT TRIAL?

15  Q.   YES.

16  A.   I REMEMBER SEEING THAT AFFIDAVIT.

17  Q.   OKAY.

18  A.   I WOULD HAVE TO READ IT AGAIN.  I DON'T RECALL WHAT IT

19  SAYS.

20  Q.   I WANT TO DIRECT YOUR ATTENTION TO PARAGRAPH 11 HERE:

21       M. WITTSTADT, G. WITTSTADT, ART MORRIS, RANDY SCHNEIDER,

22  AND I AGREED THAT MHS NEEDED TO OBTAIN FUNDS TO COVER THE

23  SHORTFALL.  WE HAD AN UNDERSTANDING THAT WE HAD TO DO WHATEVER

24  WAS NECESSARY, AND I WAS TOLD TO DO WHATEVER WAS NECESSARY.  I

25  ADVISED THAT THE FIRM WOULD HAVE TO GUARANTEE THE LOANS, AND IT

126

1   WAS UNDERSTOOD THAT I WOULD PROCEED WITH THE TRANSACTIONS.

2        DO YOU REMEMBER MR. GILFILLAN ASKING YOU ABOUT THAT?  AND

3   WE CAN LOOK AT YOUR TESTIMONY.

4   A.   NOT SPECIFICALLY.  BUT IF HE ASKED ME, I ANSWERED

5   TRUTHFULLY, YES.

6   Q.   AND BEFORE MR. GILFILLAN SHOWED YOU THIS DOCUMENT, YOU HAD

7   NEVER SEEN IT; IS THAT CORRECT?

8   A.   THAT'S CORRECT.

9   Q.   OKAY.  IN THIS DOCUMENT, IS MR. HARDWICK SAYING THAT ALL

10  HE DID WAS GET A LOAN FOR THE COMPANY?  THAT'S NOT MONEY THAT

11  HE INVESTED.  IT'S NOT MONEY THAT HE EVER PAID MR. PRITCHARD

12  BACK ON.  HE WAS JUST A BROKER GETTING A LOAN FOR THE COMPANY

13  AND OBLIGATING THE COMPANY TO PAY THAT MONEY BACK, CORRECT?

14       THAT CAME OUT AT TRIAL.  WE CAN LOOK AT YOUR TRANSCRIPT IF

15  WE WANT TO.

16  A.   AGAIN, I BELIEVE THAT 1.5 MILLION CAME FROM HIS OWN FUNDS.

17  BUT WHATEVER THE FACTS OF THIS CASE ARE --

18  Q.   I'M NOT TALKING ABOUT THE 1.4.  NO ONE HAS EVER DISPUTED

19  THAT MR. HARDWICK CONTRIBUTED 1.4 MILLION.  I'M TALKING ABOUT

20  THE MONEY FROM MR. PRITCHARD, I BELIEVE THE $3 MILLION LOAN.

21  OKAY?

22       AND YOU'VE GIVEN MR. HARDWICK CREDIT AS HAVING MADE THIS

23  CAPITAL CONTRIBUTION.  BUT IN HIS OWN WORDS, HE SAYS THAT MHS

24  IS OBLIGATED TO REPAY THAT LOAN AND NOT HIM PERSONALLY.  HE HAS

25  NEVER TO THIS DAY PAID A DIME ON THAT LOAN.  YOU UNDERSTAND

1  THAT, RIGHT?

2  A.   MY UNDERSTANDING IS THAT SOME INSURANCE COMPANY PAID THE

3  FUNDS.  BUT, YEAH, I HAVE NO PERSONAL KNOWLEDGE OF WHAT

4  HAPPENED TO THAT, TO THOSE FUNDS.

5  Q.   YOU UNDERSTAND THAT, ULTIMATELY, MR. PRITCHARD RECEIVED A

6  DEFAULT JUDGMENT IN THIS CASE AGAINST THE LAW FIRM?

7  A.   NOT SPECIFICALLY, NO.

8  Q.   AND THAT -- WELL, YOU HEARD MR. WITTSTADT TESTIFY AT

9  TRIAL, RIGHT?

10  A.   I DON'T RECALL SPECIFICALLY.  IF HE SAID THAT, I --

11  Q.   AND BECAUSE OF THAT DEFAULT JUDGMENT, MHS HAD TO FILE FOR

12  BANKRUPTCY.  YOU KNOW THAT, RIGHT?

13  A.   I THINK THAT'S A STRETCH, BUT, OKAY.

14  Q.   YOU THINK THAT'S A STRETCH --

15  A.   BECAUSE OF THAT --

16  Q.   -- BUT YOU DON'T KNOW ABOUT THIS?

17  A.   IT'S BECAUSE OF THAT THEY FILED FOR BANKRUPTCY?  I THINK

18  THERE WAS A LOT OF TESTIMONY ABOUT WHY THE COMPANY WENT

19  BANKRUPT.  AND THERE ARE NEWS REPORT AND TESTIMONY IN TERMS OF

20  WHAT THE OWNERS POST-MR. HARDWICK WERE THINKING AT THE TIME.

21  Q.   YOU ALSO UNDERSTAND THAT, SAME WITH DUSTIN JOHNSON, HE

22  FILED A LAWSUIT BECAUSE MR. HARDWICK OBLIGATED THE FIRM TO PAY

23  BACK A LOAN, A $2 MILLION LOAN THAT HE MADE TO THE FIRM?

24  A.   DON'T KNOW THAT SPECIFICALLY.  I'VE REVIEWED THE

25  PLEADINGS.  I UNDERSTAND THERE IS A LAWSUIT.

128

1   Q.   BUT YOUR EXPERT OPINION IS BASED ON THE FACT THAT THE

2   COURT SHOULD CREDIT HIM IN SOME WAY WITH THIS $6.4 MILLION

3   CAPITAL CONTRIBUTION THAT HE NEVER MADE?

4   A.   YES.  BECAUSE IF YOU'RE LOOKING AT AN ESCROW SHORTAGE, IF

5   YOU START WITH 29.5 MILLION -- AND LET'S ASSUME, LET'S JUST

6   ASSUME FOR A SECOND THAT IT IS TRUE -- AND SOMEBODY WENT TO THE

7   BANK AND STOLE 29.5 MILLION AND PUT IT IN THE COMPANY, NOW IT'S

8   A FACT THAT THAT MONEY NEVER CAME OUT OF THE ESCROW ACCOUNT,

9   CORRECT?

10       THEREFORE, IF YOU JUST LOOK AT THAT, WHAT IS MY SHORTAGE

11  IN ESCROW, IT'S ZERO.  IT'S ZERO.

12  Q.   SO IF THE QUESTION -- IF ALL WE'RE LOOKING AT IN THIS CASE

13  IS THE MONEY THAT WAS MISSING FROM ESCROW -- WHETHER IT WAS 29,

14  WHETHER IT WAS 36, WHATEVER THAT NUMBER IS -- IF THE ONLY

15  QUESTION IS HOW MUCH OF THAT WAS DUE TO MR. HARDWICK'S FRAUD,

16  THEN THAT'S A COMPLICATED ANSWER -- QUESTION TO ANSWER,

17  CORRECT?

18  A.   IT'S COMPLICATED BECAUSE I HAVE NO EVIDENCE AND,

19  THEREFORE, I HAVE TO DO A BACKTRACKING.  BUT, CLEARLY, FROM THE

20  FACE OF THE EVIDENCE -- LET'S ASSUME, FOR EXAMPLE, THAT THERE

21  WAS A $36 MILLION SHORTAGE, WHICH WE'VE -- I HAVE SEEN NO

22  EVIDENCE OF THAT, BUT I'M GOING TO ASSUME THAT FOR A SECOND --

23  THE MAXIMUM AMOUNT THAT MR. HARDWICK COULD POSSIBLY BE

24  RESPONSIBLE FOR IS $19 MILLION, LEAVING $17 MILLION THAT WE

25  HAVE NO IDEA WHERE IT IS RIGHT NOW.

1    Q.   RIGHT.

2    A.   AND THAT'S BEFORE I WOULD MAKE A CALCULATION AND SAY --

3    LET'S ASSUME THAT MR. HARDWICK WAS DETERMINED TO BE ENTITLED TO

4    15 MILLION.  THAT DOESN'T MEAN THAT BECAUSE THE 15 MILLION HE

5    WAS ENTITLED TO, HE GETS TO, ONLY HIM, BE COMING FROM ESCROW.

6         FOR EXAMPLE -- I LIKE EXAMPLES.

7    Q.   I KNOW YOU DO, MR. GINGRAS, BUT I'M GOING TO HAVE TO CUT

8    YOU OFF BECAUSE I DON'T THINK YOU'RE ANSWERING MY QUESTION.

9    A.   SO, AGAIN, SKY LEVEL, IF I HAVE A $36 MILLION IN ESCROW,

10   AND I KNOW THAT THE INDIVIDUAL THAT I AM INVESTIGATING -- AND

11   THE FIRM WOULD SAY CERTIFIED FRAUD EXAMINER -- COULD ONLY

12   POSSIBLY BE RESPONSIBLE FOR HALF, THEN I'M GOING TO START

13   ASKING QUESTIONS.  BECAUSE I'M NOT EVEN DOING AN ANALYSIS NOW;

14   I'M LOOKING AT SKY-HIGH LEVEL.

15   Q.   AND, MR. GINGRAS, RELATED TO THE QUESTION THAT I ACTUALLY

16   ASKED, WHICH I CAN'T EVEN REALLY REMEMBER NOW, AS AN

17   EMPIRICIST, WHICH YOU CLAIM TO BE, YOU WOULD AGREE WITH ME THAT

18   THE ANSWER TO THE QUESTION DEPENDS ENTIRELY ON WHAT THE

19   QUESTION IS AND WHAT THE QUESTION SEEKS TO ADDRESS, RIGHT?  THE

20   FRAMING OF THE QUESTION DRIVES THE ANSWER.  YOU WOULD AGREE

21   WITH ME?

22   A.   THE FRAMING OF THE QUESTION.  I THINK I'M LOST A LITTLE

23   BIT.

24   Q.   OKAY.  LET ME JUST ASK YOU FLAT OUT.  IF THE QUESTION

25   YOU'RE ANSWERING IS HOW MUCH OF THE ESCROW SHORTFALL IS

1    MR. HARDWICK ACCOUNTABLE TO, THAT IS A DIFFERENT QUESTION THAN

2    HOW MUCH DID HE RECEIVE BY LYING TO HIS PARTNERS.  THOSE ARE

3    DIFFERENT QUESTIONS.  YOU WOULD AGREE WITH THAT, RIGHT?

4    A.   I DON'T KNOW, BECAUSE THEN IF HE RECEIVED BY LYING TO HIS

5    PARTNERS, I WOULD WANT TO KNOW WHAT THE COMPARATIVE STATEMENT

6    IS.  JUST LIKE IN THE INDICTMENT, WHEN YOU SAY EXCESS OR TOO

7    MUCH BY LYING, I WOULD SAY, OKAY, WELL, SHOW ME WHERE FIRST.

8        MY NUMBER ONE TEST WOULD BE, PROVE TO ME, NUMBER ONE, THAT

9    HE'S RECEIVED TOO MUCH.  IF YOU GET THERE, THEN I WOULD LOOK AT

10   THE SECOND STEP:  WHAT DID HE SAY ABOUT IT, AND HOW DOES THAT

11   MATCH TOGETHER?

12       BUT, CLEARLY, IF HE'S UNDER-DISBURSED, I DON'T GET TO THE

13   SECOND STEP TO SAY, AND HE LIED ABOUT IT, BECAUSE MY FIRST

14   CONCLUSION WOULD BE DETERMINATIVE.  I WOULD SAY, HE WASN'T

15   UNDER-DISBURSED.  AND, THEREFORE, I DON'T GET TO THE SECOND

16   TEST.

17           MS. BARRON:  I HAVE NOTHING FURTHER.

18           THE COURT:  REDIRECT?

19           MR. GARLAND:  PLEASE.

20                    REDIRECT EXAMINATION

21   BY MR. GARLAND:

22   Q.   IN THIS CASE, THE EXHIBIT SHOWS A LOAN FROM MR. JOHNSON

23   DIRECTLY TO MR. HARDWICK AND A GUARANTEE OF MR. HARDWICK'S LOAN

24   FOR MR. JOHNSON, AND LIKEWISE ON WITH THE OTHER LOAN.

25   A.   I BELIEVE SO.  I HAVEN'T REVIEWED THE SPECIFIC DOCUMENT.

131

1    THAT'S MY UNDERSTANDING.  THE DOCUMENT SPEAKS FOR ITSELF.

2    Q.   IF I MAKE YOU A LOAN, THAT'S BETWEEN YOU AND I, CORRECT?

3    A.   IF YOU MAKE ME A LOAN, YES.  I MEAN, YOU'RE GETTING TO THE

4    LEGAL DETERMINATION.  BUT, YES, I WOULD SAY YES.

5    Q.   OKAY.  IF I MAKE YOU -- MORE LIKELY YOU MAKE ME A LOAN.

6         ALL RIGHT.  SO IF I GO TO MY LAW FIRM, AND I HAVE MY LAW

7    FIRM GUARANTEE IT, IT'S STILL A LOAN BETWEEN YOU AND I, NOT YOU

8    AND THE LAW FIRM, CORRECT?

9    A.   I WOULD AGREE WITH THAT.  THAT'S CORRECT.

10   Q.   AND IF THOSE WERE THE FACTS IN THIS CASE, THAT IT WAS

11   BASED ON THE GUARANTEE THAT THE LOAN WAS MADE BY MR. JOHNSON

12   AND PRITCHARD, THEN THOSE QUESTIONS WOULD BE IN ERROR.  WEREN'T

13   THEY?

14   A.   YES.  THE SIMILAR ANALOGY IS WHEN SOMEBODY TAKES A CAR

15   LOAN AND YOU HAVE A COSIGNER GUARANTEEING THE NOTE.

16   Q.   SO IF YOU MAKE ME A LOAN, I THEN TAKE THAT MONEY AND PUT

17   IT IN THE LAW FIRM, THE LAW FIRM RECEIVES THE MONEY FROM ME,

18   CORRECT?

19   A.   IN THAT CIRCUMSTANCE, YES.

20   Q.   NOW, YOU MENTIONED A SCHEDULE.  DO YOU HAVE THE SCHEDULE

21   THAT WAS SUBMITTED BY THE GOVERNMENT AS PART OF THE

22   PRESENTATION ON THIS LOSS CALCULATION?

23   A.   YES.  MY UNDERSTANDING IS THAT THAT IS THE SCHEDULE THAT

24   WAS CREATED BY FIDELITY.  THE WAY I RECEIVED THE SCHEDULE IS

25   THROUGH COUNSEL FROM THE GOVERNMENT.

132

1    Q.    ALL RIGHT.

2    A.    THAT'S MY UNDERSTANDING OF THE CHAIN OF CUSTODY.

3    Q.    WHAT DID THAT SCHEDULE TELL US?

4    A.    WELL, ON ITS FACE, IT LOOKS LIKE THERE IS A SERIES OF

5    TRANSFERS THAT LOOKS LIKE, STARTING ON AUGUST 27, 2014, SOME

6    AMOUNTS ARE COMING IN IN ESCROW ACCOUNTS; OR AT LEAST BASED ON

7    THE DESIGNATION OF THE ACCOUNT, IT HAS THE WORD ESCROW, OR

8    IOLTA, ACCOUNT.  SO THAT IS THE SCHEDULE THAT I RECEIVED.  AND

9    I ANALYZED THAT SCHEDULE.

10   Q.    WHEN YOU ANALYZED THAT SCHEDULE, WHAT DID YOU DETERMINE?

11   A.    SO THE SCHEDULE WAS NOT SORTED.  SO THE FIRST THING THAT I

12   WANTED --

13   Q.    WAS NOT SORTED?

14   A.    SORTED.  THAT'S CORRECT.

15   Q.    MEANING WHAT?

16   A.    IT WAS BY DATE, NOT BY ACTUAL ACCOUNTS.  SO WHAT I DID

17   IS -- I KNEW THAT WE HAD A SCHEDULE --

18            MS. BARRON:  THIS IS WAY BEYOND THE SCOPE OF CROSS,

19   UNLESS IT'S STUFF THAT -- IF HE WANTED TO TALK ABOUT IT HE

20   SHOULD HAVE BROUGHT IT UP ON DIRECT.

21            THE COURT:  I'LL OVERRULE.  I'LL OVERRULE.

22            THE WITNESS:  SO, REMEMBER, GOVERNMENT EXHIBIT 1000

23   TALKS ABOUT THE FACT THAT MR. HARDWICK RECEIVED

24   $26.5 MILLION -- $26,503,428.60 -- 61 CENTS.  NOW, THIS

25   SCHEDULE SHOWS YOU EXACTLY WHAT ARE THE ACCOUNTS THAT WERE THE

1    SOURCE OF THOSE FUNDS.

2             SO NOW THAT I HAVE THAT AND I HAVE A SCHEDULE THAT

3    TALKS ABOUT I AM FUNDING THE ESCROW ACCOUNT, I WOULD WANT TO

4    SEE FUNDING OF A SPECIFIC ACCOUNT RELATING TO WHAT -- THE

5    ESCROW THAT MR. HARDWICK WAS DISBURSED FROM.

6             SO IF I DO THAT ANALYSIS -- SO I SORTED THE SCHEDULE

7    BY ACCOUNT.  YOU CAN SEE THAT OUT OF 29,530,393 THOUSAND [SIC],

8    ONLY 3 MILLION SEVENTY-NINE HUNDRED THOUSAND [SIC] WERE FUNDED

9    IN ACCOUNTS THAT MR. HARDWICK RECEIVED ANY MONEY WHATSOEVER.

10   Q.   BUT WHAT IS THE SIGNIFICANCE OF THAT?

11   A.   WELL, THE SIGNIFICANCE OF THAT IS, IF ONLY 3.7 MILLION WAS

12   FUNDED TO THE ACCOUNT OF MR. HARDWICK, YOU WOULD HAVE TO MAKE A

13   LEAP OF FAITH TO SAY THAT THE REST OF THE ACCOUNTS THAT WERE

14   FUNDED, THAT ARE NOT ON THE SCHEDULE WHERE MR. HARDWICK

15   RECEIVED MONEY, SOMEHOW ARE RELATED WITHOUT ANY OTHER EVIDENCE.

16   WHICH, OBVIOUSLY, THAT WOULD BE IMPROPER TO DO, IN MY OPINION

17   AND IN MY PROFESSION.

18   Q.   AND WHAT WOULD YOU DO TO MAKE THAT DETERMINATION?

19   A.   AGAIN, WE'D GO BACK TO THE FIRST POINT, WHICH I WOULD WANT

20   TO DO, JUST LIKE THE COMPANY WANTED TO DO:  ESTABLISH A

21   STARTING POINT, RECONCILE ALL THE ACCOUNT AND SEE WHERE THE

22   SHORTAGE IS COMING FROM.

23        A SCHEDULE LIKE THIS SUPPORTS THE FACT THAT IF THERE IS AN

24   ESCROW ACCOUNT SHORTAGE -- WHICH, AGAIN, THAT'S MY OPINION THAT

25   I SEE NO EVIDENCE OF THAT -- EVEN ASSUMING SO, IT IS MORE

134

1    LIKELY THAN NOT THAT IT'S NOT COMING FROM MR. HARDWICK AND IT'S

2    POSSIBLY FROM PAYROLL, FOR EXAMPLE.  OR IT'S COMING FROM

3    ANOTHER ACCOUNT, WHICH LEADS ME TO MY SECOND POINT OF THE

4    SCHEDULE.

5        THE SECOND POINT OF THE SCHEDULE IS THAT WE UNDERSTAND HOW

6    THE SCHEDULE WAS CREATED.  SO AT THE TIME, ABOUT AUGUST 2014,

7    THEY REALIZED THAT THERE'S A DOCUMENT THAT'S PREPARED FOR THE

8    LAST SIX MONTHS SHOWING AMOUNTS COMING OUT OF AN ESCROW

9    ACCOUNT.  THAT NUMBER IS IN THE $20 MILLION RANGE.  IT SHOWS

10   MONEY BEING PAID OUT OF PAYROLL OUT OF THIS ACCOUNT.  IT SHOWS

11   MONEY BEING DISBURSED TO OTHER OWNERS OF THE COMPANY.

12       OKAY.  SO AT THAT POINT, CLEARLY THERE'S PANIC IN THE LAW

13   FIRM.  THE PROPER WAY TO HANDLE A SITUATION LIKE THIS WOULD BE

14   TO SHUT DOWN ALL THE ACCOUNTS AND STOP THE FLOW OF MONEY

15   BETWEEN THE ACCOUNTS AND RECONCILE ALL THESE ACCOUNTS, STARTING

16   FROM THE POINT IN TIME WHERE MS. MAURYA CAME IN, ALL THE WAY TO

17   THAT POINT IN TIME.  CLEARLY, THAT'S DIFFICULT TO DO BECAUSE

18   YOU'RE STOPPING BUSINESS.  YOU DON'T WANT TO DO THAT.

19       SO WHAT WAS THE PROCESS IN THIS CASE?  THE PROCESS IN THIS

20   CASE WAS, WE WILL CONTINUE TO USE THE ESCROW ACCOUNTS.  AND AS

21   THE ESCROW SHORTAGE OCCURS, WE WILL FUND THE ACCOUNT AT THAT

22   POINT AND CONTINUE OUR BUSINESS.  FIDELITY WAS PUTTING MONEY IN

23   THAT ACCOUNT.

24       HOWEVER, IF THAT'S TRUE, AT SOME POINT -- SIX MONTHS

25   LATER, NINE MONTHS LATER, A YEAR LATER -- YOU WOULD REALIZE

135

THAT I FUNDED AN ACCOUNT THAT WAS SHORT AND THE MONEY WAS

TRANSFERRED TO ANOTHER ACCOUNT.  AND YOU WOULD HAVE RECOVERED

IT, MEANING THAT AT SOME POINT YOU FUNDED AN ACCOUNT THAT YOU

SHOULDN'T HAVE BECAUSE THE MONEY WAS TRANSFERRED.

     THIS SCHEDULE HAS NO -- NOT A SINGLE ITEMS THAT WOULD SHOW

MONEY COMING BACK FROM FUNDING AN ACCOUNT WITHOUT KNOWING THAT

THE AMOUNT WAS IN ANOTHER ACCOUNT.  AND, AGAIN, YOU GO BACK TO,

IF THE ACCOUNTS WOULD BE RECONCILED, YOU WOULD FIND THESE TYPES

OF ITEMS.  BUT IT WAS NEVER DONE.

Q.   DID YOU DO AN ANALYSIS OF THAT SCHEDULE THE GOVERNMENT

SUBMITTED?

A.   YEAH.  SO IT SHOWS -- SO, AGAIN, THIS IS MY SCHEDULE --

Q.   ALL RIGHT.

A.   -- THAT SHOWS THE 29,530,393.  AND SEPARATING --

Q.   LET ME PUT AN EXHIBIT ON IT.

A.   IT IS SEPARATING THE FUNDING OF THE ALLEGED ESCROW AND

MATCHING WHAT MR. HARDWICK RECEIVED IN TERMS OF WHICH ACCOUNT

ARE FUNDED.  ONLY 3.7 MILLION OUT OF THE 29.5 MILLION RELATES

TO ACCOUNTS FROM WHICH MR. HARDWICK RECEIVED MONEY.

          MS. BARRON:  YOUR HONOR, I DON'T THINK THE GOVERNMENT

HAS RECEIVED A COPY OF THIS.

          THE COURT:  I DON'T KNOW WHAT WE'RE TALKING ABOUT.

          AND WHAT HAS IT BEEN MARKED AS, MS. BARRON?

          MS. BARRON:  APPARENTLY IT'S SOMETHING HE JUST GOT.

WE HAVEN'T HAD A CHANCE TO EVALUATE IT.  I'D ASK THE COURT

136

1   TO --

2          THE COURT:  WHAT IS THIS, AND WHAT HAS IT BEEN MARKED

3   AS?

4          MR. GARLAND:  I MARKED IT JUST NOW AS DEFENDANT'S 10.

5   THE GOVERNMENT HAS NOT SEEN IT.

6          THE COURT:  WHAT IS IT?

7          MR. GARLAND:  IT IS AN ANALYSIS OF THE SCHEDULE THE

8   GOVERNMENT SUBMITTED.  AND I CAN HAVE HIM EXPLAIN WHAT THAT

9   ANALYSIS IS.

10         THE COURT:  AND WHY HASN'T IT BEEN SHARED FOR

11  SENTENCING PURPOSES WITH THE GOVERNMENT?

12         MR. GARLAND:  DIDN'T REALIZE IT EXISTED OR THAT HE

13  HAD DONE IT UNTIL I WAS JUST -- AT THE BEGINNING OF THE HEARING

14  THIS MORNING.  AND THEN I CHECKED WHAT IT MEANT AT LUNCH.

15         THE COURT:  ALL RIGHT.  I'LL SUSTAIN THE OBJECTION AS

16  TO THE USE OF THIS FOR THIS HEARING.

17         MR. GARLAND:  MAY I GO INTO THE SUBJECT MATTER AND

18  LEAVE THE EXHIBIT OUT?

19         THE COURT:  WELL, I DON'T -- I MEAN, I DON'T KNOW HOW

20  THE GOVERNMENT CAN ADDRESS THIS IF THIS IS SOMETHING THAT THEY

21  HAVE NOT EVEN BEEN PRESENTED.  AND WE'VE SET CLEAR DEADLINES

22  FOR EXCHANGING INFORMATION FOR SENTENCING.

23         MR. GARLAND:  CERTAINLY.  AND I ABIDE BY YOUR HONOR'S

24  RULING.  SO I'M GOING TO STAY AWAY FROM EVEN QUESTIONING

25  FURTHER ABOUT THAT.

137

```
 1              THE COURT:  WE'LL SEE.

 2              MR. GARLAND:  THE -- I BELIEVE THOSE ARE ALL THE

 3    QUESTIONS THAT I HAVE.

 4              THE COURT:  ALL RIGHT.  THANK YOU, SIR.

 5              ANYTHING FURTHER FROM THE GOVERNMENT?

 6              MS. BARRON:  NO, YOUR HONOR.

 7              THE COURT:  ALL RIGHT.

 8              THANK YOU, MR. GINGRAS.  YOU AND YOUR BOX MAY STEP

 9    DOWN, EXCEPT FOR ANYTHING THAT WAS ADMITTED FOR THIS HEARING,

10    WHICH I BELIEVE I HAD OVER HERE.  IS THAT RIGHT?

11              THE WITNESS:  I WAS HANDED MY TESTIMONY AT TRIAL --

12              THE COURT:  OKAY.

13              THE WITNESS:  -- AND THIS AFFIDAVIT.  SO I'M GOING TO

14    PUT IT RIGHT HERE, YOUR HONOR.

15              THE COURT:  I THINK THE GOVERNMENT USED THOSE ITEMS.

16              ALL RIGHT.  THANK YOU SO MUCH.

17              ALL RIGHT.  AND AS HE IS GATHERING HIS BELONGINGS,

18    DEFENSE, YOU MAY CALL YOUR NEXT SENTENCING WITNESS.

19              MR. GARLAND:  JUST A MOMENT.

20              THE WITNESS:  THANK YOU, YOUR HONOR.

21              THE COURT:  THANK YOU.

22              MR. GARLAND:  WE DON'T HAVE ANY MORE WITNESSES ON THE

23    LOSS ISSUE --

24              THE COURT:  OKAY.

25              MR. GARLAND:  -- AT THIS TIME, YOUR HONOR.
```

138

1           THE COURT:  AND SO I TAKE IT THAT ALSO PERTAINS TO

2    THE HARDSHIP ISSUE, WHICH YOU ALL REPRESENTED EARLIER ARE KIND

3    OF TOGETHER.

4           ARE WE READY?

5           AND I ASK THAT BECAUSE THE REQUEST FROM THE

6    GOVERNMENT, WHICH I THINK IS A REASONABLE ONE, IS THAT WE ALLOW

7    ARGUMENT AFTER EACH OBJECTION.

8           SO ARE WE READY FOR ARGUMENT ON THIS LOSS ISSUE, LOSS

9    AND/OR HARDSHIP TOGETHER?

10          MR. GARLAND:  YES, YOUR HONOR.

11          THE COURT:  OKAY.  ALL RIGHT.  THE DEFENSE HAS

12   OBJECTED.  I GUESS I'VE HEARD ARGUMENT FROM BOTH OF YOU ALL --

13   FROM BOTH SIDES EARLIER, BUT I GUESS THAT WAS IN THE VEIN OF

14   KIND OF OPENING STATEMENTS.

15          SO, GOVERNMENT, I'LL HEAR FROM YOU AT THIS TIME.

16          MS. BARRON:  THANK YOU, YOUR HONOR.

17          I'M GOING TO TRY NOT TO REPEAT MYSELF JUST TO MOVE

18   THINGS ALONG.  BUT THE GOVERNMENT IS ASKING THE COURT TO FOCUS

19   ON INTENDED LOSS.

20          AND THE QUESTION THERE -- AND THIS IS WHAT I WAS

21   TRYING TO GET OUT WITH MR. GINGRAS -- IS:  HOW MUCH MONEY DID

22   MR. HARDWICK TAKE, DID HE AND MS. MAURYA CONSPIRE FOR HIM TO

23   TAKE, THAT HE TOOK AS A RESULT OF LIES, LIES BEING DEFINED

24   BROADLY -- OMISSIONS, MISSTATEMENTS.  SOME OF IT IS FORMAL

25   MISSTATEMENTS.

1          THIS IS GOVERNMENT 1034, WHICH I SHOWED EARLIER.   AND

2     IT COMPARES THE AMOUNTS THAT THE WITTSTADTS WERE TOLD

3     MR. HARDWICK WAS RECEIVING WITH THE AMOUNTS THAT HE ACTUALLY

4     RECEIVED.

5          THIS FALLS IN THE CATEGORY OF AFFIRMATIVE LIES, WHEN

6     HE KNOWS HE'S RECEIVING ONE THING, BECAUSE HE IS REPEATEDLY

7     ASKING MS. MAURYA TO SEND HIM MONEY, AND TELLING THE WITTSTADTS

8     HE RECEIVES A NUMBER MUCH LOWER.

9          BUT THE VAST MAJORITY OF THE MONEY HE RECEIVES FALLS

10    INTO THE CATEGORY OF OMISSIONS.   WHAT AMOUNT OF MONEY IS HE

11    ASKING -- ASKING IS A GENEROUS WORD.   WHAT AMOUNT OF MONEY IS

12    HE DEMANDING FROM MS. MAURYA THAT SHE SENDS HIM THAT THE

13    WITTSTADTS NEVER KNOW ABOUT.

14         AND IF WE LOOK AT THAT NUMBER THAT I TALKED ABOUT

15    EARLIER, THAT 26 MILLION -- LET ME STEP BACK.

16         MR. GINGRAS'S PRESENTATION FOCUSES ON ESCROW

17    SHORTAGE, ESCROW HOLE.   THAT'S WHAT THE DEFENDANT WANTS THE

18    COURT TO FOCUS ON, IS THE ESCROW HOLE.   OUR CHARTS SHOW, AND

19    THE GOVERNMENT'S 1000 SPECIFICALLY, SHOW THAT MR. HARDWICK

20    RECEIVED MONEY FROM BOTH -- OUR CASE IS NOT JUST ABOUT THE

21    MONEY THAT HE RECEIVED FROM ESCROW.   IT'S ABOUT THE TOTAL

22    AMOUNT OF MONEY.

23         AND WHERE SHOULD IT HAVE COME FROM?   WE ALL KNOW

24    WHERE IT SHOULD HAVE COME FROM.   WE BELIEVE THAT WE PROVED AT

25    TRIAL THAT HE SHOULD HAVE KNOWN THAT SOME OF IT WAS COMING FROM

1   ESCROW BECAUSE, YOU KNOW, HE RECEIVED THESE DAILY DASHBOARD

2   SUMMARIES FROM MS. MAURYA, SAYING, THIS IS HOW MUCH CASH WE

3   HAVE ON HAND.  GOVERNMENT'S 1035 SHOWED, FOR EXAMPLE, IF WE

4   LOOK AT JUNE 17, MR. HARDWICK DEMANDS A $500,000 TRANSFER TO

5   THE COSMOPOLITAN.  THIS WAS FOR KEVIN'S BIRTHDAY BASH AND POOL

6   PARTY, WHICH WE REMEMBER.  AND MS. MAURYA TELLS HIM THAT SAME

7   DAY THAT THEY ONLY HAVE $500,000 IN CASH ON HAND.  AND THEY ARE

8   HOLDING BACK $300,000.

9           THERE ARE TONS OF EXAMPLES OF THIS FROM TRIAL, WHERE

10   HE'S ASKING FOR MONEY THAT HE KNOWS DOES NOT EXIST IN THE

11   FIRM'S OPERATING ACCOUNT.  HE ASKS FOR IT ANYWAY.  SO WE THINK

12   HE KNEW THAT MONEY WAS COMING FROM ESCROW.

13           BUT THE RELEVANT QUESTION FOR SENTENCING IS NOT HOW

14   MUCH DID HE TAKE FROM ESCROW, IT'S HOW MUCH DID HE TAKE THAT HE

15   WAS NOT ENTITLED TO.  AND THE SIMPLEST, MOST CONSERVATIVE WAY

16   TO DO THAT, CONSTRUING EVERY FACT IN HIS FAVOR, IS TO GIVE HIM

17   THAT GENEROUS 55 PERCENT OWNERSHIP -- WHICH WE KNOW HIS

18   OWNERSHIP PERCENTAGE WAS MUCH LOWER THAN THAT FOR A BIG CHUNK

19   OF THE CONSPIRACY.  I THINK IT WAS AT 40 PERCENT FROM 2011 TO

20   2013.

21           BUT WE TAKE THAT 50 PERCENT -- 55 PERCENT.  AND ONLY

22   LOOKING AT THE THREE YEARS, 2011 TO 2013, AS I SHOWED EARLIER,

23   HE WAS ENTITLED TO $5.5 MILLION.  HE TOOK OVER 20 MILLION.

24           NOW, IT BENEFITS THE DEFENSE TO MAKE THIS VERY

25   CONFUSING AND TO HAVE MR. GINGRAS TALK ABOUT A WHOLE BUNCH OF

1    MATH THAT IS HARD TO FOLLOW.  BUT THE JURY DIDN'T BUY IT.  AND

2    I'M ASKING THE COURT NOT TO BUY IT, BECAUSE THAT'S NOT THE

3    QUESTION HERE.  THE QUESTION IS NOT, WHAT DID THE OTHER

4    PARTNERS GET AND WHAT SHOULD MR. HARDWICK HAVE RECEIVED IN

5    PROPORTION TO THEM.  THE QUESTION IS, WHAT DID HE TAKE THAT HE

6    LIED TO HIS PARTNERS ABOUT.

7              THEY HAD NO IDEA THAT HE WAS CONSISTENTLY ASKING FOR

8    THESE 500,000, 300,000, $400,000 TRANSFERS TO THESE CASINOS

9    WHEN THE FIRM COULDN'T SUPPORT THAT AMOUNT OF DISTRIBUTION.

10   THAT'S WHAT THIS CASE HAS ALWAYS BEEN ABOUT.  IT'S ALWAYS BEEN

11   ABOUT THE LIES AND THE FRAUD.

12             AND SO IF OTHER PARTNERS RECEIVED MORE THAN THE

13   PROFITS SUPPORTED, WE KNOW -- WARREN AVERETT TOLD US THAT, THAT

14   THE FIRM DISBURSED MORE THAN IT SHOULD HAVE, AND AT TIMES THEY

15   DID OPERATE IN THE RED.  THAT'S AN ACCOUNTING QUESTION.

16             THE FRAUD QUESTION IS, DID HE LIE TO HIS PARTNERS

17   ABOUT WHAT HE WAS GETTING.  AND THE OVERWHELMING ANSWER TO THAT

18   IS YES.

19             AND SO A CONSERVATIVE ESTIMATION OF LOSS IS THAT

20   FOR -- JUST EVEN 2011 TO 2013, THREE YEARS OF THE CONSPIRACY,

21   HE RECEIVED $15 MILLION THAT HE WAS NOT ENTITLED TO.

22             MR. GINGRAS COULD SIT HERE AND NITPICK AND SAY, WELL,

23   SOME OF THIS WAS MAYBE ARGUABLY BUSINESS EXPENSE.  BUT REMEMBER

24   THAT MR. HARDWICK AT TRIAL TESTIFIED THAT, TO HIM, IT WAS ALL

25   INCOME.  HE BELIEVED THAT HE WAS ENTITLED TO EVERY PENNY OF IT.

1    HE BELIEVED THAT HE WAS GETTING HIS SHARE OF THE PROFITS.

2           THE JURY DIDN'T BELIEVE HIM THEN, AND I ASK THE COURT

3    NOT TO BELIEVE HIM NOW.  AND I ASK THE COURT NOT TO CREDIT

4    MR. GINGRAS'S ATTEMPTS TO MAKE THIS ABOUT SMOKE AND MIRRORS

5    RATHER THAN VERY SIMPLE MATH.

6           THE COURT:  WELL, THIS IS MY ISSUE WITH THAT.  AND

7    I'LL HEAR FROM THE DEFENSE IN JUST A MOMENT.

8           THE JURY WAS TASKED WITH SLIGHTLY DIFFERENT FINDINGS.

9    AND WE'VE DISCUSSED THIS BEFORE.  THEY WERE TASKED WITH LOOKING

10   AT WHETHER HE WAS ILLEGALLY TRANSFERRING MONEY, WIRE

11   TRANSFERRING MONEY.  THEY WEREN'T REALLY ASKED TO LOOK AT

12   SPECIFIC AMOUNTS.

13          AND, AGAIN, AS WE SPOKE ABOUT EARLIER, THE GOVERNMENT

14   SAID SEVERAL TIMES, THAT'S BECAUSE WE DON'T HAVE TO PROVE

15   AMOUNTS DURING TRIAL.  AND THE GOVERNMENT WAS RIGHT IN THAT

16   RESPECT.  BUT IT'S NOT SO SIMPLE FROM EITHER SIDE.  IT'S REALLY

17   NOT.

18          AND I REMEMBER BEING A LITTLE SURPRISED WHEN I HEARD

19   THAT, FROM THE OUTSET OF THIS CASE, BACK BEFORE IT WAS

20   CERTIFIED WITH ME, THE GOVERNMENT MADE THE DECISION NOT TO GET

21   A FORENSIC ACCOUNTANT TO TESTIFY.  BUT I UNDERSTOOD AS I GOT

22   CLOSER TO TRIAL THAT IT WASN'T ABOUT AMOUNTS SO MUCH FOR TRIAL

23   PURPOSES.  IT WAS ABOUT THE EXISTENCE OF THESE ILLEGAL

24   TRANSFERS.

25          BUT HERE WE ARE NOW AT SENTENCING.  AND HERE I AM

1  BEING ASKED TO ENHANCE THE GUIDELINE, ADVISORY CUSTODIAL

2  GUIDELINE RANGE BY 20 LEVELS ATTRIBUTED TO A CERTAIN AMOUNT.

3  AND SO I NEED A LITTLE BIT OF CLARITY.

4          AND I THINK, MS. BARRON, IF ANYONE, YOU HAVE COME

5  CLOSEST FOR ME, WHICH I APPRECIATE, TO GIVING ME AN AMOUNT.

6          BUT I STILL HAVE ISSUES.  YES, I HAVE A LOT OF ISSUES

7  WITH MR. GINGRAS'S TESTIMONY, TOO, WHICH I THINK WAS APPARENT

8  WHEN I INITIALLY RULED THAT HE COULD NOT TESTIFY.  I REVERSED

9  THAT, TRYING TO GIVE THE DEFENDANT AS MUCH BENEFIT AS POSSIBLE

10  FOR THIS, THIS VERY IMPORTANT TRIAL.  ASKED THE GOVERNMENT IF

11  YOU WANTED TIME TO GET AN EXPERT OF YOUR OWN TO COUNTER IT.

12          BUT THERE ARE SOME QUESTIONS THAT I JUST DON'T HAVE

13  THE ANSWERS TO.  I'M NOT CLEAR NOW IF WE ARE BASING THIS AMOUNT

14  ON -- PRIMARILY ON THE AMOUNT FIDELITY INFUSED INTO THE FIRM;

15  WHETHER WE'RE JUST BASING IT ON THE AMOUNT THAT IS SUPPORTED BY

16  LIES, THAT HE HAD MS. MAURYA TRANSFERRING WITHOUT INCLUDING HIS

17  PARTNERS ON THOSE COMMUNICATIONS; WHETHER WE'RE BASING IT ON

18  THE SHAREHOLDERS AGREEMENT, WHICH REFLECTS CERTAIN PERCENTAGES,

19  WHICH WE'VE HEARD TESTIMONY THAT THEY DIDN'T ALWAYS FOLLOW THE

20  AGREEMENT.

21          SO ALL OF THIS IS VERY UNCLEAR TO ME.  AND SO I HAVE

22  TRIED TO WRAP MY MIND AROUND IT, VERY MUCH SO.  AS YOU HEARD

23  EARLIER, I TRIED TO COME UP WITH MY OWN STRATEGY FOR FIGURING

24  IT OUT, WHICH IS HOW I GOT TO LOOKING AT THE INDICTMENT COUNTS.

25          BUT I WILL JUST LEAVE IT AT THAT, THAT I AM STILL

1    UNCLEAR ON WHETHER EVERYTHING HAS BEEN FACTORED IN THAT I

2    NEED -- NOT TO DETERMINE THAT MR. HARDWICK ILLEGALLY TOOK

3    MONEY.  I GOT NO PROBLEM WITH THAT.  BUT WHEN WE'RE GETTING

4    DOWN TO THE AMOUNT, UNDERSTANDING IT ONLY HAS TO BE A

5    REASONABLE ESTIMATE, BUT I DON'T KNOW IF BY A PREPONDERANCE OF

6    THE EVIDENCE I AM EVEN THERE YET.

7               BUT THANK YOU FOR YOUR PRESENTATION.

8               MS. BARRON:  THANK YOU, YOUR HONOR.

9               THE COURT:  ALL RIGHT.  THANK YOU.

10              DEFENSE?

11              MR. GARLAND:  MS. NOVAY WILL SPEAK.

12              MS. NOVAY:  IF IT'S ALL RIGHT, I'M GOING TO ADDRESS

13   THE COURT.

14              THE COURT:  YES.

15              MS. NOVAY:  GIVE MR. GARLAND A BREAK FOR A MINUTE.

16              AND I'LL START OFF BY SAYING I AGREE WITH SOME OF THE

17   COURT'S CONCERNS, SO I DON'T WANT TO TALK TOO MUCH AND TALK

18   YOUR HONOR OUT OF IT.  BECAUSE I THINK THAT'S SOMETHING THAT

19   WE'VE BEEN TALKING ABOUT SINCE WE WERE BLUE IN THE FACE AND

20   PERHAPS THE GOVERNMENT AND YOUR HONOR IS RED IN THE FACE, IS

21   WE'VE GOT ALL THESE DIFFERENT STANDARDS AND ALL THESE DIFFERENT

22   NUMBERS THAT ARE BEING THROWN OUT.  AND FIDELITY SAYS, WELL, WE

23   PUT IN THIS MUCH.  AND THE DEFENSE RESPONDS, WELL, JUST BECAUSE

24   YOU PUT IN THAT AMOUNT DOESN'T MEAN THAT AMOUNT WAS LOST,

25   DOESN'T MEAN IT WAS AN INVESTMENT, BECAUSE THEY CAME IN WELL

1    AFTER THE FACT.

2            SO THERE'S ALL THESE DIFFERENT -- WITHOUT GOING INTO

3    EVERY SINGLE ISSUE, WHICH I THINK WE'VE FULLY COVERED IN THE

4    SENTENCING MEMO, THE SUPPLEMENT, AND THE RESPONSE, THE

5    PROBLEM -- AND I REALLY JUST ADDRESS WHAT THE GOVERNMENT SAID,

6    ALTHOUGH I DON'T WANT TO OVERLAP INTO WHAT THE COURT'S CONCERNS

7    ARE -- IS THAT THE GOVERNMENT'S FOCUSING ON THIS INTENDED LOSS.

8            AND THE REASON WHY WE HAVE PUT UP THIS EVIDENCE OF

9    WHAT DID EVERYBODY ELSE GET IS BECAUSE WE'VE ALWAYS TALKED

10   ABOUT MR. HARDWICK'S PERCENTAGE.  WE'VE TALKED ABOUT WHAT HE

11   BELIEVED HE SHOULD HAVE GOTTEN, BECAUSE THAT'S WHAT'S IMPORTANT

12   IN CALCULATING THE LOSS.  ACTUAL LOSS TALKS ABOUT WHAT'S

13   FORESEEABLE.

14           WELL, IF ALL THE PARTNERS ARE WITHDRAWING AND

15   RECEIVING DISTRIBUTIONS -- THERE WERE TWO EXAMPLES OF SUCH,

16   SPECIFICALLY WITH MR. MORRIS -- WHERE NONE OF THE OTHER

17   PARTNERS KNEW ABOUT IT, PARTNERS WERE ASKING MS. MAURYA, WHICH

18   CAME OUT AT TRIAL, FOR DISTRIBUTIONS IN DIFFERENT VARIOUS

19   POINTS IN TIME, THEN HOW IS MR. HARDWICK SUPPOSED TO INTEND A

20   LOSS IN THIS INCREDIBLE GREAT AMOUNT IF ALL THE PARTNERS ARE

21   DOING THE SAME THING?

22           AND I WANT TO BE CLEAR.  MY ARGUMENT ISN'T SAYING,

23   WELL, HE DID IT, THE OTHER PARTNERS WERE DOING IT; THEREFORE,

24   IT'S NOT THAT BAD.

25           WHAT I'M SAYING IS THAT WHEN IT GOES TO WHAT IS HE

146

1    INTENDING TO TAKE, WHAT IS THE ACTUAL INTENDED LOSS, WHAT IS

2    ACTUALLY FORESEEABLE, AND WE'RE TALKING ABOUT ACTUAL LOSS, I

3    THINK THAT COMPARISON IS IMPORTANT AS TO WHAT'S ACTUALLY IN HIS

4    MINDSET.

5            QUITE FRANKLY, THE COURT'S DETERMINATION OF LOSS

6    IS -- WITHOUT CONCEDING ANY ARGUMENTS ON OUR PART -- IS THE

7    ONLY ONE THAT'S MADE SENSE TO ME THUS FAR, BECAUSE THE

8    GOVERNMENT'S ARGUMENT JUST, JUST DOESN'T MAKE SENSE.  I'M

9    REALLY NOT EVEN CONFIDENT WHICH NUMBER WE'RE LOOKING AT, OR HOW

10   OR WHY.

11           I UNDERSTAND THEIR REASONING.  AND WITH RESPECT TO

12   MS. BARRON, I UNDERSTAND HER ARGUMENT.  HOWEVER, I THINK

13   THERE'S STILL A LOT OF FLAWS IN IT.

14           AND THE ARGUMENT THAT, WELL, LET'S JUST KEEP THE MATH

15   SIMPLE, AS A POLITICAL SCIENCE MAJOR, I ABSOLUTELY AGREE IN

16   ALWAYS KEEPING THE MATH SIMPLE.  BUT I THINK IT'S,

17   RESPECTFULLY, LEGALLY DISHONEST IN THIS PARTICULAR CASE BECAUSE

18   WE'RE ONLY DOING A THIRD OF THE MATH PROBLEM, WHICH IS LOOKING

19   AT JUST MR. HARDWICK.

20           AND I THINK FOR THE SENTENCING PURPOSES, IT'S A

21   GREATER DEGREE.  WE HAVE TO LOOK AT THE BIG PICTURE.  THAT'S

22   WHAT WE'RE TRYING TO GET THE COURT TO DO IN THIS RESPECT.

23           AGAIN, THIS IS 20 POINTS.  THIS IS A MASSIVE AMOUNT

24   OF THIS MAN'S LIFE THAT WE'RE LOOKING AT.  AND IT CHANGES THE

25   GUIDELINES, JUST THOSE TWO POINTS.  EVEN IF THE COURT WAS TO

1    CONSIDER 6 MILLION, IT DRASTICALLY CHANGES THE GUIDELINES AS TO

2    WHAT HE'S ACTUALLY BEING SENTENCED TO, WHICH IS PROBABLY THE

3    REASON WHY WE'VE ALL BEEN FIGHTING OVER THIS PARTICULAR NUMBER,

4    BECAUSE IT DRIVES US UP OR DOWN DEPENDING ON HOW THIS COURT

5    FINDS IT.

6           BUT I THINK THE VERY PROBLEM IS, IS THAT,

7    ULTIMATELY -- I AGREE.  THIS -- THE COURT CAN MAKE A REASONABLE

8    ESTIMATE.  THAT'S WHAT THE CASE LAW SAYS.  BUT IT HAS TO BE

9    BASED ON NOT JUST SPECULATION.  THE 11TH CIRCUIT SAYS IT HAS TO

10   BE BASED ON ACTUAL FACTS THAT THE COURT CAN POINT TO AND SAY,

11   THIS IS HOW I GET TO THIS NUMBER, THIS IS MY LOGIC, THIS IS THE

12   REASONING, AND THIS IS WHY.

13          AND I SUBMIT THAT THE GOVERNMENT JUST HASN'T GIVEN US

14   THAT.  THEY JUST HAVEN'T PROVIDED US THAT.  THEY DIDN'T PROVIDE

15   IT AT TRIAL.  WE FOUGHT ABOUT IT, BUT I THINK ULTIMATELY THEY

16   DIDN'T HAVE TO PROVE IT AT TRIAL.  AND THE JURY DIDN'T MAKE A

17   CONCLUSION BASED ON THAT AT TRIAL, JUST THAT IT WAS TOO MUCH.

18          SO NOW HERE WE ARE.  AND THE GOVERNMENT SAID OVER AND

19   OVER AGAIN, THAT'S SOMETHING FOR SENTENCING, THAT'S SOMETHING

20   FOR SENTENCING.  AND NOW WE'RE AT SENTENCING AND THE GOVERNMENT

21   SAYS, WELL, WE'RE GOING TO RELY ON THE TRIAL TRANSCRIPT.

22   THAT'S A PROBLEM.

23          YOU KNOW, I'VE KIND OF PREACHED A LITTLE BIT ABOUT

24   NOTICE AT ONE ISSUE OF MY RESPONSE TO THE GOVERNMENT'S MOTION.

25   I DON'T THINK -- I THINK 11TH CIRCUIT SAID, WE DON'T

1    NECESSARILY GET TO ALWAYS HAVE THAT.  BUT THAT'S PART OF THE

2    ISSUE.  WE'RE A LITTLE BIT ON OUR HEELS HERE TRYING TO MAKE

3    SCATTERSHOT ARGUMENTS ABOUT WHAT LOSS IS BECAUSE THERE'S NEVER

4    BEEN A SET REASONING AND METHOD OF EXACTLY, THIS IS HOW IT'S

5    CALCULATED, THIS IS WHAT HE SHOULD HAVE GOTTEN, THIS IS WHAT

6    THE OTHER PARTNERS GOT, THIS IS 55 PERCENT, 45 PERCENT,

7    WHATEVER.  IT'S JUST NOT EVEN BY SUCH A STANDARD OF

8    PREPONDERANCE OF THE EVIDENCE.  AND I THINK THAT MIGHT GIVE

9    YOUR HONOR PAUSE AND CONCERN.

10            WHAT THE GOVERNMENT KEEPS TALKING ABOUT IS FRAUD.

11   THIS IS FRAUD, THIS IS THE FRAUD.  BUT THAT DOESN'T NECESSARILY

12   EQUATE TO LOSS IN THIS PARTICULAR INSTANCE.

13            AND SO FOR THOSE REASONS, WE ASK THE COURT FIND THAT

14   THERE IS NOT ENOUGH EVIDENCE TO PRODUCE A LOSS AMOUNT BY THE

15   PREPONDERANCE OF THE EVIDENCE AND NOT APPLY THE ENHANCEMENT.

16            THANK YOU.

17            THE COURT:  THANK YOU.

18            MR. PHILLIPS:  MAY I RESPOND, YOUR HONOR?

19            THE COURT:  NO.  ALL RIGHT.

20            MR. PHILLIPS:  YOUR HONOR, MAY I BE HEARD ON THIS

21   ISSUE, PLEASE, BEFORE YOU RULE ON IT?

22            THE COURT:  VERY BRIEFLY, MR. PHILLIPS.

23            MR. PHILLIPS:  THANK YOU.

24            THE COURT:  AND I WILL JUST STATE, HOPEFULLY IT'S

25   CLEARER THAN YOUR EARLIER PRESENTATION, WHERE ALL I ASKED

1    SIMPLY WAS A SIMPLE ANSWER OF WHETHER OR NOT I COULD RELY ON

2    AMOUNTS IN THE INDICTMENT.  AND I DIDN'T REALLY GET A CLEAR

3    ANSWER THERE.  ONE FACTOR IS WHAT I WAS TOLD.  SO I JUST ASK

4    THAT YOU JUST PAY ATTENTION TO MY SPECIFIC QUESTIONS AND THE

5    SPECIFIC ISSUES BEFORE THE COURT.

6              BUT, YES, YOU MAY ADDRESS IT.  YOU MAY ATTEMPT TO.

7              MR. PHILLIPS:  THE EVIDENCE AT TRIAL SHOWS THAT THE

8    DEFENDANT TOOK MORE THAN $19.5 MILLION OUT OF THE FIRM'S ESCROW

9    ACCOUNTS.  THAT'S MONEY THAT BELONGED TO THE FIRM'S CLIENTS.

10   THAT'S UNDISPUTED.

11             LOOK AT GOVERNMENT EXHIBIT 1000, AND IT SHOWS HOW

12   MUCH MONEY HE TOOK OUT OF THE ESCROW ACCOUNTS.  THAT IS

13   ESSENTIALLY THE SAME AMOUNT THAT MS. BARRON WAS SAYING THIS

14   MORNING THAT THE DEFENDANT GOT, MINUS -- OR AFTER THE COURT

15   DEDUCTS THE AMOUNT THAT HE WAS ENTITLED TO FOR HIS

16   DISTRIBUTIONS.

17             IF YOU LOOK AT THE 26.5 MILLION THAT HE TOOK

18   OVERALL -- AND, AGAIN, THAT NUMBER IS UNDISPUTED.  THE

19   DEFENDANT ADMITTED TO IT WHEN HE WAS ON THE STAND.  HE GOT THAT

20   AMOUNT OF MONEY.  IF YOU SUBTRACT THE AMOUNT USING HIS

21   PERCENTAGES FROM AUDITED FINANCIAL STATEMENTS AND FROM THE

22   AMOUNT THAT WE SHOWED THAT THE FIRM TOOK IN IN 2014, THAT

23   LEAVES YOU WITH APPROXIMATELY 19.5 MILLION.

24             WE THINK THAT'S THE LOSS AMOUNT.  WE THINK THAT'S A

25   REASONABLE ESTIMATE.  AND IT'S WELL WITHIN THE GUIDELINE RANGE

150

1   OF 9.5 TO 25 MILLION.

2           THE COURT:  AND WHAT YOU JUST SAID IS BASED -- AND

3   YOU SAID, CONSIDERING WHAT HE WAS ENTITLED TO FOR HIS

4   DISTRIBUTIONS.  I THINK THAT'S WHAT THE WHOLE THING HAS BEEN

5   ABOUT, WHAT HIS DISTRIBUTION ENTITLEMENT WAS.

6           IF YOU'RE GOING STRAIGHT WITH THE 55 PERCENT, THERE'S

7   BEEN TESTIMONY THAT THEY VARY FROM THE AGREEMENT.  SO I THINK

8   THAT'S WHAT THIS WHOLE THING HAS BEEN ABOUT, IS WHETHER HIS

9   DISTRIBUTION HAS BEEN PROPERLY ACCOUNTED FOR AND, IF NOT,

10  WHETHER THAT'S NECESSARY HERE.

11          MR. PHILLIPS:  I THINK THE COURT WILL RECALL THAT

12  MARK WITTSTADT TESTIFIED AND ART MORRIS TESTIFIED THAT ON THOSE

13  RARE OCCASIONS WHEN THEY AGREED TO DEVIATE FROM THE AGREEMENT,

14  THEY DISCUSSED IT.  THEY HAD A UNANIMOUS AGREEMENT AMONG ALL

15  THE EQUITY PARTNERS, HEY, THIS IS HOW WE'RE GOING TO DEVIATE

16  FROM THE AGREEMENT.

17          WHEN MR. HARDWICK STOLE THE MONEY, HE DID NOT DO

18  THAT.  MARK WITTSTADT TESTIFIED UNEQUIVOCALLY, AND ART MORRIS

19  DID, TOO, THAT THEY NEVER HAD A UNANIMOUS AGREEMENT OF THE

20  BOARD OF DIRECTORS TO LET NAT HARDWICK TAKE ANY EXCESS

21  DISTRIBUTIONS.  NONE, EVER.  AND SO THOSE ARE THE NUMBERS THAT

22  ARE REFLECTED IN GOVERNMENT EXHIBIT 1000.

23          THE COURT:  ALL RIGHT.  THANK YOU, MR. PHILLIPS.

24          ANYTHING ELSE FROM EITHER SIDE?

25          ALL RIGHT.  IT'S MY FINDING THAT THE AMOUNT HAS NOT

1   BEEN ESTABLISHED BY A PREPONDERANCE OF THE EVIDENCE.  I DO

2   SUSTAIN THE DEFENSE'S OBJECTION.

3        WHAT I DO FIND IS -- I REJECT THE POSITION BY THE

4   DEFENSE THAT I CANNOT RELY ON THE AMOUNTS IN THE INDICTMENT.

5   I UNDERSTAND THE DEFENSE'S ARGUMENT THAT -- WELL, I DON'T -- I

6   UNDERSTAND WHAT YOU'RE ARGUING.  I WON'T SAY I UNDERSTAND IN

7   THE SENSE THAT IT MAKES -- THAT IT'S A GOOD ARGUMENT TO ME.

8   BUT YOU'RE SAYING SOMEHOW THAT THE AMOUNTS THAT ARE REFLECTED

9   IN THE INDICTMENT COUNTS ARE ONLY THE AMOUNTS THAT WERE

10  ILLEGALLY TRANSFERRED AND DON'T NECESSARILY REFLECT LOSSES.

11       HOWEVER, IT'S MY INTERPRETATION OF LOSS AMOUNT THAT

12  ON THE PARTICULAR DATES OF THOSE COUNTS, MR. HARDWICK CAUSED A

13  LOSS TO MHS BY TAKING THAT MONEY THAT HE WAS NOT ENTITLED TO

14  TAKE.  WHETHER HE WAS ENTITLED TO SOME EQUIVALENT AMOUNT FROM

15  SOME OTHER SOURCE, WHETHER HE WAS GOING TO PAY BACK SOME

16  AMOUNT, WHETHER HE TOOK A DISTRIBUTION THAT WAS PROPORTIONAL TO

17  WHAT THE OTHER PARTNERS WERE ACTUALLY TAKING, THOSE ARE OTHER

18  FACTORS.

19       BUT FOR MY PURPOSES, LOSS AMOUNT CAN BE TRACKED BY

20  THE AMOUNT OF EACH OF THOSE AMOUNTS STATED IN THOSE COUNTS.

21       THE JURY FOUND HIM GUILTY BEYOND A REASONABLE DOUBT

22  ON THOSE COUNTS, WHICH IS A MUCH HIGHER LEVEL THAN

23  PREPONDERANCE OF THE EVIDENCE, WITH WHICH WE'RE DEALING TODAY.

24  THOSE AMOUNTS, TOTALED UP, EXCEED $6 MILLION, WHICH GETS THE

25  GOVERNMENT AND -- OR THE GUIDELINES ENHANCED UNDER

152

1    2B1.1(B)(1)(J), WHICH IS AN 18-LEVEL ENHANCEMENT.

2             AND SO I DO SUSTAIN THE OBJECTION, BUT I DO FIND THAT

3    THE 18-LEVEL ENHANCEMENT UNDER SUBSECTION (J) DOES APPLY.

4             ALL RIGHT.  ARE WE READY TO MOVE ON TO HARDSHIP?

5             MS. NOVAY:  YOUR HONOR, ONE THING.

6             THE COURT:  YES.

7             MS. NOVAY:  I THINK THE COURT ALSO NEEDS TO MAKE A

8    RULING -- WE HAVE ASKED -- EXCUSE ME.  THE PRESENTENCE REPORT

9    GIVES OUR CLIENT CREDIT FOR THE $1.4 MILLION OF HIS PERSONAL

10   MONEY THAT HE PUT IN.  WE'RE, OF COURSE -- AND WE'VE BEEN

11   DISCUSSING, ASKING THAT THE COURT PROVIDE HIM WITH THE FULL

12   CREDIT FOR THE 6.5 MILLION.  I THINK THE COURT NEEDS TO MAKE A

13   DETERMINATION, A RULING ON THAT.

14            THE COURT:  YOU ARE CORRECT.  AND THAT'S THE REASON

15   THAT I ASKED BEFORE WE WENT TO LUNCH WHETHER WE WERE ONLY

16   LOOKING AT THAT NOTE UNDER 2B1.1.

17            GOVERNMENT, LET ME HEAR YOU WITH RESPECT TO --

18   MS. BARRON, I ASSUME THAT COMES FROM YOU BECAUSE YOU RAISED IT

19   EARLIER.  SO I'LL HEAR FROM YOU ON THAT.

20            MS. BARRON:  YES, YOUR HONOR.

21            TO THE EXTENT THAT WE CREDIT MR. HARDWICK AT ALL, THE

22   NUMBER IS 1.4 AND NOT 6.4.  AND THE REASON FOR THAT IS THAT

23   THAT IS NOT MONEY THAT HE PUT INTO THE FIRM.  IN FACT, IT'S A

24   WHOLE SEPARATE FRAUD.  IT'S HIM ENTERING THESE AGREEMENTS,

25   WHICH MR. WITTSTADT TESTIFIED AT TRIAL HE SPECIFICALLY TOLD

1    NAT, DON'T OBLIGATE THE FIRM IF -- GO OUT AND GET THIS MONEY,

2    BUT IT'S MONEY THAT YOU HAVE TO -- AND I THINK THIS WAS ON

3    REBUTTAL WHEN HE TESTIFIED TO THIS -- THAT IT IS MONEY THAT YOU

4    ARE ON THE HOOK FOR.

5            MR. HARDWICK OBLIGATED THE FIRM ON THAT, AND

6    SPECIFICALLY WITH REGARD TO THE PRITCHARD LOAN.  WHEN THAT

7    DEFAULT JUDGMENT CAME IN, THAT WAS THE REASON WHY THE FIRM HAD

8    TO FILE BANKRUPTCY.  THEY COULDN'T PAY IT.

9            AND SO THAT IS A WHOLE SEPARATE FRAUD.  SO TO GIVE

10   HIM CREDIT FOR THAT, I CAN'T BELIEVE THEY'RE EVEN ASKING FOR

11   IT.

12           BUT EVEN TO THE 1.4, REGARDLESS OF HOW MUCH CREDIT

13   YOU GET, THE APPLICATION OF 3E SUB (1) MAKES IT CLEAR THAT ANY

14   AMOUNT OF MONEY THAT THE DEFENDANT DOES GIVE BACK DOES NOT

15   COUNT IF HE DOES IT AFTER THE FRAUD IS DISCOVERED.

16           REMEMBER THAT ON JULY -- IT'S EITHER THE 30TH OR THE

17   31ST, MARK WITTSTADT FLIES DOWN FROM BALTIMORE.  HE HAS A

18   MEETING WITH NAT HARDWICK.  AND ON THAT DAY, MR. HARDWICK SAYS,

19   I WAS OVER-DISBURSED.  HE KNOWS ON THAT DAY THAT THE SHORTAGE

20   IN THE ESCROW ACCOUNT IS DUE TO THE FACT THAT HE RECEIVED TOO

21   MUCH MONEY.  THAT IS WHEN THE FRAUD IS DISCOVERED.

22           NOW, THE AMOUNT CHANGES OVER THE NEXT FEW WEEKS.

23   THEY BRING IN MR. -- I THINK HIS NAME WAS -- JEFF MOORE, THANK

24   YOU.  HE'S HIRED BY THE FIRM.  AND THEN FIDELITY COMES IN, THEY

25   CRUNCH SOME MORE NUMBERS.  IT TAKES A WHILE TO FIGURE OUT WHAT

1    THE NUMBER IS.

2            BUT THE FACT THAT THAT HOLE IS DRIVEN LARGELY BY

3    MR. HARDWICK HAS NEVER BEEN IN DISPUTE.

4            NOW, WHAT IS CLEAR IS THAT WHEN THAT HOLE IS

5    DISCOVERED, IT -- YOU KNOW, IT -- MS. MAURYA WAS PAYING PAYROLL

6    OUT OF THAT ESCROW ACCOUNT.  SHE WAS MAKING DISTRIBUTIONS TO

7    OTHER PARTNERS OUT OF THAT ESCROW ACCOUNT.  BUT THE REASON WHY

8    SHE HAD TO DO THAT IS BECAUSE THE OPERATING ACCOUNT WAS SO

9    INSOLVENT BECAUSE HE HAD BEEN PILFERING OUT OF IT FOR THAT

10   LONG.

11           SO 100 PERCENT OF THE FRAUD, WHICH IS THAT

12   MR. HARDWICK HAD BEEN OVER-DISBURSED, WAS KNOWN ON JULY 30TH,

13   JULY 31ST.  IT'S JUST A QUESTION OF HOW MUCH AFTER THAT.

14           AND SO BECAUSE THE FRAUD WAS KNOWN BY THE TIME HE

15   DECIDES TO OWN UP AND TO GO PLUG THAT HOLE, HE SHOULDN'T GET

16   CREDIT FOR THAT, YOUR HONOR.  HE'S JUST DOING WHAT HIS PARTNER

17   TOLD HIM TO DO BECAUSE HE KNEW THAT HE HAD RECEIVED WAY TOO

18   MUCH MONEY.

19           THE COURT:  ALL RIGHT.  THANK YOU.

20           DEFENSE?

21           AND SO, GOVERNMENT, JUST YOUR BOTTOM LINE IS THAT, IF

22   ANYTHING, HE SHOULD GET CREDIT FOR 1.4?  OR DO YOU EVEN

23   CONCEDE --

24           MS. BARRON:  HE SHOULD NOT GET CREDIT FOR ANY OF IT

25   BECAUSE OF THE APPLICATION NOTE, YOUR HONOR.

1           THE COURT:  ALL RIGHT.

2           ALL RIGHT.  DEFENSE?

3           MS. NOVAY:  THANK YOU, YOUR HONOR.

4           I WAS ACTUALLY LOOKING AT THE PSR.  I WANTED TO MAKE

5    SURE EXACTLY WHERE IT WAS THAT THE PSR GAVE MR. HARDWICK CREDIT

6    FOR THE 1.4 MILLION.

7           THE APPLICATION NOTE --

8           THE COURT:  WAIT.  AND WHERE ARE YOU IN THE PSR?

9           MS. NOVAY:  I WAS LOOKING FOR IT.

10           THE COURT:  OH, OKAY.  ALL RIGHT.  GO AHEAD.

11           MS. NOVAY:  I'LL LET MS. LOEB FIND THE EXACT

12   PARAGRAPH THAT I AM REFERRING TO.

13           BUT THE APPLICATION NOTE AND THE WHOLE NOTION

14   BEHIND -- I THINK THE LOGIC IS CLEAR.  WE DON'T WANT TO SAY

15   SOMEBODY WHO GETS THEIR HAND CAUGHT IN THE COOKIE JAR, THEN

16   SAYS, OH, OOPS, JUST KIDDING, AND TRIES TO PUT SOMETHING BACK,

17   ESSENTIALLY.  I GUESS THAT'S THE LAYMAN'S TERM FOR WHAT THE

18   APPLICATION NOTE SAYS.

19           BUT HERE IN THIS CASE, WE'RE DEALING WITH A MATTER

20   OF, WHAT, 24 HOURS AFTER THINGS COME TO LIGHT THAT THERE'S A

21   PROBLEM, THAT THERE'S AN ISSUE.  THIS IS DONE NEARLY

22   IMMEDIATELY -- BEFORE ANY LAWSUITS, BEFORE THE GOVERNMENT'S

23   INVOLVED, BEFORE ANY INVESTIGATION, JUST AMONGST THE PARTNERS

24   AND AMONGST THE PEOPLE AT THE LAW FIRM IN TRYING TO MAKE THIS

25   DETERMINATION.

1          SO I ARGUE, AT THE VERY LEAST, MR. HARDWICK SHOULD

2     RECEIVE THE 1.4 MILLION IN CREDIT.

3          HOWEVER, TAKING OUT THESE TWO LOANS, BASED ON HIS

4     REPUTATION, BASED ON HIS FRIENDSHIPS THAT HE HAD LEVERAGED,

5     BASED ON THE RELATIONSHIP THAT HE HAD WITH MR. PRITCHARD AND

6     MR. JOHNSON, MR. HARDWICK TAKES OUT THESE LOANS, THE TOTAL

7     BEING 6.5, INCLUDING THE AMOUNT OF MONEY THAT HE HIMSELF HAS

8     PUT IN.

9          IT'S SIGNIFICANT.  IT'S SIGNIFICANT OF WHAT THE

10    TIMING IS.  AND THE APPLICATION NOTE REALLY POINTS ENTIRELY TO

11    THE TIMING.  AND AT THIS POINT, WITHIN JUST 24 HOURS AFTER THIS

12    IS HAPPENING -- I BELIEVE THAT WAS THE TIMING OF WHAT IT WAS --

13    THIS MONEY IS IMMEDIATELY INFUSED.

14         I THINK BECAUSE OF WHAT THE TIMING IS AND BECAUSE OF

15    THE EFFECT TO TRY TO KEEP THE LAW FIRM GOING, TO FUND THE

16    ACCOUNTS, MAKE SURE THAT WE DON'T HAVE ANY SORT OF AN ISSUE,

17    THAT'S WHAT IT'S POINTING TOWARDS.  AND THAT WAS THE PURPOSE

18    AND THE EFFECT OF WHAT MR. HARDWICK WAS ATTEMPTING TO DO IN

19    ORDER TO KEEP THE LAW FIRM GOING AND KEEP IT RUNNING.

20         THIS WASN'T ONE OF THOSE THINGS WHERE INITIALLY

21    MR. HARDWICK -- EVERYONE IS POINTING THE FINGER AND THEY'RE

22    SAYING, LOOK AT WHAT YOU'VE DONE, HERE IS THE FRAUD, AND NOW

23    THE FEDS ARE KNOCKING AT YOUR DOOR.

24         THAT WASN'T THE CIRCUMSTANCES IN THIS PARTICULAR

25    CASE.  BUT INSTEAD, IT WAS AN IMMEDIATE EFFECT OF TRYING TO

1    MAKE SURE ALL THE CLIENTS ARE MADE WHOLE -- IF THERE IS A

2    MISTAKE.  BECAUSE THERE'S STILL SOME CONFUSION ABOUT WHO IS

3    OWED WHAT, WHAT'S GOING ON WITH THE ACCOUNTS.

4            THE GOVERNMENT POINTED A LOT TO MS. MAURYA WAS

5    SPECIFICALLY FORCED TO DO THESE THINGS, SHE WAS FORCED TO MOVE

6    THE ACCOUNTS AROUND.  HOWEVER, I WOULD NOTE THAT THERE WAS NO

7    TESTIMONY, CERTAINLY NOT BY MS. MAURYA OR BY ANY OTHER WITNESS,

8    THAT MR. HARDWICK WAS AWARE OF EXACTLY WHAT MS. MAURYA WAS

9    DOING AND WAS AWARE OF ANY OF THE CHECK-CUTTING.

10           NOW, I KNOW -- I SEE YOU LOOKING AT ME LIKE THAT,

11   AND --

12           THE COURT:  I'VE GOT TO GET A BETTER POKER FACE.  I'M

13   SORRY.

14           MS. NOVAY:  NO, I APPRECIATE IT, BECAUSE IT HELPS ME

15   KNOW WHAT TO RESPOND TO.

16           I SAY THAT, BUT I ALSO NOTE THAT THERE'S A LOT OF

17   INCLINATIONS.  WELL, HE HAD TO HAVE KNOWN MS. MAURYA WAS DOING

18   THAT, HE HAD TO HAVE KNOWN THAT THIS IS EXACTLY WHAT WAS GOING

19   ON, HE HAD TO HAVE KNOWN BECAUSE OF THE NUMBERS AND BECAUSE OF

20   THESE SPREADSHEETS.

21           BUT I THINK -- THAT WASN'T WHAT THE JURY FOUND WITH

22   RESPECT -- THEY WEREN'T EVEN ASKED TO MAKE ANY DETERMINATIONS

23   ABOUT CHECK KITING OR ANYTHING LIKE THAT.  SO THAT WASN'T WHAT

24   THE JURY LOOKED OVER.

25           AND SO TO CREDIT MR. HARDWICK FOR THAT CERTAINLY

158

1   WOULDN'T BE INAPPOSITE OF WHAT THE JURY -- THE DETERMINATION

2   THE JURY ACTUALLY MADE.

3            SO I ASK THAT THE COURT WOULD -- I THINK I'M STARTING

4   TO REPEAT MYSELF A LITTLE BIT NOW.  BUT I ASK THE COURT WOULD

5   FIND MY CLIENT WITH CREDIT FOR THE 6.5, WHICH INCLUDES HIS OWN

6   MONEY THAT HE PUT IN AS WELL AS THE TWO LOANS THAT HE LEVERAGED

7   AND TOOK OUT ON HIS OWN BEHALF.

8            THANK YOU.

9            THE COURT:  ALL RIGHT.

10           MR. PHILLIPS:  ONE FURTHER THING, YOUR HONOR, VERY

11   BRIEFLY?

12           THE COURT:  NO.

13           I WILL NOT, I WILL NOT GIVE THAT CREDIT.  SO I DO NOT

14   FIND THAT, AFTER LOOKING AT THE LANGUAGE IN THE OFFSET, THAT IT

15   IS WARRANTED HERE.

16           MR. PHILLIPS, DO YOU STILL WANT TO SPEAK?

17           MR. PHILLIPS:  NO, YOUR HONOR.

18           THE COURT:  OKAY.  THANK YOU.

19           MR. PHILLIPS:  THAT WOULD BE FOOLISH.

20           THE COURT:  AND THAT'S THE ONLY REASON -- WASN'T

21   BEING RUDE.  BUT THAT'S THE ONLY REASON, THAT I DIDN'T THINK

22   THAT YOU WOULD AT THAT POINT.  SO THANK YOU.

23           OKAY.  ALL RIGHT.  LET'S MOVE TO HARDSHIP.  IF THERE

24   IS ANYTHING -- THIS IS A SEPARATE OBJECTION.  SO EVEN THOUGH IT

25   WAS REPRESENTED TO THE COURT THAT IT DID BLEED OVER WITH

1  AMOUNT, LOSS AMOUNT, LET'S GO AHEAD AND SPEAK OF IT

2  SPECIFICALLY SO THAT I CAN ISSUE A SPECIFIC RULING WITH RESPECT

3  TO HARDSHIP.  ALL RIGHT?

4          WE'LL START WITH THE GOVERNMENT.

5          MR. PHILLIPS:  YOUR HONOR, IN ORDER FOR THIS

6  ENHANCEMENT TO APPLY, THE GOVERNMENT HAS TO PROVE BY A

7  PREPONDERANCE OF THE EVIDENCE THAT ONE VICTIM OR MORE SUSTAINED

8  A SUBSTANTIAL FINANCIAL HARDSHIP AS A RESULT OF THE ACTUAL

9  LOSS.

10         AND THE COURT HEARD FROM MARK WITTSTADT, ROD

11  WITTSTADT, AND ART MORRIS.  THEY ALSO HEARD FROM ERIKA

12  MEINHARDT CONCERNING FIDELITY.  IT'S THE GOVERNMENT'S

13  CONTENTION THAT ALL FOUR OF THOSE PEOPLE AND THE ENTITY

14  SUSTAINED A SUBSTANTIAL FINANCIAL HARDSHIP.

15         IT WOULD BE INAPPROPRIATE TO TAKE INTO CONSIDERATION

16  THE FINANCIAL WEALTH OF THE INDIVIDUALS WHO ARE INVOLVED IN

17  DETERMINING WHETHER IT WAS A HARDSHIP.  WHEN YOU LOSE MILLIONS

18  OF DOLLARS, IT'S A SUBSTANTIAL HARDSHIP WHETHER YOU HAVE OTHER

19  MONEY IN THE BANK OR NOT.  IT WOULD BE INAPPROPRIATE TO TREAT

20  THESE VICTIMS ON LESS THAN EQUAL FOOTING BECAUSE THEY ARE WELL

21  HEELED.

22         IF WE HAD POOR VICTIMS, THERE WOULD BE NO QUESTION

23  THAT IF THEY LOST A SUBSTANTIAL PART OF THEIR LIFE SAVINGS THAT

24  IT WOULD BE A SUBSTANTIAL HARDSHIP.  THE COURT SHOULD NOT LOOK

25  AT THESE DEFENDANTS -- OR THESE VICTIMS ANY DIFFERENTLY SIMPLY

160

1   BECAUSE THEY WERE MORE FORTUNATE AND HAD BETTER EDUCATIONS AND

2   MORE MONEY THAN A LOT OF PEOPLE.

3        BUT THE COURT ALSO HEARD THAT, FROM MARK AND ROD

4   WITTSTADT ESPECIALLY, THAT WHEN THIS FIRM WENT OUT OF BUSINESS,

5   THEY WERE DEVASTATED BY IT FINANCIALLY.  EVENTUALLY, THE LAW

6   FIRM HAD TO FILE BANKRUPTCY.  IT HAS GREATLY AFFECTED THEIR

7   PRACTICES.  IT HAS AFFECTED ROD WITTSTADT'S HEALTH IN A

8   SUBSTANTIAL WAY.  THEY HAVE HAD ALL KINDS OF PROBLEMS TRYING TO

9   GET BACK TO WHERE THEY WERE BEFORE MR. HARDWICK COMMITTED THESE

10  CRIMES.

11       IN ADDITION, THE COURT HEARD THAT FIDELITY PUT IN

12  29 AND A HALF MILLION DOLLARS.  THAT IS CERTAINLY A SUBSTANTIAL

13  HIT TO ANY COMPANY'S BOTTOM LINE.

14       AND SO WE STAND ON THE ARGUMENTS THAT WE MADE IN OUR

15  SENTENCING MEMO.  WE BELIEVE ALL OF THOSE INDIVIDUALS SUSTAINED

16  A FINANCIAL HARDSHIP.

17       BUT IT'S IMPORTANT TO POINT OUT, THE GOVERNMENT ONLY

18  HAS TO PROVE ONE.  THE COURT ONLY HAS TO FIND ONE.  IT'S NOT

19  NECESSARY FOR YOU TO FIND ALL OF THOSE PEOPLE ARE VICTIMS.  ONE

20  OR MORE IS ALL WE HAVE TO PROVE.

21       THE COURT:  ALL RIGHT.  THANK YOU.

22       DEFENSE.

23       MR. PHILLIPS:  MS. BARRON ALSO POINTED OUT TO ME,

24  YOUR HONOR, THAT 800 PEOPLE IN THAT LAW FIRM LOST THEIR JOBS

25  WHEN THIS FIRM WENT UNDER.

1          THE COURT:  WELL, AND I DEFINITELY RECALL ALL OF

2     THAT.  I HAVE HAD TO MAKE A PRETRIAL RULING ON WHETHER WE COULD

3     GET INTO SOME OF THAT DURING TRIAL.

4          BUT WHAT IS YOUR BOTTOM LINE FOR ATTRIBUTING THE

5     DEMISE OF THE FIRM AND THE LOSS OF ALL OF THOSE JOBS TO

6     MR. HARDWICK'S CONDUCT?

7          THAT'S WHAT NEEDS TO BE CLEAR ON THE RECORD.  IT'S

8     NOT JUST THE MISFORTUNE OF ALL OF THIS, BUT THERE NEEDS TO BE A

9     CLEAR REPRESENTATION OF HOW HIS CONDUCT CAUSED THAT HARDSHIP.

10          MR. PHILLIPS:  WE BELIEVE THAT THE COURT CAN TAKE

11     THAT INTO CONSIDERATION FOR OTHER PURPOSES.  BUT BECAUSE IT'S

12     SO CLEAR HERE THAT A SUBSTANTIAL FINANCIAL HARDSHIP WAS CAUSED

13     TO MARK WITTSTADT AND ROD WITTSTADT, NOT TO MENTION ART MORRIS

14     AND FIDELITY, WE DON'T THINK WE NEED TO GO INTO THAT, AND WE

15     WON'T AT THIS TIME.

16          THE COURT:  DON'T NEED TO GO INTO WHAT?

17          MR. PHILLIPS:  MS. BARRON WOULD LIKE TO SAY

18     SOMETHING.

19          THE COURT:  OKAY.

20          MS. BARRON:  I JUST WANT TO POINT THE COURT TO -- THE

21     PSR, YOU KNOW, CONTAINS THE LETTER FROM DEAN TALAGANIS.  AND I

22     THINK THIS IS SIGNIFICANT.  MR. TALAGANIS RAN ONE OF THE OHIO

23     OFFICES.  AND HIS LETTER STATES THAT THE DAY AFTER IT WAS

24     ANNOUNCED THAT THIS HAD HAPPENED, THAT MR. HARDWICK HAD LEFT

25     THE FIRM, HIS NUMBER ONE CLIENT SAID, WE ARE NO LONGER SENDING

162

1    YOU THE BUSINESS.  HE LOST ALL OF HIS CLIENTS.  THEY WOULD

2    ALLOW HIM, AS HE SAID IN HIS LETTER THAT'S IN THE PSR, TO CLOSE

3    OUT THE EXISTING WORK, BUT THEY COULD NOT GET NEW WORK.

4          THIS SUBSTANTIATES WHAT MR. WITTSTADT SAYS.

5    MR. HARDWICK LEAVING THE FIRM CRIPPLED THE ENTIRE FIRM FROM

6    BALTIMORE TO ATLANTA TO OHIO.

7          AND IN TERMS OF SUBSTANTIAL, YOU KNOW, SUBSTANTIAL

8    HARDSHIP, I THINK THAT SAYS IT RIGHT THERE.  THEY CAN'T GET NEW

9    CLIENTS.  THEY CAN'T OPERATE A BUSINESS.  AND THAT WAS A DIRECT

10   RESULT.  THE VERY NEXT DAY HE STARTS GETTING THESE CALLS FROM

11   PEOPLE WHO ARE NO LONGER GOING TO BE SENDING HIM BUSINESS.  AND

12   WITHOUT BUSINESS, THEY CANNOT AFFORD TO OPERATE.

13         AND IT TOOK A LITTLE OVER A YEAR TO GET TO THE POINT

14   WHERE THEY WERE COMPLETELY INSOLVENT AND, DESPITE THE INFUSION

15   FROM FIDELITY, JUST HAD TO CLOSE THE DOORS, THE PRITCHARD

16   LAWSUIT BEING THE NAIL IN THE COFFIN.

17         THE COURT:  AND IN ANTICIPATION OF WHAT YOU KNOW THE

18   DEFENSE IS GOING TO SAY, BECAUSE THEY'VE SAID IT THE WHOLE

19   TIME, THEY'RE GOING TO SAY THAT THE RUG WAS PULLED FROM

20   UNDERNEATH THE FIRM BECAUSE THEY WENT PUBLIC AND THEY DID ALL

21   OF THIS STUFF THAT CAUSED THIS NEGATIVE PUBLICITY, AND THAT

22   THAT IS ULTIMATELY WHAT LED TO THE DEMISE OF THE FIRM.

23         BUT, YES, THERE WAS SOME SERIOUS HURDLES TO OVERCOME,

24   BUT THEY COULD HAVE TRIED TO OVERCOME THEM INSTEAD OF JUST

25   LETTING EVERYONE -- JUST SORT OF AIRING THEIR DIRTY LAUNDRY SO

1    QUICKLY.

2          MS. BARRON:  I UNDERSTAND.  THAT'S PROBABLY -- I

3    SUSPECT THAT'S THE PRIME REASON WHY THEY CALLED MS. VELCHECK,

4    WAS TO TALK ABOUT THIS CONVERSATION WHERE SHE WARNS

5    MR. WITTSTADT; WHICH IS WHY I BROUGHT UP THE TWO PUBLIC

6    LAWSUITS THAT WERE FILED IN OCTOBER 2014, TWO MONTHS LATER,

7    WHICH NOBODY IN THIS ROOM HAD ANY CONTROL OVER, THE PUBLIC

8    FILINGS THAT FIDELITY WAS REQUIRED TO FILE WITH THE SEC WHEN

9    THEY PLUGGED THAT HOLE, AND THEN ULTIMATELY THE GOVERNMENT'S

10   PROSECUTION.

11         AND SO WHAT MR. HARDWICK DID WAS GOING TO COME TO

12   LIGHT WHETHER IT WAS IN AUGUST OR IN OCTOBER OR IN FEBRUARY

13   2016, WHEN THIS CASE WAS INDICTED.  AND THE HARM HE ULTIMATELY

14   CAUSED TO THE FIRM WAS GOING TO HAPPEN AT SOME POINT.  IT WAS

15   JUST A QUESTION OF WHEN IT BEGAN.

16         THE COURT:  ALL RIGHT.  THANK YOU.

17         DEFENSE.

18         MR. GARLAND:  MR. HARDWICK LEFT.  THE LAW FIRM AT

19   THAT POINT, AND LANDCASTLE TITLE, HAD NO FINANCIAL PROBLEM

20   WHATSOEVER.  NO CLIENT -- THE CLIENT ACCOUNTS WERE FULL.

21         NOW, MR. HARDWICK HAD WORKED 25 YEARS TO BUILD A

22   FIRM.  AND HE TOOK ALL OF HIS OWNERSHIP INTEREST -- THE FIRM

23   THAT THE EVIDENCE IN THE RECORD SHOWS HAD A MARKET VALUE.  AND

24   THIS -- PUT IN A GOOD BIT OF EVIDENCE ON THIS, INCLUDING

25   TESTIMONY OUT OF MR. WITTSTADT'S STATEMENTS, BOTH OF THEM, THAT

1    THERE WERE BUYERS THAT WOULD PAY THE RANGE OF 60 MILLION.  HE

2    TOOK HIS INTEREST IN THAT AND GAVE IT TO THE WITTSTADTS.  THAT

3    INCLUDED LANDCASTLE TITLE, WHICH WAS MAKING 300,000 A MONTH,

4    AND THE TOTALITY OF IT WAS ON TRACK TO MAKE 8 TO 10 MILLION.

5            SO THEY HAD A GOING BUSINESS.  THEY HAD CONTROL OF

6    THAT GOING BUSINESS.  THEY HAD NO SHORTAGES IN THEIR ESCROW

7    ACCOUNT.  AND THEY SAY AT DIFFERENT TIMES THEY WERE MAKING

8    PROFITS AFTER THIS, IN SPITE OF THE FACT THAT THEY MADE A

9    DECISION -- JUST LIKE YOU HEARD THEY WERE WARNED NOT TO DO,

10   THEY MADE AN ELECTED DECISION TO TRASH MR. HARDWICK IN PERSON.

11   THAT WAS THEIR DECISION, TO FILE A PUBLIC LAWSUIT TO SAY THE

12   FACE OF THE FIRM -- THAT THIS FIRM WAS OPERATING AS A FRAUD.

13           NOW, THERE HAVE BEEN MANY TIMES THAT PEOPLE HAVE HAD

14   PROBLEMS IN THEIR LAW FIRMS AND OTHERWISE.  AND THEY ALL HAVE

15   SENSE ENOUGH TO SAY, WE'RE GOING TO CURE THE PROBLEM, BUT WE'RE

16   NOT GOING TO DESTROY THE FIRM AS WE CURE THE PROBLEM.

17           SO THE FIRST THING THAT HAPPENED WAS THEY FILED A

18   LAWSUIT ALLEGING FRAUD, PUT OUT A PRESS RELEASE, AND DAMNED

19   THEIR FIRM.  THE RECORD SHOWS THE LAWSUITS AND ALL OF THAT.

20           NOW, THE SECOND THING.  THERE WAS AN ABSOLUTELY

21   UNDEFENSIBLE [SIC] GUARANTEE DONE BY A PERSON WITH AUTHORITY.

22   OUR SIDE OF THE EVIDENCE WAS, THEY SAY, GO DO ANYTHING YOU HAVE

23   TO DO, INCLUDING GIVE THE GUARANTEE OF THE FIRM.

24           SO THEY ARE FACED WITH THIS VERY SIGNIFICANT FACT.

25   THEY RECEIVED THE MONEY.  THEY GOT THE MONEY FROM BOTH THESE

1   MEN.  BOTH THOSE MEN LOANED THE MONEY TO NAT HARDWICK.  NAT

2   HARDWICK PUT IT IN THE FIRM FROM HIS ACCOUNTS.  WIRED IT IN.

3   THEY GOT THE MONEY.

4           AND THEY HAVE THE AUDACITY TO TELL BOTH THESE PEOPLE,

5   YOU CAN BLOW OFF.  WE'RE GOING TO KEEP YOUR MONEY.  WE'RE NOT

6   GOING TO PAY YOUR MONEY BACK.  WE GOT YOUR MONEY.

7           THERE'S AN UNASSAILABLE GUARANTEE BY A PERSON WITH

8   AUTHORITY, AND THEY DECIDED TO DEFEND THOSE CASES ON THAT

9   BASIS.

10          TWO MONTHS LATER, THEY DIDN'T DO WHAT THEY CLEARLY

11  COULD DO -- WE'LL WORK IT OUT WITH YOU; YES, WE OWE IT.  SO

12  THEY PUT THEMSELVES IN A SITUATION, THESE PEOPLE HAD TO SUE

13  THEM BECAUSE THEY WERE DENYING THAT THE FIRM OWED THE MONEY.

14  ONE SUED IN FEDERAL COURT, ONE SUED IN STATE COURT.  I JUST

15  TALK ABOUT -- NOW, THEY BROUGHT THAT ON THEMSELVES.  AND WE'RE

16  TALKING ABOUT SPECULATION HERE ABOUT WHY THEY GOT LOSS.

17          WELL, THE CASE LAW -- AND I'LL GIVE YOUR HONOR THE

18  CITE HERE, IT'S *U.S. VERSUS STEIN* -- SAYS, YOU CAN'T DETERMINE

19  LOSS BASED ON SPECULATION, BASED ON SOMETHING LIKE THAT.  THEY

20  BROUGHT THIS ON THEMSELVES BY THEIR ACTIONS.

21          SO IN THE FEDERAL CASE, THEY ARE MAKING ACCUSATIONS.

22  AND MR. JOHNSON'S LAWYER MAKES ACCUSATIONS THAT THEY HAVE

23  ENGAGED IN CRIMINAL CONDUCT IN CONNECTION WITH -- HOWEVER

24  MR. JOHNSON'S LAWYER CAME UP WITH THAT.  BUT THEY'VE CREATED

25  THAT FORUM.

1          AND MR. WITTSTADT SAID WHEN THAT HIT THE NEWS, WHEN

2    THAT HIT THE NEWS, THAT THEY HAD CREATED A SITUATION FOR A

3    LAWSUIT.  IT WAS OVER FOR THEM.  THAT'S WHAT HE SAID.

4          THAT WAS SOME MONTHS LATER.  I THINK THAT WAS JUNE OF

5    2015.  MR. HARDWICK LEFT BACK IN -- I THINK IT'S JULY, RIGHT?

6    AUGUST OF 2014.  SO YOU GOT A HUGE SEPARATION IN TIME.

7          NOW, ALL THREE OF THOSE THINGS -- AND THEY SENT OUT

8    PRESS RELEASES SAYING HOW BAD MR. HARDWICK WAS TO ALL THE

9    PEOPLE.  AND IT'S UNDISPUTED, WHAT NAT HARDWICK REALLY WAS WAS

10   A BUSINESS-GETTER AND A BUSINESS-KEEPER AND MAINTAINER.

11   EXTRAORDINARY, TRUTHFUL PROOF THAT HIS SOUL WAS INTO THAT.

12         SO THESE PEOPLE HAVE A $50 MILLION, $60 MILLION

13   ASSET.  THEY'VE HAD TO SELL A PIECE OF SOMETHING THAT THEY

14   DIDN'T OWN BEFORE MR. HARDWICK GAVE IT TO THEM.  THEY ARE

15   MAKING MONEY, THEY CLAIM, UNTIL THE JOHNSON LAWSUIT, ALBEIT NOT

16   THE AMOUNTS OF MONEY.

17         NOW, WHAT ELSE DID THEY DO?  THEY WENT OUT AND

18   DECIDED TO MERGE WITH A COMPANY CALLED BUTLER & HOSCH, MOVE ALL

19   OF THEIR FORECLOSURE BUSINESS INTO BUTLER & HOSCH.  THIS IS IN

20   2015, THE EARLY 2015.  IT WAS A BANKRUPT FIRM.  IT HAD BEEN

21   ENGAGING IN FRAUD, AND THEY MADE THE DECISION THAT THEY WERE

22   GOING TO JOIN WITH BUTLER & HOSCH.  YOU HAVE A $2 MILLION NOTE.

23   AND THE RECORD SHOWS THAT BOTH THE WITTSTADTS GOT OUT, AFTER

24   THIS EVENT, A COUPLE OF MILLION DOLLARS IN SALARY.

25         WHAT THEY DID WAS DESTROY THE GOLDEN GOOSE THEY HAD

1   BY GOING PUBLIC, BY MERGING WITH A BAD FIRM, BY REFUSING TO PAY

2   WHEN, IN THE STATE COURT THE JUDGE SAID, SUMMARY JUDGMENT

3   GRANTED, NO DEFENSE AT ALL, NOTHING YOU'VE PRESENTED.  THEY

4   CREATED ALL OF THAT.

5         MR. HARDWICK, WHAT DID HE DO?  TRIED TO ENCOURAGE

6   EVERY SINGLE CLIENT TO STAY WITH THE FIRM AND TOOK ALL HE HAD

7   AND PUT IT IN.  HE DIDN'T CAUSE THESE PEOPLE A SUBSTANTIAL

8   LOSS.

9         IF I'M OUT WORKING IN OHIO, AND I'VE GOT A GOOD

10  REPUTATION IN OHIO, AND THE FIRM I'M WORKING FOR COMES OUT AND

11  SAID, WE'VE BEEN RUN BY SOMEBODY THAT'S A FRAUD AND THE ESCROW

12  ACCOUNTS ARE NOT ANY GOOD, ANY PROBLEM THEY BROUGHT ON

13  THEMSELVES, OR HARDSHIP, WAS IN THEIR OWN MAKING.

14        THAT DIDN'T MEAN THAT AT SOME POINT, ONCE THEY HAD IT

15  ROLLING FORWARD, THEY COULDN'T DO ANY NUMBER OF THINGS.  THEIR

16  BUSINESS WOULD HAVE BEEN ROLLING ON.

17        SO WE SAY THERE'S NO HARDSHIP ATTRIBUTABLE

18  PROXIMATELY TO MR. HARDWICK.  THE CASE --

19        THE COURT:  THE *STEIN* CASE?

20        MR. GARLAND:  *STEIN* CASES.

21        THE COURT:  AND WHAT IS THE PROPOSITION OF THE *STEIN*

22  CASE AND THE APPLICABILITY HERE?

23        MR. GARLAND:  IT'S WHAT I SAID.  AND I HAVE A COPY

24  FOR THE COURT.

25        THE COURT:  I DIDN'T QUITE CATCH IT THE FIRST TIME

168

1  YOU SAID IT.  HOW DOES IT APPLY HERE?  WHAT DOES IT HELP ME

2  WITH?

3              MR. GARLAND:  IT APPLIES HERE -- IN THIS CASE, IT WAS

4  A SECURITY FRAUD CASE.  AND THE COURT RULED THAT YOU COULDN'T

5  SAY, JUST BECAUSE THE DEFENDANT HAD MADE FALSE STATEMENTS IN

6  THE FINANCIAL MATTERS, THAT HE CAUSED A HARDSHIP ON PEOPLE WHO

7  BOUGHT THE STOCK BASED ON HIS FALSE FINANCIAL STATEMENTS.  AND

8  THEY SAID IT WAS SPECULATION TO SAY THAT THEIR HARDSHIP WAS --

9  WHEN YOU TRIED TO SAY IN THE FUTURE WHEN SOMEBODY DID SOMETHING

10  THAT IT WAS CAUSED BY THESE PRIOR FALSE STATEMENTS, THAT THAT

11  WAS TOO ATTENUATED.  IT DID NOT PRODUCE PROXIMATE AND LEGAL

12  CAUSE.

13              AND I WISH TO HAND THIS CASE UP TO THE COURT.  I'VE

14  FURNISHED COPIES TO THE GOVERNMENT.

15              YOUR HONOR, THE CASE IS -- AND I HAVE HIGHLIGHTED THE

16  ONE REMAINING COPY.  ALTHOUGH THE DISTRICT COURT MAY ESTIMATE

17  THE AMOUNT OF LOSS, IT CANNOT SPECULATE ABOUT THE EXISTENCE OF

18  FACTS AND MUST BASE ITS ESTIMATE ON RELIABLE AND SPECIFIC

19  EVIDENCE.  THIS DEFINITION INCORPORATES A CAUSATION STANDARD

20  THAT, AT A MINIMUM, REQUIRES FACTUAL CAUSATION, OFTEN CALLED

21  "BUT FOR" CAUSATION, AND PROVIDES A RULE FOR LEGAL CAUSATION.

22              AND THEN -- JUST A SECOND, YOUR HONOR.

23              HERE, THE GOVERNMENT FAILED TO SATISFY EITHER OF THE

24  OPTIONS.  THE DISTRICT COURT'S STATEMENT THAT "FROM THE RECORD

25  THERE WAS SUFFICIENT EVIDENCE TO DEMONSTRATE RELIANCE" FOR

169

1    INVESTORS WAS ERRONEOUS.

2            SO IT APPLIES THE CONCEPT THAT I HAVE JUST SET FORTH.

3            MAY I HAND THE COURT CASE UP TO THE COURT?

4            THE COURT:  CERTAINLY.

5            THANK YOU.  ALL RIGHT.

6            MR. GARLAND:  YOUR HONOR, IF I MAY, I REQUEST

7    ASSISTANCE FROM MS. NOVAY.

8            THE COURT:  SURE.

9            MS. NOVAY:  I DON'T THINK MR. GARLAND WAS -- I'M

10   SORRY, YOUR HONOR.  I DIDN'T WANT TO INTERRUPT YOU.

11           THE COURT:  NO.  GO AHEAD.

12           MS. NOVAY:  MR. GARLAND WAS GETTING UP TO

13   SPECIFICALLY ADDRESS WHAT MS. BARRON HAD REFERENCED.  I WILL

14   NOT REPEAT ANY OF THAT.  I WILL GO SPECIFICALLY TO THE

15   GUIDELINES AND THE FACTORS THAT THE COURT -- THAT THE NOTE -- I

16   THINK IT'S NOTE 4(F) THAT TALKS ABOUT FINANCIAL, SUBSTANTIAL

17   FINANCIAL HARDSHIP.

18           AND ONE OF THE THINGS THAT MR. PHILLIPS MENTIONED

19   WAS, YOU KNOW, JUST BECAUSE MR. MORRIS AND MR. -- EXCUSE ME --

20   MISTERS -- MESSRS. WITTSTADT ARE SOMEWHAT OF MEANS DOESN'T

21   NECESSARILY MEAN THAT THEY SHOULDN'T BE CONSIDERED VICTIMS OF

22   THIS CRIME.

23           BEFORE I GO INTO THAT, FIDELITY.  WE CONTEND FIDELITY

24   IS NOT A VICTIM.  FIDELITY CAME IN AFTER THERE WERE HOLES

25   DISCOVERED, AFTER THERE WERE ISSUES DISCOVERED.  THEY MADE AN

170

1    INVESTMENT.  AND WE COVERED THAT IN OUR MEMO.  I WON'T GO ANY

2    FURTHER INTO THAT.

3         WITH RESPECT TO MR. MORRIS AND MESSRS. WITTSTADT,

4    THERE'S DIFFERENT FACTORS THAT THE COURT SHOULD CONSIDER WHEN

5    LOOKING AT TO WHETHER OR NOT SOMEONE HAS HAD SUBSTANTIAL

6    FINANCIAL HARDSHIP.  AND THOSE THINGS ARE ENUMERATED:

7         BECOMING INSOLVENT, THAT HAS NOT BEEN ALLEGED AND HAS

8    NOT HAPPENED; FILING FOR BANKRUPTCY, THAT HAS NOT BEEN ALLEGED

9    AND THAT HAS NOT HAPPENED; SUFFERING LOSS OF RETIREMENT OR

10   EDUCATION OR SAVINGS AND INVESTMENT FUNDS, THAT HASN'T

11   HAPPENED; MAKING SUBSTANTIAL CHANGES TO EMPLOYMENT, SUCH AS

12   POSTPONING RETIREMENT, THERE'S NOT BEEN ANY EVIDENCE OF THAT,

13   NO ONE'S MENTIONED ANYTHING ABOUT THAT; AS WELL AS CHANGES IN

14   LIVING ARRANGEMENTS, RELOCATING TO A DIFFERENT HOME, THAT

15   HASN'T HAPPENED; AND FINALLY, SUFFERING HARM OR THEIR ABILITY

16   TO OBTAIN CREDIT, THAT HASN'T HAPPENED.

17        THESE ARE THE FACTORS THAT ARE CONSIDERED IN THIS

18   ENHANCEMENT.  AND I DON'T THINK ANYONE'S NECESSARILY ARGUED

19   THAT, OH, THEY'RE JUST NOT VICTIMS ENTIRELY.  BUT THIS IS FOR

20   THE PURPOSES OF THIS PARTICULAR ENHANCEMENT.

21        THERE'S THREE DIFFERENT KINDS OF ENHANCEMENTS:  PLUS

22   TWO, PLUS FOUR, PLUS SIX, DEPENDING ON NUMBERS OF VICTIMS,

23   TYPES OF VICTIMS, THE HARM THE VICTIMS HAVE SUFFERED.

24        HERE, WE'RE JUST SAYING THAT THERE WEREN'T -- THERE

25   WERE LESS THAN TEN VICTIMS; AND OF THE VICTIMS THAT WERE

1    HERE -- SO THE PLUS TWO DOESN'T APPLY -- NONE OF THE VICTIMS

2    THAT ARE ENUMERATED, THERE WASN'T A SUBSTANTIAL FINANCIAL

3    HARDSHIP THAT SHOULD BE APPLIED.  THE FACTORS, THEY DON'T FALL

4    UNDER THESE PARTICULAR FACTORS.

5          AND, WELL, YOU KNOW, GENERALLY, AS A HUMAN BEING, I

6    AGREE.  JUST BECAUSE YOU HAVEN'T BEEN KICKED OUT OF YOUR HOUSE

7    DOESN'T MEAN YOU'RE NOT A VICTIM IN A CASE.  BUT IT DOES MEAN

8    THAT YOU DON'T NECESSARILY -- IT DOESN'T NECESSARILY FALL UNDER

9    THIS PARTICULAR GUIDELINE ENHANCEMENT.

10          AND SO FOR THAT REASON, WE ASK THE COURT SUSTAIN OUR

11    OBJECTION TO THIS PARTICULAR ENHANCEMENT AND NOT INCREASE IT

12    BY, I THINK IT'S PLUS FOUR.

13          THANK YOU.

14          THE COURT:  THANK YOU.

15          MR. PHILLIPS:  MAY I RESPOND, YOUR HONOR?

16          THE COURT:  YES.

17          MR. PHILLIPS:  I THINK THE PSR ONLY CALLS FOR A

18    TWO-LEVEL INCREASE, NOT A FOUR-LEVEL.

19          MS. NOVAY:  I'M SORRY.  THAT'S CORRECT.  I'M SORRY.

20    I MISSPOKE.

21          THE COURT:  CORRECT.

22          MR. PHILLIPS:  THE EVIDENCE AT TRIAL SHOWED A LOT

23    DIFFERENT PICTURE THAN WHAT THEY ARE PRESENTING.

24          FIRST OF ALL, MR. GARLAND BLAMED THE VICTIMS, SAID

25    THEY BROUGHT THIS ON THEMSELVES, WHICH IS UNCONVINCING, TO SAY

172

1    THE LEAST.  THAT'S CLEARLY NOT WHAT THIS JURY FOUND.

2         BUT THE TESTIMONY IN THE RECORD THAT I WOULD LIKE TO

3    POINT OUT TO THE COURT ON THIS POINT, MARK WITTSTADT

4    TESTIFIED -- THIS IS VOLUME -- OR DOCUMENT 297 AT PAGE 977:

5         WHAT WOULD HAVE HAPPENED IF FIDELITY HAD NOT STEPPED

6    IN?

7         ANSWER:  BANKRUPTCY, DEFAULT, PEOPLE LOSING THEIR

8    HOMES, ALL KINDS OF DISASTER.

9         THE NEXT PAGE, 978:  HOW MUCH VALUE DOES A COMPANY

10   THAT IS $37 MILLION IN THE HOLE HAVE?

11        ANSWER:  THE COMPANY WAS WORTHLESS AT THAT TIME.

12        YOUR HONOR, WE KNOW THAT EVENTUALLY THAT FIRM FILED

13   BANKRUPTCY.  AND SO MS. NOVAY POINTED OUT IN THE GUIDELINES, IN

14   THE COMMENTARY, ONE OF THE THINGS THAT THE COURT CAN LOOK AT IS

15   WHETHER A VICTIM HAS FILED FOR BANKRUPTCY OR HAS BECOME

16   INSOLVENT.

17        BUT THE NOTE THERE, (F), SAYS THESE ARE AMONG THE

18   FACTORS THAT THE COURT CAN CONSIDER.  IT DOESN'T SAY THOSE ARE

19   THE ONLY FACTORS.  IT DOESN'T SAY THE COURT CAN'T APPLY THIS

20   ENHANCEMENT IF IT DOESN'T FIND ONE OF THESE FACTORS.

21        BUT HERE WE HAVE THAT.  WE KNOW THAT THE LAW FIRM,

22   THAT ACCORDING TO ONE OF THE PARTNERS, WAS WORTHLESS WHEN THIS

23   FRAUD WAS DISCOVERED.  THEY EVENTUALLY FILED BANKRUPTCY.

24        NAT HARDWICK, IN HIS OWN TESTIMONY, DOCUMENT 310, AT

25   PAGE 3224:

1          WHAT HAPPENED TO THE VALUE OF YOUR FIRM AFTER THIS

2    HUGE HOLE IN YOUR ATTORNEY ESCROW ACCOUNTS WAS DISCOVERED?  DID

3    THE FIRM BECOME MORE VALUABLE OR LESS VALUABLE?

4          ANSWER:  I ASSUME IT WOULD BE LESS VALUABLE.

5          THOSE ARE HIS EXACT WORDS.

6          SO IT IS NOT SPECULATION TO SAY THAT THE BANKRUPTCY

7    OF THE LAW FIRM, OF MHS, WAS RELATED DIRECTLY TO THE FRAUD THAT

8    THE JURY CONVICTED NATHAN HARDWICK OF.  THAT IS WHAT THE

9    EVIDENCE AT TRIAL SHOWED, AND WE THINK THERE IS AMPLE SUPPORT

10   FOR THE COURT TO APPLY THAT ENHANCEMENT.

11         THE COURT:  OKAY.  LET ME MAKE SURE I UNDERSTAND

12   THAT, MR. PHILLIPS.  YOU'RE SAYING -- AND I DO RECALL THAT

13   TESTIMONY THAT YOU JUST RECOUNTED, SO I DON'T THINK ANYONE IS

14   DISPUTING -- NEVER MIND.

15         OKAY.  THANK YOU, SIR.

16         ALL RIGHT.  I AM GOING TO OVERRULE THAT OBJECTION.

17   AND IT IS NOT SO MUCH TIED TO THE AMOUNT.  WE DEALT WITH THE

18   AMOUNT, THE LOSS AMOUNT THAT COULD BE ESTABLISHED TO BE

19   ATTRIBUTABLE TO MR. HARDWICK IN THE FIRST OBJECTION.

20         BUT I FIND THAT THERE ARE OTHER FACTORS TO CONSIDER

21   IN WHAT LEADS TO A HARDSHIP, AND THAT IS THE TARNISHING OF THE

22   REPUTATION OF A FIRM.

23         AND I DON'T THINK THAT, YOU KNOW, MR. HARDWICK GETS

24   TO SAY, WELL, I'VE CREATED ALL OF THIS, BUT HERE'S HOW YOU

25   SHOULD RESPOND TO IT:  YOU SHOULD NOT PUBLICIZE IT AND LET THE

174

1    PUBLIC KNOW WHAT'S GOING ON JUST YET.  HE DOESN'T GET TO MAKE

2    THAT CALL.

3              I THINK IT'S FAIR THAT MHS TOOK WHATEVER STEPS THEY

4    FELT THEY NEEDED TO TAKE TO TRY TO SAVE THEIR FIRM IN RESPONSE

5    TO HIS CONDUCT.  AND THEY WERE UNABLE TO DO IT.  EVEN WITH ALL

6    THE OTHER THINGS, THE MONEY INFUSED AND ALL, THEY WEREN'T ABLE

7    TO DO IT.

8              AND I FEEL THAT THERE WAS FINANCIAL HARDSHIP.  AND I

9    FIND THAT PRIMARILY WITH RESPECT TO THE WITTSTADTS, DESPITE

10   WHATEVER THEIR FINANCIAL SITUATION WAS FOLLOWING ALL OF THIS.

11   I DON'T FIND THIS WITH RESPECT TO FIDELITY SO MUCH, BUT I WILL

12   FIND IT WITH RESPECT TO THE WITTSTADTS.

13             SO I DO OVERRULE THAT OBJECTION, AND I DO LEAVE IN

14   THE TWO-LEVEL ENHANCEMENT ON THAT BASIS.

15             MR. PHILLIPS:  YOU SAY YOU DON'T OVERRULE THE

16   OBJECTION?

17             THE COURT:  I DO OVERRULE THE OBJECTION, AND I DO

18   LEAVE IN THE TWO-LEVEL ENHANCEMENT.  SO, SORRY IF I MISSPOKE.

19   SO I DO OVERRULE THAT OBJECTION.

20             MR. PHILLIPS:  YOUR HONOR, MAY WE TAKE A SHORT BREAK

21   TO GO TO THE BATHROOM AT THIS TIME?

22             THE COURT:  YES.  OKAY.  IT'S ABOUT 3:25.  LET'S TAKE

23   TEN MINUTES.  WE'LL BE BACK IN SESSION AT 3:35.

24             THANK YOU.

25             THE COURTROOM SECURITY OFFICER:  ALL RISE.

1          (WHEREUPON, A BRIEF RECESS WAS HAD FROM 3:25 P.M. TO

2     3:37 P.M.)

3          THE COURT:  THANK YOU, MA'AM.

4          THANK YOU.  YOU MAY BE SEATED.  THANK YOU SO MUCH.

5          ALL RIGHT.  GOVERNMENT HAS ALREADY SAID NO OBJECTIONS

6     TO CALCULATIONS.

7          DEFENSE, YOUR NEXT OBJECTION, ROLE IN THE OFFENSE.

8     IS THAT AN OBJECTION?  I THINK THE GOVERNMENT DISCUSSED ABUSE

9     OF TRUST IN THEIR MEMO, BUT I DON'T THINK YOU EVER OBJECTED TO

10    THAT.

11         MS. NOVAY:  WE DIDN'T.

12         THE COURT:  OKAY.  SO ROLE IN THE OFFENSE?

13         MS. NOVAY:  THAT WOULD BE THE NEXT ONE.

14         THE COURT:  OKAY.

15         MS. NOVAY:  SHOULD I --

16         THE COURT:  LET'S SEE.  WE'VE BEEN STARTING WITH THE

17    GOVERNMENT.  YEAH, I'LL GO AHEAD AND START WITH THE GOVERNMENT

18    AGAIN.  AND I'M ONLY DOING THAT BECAUSE I'VE ALREADY READ THE

19    OBJECTIONS AS EXPRESSED, SO I WANT TO GO AHEAD AND START WITH

20    THE RESPONSE TO THEM.

21         ACTUALLY, MR. PHILLIPS, I'M SORRY.  LET ME START WITH

22    THEM, BECAUSE I WANT TO KNOW WHY THEY DON'T THINK -- WELL, YES.

23    JUST BASED ON WHERE MY INCLINATION IS RIGHT NOW, LET ME HEAR

24    FROM THE DEFENSE RIGHT NOW, BECAUSE IT WOULD BE MY INCLINATION

25    THAT THAT WOULD DEFINITELY APPLY.

1          SO LET ME HEAR FROM THE DEFENSE ON THE BASIS OF THAT

2     OBJECTION.

3          MS. NOVAY:  ARE YOU READY, YOUR HONOR?  I'M SORRY.

4          THE COURT:  YES.  YES.  I'M SORRY.

5          MS. NOVAY:  SO I'LL DO A BRIEF DISCUSSION OF THE FIVE

6     OR MORE PARTICIPANTS.  I THINK -- AND BASED ON MY READING OF

7     WHAT THE GOVERNMENT SAID, WE ALL SORT OF AGREE THAT IT'S NOT

8     FIVE OR MORE.  IT'S THE OTHERWISE EXTENSIVE IS WHAT THE

9     GOVERNMENT IS FOCUSING ON -- THE COURT IS NODDING, SO THAT'S

10    WHAT I WILL FOCUS MY ARGUMENTS ON AS WELL -- ALTHOUGH THE

11    GOVERNMENT DID DO AN ARGUMENT ABOUT WHY THE TWO-POINT ROLE

12    SHOULD APPLY AS WELL.  WE'RE -- OUR ARGUMENT WAS IT SHOULDN'T

13    BE FOUR POINTS, IT SHOULD BE TWO POINTS.  SO I'LL FOCUS IN ON

14    THAT AS WELL.

15         THE COURT:  OKAY.

16         MS. NOVAY:  SO THE ARGUMENT, ESSENTIALLY, FOR WHY

17    IT'S NOT OTHERWISE EXTENSIVE -- BECAUSE WE'RE LOOKING AT THE

18    PARTICIPANTS.  AND I THINK THE BASIS FOR THE GOVERNMENT'S

19    ARGUMENT AS TO WHY IT'S OTHERWISE EXTENSIVE, IF I'M

20    UNDERSTANDING IT, WAS THE AMOUNT OF MONEY INVOLVED AS WELL AS

21    THE -- WHAT THE GOVERNMENT REFERRED TO AS UNWITTING

22    PARTICIPANTS, WHICH, OF COURSE, THE COURT CAN TAKE INTO

23    CONSIDERATION, ALTHOUGH THE UNWITTING PARTICIPANTS WERE LARGELY

24    THE FOLKS WHO RECEIVED WIRES ON BEHALF OF MR. HARDWICK.

25         I THINK I NOTED IN THE BRIEF THAT IT WAS REALLY

1   MR. HARDWICK SAYING, THESE ARE MY DEBTS, THESE ARE THE BILLS I

2   WANT YOU TO PAY; MS. MAURYA, PLEASE PAY THEM.  AND SHE WAS.  SO

3   I THINK LUMPING IN THE PEOPLE WHO RECEIVED THE WIRES AS

4   UNWITTING PARTICIPANTS IS NOT REALLY LOGICALLY SOUND IN THIS

5   PARTICULAR INSTANCE.

6        THESE WEREN'T PEOPLE WHO WERE BEING USED AS PART OF

7   THE SCHEME.  THESE WERE PEOPLE WHO WERE JUST RECEIVING WIRES OR

8   JUST RECEIVING CHECKS ON HIS BEHALF.  THESE ARE PEOPLE THAT HE

9   OWED MONEY TO.  HE WAS ASKING THAT MONEY BE SENT.  AND SO THE

10  OTHERWISE EXTENSIVE I DISAGREE WITH.

11       BUT I THINK THE GOVERNMENT ALSO TALKS ABOUT -- WELL,

12  LET ME BACK UP.

13       I NOTED ALSO, AS WELL AS THE AUTHOR'S DISCUSSION

14  NOTE, THAT THIS WAS REALLY JUST MANAGEMENT OF HIS

15  DISBURSEMENTS.  THIS IS HOW HE'S MANAGED THEM.  THE SCHEME, AS

16  IT WERE, AND AS THE JURY FOUND, IS INCREDIBLY SIMPLE.  HE TOLD

17  MS. MAURYA, SEND THESE WIRES ON MY BEHALF.  AND SHE DID.  AND

18  THAT IS EXACTLY WHAT HAPPENED.

19       THE CRIMINALLY RESPONSIBLE PARTICIPANT WAS ENTIRELY

20  MS. MAURYA.  BUT I WOULD ARGUE THAT IN FACT SHE'S REALLY THE

21  ONLY PARTICIPANT IN THE SCHEME.  THERE WAS REALLY NO ONE ELSE

22  AT THE LAW FIRM WHO WAS INVOLVED, WHO WAS PUTTING WIRES OUT ON

23  BEHALF OF MR. HARDWICK.

24       I KNOW THE GOVERNMENT MENTIONED MS. RITCHIE, ALTHOUGH

25  I THINK SHE LARGELY SAID, FOR THE MOST PART, HER TESTIMONY,

1    THAT I'M OUT OF IT.  MR. HARDWICK AND MR. MAURYA [SIC] WOULD

2    MEET WITHOUT ME.  I WAS NOT INVOLVED IN THAT.

3            SO I DON'T THINK SHE SHOULD BE COUNTED, CERTAINLY NOT

4    AS A PARTICIPANT, BUT ALSO NOT AS AN UNWITTING PARTICIPANT IN

5    THIS INCIDENT, OTHERWISE EXTENSIVE.

6            AND I THINK THE GOVERNMENT -- I CAN'T RECALL IF THEY

7    CITED A CASE, BUT I THINK PART OF THE ISSUE THAT WE'RE LOOKING

8    FOR IS WHEN THERE'S THIS EXTENSIVE SCHEME, THERE'S ALL THESE

9    PEOPLE, THESE COGS IN THE WHEEL WHO MAY NOT KNOW WHAT'S GOING

10   ON, BUT THEY'RE MOVING MONEY AROUND, THEY'RE HAVING THESE

11   ELABORATE DRUG SCHEME OR SOMETHING TO THAT EFFECT.

12           THAT'S JUST NOT WHAT WE'RE SEEING HERE.  I DON'T KNOW

13   A BETTER WAY OF SAYING IT THAN MR. HARDWICK SAID, MS. MAURYA,

14   PAY THESE PEOPLE.  SHE SAID, OKAY, AND SHE DID.  AND THAT'S

15   REALLY THE SCHEME.  THAT'S REALLY ALL WE'RE DEALING WITH.

16   THOSE ARE THE ONLY PEOPLE THAT WE'RE DEALING WITH.

17           SO I'LL ASK THAT THE COURT HEAR FROM THE GOVERNMENT,

18   AND I'D LIKE TO RESPOND, IF I MAY.

19           THE COURT:  ALL RIGHT.  GO AHEAD.  AND, GOVERNMENT,

20   CONTRAST FOR ME A LITTLE BIT THE OTHERWISE EXTENSIVE WITH

21   SOPHISTICATED MEANS, BECAUSE THAT ENHANCEMENT IS NOT IN HERE,

22   BUT THAT KIND OF BLEEDS INTO THE TYPE OF ARGUMENT THAT WE'RE

23   HEARING A LITTLE BIT.

24           MR. PHILLIPS:  A LITTLE BIT.

25           THE COURT:  FROM THE DEFENSE'S STANDPOINT.

179

1          MR. PHILLIPS:  IT DOES, IN TERMS OF THE LENGTH OF

2     TIME THAT THE SCHEME TOOK PLACE, THE NUMBER OF PEOPLE INVOLVED,

3     THE AMOUNT OF MONEY INVOLVED, THE COMPLEXITY OF THE

4     TRANSACTIONS.

5          THERE ARE JUST TENS OF THOUSANDS OF E-MAILS FROM

6     MR. HARDWICK DIRECTING THE MOVEMENT OF MONEY.  SO IT IS BEYOND

7     ANY DOUBT THAT IT WAS EXTENSIVE IN TERMS OF THE AMOUNT OF

8     EFFORT THAT HE PUT INTO IT TO ACQUIRE THIS MONEY AND TO MOVE IT

9     AROUND FOR HIS PERSONAL PURPOSES.  THE EVIDENCE THAT WE PUT IN

10    THE TRIAL SHOWS THAT TIMES TEN.

11         SO IN THAT SENSE, YOU'RE RIGHT.  IT IS A LITTLE BIT

12    SIMILAR TO THE SOPHISTICATED MEANS ENHANCEMENT.  BUT I THINK

13    MS. NOVAY HAS OVERLOOKED A COUPLE OF THINGS IN TERMS OF WHY THE

14    GOVERNMENT IS ARGUING THAT THIS ENHANCEMENT APPLIES.

15         FIRST OF ALL, IT -- THE UNWITTING PARTICIPANTS ARE

16    NOT JUST LIMITED TO THE PEOPLE WHO WORKED AT THE VARIOUS BANKS,

17    LIKE THE MERRILL LYNCH THAT HAD THE DIVOT ACCOUNTS WHERE

18    MR. HARDWICK AND MS. MAURYA ARE DIRECTING THAT MONEY BE PAID

19    FOR PERSONAL PURPOSES.

20         WE ARE ALSO PREPARED TO SHOW THAT MR. HARDWICK

21    DIRECTED THE MOVEMENT OF MONEY OUT OF THE FIRM'S ACCOUNTS, THE

22    ACTUAL THEFT TIED TO THOSE ACCOUNTS -- OR TIED TO, RATHER,

23    THOSE COUNTS OF THE INDICTMENT THAT HE WAS CONVICTED OF.  AND

24    I'LL GIVE YOU SOME EXAMPLES OF THOSE.

25         BUT IN TERMS OF THE CASE LAW, BEFORE WE GET INTO

1   THAT, THERE'S A CASE FROM THE 11TH CIRCUIT THAT I BELIEVE IS

2   RIGHT ON POINT.  IT'S CALLED *UNITED STATES VERSUS ZADA*,

3   Z-A-D-A, 706 FEDERAL APPEALS 500.  AND THIS IS A 2017 CASE.

4            AND THE COURT STARTS TALKING ABOUT THIS ENHANCEMENT

5   TOWARD THE END IN SECTION THREE, WHERE THEY'RE TALKING ABOUT

6   SENTENCING, PAGE 509.  AND THEY TALK ABOUT THE DEFINITION OF

7   OTHERWISE EXTENSIVE AND SAY THAT THE COURT CAN CONSIDER ALL

8   PERSONS INVOLVED DURING THE COURSE OF THE ENTIRE OFFENSE,

9   INCLUDING OUTSIDERS WHO UNKNOWINGLY PROVIDED SERVICES.

10           THEY ALSO SAY THAT NO SET NUMBER OF CRIMINALLY

11   RESPONSIBLE PARTICIPANTS IS REQUIRED FOR CRIMINAL ACTIVITY TO

12   BE SUFFICIENTLY EXTENSIVE EXCEPT THAT THERE MUST BE ONE

13   PARTICIPANT OTHER THAN THE DEFENDANT.

14           WELL, WE KNOW THAT ASHA MAURYA IS CRIMINALLY

15   RESPONSIBLE FOR THIS OFFENSE IN ADDITION TO NAT HARDWICK.  SO

16   WE'VE GOT TWO OF THE FIVE RIGHT THERE IDENTIFIED.  THEY ARE

17   CRIMINALLY RESPONSIBLE.

18           THE OTHERS THAT I'M GOING TO TALK ABOUT ARE UNWITTING

19   PARTICIPANTS.  IN ADDITION, IN THAT CASE, THE COURT GOES ON TO

20   SAY THAT WHEN DETERMINING THE NUMBER OF PARTICIPANTS, THE

21   DEFENDANT IS CONSIDERED TO BE ONE OF THE FIVE.

22           IN THIS CASE, WE HAVE MORE THAN ENOUGH TO MEET THIS

23   GUIDELINE ENHANCEMENT'S REQUIREMENTS.  IN ADDITION TO HARDWICK

24   AND MAURYA, WE HAVE ALYCE RITCHIE, WHO WAS MR. HARDWICK'S LEGAL

25   ASSISTANT -- I'M SORRY, LAW PARTNER AT THE FIRM, A NON-EQUITY

1   PARTNER; BOBBIE CHRISTIAN, WHO WAS HIS LEGAL ASSISTANT; BOB

2   DRISKELL, WHO WAS THE CFO OF THE FIRM IN THE EARLY DAYS OF THE

3   SCHEME THAT'S CHARGED IN THE INDICTMENT WHEN ASHA MAURYA WAS

4   JUST AN ACCOUNTING PERSON.  SHE DID NOT BECOME THE CFO OF THE

5   FIRM UNTIL JANUARY OF 2014, SO VERY LATE IN THE SCHEME WHEN SHE

6   TOOK OVER THAT TITLE.

7          WE'VE ALSO GOT TONY ADAMS, WHO WAS A CPA WHO

8   REPRESENTED NAT HARDWICK PERSONALLY.  WE'VE GOT A NUMBER OF

9   EMPLOYEES AT SUNTRUST BANK, INCLUDING RAVELLE DAWSON AND ANDY

10  CRAIS, C-R-A-I-S.  WE'VE GOT PAULETTE SMITH AND EMMANUEL KALU,

11  K-A-L-U, AND JENNIFER HENDERSON FROM THE ACCOUNTING DEPARTMENT

12  AT MORRIS HARDWICK SCHNEIDER.

13         AND IN ADDITION, WE HAVE TWO BANKERS THAT THE COURT

14  HEARD TESTIFY CONCERNING THE -- CONCERNING MR. HARDWICK'S THEFT

15  OF THE LEGACY ACCOUNTS, THE DORMANT ESCROW ACCOUNTS THAT CAME

16  FROM HIS PRIOR LAW FIRM, JACKSON HARDWICK, WHICH THEN BELONGED

17  TO MORRIS HARDWICK SCHNEIDER.  AND THE COURT HEARD ABOUT THE

18  THEFT OF THAT MONEY.

19         SO I'VE GOT SOME DOCUMENTS THAT I'D LIKE TO SHOW THE

20  COURT THAT PROVE THAT ALL OF THESE PEOPLE ARE UNWITTING

21  PARTICIPANTS.  AND IN NO PARTICULAR ORDER.  I'LL DIRECT THE

22  COURT TO DOCUMENT NUMBER 307.  THIS IS THE TESTIMONY OF BOBBIE

23  CHRISTIAN.  I BELIEVE HER LAST NAME NOW IS TAPP, T-A-P-P.  AND

24  THIS IS PAGE 2440 OF THE EXHIBIT THAT I'M SHOWING THE COURT.

25         AND I SAID TO MS. CHRISTIAN, OR MS. TAPP:  I'M

1    SHOWING YOU GOVERNMENT EXHIBIT 1514 NOW ON THE SCREEN BESIDE

2    YOU.  WHAT IS THE AMOUNT THAT MR. HARDWICK WAS DIRECTING YOU TO

3    WIRE TO NETJETS?

4              AND SHE SAYS:  $35,832.

5              AND SO THAT'S ONE EXAMPLE OF HER BEING INVOLVED IN

6    MOVING THE MONEY AT MR. HARDWICK'S DIRECTION.

7              THE SAME EXHIBIT, GOVERNMENT EXHIBIT 307 -- I'M

8    SORRY, DOCUMENT NUMBER 307, PAGE 2398 OF HER TESTIMONY:  DID

9    YOU HAVE OCCASION TO RECEIVE ANY CHECKS OR CASH FROM HIM --

10   REFERRING TO NAT HARDWICK -- AND GIVE IT TO SOME OF THE

11   BOOKIES?

12             YES.

13             SO SHE'S INVOLVED IN THAT WAY AS WELL.

14             MR. HARDWICK'S OWN TRIAL TESTIMONY, DOCUMENT 310, AT

15   PAGE 3152, I SAID:  I'M GOING TO DIRECT YOUR ATTENTION TO

16   GOVERNMENT EXHIBIT 232-A.  THIS IS A CHECK FOR $2,000 THAT WAS

17   PAYABLE TO DIVOT HOLDINGS, AND IT CAME FROM ONE OF MORRIS

18   HARDWICK SCHNEIDER'S ESCROW ACCOUNTS.

19             AND I ASKED MR. HARDWICK IF THE N THAT HE USES AS HIS

20   SIGNATURE THAT'S ON THE BACK OF THAT CHECK, I SAID:  IS THAT

21   YOUR SIGNATURE?

22             HE SAYS:  NOPE.  HE SAYS:  THAT'S ACTUALLY BOBBIE'S

23   WRITING.

24             AND I SAID:  SO IT SAYS, FROM AN IOLTA ACCOUNT.  DO

25   YOU SEE THAT?

183

1          AND HE SAYS:  YEAH, I SEE IT.

2          SO SHE DEPOSITED INTO HIS ACCOUNT A CHECK THAT WAS

3    STOLEN FUNDS COMING OUT OF THE IOLTA ACCOUNT AT MHS.

4          DOCUMENT NUMBER 309, MORE OF MR. HARDWICK'S

5    TESTIMONY, AT PAGE 2957, I ASKED MR. HARDWICK ABOUT CRYSTAL

6    REPORTS.  AND HE -- OR RATHER, THIS IS MR. GARLAND ASKING THIS

7    QUESTION.

8          AND MR. HARDWICK SAYS:  I COULDN'T DO CRYSTAL

9    REPORTS, BUT BOBBIE AND/OR ALYCE, I BELIEVE -- WELL, I KNOW

10   BOBBIE DID, BUT I THINK ALYCE COULD ALSO GIVE THESE CRYSTAL

11   REPORTS.  AND THAT'S WHERE I KIND OF GOT THE NUMBERS ON A

12   MONTHLY BASIS.

13         SO THOSE ARE PEOPLE WHO WERE PROVIDING HIM

14   INFORMATION THAT HE THEN USED TO SET UP THIS FRAUD.

15         KIM JOHNSON, FROM THE FBI, DOCUMENT NUMBER 298, AT

16   PAGE 1338, I'M ASKING HER ABOUT ONE OF THE COUNTS.  THIS IS

17   GOVERNMENT EXHIBIT 16.

18         AND I SAID:  WHAT DID MS. CHRISTIAN SAY?

19         AND THE ANSWER WAS:  WILL YOU PLEASE SEND OVER NAT'S

20   WIRING INSTRUCTIONS TO ML -- THAT'S MERRILL LYNCH.  HE NEEDS A

21   WIRE TO GO OUT TODAY.

22         AND THIS IS ONE OF THE COUNTS IN THE INDICTMENT, AND

23   I'VE GOT THAT COUNT IF THE COURT WOULD LIKE TO SEE THAT

24   DOCUMENT THAT SHOWS EXACTLY WHAT MS. JOHNSON WAS TESTIFYING

25   ABOUT.

1      THEN ON THE NEXT PAGE, 1339, I ASKED MS. JOHNSON:

2  AND WHAT DID -- OR -- AND DID ASHA MAURYA THEN E-MAIL SOMEBODY

3  NAMED PAULETTE SMITH CONCERNING WIRING INSTRUCTIONS?

4      YES.

5      AND WHAT DID SHE SAY?

6      PLEASE SET UP $199,980.

7      AND DID PAULETTE SMITH RESPOND TO ASHA MAURYA LATER

8  THAT DAY WITH SOME INFORMATION CONCERNING THAT WIRE THAT SHE

9  HAD SET UP?

10      YES, SHE DID.

11      WHAT DID SHE SAY?

12      SHE SAID, WAS SUCCESSFULLY CREATED.

13      THAT'S ALSO IN ONE OF THE -- I GUESS THAT'S PART OF

14  GOVERNMENT EXHIBIT 16, COUNT 16 OF THE INDICTMENT.

15      THERE WAS ALSO TESTIMONY FROM MS. JOHNSON ABOUT

16  GOVERNMENT EXHIBIT 19.  AND THAT'S THE $400,000 WIRE TRANSFER

17  OUT OF THE FIRM'S ACCOUNT TO -- LET ME FIND THE NAME OF THE

18  CASINO HERE.  THE LAS VEGAS SANDS IS THE NAME OF THE CASINO.

19      SO THIS IS GOVERNMENT EXHIBIT 19.  THIS IS THE WIRE

20  TRANSFER FOR $400,000 COMING OUT OF THE MORRIS HARDWICK

21  SCHNEIDER IOLTA ACCOUNT GOING TO THE LAS VEGAS SANDS.  AND

22  THAT'S DATED JUNE 3RD, 2014.  AND THE COURT WILL RECALL THAT

23  THAT WIRE WAS REJECTED BY THE CASINO.

24      AND THEN MR. HARDWICK ENGAGED IN A NUMBER OF

25  CONVERSATIONS WITH VARIOUS PEOPLE, BOTH AT MORRIS HARDWICK

1    SCHNEIDER AND AT SUNTRUST BANK, ABOUT GETTING MONEY MOVED FROM

2    MORRIS HARDWICK SCHNEIDER TO THE FIRM'S OPERATING ACCOUNT AND

3    THEN MOVING IT TO NAT HARDWICK'S PERSONAL ACCOUNT AT SUNTRUST.

4         AND SO AFTER THE CASINO REJECTED THE $400,000 WIRE

5    COMING OUT OF IOLTA, THEN MR. HARDWICK CAUSED THE SAME AMOUNT

6    OF MONEY TO MOVE FROM THE FIRM'S ESCROW ACCOUNT TO THE FIRM'S

7    OPERATING ACCOUNT TO HIS PERSONAL ACCOUNT.  AND THEN HE HAD

8    SUNTRUST WIRE THAT MONEY DIRECTLY TO THE CASINO.

9         AND SO THIS IS MORE INFORMATION ABOUT THAT ON THIS

10   PAGE THAT I'M SHOWING THE COURT.  AND HERE ARE VARIOUS PEOPLE,

11   OR SOME OF THEM, FROM SUNTRUST THAT MR. HARDWICK WAS

12   COMMUNICATING WITH, ANDY CRAIS AND RAVELLE DAWSON.  AND

13   MR. HARDWICK SAYS, THIS IS APPROVED.  THANKS, NAT.

14        AND ASHA MAURYA WAS THE RECIPIENT OF THAT, AND THOSE

15   OTHER FOLKS FROM SUNTRUST WERE COPIED ON THAT.

16        AND MORE OF THAT SAME EXHIBIT THAT JUST SHOWS THAT

17   SUNTRUST WAS HAVING CONVERSATIONS ABOUT MOVING THAT MONEY AT

18   MR. HARDWICK'S DIRECTION.  THAT'S PAGE 7 OF THE EXHIBIT.

19        AND THEN AT MR. HARDWICK'S DIRECTION, RAVELLE DAWSON

20   FROM SUNTRUST SAYS TO ASHA, I'VE ADVISED BANK OF AMERICA THAT

21   THIS IS A PERSONAL WIRE.

22        SO THEY'VE DONE THE OLD RING AROUND THE ROSIE HERE TO

23   MAKE IT LOOK LIKE THIS WAS MR. HARDWICK'S PERSONAL FUNDS, BUT

24   REALLY IT WAS MONEY THAT WAS STOLEN FROM THE LAW FIRM.

25        THE COURT:  AND, MR. PHILLIPS, REMIND ME OF WHAT ALL

1    OF THESE EXAMPLES SUPPORT.  JUST HOW EXTENSIVE?  OR WHAT'S YOUR

2    ARGUMENT FOR THESE?

3            MR. PHILLIPS:  THESE ARE UNWITTING PARTICIPANTS.

4            THE COURT:  UNWITTING PARTICIPANTS.  OKAY.

5            MR. PHILLIPS:  PART OF THE OTHERWISE EXTENSIVE

6    FINDING HAS TO BE THAT, IN ADDITION TO ONE CRIMINALLY

7    RESPONSIBLE PARTICIPANT, YOU HAVE A TOTAL OF AT LEAST FIVE.

8    AND AFTER YOU PROVE THAT ONE IS CRIMINALLY RESPONSIBLE, THE

9    OTHERS CAN BE UNKNOWING OR UNWITTING PARTICIPANTS.

10           THE COURT:  OKAY.

11           MR. PHILLIPS:  SO MY POINT IS SIMPLY THAT THERE IS A

12   TON OF INFORMATION IN THE TRIAL RECORD THAT SHOWS THAT NAT

13   HARDWICK WAS DIRECTING A NUMBER OF PEOPLE TO MOVE MONEY AROUND

14   AT HIS BEHEST.

15           GOVERNMENT EXHIBIT 16.  THIS IS ONE OF THE COUNTS

16   THAT WE TALKED ABOUT EARLIER.  AND HERE ARE THE TWO -- TWO OF

17   THE UNWITTING PARTICIPANTS THAT ARE INVOLVED IN THIS.  THIS IS

18   PAULETTE SMITH TAKING DIRECTION FROM ASHA MAURYA TO MOVE THIS

19   $199,980 ON BEHALF OF MR. HARDWICK; AND BOBBIE CHRISTIAN,

20   ORIGINALLY, AS I SAID BEFORE, REQUESTING THAT THE MONEY BE SENT

21   TO MR. HARDWICK'S MERRILL LYNCH ACCOUNT AND PROVIDING THOSE

22   INSTRUCTIONS.

23           SO THERE'S NO ALLEGATION THAT THESE FOLKS ARE

24   CRIMINALLY RESPONSIBLE.  BUT WE BELIEVE THAT THESE PEOPLE, AND

25   A LOT MORE, INCLUDING EMMANUEL KALU, MEET THE REQUIREMENT OF

1    UNWITTING OR UNKNOWING PARTICIPANTS.

2            AND SO NOW I'M GOING TO SHOW THE COURT GOVERNMENT

3    EXHIBIT 18.  THIS IS PART OF COUNT 18.  ON PAGE 5 OF THAT

4    EXHIBIT, THERE'S A DIRECTION FROM ASHA MAURYA TO SET UP -- OR

5    TO EMMANUEL KALU TO SET UP THREE WIRES, INCLUDING ONE TO DIVOT

6    FOR MR. HARDWICK'S BENEFIT IN THE AMOUNT OF $219,304.

7            WE ALSO HAVE ALYCE RITCHIE, WHO WAS MR. HARDWICK'S

8    PARTNER, ON GOVERNMENT EXHIBIT 22.  SHE'S ONE OF THE NON-EQUITY

9    PARTNERS.  AND THIS IS ALYCE RITCHIE E-MAILING NAT HARDWICK AND

10   SAYING, I'LL SEND IT OUT RIGHT NOW.  THIS IS IN REFERENCE TO

11   MERRILL LYNCH WIRING INSTRUCTIONS, WIRE FOR NAT.

12           AND SHE E-MAILS HIM ON JULY 17, 2014, AND SAYS, I'LL

13   SEND IT OUT RIGHT NOW.  AND YOU CAN SEE BELOW THAT THOSE ARE

14   THE INSTRUCTIONS FROM NAT HARDWICK TO MS. RITCHIE TO MAKE SURE

15   THAT THIS GETS DONE.

16           THERE WAS ALSO TESTIMONY FROM ART MORRIS,

17   DOCUMENT 292, AT PAGE 426, WHEN MR. GARLAND WAS ASKING HIM

18   ABOUT DISTRIBUTIONS THAT WERE GOING OUT:  AND WOULD IT BE

19   BROUGHT TO YOU THAT NAT WANTED MONEY OR WOULD HE APPROACH

20   DRISKELL IF HE GOT MONEY?  YOU WANTED TO GET MONEY, RIGHT?

21           AND MR. MORRIS SAID:  OTHERWISE, WE'LL NEVER CATCH

22   UP.

23           SO IT'S CLEAR THAT, FROM THE TESTIMONY AT TRIAL, THAT

24   BOB DRISKELL WAS INVOLVED IN HELPING MOVE MONEY AROUND.  HE WAS

25   PROVIDING INFORMATION TO NAT HARDWICK ABOUT AUDITS AND ABOUT

1    MOVEMENT OF MONEY.

2         SO THERE ARE AT LEAST -- I'VE COUNTED

3    12 PARTICIPANTS:  NAT HARDWICK, ASHA MAURYA, ALYCE RITCHIE,

4    BOBBIE CHRISTIAN, BOB DRISKELL, TONY ADAMS -- I FORGOT ABOUT

5    TONY ADAMS, I'LL HAVE TO TALK ABOUT HIM -- THE SUNTRUST

6    EMPLOYEES, RAVELLE DAWSON, ANDY CRAIS; AND PAULETTE SMITH AND

7    EMMANUEL KALU FROM THE LAW FIRM.

8         AND THEN I FORGOT TO TALK ABOUT ALSO MICHAEL MOCK AND

9    KEVIN DEATON.  THE COURT WILL RECALL THAT MR. MOCK TESTIFIED

10   THAT HE WAS MR. HARDWICK'S PERSONAL BANKER AT BRAND BANK.  AND

11   MR. HARDWICK DIRECTED ASHA MAURYA TO CONSOLIDATE ALL OF THESE

12   DORMANT ESCROW ACCOUNTS FROM THE JACKSON HARDWICK LAW FIRM, AND

13   IT WAS A TOTAL OF AROUND $631,000 THAT SHE PUT TOGETHER.

14        AND THEN -- THEY CONSOLIDATED THAT.  THEY WIRED THE

15   MONEY TO MR. MOCK AT BRAND BANK.  AND MR. MOCK SAID AT TRIAL

16   THAT MR. HARDWICK LED HIM TO BELIEVE THAT HE WOULD BE

17   ESTABLISHING A MORE LUCRATIVE FINANCIAL RELATIONSHIP WITH

18   MR. MOCK'S BANK BECAUSE MR. HARDWICK HAD CONTROL OF ALL OF

19   THESE ESCROW ACCOUNTS.  EACH OF THESE BANKS WAS VERY INTERESTED

20   IN GETTING A PIECE OF THAT ACTION.  EVERYBODY WANTED TO HAVE

21   THOSE ACCOUNTS AVAILABLE, YOU KNOW, TO MAKE THEIR BALANCES LOOK

22   BIGGER.

23        SO MR. HARDWICK WAS LEADING THIS MAN ON, LEADING HIM

24   TO BELIEVE THAT HE WAS GOING TO LEAVE THIS MONEY AT HIS BANK.

25   BUT THE SAME DAY THAT THE MONEY WAS WIRED TO BRAND BANK,

189

1    MR. HARDWICK THEN DIRECTED THAT MONEY BE MOVED FROM BRAND BANK

2    TO RENASANT BANK.  AND THEN HE GOT A HYPOTHECATION AGREEMENT,

3    TOOK THE MONEY AWAY FROM HIS LAW FIRM, MHS, AND GOT A PERSONAL

4    LOAN FOR THE SAME AMOUNT.  FIRST HE CONVERTED IT TO A

5    CERTIFICATE OF DEPOSIT, AND THEN HE GOT A PERSONAL LOAN FOR

6    THAT SAME AMOUNT, WELL OVER $600,000.  AND HE NEVER PAID IT

7    BACK.  AND AS A RESULT, RENASANT BANK FORECLOSED ON THE

8    COLLATERAL, WHICH WAS THAT CD THAT RIGHTFULLY BELONGED TO MHS.

9            SO THOSE ARE TWO PEOPLE WHO WERE UNWITTINGLY HELPING

10   MR. HARDWICK PARTICIPATE -- OR TO CARRY OUT THIS FRAUD.

11           FINALLY, LET ME TALK ABOUT --

12           THE COURT:  MR. ADAMS?

13           MR. PHILLIPS:  YES.  THANK YOU, YOUR HONOR.

14           I NEED TO LOOK UP MR. HARDWICK'S TRIAL -- TRIAL

15   TESTIMONY AT DOCUMENT 310, PAGES 3233 AND 3234.

16           THE COURT'S HEARD A LOT OF TESTIMONY ABOUT THE

17   JOHNSON AND PRITCHARD LOANS.  AND THIS REALLY BRINGS IT MORE

18   INTO PERSPECTIVE ABOUT WHAT WAS REALLY GOING ON HERE.  THIS IS

19   DOCUMENT 310, PAGE 3233, AND THIS IS MR. HARDWICK TESTIFYING.

20   AND HE TALKS ABOUT GETTING A $2 MILLION LOAN FROM MR. PRITCHARD

21   AND THEN A $3 MILLION LOAN FROM DUSTIN JOHNSON, $5 MILLION

22   COMBINED.

23           AND I SAID:  DID YOU TELL EITHER ONE OF THOSE MEN

24   BEFORE YOU GOT THE LOANS FROM THEM THAT THERE WAS A HUGE HOLE

25   IN YOUR FIRM'S ATTORNEY ESCROW ACCOUNT?

1          AND HE SAID:  NO.

2          HE DIDN'T DO THAT.  YOU KNOW WHY?  BECAUSE HE'S

3     RELYING ON TONY ADAMS, BECAUSE TONY ADAMS WAS ALSO THE CPA WHO

4     REPRESENTED MR. PRITCHARD AND REPRESENTED MR. JOHNSON.  AND SO

5     TONY ADAMS IS IN CAHOOTS WITH NAT HARDWICK AND TAKING

6     INSTRUCTIONS FROM HIM.

7          AND MR. HARDWICK TESTIFIED -- I SAID:  YOU DIDN'T

8     TELL THEM?

9          AND HE SAID:  NO, BECAUSE TONY WAS THE ONE BRINGING

10    THEM TO THE TABLE.

11         SO HE JUST HELPED MR. HARDWICK STEAL $5 MILLION FROM

12    MR. PRITCHARD AND DUSTIN JOHNSON.

13         AND THEN I SAID AT THE BOTTOM HERE:  ISN'T IT TRUE

14    THAT YOU DID NOT REPAY THOSE LOANS TO MR. PRITCHARD AND

15    MR. JOHNSON?

16         AND MR. HARDWICK SAID:  THAT'S CORRECT.

17         AND THEN ON THE NEXT PAGE, HE ADMITS THAT HIS LEGAL

18    MALPRACTICE INSURANCE COMPANY REPAID AT LEAST A LARGE PART OF

19    THOSE LOANS TO PRITCHARD AND JOHNSON.

20         AND SO HE PRETENDS LIKE THIS IS SOMETHING THAT HE

21    DID, THAT HE BROUGHT THIS MONEY IN, AND REALLY ALL HE DID WAS

22    CONSPIRE WITH TONY ADAMS TO STEAL $5 MILLION FROM THESE MEN.

23    IF IT HADN'T BEEN FOR THE LEGAL MALPRACTICE INSURANCE COMPANY

24    TO STEP IN AND PLUG THAT HOLE, THOSE TWO GUYS WOULD BE OUT

25    $5 MILLION.

1          AND SO THAT'S MR. HARDWICK USING TONY ADAMS TO --

2    WE'LL GIVE HIM THE BENEFIT OF THE DOUBT AND CALL HIM AN

3    UNWITTING PARTICIPANT RATHER THAN A CO-CONSPIRATOR.  BUT USING

4    HIM IN THE SAME WAY THAT HE USED ALL OF THESE OTHER PEOPLE THAT

5    I'VE TALKED ABOUT.

6          THERE IS MORE THAN AMPLE EVIDENCE THAT THERE WERE

7    FIVE PARTICIPANTS -- TWO CRIMINALLY RESPONSIBLE, AND PROBABLY

8    AT LEAST TEN, IF NOT SUBSTANTIALLY MORE, WHO WERE UNWITTING,

9    UNKNOWING PARTICIPANTS.

10          AND THE COURT DOES HAVE TO MAKE A FINDING THAT THE

11    SCHEME WAS OTHERWISE EXTENSIVE.  AND WE THINK THAT WE MEET THAT

12    TEST BY SHOWING THE LENGTH OF TIME THAT THIS WENT ON, THE

13    NUMBER OF FINANCIAL TRANSACTIONS INVOLVED, THE AMOUNT OF MONEY

14    THAT WAS INVOLVED, AND THE SHEER EFFORT THAT MR. HARDWICK WENT

15    TO TO LIE TO HIS PARTNERS.

16          YOU HEARD MARK WITTSTADT AND ART MORRIS TESTIFY ABOUT

17    NUMEROUS DOCUMENTS WHERE MR. HARDWICK WAS E-MAILING THEM

18    SAYING, HEY, WE'RE GOING TO DO 300,000 THIS MONTH.  AND SO THEY

19    DO THE MATH.  THEY UNDERSTAND WHAT MR. HARDWICK'S POINTS WERE

20    AT THE TIME.  I THINK IT WAS 40 PERCENT, BUT MAYBE IT WAS AS

21    MUCH AS 55.  AND SO THEY UNDERSTOOD, BASED ON HARDWICK'S

22    REPRESENTATIONS, THAT THAT'S HOW MUCH HARDWICK WAS GOING TO BE

23    TAKING.

24          AND WE PROVED TIME AFTER TIME AFTER TIME THAT

25    MR. HARDWICK TOOK NOT ONLY MORE THAN HE LED HIS PARTNERS TO

192

1    BELIEVE HE WAS GOING TO TAKE, BUT MORE THAN HE REPRESENTED THAT

2    ALL OF THE PARTNERS COMBINED WOULD BE TAKING.

3            AND SO WE THINK THAT THAT IS A FACTOR THAT GOES INTO

4    THE CALCULUS IN DETERMINING WHAT IS OTHERWISE EXTENSIVE,

5    BECAUSE OF THE AMOUNT OF EFFORT THAT MR. HARDWICK PUT INTO

6    THIS, THE NUMBER OF E-MAILS AND MOVING MONEY AROUND, THE TIME

7    INVOLVED, THE NUMBER OF PEOPLE, THE AMOUNT OF MONEY, AND THE

8    LENGTH THAT THE SCHEME WENT ON.

9            AND, FRANKLY, THIS SCHEME MIGHT HAVE BEEN GOING ON A

10   LOT LONGER IF ASHA MAURYA HADN'T DOCTORED UP THAT ACCOUNT

11   STATEMENT FROM SUNTRUST THAT ALLOWED SOMEBODY TO DETECT THAT

12   THE FRAUD WAS GOING ON.  THERE'S NO TELLING WHAT THE DAMAGE

13   WOULD HAVE BEEN HAD THAT NOT HAPPENED.

14           THE COURT:  ALL RIGHT.  MS. NOVAY?

15           MS. NOVAY:  THANK YOU, YOUR HONOR.

16           SO IF IT'S ALL RIGHT WITH THE COURT, I'LL TRY TO

17   ADDRESS SOME OF THE THINGS INDIVIDUALLY THAT THE GOVERNMENT

18   SAID, UNLESS YOU HAVE SPECIFIC THINGS THAT YOU WANT ME TO

19   ADDRESS.

20           PART OF THE ISSUE IS I THINK WE'RE GETTING A LITTLE

21   BIT INTO -- WE'RE BLEEDING SOME ARGUMENTS OF SOPHISTICATED

22   MEANS AND THIS OTHER ENHANCEMENT ABOUT OTHERWISE EXTENSIVE.

23   THE WHOLE POINT OF THE ENHANCEMENT IS HOW MANY PEOPLE WERE

24   THERE.  ARE THERE MORE THAN FIVE; AND, IF NOT, IS IT OTHERWISE

25   EXTENSIVE?

1          AND OTHERWISE EXTENSIVE IS SORT OF AN ASIDE TO MORE

2     THAN FIVE CRIMINALLY INVOLVED PARTICIPANTS.  IT'S NOT -- THE

3     MEAT OF WHAT WE'RE LOOKING AT IS HOW MANY PEOPLE WERE ACTUALLY

4     INVOLVED IN THIS PARTICULAR SCHEME.  AND IN FOCUSING ON THE

5     SCHEME, I'M FOCUSING ON THE ACTUAL FRAUD THAT'S THE SUBJECT OF

6     COUNT ONE THROUGH 23 OF THE INDICTMENT.

7          THERE'S BEEN A LOT OF ARGUMENTS ABOUT WHAT TONY ADAMS

8     DID WITH REGARD TO THIS LOAN.  AND APPARENTLY NOW HE'S A

9     CO-CONSPIRATOR.  THAT WASN'T ANYTHING THAT CAME UP AT TRIAL.

10    SO I'M REALLY FOCUSING ON THE ACTUAL FRAUD AS ALLEGED AND

11    CONVICTED IN THIS PARTICULAR CASE.

12          AND I THINK THE GOVERNMENT IS CONFUSING PARTICIPANTS

13    WITH RECIPIENTS.  IF IN EVERY CASE, FRAUD CASE OR WHATEVER, A

14    DEFENDANT RECEIVED A LOT OF MONEY AND SPENT IT AT A VARIOUS

15    AMOUNT OF LOCATIONS, THEN, YES, IT WOULD BE OTHERWISE EXTENSIVE

16    IN EVERY SINGLE CASE.  WELL, THE JEWELER, THE CAR DEALER, THE

17    NETJETS GUY -- EVERYBODY THAT RECEIVED ANY MONEY, IF WE

18    CONSIDERED THEM ALL UNWITTING PARTICIPANTS, THEN EVERY SINGLE

19    FRAUD CASE WOULD ALWAYS GET THIS ENHANCEMENT, WHICH MIGHT MAKE

20    THE ENHANCEMENT COMPLETELY TOOTHLESS.

21          AND A NUMBER OF THE PEOPLE THAT THE GOVERNMENT ARE

22    CITING ARE ALL PEOPLE WHO RECEIVED THE MONEY.  PEOPLE WHO WERE

23    AT THE BELLAGIO -- OR EXCUSE ME, AT THE SANDS CASINO, THESE ARE

24    PEOPLE THAT WERE RECEIVING FUNDS ON BEHALF OF MR. HARDWICK.  IT

25    WAS ASHA MAURYA WHO WAS MOVING THE FUNDS TO THESE PEOPLE.

194

1       BUT CALLING EVERY SINGLE PERSON WHO SIMPLY RECEIVED

2   MONEY FROM MR. HARDWICK, OR THE INSTITUTION OR SOMEBODY THAT

3   WORKED FOR THE INSTITUTION, UNWITTING PARTICIPANT I DON'T THINK

4   IS THE POINT OF THE ENHANCEMENT.

5       AND THE *ZADA* CASE THAT THE GOVERNMENT CITED IS A

6   DISTINGUISHABLE CASE FROM MR. HARDWICK'S CASE.  THAT WAS A CASE

7   INVOLVING, I THINK, A SELF-PROCLAIMED SAUDI PRINCE WHO WAS --

8   HAD A LOSS AMOUNT OF 20 MILLION, WHERE HE WAS RECRUITING

9   INVESTORS AND WAS TELLING THE INVESTORS, COME ON IN, I'M GOING

10  TO MAKE SURE YOU GET X AMOUNT OF RETURNS ON YOUR INVESTMENT,

11  KIND OF LIKE A BERNIE MARCUS SITUATION.  AND SO EVERY SINGLE

12  INVESTOR, EVERY SINGLE PERSON THAT HE USED IN THAT PARTICULAR

13  SCHEME WAS COUNTED AS OTHERWISE EXTENSIVE.

14      HERE, WE DON'T REALLY HAVE THAT.  THERE AREN'T

15  INVESTORS.  THERE AREN'T PEOPLE THAT ARE INVOLVED.  IT'S REALLY

16  MR. HARDWICK DIRECTING MS. MAURYA, SEND THIS MONEY TO X

17  LOCATION ON MY BEHALF, AND WE'RE DOING IT IN PRIVATE.  THAT'S

18  THE ENTIRE SCHEME.

19      AND SO -- AND, OF COURSE, YES, HE WAS THE LEADER IN

20  THAT SENSE OF MS. MAURYA.  BUT TO COUNT EVERY SINGLE PERSON

21  THAT SHE THEN SENT THE MONEY TO IS I THINK UNFAIR WITH REGARD

22  TO THIS ENHANCEMENT.

23      I DON'T KNOW IF THE COURT AGREES OR DISAGREES, BUT

24  THAT'S THE BASIS OF OUR ARGUMENT AS I'M SEEING IT.

25      SO I THINK TO START COUNTING PEOPLE LIKE TONY ADAMS,

1    WHERE WE'RE NOW DEALING WITH AN AFTER-THE-FACT LOAN THAT'S

2    AFTER THE CONDUCT OF THE INDICTMENT, I DON'T THINK THAT'S

3    SOMEONE WHO IS AN UNWITTING PARTICIPANT TO THIS PARTICULAR

4    SCHEME, TO THIS PARTICULAR FRAUD SCHEME AS THE JURY FOUND IT TO

5    BE.

6            SO I ASK THE COURT NOT TO CONSIDER THESE PARTICULAR

7    PEOPLE.

8            THE COURT:  AND I AM JUST -- AND I'M SORRY TO BOTH OF

9    YOU.  I'M NOT FOLLOWING THE PRECISE LANGUAGE OF THE OTHERWISE

10   EXTENSIVE.

11           I GET THAT ON THE FIRST WAY TO PROVE THIS

12   ENHANCEMENT, YOU PROVE THE NUMBER OF PARTICIPANTS.  IS IT THAT

13   ON THE SECOND WAY, THE OTHERWISE EXTENSIVE -- HOW DOES THE --

14   HOW DID THE UNWITTING PARTICIPANTS FIT INTO THE OTHERWISE

15   EXTENSIVE OR INTO THE WHOLE ENHANCEMENT GENERALLY?

16           MS. NOVAY:  SURE.  AND IF THE COURT WILL LOOK AT -- I

17   THINK NOTE 3 --

18           THE COURT:  OKAY.

19           MS. NOVAY:  -- IS THE NOTE THAT ACTUALLY DISCUSSES

20   THAT.

21           SO THE WHOLE IDEA IS YOU EITHER HAVE FIVE OR MORE

22   PARTICIPANTS WHO ARE CRIMINALLY RESPONSIBLE -- FOR EXAMPLE,

23   MS. MAURYA.

24           THE COURT:  RIGHT.

25           MS. NOVAY:  BUT --

196

1          THE COURT:  OR?

2          MS. NOVAY:  OR YOU CAN HAVE FIVE OR MORE

3    PARTICIPANTS -- OR, EXCUSE ME, OTHERWISE EXTENSIVE, MEANING

4    THEY AREN'T NECESSARILY CRIMINALLY RESPONSIBLE, BUT THEY'RE

5    STILL A PARTICIPANT IN THIS SCHEME AND THEY WERE STILL

6    ABSOLUTELY NECESSARY IN THIS SCHEME.

7          AND, ADMITTEDLY, IT IS PRETTY VAGUE.  IT REALLY IS.

8    AND I THINK BROAD.  SO I DON'T WANT TO BE DISHONEST WITH THE

9    COURT.  I THINK THAT'S SOMETHING THAT DOES NOT CUT IN OUR FAVOR

10   ABOUT HOW, SORT OF, BROAD IT IS.

11         MY RESPONSE, MY SIMPLEST RESPONSE -- SIMPLICITY SEEMS

12   TO BE ALL THE RAGE TODAY -- IS THAT I THINK THE GOVERNMENT IS

13   TRYING TO CLASSIFY A RECIPIENT, AN INSTITUTION THAT RECEIVED

14   THE MONEY ON MR. HARDWICK'S BEHALF, AS A PARTICIPANT IN THIS

15   SCHEME.

16         MY ARGUMENT IS THEY ARE NOT PARTICIPANTS.  THAT'S

17   NOT -- SOMEBODY WHO JUST GOT THE MONEY THAT ASHA WIRED TO THEM.

18         THE COURT:  BUT DID THE GOVERNMENT NOT ALSO POINT OUT

19   SEVERAL EXAMPLES OF PEOPLE WHO WERE DIRECTED OR WHO DID MAKE

20   TRANSFERS PURSUANT TO MR. HARDWICK'S DIRECTION?  MS. CHRISTIAN

21   AND -- I DON'T EVEN REMEMBER ALL THE NAMES OF THE PEOPLE.

22         MS. NOVAY:  MS. RITCHIE.

23         THE COURT:  OKAY.  YES, MS. RITCHIE, WHO TOOK THE

24   STAND AND WAS VERY -- I MEAN, HER REPUTATION AS AN ATTORNEY WAS

25   AT JEOPARDY, TOO, AT THAT POINT.

1        SO THESE OTHER PEOPLE WHO HAD NO IDEA BUT WHO WERE

2   TRUSTING HIM TO GIVE PROPER DIRECTION, THEY ARE NOT RECIPIENTS,

3   RIGHT?

4           MS. NOVAY:  CORRECT.

5           THE COURT:  SO -- OKAY.

6           MS. NOVAY:  AND I WAS GOING TO GO INTO ADDRESSING

7   THAT, BECAUSE THERE'S MANY DIFFERENT CLASSES OF PEOPLE THAT THE

8   GOVERNMENT --

9           THE COURT:  OKAY.  GOTCHA.  OKAY.

10          MS. NOVAY:  AND I'M SORRY.

11          THE COURT:  NO.  I MAY HAVE GOTTEN THERE --

12          MS. NOVAY:  I WAS MOVING AROUND.

13          THE COURT:  OKAY.  BUT YOU ANSWERED MY FIRST QUESTION

14  IN TERMS OF HOW THEY FIT INTO THE OTHERWISE EXTENSIVE.  OKAY.

15          MS. NOVAY:  RIGHT.  AND GOING BACK, THE EXAMPLE IN

16  THE *ZADA* CASE, THESE WERE PEOPLE WHO WERE INVESTING MONEY,

17  EVERY SINGLE INVESTOR.  AND I DON'T RECALL HOW MANY INVESTORS

18  THERE WERE, BUT I THINK THERE WERE TENS OF PEOPLE THAT WERE

19  INVESTING LOTS OF MONEY WITH THIS PARTICULAR DEFENDANT.  AND,

20  AGAIN, WE DON'T HAVE THAT HERE.

21          BUT TO ADDRESS SPECIFICALLY WHAT THE COURT BROUGHT

22  UP, THE GOVERNMENT DID BRING UP MS. LEFTWICH, WHO I THINK MIGHT

23  BE, SHE MIGHT BE AN UNWITTING PARTICIPANT.  AND POSSIBLY

24  MS. RITCHIE ON ONE PARTICULAR OCCASION.

25          HOWEVER, SOME OF THE PEOPLE THAT THE GOVERNMENT

1    BROUGHT UP WERE OUTSIDE OF THE ACTUAL COUNTS IN THE INDICTMENT.

2    AND THAT'S USING THE PRESUMPTION, WELL, THE DEFENDANT'S JUST

3    NOT ALLOWED TO SPEND ANY MONEY.

4            THAT'S NOT NECESSARILY THE CASE.  JUST BECAUSE HE

5    SPENT MONEY IN A COUNT OUTSIDE THE INDICTMENT DOESN'T MEAN THAT

6    HE WASN'T NECESSARILY ENTITLED TO THAT MONEY.  I WILL NOT GO

7    INTO THAT.  WE HAVE ALREADY FOUGHT ABOUT IT, SO I'M NOT TRYING

8    TO GO THERE.

9            BUT MY FOCUS IS ON WHAT'S COUNTS TWO THROUGH 23 OF

10   THE INDICTMENT AND WHAT ARE WE LOOKING AT.

11           AND I THINK THERE MIGHT HAVE BEEN A TRANSFER FROM

12   MS. LEFTWICH -- MS. TAPP, NOW.  THE GOVERNMENT DID POINT OUT

13   HER TESTIMONY.  I THINK THAT MIGHT BE FAIR.  I THINK THAT

14   ACTUALLY MIGHT BE FAIR.  AND I THINK THE ONE FROM MS. RITCHIE

15   MIGHT ALSO BE FAIR.

16           HOWEVER, I STILL DON'T THINK IT REACHES THIS

17   OTHERWISE EXTENSIVE.  BECAUSE EVEN IF WE SAY, OKAY, THAT'S

18   TRUE, WE HAVE MS. MAURYA, WE HAVE MS. LEFTWICH -- MS. TAPP,

19   NOW -- WE HAVE MS. RITCHIE, THAT'S STILL UNDER FIVE.  IT'S

20   STILL UNDER FIVE PEOPLE WHO WERE INVOLVED IN THE ACTUAL MOVING

21   AND TRANSACTION OF THE FINANCES.

22           SO I THINK EVEN IF -- EVEN AGREEING TO THAT POINT,

23   AND THE COURT AGREES, I STILL DON'T THINK WE'RE DEALING WITH AN

24   OTHERWISE EXTENSIVE FOUR-POINT ENHANCEMENT.  I THINK WE'RE JUST

25   STILL DEALING WITH MR. HARDWICK BEING A LEADER AND THAT BEING

1    THE ONLY ROLE ENHANCEMENT IN THIS PARTICULAR INSTANCE.

2              THE COURT:  AND SO EVEN UNDER -- I STILL AM NOT ON

3    THE NOTE.  I THINK YOU JUST TOLD ME WHERE IT IS.  BUT EVEN ON

4    THE UNWITTING PARTICIPANTS ON THE OTHERWISE EXTENSIVE, IT STILL

5    HAS TO BE FIVE, YOU'RE SAYING?

6              MS. NOVAY:  IT DOESN'T.  OKAY.

7              THE COURT:  OKAY.

8              MS. NOVAY:  IT DOES NOT.  I THINK THE ONLY NUMBER THE

9    *ZADA* CASE SAYS, AS WELL AS THERE ARE OTHER CASES BEFORE THAT,

10   IT JUST HAS TO BE ONE, ONE OTHER THAN MY CLIENT.

11             THE COURT:  RIGHT.

12             MS. NOVAY:  SO THAT IS CORRECT.  BUT AGAIN, I DON'T

13   THINK THAT RISES TO THE LEVEL OF IT BEING SO OTHERWISE

14   EXTENSIVE THAT YOU'VE GOT THIS BIG CRIMINAL ORGANIZATION OR

15   YOU'VE INVOLVED SO MANY PEOPLE THAT IT'S JUST ABSOLUTELY

16   OTHERWISE EXTENSIVE THAT WE'RE ADDING AN ADDITIONAL FOUR-POINT

17   ENHANCEMENT.

18             THE COURT:  AND SO ON WHAT DO YOU BASE YOUR ARGUMENT

19   THAT IT WOULD NEED TO BE A CERTAIN NUMBER UNDER THAT OR

20   OTHERWISE EXTENSIVE AND THE UNWITTING PARTICIPANTS?  IS IT

21   JUST, JUST ARGUMENT?

22             MS. NOVAY:  YES, BECAUSE THERE IS NO CERTAIN NUMBER.

23             THE COURT:  OKAY.

24             MS. NOVAY:  THE 11TH CIRCUIT SAYS THERE IS NO CERTAIN

25   NUMBER.  THEY HAVEN'T GUESSED THAT.  SO I DON'T WANT TO STAND

1    HERE SAYING I KNOW WAY MORE THAN THE 11TH CIRCUIT, AT LEAST NOT

2    ON THAT POINT.  MAYBE SOMEWHERE DOWN THE ROAD.

3              BUT FOR THIS PARTICULAR ISSUE, THERE ISN'T A NUMBER.

4    THERE IS NOT A PARTICULAR NUMBER.  BUT I WOULD SUBMIT THAT AN

5    ADDITIONAL TWO UNWITTING PARTICIPANTS DOES NOT REACH THE

6    CATEGORY OF OTHERWISE EXTENSIVE TO JUSTIFY SUCH A MAJOR

7    ENHANCEMENT.

8              THE COURT:  OKAY.  LET ME JUST -- ALL RIGHT.

9              MS. NOVAY:  THANK YOU.

10             THE COURT:  ANYTHING ELSE?  NO?

11             MS. NOVAY:  NO, YOUR HONOR.

12             THE COURT:  I NEED TO LOOK AGAIN JUST FOR ONE SECOND

13   A LITTLE MORE CLOSELY AT THE LANGUAGE OF THIS PARTICULAR

14   ENHANCEMENT.

15             MR. PHILLIPS:  IT'S AT PAGE 3251.

16             THE COURT:  OKAY.  THAT'S WHERE I AM NOW.

17             MR. PHILLIPS:  IT'S AT THE BOTTOM, THE LAST PARAGRAPH

18   ON THAT PAGE.

19             THE COURT:  UNDER NOTE 3, APPLICATION NOTE 3?  IS

20   THAT WHAT YOU'RE SAYING, THAT LAST PARAGRAPH?

21             MR. PHILLIPS:  YES, YOUR HONOR.

22             THE COURT:  OKAY.  AND, GOVERNMENT, EXPLAIN TO ME

23   AGAIN BRIEFLY WHY YOU FEEL THE FOUR-LEVEL INSTEAD OF THE

24   TWO-LEVEL ONE WOULD APPLY.  BECAUSE, CLEARLY, UNDER (C), HE

25   WAS, IN MY MIND, AN ORGANIZER, LEADER, OR MANAGER.  BUT I'M

1    HAVING SOME DIFFICULTY WITH THE OTHERWISE EXTENSIVE LANGUAGE TO

2    SUPPORT A FOUR-LEVEL ENHANCEMENT.

3         MR. PHILLIPS:  I'M GLAD YOU ASKED.

4         IN ORDER TO APPLY THE FOUR-LEVEL ENHANCEMENT, THE

5    11TH CIRCUIT HAS SAID THAT THE DISTRICT COURT MUST FIND TWO

6    THINGS:  ONE, THAT THE DEFENDANT PLAYED A LEADERSHIP OR

7    ORGANIZATIONAL ROLE IN THE OFFENSE.  SO WE HEARD UNCONTRADICTED

8    TESTIMONY AT TRIAL THAT MR. HARDWICK WAS THE CEO OF THE TITLE

9    INSURANCE BUSINESS.  HE WAS THE MANAGING PARTNER OF THE LAW

10   FIRM.  THERE'S NO QUESTION THAT HE MEETS THAT DEFINITION, THAT

11   HE PLAYED A LEADERSHIP AND ORGANIZATIONAL ROLE IN THE OFFENSE.

12        AND THE SECOND THING WE HAVE TO PROVE IS THAT THE

13   CRIMINAL ACTIVITY INVOLVED THE SPECIFIED NUMBER OF

14   PARTICIPANTS, WHICH WOULD BE FIVE, OR THAT IT WAS OTHERWISE

15   EXTENSIVE.

16        AND THE 11TH CIRCUIT HAS SAID IN THE *LABOY* CASE,

17   L-A-B-O-Y, 351 F.3D AT 578, SPECIFICALLY FOOTNOTE 10, QUOTE:

18   THE FIVE OR MORE PARTICIPANTS AND OTHERWISE EXTENSIVE ELEMENTS

19   ARE ALTERNATIVE MEANS OF FINDING THE REQUIRED SCOPE UNDER

20   SECTION 3B1.1.  THE SENTENCING COURT NEED ONLY FIND ONE OR THE

21   OTHER, NOT BOTH.

22        SO THAT'S WHY WE ARE TALKING ABOUT THE NUMBER OF

23   UNWITTING PARTICIPANTS, BECAUSE THAT --

24        THE COURT:  RIGHT.

25        MR. PHILLIPS:  -- GETS US TO THE FIVE.

202

1           THE COURT:  SO WHICH OF THOSE TWO ALTERNATIVE WAYS OF

2     ESTABLISHING THAT ENHANCEMENT ARE YOU DEALING WITH?  ARE YOU

3     DEALING WITH THE FIVE THAT IS THE FIRST PART OF THE "OR" OR THE

4     SECOND HALF THAT YOU'RE COUNTING BECAUSE THESE UNWILLING ONES

5     OR UNSUSPECTING ONES MAKE UP THE OTHERWISE EXTENSIVE?

6           MR. PHILLIPS:  IT'S THE SECOND ONE.  IT'S OTHERWISE

7     EXTENSIVE.

8           THE COURT:  BECAUSE YOU TOO ARE SAYING THE NUMBER

9     FIVE.  AND WHAT'S, I GUESS, THROWING ME OFF IS, ON THE

10    OTHERWISE EXTENSIVE, I DON'T SEE WHERE THERE IS A NUMBER

11    SPECIFIED.  SO I'M NOT SURE WHY WE'RE TALKING ABOUT FIVE OR WHY

12    WE'RE TALKING ABOUT ANY PARTICULAR NUMBER.  IT JUST, IN MY

13    ESTIMATION, HAS TO BE MORE THAN THE ORGANIZER AND ONE OTHER

14    PERSON.  OR AM I INCORRECT?

15          MR. PHILLIPS:  LET ME ADDRESS THAT, YOUR HONOR.

16          THE COURT:  THE ONLY PLACE I SEE A NUMBER IS THE

17    FIVE, WHICH I DIDN'T THINK WE WERE DEALING WITH.  I THOUGHT WE

18    WERE DEALING STRICTLY WITH THE "OR OTHERWISE EXTENSIVE."

19          MR. PHILLIPS:  IN THE *ZADA* CASE, LIKE THE CASE BEFORE

20    THIS COURT, THE LENGTH AND SCOPE OF THE CRIMINAL ACTIVITY ARE

21    PLAINLY EXTENSIVE.  THAT'S WHAT WE BELIEVE.  IN *ZADA*, IT WAS IN

22    LESS THAN TEN YEARS AND THE LOSS WAS OVER $20 MILLION.  DOESN'T

23    HAVE TO REACH THOSE LEVELS IN ORDER FOR IT TO BE CONSIDERED

24    OTHERWISE EXTENSIVE.

25          THE COURT NOTED THAT THE DEFENDANT IN THAT CASE WAS

1    INTIMATELY INVOLVED IN ALL ASPECTS OF THE CRIMINAL ACTIVITY AND

2    WAS ITS PRIMARY IF NOT ITS SOLE BENEFICIARY.

3         SAME THING APPLIES TO NAT HARDWICK.  HE WAS THE SOLE

4    BENEFICIARY OF THAT $26.5 MILLION THAT HE TOOK.  THERE'S NO

5    EVIDENCE THAT ANYBODY GOT A DIME OF THAT OTHER THAN HIM.

6         THE COURT:  I'M SORRY.  I'M SORRY.  SO IF WE JUST

7    TALK ABOUT THE NUMBER OF PARTICIPANTS, WHICH IS WHAT I'M KEYING

8    IN ON, I'M JUST WONDERING:  IF WE'RE NOT TALKING ABOUT THE

9    FIRST PART OF THE WORDING OF THAT ENHANCEMENT, WHICH IS FIVE OR

10   MORE PARTICIPANTS, WE'RE TALKING ABOUT THE SECOND HALF, WHICH

11   IS THE OTHERWISE EXTENSIVE, IS THERE A CERTAIN NUMBER REQUIRED?

12        AND, IF NOT, WHY ARE WE TALKING ABOUT FIVE ON THAT

13   SECOND PART?  I THOUGHT THE NUMBER FIVE WAS ONLY ASSOCIATED

14   WITH THE FIRST PART.

15        MR. PHILLIPS:  I THINK THE LANGUAGE IS, YOUR HONOR,

16   THAT BY PROVING THAT THESE UNWITTING PARTICIPANTS HELPED HIM

17   CARRY OUT THE FRAUD AND COVER IT UP, IT MAKES IT THE FUNCTIONAL

18   EQUIVALENT OF THE FIRST PART OF THE STANDARD, THAT YOU HAVE

19   FIVE PARTICIPANTS.

20        THAT'S THE LANGUAGE THAT THE COURT USES HERE.  THEY

21   SAY, IN ANY CASE -- THE CRIMINAL ACTIVITY IN THIS CASE WAS THE,

22   QUOTE, FUNCTIONAL EQUIVALENT OF A CRIME INVOLVING FIVE OR MORE

23   PARTICIPANTS.  TO BEGIN WITH, THERE WERE AT LEAST TWO KNOWING

24   PARTICIPANTS, MR. ZADA AND SOMEBODY NAMED WOLFGANG.

25        SO WE'VE GOT HARDWICK AND MAURYA.  HERE, WE'VE GOT

204

1    THE SAME THING.

2              THEN THE COURT GOES ON TO CITE ANOTHER CASE, THE

3    *HOLLAND* CASE FROM THE 11TH CIRCUIT, SAYING, QUOTE:  WHEN

4    DETERMINING THE NUMBER OF PARTICIPANTS, THE DEFENDANT IS

5    CONSIDERED TO BE ONE OF THE FIVE.

6              THE COURT:  OKAY.  I'M SORRY.  LET ME STOP YOU THERE.

7              SO ARE YOU ANALYZING THIS UNDER THE FIRST PART THAT

8    GIVES FIVE PARTICIPANTS OR AN EQUIVALENT; OR ARE YOU ANALYZING

9    THIS UNDER THE SECOND PART, WHICH IS THE OTHERWISE EXTENSIVE?

10             AND IF IT'S THE SECOND PART, THE LATTER, IS THERE A

11   NUMBER REQUIRED AT ALL?

12             OR ARE YOU STILL DEALING WITH THE FIRST PART BUT

13   SAYING, EVEN IF THERE AREN'T FIVE THAT WE CAN IDENTIFY,

14   UNWITTING PARTICIPANTS CAN COUNT TO MAKE UP THAT FIVE SO THAT

15   WE ARE DEALING WITH THAT FIRST PART?

16             I GUESS I'M JUST UNCLEAR ON WHICH PART YOU'RE

17   PURSUING FOR THIS ENHANCEMENT.

18             MR. PHILLIPS:  THE NEXT SENTENCE OF WHAT I WAS

19   READING FROM THE *ZADA* CASE FROM THE 11TH CIRCUIT IS, QUOTE:

20   AND AT LEAST FOUR OTHER UNWITTING PARTICIPANTS PROVIDED

21   SERVICES THAT WERE ESSENTIAL TO THE FRAUDULENT SCHEME.

22             SO IN THAT CASE, THEY THOUGHT IT WAS IMPORTANT.

23   WHETHER IT WAS ABSOLUTELY REQUIRED THAT YOU HAVE FIVE OR NOT, I

24   DON'T KNOW.  BUT IN ANY EVENT, WE HAVE MORE THAN FIVE.  SO

25   EITHER WAY THE COURT WANTS TO LOOK AT IT, YOU'RE SAFE.

1          THE COURT:  OKAY.  SO IN THE -- I GUESS -- IS THIS

2    DIFFERENT FROM YOUR SENTENCING MEMO, WHERE IT SEEMED THAT YOU

3    DIDN'T ARGUE THE FIVE PARTICIPANTS AT ALL; IT SEEMED THAT YOU

4    ONLY ARGUED UNDER OTHERWISE EXTENSIVE?  I GUESS THAT'S WHAT'S

5    ALSO THROWING ME OFF, IS YOU ARE ARGUING THAT IT APPLIES UNDER

6    EITHER ONE OF THOSE WAYS OF ESTABLISHING THIS FOUR-LEVEL

7    ENHANCEMENT.  IS THAT CORRECT?

8          MR. PHILLIPS:  I DON'T BELIEVE THAT'S THE WAY I WOULD

9    DESCRIBE IT, YOUR HONOR.

10          THE COURT:  OKAY.

11          MR. PHILLIPS:  BUT THE COURT DID SAY IN THE *LABOY*

12    CASE THAT I QUOTED TO YOU THAT THE FIVE OR MORE PARTICIPANTS

13    AND THE OTHERWISE EXTENSIVE ARE ALTERNATIVE MEANS OF PROVING

14    IT.

15          THE COURT:  RIGHT.  WHICH ONE ARE YOU USING?  WHICH

16    ONE ARE YOU PURSUING, WHICH ONE OF THOSE ALTERNATIVES?

17          MR. PHILLIPS:  OTHERWISE EXTENSIVE.  BUT MY ARGUMENT

18    IS THAT BY HAVING ALL OF THESE OTHER PARTICIPANTS, IT'S THE

19    FUNCTIONAL EQUIVALENT OF IT.  SO I'M ARGUING THE SECOND POINT,

20    TO ANSWER YOUR QUESTION, OTHERWISE EXTENSIVE.

21          THE COURT:  OKAY.  NOW, LET ME STOP YOU THERE.

22          ON THE OTHERWISE EXTENSIVE, WHY ARE WE EVEN TALKING

23    ABOUT THE EQUIVALENT OF NUMBER FIVE -- THE ACTUAL NUMBER FIVE

24    OR EQUIVALENT OF NUMBER FIVE IF THE OTHERWISE EXTENSIVE DOESN'T

25    REQUIRE A NUMBER?  IT'S ONLY THAT FIRST PART, THAT YOU'RE NOT

206

1    ARGUING UNDER, THAT HAS A SPECIFIC NUMBER.

2            MR. PHILLIPS:  AS I SAID, IN THE CASE THAT I'M

3    RELYING ON, THE COURT THOUGHT THAT WAS IMPORTANT.  THEY POINTED

4    THAT OUT.  I JUST WANTED TO SHOW THIS COURT THAT WE'RE ON ALL

5    FOURS WITH THEM AS FAR AS THAT'S CONCERNED.  WE'VE GOT ENOUGH.

6            AND THE 11TH CIRCUIT SAID IN THAT CASE, YOU KNOW,

7    THAT IT'S SATISFIED THE STANDARD.  SO I THINK IT'S IMPORTANT.

8            THE COURT:  OKAY.  THANK YOU, SIR.

9            ALL RIGHT.  I WILL OVERRULE AND SUSTAIN IN PART.

10   I WILL FIND THAT THE TWO-LEVEL INCREASE UNDER (C) DOES APPLY,

11   THAT MR. HARDWICK WAS AN ORGANIZER, LEADER, MANAGER, OR

12   SUPERVISOR IN CRIMINAL ACTIVITY OTHER THAN DESCRIBED IN (A)

13   OR (B).

14           I AM NOT ABLE TO SAY THAT THERE WERE FIVE

15   PARTICIPANTS.  I AM NOT ABLE TO SAY THAT IT WAS OTHERWISE

16   EXTENSIVE, NECESSARILY.  BUT I DO THINK THAT THE TWO-LEVEL

17   INCREASE DOES APPLY THERE.

18           OKAY.  SO THAT IS ROLE IN THE OFFENSE.

19           ARE THERE ANY OTHER OBJECTIONS, DEFENSE?

20           MS. NOVAY:  YES, YOUR HONOR.  OBSTRUCTION.  AND I

21   THINK THAT'S OUR FINAL ONE.

22           THE COURT:  OKAY.  I TELL YOU WHAT -- LET ME SEE.  ON

23   THAT ONE, GOVERNMENT, LET ME HAVE YOU START ON THAT ONE.  AND,

24   AGAIN, THAT'S BASED ON WHAT MY INCLINATION IS AT THIS POINT.

25           MR. PHILLIPS:  YOUR HONOR, THE DEFENDANT TESTIFIED AT

1   TRIAL IN A WAY THAT OBSTRUCTED JUSTICE.

2          LOOKING AT DOCUMENT NUMBER 309, PAGE 2852, THE

3   QUESTION THAT I ASKED WAS -- OR, RATHER, THAT MR. GARLAND ASKED

4   WAS:  MR. HARDWICK, YOU ARE ACCUSED HERE IN THE INDICTMENT

5   BEFORE THIS JURY OF BEING IN A CONSPIRACY WITH ASHA MAURYA TO

6   STEAL FROM THE LAW FIRM.  DID YOU HAVE ANY CONSPIRACY WITH ASHA

7   MAURYA?

8          ANSWER:  ABSOLUTELY NOT.

9          DID YOU HAVE ANY AGREEMENT WITH MS. MAURYA TO STEAL

10  FROM THE LAW FIRM?

11         ANSWER:  ABSOLUTELY NOT.

12         ARE YOU GUILTY OR INNOCENT OF THESE CHARGES?

13         I AM INNOCENT.

14         YOU ARE ALSO CHARGED IN COUNT 23 OF THIS INDICTMENT

15  WITH KNOWINGLY MAKING AND CAUSING TO BE MADE A FALSE STATEMENT

16  IN A LOAN APPLICATION.  DID YOU KNOWINGLY MAKE OR CAUSE TO BE

17  MADE A FALSE STATEMENT?

18         ABSOLUTELY NOT.

19         ARE YOU GUILTY OR INNOCENT OF THAT CHARGE?

20         I AM INNOCENT.

21         MR. HARDWICK GOES ON IN THE NEXT VOLUME, 310, AT

22  PAGE 3131:  WERE YOU INTENDING TO STEAL FROM THE LAW FIRM, YOUR

23  LAW FIRM, OF WHICH YOU WERE 55 PERCENT OWNER?

24         ABSOLUTELY NOT.

25         PAGE 3132:  DID YOU EVER HAVE ANY INTENTION TO TAKE

208

1    ANY MONEY OUT OF AN ESCROW ACCOUNT?

2              ABSOLUTELY NOT.

3              SAME PAGE:  DID YOU KNOW THAT FUNDS OF THE LAW FIRM

4    WERE GOING INTO AN ACCOUNT LABELED IOLTA?

5              I DID NOT.

6              3133:  ARE YOU GUILTY OR INNOCENT OF THESE CHARGES?

7              I AM ABSOLUTELY INNOCENT OF ALL OF THESE CHARGES.

8    ABSOLUTELY.

9              AND DO YOU ADMIT -- THIS IS 3148:  AND DO YOU ADMIT

10   THAT YOUR PARTNERS DIDN'T KNOW THAT YOU GOT ALL OF THESE

11   DISTRIBUTIONS?

12             NO, I DO NOT ADMIT THAT.

13             3148 AGAIN:  AND DO YOU ADMIT THAT YOUR PARTNERS --

14   I'M SORRY.  I READ THAT TWICE.

15             PAGE 3223:  I HAD NO KNOWLEDGE THAT THIS WAS

16   HAPPENING.  I WAS BEING TOLD BY ASHA MAURYA.  SHE'S SHOWING ME

17   DOCUMENTATION.

18             PAGE 3227:  YOU WERE USING MHS AS YOUR PERSONAL PIGGY

19   BANK?

20             ABSOLUTELY NOT.

21             PAGE 3231:  I HAD NO IDEA THERE WAS ANY EXCESS OR

22   UNEQUAL DISTRIBUTIONS.

23             THE COURT:  MR. PHILLIPS, LET ME STOP YOU THERE FOR A

24   SECOND JUST SO THAT WE GET AN IDEA OF WHERE WE'RE GOING.

25   INSTEAD OF JUST READING ALL OF THIS, GIVE ME A NUTSHELL OF THE

1   ARGUMENT THAT IS SUPPORTED BY RECAPPING OF THIS TESTIMONY, AND

2   THEN I'LL LET YOU GO FORWARD AND READ WHATEVER THE -- POINT OUT

3   THE PARTS THAT YOU THINK ARE APPLICABLE HERE.

4           MR. PHILLIPS:  HE LIED.

5           THE COURT:  OKAY.  AND THE FACT THAT HE LIED SUPPORTS

6   THIS OBSTRUCTION BECAUSE?

7           MR. PHILLIPS:  BECAUSE HE LIED TO THE COURT.  IN THE

8   PROCESS OF BEING PROSECUTED FOR THESE CRIMES, HE LIED TO THE

9   COURT.  HE WILLFULLY ATTEMPTED TO MISLEAD THIS COURT AND THIS

10  JURY CONCERNING THE FACTS AND THE EVIDENCE IN THIS CASE.

11          THE COURT:  OKAY.  THANK YOU.  AND --

12          MR. PHILLIPS:  THERE ARE OTHER EXAMPLES OF THAT, BUT

13  I ASSUME THAT THE COURT --

14          THE COURT:  OKAY.

15          MR. PHILLIPS:  -- DIDN'T WANT TO HEAR --

16          THE COURT:  IF YOU WANT TO COMPLETE YOUR RECORD AND

17  PUT THOSE ON THE RECORD, THAT'S FINE.

18          MR. PHILLIPS:  PAGE 3231:  I HAD NO IDEA THERE WAS

19  ANY EXCESS OR UNEQUAL DISTRIBUTIONS.  WE HAD EVEN-UPS ALL OVER

20  THE PLACE.  I HONESTLY HAD NO IDEA.

21          SAME PAGE AND CONTINUING OVER TO 32:  WERE YOU

22  INTENDING TO STEAL FROM ANYONE?

23          NO.  ABSOLUTELY NOT.

24          SAME PAGE AND CONTINUING TO 33:  DID YOU KNOW YOU

25  WERE RECEIVING ANY MONEY OUT OF AN ACCOUNT LABELED IOLTA?

1          ANSWER:  THE ONLY TIME WAS THAT TIME IN JUNE THAT WE

2     TALKED ABOUT -- THAT'S THE $400,000 TO THE LAS VEGAS SANDS THAT

3     WE DISCUSSED A MINUTE AGO -- AND I REPRIMANDED EVERYBODY.  THEY

4     DID AN INVESTIGATION, SAID IT WAS A MISTAKE, AND THAT WAS THE

5     ONLY TIME.

6          AND AS I EXPLAINED A MINUTE AGO WHEN WE WERE TALKING

7     ABOUT THE PREVIOUS ENHANCEMENT, WE SHOWED THE COURT THOSE

8     DOCUMENTS, THOSE E-MAILS WHERE MR. HARDWICK WILLFULLY CAUSED

9     HIS LAW FIRM TO MOVE $400,000 FROM THE IOLTA ACCOUNT TO THE

10    OPERATING ACCOUNT, AND THEN FROM THE OPERATING ACCOUNT TO HIS

11    PERSONAL ACCOUNT TO TRY TO PRETEND LIKE THIS WAS HIS PERSONAL

12    MONEY, BECAUSE THE LAS VEGAS SANDS HAD REJECTED THE INITIAL

13    TRANSFER.  AND THE JURY FOUND HIM GUILTY ON THAT COUNT.

14         THAT'S OBSTRUCTION, YOUR HONOR.

15         THE COURT:  OKAY.  THANK YOU.

16         DEFENSE?

17         MS. NOVAY:  COULD I HAVE JUST ONE MOMENT, YOUR HONOR?

18         THE COURT:  CERTAINLY.

19         MS. NOVAY:  THANK YOU, YOUR HONOR.

20         I THINK ONE OF THE THINGS THAT WE ARGUED IN OUR

21    SENTENCING MEMO IN RESPONSE WITH REGARD TO THIS OBJECTION --

22    WITH REGARD TO OUR OBJECTION TO THIS ENHANCEMENT WAS, REALLY,

23    UP UNTIL JUST NOW IN THIS MOMENT, THE GOVERNMENT AND THE

24    PRESENTENCE REPORT -- NO DISRESPECT TO MR. MOODY -- HAS JUST

25    SAID HE TESTIFIED AND HE LIED.  AND HE HAD TO HAVE LIED BECAUSE

1    THE JURY -- THAT'S WHAT THE JURY CONCLUDED.

2         LARGELY, A LOT OF ISSUES THAT THE GOVERNMENT

3    ADDRESSED WITH REGARD TO MR. HARDWICK'S INTENT -- WHICH WE

4    AGREE.  HE DENIED THAT CATEGORICALLY OVER AND OVER AGAIN.  I

5    DIDN'T INTEND TO DEFRAUD ANYONE, I DIDN'T KNOW, I WASN'T AWARE.

6    HE SAID THAT A LOT.  AND THERE ARE PROBABLY MORE EXAMPLES THAN

7    EVEN THE ONES THAT THE GOVERNMENT NAMED.

8         HOWEVER, BUT WITH REGARD TO THIS SPECIFIC

9    ENHANCEMENT, IT HAS TO BE MORE THAN JUST HIM DENYING HIS INTENT

10   BECAUSE, AS THE COURT WILL RECALL, THE JURY RECEIVED WHAT WE

11   CALL AN OSTRICH INSTRUCTION.  IN THEORY, THE JURY COULD HAVE

12   ABSOLUTELY FOUND THAT HE KNEW -- OR EXCUSE ME, THAT HE DIDN'T

13   KNOW AND AGREED THAT MR. HARDWICK SAYS HE DIDN'T KNOW BUT ALSO

14   AGREED THAT HE PURPOSELY TRIED NOT TO KNOW.

15        SO HIS TESTIMONY ISN'T NECESSARILY INCONSISTENT WITH

16   THE JURY'S VERDICT.  AND WE THINK THAT'S THE CRUX OF OUR

17   ARGUMENT.  THIS IS WHAT HE SAID OVER AND OVER AND OVER AGAIN.

18   IT REALLY DIDN'T CHANGE THE GOVERNMENT'S CASE.

19        HE AGREED THAT HE RECEIVED EVERY SINGLE WIRE.  HE

20   AGREED THAT HE RECEIVED THE MONEY.  DIDN'T DENY THAT, DIDN'T

21   DISPUTE THAT, DIDN'T CALL ANY WITNESSES TO DENY IT OR DISPUTE

22   THAT THAT WAS MONEY THAT WENT TO HIM AND IT WAS FOR HIS BEHALF,

23   BUT REALLY JUST DENIED HIS INTENT.  THAT'S THE PROBLEM THAT WE

24   HAVE HERE.

25        FOR THE RECORD, ALTHOUGH I THINK THE 11TH CIRCUIT HAS

1    VERY FIRMLY RULED ON THIS, YOU KNOW, THERE'S A PROBLEM, THERE'S

2    A PROBLEM FOR THE DEFENSE THAT AFTER YOU TAKE THE STAND TO

3    DEFEND YOUR INNOCENCE, AND THEN EVEN IF YOU'RE CONVICTED, YOU

4    STILL GET THIS TWO-POINT ENHANCEMENT.

5           ONE OF THE ARGUMENTS WE MADE IS THAT THIS PUTS A

6    CHILL ON THE DEFENDANT'S ABILITY TO GET UP AND TAKE THE STAND

7    AND SAY, I'M INNOCENT AND I DIDN'T DO THIS.  OR IN

8    MR. HARDWICK'S CASE, I DIDN'T INTEND TO DO THIS, THIS WASN'T MY

9    INTENT, I DID NOT INTEND TO DEFRAUD ANYONE.

10          THAT'S NOT MY STRONGEST ARGUMENT, BECAUSE I THINK

11   CIRCUITS HAVE VERY MUCH RULED AGAINST ME ON THAT.  BUT I MAKE

12   THAT ARGUMENT FOR THE RECORD IN THIS PARTICULAR CASE.

13          BUT OUR ARGUMENT IS REALLY SIMPLE, IT'S VERY SIMPLE,

14   IS THAT HIS DENIALS WERE OF WHAT HE INTENDED TO DO AND OF HIS

15   INTENT IN THESE DIFFERENT CIRCUMSTANCES AND IN THESE DIFFERENT

16   CASES.  HE DIDN'T SAY, NO, THE MONEY DIDN'T COME TO ME; NO, IT

17   WASN'T FOR MY BENEFIT; NO, ACTUALLY, ALL -- EVERY SINGLE ONE OF

18   THE WIRES THAT'S IN THE INDICTMENT, THAT WAS ACTUALLY A

19   BUSINESS EXPENSE.  THAT IS A CLASSIC EXAMPLE OF OBSTRUCTION,

20   BUT THAT'S JUST NOT WHAT HAPPENED IN THIS CASE.

21          LARGELY, THERE WAS A LOT THAT WE AGREED ON, WHICH

22   WAS, YES, I GOT THAT MONEY; YES, IT WAS FOR MY BENEFIT; NO, IT

23   WASN'T A BUSINESS EXPENSE.  BUT IT WASN'T AN INTENT TO DEFRAUD,

24   AND I DIDN'T, I DIDN'T REALIZE, I DIDN'T KNOW.

25          AND, AGAIN, THE JURY RECEIVED AN OSTRICH INSTRUCTION,

1    SO IT'S NOT NECESSARILY INCONSISTENT FOR WHAT THE JURY FOUND.

2            SO FOR THOSE REASONS, WE ASK THE COURT NOT APPLY THE

3    ENHANCEMENT OF OBSTRUCTION OF JUSTICE.

4            MR. PHILLIPS:  MAY I RESPOND, YOUR HONOR?

5            THE COURT:  YES.  YOU OR MS. BARRON, EITHER ONE.

6            MR. PHILLIPS:  YOUR HONOR, THE 11TH CIRCUIT HAS HELD

7    THAT IN ORDER TO APPLY THIS ENHANCEMENT, THE COURT MUST FIND

8    FOUR ELEMENTS.  THE FIRST ONE IS THE TESTIMONY MUST BE UNDER

9    OATH OR AFFIRMATION.  THAT'S UNQUESTIONED, THAT MR. HARDWICK

10   WAS UNDER OATH.

11           SECOND THING IS THE TESTIMONY MUST BE FALSE.  THE

12   JURY FOUND BEYOND A REASONABLE DOUBT THAT HIS TESTIMONY WAS

13   FALSE.

14           THE THIRD THING IS THE TESTIMONY MUST BE MATERIAL.

15   THERE'S NO QUESTION THAT IT'S MATERIAL BECAUSE HE WAS

16   ADDRESSING THE SPECIFIC CHARGES IN THE INDICTMENT AND

17   INCLUDING, IN SOME CASES, THE SPECIFIC COUNTS IN THE

18   INDICTMENT.

19           AND, FINALLY, THE FOURTH THING IS THE TESTIMONY MUST

20   BE GIVEN WITH WILLFUL INTENT TO PROVIDE FALSE TESTIMONY AND NOT

21   AS A RESULT OF MISTAKE, CONFUSION, OR FAULTY MEMORY.

22           THERE'S NO ALLEGATION THAT MR. HARDWICK MADE A

23   MISTAKE IN TESTIFYING AS HE DID.  THERE'S NO ALLEGATION THAT HE

24   WAS CONFUSED OR THAT HE HAD A FAULTY MEMORY.  HE JUST SAID

25   STRAIGHT UP, I DIDN'T DO IT.  AND THAT WAS A LIE.  AND IT WAS

214

1  DONE WITH THE INTENT TO MISLEAD THIS COURT AND MISLEAD THE

2  JURY.

3              THE COURT:  AND HE SAID -- WHEN YOU'RE SAYING HE DID

4  NOT -- YOU'RE SAYING HE DID NOT DO IT.  DO WHAT?  THE CHARGES

5  WERE -- OF COURSE, THE BULK OF THE CHARGES WERE ILLEGAL

6  TRANSFERS.

7              MR. PHILLIPS:  AS I READ, YOU KNOW, HIS VERBATIM

8  TESTIMONY --

9              THE COURT:  RIGHT.

10             MR. PHILLIPS:  -- HE WAS QUESTIONED ABOUT, DID YOU DO

11 THESE SPECIFIC THINGS THAT YOU'RE CHARGED WITH IN THE

12 INDICTMENT?  AND EACH TIME, UNEQUIVOCALLY, HE SAID, I DID NOT.

13 I AM NOT GUILTY.

14             THE COURT:  OKAY.  AND WHAT SAY YOU WITH RESPECT TO

15 THE POINT THAT MS. NOVAY BROUGHT UP ABOUT THE DELIBERATE, THE

16 DELIBERATE IGNORANCE INSTRUCTION THAT WAS PART OF THE CASE?

17             MR. PHILLIPS:  I DON'T UNDERSTAND THAT, YOUR HONOR.

18             THE COURT:  WHAT WAS THE -- WHAT WAS THE CHARGE --

19 WHAT WAS THE LANGUAGE OF THE ESSENCE OF THE CHARGE ON WHETHER

20 MR. HARDWICK ESSENTIALLY JUST BURIED HIS HEAD IN THE SAND AND

21 JUST DIDN'T PAY ATTENTION TO THE WAY THAT THINGS WERE

22 MAINTAINED, THE RECORDS THAT WERE MAINTAINED OR WHERE THE MONEY

23 WAS COMING FROM?  DO YOU RECALL THAT?

24             MR. PHILLIPS:  I DO.

25             THE COURT:  OKAY.

215

1          MR. PHILLIPS:  THAT'S ABSOLUTELY FALSE, BECAUSE THE

2     COURT WILL RECALL THAT MARK WITTSTADT TESTIFIED IN DETAIL ABOUT

3     NUMEROUS E-MAILS THAT WERE AUTHORED BY MR. HARDWICK -- NOT BY

4     ASHA MAURYA, BUT BY HIM -- WHERE HE SAID, HEY, GUYS, THIS MONTH

5     WE'RE GOING TO DISTRIBUTE 300,000.  AND THEY UNDERSTOOD WHAT

6     HIS POINTS WERE AT THE TIME.  AND IT'S EASY TO MULTIPLY HIS

7     POINTS TIMES THE 300,000 AND UNDERSTAND WHAT HE SHOULD HAVE

8     GOTTEN.

9          BUT, INSTEAD, THE GOVERNMENT'S EVIDENCE WAS THAT HE

10    GOT THREE OR FOUR TIMES WHAT HE TOLD THEM THAT HE WAS GOING TO

11    TAKE AND ALSO MORE THAN HE TOLD THEM THE ENTIRE PARTNERSHIP AS

12    A WHOLE WOULD GET.

13         THE COURT:  OKAY.

14         MR. PHILLIPS:  SO THAT IS A WILLFUL ATTEMPT TO

15    MISLEAD.  THAT IS FALSE.  THAT IS KNOWING.  AND IT IS CLEARLY

16    MATERIAL TO THE FACTS IN THE INDICTMENT.

17         LAST POINT, YOUR HONOR.  THE ENHANCEMENT APPLIES --

18    THE COMMENTARY SAYS IN 4B, THE ENHANCEMENT APPLIES WHERE THE

19    DEFENDANT COMMITS PERJURY AND THE FALSE TESTIMONY PERTAINS TO

20    THE CONDUCT THAT FORMS THE BASIS OF CONVICTION.  SO I'VE

21    EXPLAINED THAT.

22         AND THE SECOND THING IS -- THIS IS SLIGHTLY

23    DIFFERENT -- IT ALSO APPLIES WHERE THE DEFENDANT PROVIDES

24    MATERIALLY FALSE INFORMATION TO A JUDGE.  AND HE PROVIDED

25    MATERIALLY FALSE INFORMATION TO YOU WHEN HE MADE THOSE

1    STATEMENTS UNDER OATH HERE IN YOUR COURTROOM.

2           THE COURT:  AND TELL ME AGAIN WHICH STATEMENTS YOU

3    MEAN.  DO YOU JUST SIMPLY MEAN WHEN HE WAS ASKED DIRECTLY, ARE

4    YOU GUILTY OF THESE COUNTS?  OR IS THERE SPECIFIC TESTIMONY?

5           BECAUSE I KNOW YOU READ THROUGH A BUNCH OF TRIAL

6    TESTIMONY BEFORE YOU MADE YOUR INITIAL ARGUMENT.  BUT WHICH

7    STATEMENTS?  GIVE ME A COUPLE OF EXAMPLES JUST SO THAT I KNOW

8    WHAT KINDS OF STATEMENTS YOU ARE REFERENCING AT THIS POINT.

9           MR. PHILLIPS:  WELL, I RELY ON ALL OF THOSE THAT I

10   READ EARLIER.  BUT INCLUDED IN THAT ARE -- HIS OWN LAWYER ASKED

11   HIM -- THE VERY FIRST QUESTIONS MR. GARLAND ASKED HARDWICK ARE:

12   MR. HARDWICK, YOU'RE ACCUSED IN THE INDICTMENT OF BEING IN A

13   CONSPIRACY WITH ASHA MAURYA TO STEAL FROM THE LAW FIRM.  DID

14   YOU DO THAT?

15          ABSOLUTELY NOT.

16          DID YOU HAVE ANY AGREEMENT WITH MAURYA TO STEAL FROM

17   THE LAW FIRM?

18          ABSOLUTELY NOT.

19          AND IT GOES ON AND ON AND ON LIKE THAT.  AND THEN HE

20   TALKS ABOUT SPECIFIC COUNTS IN THE INDICTMENT, LIKE COUNT 23,

21   THE FALSE STATEMENT TO A FINANCIAL INSTITUTION.  AND HE REPEATS

22   IT IN A NUMBER OF DIFFERENT WAYS, NOT ONLY AT THE BEGINNING OF

23   MR. HARDWICK'S TESTIMONY, BUT THAT'S HOW HE WRAPPED UP.  AND SO

24   IT WAS FOREFRONT IN THE JURY'S MIND.

25          THIS WAS A PLAN.  YOU'RE GOING TO TELL THE JURY THAT

1    YOU DIDN'T DO ANY OF THIS STUFF, AND THEY'RE GOING TO ACQUIT

2    YOU, WE HOPE, BECAUSE THEY'RE GOING TO BELIEVE YOU.

3              THIS WAS AN ATTEMPT TO MISLEAD.  IT CAN'T BE

4    CONSTRUED ANY OTHER WAY.

5              MS. BARRON:  YOUR HONOR?

6              THE COURT:  YES.

7              MS. BARRON:  IF I MAY ADD.

8              THE COURT:  YES.

9              MS. BARRON:  BECAUSE I WANT TO ADDRESS SOMETHING THAT

10   MS. NOVAY BROUGHT UP.

11             THE COURT:  THANK YOU.

12             MS. BARRON:  WHICH IS, YOU KNOW, THAT UNDER THE

13   11TH CIRCUIT LAW, IT IS TRUE THAT IT IS ENOUGH TO TAKE THE

14   STAND AND TO SAY, I DIDN'T DO IT.  MS. NOVAY BROUGHT UP HOW

15   THAT MAY CHILL TESTIMONY, HOW IT POTENTIALLY COMPROMISES THE

16   FIFTH AMENDMENT.  SHE ACKNOWLEDGED THAT THE 11TH CIRCUIT FINDS

17   THE OTHER WAY.

18             BUT IT'S NOT EVEN CLOSE IN THIS CASE.  BECAUSE

19   MR. HARDWICK NOT ONLY DENIED GUILT, HE INVENTED A WHOLE STORY

20   ABOUT WHAT HE BELIEVED THE CASH FLOW IN HIS FIRM TO BE.

21             AND THE COURT MAY RECALL GOVERNMENT'S EXHIBIT 1035.

22             THE COURTROOM DEPUTY:  I'M SORRY.  IT SHOULD BE BACK

23   ON.

24             THE COURT:  AND I GUESS THIS IS -- THIS SOUNDS LIKE

25   IT'S GOING TO MY SPECIFIC QUESTION.  BECAUSE I UNDERSTAND

218

1   MR. PHILLIPS' ARGUMENT CLEARLY, THAT HE SAID, NO, I DIDN'T DO

2   THIS; NO, I DIDN'T DO THAT.  BUT THE JURY FOUND OTHERWISE.

3   THEY FOUND HIM GUILTY.

4           I'M JUST ASKING IF THERE'S SOMETHING SPECIFIC THAT WE

5   CAN POINT TO THAT HE CREATED OR SOMETHING THAT HE WENT BEYOND

6   IN TRYING TO GET THE JURY TO BELIEVE THAT FALLS UNDER WHAT WE

7   NORMALLY THINK OF AS OBSTRUCTION.

8           MS. BARRON:  OBSTRUCTION.

9           THE COURT:  YES.

10          MS. BARRON:  AND I APOLOGIZE THAT I DO NOT HAVE THE

11  DEFENSE EXHIBIT THAT WAS THE COUNTERPOINT.  BUT THIS CAME IN AS

12  GOVERNMENT'S 1035.  IT CAME IN THROUGH MR. WITTSTADT.

13          AND BASICALLY WHAT IT DOES IS IT GOES COUNT BY

14  COUNT -- THESE ARE THE WIRES THAT ARE CHARGED IN THE

15  INDICTMENT -- AND IT COMPARES THAT WITH THE CASH POSITION.

16  THIS WAS THAT HUGE BINDER OF DAILY DASHBOARDS THAT MS. MAURYA

17  SENT HIM WHERE -- AND FOR EVERY SINGLE ONE OF THE CHARGED

18  WIRES, WHEN YOU LOOK AT THE AVAILABLE CASH AND CONSIDER CHECKS

19  HOLDING, HE IS ASKING FOR MORE MONEY THAN THE FIRM HAS ON HAND.

20          AND SO MR. HARDWICK TAKES OUT HIS CALCULATOR BEFORE

21  TRIAL AND PREPARES AN ALTERNATE VERSION OF THIS EXHIBIT.  AND I

22  DON'T HAVE IT, BUT I DO HAVE HIS TESTIMONY ON IT.  AND WHAT HE

23  DID IS HE SAID, THIS IS NOT RIGHT, THIS IS NOT WHAT I WAS TOLD

24  THE CASH POSITION WAS.

25          AND SO WHAT HE TESTIFIED TO IS THAT, I LOOKED AT

219

1    RESERVE BALANCE, I LOOKED AT -- AND JUST TO PINPOINT IN THE --

2    I THINK THIS IS GOVERNMENT'S 309 -- IT'S EITHER 309 OR 310.

3    BUT, ANYWAY, IT'S PAGE 2928 OF THE TRANSCRIPT.

4             AND MR. GARLAND SAYS -- WE'RE LOOKING AT COUNT THREE,

5    FOR EXAMPLE.  THAT WOULD BE THIS $500,000 TO THE COSMOS.  THIS

6    IS THE BIG BIRTHDAY BASH.

7             MR. GARLAND ASKS:  ALL RIGHT.  DID YOU LOOK AT THE

8    FIGURES ON THAT DASHBOARD AND DETERMINE HOW MUCH CASH WAS

9    AVAILABLE AS REFLECTED ON THE DASHBOARD?

10            ANSWER:  YES, I DID.

11            QUESTION:  AND HOW MUCH CASH WAS AVAILABLE AS

12   PRESENTED BY YOU -- TO YOU -- PRESENTED YOU BY MS. MAURYA ON

13   THAT DATE?

14            NOW, REMEMBER, THE DAILY DASHBOARD THAT SHE SENT HIM

15   SAYS 504,000.

16            MR. HARDWICK'S ANSWER IS:  $2,544,076.

17            MR. GARLAND ASKS:  OKAY.  NOW, HOW DID YOU GET TO

18   THAT NUMBER?

19            ANSWER:  I TOOK THE ON-HAND OR ACTUAL CASH -- SHE

20   CHANGED THE WORDING SOMETIMES -- THE RESERVE BALANCE, ANY

21   PARTNER RESERVE, AND ACTION CAPITAL AVAILABILITY.

22            AND THEN MR. HARDWICK GOES ON, COUNT BY COUNT, TO

23   EXPLAIN THAT THAT'S WHAT HE DID; THAT HE WASN'T LOOKING AT

24   AVAILABLE CASH, HE WAS LOOKING AT ALL THIS OTHER MONEY THAT HE

25   COULD DRAW DOWN.

1           NOW, WHY DO WE KNOW THAT'S A LIE?  BECAUSE

2    MR. WITTSTADT, WHICH IS MARK WITTSTADT, TESTIFIED ON REBUTTAL

3    THAT THE PARTNERS UNDERSTOOD THAT RESERVE CASH, THAT WAS MONEY

4    THEY WERE SETTING ASIDE TO PAY THE BONUSES AT THE END OF THE

5    YEAR TO THE OTHER EMPLOYEES AND TO PAY THE TAXES ON THE FIRM

6    AND THAT THEY ONLY EVER DIPPED INTO THAT MONEY TO PAY

7    DISTRIBUTIONS TO THE PARTNERS ON ONE OCCASION.  THEY TALKED

8    ABOUT IT, THEY AGREED TO IT, AND THEY DID IT.

9           AND AS TO ACTION CAPITAL, MR. WITTSTADT EXPLAINED

10   THAT THAT'S A FACTORING LINE OF CREDIT, SO YOU CAN'T JUST DRAW

11   DOWN ON IT AND MAKE DISTRIBUTIONS.  YOU HAVE TO PLEDGE SOME

12   KIND OF COLLATERAL.  AND IT WAS ON THE FORFEITURE SIDE.

13          AND WHAT THEY WOULD DO IS THEY HAD THESE BANK CLIENTS

14   THAT YOU WOULD DO THE WORK FOR THE BANK, AND YOU MAY NOT GET

15   PAID FOR 30 DAYS, 60 DAYS, 90 DAYS.  SO THEY WOULD PLEDGE THOSE

16   RECEIVABLES TO BE ABLE TO DRAW DOWN.

17          AND HE SAID THAT THEY NEVER, EVER, EVER DREW DOWN ON

18   THE ACTION CAPITAL LINE OF CREDIT EXCEPT ON THE TWO OCCASIONS.

19   AND WE TALKED ABOUT THAT, WE LOOKED AT THE EXACT EXHIBITS ON

20   THE TWO OCCASIONS THAT THEY DID.

21          SO FOR MR. HARDWICK TO INVENT THIS LIE THAT EVERY

22   SINGLE TIME HE LOOKS AT THESE DASHBOARDS AND SAYS, OH, WE'VE

23   GOT 2 MILLION, 3 MILLION IN CASH, THAT WAS JUST AN AFFIRMATIVE

24   FALSEHOOD THAT HE COOKED UP WITH HIS LAWYERS TO TELL THIS JURY.

25   THEY DIDN'T BUY IT.

1           THAT'S MORE THAN JUST DENYING GUILT, YOUR HONOR.

2    THAT IS PERPETRATING A FRAUD BY THE DEFENSE.

3           THE COURT:  ALL RIGHT.  THANK YOU.

4           ANY RESPONSE TO THAT?  YES, MS. NOVAY.

5           MS. NOVAY:  YES, YOUR HONOR.

6           THE COURT:  THANK YOU.

7           MS. NOVAY:  I THINK I'LL ADDRESS GOING BACKWARDS.

8           AS FAR AS PERPETRATING A FRAUD, HOOKING UP WITH THE

9    LAWYERS, I THINK THAT'S A BIT DISINGENUOUS IN LIGHT OF WHAT THE

10   GOVERNMENT ACTUALLY SAID AT TRIAL.

11          AND I THINK WHAT THE GOVERNMENT IS TALKING ABOUT IS

12   ACTUALITY.  WHAT I'M TALKING ABOUT IS WHAT MR. HARDWICK SAID

13   THAT HE KNEW.  AND I'LL READ DIRECTLY FROM -- THIS IS

14   MS. BARRON'S OWN STATEMENT.  SHE SAYS:  THERE'S AMPLE REASON

15   WHY THE JURY COULD CONCLUDE THAT HE -- MR. HARDWICK -- IS

16   CHOOSING NOT TO QUESTION ASHA MAURYA ABOUT WHERE THE MONEY IS

17   COMING FROM, BECAUSE HE HAS TO KNOW THERE'S NOT ENOUGH

18   OPERATING TO COVER IT.  AND I THINK THE JURY COULD CONCLUDE

19   THAT HE PURPOSELY TRIED TO STAY IGNORANT AND NOT DIG INTO THE

20   DETAILS.

21          THE COURT:  DELIBERATE IGNORANCE.

22          MS. NOVAY:  DELIBERATE IGNORANCE --

23          THE COURT:  THANK YOU.

24          MS. NOVAY:  -- WHICH IS THE WHOLE ARGUMENT AS TO WHY

25   THE GOVERNMENT SAID THEY HAD TO HAVE THIS JURY INSTRUCTION,

1   BECAUSE THEY HAD TO COVER THAT BASE.

2          AND MS. BARRON VERY ADEQUATE -- NOT ADEQUATELY --

3   CORRECTLY SAYS THAT'S THEIR WHOLE DEFENSE, IS THAT HE HAD NO

4   IDEA.  THAT'S WHAT HE SAID ON THE STAND.

5          AND WHAT THEY'RE NOW SAYING IS, WITH THESE DIFFERENT

6   EXHIBITS -- AND, I'M SORRY, I CAN'T REMEMBER THE EXHIBIT NUMBER

7   THE GOVERNMENT JUST SHOWED -- WAS THAT HE DIDN'T SAY, THIS

8   HAPPENED AND THIS DIDN'T HAPPEN AND HE'S CONTROVERTING OR

9   DISAGREEING WITH MARK WITTSTADT'S TESTIMONY.

10          WHAT HE'S SAYING IS, THIS IS WHAT I WAS AWARE OF AT

11   THE TIME, THIS IS WHAT MS. MAURYA TOLD ME.

12          AND THE PROBLEM IS THE GOVERNMENT DIDN'T CALL

13   MS. MAURYA.  SHE DIDN'T COME TO THE STAND, AND SHE DIDN'T

14   DISPUTE HIS KNOWLEDGE OR WHAT HE SAID.

15          SO TO USE MR. WITTSTADT'S TESTIMONY ABOUT WHAT WAS ON

16   PAPER, MR. HARDWICK WASN'T TALKING ABOUT WHAT WAS ON PAPER.  HE

17   WAS SAYING, THIS IS WHAT I KNEW AT THE TIME, THIS IS WHAT

18   MS. MAURYA TOLD ME.  AND THAT WAS NOT DISAGREED WITH AT TRIAL.

19          SO -- BUT I DON'T WANT TO GET TOO FAR AFIELD, BECAUSE

20   I THINK THE WHOLE REASON THE GOVERNMENT SAID, WE HAVE TO HAVE

21   THIS INSTRUCTION, WE HAVE TO HAVE THE OSTRICH INSTRUCTION, THE

22   DELIBERATE IGNORANCE INSTRUCTION IS BECAUSE OF HOW MR. HARDWICK

23   TESTIFIED AND BECAUSE OF WHAT THEY SAID.

24          IF IT WASN'T SO IMPORTANT, THEN I DON'T UNDERSTAND

25   WHAT THE ARGUMENT IS NOW, BECAUSE I THINK THE GOVERNMENT,

223

1    RESPECTFULLY, IS TALKING OUT OF BOTH SIDES OF ITS MOUTH.

2    THAT'S THE VERY BASIS --

3            THE COURT:  THIS IS THE ARGUMENT MS. LOEB ARGUED

4    AGAINST HAVING IN THERE, IF I AM THINKING CORRECTLY.

5            MS. NOVAY:  YES.

6            THE COURT:  OKAY.

7            MS. NOVAY:  YES.  ABSOLUTELY.

8            THE COURT:  OKAY.

9            MS. NOVAY:  SO THAT'S THE BASIS, THAT'S THE WHOLE

10   BASIS FOR THE DEFENSE SAYING THAT THIS ISN'T NECESSARILY

11   OBSTRUCTION.  THIS ISN'T AN OBSTRUCTION-ENHANCEMENT TYPE CASE.

12   BECAUSE WHAT HE'S SAYING IS, I DIDN'T HAVE THAT INTENT, I

13   DIDN'T HAVE THAT INTENT.  AND THAT'S WHAT THE INSTRUCTION

14   COVERED.

15           SO, IN THEORY, THE JURY COULD HAVE AGREED AND

16   DISAGREED ON SOME LEVEL AND STILL FOUND HIM GUILTY BECAUSE OF

17   THAT VERY INSTRUCTION.

18           THE COURT:  OKAY.  WELL, ASIDE FROM WHETHER HIS

19   TESTIMONY CORRESPONDS WITH THE JURY'S FINDING, WHAT SAY YOU

20   WITH RESPECT TO -- AND PERHAPS YOU THINK YOU'VE ALREADY

21   ADDRESSED THIS -- TO THE SPECIFIC EXAMPLE JUST GIVEN BY

22   MS. BARRON, WHERE SHE'S SAYING, LOOK, OBVIOUSLY, HE JUST

23   CREATED THIS STUFF.  I MEAN, THIS STUFF IS JUST -- HE PULLED

24   OUT OF NOWHERE.  THIS ISN'T JUST DELIBERATE IGNORANCE.  HE WENT

25   OUT OF HIS WAY TO REFLECT DIFFERENT AMOUNTS THAN HE KNEW WERE

224

1    IN THESE ACCOUNTS THAT HE WAS BEING ASKED ABOUT.

2            MS. NOVAY:  YES.  AND I KIND OF ADDRESSED IT, BUT

3    I'LL ABSOLUTELY DO THAT IN MORE DETAIL.

4            THE ISSUE WITH RESPECT TO THE ACCOUNTS -- AND I'M

5    TALKING AGAIN WITH, HE'S SAYING, THIS IS WHAT I KNEW AT THE

6    TIME.  THE GOVERNMENT'S CHART REFLECTS WHAT THEY'RE SAYING WAS

7    AN ACTUALITY.  WHAT MY CLIENT TESTIFIED TO -- THEY'RE SAYING AN

8    ACTUALITY AS FAR AS WHAT THE ACTION CAPITAL WAS, WHAT THE CASH

9    WAS AVAILABLE BASED ON THEIR REVIEW OF THE EXHIBITS.

10            THE CHART THAT THE GOVERNMENT SHOWED YOU IS NOT A

11    CHART THAT WENT AROUND ALL OF MHS.  THIS IS A DEMONSTRATIVE

12    EXHIBIT THAT THE GOVERNMENT CREATED.

13            AND MY CLIENT WAS SAYING, NO, THIS CHART IS INCORRECT

14    OF MY KNOWLEDGE.  THIS IS WHAT I KNEW.  AND WHAT MY CLIENT WAS

15    SAYING WAS, THIS WAS MY KNOWLEDGE AT THE TIME.  THIS IS WHAT I

16    BELIEVED TO BE THE CASE AT THE TIME.  AND THESE WERE THE

17    NUMBERS THAT BETTER REFLECT MY KNOWLEDGE AT THE TIME, BASED ON

18    THE DISCOVERY THAT'S GIVEN OVER TO THE DEFENSE BY THE

19    GOVERNMENT.

20            THE COURT:  ALL RIGHT.  THANK YOU.

21            MS. NOVAY:  THANK YOU.

22            MR. GARLAND:  IF I COULD.

23            THE COURT:  VERY BRIEFLY.

24            MR. GARLAND:  THE DOCUMENT REFLECTS, ON ITS FACE,

25    THOSE ENTRIES.  WHAT HE SAID WAS, THIS IS WHAT I WAS TOLD BY

225

1   ASHA, THAT THERE WAS AVAILABLE DISTRIBUTABLE CASH.  THERE IS NO

2   PROOF THAT ASHA DIDN'T SAY THAT TO HIM.  THERE'S NO PROOF THAT

3   ANY OF THAT IS FALSE.  THERE'S NO SPECIFIC EVIDENCE THAT ONE

4   WORD HE SAID ABOUT THAT IS FALSE.

5           ALL YOU HAVE IS HIM SAYING, SHE TOLD ME THAT THERE

6   WAS AVAILABLE CASH.  SHE SHOWED ME THESE DOCUMENTS.  WE WENT

7   OVER THE DOCUMENTS.  THE DOCUMENTS WERE IN EVIDENCE.  NOTHING

8   MANUFACTURED.  THEY'RE THERE; YOU JUST HAD TO ADD AND SUBTRACT.

9   DISTRIBUTABLE CASH WAS ALWAYS THERE.  THIS WAS THE DEFINITION

10  OF DISTRIBUTABLE CASH.  THAT'S WHAT I WAS TOLD.

11          THERE'S NO PROOF THAT HE WASN'T TOLD THAT.  SO IT IS

12  NOTHING MORE THAN HIM SAYING, I HAD NO INTENT.

13          AND WHAT IT REALLY DOES, WHENEVER YOU CUT THE -- IF A

14  PERSON SAYS, I'M NOT GUILTY, I'M NOT GUILTY, I DIDN'T HAVE AN

15  INTENT TO DEFRAUD, IT WOULD -- I DON'T BELIEVE IT WAS EVER

16  TRULY INTENDED THAT YOU WOULD MAKE IT WHERE SOMEONE COULD NOT

17  DENY INTENT AND THEN GIVE THE CHARGE SAYING, YOU CAN FIND HIM

18  GUILTY, HE SHOULD HAVE KNOWN.

19          THE COURT:  ALL RIGHT.

20          MR. GARLAND:  WE'D ASK YOU NOT TO --

21          THE COURT:  WELL, I ACKNOWLEDGE THE 11TH CIRCUIT MAY

22  ALLOW THIS ENHANCEMENT JUST FOR THE REASONS STATED AND THAT IF

23  THE DEFENDANT WAS NOT TRUTHFUL IN HIS TESTIMONY.  I AM NOT

24  GOING TO APPLY IT WITHOUT A FINDING THAT A DEFENDANT WENT

25  FARTHER AND BEYOND JUST ANSWERING QUESTIONS THAT SUPPORT HIS

1    NOT GUILTY PLEA AND THAT HE WENT TO TRIAL ABSENT SOME SHOWING

2    TO ME THAT HE CONJURED UP SOME KIND OF EVIDENCE MORE IN LINE

3    WITH WHAT I THINK OF AS OBSTRUCTION.

4            PERHAPS THIS MEETS THE FOUR-PRONG TEST THAT

5    MR. PHILLIPS SET FORTH.  PERHAPS IT DOES.

6            I DO NOT FIND THAT, UNDER WHAT'S BEEN PRESENTED TO

7    THE COURT, THAT THE TWO-LEVEL ENHANCEMENT FOR OBSTRUCTION, ON

8    WHAT'S BEEN PRESENTED TO THE COURT, IS WARRANTED.  SO I WILL

9    SUSTAIN THAT OBJECTION.

10           SO, AGAIN, THE RULINGS ARE AS FOLLOWS:

11           I HAVE SUSTAINED THE OBJECTION TO THE 20-LEVEL

12   ENHANCEMENT FOR LOSS AMOUNT, BUT I HAVE FACTORED IN AN 18-LEVEL

13   ENHANCEMENT FOR LOSS AMOUNT BASED ON THE AMOUNTS SET FORTH IN

14   THE INDICTMENT.

15           I HAVE OVERRULED THE DEFENDANT'S OBJECTION WITH

16   RESPECT TO FINANCIAL HARDSHIP, WITHOUT ATTACHING IT TO A

17   SPECIFIC LOSS AMOUNT ESTABLISHED HERE BUT JUST FINDING THAT

18   THERE WAS ENOUGH OF -- ENOUGH HARM DONE TO THE REPUTATION OF

19   MHS AND CLIENTS LOST THAT THAT DID SUBSEQUENTLY LEAD TO

20   FINANCIAL HARDSHIP, ESPECIALLY WITH RESPECT TO THE WITTSTADTS,

21   IS WHERE I'M APPLYING THAT ENHANCEMENT.

22           I HAVE SUSTAINED IN PART AND OVERRULED IN PART THE

23   OBJECTION WITH RESPECT TO MR. HARDWICK BEING AN ORGANIZER, AND

24   I HAVE LEFT IN A TWO-LEVEL, NOT A FOUR-LEVEL ENHANCEMENT.

25           AND I HAVE SUSTAINED THE DEFENSE'S OBJECTION WITH

1    RESPECT TO OBSTRUCTION OF JUSTICE.

2            BY MY CALCULATIONS, THAT LEADS TO AN ADJUSTED OFFENSE

3    LEVEL OF 31.

4            SO LET ME HEAR FROM ANYONE IF YOU HAVE DIFFERENTLY.

5            OTHER THAN THOSE SPECIFIC RULINGS, I DO ADOPT THE

6    FACTUAL FINDINGS AND THE CALCULATIONS AS SET FORTH IN THE

7    PRESENTENCE REPORT.

8            SO WITH THE 31 AS THE ADJUSTED OFFENSE LEVEL, STILL

9    CATEGORY I OF CRIMINAL HISTORY, THAT IS AN ADVISORY GUIDELINE

10   RANGE AT THIS POINT OF 108 TO 135 MONTHS, IS WHAT I COME UP

11   WITH.

12           IS THERE ANYTHING ELSE BEFORE WE PROCEED TO

13   REASONABLE SENTENCE?

14           GOVERNMENT?

15           MR. PHILLIPS:  WE DON'T HAVE ANYTHING ELSE TO

16   PRESENT.

17           THE COURT:  DEFENSE?

18           MS. NOVAY:  I THINK WE HAVE TO OBJECT IN ORDER TO

19   PRESERVE OUR ISSUES.

20           THE COURT:  YOU CAN NOW.  I'LL ALSO GIVE AN

21   OPPORTUNITY TO AT THE END OF THE HEARING, BUT EITHER WAY IS

22   FINE.

23           MS. NOVAY:  I'LL DO IT NOW WHILE IT'S STILL FRESH IN

24   MY MIND.

25           THE COURT:  OKAY.  GO AHEAD.  ANYTHING ELSE YOU WANT

1   TO SAY OR JUST TO PRESERVE, GO AHEAD.

2           MS. NOVAY:  JUST TO PRESERVE.

3           THE COURT:  ALL RIGHT.

4           MR. PHILLIPS:  WOULD YOU LIKE US TO DO THE SAME?

5           THE COURT:  IF YOU WANT.  AGAIN, I WILL OFFER YOU

6   THIS AT THE END, BUT YOU MAY DO IT AS YOU FEEL COMFORTABLE.  IF

7   YOU'D LIKE TO NOW, TOO, THAT'S FINE.

8           MR. PHILLIPS:  JUST TO BE SAFE, WE OBJECT TO THE

9   COURT'S FINDINGS CONCERNING EACH OF THE ENHANCEMENTS THAT THE

10  COURT DID NOT APPLY OR DID NOT APPLY IN FULL; SPECIFICALLY, THE

11  LOSS AMOUNT, REDUCING THAT FROM A 20 TO AN 18; THE ROLE IN THE

12  OFFENSE, REDUCING THAT FROM FOUR TO TWO; AND NOT GIVING THE

13  ADJUSTMENT OF A TWO-POINT ADJUSTMENT FOR OBSTRUCTION.

14          THE COURT:  SO NOTED.  THANK YOU.

15          OKAY.  LET'S MOVE TO REASONABLE SENTENCE PURSUANT TO

16  18 U.S.C. SECTION 3553(A).  I WILL NOTE THAT THIS IS VERY

17  OBVIOUS, THAT IN ADDITION TO PRESIDING OVER THE HEARINGS ON THE

18  PRETRIAL MOTIONS AS WELL AS THE JURY TRIAL ITSELF, SO I HAVE

19  HAD THE BENEFIT OF HEARING ALL OF THAT EVIDENCE PRESENTED, I

20  HAVE REVIEWED THE FOLLOWING -- SOME OF THIS STUFF WE'VE GOTTEN

21  INTO ALREADY:  BUT A SENTENCING MEMORANDUM SUBMITTED BY THE

22  DEFENSE ATTORNEYS ON BEHALF OF MR. HARDWICK; THE GOVERNMENT

23  SENTENCING MEMO; THE DEFENSE 'S RESPONSE TO THE GOVERNMENT'S

24  SENTENCING MEMO; THE E-MAIL FROM MARK WITTSTADT SETTING FORTH

25  DAMAGES, ALONG WITH AN ACQUISITION AGREEMENT OF -- BETWEEN MHS

229

1    AND THE WITTSTADTS.

2              THERE WAS ALSO A SUPPLEMENT TO MR. HARDWICK'S

3    SENTENCING MEMO, INCLUDING MANY CHARACTER LETTERS WRITTEN IN

4    SUPPORT OF HIM.

5              THERE WAS ALSO A LETTER FROM A HEATHER HOHLER, WHO

6    IDENTIFIES HERSELF -- AND THAT, FOR THE RECORD, IS

7    H-O-H-L-E-R -- WHO IDENTIFIES HERSELF AS MR. HARDWICK'S

8    EX-FIANCÉE AND MOTHER OF HIS CHILD AND WHO DISPUTES WHETHER HE

9    HAS A RELATIONSHIP WITH HIS DAUGHTER OR HAS SEEN HER SINCE SHE

10   WAS A BABY, WHICH SEEMINGLY MIGHT CONFLICT WITH SOME OF THE

11   REASONS HE HAS CITED FOR NEEDING A SHORTER OR LIGHTER SENTENCE.

12             SO WITH THAT BEING SAID, I AM READY TO HEAR FROM ANY

13   WITNESSES OR ANY OTHER CHARACTER STATEMENTS OR ANYTHING THAT

14   EITHER SIDE WANTS TO PRESENT.

15             AND I WILL START WITH THE GOVERNMENT.

16             MR. PHILLIPS:  YOUR HONOR, I THINK THERE ARE A NUMBER

17   OF VICTIMS HERE TODAY WHO WOULD LIKE TO BE HEARD.  SO, FIRST,

18   I'LL ASK MARK WITTSTADT TO COME UP.

19             THE COURT:  ALL RIGHT.  AND WHAT I WOULD LIKE TO DO

20   AT THIS POINT IS DO THIS MORE IN THE FORM OF STATEMENTS.

21   HOWEVER, IF EITHER SIDE FEELS YOU NEED TO QUESTION ANYBODY, LET

22   ME KNOW; WE'LL CHANGE UP THE FORMAT AND HAVE THEM GO TO THE

23   WITNESS STAND AND SWEAR THEM IN.

24             BUT FOR NOW, LET'S GO AHEAD AND JUST HAVE IT FROM THE

25   PODIUM AS STATEMENTS.

1          GOOD AFTERNOON.

2          MR. MARK WITTSTADT:  GOOD AFTERNOON, YOUR HONOR.

3    NICE TO SEE YOU AGAIN.

4          THE COURT:  THANK YOU, SIR.

5          MR. MARK WITTSTADT:  THIS ORDEAL HAS BEEN MORE TRYING

6    ON MY BROTHER AND MYSELF THAN YOU CAN POSSIBLY IMAGINE.

7          I WANT TO START WITH MR. GARLAND THIS MORNING,

8    WHAT -- THE WAY THAT -- THIS AFTERNOON, WHEN HE BASICALLY SAID

9    THAT WE SHOULD HAVE COVERED THIS UP.  MS. VELCHECK GETS ON THE

10   STAND, SAYS I SHOULD HAVE KEPT MR. HARDWICK AND LOCKED HIM IN A

11   BROOM CLOSET AND PAID HIM $50,000 AND NOT TOLD A SOUL.

12         I WAS RAISED IN THE PRACTICE OF LAW.  I GRADUATED LAW

13   SCHOOL.  I TOOK AN OATH BEFORE THE COURT UP IN MARYLAND, THE

14   COURT OF APPEALS, THE UNITED STATES DISTRICT COURT.  THE RULES

15   OF PROFESSIONAL CONDUCT REQUIRED, WHEN I FOUND THAT THERE WAS

16   THIS AMOUNT OF MONEY MISSING FROM THIS ESCROW ACCOUNT, TO

17   LAUNCH AN INVESTIGATION.

18         AND I WAS VERY -- I HAD MY SERIOUS SUSPICIONS OF

19   MR. HARDWICK IN THE VERY BEGINNING, BUT I DID NOT WANT TO MAKE

20   THOSE TYPE OF ALLEGATIONS AGAINST ANOTHER ATTORNEY UNTIL I HAD

21   AT LEAST HAD THE CHANCE TO HAVE IT INVESTIGATED.

22         WE SPENT TWO WEEKS.  DURING THAT ENTIRE TIME, THIS

23   MAN LIED TO ME.  HE BOLDFACED LIED TO ME.  KEPT TELLING ME HOW

24   SORRY HE WAS.  HE DIDN'T KNOW.  ASHA DUPED HIM.  HE NEVER KNEW

25   THAT MONEY WAS MISSING -- WAS TAKEN OUT OF THE ESCROW ACCOUNT.

231

1    HE TOLD THAT TO ME IN A TEXT, AND HE BOLDFACED LIED.  HE KNEW.

2              FORGET ABOUT EVERYTHING ELSE.  HE'S TOLD YOU NOW THAT

3    HE KNEW THAT $400,000 WAS WIRED FROM THE ESCROW ACCOUNT OF THE

4    LAW FIRM IN JUNE.  AND DID HE TELL ME?  NO, HE DID NOT.

5    BECAUSE IF HE WOULD HAVE TOLD ME IN JUNE OF 2014, HE KNOWS DARN

6    WELL THAT I WOULD HAVE BEEN IN ATLANTA INVESTIGATING IT, NOT

7    PUTTING IT INTO HIS HANDS.

8              I LATER FIND OUT THAT MS. MEINHARDT CONFRONTS HIM

9    WITH THE MILLION DOLLARS THAT'S MISSING IN A FORGED BANK

10   STATEMENT BEFORE HE STEALS $700,000 OF MY -- OF OUR MONEY AND

11   FLIES A PERSONAL BUSINESS JET WITH HIS FRIENDS AND HIS FATHER

12   TO LONDON AND TO SCOTLAND AND PAYS FOR ALL THAT OFF OF THE

13   MONEY THAT WE MADE.

14             THEN HE SAYS, OH, ASHA MOVED MONEY FROM THE --

15   INADVERTENTLY MOVES IT FROM THE ESCROW ACCOUNT TO THE OPERATING

16   ACCOUNT, SO I INSTRUCTED HER TO MOVE THAT BACK.

17             WELL, MEANWHILE, HE HAD TAKEN A MILLION DOLLARS FROM

18   OUR OPERATING ACCOUNT BETWEEN JULY 1 AND JULY 17 FROM THE TIME

19   THAT HE LEFT.  THAT WAS MY MONEY.  THAT WAS MY BROTHER'S MONEY.

20   THAT WASN'T CLIENT MONEY.  THAT WAS MINE THAT HE TOOK.

21             AND THEN HE TOOK $700,000 OF MY MONEY AND TRIED TO

22   TELL THE WORLD THAT IT WAS, OH, SHE MOVED IT FROM THE ESCROW

23   ACCOUNT TO THE OPERATING ACCOUNT, AND I HAD HER MOVE IT BACK.

24   THAT'S ANOTHER $700,000 THAT HE STOLE AND LIED TO ME ABOUT.

25   LIED.

232

1      FOR ONE -- BUT MR. GARLAND STANDS UP HERE AND HE

2   TELLS ME THAT I -- THAT WE KILLED THE GOLDEN GOOSE.

3      WELL, NO, I'M SORRY.  HE KILLED THE GOLDEN GOOSE.  I

4   AND MY BROTHER GENERATED SIGNIFICANT AMOUNTS OF MONEY AND BUILT

5   OUR LAW CAREERS AROUND THIS.  AND HE DESTROYED IT.  EVERY BIT

6   OF IT.

7      HE STOOD UP HERE AND TOLD YOU THAT WE HAD, WE HAD THE

8   AUDACITY TO DEFEND OURSELVES AGAINST THE LIES THAT HE DID, THE

9   LIES THAT HE TOLD TO MR. JOHNSON, AND THEN USED MR. JOHNSON'S

10  CELEBRITY TO SLAM US.

11     IT HAS NOT COME OUT YET, BUT THE -- VERY FEW PEOPLE

12  KNOW THIS.  MR. JOHNSON FILED A LAWSUIT.  HE WAS VERY GOOD

13  FRIENDS WITH -- THERE IS NO LOAN DOCUMENTS FOR MR. JOHNSON.

14  NONE.  NONE.

15     HE FILED A LAWSUIT ON OCTOBER 28TH.  TWO DAYS LATER,

16  MR. HARDWICK PLAYS GOLF WITH DUSTIN JOHNSON.  HE CALLS MYSELF,

17  MY BROTHER, AND MR. HARDWICK LIARS, THIEVES, AND CROOKS IN THE

18  FIRST LAWSUIT.  TWO DAYS LATER, MR. HARDWICK PLAYS GOLF WITH

19  MR. JOHNSON AT THE BEARS CLUB IN FLORIDA.

20     MIRACULOUSLY, THREE DAYS LATER, THERE'S A BRAND NEW

21  THEORY.  THE THEORY IS MR. HARDWICK IS AN INNOCENT PAWN OF THE

22  CONSPIRACY OF MY BROTHER AND I TO STEAL MR. JOHNSON'S MONEY.  I

23  FOUGHT WITH THAT.  AND MR. GARLAND SAYS THAT I SHOULDN'T HAVE

24  DONE ANYTHING.  I SHOULD HAVE SUCKED IT UP AND COVERED

25  $37 MILLION.

1           THE COURT:  MR. WITTSTADT --

2           MR. MARK WITTSTADT:  WHERE AM I GETTING $37 MILLION

3  FROM?  I DON'T HAVE THAT KIND OF MONEY.

4           THIS ACCOUNTANT STANDS -- GETS ON THE STAND AND SAYS

5  I MADE $12 MILLION DURING THAT THREE-YEAR PERIOD OF TIME.  I

6  WISH I MADE $12 MILLION.  BUT IF I WOULD HAVE GOTTEN

7  $12 MILLION DURING THAT TIME, OR MY BROTHER WOULD HAVE GOTTEN

8  $12 MILLION, I WOULD BE SITTING RIGHT NEXT TO MR. HARDWICK.

9           I DID NOT TAKE ANY MONEY.  AND WHEN I FOUND THIS OUT,

10  I DID EVERYTHING I COULD DO TO TRY TO SAVE THIS LAW FIRM.

11           BUT WE DEAL WITH BANKS, AND WE DEAL WITH THE PUBLIC.

12  AND WE ARE ATTORNEYS.  AND THE ONLY THING THAT WE HAVE IS OUR

13  ABILITIES.  OUR STOCK IN TRADE IS OUR WORD AND OUR TRUST TO OUR

14  CLIENTS.  AND WHEN THEY FOUND OUT THAT THE NAMED PARTNER OF

15  THIS LAW FIRM HAD TAKEN THAT KIND OF MONEY, I'M SURPRISED WE

16  WERE ABLE TO STAY AFLOAT FOR A YEAR.  I DID EVERYTHING I COULD

17  TO GET THAT DONE.

18           I AM 53 YEARS OLD.  I HAVE GRADUATED FROM LAW SCHOOL

19  IN 1991.  I HAVE TWO DAUGHTERS, AND I'M MARRIED.  I HAVE ONE

20  DAUGHTER AND ONE SON.  I WORKED FOR A JUDGE IN BALTIMORE COUNTY

21  DURING LAW SCHOOL, TAUGHT ME HOW TO PRACTICE LAW.  MY FATHER

22  WAS A JUDGE IN BALTIMORE COUNTY.  HE TAUGHT ME THE HONOR OF

23  BEING A LAWYER.

24           I HAVE FOUGHT FOR FOUR YEARS FOR THE REPUTATION, THE

25  REPUTATIONAL DAMAGE THAT MR. HARDWICK CAUSED TO ME, MY FAMILY,

234

MY FRIENDS, MY CLIENTS.  I'VE LOST ALL OF MY CLIENTS.  I LOST

MY ENTIRE LAW FIRM.  MY SIDE OF THE BUSINESS HAD OVER

700 EMPLOYEES.  THEY ALL LOST THEIR JOB, ALL OF THEM, BECAUSE

OF HIM.

IN 2008, I MADE A DEAL WITH MR. HARDWICK.  AND YOU'VE

SEEN THE DEAL.  I'VE SENT IT TO YOU.  MR. HARDWICK -- WE HAD

EXTENSIVE CONVERSATIONS ABOUT WHAT IT WOULD MEAN TO JOIN THAT

FIRM, WHAT IT WOULD BE TO BE PART OF A BIGGER FIRM SO THAT WE

COULD EXPAND OUR BUSINESS AND EXPAND IT AND MAKE THIS LAW FIRM

SOMETHING TO BE PROUD OF.

I TOLD MR. HARDWICK, I SAID, LOOK, DON'T WANT -- I'M

REALLY A STICKLER FOR THE WAY THINGS RUN.  WE RUN EVERYTHING

PERFECTLY.  WHAT HAPPENS IF IT GOES BAD?  MY LAW FIRM -- HE

SAYS, IT'S NOT.  AND I SAID, WELL, MY LAW FIRM I BELIEVE IS

WORTH $6 MILLION.  I BELIEVE IT IS, TOO.  AND WE HAVE PUT THAT

INTO MY AGREEMENTS.

AS FAR AS I'M CONCERNED, THAT IS THE MINIMUM AMOUNT

OF MONEY THAT HE OWES ME.  I WILL NEVER SEE IT.

AND IF HE GETS OUT OF THIS, IF -- I JUST CALCULATED.

WHEN YOU GET 135 MONTHS, IF HE GETS 11 AND A HALF YEARS AND

HE'S OUT IN TEN, I GUARANTEE YOU HE WILL FIND SOMEBODY ELSE TO

DO THIS AGAIN TO.  HE IS A LIAR AND A THIEF.  NOW, YOU CANNOT

BELIEVE ONE WORD THAT COMES OUT OF THAT MAN'S MOUTH.

2014, MY LIFE WAS RUINED.  I LOST MY BUSINESS.  I

LOST MY LAW FIRM.  I SPENT TWO YEARS GOING THROUGH A

1    BANKRUPTCY, HAVING EVERYBODY COME AFTER ME.  EVERYONE.  BEEN

2    INVOLVED IN MULTIPLE LAWSUITS.  INCURRED THOUSANDS AND

3    THOUSANDS OF DOLLARS IN ATTORNEY'S FEES.  THE AMOUNTS OF

4    MONEY -- BUT ONE THING I DID MAKE SURE, ONE THING I DID DO WAS

5    WHEN I MADE THE DEAL WITH FIDELITY, WE MADE SURE THAT NOT ONE

6    CLIENT LOST THEIR MONEY.  I LOST.  MY BROTHER ROD LOST.  BUT

7    NONE OF OUR CLIENTS LOST MONEY, BECAUSE WE COVERED IT.  I

8    COVERED IT.  MY BROTHER ROD COVERED IT.

9         I'VE TALKED TO YOU ABOUT MR. JOHNSON.  I BELIEVE THAT

10   MR. HARDWICK LEVERAGED HIS RELATIONSHIP WITH HIM IN AN EFFORT

11   TO TRY TO DESTROY ME, BECAUSE HE KNEW THAT I WAS THE ONLY ONE

12   THAT COULD FIGURE OUT THIS MESS AND FIGURE OUT WHAT HE DID.

13   AND IF HE COULD DIRTY ME UP, THAT -- AND HE COULD ATTACK MY

14   CREDIBILITY, THAT I WOULD NOT BE CONVINCING.  I DID NOT ALLOW

15   HIM TO DO THAT.

16        MR. HARDWICK HAS THE ABILITY TO CONVINCE PEOPLE THAT

17   HE DIDN'T DO ANYTHING.  HE CONVINCED MR. JOHNSON.  WELL, LET ME

18   TELL YOU WHAT ELSE HE DID.  HE CONVINCED MR. JOHNSON SO MUCH

19   THAT HE WAS CONVICTED ON OCTOBER 13TH; ON OCTOBER 14TH, MY WIFE

20   AND I START RECEIVING NUMEROUS ANONYMOUS PHONE CALLS.

21        FINALLY, ON SUNDAY, MY WIFE ANSWERS THE PHONE ON HER

22   CELL PHONE AND SOMEBODY STARTS YELLING AT HER, TELLING HER WHAT

23   A HORRIBLE PERSON I AM, THAT -- HOW I HAVE BEEN DOING THIS TO

24   PEOPLE, AND THAT THEY ARE GOING TO COME AND GET US.

25        I HAD TO CALL THE POLICE.  THE FBI INVESTIGATED.  WHO

236

1    WAS IT?  IT WAS MR. JOHNSON'S CHILDHOOD FRIEND.  MR. DUSTIN

2    JOHNSON'S CHILDHOOD FRIEND, THAT HE HAS KNOWN SINCE HE WAS A

3    BABY AND HAS STOOD AT HIS WEDDING, IS THE INDIVIDUAL THAT

4    CALLED AND THREATENED MY LIFE AND MY FAMILY, BECAUSE HE HAS

5    CONVINCED THESE PEOPLE THAT HE HAS DONE NO WRONG AND THAT I AND

6    MY BROTHER ARE RESPONSIBLE FOR THIS.

7         I HAVE COUNTLESSLY HAD TO EXPLAIN TO CLIENTS AND TO

8    MY FRIENDS, HOW DID I NOT KNOW, HOW DID I LET THIS HAPPEN.

9    BASICALLY, WHAT MR. GARLAND SAYS HAPPENED.

10        I TAKE OFFENSE TO MR. GARLAND AND THE WAY THEY HAVE

11   DEFENDED THIS LAWSUIT -- THIS CASE AND DEFENDED IN THE DUSTIN

12   JOHNSON MATTER, IN THE CASE THAT FIDELITY HAS BROUGHT AGAINST

13   MR. -- TO LAY THE BLAME NOT WHERE IT BELONGS BUT UPON MYSELF,

14   TO BLAME ME AND MY BROTHER.  I TAKE SERIOUS OFFENSE TO THAT.

15        I ALSO TAKE OFFENSE TO THE FACT THAT TODAY

16   MR. HARDWICK STANDS HERE AND ASKS YOU -- ASKS -- HAD THE NERVE

17   TO ASK YOU TO GIVE HIM CREDIT FOR THE $5 MILLION THAT HE

18   BORROWED FROM MR. PRITCHARD AND MR. JOHNSON, SAYING THAT HE

19   BORROWED THE MONEY.

20        BUT LET ME TELL YOU:  NOT ONCE, NOT ONE TIME IN THE

21   LAWSUITS THAT I WAS INVOLVED WITH, NOT ONCE DID MR. HARDWICK

22   STAND UP AND SAY, YOU KNOW WHAT, YOUR THEORIES ARE WRONG, I

23   BORROWED THE MONEY.  I DIDN'T HAVE AUTHORITY TO BIND THE FIRM,

24   AND I'M SORRY I DID THAT.  I BORROWED THE MONEY.  I WILL PAY

25   YOU BACK.  NEVER ONCE DURING THAT TIME DID HE DO IT.

237

1          BUT HE STANDS HERE TODAY AND ASKS -- AND HAD THE

2     AUDACITY TO ASK YOU TO GIVE HIM CREDIT FOR THAT.  I TOOK --

3     I -- THAT, I DON'T EVEN UNDERSTAND.

4          AS A RESULT OF MR. HARDWICK'S ACTIONS, THIS FIRM WENT

5     INTO BANKRUPTCY.  I DON'T THINK -- I DON'T KNOW HOW ANYBODY

6     COULD THINK OTHERWISE.

7          YOU HAVE -- THEY'VE COUNTED THE MONEY.  FIDELITY PUT

8     30 MILLION IN; 6.4 MILLION WENT IN BEFORE THAT; $700,000 WENT

9     IN BEFORE THAT.  IT WAS OVER $38 MILLION MISSING.  WE HAVE A

10    CHARGED PERIOD DURING THIS PERIOD.  I'VE DONE EXTENSIVE

11    INVESTIGATION INTO WHERE THAT MONEY WENT.  PLEASE DO NOT THINK

12    FOR ONE MINUTE THAT THAT IS ALL THAT MR. HARDWICK HAS DONE.

13         MS. NOVAY STOOD UP HERE AND SAID THERE WASN'T ANY

14    LOSS.  AND I THANK YOU, JUDGE, FOR SAYING THAT MY BROTHER AND I

15    DID.

16         I USED TO MAKE A LOT OF MONEY, SIGNIFICANT AMOUNT OF

17    MONEY.  I DON'T ANYMORE.  I HAVE STRUGGLED TO GET MY BUSINESS

18    BACK.  STRUGGLED.  I AM HAVING A HARD TIME PAYING FOR MY

19    DAUGHTER'S TUITION AT UNIVERSITY OF MARYLAND.  I HAVE A TUITION

20    BILL DUE NEXT MONTH.  I DON'T KNOW WHERE I'M GOING TO GET THE

21    MONEY TO PAY FOR IT.  I'LL FIGURE IT OUT.  I'LL WORK HARD AND

22    DO IT.  BUT I SHOULDN'T HAVE TO BE.

23         I'VE HAD TO SELL EVERYTHING THAT I OWNED EXCEPT FOR

24    MY HOME, EVERYTHING, IN ORDER TO COLLAPSE EXPENSES AND TO COME

25    BACK.

1          AS I SAID, THIS WAS PROBABLY THE WORST TIME IN MY

2     LIFE, OTHER THAN A TIME YEARS AGO WHEN I HAD SOME PERSONAL

3     ISSUES WITH SOME CHILDREN THAT I HAD.  BUT BUSINESS-WISE, THIS

4     AND ANYTHING ELSE PERSONALLY, WHAT MR. HARDWICK DID IS

5     UNFORGIVABLE.

6          PARTNERS IN A LAW FIRM ARE SUPPOSED TO BE THAT.  HE

7     DID NOT TREAT ME LIKE ONE.  I DID HIM.  HE TOOK ADVANTAGE OF

8     ME.  I DID NOT TAKE ADVANTAGE OF HIM.

9          THE ACCOUNTANT WANTS TO SAY THAT HE WANTED TO EXAMINE

10    WHETHER WE TOOK MONEY AND HAD THINGS PAID FOR OUT OF THE

11    ACCOUNTS IN BALTIMORE.  DID NOT HAPPEN.  WE RECEIVED A PAYCHECK

12    AND THEN WE RECEIVED OUR DISTRIBUTION CHECKS THAT WERE EXACTLY

13    THE WAY THEY WERE LINED OUT.

14          IF IT WASN'T FOR FIDELITY STEPPING IN, IF IT WASN'T

15    FOR FIDELITY TO STEP IN IN THAT PHONE CALL, THE CATASTROPHIC

16    EVENTS THAT WOULD HAVE OCCURRED IN THE REAL ESTATE COMMUNITY IN

17    THIS TOWN WOULD HAVE BEEN UNSURMOUNTABLE; $35 MILLION WOULD

18    HAVE TURNED INTO $350 MILLION OVERNIGHT.

19          PAYOFF STATEMENTS, PAYOFFS WOULD NOT HAVE GONE.

20    BUYER -- SELLERS THAT WERE SELLING THEIR HOUSE TO BUY THEIR

21    NEXT HOME WOULD NOT HAVE GOTTEN A CHECK.  INSURANCE POLICIES

22    WOULD NOT HAVE BEEN PAID.  TAXES TO THE CITY OF ATLANTA AND TO

23    THE STATE OF GEORGIA WOULD NOT HAVE BEEN PAID.  PEOPLE WOULD

24    HAVE BEEN FORECLOSED UPON.  TAX SALES -- IF IT HADN'T BEEN FOR

25    THESE FOLKS AT FIDELITY STEPPING IN AND DOING THE RIGHT THING

1   AND HELPING US AND TRYING EVERY WHICH WAY THEY COULD TO HELP

2   US, IT WOULD HAVE BEEN, IT WOULD HAVE BEEN THE WORST THING.

3   AND I DON'T EVEN LIVE HERE, AND I HAD THAT MUCH CONCERN FOR

4   THIS STATE AND THIS CITY TO TRY TO MAKE IT BETTER.

5            AND ALL I DID THE WHOLE TIME WAS TRY TO MAKE IT

6   BETTER.  AND ALL I GOT FROM THIS SIDE OF THE ROOM FOR THE LAST

7   FOUR YEARS, BETWEEN MR. HARDWICK AND ALL OF HIS FRIENDS, WAS

8   CONSTANT BLAME THAT IT WAS ALL MY FAULT.  I -- I TAKE SERIOUS

9   EXCEPTION TO THAT.

10           I WANT TO MOVE ON WITH MY LIFE.  BUT I TELL YOU, YOUR

11  HONOR, I TELL YOU TODAY, THAT IF MR. HARDWICK ONLY GOES TO JAIL

12  FOR 11 YEARS AND HE IS OUT BY THE TIME HE IS 63, HE WILL FIND A

13  WAY, HE WILL FIND A WAY TO MAKE SOMEONE ELSE SUFFER, BECAUSE HE

14  JUST HAS NO MORALS.

15           THANK YOU.

16           THE COURT:  THANK YOU, MR. WITTSTADT.

17           AND, GOVERNMENT, GIVE ME AN IDEA OF HOW MANY VICTIMS

18  THE COURT WILL HEAR FROM TODAY.

19           MR. PHILLIPS:  WE'VE GOT TWO MORE, ROD WITTSTADT, AND

20  DAVID BAUM FROM FIDELITY, AS WELL AS MR. MORRIS.  THAT'S THREE

21  PEOPLE.

22           THE COURT:  THANK YOU.

23           MR. MORRIS:  BE SHORT, YOUR HONOR.

24           THE COURT:  GOOD AFTERNOON.

25           MR. MORRIS:  WELL, FIRST OF ALL, THIS THING OF

1    OVER-DISBURSED, THERE'S NO SUCH THING AS OVER-DISBURSED.  I

2    DON'T WANT TO REPEAT WHAT EVERYBODY ELSE IS GOING TO SAY.

3            I, AS A BUSINESS PERSON, NAT AS MY PARTNER, MARK AND

4    RODDY, WE KNOW EVERY SINGLE MONTH, BASED ON THE AMOUNT OF

5    TRANSACTIONS, APPROXIMATELY WHAT OUR NET INCOME IS GOING TO BE,

6    PROBABLY WITHIN $50,000.

7            I KNOW THAT IF WE DID 3,000 FORECLOSURES, FOR

8    EXAMPLE, AND 2500 CLOSINGS, WE KNOW WHAT THE MONEY IS.  AND IF

9    THE PROFIT'S SOMEWHERE IN -- IS FIVE, SIX HUNDRED THOUSAND, AND

10   NAT TAKES A MILLION AND A HALF -- IF I TOOK A MILLION AND A

11   HALF, I WOULD SAY, WHY DO I WANT TO TAKE A MILLION AND A HALF,

12   BECAUSE IT'S GOING TO COME OUT OF THE NEXT MONTH'S.  SOMEHOW OR

13   ANOTHER, IT'S GOING TO COME OUT NEXT MONTH.  IT DOESN'T MAKE

14   ANY SENSE.

15           THIS MAN KNOWS.  HE'S NOT A STUPID GUY.  HE'S A VERY

16   SMART, TALENTED MAN.  BUT HE'S GOT A PROBLEM.  HE'S OBVIOUSLY

17   GREEDY AND TOOK MONEY THAT DIDN'T BELONG TO HIM.

18           AND WHAT HE DID -- WHETHER IT'S 15 MILLION,

19   20 MILLION -- HE BROUGHT DOWN 800 PEOPLE.

20           I WAS IN BUSINESS 46 YEARS.  AND IN TWO AND A HALF

21   YEARS, OR WHATEVER HE DID IT, HE TOOK DOWN THE FIRM.  MY WHOLE

22   LIFE.  YOU GOOGLE MY NAME, ALL YOU SEE IS NAT HARDWICK,

23   26 BILLION -- MILLION.

24           I TRIED TO SAVE THE FIRM.  YES, I DID SUFFER.  I PUT

25   THE MILLION AND A HALF IN.  I SIGNED NOTES TO FIDELITY.  IT

241

1   PROBABLY COST ME ABOUT $4 MILLION.  AND, OF COURSE, I GOT

2   DIVORCED AT THE SAME TIME, BUT THAT WAS A GOOD POINT.

3           YOU KNOW I HAVE TO GET A JOKE IN SOMEWHERE.  I KNOW.

4           THE COURT:  THAT'S IT.  THAT'S YOUR ONE.

5           MR. MORRIS:  THAT'S MY ONE.  THAT'S IT FOR ME.

6           BUT I WORKED FOR A YEAR TO TRY TO RETAIN THESE

7   CLIENTS, WHICH WAS NOT EASY.  I MEAN, ALL I COULD HEAR IS

8   THEY'RE PETRIFIED.  THEY DON'T WANT TO GO NEAR YOU.  WE

9   RETAINED MOST OF OUR CLIENTS WITH THE HELP OF FIDELITY.  AND

10  WITH MY PARTNERS, WE WENT AFTER THESE PEOPLE AND WE RETAINED

11  MOST OF THE EMPLOYEES.

12          IT WAS PROBABLY THE WORST YEAR I HAD IN MY LIFE.  I

13  PROBABLY DID THE RIGHT THING.  I LOST MONEY, BUT I WOULD HAVE

14  DONE IT AGAIN TO SAVE THAT FIRM.  IT WAS PEOPLE THAT HAVE BEEN

15  WITH ME FOR 35, 40 YEARS.  BUT THINK ABOUT THOSE FAMILIES AND

16  HOW THEY STRESSED DAY AFTER DAY.  ALL RIGHT, ARE WE GOING TO GO

17  DOWN?

18          THIS IS THE ESSENCE OF THIS CASE, AS WELL AS FIVE AND

19  A HALF MILLION, SIX MILLION -- IT'S ALMOST IRRELEVANT.  IT'S

20  WHAT HE DID.  AND, IN MY OPINION, HE DESERVES THE MAXIMUM OF

21  EVERY GUIDELINE.

22          WE SOLD THE BUSINESS, THE BACK OFFICE OF FORECLOSURE,

23  TO A COMPANY CALLED PROMISE.  AND NAT WAS ONLY WITH US A SHORT

24  PERIOD OF TIME.  AND HE RECEIVED $15 MILLION, WHICH WAS

25  TECHNICALLY RANDY SCHNEIDER'S AND MY MONEY.  OKAY.  I SAID,

242

1    WELL, NOW I HAVE A RICH PARTNER.  WHICH WAS GOOD, BECAUSE I WAS

2    THINKING, DOWN THE ROAD, I DO WANT TO RETIRE.

3            WELL, TWO AND A HALF YEARS INTO THAT, NAT SPENT THE

4    $15 MILLION.  AND IT'S THE SAME PATTERN:  CASINOS, JETS, AND

5    WOMEN.  FAMILIAR PATTERN IN HIS LIFE.

6            WELL, HE ALSO ENCUMBERED DEBT UPON THAT OF -- I DON'T

7    KNOW WHAT AMOUNT, HE NEVER TOLD ME.  BUT EVERY FEW MONTHS,

8    THERE WAS A CLIENT COMING ON, LIKE SUNTRUST BANK, AND SAYING,

9    WE'RE NOT SENDING YOU ANY MORE BUSINESS BECAUSE NAT OWES US

10   200,000.  WELL, HE'S A MAJOR PARTNER, SO WE CAME UP WITH THE

11   200,000 TO PAY SUNTRUST.  THIS WENT ON FOR LITERALLY EIGHT AND

12   A HALF YEARS.

13           THE POINT I'M MAKING IS -- I HAD CONVERSATIONS WITH

14   NAT AS BUSINESS START TO IMPROVE.  AND THESE WERE THE ROUGH

15   YEARS OF THE 2010, '11, '12, '13, BUT BUSINESS IMPROVED.  AND

16   NAT STARTED PAYING DOWN SOME OF HIS DEBTS, AND HE WAS HAPPY.

17           I TALKED TO HIM.  HE SAID, YOU KNOW, I'M REALLY HAPPY

18   IN MY LIFE.  I LOVE THIS WOMAN, I HAVE A CHILD, AND THE FIRM IS

19   DOING GREAT.  AND, YOU KNOW, I'M LOOKING FORWARD TO LIFE.

20           AND THEN SIX MONTHS LATER, HE SPENT 8 MILLION ON

21   90 DIFFERENT WOMEN.  HE INDEBTED THE ESCROW ACCOUNT.  AND THEN

22   THE FIRM WENT DOWN.  AGAIN, CASINOS, GAMBLING, PRIVATE JETS.  A

23   CONSISTENT BEHAVIOR OF LYING AND DECEIT.

24           AND I DON'T SEE HOW THIS CAN EVER POSSIBLY CHANGE.

25   IF HE GOES TEN YEARS, LIKE MARK SAID, HE WILL DO IT AGAIN.

1           HAVE YOU SEEN ANY REMORSE FROM THIS MAN?  NOTHING.

2    NOT A WORD.  THE LONGER HE STAYS AWAY, IT WILL BENEFIT THE

3    PUBLIC, BECAUSE HE WILL HURT SOMEBODY AGAIN.

4           AND I THINK, AS FAR AS I'M CONCERNED, IT'S A BAD

5    EXAMPLE FOR 11 YEARS TO THE AMOUNT OF MONEY AND THE AMOUNT OF

6    HURT OF SO MANY JOBS.  I WAS IN BUSINESS FOR 46 YEARS.  AND I

7    THINK IT WOULD BE VERY EMBARRASSING FOR ALL OF US.

8           I THANK YOU FOR LISTENING.

9           THE COURT:  THANK YOU, MR. MORRIS.

10          AND, MR. WITTSTADT, AS YOU COME UP -- I KNOW THE

11   OTHERS.  I DID NOT GET THEM TO ANNOUNCE THEIR NAMES BECAUSE

12   WE'VE BEEN TALKING ABOUT THEM ALL DAY.  BUT GO AHEAD AND JUST

13   STATE YOUR NAME AND SPELL YOUR NAME FOR THE RECORD, SIR.

14          MR. GERARD WITTSTADT:  GOOD AFTERNOON, YOUR HONOR.

15          THE COURT:  GOOD AFTERNOON.

16          MR. GERARD WITTSTADT:  MAY IT PLEASE THE COURT.  MY

17   NAME IS GERARD WITTSTADT.

18          THE COURT:  ALL RIGHT.  AND THE SPELLING OF YOUR

19   FIRST NAME, PLEASE?

20          MR. GERARD WITTSTADT:  G-E-R-A-R-D.

21          THE COURT:  ALL RIGHT.  THANK YOU, SIR.

22          MR. GERARD WITTSTADT:  YOU'RE WELCOME.

23          I WANT TO START OFF BY TELLING THE COURT THAT I TRY

24   TO BE A CHRISTIAN MAN.  I TRY.  AND I HAVE PRAYED A LOT ABOUT

25   NAT AND TRIED IN MY HEART TO FIND FORGIVENESS.  BUT I'M JUST

1  NOT THERE.  AND BECAUSE I'M NOT THERE, I'M ASKING THIS COURT TO

2  SENTENCE HIM TO THE MAXIMUM TIME IN PRISON.  HE NEEDS TO BE

3  PUNISHED FOR HIS ACTIONS.

4           NOW, I'M 54 YEARS OLD.  I WAS 50 YEARS OLD WHEN WE

5  DISCOVERED MR. HARDWICK'S THEFT.  I HAVE FOUR CHILDREN, TWO OF

6  WHOM ARE LITTLE AND DON'T REALLY UNDERSTAND WHAT'S HAPPENED TO

7  MY LIFE.  BUT THE OLDER TWO GET IT.

8           BEFORE I GO, I DO WANT TO APOLOGIZE TO THE COURT.  I

9  WANT TO APOLOGIZE BECAUSE WE SHOULDN'T BE HERE.  WE SHOULDN'T

10  BE TAKING UP THE TIME OF THE COURT BECAUSE OF A LAWYER STEALING

11  MONEY.

12          THERE'S -- IN MY OPINION, AS A LAWYER FOR NOW ALMOST

13  27 YEARS, THERE CAN'T BE ANYTHING WORSE THAN A LAWYER STEALING

14  MONEY, AND STEALING MONEY FROM CLIENTS.  I MEAN, THAT'S AS BAD

15  AS IT GETS IN OUR PROFESSION.

16          WE ALL GET LAWYER JOKES, YOU KNOW.  HE'S THE REASON

17  WHY LAWYERS HAVE A BAD REPUTATION.

18          BUT I ALSO WANT TO SAY THANK YOU TO THE COURT AND TO

19  THE UNITED STATES ATTORNEY'S OFFICE AND TO THE FBI.  I KNOW HOW

20  MUCH TIME AND EFFORT AND MONEY HAS BEEN SPENT.  I REALLY DO

21  KNOW HOW MUCH MONEY HAS BEEN SPENT ON THIS.  IT FAR EXCEEDS HOW

22  MUCH MONEY MR. HARDWICK STOLE.

23          I ALSO WANT TO TELL THE COURT THAT I'M EXTREMELY

24  EMBARRASSED TO HAVE TO BE HERE.  THERE CAN'T BE ANYTHING WORSE

25  THAN A LAWYER INVOLVED IN A CASE WHERE HIS PARTNER HAS STOLEN

1   MONEY BECAUSE -- THINK ABOUT IT.  I'M CONSTANTLY, HOW DID THIS

2   HAPPEN?  HOW COULD YOU GUYS LET THIS HAPPEN?

3          I SHOULDN'T BE HERE.  BUT YOU KNOW WHAT?  IF I WASN'T

4   HERE, MY BROTHER WASN'T HERE, HE WOULD HAVE FOUND SOMEBODY ELSE

5   TO, YOU KNOW, TO BRING IN, AND THIS CASE WOULD BE HERE ANYWAY.

6          I WAS A FORMER NAVY JUDGE ADVOCATE.  I HAVE -- IN MY

7   OPINION, I'VE TRIED TO DEDICATE MY LIFE TO COMMUNITY SERVICE.

8   YES, I WAS A SUCCESSFUL BUSINESSMAN, BUT I ALSO HAD A LOT OF

9   PHILANTHROPIC EFFORTS.  I SERVED ON A LOT OF BOARDS.

10         IT'S ALL BEEN STRIPPED OF ME.  I CAN'T GIVE THE WAY I

11   USED TO.  I CAN'T REALLY GET INVOLVED IN THE COMMUNITY THE WAY

12   I USED TO.  EVERYTHING MY BROTHER AND I HAVE DONE UP UNTIL

13   THIS, TO THIS DAY, WAS AN EFFORT TO MAKE THE PUBLIC WHOLE DOWN

14   HERE.

15         MR. GARLAND TALKS ABOUT THAT IT WAS OUR FAULT THAT

16   THE FIRM FELL.  AND MARK ADDRESSED THAT.  BUT YOU KNOW WHAT?

17   WE MADE SURE THAT EVERY CLIENT OF THE FIRM WAS MADE WHOLE.

18         AND I'VE GOT TO ADDRESS THIS FOR A SECOND, BECAUSE

19   WE'RE TALKING ABOUT THEFT.  THEFT IS ONE THING.  THEFT FROM AN

20   ESCROW ACCOUNT IS A WHOLLY DIFFERENT THING, BECAUSE IT'S REALLY

21   A DOUBLE THEFT.  OKAY?

22         IF MR. HARDWICK HAD STOLEN MONEY FROM MARK AND I

23   PERSONALLY, OKAY, IT'S GONE.  OKAY?  BUT WHEN HE STOLE MONEY

24   FROM CLIENTS, NOT ONLY IS IT GONE, BUT WE GOT TO PAY IT BACK.

25   WE GOT TO PUT IT BACK IN THERE.

1          WHAT DID WE DO?  WE SOLD OUR BUSINESS TO FIDELITY SO

2     THAT FIDELITY WOULD INFUSE ENOUGH MONEY TO STABILIZE THOSE BANK

3     ACCOUNTS.

4          THERE'S BEEN A LOT OF TALK TODAY ABOUT DUSTIN

5     JOHNSON.  I HAVE A SLIGHTLY DIFFERENT TAKE ON THIS.

6          MR. HARDWICK IS EXTREMELY BRIGHT.  I FIRMLY BELIEVE

7     THAT HE PURPOSELY WENT TO DUSTIN JOHNSON WHEN HE WAS IN A VERY

8     BAD SITUATION AND STOLE, REALLY, $3 MILLION FROM HIM.  HE STOLE

9     IT, KNOWING FULL WELL THAT THE FIRM WASN'T GOING TO BE ABLE TO

10    REPAY IT AND THEN A LAWSUIT WOULD BE BROUGHT BY MR. JOHNSON.

11         AND MR. HARDWICK AND MR. JOHNSON GOT TOGETHER, AND

12    THEY FOUND THE WORST BULLY LAWYER THAT THERE EVER WAS IN

13    ATLANTA, DAVID CORNWELL.  AND MR. CORNWELL, UNLIKE

14    MR. PRITCHARD'S LAWYER -- MR. PRITCHARD'S LAWYER FILED A

15    LAWSUIT.  I HAVE NO PROBLEM WITH THE WAY THEY DID IT.

16         MR. JOHNSON'S LAWYERS FILED A FEDERAL LAWSUIT AND

17    SAID THAT I PERSONALLY WAS MR. JOHNSON'S LAWYER AND THAT I

18    PERSONALLY STOLE $3 MILLION FROM HIM.

19         NOW, WHY DID THEY DO THAT?  THEY DID IT FOR A COUPLE

20    OF REASONS.  THE FIRST REASON IS THAT MR. HARDWICK WENT TO

21    DUSTIN JOHNSON BECAUSE HE KNEW OF HIS CELEBRITY STATUS, AND

22    THAT IF AN ALLEGATION WAS MADE IN A LAWSUIT THAT A CELEBRITY OF

23    THAT CALIBER WAS ALLEGING THAT LAWYERS STOLE MONEY, IT WOULD

24    GAIN EXCEEDINGLY BROAD EXPOSURE.

25              AND IT DID.  IT DID.  THE AMOUNT OF ARTICLES THAT

1    APPEARED IN THE NEWSPAPERS HERE LOCALLY AND NATIONALLY ARE IN

2    THE HUNDREDS.  AND HERE I AM, AN INNOCENT ATTORNEY WHO HAS BEEN

3    ACCUSED NOW OF THEFT, AND I HAVE TO DEFEND THAT.

4            NOW, WHY DID HE DO -- WHY ELSE DID HE DO IT?  BECAUSE

5    HE WAS HOPEFUL THAT THE FBI WOULD SAY, OH, MY GOSH, THE

6    WITTSTADTS STOLE MONEY, TOO.  LET'S INVESTIGATE THEM.

7            WHEN I FIRST MET WITH THE FBI, I SAID, I UNDERSTAND

8    MY RIGHTS.  I SAID, YOU GIVE ME THE PAPERWORK, I'LL SIGN

9    WHATEVER.  YOU CAN LOOK INTO EVERY BANK ACCOUNT.  I'VE NEVER

10   BEEN TO LAS VEGAS IN MY LIFE.  I'VE NEVER STOLEN ANY MONEY.

11   I'VE NEVER DONE ANYTHING FRAUDULENT.

12           I THINK -- OR I KNOW MR. HARDWICK'S INTENT WAS TO GET

13   THE FBI INTERESTED INTO US SO THAT THEY MAY INDICT US SO THAT

14   WE WOULD ALSO BE SITTING THERE AND UNABLE TO TESTIFY AGAINST

15   HIM.

16           LIKEWISE, HE HAD THAT LAWSUIT FILED SO THAT HE COULD

17   GET US UNDER OATH PRETRIAL, FOR DISCOVERY PURPOSES, AND TO TRY

18   TO SLIP US UP SOMEPLACE SO THAT HE MIGHT HAVE SOME

19   CROSS-EXAMINATION HERE WHILE WE WERE TESTIFYING AS GOVERNMENT

20   WITNESSES.

21           NOW, WE'VE HEARD A LOT ABOUT THE WORD TRUST.  WHAT IS

22   IT?  WELL, WE HEAR ABOUT IT AS A TRUST ACCOUNT.  LAWYERS.

23   OKAY?  WE ARE FIDUCIARIES.  WE ARE TRUSTED WITH A LOT OF

24   RESPONSIBILITY.  AND ONE OF THEM WAS, AT LEAST IN THIS CASE, IS

25   TO HOLD IN TRUST OVER A HALF A BILLION DOLLARS A DAY IN OUR

248

1    VARIOUS ACCOUNTS.

2                MR. HARDWICK KNEW EXACTLY HOW MUCH MONEY WAS IN EVERY

3    ACCOUNT EVERY DAY.

4                I PERSONALLY, AFTER THIS THING BROKE, SEARCHED

5    THROUGH HIS E-MAILS.  AND I CAN TELL YOU, YOUR HONOR -- AND

6    I'LL JUST MAKE UP A NUMBER -- 100 E-MAILS, 90 OF THEM DEALT

7    WITH MONEY.  THE OTHER TEN WEREN'T BUSINESS.  THE OTHER TEN

8    WERE ABOUT WOMEN.  THE AMOUNT OF INDISCRETIONS THAT

9    MR. HARDWICK HAD WITH WOMEN, WHETHER THEY BE PAID OR NOT, WAS

10   UNBELIEVABLE.

11               SO HIS E-MAIL ACCOUNT IS EITHER ABOUT, YOU KNOW, HOW

12   MUCH MONEY ARE WE MAKING TODAY, HOW MUCH MONEY IS AVAILABLE,

13   HOW MUCH DO WE HAVE, HOW MUCH CAN I GET, HOW MUCH IS AVAILABLE;

14   OR, HEY, YOUNG LADY I JUST MET AT UNIVERSITY OF SOUTH CAROLINA,

15   HOW ABOUT YOU COME TO ATLANTA, I'LL SEND A PRIVATE JET FOR YOU

16   TO COME UP HERE, I'LL PUT YOU UP IN THE RITZ CARLTON.

17               I MEAN, IT'S BAD STUFF.

18               SO I DON'T KNOW IF IT CAME OUT DURING THE TRIAL OR

19   NOT, BUT MR. HARDWICK HAD A COUPLE NICKNAMES THAT HE USED TO

20   LIKE TO REFER TO HIMSELF AS.  ONE OF THEM WAS THE CHAIRMAN.

21   THERE'S NUMEROUS VIDEOS WHERE HIS FRIENDS ARE REFERRING TO HIM

22   AS THE CHAIRMAN.

23               YOU KNOW WHAT HE WAS THE CHAIRMAN OF?  NOT A LAW

24   FIRM.  HE WAS THE CHAIRMAN OF BASICALLY A CRIMINAL ENTERPRISE.

25   THAT LAW FIRM WAS A CRIMINAL ENTERPRISE, IN MY OPINION.

1          YOU'RE GOING -- WE'VE HEARD ALL DAY ABOUT LOSS.

2     WELL, GUESS WHAT THE NAME OF HIS FRIENDS ARE WHO ARE SEATED

3     HERE IN THE FRONT ROW?  THE LOST BOYS.  IRONIC?  I DON'T KNOW.

4          WHITE P-DIDDY, THAT WAS ANOTHER ONE OF HIS NICKNAMES.

5     THAT WAS HIS NICKNAME IN LAS VEGAS.

6          I WANTED TO ADDRESS THE TESTIMONY WE HEARD FROM

7     MICHELE VELCHECK, WHO I NEVER MET IN MY LIFE.  BEEN A REAL

8     ESTATE LAWYER FOR I GUESS ABOUT 17 YEARS NOW, AND A REAL ESTATE

9     BROKER.  AND, HONESTLY, I WAS SO APPALLED BY HER TESTIMONY THAT

10    SHE WAS MORE CONCERNED ABOUT THE LAW FIRM COVERING UP HIS

11    ACTIONS THAN HER OWN CLIENTS' MONEY THAT WAS ENTRUSTED WITH US.

12         I MEAN, IF I WAS SITTING IN HER POSITION AS A REAL

13    ESTATE BROKER AND I HAD MONIES OF MY CLIENTS IN TRUST AT A LAW

14    FIRM WHERE THERE WAS AN ALLEGATION OF THEFT, I WOULD BE A

15    LITTLE BIT MORE CONCERNED ABOUT MAKING SURE THAT MY CLIENTS'

16    MONIES WERE SAFE THAN TRYING TO COVER UP AND NOT GO PUBLIC.  TO

17    ME, THAT'S -- THAT WAS REALLY BAD.  AND I HOPE THAT THE COURT

18    DOESN'T REALLY GIVE HER MUCH CONSIDERATION BECAUSE OF THAT.

19         HOW HAS THIS AFFECTED ME?  WELL, IN A COUPLE

20    DIFFERENT WAYS.  FIRST OF ALL, YOU HEARD ME REFERENCE THAT I

21    HAVE CHILDREN.  MY OLDER SON IS A SENIOR IN HIGH SCHOOL.  AND

22    HE WOULD VERY MUCH LIKE TO ATTEND COLLEGE DOWN HERE IN THE

23    SOUTH.  ABSOLUTELY NOT POSSIBLE.  I HAVE TO DENY HIM THAT

24    PRIVILEGE.  I AM, I THINK, GENUINELY AFRAID THAT IF HE CAME

25    DOWN HERE, THAT SOME OF MR. HARDWICK'S ASSOCIATES MIGHT NOT

250

1    PLAY NICELY WITH HIM.

2            I CAN'T BE -- LET ME SAY, YOU HEARD MY BROTHER SAY

3    THAT MY DAD WAS A JUDGE.  MY DAD HAS THE SAME NAME AS ME.  I'M

4    A JUNIOR.  SENIOR.  ALL THAT NEGATIVE PUBLICITY, WELL, HIS

5    FRIENDS SEE THAT, THEY THINK MAYBE IT WAS HE.

6            I HAVE OFTEN THOUGHT AND HAD ALWAYS PLANNED THAT ONE

7    DAY I WOULD BE A JUDGE.  BECAUSE OF THE NEGATIVE PUBLICITIES

8    OUT THERE, I THINK THAT'S NOT A REALITY.  I DON'T THINK THAT

9    THAT IS SOMETHING THAT I'M GOING TO BE ABLE TO BECOME.

10           MR. HARDWICK FILED A LAWSUIT AGAINST US RIGHT BEFORE

11   TRIAL.  AND YOU HEARD MY BROTHER SAY, THE DAY AFTER HE'S

12   CONVICTED, THEY DISMISSED THE SUIT.  WHAT WAS THAT LAWSUIT

13   BROUGHT FOR?  JUST TO DIRTY UP THE WATERS AGAIN AND BEAT US UP

14   A LITTLE BIT MORE.

15           MY WIFE.  FOR YEARS, YOU KNOW, SHE WAS VERY UPSET.

16   WHY WAS SHE UPSET?  WELL, SHE LOST A PRETTY NICE LIFESTYLE.  WE

17   HAD TO SELL HER BEACH HOUSE.  WE HAD TO SELL OUR FARM.  WE HAD

18   TO SELL OUR FAMILY HOME.

19           AND I FEEL UNSAFE AT HOME, AND I AM GRATEFUL THAT I

20   HAVE BEEN GRANTED A PERMIT TO CARRY A HANDGUN.

21           DOES THAT PLEASE MY WIFE THAT HER HUSBAND HAS GOT TO

22   CARRY A HANDGUN?  NO.  I MEAN, WHO WOULD EVER THINK THAT, YOU

23   KNOW, YOUR SAFETY COMES TO A POINT IN LIFE AS A LAWYER THAT YOU

24   GOT TO CARRY A HANDGUN.

25           SO I WANT THE COURT JUST TO THINK ABOUT REALLY ONE

1    WORD, AND THAT'S TRUST.  I TRIED TO TRUST MR. HARDWICK.  IN

2    FACT, I DID TRUST HIM -- I WOULDN'T SAY I TRIED.  I DID TRUST

3    HIM.  I TRIED TO BE HIS FRIEND.  NEVER WANTED TO HAVE ANYTHING

4    TO DO WITH ME.  SO, UNFORTUNATELY, I INVITED HIM TO GO SKIING,

5    WHATEVER.  BUT I DID TRUST HIM.  AND SO DID THE STATE IN

6    GRANTING HIM A LAW LICENSE.  AND, IN MY OPINION, HE BETRAYED

7    THAT TRUST TO ALL OF US.

8            AND HE DESERVES -- I MEAN, I PERSONALLY THINK HE

9    DESERVES OVER 20 YEARS.  AND, FRANKLY, I'M DISAPPOINTED THAT

10   THE SENTENCING GUIDELINES DON'T GO THAT HIGH NOW.  BUT I THINK

11   THE COURT SHOULD IN FACT SENTENCE HIM TO THE -- IN THE UPPER

12   RANGE OR GO BEYOND THE GUIDELINES IF -- I KNOW NOTICE IS

13   REQUIRED, BUT THE COURT CAN GO ABOVE THE GUIDELINES.  AND I

14   THINK IN THIS CASE, ABSOLUTELY, THE COURT SHOULD GO ABOVE THE

15   GUIDELINES.

16           CAUSED A LOT, A LOT, A LOT OF PROBLEMS.

17           THANK YOU.

18           THE COURT:  THANK YOU, MR. WITTSTADT.

19           GOVERNMENT, WE'LL HEAR FROM YOUR FINAL VICTIM, AND

20   THEN WE'LL TAKE A QUICK, QUICK STRETCH BREAK AND THEN COME BACK

21   AND HEAR FROM THE DEFENSE'S PEOPLE.

22           MR. PHILLIPS:  FOR THE RECORD, IN THE ORDER THAT THEY

23   SPOKE, THE FIRST PERSON WAS MARK WITTSTADT, SECOND PERSON WAS

24   ART MORRIS, THIRD PERSON WAS ROD WITTSTADT.

25           AND NOW WE CALL -- OR MR. BAUM, DAVID BAUM, WOULD

1    LIKE TO ADDRESS THE COURT.

2            THE COURT:  ALL RIGHT.  THANK YOU.  AND ROD IS THE

3    SAME AS GERARD.

4            MR. PHILLIPS:  THAT'S RIGHT.

5            THE COURT:  THANK YOU.

6            GOOD AFTERNOON, SIR.

7            MR. BAUM:  GOOD AFTERNOON, JUDGE.  I'M DAVID BAUM,

8    B-A-U-M.  AND I HAVE A PREPARED WRITTEN STATEMENT I'D LIKE TO

9    READ --

10           THE COURT:  YES, SIR.

11           MR. BAUM:  -- TO THE COURT.

12           GOOD AFTERNOON, YOUR HONOR.  I AM DAVID BAUM,

13   EXECUTIVE VICE PRESIDENT WITH FIDELITY NATIONAL FINANCIAL.  I

14   AM RESPONSIBLE FOR THE AGENCY DIVISION OF THE COMPANY FOR THE

15   SOUTHEAST AND MID-ATLANTIC REGIONS OF THE COUNTRY, INCLUDING --

16           THE COURT:  AND, I'M SORRY, SIR.  SINCE YOU'RE

17   READING -- BECAUSE PEOPLE ALWAYS TEND TO GO A LITTLE FAST WHEN

18   THEY'RE READING, AND MADAM COURT REPORTER STILL HAS TO TAKE

19   DOWN EVERYTHING.  SO IF YOU COULD JUST SLOW DOWN JUST A LITTLE

20   BIT.

21           MR. BAUM:  SLOW DOWN.

22           THE COURT:  OKAY.  THANK YOU.

23           MR. BAUM:  YOU WANT ME TO START OVER?

24           OKAY.  THANK YOU FOR THE OPPORTUNITY TO PROVIDE THIS

25   VICTIM IMPACT STATEMENT ON BEHALF OF MY COMPANY.

1          FIDELITY AND ITS UNDERWRITERS HAD A BUSINESS

2    RELATIONSHIP WITH NAT HARDWICK, HIS LAW FIRM, AND HIS

3    AFFILIATED TITLE INSURANCE COMPANY THAT SPANNED MORE THAN A

4    DECADE.  IT WAS A RELATIONSHIP THAT WAS NOT ONLY CONTRACTUAL

5    BUT ONE THAT WAS FOUNDED ON TRUST, A TRUST THAT, AS OUR AGENT,

6    HE WOULD ABIDE BY OUR AGENCY AGREEMENT AND, EVEN MORE

7    IMPORTANTLY, THAT HE WOULD HOLD ANY CLOSING FUNDS DEPOSITED

8    WITH HIS COMPANY IN TRUST AND DISBURSE THEM ONLY IN ACCORDANCE

9    WITH THE CLOSING INSTRUCTIONS PROVIDED TO HIM.

10          INSTEAD OF PRESERVING THAT TRUST, NAT HARDWICK CHOSE

11   TO VIOLATE IT, NOT ONCE, BUT MANY, MANY TIMES.  EVERY TIME HE

12   INSTRUCTED HIS BOOKKEEPER TO WIRE FUNDS TO HIM, KNOWING THEY

13   WERE NOT HIS, HE VIOLATED THAT TRUST.

14          NAT HARDWICK FUNDED HIS LIFESTYLE OF PRIVATE PLANES,

15   GAMBLING, AND FEMALE COMPANIONS WITH MONEY THAT BELONGED TO

16   THOUSANDS OF INDIVIDUALS WHO HAD ENTRUSTED TO HIM THEIR

17   HARD-EARNED DOLLARS TO PROTECT.  THE MILLIONS OF DOLLARS THAT

18   HE STOLE BELONGED TO YOUNG PEOPLE BUYING THEIR FIRST HOME, TO

19   MOTHERS AND FATHERS LOOKING TO CREATE A PERMANENT HOME FOR

20   THEIR FAMILIES, TO PEOPLE LOOKING TO STEP UP INTO A BETTER

21   HOME, TO BABY BOOMERS LOOKING TO DOWNSIZE, AND TO THE MANY

22   HOMEOWNERS WHO WERE LOOKING TO REFINANCE THEIR HOMES TO LOWER

23   THEIR MORTGAGE PAYMENTS.

24          OTHER MONIES HE STOLE BELONGED TO THE LENDERS THAT HE

25   REPRESENTED AND TO REALTORS THAT RELIED ON HIM TO TAKE CARE OF

1   THEIR CLIENTS.  FOR THE VAST MAJORITY OF THE PEOPLE WHO

2   ENTRUSTED THEIR MONEY TO NAT HARDWICK, THIS WAS THE MOST MONEY

3   THEY WOULD HAVE SAVED IN THEIR LIVES.  THIS WAS THEIR BIGGEST

4   INVESTMENT THEY WOULD EVER MAKE IN THEIR LIFETIME.

5           THEY CHOSE TO ENTRUST THEIR MONEY TO HIM, AND HE

6   VIOLATED THAT TRUST BY STEALING THOSE FUNDS.

7           WHEN NAT HARDWICK WAS FIRST MADE AWARE THAT FIDELITY

8   HAD DISCOVERED A SIGNIFICANT SHORTAGE IN ITS FIRM'S TRUST

9   ACCOUNTS, HIS FIRST STEP WAS TO TAKE YET ANOTHER LAVISH TRIP

10  WITH FRIENDS AND FAMILY TO EUROPE FOR A GOLF TOURNAMENT, ONCE

11  AGAIN USING CLIENTS' MONEY TO FUND THE TRIP.

12          HIS SECOND STEP WAS TO TRY TO CONVINCE FIDELITY TO

13  LOAN HIM ADDITIONAL MONIES TO COVER HIS THEFT BY LYING

14  REPEATEDLY ABOUT THE PURPOSE OF THE LOAN.

15          ULTIMATELY, FIDELITY STEPPED IN TO ATTEMPT TO PREVENT

16  WHAT WE BELIEVED WOULD HAVE BEEN A CATASTROPHE IN THE

17  RESIDENTIAL REAL ESTATE MARKET IN GEORGIA AND BEYOND.  FIDELITY

18  COULD HAVE STOOD BY AND WATCHED THE DOMINOES FALL AS HUNDREDS

19  OF PEOPLE RECEIVED THE NEWS THAT THE FUNDS THEY HAD ENTRUSTED

20  TO NAT HARDWICK WERE GONE AND THEY NO LONGER WOULD BE ABLE TO

21  BUY THAT HOME OR REFINANCE THAT MORTGAGE.

22          INSTEAD, THEY WOULD BE STANDING IN LINE TO FILE

23  CLAIMS WITH FIDELITY AND THE OTHER TITLE INSURANCE

24  UNDERWRITERS, OR WITH THE BANKRUPTCY COURT, IN HOPES OF GETTING

25  SOME PORTION OF THEIR MONEY BACK MONTHS OR YEARS DOWN THE ROAD.

1   MANY OF THEM WOULD HAVE BEEN IN TEMPORARY LIVING QUARTERS WITH

2   THEIR BELONGINGS LOADED ON A MOVING TRUCK WAITING TO MOVE INTO

3   THEIR NEW HOME WHEN THEY SAW THAT DREAM VANISH.

4           AS A RESULT OF OUR DECISION, WE ULTIMATELY FURNISHED

5   APPROXIMATELY $29.5 MILLION TO COVER ESCROW SHORTAGES IN

6   CONNECTION WITH ALL THE ACTIVE REAL ESTATE CLOSINGS.  THUS FAR,

7   WE HAVE ADDITIONALLY INCURRED OVER 4.5 MILLION IN LEGAL FEES

8   AND EXPENSES IN CONNECTION WITH HARDWICK'S LAW FIRM'S

9   SUBSEQUENT BANKRUPTCY AND FIDELITY'S LEGAL ACTIONS TO TRY TO

10  MITIGATE ITS LOSSES.

11          DESPITE ITS MITIGATION EFFORTS THUS FAR, FIDELITY

12  STILL HAS A NET LOSS OF MORE THAN $22 MILLION, NOT EVEN

13  INCLUDING THE MAJORITY OF ITS LEGAL FEES.

14          IN ADDITION TO THE FOREGOING, AS A RESULT OF NAT

15  HARDWICK'S CRIMINAL CONDUCT, FIDELITY LOST ALMOST $7 MILLION IN

16  REVENUE AS A RESULT OF A 2 PERCENT LOSS IN MARKET SHARE.

17          FIDELITY HAS ALSO SPENT COUNTLESS MAN-HOURS AT ALL

18  LEVELS OF OUR ORGANIZATION ATTEMPTING TO RECTIFY THE DISASTER

19  THAT NAT HARDWICK CREATED.

20          IN THE END, AS A RESULT OF WHAT FIDELITY DID, NOT A

21  SINGLE CONSUMER OR LENDER WAS HARMED; THE RESIDENTIAL REAL

22  ESTATE MARKET IN GEORGIA WAS NOT DAMAGED; AND THE MEMBERS OF

23  THE RESIDENTIAL REAL ESTATE SECTION OF THE GEORGIA BAR CONTINUE

24  TO BE ENTRUSTED WITH MILLIONS OF DOLLARS OF CLIENT FUNDS ON A

25  DAILY BASIS.

1          AT NO POINT HAS NAT HARDWICK EVER SHOWN ANY REMORSE

2     OR APOLOGIZED TO ANYONE AT FIDELITY FOR HIS ACTIONS OR FOR THE

3     LOSSES AND PROBLEMS HE HAS CAUSED FIDELITY AND OTHERS.  ON THE

4     CONTRARY, NAT HARDWICK EVEN HAD THE NERVE AT TRIAL TO BLAME

5     FIDELITY AND OTHERS FOR THOSE LOSSES AND PROBLEMS AND TO

6     ADVANCE THE ABSURD POSITION THAT HE, RATHER THAN BEING THE

7     CULPRIT, IS SOMEHOW A VICTIM WHO WAS OWED MONEY BY HIS LAW

8     FIRM.

9          THESE PAST FOUR YEARS HAVE BEEN EXTREMELY DIFFICULT

10    FOR THOSE OF US AT FIDELITY THAT WORKED TIRELESSLY TO ATTEMPT

11    TO SALVAGE ANYTHING FROM THE RUINS THAT NAT HARDWICK CREATED.

12    BUT SEEING JUSTICE SERVED THROUGH THE JURY'S CONVICTION HAS

13    BROUGHT A DEGREE OF RELIEF AND SATISFACTION.

14          WE'RE GRATEFUL TO THE JURY, THE U.S. ATTORNEY'S

15    OFFICE, THE FBI, AND TO THIS COURT FOR THE TREMENDOUS EFFORT

16    INVOLVED IN BRINGING ABOUT JUSTICE.  AND WE APPRECIATE THE

17    OPPORTUNITY TO PROVIDE THIS STATEMENT TODAY.

18          THANK YOU, YOUR HONOR.

19          THE COURT:  THANK YOU, SIR.

20          GOVERNMENT, IS THERE ANYONE ELSE THAT YOU'D LIKE THE

21    COURT TO HEAR FROM FOR SENTENCING?

22          MR. PHILLIPS:  ANYONE, ANYONE ELSE?

23          I DON'T THINK SO, YOUR HONOR.  THANK YOU.

24          THE COURT:  ALL RIGHT.  I SAID WE WOULD TAKE A

25    FIVE-MINUTE BREAK.  I ASSUME YOU NEED ONE.  I COULD KEEP GOING,

257

1    BUT I DON'T WANT TO PUSH IT.  IT'S LATE.

2         NOD OR SHAKE -- OKAY.  ALL RIGHT.  LET'S TAKE A QUICK

3    BREAK.  I SAY FIVE MINUTES, BUT A COUPLE OF MINUTES, FIVE TO

4    SEVEN TO EIGHT, AND THEN LET'S COME BACK AND HEAR FROM THE

5    DEFENSE.

6         THEN WE WILL HEAR FINAL ARGUMENTS IN TERMS OF

7    SENTENCING, AND I WILL ADDRESS THE DEFENSE TO SEE WHETHER

8    MR. HARDWICK WISHES TO MAKE A STATEMENT DURING THIS HEARING.

9         WE ARE IN RECESS.  THANK YOU.

10         THE COURTROOM SECURITY OFFICER:  ALL RISE.

11         (WHEREUPON, A BRIEF RECESS WAS HAD FROM 5:41 P.M. TO

12    5:49 P.M.)

13         THE COURT:  THANK YOU, MA'AM.

14         THANK YOU.  PLEASE BE SEATED.

15         ALL RIGHT.  WE ARE SHIFTING TO THE DEFENSE NOW SO

16    THAT THE COURT CAN HEAR FROM ANY FAMILY MEMBERS, FRIENDS,

17    ASSOCIATES OF MR. HARDWICK.

18         MS. LOEB:  YOUR HONOR, I'M GOING TO PRESENT THE

19    BEGINNING OF THE SECTION 3553 FACTORS.  AND I'D LIKE TO START

20    BY CALLING NATHAN HARDWICK III, ALSO KNOWN AS BUDDY HARDWICK.

21    THAT IS NAT'S DAD.

22         THE COURT:  OKAY.

23         MS. LOEB:  AND HE'S GOING TO READ A STATEMENT.

24         THE COURT:  ALL RIGHT.  IF YOU WOULD COME ON UP, SIR.

25         AND EVEN THOUGH MS. LOEB HAS JUST IDENTIFIED YOU, IF

1    YOU WOULD AGAIN IDENTIFY YOURSELF FOR THE RECORD, PLEASE.

2              MR. HARDWICK III:  YOUR HONOR, MY NAME IS NATHAN E.

3    HARDWICK III.  I'M NAT'S FATHER.

4              I AM 78 YEARS OLD AND HAVE LIVED IN ATLANTA, GEORGIA,

5    FOR 42 YEARS; 1624 DURRETT WAY IN DUNWOODY.  I -- AS A PH.D. IN

6    MECHANICAL ENGINEERING, I WORKED FOR AT&T BELL LABORATORIES AND

7    LATER LUCENT TECHNOLOGIES FOR 35 YEARS.

8              NAT HAS ALWAYS BEEN A GOOD, CARING, AND LOVING SON

9    WITH A GOOD HEART.  EVERYONE THAT HE HAS ENCOUNTERED, NO MATTER

10   THEIR INCOME LEVEL, THEY WOULD TELL ME HE'S A GREAT PERSON,

11   EVEN WITHOUT ME INQUIRING.

12             NAT HAS ALWAYS BEEN VERY OUTGOING AND HARD WORKER,

13   HAS BEEN EXTREMELY KIND TO HIS EMPLOYEES.  AND WE HAVE BEEN

14   PROUD OF HIM.

15             HE ALWAYS SURPRISED ME BY THE AMOUNT OF TIME THAT HE

16   WOULD SPEND CONVERSING WITH MAINTENANCE WORKERS, CLERKS,

17   WAITERS AND WAITRESSES WE ENCOUNTER ALONG THE WAY.  HE HAS

18   ALWAYS BEEN VERY GENEROUS WITH HIS TIME WORKING WITH CHARITIES

19   AND HAS BEEN A SUPPORTER OF A COUPLE OF CHRISTIAN FAMILY

20   OUTREACH PROGRAMS.

21             THERE HAS BEEN NO SON, I BELIEVE, THAT HAS BEEN MORE

22   KIND AND CONSIDERATE TO HIS MOTHER AND ME AS NAT HAS.  HE HAS

23   BEEN ESPECIALLY ATTENTIVE TO HIS MOTHER AND ME DURING THE

24   APPROXIMATELY LAST THREE YEARS WHEN HE WAS CONFINED TO OUR

25   HOME.

1           DUE TO MY UNDERGOING CHEMOTHERAPY FOR CANCER AND MY

2    WIFE HAVING BACK AND KNEE REPLACEMENT PROBLEMS, WE WERE BOTH

3    INCAPACITATED FOR A PORTION OF THE TIME.

4           NAT HAS ALWAYS INCLUDED US IN HIS SOCIAL AND

5    HOSPITALITY VENUES, EVEN WHEN WE WERE NOT EXPECTING IT.  THAT

6    IS, AT THESE EVENTS, I'VE BEEN AMAZED AT THE GREAT NUMBER OF

7    HIS BUSINESS CLIENTS AND ASSOCIATES THAT ARE MUCH YOUNGER THAN

8    ME THAT HAVE CALLED ME ASIDE TO TELL ME HOW MUCH THEY LIKE NAT

9    PERSONALLY.  THEY USUALLY USE THE WORD LOVE AND HAD NO OTHER

10   REASON TO APPROACH A 78-YEAR-OLD MAN OTHER THAN THAT.  I HAD

11   NOTHING TO DO WITH NAT'S COMPANY.

12          I RECALL AT ONE OF THE NATIONAL EVENTS THAT NAT AND

13   HIS COMPANY SPONSORED THAT ONE OF HIS SENIOR PARTNERS

14   APPROACHED ME TO INDICATE HOW GOOD THE ADVERTISEMENT WAS FOR

15   THE FIRM.  IN FACT, ONE OF THEM SAID THE FIRM WAS PLANNING TO

16   INCORPORATE A SPORTS DIVISION BECAUSE OF NAT'S PROFESSIONAL

17   CONTACTS.  AT THIS EVENT, A NUMBER OF CLIENTS SAID THAT THEY

18   USE MORRIS HARDWICK SCHNEIDER BECAUSE OF NAT'S PERSONALITY AND

19   THEIR CONFIDENCE THAT HE WOULD ALWAYS PROTECT THEIR INTEREST.

20          BASED ON HIS TALENTS AND HOW MANY PEOPLE LOVED TO

21   WORK WITH AND BE ASSOCIATED WITH NAT, HE CAN AGAIN BE AN ASSET

22   TO THE COMMUNITY.  I AM POSITIVE THAT HE WILL BE A GOOD

23   CHRISTIAN CITIZEN WHEN RELEASED.  FOR THIS REASON AND THE OTHER

24   REASONS STATED, I APPEAL TO YOU TO GRANT HIM LENIENCY.

25          FINALLY, I KNOW FOR MY WIFE AND ME TO SEE HIM FREE

260

1    AGAIN WHILE WE'RE STILL ALIVE WOULD BE AS GREAT A BLESSING AS

2    YOU COULD BESTOW UPON US.

3              THANK YOU FOR LISTENING.

4              THE COURT:  THANK YOU, SIR.

5              MS. LOEB:  NEXT I WOULD LIKE TO CALL ANN HARDWICK TO

6    THE STAND.  THAT IS NAT'S MOTHER.

7              THE COURT:  ALL RIGHT.

8              MS. LOEB:  TO THE PODIUM.

9              THE COURT:  AND ANN DOES NOT HAVE AN E AT THE END,

10   RIGHT?

11             MS. LOEB:  CORRECT.

12             THE COURT:  OKAY.  ALL RIGHT.  GOT THAT FOR THE

13   RECORD.

14             COME ON UP, MA'AM.

15             GOOD AFTERNOON TO YOU -- OR GOOD EVENING AT THIS

16   POINT.

17             MS. HARDWICK:  YOUR HONOR, THANK YOU FOR ALLOWING ME

18   TO SPEAK FOR MY SON TODAY.

19             MY NAME IS ANN HARDWICK, AND I'M 75 YEARS OLD.  MY

20   HUSBAND AND I MOVED TO ATLANTA WITH OUR THREE CHILDREN IN 1976

21   WHEN THEY WERE IN ELEMENTARY SCHOOL.  ALTHOUGH I TAUGHT THIRD

22   GRADE FOR SEVERAL YEARS, MY SECOND CAREER WAS SELLING REAL

23   ESTATE IN ATLANTA FOR WELL OVER 30 YEARS.  SO I SUPPOSE NAT

24   LEARNED A LOT ABOUT THE BUSINESS FROM ME IN THE BEGINNING.

25             YEARS LATER, AFTER HE BECAME A REAL ESTATE ATTORNEY,

1   I LEARNED FROM HIM, TOO.  SO AT THAT POINT I WASN'T JUST A

2   PROUD MOTHER BUT A CLIENT AS WELL.

3          HIS WARM PERSONALITY ALWAYS MADE HIM A GREAT

4   PEOPLE-PERSON, BECAUSE HE MET EVERYBODY WITH A BIG SMILE, A

5   HANDSHAKE OR A HUG, AND A WHAT-CAN-I-DO-FOR-YOU ATTITUDE.  SO

6   WHEN YOU'VE BEEN IN THE BUSINESS AS LONG AS I WAS, YOU KNOW

7   PEOPLE IN OTHER REAL ESTATE COMPANIES, MORTGAGE BROKERS, EVEN

8   OTHER REAL ESTATE ATTORNEYS.

9          I HEARD OFTEN FROM OTHER REALTORS ABOUT HOW MUCH THEY

10  LOVED THE FACT THAT HE TOOK EXTRA TIME TO ANSWER THEIR

11  QUESTIONS.  BUT MORE IMPORTANTLY, HE LISTENED TO THEM.  NOW,

12  THAT'S A HARD THING FOR A LOT OF PEOPLE TO DO.  IT IS A RARE

13  TRAIT AND A REAL ASSET IN ANY BUSINESS.

14         NAT TREATED HIS CLIENTS, HIS EMPLOYEES, AND HIS

15  FRIENDS LIKE HIS FAMILY AND WAS THERE WHEN THEY NEEDED HIM.  HE

16  SPENT A LOT OF TIME WORKING WITH DIFFERENT CHARITIES AND

17  ORGANIZATIONS IN ATLANTA OVER THE YEARS.

18         HE HAS A GOOD HEART.  AND HE HELPED -- HAS HELPED ME

19  SO MANY TIMES AS I FACED DIFFICULTIES.  AND ONE OF THOSE WAS

20  CARING FOR MY AGING PARENTS IN SOUTH CAROLINA.  HE WAS ALWAYS

21  THERE TO HELP ME THINK THROUGH DECISIONS, AND HE ENCOURAGED ME

22  WHEN THEIR HEALTH FAILED.

23         THEN ABOUT TWO AND A HALF YEARS AGO, MY HUSBAND WAS

24  DIAGNOSED WITH A HIGHLY AGGRESSIVE FORM OF STAGE 4

25  NON-HODGKIN'S LYMPHOMA.  THREE WEEKS LATER, HE HAD SURGERY AT

1   EMORY ON HIS UPPER RIGHT ARM TO REMOVE THE LARGE MALIGNANT

2   TUMOR AND INSERT A LONG ROD INTO THE BONE.  MONTHS OF CHEMO,

3   DOCTORS' APPOINTMENTS, TESTS, AND REHAB FOLLOWED, AS WELL AS

4   ALL THE SIDE EFFECTS THAT GO WITH THAT.  IT WAS A VERY

5   DIFFICULT TIME FOR OUR WHOLE FAMILY.

6           AND ALTHOUGH WE HAVE TWO OTHER CHILDREN, THEY LIVE A

7   LONG WAYS AWAY IN DIFFERENT STATES AND COULD ONLY BE HERE WITH

8   US A LIMITED AMOUNT OF TIME.  SO, UNFORTUNATELY, NAT BECAME --

9   HAD TO BECOME THE CAREGIVER FOR BOTH OF HIS PARENTS.

10          MY HEALTH HAD STARTED TO DETERIORATE ALONG THE WAY.

11  AND I KNOW IT WOULD HAVE BEEN IMPOSSIBLE TO HAVE GOTTEN THROUGH

12  THE WORST OF THOSE DAYS WITHOUT HIM.  THE GREAT THING ABOUT NAT

13  WAS THAT HIS HELP WAS CONSTANT AND WITHOUT MENTION.

14          WHEN I NEEDED A STEADY HAND, A STRONG HAND TO STEADY

15  ME -- AND I ADMIT THAT HAPPENED PRETTY OFTEN -- HE WAS RIGHT

16  THERE.  AND WHEN HE SAW THINGS I COULD NO LONGER DO, HE JUST

17  DID THEM AND MOVED ON.

18          I DON'T KNOW WHY -- HOW HE DID IT, BUT HE MANAGED TO

19  LISTEN TO THOSE STORIES THAT OLDER PEOPLE TEND TO TELL YOU OVER

20  AND OVER AND OVER AGAIN.  AND HE WOULD REACT LIKE IT WAS THE

21  FIRST TIME HE EVER HEARD IT, WITH A BIG SMILE OR A LAUGH.  AND

22  THAT'S IMPORTANT, BECAUSE THAT'S THE KIND OF HELP AND KINDNESS

23  THAT ALLOWS PEOPLE MY AGE TO KEEP THEIR DIGNITY WHEN THINGS ARE

24  TOUGH.

25          THANK YOU AGAIN FOR ALLOWING ME TO TELL YOU ABOUT SO

1    MANY THINGS THAT HAVE MADE MY SON SPECIAL TO SO MANY PEOPLE IN

2    HIS LIFE.

3              HE DOES HAVE A BEAUTIFUL LITTLE GIRL, WHO CELEBRATED

4    HER FIFTH BIRTHDAY YESTERDAY, THAT HE LOVES VERY MUCH.  THE

5    POOR LITTLE THING IS VERY PETITE.  HER MOTHER SAYS SHE'S SHORT,

6    JUST LIKE I AM.  AND THAT WAS NOT MEANT TO BE A COMPLIMENT

7    BECAUSE HER MOTHER IS A VERY TALL LADY.

8              AND NAT ALSO HAS A FAMILY THAT LOVES HIM DEARLY AND

9    HAS SUPPORTED HIM THROUGH ALL OF THIS.

10             FINALLY, MY HUSBAND AND I ARE ASKING FOR LENIENCY AND

11   THE SENTENCE GIVEN WILL ALLOW US TO AT LEAST HAVE A CHANCE TO

12   BE HERE WHEN OUR SON COMES HOME AGAIN.  WE ARE CONFIDENT THAT

13   HE HAS A LOT TO OFFER HIS COMMUNITY AND THAT HE WILL LEAD A

14   PRODUCTIVE LIFE THAT WE WILL BE PROUD OF.

15             THANK YOU VERY MUCH --

16             THE COURT:  THANK YOU, MA'AM.

17             MS. HARDWICK:  -- FOR YOUR TIME.

18             THE COURT:  THANK YOU.

19             MS. LOEB:  YOUR HONOR, THOSE ARE OUR WITNESSES.

20             BUT I DO HAVE SOME REMARKS ABOUT THE SECTION 3553

21   FACTORS THAT I'D LIKE TO PRESENT TO THE COURT.

22             THE COURT:  OKAY.  AND THAT'S FINE.  YOU ARE FINE TO

23   DO THAT NOW.

24             THE WAY THAT I NORMALLY DO IS GOVERNMENT WOULD MAKE

25   ITS SENTENCING ARGUMENT, DEFENSE WOULD HAVE THE LAST WORD, AND

264

1    THEN WE'D ASK THE DEFENDANT WHETHER HE WANTED TO ALLOCUTE.  SO

2    IF YOU ARE --

3         MS. LOEB:  THAT'S FINE WITH ME IF THE GOVERNMENT IS

4    PREPARED TO GO FORWARD WITH THEIR REMARKS.

5         THE COURT:  ALL RIGHT.  SO YOU DO NOT HAVE ANYBODY

6    ELSE FROM -- THAT YOU NEED THE COURT TO HEAR FROM AT THIS TIME;

7    IS THAT RIGHT?

8         MS. LOEB:  NOT AT THIS TIME.  BUT WE WILL HAVE

9    MR. HARDWICK DO AN ALLOCUTION.

10        THE COURT:  ALL RIGHT.  GOVERNMENT, ARE YOU READY TO

11   PROCEED?

12        MR. PHILLIPS:  YES, YOUR HONOR.

13        THE COURT:  ALL RIGHT.

14        MR. PHILLIPS:  YOUR HONOR, THE SPECIFIC 3553(A)

15   FACTORS THAT I'D LIKE TO TALK ABOUT ARE THE NEED FOR THE

16   SENTENCE TO REFLECT THE SERIOUSNESS OF THE OFFENSE, TO PROMOTE

17   RESPECT FOR THE LAW, AND TO PROVIDE JUST PUNISHMENT FOR THE

18   OFFENSE AND THE NEED TO DETER CRIMINAL CONDUCT.

19        BECAUSE OF THE WAY THE COURT HAS RULED ON THE

20   GUIDELINES, WE DON'T THINK THAT A SENTENCE WITHIN THOSE

21   GUIDELINES WOULD ADEQUATELY TAKE ANY OF THOSE FACTORS INTO

22   CONSIDERATION.

23        PREVIOUSLY, WE WERE LOOKING AT GUIDELINES OF 210 TO

24   262 MONTHS.  AND THE GOVERNMENT RECOMMENDED IN ITS SENTENCING

25   MEMORANDUM A SENTENCE AT THE HIGH END OF 262 MONTHS.  WE STILL

1   BELIEVE THAT THAT IS THE APPROPRIATE SENTENCE, AND THAT'S WHAT

2   WE'RE ASKING FOR.

3           I'D LIKE TO POINT OUT SOME THINGS THAT WERE NOT TAKEN

4   INTO ACCOUNT BY THE GUIDELINES THAT THE COURT HAS ALREADY

5   LOOKED AT TODAY -- SOME THINGS THAT THE COURT HEARD ABOUT AT

6   TRIAL, THOUGH -- THAT MAKE THIS CASE OUTSIDE THE HEARTLAND OF A

7   TYPICAL FRAUD CASE THAT WOULD HAVE THESE GUIDELINES.

8           THE COURT WILL RECALL THAT IN 2007, DEFENDANT

9   HARDWICK REPORTED ON HIS INCOME TAX RETURN THAT HE GOT

10  $11.7 MILLION FROM SELLING OFF THE BACK END OF THEIR BUSINESS.

11  THE COURT HEARD TODAY AGAIN, MR. MORRIS SAID IT WAS 15 MILLION.

12  AND I THINK THERE WAS SOME TESTIMONY AT TRIAL THAT IT WAS ABOUT

13  THAT.  IT WAS A HUGE NUMBER, WHETHER IT'S 11.7 OR 15 THAT HE

14  GOT.

15          HE PAID VIRTUALLY NO TAXES ON THAT.  HE INVENTED A

16  DEDUCTION.  HE FABRICATED A DEDUCTION AND SAID HE HAD

17  INVESTMENT LOSSES THAT ESSENTIALLY WIPED OUT ALL OF THAT

18  INCOME, AND HE PAID VIRTUALLY NO TAX ON IT.

19          IN ADDITION, THE COURT HEARD FROM THE IRS WITNESS AT

20  TRIAL.  GOVERNMENT EXHIBIT 1401 IS MR. HARDWICK'S 2012 INCOME

21  TAX RETURN.  WE PROVED AT TRIAL THROUGH THAT RETURN THAT

22  MR. HARDWICK TOLD THE IRS THAT HIS, QUOTE, TOTAL INCOME WAS

23  APPROXIMATELY $1.4 MILLION AND CHANGE.

24          WE ALSO SHOWED THROUGH GOVERNMENT EXHIBIT 1005 THAT

25  IN THAT SAME YEAR, 2012, MR. HARDWICK RECEIVED SUBSTANTIALLY

266

1  MORE THAN THAT.  IN FACT, IT WAS ALMOST $7.5 MILLION, IN

2  ADDITION TO HIS $600,000 SALARY.

3       SO HE LIED TO THE IRS IN 2007.  HE LIED TO THE IRS

4  AGAIN IN 2012.  AND WE KNOW FROM THE SHAREHOLDER AGREEMENT THAT

5  MR. HARDWICK ALREADY HAD AN OBLIGATION TO THE IRS FOR ABOUT

6  $431,000 AND CHANGE IN WITHHOLDING TAXES THAT EVIDENTLY HE HAD

7  STOLEN FROM THE IRS WHILE HE WAS OPERATING HIS PRIOR LAW FIRM.

8  AND IT'S UNDISPUTED IN THE EVIDENCE AT TRIAL THAT THAT WAS A

9  PERSONAL OBLIGATION TO NAT HARDWICK.

10      SO HE'S GOT A PATTERN OF DEFRAUDING THE TAXPAYERS,

11 YOU AND ME AND EVERYBODY IN THIS ROOM WHO PAYS TAXES.  HE'S

12 DEFRAUDED US TIME AFTER TIME AFTER TIME.

13      SO WE BELIEVE THAT'S ONE OF THE FACTORS THAT REQUIRES

14 AND CALLS FOR A HIGH-END SENTENCE AT THE LEVEL THAT WE

15 PREVIOUSLY RECOMMENDED TO THE COURT.

16      ALSO, THE COURT WILL RECALL GOVERNMENT EXHIBIT 1505,

17 WHICH WAS ADMITTED AT TRIAL.  IT'S AN E-MAIL FROM NAT HARDWICK

18 TO HIS CPA, TONY ADAMS.  AND HE SAYS, I'VE BEEN DATING THE SAME

19 GIRL NOW FOR SIX YEARS, JULIA OLIVERAS.  I GIVE HER MONEY ON A

20 MONTHLY BASIS AND PAY SOME EXPENSES.  CAN I MAKE HER AN

21 EMPLOYEE OF DIVOT HOLDINGS AND SAVE SOME MONEY BY WRITING IT

22 OFF AND JUST PAYING HER TAXES?

23      AND TONY ADAMS SAID, ABSOLUTELY.

24      AND HARDWICK RESPONDED, CAN WE DO IT RETROACTIVE

25 MOVING FORWARD?  I'VE BEEN PAYING HER TAXES FOR YEARS.

1          AND MR. ADAMS SAID, SURE, NO PROBLEM AT ALL.

2          AGAIN, JUST A TOTAL FRAUD ON THE TAXPAYERS.  LET'S

3   PRETEND LIKE ONE OF MY GIRLFRIENDS IS AN EMPLOYEE OF A COMPANY

4   THAT DOESN'T DO ANY BUSINESS AND DOESN'T EARN ANY INCOME FROM

5   DOING ANYTHING OTHER THAN ITS PASSIVE INVESTMENTS FROM HOLDING

6   FRAUD MONEY.  THAT'S THE ONLY INCOME DIVOT EVER HAD.

7          IN ADDITION, AS PART OF THE RELEVANT CONDUCT, WE

8   BELIEVE THAT THE EVIDENCE SHOWED THAT NAT HARDWICK STOLE AN

9   ADDITIONAL $5 MILLION FROM DUSTIN JOHNSON AND JIM PRITCHARD

10  BECAUSE OF WHAT I DESCRIBED EARLIER, HOW HE CONSPIRED WITH TONY

11  ADAMS TO SET UP MR. ADAMS' CLIENTS, NOT TELL THEM, HEY, THERE'S

12  A HUGE HOLE IN THE ESCROW ACCOUNTS AT MORRIS HARDWICK

13  SCHNEIDER, BUT HOW WOULD YOU LIKE TO INVEST SOME MONEY?

14  BECAUSE IT'S A GREAT OPPORTUNITY.  THEY'LL PAY YOU A LOT OF

15  INTEREST.

16          THAT'S WHAT TONY ADAMS DID.  AND IF NOT FOR THE FACT

17  THAT THAT LEGAL MALPRACTICE INSURANCE COMPANY STEPPED IN AND

18  PAID MOST OF THAT TAB, THAT WOULD HAVE BEEN ANOTHER $5 MILLION

19  LOST.  BUT CERTAINLY, MR. HARDWICK INTENDED THAT LOSS.

20          SO I KNOW THE COURT DISAGREES ABOUT THE GUIDELINES

21  BECAUSE THE COURT HAS ALREADY RULED ON THAT, BUT THAT'S THE

22  GOVERNMENT'S POSITION.  WE'RE ASKING FOR A SENTENCE OF

23  262 MONTHS BECAUSE WE BELIEVE THAT THAT'S A SENTENCE THAT'S

24  NECESSARY IN THIS CASE TO PROMOTE RESPECT FOR THE LAW AND TO

25  DETER THE TYPE OF CONDUCT THAT MR. HARDWICK ENGAGED IN, TO

1    REFLECT THE SERIOUSNESS OF THE OFFENSE AND PROMOTE RESPECT FOR

2    THE LAW.

3            ANYTHING LESS THAN THAT IS GOING TO SEND A MESSAGE TO

4    THE PUBLIC THAT YOU CAN LIVE HIGH ON THE HOG, YOU CAN STEAL

5    MONEY FROM YOUR PARTNERS, PEOPLE THAT YOU HAVE A FIDUCIARY

6    OBLIGATION TO, YOU CAN STEAL MONEY FROM YOUR CLIENTS, AND YOU

7    CAN FLY AROUND THE WORLD ON PRIVATE JETS, YOU CAN GAMBLE, AND

8    YOU CAN PHILANDER, YOU CAN DO ANYTHING YOU WANT; AND WHEN YOU

9    GET CAUGHT, YOU'RE GOING TO GET A LITTLE SLAP ON THE WRIST.

10           WE CAN LINE PEOPLE UP AROUND THIS BLOCK WHO WOULD

11   LIVE GLADLY THE LIFESTYLE THAT NAT HARDWICK LIVED BETWEEN

12   JANUARY 2011 AND AUGUST OF 2014 TO GET SOME LIGHTWEIGHT

13   SENTENCE.

14           THAT'S NOT PROMOTING RESPECT FOR THE LAW.  THAT'S NOT

15   DETERRING THIS TYPE OF CONDUCT.

16           A SENTENCE THAT IS IN THE GUIDELINE RANGE THAT THE

17   COURT HAS ALREADY SAID THAT IT'S GOING TO IMPOSE, WITH RESPECT,

18   WE BELIEVE SENDS THE WRONG MESSAGE TO THE PUBLIC, AND IT DOES

19   NOT -- IT DOES NOT MEET THESE 3553(A) FACTORS THAT I'VE

20   DESCRIBED.

21           THANK YOU.

22           THE COURT:  THANK YOU.

23           ALL RIGHT.  DEFENSE?

24           MS. NOVAY:  MAY WE HAVE JUST ONE MOMENT?

25           THE COURT:  SURE.

269

1           MS. LOEB:  YOUR HONOR, I WOULD LIKE TO START BY

2     ADDRESSING THE NATURE AND CIRCUMSTANCES OF THE OFFENSE.

3           NAT HARDWICK BECAME A MEMBER OF THE GEORGIA BAR IN

4     1991.  HE GOT INTO THE REAL ESTATE BUSINESS FROM THE GROUND UP.

5     HE STARTED WORKING AS A COURIER BEFORE HE EVER EVEN GOT OUT OF

6     LAW SCHOOL.  HE WORKED IN THE RECORD ROOM RUNNING TITLES, DOING

7     CLOSINGS, AND BUILDING A NATIONWIDE FIRM WHICH ULTIMATELY

8     EMPLOYED OVER 800 PEOPLE ACROSS THE COUNTRY.

9           HE WAS TIRELESS IN HIS EFFORTS TO EXPAND THE

10    BUSINESS, FINDING NEW LOCATIONS AND MARKETING TO MAKE

11    CONNECTIONS WITH BUILDERS, BANKERS, DEVELOPERS, AND ANYONE IN

12    ANY RELATED INDUSTRY IN ORDER TO KEEP THE BUSINESS GROWING, ALL

13    THE WHILE PROVIDING A LOT OF JOBS FOR A LOT OF PEOPLE,

14    CONTRIBUTING TO THE REAL ESTATE INDUSTRY, AND MAKING MONEY NOT

15    JUST FOR HIMSELF, BUT FOR OTHERS.

16          THE FIRM WAS HIS LIFE'S WORK.  HE POURED HIMSELF INTO

17    THAT FIRM 100 PERCENT OF THE TIME.  YOU'VE HEARD HOW HE READILY

18    GAVE OUT HIS CELL PHONE NUMBER.  HE WAS AVAILABLE 24/7 FOR

19    ANYBODY WHO HAD ANY QUESTIONS.  HE TRAVELED FROM OFFICE TO

20    OFFICE.  THEY WOULD CALL HIS BLUE TIE TOUR, WHERE HE WENT AND

21    HE SPOKE TO EVERY EMPLOYEE THAT WORKED FOR THAT FIRM TO MAKE

22    THEM FEEL LIKE A SPECIAL AND IMPORTANT PART OF THE ORGANIZATION

23    AND TO MAKE SURE THEY UNDERSTOOD THE IMPORTANCE OF

24    PROFESSIONAL, QUALITY WORK.

25                EVEN IN HIS TIME OFF FROM WORK, HE WAS CONSTANTLY

270

1   MARKETING, BECAUSE IT WAS NEVER REALLY TIME OFF FOR NAT.  HE

2   LOVED THE BUSINESS SO MUCH.  THERE WAS ALWAYS SOMETHING BIGGER,

3   SOMETHING BETTER OUT THERE, AND HE WAS GOING TO CAPTURE IT.

4   FOR DECADES HE DID A GREAT JOB, DOING EXCELLENT WORK.

5        WE HAVE HEARD NO COMPLAINTS FROM ANYONE ABOUT HIS

6   PROFESSIONALISM, ABOUT HIS SPIRIT, ABOUT HIS GOOD HUMOR, WHAT

7   HE BROUGHT TO THE CLOSING TABLE.  IN FACT, WE HEARD THE

8   OPPOSITE.  HE ALWAYS BROUGHT A GREAT ATTITUDE AND A

9   PROFESSIONAL PRODUCT.  HE WAS A WORKAHOLIC.

10        AND AT SOME POINT HE LOST PERSPECTIVE.  HE LOST HIS

11   MOORINGS.  HE DIDN'T HIDE HIS MONEY, HE WASN'T A MISER, BUT HE

12   MADE SOME FOOLISH CHOICES.

13        NOW, THE COURT HEARD ALL THAT TESTIMONY, ALL THOSE

14   FOOLISH CHOICES THAT HE MADE.  AND NAT'S BEEN CHARACTERIZED BY

15   THE PROSECUTION AS, AND I QUOTE, AN UNUSUALLY GREEDY,

16   DECEPTIVE, AND MANIPULATIVE FRAUDSTER.

17        BUT WHAT HAPPENED BETWEEN 2011 AND 2014 IS NOT THE

18   ENTIRE MEASURE OF THE MAN.  AS SERIOUS AS THIS OFFENSE IS,

19   THERE ARE OTHER CONSIDERATIONS TO TAKE INTO ACCOUNT TO

20   DETERMINE THE PROPER SENTENCE.

21        NOW, LET'S LOOK AT THE HISTORY AND CHARACTERISTICS OF

22   NAT HARDWICK.

23        FIRST, HE HAS NO CRIMINAL HISTORY.  HE HAS NEVER HAD

24   ANY ISSUES IN THE LAW WITH THE EXCEPTION OF THIS CASE.  THERE

25   IS NO REASON TO ANTICIPATE THAT HE WOULD EVER HAVE TROUBLE WITH

1   THE LAW IN THE FUTURE.

2           HE WON'T BE IN A POSITION TO PRACTICE LAW.  HE WON'T

3   HAVE CLIENT TRUST FUNDS.  SO WHEN MR. MARK WITTSTADT SAID HE'LL

4   DO THE SAME THING AGAIN, HE'S REALLY NOT GOING TO BE IN A

5   POSITION TO DO THAT.

6           WHEN MR. RODDY WITTSTADT SAID HE'S AFRAID AND NOW HE

7   HAS TO CARRY A GUN, THERE IS NO EVIDENCE THAT NAT HARDWICK IS

8   DANGEROUS OR THAT HE'S EVER HAD ANYBODY THREATEN ANYONE.

9           SECOND, NAT WAS CONSCIENTIOUS AND LOYAL TO THE FIRM

10  WHEN THE ECONOMIC DISPARITIES GIVING RISE TO THIS CASE WERE

11  FIRST KNOWN IN 2014, FOUR AND A HALF YEARS AGO.  HE PUT

12  $1.4 MILLION OF HIS OWN MONEY INTO THE FIRM, AND HE RAISED

13  ANOTHER $5 MILLION.

14          NOW, I KNOW THAT'S BEEN CHARACTERIZED AS YET ANOTHER

15  FRAUD.  BUT THE TRUTH OF IT IS HE WENT OUT AND HE DID IT AT THE

16  TIME HE WAS TOLD THAT THE DISPARITY IN THE ACCOUNT WAS

17  $5.9 MILLION, GIVE OR TAKE ANOTHER $500,000.  HE WENT OUT AND

18  GOT $6.4 MILLION TO PUT INTO THE ACCOUNT TO TRY TO SAVE THE

19  FIRM, TO SAVE THE JOBS OF THE PEOPLE THAT WORKED THERE.

20          HE WENT AND HE ASKED THE CLIENTS TO REMAIN CLIENTS OF

21  THE FIRM, EVEN AFTER HE WITHDREW FROM THE FIRM.  HE ASKED THE

22  CLIENTS TO STAY FOR THE GOOD OF THE FIRM, FOR THE GOOD OF THE

23  EMPLOYEES.  AND THEN HE GAVE UP HIS INTEREST IN THE FIRM AND IN

24  LANDCASTLE TITLE AND WALKED AWAY FROM HIS LIFE'S WORK SO THE

25  FIRM COULD SURVIVE.

1          NAT HAS ALSO SHOWN RESPECT FOR THE LEGAL SYSTEM.

2    HE'S WORKED DILIGENTLY WITH THE LAWYERS ON WHAT STARTED AS A

3    CIVIL CASE.  AND HE WAS ULTIMATELY ARRESTED AND RELEASED ON

4    BOND.  HE WAS ON HOME CONFINEMENT AND WORE AN ANKLE MONITOR FOR

5    32 MONTHS.  HE WAS ALWAYS WHERE HE WAS SUPPOSED TO BE WHEN HE

6    WAS SUPPOSED TO BE THERE, ACCORDING TO PRETRIAL SERVICES.

7          THE COURT WILL RECALL RIGHT AFTER CONVICTION, HIS

8    PRETRIAL SERVICES OFFICER CAME TO COURT AND TESTIFIED THAT

9    NAT'S CONDUCT WAS PERFECT.  THERE WAS NEVER AN INSTANCE WHEN HE

10   FAILED TO TAKE THIS MATTER AND HIS RESPONSIBILITY FOR

11   APPROPRIATE CONDUCT FOR THE JUDICIAL SYSTEM SERIOUSLY.

12         NOW, THE BUREAU OF PRISONS WON'T TAKE THAT PERIOD OF

13   HOME CONFINEMENT INTO CONSIDERATION, BUT THIS COURT CAN.

14         NAT HAS ALWAYS BEEN DEVOTED TO FAMILY.  NAT'S BELOVED

15   PARENTS ARE HERE.  WE JUST HEARD FROM THEM.  HIS DAD WAS

16   DIAGNOSED WITH NON-HODGKIN'S LYMPHOMA WHILE NAT WAS ON

17   CONFINEMENT.  HIS MOTHER HAS DEBILITATING ARTHRITIS.  WHEN HE

18   WAS HOME, HE WAS THEIR CAREGIVER.

19         THE LETTERS THAT THEY WROTE, AS WELL AS THE LETTERS

20   FROM NAT'S OTHER FAMILY MEMBERS, AND THEIR SPEAKING FOR THE

21   COURT TODAY MAKE IT CLEAR HOW DEVOTED A SON NAT HAS BEEN TO

22   THEM.  THE LONG SENTENCE WILL NOT ONLY DEPRIVE BUDDY AND ANN

23   HARDWICK OF NAT'S HELP, BUT IT COULD MEAN THAT THEY NEVER GET

24   TO SPEND TIME WITH THEIR SON FOR THE REST OF THEIR LIVES.

25         NAT LOVES HIS DAUGHTER, VIVIAN, WHO'S FIVE YEARS OLD.

1    HE WAS CLOSE TO HER AFTER SHE WAS BORN AND FOR THE FIRST

2    18 MONTHS OF HER LIFE.  IN FACT, THERE WAS A PERIOD OF TIME

3    THAT HE RENTED A HOME NEAR WHERE SHE LIVES SO THAT HE COULD

4    SPEND MORE TIME WITH HER.  UNFORTUNATELY, THE TRAVEL

5    RESTRICTIONS IN THIS CASE AND THE ATTITUDE OF THE CHILD'S

6    MOTHER HAS MADE IT DIFFICULT OR IMPOSSIBLE FOR NAT AND HIS

7    PARENTS TO SPEND TIME WITH VIVIAN.

8            VIVIAN IS VERY MUCH LOVED BY NAT, AND HE WANTS TO BE

9    A FATHER TO HER.  A LONG PERIOD OF INCARCERATION WILL NOT ONLY

10   PREVENT HIM FROM SPENDING TIME WITH HIS DAUGHTER, BUT THERE'S A

11   STATUTE IN FLORIDA THAT ENABLES THE CUSTODIAL PARENT TO

12   TERMINATE PARENTAL RIGHTS OF AN INCARCERATED PARENT IF THE

13   LENGTH OF THE SENTENCE WILL CONSTITUTE A SIGNIFICANT PORTION OF

14   THE CHILD'S MINORITY.

15           FOR THIS REASON, A LONG SENTENCE WILL NOT ONLY BE

16   ENFORCED SEPARATION, BUT IN FACT NAT WILL LOSE HIS RIGHTS AS A

17   FATHER.

18           NOW, WE KNOW THAT VIVIAN'S MOTHER, HEATHER HOHLER,

19   HAS WRITTEN TO THE COURT AND SAID VERY HARSH THINGS ABOUT NAT.

20   WE ASK THE COURT TO TAKE WHATEVER MS. HOHLER SAYS WITH A GRAIN

21   OF SALT.  MS. HOHLER'S E-MAILS TO NAT WERE THE SUBJECT -- WERE

22   A SUBJECT IN THE BOND HEARING ON FEBRUARY 25TH, 2016.  THEY ARE

23   INCLUDED IN THE RECORD, NOT THE TRIAL TRANSCRIPT, BUT IN THE

24   RECORD AT DOCUMENT 39-4.  THEY DEMONSTRATE HER VITUPERATIVE

25   NATURE.

1        THE COURT WANTS TO REVIEW THEM, THE COURT WILL SEE

2   HER LANGUAGE IS EXTREMELY FOUL.  I WON'T QUOTE ANY OF IT

3   DIRECTLY.  BUT SHE DID WRITE TO NAT REPEATEDLY SAYING THINGS

4   LIKE HE SHOULD DO EVERYONE A FAVOR AND COMMIT SUICIDE.  HE

5   SHOULD DIE A PAINFUL DEATH.  THE BEST THING HE COULD DO FOR HIS

6   DAUGHTER WAS TO KILL HIMSELF.  DEMANDING MONEY, THREATENING TO

7   GO TO THE PROSECUTOR IF SHE DIDN'T GET IT, AND THEN WRITING

8   THINGS LIKE, $80,000 NOW AND $15,000 A MONTH.  I'M ON HOLD FOR

9   CHAIKEN, THE PROSECUTOR, NOW.

10       ALL OF THIS WENT ON WHILE NAT WAS BEGGING TO SEE HER,

11  EVEN BEGGING JUST TO DO SOME FACETIME WITH HER ON HIS

12  TELEPHONE, ALL OF WHICH WAS REFUSED.

13       WE ASK YOU TO TAKE THAT INTO CONSIDERATION IF YOU ARE

14  GOING TO CONSIDER HEATHER HOHLER'S LETTER TO THE COURT.

15       NAT HAS ALREADY LOST A LOT.  WE RECOGNIZE THAT ONE OF

16  THE PURPOSES OF PUNISHMENT IS RETRIBUTION, BUT WE ASK THE COURT

17  TO CONSIDER THAT NAT HAS ALREADY RELINQUISHED HIS LAW LICENSE

18  AND HIS ABILITY TO EARN A LIVING AS A LAWYER.  HE RESIGNED AND

19  WALKED AWAY FROM THE LAW FIRM AND THE TITLE COMPANY HE BUILT

20  OVER THE COURSE OF HIS ENTIRE ADULT LIFE.  HE'S LOST HIS HOME

21  AND VIRTUALLY ALL OF HIS OTHER ASSETS.  HE'S LOST THE ABILITY

22  TO SEE HIS DAUGHTER AND BUILD A RELATIONSHIP WITH HER.  AND

23  HE'S LOST HIS REPUTATION AND HIS GOOD NAME.

24       ONE OF THE CHARACTERISTICS I'D LIKE TO ADDRESS IS

25  NAT'S CHARITABLE NATURE.  AND I'M NOT TALKING ABOUT ONLINE

1    DONATIONS, TAX DEDUCTIONS, OR PUBLIC RECOGNITION.  I'M TALKING

2    ABOUT THE CHARITY THAT INVOLVES RANDOM AND SIMPLE ACTS OF

3    KINDNESS TO OTHERS, THE KIND THAT COMES FROM BEING A DECENT

4    PERSON.

5         FORTY-SEVEN LETTERS WE SUBMITTED ARE REPLETE WITH

6    EXAMPLES OF THIS KIND OF CHARITY.  AND THE LETTERS COME FROM

7    ALL KINDS OF SOURCES -- MILITARY PERSONNEL, LOAN OFFICERS,

8    LAWYERS, PERSONAL TRAINERS, A SOUTH CAROLINA STATE SENATOR,

9    HIGH SCHOOL AND COLLEGE FRIENDS, EMPLOYEES, REALTORS, A

10   FOOTBALL SCOUT, A GOLFER, A CHIROPRACTOR, AN ACCOUNTANT -- BUT

11   THEY ALL HAVE ONE THING IN COMMON.  THEY TALK ABOUT WHAT A

12   TRULY DECENT PERSON NAT IS.

13        HE PAID FOR AN EMPLOYEE'S CHILD'S BURIAL AND

14   HEADSTONE.  AN EMPLOYEE WHO HAD DIFFICULTIES WITH HER CHILD

15   KEPT MAKING MISTAKES.  NAT CALLED HER IN, BUT HE DIDN'T FIRE

16   HER.  RATHER, HE HELPED HER WITH A REVISED SCHEDULE SO SHE

17   COULD SPEND MORE TIME WITH HER TROUBLED KID WHEN IT WAS NEEDED.

18        HE MADE DONATIONS TO THE BALL STATE CAMPUS MINISTRY.

19   HE PAID FOR A FRIEND'S DEDUCTIBLE TO HAVE A CARDIAC

20   CATHETERIZATION BECAUSE THE FRIEND COULDN'T AFFORD THE

21   PROCEDURE.  HE PAID THE FUNERAL EXPENSES FOR AN EMPLOYEE'S

22   SISTER'S BABY BECAUSE SHE COULDN'T AFFORD TO BURY HER CHILD.

23        HE'S WORKED WITH HOMELESS PETS.  HE STAYS IN TOUCH

24   WITH HIS FRIENDS WHOSE CHILDREN HAVE HAD CANCER, WERE BORN

25   PREMATURELY WITH MEDICAL DEFICITS.  HE'S CALLED IN TO PROVIDE

1    SUPPORT, EVEN WHEN HE WAS GOING THROUGH THESE TERRIBLE LEGAL

2    DIFFICULTIES HIMSELF.

3           HE'S DONATED BICYCLES AND TRICYCLES TO

4    UNDERPRIVILEGED CHILDREN.  HE'S ANSWERED TELEPHONES IN A

5    TELETHON RAISING MONEY FOR CHILDREN WITH CANCER.

6           WE HEARD THIS MORNING FROM MICHELE VELCHECK.  HIS

7    BELIEF AND TIME INVESTMENT IN HER ENABLED HER TO BE SOMEONE WHO

8    COULD BUILD A CHARITABLE FOUNDATION THAT PROVIDED CLEAN WATER

9    TO SCHOOL CLASSROOMS, SAFE HOUSES, AND ECONOMIC GROWTH PROJECTS

10   FOR OVER 100,000 PEOPLE TODAY IN METRO ATLANTA, IN KENYA,

11   UGANDA, ZAMBIA, HAITI, SOMALIA, AND GUATEMALA.

12          HE ALSO SPEARHEADED PHILANTHROPIC ENDEAVORS FOR THE

13   LAW FIRM, LIKE DONATING BREATHING MACHINES TO A LOCAL HOSPITAL,

14   RESCUING DOGS, DOING ADOPT-A-FAMILY PROGRAMS FOR CHRISTMAS, AND

15   SPONSORING CANCER CARE EVENTS.  THE FIRM HAD A DUPLEX CALLED

16   THE LANDCASTLE HOUSE THAT THEY CLEANED, REPAIRED, AND FURNISHED

17   TO PROVIDE TRANSITIONAL HOUSING FOR BATTERED WOMEN.

18          THESE KINDS OF ACTS OF CHARITY AND GOODNESS ARE THE

19   KIND OF PERSON THAT NAT IS AT HIS CORE.  AND THAT'S THE KIND OF

20   PERSON HE'LL BE WHEN HE'S RETURNED TO THE COMMUNITY.

21          AS SO MANY OF THE LETTERS HAVE NOTICED -- HAVE NOTED,

22   HE HAS SO MUCH TO OFFER.  AND IT'S ALSO CLEAR THAT HE HAS A

23   WONDERFUL AND LARGE SUPPORT NETWORK FOR WHEN HE IS AGAIN

24   RETURNED TO THE COMMUNITY.

25          HIS SISTER, NATALIE, WROTE A VERY BEAUTIFUL LETTER.

1    IN PART OF THAT LETTER, SHE SUMMARIZES SOME OF THE OTHER

2    LETTERS.  WE HAVE ANOTHER COPY OF THAT IF THE COURT WOULD LIKE

3    THAT NOW.  MARKED IT AS DEFENDANT'S SENTENCING EXHIBIT 11.

4              THE COURT:  THANK YOU.

5              MS. LOEB:  AND IT REITERATES MUCH OF WHAT THE OTHER

6    LETTERS SAID AND REALLY SHOWS THE PERSON THAT NAT IS AT HIS

7    CORE.

8              SECTION 3553(A) SAYS THAT THE SENTENCE MUST BE

9    SUFFICIENT BUT NOT GREATER THAN NECESSARY.

10             WE ASK THE COURT TO TAKE INTO ACCOUNT THE TOTALITY OF

11   NAT'S 53 YEARS AS A HARD WORKER, A DEVOTED FAMILY MEMBER AND A

12   FRIEND, A FATHER, AND A PERSON GENEROUS WITH HIS TIME AND

13   MONEY.  HE'S ALWAYS BEEN CONCERNED ABOUT OTHERS.

14             EXCESSIVE PUNISHMENT IS DESTRUCTIVE.  IT RUINS LIVES.

15   THERE'S AN ENORMOUS COST TO SOCIETY.  THE VALUE OF RETRIBUTION

16   MUST BE BALANCED AGAINST OTHER SOCIETAL AIMS.  EVEN

17   CONSERVATIVES HAVE WEIGHED IN RECENTLY ON THE SUBJECT OF

18   CRIMINAL JUSTICE REFORM AND THE BELIEF THAT PACKING PRISONS

19   WITH NON-VIOLENT OFFENDERS IS NOT A GOOD PLAN.

20             NAT HAS DONE MUCH GOOD IN THE PAST, AND HE HAS SO

21   MUCH TO OFFER IN THE FUTURE.  HE SHOULDN'T BE CAGED FOR THE

22   REST OF HIS LIFE.

23             ABE LINCOLN SAID, I'VE ALWAYS FOUND THAT MERCY BEARS

24   RICHER FRUIT THAN STRICT JUSTICE.

25             WE ASK THIS COURT FOR MERCY IN SENTENCING NAT, IN

278

1  LIGHT OF THE BIGGER PICTURE OF THE PERSON THAT HE REALLY IS.

2          THE COURT:  THANK YOU.

3          ALL RIGHT.  YOU DID INDICATE THAT MR. HARDWICK WISHES

4  TO ADDRESS THE COURT DURING THIS HEARING; IS THAT CORRECT?

5          MS. NOVAY:  HE DOES, YOUR HONOR.

6          BEFORE HE DOES, I THINK -- WELL, WILL WE HAVE A

7  CHANCE TO SPEAK AFTER OUR CLIENT SPEAKS?  OR WHAT IS THE

8  COURT'S INTENTION?

9          THE COURT:  IT WOULD BE MY INTENTION TO -- IS THERE

10 SOME REASON THAT YOU WISH TO WAIT UNTIL THEN?

11         MS. NOVAY:  WHATEVER THE COURT PREFERS.  BUT MS. --

12 SORRY.  MS. LOEB JUST ADDRESSED THE NATURE OF THE -- NATURE AND

13 CIRCUMSTANCES OF THE DEFENDANT AS PART OF THE FACTORS.  THERE

14 WAS ONE OTHER FACTOR THAT I WANTED TO ADDRESS.

15         THE COURT:  OH.  YOU MAY DO SO NOW.

16         MS. NOVAY:  OKAY.  THANK YOU, YOUR HONOR.

17         I'LL PIGGYBACK A LITTLE BIT ON VERY END OF WHAT

18 MS. LOEB SAID, TALKING ABOUT THE VERY REAL IMPLICATIONS OF TIME

19 AWAY AND A SENTENCE THAT'S IMPOSED.  AND, YOU KNOW, THE

20 GOVERNMENT MADE THE COMMENT THAT TEN YEARS, ESSENTIALLY, WHICH

21 IS SOMEWHAT CLOSE TO THE MIDDLE OF THE GUIDELINE RANGE AS THEY

22 ARE NOW, AT A LEVEL 31, AS THE COURT HAS FOUND, I THINK THE

23 PHRASE WAS LIGHTWEIGHT.

24         THE COURT:  YES.  SOMEBODY SAID A SLAP ON THE WRIST.

25         MS. NOVAY:  I, RESPECTFULLY, COMPLETELY DISAGREE THAT

1    TEN YEARS AWAY IS IN ANY SORT OF MEANINGFUL WAY A LIGHTWEIGHT

2    SENTENCE.  THAT A DECADE AWAY FROM FAMILY, NEVER BEING ABLE TO

3    BE FREE WITH HIS FAMILY AGAIN, IT'S POSSIBLE HIS PARENTS -- HIS

4    DAUGHTER AT THAT POINT WOULD BE 15 YEARS OLD, WILL HAVE

5    COMPLETELY MISSED THE LARGEST, BIGGEST CHUNK OF THIS CHILD'S

6    LIFE, AS WELL AS SAYING THAT A LOT OF PEOPLE WOULD HAPPILY -- I

7    CAN'T REMEMBER QUITE HOW MR. PHILLIPS PUT IT -- WOULD HAPPILY

8    LIVE HIS LIFESTYLE TO PERHAPS BE PUT AWAY FOR TEN YEARS OF

9    CONFINEMENT PLUS 32 MONTHS' HOME CONFINEMENT, WHICH HE WILL NOT

10   RECEIVE CREDIT FOR.

11          BUT I THINK IT'S ESPECIALLY UNNERVING TO HEAR THE

12   GOVERNMENT SAY THAT IN LIGHT OF THE FACT OF WHAT THEY ARE

13   ASKING FOR MS. MAURYA.  AND I DON'T WANT TO MAKE THE SENTENCING

14   ABOUT MS. MAURYA, BUT I DO THINK WE HAVE TO ADDRESS SENTENCING

15   DISPARITIES.

16          AND IN THIS PARTICULAR CASE, MS. MAURYA IS BEING HELD

17   TO THE SAME CONDUCT, THE SAME CONSIDERED LOSS AMOUNT, THE SAME

18   ARGUMENTS AS MR. HARDWICK, ALTHOUGH HE IS CONSIDERED THE

19   ORGANIZER OR LEADER, WHERE I DON'T BELIEVE SHE HAS THAT

20   ENHANCEMENT.

21          HOWEVER, THE GOVERNMENT'S EVEN GIVING THIS WOMAN A

22   5K.  AND THIS IS AFTER THIS WOMAN HAS LIED TO SIX OTHER

23   PREVIOUS EMPLOYEES; NEVER SERVED A DAY OF JAIL TIME; STOLEN

24   COUNTLESS, COUNTLESS AMOUNTS OF MONEY; THEN IN THIS CASE

25   CONTINUED TO LIE TO THE GOVERNMENT; AND THEN WHILE SHE WAS OUT

280

1   ON BOND, STOLE TONS MORE FROM THE NEXT EMPLOYEE, EFFECTIVELY

2   BANKRUPTING THE ENTIRE SYSTEM.

3          AGAIN, IT'S NOT ABOUT MS. MAURYA.  BUT THE PROBLEM IS

4   THIS IS THE CODEFENDANT, THIS IS THE CODEFENDANT THAT THE COURT

5   IS GOING TO LOOK AT.

6          AND 11TH CIRCUIT CASES HAVE TALKED ABOUT LOOKING AT

7   SENTENCING DISPARITIES AND LOOKING AT THE CODEFENDANT.

8   *NEUFELD*, N-E-U-F-E-L-D, AN 11TH CIRCUIT OPINION.  THE OTHER ONE

9   WAS *ESPANOZA*, E-S-P-A-N-O-Z-A.  AND I HAVE THE CITES AT MY DESK

10  AND I CAN PROVIDE THAT TO THE COURT AS WELL AS THE GOVERNMENT,

11  IF THE COURT'S INCLINED.

12         BUT THE PROBLEM IS THEY ARE ASKING -- THE GOVERNMENT

13  IN MS. MAURYA'S CASE IS ASKING FOR 63 MONTHS.  AND YET THEY'RE

14  ASKING FOR 200, NEARLY 200 MORE MONTHS FOR MR. HARDWICK FOR THE

15  EXACT SAME CONDUCT.

16         AND I UNDERSTAND SHE PLED GUILTY AND THERE'S

17  DIFFERENT RESPONSIBILITIES AND THERE'S DIFFERENT DISPARITIES.

18  BUT I THINK, QUITE FRANKLY, FIVE YEARS, PERHAPS THAT'S

19  REASONABLE.

20         BUT WE HAVE ASKED FOR 96 MONTHS FOR MR. HARDWICK.

21  AND WE'VE ASKED FOR THAT IN LIGHT OF THE FACT THAT THIS IS REAL

22  TIME.  THIS IS NOT JUST SOME NUMBER, JUST SOME FINE, JUST SOME

23  AMOUNT THAT HE'S PAYING THAT'S TO BE DEALT WITH I UNDERSTAND IF

24  THE COURT WANTS TO AT A LATER DATE.  BUT THIS IS VERY REAL TIME

25  AWAY FROM HIS FAMILY AND AWAY FROM HIS LIFE.

1          I CAN'T IMAGINE -- I MEAN, I GUESS THE GOVERNMENT HAS

2     SAID.  BUT I CAN'T IMAGINE ANY HUMAN BEING WHERE IF YOU SAID

3     YOU COULD LIVE HIGH ON THE HOG FOR FOUR YEARS, BUT, ULTIMATELY,

4     YOU'RE GOING TO BE SITTING HERE IN A FEDERAL COURTROOM, EVERY

5     DOLLAR YOU SPEND IS GOING TO BE TROTTED OUT IN FRONT OF YOUR

6     FAMILY AND FRIENDS, AND THEN YOU'RE GOING TO SIT IN A JAIL CELL

7     FOR POTENTIALLY A DECADE OR MORE, I DON'T THINK ANYONE WOULD

8     CHOOSE THAT, AS WELL AS BEING AWAY FROM FAMILY AND FRIENDS.

9     AND I THINK THE VERY FACT THAT THE GOVERNMENT IS CONSIDERING

10    THAT LIGHTWEIGHT IS, RESPECTFULLY, RIDICULOUS.

11         I DON'T KNOW IF MR. GARLAND PREPARED SOME REMARKS,

12    BUT I THINK, REALLY, I'M JUST ADDRESSING THE DISPARITIES IN

13    SENTENCING.  WE COVERED A LOT OF OTHER STATISTICS IN OUR MEMO,

14    WHICH I KNOW WE HAVE SUBMITTED TO THE COURT, SO I WON'T REARGUE

15    THAT.  WE DO RELY ON THAT, AS WELL AS 11TH CIRCUIT CASE LAW.

16         BUT I THINK THAT THE VERY BASIS FOR WHICH THE COURT

17    SHOULD CONSIDER IS HOW THE COURT PLANS TO SENTENCE THE

18    CODEFENDANT, HOW THE -- WHAT THE COURT PLANS TO DO IN THIS

19    PARTICULAR CASE.

20         BUT WE ASK FOR 96 MONTHS, WHICH IS NOT LIGHTWEIGHT,

21    WHICH IS VERY REAL TIME.

22         AND WE ASK THE COURT TO ALSO CONSIDER THE 3553

23    FACTORS, THE NATURE AND THE HISTORY OF MR. HARDWICK, WHO HAS

24    LIVED 53 YEARS -- CELEBRATED HIS 53RD BIRTHDAY HERE IN

25    SEPTEMBER WITH US IN THE COURTROOM, CERTAINLY NOT AN IDEAL

282

1  SITUATION FOR ANY DEFENDANT -- AND THE FACT THAT HE'S NOT GOING

2  TO BE RECEIVING THE CREDIT FOR 32 MONTHS THAT WAS SPENT ON HOME

3  CONFINEMENT, ALTHOUGH HE HAS CLASSIFIED THAT AS A GIFT AND TIME

4  TO BE WITH HIS FAMILY AND FRIENDS.  BUT I STILL ASK THE COURT

5  TAKE THAT INTO CONSIDERATION WHEN SENTENCING MY CLIENT.

6          THANK YOU, YOUR HONOR.

7          THE COURT:  THANK YOU.

8          MR. GARLAND:  VERY BRIEFLY, YOUR HONOR.

9          THE COURT:  YES, SIR.

10         MR. GARLAND:  SEVERAL THINGS.

11         I THINK WHAT HAPPENED TO NAT IS HE GOT LOST IN THE

12  LIFESTYLE OF EXTRAVAGANCE.  THERE WAS A BLURRED LINE IN WHICH

13  HE WAS PROMOTING 24/7 BUT MIXING IN ESCAPISM FROM BEING A

14  WORKAHOLIC.  AND HE JUST GOT LOST AND MADE TERRIBLE DECISIONS,

15  AND THEY HAD A BAD IMPACT.

16         BUT HE THOUGHT HE WAS MAKING VAST AMOUNTS OF MONEY.

17  AND AS HE TESTIFIED, HE THOUGHT HE COULD SETTLE UP IF ANYTHING

18  WAS OUT OF LINE.  AND WE BELIEVE THAT THE INFLUENCE OF ASHA

19  PLAYED A ROLE IN HIM BEING LOST IN EXTRAVAGANCE.

20         NOW, THE GOVERNMENT DIDN'T -- IT WASN'T A MATTER OF,

21  OKAY, I'M GOING TO DO THIS.  IT WAS, HE WAS LIVING LARGE.  ALL

22  THESE EFFORTS TO FLY AND CREATE THE ATTITUDE OF SUCCESS, TO

23  CREATE THE ATTITUDE OF SUCCESS BEGETTING SUCCESS, THE BUILDING

24  OF THE BUSINESS WAS GROWING LIKE CRAZY, HIS DREAM OF GOING

25  PUBLIC, AND HE DID NOT KEEP UP WITH WHAT HE WAS DOING OR THINK

1    ABOUT IT.

2            NOW, THERE WERE A COUPLE OF THINGS THAT JUST CAME OUT

3    OF THE BLUE HERE.  THE CLAIM THAT WHEN HE GOT HIS MONEY BACK

4    IN -- I THINK IT WAS '72 -- I MEAN, 2007, THAT HE DID SOMETHING

5    WRONG ON HIS TAXES.  THERE'S NEVER BEEN A CHARGE.  THERE'S

6    NEVER BEEN A CLAIM BY THE GOVERNMENT.  THERE'S BEEN ABSOLUTELY

7    NO ADJUDICATION OF ANY IMPROPRIETY TAX-WISE OR OTHERWISE.  I

8    DON'T -- THAT CERTAINLY DOESN'T COME OUT OF THE EVIDENCE IN

9    THIS CASE.

10           SECONDLY, THERE'S BEEN NO ASSESSMENT, NO CLAIM OF ANY

11   IMPROPRIETY IN CONNECTION WITH HIS TAXES.  A TAX MATTER, THERE

12   ARE ALL KINDS OF SETOFFS, WRITE-OFFS, DEDUCTIONS, TAX CREDITS,

13   ON AND ON.  BUT THE GOVERNMENT JUST TO SAY, WELL, WE THINK

14   THERE'S SOMETHING WRONG WITH HIS TAXES, I ASK YOU NOT TO

15   CONSIDER THAT.

16           PUNISHMENT IS PUNISHMENT.  DAYS ON END IN A PRISON,

17   KNOWING THAT WHEN YOU LEAVE THAT PRISON, YOU WILL STRUGGLE,

18   YOU'LL BE IN YOUR SIXTIES.  THERE'S A POINT WHERE PUNISHMENT

19   ACHIEVES NOTHING FURTHER.  WHEN YOU HAVE DONE THAT TO HIM, WHEN

20   YOU'VE SENTENCED, AS WE REQUEST OR AS THE GUIDELINES STATE, YOU

21   HAVE ACCOMPLISHED ALL OF VENGEANCE THAT'S NEEDED.  AND

22   VENGEANCE DOESN'T ACHIEVE ANYTHING.

23           AND I THINK THAT IS THE MODERN THOUGHT OF THE MOST

24   CONSERVATIVE PEOPLE, CERTAINLY OUR STATE AND GOVERNOR DEAL AND

25   THE REFORMS HERE HAVE LED THE COUNTRY.  AND JUDGE BOGGS IS

1   GOING TO LEAD THE NATIONAL CONVENTION ON THE RECOGNITION OF THE

2   NATIONAL ORGANIZATION WHEN HE IS HEAD OF THE STATE EFFORTS.

3        AND CERTAINLY THIS NEW EFFORT TO RECOGNIZE IS FOUNDED

4   ON THE IDEA THAT THERE'S NOTHING ACCOMPLISHED AFTER A CERTAIN

5   PERIOD OF TIME.  AND CERTAINLY, THIS SENTENCE DOES NOT NEED TO

6   BE ENHANCED TO BOTH PUNISH AND TO SEND A MESSAGE.

7        AND WE ASK FOR MERCY AT THIS TIME.

8        THE COURT:  THANK YOU.

9        MS. NOVAY:  MR. HARDWICK IS PREPARED FOR ALLOCUTION.

10       THE COURT:  ALL RIGHT.  IF YOU WILL COME TO THE

11  PODIUM, ALONG WITH WHOMEVER WILL ACCOMPANY HIM FROM HIS DEFENSE

12  TEAM.

13       GOOD EVENING.

14       THE DEFENDANT:  GOOD EVENING, YOUR HONOR.  I PREPARED

15  A STATEMENT.

16       THE COURT:  YES, SIR.

17       THE DEFENDANT:  TAKE MY GLASSES OFF.

18       YOUR HONOR, I SPENT A LOT OF TIME IN REFLECTION

19  TRYING TO COME TO TERMS WITH HOW MY OWN ACTIONS HAVE BROUGHT ME

20  TO THIS MOMENT AND THINKING ABOUT HOW I CAN LEARN THE LESSONS

21  THAT I NEED TO LEARN AND THEN START TO REBUILD MY LIFE.  AS I

22  SAT THERE THINKING ABOUT IT OVER AND OVER, THE WORDS THAT CAME

23  TO MY MIND WERE PERSONAL RESPONSIBILITY.

24       TO UNDERSTAND HOW I GOT TO THIS CONCLUSION, I MUST

25  LOOK AT WHAT I'VE COME FROM.  MY HISTORY WITH MHS WAS A LONG

1    ONE.  I STARTED WORKING AS A COURIER FOR A PREDECESSOR FIRM,

2    JACKSON FAGAN & TANNER, WHILE I WAS IN LAW SCHOOL.

3            UPON GRADUATING FROM LAW SCHOOL, I WORKED AS AN

4    ASSOCIATE.  AND AFTER YEARS OF HARD WORK, I BECAME A PARTNER;

5    AND AFTER A SERIES OF MERGERS, EVENTUALLY THE FIRM'S CEO.

6            I ACKNOWLEDGE THAT I WAS A WORKAHOLIC.  FROM THE

7    BEGINNING, I LOVED THE BUSINESS.  I LOVE OUR CLIENTS.  I WAS

8    GOOD AT IT.  I LOVED OUR FIRM.  I LOVED OUR STAFF.  AND MY

9    FOCUS WAS ALWAYS ON BUILDING THE BRAND, BUILDING THE FIRM.  IN

10   MY MIND, I WOULD NEVER INTENTIONALLY DO ANYTHING TO HARM MHS.

11           HOWEVER, I NOW SEE, UPON REFLECTION, HOW MY ACTIONS

12   AND/OR INACTIONS, AS WELL AS SOME OF MY PERSONAL AND BUSINESS

13   FAILINGS, HAD THE UNINTENDED CONSEQUENCES OF HURTING THE FIRM

14   AND ITS ASSETS, THE PEOPLE AND MY PARTNERS.

15           AS THE FIRM'S CEO AND MANAGING PARTNER, THE BUCK

16   STOPPED WITH ME.  AND I SHOULD HAVE PAID CLOSER ATTENTION TO

17   THE FIRM'S MANAGEMENT AND FINANCES, AS WELL AS MY OWN PERSONAL

18   FINANCES.  SIMPLY PUT, MY PERSONAL SPENDING WAS RECKLESS,

19   IRRESPONSIBLE, AND EXCESSIVE.

20           I SAT HERE DURING TRIAL AND LISTENED TO WITNESS AFTER

21   WITNESS BASICALLY, YOU KNOW, ITEMIZE HOW I SPENT MY MONEY.  I

22   WAS ASHAMED.  I WAS, FRANKLY, SHOCKED AT THE AMOUNTS.  AND I

23   WAS EMBARRASSED FOR MYSELF AND FOR MY FAMILY.  MY FAMILY IS A

24   GREAT FAMILY WHO TAUGHT ME A LOT BETTER THAN HOW MY MONEY WAS

25   SPENT DURING THOSE YEARS.

1          I SHOULD NOT HAVE RELIED SO HEAVILY ON MY MANAGERS

2     WITHOUT ALSO PROVIDING THE NECESSARY OVERSIGHT, TRAINING, AND

3     SUPPORT.  I KNEW BETTER, AND MY PEOPLE DESERVED BETTER.  I OWED

4     MY PARTNERS AND STAFF THAT DUTY.  I FAILED THEM.

5          I ALSO SHOULD NEVER HAVE RELIED SO HEAVILY ON

6     INFORMATION GIVEN TO ME BY ASHA MAURYA.  I SHOULD HAVE MADE

7     FURTHER INQUIRIES.  I SHOULD HAVE PAID MORE ATTENTION.

8          THIS MATTER HAS TAKEN A GREAT EMOTIONAL AND FINANCIAL

9     TOLL, NOT ONLY ON THOSE ASSOCIATED WITH MHS, BUT ALSO ON MY

10    FAMILY AND FRIENDS.  FOR THIS I AM TRULY SORRY.  I WAS VERY

11    WRONG, AND I'M VERY SORRY.

12         ASIDE FROM MY BUSINESS-RELATED FAILURES, I RECOGNIZE

13    MY OWN PERSONAL FAILURES AND BLIND SPOTS HAVE CONTRIBUTED TO ME

14    BEING HERE TODAY.  I'M PERSONALLY ASHAMED OF THE THINGS THAT

15    HAVE BEEN REALIZED ABOUT MY PERSONAL LIFESTYLE DURING THE

16    COURSE OF THIS ORDEAL.

17         IN PARTICULAR, I'M NOT PROUD OF THE WAY I SPENT SOME

18    OF MY MONEY ON SEEMINGLY FRIVOLOUS PERSONAL INDULGENCES, SUCH

19    AS GAMBLING AND SOCIAL INTERACTIONS.  I DID NOT PAY ATTENTION

20    TO THE IMPORTANT DETAILS OF MY LIFE OR EXERCISE THE TYPE OF

21    RESTRAINT AND SOUND JUDGMENT THAT WAS INCUMBENT UPON ME, BOTH

22    PERSONALLY AND PROFESSIONALLY.  I DID NOT KEEP UP WITH MY

23    SPENDING.  I MADE CARELESS DECISIONS, WHICH HAS HAD THE EFFECT

24    OF TAKING AWAY THE THINGS THAT MATTER TO ME MOST:  MY FIRM, MY

25    RELATIONSHIPS, AND MY FAMILY.

1          THE LESSONS I HAVE LEARNED HAVE BEEN HARSH.  MY

2   ACTIONS HAVE HAD A DETRIMENTAL IMPACT ON OTHERS, AND FOR THAT

3   I'M DEEPLY REMORSEFUL.

4          I AM GRATEFUL TO HAVE SUCH AN AMAZING FAMILY.  IT'S

5   VERY DIFFICULT TO SIT UP HERE AND LISTEN TO MY MOM AND DAD

6   SPEAK.  MY MOM'S MY HEART.  MY FAMILY HAS ALWAYS BEEN THERE FOR

7   ME, AND I AM TRULY BLESSED.

8          MY PARENTS, BROTHER ALEX, SISTER NATALIE AND I ARE

9   VERY CLOSE.  TO MY FAMILY, YOU HAVE BEEN MY SILVER LINING

10  DURING THIS EMBARRASSMENT AND THE SHAME OF THIS CASE.

11          I'M SORRY.

12          THE COURT:  THAT'S OKAY.  YOU DON'T HAVE TO

13  APOLOGIZE.  FOR CRYING, YOU DON'T HAVE TO APOLOGIZE.

14          THE DEFENDANT:  ONE OF THE BLESSINGS I INCURRED

15  DURING MY HOME DETENTION AT MY PARENTS' HOUSE WAS THAT I WAS

16  ABLE TO BE THERE TO HELP MY DAD WHEN HE FOUGHT STAGE 4

17  LYMPHOMA.  ALTHOUGH THE CIRCUMSTANCES UNDER WHICH I WAS BACK AT

18  HOME WERE STRESSFUL --

19          I'M GOING TO TRY TO SLOW DOWN.

20          -- BEING THERE DURING MY PARENTS' TIME OF NEED WAS

21  ONE OF THE MOST FULFILLING TIMES OF MY LIFE.

22          I WANT TO APOLOGIZE TO EVERYONE, ESPECIALLY MY

23  FAMILY, FOR THE PAIN THIS SITUATION HAS CAUSED.  I KNOW THAT MY

24  ACTIONS HAVE TURNED MANY LIVES UPSIDE-DOWN.  I WANT TO

25  ACKNOWLEDGE THE EMOTIONAL, FINANCIAL TOLL IT HAS TAKEN ON MY

288

1    PARENTS, AND THANK YOU FOR SUPPORTING ME THROUGH THIS WHOLE
2    THING.
3            I ALSO WANT TO THANK MY FRIENDS WHO HAVE SUPPORTED ME
4    AND WRITTEN LETTERS TO THE COURT ON MY BEHALF.  FOR THE
5    47 LETTERS THAT WERE WRITTEN, I AM TRULY HUMBLED.  GOING
6    FORWARD, I HOPE TO BE ABLE TO LIVE UP TO THE HEARTFELT AND HIGH
7    OPINIONS THEY HAVE OF ME.
8            ONE OF THE THINGS THAT ALSO CONTRIBUTED TO ME HAVING
9    A GREAT LIFE IS MY BEAUTIFUL DAUGHTER, VIVIAN ANN HARDWICK, WHO
10   IS NAMED AFTER MY MOTHER.  VIVIAN WAS FIVE YESTERDAY.  SHE IS
11   MY ONLY CHILD AND MY PARENTS' ONLY GRANDCHILD.
12           DURING THE FIRST PART OF HER LIFE, WE WERE CONSTANTLY
13   TOGETHER.  SHE IS TRULY A DADDY'S GIRL.  I SINCERELY REGRET
14   THAT I'VE MISSED THREE PRECIOUS YEARS OF HER LIFE.  I LOOK
15   FORWARD TO THE TIME WHERE I CAN ACTUALLY RAISE HER, WATCH HER
16   GROW UP, AND SUPPORT HER IN EVERY WAY POSSIBLE.  I REGRET MY
17   ACTIONS HAVE CAUSED ME TO BE ABSENT DURING THIS TIME IN HER
18   LIFE.  THIS WAS MY DOING, AND I HOPE TO MAKE IT RIGHT SOME DAY.
19           I WANT MY FAMILY TO KNOW THAT, DURING MY PAST FEW
20   MONTHS OF INCARCERATION, I'VE BEEN FORTUNATE TO BE IN A CELL
21   BLOCK THAT HAS A STRONG CHRISTIAN PRESENCE.  WE MEET THREE
22   TIMES A DAY FOR BIBLE STUDY, AND I HAVE GRADUATED TO GIVING THE
23   WORD ON FRIDAY NIGHT.  I TRULY BELIEVE THAT GOD IS USING THIS
24   TIME IN MY LIFE TO GROW ME SPIRITUALLY.  I'M WORKING HARD EVERY
25   DAY TO BE A BETTER PERSON AND A BETTER CHRISTIAN.

1          AT 53, I REGRET THAT MY LIFE HAS COME TO ITS CURRENT

2     CONDITION.  NEVERTHELESS, I AM READY TO HELP.  I AM READY TO

3     MOVE ON WITH MY LIFE AND FOCUS ON BUILDING A NEW LIFE THAT IS

4     MORE MEANINGFUL AND PURPOSEFUL THAN THE ONE I HAD BEFORE.  I

5     FIRMLY BELIEVE THAT I WILL GO ON TO USE MY TALENTS AND GIFTS TO

6     AGAIN BECOME A PRODUCTIVE, LAW-ABIDING MEMBER OF SOCIETY.

7          JUDGE ROSS, I APPRECIATE THE WAY THE COURT HAS

8     HANDLED A DIFFICULT AND FIERCELY CONTESTED, COMPLICATED AND

9     LENGTHY TRIAL.  I ALSO APPRECIATE THE COURTEOUS AND

10    PROFESSIONAL WAY YOUR STAFF PERFORMED AND TREATED ALL INVOLVED.

11         I ESPECIALLY WANT TO THANK MS. BECK, WHO WENT OUT OF

12    HER WAY WHEN I WAS SICK DURING TRIAL TO ENSURE THAT I WAS AS

13    COMFORTABLE AS POSSIBLE.  THAT KINDNESS AND EMPATHY SHE SHOWED

14    ME WAS GREATLY APPRECIATED.

15         THANK YOU VERY MUCH.

16         AT THIS TIME I WANT TO PERSONALLY SAY THAT I'M SORRY

17    FOR MY BUSINESS FAILINGS AND FOR MY PERSONAL SPENDING.  I WANT

18    TO APOLOGIZE TO MARK, ART -- I DON'T HAVE MY GLASSES -- ROD AND

19    THE MEMBERS FROM FIDELITY.

20         THANK YOU VERY MUCH FOR LISTENING TO MY STATEMENT.

21         THE COURT:  THANK YOU.

22         YOU MAY ACTUALLY REMAIN AT THE PODIUM --

23         THE DEFENDANT:  YES, MA'AM.

24         THE COURT:  -- AND MAY BE JOINED BY WHICHEVER

25    ATTORNEYS WILL JOIN YOU FOR THE IMPOSITION OF SENTENCE.

1          AND I WILL TELL YOU, MR. HARDWICK, IT HURTS ME

2    PERSONALLY TO SEE YOU BEFORE ME, NOT BECAUSE I KNOW YOU

3    PERSONALLY.  I DO NOT, DID NOT KNOW YOU BEFORE THIS CASE.

4          BUT I AGREE WITH MANY OF THE STATEMENTS MADE BY ROD

5    WITTSTADT IN TERMS OF OUR EXPECTATIONS OF A LAWYER AND HOW A

6    LAWYER'S FAILURES AND DECEIT LIKE THE ONES THAT YOU HAVE

7    DISPLAYED AFFECT US ALL AS OFFICERS OF THE COURT.

8          I AM BY NO MEANS PERFECT AS A JUDGE OR NOR WAS I AS

9    AN ATTORNEY.  BUT I REALLY GO OUT OF MY WAY TO BE AS

10   PROFESSIONAL AS POSSIBLE, TO BE AS ETHICAL AS POSSIBLE.  AND IT

11   HAS KEPT ME FROM GETTING WHAT SOME PEOPLE WOULD CALL AHEAD IN

12   MY CAREER.

13         BUT I DON'T REGRET THAT AT ALL, BECAUSE I CAN LOOK AT

14   MYSELF IN THE MIRROR.  I CAN SLEEP AT NIGHT.  DO I HAVE AS MUCH

15   MONEY AS SOME OF MY COLLEAGUES AND COUNTERPARTS IN THE LAW?

16   NO.  BUT I'M CONTENT.  I HAVE A PEACE KNOWING THAT I REALLY DO

17   STRIVE TO DO THE RIGHT THING FOR MYSELF, FOR MY CHILDREN WHO

18   LOOK UP TO ME, FOR YOUNGER LAWYERS WHO LOOK UP TO ME, JUST FOR

19   ALL OF THE PEOPLE WHO EXPECT SO MUCH OF US IN OUR POSITIONS TO

20   DO THE RIGHT THING.

21         AND YOU ARE JUST AS GOOD OF A PERSON AS YOU MAY BE

22   FROM ALL OF THESE LETTERS.  I'VE NEVER HAD A CASE WHERE I'VE

23   HAD THIS MANY LETTERS.  YOU ARE SERIOUSLY A DISAPPOINTMENT TO

24   OUR LEGAL PROFESSION.  I CAN'T SAY IT ANY OTHER WAY.  AND I'M

25   SORRY THAT THAT MAY SOUND AS HARSH AS IT PROBABLY DOES.  I

1    DON'T MEAN TO BE MEAN, BUT I THINK YOUR CONDUCT IN THIS CASE

2    HAS JUST TRULY BEEN EGREGIOUS.

3           AND I DON'T THINK IT'S JUST CARELESSNESS OR

4    RECKLESSNESS IN SPENDING.  I THINK THAT, REGARDLESS OF HOW I

5    RULED ON WHAT I PERCEIVE AS THE GOVERNMENT NOT MEETING CERTAIN

6    BURDENS IN CERTAIN AREAS, AND MAYBE THEY DIDN'T HAVE ACCESS TO

7    CERTAIN INFORMATION TO DO SO, IT IS INDISPUTABLE THAT YOU WERE

8    JUST A GREEDY AND DECEITFUL PERSON WHO DIDN'T NEED TO BE.

9    BECAUSE BY ALL ACCOUNTS, VERY SMART, VERY CAPABLE, VERY

10   COMPETENT ATTORNEY.  I JUST, I DON'T KNOW HOW YOUR GREED GOT SO

11   FAR AWAY FROM YOU.  I REALLY DON'T.

12          I ALSO HAVE TO COMMENT ON SOME OF THE THINGS THAT YOU

13   SAID DURING YOUR TESTIMONY.  I REMEMBER AT ONE POINT

14   MR. PHILLIPS WAS QUESTIONING YOU, AND YOU REFERRED TO THIS

15   WHOLE PROCESS AS "THIS SHOW."  YOU SAID, OKAY, IF THIS IS WHAT

16   WE'RE DOING IN THIS SHOW.  AND I THOUGHT, DOES HE NOT GET IT?

17   HE'S A LAWYER.  DOES HE NOT UNDERSTAND THE SERIOUSNESS OF WHY

18   WE ARE HERE?

19          THIS WAS NOT A SHOW.  I MEAN, THAT KIND OF THING MADE

20   ME JUST WONDER IF YOU JUST NEVER GRASPED HOW SERIOUS ALL OF

21   THIS WAS.  AND I HOPE IF YOU HAVEN'T BY NOW, YOU WILL AT SOME

22   POINT DURING YOUR CUSTODY.

23          I ALSO WANT TO SAY THAT, DESPITE MY RULING ON THE

24   LOSS AMOUNT HERE, I -- IT'S MY PERSONAL FEELING FROM HEARING

25   ALL OF THE TESTIMONY PRESENTED THAT YOU TOOK WAY MORE THAN YOU

292

1    WERE ENTITLED TO.  WAS THAT ESTABLISHED FOR PURPOSES OF THE

2    LOSS AMOUNT ENHANCEMENT?  I COULD NOT SAY, AGAIN, THAT IT WAS

3    UNDER CERTAIN CIRCUMSTANCES FOR THE ENHANCEMENT AS WAS

4    PRESENTED TO THE COURT.

5          BUT I DEFINITELY WANT TO MAKE IT CLEAR THAT THAT DOES

6    NOT REFLECT WHAT MY THOUGHTS ARE AFTER SITTING THROUGH ALL OF

7    THE TESTIMONY.

8          I AM SORRY FOR YOUR PARENTS.  THEY SEEM LIKE

9    WONDERFUL PEOPLE.  I AM SORRY FOR VIVIAN, THAT SHE WILL BE

10   WITHOUT YOU FOR A SIGNIFICANT PORTION OF HER LIFE.  BUT I CAN

11   ONLY CONSIDER THOSE THINGS TO A CERTAIN EXTENT AS I IMPOSE THE

12   SENTENCE THAT I FEEL IS JUSTIFIED BASED ON THE SENTENCING

13   FACTORS PURSUANT TO 3553(A) AND THE EVIDENCE AS PRESENTED TO

14   THIS COURT.

15         SO TAKING INTO ACCOUNT EVERYTHING THAT HAS BEEN

16   PRESENTED TO ME, AND PURSUANT TO THE SENTENCING REFORM ACT OF

17   1984, IT IS THE JUDGMENT OF THIS COURT THAT YOU, NATHAN E.

18   HARDWICK IV, BE HEREBY COMMITTED TO THE CUSTODY OF THE BUREAU

19   OF PRISONS TO BE IMPRISONED FOR A TERM OF 180 MONTHS ON COUNTS

20   ONE THROUGH 23 OF THE INDICTMENT, TO RUN CURRENTLY, FOR A TOTAL

21   SENTENCE OF 180 MONTHS.

22         IT IS FURTHER ORDERED THAT YOU SHALL PAY TO THE

23   UNITED STATES A SPECIAL ASSESSMENT OF $2300, WHICH SHALL BE DUE

24   IMMEDIATELY.

25         I WILL SET A RESTITUTION HEARING, WHICH AT THIS TIME

293

1    I INTEND TO SET FOR MAY 9TH, SO THAT RESTITUTION WOULD BE

2    DETERMINED AND THEN ORDERED TO BE PAID TO THE VICTIMS LISTED IN

3    THE VICTIM IMPACT SECTION OF WHATEVER CORRESPONDING REPORT IS

4    PREPARED BY THIS COURT.

5            YOU ALSO SHALL FORFEIT TO THE UNITED STATES ANY

6    PROPERTY OR PROCEEDS DERIVED FROM OR OBTAINED FROM THE

7    COMMISSION OF THE OFFENSE.

8            THE UNITED STATES SHALL SUBMIT ANY ADDITIONAL

9    FORFEITURE CLAUSES OR LANGUAGE -- MS. CONNORS, IS THERE STILL

10   OUTSTANDING FORFEITURE?

11           MS. CONNORS:  YOUR HONOR, THE COURT ACTUALLY ENTERED

12   THE PRELIMINARY ORDER OF FORFEITURE IN THIS CASE ON

13   FEBRUARY 1ST, INDICATING THE FORFEITURE MONEY JUDGMENT IN THE

14   CASE.

15           THE COURT:  ALL RIGHT.

16           MS. CONNORS:  THAT ORDER JUST NEEDS TO BE

17   INCORPORATED INTO THE J&C.

18           THE COURT:  YES, MA'AM.  IT WILL BE.

19           UPON YOUR RELEASE FROM IMPRISONMENT, YOU SHALL BE

20   PLACED ON SUPERVISED RELEASE FOR A TERM OF THREE YEARS ON

21   COUNTS ONE THROUGH 22, TO RUN CONCURRENTLY, AND A TERM OF THREE

22   YEARS ON COUNT 23, TO RUN CONSECUTIVE TO COUNTS ONE THROUGH 22.

23   SO THAT IS A TOTAL TERM OF SIX YEARS OF SUPERVISED RELEASE.

24           WITHIN 24 HOURS OF YOUR RELEASE FROM CUSTODY, YOU

25   SHALL REPORT IN PERSON TO THE NEAREST PROBATION OFFICE SO THAT

294

1   YOU MAY BE PROCESSED FOR SUPERVISED RELEASE.

2           AS PART OF YOUR SUPERVISION, YOU MUST COMPLY WITH THE

3   FOLLOWING ADDITIONAL STANDARD CONDITIONS AND/OR SPECIAL

4   CONDITIONS OF SUPERVISION:

5           YOU MUST COOPERATE IN THE COLLECTION OF DNA AS

6   DIRECTED BY PROBATION.

7           YOU MUST REFRAIN FROM UNLAWFUL USE OF A CONTROLLED

8   SUBSTANCE.

9           ALSO, YOU MUST SUBMIT TO ONE DRUG TEST WITHIN 15 DAYS

10  OF YOUR RELEASE FROM IMPRISONMENT AND AT LEAST TWO PERIODIC

11  ONES THEREAFTER.

12          YOU MUST NOT OWN, POSSESS, OR HAVE ACCESS TO A

13  FIREARM, AMMUNITION, DESTRUCTIVE DEVICE, OR DANGEROUS WEAPON.

14          YOU MUST SUBMIT YOUR PERSON, PROPERTY, HOME,

15  RESIDENCE, VEHICLE, PAPERS, COMPUTERS, AND OTHER ELECTRONIC

16  COMMUNICATIONS OR DATA STORAGE DEVICES OR MEDIA TO A SEARCH

17  CONDUCTED BY UNITED STATES PROBATION UPON REASONABLE REQUEST

18  AND UNDER REASONABLE CIRCUMSTANCES.

19          YOU MUST MAKE A FULL AND COMPLETE DISCLOSURE OF YOUR

20  FINANCES AND SUBMIT TO AN AUDIT OF YOUR FINANCIAL DOCUMENTS

21  UPON PROBATION'S REQUEST.

22          YOU MUST NOT INCUR ANY NEW CREDIT CHARGES OR OPEN ANY

23  ADDITIONAL LINES OF CREDIT WITHOUT PROBATION'S APPROVAL.

24          AND, AGAIN, YOU WILL BE ORDERED TO PAY RESTITUTION

25  IMPOSED BY THIS JUDGMENT UNDER THE CONDITIONS THAT ARE SET

295

1   FORTH AT THE TIME THAT RESTITUTION IS IMPOSED, WHICH WILL BE

2   DONE AT A FUTURE DATE THAT WILL BE SET WITHIN 90 DAYS OF

3   TODAY'S HEARING.

4           I HAVE VARIED UPWARD FROM THE CUSTODIAL GUIDELINE

5   RANGE AS I FOUND IT TO BE.  I HAVE NOT VARIED AS HIGHLY AS THE

6   GOVERNMENT HAS ASKED THAT I DO, BUT I HAVE DONE SO BASED ON A

7   NUMBER OF FACTORS WHICH I HAVE DISCUSSED HERE TODAY.

8           BUT, AGAIN, BASED ON WHAT I PERCEIVE TO JUST BE VERY

9   EGREGIOUS BEHAVIOR ON YOUR PART, A LACK OF REMORSE -- NOT WITH

10  RESPECT TO RECKLESS SPENDING BUT TO THE ACTUAL FRAUD, THE

11  ACTUAL STEALING OF CLIENT FUNDS THAT I HEARD ABOUT IN THIS

12  CASE -- AND JUST SO MANY OTHER FACTORS THAT CAME OUT IN THIS

13  CASE THAT HAVE SHOWN HOW MUCH YOUR CONDUCT AFFECTED SO MANY

14  OTHER PEOPLE WHO SUFFERED SO MANY LOSSES AS A RESULT OF YOUR

15  ILLEGAL CONDUCT.

16          DO YOU UNDERSTAND THE SENTENCE I'VE JUST NOW IMPOSED?

17          THE DEFENDANT:  YES, MA'AM.

18          THE COURT:  I DO FIND JUSTIFICATION IN THIS SENTENCE

19  FOR YOU, MR. HARDWICK, AFTER CONSIDERING ALL OF THE SENTENCING

20  FACTORS PURSUANT TO 18 U.S.C. SECTION 3553(A).

21          I FIND THE SENTENCE SHOULD PROVIDE SUFFICIENT

22  PUNISHMENT AND ADEQUATE DETERRENCE, AND THAT THE SIX YEARS OF

23  SUPERVISED RELEASE SHALL ASSIST PROBATION IN MONITORING ANY

24  FUTURE CRIMINAL ACTIVITY.

25          ARE THERE ANY OBJECTIONS ON BEHALF OF MR. HARDWICK

1    FROM THE DEFENSE?

2            MR. GARLAND:  OTHER THAN THE ONES WE'VE MADE, THE

3    PRIOR FINDINGS.  AND WE DO OBJECT TO THE DEPARTURE UPWARD.

4            THE COURT:  YES, SIR.

5            ANY OBJECTIONS ON BEHALF OF THE GOVERNMENT?

6            MR. PHILLIPS:  YES, YOUR HONOR.

7            AS STATED PREVIOUSLY, WE OBJECT TO THE COURT'S

8    RULINGS ON THE GUIDELINES THAT THE COURT DID NOT APPLY FULLY AS

9    SET FORTH IN THE PSR AS BEING PROCEDURALLY UNREASONABLE, AND WE

10   OBJECT TO THE SENTENCE IMPOSED AS BEING SUBSTANTIVELY

11   UNREASONABLE.

12           I SAY THAT WITH RESPECT.

13           THE COURT:  OH, TAKEN WITHOUT ANY DISRESPECT.  THANK

14   YOU.

15           MR. HARDWICK, I DO NEED TO ADVISE YOU THAT YOU DO

16   HAVE THE RIGHT TO APPEAL THIS CONVICTION AND SENTENCE.  AND IF

17   YOU WISH TO DO SO, YOU HAVE 14 DAYS FROM SENTENCING TO DO SO.

18           IF UNABLE TO PAY THE COST OF SUCH AN APPEAL, YOU DO

19   HAVE THE RIGHT TO ASK THE COURT TO ALLOW YOU TO APPEAL IN FORMA

20   PAUPERIS, WHICH BASICALLY MEANS AS SOMEONE WHO DOESN'T HAVE THE

21   FINANCIAL RESOURCES TO FILE AN APPEAL.

22           DO YOU HAVE ANY QUESTIONS ABOUT ANYTHING THAT HAS

23   OCCURRED DURING THIS HEARING, INCLUDING YOUR APPELLATE RIGHTS,

24   BUT ALSO ANYTHING ELSE, SIR?

25           THE DEFENDANT:  NO, MA'AM.

297

1          THE COURT:  IS THERE ANYTHING ELSE ON BEHALF OF

2    MR. HARDWICK ON BEHALF OF THE DEFENSE FROM ANY OF THE DEFENSE

3    ATTORNEYS?

4          MR. GARLAND:  NO, YOUR HONOR.

5          THE COURT:  ANYTHING ELSE ON BEHALF OF THE

6    GOVERNMENT?

7          MR. PHILLIPS:  NO, YOUR HONOR.

8          THE COURT:  ALL RIGHT.  THANK YOU.  WE'RE ADJOURNED.

9          THE COURTROOM SECURITY OFFICER:  ALL RISE.

10                  (PROCEEDINGS CONCLUDED AT 6:54 P.M.)

11                        -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

298

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF GEORGIA

3    CERTIFICATE OF REPORTER

4

5

6              I DO HEREBY CERTIFY THAT THE FOREGOING PAGES ARE A

7    TRUE AND CORRECT TRANSCRIPT OF THE PROCEEDINGS TAKEN DOWN BY

8    ME IN THE CASE AFORESAID.

9              THIS, THE 17TH DAY OF APRIL, 2019.

10

11

12

13                              /S/ ELIZABETH G. COHN

                                _____
14                              ELIZABETH G. COHN, RMR, CRR
                                OFFICIAL COURT REPORTER
15

16

17

18

19

20

21

22

23

24

25