IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

*v.*

NATHAN E. HARDWICK IV
and ASHA R. MAURYA

CRIMINAL INDICTMENT
1:16-CR-65-ELR-CMS

**Government's Restitution Brief**

**Statement of Facts**

The original Indictment charged Nat Hardwick and Asha Maurya with conspiracy and wire fraud arising from a scheme to defraud MHSLAW, Inc. and its subsidiaries (MHS); it charged Hardwick with bank fraud and making false statements to influence a bank; and it charged Maurya with mail fraud arising from a separate scheme to defraud MHS. (Doc. 1).

Maurya pleaded guilty to the conspiracy count. (Doc. 112). Maurya's Plea Agreement requires her to pay full restitution to "all victims of the offense(s) to which she is plead[ed] guilty [that is, Count 1, the conspiracy count] and all relevant conduct, including, but not limited to, any counts dismissed as a result of [her] Plea Agreement." (Doc. 112 ¶25).

The Superseding Indictment charged Hardwick with one count of conspiracy, 21 counts of wire fraud, and three counts of making false statements to influence a bank. (Doc. 126). Before trial, the government dismissed one of the false statement counts. (Doc. 291-14). At the conclusion of the government's case-in-chief, the court granted Hardwick's motion for judgment of acquittal as to another of the false statement counts. (Doc. 305 at 2019-20; Doc. 307 at 2273). And after a four-week trial, a jury convicted Hardwick on all of the remaining counts. (Docs. 312 at 3538-40; Doc. 329).

On May 9, 2019, the Court ordered Hardwick and Maurya, jointly and severally, to pay restitution as follows:

- $23,307,431 to Fidelity National Financial, Inc.;
- $6,000,000 to Mark Wittstadt;
- $6,000,000 to Gerrard "Rod" Wittstadt; and
- $5,000,000 to Art Morris.

(Doc. 368-1).

The Eleventh Circuit vacated the restitution order—not because it felt that the restitution amounts were inappropriate, but because the order was not "supported by specific factual findings." *United States v. Maurya*, 25 F.4th 829, 837 (11th Cir. 2022).

**Argument and Citation of Authority**

**1.    The MVRA requires the district court to order restitution in the full amount of each victim's losses.**

The Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, requires restitution for victims of certain crimes, including conspiracy to commit wire fraud. *Robers v. United States*, 572 U.S. 639, 647 (2014). Under the MVRA, "victim" means "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2).

"[T]o prove [that] a victim suffered an actual loss under the MVRA, the government must establish both factual and legal causation in essentially the same manner as it must show causation under the guidelines—by proving but for and proximate causation." *United States v. Stein*, 846 F.3d 1135, 1153 (11th Cir. 2017). "Under the guidelines, '[a]ctual loss . . . is defined as the 'reasonably foreseeable pecuniary harm that resulted from the offense.'" *United States v. Campbell*, 765 F.3d 1291, 1302 (11th Cir. 2014) (quoting USSG § 2B1.1 cmt. n.3(A)(i)). "Reasonably foreseeable pecuniary harm can include losses caused by co-conspirators, and is not limited to the harm caused by the conduct charged in the indictment." *Id.* (quotations omitted).

The district court must order restitution in "the full amount of each victim's losses." 18 U.S.C. § 3664(f)(1)(A). The restitution amount is limited to "the amount of loss actually caused by the defendant's conduct." *United States v. Liss*, 265 F.3d 1220, 1231 (11th Cir. 2001). If more than one defendant "contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution." 18 U.S.C. § 3664(h).

The government bears the burden of demonstrating the amount of the loss sustained by each victim by the preponderance of the evidence. *Id*. at § 3664(e). "The Government must demonstrate the amount of such loss with evidence bearing sufficient indicia of reliability to support its probable accuracy." *United States v. Singletary*, 649 F.3d 1212, 1217 n.21 (11th Cir. 2011) (quotation omitted). Determining the restitution amount, however, is an "inexact science." *United States v. Huff*, 609 F.3d 1240, 1248 (11th Cir. 2010). "That being the case, where difficulties arise in establishing the exact amount of restitution, a district court may accept a 'reasonable estimate' of the loss based on the evidence presented." *United States v. Rouhani*, 598 F. App'x 626, 632 (11th Cir. 2015). And a district court should resolve any uncertainties in calculating the restitution amount "with a view toward achieving fairness to the victim." *Huff*, 609 F.3d at 1248 (quotation omitted).

"To enable meaningful appellate review, a district court's calculation of restitution must be supported by specific factual findings." *Singletary*, 649 F.3d at 1222. If a restitution order is vacated and the case is remanded to the district court with instructions to enter a new restitution order, the Government does not receive "another bite of the apple. The district court shall render the necessary findings of fact and conclusions of law . . . on the basis of the evidentiary record as it now exists." *Id.*

**2.     Fidelity is entitled to restitution in the amount of $23,307,431.**

At trial, Erica Meinhardt and Mark Wittstadt testified that Fidelity's obligation to cover the shortfall in MHS's escrow account was based on two things: (1) title insurance policies that Fidelity issued through its agent, LandCastle Title; and (2) Fidelity's closing protection letters. (Doc. 303 at 1841-43; Doc. 293 at 735-37). Ms. Meinhardt further testified that, in a case like this, where "the funds were stolen by a principal" of the law firm, Fidelity would normally cancel its agency agreement with the firm. (Doc. 303 at 1879). Fidelity's only other option was to try to keep MHS afloat. (*Id.* at 1887, 1889). Fidelity believed that canceling its agency agreement with MHS would have created "a crisis in the residential real estate market." (*Id.* at 1970). Fidelity wanted to prevent consumers from being harmed and also wanted to help MHS's 800 employees

keep their jobs. (*Id*. at 1890). So Fidelity decided not to cancel its agency agreement with MHS; instead, because of Fidelity's contractual obligations in the title insurance policies and closing protection letters that it had issued to MHS's clients, Fidelity agreed to cover the shortfall in MHS's trust accounts. (*Id*. at 1842-43, 1892-93; Doc. 293 at 736-37). In the end, though, MHS could not survive the "reputational damages" that it suffered as a result of Hardwick and Maurya's crimes, and MHS was forced to file bankruptcy in early 2015. (Doc. 341 ¶¶ 62, 73; Doc. 388 at 14-15).

Maurya admitted in her guilty plea hearing that, if she had gone to trial, the Government would have proved beyond a reasonable doubt that MHS collapsed "as a result of the scandal that surrounded this case." (Doc. 113 at 22). Before accepting Maurya's guilty plea, the Court asked Maurya if she disagreed with any part of what the Government said it could prove beyond a reasonable doubt, and Maurya answered, "No, ma'am." (*Id*. at 24).

At the restitution hearing, Fidelity's Chief Accounting Officer, Jeffrey Colby, testified that, to cover the shortfall in the trust accounts, Fidelity wire transferred to MHS a total of $29,530,391. (Doc. 388 at 59-61; Fidelity Ex. 1). He further testified that, through its own mitigation efforts, Fidelity reduced its out-of-pocket loss to $23,307,431. (Doc. 388 at 42, 61, 64).

Hardwick and Maurya had the opportunity to challenge Mr. Colby's testimony at the restitution hearing, and they chose not to ask him a single question on cross-examination. (*Id*. at 64). And both of Mr. Colby's exhibits were admitted without objection. (*Id*. at 60, 62). Hence, there is no reason to believe that Mr. Colby's uncontested testimony was "inaccurate or untrustworthy." *See United States v. Baston*, 818 F. 3d 651, 665 (11th Cir. 2016) (holding that the district court was entitled to base its restitution award on the victims' testimony at trial and at the restitution hearing, and noting that the defendant did not offer "any specific reason why [the victims'] testimony was inaccurate or untrustworthy").

The unchallenged evidence produced at the restitution hearing shows that Fidelity is entitled to restitution in the amount of $23,307,431 as a proximate result of Hardwick and Maurya's crimes.

3.     **Mark Wittstadt and Rod Wittstadt are each entitled to restitution in the amount of $6,000,000.**

It is not necessary to "calculate the victim's actual loss with laser-like precision." *United States v. Martin*, 803 F.3d 581, 595 (11th Cir. 2015). "[F]raud, by its very nature, does not lend itself to a precise accounting. . . . To forego the imposition of restitution because [the] defendant has successfully camouflaged the amount of the loss caused by his fraud would serve to reward his wrongdoing." *United States v. Weichert*, 89 B.R. 346, 349 (S.D.N.Y. 1988). Where,

as here, it is difficult to establish the exact amount of restitution owed, a district court may base its award on a "reasonable estimate" of the loss. *Rouhani*, 598 F. App'x at 632. Any uncertainties in the amount of restitution should be resolved "with a view toward achieving fairness to the victim." *Huff*, 609 F.3d at 1248.

**(a)    Lost value of ownership stake in MHS**

When the fraud was discovered, Mark Wittstadt and Rod Wittstadt each owned 22.23% of MHS. (GX 1002).

At trial, Hardwick called Rod Wittstadt as a defense witness. Rod Wittstadt admitted that he and his brother, Mark Wittstadt, had a discussion with Hardwick in which the three of them agreed that MHS was worth approximately $70 million. (Doc. 305 at 2220-21). Based on the equity owners' collective opinion that their firm was worth $70 million, Mark Wittstadt and Rod Wittstadt each owned an asset worth more than $15 million, which they subsequently lost as a proximate result of Hardwick and Maurya's fraud. (Doc. 388 at 24; GX 1002).

At the restitution hearing, Mark Wittstadt testified that "Hardwick filed a lawsuit against [him and his brother, Rod Wittstadt,] and Fidelity, on the eve of the criminal trial, alleging that [they] conspired . . . to breach [their] fiduciary duties to him and that [they] owed him $50 million for his, for his loss." (Doc. 388

at 24). In that lawsuit, Hardwick alleged that MHS was worth $100 million. (*Id.*). Based on Hardwick's $100 million estimate of the firm's worth, Mark Wittstadt and Rod Wittstadt each lost more than $22 million as a result of MHS's collapse. (*Id.*; GX 1002).

"[F]air market value generally provides the best measure to ensure restitution in the full amount of the victim's loss." *United States v. Kaplan*, 839 F. 3d 795 (9th Cir. 2016). Either of Hardwick's estimates of the firm's fair market value ($70 million or $100 million) would easily support an award of restitution to each of the Wittstadts in the amount of $6 million.

**(b)    Future lost income from MHS**

Before the fraud was discovered, Mark Wittstadt and Rod Wittstadt each received a base salary of $600,000 per year from MHS. (Doc. 388 at 16). In addition, they each received distributions based on the firm's profits. (GX 976 at 6-7; GX 979 at 13-14; GX 980 at 8; Doc. 292 at 356, 506-07). In 2013, the last full year before Hardwick and Maurya's fraud was discovered, each of the Wittstadts received a total of approximately $2.8 million from MHS. (Doc. 388 at 17, 23). After the fraud was discovered, they received a reduced salary for a while and then "stopped getting paid" any salary in March 2015. (*Id*. at 16).

Mark Wittstadt testified that, but for Hardwick and Maurya's fraud, which forced MHS into bankruptcy in early 2015, he and his brother each would have continued to earn $2 million or more per year from practicing law at MHS. (*Id*. at 23, 33).

"Because future income is income that is lost to the victim as a direct result of the crime, the plain language of the [MVRA] leads to the conclusion that lost future income can be included in a restitution order." *United States v. Oslund*, 453 F.3d 1048, 1063 (8th Cir. 2006). "While calculation of future lost income must be based upon certain economic assumptions, the concepts and analysis involved are well-developed in federal law, and thus the district court is not without persuasive analogy for guidance." *United States v. Cienfuegos*, 462 F.3d 1160, 1169 (9th Cir. 2006) (citing *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 533-53 (1983) (outlining method for estimating stream of future earnings and choosing discount rate)).

### (c)     Losses related to failure to pay income taxes on time

Mark Wittstadt and Rod Wittstadt each instructed Maurya to withhold from their 2013 year-end distribution and their June 2014 distribution a total of $525,000 to pay their income taxes, and they instructed Maurya to send $450,000 of that to the IRS and the remaining $75,000 to the State of Maryland. (Doc. 388 at

18-19). Maurya told the Wittstadts that she had made those payments, but she had not; instead, she fraudulently diverted the money to Hardwick. (*Id*.). "As a result of that, [Mark Wittstadt paid out-of-pocket $200,000 in] interest, penalties, lawyer fees, [and] accountant fees to deal with that entire mess." (*Id*. at 19). Mark Wittstadt continued to incur attorney fees because the Liquidating Trustee in MHS's bankruptcy case filed "an adversary proceeding against the IRS[,] trying to claw back [Mark Wittstadt's] income tax money." (*Id*. at 19-20). His legal fees and expenses were "a direct and foreseeable result of the fraud," and so it is proper to include them in the restitution calculation. *United States v. Ghertler*, 605 F.3d 1256, 1270 n.8 (11th Cir. 2010)

### (d) Additional losses sustained by Mark Wittstadt

#### (i) Future lost income from Holabird

In addition to the income that the shareholders received directly from MHS, they received income from a joint venture called Holabird Abstracts, which performed title searches for MHS's clients. (Doc. 292 at 512-15). When the fraud was discovered, "that business completely dried up. . . . It had to fold." (Doc. 388 at 15-16). "Holabird usually made about a million three a year, million four a year," and Mark Wittstadt owned 40% of Holabird. (*Id*. at 16). Therefore,

Mark Wittstadt lost approximately $520,000 *per year* ($1.3 million per year x 40% = $520,000 per year) as a result of Holabird's collapse.

### (ii) Employment contract with MHS

Mark Wittstadt testified that he had an employment contract with MHS, which provided that he would be paid $6 million if he were "terminated from the firm" (Doc. 388 at 24-25).

A reasonable estimate of the loss sustained by Mark Wittstadt as a proximate result of Hardwick and Maurya's crimes is $6,000,000.

A reasonable estimate of the loss sustained by Rod Wittstadt as a proximate result of Hardwick and Maurya's crimes is $6,000,000.

**4. Art Morris should is entitled to restitution in the amount of $5,000,000.**

Art Morris retired from MHS on January 1, 2013. (Doc. 292 at 367). When the fraud was discovered in August 2014, he was drawing benefits from MHS under a deferred compensation agreement, which entitled him to $350,000 per year plus 10% of the profits generated by MHS for a period of 12 years, that is, from 2013 through 2022. (Doc. 388 at 36). According to MHS's audited financial statements, in 2013, the last full year before the fraud was discovered, MHS's net income was $7,871,051. (GX 1001; Doc. 298 at 1235).

Mr. Morris testified that he wrote a $1,500,000 check to Fidelity to help replace the money that Hardwick and Maurya stole from MHS's trust accounts. (Doc. 388 at 35-36).

In addition, Mr. Morris testified that he wrote a $600,000 check to pay the creditors in MHS's bankruptcy case. (*Id.* at 37). MHS's bankruptcy was the proximate result of Hardwick and Maurya's fraud. (*Id.* at 38; Doc. 113 at 22, 24).

And Mr. Morris testified that he wrote a $700,000 check to Fidelity to pay off a note that Hardwick had obligated MHS to pay in an effort to raise money to replace part of what he and Maurya stole from MHS's trust accounts. (Doc. 388 at 38).

A reasonable estimate of the loss sustained by Art Morris as a proximate result of Hardwick and Maurya's crimes is $5,000,000.

5.  **The Court should order Hardwick and Maurya to pay restitution jointly and severally, except to the extent that any portion of the restitution is attributable solely to Maurya's separate $900,000 mail fraud scheme.**

In her Plea Agreement, Maurya agreed to pay full restitution to "all victims of the offense(s) to which she is plead[ed] guilty [that is, Count 1, the conspiracy count] and all relevant conduct, including, but not limited to, any counts dismissed as a result of [her] Plea Agreement." (Doc. 112 ¶25). Therefore, the court can order Maurya to pay restitution based upon the $900,000 that she

stole from MHS to pay her personal credit card bills, even though Maurya was not required to plead guilty to that offense. *See United States v. Edwards*, 728 F.3d 1286, 1293 (11th Cir. 2013) ("[W]hen the crime of conviction includes a scheme, conspiracy, or pattern of criminal activity as an element of the offense, the court may order restitution for acts of related conduct for which the defendant was not convicted.") (quotation omitted). Hardwick should not be held jointly and severally liable for that $900,000 loss, however, because there is no evidence that he aided and abetted Maurya in stealing that money or even that he knew she was stealing it.

On the other hand, Maurya should be held jointly and severally liable with Hardwick for all losses related to the conspiracy to commit wire fraud, because Hardwick and Maurya were both convicted of that offense.

### Conclusion

For all of these reasons, the Court should award restitution to the victims in the following amounts:

- $23,307,431 to Fidelity National Financial, Inc.;
- $6,000,000 to Mark Wittstadt;
- $6,000,000 to Gerrard "Rod" Wittstadt; and
- $5,000,000 to Art Morris.

Respectfully submitted,

RYAN K. BUCHANAN
*United States Attorney*

/s/ *John Russell Phillips*
JOHN RUSSELL PHILLIPS
*Assistant United States Attorney*
Georgia Bar Number 576335

600 U.S. Courthouse
75 Ted Turner Drive, SW
Atlanta, GA 30303
(404) 581-6000

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 23, 2022, I electronically filed the foregoing

document with the Clerk of Court using the CM/ECF system.

JOHN RUSSELL PHILLIPS
*ASSISTANT UNITED STATES ATTORNEY*
GEORGIA BAR NO. 576335

600 U.S. Courthouse
75 Ted Turner Drive, SW
Atlanta, GA 30303
(404) 581-6000